

# Superior Court of New Jersey

## Appellate Division

Docket No. A-6576-06T4

STATE OF NEW JERSEY,

    *Plaintiff-Respondent,*

vs.

MELANIE McGUIRE,

    *Defendant-Appellant.*

:
:
:
:
:
:
:
:
:
:
:
:
:
:

CRIMINAL ACTION

ON APPEAL FROM A
JUDGMENT OF CONVICTION,
SUPERIOR COURT
OF NEW JERSEY,
LAW DIVISION,
MIDDLESEX COUNTY

Sat Below:

HON. FREDERICK P. DeVESA,
Pr.J.Cr.

---

# APPENDIX ON BEHALF OF DEFENDANT-APPELLANT MELANIE McGUIRE

---

**OF COUNSEL**

JEFFREY A. LAMKEN, ESQ.
JAMIE S. KILBERG, ESQ.
MARY J. SCHMID, ESQ.
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 639-7700

**ATTORNEY OF RECORD**

STEPHEN TURANO, ESQ.
TACOPINA SEIGEL & TURANO, P.C.
275 Madison Avenue, 35th Floor
New York, New York 10016
(212) 227-8877
sturano@tacopinalaw.com

*Attorneys for Defendant-Appellant Melanie McGuire*

---



# TABLE OF CONTENTS

                                                                    **Page**

Indictment No. 05-10-00164-S, Filed October 11, 2005...     Da1

Indictment No. 06-10-00119-S, Filed October 26, 2006...     Da6

Order Joining Indictments for Trial, Filed January 25,
      2007.............................................     Da17

Excerpts of the Pre-Trial Hearing Initially Qualifying
      Expert Thomas Lesniak, Dated January 25, 2007.....     Da18

Excerpts of the Pre-Trial Hearing Qualifying Expert
      Frank Ruiz and Further Qualifying Thomas Lesniak,
      Dated January 31, 2007...........................     Da25

Order Qualifying Thomas Lesniak as an Expert, Filed
      February 28, 2007................................     Da33

Order Qualifying Frank Ruiz as an Expert, Filed
      February 28, 2007................................     Da34

Excerpt of the Transcript of Trial Proceedings,
      Containing the Mid-Trial Ruling Limiting the
      Scope of the Testimony of George Lowery, Dated
      April 9, 2007....................................     Da35

Excerpt of the Transcript of Trial, Containing the
      Mid-Trial Ruling Limiting the Scope of Testimony
      of Marcie Paulk, Dated April 10, 2007............     Da39

Transcript of Decision, Containing the Ruling Denying
      Any Relief Following Voir Dire of Jurors'
      Regarding Extraneous Influences, Dated April 23,
      2007.............................................     Da43

Memorandum of Law in Support of Defendant Melanie
      McGuire's Motion for a New Trial or, in the
      Alternative, A Mistrial, Dated May 14, 2007, with
      the Following Attached Exhibits..................     Da49

      Exhibit A:  Various Internet Blogs from Court
            TV's Website...............................     Da79

      Exhibit B: Internet Blogs from Court TV's Website.     Da107

Trial Exhibits:

Trial Exhibit S-231: Bureau of Alcohol, Tobacco, and Firearms, Firearm Purchase Application, Dated April 26, 2004........................ Da281

Trial Exhibit S-232: Receipt from John's Gun & Tackle Room, Dated April 26, 2004........... Da284

Trial Exhibit D340: Statements from First Savings Bank.................................... Da285

Letter from Christopher S. Romanyshyn, Esq., Deputy Attorney General to Stephen Turano, Esq., Dated October 4, 2007 ................................. Da305

Letter from Stephen Turano, Esq. to Christopher S. Romanyshyn, Esq., Deputy Attorney General, Dated August 22, 2008................................. Da306

Letter from Stephen Turano, Esq. to the Honorable Frederick P. DeVesa, Pr.J.Cr., Dated November 14, 2008........................................... Da308

Facsimile Letter from Christopher S. Romanyshyn, Esq., Deputy Attorney General to the Honorable Frederick P. DeVesa, Pr.J.Cr., Dated January 13, 2009, with Attached Correspondence............... Da311

Letter from the Honorable Frederick P. DeVesa, Pr.J.Cr. to Stephen Turano, Esq. and Christopher Romanyshyn, Esq., Deputy Attorney General, Dated January 28, 2009................................. Da318

Unpublished Opinion in State of New Jersey v. George Jenewicz, Superior Court of New Jersey, Appellate Division, Decided August 8, 2006, 2006 WL 2590114(N.J.Super.A.D.)......................... Da319

Unpublished Opinion in State of New Jersey v. Paul Cibelli, Jr., Superior Court of New Jersey, Appellate Division, A-6422-06T4, Decided June 12, 2009........................................... Da329

INDICTMENT NO. 05-10-00164-S, FILED OCTOBER 11, 2005

SUPERIOR COURT OF N.J.
FILED

OCT 11 2005

DONALD F. PHELAN
CLERK

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - CRIMINAL

State Grand Jury
    Number  SGJ507-05-4
Superior Court
Docket Number   05-10-00164-S
                05

STATE OF NEW JERSEY          )

                  v.         )          INDICTMENT

MELANIE MCGUIRE              )

    The Grand Jurors of and for the State of New Jersey, upon their
oaths, present that:

COUNT ONE

(Murder - First Degree)

MELANIE MCGUIRE

between on or about April 28, 2004 and on or about May 5, 2004, at
the Township of Woodbridge in the County of Middlesex, elsewhere and
within the jurisdiction of this Court, did purposefully cause the
death of William McGuire and did aid or agree or attempt to aid in
the planning or commission of said crime, contrary to the provisions
of N.J.S.A. 2C:11-3 and N.J.S.A. 2C:2-6 and against the peace of
this State, the government and the dignity of the same.

014373

Da1

<u>COUNT TWO</u>

(Possession of a Weapon for an Unlawful Purpose - Second Degree)

MELANIE MCGUIRE

between on or about April 26, 2004 and on or about May 5, 2004, at the Township of Woodbridge, elsewhere and within the jurisdiction of this Court, did possess a certain weapon, a firearm, with purpose to use it unlawfully against the person of another, that is William McGuire, contrary to the provisions of <u>N.J.S.A.</u> 2C:39-4a and <u>N.J.S.A.</u> 2C:2-6 and against the peace of this State, the government and the dignity of the same.

- 2 -

014274

Da2

<u>COUNT THREE</u>

(Desecrating Human Remains - Second Degree)

MELANIE MCGUIRE

between on or about April 28, 2004 and on or about May 5, 2004, at the Township of Woodbridge, elsewhere and within the jurisdiction of this Court, did purposefully, knowingly and unlawfully desecrate, damage or destroy the human remains of William McGuire and did aid or agree or attempt to aid in the planning or commission of said crime, contrary to the provisions of <u>N.J.S.A.</u> 2C:22-1 and <u>N.J.S.A.</u> 2C:2-6 and against the peace of this State, the government and the dignity of the same.

- 3 -

014375

Da3

<u>COUNT FOUR</u>

(Perjury - Third Degree)

MELANIE MCGUIRE

on or about April 30, 2004, in the City of New Brunswick, in the County of Middlesex, elsewhere and within the jurisdiction of this Court, knowingly did appear at an official proceeding, namely in the matter of <u>McGuire v. McGuire</u>, was duly sworn under oath or equivalent affirmation and at such proceeding Melanie McGuire did make false material statements, in sum and substance, by advising the Superior Court of New Jersey, Law Division, Family Part, that William McGuire was a threat to her health and safety, that she required the protection of a restraining order, that her husband left their home by his own volition, and more specifically by stating that:

> I mean, he wasn't in any rush, he didn't bolt
> out the door or anything and I just stayed in
> there and stayed away from him until he left;

- 4 -

014376

Da4

all of which Melanie McGuire did not believe to be true, contrary to
the provisions of N.J.S.A. 2C:28-1 and against the peace of this
State, the government and the dignity of the same.

Vaughn L. McKoy
Director
Division of Criminal Justice

A TRUE BILL:

Foreperson

Dated: Oct 11, 2005

- 5 -

014377

Da5

**INDICTMENT NO. 06-10-00119-S, FILED OCTOBER 26, 2006**

SUPERIOR COURT OF N.J.
**REC'D**

OCT 26 2006

*[signature]* J. *[illegible]*
**Acting Clerk**

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - CRIMINAL

State Grand Jury
Number  <u>SGJ 529-06-7(2)</u>
Superior Court  06 - 10 - 00119 - S
Docket Number _____

STATE OF NEW JERSEY    )

      v.           )                INDICTMENT

MELANIE MCGUIRE       )

The Grand Jurors of and for the State of New Jersey, upon their oaths, present that:

<u>COUNT ONE</u>

(Hindering Prosecution - Third Degree)

MELANIE MCGUIRE

on or about August 11, 2005, at the City of Trenton, in the County of Mercer, elsewhere, and within the jurisdiction of this Court, with purpose to hinder her own detention, apprehension, investigation, prosecution, conviction or punishment, did give false information to a law enforcement officer, via a letter addressed to New Jersey Attorney General Peter Harvey and mailed to the Trentonian newspaper, contrary to the provisions of <u>N.J.S.A.</u> 2C:29-3b(4) and <u>N.J.S.A.</u> 2C:2-6, and against the peace of this State, the government and dignity of the same.

Da6

<u>COUNT TWO</u>

(Hindering Prosecution - Third Degree)

MELANIE MCGUIRE

between on or about October 9, 2005 and on or about October 11, 2005, at the City of Passaic and at the City of Clifton, in the County of Passaic, at the City of Trenton, in the County of Mercer, elsewhere, and within the jurisdiction of this Court, with purpose to hinder her own detention, apprehension, investigation, prosecution, conviction or punishment, did give false information to a law enforcement officer via a Federal Express package sent to the New Jersey Attorney General's Office, contrary to the provisions of <u>N.J.S.A.</u> 2C:29-3b(4), and against the peace of this State, the government and dignity of the same.

- 2 -

Da7

<u>COUNT THREE</u>

(Tampering With or Fabricating Physical Evidence - Fourth Degree)

MELANIE MCGUIRE

between on or about October 9 and on or about October 11, 2005,
at the City of Passaic and at the City of Clifton, in the County
of Passaic, at the City of Trenton, in the County of Mercer,
elsewhere, and within the jurisdiction of this Court, believing
that an official proceeding or investigation was pending or about
to be instituted, knowingly did make, devise, prepare, present,
offer or use an article, object, record, document, or other thing
of physical substance, knowing it to be false and with purpose to
mislead a public servant who is engaged in such proceeding or
investigation via a Federal Express package sent to the New
Jersey Attorney General's Office, contrary to the provisions of
<u>N.J.S.A.</u> 2C:28-6(2), and against the peace of this State, the
government and dignity of the same.

- 3 -

Da8

<u>COUNT FOUR</u>

(False Reports to Law Enforcement Authorities - Fourth Degree)

MELANIE MCGUIRE

between on or about October 9, 2005 and on or about October 11,
2005, at the City of Passaic and at the City of Clifton, in the
County of Passaic, at the City of Trenton, in the County of
Mercer, elsewhere, and within the jurisdiction of this Court,
knowingly did give or cause to be given false information to a
law enforcement officer via a Federal Express package sent to the
New Jersey Attorney General's Office, with purpose to implicate
another in the murder of William McGuire, contrary to the
provisions of <u>N.J.S.A.</u> 2C:28-4a, and against the peace of this
State, the government and dignity of the same.

- 4 -

Da9

<u>COUNT FIVE</u>

(Possession of a Controlled Dangerous Substance - Third Degree)

MELANIE MCGUIRE

On or about October 9, 2005, at the City of Passaic and at the City of Clifton, in the County of Passaic, elsewhere and within the jurisdiction of this Court, knowingly or purposely did possess a controlled dangerous substance, that is Adderall XR (Dextroamphetamine Saccharate, Amphetamine Aspartate, Dextroamphetamine Sulfate, Amphetamine Sulfate), a Schedule II narcotic drug, contrary to the provisions of <u>N.J.S.A.</u> 2C:35-10a(1), and against the peace of this State, the government and dignity of the same.

- 5 -

<u>COUNT SIX</u>

(Possession of a Controlled Dangerous Substance - Third Degree)

MELANIE MCGUIRE

on or about October 9, 2005, at the City of Passaic and at the City of Clifton, in the County of Passaic, elsewhere, and within the jurisdiction of this Court, knowingly or purposely did possess a controlled dangerous substance, that is Ambien (Zolpidem), a Schedule IV substance, contrary to the provisions of <u>N.J.S.A.</u> 2C:35-10a(1), and against the peace of this State, the government and dignity of the same.

Da11

<u>COUNT SEVEN</u>

(Possession of a Controlled Dangerous Substance - Third Degree)

MELANIE MCGUIRE

On or about October 9, 2005, at the City of Passaic and at the City of Clifton, in the County of Passaic, elsewhere, and within the jurisdiction of this Court, knowingly or purposely did possess a controlled dangerous substance, that is Alprazolam, a Schedule IV substance, contrary to the provisions of <u>N.J.S.A.</u> 2C:35-10a(1), and against the peace of this State, the government and dignity of the same.

- 7 -

Da12

<u>COUNT EIGHT</u>

(Possession of a Controlled Dangerous Substance - Third Degree)

MELANIE MCGUIRE

on or about October 9, 2005, at the City of Passaic and at the City of Clifton, in the County of Passaic, elsewhere, and within the jurisdiction of this Court, knowingly or purposely did possess a controlled dangerous substance, that is Temazepam, a Schedule IV substance, contrary to the provisions of <u>N.J.S.A.</u> 2C:35-10a(1), and against the peace of this State, the government and dignity of the same.

Gregory A. Paw, Director

BY: _____

Jennifer L. Gottschalk, S.D.A.G.
Division of Criminal Justice

A TRUE BILL:

_____
Dep. Foreperson

Dated: 10/26/06

- 8 -

Da13

SUPERIOR COURT OF N.J.
REC'D

OCT 2 6 2006

*~Maxine J. Nitz~*
Acting Clerk

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - CRIMINAL

State Grand Jury
Number SGJ529-06-7(2)
Superior Court
Docket Number 06-10-001

RONALD FOHRMAN
CLERK OF SUPERIOR COURT
SUPERIOR COURT OF N.J.
MERCER COUNTY
RECEIVED AND FILED

STATE OF NEW JERSEY )

v. )          ORDER OF VENUE  *

MELANIE MCGUIRE )

OCT 2 6 2006

*~Sue Regan~*
SUE REGAN
DEP CLERK OF SUPERIOR COURT

An Indictment having been returned to this Court by the State Grand Jury in the above captioned matter,

IT IS ORDERED on this 26th day of OCTOBER, 2006, pursuant to paragraph 8 of the State Grand Jury Act, that the County of Middlesex be and hereby is designated as the County of venue for the purpose of trial.

IT IS FURTHER ORDERED that the Clerk of the Superior Court shall transmit forthwith the Indictment in this matter and a certified copy of this Order to the Criminal Division Manager of the County of Middlesex or filing.

_____
Neil H. Shuster, J.S.C.

* The Court inquired as to the basis for venue
in Middlesex since none of the acts alleged
seemed to implicate Middlesex. The Court
was advised that the subject matter of this
Indictment implicates a pending Indictment in

Da14

SUPERIOR COURT OF N.J.
REC'D

OCT 26 2006

*Acting Clerk*

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - CRIMINAL

06-10-00119-S

VERIFIED PETITION

IN THE MATTER OF )
STATE GRAND JURY INDICTMENT )
NUMBER SGJ529 )

STATE OF NEW JERSEY )
                     ) SS.
COUNTY OF MERCER )

Patricia Prezioso, of full age, being duly sworn according to law, upon her oath, respectfully petitions the Court as follows:

1.   I am an Assistant Attorney General assigned to the Division of Criminal Justice.

2.   On October 26, 2006, an indictment in the above-captioned matter was returned to this Court.

3.   Due to the extensive publicity surrounding the pending matter that relates to the present case, defendant's right to a fair and impartial trial jury on the original case might be compromised.  Accordingly, I wish to await defendant's presence at our next anticipated court proceeding, expected to be on or about October 30, 2006, when she will be served with these new charges and bail can be set by the Court, as provided in R. 3:6-8(a).

4.   Therefore, I respectfully petition this Court to order the above captioned indictment and Order of Venue be sealed.

Patricia Prezioso, A.A.G.
Division of Criminal Justice

Sworn and subscribed to
before me this 26th   day
of October , 2006.

An Attorney at Law of New Jersey

Da15

SUPERIOR COURT OF N.J.

REC'D

OCT 2 6 2006

*Richard J. Petty*
**Acting Clerk**

IN THE MATTER OF )
STATE GRAND JURY INDICTMENT )
NUMBER SGJ529-06-7(2) )

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - CRIMINAL

06-10-00119-OCT 2 6 2006

ORDER TO SEAL INDICTMENT

SUE REGAS
DEPUTY CLERK OF

Patricia Prezioso, Assistant Attorney General of the State of New Jersey, having on this date made written and oral application for an order to seal State Grand Jury Indictment Number SGJ529-06-7(2), and to seal an Order of Venue designating a county of venue for the purpose of trial of the said indictment,

IT IS ORDERED on this *26th* day of *OCTOBER* 2006, that the Clerk of the Superior Court seal State Grand Jury Indictment Number SGJ529-06-7(2), and the Order of Venue designating a county of venue for the purpose of the trial of the said indictment.

IT IS FURTHER ORDERED that the Indictment and Order of Venue are to be unsealed on or about October 30, 2006, or when defendant is served with the indictment.

_____
Neil H. Shuster, J.S.C.

Da16

# FILED

JAN 2 5 2007

HON. FREDERICK P. DE VESA

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY

STATE OF NEW JERSEY,                  :          CRIMINAL ACTION

    Plaintiff,                            :      Docket Nos.:  05-10-164-S and 06-10-116-S

        v.                             :      **ORDER JOINING INDICTMENTS FOR
                                                         TRIAL**

MELANIE MCGUIRE                       :

    Defendants.                           :

This matter having been opened to the Court on motion by the State of New Jersey,

Assistant Attorney General Patricia Prezioso, appearing, on notice to Stephen Turano, Esq., and

the Court having had the opportunity to consider the certifications, briefs and arguments of

counsel and for other good cause shown;

IT IS on this _2-4th_ day of January, 2007,

ORDERED that the motion to consolidate the captioned indictments is hereby granted,

and it is further

ORDERED that Indictments 05-10-164-S and 06-10-116-S are hereby joined for trial

consistent with the Opinion of this Court issued on January 22, 2007; and it is further

ORDERED that a copy of this Order shall be served upon all counsel of record within 7

days of the date of this Order.

_____
FREDERICK P. DEVESA, P.J.S.C.

Da17

EXCERPTS OF THE PRE-TRIAL HEARING INITIALLY QUALIFYING EXPERT
THOMAS LESNIAK, DATED JANUARY 25, 2007

1

1
2
3

|SUPERIOR COURT OF NEW JERSEY
LAW DIVISION-MIDDLESEX COUNTY
INDICTMENT NO. 05-10-0164
APPELLATE NO. 6576-06-T4

4       STATE OF NEW JERSEY            *   STENOGRAPHIC TRANSCRIPT
                                       *
5               VS.                    *              OF
                                       *
6       MELANIE MC GUIRE,              *   MOTION PROCEEDINGS
                    Defendant.         *
7

8                          Place: Middlesex County Courthouse
                                  1 Kennedy Square
9                                 New Brunswick, N.J.  08903

10                         Date:   January 25, 2007

11

12      B E F O R E:
                   HONORABLE FREDERICK P. DE VESA, J.S.C.

13

14      A P P E A R A N C E S:

15      PATRICIA PREZIOSO, ESQ.,
        CHRISTOPHER ROMANYSHYN, ESQ.,
16      DEPUTY ATTORNEY GENERAL
        FOR THE STATE

17      JOSEPH TACOPINA, ESQ.,
        STEPHEN TURANO, ESQ.,
18      ATTORNEYS FOR THE DEFENDANT

19

20                          Susan Marcinczyk, C.S.R.
                            Official Court Reporter
21                          Middlesex County Courthouse
                            New Brunswick, New Jersey
22                                        08903

23

24

25

Da18

129

1    MS. PREZIOSO:  To amplify the findings of Mr.

2 Lesniak.

3    Now, the State has never submitted that Mr.

4 Lesniak's chemical tests should go before the Court, albeit

5 he spoke about doing the infrared test and certainly those

6 documents and charts are included in the discovery

7 materials.

8    What the State did is after getting the visual

9 report from Mr. Lesniak which based on a tool mark analysis

10 the State would submit is perfectly appropriate, the State

11 took it a step further and identified Mr. Ruiz, who is that

12 plastic's manufacturing expert who did do those further

13 chemical comparisons and the State would submit these two

14 gentlemen came to the same opinion.  That would be what the

15 State would be seeking to argue to this jury and, the State

16 feels that after the Court has heard the testimony will

17 agree that that's an appropriate argument.

18    But today's hearing, Judge, is about the

19 qualifications of Mr. Lesniak to render an opinion before

20 the jury as to his analysis of these garbage bags, and the

21 State submits his testimony amply supports his

22 qualifications and we would ask that the defense motion be

23 of denied.

24    THE COURT:  Counsel, I have had an opportunity to

25 consider Mr. Lesniak's testimony here, and I have also had

Da19

130

1     an opportunity to consider the findings contained in his

2     report.  Unfortunately, I do not have his notes, but he has

3     testified from them to a certain extent and it appears to

4     me, again, that what we have here is someone who clearly has

5     technical and specialized knowledge and, to a certain

6     extent, even scientific knowledge that may assist the trier

7     of fact to understand the evidence in this case and that he

8     has been qualified as an expert in the field of

9     criminalistics, if you will, he is a certified forensic

10     scientist and he does have a vast amount of experience in

11     this so-called analysis of tool marks.

12         I am satisfied that based upon his vast

13     experience, twenty-seven years in the State Police, his

14     current assignment in criminalistics unit and the work that

15     he has done on hundreds of cases, and the examinations of

16     literally thousands of items for tool mark comparison that

17     he's clearly qualified to testify as an expert in the

18     so-called tool mark analysis which, in this case, seems to

19     translate into making observations and examination of

20     plastic bags from two different sources, if you will, and

21     rendering an opinion as almost like Agent Fitzgerald as to

22     the similarities of those bags, you know, the striations,

23     and the size, and the seal, and the nature of the bags, if

24     you will.

25         I don't believe that his expertise allows him to

131

1   go further and render a scientifically or a -- I don't

2   believe his expertise allows him to render a reliable

3   opinion, I don't think it has to be scientifically

4   established, but I don't think his expertise allows him to

5   render a reliable opinion that the bags were produced by the

6   same manufacturer, the same plant, the same extrusion line

7   at the same type; and I say this because, and that's why I

8   asked him to summarize his conclusions, in order to make

9   that kind of conclusion, based upon my understanding of the

10  reports and the testimony, one would have to be qualified to

11  examine plastics bags and to note the important

12  characteristics, but then one would be required to have a

13  very significant and indepth knowledge as to the

14  manufacturing process of plastic bags, because he's not

15  simply saying these bags are alike.  He's saying that they

16  are manufactured on the same line, in the same plant, at the

17  same time.

18          Now, from my understanding of his testimony and my

19  findings in this case, Mr. Lesniak's knowledge and

20  experience regarding the manufacturing of plastic bags is

21  essentially working on one case under someone else's

22  mentorship, if you will, reading some journals, attending a

23  course and then going out and interviewing people who are

24  involved in the manufacturing process, and I think that is a

25  very good start, and I think that the State Police forensic

Da21

132

1    scientist may play a very pivotal role in examining this

2    kind of evidence and then sending it for further analysis

3    because, I guess as one of the defense brief says, no one

4    can be a Jack of all trades, and just like the forensic

5    scientists in the State Police Laboratory system may refer

6    complex DNA matters to outside labs with a greater degree of

7    specialty.

8         Here, Mr. Lesniak could reach a certain level of

9    tentative conclusion and then that would trigger a further

10   analysis by a manufacturing expert; but, I don't believe

11   that simply going out and asking people about how plastic

12   bags are manufactured on a couple of occasions gives one the

13   right to then conclude much about the manufacturing process;

14   and I don't believe that, because it seems to me that that

15   would almost make cross examination impossible, since it is

16   clear that whatever he can say about the line and the time

17   frame and the inverted tool, if you will, these are all

18   things that somebody told him and that doesn't suggest to me

19   a level of expertise that is sufficiently reliable.

20        Again, I don't mean to be critical of that because

21   I think that's a very good first step, but I don't believe

22   that he possesses the combination of training and experience

23   on the composition of plastic bags and their manufacturing

24   process that would allow him to reach those other

25   conclusions about, you know, the time frame during which the

Da22

133

1   bags were manufactured and whether they were manufactured in
2   the same plant and so on and so forth.
3       I really believe that he is operating simply on
4   the basis of hearsay that he learned from a couple different
5   sources most recently just before this case.
6       So, I am satisfied that he is qualified to testify
7   as an expert in the field of criminalistics, if you will,
8   and tool marks, and therefore he can surely come to court
9   and testify that he received these bags, that he cleaned
10  them, that he did the appropriate preparation for their
11  examination and that he made certain findings about the
12  similarities of these bags and what they suggested to him,
13  but I don't think he can go as far as saying, same plant,
14  same extrusion line, and same time frame.  I just don't
15  think that those conclusions are based on anything more than
16  hearsay, not that experts can't rely on hearsay because I
17  understand that they can, but surely not one interview about
18  a complex manufacturing process or two interviews about a
19  complex manufacturing process.  I just don't think it makes
20  it.  So, that's my finding.
21      Again, I will permit him to testify within the
22  limits of what I have just described, but I don't think he
23  has sufficient expertise to go beyond what I have described
24  in making those bottom line conclusions.
25      Any questions?

134

1    MS. PREZIOSO:  Yes, Judge.

2         So, Mr. Lesniak can't testify he believes it was

3    the same metal tool that manufactured these bags?

4         THE COURT:  I think from what I understand of his

5    testimony he probably has sufficient expertise to say the

6    same kind of tool, just like he said when he talked about, I

7    think he said something about a distinction between

8    individual analysis or comparison and class analysis, I

9    think he could probably have enough expertise, he probably

10   does have enough expertise to talk about certain kinds of

11   tools to say that the cuts, if you will, for want of a

12   better word, appear to be made by the same class of tool or

13   kind of tool.

14        I don't think he, based upon what I have heard, he

15   may be able to go further than that, but I don't think he

16   could say the same tool.  I don't hear his testimony to say

17   that.

18        MR. TURANO:  I think when asked the question he

19   didn't know if it was an extrusion or extraction or what

20   type of process it was.

21        THE COURT:  And surely if he really doesn't know

22   enough to say the same manufacturer, plant, line and time.

23        Anything further?

24        MR. TURANO:  No, Judge.

25        MR. TACOPINA:  No.

**EXCERPTS OF THE PRE-TRIAL HEARING QUALIFYING EXPERT FRANK RUIZ AND
FURTHER QUALIFYING THOMAS LESNIAK, DATED JANUARY 31, 2007**

1

```
1                                    SUPERIOR COURT OF NEW JERSEY
                                     LAW DIVISION-MIDDLESEX COUNTY
2                                    INDICTMENT NO. 05-10-00164-S
                                     APPELLATE NO. 6576-06-T4
3

4    STATE OF NEW JERSEY          *    STENOGRAPHIC TRANSCRIPT
                                  *
5         VS.                     *              OF
                                  *
6    MELANIE MC GUIRE,            *      MOTION PROCEEDINGS
                    Defendant.    *
7

8                                Place: Middlesex County Courthouse
                                        1 Kennedy Square
9                                       New Brunswick, N.J.  08903

10                               Date:   January 31, 2007

11

12   B E F O R E:
                      HONORABLE FREDERICK P. DE VESA, J.S.C.
13

14   A P P E A R A N C E S:

15   PATRICIA PREZIOSO, ESQ.,
     ASSISTANT ATTORNEY GENERAL
16   CHRISTOPHER ROMANYSHYN, ESQ.,
     DEPUTY ATTORNEY GENERAL
17   ATTORNEYS FOR THE STATE

18   JOSEPH TACOPINA, ESQ.,
     STEPHEN TURANO, ESQ.,
19   ATTORNEYS FOR THE DEFENDANT

20
                                 Susan Marcinczyk, C.S.R.
21                               Official Court Reporter
                                 Middlesex County Courthouse
22                               New Brunswick, New Jersey
                                            08903
23

24

25
```

67

1   but the Court's questions that he would not be qualified as

2   an expert in certainly the areas of the distribution or

3   should not be permitted to make those, render an opinion

4   with respect to the distribution process because it's based

5   on, as he admitted, many assumptions that may or may not

6   make, may or may not prevail.

7          As far as his qualifications as an expert, it sure

8   seemed like a plastic bag expert to me.  The fact of the

9   matter, though, is I would reserve, your Honor, pending the

10  ability or pending us getting our own expert, I, in all

11  fairness, had no expert to help assist me in cross

12  examination, so I really have no basis to cross examine him

13  on a lot of areas I would intend to go into.

14         THE COURT:  Then I must commend you, Mr. Turano,

15  with your ability and your facility with respect to cross

16  examination on plastic bag technology because if you were

17  able to do that without the benefit of guidance you are

18  terrific.

19         In any event, I do believe I should at least

20  render a preliminary opinion because both sides are

21  attempting to prepare for trial as quickly as possible; and

22  I will say at the outset that I will entertain a motion for

23  reconsideration if any defense expert raises serious

24  questions about Mr. Ruiz' expertise or if further cross

25  examination of him raises those questions; but, for now,

1   based upon his testimony and based upon the reports that

2   he's written and, frankly, based upon my own assessment of

3   his testimony and his credibility, I find that Mr. Ruiz is

4   qualified to testify as an expert in these proceedings in

5   the field of plastic bag technology, as he called it, and

6   manufacturing.

7          First of all, Mr. Ruiz has twenty-seven years

8   experience in this industry and even today holds the title

9   of Technical Director for the Heritage Bag Company and, of

10  course, he's on a number of national

11      and international boards or associations that are

12  involved in this industry and has published articles, and

13  has been determined to be an expert in the past, even in

14  homicide cases.

15         So, I think he's highly qualified by virtue of his

16  training and experience to assist the jury in its

17  fact-finding mission with respect to the probative value and

18  the relevance of his plastic bag comparisons.

19         I do concede that, and that's why I specifically

20  asked those questions, that, and of course, Mr. Ruiz has

21  acknowledged that he is not or was not able to form an

22  expert opinion as to where the bags were manufactured, where

23  the bags were delivered or whether or not the bags that were

24  compared came from the same box, if you will.  The term box

25  meaning the end user retail box, not the big box with the

69

reprocessed material.

So, consistent with his reports I do believe that he has sufficient expertise to testify with respect to those opinions that are contained in his reports, but, nothing further.

I would also just acknowledge that it is true that, clearly, some of his opinions are based upon factual an assumptions, but that does not in any way render his expert opinion inadmissible. As counsel know in the jury instructions that we provide in the case of expert testimony we often caution the jury that, of course, when an expert's opinion is based upon certain assumptions of fact that the opinion is only entitled to the weight that they deem appropriate based upon the question of whether those facts have been proven.

So, I think with respect to that argument, Mr. Turano, obviously you are free to, in the form of your own expert or additional factual testimony or cross examination, to raise questions about the validity of those assumptions, and the Court will give the jury the appropriate instructions; but, at least at this point barring any additional defense examination of Mr. Ruiz, I am satisfied that he is highly qualified to testify as an expert in these proceedings and will allow him to offer opinions consistent with his original and supplemental reports; but, again, I am

1   going to urge the State to be very careful that he be, that

2   he's not asked to render opinions beyond what he has written

3   in his reports.

4         As an example, and I think this is a very good

5   example, he then, in response to my questions, he speculated

6   about the delivery of the bags, based upon, you know, some

7   discussion with people, and he clearly admits that he was

8   not able to form an expert opinion.

9         If he were to say something like that in the

10   presence of a jury that would be a significant problem.

11         So, I think you need to go over with him issues of

12   that sort, and I think you have to limit your examination of

13   him to those areas that are contained in his report.

14         But, as far as that is concerned, I am satisfied

15   he's qualified.

16         MR. TURANO:  On a minor point, and I brought this

17   up with Mr. Romanyshyn, I don't think there's any dispute

18   but I want to put it on the record for purposes of this

19   hearing I did not object and I consciously did not object,

20   but I would ask the Court instruct the State, again Mr.

21   Romanyshyn has acknowledged this, that the expert not be

22   permitted to talk about, clearly he can talk about his

23   involvement in testifying in other matters, but he certainly

24   should not be allowed to testify that in his opinion his

25   testimony led to the conviction of, which is what he said

71

1    here, or that even the results of those particular cases.

2              THE COURT:  I think that's a fair request,

3    counsel.

4              So, please, obviously the jury is entitled to hear

5    the expert's qualifications, if you will, so they can weigh

6    his credibility and the validity of his opinions, but with

7    respect to those couple of homicides cases that he talked

8    about and the results, I really think that that might be

9    somewhat prejudicial.  So, please caution him.

10             MR. ROMANYSHYN:  I discussed that in the hall and

11   I assured him the testimony will not go that far.

12             THE COURT:  All right, counsel, we have some other

13   matters to address at this point?  Do you have any

14   particular order you with like to address them?

15             MS. PREZIOSO:  Judge, I apologize if I am

16   incorrect, but I can't remember whether you made a ruling

17   after Mr. Lesniak testified today or not or if we went right

18   into Mr. Ruiz?

19             THE COURT:  I did not make a ruling after Mr.

20   Lesniak testified.  So, would you like to hear that ruling?

21             MS. PREZIOSO:  I would love to hear that ruling,

22   Judge, I think.

23             THE COURT:  Well, I do believe, now that I've

24   heard, again I have not seen the transcripts and counsel

25   have not provided me with the answer, but Mr. Lesniak did

Da30

72

1  testify and after hearing Mr. Lesniak testify, again, I am

2  satisfied that he is qualified to testify as an expert in

3  the field of criminalistics.  He's been with the State

4  Police, I think he said twenty-seven years, thereabouts.

5  He's performed thousands of tests.  One of his

6  subspecialties, if you will, is tool mark comparison, and I

7  am satisfied that with respect to the issue of tool marks

8  and that he is qualified to render an expert opinion and,

9  therefore, I do at this point.

10        Now, I am satisfied that he is qualified to render

11  an opinion with respect to whether the marks on the bags

12  that he compared were made by the same tool, in this case

13  the die and the cutters, if you will.

14        I am not satisfied that he has sufficient

15  expertise with respect to the manufacturing process,

16  vis-a-vis, how many bags can be manufactured per hour and,

17  you know, so on and so forth, to the extent that Mr. Ruiz

18  was able to shed light on that issue.  I don't believe he is

19  able to testify as an expert, as he wrote in his report,

20  that the bags were manufactured at about the same time.

21        So, I will permit him to testify that after

22  examining the victim-related bags, if you will, and the bags

23  from the apartment, that based on the markings of those bags

24  and his discussions with others that they were cut, if you

25  will, or marked, or manufactured with the use of the same

Da31

1    tool.

2           And, of course, he would be permitted to use his

3    photographic comparisons, if you will, and to explain them,

4    and I would hope he would be able to do that with a

5    presenter so that it would be more meaningful to the jury;

6    but I believe that's where his expert opinion must be

7    limited, that he really isn't, despite going out and doing

8    some commendable research he really isn't an expert in

9    plastic bag composition or manufacturing.

10          So, what else do we need to cover, counsel, and

11   how would you like to do it?

12          MR. TURANO:  Judge, I think I see two issues, I

13   mean two topics.  The only two I am aware of are the ruling

14   with respect to that one remaining consensual.

15          THE COURT:  Yes.

16          MR. TURANO:  The only other one I am aware of is

17   essentially the defense's update as to the status of those

18   four, or now three areas that need to be addressed.

19          THE COURT:  Let's address the consensual first.

20          All right, counsel, what we have here is the

21   question, the Court has previously ruled on the

22   admissibility of certain conversations between the defendant

23   and friends and family of the defendant which were

24   intercepted through a court-authorized electronic

25   surveillance, and the Court has rendered some judgments with

**ORDER QUALIFYING THOMAS LESNIAK AS AN EXPERT, FILED FEBRUARY 28, 2007**

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY

| | | |
|---|---|---|
| STATE OF NEW JERSEY, | : | **CRIMINAL ACTION** |
| Plaintiff, | : | Docket Nos.: 05-10-164-S and 06-10-116-S |
| v. | : | **ORDER QUALIFYING THOMAS LESNIAK AS AN EXPERT** |
| MELANIE MCGUIRE | : | |
| Defendants. | : | |

This matter having been opened to the Court on motion by the State of New Jersey, Assistant Attorney General Patricia Prezioso, appearing, on notice to Stephen Turano, Esq., and the Court having had the opportunity to consider the certifications, briefs and arguments of counsel and for other good cause shown;

IT IS on this ___28th___ day of ___February___, 2007,

ORDERED that Thomas Lesniak is qualified as an expert in criminalistics and tool mark analysis, and it is further

ORDERED that Thomas Lesniak will be specifically permitted to testify that the plastic garbage bags he examined were produced by the same tool (die and cutters), consistent with the Opinion of this Court issued on January 31, 2007; and it is further

ORDERED that a copy of this Order shall be served upon all counsel of record within 7 days of the date of this Order.

**FILED**

FEB 2 8 2007

HON. FREDERICK P. DE VESA

_____
FREDERICK P. DEVESA, P.J.S.C.

Da33

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY

STATE OF NEW JERSEY,               :            CRIMINAL ACTION

    Plaintiff,                     :      Docket Nos.:  05-10-164-S and 06-10-116-S

    v.                             :      **ORDER QUALIFYING FRANK RUIZ AS**
                                      **AN EXPERT**

MELANIE MCGUIRE                    :

    Defendants.                    :

This matter having been opened to the Court on motion by the State of New Jersey,

Assistant Attorney General Patricia Prezioso, appearing, on notice to Stephen Turano, Esq., and

the Court having had the opportunity to consider the certifications, briefs and arguments of

counsel and for other good cause shown;

IT IS on this ___28th___ day of __February__, 2007,

ORDERED that Frank Ruiz is qualified as an expert in plastic bag manufacture and

technology, and it is further

ORDERED that Frank Ruiz will be permitted to testify in accordance with the contents of

his expert report and the supplement thereto, consistent with the Opinion of this Court issued on

January 31, 2007; and it is further

ORDERED that a copy of this Order shall be served upon all counsel of record within 7

days of the date of this Order.

FREDERICK P. DEVESA, P.J.S.C.

F I L E D

FEB 2 8 2007

HON. FREDERICK P. DE VESA

Da34

**EXCERPT OF THE TRANSCRIPT OF TRIAL PROCEEDINGS, CONTAINING THE MID-TRIAL RULING LIMITING THE SCOPE OF THE TESTIMONY OF GEORGE LOWERY, DATED APRIL 9, 2007**

SHEET 1   PAGE 1

1

```
1                    SUPERIOR COURT OF NEW JERSEY
                     LAW DIVISION - MIDDLESEX COUNTY
2                    INDICTMENT NO. 05-10-164-S
                                    06-10-119-S
3        ---------------------------x
THE STATE OF NEW JERSEY
4
                                     Transcript of
5
         vs.                         Trial Proceedings
6

7    MELANIE MCGUIRE,

8                  Defendant.
         ---------------------------x
9                      Place:  Middlesex County Courthouse
                               56 Paterson Street
10                             New Brunswick, New Jersey

11                     Date:  April 9, 2007

12   B E F O R E:

13   THE HONORABLE FREDERICK P. DeVESA, J.S.C. and a Jury.

14

     TRANSCRIPT ORDERED BY:  PATRICIA M. PREZIOSO, ESQ.
15                           Assistant Attorney General

16      A P P E A R A N C E S:

17          PATRICIA M. PREZIOSO, ESQ.
            Assistant Attorney General
18               -and-
            CHRISTOPHER S. ROMANYSHYN, ESQ.
19          Deputy Attorney General
            Attorneys for the State
20

21          JOSEPH TACOPINA, ESQ.
                 -and-
22          STEPHEN TURANO, ESQ.
            Attorneys for the Defendant
23
                 Anne C. Nemeth
24               Certified Court Reporter
                 Middlesex County Courthouse
25               New Brunswick, New Jersey
```

SHEET 8   PAGE 14

14

1   madness, and it was sort of this.  But, more
2   importantly, obviously, Mr. Lowery, if permitted to
3   testify, will testify what the first interview was about
4   and why that wasn't the topic of discussion, and the
5   reason that he called them back was to talk about the
6   gun, but that, again, goes to his credibility.
7          Again, I think should he be allowed to
8   testify regarding the statement that Bill McGuire made,
9   which was he wanted to get a gun because of all these
10  repeated thefts of his high beams or some sort of lights
11  in his Nissan Maxima that he had over a period of a few
12  months, that he wanted to get a gun, but was not able
13  to.  He couldn't get a permit.  We know why he couldn't
14  get a permit.  He didn't share that with Mr. Lowery,
15  that he was a convicted felon, but just said he couldn't
16  get a permit, and he was going to have to have his
17  wife -- didn't mention her name -- secure that for him.
18         Your Honor, that is not being offered for the
19  truth of the matter asserted.  In other words, it's not
20  being offered to show that McGuire actually needed
21  Melanie McGuire to get a gun for him, but rather to show
22  William McGuire's state of mind, and that is, the state
23  of mind exception is a very broad exception to the
24  hearsay rule, the state of mind being that Bill McGuire
25  believed he needed Melanie McGuire to buy a gun for him.

PAGE 15

15

1          And that evidence, your Honor, is entirely
2   relevant in this case where we've had tapes played and
3   evidence showing that Melanie McGuire's position on
4   these tapes have been that her husband wanted her to
5   purchase this gun.  I think it's a more than reasonable
6   inference the jury can draw.  It's a state of mind
7   exception.  I, quite frankly, think it also falls under
8   the admission against penal interest, in addition to the
9   state of mind hearsay exception, because William McGuire
10  being a convicted felon could not possess a gun, and
11  certainly that was something he was looking to do.
12         But I think the more appropriate exception,
13  your Honor, is the state of mind exception.  And time
14  and again in this case, the state has relied on hearsay
15  testimony, in particular, hearsay testimony of William
16  McGuire's state of mind.  How he was so excited for the
17  house purchase, how he was so excited for this, how he
18  would never leave his children.  We've heard that
19  throughout the state's case.  That's hearsay, and it
20  went to his state of mind.  So, I think the same way
21  that came in, this equally should come in under the
22  state of mind exception.  So, that's our position.  He
23  should be able to testify.
24         THE COURT:  All right.  Well, counsel, first
25  of all, while I would agree that there has been a

Da36

16

1  certain amount of hearsay in this court, it has never
2  been with the approval or the encouragement of the
3  court. As you all know, from time to time, the court
4  has had to interrupt examinations because there has been
5  hearsay elicited, and neither side objected to it. That
6  doesn't make it any more reliable or subject to
7  cross-examination. And so on important points, other
8  than when we're just talking about background
9  information, the court has tried to rectify the
10  situation.
11        In this case, Mr. McGuire's statements to
12  Mr. Lowery or his alleged statements to Mr. Lowery do
13  not fall, as far as I could tell, within any exception
14  to the hearsay rule. First of all, Mr. McGuire's state
15  of mind prior to the time of the murder is not really
16  that significant. I have permitted -- and I want to
17  make this clear now as we go ahead. I have permitted a
18  certain amount of background information on the marriage
19  between the defendant and the victim, and I've permitted
20  a certain amount of discussion about Mr. McGuire's
21  activities, either because the court felt it was, within
22  limits, appropriate to address the suggestion on the
23  part of the defense that there may have been a
24  third-party responsible for this murder, and, of course,
25  the defendant's state of mind, which is an issue in this

17

1  case, a central issue in this case, obviously has to do
2  somewhat with the marital relationship for a variety of
3  reasons.
4        I've made it very clear that with those two
5  limitations in mind, I would not allow this trial to
6  become involved in character inquiries of William
7  McGuire. He's not on trial. He's not here to have
8  anyone cross-examine witnesses on his behalf. And,
9  therefore, statements that he may have made to others,
10  which cannot be verified at this point or determined to
11  be reliable, cannot be admitted.
12        Now, in this case, what we have here is an
13  assertion by the defense that the defendant purchased a
14  gun at the request of her husband, and, of course, she
15  has made statements to that effect during intercepted
16  conversations, and others have testified to that. So,
17  first of all, I don't really believe that it is
18  necessary to have another witness testify, particularly
19  when it comes to statements made by Mr. McGuire. So,
20  there not being any exceptions that I can think of, I do
21  not believe that Mr. Lowery, unless there's something
22  else he has to say, can testify in these proceedings.
23        I might add that I don't believe
24  Mr. McGuire's statement to anyone, if such a statement
25  was made, that he would like his wife to purchase a gun

SHEET 10   PAGE 18

18

1   because he couldn't, necessarily is contrary to his
2   penal interest.  If the defendant chose to buy a gun so
3   it could be in the house, then, obviously, Mr. McGuire
4   may feel safer about that, if that's what was happening.
5   But surely it wasn't necessarily contrary to his penal
6   interest for him to so state that to someone else.
7           As far as his state of mind, I don't believe
8   his state of mind in discussions with other people long
9   before his murder have anything to do with this case.
10  And, again, I'm going to suggest to counsel, I do not
11  intend to allow witnesses to testify regarding all of
12  this historical information about Mr. McGuire's
13  character or his state of mind.  If that should occur in
14  either direct or cross-examination, I am going to
15  interrupt counsel, and I'm going to simply make
16  reference to my prior ruling, so we don't have to go to
17  sidebar every time that occurs.  Okay.
18          So, if I say, "counsel, let's move on, prior
19  ruling," that means that I believe that the inquiry in
20  these proceedings is getting too far into Mr. McGuire's
21  character or his past activities that are far beyond the
22  relevance of the issues in this case.  So, again, Mr.
23  Tacopina, unless Mr. Lowery has something more to say
24  than what has been described to the court, I see no
25  basis for his testimony.

PAGE 19

19

1           MR. TACOPINA:  Your Honor, just two things.
2   One, I just want to make clear it's not our position
3   that the testimony that went in about William McGuire
4   being excited about the purchase of his new home is sort
5   of irrelevant and not that significant.  The state will
6   argue on the summation, without question, that it's not
7   likely that he would leave because he was so excited.
8   He was carrying his laptop around with his pictures.
9   So, that came in for his state of mind, and the state is
10  going to use that.
11          THE COURT:  Without objection, Mr. Tacopina.
12          MR. TACOPINA:  Oh.
13          THE COURT:  And I understand the defense's
14  hesitance to make objections, and, you know, to make --
15  you know, to create the impression that the defense is
16  trying to keep something from the jury.  But when there
17  is no objection, I have to be reluctant to interfere.
18  And, frankly, I'm not always sure whether there is a
19  basis to object or not until I've heard much more of the
20  testimony.
21          So, it is true that the state was able to
22  elicit this information without objection.  In some
23  cases, it wasn't hearsay; it was observation of one's
24  demeanor.  In other cases, it was hearsay in terms of
25  his statements to others and should have been objected

Da38

**EXCERPT OF THE TRANSCRIPT OF TRIAL, CONTAINING THE MID-TRIAL RULING LIMITING THE SCOPE OF TESTIMONY OF MARCIE PAULK, DATED APRIL 10, 2007**

```
                                                                    1
 1                      SUPERIOR COURT OF NEW JERSEY
                        CRIMINAL DIVISION - MIDDLESEX COUNTY
 2                      INDICTMENT NOS. 05-10-164-S
                                        06-10-119-S
 3                      APPEAL NO.      6576-06T4

 4   STATE OF NEW JERSEY,

 5        Complainant,

 6        V.                       Transcript of Trial

 7   MELANIE McGUIRE,

 8        Defendant.

 9

10                      Place:  Middlesex County Courthouse
                                56 Paterson Street
11                              New Brunswick, N.J. 08903

12                      Date:   Tuesday, 4-10-2007

13   B E F O R E:
     THE HONORABLE FREDERICK P. DeVESA, J.S.C., and a Jury.
14
     TRANSCRIPT ORDERED BY:  Helen C. Godby, Esq.,
15                             ADPD, Intake Unit

     A P P E A R A N C E S:
16   PATRICIA M. PREZIOSO, ESQ.,
     Assistant Attorney General,
17        -and-
     CHRISTOPHER S. ROMANYSHYN, ESQ.,
18   Deputy Attorney General,
     Attorneys for the State.
19
     JOSEPH TACOPINA, ESQ.,
20   Attorney for the Defendant.

21   STEPHEN TURANO, ESQ.,
     Attorney for the Defendant.
22

23

24                           June Andrian, C.S.R.
                             Certified Court Reporter
25                           Middlesex County Courthouse
                             56 Paterson Street
                             New Brunswick, N.J. 08903
```

Colloquy                                          150

1      MR. ROMANYSHYN:  Not with respect to that.
2  If there's going to be some sort of a mention that he
3  did that to me and that's what he's doing here then
4  that's going to be a problem but more so the main
5  thrust of the argument is that it's irrelevant.
6  It happened ten years ago.  It is not habit evidence
7  and I don't understand what the connection to the
8  McGuire marriage during the relevant time frame is with
9  respect to how the first marriage ended ten years
10 before.
11      THE COURT:  I agree.
12      Counsel, I do not believe that William
13 McGuire's ex wife should be allowed to come into these
14 proceedings and testify that ten years earlier of the
15 disappearance of Mr. McGuire, he walked out on her,
16 at the same time apparently tampered with their credit
17 cards.  I really don't see that any logical inference
18 that is relevant to the issues before this Court can be
19 drawn from that testimony.  I think that the desire to
20 do that is really nothing more than a veiled attempt to
21 attack the character of William McGuire and to gain
22 sympathy for the defendant.  An isolated termination of
23 an earlier marriage surely is not habit or custom under
24 Rule 406 and the remoteness of it and the nature of it
25 surely does not satisfy Rule 403 or Rule 404.  It is

Colloquy                                          151

1  surely in my view not only irrelevant but it's also
2  inappropriate and inflammatory in that it really
3  amounts to a character attack and an appeal to the
4  sympathy of the jury for the defendant so Miss Paulk
5  will not be allowed to testify about the circumstances
6  of her divorce with William McGuire ten years earlier.
7      MR. TACOPINA:  Moving right along, your
8  Honor, we also want to elicit testimony, you know, I've
9  heard character assassination and smear and all these
10 sorts of things--
11      THE COURT:  I didn't say "smear."
12      MR. TACOPINA:  I didn't say you said it.  I
13 said I've heard it.
14      MR. ROMANYSHYN:  I certainly didn't say it.
15      MR. TACOPINA:  What we have, we have the
16 State has put William McGuire's character into issue.
17      THE COURT:  You've opened it.
18      MR. TACOPINA:  I didn't do it.
19      THE COURT:  Mr. Turano did when he talked
20 about what a heavy gambler he was, he was in debt and
21 all the problems he had and how he was about to be
22 fired and all of that and the mob may have killed him.
23      MR. TACOPINA:  He did say he was a heavy
24 gambler.  I think we need to reread Mr. Turano's
25 opening.  That's not what he said.

Da40

Colloquy                                    152

1        THE COURT:  The argument that was being made
2   that's the inference that the defense is willing or
3   trying to have the jury draw.
4        MR. TACOPINA:  Actually it's not.
5        THE COURT:  Well then we would all agree
6   that Mr. McGuire's character in the general sense
7   is not really an issue in this case.  I have allowed
8   the defense to explore some of the background of
9   William McGuire particularly the gambling activity to
10  attempt to seek evidence of third party guilt although
11  I have not seen any yet and I have allowed more
12  importantly some discussion of this by both the State
13  and defense because the State is arguing that the
14  defendant's apparent callousness on the intercepted
15  conversations is evidence of consciousness of guilt and
16  so what I have said is in fairness to the defendant
17  there should be enough discussion of the marital
18  difficulties and the personality of William McGuire and
19  his activities to at least allow the defense to argue
20  that the apparent callousness of the defendant is not
21  necessarily consciousness of guilt but it may be more
22  due to his general marital problems and the hostility
23  arising therefrom.  That's what the Court decided.
24  That's why we have a little bit of this background
25  information about William McGuire.  We're not going ten

Colloquy                                    153

1   years beyond that to have the ex wife of William
2   McGuire come in and talk about him when they were
3   married and when they got divorced.  That is going way,
4   way beyond the limited purpose that the Court allowed
5   both the State and the defense to get into when we
6   began this trial.  It's simply not relevant.  There's
7   no logical inference that can be drawn from that
8   testimony.
9        MR. TACOPINA:  So I'm clear and no
10  misunderstanding when she's here--
11       THE COURT:  Now you're starting to sound like
12  the State.
13       MR. TACOPINA:  I know.  I'm sorry.  I am a
14  recovering prosecutor.
15       THE COURT:  Any time I make a ruling somebody
16  finds it unclear.
17       MR. TACOPINA:  It's actually quite clear.  I
18  want to make sure you don't want to reconsider.  She
19  will not be able to testify and that was exactly the
20  last point I was going to make that the evidence of
21  William McGuire's bad character, if you will, by Miss
22  Paulk is relevant to explain the State's position that
23  Melanie McGuire's reaction is consciousness of guilt
24  when in fact they don't.  That was something and I
25  appreciate your ruling and I know what you did say and

Da41

```
                        Colloquy                    154
 1  I understand the remoteness, if you will, of this and
 2  that's perhaps where we're going but I thought because
 3  this was his first marriage and this was his second
 4  marriage while I agree two things have meaning don't
 5  make something a pattern except when you're only
 6  married twice and you walk out twice that's batting
 7  200 or is it a 4000?  But, your Honor--
 8          THE COURT:  This isn't a ball game.
 9          MR. TACOPINA:  The fact of the matter is
10  we do have evidence that Marci Paulk applied for a
11  temporary restraining order.  There was violence,
12  things that the State is alleging now that Melanie
13  McGuire is fabricating, and I think that is relevant.
14  I think even though it's remote, it's relevant because
15  there is only one other marriage.  I think there is a
16  tendency to make the existence of the fact that Melanie
17  McGuire is putting forth more probable and I think
18  therefore it's relevant despite the time on this.  We
19  talk about a marriage, not something you do every year.
20  That limiting portion should come in.
21          THE COURT:  Mr. Tacopina, I understand your
22  role, if you will, but the fact is that in this case
23  first of all it seems to me I could be wrong since
24  there has been so much testimony and so many documents,
25  so much evidence, but it seems to me that the defendant
```

```
                        Colloquy                    155
 1  herself on intercepted conversations and in her sworn
 2  testimony before Judge Meyer in the Family Court
 3  indicated Mr. McGuire had not been abusive to her
 4  before, that he was all of a sudden acting weird, so
 5  clearly she would have had no knowledge of Marci
 6  Paulk's victimization if there was any and again ten
 7  years earlier it surely is not relevant.  The fact that
 8  someone may have had marital problems in a previous
 9  marriage ten years ago really does not allow a logical
10  reference.  I would have to then allow the State to
11  cross examine Miss Paulk and then we would go on to the
12  collateral inquiry which would be very time-consuming
13  and very confusing to this jury about who was the good
14  guy and who was the bad guy in the prior marriage and
15  we're simply not going to do that.
16          The issue of the prior marriage is too remote
17  in all respects to have any logical connection to the
18  issues in the marriage that's involved in this trial
19  so I do believe that the defense has a right to attempt
20  to elicit that Mr. McGuire was using that same home
21  computer around the time that these very suspicious
22  searches were conducted.  If Miss Paulk can corroborate
23  that I think it's fair game.  All this about the prior
24  marriage, no good.
25          MR. TACOPINA:  I'll instruct her and
```

**TRANSCRIPT OF DECISION, CONTAINING THE RULING DENYING ANY RELIEF FOLLOWING VOIR DIRE OF JURORS' REGARDING EXTRANEOUS INFLUENCES, DATED APRIL 23, 2007**

```
 1                        SUPERIOR COURT OF NEW JERSEY
                         LAW DIVISION - MIDDLESEX COUNTY
 2                       INDICTMENT NOS. 05-10-165-S
                                        06-10-119-S
 3      _____

 4   THE STATE OF NEW JERSEY

 5          vs.                    Transcript of Decision

 6   MELANIE McGUIRE,

 7            Defendant.

 8      _____

                        Place:  Middlesex County Courthouse
 9                              56 Paterson Street
                                New Brunswick, New Jersey
10
                         Date:  April 23, 2007
11
     B E F O R E:
12
            HONORABLE FREDERICK P. DeVESA, J.S.C.
13

14   TRANSCRIPT ORDERED BY:  Patricia Prezioso, Esq.
                             (Office of the Attorney General)
15
     A P P E A R A N C E S:
16
            PATRICIA PREZIOSO, ESQ.
17          and CHRISTOPHER S. ROMANYSHYN, ESQ.
            Assistant Attorney Generals
18          Attorneys for the State

19          JOSEPH TACOPINA, ESQ.
            (Firm of Tacopina and Seigel, Esqs.)
20          STEPHEN TURANO, ESQ.
            (Firm of Stephen Turano, Esq.)
21          Attorneys for the Defendant

22                              Linda Urbaniak
                                Certified Court Reporter
23                              Official Court Reporter
                                Middlesex County Courthouse
24                              56 Paterson Street
                                New Brunswick, New Jersey
25
```

Da43

```
                         Decision                      2
 1          (The following is out of the presence of the
 2  jury.)
 3          THE COURT:  All right.  Counsel, good
 4  morning, first of all.
 5          MR. TACOPINA:  Good morning, your Honor.
 6          THE COURT:  And before we begin with the --
 7  with bringing the jury out for the additional
 8  instructions, the Court, after consulting with counsel,
 9  agrees that it really at this point should place its
10  reasons on the record for the decisions the Court has
11  made regarding the interviews, the findings that the
12  Court has made regarding the juror interviews, and
13  ultimately the decisions that the Court has made.
14          So bear with me for a moment.  I just want to
15  state for the record what has occurred over the last
16  several days.
17          First of all, on April 20th, that was Friday,
18  the Court was advised by the court clerk that the clerk
19  had discovered that a note from one of the excused
20  jurors had been found in the jury room at the end of
21  the day on April 19th and, of course, since the juror
22  was excused previously the note to the jury constituted
23  a possible inappropriate communication to the jury.
24  The Court reviewed the note with counsel and the note
25  essentially was a farewell note, if you will, but it
```

```
                         Decision                      3
 1  did make reference at one point to the fact that the
 2  excused juror had begun to review internet
 3  communications and, therefore, it suggested at least
 4  the possibility that those communications had been
 5  communicated to the other jurors, and as a result of
 6  that and just generally the widespread publicity the
 7  Court decided with the concurrence and, frankly, at the
 8  request of all counsel that it would interview all of
 9  the jurors in the case.
10          Ultimately during that interview of all the
11  jurors it became clear that one of the jurors that was
12  excused did write this farewell note, if you will, and
13  placed it on the car of one of the jurors who was not
14  excused and then that note was brought into the
15  courthouse by that juror and was ultimately read aloud
16  to all of the other jurors as the farewell note from
17  one of the excused jurors.
18          The Court extensively questioned each of the
19  jurors about this reference to the internet, if you
20  will, and it did -- it did result in the Court
21  concluding that at one point during the trial
22  apparently one juror whose name is not known, whose
23  identity is not known, but one juror apparently came to
24  the courthouse and mentioned that one of their family
25  members had noted that the jurors' names and addresses
```

Da44

Decision                                                    4
1  were in the paper and that generated some brief
2  discussion or concern among the jurors about the fact
3  that their identities are apparently disclosed and
4  being printed in the paper and even talked about on the
5  internet even as far as some concern that they may have
6  been given nicknames.
7          Frankly, after concluding -- after hearing
8  each of these jurors describe what occurred, the Court
9  is -- and nearly every juror pretty much had the same
10  recollection, the Court is satisfied that there was not
11  any intentional circumvention of the Court's
12  instructions since each of the jurors upon questioning
13  made it clear to the Court that they understood the
14  Court's instructions to prohibit them from talking
15  about or receiving any communication about the case,
16  but it was very obvious to me from their demeanor and
17  their responses to the Court which, of course, all were
18  in the presence of counsel, that they really didn't
19  connect some reference to themselves or discussion
20  about themselves as, you know, reference or discussion
21  about the case.  I obviously have already told them
22  that that isn't so, but I don't believe at the time
23  that they had this brief discussion or these brief
24  remarks were made that in any way they felt they were
25  circumventing the Court's instructions.  Also I'm very

Decision                                                    5
1  satisfied that the remarks or comments that were made
2  were clearly not that significant to them because most
3  didn't even remember how they came about.  It was just
4  like a passing remark by someone.  No one could even
5  remember or identify the source, the original source,
6  of the brief comment.  And again this was universally
7  their position, if you will, even though each person
8  was individually and privately interviewed without any
9  notice to any of the other jurors, but to a person it
10  was clear that this had to be nothing more than some
11  passing insignificant casual type communication or
12  conversation.  Most importantly -- most importantly,
13  all the jurors clearly and unequivocally reported to
14  the Court that they did not discuss and have not been
15  made aware of any information relating to the facts or
16  the merits of the case.  All the jurors unequivocally
17  and very vigorously stated that they could be fair and
18  they could decide the case based solely on the evidence
19  and the law that the Court has instructed them on.
20          Now, this trial has been broadcast live on
21  Court TV and has been the subject of extensive coverage
22  on other media outlets as well.  There have been daily
23  articles in the newspapers as well as extensive
24  discussions about the case on internet websites, chat
25  rooms and blogs.  There is also a Melanie McGuire

Da45

Decision                          6

1  website.  I think it's fair to conclude in this case
2  that the widespread publicity that has been generated
3  has been generated primarily because of the nature of
4  the case, but also because of the identity and the
5  conduct of all the parties involved.  The publicity, as
6  far as the Court is concerned, has been so pervasive
7  that it is virtually impossible to really evaluate all
8  of it.  There is no way that one could now try to read
9  and address every communication or matter of coverage
10  or report about this case that has been disseminated
11  nationwide.
12        I mentioned to counsel in passing I received
13  a phone call from a friend who was in South Carolina
14  over the weekend who said that he was sitting in a bar
15  and he saw my chubby face on the television camera, but
16  he couldn't -- the volume was off and he had no idea
17  what was going on, but he did want to mention to me
18  that in a bar in South Carolina there I was.
19        So it's clear that there is no way that the
20  Court can really evaluate all of the information that
21  has been disseminated.  I can say, however, that
22  a great deal of news commentary and opinion and
23  discussion being out there, very little has come to the
24  Court's attention that wasn't presented or already
25  argued to the jury by the attorneys.

Decision                          7

1        Frankly, the only thing of significance that
2  has been so far brought to the Court's attention were
3  the reports that the defendant had allegedly passed
4  a polygraph that was triggered by the defense motion
5  and later comments by defense counsel that the Court
6  had barred some information that the defendant wished
7  to present in court.  These are the only two things
8  that I would say that this jury has not been made aware
9  of by attorneys in the form of argument that to my
10  knowledge have been the subject of media attention.
11  Now, those two items clearly were not in any way
12  prejudicial to the defendant.
13        Now, this coverage has always been of concern
14  to the Court and counsel.  We've talked about it many
15  times.  I've concluded, and I think counsel have
16  agreed, that there is no way to avoid this type of
17  attention consistent with our First Amendment.  I also
18  believe, although, you know, it had been discussed from
19  time to time, that today it is virtually impractical or
20  impossible to have a truly sequestered jury.  Given our
21  world of electronic communications one would find it
22  virtually impossible to completely isolate a jury from
23  the outside world.  We have televisions, radios,
24  watches, telephones, E-mail, blackberries.  I think
25  sadly we have learned that even in prison jailers find

Decision                                    8

1   it very difficult to keep prisoners free from
2   contraband and inappropriate communications, even in
3   that type of a secure segment.  The world of
4   information has become so pervasive that it's not
5   really possible.
6          So all the Court can do is what the Court has
7   already done with the cooperation and the assistance of
8   counsel.  We've taken many measures to reduce the risk
9   of any type of juror taint in this matter.  First of
10  all, during jury selection we screened hundreds and
11  hundreds of individuals using an extensive written
12  questionnaire regarding exposure to pretrial publicity
13  and we followed that up by extensive verbal voir dire
14  talking to people about where they get their news from,
15  what newspapers they read and whether or not this
16  intense media attention would have any influence on
17  them or in any way prevent them from being fair and
18  impartial jurors.  After many weeks of this process we
19  ended up with a jury that promised and took an oath
20  that they could follow the law and the instructions of
21  the Court and provide both the State and the defense
22  with a fair trial, and both the State and the defense
23  agreed at that point that the jury was satisfactory.
24         During the trial the matter was presented,
25  and I've said this before, very, very professionally by

Decision                                    9

1   counsel.  We had very good lawyers and we had very few
2   problems.  The witnesses that were subpoenaed were
3   asked to appear, all appeared and presented the
4   evidence that counsel wished to have them present.  At
5   least nearly all of the evidence, confidential -- truly
6   confidential matters or matters that would be
7   statutorily exempt from public access were discussed in
8   chambers and, of course, this Court has repeatedly
9   asked jurors if they were subject to any outside
10  information about the case and, of course, now this
11  Court has even taken the extraordinary step of
12  interviewing each juror personally and privately with
13  the presence of counsel and counsel participating on
14  two separate occasions.  Each juror has convinced the
15  Court that they can follow the law and attempt to reach
16  a verdict based solely on the evidence and the law that
17  it has explained.
18         This has been a very long, hotly contested
19  trial.  I do not believe that it could ever get any
20  better.  I don't believe that if this Court were to in
21  any way reach a determination today that this matter
22  should not go forward because of the communications and
23  the publicity surrounding the trial that there could
24  have been a retrial where there would be less of a
25  problem.  I think at some point everyone must

Da47

```
                         Decision                         10
 1  recognize, and the Court surely recognizes, that the
 2  system of trial by jury places some trust in a jury to
 3  follow the law.
 4          In this case after interviewing and speaking
 5  to these jurors at length on two separate occasions,
 6  having gone through this very, very comprehensive
 7  selection process with counsel, I am satisfied that
 8  this jury remains capable of following the law and
 9  giving the State and the defendant a fair trial, so
10  I am satisfied that this matter can go forward and that
11  the jury can continue to deliberate despite these
12  inadvertent and largely non-prejudicial communications
13  that may have existed between and among them.
14          Counsel, does anyone have anything to add or
15  state at this point regarding the Court's findings as
16  it relates to those interviews?
17          MR. TACOPINA:  Not at this point, your Honor.
18          MS. PREZIOSO:  No, Judge.
19                         * * *
20
21
22
23
24
25
```

```
 1                 C E R T I F I C A T I O N              11
 2
 3
 4  I, Linda Urbaniak, Certified Court Reporter, License
 5  Number XI00678, an Official Court Reporter in and for
 6  the State of New Jersey, do hereby certify the
 7  foregoing to be prepared in full compliance with the
 8  current Transcript Format for Judicial Proceedings and
 9  is a true and accurate compressed transcript of my
10  stenographic notes taken in the above matter to the
11  best of my knowledge and ability.
12
13
14
15           Linda Urbaniak
16                 Linda Urbaniak
17                 Certified Court Reporter
18                 Official Court Reporter
19                 Middlesex County Courthouse
20                 56 Paterson Street
21                 New Brunswick, New Jersey
22
23
24
25  Date:  May 29, 2007
```

| | |
|---|---|
| STATE OF NEW JERSEY : <br><br> v. : <br><br> MELANIE McGUIRE, : <br><br> Defendant. : | SUPERIOR COURT OF NEW JERSEY <br> MIDDLESEX COUNTY <br> LAW DIVISION, CRIMINAL PART <br><br> Indictment No. 05-10-164-S <br> Indictment No. 06-10-119-S |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT MELANIE MCGUIRE'S MOTION FOR A NEW
## TRIAL OR, IN THE ALTERNATIVE, A MISTRIAL

Da49

## PROCEDURAL BACKGROUND

After a seven-week trial, Melanie McGuire ("Melanie") was convicted on April 23, 2007, of the murder of her husband, William McGuire ("McGuire"), contrary to N.J.S. 2C:11-3, desecration of his remains, contrary to N.J.S. 2C:22-1, possession of a weapon for an unlawful purpose, contrary to N.J.S. 2C: 39-4a, and perjury in connection with representations she made during her application for a temporary restraining order ("TRO") against McGuire, contrary to N.J.S. 2C:28-1 (Indictment No. 05-10-00164-S). She was acquitted of all charges associated with the various anonymous communications (Indictment No. 06-10-00119-S).

On April 27, 2007, the Court set May 11, 2007, for the filing of post-trial motions. The Court granted Melanie's May 8, 2007 adjournment request and permitted Melanie to file her post-trial motions on May 14, 2007. This memorandum is submitted in support of Melanie's pre-trial motions.

## PRELIMINARY STATEMENT

Melanie's convictions for murder, desecration of human remains, perjury, and possession of a firearm for an unlawful purpose were improper and must be reversed. Those convictions stem from the State's allegations that Melanie shot her husband, placed his remains in three suitcases, disposed of them in the Chesapeake Bay, and then perjured herself when she sought a TRO against him to conceal his murder.

Because the State's evidence in no way supported proof beyond a reasonable doubt, Melanie's convictions must be reversed and a new trial granted. In addition, the jury's exposure to outside influences requires that a new trial be granted.[1] At the very least, pursuant to R. 1:16-1, Melanie seeks leave of the Court to permit defense counsel to interview all jurors.

---

[1] Defense Counsel did not obtain most of the blogs the jurors referred to during the Court's *voir dire* until after the verdict. Nonetheless, counsel voiced to the Court its concerns about the jury's exposure to media coverage and stated the desire to make a motion for a mistrial. Counsel's immediate concern, however, was that jurors, some of whom already admitted they had access to media coverage, would learn that Melanie moved for a mistrial based on their own misconduct. Therefore, should the Court not grant Melanie a new trial, she nonetheless preserves this issue for appeal.

2

## <u>MELANIE'S MOTION FOR A NEW TRIAL SHOULD BE GRANTED</u>

In this case, regardless of the legal standard applied, the following errors deprived Melanie of a fair trial to which she was constitutionally entitled: (1) there was insufficient evidence to sustain a conviction; and (2) the jury engaged in misconduct when it monitored pre-verdict media coverage, including newspaper articles and internet blogs. In addition, Melanie seeks leave of the Court pursuant to <u>R</u>. 1:16-1 to permit defense counsel to interview the jurors. Melanie will address each of these issues separately.

### A.  There Was Insufficient Evidence To Sustain A Conviction

The State failed to prove Melanie's participation in McGuire's murder beyond a reasonable doubt. The proofs offered by the State were entirely circumstantial and the inferences it asked the jury to make to convict Melanie were unsubstantiated during the prosecution's case-in-chief.   As a result, many of the important prosecution theories were left unsubstantiated. The State's failure to prove beyond a reasonable doubt numerous links in its chain of inferences renders its evidence insufficient to sustain the jury's guilty verdicts. This brief raises some of the most salient evidentiary insufficiencies below.

Melanie moved for a judgment of acquittal at the conclusion of the State's case-in-chief. The Court denied Melanie's motion. Melanie now files a motion for a new trial pursuant to <u>R</u>. 3:20-1. A motion for a new trial under <u>R</u>. 3:20-1 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial "if required in the interest of justice." *See State v. Russo*, 333 N.J.Super. 119, 137 (App.Div. 2000).

Unlike a motion for judgment of acquittal, a trial court under a <u>R</u>. 3:20-1 motion for a new trial need not give the State the benefit of all of its favorable evidence and all of

3

the favorable inferences from that evidence before determining whether a reasonable jury could find defendant's guilt beyond a reasonable doubt. *R. 3:20-1; State v. Person*, 2007 WL 1108941, *7 (App.Div. April 2007). Instead, a motion for a new trial based on the ground that the verdict was against the weight of the evidence permits a judge to "sift through the evidence to determine whether any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present." *State v. Smith*, 262 N.J.Super. 487, 512 (App.Div.), *certif. denied*, 134 N.J. 476 (1993). In making its R. 3:20-1 inquiry, the Court should assess the weight of the evidence consistent with human experience and evaluate for itself the credibility of the witnesses. *State v. Todd*, 2005 WL 3369892, *4 (App.Div. Dec. 13, 2005).

Moreover, whereas appellate review of a decision to grant post-trial motion for judgment of acquittal is *de novo*, the decision to grant a new trial based on the weight of the evidence is committed to "the sound discretion of the trial court" and is reviewed only for a clear abuse of that discretion. *State v. Russo*, 333 N.J.Super. at 137. The standard at this stage of the proceeding is whether the evidence is sufficient to sustain a conviction. *Id; State v. Reyes*, 50 N.J. 454, 458 (1967).

The verdict here was clearly against the weight of the evidence.

### 1. Location of Murder Not Proven Beyond a Reasonable Doubt

The State clearly recognized the difficulty it would have proving beyond a reasonable doubt Melanie's complicity in McGuire's murder if he left their Woodbridge apartment ("Apartment") on the morning of April 29, 2004, under his own volition. Therefore, during its opening, the State alleged that McGuire was murdered in the Apartment after the McGuires closed on the purchase of their new home in Asbury, New

4

Jersey. In fact, throughout the trial the State presented witnesses intending to prove its long-standing theory that McGuire was indeed murdered in the Apartment.[2] On cross examination, however, the State's witnesses critically undermined the State's very own contention that McGuire was murdered in the Apartment. By the conclusion of the trial, the State utterly failed to prove that McGuire was murdered in New Jersey, let alone in the Apartment.

Law enforcement conducted at least five separate searches of the Apartment -- the first occurring almost one month after McGuire's death on June 3, 2004, and the last in September 2006 -- for evidence that McGuire was murdered there. Virginia Beach Police Detective Joseph Ray Pickell testified on cross examination that luminal applied to surfaces of all of the bathrooms in the Apartment on June 3, 2004, failed to produce any blood evidence. At Detective Pickell's request, a portion of the plumbing trap and piping from the bath tub drain in the upstairs bathroom was removed and tested negative for any human tissue or blood evidence.

Forensic Scientist Lesniak ("Lesniak"), who personally participated in four of the Apartment searches, confirmed that no blood or DNA was ever discovered in the Apartment to support the State's contention that McGuire was killed there. Moreover,

---

[2] For example, the State called Lori Thomas ("Thomas"), who, despite testifying in the grand jury and having previously provided numerous interviews to State investigators, testified for the very first time at trial that when she visited and toured the Apartment at the end of May 2004 -- almost one month after McGuire's death -- it smelled like a "morgue." And Assistant Attorney General ("AAG") Patricia Prezioso asked State Police Forensic Scientist Thomas Lesniak ("Lesniak") on direct examination questions regarding the relative ease with which blood and DNA could be cleaned so as not to be detectable during forensic examinations.

none of the fibers found in the suitcases with McGuire's remains or on the bullet[3] matched any fibers found in the Apartment or from any of the McGuires' rugs, furniture and throw pillows. Likewise, the white, plastic shavings and paint chips found in the garbage bags containing McGuire's remains did not match anything from the Apartment.

Lesniak returned to the Apartment in September 2006 to search for the presence of tool marks left by a reciprocating saw – the tool the State argued was used to dismember McGuire – on the porcelain tub and shower stool. On cross examination, Lesniak acknowledged that there were no tool marks present on any of the surfaces. Despite the State's considerable efforts and the advanced technology available to it, Lesniak also conceded that investigators never found any evidence to conclude that McGuire was murdered in the Apartment.[4]

> Q: You . . . the scientist, looking with forensic testing can pick up DNA or blood evidence that a lay person couldn't see?
> A: Correct.
> Q: Okay. That a lay personal couldn't feel, right?
> A: Correct.
> Q: That a lay personal couldn't smell, for instance, yes?
> A: Yes.
> Q: Okay. And that's why you went to that Woodbridge apartment yourself four times, correct?
> A: Yes.
> Q: And you looked thoroughly as you describe to this jury, yes?
> A: Yes.
> Q: And you came up with no evidence.

---

[3] During closing argument, AAG Prezioso speculated that McGuire may have used a pillow as a silencer to prevent neighbors from hearing the gunshots. Only one of the two bullets recovered from the body, however, contained fibers.

[4] The State's extensive search of the Apartment included testing all of the surfaces of the bathrooms for DNA and blood, vacuuming air vents and air filters for fibers, and searching the crevices of the floor boards and behind molding and light sockets and electrical switches for any trace evidence.

6

A: That's correct.[5]

At least four State witnesses contradicted Thomas's testimony that the Apartment smelled like a "morgue." Detective Pickell and Woodbridge Police Sergeant Joseph Joraskie, who searched the Apartment two weeks after Thomas was there, did not notice any foul odors. Brad Miller ("Miller") was in the Apartment the very same day Thomas was and, on cross examination, testified that he did not smell any foul odors and specifically denied that the Apartment smelled like a morgue. Likewise, State witness Justin Marrero, who assisted McGuire with her move from the Apartment only days after Ms. Thomas was there, testified that he too did not notice any foul odors.

Moreover, not one State investigator or any of the other law-enforcement officers who testified at trial found a single witness who could corroborate that the murder took place in the Apartment. Law enforcement canvassed the Apartment complex in June 2004, and again after New Jersey took over the investigation. No one from the Apartment complex heard any gunshots[6] or a reciprocating saw or witnessed anything consistent with a body or items associated with the murder being removed from the Apartment. Interestingly, State Police Investigator David Dalrymple confirmed that one

---

[5] As of the date of this submission, the certified transcript is not available and defense counsel has only a few selected excerpts from the trial testimony.

[6] Virginia Beach Medical Examiner Wendy Gunther ("Gunther") testified that, although only two bullets were recovered with his remains, McGuire was shot at least three and likely four times. The remaining discharged shell casings, as well as any holes or damage caused by the exiting bullet or bullets were not found anywhere in the Apartment.

7

neighbor, Dawn Zhu, corroborated Melanie's account of an argument on the morning McGuire left the Apartment, but did not hear any gunshots or power tools.[7]

The State failed to prove beyond a reasonable doubt that McGuire was murdered in New Jersey, let alone the Apartment.[8]

## 2. Date and Time of Death Not Proven Beyond a Reasonable Doubt

The State's theory was that Melanie murdered McGuire during the early morning hours of April 29, 2004, and that his remains were discarded nearly 600 miles away, in the Chesapeake Bay on May 4, 2004, one day before the first suitcase was discovered.

Virginia Beach Medical Examiner Wendy Gunther's trial testimony made the State's theory untenable. She testified that the legs recovered on May 5, 2004, appeared to be "fresh" as if the person to whom the legs belonged had died the night before in a hospital setting. Given Gunther's testimony, the State's theory that McGuire was killed in the Apartment on April 29th became extremely unlikely.

During her closing argument, AAG Prezioso, to combat the now glaring weakness in the State's proofs, argued for the very first time that McGuire may have been killed or incapacitated on April 29th, dismembered much later, and his body kept on ice for as

---

[7] During her closing, AAG Prezioso contested defense counsel's version of the testimony and improperly argued that McGuire would have called Ms. Zhu as a defense witness at trial had she corroborated Melanie's account.

[8] Before trial and again after the State's case-in-chief, during her motion for judgment of acquittal under R. 3:18-1, Melanie moved to dismiss the murder and desecration counts of Indictment No. 05-10-00164-S on the grounds that the Court did not have territorial jurisdiction. Specifically, Melanie argued that the State did not prove beyond a reasonable doubt that McGuire was murdered in New Jersey or that Melanie engaged in any acts in New Jersey to establish her complicity in his Murder. Melanie respectfully requests that the Court consider the territorial jurisdiction argument as part of her motion for a new trial based on the sufficiency of the evidence, as well as renews her motion to dismiss pursuant to 2C:1-3.

8

Da57

many as six days.  There was absolutely no evidence offered during trial to support this

argument.[9]  The State did not offer any evidence that McGuire's body or his remains

were refrigerated or kept in ice.  In fact, medical examiners Gunther and Zhongxue Hua

both testified that they did not find any evidence that McGuire's remains had been

refrigerated.

Importantly, the State's new theory directly contradicted its earlier and long-

standing contention that McGuire's may have been dismembered after April 30th.  The

State previously contended that the microscopic tissue found on the floor of the front

driver and passenger's sides of the Maxima were tracked in from underneath Melanie's

feet proved McGuire was murdered and dismembered before Melanie moved the Maxima

to the Flamingo Hotel parking lot on April 30, 2004.

The State failed to prove beyond a reasonable doubt the date and time McGuire

was murdered.

### 3. Manner of Death Not Proven Beyond a Reasonable Doubt

The State also contended that McGuire was incapacitated before he was shot and

killed.  In particular, it argued that McGuire was sedated with wine laced with the drug

chloral hydrate before he was shot.  To explain why two separate toxicology reports did

not reveal the presence of chloral hydrate, the State called George Jackson, Ph.D.,

---

[9] Prosecutors are "duty-bound to confine their comments to facts revealed during the trial
and reasonable inferences to be drawn from that evidence." *State v. Frost*, 158 N.J. 76,
85 (1999).  In fact, it is "well settled that prosecutors . . . must confine their comments to
evidence revealed during the trial and reasonable inferences to be drawn from that
evidence." *State v. Mahoney*, 188 N.J. 359, 376 (2006).  During her summation, AAG
Prezioso repeatedly made arguments that were either different from what the State had
argued previously during trial or called for inferences that were not reasonably based on
the evidence presented at trial.  A new trial is required based on, among other things, this
prosecutorial misconduct.

9

("Jackson") toxicologist with the State of New Jersey, who testified that chloral hydrate is difficult to detect in the human body because it has an extremely short half-life.[10]  On cross examination, however, Jackson acknowledged that the break-down products of chloral hydrate are less volatile and that the primary break-down products, trichloroethanol and trichloroacetic acid, have half-lives of six to ten hours each.  He also acknowledged that New Jersey's toxicology screen did not detect the presence of chloral hydrate or its break-down products in McGuire's blood even though the test was sophisticated enough to do so.  Finally, a toxicologist for Virginia Beach Division of Forensic Science, David Barron, Ph.D. ("Barron"),[11] acknowledged on cross examination that the human body stops metabolizing chemical components once a person dies.  Therefore, if McGuire was shot before the sedative effects of chloral hydrate wore off – as was the State's theory – one would have expected to find measurable levels of trichloroethanol or trichloroacetic acid in McGuire's blood samples at the time of his death.

Moreover, had Melanie laced McGuire's wine with the chloral hydrate after the house closing, one would have expect to find alcohol still in his blood.  The toxicology screen taken during Virginia Beach's autopsy, however, did not reveal an appreciable level of alcohol in McGuire's system.  In fact, Barron testified that the trace amount of alcohol on Virginia Beach's toxicology report was consistent with the natural

---

[10] The half-life of a chemical substance is the time required for half of that substance to be removed from an organism by either a physical or chemical process.

[11] Interestingly, the State did not ask Barron to opine about the volatility of chloral hydrate or why it was not revealed on either toxicology screening, but chose to call its own toxicologist, Jackson, to do so instead.

10

decomposition process and inconsistent with the consumption of alcohol before McGuire's death.

The State failed to prove beyond a reasonable doubt that Melanie administered chloral hydrate or any other sedative to McGuire to incapacitate him.[12] Therefore, evidence at trial about the use of a sedative to kill McGuire was unfairly prejudicial and a new trial is warranted.

### 4. Evidence of the Existence or Role of Accomplice Not Offered

Melanie acknowledges that New Jersey law generally permits prosecutors to argue that a defendant can be charged as both an accomplice and a principle. Here, however, evidence presented by the State did not support an accomplice charge. Defense counsel objected to the accomplice charge during the charge conference. At the conclusion of the State's case-in-chief, Melanie moved that the State not be permitted to argue to the jury that it could find Melanie guilty as an accomplice. In particular, counsel again argued that the State failed to present any evidence to support the notion that more than one person participated in McGuire's murder or to delineate the role that an accomplice would have had. Without any credible evidence of the existence and role of an accomplice, Melanie argued that it would be improper to permit the jury to consider her guilty under accomplice liability. Much like a trial court must be guided by the unique facts of a particular case when crafting jury charges, here, the State should not have been permitted to consider Melanie's guilt under a complicity theory. *See e.g. State v. Cocepcion*, 111 N.J. 373, 379 (1988) (jury instructions must provide a comprehensible

---

[12] Cindy Ligosh acknowledged on cross examination that, shortly before his death, McGuire's head grew "ala Jason Giambi," possibly suggesting he was using steroids. Chloral hydrate and other sedatives like Dalmane, the drug for which a prescription was made in the name of McGuire's already deceased mother, have been linked to steroid use.

11

Da60

explanation of the questions the jury must determine and should be tailored to the particular case at hand).  Any reasonable doubt the jurors may have had as to Melanie's ability to have participated in the murder and its concealment could be reconciled by the jury's rank speculation that she was guilty of the charged crimes as an accomplice.  In essence, the accomplice-liability charge provided a safety net for the jury when confronted with reasonable doubt as to Melanie's participation in McGuire's murder.

Here, the State failed to offer a theory of complicity in which Melanie could be found guilty as an accomplice.  Unlike a R. 3:18-1 motion for a judgment of acquittal, a R. 3:20-1 motion for a new trial does not require the Court to give the State the benefit of all of its favorable evidence and all of the favorable inferences from that evidence.  Therefore, Melanie renews its request that the State's case charging her as an accomplice be dismissed and a new trial be granted.

The only evidence the State presented regarding an accomplice was the grainy Flamingo Hotel video from which the State attempted to argue that an SUV sharing some consistent characteristics to Melanie's Pathfinder was captured on the surveillance camera moments after she drove McGuire's Maxima into a parking space.  Nicole Spaun ("Spaun"), an imaging expert with the FBI, identified certain class characteristics between Melanie's Pathfinder and the vehicle in the surveillance video.  Conceding that she was not an automotive expert, Spaun merely testified that the position of the license plate and taillights was consistent with any number of other vehicles, including a Pathfinder, and that the vehicle appeared to stop at the end of the parking lot for a few seconds before turning right onto Atlantic Avenue.  Significantly, Spaun conceded on cross examination that she did not view anyone either enter or exit the stopped vehicle.

12

Da61

The State did not offer any credible evidence, let alone beyond a reasonable doubt, to sustain a guilty verdict based on accomplice liability. It also failed to provide enough accomplice evidence to warrant a jury charge on accomplice liability.

### 5. Absence of Motive

The State contends that it did not have to prove motive to obtain a guilty conviction. While the defense acknowledges that motive is not an essential element of the offenses for which Melanie was found guilty, the absence of motive should have raised reasonable doubt as to her guilt. Here, the State argued that Melanie's three-year, secret affair with Miller and the closing on the McGuires' home in Asbury, New Jersey, was her motive for shooting and dismembering her husband.

Contrary to his direct testimony, Miller acknowledged on cross examination that he: (1) specifically told the grand jury in 2005 that Melanie was not "surprised" that the closing took place; (2) specifically told the grand jury in 2005 that Melanie was "not resentful of her husband at the time" of the closing; (3) specifically told the grand jury in 2005 that Melanie was not "upset with her husband at the time" of the closing; (4) specifically told the grand jury in 2005 that Melanie was "excited" about the move into a their new home; (5) did not tell the grand jury in 2005 that Melanie was "upset" that the closing took place; (6) did not remember the substance of the call between him and Melanie at approximately 8:30 p.m. on the night of the closing; (7) recalled that Melanie took the day off from work to attend the closing; and (8) recalled that the McGuires had existing plans to move into their new house the next weekend. Miller repeatedly acknowledged that his memory of the events was better in May 2005 at the time he provided his grand jury testimony than it was at the trial.

13

Most importantly, Miller conceded that in April 2004, neither he nor Melanie had plans to leave their spouses.

> Q: Now, Doctor, you would agree that if Melanie had some grand plans to be with you, it certainly wouldn't make sense if she were single and you weren't divorced, would it?
> A: Correct.
> Q: And you made it clear to her that that was not happening, right . . . that you were not getting divorced, correct?
> A: At that time, no, I was not getting divorced.

In fact, before McGuire's death, Melanie never asked Miller to leave his wife or in any way suggest she would do the same.

> Q: And, again, never once, not before the death of her husband or after, did she ever ask you to leave your wife, right?
> A: No, she did not.
> Q: Nor did she ever insinuate to you, Doctor, directly of indirectly, that, hey I'm available now, you want to get together? She never said that to you, did she?
> A: No, she did not.

The State, although it tried, failed to prove an adequate motive for Melanie to have murdered McGuire.

## C. Right To A Fair Trial Was Denied By Extraneous Influences On The Jury

Repeated *voir dire* of the jury revealed a consistent theme that permeated the jury's deliberations: the jurors were impermissibly focused on how the print, television, and internet media were portraying them as they conducted their deliberations. Moreover, the jurors had impermissible contact with a former juror, during their deliberations, who asked the jurors to "do what is right" in rendering their verdict. Finally, the jury was admittedly exposed to mid-trial publicity, including an assertion in the media that Melanie would testify in her own defense. In that Melanie exercised her

14

Da63

constitutional right not to testify, the inherent expectation caused by the jury's exposure to media reports to the contrary necessarily had the potential to be prejudicial. All of these extraneous influences, whether individually or taken as a collective whole, had the capacity to unduly influence the jury's verdict. For these reasons, a new trial should be granted.

### 1. The State Has A High Burden To Prove The Jury Was Not Subject To Extraneous Influences

It is settled law in New Jersey that a new trial must be granted when "jury misconduct or intrusion of irregular influences into the jury deliberation 'could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge.'" *State v. Grant*, 254 N.J. Super. 571, 583, 604 A.2d 147, 153 (App. Div. 1992) (quoting *Panko v. Flintoke Co.*, 7 N.J. 55, 61, 80 A.2d 302, 305-306 (1951)). The Supreme Court has made clear that the "test is not whether the irregular matter actually influenced the result, but whether it had *the capacity of doing so.*" *Panko*, 7 N.J. at 61, 80 A.2d 302, 306 (emphasis added).

Importantly, capacity-to-influence is *presumed* from the irregularity. *State v. Wormley*, 305 N.J. Super. 57, 69, 701 A.2d 944, 951 (App. Div. 1997). To overcome that presumption, the State must "affirmatively" show that the irregularity *could not* have had the capacity to influence the result. *Id.*; *Grant*, 254 N.J. Super. at 588, 604 A.2d at 156. Moreover, the State's burden is to show lack of capacity *beyond a reasonable doubt*. *State v. Basaccia*, 319 N.J. Super. 1, 19, 724 A.2d 836, 846 (App. Div. 1999).

The Appellate Division has repeatedly held that "[t]he stringency of this rule is not a mere formalism." *Grant*, 254 N.J. Super. at 583, 604 A.2d at 154. Instead, it is "imperatively required to secure verdicts based on proofs taken openly at the trial free

15

from all danger of extraneous influences." *Id.* (quoting *Palestroni v. Jacobs*, 10 N.J. Super. 266, 271, 77 A.2d 183, 185 (App. Div. 1950)). Thus, the court must carefully consider the evidence of extraneous influences to determine whether the State has met its burden to prove beyond a reasonable doubt that the extraneous influences did not have the capacity to influence the result of the trial.

### 2. The Jury's Fixation On Whether Media Reports Were Painting Them In A Negative Light Necessarily Exposed Them To Numerous Negative Reports Regarding Ms. McGuire

In multiple *voir dire* of the jurors during both trial and deliberations, it became clear that instead of focusing solely on the evidence, testimony, and the Court's instructions to steer clear of outside influences, the jurors were acutely concerned with how they were being portrayed in the print, television, and internet media. These concerns led to the jurors receiving information directly from media sources, from family, and from each other. Given the nature of the coverage of these matters – including unfiltered internet bloggers and commentators who often asserted Melanie's guilt and generally painted her in a negative light – it is inconceivable that the jurors were not exposed to prejudicial material. And the Court must do more than accept their statement that the prejudicial material they inevitably saw and reviewed would not influence their decision making. Indeed, on its face, the material could have so influenced the outcome. A new trial is thus warranted.

Juror after juror acknowledged the jury's preoccupation – during deliberations – with the media's portrayal of the jurors. According to the jury foreman, "some of the jurors are interested into like how the media is looking at the jurors," and the jurors were

16

"worried about how they're viewed." *See* Apr. 20, 2007 Tr. at 23, 26 (Juror #1).[13] Jurors

admitted that they "hear . . . what the [media's] saying about us," and "talked about what

we hear about us" from external sources. *Id.* at 55, 52 (Juror #3). Other jurors noted that

the jury had a "general curiosity" about what the media was "saying about us," *id.* at 69

(Juror #5), and that they had "[overheard] different things that they've said about the

jurors," *id.* at 62 (Juror #4). *See also id.* at 81 (Juror #8 affirmatively responding to

Court's question of whether "at any time outside the deliberations" there had been

"specific discussions among jurors about . . . what the internet is reporting or what the

TV is reporting or the newspapers are reporting").

The jurors were particularly worried about how they were being described on

various internet blogs. Virtually every juror reported discussing the blogs.[14] *See id.* at 50

(Juror #3 admitting to bringing a blog to the jury's attention wherein the blogger thought

one of the jurors "had hard eyes"); *id.* at 23 (Juror #1 acknowledging discussion of same

blog); *id.* at 38 (Juror #2 acknowledging same); *id.* at 61 (Juror #4 acknowledging same);

*id.* at 69-70 (Juror #5 acknowledging same); *id.* at 95 (Juror #12 acknowledging same).

*See also id.* at 91 (Juror #11 acknowledging discussion of blogger "that sits in the

benches [in court] and depicts who everyone is").

Beyond the ubiquitous blogs, the jurors expressed concerns about how media

commentators were portraying them during the trial. *See, e.g.,* Tr. at 55 (Juror #3 stating

that "the first day somebody said that there was a comment made about even a caveman

---

[13] Attached hereto as Exhibit G is the transcript of the *voir dire* of the individual jurors
conducted in chambers on April 20, 2007.

[14] Attached hereto as Exhibit A are various internet blogs from Court TV's website.
There are literally thousands of other internet blogs on the website discussing the trial and
verdict.

can do it or something," and "they were talking about the jury and they referred us to like cavemen"); *id.* at 62, 65 (Juror #4 describing media comment on jury that "somebody looked like they were sleeping," and describing herself as "concerned, kind of upset, having a Court TV nickname like everybody has"); *id.* at 70-72 (Juror #5 acknowledging discussion of Court TV nicknames for jurors, including "Tweedledee and Tweedledum").

And they were especially troubled to learn that the media obtained identifying information, including their ages. *See id.* at 26 (Juror #1 acknowledging that jurors "worried about what information's going out to the public about – about the jurors themselves"); *id.* at 39 (Juror #2 acknowledging that "[s]omebody mentioned that – something about our ages or where we lived . . . ."); *id.* at 52 (Juror #3 acknowledging discussion regarding "one of the papers [that] had our name, our occupation, our age and our hometown"); *id.* at 62 (Juror #4 agreeing that jurors "heard that all of our home towns and ages were listed in the paper the other day"); *id.* at 76 (Juror #6 overhearing juror "say that, you know, some were in the paper, no names, just our numbers, and basically they just mentioned where we came from and our ages"); *id.* at 85 (Juror #10 "wondering how all our ages and where we lived and everything got into the newspapers"); *id.* at 96 (Juror #12 acknowledging pre-deliberations discussion about "reporting of our numbers . . . where we live and our ages"); *id.* at 105 (Juror #15 acknowledging discussion about "newspaper [that] had everybody's . . . town where they lived, and how old they were").

This concern over media contact was all the more acute after a sitting juror who was to be excused the following day informed the other jurors that she had been contacted by the media. *See id.* at 52 (Juror #3 reported a soon-to-be excused juror "came in and – actually . . . one of the newspapers called her"); *id.* at 101 (Juror #13

18

Da67

reporting that a soon-to-be excused juror said "somebody called her house").  The jurors clearly were anxious about the prospect of the media contacting them.  *Id.* at 62 (Juror #4, after Court explained that it does not give out specific address or age information about jurors, hoping "No one's going to show up at my house"); *id.* at 102 (Juror #13 relaying that former juror contacted by newspaper was "very scared because she didn't know how they got her number").

All of this extraneous information that found its way into the jury's deliberation room came from several outside, and inappropriate, sources.  Many appear to have received it from the media directly.  *Id.* at 71 (Juror #5 intimating that another juror told her about nicknames from Court TV); *id.* at 86 (Juror #10 noting that "we all" knew about the newspaper reports listing the jurors "because it wasn't just me that heard it"); *id.* at 51 (Juror #3 admitting that "many people [have] been telling us [the media is] writing stuff"); *id.* at 65 (Juror #4 admitting that she was "taping [Court TV] every day").  Other jurors received reports from family members.  *See id.* at 51 (Juror #3 admitting that her sister described a blog to her); *id.* at 86 (Juror #10 admitting to discussion with her husband about jury's description in newspaper).  Finally, the jurors heard reports from other jurors.  *Id.* at 56 (Juror #3 stating that "somebody said [the media] nicknamed the jurors"); *id.* at 52 (Juror #3 reporting on contact with soon-to-be excused juror regarding media contact); *id.* at 101 (Juror #13 reporting same).

These extraneous influences alone may have influenced the outcome.  Indeed, the jury's articulated interest in, and anxiety over, outside scrutiny undoubtedly stemmed, to some degree, from its desire to avoid denigration by a public that was not required to apply the same higher standard of proof beyond a reasonable doubt. Having already been

referred to in blogs as "Tweedledee and Tweedledum," as well as "cavemen," the jury could only have been wrongfully influenced by a public – free to operate on hunches and whims – which viewed the jury's deliberative process as easy.  Given that jurors were admittedly frightened about the disclosure of their identifying information, it is reasonable to conclude that a desire to appease the masses, albeit conscious or subconscious, infected the jury's deliberative process and diluted the burden of proof.

Equally, if not more, important is what was withheld and unexplored during the *voir dire*.  It is not credible to suggest that the jurors could have learned what they admitted to knowing without being exposed to other media.  Indeed, the reports about which we are aware the jurors learned were embedded in scathing blogs, newspaper stories about the trial, and Court TV commentaries.  For example, in one blog entry – entitled "Observations from the courtroom 4/3"– refers to a juror as having "hard eyes."[15] This comment became the focus of a *voir dire* of the jurors when it was learned the jurors heard about and had discussed it.  *See infra*.  Just a few lines above the reference to "hard eyes," the blogger describes Melanie: "I don't like MM posture while she is listening to this testimony.  She leans to the right & looks defiant & confrontational from where I'm sitting.  Body language & demeanor is going to hang her."  (Attached hereto as Exhibit D).  A similar entry from the same blogger the day before – "Observations from the courtroom 4/2" – recounts observing Melanie entering the courthouse: "If you believe in omens – MM goose is cooked."[16]  (Attached hereto as Exhibit E).

---

[15] The blog describing a juror as having the "hard eyes" is attached hereto as Exhibit B.

[16] The bloggers even went so far as to presume to analyze the case for the jurors. Following a lengthy blog entitled "If I was a juror this is how I would connect the dots...." and written toward the end of the trial, the blogger concludes, "I do think she was

It is not possible for the jurors, in exploring how the media was portraying them, to have missed these other, inflammatory reports. With respect to the blogs, especially, the information the jurors admitted to learning about was buried amongst thousands upon thousands of postings. Indeed, in the Court TV blog forum alone, to date there have been nearly 50,000 individual postings regarding this trial. To think that jurors, or those who were relaying outside information to the jurors, were seeing only those comments that specifically addressed the jurors is like suggesting the jurors, or their family members, went searching for a lone needle in a mountainous haystack, and happened to find it on their first shot. That is simply not credible.[17]

Moreover, these are the instances of outside contact about which the defense knows, through the mere happenstance of one former juror trying to make contact with the rest of the jury during its deliberations. *See infra.* Other potential contacts remain a mystery.

Given this near-unanimous obsession with media portrayal, it is unreasonable to conclude there were no other inappropriate contacts and conduct. And the jurors' claims that they were unaffected by the media they admitted they were exposed to are insufficient. In *State v. Weiler*, 211 N.J. Super. 602, 612, 512 A.2d 531, 536 (App. Div.

---

very guilty." (Attached hereto as Exhibit F). Other bloggers were quick to agree, adding such comments as, "MM is going to prison where she belongs," "can't wait for the book to be thrown at this little devil," and, criticizing a blogger who dared to question the State's evidence, "[y]ou should be ashamed of yourself" because "you would let this monstrous killer go scott free." Exhibit F.

[17] For example, searching for the term "hard eyes" on the Court TV blog – where the comment was found – yields 30 different search threads, with nearly 14,500 different postings. The casual viewer would have to scroll past blog postings with titles such as "Sociopath – 13 rules" and "The look on her face says it all," before happening upon the "Observations from the courtroom 4/3" entry described in the text containing the "hard eyes" comment.

21

1986), the court held that, despite the trial court's "conscientious efforts to ensure the verdict had not been affected," "the jurors' words [that they were not affected by extraneous influences] alone are 'too weak a reed' upon which to rest the difficult question of whether the verdict was subject to improper influence and tainted thereby." *Id.* Likewise, if the influences could have affected the result "indirectly or unintentionally," the jury's "disclaimer" at misconduct is not enough. *Wormley*, 305 N.J. Super. at 69, 701 A.2d at 951.

Thus, the State cannot meet its burden to show that these extraneous influences could not have influenced the outcome beyond a reasonable doubt. While the Court attempted to conduct a thorough *voir dire* of the jurors, most of these areas were left unexplored as defense counsel had to walk a tightrope between aggressively exploring jury taint and risking juror alienation. On one occasion, a juror started to explain other instances of jurors coming into contact with media sources, but counsel was unable to inquire further without risking such alienation. *See* Tr. at 56 (Juror #3 describing how certain jurors were nicknamed, and stating, "There were a couple other ones, but —," but she did not continue any further. Another time, when one juror suggested that other jurors knew Court TV had given them nicknames, Tr. at 70-71, defense counsel sought to press the matter. The State disagreed with counsel's interpretation and the Court took no further action. *Id.* at 73.

Because all of this exposure had the capacity to influence the deliberations, a new trial must be given. At the very least, the Court should allow a *voir dire*, under R. 1:16-1, of the jurors.

22

Da71

Besides the jury's admitted exposure to the "hard eyes" comments from the blogs, the blogs themselves indicated the jurors were exposed to other blogs. During deliberations, a blog entry appeared wherein the writer was "implying that they were a juror." (Attached hereto as Exhibit H). Indeed, according to other bloggers, in a thread entitled "to all the jurors illegally reading this board," wherein one poster requested the jury return its verdict by Friday of that week, someone responded, "ok, and we are leaning toward guilty." *Id.* The blog thread was, apparently, removed. *Id.*

This exposure is particularly problematic because the various blogs contained numerous other potentially prejudicial comments to which the jurors must have been exposed. *First,* the bloggers were particularly vindictive in attesting to Melanie's guilt long before a verdict was rendered. *See, e.g.,* (Mar. 31 bloggers stating that "It's a wonder she's not on death row already" and "String 'er up I say!!") (attached hereto as Exhibit I); (bloggers stating on Apr. 5 & 6, that Ms. McGuire's guilt is "very clear to all who listen closely to this case," "I want this woman to face the electric chair," and "His wife murdered him in cold blood," ) (attached hereto as Exhibit J); (blogger stating on Apr. 10 that "every lie [Ms. MsGuire] has told . . . only serves to put more bars on her jail cell") (attached hereto as Exhibit K).

*Second,* the bloggers also suggested facts not in evidence at the trial would be legitimate bases for finding Ms. McGuire guilty. *See, e.g.,* (Mar. 24 blogger supposing that "Nurses have access to operating room cleaning solvents that totally remove all traces of blood"); (attached hereto as Exhibit L) (Mar. 28 blogger, responding to earlier posting regarding "DNA remover" cleaning product: "Since this woman is a nurse she had more access to such a product than the average person in other professions than

23

medical.") (*id.*); (bloggers supposedly "actually POSTING FACTS" on Apr. 6, stating

that Ms. MsGuire took polygraph test "after already being made familiar with it,"

"already taken practice tests, "had nearly 2 years to 'mentally' prepare for this stunt," was

"afraid to take a polygraph at the beginning" of the case "just like a frightened puppy

dog") (attached hereto as Exhibit M); (Apr. 6 blogger speculating on what Ms. McGuire

was "thinking from the beginning") (attached hereto as Exhibit N); (Apr. 9 blogger

opining that hypothetical "[o]bservation in surgery" could teach nurse how to dismember

a body) (attached hereto as Exhibit O); (Apr. 11 blogger offering "guestimate" [*sic*] of

how body could have lost weight, making it easier to carry) (*id.*); (Apr. 12 blogger

opining that "there would be no blood spatter if he was already dead") (*id.*).

    *Finally*, the bloggers confused matters worse by frequently invoking the incorrect

legal standard. *See, e.g.*, (Apr. 6 blogger justifying belief of guilty on "*clear and*

*convincing* circumstantial evidence all the way through this case") (attached hereto as

Exhibit P); (same blogger noting that "unanswered questions" in prosecution's evidence

"do NOT *prove innocence*") (*id.*).

    The blogs cited herein are but examples.  The nearly 50,000 postings contain

many more similarly worded sentiments, all equally inappropriate for a jury to obtain

access to.

### 3. The Jury Was Extolled To "Do What Is Right" By A Former Juror During Their Deliberations

As deliberations were to get underway, one juror (Juror #5) discovered a card on

her windshield at her home.  It turned out the card was from an excused juror released

before closing arguments.  Inside was a long note in which the excused juror (Juror #14)

told the remaining jurors that she was "praying . . . that you will have the wisdom to do

what is right."(the "Juror Note") (Attached hereto as Exhibit C). The Juror Note also stated that the excused juror had reviewed the blogs and discovered she was the juror described as having "hard eyes," about which the jury apparently had been speculating. Upon *voir dire* of this incident, the jurors admitted that they were all aware of the contents of the Juror Note.

On its face, Juror #14's communication with the remaining jurors, as they began their deliberations, was improper. *See, e.g., Gov't of Virgin Islands v. Riley*, 973 F.2d 224, 227 n.7 (3d Cir. 1992) (excusing juror for improper contact with "friend of the victim who blurted out that he hoped she would do the right thing as a juror"); *Impson v. State*, 721 N.E.2d 1275, 1283 (Ind. Ct. App. 2000) (holding prosecutor's request that the jury "do the right thing" was "an improper statement" insofar as it urged the jury to act for reasons other than the evidence); *Lisle v. State*, 113 Nev. 540, 937 P.2d 473, 482 (1997) (holding prosecutor's statements to the jury that it must be "accountable" and "do the right thing" were improper); *State v. Musser*, 721 N.W.2d 734, 756 (Iowa 2006) (holding prosecutor improperly sought to expand jury's duty "to include a responsibility to do the right thing"). Moreover, in that the note contained the ambiguous plea to "do what is right," it is entirely plausible that the improper contact could have influenced the outcome.

Thus, prejudice is presumed, and a new trial is warranted unless the State can prove beyond a reasonable doubt that Juror #14's plea could not have influenced the outcome.

The State cannot and has not met its burden. First, defense counsel repeatedly asked the Court to inquire of those jurors who had seen or heard the Juror Note whether

25

Da74

they had any understanding of what Juror #14 thought the "right" thing to do was – that is, whether the jurors discussed with each other, before the beginning of deliberations, opinions as to guilt or innocence. Tr. at 32-33, 43. At the State's urging, the Court declined. *Id.* at 45 ("I'm inclined to think my questions are covering it."). Only with Juror #4 did the Court begin asking the questions that would lead to relevant answers. *Id.* at 63 ("When this – this letter from [Juror #14] was read, there's a part of it that talks about hoping that you do the right thing. What – did that mean anything to you or did that relate back to any prior conversations or anything like that?"). The juror, however, never completed a response. Additionally, the Court never made the relevant inquiry of the first three jurors, despite repeated requests from defense counsel. *See, e.g.*, Tr. at 29-34 (exchange with counsel following *voir dire* of Juror #1, requesting Court make proper inquiry); *id.* at 41-46 (same as to Juror #2).

Second, during *voir dire*, Juror #14, who had left the Juror Note, acknowledged that Juror #5 later called her to discuss the note. *See id.* at 10-11. When Juror #5 was interviewed, however, her recollection of this improper contact with a former juror was not explored. *See id.* at 65-73.

The State has not met its burden. Therefore, a new trial must be granted.

### 4. The Jurors Were Admittedly Exposed To Headlines Suggesting Ms. McGuire Would Testify In Her Own Defense

At around the time the State rested its case-in-chief, several jurors admitted that they were exposed to newspaper headlines which announced that Melanie might testify in her own defense.[18]

---

[18] A number of jurors acknowledged that they were aware of newspaper coverage that defense counsel sought a ruling from the Court regarding the admissibility of polygraph results. Several jurors stated that they saw this while catching the front page of the Home

It is bedrock law that it would have been reversible error if the State had pointed out to the jury that Melanie did not testify, or had noted that she planned to testify but later changed her mind, or that she was considering testifying but opted not to – leaving it to the jury to speculate why. *See, e.g., State v. Irizarry,* 270 N.J. Super. 669, 675, 637 A.2d 965, 968 (App. Div. 1994). There can be no less doubt that the jury's improper discovery, on its own, of this same information could have influenced the outcome of the trial.

### 5. In Combination, These Errors Clearly Could Have Influenced The Outcome

As noted at the outset of this section, a new trial must be granted when jury irregularities, such as exposure to prejudicial media and contact with non-jurors during deliberations, had the capacity to influence the jury. Even if none of the irregularities above, alone, suffice to constitute intrusion on the jury, in combination they raise the inference of error. This jury was extolled by a former member to "do the right thing." They learned that their job, given the nature of and evidence in the case, was supposedly so easy, "even a caveman can do it." They were exposed to blogs which incessantly argued with force that Melanie was guilty, long before the evidence concluded – and which even recommended at length how they ought to assess the evidence. And all the while, the jurors were fixated on how they were being portrayed in the media. We have no doubt that the jurors intended to act sincerely and in accordance with their individual

---

News Tribune. As defense counsel pointed out to the Court at the time, the relevant Home News Tribune article to which the jurors referred only referenced the polygraph within the text of the article, which means that these jurors must have read the article. Importantly, the same article was accompanied by a color photo of Melanie and the prejudicial headline stating that Melanie might testify.

27

oaths, but under the circumstances in this case, their assurances of subjective belief in their ability to be fair simply cannot be trusted.

In that all of these irregularities had the capacity to influence the ultimate outcome of this case, a new trial must be granted.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should grant Melanie's application for a new trial or, in the alternative, a mistrial. In the event the Court does not grant Melanie a new trial, it, at the very least, should permit defense counsel an opportunity to interview the jurors.

Respectfully submitted by:

Stephen Turano, Esq.

275 Madison Avenue
35th Floor
New York, NY 10016
Tel: (212) 905-4900
Fax: (212) 208-2981

50 Park Place
Suite 1400
Newark, NJ 07102
Tel: (973) 236-0119
Fax: (212) 208-2981

Email: sturano@turanolaw.com

Dated: May 14, 2007

29

Da78

EXHIBIT A: VARIOUS INTERNET BLOGS FROM COURT TV'S WEBSITE

Courttv.com Message Boards - Observations from the courtroom        Page 1 of 6



**T··Mobile·**
**my Faves** for families

Each person gets
unlimited Any-Network Calling"
to your 5 favorite people
to any phone in the U.S.

  free ph

**court news**



**Courttv.com Message Boards** > **McGuire Murder Trial** > **Observations from the courtroom**

Go to first unread post 🗔        ◁ Last Thread   Next Thread ▷

| Author | Thread | |
| --- | --- | --- |

New thread   post reply

**SummerMadness**
Senior Member

Registered: Oct 2006
Location: On a hammock
between two palm trees
Posts: 1663

**Observations from the courtroom**

Disclaimer- Let me just state up-front that this post is all observations I have made while in the courtroom and in my opinion.

Part 1

9 o'clock- I get to the courthouse so happy that I got a parking spot close by. (no easy feat my friends)

Debate whether to get on line with the attornyes since their line is so much shorter & yellow said that I looked like an attorney. While Im deciding, in walks Steven Turano breathlessly & walks right past everyone & speaks to the deputy-I gues asking if he can cut the line beacuse he is late & Joe T is going to string him up. This does not move the deputy & he is sent to the back of the line, Turano insists & I hear the deputy say 'move to the end of the line. and he does. I have to say that he looks like a really nice guy & he has a kind face, but his hair reminds me of "There's something about Mary" the hair issues again.

Upstairs I see MM mom & step f.
MM mother is elegant looking but aloof, IMO. She is always very well dressed.

I get a seat on the edge of the bench ( for a quick getaway). and observe Joe T looking very serious in his very fitted suit. Extra gel today (the only time I have seen it). I don't see him relax very often he is ALWAYS serious & intense. Good for MM, this is a murder trial after all.

MM is sitting next to him & looks great today. Tan pants & black pinstripe blazer, black shoes & large leather bag. I have to agree with Charm from last night. Today she looks .....pretty. Her profile is

Da79

Courttv.com Message Boards - Observations from the courtroom                    Page 2 of 6

the worst but if she's facing you, she is actually pretty. Did not see that before, BTW.
Madam prosecutor is also there talking quietly to Mr. prosecutor who looks upset. He has the most intense gaze ever. If he looks at you, he does it for a couple of seconds☺

The judge comes in, nobody stands up. There is no fan fare for this man, the only time anyone stands is for the jury.
The jury comes in some laughing some smiling, nobody looks at MM, except a lone woman. No smile just a glance.

Report this post to a moderator | IP: Logged

**Browneyes**
Senior Member

Registered: Sep 2003
Location: In loving memory of my little angel Noah...2/5/01–3/7/04
Posts: 1508

□ 03-28-2007 09:52 PM

Great info. Summer~~~hope you have more to share.

Report this post to a moderator | IP: Logged

**FrankieBones1**
Senior Member

Registered: Jun 2006
Location:
Posts: 5318

□ 03-28-2007 10:10 PM

Summer,
This colour commentary is awesome! Thanks. I hope you continue to keep it up. It is very enjoyable.

Report this post to a moderator | IP: Logged

**checkinuout**
Senior Member

Registered: Mar 2007
Location: N.J.
Posts: 3061

□ 03-28-2007 10:11 PM

Summer is the best, so glad she is my MIL

Report this post to a moderator | IP: Logged

**Bama0f14**
Senior Member

Registered: Mar 2007
Location: Live free or die
Posts: 1181

□ 03-28-2007 10:15 PM

Well so far sogood waiting for next instalment.☺

Report this post to a moderator | IP: Logged

**clannad**
Senior Member

Registered: Jan 2007
Location: Brick, NJ
Posts: 2104

□ 03-28-2007 10:17 PM

Great job, Summer!

Report this post to a moderator | IP: Logged

**yellowcake**
Senior Member

□ 03-28-2007 10:18 PM

That was GREAT! I hope to see more soon! Check, you are related to that woman? You are lucky!

showthread.php?s=0d88960717a502670e3456b4aad72a30&thre...    4/25/2007

Courttv.com Message Boards - Observations from the courtroom                Page 3 of 6

Registered: Mar 2007                                    Report this post to a moderator | IP: Logged
Location: New England
Posts: 1526

🗋 03-28-2007 10:21 PM

**NJ_follower**
Senior Member

Registered: Mar 2007
Location: shore area, nj
Posts: 1881

Thanks Summer-sounds interesting. I saw her at a local store before trial and she seemed very normal and "cute". I agree Turano looks to be nice, too. Maybe Romanyshym was upset b/c he knew the judge was going to rule that way? Did you see that whole debacle in person BTW? Keep 'em coming-you're doing a great job...if I can ever get over there, I'll PM you and maybe we can actually meet and tag team this board with our observations?! LOL-that poor courtroom.

Report this post to a moderator | IP: Logged

🗋 03-28-2007 10:27 PM

**Precisely**
Senior Member

Registered: Jan 2007
Location: On the road again...
Posts: 1170

Please, summer, can we have some more? (In my best Oliver Twist voice).

Report this post to a moderator | IP: Logged

🗋 03-28-2007 10:32 PM

**Datum**
Member

Registered: May 2006
Location:
Posts: 392

More, More! It's fantastic!

Report this post to a moderator | IP: Logged

🗋 03-28-2007 10:34 PM

**Adel99**
Member

Registered: Mar 2007
Location:
Posts: 75

Excellent job, Summer. Really adds to what we see, having you flesh it out.

Report this post to a moderator | IP: Logged

🗋 03-28-2007 10:34 PM

**SummerMadness**
Senior Member

Registered: Oct 2006
Location: On a hammock
between two palm trees
Posts: 1663

quote:
───────────────────────────────
*Originally posted by NJ_follower*
**Thanks Summer-sounds interesting. I saw her at a local store before trial and she seemed very normal and "cute". I agree Turano looks to be nice, too. Maybe Romanyshym was upset b/c he knew the judge was going to rule that way? Did you see that whole debacle in person BTW? Keep 'em coming-you're doing a great job...if I can ever get over there, I'll PM you and maybe we can actually meet and tag team this board with our observations?! LOL-that poor courtroom.**
───────────────────────────────

Da81

You are welcome!

I would love that NJ- come on down.
Yes I saw the whole prosecution smackdown, lol

Report this post to a moderator | IP: Logged

🗎 03-28-2007 10:51 PM

**SummerMadness**
Senior Member

Registered: Oct 2006
Location: On a hammock
between two palm trees
Posts: 1663

Thanks everyone, really, I appreciate it. I wasn't sure if anyone was interested in my ramblings.
Ill go again tomorrow.

Report this post to a moderator | IP: Logged

🗎 03-28-2007 10:53 PM

**clannad**
Senior Member

Registered: Jan 2007
Location: Brick, NJ
Posts: 2104

quote:
─────────────────────────
*Originally posted by SummerMadness*
**Thanks everyone, really, I appreciate it. I wasn't sure if anyone was interested in my ramblings. Ill go again tomorrow.**
─────────────────────────

Thanks Summer, I can't wait for the next installment tomorrow!

Report this post to a moderator | IP: Logged

🗎 03-28-2007 10:55 PM

**mm411**
Member

Registered: Jun 2006
Location: CA
Posts: 223

quote:
─────────────────────────
*Originally posted by SummerMadness*
**Thanks everyone, really, I appreciate it. I wasn't sure if anyone was interested in my ramblings. Ill go again tomorrow.**
─────────────────────────

Oh my gosh...you know us by now, we hang on your every word and detail!
Thanks!

Report this post to a moderator | IP: Logged

🗎 03-28-2007 11:24 PM

**SummerMadness**
Senior Member

[QUOTE]*Originally posted by Cornblossom*
**Not interested???? I want to know what kind of kleenex they use if they sneeeeze LMAO** [/QUOTE

Da82

Courttv.com Message Boards - Observations from the courtroom                    Page 5 of 6

Registered: Oct 2006
Location: On a hammock
between two palm trees
Posts: 1663                            Puffs plus.

                                    Report this post to a moderator | IP: Logged

☐ 03-28-2007 11:27 PM

**Dunlurken**
Senior Member                         Let me add, that I was just reading from work, and when I saw that
                                      you would post your reactions later, I had to keep coming back to
Registered: Aug 2004                  see what you had posted.
Location:
Posts: 4105                           Thank you so much. We do LOVE what posters think about the
                                      proceedings. Were you there for the bag testimony? I missed all of
                                      it today. Whaaaaaaaaaaa! Going to the daily thread to see what I
                                      missed. JMO.

                                      

                                    Report this post to a moderator | IP: Logged

☐ 03-28-2007 11:38 PM

**seawolf4**
Member                                Thank you so much for your posts. Always love to get a view from
                                      the inside,
Registered: Aug 2006
Location: Long Island, NY           Report this post to a moderator | IP: Logged
Posts: 167

☐ 03-28-2007 11:40 PM

**Laney25**
Member
                                      Me too. I like the tidbits of inside info from the courtroom. It's
Registered: Mar 2007                  interesting details that make much of the sometimes ritualistic
Location: Thoroughbred country,       boring proceedings worth watching. Thanks SM!
SC
Posts: 213                          Report this post to a moderator | IP: Logged

☐ 03-29-2007 12:35 AM

**Kelly3820**
Member                                Thank you SummerMadness for taking the time to post your
                                      observations. It means alot when your glued to this trial like I am
Registered: Sep 2006                  and then come on hear and be able to read a fellow poster's
Location:                             thoughts of the trial. Turano does look kind. He reminds me of one
Posts: 332                            of my brother's friends. JT is a hunk and one heck of a lawyer. I just
                                      bet he smells good☺ Patty looks thin on TV is she thinner in
                                      person? Also thanks for the jury observation! They are and will be
                                      the most important part of this in the end. Can't wait for more!
                                      Thanks again!!!!!

                                    Report this post to a moderator | IP: Logged

☐ 03-29-2007 04:41 AM

**sciencegirl**
Senior Member                         bump

Registered: Oct 2006                Report this post to a moderator | IP: Logged

Da83

Courttv.com Message Boards - Observations from the courtroom          Page 6 of 6

Location: Happily @ Home With
My Dog Molly
Posts: 2379

□ 03-30-2007 02:11 PM

All times are GMT. The time now is 06:21 PM.
The correct time for your location is displayed while logged in.

◁ Last Thread    Next Thread ▷

Show Printable Version | Email this Page | Subscribe to this Thread

**Forum Jump:**
McGuire Murder Trial

**Rate This Thread:**
Select a rating...

**Forum Rules:**
You may not post new threads    HTML code is OFF
You may not post replies         vB code is ON
You may not post attachments     Smilies are ON
You may not edit your posts      [IMG] code is OFF

monster    Accelerate your time-to-hire with Resume Search.    Learn More

**< Contact Us - Courttv.com Home >**

Powered by: vBulletin Version 2.2.6
Copyright ©2000- 2002, Jelsoft Enterprises Limited.
All content Copyright Courtroom Television Network, LLC., All Rights Reserved.

Da84

Courttv.com Message Boards - Observations from the courtrom 3/29



### Courttv.com Message Boards > McGuire Murder Trial > Observations from the courtrom 3/29

Go to first unread post 🔘        ◁ Last Thread   Next Thread ▷

| Author | Thread | new thread   post reply |
|---|---|---|

**SummerMadness**
Senior Member

Registered: Oct 2006
Location: On a hammock
between two palm trees
Posts: 1663

**Observations from the courtrom 3/29**

Good morning everyone!

Again, these are my observations, in my opinion. Im going to tell you what I saw, as I saw it. From 9-12 this morning.

CT=courtroom

Got a parking space at a 4 hour meter. I was so happy you would think I won Lotto.

Got to the 5th floor at 9:10. MM mom & stepdad are outside the CT as usual.

Inside the judge is asking everyone to move the proceedings along & DON'T BORE the jury.
plot spoiler- Nobody listened.

Everyone is looking spify. MM has a plum dress on with a long black knit duster on top.

Again the jurors do not look at MM when filing in. some look at the judge & say good morning to him.

There is a female juror who has very hard eyes. She cuts them much like MM does. This morning she is staring at MM. I have been really looking at her, she intrigues me.

Report this post to a moderator | IP: Logged

🗐 03-29-2007 06:24 PM

**redfox**
Member

what is the pin

Da85

Registered: Dec 2005
Location: Florida
Posts: 74

MM wears each day?

Love your posts-- btw--great job!

Report this post to a moderator | IP: Logged

☐ 03-29-2007 06:59 PM

**Dunlurken**
Senior Member

Registered: Aug 2004
Location:
Posts: 4105

So, the jurors aren't looking at her. That is very telling if you ask
me. JMO.

Thanks Summer.

Report this post to a moderator | IP: Logged

☐ 03-29-2007 07:00 PM

**SummerMadness**
Senior Member

Registered: Oct 2006
Location: On a hammock
between two palm trees
Posts: 1663

Re: Observations from the courtrom 3/29

quote:
_____

*Originally posted by SummerMadness*
**Good morning everyone!**

**Again, these are my observations, in my opinion.
Im going to tell you what I saw, as I saw it. From
9-12 this morning.**

**CR=courtroom**

**Got a parking space at a 4 hour meter. I was so
happy you would think I won Lotto.**

**Got to the 5th floor at 9:10. MM mom & stepdad
are outside the CR as usual.**

**Inside the judge is asking everyone to move the
proceedings along & DON'T BORE the jury.
plot spoiler- Nobody listened.**

**Everyone is looking spify. MM has a plum dress on
with a long black knit duster on top.**

**Again the jurors do not look at MM when filing in.
some look at the judge & say good morning to
him.**

**There is a female juror who has very hard eyes.
She cuts them much like MM does. This morning
she is staring at MM. I have been really looking at
her, she intrigues me.**
_____

Stupid me I sent this before I had finished. Sorry-

Moving on-
The deputy that guards the jury is a jovial sort, he smiles & grins all the time. sometimes he just grins wildly at noone. Im mystified.

Half of the jurors are looking at P.P, the other half are turned away from her, totally turned towards the witness.

MM is writing furiously. JT is highlighting stuff on his notes w/ a pink highlighter.

Two more women are looking at MM.

JT & MM are now talking while the still camera clicks non-stop. Turano is always left out of these little pow-wows, only because JT & MM are sitting so close- I think.

Everyone in the CT is looking intently at the flow chart that is up on the screen.

Now, a lot of the jurors are looking at JT, he is up on cross.

There's a woman juror that is a wonder to watch. She alternates between an array of faces. I think this is just her & they don't mean anything. However if you haven't seen her before, the faces she makes may seem bizarre.
She was looking at JT & the witness as if it was a game of ping-pong, back & forth furiously. Oh, and her mouth was sort of hanging open, and she was squinting.

JT made a joke (Cherokee) and the jury, judge, MM & gallery laughed.

Jurors looked confused with the bag fold testimony.

I just noticed that one of the jurors is sitting outside the jury box. Much lower, you cannot see her at all. WTH.

Is JT a weight lifter? He has really broad shoulders.

The reporter in front of me is looking at the jury. Trying to read them perhaps? Then I see him talking to the guy next to him, and I hear him say "the blonde" I think its the juror with her mouth hanging open (the 1 I noticed before) I wish I could read his columm.

JT cracks another joke, and everyone laughs or smiles, He seems to be more relaxed today.

The judge admonisheS JT, but in such a nice way that everyone smiles. JT says he is no expert on DNA and again everyone smiles. One female jurors has a big grin on her face.

Courttv.com Message Boards - Observations from the courtrom 3/29                    Page 4 of 9

P.P is looking at JT like he's lost his mind

Im sleepy-the girl next to me looks like sh's sleeping too. I can't stop yawning...

what the heck is MM writing War & Peace II? she is also leafing through documents.

Recess- Everyone heads outside- Nothing going on. Mm is nowhere to be found. a couple that was in the courtroom is talking to MM parents.
Back in-
Jean Casarez just entered the CR. She looks very nice. She is left handed. .
It's 11:10

Rupol? I thought they were talking about the drag queen. Wake up! Blonde moment.

One of the male jurors looks like he fell asleep, maybe just resting his eyes?
The looney deputy is ginning wildly again.... at me I make a face at him to make sure, and he acknowledges it & grins somemore. I have officially entered The Twighlight Zone.
Someone from the pros team sneezes & JT says"god bless you"

Someone just came in that smells like a Glade candle. UGH!!

Jt makes another joke & everyone laughs.

JT is on a roll today.

I am outta here.


Summer

Report this post to a moderator | IP: Logged

🗎 03-29-2007 07:05 PM

**Dunlurken**
Senior Member

Registered: Aug 2004
Location:
Posts: 4105

Thanks again! I wonder why JT keeps cracking jokes? Maybe trying to lighten the place up a bit, like we do here sometimes.

Report this post to a moderator | IP: Logged

🗎 03-29-2007 07:12 PM

**Jury'sOut**
Senior Member

Registered: Mar 2007
Location: Chronic Curiosity
Posts: 1182

That's a great recap, thanks!

Think the "low" juror is an alternate, maybe?

Report this post to a moderator | IP: Logged

🗎 03-29-2007 07:16 PM

Da88

Courttv.com Message Boards - Observations from the courtrom 3/29          Page 5

**Jury'sOut**
Senior Member

Registered: Mar 2007
Location: Chronic Curiosity
Posts: 1182

..I forgot...

I thought they were talking about RuPaul, too.

I'm half listening to Extra at the office.

Yes, I'm blonde.

Report this post to a moderator | IP: Logged

🗎 03-29-2007 07:17 PM

**So_over_it**
Member

Registered: Mar 2007
Location:
Posts: 371

Great stuff, Summer! Thanks! You're a riot!

Report this post to a moderator | IP: Logged

🗎 03-29-2007 07:21 PM

**Manning18**
Member

Registered: Feb 2007
Location: My Opinion Only
Posts: 38

Re: what is the pin

quote:
_____
*Originally posted by redfox*
**MM wears each day?**

**Love your posts-- btw--great job!**
_____

It has something to do with Autism.

Report this post to a moderator | IP: Logged

🗎 03-29-2007 07:25 PM

**sciencegirl**
Senior Member

Registered: Oct 2006
Location: Happily @ Home With
My Dog Molly
Posts: 2379

Re: what is the pin

quote:
_____
*Originally posted by redfox*
**MM wears each day?**

**Love your posts-- btw--great job!**
_____

It is an Autism Speaks pin. See link

http://images.google.com/images?q=a...m=1&sa=N&tab=wl

Report this post to a moderator | IP: Logged

Da89

.com Message Boards - Observations from the courtroom 3/29

03-29-2007 07:35 PM

**dtviewer**
Member

Registered: Mar 2007
Location:
Posts: 599

Re: what is the pin

quote:

> Originally posted by redfox
> **MM wears each day?**
>
> **Love your posts-- btw--great job!**

Its an "A" for adulterer.

J/K Its for Autisim Awareness

03-29-2007 07:37 PM

**Laney25**
Member

Registered: Mar 2007
Location: Thoroughbred country, SC
Posts: 213

Re: Re: what is the pin

quote:

> Originally posted by dtviewer
>
> **Its an "A" for adulterer.**
>
> **J/K Its for Autisim Awareness**

It looks like a big ole "A"......the Scarlet Letter...uh huh, Adulterer.

03-29-2007 08:25 PM

**LNL**
Member

Registered: Sep 2003
Location: Wipe.....My ignore list is longer than a roll of Charmin.
Posts: 712

Great courtroom updates. Thanks Summer.

03-29-2007 08:56 PM

**clannad**
Senior Member

Registered: Jan 2007
Location: Brick, NJ
Posts: 2104

Great updates, Summer. Thanks!!! Wanna borrow my hat? LOL

03-29-2007 09:05 PM

Report this post to a moderator | IP: Logged

Report this post to a moderator | IP: Logged

Report this post to a moderator | IP: Logged

Report this post to a moderator | IP: Logged

...com/showthread.php?s=0d88960717a502670e3456b4aad72a30&thre...   4/25/2007

Da90

Courttv.com Message Boards - Observations from the courtrom 3/29                    Page 7 of 9

**kakax**
Member

Registered: Mar 2007
Location: Augusta, GA
Posts: 204

You are fabulous LOL!! They need to give you a spot on Court TV !!!
Please, please, please keep it up!!!

Report this post to a moderator | IP: Logged

□ 03-29-2007 09:36 PM

**Precisely**
Senior Member

Registered: Jan 2007
Location: On the road again...
Posts: 1170

Thanks, Summer!                This is the most I've gotten today and
its great stuff.

FYI: The guy who is making the funny faces might have Tourette Syndrome.

Report this post to a moderator | IP: Logged

□ 03-29-2007 09:44 PM

**Kelly3820**
Member

Registered: Sep 2006
Location:
Posts: 332

I find it interesting that the jurors don't look at MM but do seem to
like JT. I wonder how this will play out? Thanks bunches to Summer
for being there and taking the time to update us all

Report this post to a moderator | IP: Logged

□ 03-29-2007 10:27 PM

**psbperu**
Member

Registered: Aug 2002
Location: Isla del Sol, Florida
Posts: 346

Summer:

Your efforts are greatly appreciated. Thanks for the "human
interest" angle.

Report this post to a moderator | IP: Logged

□ 03-29-2007 10:49 PM

**SummerMadness**
Senior Member

Registered: Oct 2006
Location: On a hammock
between two palm trees
Posts: 1663

THANKS EVERYONE!!!!!
I enjoy going to the trial & doing this.

I forgot to add that yesterday & today, reporters were waiting
outside with cameras & microphones. I asked a deputy why they
were there (as if I didn't know) & he said simply "that McGuire
chick's trial"

Report this post to a moderator | IP: Logged

□ 03-29-2007 11:11 PM

**FrankieBones1**
Senior Member

Registered: Jun 2006
Location:
Posts: 5318

Thanks again for another delightful commentary, Summer.

Report this post to a moderator | IP: Logged

□ 03-29-2007 11:33 PM

**adair**
Senior Member

Good Job Summer!!!

Registered: Aug 2005
Location:
Posts: 1315

Report this post to a moderator | IP: Logged

🗋 03-29-2007 11:35 PM

**Bama0f14**
Senior Member

wonderful, excelent great Job keep up the good work I love it

Registered: Mar 2007
Location: Live free or die
Posts: 1181

thanks 🏵

Report this post to a moderator | IP: Logged

🗋 03-30-2007 01:51 AM

**annalyzer**
Senior Member

Thanks summer. 😊

Registered: Jan 2007
Location:
Posts: 1662

Report this post to a moderator | IP: Logged

🗋 03-30-2007 02:45 AM

**Topaz**
Member

**Fascinating!!**

Registered: Feb 2007
Location: State of Confusion
Posts: 283

Thanks Summer... this thread is very interesting.

I am enjoying it immensely! 😊

Report this post to a moderator | IP: Logged

🗋 03-30-2007 01:39 PM

**FrankieBones1**
Senior Member

quote:

Registered: Jun 2006
Location:
Posts: 5318

_Originally posted by SummerMadness_
**THANKS EVERYONE!!!!!**
**I enjoy going to the trial & doing this.**

**I forgot to add that yesterday & today, reporters were waiting outside with cameras & microphones. I asked a deputy why they were there (as if I didn't know) & he said simply "that McGuire chick's trial"**

Will you be going back there today? Looking forward to more updates.

Report this post to a moderator | IP: Logged

🗋 03-30-2007 02:22 PM

All times are GMT. The time now is 06:20 PM.
The correct time for your location is displayed while logged in.

◁ Last Thread   Next Thread ▷

🖨 Show Printable Version | 📧 Email this Page | 📋 Subscribe to this Thread

Forum Jump:
[McGuire Murder Trial                              ]  ▣ ⬛

Rate This Thread:
[Select a rating...]  ▣ ⬛

**Forum Rules:**

| | |
|---|---|
| You **may not** post new threads | HTML code is **OFF** |
| You **may not** post replies | vB code is **ON** |
| You **may not** post attachments | Smilies are **ON** |
| You **may not** edit your posts | [IMG] code is **OFF** |

Web-Only Blowout Sale
FREE BlackBerry 7105t!
Mobile
stick togel

< **Contact Us** - **Courttv.com Home** >

Powered by: vBulletin Version 2.2.6
Copyright ©2000- 2002, Jelsoft Enterprises Limited.
All content Copyright Courtroom Television Network, LLC., All Rights Reserved.

Da93





court news

**⊞ Courttv.com Message Boards > McGuire Murder Trial > Observations from the courtroom 4/2**

Go to first unread post 🔖                                          ◁ Last Thread   Next Thread ▷

| Author | Thread | |
|---|---|---|

**SummerMadness**
Senior Member

Reg'     '006          Observations from the courtroom 4/2
Loca      mock
betw       rees
Posts:

I get out of my job at 12:30, in plenty of time to pick up my sidekick-daughter & head to the courthouse.
I call her but she informs me she overslept & will not be ready on time. Just as well because last time I spoke to her last night I told her what was on the agenda FIND OUT WHAT JOE SMELLS LIKE-she said-"mom please don't embarrass me" I said "I can't promise anything". I should have invited my MIL, a woman after my own heart (long on nerve, short on common sense).

So I head out alone- Get there no problem. right away I see 3 jurors walking by the side of the building. Two women & one man. They are smiling & chatting. When I pass by the courthouse MM is going in the main door while the photographers click away. The song that is playing on the radio is Invisible Sun by The Police; Im looking at MM as the lyrics are swimming in my head-
"I don't want to spend my time in hell, looking at the walls of a prison cell "
"I don't ever want to play the part of a statistic on a government chart".
If you believe in omens- MM goose is cooked.

I park with no drama, on the first floor of a 6 story parking garage.
Im happy- like having 5 numbers of a 6 number lottery.
I walk in the elevator & see a reporter & try to make small talk. He is having none of it. I ask him who he works for-he says Star Ledger, he has covered the MM mess for 3 years. doesn't seem happy about this fact. I ask-So what do you think? He grunts & walks out of the elevator without a word.
O.K be that way, you rude....

I walk in the courtroom & mark my territory with my coat & head out to the bathroom. When I walk out I almost bump into MM & ST

Da94

who are walking in. She is talking animately & he is smiling. JT is not with them. I walk in the bathroom & it's empty, when I walk out of the stall, MM mom is there. She looks very nice, & is wearing a tan raincoat. I wash my hands & walk out without a word.

PP is now on direct-Everyone is paying attention to the mitochondrial DNA testimony. Some ladies are taking notes.

It is now that I see the camear that is above the witness move. It is controlled remotely.It looks like a little monster from Alien & I am mesmerized by it.
Deputy De Vito is not sitting in his usual spot. I can't see him at all.
Mr. R is wrting.
MM is not.
The girl that used to take notes & show them to MM parents is in today, but she is NOT taking notes.
Most of the jurors are taking notes about the bucal swab LE took from MM. Very telling.
MM is also taking notes of this. Jury keeps taking notes.

ST is up on cross.Does not greet the witness, goes right into the meat of the matter.
Some of the female jurors are looking at ST. The female I told you about the other day, the one with all the facial expressions, says something to the lady next to her. It appears to be something funny because they both giggle & look at ST.
The judge asks a question of the witness. Everyone is focused on the judge. Good question.
The 2 jurors are talking again. One of them is shielding her face with her legal yellow pad. I have no idea what is going on.

Recess- I go outside. Reporters are talking to MM mom. I see MM walk out of the courtroom with a quilted black coat over her shoulders, her stepfather is half way up the room & meets her. They appear to be very close.
Joe passes by talking to someone- He SMELLS GOOD, its SUBTLE CLEAN & EXPENSIVE. I stalk him like prey, but he is talking to several people. Several press members touch his arm as they go by, he says hello.
To go back in the courtroom, I have to squeeze between ST & JT (eat your heart out Charm) it's a tight squeeze
☺
Back in the courtroom I am looking at PP, she is talking to some ladies that are always in the courtroom. She seems to be super nice. Very sweet & kind. I like her a lot.
PP is super thin but her clothes fit her well.
JT is joking with the judge & the judge responds in kind. They have an easy rapport.
The court clerk is handing some white & pink papers to the press.
Hey what about me, Im summermadness darn it.
An investigator is now on the stand. There's one woman & one man taking notes.
ST talks to JT.
Jt takes notes.

Mr R is up now but seems to be fumbling with notes & promptly sits down.
JT is up on cross- He greets the investigator & asks how he is. Very smooth this Joe, like butta. He is polite to a fault.
He kids around with the investigator & everyone smiles easily.

A thought pops in my warped mind- If Jt & MM had a child, what would it look like? Its cheekbones would be so high & sharp they would cut glass, the hair would be so dark & curly it would make you seasick. Sorry Im daydreaming.
3:15 & we are done.

After court recesses for the day, I sit there to see what is coming up.
I see the grinning deputy out of the corner of my eye, he is looking at me. I decide to look at him, "I've missed you crazy man" lol He gives me the biggest grin I have ever seen, complete with eyebrow flexing.The girl next to me looks at him & then at me aware of the exchange. Ooops, i think we have been outed.

Mr R is arguing loudly. This is an exitable boy.
The judge mentions the pros may end its presentation on Thrus.

There is a SMACKDOWN in the courtroom. PP is complaining to the judge and is accussing the defense team of some very dastardly things, she looks & sounds very upset.
The judge will have none of it. He puts her in her place ASAP. He tells her that they have vigorously investigated this case for more than 3 years & they are still coming up with experts at the eleventh hour. He questions the wisdom of putting up another expert with inconclusive test results.
The judge is so reasonable & so fair that PP sits down without arguing further. I love this man, he makes Solomon proud.
He should be on Super Nanny- Go to your naughty corner Ms.Preciozo.

Report this post to a moderator | IP: Logged

04-03-2007 12:00 AM

**NJ_follower**
Senior Member

Registered: Mar 2007
Location: shore area, nj
Posts: 1881

FANTASTIC! I just posted on the PM thread "where is Summer and her report" and here you are. Sounds like a good day. I can just picture you following in Tacopina's wake, taking a slow deliberate breath trying not to appear obvious LOL! Going tomorrow again?

Report this post to a moderator | IP: Logged

04-03-2007 12:07 AM

**clannad**
Senior Member

Registered: Jan 2007
Location: Brick, NJ
Posts: 2104

Another great post, Summer!!! I think I may be able to identify JT's scent just from your description! Thanks Summer!!!

Report this post to a moderator | IP: Logged

04-03-2007 12:12 AM

Courttv.com Message Boards - Observations from the courtroom 4/2          Page 4 of 13

**sciencegirl**
Senior Member

Registered: Oct 2006
Location: Happily @ Home With
My Dog Molly
Posts: 2379

Great job Summer. I love these reports. Next time you go; could you slip JT a note and tell him I want to have his baby 🐵

I sure would have engaged MM's mom in the bathroom. Say something like "so, whatca think about your daughter killing her husband"; does she get that anger from your side or your husband's side. 😊

Keep up the good work. I love these reports.

Report this post to a moderator | IP: Logged

🔲 04-03-2007 12:15 AM        🔳 🔳 🔳 🔳 🔳                    🔳 🔳

**Avalon**
Senior Member

Registered: Feb 2007
Location: Philly
Posts: 1963

Thanks, Summer! I haven't had a chance to review in detail but first I wanted to ask about the discussion board -- I just to tried to log on and it's closed, and I don't see an evening board. Hope we're not shut down! 😊

Report this post to a moderator | IP: Logged

🔲 04-03-2007 12:17 AM        🔳 🔳 🔳 🔳 🔳                    🔳 🔳

**psbperu**
Member

Registered: Aug 2002
Location: Isla del Sol, Florida
Posts: 346

Just great Summer!

Thank you from the bottom of my heart.

Joan

Report this post to a moderator | IP: Logged

🔲 04-03-2007 12:19 AM        🔳 🔳 🔳 🔳 🔳                    🔳 🔳

**FrankieBones1**
Senior Member

Registered: Jun 2006
Location:
Posts: 5318

You did it again, Summer! Another fantastic courtroom update.

Report this post to a moderator | IP: Logged

🔲 04-03-2007 12:19 AM        🔳 🔳 🔳 🔳 🔳                    🔳 🔳

**Marlena**
Member

Registered: Mar 2007
Location:
Posts: 275

**Oh man, I would have engaged the Mom too. I would have just whispered quietly to her, "Don't worry Ma'am. Everything will work out for the best. You'll see!"**

**How can a Mom resist such a consolation????**

**I also would have put my hand on JT's back as I passed him in the hallway, just to see if his suit had good hand!! 😊**

**Marl...**

Report this post to a moderator | IP: Logged

Da97

Courttv.com Message Boards - Observations from the courtroom 4/2          Page 5 of 13

---

**04-03-2007 12:20 AM**

**BamaOf14**
Senior Member

Registered: Mar 2007
Location: Live free or die
Posts: 1181

That was fantastic i love your reports keep them coming you really do a great job.

Report this post to a moderator | IP: Logged

---

**04-03-2007 12:22 AM**

**Avalon**
Senior Member

Registered: Feb 2007
Location: Philly
Posts: 1963

[QUOTE]*Originally posted by sciencegirl*
**Great job Summer. I love these reports. Next time you go, could you slip JT a note and tell him I want to have his baby**

**I sure would have engaged MM's mom in the bathroom. Say something like "so, whatca think about your daughter killing her husband"; does she get that anger from your side or your husband's side.**

**Keep up the good work. I love these reports. [/QUOTE]**

Double ☒ to both Summer's report and SC's comment about what she'd say to MM's mother.

Summer, you MUST write a book! Your talent must not be wasted. "I'm SummerMadness, darn it!" OMG, I'm still laughing.

If I were there, I would want to touch the reporters who touched JT as he went by......(sigh....)...

Report this post to a moderator | IP: Logged

---

**04-03-2007 12:24 AM**

**bluwater**
Member

Registered: Mar 2007
Location: ...stuck in the middle with you...
Posts: 453

Summer, you rock!
So, do you think DD overslept on purpose? I hope someday she will appreciate how cool her mom is!
Great insights and humorous delivery. You ARE Summermadness and you should be treated with at least as much dignity as the press!
Will you be back tomorrow?

You did gross me out about JT and MM having a baby. Wicked thoughts.

Report this post to a moderator | IP: Logged

---

**04-03-2007 12:25 AM**

**rocki**
Senior Member

Registered: Apr 2006
Location: In the Witness Protection Program

Summer you are FABulous!!! I love the way you write. I sit here laughing and feel like i'm there. I can 'see' it all. You've got a gift girl! Thanx!

---

Posts: 1964

And you sound like you're enjoying yourself. Before this is over you'll be interviewing JoeT.

I still think that both sides have people monitoring these boards - to see what 'us commoners' think.

Report this post to a moderator | IP: Logged

🗎 04-03-2007 12:28 AM

**court~critic1**®
Member

Registered: Jun 2004
Location: 3rd. rock from the sun
Posts: 234

Fantastic job , Summer. Thanks!!!!

You can bet I would have made it a looooong squeeze between Joe and ST. then I would have swooned so he would have had to catch me. 😊

Report this post to a moderator | IP: Logged

🗎 04-03-2007 12:36 AM

**Greg_Smith**
Member

Registered: Apr 2007
Location: San Diego, CA
Posts: 11

Summermadness you are too much! You make a terrific "color" announcer. I registered just to tell you that your fan club is growing.

BTW, "white wale corduroy" probably was "wide wale corduroy" -- you know, the kind with the thick ridges.

Report this post to a moderator | IP: Logged

🗎 04-03-2007 12:43 AM

**theDeejay**
Member

Registered: Sep 2003
Location:
Posts: 761

SUM! You are brilliant!! Excellent reporting!

You can't manage to catch JT for a second to ask about his fragrance? Does he *run* outta the courtroom?

Report this post to a moderator | IP: Logged

🗎 04-03-2007 12:43 AM

**Browneyes**
Senior Member

Registered: Sep 2003
Location: In loving memory of my little angel Noah...2/5/01-3/7/04
Posts: 1508

Thanks Summer~~~I too felt like I was right there with you. I love your sense of humor. You really should write a book. 😊

Are you going to be in the courtroom tomorrow?

Report this post to a moderator | IP: Logged

🗎 04-03-2007 12:44 AM

**NJ_follower**
Senior Member

Registered: Mar 2007

Hi Summer-thx for update. Were you there for the outcome of the afternoon arguments after jury's dismissal.. EXTRA cut out for some reason & we couldn't see how the judge ruled? What was the deal-why was he so mad at PP? I'm PM'ing and posting on your thread to

Da99

Location: shore area, nj
Posts: 1881

be sure you get this ---thanks!

Report this post to a moderator | IP: Logged

🗎 04-03-2007 12:46 AM

**theDeejay**
Member

Registered: Sep 2003
Location:
Posts: 761

quote:

Originally posted by NJ_follower
**Hi Summer-thx for update. Were you there for the outcome of the afternoon arguments after jury's dismissal.. EXTRA cut out for some reason & we couldn't see how the judge ruled? What was the deal-why was he so mad at PP? I'm PM'ing and posting on your thread to be sure you get this --- thanks!**

Extra cut out for me as well.....JUST as the judge was going to speak and rule on the issue....I was 😵 😵

Report this post to a moderator | IP: Logged

🗎 04-03-2007 12:59 AM

**Laney25**
Member

Registered: Mar 2007
Location: Thoroughbred country, SC
Posts: 213

quote:

Originally posted by theDeejay

**Extra cut out for me as well.....JUST as the judge was going
to speak and rule on the issue....I was** 😵 😵

As the "expensive" waft of JT's essence hits MM's senses, she edges ever closer to him as the days go by....thoughts of a love child with black curly greasy hair, cheekbones that would cut glass, black piercing cold eyes....like a "doll's eyes" flow through MM's twisted mind. OH gawd, not again! Hey Brad!!! You can stop running. She's found another!!

Report this post to a moderator | IP: Logged

🗎 04-03-2007 02:30 AM

**waynecountygirl**
Member

Registered: Jan 2007
Location:
Posts: 157

Keep them coming. I so enjoy reading your posts...and it's helpful to have that "real" view of the courtroom....

Report this post to a moderator | IP: Logged

Da100

Courttv.com Message Boards - Observations from the courtroom 4/2                    Page 8 of 13

■ 04-03-2007 04:14 AM

**Goal Post**
Member

Registered: Mar 2007
Location:
Posts: 30

If laughter is the best medicine, we're all gonna live a long time...

G'nite all

Report this post to a moderator | IP: Logged

■ 04-03-2007 04:26 AM

**velvetbrown**
Member

Registered: Oct 2004
Location: houston tx
Posts: 160

**Thanks Summer**

You have a great talent and humor. "This is Summer Madness from Court TV, and today I'm reporting from..."

Report this post to a moderator | IP: Logged

■ 04-03-2007 04:56 AM

**lynbit**
Member

Registered: Mar 2007
Location: VA
Posts: 146

Summer you are amazing. Your attention to detail is amazing and the fact that you can remember it to come back and share it with us is wonderful. I was following the board posts when the idea was birthed for you to do these. You jumped right on the idea and WOW. Thank you!!

Report this post to a moderator | IP: Logged

■ 04-03-2007 04:57 AM

**Kelly3820**
Member

Registered: Sep 2006
Location:
Posts: 332

HE SMELLS GOOOOOOOOODI!!!! Thats what we all wanted to hear☺ I would say if we ever find out what that SUBTLE CLEAN and EXPENSIVE man juice is ithe company will see sales jump 120%. Thanks bunches Summer!!! I always get the feeling that the prosecution feels that the defense is always trying to dirty trick them or slip some papers to the jury that the prosecution haven't seen. But I like PP. I just think that she is a good woman. The guy prosecutor I don't care for so much. When he gets nervous or heated he acts like whiny ninny. JMO I love this Judge. He owns his courtroom and dosen't let the the lawyers run amuck. Nothing makes me madder at a trial to see a courtoom being taken over by any lawyer and the Judge sitting like a lump. This Judge ROCKS!!! Once again but its never enough thanks for taking time out of your day and going to the trial and then taking more time and posting for

us. Your smarts and good humor shine thru Summer

Report this post to a moderator | IP: Logged

■ 04-03-2007 05:16 AM

**MadeinBrooklyn**
Member

Registered: Oct 2006
Location: Colorado

**Re: Observations from the courtroom 4/2**

quote:
_____

Da101

Posts: 15

*Originally posted by SummerMadness*
I get out of my job at 12:30, in plenty of time to pick up my sidekick-daughter & head to the courthouse.
I call her but she informs me she overslept & will not be ready on time. Just as well because last time I spoke to her last night I told her what was on the agenda FIND OUT WHAT JOE SMELLS LIKE- she said-"mom please don't embarrass me" I said "I can't promise anything". I should have invited my MIL, a woman after my own heart (long on nerve, short on common sense).

So I head out alone- Get there no problem. right away I see 3 jurors walking by the side of the building. Two women & one man. They are smiling & chatting. When I pass by the courthouse MM is going in the main door while the photographers click away. The song that is playing on the radio is Invisible Sun by The Police; Im looking at MM as the lyrics are swimming in my head-
"I don't want to spend my time in hell, looking at the walls of a prison cell "
"I don't ever want to play the part of a statistic on a government chart".
If you believe in omens- MM goose is cooked.

I park with no drama, on the first floor of a 6 story parking garage. Im happy- like having 5 numbers of a 6 number lottery.
I walk in the elevator & see a reporter & try to make small talk. He is having none of it. I ask him who he works for-he says Star Ledger, he has covered the MM mess for 3 years. doesn't seem happy about this fact. I ask-So what do you think? He grunts & walks out of the elevator without a word.
O.K be that way, you rude....

I walk in the courtroom & mark my territory with my coat & head out to the bathroom. When I walk out I almost bump into MM & ST who are walking in. She is talking animately & he is smiling. JT is not with them. I walk in the bathroom & it's empty, when I walk out of the stall, MM mom is there. She looks very nice, & is wearing a tan raincoat. I wash my hands & walk out without a word.

PP is now on direct-Everyone is paying attention to the mitochondrial DNA testimony. Some ladies are taking notes.

It is now that I see the camear that is above the

witness move. It is controlled remotely.It looks
like a little monster from Alien & I am mesmerized
by it.
Deputy De Vito is not sitting in his usual spot. I
can't see him at all.
Mr. R is wrting.
MM is not.
The girl that used to take notes & show them to
MM parents is in today, but she is NOT taking
notes.
Most of the jurors are taking notes about the bucal
swab LE took from MM. Very telling.
MM is also taking notes of this. Jury keeps taking
notes.

ST is up on cross.Does not greet the witness, goes
right into the meat of the matter.
Some of the female jurors are looking at ST. The
female I told you about the other day, the one
with all the facial expressions, says something to
the lady next to her. It appears to be something
funny because they both giggle & look at ST.
The judge asks a question of the witness.
Everyone is focused on the judge. Good question.
The 2 jurors are talking again. One of them is
shielding her face with her legal yellow pad. I
have no idea what is going on.

Recess- I go outside. Reporters are talking to MM
mom. I see MM walk out of the courtroom with a
quilted black coat over her shoulders, her
stepfather is half way up the room & meets her.
They appear to be very close.
Joe passes by talking to someone- He SMELLS
GOOD, its SUBTLE CLEAN & EXPENSSIVE. I stalk
him like prey, but he is talking to several people.
Several press members touch his arm as they go
by, he says hello.
To go back in the courtroom, I have to squeeze
between ST & JT
(eat your heart out Charm) it's a tight squeeze
☺

Back in the courtroom I am looking at PP, she is
talking to some ladies that are always in the
courtroom. She seems to be super nice. Very
sweet & kind. I like her a lot.
PP is super thin but her clothes fit her well.
JT is joking with the judge & the judge responds in
kind. They have an easy rapport.
The court clerk is handing some white & pink
papers to the press.
Hey what about me, Im summermadness darn it.
An investigator is now on the stand. There's one
woman & one man taking notes.

Da103

ST talks to JT.
Jt takes notes.
Mr R is up now but seems to be fumbling with
notes & promptly sits down.
JT is up on cross- He greets the investigator &
asks how he is. Very smooth this Joe, like butta.
He is polite to a fault.
He kids around with the investigator & everyone
smiles easily.

A thought pops in my warped mind- If Jt & MM
had a child, what would it look like? Its
cheekbones would be so high & sharp they would
cut glass, the hair would be so dark & curly it
would make you seasick. Sorry Im daydreaming.
3:15 & we are done.

After court recesses for the day, I sit there to see
what is coming up.
I see the grinning deputy out of the corner of my
eye, he is looking at me. I decide to look at him,
"I've missed you crazy man" lol He gives me the
biggest grin I have ever seen, complete with
eyebrow flexing.The girl next to me looks at him &
then at me
aware of the exchange. Ooops, i think we have
been outed.

Mr R is arguing loudly. This is an exitable boy.
The judge mentions the pros may end its
presentation on Thrus.

There is a SMACKDOWN in the courtroom. PP is
complaining to the judge and is accussing the
defense team of some very dastardly things, she
looks & sounds very upset.
The judge will have none of it. He puts her in her
place ASAP. He tells her that they have vigorously
investigated this case for more than 3 years &
they are still coming up with experts at the
eleventh hour. He questions the wisdom of putting
up another expert with inconclusive test results.
The judge is so reasonable & so fair that PP sits
down without arguing further. I love this man, he
makes Solomon proud.
He should be on Super Nanny- Go to your naughty
corner Ms.Preciozo.

I can't stand it anymore!!! I'm "done lurking"!!! Summer that was
brillant!!! In the light of this unfortunate trial, you've come out on
top!!!!! You should truly consider writing a book!!! Your witticims are

Da104

Courttv.com Message Boards - Observations from the courtroom 4/2          Page 12 of 13

precious. I am so overwhelmed!!!!

Report this post to a moderator | IP: Logged

**04-03-2007 05:37 AM**

**redfox**
Member

Registered: Dec 2005
Location: Florida
Posts: 74

**hair do-s (and don'ts)**

Does it look like PP and MM have the same hairstylist when you see them up close and personal?

Great job--BTW!!

Report this post to a moderator | IP: Logged

**04-03-2007 05:42 AM**

**chambord**
Senior Member

Registered: Feb 2006
Location: top shelf
Posts: 7145

Summer

Thank you so much for your on the spot reporting. You bring the essence of the day vividly to my mind. I haven't been able to follow this trial as closely as I would like, but you do manage to bring me close enough.

You should consider a writing career.

hugs

Report this post to a moderator | IP: Logged

**04-03-2007 05:48 AM**

**karen4**
Member

Registered: Mar 2007
Location: oregon
Posts: 3

What a wonderful report..

You know I rememeber the first time I saw JT on TV my first thought was...oohhh I bet he smells nice lol...

Report this post to a moderator | IP: Logged

**04-03-2007 09:03 AM**

**lost indie**
Senior Member

Registered: Jul 2006
Location: gaslighting abbie~
Posts: 2829

Summer...you are absolutely awesome! Joe smells just like I suspected he would.

Too early to think now...and I have a drooling chocolate lab who wants to be in my mouth here (it's storming)....

more later...Thanks so much....

Report this post to a moderator | IP: Logged

**04-03-2007 11:44 AM**

**llylabrat**
Member

Registered: Jun 2006
Location:

nice job!

Report this post to a moderator | IP: Logged

Da105

Courttv.com Message Boards - Observations from the courtroom 4/2                Page 13 of 13

Posts: 34

🗋 04-04-2007 12:43 AM        [icons]                              [icons]

**doja**
Member

Registered: Sep 2006          I greatly enjoy reading these observations and look forward to each
Location:                     new installment.
Posts: 18
                              Wonderful work, Summer, and thank you!

                                                    Report this post to a moderator | IP: Logged

🗋 04-04-2007 12:51 AM        [icons]                              [icons]

**MacKenzie**
Member                        If Perfect Gossip Columnist and Sharp Crime Reporter met and fell
                              in love their love child would be SummerMadness.

Registered: Mar 2007
Location: west of the Mississippi                    Report this post to a moderator | IP: Logged
Posts: 488

🗋 04-04-2007 04:53 AM        [icons]                              [icons]

All times are GMT. The time now is 06:24 PM,                    [new thread]  [post reply]
The correct time for your location is displayed while logged in.
                                                          ◁ Last Thread   Next Thread ▷

        [icon] Show Printable Version | [icon] Email this Page | [icon] Subscribe to this Thread

Forum Jump:                                           Rate This Thread:
|McGuire Murder Trial                    |  [▼] [go]    |Select a rating...|  [▼] [go]

Forum Rules:
You **may not** post new threads    HTML code is **OFF**
You **may not** post replies        vB code is **ON**
You **may not** post attachments    Smilies are **ON**
You **may not** edit your posts     [IMG] code is **OFF**

**< Contact Us - Courttv.com Home >**

Powered by: vBulletin Version 2.2.6
Copyright ©2000- 2002, Jelsoft Enterprises Limited.
All content Copyright Courtroom Television Network, LLC., All Rights Reserved.

Courttv.com Message Boards - Observations from the courtroom 4/3          Page 1 of 10



🎌 **Courttv.com Message Boards** > **McGuire Murder Trial** > **Observations from the courtroom 4/3**

Go to first unread post 📧                                    ◁ Last Thread   Next Thread ▷

| Author | Thread |
|---|---|

**SummerMadness**
Senior Member

Registered: Oct 2006
Location: On a hammock
between two palm trees
Posts: 1663

**Observations from the courtroom 4/3**

I get up early today, wake up the sidekick, she only groans. I inform her that if she doesn't go with me she has to stay home & clean all 3 bathrooms plus the litter boxes. She doesn't stir.

Give up on the sidekick, & get in my car. I turn on the radio and "Cruel Summer" by Bananarama is playing. Coincidence?
Get to the courthouse & park with no problem in a lot near by.

I sit, but the deputy that runs the courtroom tells me that the sit I'm in is reserved for (he mumbled) I know who he means they are always there. He tells me I can sit with the press-finally some recognition. I opt to sit with the commoners. The press bench is too crowded.

Everyone is in their GQ best. MM has a light brown suit, exactly like my unlucky suit. I wonder if it will bring her luck. I doubt it.
The thing is evil.

The jury files in.
The prosecution calls CINDY LIGOSH.
OMG, everyone is caught offguard. The guy next to me says "Finally" audibly. Exactly, I agree.
MM stares hard at her. Cindy looks quickly at MM, with venom in her eyes. If looks could kill...
The defense is looking down & writing.
Jean Casarez comes in & sits in the back bench.
Almost everyone is taking notes, even the men.
Everyone is rivited. Cindy is a low talker. Jean & I are craning our necks, alternating between looking at MM, Cindy & the jury. We look like that crazy camera that is suspended above the witness stand that is remotely controlled.
While the pros is showing the defense some exibit, Cindy takes the

Da107

*Hard eyes*

time to smile at the young redhead sitting In front of me.
I don't like MM posture while she Is listening to this testimony. She leans to the right & looks defiant & confrontational from where Im sitting. Body language & demeanor is going to hang her.

When they show Cindy her brothers jewelry, she breaks down. One woman In the jury appears to have tears in her eyes & Is making a motion with her head. You can hardly catch it but It's there. This is the chick with the hard eyes, Jt should be concerned with this woman.
The deputy hands the red head spectator a box of tissues. Female jurors are looking at her puzzled.

9:50 Jean exits the courtroom.
Side bar- The jury is still looking at the crying red head. Who is she??? One male juror is looking at MM.
Mm is talking with a member of her defense team, that sits behind the def. council table. Two ladies that were looking at the red head are now looking at MM. A pack of gum is passed around the jury box.
Back from SB- Cindy is back testifying about her son's arrest record. OMG I feel bad for her, having to air her dirty laundry In public.
Morning break-
Cindy Ligosh walks into a room with PP. The crying red head is escorted back there too.
I go to the bathroom, when Im walking out Harriet Ryan is coming In & says hello. I say 'HI" and run out. Better to keep my mouth shut & be thought a fool then open my mouth & remove all doubt. A little late for that, but still.

Back in the CR-

There's a huddle of men (def, pros, ivestigators, press, deputies) all talking about the game last night. Tons of testastorone.
They are not talking about the case.

Mr Intensity ( Romanyczyn) is talking to a reporter. He seems very competent & accomplished, but honey- take a chill pill.
I notice that ST has a dark caramel color belt with his navy suit. A novice mistake for this GQ man in training. JT better have a talk with him.

JT & PP are talking to the judge. JT is gesturing with his hands, but his face is blocked by PP hair. Woman-for God's sake whip that hair into submission. It is totally distracting.

This is a long recess, I make a phone call to my office & don't even notice that the judge is conducting some business on the record. The deputy catches me on the phone & motions for me to END IT. OMG Im so embarrassed. Yesterday, he told me to go back when I tried to exit the CR at the same time as the jury.
He comes over & tells me this is my second strike. Next time he is throwing me out. WHAT????
I think he is kidding, but better not chance it. He has Is so very nice

every other time.
Back on-
JT is up on cross- He says good morning twice.Only 2 women are
looking at him. There's a woman that NEVER looks at him.

This furniture testimony is confusing me. MM furniture sounds like a
nightmare.
Cindy is being very nice to Joe & Joe to Cindy. I think she has fallen
for the Tacopina charm. What does it matter that later he'll try to
pin all sorts of horrible deeds on her. This guy is HOT.

JT is now pushing back the podium with his arms, Im afraid one day
his suit is going to split open. His suits are probably made out of
some sapace-age fabric that is muscle-man proof.
The girl that takes notes for MM parents is back taking notes.
The deputy smiles a devilish smile & comes over & makes sure none
of us have any cell phones or high tech contraband-he must have
heard something.
We are cool.
I hear something about WM having an affair with a "part time opera
singer" I wonder what she does with the rest of her time. Part time
heart surgeon? Part time ballerina?
There's more cringe worthy testimony from Cindy- Molestation.
Everyone is still paying attention.

P.P is up on re-direct. She is outraged . JT stands like a shot & trips
over MM chair. He apologizes & says "didn't mean to run you over.
MM laughs.
Cindy is off the stand, walks out & the press follows her. Stampede!
The guy next to me says "who the hell is that?" out loud when the
state calls their next witness, Mr. Penn. I think this guy has Turretts.
The deputy glares at him.

5mn recess-

MM bounces out of the CR- She looks really good today. Her suit &
coat are beautiful.

Back from break.
There is a CSI on the stand. When he is called, the Turretts guy
says "Who?"
I don't want to be associated with this psycho. Guilt by association.
The deputy is glaring again.
My stomach is growling- this will be my third strike if the deputy
hears it.
Across the room I see deputy De Vito (the grinning deputy) & he
sees me. We smile at each other dementedly.

All is right with the world.

It is 12 & I have to go. I stand up & walk out. Deputy opens the
door for me. I mouth an apology for my transgressions of the day.
He says "I was only kidding you" & he smiles with a devilish glint in
his eye.

Courttv.com Message Boards - Observations from the courtroom 4/3            Page 4 of 10

I walk to the elevator with another deputy in my back pocket☺

Report this post to a moderator | IP: Logged

**04-04-2007 12:51 AM**

**checkinuout**
Senior Member

Registered: Mar 2007
Location: N.J.
Posts: 3061

Great thread again my MIL
You always do a good job.
I taught you so well..lol☺

*Last edited by checkinuout on 04-04-2007 at 12:59 AM*

Report this post to a moderator | IP: Logged

**04-04-2007 12:56 AM**

**NJ_follower**
Senior Member

Registered: Mar 2007
Location: shore area, nj
Posts: 1881

Awesome job as usual Summer...I may try to get down there some day this week. I'll let you know.

Report this post to a moderator | IP: Logged

**04-04-2007 01:00 AM**

**Test123**
Member

Registered: May 2003
Location: A little yellow jelly bean, Moo
Posts: 86

☺

This is like one of those wonderful books, the kind you cant put down. Too bad it is over something so real as murder. ☺

Report this post to a moderator | IP: Logged

**04-04-2007 01:10 AM**

**clannad**
Senior Member

Registered: Jan 2007
Location: Brick, NJ
Posts: 2104

Great read once again, Summer!!! Thank you!!!

Report this post to a moderator | IP: Logged

**04-04-2007 01:16 AM**

**Kelly3820**
Member

Registered: Sep 2006
Location:
Posts: 332

Hi Summer,

Great Job!!! Interesting that the jury is not responding to JT. Not good news for the defense. How do they react to PP? My take I like PP. I think that she comes across as a good hardworking DA. I bet the women on the jury like her. I think what JT was trying to show was that CL said something else in Grand Jury about the pillows than she said today. I think it was kind of obvious she had more pillow memory today than she did in the Grand Jury. But I think or felt the prosecution had a better day today then other days. I think MM looks more nervous as the trial goes on. I wonder if the defense tells MM how they really think it is going by reading the jury? I bet you were surprised when CL was announced today as a witness. I know my jaw dropped when I was drinking my coffee and saw her on the witness stand this morning.

Da110

Courttv.com Message Boards - Observations from the courtroom 4/3          Page 5 of 10

Thanks Bunches and Double Hugs😊
Kelly

Report this post to a moderator | IP: Logged

**Browneyes**
Senior Member

Registered: Sep 2003
Location: In loving memory of
my little angel Noah...2/5/01-
3/7/04
Posts: 1508

☐ 04-04-2007 01:29 AM

Great post Summer~~~gosh, I feel like I was right there with you.

You really should write a book. 🌸

Report this post to a moderator | IP: Logged

**psbperu**
Member

Registered: Aug 2002
Location: Isla del Sol, Florida
Posts: 346

☐ 04-04-2007 01:29 AM

Hey Summer:

Just getting better & better. Thanx so much, look forward to your
observations each day.

And you do make me smile!

Report this post to a moderator | IP: Logged

**annalyzer**
Senior Member

Registered: Jan 2007
Location:
Posts: 1662

☐ 04-04-2007 01:31 AM

Thanks for the great observations Summer.

Report this post to a moderator | IP: Logged

**bluwater**
Member

Registered: Mar 2007
Location: ...stuck in the middle
with you...
Posts: 453

☐ 04-04-2007 01:33 AM

Summer; I have looked forward to reading this all day long! The
only criticism I have is that I hate to come to the end of your report.
I wish that it went on for pages. My stomach dropped when I
thought you were in danger of being thrown out.

Do you know who the mysterious redhead is? Wow! This story has
everything - now a redhead in tears appears on the scene.
Who can she be?
Cindy's grown daughter?
The p/t opera singer?
Hope Mercer?

I can't wait for the next installment!

Report this post to a moderator | IP: Logged

**FrankieBones1**
Senior Member

Registered: Jun 2006
Location:

☐ 04-04-2007 01:35 AM

What an enjoyable read, Summer.
The redhead that you wrote about; was she in her mid-twenties?
She could have been Laura, Cindy's daughter.

Courttv.com Message Boards - Observations from the courtroom 4/3

Page 6 of 10

Posts: 5317

*still smiling about the caramel coloured belt and your view blocked by Prezioso's hair* Not in that order!

04-04-2007 01:36 AM

Report this post to a moderator | IP: Logged

**NJ_follower**
Senior Member

Registered: Mar 2007
Location: shore area, nj
Posts: 1881

quote:

---

*Originally posted by bluwater*
**Summer, I have looked forward to reading this all day long! The only criticism I have is that I hate to come to the end of your report. I wish that it went on for pages. My stomach dropped when I thought you were in danger of being thrown out.**

**Do you know who the mysterious redhead is? Wow! This story has everything – now a redhead in tears appears on the scene. Who can she be? Cindy's grown daughter? The p/t opera singer? Hope Mercer?**

**I can't wait for the next installment!**

---

I think she was Nancy (WM's other sister)--

04-04-2007 01:36 AM

Report this post to a moderator | IP: Logged

**Bama0f14**
Senior Member

Registered: Mar 2007
Location: Live free or die
Posts: 1181

Great as usual I was a little nervous that you were going to get kicked out they wouldn't dare do that I hope LOL

04-04-2007 01:41 AM

Report this post to a moderator | IP: Logged

**ChronicTonic**
Senior Member

Registered: Jun 2006
Location: Chilly East, CA Transplant
Posts: 1145

Ooooooooooooo thanks again SM! I am totally envious. I miss going to jury trials............and love to hear the behind the scenes tom foolery. You really need a column.
CT

04-04-2007 02:20 AM

Report this post to a moderator | IP: Logged

**Avalon**
Senior Member

Registered: Feb 2007
Location: Philly
Posts: 1963

Summer, I am enjoying your updates so much that I am now reading them to my mother. My favorite today was the "MM furniture was a nightmare" comment....LOL.

I swear, if this trial is still going on by the time I get back home to

Da112

Courttv.com Message Boards - Observations from the courtroom 4/3        Page 7 of 10

NJ, I am coming one day! How does one get in, by the way? Would I get special VIP treatment 'cause I know Summer (sort of)???

Report this post to a moderator | IP: Logged

**04-04-2007 02:24 AM**

**lynbit**
Member

Registered: Mar 2007
Location: VA
Posts: 146

Kudos to you, Summer. I had to let out a laugh when reading about PP needing to "whip that hair into submission." I know exactly what you mean, but would never have thought to word my feelings that way. Thanks so much for sharing your experieces again.

Report this post to a moderator | IP: Logged

**04-04-2007 03:49 AM**

**MacKenzie**
Member

Registered: Mar 2007
Location: west of the Mississippi
Posts: 488

quote:

*Originally posted by bluwater*
**Summer, I have looked forward to reading this all day long! The only criticism I have is that I hate to come to the end of your report. I wish that it went on for pages. My stomach dropped when I thought you were in danger of being thrown out.**

**Do you know who the mysterious redhead is? Wow! This story has everything - now a redhead in tears appears on the scene.
Who can she be?
Cindy's grown daughter?
The p/t opera singer?
Hope Mercer?**

**I can't wait for the next installment!**

The mysterious redhead was either:

(1) the mob hit woman
(2) the EZpass custome service operator
(3) Brad Miller's wife
(4) ClearThinker in drag

Report this post to a moderator | IP: Logged

**04-04-2007 04:39 AM**

**chilione**
Member

Registered: Nov 2004
Location:
Posts: 635

Summer, thanks so much for your inside view of the courtroom! You do a wonderful job! 😊

Report this post to a moderator | IP: Logged

**04-04-2007 04:45 AM**

Da113

Courttv.com Message Boards - Observations from the courtroom 4/3         Page 8 of 10

**chillone**
Member

Registered: Nov 2004
Location:
Posts: 635

quote:

*Originally posted by MacKenzie*

**The mysterious redhead was either:**

**(1) the mob hit woman**
**(2) the EZpass custome service operator**
**(3) Brad Miller's wife**
**(4) ClearThinker in drag**

ROTFLMAO!! You are killing me! 

☒

Report this post to a moderator | IP: Logged

📅 04-04-2007 04:46 AM

**Regina.Lampert**
Senior Member

Registered: Mar 2005
Location: The Land of Pleasant
Living
Posts: 2366

quote:

*Originally posted by MacKenzie*

**The mysterious redhead was either:**

**(1) the mob hit woman**
**(2) the EZpass custome service operator**
**(3) Brad Miller's wife**
**(4) ClearThinker in drag**

☺

Great job summer, love your style of writing, takes us right into that
courtroom.

Report this post to a moderator | IP: Logged

📅 04-04-2007 12:43 PM

**cheddarlyn**
Member

Registered: Mar 2007
Location: Rome, Ga
Posts: 84

Thank You!!!

Report this post to a moderator | IP: Logged

📅 04-04-2007 01:15 PM

Courttv.com Message Boards - Observations from the courtroom 4/3          Page 9 of 10

**lisafremont**
Senior Member

Registered: Feb 2004
Location:
Posts: 2521

I really enjoy your courtroom observations, summer! Don't stop!!

Report this post to a moderator | IP: Logged

⬛ 04-04-2007 02:18 PM

**sciencegirl**
Senior Member

Registered: Oct 2006
Location: Happily @ Home With My Dog Molly
Posts: 2379

Brilliant; absolutely Brilliant!!!!

Forget Joe T.; I think I you need to tell the deputy; I want to have his baby. 😊

Report this post to a moderator | IP: Logged

⬛ 04-04-2007 02:20 PM

**So_over_it**
Member

Registered: Mar 2007
Location:
Posts: 371

LOL!!!! Dang, Summer! if you keep this up, you'll have the Judge in your back pocket! You'll have to buy more pants!!!!!

Report this post to a moderator | IP: Logged

⬛ 04-04-2007 02:32 PM

**Lara**
Member

Registered: Mar 2007
Location: Milwaukee, WI
Posts: 183

quote:
_____
Originally posted by Test123
**This is like one of those wonderful books, the kind you cant put down. Too bad it is over something so real as murder.** 😊
_____

Oh, I so agree!! Summer, your writing reminds me of Janet Evanovich... in her "One for the Money" series... highly , highly, highly recommend it for a "fun" fictional read with sense of humor similar to yours!!
Lara

Report this post to a moderator | IP: Logged

⬛ 04-04-2007 04:42 PM

All times are GMT. The time now is 06:17 PM.
The correct time for your location is displayed while logged in.

◁ Last Thread   Next Thread ▷

Show Printable Version | Email this Page | Subscribe to this Thread

Forum Jump:
[McGuire Murder Trial]

Rate This Thread:
[Select a rating...]

Forum Rules:

Da115

Case 3:18-cv-03411-MAS   Document 9-5   Filed 09/14/18   Page 119 of 362 PageID: 369

| You **may not** post new threads | HTML code is **OFF** |
|---|---|
| You **may not** post replies | vB code is **ON** |
| You **may not** post attachments | Smilies are **ON** |
| You **may not** edit your posts | [IMG] code is **OFF** |

UNLIMITED CALLING
• Call across the U.S., Puerto Rico and Canada
• 13 calling features included
• No hidden fees
START CALLING
OPTIMUM VOICE
as low as $29.95 a month for the 1st year

< **Contact Us** - **Courttv.com Home** >

Powered by: vBulletin Version 2.2.6
Copyright ©2000- 2002, Jelsoft Enterprises Limited.
All content Copyright Courtroom Television Network, LLC., All Rights Reserved.

Da116

**EXHIBIT C: NOTE TO JUROR #5 FROM EXCUSED JUROR #14**

for the jury

To all —

I cannot believe I am not there to see this through with all of you. I feel a little disappointed, although I can't say I'm not relieved as well. I had prayed on Sunday for help with the awesome task ahead of me this week and he sent wind and rain and I was excused. Careful what you pray for, right?

I am praying for all of you today, that you will have the wisdom to do what is right.

I have to tell you I spent all day yesterday reading blogs and watching closing arguments. It was so tempting to blog back, but I did not.

Linda — I am the one w/ hard eyes ☺ and I intrigue the bloggers. They talk about us, but nothing terrible.

Deb & Rafik — you must feel some relieve today too. Deb, if you get a moment

Da118



(like you would have all day) call me

733-304-0552

God luck to you all you in

in my thoughts

American Diabetes Association.

*Cure · Care · Commitment*

The sender of this card has made a generous contribution to
the American Diabetes Association to aid in its mission —
to prevent and cure diabetes and to improve the
lives of all people affected by diabetes.

© Annie Lapoint
under license from Penny Lane Publishing, Inc.
Greeting card art not for framed use.

V4117

*Lulu*

EXHIBIT D: BLOG ENTRY REGARDING JUROR WITH THE HARD EYES AND
MELANIE MCGUIRE'S POSTURE

Courttv.com Message Boards - Observations from the courtroom 4/3                    Page 2 of 10



time to smile at the young redhead sitting in front of me.
I don't like MM posture while she is listening to this testimony. She
leans to the right & looks defiant & confrontational from where Im
sitting. Body language & demeanor is going to hang her.

When they show Cindy her brothers jewelry, she breaks down. One
woman in the jury appears to have tears in her eyes & is making a
motion with her head. You can hardly catch it but it's there. This is
the chick with the hard eyes, Jt should be concerned with this
woman.
The deputy hands the red head spectator a box of tissues. Female
jurors are looking at her puzzled.

9:50 Jean exits the courtroom.
Side bar- The jury is still looking at the crying red head. Who is
she??? One male juror is looking at MM.
Mm is talking with a member of her defense team, that sits behind
the def. council table. Two ladies that were looking at the red head
are now looking at MM. A pack of gum is passed around the jury
box.
Back from SB- Cindy is back testifying about her son's arrest record.
OMG I feel bad for her, having to air her dirty laundry in public.
Morning break-
Cindy Ligosh walks into a room with PP. The crying red head is
escorted back there too.
I go to the bathroom, when Im walking out Harriet Ryan is coming
in & says hello. I say 'Hi" and run out. Better to keep my mouth
shut & be thought a fool then open my mouth & remove all doubt.
A little late for that, but still.

Back in the CR-

There's a huddle of men (def, pros, ivestigators, press, deputies) all
talking about the game last night. Tons of testastorone.
They are not talking about the case.

Mr Intensity ( Romanyczyn) is talking to a reporter. He seems very
competent & accomplished, but honey- take a chill pill.
I notice that ST has a dark caramel color belt with his navy suit. A
novice mistake for this GQ man in training. JT better have a talk
with him.

JT & PP are talking to the judge. JT is gesturing with his hands, but
his face is blocked by PP hair. Woman-for God's sake whip that hair
into submission. It is totally distracting.

This is a long recess, I make a phone call to my office & don't even
notice that the judge is conducting some business on the record.
The deputy catches me on the phone & motions for me to END IT.
OMG Im so embarrassed. Yesterday, he told me to go back when I
tried to exit the CR at the same time as the jury.
He comes over & tells me this is my second strike. Next time he is
throwing me out. WHAT????
I think he is kidding, but better not chance it. He has is so very nice

Da120

EXHIBIT E: INTERNET BLOGS FROM COURT TV'S WEBSITE

Courttv.com Message Boards - Observations from the courtroom 4/2          Page 1 of 13





CLICK HERE
or go to lasikplus.c

**court news**

> **Courttv.com Message Boards** > **McGuire Murder Trial** > **Observations from the courtroom 4/2**

Go to first unread post

◁ Last Thread     Next Thread ▷

| Author | Thread |
|---|---|
| **SummerMadness**<br>Senior Member<br><br>Registered: Oct 2006<br>Location: On a hammock<br>between two palm trees<br>Posts: 1663 | **Observations from the courtroom 4/2**<br><br>I get out of my job at 12:30, in plenty of time to pick up my sidekick-daughter & head to the courthouse.<br>I call her but she informs me she overslept & will not be ready on time. Just as well because last time I spoke to her last night I told her what was on the agenda FIND OUT WHAT JOE SMELLS LIKE-she said-"mom please don't embarrass me" I said "I can't promise anything". I should have invited my MIL, a woman after my own heart (long on nerve, short on common sense).<br><br>So I head out alone- Get there no problem. right away I see 3 jurors walking by the side of the building. Two women & one man. They are smiling & chatting. When I pass by the courthouse MM is going in the main door while the photographers click away. The song that is playing on the radio is Invisible Sun by The Police; Im looking at MM as the lyrics are swimming in my head-<br>"I don't want to spend my time in hell, looking at the walls of a prison cell "<br>"I don't ever want to play the part of a statistic on a government chart".<br>If you believe in omens- MM goose is cooked.<br><br>I park with no drama, on the first floor of a 6 story parking garage. Im happy- like having 5 numbers of a 6 number lottery.<br>I walk in the elevator & see a reporter & try to make small talk. He is having none of it. I ask him who he works for-he says Star Ledger, he has covered the MM mess for 3 years. doesn't seem happy about this fact. I ask-So what do you think? He grunts & walks out of the elevator without a word.<br>O.K be that way, you rude....<br><br>I walk in the courtroom & mark my territory with my coat & head out to the bathroom. When I walk out I almost bump into MM & ST |

http://boards.courttv.com/showthread.php?s=0d88960717a502670e3456b4aad72a30&thre...   4/25/2007

Da121

**EXHIBIT F: INTERNET BLOGS FROM COURT TV'S WEBSITE**



Show all 61 posts from this thread on one page

**Courttv.com Message Boards** (http://boards.courttv.com/index.php)
- **McGuire Murder Trial** (http://boards.courttv.com/forumdisplay.php?forumid=389)
-- **If I was a juror this is how I would connect the dots....**
(http://boards.courttv.com/showthread.php?threadid=294736)

---

Posted by CozyKitten on 04-13-2007 04:36 PM:

**If I was a juror this is how I would connect the dots....**

This is what I have learned from watching the trial, and reading past articles.

I think that this marriage was pretty much over. It appears to me that WM wanted to try and make things better, but MM didn't want anything to do with him. Moving into a new home with him was not what she wanted to do. She wanted him out of her life for good. I think she wanted to be with the good doctor. Getting rid of her husband would keep her having to move further away, draw sympathy from family/friends, and pave the way for a future with her lover.

I do think she sedated him with the CH. She shot him, and let him bleed. She could have shot him on a rug/bags that he bled onto. I think she did this in the basement. IMO, I think she left him there while she left all clothes/shoes in the basement. She cleaned up in the master bathroom of her apartment. She got her kids ready, and took them to school. She sent a message on WM blackberry that he would be out sick. She took her children to daycare, and she told the daycare provider about the fight. She called the speech pathologist, and also told her the story. IMO this is staging the disappearance. I think she called the lover/doctor shortly after telling him about the fight, and she asked him for Xanax. It's possible she could have bought a reciprocating saw herself, and knife. She could have gone back to the apartment and dismembered him in the basement during the day while her children were at daycare. I think she put him in the bags/suitcase by herself. The weight was added to one of the bags because she knew she was going to toss them in the water, but didn't know that when she would put them in the water. I think she sealed the bags up, and removed her clothes/shoes. She took a shower in her master bathroom. She dressed and went to pick up her kids. She took her kids to her parent house. She drove to Edison where she checked into a hotel. She drove over to her apartment in Woodbridge. She knew that she needed to get rid of the Maxima. She was afraid that people that were supposed to help them move could show up and see his car. This would interfere with her saying her husband walked out on her. I think she probably went down into the basement grabbed rugs/bags/saws, and put them on the floorboard of the passenger seat. She put these in bags and drove to AC in his car. She was smart enough to remove his EZ pass. I also think she put that syringe in his glove box to dispose of it, too. She just wasn't smart enough to remove her clothes/shoes this time before carrying this stuff out to the car. I think this is how both sides ended up with sawdust on each side. I think she disposed of the items she had on the passenger floorboard in a dumpster somewhere in AC. I think she parked the car at some sleezy hotel, and she got a cab back to Woodbridge. I don't think the SUV in the parking garage was hers. I think she got a cab. I thinks she went back to her apartment and washed up, and probably cleaned up the scene as well. She still needed to get rid of the suitcases. But didn't know how?? She went back to her hotel after removing her clothes/shoes before getting into her car. I believe she stayed I a hotel because she didn't want to stay in the apartment with those suitcases. I guess it creeped her out. I think she went and filed a TRO later in the day, and called the speech pathologist asking if WM was looking for her. Again, set the stage for his leaving

and called the speech pathologist asking if WM was looking for her. Again, set the stage for his leaving her. I do believe she spent some of her time cleaning up her apartment. I also believe she cleaned up her apartment on May 1st. She drove down to AC in her SUV on the night of AC. She used WM cell phone to call his Woodbridge apartment to make it appear through cell phone records that he was alive and calling her. She just forgot to take down her EZ pass, and she ended up getting a hit on it. She drove back to her hotel. Her lover/dr shows up a couple hours later. She appears to be tired ( of course). She checks out of her hotel, and goes to her parents house. She still needs to get rid of the suitcases. I believe on May 3rd she probably drove down to VA, and through them off the bridge on an emergency stop. She drove back being seen driving over the Delaware bridge on May 4th.

This is how I would put the dots together if I had to deliberate. I do think she was very guilty.

This is what the testimony leads me to visualize.

---

I think you did a wonderful job with the visualization. I think you have it just about right...and they

need to consult you when the make the Movie of the Week out of this murder trial.

---

*Posted by NYSETech on 04-13-2007 05:12 PM:*

Awesome job of connecting the dots!!! If the prosecution sums it up half as good as you did MM is going to prison where she belongs.

---

*Posted by DDD on 04-13-2007 05:17 PM:*

quote:

*Originally posted by CozyKitten*

I just wanted to say DDD, you are amazing for reading this. I know it is long. I didn't realize how long until I reread it. Also, I wanted to add another mistake she made. She forgot to dispose of the syringe when she was throwing the rest of the stuff out.

---

Thanks Cozy, I do try and read everything no matter the length. You can sometimes find interesting details that you may have missed or someone elses take on things!!!

---

*Posted by KR12345 on 04-13-2007 06:51 PM:*

Da123

thought ...

JMO

Posted by NJ_follower on 04-14-2007 02:17 AM:

quote:

*Originally posted by direstraits*

LOL, Think About It. You are either completely lost or a hopeless Melanie worshipper. I suspect the latter because no one could possibly be that lost and still be able to operate a computer and actually post comments.

And I love your handle -- you quite clearly don't think about ANYTHING. You can't "connect the dots" here?

Duh!!

Except that I do NOT believe you are that clueless. I think you're just a confirmed Melanie worshipper. Which is pathetic. An innocent man has been brutally murdered and then further brutalized and you would let his monstorous killer go scott free. You should be ashamed of yourself -- assuming you understand the concept.

What exactly would EVER convince you that this woman is guilty?

You need a video? A confession? What?

Who do you think killed Billy? Space aliens?

Unbelieveable.

Here's another idiotic comment by you in another post -

"How can you drug, murder, chop and drive over 2 hours each way to dispose of evidence and take your kids to school the next day?"

The kids were at the parents' house (in Barnegat) after daycare on 4/29/04. So why do you think Melanie was driving them to school? Where did you get that from? Are you paying attention at all? Obviously not.

And then there's this comment of yours, also from another post -

"I still am not decided, myself"

WHAT??!!

Did you not just say here: "Proof of guilt beyond a reasonable doubt? Not by a long shot. JMO"

Does that not mean you've concluded that the State failed to carry it's burden of proof? Which I believe you also said in yet another post.

**If she was so darn smart as to do all the other to avoid being caught out, why in hades did she use her own suitcases? Even a stupid person would know to use different luggage ; and if she managed to cover all the dna, surely she would have been smarter than to use her own luggage........**

She used her own suitcases because she (for some reason) thought they would not float to the top so his body would never be found.

Or she did not have time to buy new suitcases or she thought she might get caught on some store's survallience camera buying suitcases in the middle of moving and husband supposed to be leaving her or she could not get into CL's house to steal hers.

What I dont get is how she forgot about the EZ pass, if she remembered to take it down on other trips.

Posted by Southdog on 04-16-2007 08:59 PM:

**connecting the dots**

Reason for mistakes is simple, because there is no such thing as a perfect crime. It is these very things that get you caught!

Posted by msibarra on 04-16-2007 10:30 PM:

Now this scenario makes sense!!! I like the way you brought it all together to fit like a puzzle. I

can't wait for the book to be thrown at this little devil. 

Posted by msibarra on 04-16-2007 10:31 PM:

**Connecting the dots**

> quote:
>
> Originally posted by msibarra
> **Now this scenario makes sense!!! I like the way you brought it all together to fit like a puzzle. I can't wait for the book to be thrown at this little devil.**
>
> 

Posted by LisaB2007 on 04-19-2007 05:54 PM:

**But where's the hard evidence?**

**EXHIBIT G: TRANSCRIPT OF JURORS' INTERVIEWS IN CHAMBERS, DATED APRIL 20, 2007**

```
                                                              1
 1                        SUPERIOR COURT OF NEW JERSEY
                          LAW DIVISION - MIDDLESEX COUNTY
 2                        INDICTMENT NOS. 05-10-165-S
                                          06-10-119-S
 3      _____

 4   THE STATE OF NEW JERSEY

 5        vs.                            Transcript of
                                  Jurors' Interviews in Chambers
 6
     MELANIE McGUIRE,
 7
              Defendant.
 8      _____

 9                       Place:  Middlesex County Courthouse
                                 56 Paterson Street
10                               New Brunswick, New Jersey

11                       Date:   April 20, 2007
                                 P.M. Session
12
     B E F O R E:
13
          HONORABLE FREDERICK P. DeVESA, J.S.C., and a Jury
14

15   TRANSCRIPT ORDERED BY:  Patricia Prezioso, Esq.
                             (Office of the Attorney General)
16
     A P P E A R A N C E S:
17
          PATRICIA PREZIOSO, ESQ.
18        CHRISTOPHER S. ROMANYSHYN, ESQ.
          Assistant Attorney Generals
19        Attorneys for the State

20        JOSEPH TACOPINA, ESQ.
          (Firm of Tacopina & Seigel, Esqs.)
21        STEPHEN TURANO, ESQ.
          (Firm of Stephen Turano, Esq.)
22        Attorneys for the Defendant

23                               Linda Urbaniak
                                 Certified Court Reporter
24                               Official Court Reporter
                                 Middlesex County Courthouse
25                               56 Paterson Street
                                 New Brunswick, New Jersey
```

2

I N D E X

JUROR                                              PAGE

Luann Bachetti (via telephone)                       3
Donald Adams                                         20
Patricia Ciaccio                                     35
Linda Krzyzanowski                                   47
Patricia O'Donnell                                   59
Laura Krepps                                         65
Teresa Victoriano                                    73
Franklin Wright                                      78
Victoria Kim                                         82
Sandra Eid                                           88
Antowon Hinton-Graham                                94
Basil Thomas                                         98
Celia Ahern                                         103

---

### Luann Bachetti

3

(The following took place in Judge DeVesa's chambers with all four trial counsel present.)

(Juror Luann Bachetti is speaking via telephone.)

THE COURT:  Hello, Miss Bachetti.

MS. BACHETTI:  Yes.

THE COURT:  Hi.  This is Judge DeVesa.  How you doing?

MS. BACHETTI:  Oh.  Good.  How are you?

THE COURT:  Okay.  I have with me the attorneys on the McGuire case, all four of them, and I have our court reporter here.  We need to speak to you on the record.  Okay?

MS. BACHETTI:  That's fine.

THE COURT:  All right.  The reason I'm calling is that yesterday in the jury room we learned that there was this note to the jurors apparently from you and wanted to talk to you about that.  Okay?

MS. BACHETTI:  Oh.  My goodness.  Okay.

THE COURT:  First of all, can you tell me how the note got there.

MS. BACHETTI:  Oh.  My god.  It's so terrible.  I didn't realize it would be an issue.

Laura, I don't remember what number she was, she only lives a couple blocks from me, I left it on her car.

Luann Bachetti                                                 4
```
 1          THE COURT:  All right.  So that's Laura
 2  Krepps, juror number five?
 3          MS. BACHETTI:  Yes.
 4          THE COURT:  So you left it on her car?
 5          MS. BACHETTI:  Right.
 6          THE COURT:  Okay.  I'm -- Miss Bachetti,
 7  don't be uncomfortable.  I'm repeating some of this
 8  because our reporter has to take it down.  Whenever
 9  there's any communication between jurors or with jurors
10  from someone who is not on the jury the Court is
11  required to make an inquiry just to find out what
12  occurred, so this is kind of a routine thing, and don't
13  worry about it --
14          MS. BACHETTI:  Okay.
15          THE COURT:  -- but I am required to do that.
16          MS. BACHETTI:  That's fine.
17          THE COURT:  As you know, we already did that
18  a couple times.
19          MS. BACHETTI:  Yes.
20          THE COURT:  So -- okay.  So again this note
21  was found and the note reflects that you have been, you
22  know, kind of catching up on the case, if you will, by
23  reading -- reading about it on the internet I guess.
24          MS. BACHETTI:  Right.
25          THE COURT:  Is that true?
```

Luann Bachetti                                                 5
```
 1          MS. BACHETTI:  Yes.
 2          THE COURT:  There's a couple -- how long have
 3  you been doing this?
 4          MS. BACHETTI:  Oh.  Not -- that happened on
 5  Tuesday.
 6          THE COURT:  You mean before --
 7          MS. BACHETTI:  When I was excused.
 8          THE COURT.  The day you were excused?
 9          MS. BACHETTI:  The day after.
10          THE COURT.  The day after?
11          MS. BACHETTI:  Right.
12          THE COURT:  And what have you -- what have
13  you heard so far?
14          MS. BACHETTI:  Oh.  My goodness.  You know
15  what?  You could go in any direction, you hear that --
16  that she's guilty or she's not guilty or there's a
17  verdict coming in five minutes.  These are bloggers, so
18  you don't know anything.  I'm sure you're familiar with
19  it.
20          THE COURT:  So you've been -- you know,
21  I mean I guess you've been reviewing a lot of
22  information.  Is that the bottom line?
23          MS. BACHETTI:  Sure.  I mean I can't believe
24  I'm not there now and seeing what's actually going to
25  happen, so I'm watching it on TV and reading the blogs.
```

Luann Bachetti                                                6

1      THE COURT:  Have you been watching Court TV?
2  Is that what you're primarily looking at?
3      MS. BACHETTI:  Right.
4      THE COURT:  And the Court TV blogs, that's
5  what you've been checking?
6      MS. BACHETTI:  That's right.  Right.
7      THE COURT:  I do have one -- there's one part
8  of this note that you wrote that I don't quite
9  understand.  It said Linda, I'm the one with the hard
10 eyes and I intrigue the bloggers.  What does that mean?
11     MS. BACHETTI:  Because the woman said that --
12 one of the women who's blogging says there's a juror
13 with very hard eyes and it happens to be the juror who
14 was excused, so I knew it was me.
15     THE COURT:  Oh.  Well -- and who is Linda?
16     MS. BACHETTI:  Oh.  Linda's a juror.  Oh.
17 I see.
18     THE COURT:  Well, why would you be telling
19 her that?
20     MS. BACHETTI:  Because at some point someone
21 had said a blog there that said there's a
22 tough-looking juror, and I don't know who said it or
23 how they knew it, but we were guessing which one it was
24 and it was me.
25     THE COURT:  So you had this discussion with

Luann Bachetti                                                7

1  the jurors?
2      MS. BACHETTI:  At one point -- not -- not --
3  obviously not after I had gone on the blog.  At one
4  point during sitting in the jury room somebody said
5  there was a juror with hard eyes and we guessed who it
6  might be.  Everybody said it was probably me and, oh,
7  it was.
8      THE COURT:  Have you -- have you -- as a
9  result of this note or before you wrote the note and
10 after you were excused, did you discuss what you've
11 read on the internet or what you've learned on
12 television?  Have you discussed this with any of the
13 other jurors?
14     MS. BACHETTI:  Oh.  No.  Absolutely not.
15 I've had no -- honestly, that note was written as a --
16 you know, I'm praying for you guys to do the right
17 thing and I wish I was there with you.  How ironic is
18 that?  But by no means would I ever tell them anything
19 I read.  I totally understand.
20     THE COURT:  Have there been any discussions
21 other than this mention of, you know, a juror with hard
22 eyes?  Have there been any other discussions about what
23 was on the internet or on television in your presence?
24     MS. BACHETTI:  Honestly, I can tell you that
25 I believe no one looked at any of that as what was

Luann Bachetti                                    8

 1  going on.  No.  This is very serious.  I don't believe
 2  there's one person in there who is looking at the
 3  blogs.
 4          THE COURT:  Okay.  Have you?
 5          MS. BACHETTI:  Terrible that I wrote this
 6  note.  I honestly did it as, you know, a -- with the
 7  right intentions.  I didn't think it was --
 8          THE COURT:  Well, you heard me mention many
 9  times that jurors shouldn't be speaking about the case
10  among themselves or with anybody outside and, you know,
11  I have been trying to confirm that all the time, that's
12  what the law requires, so we do have to follow up on
13  this note.
14          MS. BACHETTI:  No.  I understand.  I
15  understand.
16          THE COURT:  Is there -- is there anything
17  else -- have there been any other discussions of this
18  sort with any of the other jurors or any type of
19  mention of what's been on the internet or what's been
20  on television or any comments --
21          MS. BACHETTI:  No.  No.
22          THE COURT:  -- from jurors about what they
23  may have learned from the outside?
24          MS. BACHETTI:  Let me think.
25          THE COURT:  This is really important.

Luann Bachetti                                    9

 1          MS. BACHETTI:  No.  I totally understand what
 2  you're saying.  No.  I would have to say no.
 3          THE COURT:  All right.  I'm going to -- Miss
 4  Bachetti, I'm going to ask if any of the attorneys have
 5  any questions at this point in time, so just hold on
 6  one second and one or more of them may have some
 7  questions.
 8          Counsel, does anybody have a question of Miss
 9  Bachetti at this point?
10          MR. TACOPINA:  I have a few, your Honor.
11          THE COURT:  All right.  This is Mr. Tacopina.
12  Miss Bachetti, he says he has a couple questions.
13          MS. BACHETTI:  Hi.
14          MR. TACOPINA:  Hi.  How are you?
15          MS. BACHETTI:  I'm okay.  How are you?
16          MR. TACOPINA:  Okay.  Miss Bachetti, just
17  based on your answers I do have a few questions.
18          What day did you put the card on on whose car
19  you put it on, Laura's?
20          MS. BACHETTI:  It had to be Wednesday
21  morning.
22          MR. TACOPINA:  Wednesday morning.  Okay.  So
23  Wednesday morning you put it on, so that means, as far
24  as you know, she -- she had the card on Wednesday and
25  brought it with her on Wednesday probably?

Luann Bachetti                                    10

1        MS. BACHETTI:  No.
2        MR. TACOPINA:  Did she speak to you -- did
3   she tell you she got the note or anything like that?
4        MS. BACHETTI:  I had a phone call that said,
5   you know, thanks for your support and we'll be in touch
6   when it's over.
7        MR. TACOPINA:  Who -- who called you, Miss --
8        MS. BACHETTI:  Laura did.
9        MR. TACOPINA:  Laura called you to say thanks
10  for your support?
11       MS. BACHETTI:  Right.
12       MR. TACOPINA:  Was it a voice message or did
13  you actually speak with her?
14       MS. BACHETTI:  No.  She called.  I spoke with
15  her, but I was at work and she was a juror, and that
16  was it.
17       MR. TACOPINA:  Oh.  She called you from the
18  court?
19       MS. BACHETTI:  That doesn't mean that.
20  That's an assumption on my part.
21       MR. TACOPINA:  Miss Bachetti, did she tell
22  you she shared that note with everyone and what their
23  responses were?
24       MS. BACHETTI:  She didn't.  She said it was
25  very sweet of you.  Whether that was her opinion, their

Luann Bachetti                                    11

1   opinion, I honestly don't know.
2        MR. TACOPINA:  Okay.  You said in the note
3   and you said just now that you were praying for you
4   guys to do the right thing.  Did you --
5        MS. BACHETTI:  Okay.  Go ahead.
6        MR. TACOPINA:  Well, what did you mean by
7   that?  Let's start with that.
8        MS. BACHETTI:  I'm just a very religious
9   person.  I prayed for help in making the right
10  decision.  I don't know what the right decision is in
11  this case.  I just prayed that they would have
12  guidance.  I wasn't trying to get a message to her.
13       MR. TACOPINA:  Okay.  Because exactly what
14  you said, you didn't put in this letter what you
15  believed the right thing was, so I'm just wondering.
16       MS. BACHETTI:  No.  We have never discussed
17  that as a group.  No.  This was just I'm praying for
18  guidance for the right decision.
19       MR. TACOPINA:  Okay.  So that's my next
20  question.  You said you never discussed what the right
21  thing would be like informally?
22       MS. BACHETTI:  No.  No.  No.
23       MR. TACOPINA:  And when the judge asked you
24  about Linda, clearly there was some discussions about
25  the blogs during some point in the trial prior to you

Da131

Luann Bachetti                                    12

1  being excused because that's what you reference back,
2  right?
3          MS. BACHETTI:  Right.  Somebody had known
4  that there was a hard-eyed juror.  I don't remember how
5  that came in.  It just, you know -- I can't tell you.
6  I honestly don't believe anyone read that.
7          MR. TACOPINA:  Well -- okay.  But someone
8  read it and told a juror about it and the juror shared
9  it with all of you?
10         MS. BACHETTI:  Yeah.  In some way.  I
11 remember there being a discussion.
12         I'm sorry.  The other phone's ringing.
13         MR. TACOPINA:  Okay.
14         MS. BACHETTI:  There was a discussion with
15 one of the jurors had a hard look to her, who do you
16 think they mean, and, lucky me, it was me.
17         MR. TACOPINA:  First of all, I disagree with
18 that if that means anything.
19         MS. BACHETTI:  Well, thank you.
20         It's funny, how you hear everything
21 unfortunately.
22         MR. TACOPINA:  But who -- who was the juror
23 who said that someone said one of us?
24         MS. BACHETTI:  That's where I can't really
25 answer you because, you know, a bunch of conversations

Luann Bachetti                                    13

1  going on at once and then we just heard it, oh, who do
2  you think has that look, so I don't know where it even
3  originated.
4          MR. TACOPINA:  So there was a discussion
5  though, at least one discussion, in the jury room about
6  what people were saying about you all on the blogs?
7          MS. BACHETTI:  Yeah.  But a discussion or
8  just this one comment, I did not know.  I was amazed,
9  quite honestly, when I went on the blog to see how much
10 there was.  This was the only comment I ever heard and
11 it wasn't like an ongoing discussion where I don't
12 think anybody was familiar with the many different
13 things said about them.
14         MR. TACOPINA:  Okay.  But my question is,
15 Miss Bachetti, if you can, someone is -- according to
16 what you said, someone from the jury relayed something
17 to all of you or some of you, at least you, about what
18 someone told them was on the blogs, you don't remember
19 which juror that was?
20         MS. BACHETTI:  Right.
21         MR. TACOPINA:  Anything else from the blogs
22 that was discussed at all?
23         MS. BACHETTI:  Honestly, no.
24         MR. TACOPINA:  And why was it Linda you told
25 that to?

Da132

Luann Bachetti                                                    14

1        MS. BACHETTI:  Linda said to me I think it's
2   you.  Nobody wants to see -- Linda is honest, but I
3   think you have the eyes, so I was just answering back.
4        You're right.  I feel terrible that I even
5   wrote this note.
6        MR. TACOPINA:  Okay.
7        THE COURT:  Counsel, any other questions of
8   Miss Bachetti?
9        MS. PREZIOSO:  Yes.
10       Hi, Miss Bachetti.  Patty Prizioso here.
11       MS. BACHETTI:  Hi.
12       MS. PREZIOSO:  What time did you leave the
13  note on Laura's car?
14       MS. BACHETTI:  It must have been before eight
15  when I was taking my children to school.
16       MS. PREZIOSO:  It was before eight o'clock?
17       MS. BACHETTI:  I would think so.  Yeah.
18       MS. PREZIOSO:  Do you know how much before
19  eight o'clock?
20       MS. BACHETTI:  About five of.  That's what
21  time I leave.
22       MS. PREZIOSO:  Okay.  And Mr. Tacopina just
23  asked you questions about reading the blog or whether
24  somebody commented on the comment from the blog.
25  I just want to know, crystal clear, do you have

Luann Bachetti                                                    15

1   information that any of the jurors was reading the
2   blog?
3        MS. BACHETTI:  Honestly, no, not at all.
4        MS. PREZIOSO:  And beyond the comments that
5   someone had heard that one of the jurors has hard eyes,
6   beyond that one comment, was anything else related to
7   the jury that you know of about what was contained in
8   the blogs?
9        MS. BACHETTI:  No.
10       MS. PREZIOSO:  Thank you.
11       THE COURT:  All right.  Counsel, anything
12  else?
13       MS. PREZIOSO:  No, your Honor.
14       MR. TACOPINA:  No, your Honor.
15       THE COURT:  All right.  Miss Bachetti, we
16  don't have any more questions at this time.
17       I'm going to please again ask you please do
18  not discuss this case with any of the other jurors.  If
19  they call you just indicate that, you know, since
20  you've been excused you really can't speak to them at
21  this time until the case is over.  And I don't know
22  whether the press will be reaching out for you or other
23  jurors, you know, they may do so in this case, as you
24  can see, there's a lot of interest, but I would really
25  strongly urge that you not discuss this with anybody

Da133

```
                    Luann Bachetti                    16
 1  else because every time there's a discussion I will
 2  have to make inquiry about it and it will just cause
 3  additional difficulties.  So I would really ask you
 4  just not to discuss this with anybody at all.
 5          MS. BACHETTI:  I understand.
 6          THE COURT:  Okay?  All right.  Thank you very
 7  much.
 8          MS. BACHETTI:  Okay.
 9          THE COURT:  Do you have any questions?
10          MS. BACHETTI:  I have one question just in
11  general.
12          THE COURT:  Yeah.
13          MS. BACHETTI:  I read in the paper things
14  like the woman -- the mother of three from Milltown has
15  been excused.  We're not as anonymous as we think we
16  are, are we?
17          THE COURT:  No, you're not anonymous at all.
18  Your names are part of public records, your
19  addresses -- your addresses are not and your phone
20  numbers are not, but when you are selected you come
21  from a public list of people who have driver's licenses
22  and voter registration and we in the courts are not
23  authorized by law to keep that information
24  confidential, these are public records, so that the
25  people involved in the case have a right to -- you
```

```
                    Luann Bachetti                    17
 1  know, to know your name, but no one is given your
 2  address or your phone number.  Now, whether they could
 3  find it out or not by making inquiry, obviously, you
 4  know, you're not hiding, so it is possible, but it
 5  won't come from the Court.
 6          MS. BACHETTI:  Okay.
 7          THE COURT:  But again if anybody should
 8  contact you which is possible in a case like this
 9  because they do like to interview jurors, I would
10  really urge that you not speak to them because, you
11  know, if you're misquoted or you're quoted in a way
12  that suggests that there were some problems, then --
13  you know, then we have to go back and interview
14  everybody all over again.
15          MS. BACHETTI:  Oh.  I understand what you're
16  saying.
17          THE COURT:  Okay.
18          MS. BACHETTI:  Okay.  Again I am sorry.
19          THE COURT:  All right.  Thank you very much.
20          MS. BACHETTI:  Take care.
21       (Judge DeVesa and Ms. Bachetti hung up the
22  telephones.)
23          THE COURT:  Well, it's obvious that we have
24  to interview all the jurors.  Does anyone disagree with
25  that?
```

Da134

```
                         Schedule                    18
 1          MR. TACOPINA:  No.
 2          MR. TURANO:  No.
 3          THE COURT:  So I think I'm going to go out
 4  there now and tell all of these people that again
 5  because of the media coverage in this case I have
 6  consulted with counsel and we're going to interview the
 7  jurors because my recollection is that the jury had
 8  indicated that they wanted to leave at 3:30 today
 9  because somebody has an appointment and they're going
10  to come back Monday.  That's what they had said.
11          THE CLERK:  That was yesterday.  Today they
12  didn't give a time yet.
13          THE COURT:  Yesterday they did.
14          THE CLERK:  They left at 3:30 yesterday.
15          THE COURT:  Oh.
16          THE CLERK:  Today they haven't given a time.
17          THE COURT:  But they did indicate they wanted
18  to come back Monday.
19          THE CLERK:  No.  We just told them that if
20  they didn't finish Monday would be the date to come
21  back.
22          THE COURT:  In any event, by the time we
23  interview them it will be quarter to four, so I
24  don't -- I'd rather not have them speculating out there
25  on Court TV as to what we're doing in here.  I think
```

```
                         Schedule                    19
 1  I'm better off just indicating that as a result of, you
 2  know, the extensive media coverage I'm going to
 3  interview them again.  Anybody have a better idea?
 4          MR. TACOPINA:  No, your Honor.
 5          MR. TURANO:  No.  No.
 6          MR. TACOPINA:  We're okay.  You're right.
 7  I agree.
 8          THE COURT:  And -- well, all right.  What
 9  about this issue of the State's application for a gag
10  order?  Is there going to be an application?  Do you
11  want to research it further?  How do you want to handle
12  it?
13          (Colloquy took place unrelated to the jurors'
14  interviews and is not included in this transcript.)
15                          * * *
16          THE COURT:  All right.  We're going to go in
17  order.  I'm going to leave the alternates out unless
18  there's a need.
19          MS. PREZIOSO:  Great.
20          THE COURT:  If you get 12 people say they
21  didn't talk about anything in there then, you know, I'm
22  inclined not to talk to the alternates because they
23  won't be deliberating, but if it turns out there's any
24  question or anything that needs further inquiry then
25  we'll -- we'll interview them all.
```

```
                         Donald Adams                    20
 1           MS. PREZIOSO:  Okay.
 2           MR. TACOPINA:  You have 12 people say that,
 3   your Honor, we got a problem, so --
 4           THE COURT:  Huh?
 5           MR. TACOPINA:  You got 12 people say that, we
 6   got a problem.
 7           THE COURT:  Say what?
 8           MR. TACOPINA:  That they didn't talk about
 9   anything.
10           THE COURT:  Well, anything about the case.
11   They are allowed to speak.
12           MR. TACOPINA:  Well, they're not allowed to
13   have people tell them what was on a blog, your Honor,
14   so --
15           THE COURT:  Well, I don't know about that
16   either.  Depends on what they tell them.
17           THE CLERK:  Number one.
18       (Juror Donald Adams entered chambers.)
19           THE COURT:  Hi, Mr. Adams.  How are you?
20           MR. ADAMS:  All right.
21           THE COURT:  We're back again on our personal
22   interviews mode.
23           MR. ADAMS:  Fire away.
24           THE COURT:  You've been here before --
25           MR. ADAMS:  Yeah.
```

```
                         Donald Adams                    21
 1           THE COURT:  -- so you know the drill.
 2           MR. ADAMS:  I'm an old hat at this.
 3           THE COURT:  This time the reason that we're
 4   interviewing members of the jury is that when our clerk
 5   gathered up the evidence on -- today's Friday? --
 6   I guess it was last night, last night, she found this
 7   note to jurors which obviously, you know, concerned her
 8   because no one should be writing a note to the jurors.
 9           MR. ADAMS:  Note to jurors?
10           THE COURT:  Yes.
11           MR. ADAMS:  Okay.
12           THE COURT:  And I don't -- maybe you haven't
13   seen it, but, in any event --
14           MR. ADAMS:  Oh.  That.  That's from Luann.
15   That was a card.
16           THE COURT:  Yes.
17           MR. ADAMS:  She left it on the -- on Laura's
18   windshield.
19           THE COURT:  Yes.
20           MR. ADAMS:  Yes.  She told us about it, that
21   it was nice of her.
22           THE COURT:  Uh-huh.  So, anyway, you know, as
23   I explained here earlier, whenever there's any
24   communication to the jury from someone not on the jury
25   I have to conduct these interviews.  And she has been
```

```
                              Donald Adams                        22
 1  excused --
 2             MR. ADAMS:  Okay.
 3             THE COURT:  -- so she's not on the jury any
 4  more.
 5             MR. ADAMS:  Didn't even think about that.
 6  Yeah.
 7             THE COURT:  Well, it's kind of an unusual
 8  situation, but, in any event, what can you tell me
 9  about the note?
10             MR. ADAMS:  All -- all I know about it is
11  that when Laura came in, whatever morning that was, you
12  know, she says I found this note on my windshield of my
13  car turned upside down.  First thing came to my head
14  was well, okay, we got a note on there says to the
15  jurors, I wouldn't even touch the damn thing.  Excuse
16  me.  You know, I would have had gloves on or something.
17  You just don't know.  And then, you know, we opened it
18  up and everybody looked at it and, you know, all the
19  other jurors looked at it, said that was really nice of
20  her, glad that she got out of this, but, you know,
21  didn't make too much of it though.  But, you know, that
22  was -- I didn't even think about that to tell you the
23  truth, you know.
24             THE COURT:  Well, there's one part of the
25  note that makes reference to her reading a blog and
```

```
                              Donald Adams                        23
 1  determining that she is the juror with the hard eyes
 2  and it -- you know, when you read it it suggests that
 3  at least to the person that she was writing to or
 4  mentioning that to that there had already been some
 5  discussion about a blog saying one of the jurors had
 6  hard eyes.
 7             MR. ADAMS:  Yeah.  I do remember.
 8             THE COURT:  Do you remember anything about
 9  that?
10             MR. ADAMS:  I remember -- I can't honestly
11  say who or what, but I just remember somebody saying
12  that -- you know, that it was somebody had mentioned
13  it, about being a blog or whatever, not that a juror
14  got into it, but somebody mentioned it to a juror,
15  I don't know which one it is, and I -- I really can't
16  remember who it was, but --
17             THE COURT:  Was anything else said at that
18  time, any kind of comment beyond that, that you can
19  remember?
20             MR. ADAMS:  Not -- no, not -- not pertaining
21  to the case.  I really think -- I think it was more of
22  some of the jurors are interested into like how the
23  media is looking at the jurors, you know, that type of
24  thing.  I don't think it had anything to do with
25  influence of anybody.  Honestly, I don't -- I -- the
```

Donald Adams                                    24

1   sense -- I can't speak for anybody else --
2          THE COURT:  Right.
3          MR. ADAMS:  -- on the jury, but the sense
4   I get from everybody is they're being pretty honest
5   about not getting information from the outside.  I
6   think some people have been trying to give maybe -- or
7   give information on things that aren't -- or they
8   didn't feel it's relative to the case, if that makes
9   sense.
10          THE COURT:  Well, I mean, if you can
11  remember, have there been any discussions about
12  information that has been posted on the internet or by
13  the media about the case?
14          MR. ADAMS:  No, not -- not that.  Like I
15  said, the only thing that I know of is when somebody
16  mentioned, and I don't know who, about this hard eyes
17  thing, and, you know, I think it was natural for
18  everybody to wonder, wonder who the heck that is, you
19  know, but as far as to the case itself, I don't
20  remember any information, you know.
21          THE COURT:  Okay.  Have -- now let's look --
22  address you as an individual.  Have you heard or read
23  or have been told about anything about this case other
24  than what you have heard in the courtroom?
25          MR. ADAMS:  No.

Donald Adams                                    25

1          THE COURT:  Okay.  Have you had any
2   discussions with anybody that would have caused you to
3   form an opinion already or, you know, would make it
4   difficult for you to continue to be a fair and
5   impartial juror?
6          MR. ADAMS:  No.
7          THE COURT:  Do you -- have you witnessed
8   anything in the jury room that would raise any
9   questions in your mind -- I mean you are the foreperson
10  of the jury, anything in the jury room that would raise
11  any questions in your mind about any other juror acting
12  improperly or saying anything improper?
13          MR. ADAMS:  Not improper.  I think -- how
14  should I put this?  Some emotions have been running
15  higher I think just because some people don't really
16  know how to express themselves in a professional
17  manner.
18          THE COURT:  Well, look, I don't want to
19  intrude into the confidentiality of deliberations.
20  Okay?  What I'm talking about is whether anybody has
21  mentioned anything outside, you know, the evidence in
22  the case.  I mean you guys are free to express your
23  opinions and argue about the evidence and your opinions
24  are -- that's what's expected of you.  Okay?  What I'm
25  talking about is anybody, you know -- you know, said to

Da138

Donald Adams                                    26

1  you well, you know, on ABC they already said this, that
2  or the other thing or on Court TV.
3          MR. ADAMS:  No.
4          THE COURT:  When I talk about juror
5  misconduct I mean trying to influence other jurors by
6  raising information that's not part of this trial --
7          MR. ADAMS:  Right.
8          THE COURT:  -- that they heard from an
9  outside source --
10         MR. ADAMS:  No.  There's --
11         THE COURT:  -- or somebody told them or
12 something like that.
13         MR. ADAMS:  I -- unless I was in the bathroom
14 and which, you know, that doesn't happen that often,
15 lot more women in there, no, there hasn't -- I haven't
16 heard anybody say anything to that effect of, you know,
17 I heard this or I heard that.  You know, I really think
18 that some are just worried about how they're viewed and
19 worried about what information's going out to the
20 public about -- about the jurors themselves and -- and
21 that's --
22         THE COURT:  Maybe I'll address that with
23 everybody as a group.  But, you know, I have explained
24 earlier that -- and, if you remember, during jury
25 selection we did talk about the fact that there would

Donald Adams                                    27

1  be people observing this case and there would be some
2  media coverage and that obviously is not the kind of
3  thing that should influence anybody and, you know,
4  after the case is concluded I will be giving the jury
5  some further instructions about what they might expect
6  in terms of whether any members of the press are going
7  to try to contact them or not, but maybe I'll address
8  that a little bit when we go back outside.  But do you
9  believe that there's anyone that has become so
10 influenced by this media coverage that they would not
11 be able to follow the law as I've explained it?
12         MR. ADAMS:  No.  Actually I think that
13 they're taking this very, very seriously and it's the
14 point where they -- I think some -- I get a sense from
15 some of the other jurors that they really want to go
16 over every letter of the law.  I think that's why they
17 want you to explain things over.  Some of us can grasp
18 these concepts quite easily and others are having
19 problems with it.  But I think they take it very
20 seriously and, you know, it's -- it's, you know --
21         THE COURT:  Okay.
22         MR. ADAMS:  -- they just -- they don't want
23 to make a mistake and nobody wants to be railroaded
24 into making a decision and that's why it's taking as
25 much time as it is.

Da139

Donald Adams                                      28

1        THE COURT:  As the foreperson I can assure
2   you if anybody has any questions on the law or
3   questions about the case people should feel free to
4   ask.  I go over these inquiries with counsel and we do
5   our best to get back to you as quickly as possible --
6        MR. ADAMS:  Right.
7        THE COURT:  -- with the best answers.  Some
8   of these issues are complicated, as you can tell, but
9   we get -- we try to get back to you as clearly as we
10  can in short order.
11       MR. ADAMS:  All right.
12       THE COURT:  Counsel, do any of you have any
13  questions of Mr. Adams?
14       MR. TACOPINA:  No, your Honor.
15       MS. PREZIOSO:  No, Judge.
16       MR. ADAMS:  Okay.
17       THE COURT:  Mr. Adams, again please don't
18  discuss this conversation with any of the others.
19       MR. ADAMS:  I remember the drill.
20       THE COURT:  Okay.
21     (Mr. Adams left chambers.)
22       MR. TURANO:  Judge, I'm sorry if I missed
23  this, they were told not to stop -- they were told to
24  stop deliberating obviously, right?
25       THE COURT:  Well, they're not together any

Suggestions                                       29

1   more.  Yes.
2        MR. TURANO:  Well, one at a time is leaving,
3   right?
4        THE COURT:  No.  Six are up here and six are
5   downstairs.  And, you know, I repeatedly told them that
6   they must be altogether as a jury of 12.
7        MR. TURANO:  One at a time.
8        THE COURT:  No.  The room's too small even.
9        THE CLERK:  Ready for two?
10       MR. TACOPINA:  No.
11       THE COURT:  Just a minute.
12       MR. TACOPINA:  I don't want to ask these
13  questions, look like we're concerned one way or
14  another, but this whole thing about when Linda comes in
15  here who is juror number three I think we got to be a
16  little more focused why it was directed to her, what
17  did she say.  That's one thing.
18       THE COURT:  Yeah.
19       MR. TACOPINA:  The other thing is this thing
20  about wisdom to do the right thing or do what is right,
21  could you just ask them if they've discussed prior to
22  this.
23       THE COURT:  But, see, here's the problem with
24  that.  You know, I believe that the Court has a
25  responsibility to inquire into possible jury

Da140

Suggestions                                30

1  misconduct, but I don't believe that it's appropriate
2  for me to start asking people about their
3  deliberations.
4          MR. TACOPINA:  No.  No.
5          THE COURT:  Well, but, you see, when you
6  start asking people what do you mean by doing the right
7  thing there is absolutely nothing wrong with any of
8  these jurors now having formed an opinion as to the
9  guilt or innocence of Melanie McGuire.
10         MR. TACOPINA:  Right.
11         THE COURT:  I don't want to really get into
12 that with them unless, you know, I'm -- look, if
13 there's better ways to word these questions I invite
14 you to do so, but I cut him off because he
15 misunderstood -- I thought that he began to
16 misunderstand and thought that I was asking him about
17 the deliberations and how they're going and I don't
18 think that's appropriate and I don't think that people
19 should be asked what something means because then that
20 suggests like, you know, they might express their
21 opinion --
22         MR. TACOPINA:  Yeah.
23         THE COURT:  -- but I can ask them whether
24 they've had discussions, you know, about these things
25 before or, you know, about the letter or whatever, but,

Suggestions                                31

1  you know, and if you got better questions I'll ask
2  them, too.
3          MR. TACOPINA:  Yeah.  I wouldn't expect you
4  to ask them what they think the right thing is in front
5  of us, but what I would ask based upon what she wrote
6  in the letter, one line she said I hope you have the
7  wisdom to do what is right, did you have discussions
8  prior to deliberation with Miss Bachetti or anyone else
9  about what anyone thought was right, was the right
10 thing, prior to deliberations, I'm not asking them what
11 they're thinking now, prior to deliberations, because
12 again that was my concern, reading this jumped out at
13 me, I hope you have the wisdom to do what is right,
14 praying to do the right thing.  That indicates to me,
15 without Miss Bachetti indicating what the right thing
16 is in this letter, that perhaps they had some
17 discussions about the comment they need to do what is
18 right.  That's all I'm asking.  Maybe if you could word
19 it in a way that predates deliberations.
20         THE COURT:  I'll try.  I'll try, but --
21         MS. PREZIOSO:  Could I suggest --
22         THE COURT:  Miss Prezioso?
23         MS. PREZIOSO:  Yes, sir.  I'm sorry.
24 I didn't mean to interrupt you.
25         THE COURT:  That's all right.  I was almost

Da141

Suggestions                                    32

1  done.
2          MS. PREZIOSO:  Could I suggest maybe the
3  jurors just be asked if Miss Bachetti prior to her
4  being discharged expressed an opinion as to the
5  defendant's guilt or innocence?  Is that what --
6  because that's what you're trying to get at, right?
7          MR. TACOPINA:  Not just her opinion.
8          MR. TURANO:  How about prior to her being
9  discharged did anyone express their opinion?
10          MR. TACOPINA:  About what's right.
11          MR. TURANO:  Prior to her being dismissed.
12          MR. TACOPINA:  Yeah.
13          MS. PREZIOSO:  But I do think the judge is
14  right.
15          THE COURT:  I, frankly, think those kind of
16  questions will cause an intrusion into their
17  deliberations.  I got to tell --
18          MR. TACOPINA:  Prior to deliberation.  Prior
19  to deliberation.
20          THE COURT:  Yeah.  But, see, with that kind
21  of a question, did anyone express an opinion or, you
22  know, was anything said that could suggest an opinion,
23  I mean I'm not so sure there's anything wrong with any
24  of that.
25          MR. TACOPINA:  Well, if they discussed

Suggestions                                    33

1  whether they thought there was evidence pointed towards
2  guilt or innocence prior to their deliberations I think
3  there's a lot wrong with that.
4          THE COURT:  It depends on how they discussed
5  it.  I mean if they formed -- if they have formed a
6  conclusion, you know, if they began deliberations in
7  effect and formed a conclusion before all the evidence
8  was in, yes, that's inappropriate, but I'm not so sure
9  somebody's supposed to sit there for six weeks and not
10  have, you know, any opinion at all or, you know, start
11  off with any opinion.  I mean --
12          MR. TACOPINA:  Well, I agree with you, but
13  it's not whether they have their own opinions, it's
14  whether they discussed it with others, and how do we
15  know without asking that question, your Honor?  I don't
16  think we can know if they violated their oaths without
17  asking that question.  Again we're in a very leading
18  fashion prior to deliberations with Miss Bachetti
19  because she was never part of deliberations obviously.
20  Was there any discussion, not what the right thing was,
21  but as to what you all thought was right as far as
22  the -- the verdict in this case, was there any
23  discussion about that, I'm concerned about this and
24  that is I don't know how else to get to it.
25          I appreciate your concerns, your Honor.  I'll

Da142

```
                        Suggestions                    34
 1   defer however you want to word it, but I think we do
 2   have to -- this is part of this letter that this jury
 3   read, so, you know, leaving unsaid I'm praying for all
 4   of you today that you will have the wisdom to do what
 5   is right, I mean do they understand what that meant?
 6   Do they understand what that meant?
 7           THE COURT:  Well, that may be a more
 8   appropriate answer (sic).
 9           MR. TACOPINA:  Fine.  Question.
10           THE COURT:  Yes.  Question.  That would
11   suggest -- I mean the real question is now that she's
12   no longer a juror -- right? -- is she communicating
13   with these people and suggesting a particular course of
14   action to them.
15           MS. PREZIOSO:  Right.
16           THE COURT:  That's what --
17           MR. TURANO:  Right.
18           THE COURT:  -- what we really need to get at.
19           Let's try it with number two.
20           MS. PREZIOSO:  Your Honor, can I also make
21   the suggestion that perhaps you tell them before you
22   get into -- allow them to answer any question that
23   you're not seeking information about the deliberative
24   process and that should remain confidential.
25           THE COURT:  Good idea.
```

```
                      Patricia Ciaccio                 35
 1           MS. PREZIOSO:  Okay.
 2       (Juror Patricia Ciaccio entered chambers.)
 3           MS. CIACCIO:  Hello.
 4           THE COURT:  Hi, Patricia.  How are you?
 5           MS. CIACCIO:  Good.  How are you?
 6           THE COURT:  Okay.  As you know, from time to
 7   time if there are any questions that the Court has
 8   about communications to jurors and things like that I'm
 9   required to talk to jurors individually, so we're here
10   again on that issue.
11           Now, of course, deliberations have begun, so
12   I want to make it clear that I don't want to talk about
13   your deliberations any more than with respect to the
14   questions that I ask, so, you know, don't -- don't read
15   anything into what I'm asking and volunteer any
16   information because your deliberations should remain
17   confidential other than what I specifically ask about.
18   Okay?
19           MS. CIACCIO:  Uh-huh.
20           THE COURT:  The -- it came to my attention
21   that one of the jurors who was excused left a note to
22   the rest of the jury.  This is the note.  I don't know
23   if you've seen it before.  You could --
24           MS. CIACCIO:  Oh.  Yeah.
25           THE COURT:  I don't want you to read it if
```

Da143

Patricia Ciaccio                              36

1  you haven't seen it before, but have you read that
2  before?
3          MS. CIACCIO:  I didn't personally read it.
4  It was read to us.
5          THE COURT:  Okay.  Can you tell me what you
6  know about the note or what you remember.
7          MS. CIACCIO:  The person that left the note
8  said good luck I guess or, you know, that's -- that's
9  basically what I really took from this, you know.
10         THE COURT:  Was it read to the whole jury?
11 Is that how you heard it?
12         MS. CIACCIO:  Well, I don't know -- I don't
13 remember how many people were actually standing there
14 when the note was read.
15         THE COURT:  Where was it?  Was it in the jury
16 room or downstairs or --
17         MS. CIACCIO:  Downstairs.  That's where it
18 was read, where I heard it.  I don't know what happened
19 to it afterwards, you know.
20         THE COURT:  But you heard it downstairs --
21         MS. CIACCIO:  Uh-huh.
22         THE COURT:  -- when you were gathered
23 together?
24         MS. CIACCIO:  Uh-huh.
25         THE COURT:  Do you know how many people were

Patricia Ciaccio                              37

1  there at the time?
2          MS. CIACCIO:  Maybe five people.  I'm not
3  sure.  I didn't really take note.
4          THE COURT:  So again, I know this is hard,
5  but I have to go through this, can you tell me to the
6  best of your recollection what you heard about the
7  note.
8          MS. CIACCIO:  Where -- where you mean from
9  start -- where it was found?
10         THE COURT:  Well, whatever was mentioned
11 about it.
12         MS. CIACCIO:  That it was found on one of the
13 juror's windshields when she came out of the house in
14 the morning and she was afraid to read it, but she read
15 it.  She opened it, she read it, and basically saying,
16 you know, like I said, something like good luck or
17 whatnot.  That's -- you know, I really didn't make much
18 of it.
19         THE COURT:  Was there anything that was
20 reported about the letter that would have suggested to
21 you that the writer of the letter had an opinion as to
22 what you guys should do?
23         MS. CIACCIO:  No.  Or I didn't take it that
24 way.
25         THE COURT:  The -- the letter seems to

Da144

Patricia Ciaccio                                      38

1   suggest that there may have been an earlier comment
2   about someone learning of a blog that mentioned a juror
3   with hard eyes or something like that.  Does that ring
4   a bell with you?
5            MS. CIACCIO:  Yeah.  It does.  Yeah.  Yeah.
6   Yeah.
7            THE COURT:  What do you remember about that?
8            MS. CIACCIO:  Yeah.  That the person who
9   wrote this said that she found out that she had the
10  hard eyes.  That's -- yeah.  I forgot about that.
11           THE COURT:  But -- but that means that there
12  had to be a discussion earlier about somebody having
13  the hard eyes.  Like what would that mean to you?
14  If --
15           MS. CIACCIO:  Yeah.
16           THE COURT:  -- someone writes it and says I'm
17  the one with the hard eyes what does that mean?
18           MS. CIACCIO:  Yeah.  Somebody mentioned that.
19  Right.  Somebody mentioned that somebody told -- I
20  don't even remember who it was.  Somebody told somebody
21  that somebody was writing a blog and that one of the
22  jurors had hard eyes.
23           THE COURT:  Okay.
24           MS. CIACCIO:  I --
25           THE COURT:  Do you recall any other

Patricia Ciaccio                                      39

1   discussions about people reporting information that
2   comes from the internet or from television or from
3   newspapers or anything like that?
4            MS. CIACCIO:  Somebody mentioned that --
5   something about our ages or where we lived, something
6   somebody -- that -- you know, I don't get too involved
7   in a lot of these, you know -- I sit there and I wait
8   to be called a lot of times.
9            THE COURT:  Have you heard anything from
10  anyone about the facts of the case or the merits of the
11  case that have been reported from outside the
12  courtroom?
13           MS. CIACCIO:  No.
14           THE COURT:  Have you overheard any
15  discussions in the jury room where someone has been
16  reporting information from outside the courtroom about
17  the merits of the case or any information about the
18  case or anything like that?
19           MS. CIACCIO:  No.
20           THE COURT:  Have you been exposed to any
21  information that would prevent you from following the
22  law and being an impartial juror as I've explained it?
23           MS. CIACCIO:  No.
24           THE COURT:  Are you aware of anybody else
25  that you feel has reported information or been exposed

Patricia Ciaccio                                    40

1  to information outside the courtroom?
2         MS. CIACCIO:  Not to my knowledge, no.
3         THE COURT:  Let's see.  And you -- you don't
4  believe that it was mentioned that the author of the
5  note was trying to communicate any opinion to you about
6  how you guys should vote on this case or anything like
7  that?
8         MS. CIACCIO:  No, I didn't take it that way.
9         THE COURT:  Counsel, do you have any
10 questions of Miss Ciaccio?
11        MR. TACOPINA:  Miss Ciaccio, who all read the
12 note?
13        MS. CIACCIO:  The person who actually
14 received it.
15        MR. TACOPINA:  Laura?
16        MS. CIACCIO:  Laura.
17        MS. PREZIOSO:  I have one question.  Does
18 that note -- has it had any effect whatsoever on your
19 deliberations?
20        MS. CIACCIO:  No.
21        MS. PREZIOSO:  Thank you.
22        MS. CIACCIO:  My face is so red.
23        THE COURT:  It's warm in here.
24        MS. CIACCIO:  I know.
25        THE COURT:  Sorry.

Patricia Ciaccio                                    41

1         MS. CIACCIO:  That's okay.
2         THE COURT:  We don't usually have this much
3  hot air in here with me starting and doing all the
4  talking, you know.
5         But, in any event, please don't discuss
6  this --
7         MS. CIACCIO:  No, I won't.
8         THE COURT:  -- with anybody else and, you
9  know, we'll try to get going as soon as I go through
10 the rest of the jurors.
11        Thank you very much.
12        MS. CIACCIO:  You're welcome.
13        MS. PREZIOSO:  Thank you.
14        MS. CIACCIO:  Thank you.
15        MR. TACOPINA:  Thank you.
16     (Ms. Ciaccio left chambers.)
17        THE CLERK:  Ready for the next one?
18        MR. TACOPINA:  No.
19        THE COURT:  What?
20        MR. TACOPINA:  I just want to make a request.
21        THE COURT:  Okay.
22        MR. TACOPINA:  What I'd like to do is just
23 read this part of the note and say in the note it said
24 I'm praying for all of you today that you will have the
25 wisdom to do what is right, did you attach any

Da146

1  significance to that.  The way you're asking it
2  I appreciate, I don't want to get into what they're
3  doing now, I think the preface what Patty suggested,
4  not saying where they're at or anything like that, I'm
5  really uncomfortable with this thing about heralding to
6  the jurors they have the wisdom to do what is right, is
7  it just a vague statement or because I don't think it's
8  clear that should be relaying to them what she thinks
9  they should do.  My problem is did they have
10 discussions before deliberations with this particular
11 juror about her opinion.  Why can't you just read the
12 question?
13        THE COURT:  Because I'm not satisfied that
14 all of these 12 jurors have any idea what this letter
15 says in its entirety and I don't really want to read it
16 to them.  You've just heard someone say she thinks five
17 people were present, obviously could be more or less,
18 but it doesn't seem like it was very carefully
19 discussed, and when I spoke to her she clearly doesn't
20 have a real strong recollection of it and if the evil
21 that we're trying to address here is the potential of
22 being influenced by this letter or to uncover whether
23 or not there were prior discussions, then reading the
24 letter only makes it worse.
25        MR. TACOPINA:  Well, she said she heard the

1  letter.  I agree if a juror --
2        THE COURT:  She didn't say she remembered
3  every word of it or that she -- you know, she remembers
4  it being a letter that involved, you know, thank you,
5  you know, and I'm not very comfortable reading the
6  whole letter to them.
7        MR. TACOPINA:  I'm not asking you read the
8  whole letter, but the one line that says you'll have
9  the wisdom to do what is right.  Miss Juror, did you
10 discuss with Miss Bachetti, whatever her name is, prior
11 to her being excused what either you or she thought was
12 right.  I think if we don't do that I think we're
13 potentially letting an issue escape us, and I'm not
14 talking about jurors who haven't seen the letter, but
15 if this was read to them, this is a grave concern, that
16 you'll have the wisdom to do what is right, did you
17 discuss with Miss Bachetti -- I'm sorry, I'm butchering
18 her name -- either you or she thought it was right
19 prior to deliberation.
20        THE COURT:  What's the State's position?
21        MS. PREZIOSO:  Judge, I -- I -- I think if
22 the juror is asked if the letter had any effect on
23 their deliberations that means they weren't influenced.
24 I -- I think that that's probably fine.  I understand
25 what Mr. Tacopina is saying.  I guess what I'm not

Suggestions                                44

1  understanding is are you concerned with discussions
2  prior to deliberations rather than the effect that the
3  letter has had since?
4        MR. TACOPINA:  Both.  But, yes, Patty, in
5  particular prior.  Not that each juror may have in
6  their own mind formed an opinion and now we're
7  deliberating, nothing we could do about that.  Like the
8  judge said, I agree that's nothing necessarily
9  improper, but to be discussing with two jurors what
10 they thought was right prior to deliberations I think
11 is juror misconduct and that's what I want to uncover
12 if there was, and certainly I think that's the first
13 level of inquiry, and if there was no discussion about
14 it then the general question about whether this would
15 affect their deliberations is appropriate and it covers
16 everything I think.
17       MS. PREZIOSO:  And you don't think the judge
18 asking whether the juror interpreted the writer as
19 having a specific opinion covers it?
20       MR. TACOPINA:  No because I don't think she's
21 expressing her opinion here.  My concern is the fact
22 she's alluding to doing what is right.  Not expressing
23 that opinion makes me believe that she had a discussion
24 with someone -- and I could be wrong, by the way, makes
25 me believe she had a discussion with someone about what

Suggestions                                45

1  she thought was right before she left.
2        MS. PREZIOSO:  Well, I think doing what's
3  right -- your Honor, forgive me, I don't mean to
4  address Mr. Tacopina instead of you, but for me I --
5  I would interpret doing what's right as reading the
6  evidence, following the law and making a decision, and
7  I don't think that the term of and by itself I'm
8  praying for you that you do what's right is indicative
9  of that.  But, again, your Honor, I defer to the Court.
10       I -- I'm not in disagreement with what
11 Mr. Tacopina is suggesting.  Perhaps I just think that
12 the Court's questions are covering it, but I defer to
13 the Court.
14       THE COURT:  Yeah.  I'm inclined to think my
15 questions are covering it, Mr. Tacopina.  I'll try to
16 work around it, but I really do not want to ask
17 questions that will try to elicit from this jury what
18 they're thinking and any question involving the
19 interpretation of what's right, you know, invites
20 someone to talk about what they think is right.  I hear
21 what you're saying, but, you know, I'm just going to
22 have to do this as best I can.
23       If you want to ask particular questions I'm
24 allowing you to do that as long as, you know, you're
25 not going to get into their deliberations.

Suggestions                                      46

1   MR. TACOPINA:  Okay.  So, Judge, I don't want
2   to ask that question, you say don't ask that, but my
3   simple question would be, you know, in this letter if
4   they've read it or heard it, where Miss Bachetti says
5   you hopefully will have the wisdom to do right, did you
6   have a prior discussion before deliberations again with
7   Miss Bachetti what is right, don't tell us what you
8   think, I don't think that covers it.
9         THE COURT:  Well, if they say yes you're
10  going to want to have the discussion, right?
11        MR. TACOPINA:  If they say yes there's a
12  violation, two jurors decided --
13        THE COURT:  I don't know there's a violation.
14        MR. TACOPINA:  I don't know how we know
15  unless we ask.
16        THE COURT:  Well, then I don't know how you
17  get into all this without intruding into deliberations.
18  That's the problem.
19        MR. TACOPINA:  Prior to deliberations.
20        MS. PREZIOSO:  May I make another suggestion?
21        The judge ask did you feel that the writer of
22  the letter was indicating a direction to go, whether
23  guilty or innocent.
24        MR. TACOPINA:  Judge asked that already.
25        MS. PREZIOSO:  Then follow it up with prior

Linda Krzyzanowski                               47

1   to deliberations were there any discussions where she
2   expressed her opinion to you.  Would that cover it?
3         MR. TACOPINA:  I think so.
4         THE COURT:  I'll do the best I can.  We got
5   to get rolling here.
6         (Juror Linda Krzyzanowski entered chambers.)
7         THE COURT:  Hello, Linda.
8         MS. KRZYZANOWSKI:  Hi.
9         THE COURT:  How are you?
10        We're back again interviewing jurors --
11        MS. KRZYZANOWSKI:  Yes.
12        THE COURT:  -- as you can tell.  And, as I
13  explained to you the first time we did it, it's kind of
14  a routine thing that when the Court has any concern or
15  reason to believe that there's been some communication
16  from outside the jury to the jury about the case,
17  whether it be because of media coverage or otherwise,
18  the law requires that I interview the jurors.  It's
19  just kind of a routine part of our safeguards, if you
20  will, so I don't want you to feel uncomfortable.
21        The reason I'm talking to you all now is that
22  the Court learned that one of the jurors who was
23  excused sent a note in to the jury --
24        MS. KRZYZANOWSKI:  Yes.
25        THE COURT:  -- and so, you know, since she is

Da149

Linda Krzyzanowski                    48

1  no longer on the jury, she is someone from outside who
2  is communicating with you guys, and so I have to talk
3  to you a little about what happened and what you make
4  of it.
5          So can you tell me, first of all, what you
6  remember hearing about the note.
7          MS. KRZYZANOWSKI:  Hearing about the note?
8          THE COURT:  Or seeing the note if you saw it.
9  I don't know.  What do you know about the note?
10         MS. KRZYZANOWSKI:  I read the note.
11         THE COURT:  Okay.  You actually read it
12 yourself?
13         MS. KRZYZANOWSKI:  Yes.
14         THE COURT:  Did you read it to yourself or
15 did you read it out loud?
16         MS. KRZYZANOWSKI:  When the -- who received
17 it?  When the person that received it came in she
18 explained that she was nervous because she had an
19 envelope on her car and when she saw it she said to
20 said to the jurors, she didn't want to touch it, she
21 didn't know what it was, she was nervous.  She said
22 I really didn't read it.  That's because she was late.
23 She's always late.  So when she got here she just
24 looked to see who it was from and she felt better,
25 whatever, and I think she just handed it to me and

Linda Krzyzanowski                    49

1  I just read it.  Everybody wasn't there yet.
2          THE COURT:  Before I ask you any questions,
3  I forgot to say to you since your deliberations have
4  begun I don't want you to volunteer more information
5  than I ask you about because I don't really want to
6  intrude into the confidentiality of your deliberations.
7  Okay?  There's certain things I have to ask about which
8  I need you to try to remember and tell me about, but,
9  you know, try not to get beyond what I'm asking you and
10 go into your current deliberations.  Okay?
11         MS. KRZYZANOWSKI:  Right.
12         THE COURT:  Now, in terms of the letter,
13 again where were you when you first were shown the
14 letter?
15         MS. KRZYZANOWSKI:  Downstairs in the lobby.
16         THE COURT:  How many -- you remember how many
17 jurors were there?
18         MS. KRZYZANOWSKI:  About six I would say.
19         THE COURT:  Now, did they ultimately come to
20 learn about the letter, too?
21         MS. KRZYZANOWSKI:  Yes.  I think so.  I think
22 somebody read it in the jury room.
23         THE COURT:  Okay.  So your recollection is
24 that it was read to the jury in the jury room when all
25 the jurors were present?

Linda Krzyzanowski                                          50

1       MS. KRZYZANOWSKI:  I'm not sure if they read
2  it out loud.
3       THE COURT:  But you think they all kind of
4  were aware of it?
5       MS. KRZYZANOWSKI:  Yes.
6       THE COURT:  Now, tell me what you remember
7  now since you read the letter.  What do you remember
8  about it?
9       MS. KRZYZANOWSKI:  That she said that she's
10  sorry she couldn't be there, her -- her thoughts and
11  prayers were with us and she knows -- well, you know,
12  make the right decision I believe, something to that
13  effect, and in a way she -- she was relieved because of
14  the stress that it's putting on us, and she said I'm
15  sure Deb and Rafik are, and then she writes -- she
16  wrote something to me also.  I did tell them something
17  that I did hear from outside, but I -- it was about us,
18  something somebody told me they said about us, and it
19  was about somebody that had hard eyes.
20       THE COURT:  Who told you?
21       (Mr. Tacopina's cell phone is ringing.)
22       MR. TACOPINA:  Gees.  I'm sorry, your Honor.
23       THE COURT:  Nice music, but we don't really
24  need music now.
25       MR. TACOPINA:  Sorry about that.

Linda Krzyzanowski                                          51

1       MS. KRZYZANOWSKI:  I think it was my sister.
2       THE COURT:  She mentioned to you something
3  about hard eyes?
4       MS. KRZYZANOWSKI:  Yes.  Because many people
5  been telling us they're writing stuff, they're putting
6  our hometown, our ages -- right? -- our names.
7       THE COURT:  I don't know that.  I mean I
8  don't see all the -- you know, I obviously can't keep
9  track of all the newspapers and things like that.
10       MS. KRZYZANOWSKI:  Right.  Right.  I'm not
11  saying I saw it.
12       THE COURT:  I mean your names are public
13  records and your hometown is a public record.  Before
14  you're selected you come off a list of driver's
15  licenses and voter registration and it's a public
16  record.  Your addresses, your phone numbers, your ages
17  are not given out to anybody.  So now that's not to
18  say, you know, none of us here have a great deal of
19  privacy any more because of the way records are kept.
20  But I can assure you that as far as the court records
21  are concerned just your names and your home towns are
22  listed in the juror records and anyone has a right to
23  look at juror records and get a name or a hometown.
24       But, in any event, so -- so your sister
25  tells --

Da151

Linda Krzyzanowski                                          52

1          MS. KRZYZANOWSKI:  Right.  And we talk about
2     what we hear about us.  Are we not allowed to?
3          THE COURT:  Well, you're not allowed to talk
4     about the case.  But what do you hear about us?
5          MS. KRZYZANOWSKI:  Actually Deb -- Deb.
6     Yeah.  Deb came in and -- actually somebody called, one
7     of the newspapers called her after she was excused.
8          THE COURT:  Yeah.  That wouldn't surprise me.
9          MS. KRZYZANOWSKI:  Somebody else came in and
10    said one of the papers had our name, our occupation,
11    our age and our hometown, and we do talk about that
12    stuff.  And I also mentioned that someone told me about
13    the hard eyes and so she did write in that that it was
14    her.  I guess she found out it was her.  She said,
15    by the way, Linda, it was me who has the hard eyes.
16         THE COURT:  Have you ever talked about the
17    merits of the case or the facts of the case or has
18    anyone reported anything like that to you?
19         MS. KRZYZANOWSKI:  Absolutely not.  Nothing
20    about the case, no.  Outside the deliberation room?
21         THE COURT:  Yeah.
22         MS. KRZYZANOWSKI:  No.
23         THE COURT:  Has this --
24         MS. KRZYZANOWSKI:  I expressed my concerns
25    like to my husband.  I was very upset yesterday.  We

Linda Krzyzanowski                                          53

1     had a very stressful day yesterday and I'm a stressful
2     person.
3          THE COURT:  Again I don't want to talk about
4     your deliberations.
5          MS. KRZYZANOWSKI:  Right.
6          THE COURT:  I mean --
7          MS. KRZYZANOWSKI:  The effects, as far as the
8     evidence goes, the case itself, absolutely, I haven't
9     talked to anybody about anything.
10         THE COURT:  Has anybody tried to contact you
11    about the case other than Miss Bachetti?  I mean has
12    anybody communicated with you, any reporters tried to
13    reach you or anything like that?
14         MS. KRZYZANOWSKI:  No, not at all.  Actually
15    I actually bumped into Melanie yesterday, too,
16    physically.  You know what I mean?  It was like --
17    I guess I should tell you that.  Going into the coffee
18    shop, I was turning around talking, going in, she was
19    talking, and we kind of just, you know --
20         THE COURT:  Well, that happens.
21         MS. KRZYZANOWSKI:  Right.  But just to be
22    clear on everything.
23         THE COURT:  This Deborah, when did she -- she
24    was, you know, determined to be an alternate, right?
25         MS. KRZYZANOWSKI:  She is an alternate.  You

Da152

Linda Krzyzanowski                    54

1  excused her, then I believe you told her she could come
2  back the next day.
3         THE COURT:  No.  That's Jennifer Malone.
4         MS. KRZYZANOWSKI:  See, I got them mixed --
5  I'm sorry.
6         THE COURT:  Jennifer Malone was going to be
7  excused because of her vacation --
8         MS. KRZYZANOWSKI:  Yes.
9         THE COURT:  -- plans.
10        MS. KRZYZANOWSKI:  I'm sorry.  It was her,
11 not Deborah, that got the phone call.
12        THE COURT:  So what did she say?
13        MS. KRZYZANOWSKI:  Deborah?  I mean I --
14        THE COURT:  No.  Jennifer Malone.
15        MS. KRZYZANOWSKI:  I'm sorry.  I get them
16 confused.  She said she went home yesterday after you
17 excused her and someone from the paper called her
18 house.  She thought it was her husband.  She didn't
19 look at the Caller ID.  She just talked to her husband.
20 She picked it up.  Jennifer.  She said yes.  They said
21 it was the paper.  He said would you like to talk about
22 the case.  And she said no.  And they said you're
23 excused.  And she said well, she wouldn't do it.  She
24 said the conversation lasted two minutes I believe and
25 that was it.

Linda Krzyzanowski                    55

1         THE COURT:  And it was unfortunate we had
2  agreed to excuse her, but then she said she wanted to
3  be excused the next day because she wanted to come and
4  listen to the closing arguments, so she was not yet
5  excused, but I could see if -- if a reporter thought
6  she was excused, so --
7         MS. KRZYZANOWSKI:  There's no other comments,
8  to like we just hear that I guess people tell us, what
9  the jury's (sic) saying about us.  Like the first day
10 somebody said they were saying that there was a comment
11 made about even a caveman can do it or something.
12 That's what -- I'm just telling you.  I'm just telling
13 you like we're not believing everything, but we do talk
14 about what we hear about that.  But as far as the
15 evidence --
16        MR. TACOPINA:  I'm sorry.  Is it my turn?
17        THE COURT:  Yeah.
18        MR. TACOPINA:  What do you mean?  Even
19 a caveman could do what?
20        MS. KRZYZANOWSKI:  They said they were
21 talking about the jury and they referred us to like
22 cavemen.
23        MR. TACOPINA:  Do you know what context?
24        MS. KRZYZANOWSKI:  We don't know.  That was
25 one of the first things we started talking about.  Like

Da153

Linda Krzyzanowski                                    56

1  somebody said they nicknamed the jurors.  You know what
2  I mean?  And that just came up.  And so like that was
3  just one of the things that came up, the hard eyes.
4  There were a couple other ones, but --
5            THE COURT:  Well, let me ask you this.  Have
6  you -- you got to really, you know, think about this,
7  but have you -- has anybody mentioned anything to you
8  or has anything been brought to your attention that
9  would in any way have an influence as to how you would
10 decide this case?
11           MS. KRZYZANOWSKI:  No.
12           THE COURT:  Are you satisfied that you can
13 continue to deliberate and decide the case based only
14 on the evidence that's been presented in the courtroom?
15           MS. KRZYZANOWSKI:  Yes.
16           THE COURT:  Any questions, counsel?
17           MS. PREZIOSO:  No.
18           MR. TACOPINA:  Could I ask like one thing,
19 your Honor?
20           THE COURT:  Sure.
21           MR. TACOPINA:  With -- with Miss Malone,
22 Malone or Malone, I'm not --
23           THE COURT:  Malone.
24           MS. KRZYZANOWSKI:  Jen.
25           MR. TACOPINA:  Yeah.  Jen.  What she told you

Linda Krzyzanowski                                    57

1  about that with the paper calling her, did she come
2  back the next day to the jury room like to deliberate?
3            MR. TACOPINA:  Not to deliberate.  I mean she
4  was back, but --
5            MS. KRZYZANOWSKI:  She came back because I
6  think you told her she could come back and listen the
7  next day and she came back.
8            MR. TACOPINA:  The person contacted her the
9  night before I guess?
10           MS. KRZYZANOWSKI:  As soon as she got here,
11 I guess they were in the courtroom, you did mention,
12 I don't think you said it in front of us, that she was
13 excused.
14           THE COURT:  No.  What happened was we were in
15 court and we had made a determination because of the
16 weather conditions that one person was going to be
17 excused and Miss Malone because of her vacation
18 asked -- had asked to be excused, so we had made a
19 determination that that would happen, but Miss Malone
20 wasn't excused until the next day because she wanted to
21 hear the -- she wasn't going on vacation until after
22 the closing arguments, so she wanted to come back in --
23           MS. KRZYZANOWSKI:  Right.
24           THE COURT:  -- but I guess one of the
25 reporters thought she had been excused I guess.

Da154

Linda Krzyzanowski                                    58

1          MS. KRZYZANOWSKI:  Right.
2          THE COURT:  But, in any event, she told you
3    she didn't speak --
4          MS. KRZYZANOWSKI:  She said the conversation
5    lasted less than two minutes she said --
6          THE COURT:  Okay.
7          MS. KRZYZANOWSKI:  -- that she didn't want to
8    talk about it, she couldn't talk about it.  He tried to
9    tell her she could talk about it, she was excused.  And
10   she was like oh, well, I'm not going to.  That's how
11   she said it.
12         THE COURT:  All right.  Anything else?
13         MR. TACOPINA:  No, your Honor.
14         THE COURT:  All right.  Linda, thank you very
15   much.
16         MS. KRZYZANOWSKI:  All right.
17         THE COURT:  Please don't talk to anybody
18   about this conversation and if any reporters call you
19   don't talk to them.
20         MS. KRZYZANOWSKI:  I won't.
21         THE COURT:  Okay?  Thanks.
22       (Ms. Krzyzanowski left chambers.)
23         THE COURT:  Want to take a 10-minute break?
24         MR. TACOPINA:  Yeah.
25         MS. PREZIOSO:  Ten minutes, Judge?

Patricia O'Donnell                                    59

1        (A recess was taken.)
2        (Juror Patricia O'Donnell entered chambers.)
3          MS. O'DONNELL:  Hello.
4          THE COURT:  Patricia, our happiest juror.
5    Glad to see you're still happy.
6          MS. O'DONNELL:  Yeah.
7          THE COURT:  As I've explained before, every
8    now and then, if there's any concern by the Court that
9    there's been any kind of media coverage that may have
10   been communicated to the jury or any type of outside
11   communication it's routine procedure that I interview
12   the jurors, so we're back here again.  I want you to
13   understand though that now that deliberations have
14   begun I really don't want to intrude into the
15   confidentiality of your deliberations.  If I ask you
16   anything that seems to be in that direction just answer
17   me very precisely, but don't volunteer any information
18   about the deliberations.  Okay?
19         MS. O'DONNELL:  Okay.
20         THE COURT:  It has come to my attention that
21   one of the jurors who were excused had left a note for
22   the jury and I wanted to ask you what you know about it
23   or what you remember about it.
24         MS. O'DONNELL:  About the note?
25         THE COURT:  Yeah.

Patricia O'Donnell                    60

```
 1          MS. O'DONNELL:  She was wishing us good luck,
 2  sorry she wasn't there.
 3          THE COURT:  When did you first learn of the
 4  note?
 5          MS. O'DONNELL:  Today's Friday?
 6          THE COURT:  Yeah.  I think.
 7          MS. O'DONNELL:  Yeah.  Me, too.
 8  Wednesday or -- yeah.  I think Wednesday.
 9          THE COURT:  You remember where it was that
10  you learned of the note?
11          MS. O'DONNELL:  Here.  Downstairs.
12          THE COURT:  Was it downstairs or upstairs?
13          MS. O'DONNELL:  Downstairs they said they had
14  the note.  She read it to everybody upstairs.
15          THE COURT:  And do you remember who read it?
16          MS. O'DONNELL:  Uh-huh.
17          THE COURT:  Who was it?
18          MS. O'DONNELL:  Juror number five.
19          THE COURT:  Laura?
20          MS. O'DONNELL:  Uh-huh.
21          THE COURT:  Did she read the whole note?
22          MS. O'DONNELL:  I think so.  Yeah.
23          THE COURT:  What do you remember that she --
24  you know, that the note said?
25          MS. O'DONNELL:  Just that she was wishing us
```

Patricia O'Donnell                    61

```
 1  luck, it was an awesome responsibility, she was praying
 2  for all of us.
 3          THE COURT:  Do you remember anything about
 4  this issue of the juror with hard eyes?
 5          MS. O'DONNELL:  Oh.  Well -- yeah.  That's
 6  her.
 7          THE COURT:  Tell me -- what does that mean to
 8  you?  I mean what you know, what's this issue of a
 9  juror with hard eyes?
10          MS. O'DONNELL:  That she was just looking
11  intently at everything.  That's really it.
12          THE COURT:  But how would you -- like if
13  somebody says to you I'm the juror with hard eyes --
14          MS. O'DONNELL:  Uh-huh.
15          THE COURT:  -- you know, what kind of a
16  connection does that give?  Where does that come from?
17          MS. O'DONNELL:  There was I think some talk
18  about the jurors outside and somebody said somebody has
19  hard eyes and she confirmed that it was her.
20          THE COURT:  So you remember it being reported
21  that somebody outside was making reference to the
22  jurors?
23          MS. O'DONNELL:  Yeah.
24          THE COURT:  When did that happen?  If you
25  remember.
```

Patricia O'Donnell                                        62

1    MS. O'DONNELL:  I have no idea.  It's been
2  a long few weeks.  I don't remember when exactly.
3    THE COURT:  Have you overheard any other
4  discussions about information from outside the --
5    MS. O'DONNELL:  About us specifically?
6    THE COURT:  Well, about the case or you.
7    MS. O'DONNELL:  Not about the case.  Just
8  about different things that they've said about the
9  jurors.  Just somebody looked like they were sleeping.
10  We heard that all of our home towns and ages were
11  listed in the paper the other day.  Really just basic
12  things about what they're saying about us, like that.
13    THE COURT:  I'll explain this to all of the
14  jurors, but I don't know about this issue about the
15  ages.  I mean your names and your home towns, whatever
16  occupations that you reported come from this juror list
17  that comes from voter registration and driver's
18  licenses and those are deemed to be public records.
19  People can get them.  The Court does not give out any
20  information about anyone's specific address or age or
21  anything like that.
22    MS. O'DONNELL:  No one's going to show up at
23  my house.
24    THE COURT:  I guess unless you're real good
25  at hiding somebody can find out, all of us, where we

Patricia O'Donnell                                        63

1  live, but we don't give that information out and
2  reporters are not permitted to try to contact you
3  during deliberations or while the case is going on.
4  They may try to contact you after the case and I will
5  give you further instructions about how you may respond
6  to that, you know, at the appropriate time, but you
7  could rest assured it's not anything you have to worry
8  about.
9    Now, but -- but aside from this issue of
10  somebody reporting to you or mentioning to you that the
11  jurors are being talked about, was there any other
12  discussion about the case or the evidence or anything
13  like that?
14    MS. O'DONNELL:  No.
15    THE COURT:  When this -- this letter from
16  Miss Bachetti was read, there's a part of it that talks
17  about hoping that you do the right thing.  What -- did
18  that mean anything to you or did that relate back to
19  any prior conversations or anything like that?
20    MS. O'DONNELL:  No.
21    THE COURT:  I think there's a spot that says
22  I'm praying for all of you today that you will have the
23  wisdom to do what is right.  That's the exact quote.
24  Did that -- does that relate to any conversations that
25  you had with her before or her suggesting to you how

Da157

Patricia O'Donnell                                        64

1   you should vote on the case or anything like that?
2          MS. O'DONNELL:  No.
3          THE COURT:  Has -- have there been any other
4   discussions that would in any way make it difficult for
5   you to follow the law and try to reach a verdict simply
6   on the evidence that's been produced in court?
7          MS. O'DONNELL:  No.
8          THE COURT:  Have you been -- I mean have you
9   been exposed to any information that would possibly
10  influence you in a way that, you know, is contrary to
11  what I've explained your duties are?
12         MS. O'DONNELL:  No.
13         THE COURT:  Counsel, any questions --
14         MR. TACOPINA:  No.
15         THE COURT:  -- of Miss O'Donnell?
16         MS. PREZIOSO:  No.
17         MS. O'DONNELL:  No.
18         MS. PREZIOSO:  Thank you.
19         THE COURT:  Okay.  Thank you very much.
20         MS. O'DONNELL:  You sure?
21         THE COURT:  Please -- please -- I guess I got
22  to mention this to you.  Please don't talk to anybody
23  about the case and even this issue.  I know it's not
24  exactly about the case, but jurors should not be
25  talking about what other people might be saying.

Patricia O'Donnell                                        65

1          MS. O'DONNELL:  Saying about us?
2          THE COURT:  You know, it really isn't
3   productive.  Do you think -- I guess I should ask.  Do
4   you think that -- first of all, are you concerned about
5   what other people might be saying about you or would
6   that tend to influence your verdict in any way?
7          MS. O'DONNELL:  No.  I am concerned, kind of
8   upset, having a Court TV nickname like everybody has,
9   but other than that --
10         THE COURT:  How do you know?  You might.
11         MS. O'DONNELL:  I don't know, but I'm taping
12  every day, but I don't know.
13         THE COURT:  You'll be able to look it up some
14  time from now, but who knows.  You might.
15         All right.  Well, thank you very much,
16  Mrs. O'Donnell.
17         MS. O'DONNELL:  Thank you.  Have a good
18  weekend.
19         MS. PREZIOSO:  Thank you.
20         MR. TACOPINA:  Good-bye.
21     (Ms. O'Donnell left chambers.)
22         THE CLERK:  Next?
23         THE COURT:  Yep.
24     (Juror Laura Krepps entered chambers.)
25         MS. KREPPS:  Hello.

Laura Krepps                                            66

```
 1          MR. TACOPINA:  Hi.
 2     MS. KREPPS:  Hi.
 3          THE COURT:  Hi.  Laura, how you doing?
 4     MS. KREPPS:  Very good.  Thank you.
 5          THE COURT:  As you know from the last time we
 6 talked to all the jurors, whenever I give any kind of
 7 indication that there has been any type of media
 8 coverage or communication --
 9     MS. KREPPS:  Oh.  Okay.
10          THE COURT:  -- with jurors it's a routine
11 part of procedure that we have to speak to all the
12 jurors.
13     MS. KREPPS:  Oh.
14          THE COURT:  Since you've begun deliberations
15 I really don't want to talk to you about your
16 deliberations, so don't, you know, volunteer any
17 information like that.  What I do want to discuss with
18 you is this letter, you know, that was sent to the
19 jurors or brought to the jurors from Luann Bachetti.
20     MS. KREPPS:  Oh.  The card that she wrote.
21 Okay.
22          THE COURT:  Is it a card or -- can you tell
23 me, you know, what you know about it.
24     MS. KREPPS:  Yeah.  It was actually left on
25 my car --
```

Laura Krepps                                            67

```
 1          THE COURT:  Okay.
 2     MS. KREPPS:  -- in the morning because she
 3 lives in Milltown by me and it actually threw me for
 4 a loop because, you know, walking out in the morning
 5 I see a card on my windshield.  You know, my first
 6 things is, you know, just being exausted after the
 7 trial I went to bed early, so I'm saying okay, who is
 8 trying to get hold of me who won't come to the house,
 9 that sort of thing.  When I picked it up, turned it
10 over, the card said to all the jurors and, you know,
11 your heart kind of stops at that point, and I was like
12 oh, okay, you know, and I got in my car and I looked
13 around and, you know, from sitting through, you know,
14 testimony and forensic, after this I took my sleeve of
15 my sweater, you know, and I was like okay, secondary
16 note, and I pulled the card out like forensic evidence,
17 so I'm, you know, very careful and like I opened it up
18 and I'm looking at the handwriting, I'm going okay and,
19 you know, it -- I didn't get into like the wording of
20 it, but it was so long, it didn't say who it was from,
21 and I'm flipping it over and I went oh, Luann.  I went
22 okay, okay, like she lives two blocks from me.  And if
23 you guys know, like Milltown lost power the day of that
24 storm, so, you know, I got dressed in the dark and, you
25 know, whatever, and I knew she wasn't going to come, so
```

Laura Krepps                                    68

1   that's why I think she brought it to my house because
2   I was close to her, she lives like two blocks from me.
3   So I didn't read it in the car, in the car like before
4   I got here, but I shared my story, they thought it was
5   funny as anything, and we all read it like together.
6   So they were like oh, my God, are you okay.  I'm like
7   yeah, I'm just a little shaken up.
8            THE COURT:  Did she talk to you ahead of time
9   about sending you the letter?
10           MS. KREPPS:  No.  I had no idea she was even
11  going to reach out or like send the card.  I know that
12  she has like some people's like phone numbers, that
13  sort of thing, but, no, she didn't say like, you know,
14  she was going to leave the card or anything.
15           THE COURT:  There's a part of the letter
16  that -- that says I'm praying for all of you today,
17  that you'll have the wisdom to do what is right.
18           MS. KREPPS:  Oh.
19           THE COURT:  Has she communicated to you or
20  anyone else anything about how you should vote or what
21  kind of a verdict you should reach or anything like
22  that?
23           MS. KREPPS:  No.  No.  She just said, you
24  know, pretty much for herself, you know, that she'd
25  been praying really hard about it, you know, to just

Laura Krepps                                    69

1   have the strength to do what's right and make those
2   decisions.  You know, as you see in her card, she said
3   that -- you know, she's like I guess I prayed, you
4   know, and he sent me, you know, wind and rain and that
5   was, you know, her sign or whatever, but she never said
6   like, you know, this is what I think, so just let you
7   guys know this is -- if I would have been here this is
8   what I would have said.  It was never anything like
9   that, so I think it was just her good nature of wishing
10  us like the best on something that's so difficult like
11  this, so --
12           THE COURT:  There's one part where she does
13  indicate that she's the juror with the hard eyes and
14  that she intrigues the bloggers, so obviously there had
15  been some discussion about that.  What do you remember
16  about that?
17           MS. KREPPS:  I know that, you know -- you
18  know, you're -- I think just the general curiosity is
19  not what are they saying about the facts of the case,
20  like that sort of thing, but what are they kind of
21  saying about us because you hear Court TV gives jurors
22  nicknames and that sort of thing, so there's been
23  mention of -- you know, I don't remember how it came to
24  us, but, you know, one of the people, like the news in
25  the courtroom, just said that, you know, somebody --

Laura Krepps                                    70

1  one of the jurors has hard eyes, you know, so we were
2  discussing like who do you think it is.  You know,
3  well, I was -- fur on my brows I was thinking, so it
4  was that discussion of it, so --
5       THE COURT:  Do you think that -- this letter
6  or any of these discussions or concerns that people
7  have about the jurors, do you think that has influenced
8  you in any way or that would make it difficult for you
9  to decide this case based on the evidence and the law?
10      MS. KREPPS:  No.  No.  It's -- I think it's
11 just the natural curiosity of, you know, what they're
12 kind of saying about us in particular, not, you know,
13 about, you know, the facts or, you know, that sort of
14 thing, but what are they saying about us.  But that's
15 not going to change, you know, the way I feel or how
16 I'm going to apply the law in my decision, so --
17      THE COURT:  Okay.  Counsel, any questions of
18 Laura?
19      MR. TACOPINA:  Yeah.  Laura, I just wanted --
20 how do you guys know Court TV's giving you nicknames?
21      MS. KREPPS:  I can't remember exactly like
22 who had said it, but, you know, people that do watch
23 Court TV -- like I don't really watch Court TV, me
24 personally, but I remember somebody saying like yeah,
25 you know, it's known that, you know, when they do cover

Laura Krepps                                    71

1  trials that jurors get nicknames, like that sort of
2  thing, so --
3       MR. TACOPINA:  One of the jurors said that to
4  you?
5       MS. KREPPS:  Yeah.  I think it was just up in
6  conversation like that sort of thing.
7       MR. TACOPINA:  Was that the same juror who
8  told you about the nicknames in this case?
9       MS. KREPPS:  I can't say that it is or it
10 isn't because I know it's not -- I can't say like, you
11 know, I think it's Bachetti, like the same person
12 always kind of saying hey, Court TV said this or they
13 nicknamed the jurors, like that sort of thing.
14      MR. TACOPINA:  The same person.
15      MS. KREPPS:  I don't think it's the same
16 person.
17      MR. TACOPINA:  Oh.  You don't?
18      MS. KREPPS:  No because I can't say it's
19 always this person saying Court TV this or that sort of
20 thing, but I just remember it just being like an
21 overall discussion, but I honestly don't know where it
22 kind of stems from or that sort of thing, so --
23      MR. TACOPINA:  Okay.
24      MS. PREZIOSO:  May I, your Honor?
25      THE COURT:  Sure.

Laura Krepps                                    72

1          MS. PREZIOSO:  Just to be clear, your
2    discussions have all been about the jurors and how the
3    media is handling the jurors, correct?
4          MS. KREPPS:  Yeah.
5          MS. PREZIOSO:  So it's been nothing about
6    she's innocent or she's guilty or anything like that?
7          MS. KREPPS:  No.  No.  There's never been
8    anything like facts or hearsay or what, you know, the
9    media's opinions are, like that sort of thing.
10         MS. PREZIOSO:  Sure.
11         MS. KREPPS:  It's just pretty much wanting to
12   know like, you know, they're talking about, what are
13   they saying about us.
14         MR. TACOPINA:  What are they saying about you
15   guys?
16         MS. KREPPS:  Did they give us like Tweedledee
17   and Tweedledum or nicknames, stuff like that.
18         MS. PREZIOSO:  Has anything about how the
19   media is treating the jurors -- has that had any impact
20   on the deliberations?
21         MS. KREPPS:  No.  No.  Yeah.  There's no --
22   no -- like we're in there, we're really like --
23         MS. PREZIOSO:  I didn't mean to ask --
24         MS. KREPPS:  No.  I totally understand.
25   Yeah.  No.  No.

Laura Krepps                                    73

1          THE COURT:  All right.  Anything else,
2    counsel?
3          MR. TACOPINA:  No.  Thanks.
4          MS. KREPPS:  All right.
5          THE COURT:  Laura --
6          MS. KREPPS:  All right.
7          THE COURT:  -- please don't talk to any of
8    the other jurors about this and don't talk to anybody
9    else about it.
10         MS. KREPPS:  Sure.  Sure.  Thanks
11         (Laura Krepps left chambers.)
12         MS. PREZIOSO:  Judge, may I take a tissue?
13         THE COURT:  Yeah.  Sure.
14         MR. TURANO:  It's like someone's watching TV.
15         MS. PREZIOSO:  I didn't take it like that.
16   She said prior trials.
17         MR. TACOPINA:  She said nicknames in this
18   case.
19         MR. ROMANYSHYN:  I don't know whether anybody
20   said specifically names were given in this case.
21         (Juror Teresa Victoriano entered chambers.)
22         THE COURT:  Hi, Teresa.
23         MS. VICTORIANO:  Hello, sir.
24         THE COURT:  As you know, the Court will from
25   time to time interview jurors to see if there's any

Da162

Teresa Victoriano                                    74

1   problem with media coverage or anything like that.  So
2   I have learned that one of the jurors -- one of the
3   jurors was excused sent a note into the jury, so I need
4   to talk to you about it.  I've talked to all the jurors
5   about it.
6         Do you know anything about this note that was
7   sent into the jury from one of the excused jurors?
8         MS. VICTORIANO:  A note from one of the
9   jurors -- jurors that were excused?
10        THE COURT:  Yes.
11        MS. VICTORIANO:  It was just a card, sir --
12        THE COURT:  Card.
13        MS. VICTORIANO:  -- that was sent out just
14   basically thanking that the jury -- you know, the whole
15   jury, that there were -- we were all -- we got along
16   well and that it was unfortunate that she could not,
17   you know, complete her -- you know, her time, you know,
18   because of the problem.
19        THE COURT:  Okay.  When did this come to your
20   attention?  I mean when did you learn about the note?
21        MS. VICTORIANO:  I think that was the time --
22   I know it was this week.  Could be -- could be Tuesday.
23        THE COURT:  Do you remember how it was
24   brought to your attention?
25        MS. VICTORIANO:  Well, one of our jurors

Teresa Victoriano                                    75

1   actually just, you know, sent -- you know, just
2   happened to have it and she said that it was left on
3   her -- on her car.
4         THE COURT:  Was it read to everybody?
5         MS. VICTORIANO:  Yeah.  We read that.  Yeah.
6         THE COURT:  Do you remember anything in
7   particular about what it said?
8         MS. VICTORIANO:  I would -- I heard -- I'm
9   sorry.  I read the card.  Everybody, you know, knew
10   about it, and I actually read it, yes.  She was just
11   thanking everyone and she was actually -- there was
12   just mention that she had -- she just said that she --
13   you know, she just had to do some researches about the
14   case, but she did not particularly mention anything
15   about -- you know, anything about our case or anyone
16   but us, you know, nothing.  It was just general, you
17   know.
18        THE COURT:  She did mention that she was the
19   juror with the hard eyes?  You remember reading that?
20        MS. VICTORIANO:  Yes.
21        THE COURT:  What does that mean?  If you
22   know.
23        MS. VICTORIANO:  I don't know, sir, but from
24   the -- I -- I -- I think it's from the card she said
25   don't worry about the juror that has hard eyes or

Teresa Victoriano                                    76

1    something.  She said it was me, something like that.
2         THE COURT:  Okay.  But what did that refer
3    to?
4         MS. VICTORIANO:  I -- I have no idea, sir.
5         THE COURT:  Was there some talk among the
6    jurors about some juror having hard eyes or something
7    like that?
8         MS. VICTORIANO:  No, sir.  It probably -- she
9    probably picked it up from -- from the newspaper or
10   from media.
11        THE COURT:  Okay.  During the course of this
12   trial and now have there been any discussions by the
13   jurors about what's out there in the newspapers or
14   what's out there on the internet or anything like that?
15        MS. VICTORIANO:  Not from my side, sir.  I
16   mean I don't know anything about it.
17        THE COURT:  Well, have you overheard other
18   jurors mentioning anything about the case that was on
19   the internet or, you know, in the newspapers or
20   television or anything?
21        MS. VICTORIANO:  Some of the -- I just
22   overheard one of them say that, you know, some were in
23   the paper, no names, just our numbers, and basically
24   they just mentioned where we came from and our ages.
25   That's all.  But --

Teresa Victoriano                                    77

1         THE COURT:  Have you -- this is an important
2    question.  Have you heard anything about the case,
3    either on television, you know, on the internet, read
4    anything on the internet, newspaper or from any other
5    juror about information not coming from the courtroom
6    that would in any way influence your judgment or
7    deliberations about this case?
8         MS. VICTORIANO:  No, sir.
9         THE COURT:  Can you -- will you be able to
10   follow the law and decide this case based only on the
11   evidence that's been presented in the courtroom?
12        MS. VICTORIANO:  Yes, sir.
13        THE COURT:  Mr. Tacopina, you look like you
14   have a question.
15        MR. TACOPINA:  No.  No.  No.  I don't, for
16   once.
17        THE COURT:  Sorry.  Anybody else have a
18   question?
19        MS. PREZIOSO:  No.  No.  Thank you very much.
20        THE COURT:  All right.  Miss Victoriano,
21   again please don't discuss this conversation with
22   anybody.  We try not to have the jurors talking about
23   stuff other than the merits of the case.  Okay?
24        All right.  Thank you very much.
25        MS. VICTORIANO:  Yes, sir.

Franklin Wright                    78
1    THE COURT:  Thank you very much.
2    (Ms. Teresa Victoriano left chambers.)
3    THE COURT:  Okay.
4    (Juror Franklin Wright entered chambers.)
5    THE CLERK:  Juror number eight.
6    THE COURT:  Hi, Mr. Wright.  How are you?
7    MR. WRIGHT:  Okay.  How are you?
8    THE COURT:  How you doing today?
9    I'm back on the interview of jurors at the
10  moment here.  Every now and then, as you know, when
11  there's a lot of media coverage in the case, I've
12  explained this before, the Court will interview the
13  jurors to see how things are going or to make inquiry
14  about any specific questions.
15      In this case I learned that one of the
16  excused jurors had written a note or a card to the rest
17  of the jurors --
18      MR. WRIGHT:  Uh-huh.
19      THE COURT:   -- and although she was a juror
20  at one time obviously now she's not a juror any more,
21  so she has written a note and so I got to make some
22  inquiry about it.  So, first of all, can you tell me
23  what you know or remember about this card or this note.
24      MR. WRIGHT:  I know it was put on one of the
25  juror's cars.  It said to the jurors.  I think she said

Franklin Wright                    79
1   she was praying to God to give her the strength to get
2   through this and the next day it rained and her
3   basement flooded, so that was -- that was -- that was
4   God's answer I guess for her not to be on the jury.
5   That's -- wishing us well.  And that was basically it.
6   That's all I took from it.
7       THE COURT:  This -- there was a part -- two
8   parts in the note that I want to talk about.  The first
9   part is this saying to you, all of you, that she hopes
10  you will have the wisdom to do what is right.  Now, has
11  she previously suggested to any members of the jury how
12  they should vote or what their verdict should be or
13  anything like that?
14      MR. WRIGHT:  No.  No.
15      THE COURT:  I mean did you take that to be an
16  expression of her opinion to you as to what you should
17  do?
18      MR. WRIGHT:  No.  No.  Not really.
19      THE COURT:  What did you make of that
20  particular --
21      MR. WRIGHT:  I mean, you know, I hope we have
22  the wisdom to do what's right meaning we've heard the
23  case, we have to apply the law and the law is what it
24  is.  We have to apply what the law says about it and
25  whatever verdict comes is what's -- what's -- that's

```
                        Franklin Wright                   80
 1  what's doing right.  That's it.
 2          THE COURT:  Second thing.  She made some
 3  mention about her being the one with the hard eyes and
 4  that she intrigues the bloggers.  So, you know, she's
 5  talking apparently.  I know that she had said in the
 6  letter that she had now gone out to do some research
 7  because she wasn't on the jury any more, but this seems
 8  to refer to earlier discussions about some juror with
 9  hard eyes.  What do you remember about that, if
10  anything?
11          MR. WRIGHT:  Really nothing, tell you the
12  truth.  I mean by hard eyes I think it was -- I don't
13  know that may have came through saying the juror with
14  hard eyes, but there's so many conversations going on,
15  it's -- I just wouldn't -- to me, to know that I'm
16  pretty focused, and if something like that, it just
17  went over my head.  It's not something I entertained to
18  tell you you the truth.
19          THE COURT:  Have there been discussion about
20  what's going out on the television or on the internet
21  or in the newspapers about the case?
22          MR. WRIGHT:  In the jury room?
23          THE COURT:  Yeah.
24          MR. WRIGHT:  Not -- not something that
25  would -- that would -- not really, no, not -- not
```

```
                        Franklin Wright                   81
 1  something that would -- would cause anybody to change
 2  in a new direction or something like that.
 3          THE COURT:  I don't want to get into your
 4  deliberations.  Okay?
 5          MR. WRIGHT:  Yeah.  Yeah.
 6          THE COURT:  Those remain confidential.  But
 7  before the deliberations begun or, you know, at any
 8  time outside the deliberations I mean have there been
 9  specific discussions among jurors about, you know, what
10  the internet is reporting or what the TV is reporting
11  or the newspapers are reporting?
12          MR. WRIGHT:  Has there been discussion?
13          THE COURT:  Yeah.
14          MR. WRIGHT:  Meaning --
15          THE COURT:  About what they're saying out
16  there about the case or the facts of the case or about
17  the jurors, I mean anything like that?
18          MR. WRIGHT:  There was a couple -- yeah,
19  couple things that were said.  To what -- what they
20  were I really didn't -- couldn't -- couldn't tell you
21  what they were, but there were some -- this -- some
22  discussion about it.
23          THE COURT:  Anything about the facts of the
24  case or the merits of the case?
25          MR. WRIGHT:  No.  No.  Nothing like that.
```

Da166

Victoria Kim                                          84

1        MS. KIM:  Yes.
2        THE COURT:  There's a couple things it said
3    that I do want to go over with you and the first one
4    is -- and, by the way, I don't want to get into
5    deliberations.  All right?  Those are confidential.  So
6    I'm not asking you to talk about the deliberations, but
7    I do want to talk about this note.  The note said
8    something to the effect that she was praying to all of
9    you to have the wisdom to do the right thing.  Had she
10   expressed to you what she meant by that previously or
11   did -- was she -- did you take this to mean that she
12   was rendering an opinion to you as to how you should
13   decide this case?
14       MS. KIM:  No.
15       THE COURT:  What did you think she meant by
16   that?
17       MS. KIM:  Just that we had to do what we felt
18   was right.
19       THE COURT:  But you don't know what she
20   thought you should do?
21       MS. KIM:  No.  I really didn't talk to her
22   much.
23       THE COURT:  Okay.  Now, the other thing she
24   said was that somehow she had learned now from
25   researching the case on I guess the internet that she

Victoria Kim                                          85

1    was the juror with the hard eyes.  What do you make of
2    that?
3        MS. KIM:  I didn't hear that one.  I didn't
4    hear that one.
5        THE COURT:  Okay.  Does that mean anything to
6    you, that she's the juror with the hard eyes?
7        MS. KIM:  I think if anybody had hard eyes it
8    was me.  No.
9        THE COURT:  But have you heard?  Was there
10   any discussion before that you're aware of?
11       MS. KIM:  That's the first time I heard that.
12       THE COURT:  Has there been any discussion
13   among the jurors aside from this communication about
14   the internet or about TV or about the newspapers and
15   what they were saying about the case?
16       MS. KIM:  Well, we were all kind of wondering
17   how all our ages and where we lived and everything got
18   into the newspapers.
19       THE COURT:  How -- now, how -- first of
20   all --
21       MS. KIM:  Well, my husband came out
22   laughing --
23       THE COURT:  I'm not even sure that's really
24   happened, but -- I really am not.  But how did it get
25   to be reported to you that it happened?

Da168

Franklin Wright                                          82

1         THE COURT:  Anything that would tend to
2    influence you in the way you would decide the case?
3         MR. WRIGHT:  No.
4         THE COURT:  I mean have you been exposed to
5    any information that would in any way, you know, cause
6    you to be influenced, you know, so you couldn't decide
7    the case based on the evidence?
8         MR. WRIGHT:  No.  No, not me.  No.
9         THE COURT:  Counsel, anything further?
10        MR. TACOPINA:  No.
11        MS. PREZIOSO:  No.
12        THE COURT:  Okay.  Mr. Wright, please just --
13   you know, don't discuss this with anybody.
14        MR. WRIGHT:  I know.  I won't.  I won't.
15        THE COURT:  Thanks a lot.
16        MR. WRIGHT:  Okay.
17     (Mr. Wright left chambers.)
18        THE COURT:  Can we get Victoria Kim in.
19     (Juror Victoria Kim entered chambers.)
20        THE COURT:  Hello, Victoria.  How are you?
21   That's the better seat.
22   How you doing?
23        I wanted to talk to you a little bit.  As you
24   know, from time to time the Court will speak to the
25   jurors if there's been any kind of media coverage that

Victoria Kim                                            83

1    might have gotten into the jury or any type of
2    communication from an outside source, and in this
3    particular case I've learned that one of the jurors
4    that was excused has written a note or a card to the
5    jury and I just wanted to talk to you guys about it
6    just to make sure I understood it and see how you felt
7    about it.  Can you tell me what you remember about
8    that.
9         MS. KIM:  That she was just wishing us all
10   well and that she missed us, and that was really about
11   all that I remember.
12        THE COURT:  How do you -- do you remember
13   when you first learned about the card or where you were
14   told about the card?
15        MS. KIM:  In the jury room.
16        THE COURT:  In the jury room?
17        MS. KIM:  Yeah.  Laura came in and said she
18   found it on her car and she didn't know who it was and
19   she tried to, you know, put so she didn't have
20   fingerprints or anything on it, so and then she opened
21   it and it was from Luanne.
22        THE COURT:  Now, did she read it to
23   everybody?
24        MS. KIM:  Yes.
25        THE COURT:  So you heard what it said, right?

Da167

Victoria Kim                                        84

1       MS. KIM:  Yes.
2       THE COURT:  There's a couple things it said
3  that I do want to go over with you and the first one
4  is -- and, by the way, I don't want to get into
5  deliberations.  All right?  Those are confidential.  So
6  I'm not asking you to talk about the deliberations, but
7  I do want to talk about this note.  The note said
8  something to the effect that she was praying to all of
9  you to have the wisdom to do the right thing.  Had she
10 expressed to you what she meant by that previously or
11 did -- was she -- did you take this to mean that she
12 was rendering an opinion to you as to how you should
13 decide this case?
14      MS. KIM:  No.
15      THE COURT:  What did you think she meant by
16 that?
17      MS. KIM:  Just that we had to do what we felt
18 was right.
19      THE COURT:  But you don't know what she
20 thought you should do?
21      MS. KIM:  No.  I really didn't talk to her
22 much.
23      THE COURT:  Okay.  Now, the other thing she
24 said was that somehow she had learned now from
25 researching the case on I guess the internet that she

Victoria Kim                                        85

1  was the juror with the hard eyes.  What do you make of
2  that?
3       MS. KIM:  I didn't hear that one.  I didn't
4  hear that one.
5       THE COURT:  Okay.  Does that mean anything to
6  you, that she's the juror with the hard eyes?
7       MS. KIM:  I think if anybody had hard eyes it
8  was me.  No.
9       THE COURT:  But have you heard?  Was there
10 any discussion before that you're aware of?
11      MS. KIM:  That's the first time I heard that.
12      THE COURT:  Has there been any discussion
13 among the jurors aside from this communication about
14 the internet or about TV or about the newspapers and
15 what they were saying about the case?
16      MS. KIM:  Well, we were all kind of wondering
17 how all our ages and where we lived and everything got
18 into the newspapers.
19      THE COURT:  How -- now, how -- first of
20 all --
21      MS. KIM:  Well, my husband came out
22 laughing --
23      THE COURT:  I'm not even sure that's really
24 happened, but -- I really am not.  But how did it get
25 to be reported to you that it happened?

1      MS. KIM:  Well, my husband came out laughing
2  to me you're in the paper.  I said what.  And he said
3  yeah, and he said you're blah, blah, blah.  And I said
4  well, I'm not juror number whatever.  So they had me
5  wrong anyway.
6      THE COURT:  Okay.
7      MS. KIM:  And that's all he told me.  So and
8  then somebody came in the next day.  We all -- because
9  it wasn't just me that heard it.
10      THE COURT:  So -- so -- so -- so did your
11  husband tell you anything else about what the paper
12  said?
13      MS. KIM:  No.  I couldn't be bothered.
14  I couldn't be bothered.
15      THE COURT:  These discussions, you know,
16  among the jurors or about the fact that jurors'
17  information, if you want to call it that, may have been
18  in the paper, was there anything more specific than
19  that, anything that got into the merits of the case?
20      MS. KIM:  No.
21      THE COURT:  Would -- would the fact that you
22  heard this information -- is that going to influence
23  you in any way in terms of how you decide this case?
24      MS. KIM:  No.
25      THE COURT:  Are you satisfied that, you know,

1  even though this note has been talked about or, you
2  know, the fact that jurors' information has been in the
3  paper, are you satisfied that that's not going to
4  influence you in any way?
5      MS. KIM:  No, I don't think so.
6      THE COURT:  Okay.  Well, first of all,
7  counsel, do you have any questions?
8      MR. TACOPINA:  No.
9      MS. PREZIOSO:  No, Judge.
10      THE COURT:  I do want to say to you just so
11  it's clear, first of all, the Court -- your names and
12  the town that you're from are part of the official
13  public records of the county, from voter registration
14  and from driver's license, and people can get that
15  information.  Your addresses and your phone numbers are
16  not.  Unless you have, you know, a published phone
17  number, so -- and your ages are not, so I mean I
18  don't -- I haven't seen any newspaper articles with,
19  you know, names or where you're from or addresses, but
20  it would not be impossible for somebody to get your
21  names and the towns that you're from because that is
22  a public record --
23      MS. KIM:  All right.
24      THE COURT:  -- and that's always been a
25  public record, all of these lists that the government

Victoria Kim                                                88

1  maintains about, you know, voters and driver's --
2  driving records are public records, but we don't give
3  that information out, so you shouldn't be worried.  We
4  don't give home addresses out or home phone numbers.
5  Now, from time to time people have unlisted numbers and
6  there are other ways that, you know, reporters can find
7  out, and I've asked everybody if somebody contacts you
8  about this case you got to let me know, but I
9  wouldn't -- you shouldn't worry about it.  There's
10 really nothing to worry about.
11          All right.  Well, thank you very much.
12          Please don't discuss this conversation with
13 the other jurors and make sure your husband doesn't
14 tell you anything about the case.
15          MS. KIM:  No, he won't.
16          Thank you.
17          MS. PREZIOSO:  Thank you very much.
18          MS. KIM:  Thank you.
19      (Ms. Kim left chambers.)
20      (Juror Sandra Eid entered chambers.)
21          MS. EID:  Hello.  Hello.
22          THE COURT:  Hello, Sandra.  How you doing?
23          MS. EID:  Good.  How are you?
24          THE COURT:  Have a seat.
25          I just wanted to get together and speak to

Sandra Eid                                                89

1  you a little bit.  Whenever there's any possibility
2  that there's been media coverage about the case that
3  may have been communicated to a juror or any
4  communication from a non-juror to the jury I have to
5  talk to jurors about it and in this case I've come to
6  learn that one of the excused jurors sent you guys
7  a card, and so technically she's not a juror any more,
8  you know, and, therefore, when she sends you a card we
9  have to talk about it, see what that means to you.
10          First of all, what do you know about this
11 card or what do you remember about this card?
12          MS. EID:  Okay.  I remember Laura came in
13 that morning and said that there was something on her
14 car and she was nervous about it, like she was scared
15 because she's like what is this on my car, and then she
16 turned it over and it said to the jurors, and she's
17 really scared about picking it up and everything, that
18 she was really careful she said, so she thought, you
19 know, may be a possibility there was something crazy in
20 it, but then when she opened it she saw all this
21 writing and she was still crazy because she's like
22 I don't see a name, I don't see a name.  So she was
23 looking for a name and then finally she turned it over
24 and it was from Luann, so she calmed down.  And it was
25 just basically saying that she had prayed for us that

Sandra Eid                                    90

1   we would make the right decision and -- and that was it
2   really, you know, that she had prayed for us and just
3   God be with you and -- something to that effect.
4           THE COURT:  Okay.  Had she ever communicated
5   to you or said to you or tried to suggest to you what
6   the right decision would be?
7           MS. EID:  No.  No.
8           THE COURT:  So you -- you took it to mean she
9   was just talking generally about making the right
10  decision?
11          MS. EID:  Yeah.
12          THE COURT:  Now, there's one part in the
13  letter that she talks about the fact that she has
14  learned from watching TV and researching the internet
15  that she was the juror with the hard eyes.  Do you
16  remember that?
17          MS. EID:  Yes, I do.  I do remember that.
18  When the letter was received people were talking about
19  it, like the group was talking about it, because we --
20  they opened it up and everybody was looking at it
21  together, you know --
22          THE COURT:  Right.
23          MS. EID:  -- but that wasn't like a big
24  thing, to me at least, you know.
25          THE COURT:  Well, do you know what she was

Sandra Eid                                    91

1   referring to when she said that she learned that she
2   was the juror with the hard eyes?
3           MS. EID:  That she had hard eyes.  I mean
4   I don't know.
5           THE COURT:  Well, I mean had there been a
6   discussion about a juror with hard eyes before that was
7   on the internet or on television or anything like that
8   that you were a part of?
9           MS. EID:  I didn't know anything about the
10  hard eyes thing until this letter came out, so --
11          THE COURT:  Have you been involved or have
12  you heard any other discussions among the jurors about
13  how they were being characterized on the internet or
14  anything about the case on the internet or on TV or in
15  the newspapers?
16          MS. EID:  Internet or TV or newspapers?  I'm
17  trying to remember if anybody ever said anything about
18  that.  I think somebody might have said at one point,
19  and I can't remember who it was, something about that
20  there's a blogger, there's a court blogger or something
21  like that in the -- that sits in the benches and
22  depicts who everyone is, who the jurors are or
23  something, something like that.  But I didn't know
24  anything about the hard eyes until that letter came out
25  and that supposedly it was Luann because she said it in

Da171

Sandra Eid                                    92

1  the letter.
2          THE COURT:  Right.  Do you remember who it
3  was that made this comment about the blogger?
4          MS. EID:  Who made the comment about the
5  blogger?  That's hard to say.  It was just like general
6  conversation.  It wasn't --
7          THE COURT:  You don't remember specifically
8  who might have said it?
9          MS. EID:  No.
10         THE COURT:  Counsel, do you have any
11 questions of Sandra?
12         MR. TACOPINA:  No.
13         MS. PREZIOSO:  I do.
14         The discussions about the blogger --
15         MS. EID:  Sure.
16         MS. PREZIOSO:  -- did any of it involve facts
17 about the case or whether the defendant was innocent or
18 guilty or not guilty or anything like that?
19         MS. EID:  No.  Absolutely not.
20         MS. PREZIOSO:  Was it all about how the media
21 was regarding the jury?
22         MS. EID:  Yes.
23         MS. PREZIOSO:  And beyond how the media is
24 regarding the jury was there anything else discussed
25 about the facts of the case or opinions on the case or

Sandra Eid                                    93

1  media on the case or anything that would involve
2  bringing in information from outside of this courtroom?
3          MS. EID:  No.  Absolutely not.
4          MS. PREZIOSO:  Thank you.
5          MS. EID:  That's it?
6          MS. PREZIOSO:  Thank you.
7          THE COURT:  Okay.  All right.  Sandra, I'm
8  going to ask you not to discuss our conversation here
9  with anybody because I really -- you know, people
10 remember things differently, so I want everybody to
11 tell me what they remember without influence from
12 others.
13         MS. EID:  Sure.  Sure.
14         THE COURT:  Okay.  Again make sure no one
15 from outside the jury talks to you about the case and
16 if that should ever occur you have to report that to
17 me.
18         MS. EID:  Right.
19         THE COURT:  Okay?
20         MS. EID:  Uh-huh.
21         THE COURT:  Thank you.
22         MS. PREZIOSO:  Thank you.
23         MS. EID:  Thank you.
24         MS. PREZIOSO:  Thank you.
25      (Ms. Eid left chambers.)

Antowon Hinton-Graham                               94

1       (Juror Antowon Hinton-Graham entered chambers.)
2               MS. PREZIOSO:  Hello.
3               MR. ROMANYSHYN:  Hi.
4               MS. PREZIOSO:  How are you?
5               THE COURT:  Hi.  Antowon, have a seat.
6           As I explained to you the last time we spoke,
7    every now and then when, you know, there's a
8    possibility of some outside communication to the jury
9    the Court has to inquire about it just to make sure,
10   you know, it's nothing inappropriate or doesn't have
11   the potential to influence anybody.
12          I learned today that one of the excused
13   jurors had sent a note in to the jury.  So it's
14   something because she is no longer a juror and she
15   sends a note in I got to talk to you guys about it, so
16   that's what this is all about.  And I guess the first
17   thing I'd like to do then is ask you, do you know
18   anything about this note or were you made aware of the
19   note?
20              MS. HINTON-GRAHAM:  Yes, I was.
21              THE COURT:  And what -- what do you remember
22   about the note and how were you made aware of it?
23              MS. HINTON-GRAHAM:  What I remember, a note
24   was put on one of the other juror's car.  It was a
25   card, and I don't think there was anything in detail,

Antowon Hinton-Graham                               95

1    it was just that she was sorry that she wasn't there to
2    see us through with the whole incident of everything.
3    And I didn't read the card, but just from memory it
4    was, you know, she was on the blog I guess and there
5    were a lot of things there, but she was tempted to say
6    something, but she chose not to, and she'll just have
7    us all in her prayer.
8               THE COURT:  Okay.  She did mention in the --
9    two things that I wanted to go over a little bit with
10   you.  One was this issue of the blog where she said
11   something to the effect that she was the one with the
12   hard eyes.  Apparently when she looked at the
13   information that the bloggers were, you know, writing,
14   she came to conclude that she was the one with the hard
15   eyes.  What does that refer to?
16              MS. HINTON-GRAHAM:  I don't know who it was,
17   but I guess someone told them that they referred to
18   a juror as a hard-eyed person.
19              THE COURT:  You don't remember who mentioned
20   that or --
21              MS. HINTON-GRAHAM:  I'm not sure.  I'm not
22   positive to which juror.
23              THE COURT:  Do you have any idea?
24              MS. HINTON-GRAHAM:  It was a friend that told
25   the juror, but I don't recall which one actually.

Antowon Hinton-Graham                                    96

1    THE COURT:  Okay.  Was there -- has there
2  been any -- by the way, I don't want to talk about your
3  deliberations.  Huh?
4         MS. HINTON-GRAHAM:  From memory -- I want to
5  say that possibly -- I don't know her number -- Linda.
6  I'm not sure.
7         THE COURT:  That would be juror number three.
8         MS. HINTON-GRAHAM:  I don't know if it was
9  that one.  I could be mistaken though.  I just heard
10  the comment, but I'm not sure to exactly who.
11         THE COURT:  Okay.  Would you -- again I don't
12  want to go into the deliberations.  Okay.  Those really
13  should remain confidential.  But prior to the
14  deliberations has there been any discussion among the
15  jurors about anything else that was reported on the
16  internet or reported on television or in the
17  newspapers?
18         MS. HINTON-GRAHAM:  The name -- well, not
19  names, no one's names, but the I guess reporting of our
20  numbers --
21         THE COURT:  Your numbers?
22         MS. HINTON-GRAHAM:  -- our numbers, where we
23  live and our ages.  That was it.
24         THE COURT:  Have you heard anything while you
25  were on this jury about information that has come out

Antowon Hinton-Graham                                    97

1  outside the courtroom that would in any way influence
2  you or make it difficult for you to continue to follow
3  the law and be a fair juror?
4         MS. HINTON-GRAHAM:  No.
5         THE COURT:  Counsel, do you have any other
6  questions of Miss Hinton-Graham?
7         MS. PREZIOSO:  No.  Thank you.
8         THE COURT:  I will tell you; I'll go over it
9  a little more in detail when all the jurors are
10  present, but I know that from my discussions that there
11  is some concern about this issue of your identities.
12  You should know that your names and your towns are
13  matters of public record, they're pulled together from
14  the voting records and the driving records, and
15  consequently whether you're on a jury or not someone
16  could find out your name and the town you're from.
17  Your addresses and your phone numbers, assuming they're
18  unlisted, are not records that are ever accessible, so
19  I don't really know what was in the paper.  Okay?  But
20  I can tell you that, you know, the Court does not
21  disclose and no one else to the best of my knowledge
22  can disclosure addresses or your phone numbers, so
23  much, if anything, was in the paper they would be able
24  to put down juror number four from South River or
25  something like that, you know, but it would not

Antowon Hinton-Graham                                98
1  disclose, you know, your actual address, so you really
2  shouldn't worry about that --
3            MS. HINTON-GRAHAM:  All right.
4            THE COURT:  -- but I'll discuss this a little
5  further with the jurors.
6            MS. HINTON-GRAHAM:  Okay.
7            THE COURT:  In the meantime I'm going to ask
8  you please don't talk to any of the other jurors about
9  this discussion because I'd like to hear from each one
10 individually without being kind of commingled, if you
11 will, and clearly if there is any discussion, if
12 anybody reports anything to you that's in the
13 newspapers or on television, you really need to let the
14 Court know so I can make further inquiry.  Okay?
15           MS. HINTON-GRAHAM:  Okay.
16           THE COURT:  Thank you very much.
17           MS. PREZIOSO:  Thank you.
18           MS. HINTON-GRAHAM:  Thank you.
19      (Ms. Hinton-Graham left chambers.)
20      (Juror Basil Thomas entered chambers.)
21           MS. PREZIOSO:  Hello.
22           MR. THOMAS:  Why am I always the last one?
23           THE COURT:  How are you, Mr. Thomas?
24           MR. THOMAS:  I'm doing good.
25           THE COURT:  I'm talking to the jurors today

Basil Thomas                                99
1  because one of the excused jurors sent a card into the
2  jury and since she was already excused prior to the
3  time she sent the card in that means that someone from
4  outside the jury had a communication to the jury and,
5  therefore, I have to make inquiry about it.
6            MR. THOMAS:  Okay.
7            THE COURT:  So I'd like to know from you what
8  you know about this card, when you learned about it and
9  what you remember about it.
10           MR. THOMAS:  I think it was Monday morning or
11 Tuesday morning, I forgot which day it was, and when we
12 got upstairs Laura said she -- she was coming out of
13 her house and she walked downstairs and there was
14 something on her windshield, like she was very scared,
15 she didn't know what it was, and she picked it up and
16 she looked at the back and then she got relieved, and
17 she said I have a surprise for you guys, so when we got
18 upstairs she opened it up and she read the note from
19 Luann --
20           THE COURT:  Okay.
21           MR. THOMAS:  -- and in the note she said
22 I miss you guys, I prayed for you guys last night and
23 wish you all the best, and that was the gist of it.
24 She said I know it's going to be hard on you guys,
25 I wish I was there for you, I prayed for you last

Da175

Basil Thomas                                  100

1  night, and that was the extent of the letter.
2          THE COURT:  One of the things she said was,
3  you know, she -- she was praying that you would do the
4  right thing.
5          MR. THOMAS:  Correct.
6          THE COURT:  I guess one of the questions I
7  have is had she expressed to you or suggested to you
8  how you should decide this case or what the right thing
9  was?
10         MR. THOMAS:  No, sir.  No.
11         THE COURT:  So it's just a general do the
12 right thing?
13         MR. THOMAS:  Right.  Correct.
14         THE COURT:  Second thing is she did make
15 mention of the fact that she now because she was
16 excused -- which is okay, she was researching the
17 internet and, you know, looking at television and she
18 had learned that she was the juror with the hard eyes
19 and I wanted to know what she meant by that because --
20         MR. THOMAS:  I have no idea what she meant by
21 that.
22         THE COURT:  No?
23         MR. THOMAS:  No.
24         THE COURT:  Do you remember any discussions
25 among the jurors about somebody being characterized as

Basil Thomas                                  101

1  having hard eyes?
2          MR. THOMAS:  It might have been mentioned and
3  nobody didn't know who they were talking about, could
4  have been myself, so I -- I don't remember the contents
5  and what it was used.
6          THE COURT:  Do you know who might have
7  mentioned it?
8          MR. THOMAS:  No, I don't remember.  It wasn't
9  Laura really because I think at that time she wasn't
10 there, so I don't remember who actually mentioned that.
11         THE COURT:  Has there been anything else
12 mentioned in the jury room about what's being printed
13 out there on the internet or what's being in the
14 newspapers or on television, you know, about the jurors
15 or about the case?
16         MR. THOMAS:  No.  Only Jennifer, she went to
17 Canada.
18         THE COURT:  Uh-huh.
19         MR. THOMAS:  When she came back the last day
20 which was Tuesday before she went back to Canada she
21 said somebody called her house and she didn't speak to
22 that person, somebody from -- I don't remember -- the
23 Asbury News or somebody called her because I don't know
24 how she knew that she wasn't going to be on the
25 deliberating jury, and they called her house and she

Basil Thomas                                         102

1  said she was very scared because she didn't know how
2  they got her number.  First she thought it was her
3  husband.
4              THE COURT:  Did she mention whether she had
5  a published number or not?
6              MR. THOMAS:  I don't remember, but she said
7  she was very scared, didn't know how that person got
8  her home number, but she never spoke to that person.
9  Her husband walked through the door and the dogs were
10 barking and she just hung up the phone and that was the
11 extent of that.
12             THE COURT:  Okay.  Counsel, any questions of
13 Mr. Thomas?
14             Okay.  Thank you again.  And please don't
15 discuss this with the other jurors because I want to
16 hear from each one individually without, you know, any
17 kind of comingling of memories or anything like that.
18             MR. THOMAS:  You only have one more to go,
19 so --
20             MS. PREZIOSO:  Thank you.
21             THE COURT:  Thank you very much, Mr. Thomas.
22             MR. THOMAS:  No problem.
23      (Mr. Thomas left chambers.)
24             MR. TACOPINA:  What is this, number 15?
25             THE COURT:  Yeah.  This is 15.

Celia Ahern                                          103

1       (Juror Celia Ahern entered chambers.)
2              THE COURT:  Hi, Miss Ahern.  How you doing?
3              MS. AHERN:  Good.
4              THE COURT:  I've been interviewing the jurors
5  because I learned today that one of the excused jurors
6  sent in a note to the jury and so when someone from
7  outside the jury sends in a note I have to talk to the
8  jurors about it and, you know, see if there's anything
9  that I need to address.
10             Do you know anything about this note?  I mean
11 have you heard about this note --
12             MS. AHERN:  No.
13             THE COURT:  -- from Luann Bachetti?
14             MS. AHERN:  Oh.  A card.
15             THE COURT:  A card.  I'm sorry.
16             MS. AHERN:  Yes.  She put a card on Lori's
17 thing and I read it, I read the note, and something
18 like I wish I could be there with you or something to
19 that effect.  I don't -- I don't remember it word for
20 word though.
21             THE COURT:  When did you learn about it?
22             MS. AHERN:  The day that Lori got it,
23 whatever day that was.  Oh.  It was probably Monday.
24             THE COURT:  Where were you when you read it?
25             MS. AHERN:  Downstairs in the jury assembly

Celia Ahern                                            104

1  room.
2              THE COURT:  Okay.
3              MS. AHERN:  She passed it around.  We read
4  it.
5              THE COURT:  All righty.  There's a couple
6  spots in here that I do want to talk about a little bit
7  if you have a recollection of them.  There's one spot
8  where she says that I hope you will have the wisdom to
9  do what is right.  Has she ever communicated to you
10 what you should do or how you should -- you know, what
11 kind of verdict you should reach or anything like that?
12             MS. AHERN:  No.  In fact I didn't even recall
13 that.  I thought -- you know, no, absolutely not.  No.
14             THE COURT:  Okay.  And the other part of the
15 card talks about she was -- now she was excused she was
16 watching television and reading blogs on the internet
17 and she had learned that she was the one with the hard
18 eyes as though she -- you know, apparently someone on
19 the internet had called her somebody with hard eyes.
20             MS. AHERN:  That's right.
21             THE COURT:  What did that refer to?  I mean
22 what --
23             MS. AHERN:  I don't know who mentioned it,
24 but somebody said that Luann said oh, I'm the one with
25 the hard eyes, but I didn't know the background for I'm

Celia Ahern                                            105

1  the one with the hard eyes.
2              THE COURT:  Have you heard any discussions
3  before that that people were talking about a juror with
4  the hard eyes or --
5              MS. AHERN:  No.  I didn't know anything about
6  that.
7              THE COURT:  Okay.  Have you overheard any
8  discussions among the jurors about names that they
9  might have been referred by or, you know, anything on
10 the internet or television, newspaper about the case?
11             MS. AHERN:  Somebody in the jury said that
12 somebody said some newspaper had everybody's -- not
13 their name, their address -- not their address, the
14 town, the town where they lived, and how old they were,
15 but I didn't -- that was mentioned once, but I --
16             THE COURT:  You don't remember who mentioned
17 it by any chance?
18             MS. AHERN:  No, I don't.  I don't know who
19 mentioned it, but I don't know what that meant or how
20 that came about.
21             THE COURT:  Okay.
22             MS. AHERN:  I mean I don't think anyone told
23 anybody.
24             THE COURT:  Have you heard anything about
25 this case or about the jury that would in any way

Celia Ahern                                                          106

1  influence your deliberations or make it difficult for
2  you to be a fair and impartial juror?
3          MS. AHERN:  No, I have not.
4          THE COURT:  You're still satisfied you can
5  decide this case based only on the evidence?
6          MS. AHERN:  Yes, I can.  Yes.
7          THE COURT:  All right.  Counsel, any
8  questions of Miss Ahern?
9          MR. TACOPINA:  No.  Thanks.
10         THE COURT:  Okay.  Thank you very much.
11         Please don't discuss this with the other
12 jurors --
13         MS. AHERN:  No, I will not.
14         THE COURT:  -- because I'd like you all to
15 have your own individual memories.
16         MS. AHERN:  No, I will not.
17         THE COURT:  Thank you.
18         (Ms. Ahern left chambers.)
19         THE COURT:  Denise, we can bring the jury out
20 into the courtroom in a moment.
21         Counsel, what I'm going to do is excuse this
22 jury.  Now, I know you want me to ask them if they want
23 to continue to deliberate, but at this point I think
24 it's hopeless and -- why are you looking at me like
25 that?

Scheduling                                                          107

1          MS. PREZIOSO:  What do you mean you think
2  it's hopeless, Judge?
3          THE COURT:  They're never going to be able to
4  continue to deliberate and reach a verdict tonight.
5          MS. PREZIOSO:  Oh.
6          MR. TACOPINA:  Yeah.  Tonight.
7          MS. PREZIOSO:  Oh.  You almost gave me a
8  heart attack, Judge.
9          THE COURT:  I wouldn't --
10         MR. TACOPINA:  He'll grant my application
11 later.  Don't worry.
12         THE COURT:  Well, that's what I was going to
13 suggest, but that's another reason I was going to
14 excuse the jury.  You folks can absorb this information
15 and contemplate what you want to do about it and if
16 there is any application you could make it at 8:30 on
17 Monday morning and this way I'll excuse the jury now.
18 I'll instruct them as to not to discuss the case with
19 anybody, give them some further instructions, and then
20 I will need a little bit of, you know, advance notice
21 if I'm going to get any paperwork on this so I could
22 decide it first thing Monday morning without a heck of
23 a lot more delay because again the longer this goes on
24 the more likelihood of mischief as you could see, so --
25 and I don't think it's fair to any of you to ask you to

Da179

Scheduling                                                         108

1  do this now without, you know, really -- you got notes,
2  you can think about this, take a look at the case law
3  and have a better reasoned kind of, you know, debate
4  about this on Monday if you're even going to have
5  a debate.
6        (Colloquy took place unrelated to the jurors'
7  interviews and is not included in this transcript.)
                                        *  *  *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                                                                   109

                     C E R T I F I C A T I O N
1
2
3
4    I, Linda Urbaniak, Certified Court Reporter, License
5    Number XI00678, an Official Court Reporter in and for
6    the State of New Jersey, do hereby certify the
7    foregoing to be prepared in full compliance with the
8    current Transcript Format for Judicial Proceedings and
9    is a true and accurate compressed transcript of my
10   stenographic notes taken in the above matter to the
11   best of my knowledge and ability.
12
13
14
15                  *Linda Urbaniak*
16                  Linda Urbaniak
17                  Certified Court Reporter
18                  Official Court Reporter
19                  Middlesex County Courthouse
20                  56 Paterson Street
21                  New Brunswick, New Jersey
22
23
24
25   Date:  May 29, 2007

Da180

**EXHIBIT H: INTERNET BLOGS FROM COURT TV'S WEBSITE**



Show all 149 posts from this thread on one page

**Courttv.com Message Boards** (http://boards.courttv.com/index.php)
- **McGuire Murder Trial** (http://boards.courttv.com/forumdisplay.php?forumid=389)
-- **How Long Will The Jury Be Out/s/b sequestered [m]**
(http://boards.courttv.com/showthread.php?threadid=295023)

---

*Posted by sciencegirl on 04-16-2007 01:56 PM:*

**How Long Will The Jury Be Out**

Vote now on how long you think the jury will be out.

I'm going with 4+ days because I think their will be at least 1-2 who are still on the fence after closing arguments and are going to need help in getting down.😬

---

*Posted by lost indie on 04-16-2007 02:05 PM:*

Hi sciencegirl.....🐵

I'm going with three days. I wouldn't be shocked by a hung jury...

---

*Posted by augustus on 04-16-2007 02:12 PM:*

I voted 4 days. I think we'll have a Friday afternoon guilty verdict.
Even though, IMO, the case is a slam dunk, there ARE some questions for the jury to try to answer.
They will go to each piece of evidence carefully, consider some alternate theories, wonder about a possible accomplice, but at the end conclude that it would be a one in a billion long shot that any of the defense theories have any merit.
The common sense, logical verdict is guilty. But they will deliberate long and hard, make sure all the ts are crossed, all the Is dotted, before delivering their verdict, IMO.

---

*Posted by yellowcake on 04-16-2007 03:57 PM:*

I don't think it will take that long, but I'm always wrong about these things.

I guessed 2 days. That's assuming the first day is tomorrow. With the late start today, they won't even get to start today, and will start tomorrow morning.

IMO

---

JT and company should have been telling her to plead guilty instead of charging inflated prices and getting all the free publicity engendered by trying the case on CTV.

True, that might be the going rated to be defended of a crime in the USA, but that still does not make it right.

---

Posted by MAUIFC on 04-19-2007 06:52 PM:

Well, if they are going to take 1.5 hour lunches everyday, I'll be 80 by the time they are done...

Let me know how it turns out...

---

Posted by MAUIFC on 04-19-2007 07:53 PM:

Great – I just read on another thread that the jury does not start deliberating on Fridays until 1 p.m.

This is utter nonsense – I'm really surprised the Court is allowing these 1/2 day schedules (and, yes, that comment applies to today as well).

---

Posted by MAUIFC on 04-20-2007 06:57 PM:

**This Jury Needs To Be Sequestered Now**

This is really way past the point of ridiculous now. Jurors now being reinterviewed re; exposure to internet regarding case.

SEQUESTER THE JURY. IMMEDIATELY.

This has really been very poorly handled re: jury setting their own hours.

---

Posted by Daniel Konrath on 04-20-2007 07:06 PM:

Even though it's expensive, a lot of trouble and could make it more difficult to assemble a jury I've long held jurys should be sequestered in cases that generate excessive publicity..........You'll see it in celebrity cases a lot almost automatically..............Tough to predict cases that will capture the public's attention sometimes.............Once there is the judge should sequester though.............

---

Posted by muffy on 04-20-2007 07:30 PM:

**Looks like someone wants a retrial?**

I agree, **This Jury Needs To Be Sequestered Now!!**

---

Posted by yellowcake on 04-20-2007 07:51 PM:

**Re: Looks like someone wants a retrial?**

> quote:
>
> *Originally posted by muffy*
> **I agree. This Jury Needs To Be Sequestered Now!!**

I see no problem with the jury meeting on Saturday, and being sequestered until a verdict comes in.

On another note, I don't find this judge to be a really intelligent one. I disagreed with his rulings on objections several times for both sides. I think he is pro defense, and yet he neglected to instruct the jury about 3'rd party exclusivity requiring NG.

Now, as to the questioning the jurors, you kno that earlier today on another thread there was a person posting who was probably joking but implying that they were a juror. The thread was titled something like "to all the jurors reading this"...I am sure it was a joke. That thread is gone now.

But we shouldn't be playing games here when obviously someone on the Pros and on the Defense is reading these boards. IMO We know they are.

Posted by Ragnar on 04-20-2007 07:56 PM:

**Re: Re: Looks like someone wants a retrial?**

> quote:
>
> *Originally posted by yellowcake*
>
> **I see no problem with the jury meeting on Saturday, and being sequestered until a verdict comes in.**
>
> **On another note, I don't find this judge to be a really intelligent one. I disagreed with his rulings on objections several times for both sides. I think he is pro defense, and yet he neglected to instruct the jury about 3'rd party exclusivity requiring NG.**
>
> **Now, as to the questioning the jurors, you kno that earlier today on another thread there was a person posting who was probably joking but implying that they were a juror. The thread was titled something like "to all the jurors reading this"...I am sure it was a joke. That thread is gone now.**
>
> **But we shouldn't be playing games here when obviously someone on the Pros and on the Defense is reading these boards. IMO We know they are.**

If I were JT or PP I'd certainly have one of my staff monitoring these boards. I would most definitely want to know what real people thought about the trial.

---

Posted by yellowcake on 04-20-2007 07:58 PM:

**Re: Re: Re: Looks like someone wants a retrial?**

> quote:
>
> ---
>
> *Originally posted by Ragnar*
>
> **If I were JT or PP I'd certainly have one of my staff monitoring these boards. I would most definitely want to know what real people thought about the trial.**
>
> ---

If I were paying Joe T $750 an hour, I would certainly want his staff to be monitoring this every day.

---

Posted by meisahotmama on 04-20-2007 08:01 PM:

**It's too late...**

If one of these jurors is going to look at coverage or seek out msg boards, they are not just starting to look - they already have been exposing themselves to outside influences and sequestering them now iis not going to heiip untaint their vote.

😊

---

Posted by Radar on 04-20-2007 08:04 PM:

OMG YOU ARE KIDDING ME???????????

You mean the reason the judge is polling the jury could be that an IDIOT poster said that????

Whoever it is should be banned.

A trial is a serious matter, there is a dead man, two fatherless children and a woman whose life depends on that trial.........a brainless message board poster should be arrested and made to pay for all the excess charges that are going to be piled on the nj tax payers.

Okay..........I got that out of my system.

radar

---

Posted by Fallen Angel on 04-20-2007 08:04 PM:

**Re: This Jury Needs To Be Sequestered Now**

quote:

---

*Originally posted by MAUIFC*
**This is really way past the point of ridiculous now. Jurors now being reinterviewed re: exposure to internet regarding case.**

**SEQUESTER THE JURY. IMMEDIATELY.**

**This has really been very poorly handled re: jury setting their own hours.**

---

The last time the Judge had to call all them into chambers he should have Sequestered them then.


-----MOO-----

---

*Posted by redfox on 04-20-2007 08:05 PM:*

WHAT DID I MISS??

---

*Posted by Pinetree on 04-20-2007 08:19 PM:*

quote:

---

*Originally posted by Radar*
**OMG YOU ARE KIDDING ME??????????**

**You mean the reason the judge is polling the jury could be that an IDIOT poster said that????**

**Whoever it is should be banned.**

**A trial is a serious matter, there is a dead man, two fatherless children and a woman whose life depends on that trial.........a brainless message board poster should be arrested and made to pay for all the excess charges that are going to be piled on the nj tax payers.**

**Okay..........I got that out of my system.**

**radar**

---

Huh? Idiot poster said what? Why would a juror be reading about this case on the internet?

---

*Posted by Fallen Angel on 04-20-2007 08:21 PM:*

Da185

quote:

---

*Originally posted by Radar*
**OMG YOU ARE KIDDING ME??????????**

**You mean the reason the judge is polling the jury could be that an IDIOT poster said that????**

**Whoever it is should be banned.**

**A trial is a serious matter, there is a dead man, two fatherless children and a woman whose life depends on that trial..........a brainless message board poster should be arrested and made to pay for all the excess charges that are going to be piled on the nj tax payers.**

**Okay..........I got that out of my system.**

**radar**

---

Radar with all due respect what the heck are you talking about?

-----MOO-----

---

*Posted by yellowcake on 04-20-2007 08:22 PM:*

quote:

---

*Originally posted by Radar*
**OMG YOU ARE KIDDING ME??????????**

**You mean the reason the judge is polling the jury could be that an IDIOT poster said that????**

**Whoever it is should be banned.**

**A trial is a serious matter, there is a dead man, two fatherless children and a woman whose life depends on that trial..........a brainless message board poster should be arrested and made to pay for all the excess charges that are going to be piled on the nj tax payers.**

**Okay..........I got that out of my system.**

**radar**

---

I kid you NOT! It was a thread up here earlier today. I remember there were a few posts on it. The

thread is gone, the posters may be banned already, and their IP addresses traced to NJ??? Perhaps!

That would put scare into CTV and the Pros and Defense and judge, IMO!

---

Posted by Fallen Angel on 04-20-2007 08:23 PM:

> quote:
>
> ---
>
> Originally posted by Pinetree
>
> **Huh? Idiot poster said what? Why would a juror be reading about this case on the internet?**
>
> ---

I have NO clue what Radar is talking about.

-----MOO-----

---

Posted by yellowcake on 04-20-2007 08:24 PM:

> quote:
>
> ---
>
> Originally posted by Fallen Angel
>
> **Radar with all due respect what the heck are you talking about?**
>
> -----MOO-----
>
> ---

Radar was responding to my post, above his....

About a thread addressed to jurors, which has now been removed.

---

Posted by Fallen Angel on 04-20-2007 08:25 PM:

> quote:
>
> ---
>
> Originally posted by yellowcake

**I kid you NOT! It was a thread up here earlier today. I remember there were a few posts on it. The thread is gone, the posters may be banned already, and their IP addresses traced to NJ??? Perhaps!**

**That would put scare into CTV and the Pros and Defense and judge, IMO!**

---

what was the thread about?

---

Posted by Radar on 04-20-2007 08:26 PM:

Piney et al,

You must have ole yellercake on "ignore."😕

Please read what yc had to say about thread that has been pulled.

radar

edited to say..............BTW, I am a chick!😎

---

Posted by Pinetree on 04-20-2007 08:42 PM:

quote:

*Originally posted by Radar*
**Piney et al,**

**You must have ole yellercake on "ignore."😕**

**Please read what yc had to say about thread that has been pulled.**

**radar**

**edited to say..............BTW, I am a chick!😎**

---

lol.....sorry....😕

Note to self.....read ALL posts before jumping in!

---

Posted by melani on 04-20-2007 08:51 PM:

I read the thread earlier.....It was titled something like 'To all the jurors who are reading this.....' then the post said something like, wait to make a decision on Monday because I have to work today.... There were a few laughs and a few skip work responses...nothing really to try to influence a jury. So, I don't think the issue with the court is about the thread here.

Posted by thiscaseonly on 04-20-2007 09:02 PM:

**If a juror was following**

info on the net, would they be in contempt of court or worse? Aren't they instructed to not discuss or read about the case? If you were a juror could you resist the temptation?

Posted by Briar on 04-20-2007 10:21 PM:

quote:

*Originally posted by Lily23*

**You would never murder your husband...with your honest attitude. You would kick him to curb (if needed) and then divorce him. I so agree with that amount of money being spent on lawyers is obscene.**

**JT and company should have been telling her to plead guilty instead of charging inflated prices and getting all the free publicity engendered by trying the case on CTV.**

**True, that might be the going rated to be defended of a crime in the USA, but that still does not make it right.**

So how DOES she pay the astromonical fees plus bail???

Posted by ipsedixit on 04-20-2007 10:28 PM:

**Re: If a juror was following**

quote:

*Originally posted by thiscaseonly*
**info on the net, would they be in contempt of court or worse? Aren't they instructed to not discuss or read about the case? If you were a juror could you resist the temptation?**

I don't think jurors are usually punished unless there is a bribery/tampering thing going on. Yes they are instructed not to do this. Yes I could resist the temptation.

---

Posted by TB56 on 04-20-2007 10:45 PM:

The jury was questioned by the judge because information got out to one of the jurors that the names and town they lived in was released somewhere in the media. It had absolutely nothing to do with a post on this board. The jury does not need to be sequestered, just let them do their job.

---

Posted by warhorse46 on 04-20-2007 10:54 PM:

Re: This Jury Needs To Be Sequestered Now

quote:

---

Originally posted by MAUIFC
This is really way past the point of ridiculous now. Jurors now being reinterviewed re: exposure to internet regarding case.

SEQUESTER THE JURY. IMMEDIATELY.

This has really been very poorly handled re: jury setting their own hours.

---

Jurors setting their own hours during deliberations is the norm. Most judges encourage that & will not set specific hours for deliberations even when the jury is sequestered.

---

Posted by MAUIFC on 04-21-2007 01:44 AM:

Setting hours is one thing - yet they really should be discussing the case more than 4.5 hours/day (and I am not talking about today).

---

Posted by Bama0f14 on 04-21-2007 01:59 AM:

Hey what the heck happened to our message board BTW I 'm sorry HELLO EVERYONE 😊

---

Posted by NJ_follower on 04-21-2007 02:07 AM:

Whew! I was truly suffering from withdrawal-how pathetic. Hi Bama! What the heck happened before?

---

Posted by Bama0f14 on 04-21-2007 02:10 AM:

Da190

quote:

*Originally posted by NJ_follower*
**Whew! I was truly suffering from withdrawal–how pathetic. Hi Bama! What the heck happened before?**

Well I read a message from CW that the thread was all about Jean on CTV not good OH HI NJ

*Posted by NJ_follower on 04-21-2007 02:12 AM:*

Started a new general verdict watch thread if you want to hop over later...

*Posted by Bama0f14 on 04-21-2007 02:13 AM:*

I felt bad I like our old groupso we can chat☺

*Posted by Bama0f14 on 04-21-2007 02:14 AM:*

quote:

*Originally posted by NJ_follower*
**Started a new general verdict watch thread if you want to hop over later...**

O.K. when are you going to start it.

*Posted by NJ_follower on 04-21-2007 02:20 AM:*

quote:

*Originally posted by Bama0f14*

**O.K. when are you going to start it.**

It's up girlfriend!

*Posted by waynecountygirl on 04-21-2007 04:46 AM:*

Looking at this discussion board is not going to be a predictor for the outcome of the trial. If you followed the Cynthia Sommer threads... a LOT of people found her not only "not guilty" but indeed very INNOCENT. So did the media.

She was convicted.

I think that MM will be convicted. I think she was convicted (as are MOST defendants) at the beginning of the trial because she IS a defendant.. being arrested and charged is enough for a lot of people to presume one's guilt..

My mother ,. bless her heart... is a prosecutor's DREAM juror. To my mother, if someone is arrested for a crime...then by golly..they DID IT! Period. There is no changing her mind. She has told me that IF she is ever on a jury and someone is charged with murder...they'll be sorry she was a juror.. because she believes that anyone arrested by police for murder is a murderer...period. My mother is not unintelligent. She is not without compassion. She is a kind woman. A "senior citizen".But...she believes ALL defandants are guilty.

I do think that AFTER her conviction...it might behoove the appeal lawyers to read this board..they might find the weaknesses in the prosecution's case and also might find how to "niggle" into the reasonable doubt of the NG's.....

I wish to heck they would have given their verdict today. I'm sure 10000% that they have already determined that she is guilty...I think now they're just playing with their power and perhaps enjoying the time off work........

Put her out of her misery...get it over with..... let the woman start accepting life in prison...

I don't KNOW if MM is guilty ... I don't KNOW if MM is innocent... I do KNOW that I'm not SURE...either way. And because of that.....I'd definitely NOT be able to vote "guilty"...I hope there is at least ONE person like me on that jury.....I would rather 10 guilty people go free than ONE innocent person go to prison......

Posted by Icefog on 04-21-2007 04:55 AM:

> quote:
>
> *Originally posted by yellowcake*
>
> **I kid you NOT! It was a thread up here earlier today. I remember there were a few posts on it. The thread is gone, the posters may be banned already, and their IP addresses traced to NJ??? Perhaps!**
>
> **That would put scare into CTV and the Pros and Defense and judge, IMO!**

It was here last night. Somebody posted "to all the jurors illegally reading this board" please come back with the verdict on Friday etc etc. Somebody with very few posts responded back something like "ok, and we are leaning toward guilty"

Funny thing was I almost posted last night how stupid it could be to mess around like that because in another trial discussed on these boards I remember a certain poster who was printing out all of our posts and showing them to the judge in the trial. I didn't post it because I figured I would get bashed for not seeing it as a joke....

Then today the thread is gone and the news story about the jurors.... 🐸

I agree with the poster that said we need to be careful what we post here, this is a real life murder trial and we don't need to be messing with it.

---

*Posted by Kamper on 04-21-2007 05:15 AM:*

**ITA**

I have to agree with Augustus here.

There is just too much CE leading to MM for me to not think she is guilty of this crime.

The computer searches alone are unexplainable given the fact that here husband was killed by a 38 cal bullet. And the Chloral Hydrate prescription written out to a client of the clinic where she worked and on the prescription pad of her Dr lover. There is no way to explain this away. And the fact that she purchased the gun and used fake home address and fake work address just two days before the murder too place.

Almost all the CE points to MM.

She should not get a "get out of jail card" just because the police didn't cover ever base. The police didn't even know there was a murder until the body parts were found. And they didn't know who the body was until it was eventually ID by a friend of the victim. Too much time expired before the police could start their investigation. This was part of the murderers plan.

If the body parts had actually sank to the bottom of the ocean as planned this murder would never have been solved. Billy McGuire would have been just another missing person.

I still know know why his employers didn't look for him. I am under the impression that he worked at two different jobs. He was as IT at one and a professor at a college? I did read on a time line that he was on a two week vacation from one job. And that his wife the accused called his employer after his two weeks of vacation was up? This part is fuzzy to me.

I don't believe anything that MM has said since she was first contacted by the police. I think that she was suspecting wire tapping from the get go. I also think that she may have used multiple cell phones to conduct her business. The letter sent to the prosecutor and the media gives me this idea. This letter suggests that the victim had cell phones accounts that the police didn't know about. And the letter also contained information that only the killer may know. Purple underwear? Only the police and the murderer would know what the victim was wearing when the body was found or packed up. The person who wrote this letter was basing the story on their own knowledge. That tells me that they were aware of using untraceable cell phones. Anyone can go to walmart and purchase with cash a Verizon pay as you go account. They could easily get an account using false information. For as little as 50 to 75 dollars one could have a new cell phone and activate the account. The woman has a history of using false information when filling out forms to purchase things such as guns and insurance. I know this is pure speculation and there is not evidence to point to this other than speculation and the letter. And the letter also talked about chopping someone off at the knees. An expression used in the letter that just coincides with the fact that the victim was chopped up at the KNEES.

Put together the fact that bills ac gambling card was found at MM parents house, the Ezy pass hits, and it all points to MM.

This case is pretty easy if you ask me. Common sense and all the CE points to one person. MM did it.

## EXHIBIT I: INTERNET BLOGS FROM COURT TV'S WEBSITE

Page 1 of 48



Show all 95 posts from this thread on one page

**Courttv.com Message Boards** (http://boards.courttv.com/index.php)
- **McGuire Murder Trial** (http://boards.courttv.com/forumdisplay.php?forumid=389)
-- **Tell me again WHY Melanie is on trial......** (http://boards.courttv.com/showthread.php?threadid=293147)

---

*Posted by packer48 on 03-30-2007 05:00 PM:*

**Tell me again WHY Melanie is on trial......**

NO MATCH, NO MATCH, NO MATCH.....

Just where is the state headed with ALL THESE NO MATCHES???

JMHO

packer

---

*Posted by st777jo on 03-30-2007 05:33 PM:*

because she killed her husband

---

*Posted by josey on 03-30-2007 06:02 PM:*

She is on trial because she is the spouse of a dead person.

---

*Posted by Go Truth on 03-30-2007 06:27 PM:*

To be fair there have been two matches of things that are the same as what was in her house;

1) out of 5 plastic bags, 3 appear to be of the same production run as the ones in her house. We havn't heard yet whether every one in New Jersey who bought that brand that month would have gotten the same production run.

2) The luggage. This also is alleggedly a match.
Come to think of it, I have not seen any evidence to prove it was the McGuires. The only reason I have heard so far is that; while she did not recognize their description of the luggage, when she saw the photos she recognized them because "Bill liked to buy matched sets".

But since there were no remaining suitcases in the house to compare them to, or any reciepts, can we really call it an absolute match? Maybe Melanie just jumped to the conclusion they were Bill's and hers.

>>Meanwhile, she has perjured herself numerous times and otherwise obstructed justice in the investigative runup to the trial. Even if she DID buy the handgun at WM's request, it may be ANOTHER felony to buy a firearm for someone legally banned from buying it himself. Not to mention perjuring herself on the gun purchase forms.<<

Oh, she's no angel, I agree. In fact, it seems that she and WM should have made a good pair.

>>I don't know how quickly they ruled Miller and Finn out. Personally, I believe they should consider presenting (somehow) exculpatory evidence re those two in order to shut down those "reasonable doubt" escape routes for the defense.<<

I agree completely. Although she could have acted alone, it just seems much more likely that she would have had help.

>>But -- since many who think MM is guilty also think she may have had an accomplice -- she may not even have committed the murder proper. She may have drugged him, then someone (say, one or two men) take the drugged WM elsewhere to shoot and dismember him. She's still guilty. Even if she had an alibi that placed her out of state at the time of the actual murder. There's way too much CE and too much obstructing of justice/framing others, etc., on her part. <<

That's where we part ways --- I just can't make the exclusive link between MM and the evidence thus far. However it certainly is a pleasure batting ideas back and forth with you. You make me stop and think about it all. Who knows, I may go over the fence yet. LOL

---

Posted by SummerMadness on 03-31-2007 01:13 PM:

**Re: Re: JMO, but she's on trial because ...**

> quote:
> ---
> *Originally posted by MacKenzie*
>
> **I agree with everything you say -- except that you think the only reason she's on trial is her affair w/Miller?**
>
> **There is much about that either directly or indirectly shows either bad character, a willingness to commit criminal acts, and -- in most of these, did so in attempts to deceive LE in THIS CASE.**
>
> **She lied to Finn, Miller, divorce court (under oath) and LE during a murder investigatio (so she perjured herself twice already before her arrest-- both felonies).**
>
> **Claimed (possibly illegally) out of state resident in PA to avoid NJ vehicle taxes.**
>
> **Violated PA law in providing a false address while buying a firearm.**
>
> **Has been indicted for obstruction of justice/trying to frame Ligosh.**
>
> **Probably has one or more accomplices, so add conspiracy -- another felony.**
>
> **Forged unauthorized prescriptions for personal use -- surely another violation**

Page 12 of 48

of state law.

If I sit here a while longer I probably can think of other actual crimes she has committed. But other noncriminal matters include:

Being a homewrecker once and nearly twice.
Cheating on her husband for three years.
Violating workplace rules by having a romantic rel'p with a senior colleague.
Engaging in sex in the workplace. Especially in a medical facility. Another policy violation.

Add in CE like EZ pass hits and attempts to eliminate their record, trips to AC and Delaware, Google searches, hospital blanket, plastic bags, luggage, buying gun of same caliber and same type bullets used to kill husband, etc. etc. etc.

The crime would be if she were NOT on trial. Even if she had an alibi and was out of state when he was killed, this much CE would give massive probable cause that she helped engineer his death at someone else's hands.

Is she actually guilty? Probably.
Beyond a reasonable doubt? At this point, yes, unless new exculpatory evidence is provided by the defense.
Will she be found guilty? Who knows? Remember OJ.

---

Holy cr@ap Mac,
It's a wonder she's not on death row already. Ma Barker has nothing on this chick.

---

Posted by Parrot on 03-31-2007 02:14 PM:

quote:

*Originally posted by st777jo*
**because she killed her husband**

---

...because she is suspected of killing her husband and has been arrested for such. She is now on trial for that crime. ☺

---

Posted by koawally on 03-31-2007 07:29 PM:

quote:

*Originally posted by Dion Belmont*

Page 14 of 48

☺☺☺☺ **This could be the pros. closing argument!**

Only if they want to ensure an acquittal. LOL JMO

*Posted by HoratioJr on 03-31-2007 08:58 PM:*

quote:

*Originally posted by Think About It*

**Only if they want to ensure an acquittal. LOL JMO**

**String'er up, I say!!**

*Posted by Think About It on 03-31-2007 11:11 PM:*

quote:

*Originally posted by kindeekat*

☺☺☺ **Maybe we are reading it differently. I think it makes any defense arguments ANTI common sense and supports the prosecution 100%. But as you say it's JYO.**

It's always interesting to me to see how differently folks can view the same scenarios. Respectfully disagreeing, I just can't see a "common sense" theory bridging the lack of evidence gaps in the prosecution's case.

For example, is there any evidence that the .38 MM bought was the same .38 that WM was shot with? No. It may well be the same gun, but there is no evidence of that. Then is it common sense that MM was the only person who might have owned or had access to a .38? Hardly. It is an all too common weapon.

The computer searches: is there any evidence that it was MM who conducted those queries, rather than WM? No. Then which of the two would be more likely to be searching for how to buy an illegal

http://boards.courttv.com/printthread.php?s=f0869e8a5daaa2bae766d590ed3ad372&threadid=293147...

the pants she was wearing on the 23rd when her sister saw her last. There's no innocent explanation for that.

By his own words and the cell phone he placed himself in or near the house close to 10am. The dog was returned to the yard at 10:18, creating a 20 min. window for Laci to be abducted. It's ridiculous.

The worst evidence for SP was placing himself in the Bay. But he also didn't help himself by:
telling some people he went fishing, others he was golfing
claiming his fishing trip was "last minute" but having a predated license
searching tides and currents in the Bay on the 'net
buying a secret boat from a man named Peterson
making weights in his warehouse and not cleaning up
calling Amber obsessively
pretending he was in Paris while calling from Laci's vigil
smiling at same
lying
giving interviews in which he looked like he was lying

The gasoline on the boat cover, the hair in the pliers, the cleaning, the behavior coming home from the Bay.....The list is very long. This is hardly "almost no evidence." It's ALL evidence. Behavior is evidence. Statements are evidence.

jmo

---

*Posted by st777jo on 04-01-2007 04:26 AM:*

---------------------------------------------------------------------------
Originally posted by st777jo
because she killed her husband
---------------------------------------------------------------------------

quote:
---------------------------------------------------------------------------
*Originally posted by Parrot*

**...because she is suspected of killing her husband and has been arrested for such. She is now on trial for that crime.** ☺
---------------------------------------------------------------------------

because she killed her husband. would have no problem convicting her.

---

*Posted by txfemale45 on 04-01-2007 03:15 PM:*

They don't have to prove that she murdered him in their apt they just have to prove she did it...and there had to be enough evidence to get a inditement..it is up to the jury to convict..

---

I don't think its reasonable to doubt computer searches about how to commit murder if a murder occured with all the above evidence.

If these are all not reasonable, and just coincidences, MM is surely the most unlucky girl in the world and going to prison is just simply another unlucky thing to happen in her poor life LOL

---

*Posted by Goal Post on 04-01-2007 09:33 PM:*

Nothing like a good Sunday afternoon dustup to ferrat out
how many MM supporters are finding it beneficial to
try to score points here. Of course, they know the evidence is powerful in this case. Of course, they will deny it, even after the verdict. If the posters represent a cross-section, another 'jury' forum, of sorts, MM might want to spend the next few weeks doing something outside, while she is still on the outside.
If you are reading this MM, I wonder if your next big plan might include a FLIGHT with
a suitcase full of cash, a new ID and some family members
who are willing to go to the mat to protect your whereabouts.
Well, you already have 2 outta 3, and the greatest new sets
of luggage are at Marshalls now! Opt this time for something
a little less business class in fabric. Lower profile.

---

*Posted by Lara on 04-01-2007 10:14 PM:*

> quote:
>
> *Originally posted by ClearThinker*
>
> **Hmmmm, okay.**
>
> .
>
> **Really, you people cannot possibly have an IQ over 95 if you honestly believe this illogical gibberish. It's not a matter of opinions, it's a matter of basic logic and common sense.**
>
> **Oh, and have a nice day!** 😊

Clear Thinker... I can't believe you are as thoughtless as comments like this make you appear. You are intelligent well read person who has NO reason to insult and hurt the rest of us. Im here to learn and to share. Please try to remember that in the future. Thanks a bunch 😊
Lara

---

*Posted by AmerJus on 04-02-2007 12:08 AM:*

wow....lots of animosity on this board IMO

http://boards.courttv.com/printthread.php?s=f0869e8a5daaa2bae766d590ed3ad372&threadid=293147

I agree the luggage will be one of the things the jury will zero in on in this case but it will tend to incriminate her more than any one thing.............If this was some kind of mob hit why would they put the body parts in 3 seperate bags?..............In fact why would they have used what the jury will believe was his luggage at all?.................The so called hit man knew way too much about details about their lives according to the letter itself............Why take any risk of the bags resurfacing in case her husband ever gave names to Melanie that there were people that could want him dead for gambling debts...............Even when a marraige isn't real hunky dory people tend to tell things to those that are closest to them....... Things that are important............

What could be more important than him being in the kind of jeopardy Melanie wants the jury to believe?................

The real Donnie Brasco, who infiltrated the mafia in real life, conveyed 3 important things in a ctv interview..............

1. They would not write a lengthy letter like that..........In fact he intimated the grammar was way too good and one of these wise guys would have trouble putting 3 coherent sentences together..........

2. The body simply isn't found unless unless they want it found as an example................

3. They would relish in the idea that the heat (wasn't) on them for the murder and never attempt to get Melanie conveniently off the hook..................

4. My own personal conjecture why 3 bags?..............Melanie is small and cutting up and deviding the body into 3 bags was the only way she could handle the weight so she could dispose of the body in the bay............Talk to you later Go Truth

Posted by Laney25 on 04-03-2007 06:46 AM:

**Why Melanie McGuire is on trial?**

She gave her husband 40 whacks
Shot him in the head, front to back
Chopped him up
Packed his bags.
Threw him in the Bay
and that was that......
Til one day who pops up?
Well, bless my stars, it's BillyMac
Floated up to say "hello"
And let a couple people know
I was drugged, I was shot..
And simply thrown away.... to rot.

-- Laney

Posted by Think About It on 04-03-2007 06:25 PM:

**Re: Why Melanie McGuire is on trial?**

EXHIBIT J: INTERNET BLOGS FROM COURT TV'S WEBSITE

Page 1 of 45



Show all 109 posts from this thread on one page

**Courttv.com Message Boards** (http://boards.courttv.com/index.php)
- **McGuire Murder Trial** (http://boards.courttv.com/forumdisplay.php?forumid=389)
-- **I Need 100% Proff Of Guilt To Convict** (http://boards.courttv.com/showthread.php?threadid=293863)

_Posted by BKCannaday on 04-05-2007 08:39 PM:_

**☒ I Need 100% Proff Of Guilt To Convict**

I do not think the prosecution has made a strong enough case. At this point I do have reasonable doubt. I want to know where and when the murder took place. I don't believe the murder even happened in the home because you can't clean up that much mess and leave NO evidence, bleach or no bleach. The video tape presented was grainy and unclear. The trash bags could have been bought at a store by anyone around the same time as the ones found at the McGuire home or he may have taken a few trash bags with him for dirty laundry. Of coarse the husband had suite cases, he was traveling and the fact that a hair belonging to Melanie was found in the suite case means nothing to me except that the suite case belonged to couple. The sister -in -law, brother-in-law or anyone else could have sent the letter to "Madam Attorney General" and the "writing analysis" testimony proved nothing to me except that it is not an exact science much like a lie detector test. The prescription time and place bothers me but still leaves room for doubt. I think it is conceivable that a spouse would purchase a gun for the other spouse. He was gambling, having affairs and may have felt he needed a gun. She was in a bad marriage and it looks like blame could be directed at both the husband and wife! My guess is he could have been in debt to the wrong people or some jilted lover or a lover's husband may have wanted revenge. GIVE ME SOME REAL PROOF before I take a mother away from her children.
I don't think it is necessary for Melanie to testify but I would like to see her on the stand!

BKCannaday



_Posted by BlueHeron on 04-05-2007 08:54 PM:_

boy, I sure hope you never get called for jury duty. Please name one trial in recent history that had 100% proof of guilt! You would have let Westerfield, Peterson (both of them) off scott free by your standards!

_Posted by BKCannaday on 04-05-2007 09:04 PM:_

Hey Blue,

I did sit for 3 days as a juror on an armed robbery case. I had no problem convicting the man as the video clearly showed the man on trial shooting at the cashier. The cashier pointed the accused out in a line up and in the court room. Other jurors did take a little longer to say guilty then I did.

Page 5 of 45

Sorry I am not an attorney, critic, or writter for trials. Just your average person voicing my opinion.

When I was called for jury duty I filled out my question sheet and was asked questions before being picked as a juror. I was honest and I got picked. I felt our Guilty verdict was the right verdict. Even without a video the kid shot at picked out the person and said he could not forget the person who shot at him at close range (got him in the foot). I think I would remember the person who shot me too! That is what I call real evidence. The video took away any reasonable doubt. I am not seeing strong enough proof of guilt for Melanie and have reasonable doubts.

*Posted by annalyzer on 04-05-2007 09:42 PM:*

> quote:
>
> *Originally posted by Marlena*
> **William who????**

Justice for William McGuire

*Posted by yellowcake on 04-05-2007 10:15 PM:*

His wife, Melanie killed her husband and did a number of things after the killing, including throwing parts of his body into the river or ocean, thinking he would never be found, and that her purchase of a gun in PA, searches on the internet, drives to DEL, and to Atlantic City, would never be discovered and linked to her actions. No one framed her, no one did all those drives in her car, or searched on her computer, nor bought the missing gun.

This is very clear to all who listen closely to the case.

*Posted by rainycoast on 04-05-2007 10:29 PM:*

Melanie killed her husband, and I believe she did it all on her own, with no help from anyone else.

She had a whole week away from her job to work her magic and dispose of the body.

*Posted by yellowcake on 04-05-2007 10:31 PM:*

> quote:
>
> *Originally posted by rainycoast*
> **Melanie killed her husband, and I believe she did it all on her own, with no help from anyone else.**

Page 6 of 45

I don't care if she had help. I want this woman to face the electric chair. I don't think she will, I think she will spend the next 40 to 50 years left in her life doing nursing in a prison setting, no baby making at all.

---

*Posted by ALL RISE on 04-05-2007 11:29 PM:*

**I thought NJ**

> quote:
> ---
> *Originally posted by KR12345*
>
> **Is there a death penalty in NJ ? I thought the most she could get was life ?**
> ---

was one of the states that discontinued the d/p?

Inasmuch as Billy fooled around (per the prosecutor) too, one of his conquests could have done it (just a thought)? Then we've all heard about the mob...and the gambling debt. I don't know about that?

If MM agrees to a State given lie detector and passes (that's a very big IF), I could believe MM is not guilty...but that's a very big IF.😳

Also by the same token, if MM refuses to take a State lie detector, I'll truly believe MM is guilty guilty guilty !!😡

---

*Posted by Greg_Smith on 04-05-2007 11:35 PM:*

**Re: I thought NJ**

> quote:
> ---
> *Originally posted by ALL RISE*
>
> **was one of the states that discontinued the d/p?**
>
> **Inasmuch as Billy fooled around (per the prosecutor) too, one of his conquests could have done it (just a thought)? Then we've all heard about the mob...and the gambling debt. I don't know about that?**
>
> **If MM agrees to a State given lie detector and passes (that's a very big IF), I could believe MM is not guilty...but that's a very big IF.😳**
>
> **Also by the same token, if MM refuses to take a State lie detector, I'll truly**

Da203

death penalty is on hold in NJ but u can still be sentenced to it.

Meanwhile, in New Jersey, executions have been on hold since January 2006, when the state Legislature appointed a commission to study the issue. This January, the group recommended the death penalty be abolished. Reverend M. William Howard of Bethany Baptist Church in Newark, N.J., who chaired the 13-member New Jersey Death Penalty Study Commission, agreed with speculation that the state could become the next to abolish the death penalty.

http://www.law.com/jsp/article.jsp?id=1173101904578

---

Posted by Cornblossom on 04-06-2007 12:26 AM:

> quote:
>
> Originally posted by checkinuout
> **if u recall in the begining of the trial the State was going for the death penalty but decided to go for life since they feel no one would sentence a mom to death.**
>
> **death penalty is on hold in NJ but u can still be sentenced to it.**
>
> **Meanwhile, in New Jersey, executions have been on hold since January 2006, when the state Legislature appointed a commission to study the issue. This January, the group recommended the death penalty be abolished. Reverend M. William Howard of Bethany Baptist Church in Newark, N.J., who chaired the 13-member New Jersey Death Penalty Study Commission, agreed with speculation that the state could become the next to abolish the death penalty.**
>
> **http://www.law.com/jsp/article.jsp?id=1173101904578**

I really messed that one up,huh? LMAO I remember reading an article about it and thought it stated NJ had abolished it. Thanks for the correction. I believe in the Death Penalty and don't agree with doing away with it...but that's another topic. LMAO

---

Posted by clannad on 04-06-2007 12:30 AM:

IMO Melanie McGuire murdered her husband, William McGuire.

---

Posted by txfemale45 on 04-06-2007 01:00 AM:

His wife murdered him in cold blood..... and she is a sociapath is how she could have passed a lie detector test

---

Posted by mema3 on 04-06-2007 01:10 AM:

**Melanie McGuire**

http://boards.courttv.com/printthread.php?s=61068cf927ed1f4f69e5c5809f17968a&threadid=293863...

**EXHIBIT K: INTERNET BLOGS FROM COURT TV'S WEBSITE**

Page 1 of 2



Show all 5 posts from this thread on one page

**Courttv.com Message Boards** (http://boards.courttv.com/index.php)
- **McGuire Murder Trial** (http://boards.courttv.com/forumdisplay.php?forumid=389)
-- **Questions** (http://boards.courttv.com/showthread.php?threadid=294187)

---

*Posted by maggieb on 04-09-2007 09:15 PM:*

**Questions**

I haven't been able to see much of this trial, so I was hoping someone can answer my questions

1. She obviously needed help to get his car to A.C. are there any theories about who that might be? if it was another boy friend wouldn't he be found through phone records?

2. Was there insurance and if so, doesn't she know that he would have to be declared dead to collect the money, which would take years? she obviously didn't want his body to be found.

3. Did I hear correctly, did her affair with the Dr. start when she was 9 months pregnant? ick.

4. What was Bill's felony?

Thanks!

---

*Posted by NJ_follower on 04-09-2007 11:21 PM:*

**Re: Questions**

[QUOTE]*Originally posted by maggieb*
[B]I haven't been able to see much of this trial, so I was hoping someone can answer my questions

SORRY MAGGIE-DIDN'T SEE IF YOUR POST TIL NOW-HERE IS MY TAKE ON ANSWERS, BUT DON'T HANG YOUR HAT ON IT-SOMEBODY ELSE MAY HAVE OTHERS. lol!!

1. She obviously needed help to get his car to A.C. are there any theories about who that might be? if it was another boy friend wouldn't he be found through phone records? COULD BE A FEW DIFFERENT PEOPLE...PERSONALLY, LOOKS LIKE STEPFATHER SEEMS MOST LIKELY AT THIS TIME.

2. Was there insurance and if so, doesn't she know that he would have to be declared dead to collect the money, which would take years? she obviously didn't want his body to be found. YES, $250k PLACED INTO A TRUST FOR CHILDREN-NOT SURE OF NJ STATUTE ON HOW LONG DECLARED DEAD, ETC.

3. Did I hear correctly, did her affair with the Dr. start when she was 9 months pregnant? ick. YES, DITTO X 2!!

4. What was Bill's felony? A 3RD DEGREE-ASKING A WITNESS TO LIE ON HIS BEHALF FOR A

Da205

Page 2 of 2

COURT HEARING FOR A TRAFFIC OFFENSE--I'M NOT SURE BUT I THINK THE PERSON HE WAS INFLUENCING TO LIE WAS MELANIE MCGUIRE.

---

*Posted by redwine218 on 04-10-2007 10:21 PM:*

**video**

how many of you think that it WAS MM in that video leaving the drugstore....I certainly do!

---

*Posted by yellowcake on 04-10-2007 10:37 PM:*

**Re: video**

> quote:
>
> *Originally posted by redwine218*
> **how many of you think that it WAS MM in that video leaving the drugstore....I certainly do!**

Unlikely it was anyone else. I really don't care, we know she bought the gun and bullets... that's all that really matters.

Every lie and story she told from then on only serves to put more bars on her jail cell. IMO

---

*Posted by Manning18 on 04-10-2007 10:56 PM:*

I think it was her.Same build and snug fitting clothes like she wears in court.The woman's hair is the same as MM.Just longer then and pulled back.

---

All times are GMT. The time now is 03:20 PM.
The correct time for your location is displayed while logged in.       Show all 5 posts from this thread on one page

Powered by: vBulletin Version 2.2.6
Copyright © Jelsoft Enterprises Limited 2000, 2001.
All content Copyright Courtroom Television Network, LLC., All Rights Reserved.

http://boards.courttv.com/printthread.php?s=1a95d02fb0788460dec9d6175ef10225&threadid=294187



Show all 104 posts from this thread on one page

**Courttv.com Message Boards** (http://boards.courttv.com/index.php)
- **McGuire Murder Trial** (http://boards.courttv.com/forumdisplay.php?forumid=389)
-- **Here's why no blood in bathroom** (http://boards.courttv.com/showthread.php?
threadid=292247)

---

*Posted by MarkJ5119 on 03-24-2007 12:29 AM:*

**Here's why no blood in bathroom**

A lot has been said about that no blood was found in the bathroom even though the housband was
dismembered. There's a simple possible explantion.

The defendant is a nurse. Nurses have access to operating room cleaning solvents that totally
remove all traces of blood.

Even Luminol cannot detect traces of blood after an area has been thoroughly gone over with
operating room cleansers that are designed to remove blood.

As a nurse, McGuire would know this and would have had access to such cleaning agents.

---

*Posted by DandyCandy on 03-24-2007 12:32 AM:*

**Re: Here's why no blood in bathroom**

> quote:

> *Originally posted by MarkJ5119*
> **A lot has been said about that no blood was found in the bathroom even
> though the housband was dismembered. There's a simple possible explantion.**
>
> **The defendant is a nurse. Nurses have access to operating room cleaning
> solvents that totally remove all traces of blood.**
>
> **Even Luminol cannot detect traces of blood after an area has been thoroughly
> gone over with operating room cleansers that are designed to remove blood.**
>
> **As a nurse, McGuire would know this and would have had access to such
> cleaning agents.**

Right and I do believe someone testified to the overwhelming smell of bleach coming from one of
Melanie's bathrooms. Now, whether or not she was telling the truth or not I don't know but I did
hear her testify to that fact.

companies.

Here is info on one such product:

DNA Remover™ is a cleansing solution that is highly active against DNA contamination. DNA Remover TM is intended for use at PCR workstations. The solution contains a surfactant and a DNA destroying agent.
DNA Remover™ is ready-to-use for eliminating DNA from any surface. By following the decontamination instructions, DNA is completely destroyed and removed.

---

*Posted by Adalena935 on 03-28-2007 12:17 AM:*

quote:

---

*Originally posted by WhiteShark*
**Luminol goes positive in the presence of bleach and other things besides blood ( actually the iron in blood)**

**http://science.howstuffworks.com/luminol3.htm**

---

Thank you. This jumped out at me.

http://science.howstuffworks.com/luminol3.htm

*Luminol in itself won't usually solve a murder case.*

There have been so many cases over the yrs I've followed where little to no trace of forensics was found at the house where the crime was said to have happened. Several come to mind where someone dismembered someone in a bathtub and miniscule evidence was finally located maybe 20 or more years later.

In this case, I'd just move on to some other evidence and look at the whole picture if I couldn't solve the case based only on luninol as you link so rightfully states.

---

*Posted by Adalena935 on 03-28-2007 12:20 AM:*

**Re: DNA remover**

quote:

---

*Originally posted by pjvic*
**I posted this another thread but I believe it belongs here.**

**I work in a lab and there is a product specifically made to remove DNA. When PCR testing is done it is important that there is no cross contamination between samples so the whole lab and all the equipment is clean with DNA remover. It can be easily order from many, many medical supply companies.**

**Here is info on one such product:**

> **DNA Remover™ is a cleansing solution that is highly active against DNA contamination. DNA Remover TM is intended for use at PCR workstations. The solution contains a surfactant and a DNA destroying agent.**
> **DNA Remover™ is ready-to-use for eliminating DNA from any surface. By following the decontamination instructions, DNA is completely destroyed and removed.**

Thanks! Since this woman is a nurse she had more access to such a product than the average person in other professions than medical.

---

Posted by Adalena935 on 03-28-2007 12:24 AM:

> quote:
>
> ---
>
> *Originally posted by lisafremont*
> **I think the theories presented here are interesting. But my thinking is that Melanie would have wanted to control the situation as much as she could and that would mean doing the murder in the home.**
>
> **Here's my theory: she used the chloryl hydrate to sedate the kids and Billy. She had lots of time to do the deed. And the shooting could be both quiet and neat if she used a tarp and a cushion. Place his sedated body on the tarp in the bathroom, use a pillow to muffle the noise, close the tarp to contain the splatter.**
>
> **Her training as a nurse could help her with the exsanguination and dismemberment.**
>
> **And she would have lots of time to clean the bathroom thoroughly.**
>
> **I think even if there is some noise, like from a saw, that neighbors would not have necessarily noticed it. Or they could have dismissed it. I hear strange noises all the time and unless there is something specific to attach that noise to— days, weeks later, who would have anything to report??**
>
> **I say it's Melanie in the bathroom with the chloryl hydrate, the .38, a tarp, a pillow, a saw and the Kenneth Cole luggage.**
>
> **I also don't think the prosecution has to prove all the details— like how, where and why— to prove WHO did this. It's the who that really matters.**
> **jmo**
>
> ---

I so agree. Have to take all the evidence as a whole. Can't just hinge the whole jury decision on blood evidence by itself.

---

Posted by funkyflower on 03-28-2007 03:42 AM:·

Da209

ge 1 of 35



Show all 82 posts from this thread on one page

**Courttv.com Message Boards** (http://boards.courttv.com/index.php)
- **McGuire Murder Trial** (http://boards.courttv.com/forumdisplay.php?forumid=389)
-- **MM's Lie Detector Offer DEBUNKED** (http://boards.courttv.com/showthread.php?threadid=293943)

---

Posted by *bugsy* on 04-05-2007 12:18 PM:

**MM passed a lie detector test?**

I did not know this.

read...

http://www.thnt.com/apps/pbcs.dll/a...D=2007704050432

In a nutshell, MM took a lie detector test, apparently passed it, defense is arguing to admit the results if MM takes the stand. If Pros has a problem with it, defense is offering to have MM take another lie detector test administered by the state, before she takes the stand.

This is one of the motions being argued today out of the presence of the jury.

---

Posted by *sciencegirl* on 04-05-2007 12:47 PM:

**Re: MM passed a lie detector test?**

quote:
-----------------------------------------
*Originally posted by bugsy*
**I did not know this.**

**read...**

http://www.thnt.com/apps/pbcs.dll/a...D=2007704050432

**In a nutshell, MM took a lie detector test, apparently passed it, defense is arguing to admit the results if MM takes the stand. If Pros has a problem with it, defense is offering to have MM take another lie detector test administered by the state, before she takes the stand.**

**This is one of the motions being argued today out of the presence of the jury.**
-----------------------------------------

Morning bugsy - All I can say is Holy Cow!!! I did not know this. Not sure why the defense wants

**state prison**

Good one, Check...lol

Posted by Bama0f14 on 04-06-2007 02:25 AM:

quote:

*Originally posted by ClearThinker*
**Hey everybody! :-)**

**My time permitted me to make a post today, and since this new angle came up (in a thread from BUGSY), I just thought I'd post.**

**I've already said (in a previous post) that if I was Melanie (and if I was totally innocent).........then I'd have volunteered at the very beginning of the investigation to take a polygraph test with the police.**

**Volunteering to take a test at this late stage is kind of funny, but a clever tactic by JT.**

**Here's the truth about polygraphs after waiting too long to take them:**

**Unlike many of you who are speculating about what it's like to take (and beat) a polygraph test, I have first hand experience and I also have a friend who has first hand experience.**

**So I don't have an opinion on this matter, I have REAL WORLD FACTS.**

**I've taken a polygraph twice, and I have an acquaintence who administers them too.**

**Beating a polygraph test is like beating any other test, the more you "study" and/or "practice"............then the better your performance will be. The less you practice and study, the worse your test performance will be.**

**I've taken 2 lie detector tests (after studying how to beat them), and I passed both tests.......even though I was 100% lying on both tests. ...and I was able to do this even though I had no PRACTICE TESTS beforehand to prepare myself...**

**(if you actually take several practice tests first, then it becomes easier to beat the polygraph machine).**

**I used 2 different technqiues to beat the 2 polygraph tests.......for the first test I used one technique and for the second test I used another technique. Both worked, and I passed both tests even though I was lying both times.**

**I personally had no help from anybody with my study methods on how to beat the test (I did it on my own), but there are professional places which will give you PROFESSIONAL help on how to beat the test..........and which will**

adminster practice tests until you are able to beat the test.

So I personally did it "without" any professional help to "beat" the tests........but if somebody had help then it would be even easier to beat the test.

If Melanie had volunteered RIGHT FROM THE START (from the first day of questioning) to march into the police station and take a polygraph....then that would be a different story...

....but her "11th hour" offer to take a polygraph (after already being made familar with it and likely studying the various ways to beat it) is just something to give the Melanie Worshippers extra false-hope. :-)

She's already taken practice tests, and she's already been made familiar with it (and she's had nearly 2 years to "mentally" prepare for this stunt.)

It's just a PR stunt, and means nothing at this point. It's just too easy to pass this test after enough practice has been done, or after enough studying has been done.

There's lots of places online which can assist you in beating a polygraph, and one link is below:

**www.polygraph.com**

Here's some of what this page says about their polygraph training:


Keep in mind that there are MANY other places which can help you beat a polygraph, and MM has access to the best defense money can buy (which is EXACTLY why she had a PRIVATE POLYGRAPH administered 2 years later rather than marching into the police station to have somebody give her a polygraph IN THE BEGINNING).

Anyway, it's sure FUNNY to see Bugsy and NJ_Follower (and the other Melanie Worshippers) come forward to imply that MM is probably innocent because of this polygraph info.

It's also funny how they claim this should be used as evidence this late in the game, when in fact MM was afraid to take a polygraph at the beginning when police were first questioning her.

MM was scared to take a "police-administered polygraph" during the first days of questioning just like a frightened puppy dog, she was scared out of her wits back then because she had no control over the outcome (but now that she has more control, after practicing, then suddenly were supposed to admit this as "evidence"?).

Gimme a break, you're only too funny MM! :-)

IF MM had volunteered to take a polygraph at the BEGINNING of this case (right from the first questioning session with police) then I'd agree that it should be used as evidence if both sides agree, since that would be very consistent with the behavior of an innocent person

But waiting 2 years later (after hiring one of the best defense teams in the world) before offering to take a polygraph is an absolute JOKE (especially after taking practice tests and likely studying how to beat them).

....This is not just a joke, but it's actually sad that the Melanie worshippers are too feeble minded to realize how much of a joke this is.

But then again, I've taken real polygraphs and BEAT them before, unlike most of you, so unlike you I'm actually POSTING FACTS about this topic, not a bunch of meaningless jibber-jabber which attempts to exonerate Melanie.

I do admire Bugsy's desire to set a killer free..

..and I also admire that "4 Times a Charm" has stated (in another thread) that she told her kids that:

"a family that WORSHIPS [MURDERERS] TOGETHER, STAYS TOGETHER." :-)

Wow, I can only speculate how those kids will turn out when they grow up. :-)

...but frankly, I tell my kids that killing is wrong and that a murderer should not be set free, not even if they are the mother of 2 young kids.

We had another poster who said that she would never vote to "take away the mother of 2 young kinds" (unless she's given 100% VIDEO-like proof of a crime)....but what difference should it make if a murderer has 2 young kids or not?

What a joke, and it shows just how EMOTIONAL and ILLOGICAL the Melanie Worshippers are.

Killing is wrong.........and regardless if a man or woman does it it's still wrong, and if Scott Peterson should fry then Melanie should go to jail for the same crime.

The gun is still there in evidence, the murder searches are still there, the luggage is still there, the hospital blankets are still there, the EZ pass fiasco is still there, MM's 100 mile trip to AC is still there, and PHONY letters to exonerate MM are still there......and finally, the lack of proving that WM was in debt to AC thugs is still there.

It's amazing how this evidence can be overlooked by the people who are so desperate to set a killer free that they'll just bury their head in the sand and pretend as though this evidence is not there.

I support a conviction whether it's a man or a woman who did the killing, but then again, I'm a logical person. :-)

I'm sorry to destroy your logic Bugsy and NJ_Follower, but hey, we must let the TRUTH come out no matter what the personal cost to your own egos. The TRUTH shall set us all FREE. :-)

As always, have a nice day! ☺

**(This will be my FINAL FINAL post) I promise. :-) :-)**

Where have we heard that before???And what is your obsession with Scott Peterson are you related to him you mention him in all your post. Maybe you need therapy to help you get over Scott peterson and get on with your life.☺↓

*Posted by ipsedixit on 04-06-2007 02:36 AM:*

A polygraph result has no place in a criminal trial. I didn't read the links, but maybe NJ allows them in civil cases or something.

They have a role during investigation to possibly eliminate some suspects, but don't think the results are admissible in criminal proceedings. They are just not accurate enough.

*Posted by MacKenzie on 04-06-2007 04:05 AM:*

quote:

*Originally posted by ClearThinker*
**Hey everybody! :-)**

**My time permitted me to make a post today, and since this new angle came up (in a thread from BUGSY), I just thought I'd post.**

**I've already said (in a previous post) that if I was Melanie (and if I was totally innocent).........then I'd have volunteered at the very beginning of the investigation to take a polygraph test with the police.**

**Volunteering to take a test at this late stage is kind of funny, but a clever tactic by JT.**

**Here's the truth about polygraphs after waiting too long to take them:**

**Unlike many of you who are speculating about what it's like to take (and beat) a polygraph test, I have first hand experience and I also have a friend who has first hand experience.**

**So I don't have an opinion on this matter, I have REAL WORLD FACTS.**

**I've taken a polygraph twice, and I have an acquaintence who administers them too.**

**Beating a polygraph test is like beating any other test, the more you "study" and/or "practice"............then the better your performance will be. The less you practice and study, the worse your test performance will be.**

**I've taken 2 lie detector tests (after studying how to beat them), and I passed both tests........even though I was 100% lying on both tests. ...and I was able to do this even though I had no PRACTICE TESTS beforehand to prepare myself...**

**(if you actually take several practice tests first, then it becomes easier to beat**

**EXHIBIT N: INTERNET BLOGS FROM COURT TV'S WEBSITE**

Page 1 of 1



Show all 1 posts from this thread on one page

**Courttv.com Message Boards** (http://boards.courttv.com/index.php)
- **McGuire Murder Trial** (http://boards.courttv.com/forumdisplay.php?forumid=389)
-- **just because MM is petite does not mean she can't kill**
(http://boards.courttv.com/showthread.php?threadid=294004)

*Posted by trc4949 on 04-06-2007 07:03 PM:*

**just because MM is petite does not mean she can't kill**

that infact was her thinking from the beginning... thinking " no one will ever think I could do such a crime like this, little ole petitee MM"

BUT

The *whole reason* she dismembered her husbands body was because he was too heavy to carry and get rid of as a whole body!! (because of her petite size and weakness)

All times are GMT. The time now is 02:23 PM.
The correct time for your location is displayed while logged in.   Show all 1 posts from this thread on one page

Powered by: vBulletin Version 2.2.6
Copyright © Jelsoft Enterprises Limited 2000, 2001.
All content Copyright Courtroom Television Network, LLC., All Rights Reserved.



Show all 96 posts from this thread on one page

**Courttv.com Message Boards** (http://boards.courttv.com/index.php)
- **McGuire Murder Trial** (http://boards.courttv.com/forumdisplay.php?forumid=389)
-- **Could You Lift 60 lbs.?** (http://boards.courttv.com/showthread.php?threadid=293844)

---

*Posted by Daniel Konrath on 04-05-2007 06:19 PM:*

**Could You Lift 60 lbs.?**

I'm the first one to admit that the pros. case has some holes,(mainly where did she cut up the body?), but I also think there's enough CE that she did it and would hate to see her walk or the jury hang on a point that has a simple explanation...........

Say he was a 200 pound man..........After the massive blood and other bodily fluid loss from dismemberment you'd be talking about a corpse that was roughly 20 lbs. lighter..........Couple that with the body being seperated into 3 sections and different bags.............Since the vast majority of the posters are women do you think you could hoist a 60 pound suitcase about 3 feet and throw it over the rail?..................

I've seen many women , including my own wife when my son was young, pretty easily pick them up at that weight..........Kids don't come with handles either............

If the jury gets hung up on her having to have had an accomplice that remains a mystery as to who, because they conclude the mechanics of the murder seems impossible for a 120 pound woman they might let a killer go free..........

---

*Posted by redfox on 04-05-2007 06:25 PM:*

I've got 20 years on MM, am her height and I could lift 20lbs easy. I'm also a nurse-- we're used to moving oversized,animate objects *L*

---

*Posted by Lily23 on 04-05-2007 06:34 PM:*

**Re: Could You Lift 60 lbs.?**

quote:
──────────────────────────────
*Originally posted by Daniel Konrath*
**I'm the first one to admit that the pros. case has some holes,(mainly where did she cut up the body?), but I also think there's enough CE that she did it and would hate to see her walk or the jury hang on a point that has a simple explanation...........**

**Say he was a 200 pound man..........After the massive blood and other bodily fluid loss from dismemberment you'd be talking about a corpse that was**

Da216

------------moo------------

*Posted by NewEngland on 04-06-2007 05:34 PM:*

I can lift 60 lbs-
when I was 30 /31 I had two little boys, lugged groceries carseats strollersetc...I was iin mommy shape...we are very strong!!! I have three boys and can carry kids skis helmets duffle bags etc... i am the same size as melanie. I have always been able to move furniture by myself(mostly)... let me tell you, I firmly believe this woman was physically able to do this crime. also-nursing experience in how to lift 'dead weight"...imo

*Posted by Daniel Konrath on 04-09-2007 07:39 PM:*

**Re: Re: Could You Lift 60 lbs.?**

> quote:
>
> *Originally posted by MaybytheBay*
>
> **MM might have been able to lift 60 lbs keeping in mind that an object with handles would be easier to manage. I will say, it is quite a load especially for a petite woman MMs size......up and over. I work with weights daily so I have an awareness. I suspect managing the suitcases would be a considerable struggle......placing her on the bridge for considerable enough time........I'm somewhat amazed that no one person witnessed anything.**

You had an interesting thought..........Are you or anyone else from that exact area and know that stretch oh highway?...........If anyone is, how much traffic is there?............

She did it probably but that would be another thing in her favor if it would be almost impossible for her not to have been seen.............When you couple that with the pristine alleged crime scene, the phantom accomplice and there being no motive that is really clear.............Maybe a local can help us out here?.............

*Posted by sneakers on 04-09-2007 07:53 PM:*

**Re: Re: Could You Lift 60 lbs.?**

> quote:
>
> *Originally posted by Lily23*

**This is the one thing ALL nurses will agree on. You are taught how to lift *dead* weight. No pun intended...well maybe a little.** 😊

Da217

**Not so with dismemberment. No nurse is taught how to cut up a body.**

Observation in surgery could accomplish that. Also, my DIL is studying nursing, she said she had to purchase a corpse for her studies. Wouldn't that teach something?

Did Robert Durst study for the dismemberment of his victim?

I cut up chickens all the time. I didn't study for that.
imo

---

*Posted by sneakers on 04-09-2007 07:55 PM:*

quote:

*Originally posted by Think About It*

**ITA. Although I am certainly impressed with the herculean abilities of some of the posters, I question whether MM could have hauled three heavy suitcase in and out of the car, then off the bridge. JMO**

I have a luggage carrier. I accomplish amazing feats with it. Please...

---

*Posted by Manning18 on 04-09-2007 07:58 PM:*

quote:

*Originally posted by NewEngland*
**I can lift 60 lbs–
when i was 30 /31 i had two little boys, lugged groceries carseats strollersetc...i was iin mommy shape...we are very strong!!! i have three boys and can carry kids skis helmets duffle bags etc...
i am the same size as melanie. i have always been able to move furniture by myself(mostly)... let me tell you, i firmly believe this woman was physically able to do this crime. also-nursing experience in how to lift 'dead weight"...imo**

Exactly.I have 4 children.Lifting and lugging all day,everyday.Makes a Mommy very strong.

😊🐝🐝

---

*Posted by BKCannaday on 04-09-2007 08:34 PM:*

Da218

Melanie and she did the searches............

1. She knew she'd be an automatic suspect and you can never really delete anything because she probably follows cases on tv...............She knew tha cops would want that computer because her husband disappeared under suspicious looking circumstances...........................

2. Make it look like the husband was searching............She knew he gambled...............Still need to know from a local if the body was dumped in a secluded stretch of road.........with all her planning she never would have taken that chance...............IMO..........

---

*Posted by Datum on 04-11-2007 09:19 PM:*

**Re: Re: Could You Lift 60 lbs.?**

> quote:
>
> ---
> *Originally posted by Bernadette*
>
> **Daniel, you always post good stuff. However, how do you get the 20 lb weight loss and guestimate of dead weight.**
> **It is my understanding a corpse is actually heavier, particularly when rigor sets in...........Just wondering**
>
> ---

I would also guestimate that WM was 20 lbs. lighter after she finished dismembering him. He would have lost a considerable percentage of his blood and body fluids during this process. His "live" weight indicates he had approximately 6 liters of blood in his body - most of which he would have lost. That's roughly 15 pounds right there.

Bodies don't weigh more dead - they just feel like it - that's what people mean when they talk about "dead weight". When someone isn't helping you in any way shape or form, they feel much heavier. If you put them on a scale, they weigh the same. Rigor doesn't add weight, just stiffness.

---

*Posted by sneakers on 04-12-2007 06:47 PM:*

> quote:
>
> ---
> *Originally posted by Daniel Konrath*
>
> **How ya doing Datum?...............That's pretty strong for 110 lbs.............There's an awful lot that points to Melanie............do you think she did the murder in the condo?............I think that's something that could really bother the jury that place being so absent of anything..............Chopping up a body in a violent manner with a power saw would produce microscopic blood traces that wouldn't even be apparent to the naked eye like visible blood spatter............If she did it there it was an amazing clean up job....................**
>
> **Still looking for a local on the board that's following the case as far as how much traffic would be where she allegedly threw the suitcases...............This crime took meticulous planning and I can't imagine that she'd take the chance**

of being seen even if it was late at night...........Was it the kind of road where she'd have a reasonable expectation of someone coming along or was it a secluded road that would be highly unlikely a car would drive past, even in the minute or so it would take to get the 3 bags into the water?......................

Hey, Dan. 🐵

Imo, she didn't use a power saw, and there would be no blood spatter if he was already dead. She could have used a small saw, can't think of the name of the saw right now, but it cuts in places ya can't get a power saw.

Easy to clean up a tub and walls with bleach.

I think she used the luggage to transport the body parts so that if anyone saw her, they'd simply think she was getting ready to travel. imo

---

*Posted by Parrot on 04-12-2007 08:23 PM:*

I'm trying to imagine crossing the Cheasapeake bay bridge and seeing a small woman struggle with 3 suitcases! Trying to lift these very heavy suitcases up over the rails of the bridge. I just don't see it! She would have had to do this in the middle of the night for someone not to see her!

http://www.cyconpub.com/jacassologs...1_baybridge.jpg

and

http://www.cbbt.com/

---

*Posted by sneakers on 04-12-2007 09:35 PM:*

quote:
--------
*Originally posted by Parrot*
**I'm trying to imagine crossing the Cheasapeake bay bridge and seeing a small woman struggle with 3 suitcases! Trying to lift these very heavy suitcases up over the rails of the bridge. I just don't see it! She would have had to do this in the middle of the night for someone not to see her!**

http://www.cyconpub.com/jacassologs...1_baybridge.jpg

**and**

http://www.cbbt.com/
--------

Are we sure she had to hoist them over the railing? No access anywhere beyond the railing?

---

*Posted by Bernadette on 04-12-2007 10:00 PM:*

**Bridge -tunnel**

Da220

Page 1 of 45



Show all 109 posts from this thread on one page

**Courttv.com Message Boards** (http://boards.courttv.com/index.php)
- **McGuire Murder Trial** (http://boards.courttv.com/forumdisplay.php?forumid=389)
-- **I Need 100% Proff Of Guilt To Convict** (http://boards.courttv.com/showthread.php?threadid=293863)

---

*Posted by BKCannaday on 04-05-2007 08:39 PM:*

**I Need 100% Proff Of Guilt To Convict**

I do not think the prosecution has made a strong enough case. At this point I do have reasonable doubt. I want to know where and when the murder took place. I don't believe the murder even happened in the home because you can't clean up that much mess and leave NO evidence, bleach or no bleach. The video tape presented was grainy and unclear. The trash bags could have been bought at a store by anyone around the same time as the ones found at the McGuire home or he may have taken a few trash bags with him for dirty laundry. Of coarse the husband had suite cases, he was traveling and the fact that a hair belonging to Melanie was found in the suite case means nothing to me except that the suite case belonged to couple. The sister -in -law, brother-in-law or anyone else could have sent the letter to "Madam Attorney General" and the "writing analysis" testimony proved nothing to me except that it is not an exact science much like a lie detector test. The prescription time and place bothers me but still leaves room for doubt. I think it is conceivable that a spouse would purchase a gun for the other spouse. He was gambling, having affairs and may have felt he needed a gun. She was in a bad marriage and it looks like blame could be directed at both the husband and wife! My guess is he could have been in debt to the wrong people or some jilted lover or a lover's husband may have wanted revenge. GIVE ME SOME REAL PROOF before I take a mother away from her children.
I don't think it is necessary for Melanie to testify but I would like to see her on the stand!

BKCannaday



---

*Posted by BlueHeron on 04-05-2007 08:54 PM:*

boy, I sure hope you never get called for jury duty. Please name one trial in recent history that had 100% proof of guilt! You would have let Westerfield, Peterson (both of them) off scott free by your standards!

---

*Posted by BKCannaday on 04-05-2007 09:04 PM:*

Hey Blue,

I did sit for 3 days as a juror on a armed robbery case. I had no problem convicting the man as the video clearly showed the man on trial shooting at the cashier. The cashier pointed the accused out in a line up and in the court room. Other jurors did take a little longer to say guilty then I did.

you do bring up some strong points, probably why I think she is probably guilty, I am just waiting for the point where I think she is definitely guilty

---

*Posted by lisafremont on 04-06-2007 02:27 PM:*

> quote:
> ---
> *Originally posted by LisaM22*
> **you do bring up some strong points, probably why I think she is probably guilty, I am just waiting for the point where I think she is definitely guilty**
> ---

I don't know what would push you over that line but I am already there. There is no reasonable alternative.
jmo

---

*Posted by yellowcake on 04-06-2007 02:30 PM:*

> quote:
> ---
> *Originally posted by lisafremont*
>
> **I don't know what would push you over that line but I am already there. There is no reasonable alternative.
> jmo**
> ---

Exactly, this is a case where "the snow fell in the night" ...none of us saw it snowing, but there's snow on the ground outside our window, so we know it snowed.

There is clear and convincing circumstantial evidence all the way through this case.

---

*Posted by yellowcake on 04-06-2007 02:35 PM:*

> quote:
> ---
> *Originally posted by LisaM22*
>
> **so your saying your not 100% sure those people are guilty? should we kill people we are not 100% sure are guilty?**
> ---

Page 31 of 45

> quote:
> ─────────────────────────────────────────
> *Originally posted by lisafremont*
>
> **Right. But there would be OTHER circumstantial evidence — to wit, all the other lawns in the neighborhood — to support or dispute that evidence.**
> ─────────────────────────────────────────

But if the wife were bedridden and all she could do was look out her window and as far as her eye could see there was snow.......

The rest of your post is unnecessary. You don't have to convince me of Melanie's guilt. I was just making a point.

─────────────────────────────────────────────

*Posted by LisaM22 on 04-06-2007 04:27 PM:*

> quote:
> ─────────────────────────────────────────
> *Originally posted by annalyzer*
>
> **Not necessarily. There was a man last year that wanted to surprise his wife. Her wish was for snow so he rented a snow maker and worked all night. When his wife awoke the next morning their lawn was coverd with snow.**
> ─────────────────────────────────────────

ok, got me there, but that shows how all ce can really be nothing more then circumstantial when their are unknowns as to what the real circumstances were

─────────────────────────────────────────────

*Posted by yellowcake on 04-06-2007 04:28 PM:*

**Re: Re: Re: Re: right**

> quote:
> ─────────────────────────────────────────
> *Originally posted by direstraits*
>
> **...................**
> **Yellowcake, I admire your persistence. But for my part, I decline to argue with any of these people. They are hopeless, in my view. But keep up the fight for the rest of us thinking folks.**
> **.........**
> ─────────────────────────────────────────

Well, disregarding the rest of your post, which, in my opinion, is a bit "over the top"...generalizing about the state of the world, let's keep this discussion on the case at hand.

I see where some of these people are coming from, they want absolutes in their lives, and are uncomfortable, IMO, with any ambiguity.

I don't find them stupid, I find them a challenge, because they demand answers, sometimes where ther are no perfect answers, like how and where the murder happened, how things were done. Those are some of the more important unanswered questions, but they do NOT prove innocence, nor do they take away from all the other evidence we have in this trial.

It would be nice if we had a few specks of blood somewhere, but we don't. I think that bothers some people a lot more than others. I don't really care where the murder happened, it happened and all the evidence points to MM as the murderer, with means, motive and opportunity. No one else.

---

*Posted by socmom on 04-06-2007 04:29 PM:*

**Re: Re: Re: Re: right**

> quote:
>
> ---
>
> *Originally posted by direstraits*
>
>
> **Now, see, THAT really makes my point. I cannot believe what I've been reading on this thread from folks who want "more proof" etc.**
>
>
> ---

Some people will only believe what they see with their own eyes, must have a video or the person doing it, or a witness that saw the whole thing and then they would nitpik that poor person to death and say they were lying.....right Lisa....sans CS....JMO

---

*Posted by socmom on 04-06-2007 04:31 PM:*

**Re: Re: Re: Re: Re: right**

> quote:
>
> ---
>
> *Originally posted by yellowcake*
>
>
> **Well, disregarding the rest of your post, which, in my opinion, is a bit "over the top"...generalizing about the state of the world, let's keep this discussion on the case at hand.**
>
> **I see where some of these people are coming from, they want absolutes in their lives, and are uncomfortable, IMO, with any ambiguity.**

**EXCERPT OF THE TRANSCRIPT OF THE MOTION FOR A NEW TRIAL, CONTAINING THE RULING DENYING THE DEFENDANT'S MOTION FOR A NEW TRIAL, DATED JUNE 18, 2007**

```
                                                                    1
 1                       SUPERIOR COURT OF NEW JERSEY
                         CRIMINAL DIVISION - MIDDLESEX COUNTY
 2                       INDICTMENT NOS.  05-10-164-S
                                          06-10-119-S
 3                       APPEAL NO.       6576-06T4
     _____
 4   STATE OF NEW JERSEY,

 5           Complainant,

 6       V.          Transcript of Motion for a New Trial

 7   MELANIE McGUIRE,

 8           Defendant.

 9

10   _____

                      Place:  Middlesex County Courthouse
11                            56 Paterson Street
                              New Brunswick, N.J.  08903
12
                      Date:   Monday, 6-18-2007
13

     B E F O R E:
14   THE HONORABLE FREDERICK P. DeVESA, J.S.C.

15   TRANSCRIPT ORDERED BY:  Helen C. Godby, Esq.,
                             ADPD, Intake Unit.
16
     A P P E A R A N C E S:
17   PATRICIA M. PREZIOSO, ESQ.,
     Assistant Attorney General,
18       -and-
     CHRISTOPHER S. ROMANYSHYN, ESQ.,
19   Deputy Attorney General,
     Attorneys for the State.
20
     JOSEPH TACOPINA, ESQ.,
21   Attorney for the Defendant.

22   STEPHEN TURANO, ESQ.,
     Attorney for the Defendant.
23
                         June Andrian, C.C.R.
24                       Official Court Reporter
                         Middlesex County Courthouse
25                       56 Paterson Street
                         New Brunswick, N.J.  08903
```

Colloquy                                106

1  well, let me ask you this.  Do you know anything about
2  this?  Has anybody mentioned anything to you or has
3  anything been brought to your attention that would in
4  any way have an influence as to how you would decide
5  this case?  The juror responds no.  The Court asks are
6  you satisfied you can continue to deliberate and decide
7  the case based on the evidence that's been presented in
8  the courtroom?  Response:  Yes.  And then the Court
9  offered the attorneys the opportunity and you declined
10 to question further.
11        With respect to the note it speaks for
12 itself.  It doesn't contain anything outside innocuous
13 information.  This was a good-bye from a juror who
14 spent seven weeks with these other jurors who didn't
15 have an opportunity to say good-bye because her home
16 was flooded and she was unexpectedly excused prior to
17 deliberations.  She stated when she was interviewed by
18 the Court she had had no prior discussions with any of
19 the jurors prior to deliberations on what her view of
20 the case was and any language in the note was not
21 intended to convey any message to them in any way as to
22 what they should do, how to view the evidence or how
23 they should ultimately decide the case.
24        Judge, perhaps what's most important is the
25 trial record and interviews of the records and

Colloquy                                107

1  everything viewed in its totality it can be said any of
2  this rises to the level of a manifest denial of justice
3  under the law where this Court would be clearly
4  convinced the jury had inability to do its job and it
5  requires the verdict to be set aside.  I don't know if
6  Miss Prezioso wishes to add anything.
7        MS. PREZIOSO:  No, your Honor.
8        MR. ROMANYSHYN:  We would submit on our
9  paperwork and request the Court deny the motions since
10 they don't rise in a denial.  The trial record to
11 support the verdict the Court's clear and forceful
12 instructions to the jury repeatedly throughout the
13 trial concerning media and the final instructions that
14 were submitted to the jury all adequately reflect New
15 Jersey law and support the findings this jury
16 ultimately made.  If the Court has no further
17 questions I simply thank you for your time.
18        THE COURT:  I have one question.  Mr.
19 Tacopina points out something that we had not discussed
20 earlier because we were not aware of it obviously.
21 That is their research reveals one particular internet
22 communication which apparently is a response to a
23 comment to all jurors illegally reading this board
24 please come back with a verdict on Friday because that
25 particular person was not around and wanted to be

Colloquy                                                    108

1  present.  And then according to this response someone
2  wrote back saying okay, and we are leaning towards
3  guilty.  And then evidence of that response was somehow
4  deleted from the internet.  I know that you have the
5  documentation.  If in fact that response was from a
6  juror then it would be evidence of the fact that some
7  juror was at the time of deliberations, this was on
8  April 21st at 4:55 A.M. or thereabouts, it would be a
9  possible indication that some juror was communicating
10 with others on the internet and therefore being exposed
11 to inappropriate information or engaging in
12 inappropriate communications.  Should there not be some
13 inquiry about that communication and whether or not it
14 can be determined to have originated from any
15 particular location or source?
16              MR. TACOPINA:  Judge, I have no specific
17 evidence that any juror was on that board or any juror
18 communicated with that.  I understand the Court's
19 point perhaps further inquiry should be made if
20 possible with respect to that particular posting.
21              THE COURT:  The person who quotes this is
22 even saying it may be seen as a joke so I am not
23 suggesting that there's reason to believe at this point
24 that this actually came from one of the jurors.  What I
25 am suggesting is it does seem possible to make further

Colloquy                                                    109

1  inquiry into this instead of letting it hang out there
2  observations that there is no evidence from where it
3  came.  Given all the expert testimony that we've
4  received in this trial it seems to me there are people
5  who are very good in going back and reconstructing
6  internet communications.  I don't know whether that's
7  possible here.  I guess what I'm thinking is that I
8  would to the extent that either side thinks that it
9  would be inappropriate to look into this because of
10 some restriction on both verdict investigation I don't
11 really see any reason not to look into this if it's
12 possible because at least arguably if this does come
13 from a juror it may warrant further inquiry.  That's
14 the only question I have so I take it the State is not
15 engaged in any further inquiry at this point in time
16 but if I felt it was necessary the State or the defense
17 might be willing to do that.
18              MS. PREZIOSO:  If Mr. Romanyshyn wouldn't
19 mind I'll just jump in.
20              MR. ROMANYSHYN:  That's fine.
21              MS. PREZIOSO:  Of course we can make further
22 inquiry.  That's fine.  I would relay to the Court I
23 had some recent contact on a different matter trying to
24 get behind what came up in a chat room and the header
25 information does not necessarily transmit.  I haven't

Da227

```
                              Colloquy                       110
 1   looked into specifically a blog.  I was looking at a
 2   chat room.  I believe administratively they would be
 3   set up similarly.  We're happy to ask.  But it seems
 4   from the context of this there is no reason to believe
 5   that what appeared in that blog was from a juror.  We
 6   had all of the jurors interviewed with your Honor.  All
 7   of them, their demeanor comported with the very serious
 8   matter that was going on and all of them denied having
 9   any exposure to the blog.  That's the evidence before
10   us in the case.  Of course the State would be happy
11   to make additional inquiries.  We'll do just that.
12           THE COURT:  I don't mean to suggest this is
13   evidence of any inappropriate communication.  I do
14   agree with you that each juror denied any such
15   communication but on the other hand given the issue of
16   public confidence in our court system if there is
17   something like this out there that can be addressed,
18   and it doesn't seem like it would require extensive
19   amount of investigation I think it would be more
20   appropriate for the Court to see a report that either
21   indicates that the source has been identified and it's
22   not a juror or the source can't be identified with all
23   reasonable efforts.
24           MS. PREZIOSO:  That's fine.  We'll make that
25   inquiry and we'll let the defense and the Court know as
```

```
                              Colloquy                       111
 1   soon as we get it.
 2           THE COURT:  Thank you.  Counsel, I appreciate
 3   all of your efforts.  The briefs, the submission of all
 4   of the material in this case have been very, very
 5   extensive.  Again, it reinforces my earlier view all
 6   counsel in this case have worked very, very hard and
 7   very professional in providing their arguments to the
 8   Court.  At this point obviously given the importance of
 9   the Court's determination and its reasons for such I
10   will ask you to bear with me while I place my findings
11   on the record.
12           In this case after a six week trial
13   consisting of approximately 80 witnesses the defendant
14   was convicted of murder, desecration of human remains,
15   possession of a firearm for an unlawful purpose and
16   perjury.  The defendant was acquitted of related
17   crimes of tampering with evidence and tampering with
18   witnesses.  The defendant now moves for a new trial on
19   the grounds that the State simply did not present
20   sufficient evidence to the jury to prove a motive, to
21   prove that William McGuire was murdered in New Jersey
22   or in his apartment for that matter.
23           The State did not prove the date and time
24   that William McGuire was murdered, the manner of the
25   death of William McGuire and even the existence of an
```

Colloquy                                    112

```
 1    accomplice.   The defense also argues that a new trial
 2    should be granted because the jury engaged in
 3    misconduct when it monitored media coverage and had
 4    impermissible contact with a former juror during
 5    deliberations and in the alternative the defendant
 6    seeks leave of the Court to permit defense to further
 7    interview jurors about some of these issues.
 8              Now, as has been stated Rule 3:20-1 simply
 9    provides that the trial judge may grant a new trial if
10    required in the interest of justice and that rule
11    further provides that the trial judge should not,
12    however, set aside the verdict of a jury unless it
13    clearly and convincingly appears that there was a
14    manifest denial of justice under our law.  So the
15    appropriate standard of review in this case is whether
16    there clearly and convincingly appears to be a manifest
17    injustice that resulted from the jury's verdict.
18              The law of this State goes on very clearly to
19    suggest that the Court should correct a clear error or
20    mistake by the jury but may not substitute its judgment
21    for that of the jury.  The judge is not a thirteenth
22    and decisive juror.  And that was stated by our Supreme
23    Court in the case of Dolson v. Anastasia.
24              This Court has previously heard motions
25    regarding many of the issues that were raised here and
```

Colloquy                                    113

```
 1    I do simply want to state that my findings of fact are
 2    incorporated into this decision as well since they were
 3    quite extensive and I do not want to appear to have
 4    left anything out.  For purposes of today's proceeding,
 5    however, I will say that the evidence in this case
 6    showed at the time of the murder of William McGuire the
 7    defendant was having a three year affair with Dr.
 8    Bradley Miller and that the lovers planned some day to
 9    leave their respective spouses and come together and
10    perhaps even have their own children.
11              On April 26th, two days before Mr. McGuire's
12    disappearance, the defendant traveled to Pennsylvania
13    where she purchased a gun and ammunition claiming a
14    Pennsylvania address which was not her true address.
15    The jury heard testimony from ballistic experts who
16    testified that the gun and the bullets purchased by the
17    defendant were consistent with those that were involved
18    in the murder of William McGuire.
19              During April of 2004, the McGuire home
20    computer was used for internet searches for such
21    things as how to commit a murder, how to purchase a
22    gun illegally, how to purchase a gun in Pennsylvania,
23    undetectable poisons, chloral hydrate in Walgreens Drug
24    Store.
25              On April 28th, a few days later, the
```

Da229

Colloquy                                    114

1  defendant dropped off her children at a day care
2  center in Metuchen.  Less than 15 minutes later an
3  unidentified woman filled a prescription for chloral
4  hydrate in the Wallgreens Drug Store less than a mile
5  away from the day care center.  The prescription which
6  was a forgery was in the name of a patient from the
7  same medical practice where the defendant worked,
8  written on a prescription pad from Dr. Miller, the
9  defendant's lover, who testified that the handwriting
10  was not his but was similar to that of the defendant
11  who often had access to his prescription pads and was
12  authorized to use them.
13         The defendant in various conversations that
14  she had with others claimed that later that same
15  evening and into the morning hours of the next day she
16  and the victim had an altercation, that he assaulted
17  her and that he left the apartment.  She thereafter
18  went to a hotel and out of fear obtained a restraining
19  order against the victim here in New Brunswick but when
20  questioned made no mention of any access to any gun.
21         On April 30th William McGuire's vehicle was
22  discovered by the police at the Flamingo Hotel in
23  Atlantic City.  On intercepted phone conversations the
24  defendant admitted she drove to Atlantic City and moved
25  the victim's car out of spite.  She also alleged she

Colloquy                                    115

1  took a cab back to Woodbridge and then returned to
2  Atlantic City the same night to pick her car up the
3  same distance a hundred miles but the investigation
4  revealed no evidence of any such cab trips nor was
5  there any record of William McGuire being present at
6  the Flamingo Hotel or any other casino hotel in
7  Atlantic City at that time.  Inside the glove
8  compartment of the defendant's car was a syringe and a
9  vial containing chloral hydrate.  There was testimony
10  the syringe was somewhat similar to syringes in use at
11  the defendant's practice.  Found on the floor mats of
12  the car were tiny bits of human tissue from the victim.
13  Expert testimony provided that it was the type of
14  tissue that would not have been shed by a healthy
15  living person but it was deemed connective tissue that
16  only disease or trauma would separate from the body.
17         On May 5th and 11th and 16th the remains
18  of William McGuire were recovered from the Chesapeake
19  Bay in three suitcases which belonged to the defendant
20  and William McGuire.  One of the suitcases contained a
21  medical blanket consistent with linen supplied to the
22  defendant's employer along with a five pound weight
23  consistent with weights seen earlier in the McGuire
24  apartment by a friend.
25         The defendant's remains were found inside

Da230

Colloquy                                116

1 large trash bags that forensic analysis revealed were
2 the same type of trash bags that the defendant had used
3 to pack William McGuire's belongings in the Woodbridge
4 apartment.  These bags contained the victim's parts and
5 the bags used by the defendant were manufactured by the
6 same manufacturer within hours of each other according
7 to expert testimony.  In addition, the garbage bags
8 were sealed with tape from which was recovered two
9 short pieces of hair consistent with razor stubble.
10 One piece matched the defendant's DNA and one piece
11 matched the victim's DNA.
12          The State's investigation also revealed
13 that prior to his death William McGuire had two
14 wireless telephones and a Blackberry.  On April 29th,
15 6:15 or 17 in the morning, evidence was presented to
16 the jury that William McGuire's Blackberry was used to
17 send a text message to his employer that he would be
18 out sick that day.  Records show that the sender used
19 the wrong E-mail address for Mr. McGuire's supervisor,
20 the State arguing that someone other than the victim
21 sent the message.
22          Investigators testified that the victim's
23 cell phone was used to make one final phone call to
24 his home at 1:10 A.M. on May 2nd.  Defendant told
25 detectives she wasn't home at the time and no message

Colloquy                                117

1 was left.  However, her E-Z Pass records revealed that
2 15 minutes before that call the defendant's vehicle
3 passed through a toll on the Atlantic City Expressway
4 and after being interviewed by the police the defendant
5 called E-Z Pass to have the charge removed from her E-Z
6 Pass records.
7          The E-Z Pass records also reflect the fact
8 that an unidentified male also called to have the same
9 charges removed.  The defendant according to the
10 evidence was to be furniture shopping in New York
11 placing herself between New Jersey and the site where
12 the body ultimately showed up in Virginia.
13          During the investigation of this matter
14 letters and evidentiary items were sent to the Attorney
15 General suggesting the victim may have been murdered by
16 others involved in organized crime but circumstancial
17 evidence that has been summarized earlier by the Court
18 pointed to the fact that defendant or someone acted in
19 her behalf actually was responsible for these
20 communications.
21          From all of the foregoing the jury surely had
22 sufficient basis to conclude that the defendant either
23 committed or participated in the murder of her husband
24 and her conduct in this State establishing her
25 complicity in the murder of her husband.

Colloquy                          118

1    The fact that the State could not prove all
2  the precise details of the murder does not entitle the
3  defendant to a new trial.  Neither the precise method
4  or the motive of the murder are elements of the crime
5  of murder although the jury could have concluded the
6  defendant's affair and fear of losing her children in
7  a divorce did provide a motive.  In any event, the jury
8  was given adequate instruction by the Court including
9  instruction that the absence of a motive could be
10  considered by them in weighing whether or not the
11  defendant was guilty of any of the crimes charged.
12    Now, in asserting that there was a lack of
13  territorial jurisdiction the defendant argues that the
14  State failed to prove that William McGuire was murdered
15  in New Jersey.  However, under our law such proof is
16  not necessarily required.  Under N.J.S.A. 2C:1-3 a
17  person may be convicted of a crime in this State if
18  an element of that crime occurs within this State or
19  conduct occurring within this State establishes
20  commission, complexity in a commission of a crime in
21  another jurisdiction which is also a crime in this
22  State or an overt act in furtherance of a conspiracy
23  to commit a crime occurs in this State.  Under our law
24  there were alternative means to establish territorial
25  jurisdiction.  Thus, to find jurisdiction the jury

Colloquy                          119

1  would have had to find either that William McGuire was
2  murdered in New Jersey or if he was killed elsewhere
3  the defendant engaged in conduct that established her
4  complexity in the murder here in New Jersey.
5    The evidence revealed again William McGuire
6  was last alive inside the apartment he shared in
7  Woodbridge, New Jersey.  He placed a telephone call
8  to the Elizabeth Gas Company on April 28th at about
9  5:15 P.M..  The victim never spoke to anyone again.
10  The Blackberry message sent to his employer appears to
11  have been an attempt to create an illusion the victim
12  was alive at the time.  The physical evidence including
13  the couples' luggage, the medical blanket, the weight,
14  the garbage bags, the hairs on the tape that sealed the
15  garbage bags all relate and come from the Woodbridge
16  apartment.  The bathroom of the couples' apartment and
17  the rest of the apartment had been so meticulously
18  cleaned shortly after his disappearance that no
19  evidentiary matter was found.
20    The flesh of the deceased recovered from the
21  front driver's side and passenger side of his car of
22  course was found in Atlantic City and again according
23  to the expert testimony was not shed from a live
24  healthy human being.  Thus, the parts that the jury
25  could have easily concluded body parts of the deceased

Da232

Colloquy                                    120

1  were recovered in New Jersey thus creating a
2  presumption that the murder took place in New Jersey.
3  Clearly the jury could have also found jurisdiction to
4  exist through evidence that the defendant engaged in
5  conduct in New Jersey establishing her complexity in
6  the commission of the murder of William McGuire and/or
7  the desecration of his remains.
8          The evidence included her purchase of a gun
9  and bullets which she brought with her back in New
10 Jersey.  The computer searches done from the Woodbridge
11 apartment, the filling of the prescription of chloral
12 hydrate in Metuchen, the moving of the car in Atlantic
13 City and the obtaining of the restraining order in the
14 City of New Brunswick.  And here again the jury was
15 told quite thoroughly that in order to find
16 jurisdiction they must find the elements that establish
17 jurisdiction under the statute beyond a reasonable
18 doubt.
19         The defendant has also argued that since she
20 was charged both as a principal and accomplice it was
21 error that led the jury to some type of safety net
22 verdict, if you will.  The Court has already heard
23 extended legal argument as to the ultimate instructions
24 to be given to the jury and again I incorporate my
25 reasoning for giving those instructions at the time

Colloquy                                    121

1  that there was a charge conference.  I might also add
2  that there never was other than a general objection to
3  the accomplice charge.  There was no request for a
4  specific unanimity instruction as has been mentioned
5  here today nor based on the case law was there a
6  justification for one.
7          Now, in order for accomplice liability to
8  have been properly instructed the jury, it is clear
9  the State was not required to establish the identity of
10 a person who committed or participated in the murder.
11 It's sufficient to establish that the defendant
12 solicited, aided or attempted to aid a perpetrator
13 or participated in the murder with the requisite intent
14 to cause the death of William McGuire.
15         There was significant evidence presented
16 during the course of the trial to support this basis
17 of liability.  A video analyst testified that a
18 surveillance videotape showed whether or not McGuire's
19 Maxima of being abandoned in the parking lot at the
20 Flamingo Hotel on April 30th.  Minutes later after that
21 car was parked a second vehicle is depicted which stops
22 for a very short time and then drives away.
23         According to the testimony there were some
24 similarities between the defendant's vehicle and that
25 second car.  Given the defendant's earlier admissions

Da233

Colloquy                          122

1  about her trip to Atlantic City the jury could
2  reasonably have found that the defendant planted the
3  Maxima at the Flamingo and the images on the security
4  tape supported the logical inference that a second
5  person drove her vehicle to Atlantic City with the
6  defendant and brought her back to Woodbridge after the
7  victim's vehicle was dropped off there.
8         E-Z Pass records revealed again that after
9  the defendant attempted to have her records of travel
10 to Atlantic City erased an unidentified male also made
11 a call and had the same charges removed.  Most
12 importantly I think the very nature and sheer
13 complexity of the crime or the criminal episode allows
14 the inference there was another person involved in this
15 criminal episode.  This was a well-planned, well-
16 executed complicated criminal episode that involved a
17 scheme to poison and murder William McGuire, surgically
18 sever his remains, pack them in luggage and then dumped
19 him in Chesapeake Bay in a manner so as to conceal a
20 murder.  There were also substantial efforts to conceal
21 the crime.  The criminal episode spanned at least four
22 States in a matter of several days.  The murder scene
23 was apparently cleaned up and concealed so well there
24 is no direct evidence of where the murder specifically
25 took place.

Colloquy                          123

1         The victim in this case was a fairly well-
2  built muscular male and the defendant is a very
3  petite female.  There were numerous conversations
4  between the defendant and friends and family which
5  suggested that other people had knowledge or awareness
6  of the events surrounding the murder.  Some of the
7  conversations appeared to have been guarded and some of
8  the conversations appeared to have been spoken in some
9  code.  In some of the conversations the defendant
10 coaches friends about having an attorney present when
11 they are questioned by the police and also discusses
12 with some friends that others know more than others and
13 so on and some people know nothing.  And again we have
14 also evidence that the defendant's stepfather made one
15 anonymous communication to the police that the jury
16 could have inferred was part of some effort to
17 interfere with the police investigation.
18        Now, in this case while it is clear that the
19 defense has pointed out many unanswered questions about
20 this murder and particularly the details of the murder
21 the fact remains that again it is not this Court's
22 responsibility to second-guess the jury but to make
23 a determination as to whether the jury erred so
24 significantly as to create a manifest injustice.  The
25 Court is satisfied that the jury paid very careful

Da234

Colloquy                                            124

1  attention to the testimony in this case.  They heard an
2  enormous amount of evidence and I believe the jury
3  could reasonably have found that the defendant either
4  committed the murder of William McGuire or that she
5  participated in the murder by engaging in conduct that
6  took place in the State of New Jersey.
7       For the defendant to have committed this
8  murder completely by herself would have required her
9  to be an extraordinary almost superhuman individual.
10 Again, the complexity of the scheme, the physical
11 effort that would be required, the mental fortitude
12 that would be required to take each of these steps
13 that have been well-documented simply make it rather
14 incredible to the Court that one could have done this
15 completely by one's self so the Court is satisfied that
16 there was sufficient evidence to support the jury's
17 verdict.
18       Now, the defense also raises the assertion
19 that a new trial should be granted because of jury
20 misconduct for intrusion of irregular influences into
21 the jury's deliberations that could have had a tendency
22 to influence the jury in arriving at its verdict in a
23 manner inconsistent with the legal proofs and the
24 Court's charge.  I do agree with defense that is the
25 appropriate standard in this case.  However, I also

Colloquy                                            125

1  must point out that if the irregularity that is alleged
2  is clearly shown to have that tendency it influenced a
3  verdict and a reversal or new trial could or would not
4  be required so this Court has a responsibility to
5  consider the gravity of the information in relation to
6  the case, the demeanor and the credibility of the
7  jurors who are exposed to the information and the
8  overall impact on these alleged irregularities on the
9  proceedings.
10       Now, the first issue that arises at least
11 chronologically during this trial was this issue of
12 the jurors possibly being exposed to newspaper headline
13 which announced that the defendant might testify in her
14 own defense and such an article was published in the
15 Home News Tribune on April 5th, 2007, and there was
16 also information in that same edition of the newspaper
17 that the jurors may have seen pertaining to the
18 defendant taking a polygraph examination.
19       Now, without request of counsel the Court on
20 its own initiative after learning of this publicity
21 that as I recall took place over a week end notified
22 counsel that the Court felt pursuant to State v. Bay
23 that it was appropriate for the Court to conduct an
24 individual voir dire of each juror to determine whether
25 exposure to those newspaper headlines, if you will,

Da235

Colloquy                                    126

1  would have caused any possible taint to the jury.
2        First of all, and I don't mean to be critical
3  because I sincerely believe the defense acted
4  professionally throughout these proceedings but it was
5  defense the Court finds was responsible for creating
6  this media publicity.  In its motion of April 4th the
7  defense sought a ruling allowing the introduction of
8  the results of the polygraph test taken by the
9  defendant and in the motion the defense stated we
10 respectfully ask that the Court allow the introduction
11 of such a test during the course of Miss McGuire's
12 examination should she elect to testify.  And then the
13 defense' motion closes at a later part saying we ask in
14 the alternative that it happened during Ms. McGuire's
15 potential testimony the result of an examination
16 administered by an expert agreed upon by both the
17 defense and the State so any publicity that was
18 generated regarding the defendant passing a polygraph
19 test or offering to take a polygraph test or even
20 considering testimony was clearly generated by the
21 defense and not by the State.
22        I should also point out that during jury
23 selection each juror was asked about media attention,
24 whether they would be influenced and I should also
25 point out that the defense during the course of the

Colloquy                                    127

1  trial raised the question of Miss McGuire's failure
2  to testify and indeed I think the defense made very
3  persuasive point that the jury in its closing argument
4  that with all the conversations between the defendant
5  and her friends and family where she could expect to be
6  telling the truth she actually told the jury what her
7  version of the events was so long before deliberations
8  this jury was instructed about the right to remain
9  silent, it was questioned extensively when it was
10 selected about that right and whether they would hold
11 that against the defendant if she failed to testify and
12 during the course of the trial the defense raised in a
13 fairly creative tactical way the fact that the
14 defendant would not testify and again it was this
15 motion that really generated the publicity.  Again I
16 don't mean to point any of that out to be critical.  I
17 said that previously.  I think it's important that in
18 this context to make it clear that the State was not in
19 any way responsible for this publicity.  In any event,
20 each juror was specifically asked by the Court if they
21 had any conversations or overheard anyone talking about
22 the evidence or the merits of the case and each juror
23 answered in the negative.  Only three jurors recalled
24 seeing the headline and in each case they pretty much
25 took the position they saw the headline but they did

Da236

Colloquy                                            128

1  not read the article and nothing that they had seen
2  would in any way prevent them from being fair and
3  impartial in deciding the case based solely on the
4  evidence.
5            I might also add that to the extent that
6  there was some exposure about the polygraph that
7  obviously was not prejudicial to the defendant in any
8  way.  Most people would conclude that that information
9  tended to make the defendant, tended to exculpate
10 the defendant if one were to believe that there was a
11 polygraph and that she had in fact passed one.  Again,
12 as counsel have both pointed out during the course of
13 this voir dire all counsel were invited to participate
14 and consequently everyone at least at that time
15 appeared to be satisfied that at least with respect to
16 the polygraph and the writing the defendant to testify
17 no further questions were necessary.
18           In any event, the defendant next argues
19 there was jury misconduct and a possible taint during
20 deliberations when this note from an excused juror,
21 Juror #14, was found inside the jury deliberation room
22 on April 19th at the beginning of deliberations.  The
23 following day and as counsel has pointed out this note
24 was found by our Court Clerk while collecting the
25 evidence in the jury room and it was brought to my

Colloquy                                            129

1  attention the following day.  The Court notified the
2  State and defense counsel.  I proposed that we
3  immediately contact Juror #14.  That was agreed to and
4  we did place a telephone call to Juror #14 who admitted
5  writing the note and placing it on the car of one of
6  the neighboring jurors and, of course, the note did
7  contain two sentences that required further inquiry.
8  One was an excerpt that suggested 14 was the juror with
9  the hard eyes which did suggest the jurors had heard
10 information somewhere how the media was characterizing
11 him.  When questioned the juror stated how the media
12 may be reporting about themselves but there was no
13 discussion among them about the facts of the case or
14 the evidence or the manner in which the media or
15 bloggers may be reporting the facts or evidence in the
16 case.
17           The juror was also questioned about this
18 invocation to do the right thing and she, of course,
19 said in the note I'm praying for all of you that you
20 will have the wisdom to do what is right.  She
21 indicated upon being questioned she didn't even at that
22 point necessarily know what the right decision was but
23 she was praying for the other jurors to help them in
24 making their decision.  Frankly, that response was
25 confirmed by Mr. Tacopina when he was allowed to

Da237

Colloquy                                    130

1   question her and when he asked what she believed the
2   right thing was and whether it was discussed and she
3   simply said no, we have never discussed that as a
4   group.  No, I'm just praying for guidance for the
5   right decision.  Here again counsel was allowed to
6   participate in any way that it chose in the voir dire
7   that the Court was conducting.
8           Immediately following that the Court did
9   conduct an individual voir dire with each juror about
10  each juror's knowledge of the note, what if any meaning
11  its contents had, whether there had been any prior
12  discussion with Juror 14 about the evidence or facts of
13  the case including her views of the evidence, what the
14  verdict should be and whether each juror had the
15  continued ability to decide the case based on the
16  evidence without regard for the note or any other
17  outside information.
18          The defendant argues it is clear through this
19  voir dire instead of focusing solely on the evidence
20  and testimony the jurors were very much aware and
21  concerned with how they were being portrayed by the
22  media.  The defendant argues the jury was preoccupied
23  during deliberations with the media's portrayal of them
24  and the defense argues given the nature and coverage by
25  the media it's inconceivable that the jurors were not

Colloquy                                    131

1   exposed to prejudicial material or that the media
2   coverage had not influenced them.
3           Now, during questioning each juror it was
4   almost unanimous rendered the same basic facts during
5   their individual interviews.  Each juror acknowledged
6   they were aware that the media was reporting some
7   information about them, perhaps giving them nicknames.
8   Juror #3 admits that she may have been the one that
9   told the other jurors there was a reference to hard
10  eyes because her sister told her there was a mention of
11  this in the media.
12          It is clear that other jurors indicated that
13  they did hear comments about themselves from other
14  jurors.  It is clear, however, from each juror that the
15  curiosity or the media coverage did not influence them
16  in their deliberations nor did it have any capacity
17  to.  I might say that I have never seen a jury that was
18  not somewhat concerned about how their identity was
19  being portrayed and it would be rather inconceivable
20  that a juror sitting on a murder case would not be at
21  all concerned about how they were being characterized
22  or portrayed or how their identity was being disclosed
23  but that fact by itself does not suggest that that
24  curiosity or that concern was so overwhelming that it
25  distracted them from their mission.  The issue of hard

Da238

Colloquy                           132

1   eyes seemed like a quick comment or two and the subject
2   changed.  One of the jurors was not even aware of what
3   we were referring and none of the jurors was able to
4   specifically recall or detail how this conversation or
5   conversations took place.
6         The foreman of the jury was specifically
7   asked if anyone on the jury had become so influenced by
8   media coverage they would not be able to follow the law
9   and he stated no, actually I think they're taking this
10  very, very seriously.  Juror after juror claimed they
11  had neither overheard or talked about the merits of the
12  case or evidence from the case with any outside source.
13  Each juror answered no as to whether they had ever
14  heard any discussions in the jury room whether someone
15  had been reporting information about the merits of the
16  case.  Each juror answered no as to whether they had
17  been exposed to any information that would prevent them
18  from following the law and being an impartial juror.
19  In fact the only thing the jurors responded
20  affirmatively to hearing about dealt with themselves
21  and nothing about the case.  One juror stated we heard
22  about our hometowns and ages were listed in the papers,
23  just basic things about what they're saying about us.
24  Each juror was asked during jury selection but then
25  again individually during this voir dire whether they

Colloquy                           133

1   would be influenced by anything in the media or the
2   extraordinary attention being paid to this case and, of
3   course, during jury selection the jurors who ultimately
4   were selected obviously indicated they would not be
5   influenced by any special media coverage or attention
6   to this case and in voir dire they also indicated that
7   they would not be influenced.  None of the jurors felt
8   that the mention to do the right thing in the note
9   meant that the excused juror was telling them how to
10  vote nor did the jurors find the note affected their
11  deliberations in any way.
12        The defense argues that the Court should have
13  asked every juror to explain what their understanding
14  of what the right thing was and the Court concedes that
15  one or two or three jurors did not expressly ask that
16  question.  However, with respect to each of those
17  jurors it's clear that the Court asked many questions
18  regarding whether the note had any impact on them or
19  their deliberations and how they understood the note.
20  I think the record will speak for itself that the
21  jurors took the note as an innocent farewell note
22  from a juror who had been excused and under the
23  circumstances was not able to personally say farewell.
24  Again, obviously, counsel, further review of this
25  transcript will allow others to draw their own

Colloquy                                    134

1    conclusions but I had the ability after asking the
2    questions myself, after being personally in
3    conversation with the jurors, after inviting counsel to
4    ask their own questions and then observe and evaluate
5    the responses while these jurors were having
6    conversations or engaging in colloquy with counsel, I
7    had the opportunities to do what the case law suggests
8    which is to not only simply hear what the jurors were
9    saying but evaluate their credibility and observe their
10   demeanor, to consider the subject matter and all we
11   knew at the time and I am really satisfied that each
12   juror was not unduly influenced by any outside
13   information; that, frankly, the only outside
14   information that we clearly know about that did reach
15   some of the jurors was the information about the
16   polygraph and the possible testimony of the defendant,
17   it's very clear that that information only reached a
18   few jurors and surely could not have had the capacity
19   to prejudice the defendant in light of the
20   circumstances and this note which was simply a note
21   again of a juror that innocently bode farewell to the
22   other jurors.
23          Now, as I previously alluded I am somewhat
24   curious about this excerpt where someone purportedly
25   acting as a juror communicated with someone on the

Colloquy                                    135

1    internet but even in the excerpt it's talked about it
2    being a joke and, of course, we know such things occur.
3    I do not believe at this point that internet
4    communication in any way suggests the need to interview
5    these jurors further.
6           As the Court has stated previously
7    interviewing jurors is a very, very extraordinary step
8    because a very, very important principle in our system
9    of justice is that jury deliberation should remain
10   confidential so that jurors have an expectation that
11   their votes should not be put out into the community
12   and thereby cause fear of retaliation and so there must
13   be good cause when this extraordinary step of
14   interviewing jurors is undertaken.
15          The Court felt that during the course of the
16   trial because of the extensive mid trial publicity and
17   because of the issue of this note there was good cause
18   at that time.  The Court personally and individually
19   spoke to each of these jurors and all counsel were
20   invited to do the same at the end of that process.  I
21   am satisfied there is no longer any good cause to
22   interview the jurors further at this time.  Obviously I
23   asked the Attorney General to make inquiry into this
24   communication and should that inquiry produce good
25   cause to make further inquiry the Court may entertain

Da240

Colloquy                                                    136

1    that.
2              Counsel, I would like to conclude by simply
3    saying that under our law it has been said many times
4    that one is entitled to a fair trial but not a perfect
5    trial.  It is inconceivable in a trial of eight weeks
6    generating this level of attention and publicity and
7    curiosity that there could be a trial that would take
8    place without any concern regarding possible problems.
9    I'm satisfied in this case, however, there was
10   substantial evidence that a reasonable jury could have
11   found credible and thereby convicted the defendant.
12             I am satisfied that the jury did its job
13   properly.  As counsel have already stated the Court
14   not only individually interviewed each juror on two
15   separate occasions but I did repeatedly ask the jury as
16   they came out on various mornings about whether they
17   had been exposed to any extraneous or outside
18   information about the facts of the case.  I do not
19   believe that they intentionally disregarded the Court's
20   instructions or answered the Court because there had
21   been some mention or passing reference to them being
22   talked about in the media.  I really believe that was
23   something that they did not see as violating the
24   Court's instructions.  I think our Supreme Court have
25   said it better than I can say it.  Faith in the ability

Colloquy                                                    137

1    of the jury to examine evidence critically and to apply
2    the law impartially serves as a cornerstone of our
3    system of justice.
4              I have that faith that this jury performed
5    their role in this way.  I have made repeated inquiries
6    about it.  I have invited counsel to do so as well and
7    nothing has demonstrated to the Court that this jury
8    has done anything to undermine the Court's faith in the
9    fact that they have considered all the evidence and the
10   law and they reached a verdict based upon their view of
11   that evidence.  It is not for this Court to usurp the
12   role of the jury unless there was some clear manifest
13   injustice and nothing before me suggests that there
14   was.  I also am satisfied that there could never be in
15   the future any trial in this matter that would be more
16   fair.
17             The defense has not really been able to
18   demonstrate although the defense has raised many
19   significant questions, the defense has never really
20   been able to demonstrate that a new trial would be
21   more error free than this trial was with the exception
22   of this issue whether the State was entitled to
23   accomplice liability charge.  For the most part all of
24   the concerns that the defense has would sure exist in a
25   new trial.  Presumably the State would still be unable

Da241

Colloquy                                  138

1  to prove the precise details of the murder.  Presumably
2  there would be this enormous amount of media coverage.
3  Presumably somehow, someway in the trial of so many
4  weeks a jury would be exposed to some information about
5  the case.  I don't believe that it would be possible to
6  sequester a jury effectively in today's modern age of
7  electronic communications.  It would require almost a
8  prison like setting and as I've said before even in
9  prison we haven't been so successful in preventing
10 improper information from getting to inmates or getting
11 out from the prison to inappropriate sources so I don't
12 believe there would be any likelihood that there could
13 be a trial that would be more fair.  Accordingly, the
14 defense' motion for a new trial is denied.
15            Counsel, my understanding is that we have
16 agreed now that there would be a change in the
17 sentencing date.  The sentencing is scheduled for
18 July 19th, is that correct?
19            MS. PREZIOSO:  Yes.
20            MR. TACOPINA:  Yes, your Honor.
21            THE COURT:  I would like to remind counsel
22 any sentencing memoranda to be supplied to this Court
23 should be supplied to on or about July 1st so the Court
24 has sufficient time to consider all of the information
25 that I expect will be forthcoming.  Are there any

Colloquy                                  139

1  questions?
2            MS. PREZIOSO:  No.
3            MR. TACOPINA:  No.
4            THE COURT:  Thank you for your courtesies to
5  the Court and your professionalism.  This matter is
6  adjourned until 19th.
7            MR. TURANO:  There is one issue with respect
8  to the Court's scheduling.  I would like to put the
9  Court and the State on notice we intend to file a new
10 motion for a new trial based at this time on newly
11 discovered evidence.  Sometime after the verdict we
12 were contacted by an individual, a New Jersey inmate,
13 who indicated that he had some information that would
14 be important.  I interviewed the witness a while back,
15 just a few weeks ago to try to see what that
16 information was.  I went to see him again last week,
17 actually Thursday I think it was, to speak to him again
18 this time with another attorney from my office.  At
19 that time we actually took a written statement from
20 the witness.
21            Essentially what the witness has provided
22 to us is that back in April of 2004 he was working for
23 a known member of a particular crime family down in
24 Philadelphia, South Jersey including areas in AC.  This
25 particular individual was engaged in among other things.

STATE OF NEW JERSEY'S SENTENCING MEMORANDUM, DATED JULY 2, 2007



### State of New Jersey
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF CRIMINAL JUSTICE
PO BOX 085
TRENTON, NJ 08625-0085
TELEPHONE: (609) 984-6500

JON S. CORZINE
*Governor*

ANNE MILGRAM
*Attorney General*

GREGORY A. PAW
*Director*

July 2, 2007

Honorable Frederick P. DeVesa, P.J.S.C.
Superior Court of New Jersey
Middlesex County Courthouse
One JFK Square, P.O. Box 964
New Brunswick, New Jersey 08903

RE:   State v. Melanie McGuire
        Indictment No: 05-10-164-S

Dear Judge DeVesa:

Please accept this submission as the State's position relative to the sentencing of Melanie McGuire, which is scheduled for July 19, 2007. The State is requesting that this Court sentence defendant to the maximum penalty under the law for each of the charges for which she was convicted, and that the Court further run the sentences consecutively, as described more fully below.

**I) Case Summary:**

On April 23, 2007 a jury found defendant guilty of Murder in the First Degree, contrary to N.J.S.A. 2C:11-3 and N.J.S.A. 2C:2-6, Possession of a Weapon for an Unlawful Purpose, contrary to N.J.S.A. 2C:39-4a and N.J.S.A. 2C:2-6, Desecrating Human Remains, contrary to N.J.S.A. 2C:22-1 and N.J.S.A. 2C:2-6, and Perjury, contrary to N.J.S.A. 2C:28-1. These charges



*New Jersey Is An Equal Opportunity Employer · Printed on Recycled Paper and is Recyclable*

all relate to a series of actions by defendant that took place between April 28, 2004 and May 5, 2004 wherein she participated in killing her husband, using a gun that she purchased illegally in Pennsylvania, and then cut up his body to fit in three suitcases that were dumped in the Chesapeake Bay.  Further, during this same time frame, defendant lied under oath to the Family Court of Middlesex County to obtain a restraining order against her husband, knowing full well that he was either incapacitated or dead, to create the illusion that she believed him to be alive and of full capacity.

The victim of this crime was William McGuire, defendant's husband and the father of her two children.  At the time of his murder, Mr. McGuire was 39 years old.  He worked at the New Jersey Institute of Technology full-time, and was also working with a close friend in what was then a fledgling computer business.  By all accounts, he was a devoted father whose primary focus was the well-being and happiness of his young sons.  On the very day that he disappeared he closed on a beautiful house in Asbury, New Jersey, that he purchased for the benefit of his family.  Mr. McGuire was a veteran of the United States Navy and was a close friend to many.  He is survived by two infant sons, and two sisters, Cindy Ligosh and Nancy Taylor.

Defendant, at the time of her husband's murder, had been heavily involved in an intimate relationship with a co-worker, with whom she had planned to have a future.  Her friends and associates believed her to be unhappy in her marriage, while her husband's friends and family had no idea that anything was amiss.  There was no evidence recovered during the investigation to support that William had any idea of his wife's affair and her displeasure in their marriage.

The evidence of defendant's guilt was almost entirely circumstantial, but when taken in

its totality presented a clear picture of defendant's participation in these meticulously planned and executed crimes. Some of the evidence consisted of defendant's excuses for her actions that inculpated her in these crimes. Defendant has steadfastly maintained her innocence, and has not cooperated with law enforcement in any way. In fact, the evidence revealed that defendant has done her very best to insure that all those closest to her had legal representation in hopes that interviews with police would be "cut off at the knees," and she proceeded to debrief her friends who testified in the grand jury or spoke to police. Her attempts to control the investigation were evident in captured conversations using electronic surveillance.

While the defense opened the trial with lots of disparaging innuendo about the victim, not one shred of evidence was produced to support that the victim abused defendant in any way, that the victim was a degenerate gambler, that the victim suffered heavy gambling losses, or that the victim had any associations with organized crime.[1]

The Court is well versed in the detailed facts of the case and as such they will not be repeated here. Pertinent facts that influence aggravating or mitigating factors will be discussed below.

### *Sentence Ranges*:

1.    **Murder**, <u>N.J.S.A.</u> 2C:11-3(b)(1):   Murder is a crime of the first degree but a person convicted of murder shall be sentenced... by the court to a term of 30 years, during which the person shall not be eligible for parole, or be sentenced to a specific term of years which shall be

---

[1] It is important to note that both the prosecution and defense had the victim's phone records, work records, EZ Pass records, school records and interviewed family and friends.

between 30 years and life imprisonment....[2]  The No Early Release Act, ("NERA"), N.J.S.A.

2C:43-7.2, applies to defendant's sentence on this charge, and as such, she must serve 85% of her

sentence before becoming eligible for parole.[3]

2.        **Possession of a Weapon for an Unlawful Purpose**, N.J.S.A. 2C:39-4a: This is a second

degree crime, to which defendant shall be sentenced to a specific term of years fixed by the court,

between five and ten years.  As articulated further below, this crime, by operation of law, merges

with the murder charge.

3.        **Desecrating Human Remains**, N.J.S.A. 2C:22-1:  This is a second degree crime, to

which defendant shall be sentenced to a specific term of years fixed by the court, between five

years and ten years.   See N.J.S.A. 2C:43-6(2).

4.        **Perjury**, N.J.S.A. 2C:28-1: Perjury is a third degree crime, to which defendant shall be

sentenced to a specific term of years fixed by the court, between three years and five years.  See

N.J.S.A. 2C:43-6(3).

---

[2] N.J.S.A. 2C:11-3(b)(1) goes on to say... or to be sentenced to a specific term between 30 years and life imprisonment of which the person shall serve 30 years before being eligible for parole.  This latter clause is now only operable in the limited circumstance where the Court sentences a defendant to a fixed term of years between 30 and 35 years in light of the amended NERA statute which became effective June 30, 2001.  That statute, N.J.S.A. 2C:43-7.2, requires a parole eligibility term of 85% of the base term and a period of parole supervision, but eliminated the violent crime standard.  Instead, the amended statute listed specific NERA offenses, of which Murder, N.J.S.A. 2C:11-3, is one.  The amended law also defines a life term as 75 years, for purposes of determining the length of NERA parole ineligibility term.  Thus, the NERA parole ineligibility term on a life sentence is 63 3/4 years (85% of 75 years).  N.J.S.A. 2C:43-7.2b.  See State v. Allen, 337 N.J. Super. 259, 274  (App Div. 2001) cerif. denied, 171 N.J. 43 (2002).

[3] If NERA applies to a sentence, the failure to impose the mandatory 85% period of parole ineligibility renders the sentence illegal which the State may appeal to correct.  State v. Parolin, 171 N.J. 223 (2002); State v. Johnson, 376 N.J. Super. 163, 168-169 (App. Div. 2005).

***State's Recommended Sentences***:

1.      Murder, <u>N.J.S.A.</u> 2C:11-3(b)(1): The State recommends that defendant be sentenced to a

term of life imprisonment.

2.      Possession of a Weapon for an Unlawful Purpose, <u>N.J.S.A.</u> 2C:39-4a:  As noted above,

the State concedes that this charge merges with the murder charge for purposes of sentencing

because the specific unlawful purpose charged in the indictment was that the gun was to be used

against the victim.  <u>State v. Diaz</u>, 144 <u>N.J.</u> 628, 636 (1996) (When the only unlawful purpose in

possessing the gun is to use it to commit the substantive offense, merger is required).  Further,

the jury was instructed on that specific unlawful purpose and was not instructed that they may

find a broader unlawful purpose based on the facts of the case that would support a separate

sentence.  <u>State v. Williams</u>, 213 <u>N.J. Super.</u> 30, 35-37 (App. Div. 1986) (where jury instruction

limits the scope of the unlawful purpose, merger is required despite evidence in the record that

may support a finding of a broader unlawful purpose).

3.      Desecrating Human Remains, <u>N.J.S.A.</u> 2C:22-1: The State recommends that defendant be

sentenced to a term of ten years imprisonment, to run consecutively to the her sentence on the

Murder charge.

4.      Perjury, <u>N.J.S.A.</u> 2C:28-1: The State recommends that defendant be sentenced to a term

of five years imprisonment, to run consecutive to both the Murder and the Desecrating Human

Remains charges.

**Aggravating and Mitigating Factors:**

The standard of proof for aggravating factors is whether there is "competent reasonably credible evidence" in the record to support the finding.  State v. Roth, 95 N.J. 334, 363 (1984). The Court is not limited to a defendant's version of the facts on a plea and may utilize the trial record after a jury trial.  The findings of the trial judge on the aggravating and mitigating factors must be based on sufficient credible evidence in the record; considering an inappropriate aggravating factor is grounds for vacating the sentence. State v. Kromphold, 162 N.J. 345, 355 (2000); State v. Sherman, 367 N.J. Super. 324, 359 (App. Div.), certif. denied, 180 N.J. 356 (2004).

When a trial court imposes a sentence based on defendant's guilty plea, the defendant's admissions or factual version need not be the sole source of information for the Court's sentencing decision.  State v. Sainz, 107 N.J. at 293.  The court may look to other evidence in the record when making such determinations, and should consider "the whole person," and all the circumstances surrounding the commission of the crime.  Id.

a. **Aggravating Factors**:

Murder and Desecration

The aggravating factors speak mainly to the crimes of murder and desecration.  There is a distinct overlap among aggravating factors for these charges, and even with the perjury charge, based largely on the nature and circumstances of the offense.  Where possible, the State has sought to delineate specific factors and their relative applicability.

1. The Nature and Circumstances of the Offense, 2C:44-1a(1)

This factor, which considers the overall picture of a crime, has been described to be the single most important factor within both the aggravating and mitigating factor lists. State v. Roth, 95 N.J. 334, 368 (1984) and State v. Hodge, 95 N.J. 369, 377-379. The nature and circumstances of this crime constitute an aggravating factor in that the complexity, premeditation, and planning indicates a coldness and viciousness that is far beyond the elements of the crime. Likewise, the extraordinary efforts of the defendant to cover up the murder by engaging in the additional criminal behavior of dismembering the body and perjuring herself to create the illusion that her husband was still alive (or to manufacture a possible self-defense argument) speak directly to a comprehensive plan to shield herself from being implicated in the murder. The evidence showed that defendant researched "how to commit a murder,"" "undetectable poisons,"" how to buy a gun in Pennsylvania,""chloral hydrate," and "Walgreens." The gun and bullets were purchased two days before the victim disappeared. A prescription for chloral hydrate was filled the day the victim disappeared at the Walgreens located near her sons' day-care facility minutes after she dropped them off, on a prescription pad from the defendant's medical practice to which she had access and had filled out and signed on other occasions. An amount of Chloral hydrate that was less than the full prescription amount was later discovered together with a syringe in the victim's car, which defendant admitted to parking at the Flamingo Motel in Atlantic City. Clearly, defendant meticulously planned and executed this crime.[4]

---

[4]See, State v. Malik, 365 N.J. Super. 267 (App. Div. 2003), cert. denied, 180 N.J. 354 (2004). The complexity and duration of the Medicaid fraud scheme far exceeded the elements required to prove the offense and thus the court's consideration of the pervasive and extensive nature of the criminal fraud

The murder is further aggravated by the fact that defendant cut up the victim's body and dumped it in the Chesapeake Bay, Virginia.   While a victim's death may not be considered as an aggravating factor for a murder sentence, it may be considered in sentencing defendant on other counts of the indictment in which it is not an element.  State v. Boyer, 221 N.J. Super. 387, 405-06 (App. Div. 1987), certif. denied, 110 N.J. 299 (1988).  The victim's body was treated as trash, cut and sawed apart and then packaged in garbage bags enclosed in suitcases.  His remains left to decompose in the waters of a foreign state, without his name or identification.  While the victim doesn't suffer the indignity of death, his survivors certainly did.  His body parts were left to rot without a proper burial or service.  Defendant made clear that she didn't just want to kill her husband, but she wanted him to disappear completely.  Each of these actions was deliberately undertaken to conceal her involvement in the murder, if not to conceal the murder itself.

There was no evidence presented at the trial or discovered through the investigation that the victim knew that his wife was unhappy with him or had any idea that his marriage was coming to an end.  In fact, the evidence showed quite the contrary.  The victim's colleagues portrayed him as a loving father and family man.  On the day that he disappeared he had purchased his dream house in Warren County, and he spent the early evening hours calling his friends with the exciting news of their new home.  Later that night, the evidence supports that he was incapacitated and some time later was killed in a series of events that started in his own home, and were committed by defendant, his own wife.

Two days prior to the victim's disappearance, defendant traveled to Pennsylvania and

---

under 2C:44-1a(1), did not constitute double counting of aggravating factors.

purchased a gun and bullets consistent with what was used to kill the victim. She researched her purchase, both on her computer and through e-mails and discussions with her friend, Jim Finn. She told Finn that she needed the gun for her protection against her husband, and later used a contradictory excuse with others that she purchased the gun for the victim. She used a Pennsylvania license that listed her residence as that of a relative. The investigation revealed that she never lived in Pennsylvania and as such, this license was illegally obtained.

After incapacitating/killing the victim, defendant then went on to plant the victim's car in Atlantic City and attempted to cover her tracks by creating the illusion that the victim was alive. Although a security tape shows a vehicle consistent with defendant's Nissan Pathfinder arriving at the Atlantic City motel minutes after the victim's car is parked there, stopping for a short period consistent with someone getting into the car, and driving away, defendant claimed that she took a series of cab rides after abandoning the victim's car. These claimed cab rides from Atlantic City to Woodbridge, and Woodbridge back to Atlantic City never took place, and were offered by defendant to hide the existence of her accomplice.

The evidence at trial supported that she or her accomplice used the victim's cell phone and Blackberry on the morning of April 29, 2004, to make it appear that he was alive and using his electronic devices. The Blackberry message to his boss saying that he was out sick was sent to the wrong address. The evidence at trial further supported that the victim certainly knew his boss's correct e-mail address, as he was the e-mail administrator, and frequently communicated with his boss through e-mail. The phone call placed from the victim's cell phone to the McGuire household, which defendant reported to the police claiming he called the house but she wasn't

home and he didn't leave a message, was within minutes of the defendant's EZ Pass hitting on

the Atlantic City Expressway. This toll charge was later contested by defendant, who claimed

she was not in Atlantic City. After EZ Pass refused to remove the charge[5], defendant admitted to

Brad Miller that she had made the trip. Further, the defendant claimed she took a picture of the

caller identification box reflecting the unanswered call, but the picture did not come out. Had the

police been able to have obtained cell cite information, it would have appeared that the call was

from the Atlantic City area, the same area where defendant planted the victim's car.

Separately, defendant admitted to Dr. Miller and others, in statements that were captured

during electronic surveillance, that she had "moved" the victim's car to the Flamingo Motel in

the early morning hours of April 30, 2004, claiming that she happened upon the car in Atlantic

City and moved it out of spite. She also admitted that she had the victim's cell phones and she

threw them out. The victim's Blackberry was recovered in the trunk of his car, along with his lap

top computer. The defendant was the last person known to drive the car.

There was further evidence supporting that defendant transported the victim's body out of

New Jersey on the night of May 3rd, with the return trip placing defendant in Delaware in the

early morning of May 4th. The first suitcase containing the victim's body was recovered on May

5th.

Defendant further aggravated her heinous acts by going to Family Court in Middlesex

County, where she claimed that she needed a restraining order against the victim, who the

---

[5]Defendant disputed two charges to EZ Pass claiming that she was not there. Both were for trips
to Atlantic City that she later admitted to Dr. Miller were for her and her step-father to "check on Bill's
car." Each of the disputed charges was for forty-five cents, for a total dispute of ninety cents.

defendant knew was either incapacitated or dead.  Defendant told a story of a fight and the victim

becoming physically abusive for the first time, slapping her and shoving a dryer sheet in her

mouth.  Interestingly, in the Confidential Victim's Information Sheet that defendant filled out the

day before giving testimony before the judge, the dryer sheet incident was separate and apart

from the alleged argument on the early morning hours of April 29, 2004.  Even more telling,

defendant lied about there being a gun in the household, even though she purchased the gun only

four days before.

All told, these facts and others delineating defendant's actions paint a picture of

defendant's activities over several days.  This crime was not committed during a momentary

lapse of judgment but rather was the result of careful planning and execution.  The complexity of

this crime, the brutal and disgusting nature of desecration of the victim's remains, the planning

and manipulation that defendant participated in, and continues to perpetrate, simply shocks the

conscience.  As such, the nature and circumstances surrounding this execution are well beyond

the bounds of the elements of murder, and do aggravate and escalate the criminality involved.  As

such, they should be considered by the Court to be an aggravating factor.


2.  Age and Vulnerablity of the Victim, N.J.S.A. 2C:44-1a(2)

Aggravating factor N.J.S.A. 2C:44-1a(2) which refers to the vulnerability of the victim is

applicable in this case.  This factor is not limited to the intrinsic condition of the victim, i.e., age

or physical disability, but includes any other reason that renders the victim substantially

incapable of exercising normal physical or mental power of resistance, including conditions

created by the defendant. State v. O'Donnell, 117 N.J. 210, 218-219 (1989). In this case, there was reasonably competent credible evidence presented that the victim was given chloral hydrate, which incapacitated him, and permitted defendant to kill him without his being able to resist. While this evidence was circumstantial, it was very clear and convincing. There were computer searches for undetectable poisons, chloral hydrate, and Walgreen's. There was a prescription filled at the Walgreen's near where defendant had dropped her children at day-care filled minutes after she dropped them off, and there was a lesser amount of chloral-hydrate than the defendant obtained by prescription recovered in the victim's car, which defendant planted at the Flamingo Motel in Atlantic City. Further, the victim was larger and stronger than the defendant, yet no struggle or argument was heard from their apartment on the night he disappeared nor were there any defensive injuries on the victim. All of these facts are consistent with defendant drugging the victim so she would have full control of him and could carry out her crime.

When a victim is so restrained as to make physical resistance virtually impossible, he or she has been rendered vulnerable within the meaning of N.J.S.A. 2C:44-1a(2). State v. O'Donnell, 117 N.J. 210, 218-219 (1989). See also State v. DeRoxtro, 327 N.J. Super. 212, 226 (App. Div. 2000) (where defendant initiated a drinking game to humiliate the victim and make him more vulnerable, then had an accomplice beat him). William McGuire never got to fight for his life. For this reason, this should be considered an aggravating factor.


3. Risk of another offense, N.J.S.A. 2C:44-1a(3)

Defendant has exhibited a total and complete lack of remorse for this crime. Defendant

Page 13

continues to deny responsibility and has in fact done television interviews saying that she is innocent. Defendant's total denial of responsibility, coupled with the meticulous planning and planting of evidence, and access to poisonous prescription medications clearly shows defendant to be a danger to society. Defendant's prescription records showed that she was self-medicating with an abundance of anti-anxiety medication yet has steadfastly denied any problems on her part. Defendant killed, cut up, and disposed of the man who she married and who fathered her children. This is ample support that she might commit other crimes.


4. Need to Deter, N.J.S.A. 2C:44-1a(9)

Defendant has steadfastly denied any involvement or responsibility for this crime. Instead, she has presented a defense that, while it wholly lacked evidence of wrongdoing by the victim, sought to portray the victim as a degenerate gambler and an abusive husband. Evidence was presented that defendant was carrying on a long term, intimate affair with a colleague with whom she was planning a future.

It is unfortunate that divorce can be viewed as a harrowing experience that is incredibly unpleasant to endure. Divorce involves not only issues of finance, but of child custody. Defendant had two children this victim, and as such, he was cemented into defendant's life, whether they were to be married or divorced. This defendant, like many other defendants that have garnered media attention in recent years, chose to execute her spouse rather than take the legal road to separation. This defendant, being articulate, smart, gainfully employed, and part of a close knit circle of family and friends, believed that she could get away with her crimes.

Page 14

The need for public safety and deterrence increases proportionally with the degree of the offense, and there is no greater wrong than murder. This defendant and others need to see that killing one's spouse is not an option when faced with wanting to leave a marriage. Further, well articulated excuses and manipulation cannot get anyone, even those that don't look or act like "criminals" in other aspects of their life, around the law. For all of these reasons, the need to deter should be considered an aggravating factor.

**Perjury**

The State submits that the following aggravating factors are applicable to the perjury charge in this case:

Prior Record, N.J.S.A. 2C:44-1a(6)

The defendant's record contains a prior successful completion of the Pre-Trial Intervention Program. Certainly, the existence of prior involvement with the judicial system speaks directly to aggravating factors concerning risk of re-offense (3) and deterrence (9) as to all charges. Although in itself not a significant record, the underlying facts increase its significance to the point that it should be considered an aggravating factor particularly as to the perjury charge in this case. The defendant's prior PTI was for a perjury charge in Union County in or about 1997. The defendant lied under oath in that case in a municipal court proceeding. Despite the second chance afforded the defendant through PTI, it did not deter her from once again lying under oath in a deliberate use of the Middlesex County Family Court to conceal her involvement in the murder or to fabricate a potential defense to a murder charge. A court can consider defendant's prior arrest which resulted in supervisory treatment under the drug laws. State v.

Walters, 279 N.J. Super. at 633; State v. Marzolf, 79 N.J. 167, 176-77 (1979).  In this context, defendant has demonstrated her willingness to repeatedly engage in criminal behavior when it is to her advantage, and as such her prior record should be considered as an aggravating factor.

Moreover, this pattern of deception similarly supports a rejection of defendant's anticipated assertion of lack of a prior record as a mitigating factor under N.J.S.A. 2C:44-1b(7). See State v. Torres, 313, N.J. Super. 129, 162 (App. Div.) certif. denied, 156 N.J. 425 (1998) (recognizing that consideration of prior juvenile arrests not resulting in conviction are proper in declining to find this mitigating factor).

Fraudulent or Deceptive Practices Against State Government, N.J.S.A. 2C:44-1a(10)

In addition to a prior record of perjury, the defendant not only deliberately committed a fraud against the judicial branch of the state government as she attempted to conceal the murder of her husband, but she attempted to manipulate the judicial system by making a legal record she knew to be false.  In effect, the defendant consciously sought to utilize the court record to create the false impression that her husband was still alive, or in the alternative, to establish a record that could potentially be used to support a future self-defense argument.

**Mitigating Factors:**

The State submits that there are no applicable mitigating factors for any of the crimes to be sentenced, and as such the aggravating factors outweigh the mitigating factors.  In response to an anticipated assertion of the hardship mitigating factor, N.J.S.A. 2C:44-1b(7), the State analogizes to State v. Kelly, 94 N.J. 178 (1984) (finding that the effects on minor children of incarcerating their mother is insufficient to overcome the presumption of imprisonment under

N.J.S.A. 2C:44-1d).  Kelly does not specifically address maternal imprisonment in the context of the hardship mitigating factor.  However, in this case, the State urges that the Court not recognize hardship as a mitigating factor.  The McGuire children are being cared for by the victim's family.  Their mother stands convicted of murdering their father and depriving them of his parental care, love and guidance.  To consider as a mitigating factor beneficial to the defendant the dual hardship imposed on the children by her direct and deliberate actions in depriving them of both of their parents is inappropriate.

**Consecutive verses Concurrent Time:**

Defendant stands convicted of four charges, for which the State is requesting that the sentences run consecutively for all but the Weapons charge.  The State concedes that the weapons sentence merges with that of the Murder, and as such the discussion that follows pertains to the Murder, Desecrating Human Remains, and Perjury convictions for which the State is recommending that the Court impose consecutive sentences.

Defendant stands convicted of several crimes that were committed at different times. While all were intended to eliminate her husband and to cover her own culpability, they were indeed independent of each other.  Defendant's crimes illustrate that they were not one continuous action, but were the product of meticulous and calculated planning that exposes defendant to be a cruel and methodical criminal.  Each of these acts, as described in more detail below, were separate and apart from each other.  Each added to the heinousness of the situation that she created, and each illustrates defendant's ruthless disregard for human life, disregard for the laws of our society, and complete disregard for not only this victim's life, but for his memory.

Guidelines for imposition of concurrent or consecutive sentences are set forth in State v. Yarbough, 100 N.J. 627 (1985), cert denied, 475 U.S. 1014 (1986). The Yarbough guideline that provides the clearest guidance to sentencing courts faced with a choice between concurrent and consecutive sentences is Guideline 3, which focuses on the "five facts relating to the crimes." State v. Carey, 168 N.J. 413, 423 (2001); State v. Molina, 168 N.J. 436, 442-43 (2001).

The five factors which relate to the factors of the case (Guideline 3) are whether:

(1) the crimes and their objectives were predominantly independent of each other;

(2) the crimes involved separate acts of violence or threats of violence;

(3) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(4) any of the crimes involved multiple victims;

(5) the convictions for which the sentences are to be imposed are numerous.

State v. Carey, 168 N.J. 413, 422-423 (2001), quoting from State v. Yarbough, 100 N.J. at 643-644.

In this case factors one and three would clearly be applicable to running the sentences consecutive. Each of the acts, specifically, the murder, the desecration of the victim's body, and the perjury were separate and distinct acts. Defendant's purpose in desecrating the victim's remains after he was already dead was separate and apart in purpose from killing him. Desecrating the victim's remains permitted the victim's body to be packaged in suitcases and transported to the Chesapeake Bay where they were dumped. The main purpose for the dismemberment and disposal of the body parts was to conceal the defendant's involvement in the

murder and to eliminate the possibility of any investigation by making the victim simply disappear. Further, the perjury was separate and apart from both the murder and the desecration in that through her perjurious statements, defendant sought to use the Family Court to create the illusion that she was acting as if her husband was alive. In effect, she was manufacturing a defense.

Similarly, these three crimes were separated by time and space. This separation shows that these acts were not the rushed actions of someone in the heat of the moment, but the methodical, well-organized, and calculated actions of a cold criminal. As such, each of these three crimes deserves separate sentences that are consecutive to each other. Evidence presented at trial showed that very little blood was inside the suitcases, and further, that the victim was wrapped in garbage bags likely to prevent leakage when the body was transported. The victim was cut up, according to expert witness Dr. Steven Symes, with at least two tools, a saw and a sharp object, such as a knife. The circumstances surrounding the victim's desecration show it to be a product of thought and planning, and certainly it took some time to achieve. Defendant at no time reflected and stopped her criminality, but indeed, purposefully and with full knowledge, continued on with her crimes.

Defendant's perjurious statements took place on April 30, 2004 in a location that was completely separate from the scene of the murder and desecration. Defendant, according to her own statements, went to Family Court not once, but twice. This required her to travel to the court house and with due consideration, fill out the paper work, swear to tell the truth on the record in court, and then provide testimony to the judge.

These three convictions are for separate and distinct actions by the defendant and each merits it's own punishment.  Running the sentences concurrent posits the desecration and perjury as "free crimes," where the defendant would get no greater punishment.  Such sentencing would treat defendant as if she had not done the lesser acts.  Indeed, it was the lesser acts that added to the horror that the victim's family had to endure, the loss of dignity to the victim, and to the public manipulation of our judicial system.

The fact that all of these crimes involved one victim is of no moment to this discussion.  Consecutive sentences can be imposed on multiple convictions arising from one incident involving one victim but which is comprised of distinct and dissimilar offenses.  State v. Mosch, 214 N.J. Super. 457, 462-466 (App. Div) 1986), certif. denied, 107 N.J. 1312 (1987).

While the other factors may not be applicable in this case, either one of the two factors above sufficiently justify consecutive sentences.  The five "facts relating to the crime" in Guideline 3 should be applied qualitatively, not quantitatively.  Thus, the trial court may impose consecutive sentences even though the majority of Yarbough factors support concurrent sentences.  State v. Carey, 168 N.J. 413, 427 (2001).

**Fines and Penalties**

Mandatory assessments for the Victims of Crime Compensation Board ("VCCB"), Safe Neighborhoods Services Fund ("SNSF") assessments and Law Enforcement Officers Training and Equipment Fund penalties apply in this case.  The State recognizes that no such penalties will apply to the weapons charge, as separate assessments may not be imposed on counts which merge at the time of sentencing.   Assessments and penalties are not imposed on merged counts.

State v. Huff, 292 N.J. Super. 185, 187 n.1 (App. Div), aff'd in part, 148 N.J. 78 (1997) and State

v. Strecko, 244 N.J. Super. 463, 464 (App. Div. 1990).  The sums collected on each count are

defined by statute and are fixed the exception of the VCCB penalty on the murder conviction,

which bears some discussion here. The SNSF penalty is defined in N.J.S.A. 2C:43-3.2 (eff.

August 3, 1993) and provides for a $75 assessment to be imposed for each conviction of a crime,

disorderly persons offense, petty disorderly persons offense, driving while under the influence,

P.T.I. and conditional discharges occurring after the effective date.  The LEOTEF defined at

N.J.S.A. 2C:43-3.3 (eff. January 9, 1997) provides for a $30  penalty assessed for any person

convicted of crime.

   The VCCB penalty defined at  N.J.S.A. 2C:43-3.1 is only applicable to crimes committed

after February 6, 1980  N.J.S.A. 2C:43-3.1a(2)(a). State v. Chapman, 187 N.J. Super. 474, 477

(App. Div. 1982).   For all crimes, not resulting in injury or death, drug offenses, D.P.'s and petty

D.P.'s, the VCCB penalty is $50 (if committed after December 23, 1991).  This assessment is

applicable to the desecration and perjury charges in this case.  N.J.S.A. 2C:43-3.1a(2)(a).  For

crimes of violence resulting in injury or death, the minimum VCCB penalty is $100 (if

committed after December 23, 1991) and the maximum penalty is $10,000. N.J.S.A. 2C:43-

3.1a(1).  The State requests that the maximum VCCB penalty be imposed in this case.  The

factors to be considered by the Court in determining the VCCB penalty in violent crimes are: 1.

the severity of the crime; 2. the defendant's criminal record; 3. the defendant's ability to pay; and

4. the impact of the assessment on the defendant's dependents.

   In this case, the crime could not be any more severe than the resulting death of the victim.

This factor alone should mandate a high VCCB penalty.   The defendant also has prior criminal involvement, albeit minor, as detailed above.  The defendant also has the ability to pay.  She has been out on $2.1 million bail for essentially the entirety of the time between the crime and conviction and has at least some equity in the home she owns in Brick, New Jersey, which the State believes would more than adequately cover the maximum VCCB penalty.  Finally, there would be no impact on the defendant's dependents given that she currently does not have any.  As noted, the McGuire children are being cared for by the victim's family and as such the defendant is not currently responsible for their financial support.  A weighing of these factors militates that the maximum $10,000 VCCB penalty be imposed.

For similar reasons, the defendant should be required to pay the maximum $200,000 fine assessed on first degree crimes.  N.J.S.A. 2C:43-3a (1).  The Court should impose this fine both because the defendant derived a pecuniary gain from the crime and because such a fine is specially adapted to deterrence and to the correction of the defendant.  The pecuniary gain to the defendant was realized in the form of her becoming the sole owner of the newly purchased home at 29 Halls Mills Road in Asbury, New Jersey, and all of the equity therein.  Further, she became the sole owner of all jointly held assets, including bank and investment accounts.  As to the defendant's ability to pay, the State believes that these assets, and others,  will enable the defendant to pay such a fine.  Defendant quickly posted 2.1 million dollars in bail during the pendancy of this case, which evidences access to funds that the state may not know about.

In addition, such a fine may be characterized as specifically tailored to deter others from committing similar crimes and to the defendant's individual correction.  There was credible

Da263

competent evidence adduced during the trial that the defendant discussed divorce with a co-worker who had experience with the process.  That testimony revealed that the defendant learned that a divorce could cost as much as $100,000 and that there were no guarantees that she would gain custody of the children.  Defendant then opted to plan, commit, and cover up a murder rather than endure the emotional and financial burdens of a divorce and custody proceeding.  The deterrence message sent by imposing such a fine is loud and clear: choosing murder over divorce will cost both your liberty and your assets.  The imposition of the fine would specifically punish the defendant by setting the financial cost of her choice to commit these crimes rather than file for divorce at a level approximately twice what a divorce would have cost her, accepting the approximately $100,000 figure she believed such a proceeding may require.

Alternatively, if the Court is not inclined to impose a fine, and, as the State prefers and recommends, the Court should order that restitution be paid from the defendant's assets to the McGuire children.  N.J.S.A. 2C:44-2b (1) and (2) provide that the Court shall sentence a defendant to pay restitution in addition to a sentence of imprisonment or probation if (1) the victim, or in the case of a homicide, the nearest relative of the victim, suffered a loss; and (2) the defendant is able to pay, or if given a fair opportunity, will be able to pay restitution. (emphasis added).  It is clear that the McGuire children are the victim's closest relatives and that they have suffered an immeasurable loss.  Aside from the irreplaceable benefits of a father's love and guidance throughout one's life, they have also lost his financial support, which is perhaps the only quantifiable portion of this monumental loss .  The evidence adduced at trial revealed, and it

is beyond dispute, that the victim was earning approximately $65,000 per year at his NJIT job.[6]
The McGuire children were 2 and 4 at the time of their father's death. Therefore, if the
childrens' ages are averaged to 3 and subtracted from 18, the bare age of majority, leaving aside
for the moment the possible educational obligations of parents through approximately age 22,
and utilizing the $65,000 salary, the McGuire children have lost approximately $975,000 in
financial support from their father due to the direct actions of the defendant. This very brief, and
admittedly non-actuarial analysis, is simply to illustrate the staggering financial loss to the
McGuire children and to support the argument that the defendant should not be permitted to not
only cause such catastrophic injury to her sons, but also to escape her own financial obligations
to them, by her actions.

A restitution order in this case would not necessarily require a hearing. State v. Orji, 277
N.J. Super. 582 (App. Div. 1994). (holding that a defendant was not entitled to restitution
hearing where no dispute existed as to amount of restitution and defendant raised no objection to
concession made by his counsel that defendant had funds to pay restitution nor did he dispute his
ability to pay).

---

[6]For the purposes of this argument, the State does not even include monies the victim was
earning from other employment with Jay Vista Software and the Essex County Health Department,
except to note that these jobs would only increase his income.

Page 24

## Conclusion

For the foregoing reasons, the State requests that the Court impose the maximum terms of imprisonment with the appropriate periods of parole ineligibility for each crime of conviction and order that these sentences be served consecutively. Further, the State seeks imposition of the maximum $10,000 VCCB penalty and the maximum $200,000 fine for a first degree crime. Alternatively, the State seeks and recommends that appropriate restitution to be paid to the McGuire children as the nearest relatives of the victim.

Respectfully submitted,

Patricia Prezioso
Assistant Attorney General

Christopher S. Romanyshyn
Deputy Attorney General

New Jersey Division of Criminal Justice

cc:    Joseph Tacopina, Esq.
       Stephen Turano, Esq.

# JUDGMENT OF CONVICTION AND ORDER FOR COMMITMENT, DATED JULY 19, 2007

| 05O01293-001 State of New Jersey | New Jersey Superior Court Law Division - Criminal |
|---|---|
| v. | ● JUDGEMENT OF CONVICTION |
| **MCGUIRE, MELANIE** | ○ CHANGE OF JUDGEMENT |
| Defendant: (Specify Complete Name) | ● ORDER FOR COMMITMENT |

| DATE OF BIRTH 10/08/1972 | SBI NUMBER 319833C | ○ INDICTMENT / ACCUSATION DISMISSED |
|---|---|---|
| DATE OF ARREST 06/02/2005 | DATE INDICTMENT / ACCUSATION FILED | ○ JUDGEMENT OF ACQUITTAL |
| DATE OF ORIGINAL PLEA | ORIGINAL PLEA ○ NOT GUILTY ○ GUILTY | ○ |

| ADJUDICATION BY | ○ GUILTY PLEA | DATE: | ○ NON-JURY TRIAL | DATE: |
|---|---|---|---|---|
| | ● JURY TRIAL | DATE: 04/23/2007 | ○ Dismissed/Acquitted | DATE: |

**ORIGINAL CHARGES**

| IND.ACC NO. | COUNT | DESCRIPTION | DEGREE | STATUTE |
|---|---|---|---|---|
| 05-10-00164-S | 1 | Murder | 1 | NJSA 2C:11-3; 2C:2-6 |
| | 2 | Possession of Weapon for Unlawful Purposes | 2 | NJSA 2C:39-4a; 2C:2-6 |
| | 3 | Desecrating Human Remains | 2 | NJSA 2C:22-1; 2C:2-6 |
| | 4 | Perjury | 3 | NJSA 2C:28-1 |

**FINAL CHARGES**

| COUNT | DESCRIPTION | DEGREE | STATUTE |
|---|---|---|---|
| 1 | Murder | 1 | NJSA 2C:11-3 |
| 2 | Possession of Weapon for Unlawful Purposes | 2 | NJSA 2C:39-4A & 2C:2-6 |
| | Continued on Page 3 | | |

It is, therefore, on **07/19/2007** ORDERED and ADJUDGED that the defendant is sentenced as follows. As to Count 1 of the Indictment, the Defendant is committed to the custody of the Commissioner of the Department of Corrections to serve a term of life imprisonment and the Defendant must serve 85% of the term before being eligible for parole. In addition, the defendant is Ordered to pay SNSF $75, VCCB $1000, LEO $30. Parole supervision for 5 years. Count 2 merges with Count 1.

.................... CONTINUED ON PAGE 3 ......

JAIL CREDIT: 6/2/05 to 6/7/05; 10/12/05 to 12/3/05; 10/30/06 – 10/31/06; 4/23/07 to 7/18/07 = 148 days.

○ You are hereby sentenced to community supervision for life.
○ The defendant is hereby ordered to serve a ___ year term of parole supervision which term shall begin as soon as defendant completes the sentence of incarceration.
○ The court finds that the defendant's conduct was characterized by a pattern of repetitive and compulsive behavior.
○ The court finds that the defendant is amenable to sex offender treatment.
○ The court finds that the defendant is willing to participate in sex offender treatment.
● The defendant is hereby ordered to provide a DNA sample and ordered to pay the costs for testing of the sample provided.

● It is further ORDERED that the sheriff deliver the defendant to the appropriate correctional authority.

| ● Defendant is to receive credit for time spent in custody (R. 3:210-8). | Total Number of Days 148 | DATE (From/To) |
|---|---|---|
| | | DATE (From/To) |
| | | DATE (From/To) |
| ○ Defendant is to receive gap time credit for time spent in custody (N.J.S.A. 2C:44-5b(2)). | Total Number of Days | DATE (From/To) |

| TOTAL CUSTODIAL TERM | life | INSTITUTION | CCDC | TOTAL PROBATION TERM |
|---|---|---|---|---|

Administrative Office Of The Courts
State Bureau Of Identification
COPIES TO: CHIEF PROBATION OFFICER    STATE POLICE    AOC CRIMINAL PRACTICE DIVISION    DEPARTMENT OF CORRECTIONS or COUNTY PENAL INSTITUTION

CPD108 (rev. 12/96)

State of New Jersey v.   MCGUIRE, MELANIE   S.B.I. #   319833C   IND/ACC #   05-10-00164-S

| Total FINE | If any of the offenses occurred on or after July 9, 1987, and is for violation of Chapter 35 or 36 of Title 2C, |
|---|---|
| Total RESTITUTION | 1) A mandatory Drug Enforcement Demand Reduction (DEDR) penalty is imposed for each count. (Write in # times for each.) |

If the offense occurred on or after December 23, 1991 an assessment of $50 is imposed on each count on which the defendant was convicted unless the below indicates a higher assessment to N.J.S.A. 2C:43-3.1. (Assessment is $30 if offense is on or after January 9, 1986 but before December 23, 1991, unless a higher penalty is noted. Assessment is $25 if offense is before January 9, 1986.)

1) A mandatory Drug Enforcement Demand Reduction (DEDR) penalty is imposed for each count. (Write in # times for each.)
   1st Degree @$3000          4th Degree @$750
   2nd Degree @$2000         Disorderly Persons or Petty
   3rd Degree @$1000          Disorderly Persons @ $500

○ Court further ORDERS that collection of the DEDR penalty be suspended upon defendant's entry into a residential drug program for a term of the program

● Assessment imposed on

   count(s)                              3

   is                      each.

   Total VCCB Assessment         $1,100.00

2) A forensic laboratory fee of $50 per offense is ORDERED.   Offenses @ $50.

                              Total Lab FEE

3) Name of Drugs Involved

4) A mandatory driver's license suspension of          months is ORDERED.

   The suspension shall begin today,          and end

   Driver's license number

   (IF THE COURT IS UNABLE TO COLLECT LICENSE, PLEASE ALSO COMPLETE THE FOLLOWING.)

   Defendant's address

○ Installment payments are due at the rate

   of                      per

   beginning

                  (DATE)

   Eye Color          Sex          Date of Birth   10/08/1972

   The defendant is the holder of an out-of-state driver's license from the following jurisdiction          Driver's License

   Defendant's non-resident driving privileges are hereby revoked for          months.

If the offense occurred on or after February 1, 1993 but was before March 13, 1995 and the sentence is to probation or to a State Correctional Facility, a transaction fee of up to $1.00 is ordered for each occasion when a payment or installment is made.(P.L. 1992, c.199). If the offense occurred on or after March 13, 1995 and the sentence is to probation, or the sentence otherwise requires payments of financial obligations to the probation division, a transaction fee of up to $2.00 is ordered for each occasion when a payment is made (P.L. 1995, c.9).

If the offense occurred on or after August 2, 1993, a $75.00 Safe Neighborhood Services Fund assessment is ordered for each conviction.
P.L. 1993, c. 220   TOTAL   $225.00

If the offense occurred on or after January 5, 1994 and the sentence is to probation, a fee of up to $25 per month for the probationary term is ordered.
(P.L. 1993, c. 275)   Amount per month

If the crime occurred on or after January 9, 1997, a $30 Law Enforcement Officers Training and Equipment Fund penalty is ordered.   Total:          $30.00

If the crime occurred on or after May 4, 2001, and the defendant has been convicted of aggravated sexual assault, sexual assault, aggravated criminal sexual contact, kidnapping under 2C:13-1c(2), endangering the welfare of a child by engaging in sexual conduct which would impair or debauch the morals of a minor under 2C:24-4a, endangering the welfare of a child pursuant to 2C:24-4b(4), luring or enticing a child pursuant to 2C:13-6, criminal sexual contact pursuant to 2C:14-3b if victim is a minor, kidnapping pursuant to 2C:13-1, criminal restraint pursuant to 2C:13-2 or false imprisonment pursuant to 2C:13-3 if the victim is a minor and the offender is not the parent.

| NAME (Court Clerk or Person who prepares this form) | TELEPHONE NUMBER | NAME (Attorney for defendant at Sentencing) |
|---|---|---|
| A.C. | (732) 981-3198 | Stephen Turano, Esq. |

STATEMENT OF REASONS - include all applicable aggravating and mitigating factors

A jury found defendant guilty of Murder in the first degree, Possession of a Weapon for an Unlawful Purpose, Desecrating Human Remains, and Perjury. The No Early Release Act applies to the Murder Conviction. The Court has reviewed the Presentence Report, certain psychological evaluations received in connection with the Presentence Report, various letters from family and friends of the victim and the defendant, the arguments of counsel, and the statements made to the Court today by victims, witnesses, and the defendant. After reviewing all this information, the Court finds the following aggravating factors with respect to the murder conviction.

CONTINUED ON PAGE 3 ..................

| JUDGES NAME | JUDGE (Signature) | DATE |
|---|---|---|
| Hon. Frederick P. DeVesa, PJCr. |  | 07/19/2007 |

Administrative Office Of The Courts
State Bureau Of Identification                                                                                     CPO105j/rev. 12/99)
COPIES TO: CHIEF PROBATION OFFICER   STATE POLICE   AOC CRIMINAL PRACTICE DIVISION   DEPARTMENT OF CORRECTIONS OR COUNTY PENAL INSTITUTION

State of New Jersey v.   MCGUIRE, MELANIE          S.B.I. #      319833C          IND/ACC #      05-10-00164-S

Final Charges Continued....

| Count 3 | Desecrating Human Remains | 2nd Degree | NJSA 2C:22-1 & 2C:2-6 |
| Count 4 | Perjury | 3rd Degree | NJSA 2C:28-1 |

SENTENCING ORDER CONTINUED .....

As to Count 3 of Indictment, the Defendant is committed to the custody of the Commissioner of the Department of Corrections to serve a term of imprisonment of 10 years with a period of parole ineligibility of 5 years.  Since the desecretation of the remains of William was an integral part and continuation of the same criminal episode that included this heinous murder, the sentence must run concurrent to Count 1.  In addition, the Defendant is Ordered to pay SNSF $75, VCCB $50  Parole supervision for 3 years.

As to Count 4, Defendant is committed to the custody of the Commissioner of the Department of Corrections to serve a term of imprisonment of 5 years with a period of parole ineligibility of 2.5 years.  The sentence for Count 4 shall be served consecutive to Counts 1 and 2.  In addition, Defendant is Ordered to pay SNSF $75 and VCCB $50.

STATEMENT OF REASONS CONTINUED .....

The Nature and Circumstances of the Offense constitutes an aggravating factor in that the crime was committed in an especially heinous, cruel or depraved manner.  The nature, complexity and scope of the criminal episode involving numerous overt acts committed over a three week period and spanning four different states reflects willfulness and malice that goes far  beyond the elements of murder.  The desecration of William McGuire's remains was particularly heinous and depraved.  His body was treated as trash, cut and sawed apart and then packaged in garbage bags.  His remains were left to rot in the waters of a foreign state, without identification, so that his family and friends would be deprived of a dignified funeral service and burial.

The depravity of the murder was further manifested by the efforts on the part of the defendant to portray William McGuire as an abusive husband and chronic gambler who was indebted to organize crime figures as part of her attempt to shift the blame for his murder to others.

Most tragically, the murder of William McGuire and the attack on his character has surely caused grave harm to his children.  They must now grow up without a mother or father and their memories of both will be distorted and confused by the web of deception created by the defendant.  The depravity of this murder simply shocks the conscience.

Clearly the need to deter this defendant and others from this type of horrendous criminality is also an aggravating factor  Evidence was presented that defendant was carrying on a long term, intimate affair with a colleague with whom she was planning a future. The need for deterrence is particulary important in cases of calculated premeditated murder.  This Court must impose a sentence that makes it clear that one who callously destroys a family by resorting to violence and murder to accomplish her own selfish ends must face the most severe consequences that the law provides.

Incredibly, the defendant argues that her imprisonment and the resultant excessive hardship to her children should be considered as a mitigating factor.  There is no doubt that because of her cruel and deliberate actions, the McGuire children have been deprived of both of their parents but they are being well cared for by their father's family.  To consider this hardship imposed on them as a mitigating factor that should benefit the defendant would make a mockery of our system of justice.

Counsel for the defense also argue that the character and attitude of the defendant indicate that she is unlikely to commit another offense and have provided the court with numerous letters of support for her. Ironically the State argues that defendant's character is an aggravating factor and offers equally persuasive evidence. Given the mandatory term of imprisonment, neither of these factors seem quite significant.  In any event, the Court simply cannot conclude that the defendant's character is a mitigating factor. While it does appear that the defendant has done  some good deeds, the record in this case also reveals that she has been a ruthless, calculating and  manipulative individual,. History is replete with evil doers who have also done good deeds and  have their supporters.

CONTINUED ON PAGE 4. ....

Da269

State vs. MCGUIRE, MELANIE          Page 4          Ind. # 05-10-00164-S

STATEMENT OF REASONS CONTINUED ....

Before the murder of her husband and the desecration of his remains, the defendant carried on extramarital affairs even while expecting one of her children. After the murder, the defendant callously ridiculed her husband and even joked about his death on intercepted telephone conversations with friends and relatives. As she orchestrated her web of deception, she manipulated friends like Jim Finn and relatives to help her and she discouraged them from cooperating with the investigation. Her character cannot be considered a mitigating factor.

Finally, the defense argues that defendant has led a law-abiding life for a substantial period of time before the commission of the present offense. While this is technically accurate, the Court finds this factor to be relatively insignificant since the defendant was previously charged with perjury before a municipal court in Union County but allowed Pre Trial Intervention as recently as 1998. Despite the second chance afforded the defendant through PTI, she once again made false statements to obtain a handgun in Pennsylvania in 2004 and has now also been convicted of perjury in connection with this criminal episode.

After careful consideration, the Court is clearly convinced that the two very significant aggravating factors substantially outweigh the one mitigating factor. The overall circumstances of a crime has been described to be the single most important sentencing factor under our law. In this case crime was so heinous, so cruel and depraved that the Court finds that the maximum sentence should be imposed.

1

1     SUPERIOR COURT OF NEW JERSEY
      LAW DIVISION - MIDDLESEX COUNTY
2     INDICTMENT NOS. 06-10-00119-S
                       05-10-00164-S
3     _____

4     THE STATE OF NEW JERSEY

5          vs.                    Transcript of Sentencing

6     MELANIE McGUIRE,

7          Defendant.

8     _____

9                          Place:  Middlesex County Courthouse
                                   56 Paterson Street
10                                 New Brunswick, New Jersey

11                         Date:   July 19, 2007

12    B E F O R E:

13        HONORABLE FREDERICK P. DeVESA, J.S.C.

14    TRANSCRIPT ORDERED BY:  Christopher S. Romanyshyn, Esq.
                              (Office of the Attorney General)

15    A P P E A R A N C E S:

16        PATRICIA PREZIOSO, ESQ.
          and CHRISTOPHER S. ROMANYSHYN, ESQ.
17        Deputy Attorney Generals
          Attorneys for the State

18
          JOSEPH TACOPINA, ESQ.
19        (Firm of Joseph Tacopina, Esq.)
          STEPHEN TURANO, ESQ.
20        (Firm of Stephen Turano, Esq.)
          Attorneys for the Defendant

21

22                              Linda Urbaniak
                                Certified Court Reporter
23                              Official Court Reporter
                                Middlesex County Courthouse
24                              56 Paterson Street
                                New Brunswick, New Jersey

25

Sentencing                                46
 1  arrogance for three years and since she committed this
 2  crime she has not shown one ounce of remorse, shame or
 3  passion.  Give her a sentence that will wipe that
 4  arrogance off of her face.  Never let her have hope.
 5  We have no hope.  She had no pity.  Show her no pity.
 6  She showed no mercy.  Give her no mercy.  She alone
 7  passed sentence on her husband and her sons and she
 8  chose for them a life sentence and I ask you on behalf
 9  of our family to give her a life sentence in return.
10          Thank you.
11          THE COURT:  Thank you, Miss Ligosh.
12          All right.  Ladies and gentlemen, I
13  understand that there are others of you who would wish
14  to speak to the Court and make statements here, but, as
15  I hope the attorneys have advised you, our law imposes
16  guidelines and rules on who may speak at sentencing.
17  I want to assure you that even though you may not have
18  had a chance to speak, every letter that has been
19  written to the Court has been carefully read by the
20  Court and has been considered prior to this sentencing
21  proceeding today, so for those of you who have written
22  I thank you for your input.
23          Mr. Tacopina, does the defendant wish to make
24  a statement before sentence is imposed?
25          MR. TACOPINA:  No, your Honor.

Sentencing                                47
 1          THE COURT:  All right.  Counsel, thank you
 2  very much for your input.
 3          Again in addition to the documents that I've
 4  made reference to earlier, I now have had a chance to
 5  consider the arguments of counsel, the statements made
 6  today by the victims and witnesses in this matter and,
 7  as the -- as all the attorneys have pointed out, in
 8  this case the crime of murder carries with it a minimum
 9  term of 30 years and a maximum term of life
10  imprisonment.  It is the responsibility of the Court to
11  review all of this information that has been provided
12  to the Court and to consider whether there are
13  aggravating factors that are present that would warrant
14  imposing a greater term than the minimum term or
15  whether there are mitigating factors that would cause
16  the Court to lean towards the minimum term.  I have
17  done that to the best of my ability and after
18  conducting an analysis of the aggravating factors in
19  this matter I am convinced, first of all, that the
20  nature and circumstances of this offense do in fact
21  constitute a very significant aggravating factor in
22  that the crime was committed in an especially heinous,
23  cruel and depraved manner.  The nature and the
24  complexity and the scope of this criminal episode
25  involved many, many overt actions committed over

Sentencing                                48

1  a three-week period spanning four different states and
2  reflected a willfulness and a malice that goes far
3  beyond the elements of the crime of murder in our law.
4         The desecration of William McGuire's remains
5  was particularly heinous and depraved.  His body was
6  treated as trash.  It was cut and sawed apart and then
7  packaged in garbage bags.  His remains were left to
8  decompose in the waters of another state without
9  identification so that his family and friends might
10 always be deprived of a dignified funeral service and
11 burial.
12        The depravity of the murder was further
13 manifested by the efforts on the part of the defendant
14 to portray William McGuire as an abusive husband and
15 a chronic gambler who was indebted to organized crime
16 figures as part of her attempt to shift the blame for
17 his murder to others, and, as the Attorney General
18 pointed out, during the course of the trial there was
19 simply no credible evidence to suggest that this
20 characterization of Mr. McGuire was in any way
21 accurate.  But perhaps most tragically the murder of
22 William McGuire and the attack on his character has
23 surely caused grave harm to his children.  They must
24 now grow up without a mother or father and their
25 memories of both will be distorted and confused by the

Sentencing                                49

1  web of deception created by the defendant.
2         The depravity of this murder simply shocks
3  the conscience of the Court.
4         Clearly as another aggravating factor the
5  Court finds that there is indeed a need to deter this
6  defendant and others from this type of horrendous
7  criminality.
8         Evidence was presented to this Court that the
9  jury found credible that this defendant was carrying on
10 a long-term intimate affair with a colleague who she
11 was at some point claiming to have a future with after
12 they both left their spouses.  The need for deterrence
13 is particularly important in cases of calculated
14 premeditated murder.  The Court must impose a sentence
15 that makes it clear that one who callously destroys
16 a family by resorting to violence and murder to
17 accomplish her own selfless ends must face the most
18 severe consequences that the law would provide.
19        These are the aggravating factors that this
20 Court finds to be significant.
21        I do not find that the vulnerability of the
22 victim or that the risk that this defendant would
23 necessarily commit another crime can constitute
24 an aggravateding factor in this case, and surely
25 a defendant has a right to trial and if a defendant

1  chooses to plead not guilty and go to trial this Court
2  cannot under our law characterize that as a lack of
3  remorse and impose greater punishment on the defendant,
4  so I cannot find those aggravating factors that the
5  Attorney General requests.
6          Now, with respect to mitigating factors,
7  incredibly the defendant argues that her imprisonment
8  and the resultant excessive hardship to her children
9  should be considered as a mitigating factor.  There's
10 no doubt that because of her cruel and deliberate
11 actions the McGuire children have been deprived of both
12 their parents, but they are, from everything that I can
13 tell, being well-cared for by their father's family.
14 To consider the hardship imposed on them as a
15 mitigating factor that should benefit the defendant
16 would make in my view a mockery of our system of
17 justice.
18         Counsel for the defense also argue that the
19 character and attitude of the defendant indicate that
20 she is unlikely to commit another offense, and they
21 have indeed provided the Court with numerous, numerous
22 letters of support for her.  Ironically the State
23 argues that the defendant's character is an aggravating
24 factor and offers equally persuasive evidence.
25         Frankly, given the requirement of a mandatory

1  30-year prison term, neither of these factors seem
2  quite significant to the Court with respect to the risk
3  of the defendant committing another offense.  In any
4  event, I surely cannot conclude that the defendant's
5  character is indeed a mitigating factor.  While it
6  clearly has been demonstrated that the defendant has
7  done many good deeds, the record in this case also
8  reveals that she has been a ruthless, calculating and
9  manipulative individual.  Regrettably history is
10 replete with evil-doers have done some good deeds and
11 who also have their supporters, but in this matter
12 before the murder of her husband and desecration of his
13 remains the defendant carried on affairs, extramarital
14 affairs, even while expecting one of her children.
15         After the murder the defendant callously
16 ridiculed her husband and even joked about his death on
17 intercepted telephone conversations with friends and
18 relatives.  As she orchestrated her web of deception
19 she manipulated friends, friends like Jim Finn, and
20 relatives to help her and she discouraged them from
21 cooperating with the investigation.  Under these
22 circumstances her character cannot in any way be
23 considered a mitigating factor.
24         Finally, the defense argues that the
25 defendant has led a law-abiding life for a substantial

Da274

Sentencing                                                      52

1   period of time before the commission of these present
2   crimes.  While this is technically accurate, the Court
3   finds this factor to be largely insignificant since the
4   defendant was previously charged with perjury before
5   a municipal court in Union County but allowed the
6   opportunity for Pretrial Intervention as recently as
7   1998.  Despite the chance afforded the defendant
8   through PTI, she once again made false statements to
9   obtain a handgun in Pennsylvania in 2004 and, of
10  course, now has also been convicted of perjury before
11  the Family Court with respect to this criminal episode.
12          So, after careful consideration, the Court is
13  clearly convinced that these two very aggravating and
14  significant factors substantially outweigh this one
15  mitigating factor which again I find to be
16  insignificant.
17          The overall circumstance of a crime has been
18  described in our law as the single most important
19  sentencing factor.  In this case the crime was so
20  heinous, so cruel and so depraved that the Court finds
21  that the maximum sentence should be imposed.  So as to
22  count one of the indictment charging the murder of
23  William McGuire, the defendant is committed to the
24  custody of the Department of Corrections to serve
25  a term of life imprisonment and the defendant must

Sentencing                                                      53

1   serve 85 percent of the maximum term before being
2   eligible for parole.  In addition, the defendant is
3   ordered to pay certain mandatory fines and penalties
4   which the Court will set forth on the Judgment of
5   Conviction.
6           The Attorney General has asked the Court to
7   impose a very heavy fine and to order restitution to
8   compensate the children for the loss of their father's
9   income.  I've carefully reviewed the presentence
10  report.  The Court may only impose fines and
11  restitution based upon the defendant's ability to pay.
12  I am satisfied from reviewing the presentence report
13  that this defendant is virtually bankrupt and that her
14  legal fees and other debts make it impossible for her
15  at this time to pay any substantial fine or
16  restitution.  I am also satisfied that in light of the
17  circumstances of these proceedings and this sentence
18  that any additional support that the children need or
19  any compensation that the children need can be dealt
20  with in the Family Court under more appropriate
21  proceedings.
22          Under our law when one is convicted of
23  a first degree crime the Court must also order a period
24  of parole supervision for five years upon the release
25  of the defendant.

Da275

Sentencing                                                    52

1  period of time before the commission of these present
2  crimes.  While this is technically accurate, the Court
3  finds this factor to be largely insignificant since the
4  defendant was previously charged with perjury before
5  a municipal court in Union County but allowed the
6  opportunity for Pretrial Intervention as recently as
7  1998.  Despite the chance afforded the defendant
8  through PTI, she once again made false statements to
9  obtain a handgun in Pennsylvania in 2004 and, of
10 course, now has also been convicted of perjury before
11 the Family Court with respect to this criminal episode.
12          So, after careful consideration, the Court is
13 clearly convinced that these two very aggravating and
14 significant factors substantially outweigh this one
15 mitigating factor which again I find to be
16 insignificant.
17          The overall circumstance of a crime has been
18 described in our law as the single most important
19 sentencing factor.  In this case the crime was so
20 heinous, so cruel and so depraved that the Court finds
21 that the maximum sentence should be imposed.  So as to
22 count one of the indictment charging the murder of
23 William McGuire, the defendant is committed to the
24 custody of the Department of Corrections to serve
25 a term of life imprisonment and the defendant must

Sentencing                                                    53

1  serve 85 percent of the maximum term before being
2  eligible for parole.  In addition, the defendant is
3  ordered to pay certain mandatory fines and penalties
4  which the Court will set forth on the Judgment of
5  Conviction.
6          The Attorney General has asked the Court to
7  impose a very heavy fine and to order restitution to
8  compensate the children for the loss of their father's
9  income.  I've carefully reviewed the presentence
10 report.  The Court may only impose fines and
11 restitution based upon the defendant's ability to pay.
12 I am satisfied from reviewing the presentence report
13 that this defendant is virtually bankrupt and that her
14 legal fees and other debts make it impossible for her
15 at this time to pay any substantial fine or
16 restitution.  I am also satisfied that in light of the
17 circumstances of these proceedings and this sentence
18 that any additional support that the children need or
19 any compensation that the children need can be dealt
20 with in the Family Court under more appropriate
21 proceedings.
22          Under our law when one is convicted of
23 a first degree crime the Court must also order a period
24 of parole supervision for five years upon the release
25 of the defendant.

Da275

Sentencing                                    54

1    As has been mentioned by counsel, count two
2    charging the possession of a handgun for an unlawful
3    purpose will merge with count one.
4         As to count three, the desecration of the
5    remains of William McGuire, the defendant is committed
6    to the custody of the Department of Corrections to
7    serve a term of imprisonment of 10 years with a period
8    of parole ineligibility of five years.  Since the
9    desecration of the remains of William McGuire was an
10   integral part and a continuation of the same criminal
11   episode that included this heinous murder, the sentence
12   must run concurrent to count one.
13        I do not agree with the Attorney General that
14   this represents a free crime.  The desecration that has
15   been considered by this Court has been a significant
16   element that causes this Court to consider the
17   aggravating factors associated with the murder and to
18   impose the maximum sentence allowed by law.
19        As to count four of the indictment, the
20   defendant is committed to the custody of the Department
21   of Corrections to serve a term of imprisonment of five
22   years with a period of parole ineligibility of two
23   and-a-half years.  Since the perjury before the Family
24   Court did involve a separate and distinct crime
25   committed at a different time and a different location

Sentencing                                    55

1    and also constituted an offense against our judicial
2    system and our system of justice, the sentence for
3    count four shall be served consecutive to counts one
4    and two.
5         The defendant has credit for time served of
6    148 days.
7         Under our law the defendant has a right to
8    appeal within 45 days.  If the defendant cannot afford
9    an attorney in order to exercise her right to appeal
10   an attorney will be assigned to represent her.  If the
11   attorney does not exercise her right to appeal within
12   45 days then she may be deemed to have waived her right
13   to appeal.
14        Counsel, are there any questions of the
15   Court?
16        MS. PREZIOSO:  No, your Honor.
17        MR. TACOPINA:  No, sir.
18        THE COURT:  All right.  Counsel, thank you
19   for your patience and cooperation.
20        The defendant is remanded to the Department
21   of Corrections at this time.
22        And, ladies and gentlemen, thank you for your
23   patience and cooperation.
24        These proceedings are concluded.
25                      *  *  *

Da276

## NOTICE OF APPEAL

PLEASE PRINT OR TYPE

### SUPERIOR COURT OF NEW JERSEY - APPELLATE DIVISION

TITLE IN FULL (AS CAPTIONED BELOW):

STATE OF NEW JERSEY

-v-

MELANIE MCGUIRE
Defendant

ATTORNEY OR PRO SE LITIGANT

NAME  Stephen Turano

ADDRESS  275 Madison Ave. 35th Fl. NY, NY 10016

TELEPHONE NO.  (212) 905-4900

ATTORNEY FOR  Melanie McGuire
ON APPEAL FROM:

Superior Court, Law Division, Middlesex County

TRIAL COURT OR STATE AGENCY

05-10-164-S and 06-10-00119-S

TRIAL COURT OR AGENCY NUMBER

Hon. Frederick P. DeVesa

TRIAL COURT JUDGE

CIVIL [  ]   CRIMINAL [X]   JUVENILE [  ]

NOTICE IS HEREBY GIVEN THAT Melanie McGuire
APPEALS TO THE SUPERIOR COURT OF NEW JERSEY, APPELLATE DIVISION, FROM THE JUDGMENT [X]
ORDER [  ] STATE AGENCY DECISION [  ] ENTERED IN THIS ACTION ON          July 19, 2007
                                                                                                                      DATE

IF NOT APPEALING THE ENTIRE JUDGMENT, ORDER OR AGENCY DECISION, SPECIFY WHAT PARTS OR
PARAGRAPHS ARE BEING APPEALED.

HAVE ALL ISSUES AS TO ALL PARTIES BEEN DISPOSED OF IN THIS ACTION IN THE TRIAL COURT OR
AGENCY?  (IN CONSOLIDATED ACTIONS, ALL ISSUES AS TO ALL PARTIES IN ALL ACTIONS MUST HAVE BEEN
DISPOSED OF.)  YES [X]   NO [  ]

IF NOT, HAS THE ORDER BEEN CERTIFIED AS FINAL PURSUANT TO R. 4:42-2?  YES [  ]   NO [  ]

IN CRIMINAL, QUASI-CRIMINAL AND JUVENILE ACTIONS:

GIVE A CONCISE STATEMENT OF THE OFFENSE AND OF THE JUDGMENT, DATE ENTERED AND
ANY SENTENCE OR DISPOSITION IMPOSED.

Defendant McGuire found guilty by jury on April 23, 2007 of murder, 2C:1-3; desecrating human remains,
2C:22-2; perjury, 2C:28-1; and possessing a firearm for an unlawful purpose, 2C:39-4A.  Sentenced to life
in prison on July 19, 2007.

IS DEFENDANT INCARCERATED?  YES [X]   NO [  ]

WAS BAIL GRANTED OR THE SENTENCE OR DISPOSITION STAYED?  YES [  ]   NO [X]

IF IN CUSTODY, GIVE THE PLACE OF CONFINEMENT.

Edna Mahn Correctional Facility for Women.

Revised 04/2001, CN 10502-English                    (Page 1 of 2)

Da277

ATTACH ADDITIONAL SHEETS IF NECESSARY

NOTICE OF APPEAL AND ANNEXED CASE INFORMATION STATEMENT HAVE  BEEN SERVED ON:

| | NAME | DATE OF SERVICE |
|---|---|---|
| TRIAL COURT JUDGE | Hon. Frederick P. DeVesa | 08/22/07 |
| TRIAL COURT CLERK OR STATE AGENCY | James J.Murray, Superior Court, Middlesex County | 08/22/07 |
| ATTORNEY GENERAL OR ATTORNEY FOR OTHER GOVERNMENTAL BODY PURSUANT TO R. 2:5-1(a), (e) or (h) | Appellate Bureau, New Jersey Division of Criminal Justice | 08/22/07 |

OTHER PARTIES:

| NAME AND DESIGNATION | ATTORNEY NAME, ADDRESS AND TELEPHONE NO. | DATE OF SERVICE |
|---|---|---|
| Assistant Attorney General | Patricia Prezioso, One Apollo Drive, Whippany, N.J. (973) 599-5900 | 08/22/07 |
| Deputy Attorney General | Christopher Romanyshyn, One Apollo Drive, Whippany, N.J. (973) 599-5900 | 08/22/07 |

ANNEXED TRANSCRIPT REQUEST FORM HAS BEEN SERVED ON:

| | NAME | DATE OF SERVICE | AMOUNT OF DEPOSIT |
|---|---|---|---|
| COURT REPORTER'S SUPERVISOR, CLERK OF COURT OR AGENCY | | | |
| COURT REPORTER | | | |

EXEMPT FROM ANNEXING THE TRANSCRIPT REQUEST FORM DUE TO THE FOLLOWING:

[  ] NO VERBATIM RECORD.

[  ] TRANSCRIPT IN POSSESSION OF ATTORNEY OR PRO SE LITIGANT, (FOUR COPIES,  ALONG WITH THE COMPUTER DISKETTE FROM THE TRANSCRIPT PREPARER,  MUST BE SUBMITTED.) LIST THE DATE(S) OF THE TRIAL OR HEARING.

[  ] MOTION FOR ABBREVIATION OF TRANSCRIPT FILED WITH THE COURT OR AGENCY BELOW.

[X] MOTION FOR FREE TRANSCRIPT FILED WITH THE COURT BELOW.

I CERTIFY THAT THE FOREGOING STATEMENTS ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF. I ALSO CERTIFY THAT, UNLESS EXEMPT, THE FILING FEE REQUIRED BY N.J.S.A. 22A:2 HAS BEEN PAID.

| August 22, 2007 | |
|---|---|
| DATE | SIGNATURE OF ATTORNEY OR PRO SE LITIGANT |

AD-9(Elec)
4/01

Revised 04/2001, CN 10502-English

(Page 2 of 2)

Da278

**APPELLATE DIVISION CRIMINAL CASE INFORMATION STATEMENT, DATED AUGUST 22, 2007**

**CRIMINAL CASE INFORMATION STATEMENT**
[For use in Criminal, Quasi-Criminal and Juvenile Actions]

| TITLE IN FULL: | SUPERIOR COURT OF NEW JERSEY |
|---|---|
| STATE OF NEW JERSEY | APPELLATE DIVISION |
| -v- | DOCKET NO.: 05-10-164-S; 06-10-119-S |
| MELANIE MCGUIRE | |

**APPELLANT'S ATTORNEY:**

| NAME | ADDRESS | TELEPHONE | CLIENT |
|---|---|---|---|
| Stephen Turano | 275 Madison Avenue 35th Floor New York, New York 10016 | (212) 905-4900 | Melanie McGuire |
| Joseph Tacopina | 275 Madison Avenue 35th Floor New York, New York 10016 | | |

**RESPONDENT'S ATTORNEY:**

| NAME | ADDRESS | TELEPHONE | CLIENT |
|---|---|---|---|
| Attorney General Appellate Bureau | Hughes Justice Complex 25 Market Street PO Box 085 Trenton, New Jersey 08625 | | State of New Jersey |

**GIVE DATE AND SUMMARY OF JUDGMENT OR ORDER BEING APPEALED AND ATTACH A COPY:**

On July 19, 2007, McGuire sentenced to life in prison after a jury verdict convicting her of Murder, 2C:1-3; Desecration of Human Remains, 2C:22-1; Perjury, 2C:28-1; and Possessing a Firearm for an Unlawful Purpose, 2C:39-4A. McGuire is appealing her conviction and sentence.

Are there any issues below in this action involving defendant
which have not been disposed of?          Yes_____   No _X_
(If so, leave to appeal must be sought. R. 2:2-4, 2:5-6)
Is the validity of a statute, regulation, executive order, franchise or
constitutional provision of this State being questioned? (R. 2:5-1(h))   Yes _X_   No _____

Is defendant presently confined?          Yes _X_   No _____
If not, is defendant on bail?          Yes _____   No _____
Provide any State Bureau of Identification (SBI) number.

Will the issue(s) in this appeal involve only whether the trial
court imposed a proper sentence?          Yes _____   No _X_
If so, briefs shall not be filed without leave of court. (R. 2:9-11)

Are there co-defendants?          Yes _____   No _X_
If so, state their names and whether they were tried with the defendant
or shared any pretrial motion.

**GIVE A BRIEF STATEMENT OF THE FACTS AND PROCEDURAL HISTORY:**

-10/11/2005, Indictment 05-10-00164-S, McGuire charged with Murder (1st Degree), Desecration of Human Remains (2nd Degree), Possession of a Firearm (2nd Degree), and Perjury (3rd Degree)
-10/26/2005, Indictment 06-10-00119-S, McGuire charged with two counts of Hindering Prosecution (3rd Degree), Tampering with or Fabricating Physical Evidence (4th Degree), False Reports to Law Enforcement Officials (4th Degree), and four counts of Possession of a Controlled Dangerous Substance (3rd Degree)
-04/23/2007, after a seven week jury trial, McGuire convicted of all charges in Indictment 05-10-00164-S and acquitted of all charges in Indictment 06-10-00119-S ---- 07/19/2007 Honorable Frederick P. DeVesa sentenced McGuire to life in prison.

**(OVER)**

Da279

TO THE EXTENT POSSIBLE, LIST THE PROPOSED ISSUES TO BE RAISED ON THIS APPEAL AS THEY WILL BE DESCRIBED IN APPROPRIATE POINT HEADINGS PURSUANT TO R. 2:6-2(a)(5). (Appellant or cross-appellant only.)

1. Whether the jury's exposure to outside influences during deliberartion, including prejudicial media coverage, resulted in juror misconduct.
2. Whether the trial court had territorial jurisdiction in this matter.
3. Whether the jury's verdict was supported by the weight of the evidence.
4. Whether prosecutorial misconduct, including failure to disclose to the defense Brady material, requires a new trial.
5. Whether the trial court erred in charging the jury that McGuire could be found guilty of murder and the other charges, as either an accomplice or principal.

IF YOU ARE APPEALING FROM A JUDGMENT ENTERED BY A TRIAL JUDGE SITTING WITHOUT A JURY OR FROM AN ORDER OF THE TRIAL COURT, COMPLETE THE FOLLOWING:

1. **Did the trial judge issue oral findings or opinion?**        Yes _____   No _____
   If so, on what date?

2. **Did the trial judge issue written findings or opinion?**     Yes _____   No _____
   If so, on what date?

Caution: Before you indicate that there was neither an opinion nor findings, you should inquire of the trial judge to determine whether findings or an opinion was placed on the record out of counsel's presence or whether the judge will be filing a statement or opinion pursuant to R. 2:5-1(b).
Date of your inquiry: _____

Will the trial judge be filing a statement or opinion pursuant to R. 2:5-1(b)?  Yes _____     No _____

1. IS THERE ANY CASE NOW PENDING OR ABOUT TO BE BROUGHT BEFORE THIS COURT WHICH:

   (A) Arises from substantially the same case or controversy as this appeal?        Yes _____   No  X

   (B) Involves an issue that is substantially the same, similar or related to an issue in this appeal?        Yes _____   No  X

2. WAS THERE ANY PRIOR APPEAL INVOLVING THIS CASE OR CONTROVERSY?        Yes _____   No  X

IF THE ANSWER TO EITHER 1 OR 2 ABOVE IS YES, STATE:

   Case Name:                                    Appellate Division Docket Number:

Melanie McGuire                                  Stephen Turano, Esq.
_____                  _____
    Name of Appellant or Respondent                  Name of Counsel of Record

August 22, 2007                                  _____
_____                      Signature of Counsel of Record
            Date
AD-8
5/00

## TRIAL EXHIBIT S-231: BUREAU OF ALCOHOL, TOBACCO, AND FIREARMS, FIREARM PURCHASE APPLICATION, DATED APRIL 26, 2004

**A | INSTRUCTIONS**

1. TRANSFEREE/PURCHASER - COMPLETE SECTION B AT TIME OF APPLICATION.
LICENSEE/SELLER - COMPLETE SECTION C AT TIME OF SALE OR TRANSFER.
TRANSFEROR/SELLER - COMPLETE BLOCKS 1, 3 AND 4, AND SECTIONS D AND E.
FOR PRIVATE SALES ONLY COMPLETE SECTION F.

**2. TRANSACTION SERIAL NO.** 1181702

**3. STATE IDENTIFICATION NO.**

**4. APPROVAL NO./DATE** 3077663 04 26 2004

**TRANSACTION SUBJECT TO SALES TAX** ☒ YES ☐ NO

**B | TRANSFEREE'S/PURCHASER'S INFORMATION**

| 5. LAST NAME | 6. JR ETC | 7. FIRST NAME | 8. MIDDLE NAME | 9. DATE OF BIRTH |
|---|---|---|---|---|
| McGUIRE | N/A | CATHERINE | LYN | |

| 11. SEX | 12. RACE | 13. EYE COLOR | 14. HAIR COLOR | 15. HEIGHT | 16. WEIGHT | 17. SOCIAL SECURITY NO. | 18. COUNTY OF RESIDENCE |
|---|---|---|---|---|---|---|---|
| F | W | brown | brown | 5'5" | | 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 | Monroe |

| 19. STREET ADDRESS | 20. CITY | 21. STATE | |
|---|---|---|---|
| 63 PINE CREEK ESTATES | E STROUDSBURG | PA | |

| 23. PA PHOTO IDENT/DRIVER LICENSE NUMBER | 24. EMPLOYER/SCHOOL NAME/ADDRESS | 25. OCCUPATION |
|---|---|---|
| 27 460 866 | RMA of New Jersey | Registered Nurse |

| 26. STREET ADDRESS | 27. CITY | 28. STATE | 29. ZIP CODE |
|---|---|---|---|
| 115 Gethsulk | Stroudsburg | PA | |

30. ARE YOU A UNITED STATES CITIZEN? IF NO, COUNTRY OF BIRTH:
COUNTRY OF CITIZENSHIP: ☒ YES ☐ NO

31. HAVE YOU EVER BEEN CONVICTED OF A CRIME ENUMERATED IN SECTION 6105 (b), OR DO ANY OF THE CONDITIONS UNDER 18 U.S.C. 922 (g), 6105 (c) APPLY TO YOU? (READ INFORMATION ON BACK PRIOR TO ANSWERING) ☐ YES ☒ NO

32. ARE YOU NOW CHARGED WITH, OR HAVE YOU EVER BEEN CONVICTED OF A CRIME PUNISHABLE BY IMPRISONMENT FOR A TERM EXCEEDING ONE YEAR? ☐ YES ☒ NO

33. I verify the facts that I have set forth in blocks 5-30 of this form are true and correct to the best of my knowledge, information and belief...

**SIGNATURE OF TRANSFEREE/PURCHASER:** *[signature]*   **DATE OF APPLICATION:** 26 APR 04

**C | ACKNOWLEDGMENT**

34. I ACKNOWLEDGE RECEIPT OF THE FIREARM (HANDGUN/LONG-GUN) AND A SUMMARY OF THE UNIFORM FIREARMS ACT WHICH INCLUDES A SAFETY BROCHURE.

**SIGNATURE OF TRANSFEREE/PURCHASER:** *[signature]*   **DATE:** 26 APR 04

**D | LICENSEE/SHERIFF'S INFORMATION**

| 35. LAST NAME | 36. JR. ETC. | 37. FIRST NAME | 38. MIDDLE NAME | 39. SIGNATURE |
|---|---|---|---|---|
| Coscia | N/A | John | N/A | |

| 40. BUSINESS NAME/SHERIFF'S DEPARTMENT | 41. BUSINESS TELEPHONE NO. | 42. COUNTY OF LICENSEE/SHERIFF |
|---|---|---|
| John Coscia's Gun Tackle | (610) 253-1111 | Northampton |

| 43. BUSINESS ADDRESS | 44. CITY | 45. STATE | 46. ZIP CODE |
|---|---|---|---|
| 2604 Freemansburg Ave | Easton | PA | 18045 |

| 47. DATE OF TRANSACTION |
|---|
| 04/26/2004 |

**E | FIREARM INFORMATION**

49. DOES THIS PURCHASE INVOLVE A PISTOL OR REVOLVER WITH A BARREL LENGTH OF LESS THAN 15 INCHES, A SHOTGUN WITH A BARREL LENGTH OF LESS THAN 18 INCHES, A RIFLE WITH A BARREL LENGTH OF LESS THAN 16 INCHES, OR A FIREARM WITH AN OVERALL LENGTH OF LESS THAN 26 INCHES? ☐ YES ☐ NO (INFORMATION NOT REQUIRED)

| 50. MAKE | 51. MODEL | 52. CALIBER | 53. LENGTH OF BARREL | 54. SERIAL NUMBER |
|---|---|---|---|---|
| Taurus | 85 | 38 | 2 | XA53389 |

**F | TRANSFEROR'S/SELLER'S INFORMATION FOR PRIVATE SALE ONLY**

| 55. NAME | 56. JR. ETC. | 57. FIRST NAME | 58. MIDDLE NAME | 59. SIGNATURE |
|---|---|---|---|---|
| | | | | |

| 60. STREET ADDRESS | 61. CITY | 62. COUNTY/STATE | 63. ZIP CODE |
|---|---|---|---|
| | | | |

C31156

FIRST COPY - LICENSEE/SHERIFF

Da281

X-13   D-28

OMB NO. 1512-0129

**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
**FIREARMS TRANSACTION RECORD PART I - OVER-THE-COUNTER**

Transferor's Transaction Serial Number

12676

**WARNING:** You may not receive a firearm if prohibited by Federal or State Law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm. Prepare in original only. All entries must be in ink. Read the Important Notices, Instructions and Definitions on this form.

### Section A - Must Be Completed Personally By Transferee (Buyer)

| 1. Transferee's Full Name *(Last, First, Middle)* | 2. Residence Address *(No., Street, City, County, State, ZIP Code; cannot be a post office box)* |
|---|---|
| MCGUIRE, MELANIE, L | 63 Pine Creek Estates East Stroudsburg PA 18301 |

| 3. Place of Birth *(City, State or foreign country)* | 4. Height | 5. ☐ Male ☒ Female | 6. Birth Date | 7. Social Security Number *(Optional, but will help prevent misidentification)* |
|---|---|---|---|---|
| Ridgewood, NJ | 5'5" Weight 120 | | Month 10 Day 08 Year A72 | 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 |

8. Race (Ethnicity) (Check one or more boxes)

☐ American Indian or Alaska Native    ☐ Black or African American    ☐ Native Hawaiian or Other Pacific Islander

☐ Hispanic or Latino    ☐ Asian    ☒ White

9. What is your State of residence (if any)? **PA** (See Definition 5. If you are not a citizen of the United States, you have a State of residence only if you have resided in a State for at least 90 days prior to the date of this sale.)

10. What is your country of citizenship? (List more than one, if applicable.) **USA**

11. If you are not a citizen of the United States, what is your INS-issued alien number or admission number?

### Certification Of Transferee

12. Answer questions 12a through 12l by writing "yes" or "no" in the boxes to the right of the questions.

| | | |
|---|---|---|
| a. | Are you the actual buyer of the firearm(s) listed on this form? **Warning:** You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you. (See Important Notice 1 for actual buyer definition and examples.) | YES |
| b. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? (An information is a formal accusation of a crime by a prosecutor. See Definition 3.) | NO |
| c. | Have you been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? (See Important Notice 6, Exception 1.) | NO |
| d. | Are you a fugitive from justice? | NO |
| e. | Are you an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance? | NO |
| f. | Have you ever been adjudicated mentally defective (which includes having been adjudicated incompetent to manage your own affairs) or have you ever been committed to a mental institution? | NO |
| g. | Have you been discharged from the Armed Forces under dishonorable conditions? | NO |
| h. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? (See Important Notice 7.) | NO |
| i. | Have you been convicted in any court of a misdemeanor crime of domestic violence? (See Important Notice 6, Exception 1 and Definition 4.) | NO |
| j. | Have you ever renounced your United States citizenship? | NO |
| k. | Are you an alien illegally in the United States? | NO |
| l. | Are you a nonimmigrant alien? (See Definition 6.) | NO |

13. If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in Important Notice 6, Exception 2?

Yes ☐   No ☐   Not applicable ☒   (If "yes," the licensee must complete question 18c.)

I certify that the above answers are true and correct. I understand that answering "yes" to question 12a when I am not the actual buyer of the firearm is a crime punishable as a felony. I understand that a person who answers "yes" to any of the questions 12b through 12k is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 12l is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 13. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law. (See Important Notice 8.)

| 14. Transferee's Signature | | 15. Date |
|---|---|---|
| *[signature]* | 031157 | 26 APR 04 |

ATF F 4473 (5300.9) PART I (10-2001)   PREVIOUS EDITIONS ARE OBSOLETE

**Section B - Must Be Completed By Transferor (Seller)**

16. Type of firearm(s) to be transferred:

☒ Handgun  ☐ Long Gun  ☐ Both

17. Location of sale if at a gun show. *(See Instruction to Transferor 13.)*

_____

(city, state)

Type of Identification *(e.g., driver's license or other valid government- issued photo identification.)*: Drivers

Number on identification: 2746 0866

Expiration Date of Identification *(if any)* 10-9-05 *(See Instruction to Transferor 1.)*

18b. Aliens only. Types and dates of additional required identification *(e.g., utility bills or lease agreements. See Instruction to Transferor 2.)*

18c. Nonimmigrant aliens only. Type of documentation showing an exception to the nonimmigrant alien prohibition *(e.g., hunting license/permit; waiver. See Instruction to Transferor 3.)*

**Question 19, 20, or 21 Must Be Completed Prior To The Transfer Of The Firearm(s) (See Instructions to Transferor 5-7)**

19a. The transferee's identifying information in Section A of this form was transmitted to NICS or the appropriate state agency on: 4-26-04 *(Date)*.

19b. The NICS or state transaction number *(if provided)* was: 307663

19c. The response initially provided by NICS or the appropriate state agency was:

☒ Proceed  ☐ Denied  ☐ Delayed

19d. If initial NICS or state response was "Delayed," the following response was received from NICS or the appropriate state agency on _____ *(Date)*

☐ Proceed  ☐ Denied  ☐ No resolution was provided within 3 business days.

19e. The name and Brady identification number of the NICS examiner *(if provided - optional)*.

_____ *(name)*  _____ *(number)*

20. ☐ No NICS check was required because the transfer involved only NFA firearm(s). *(See Instruction to Transferor 7.)*

21. ☐ No NICS check was required because the buyer has a valid permit which qualifies as an exemption to NICS - *(See Instruction to Transferor)*

State Permit Type: _____  Date of Issuance _____

Expiration Date *(if any)* _____  Permit Number _____

**Section C**

If the transfer of the firearm(s) takes place on a different day from the date that the transferee signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s). *(See Instruction to Transferee 3 & Instruction to Transferor 8.)*

I certify that the answers I provided to the questions in Section A of this form are still true and correct.

22. Transferee's Signature

23. Date

**Section D**

| 24. Manufacturer and/or Importer | 25. Model | 26. Serial Number | 27. Type *(pistol, revolver, rifle, shotgun, etc.)* | 28. Caliber or Gauge |
|---|---|---|---|---|
| Taurus | 85 | XA53389 | Revolver | 38 spec |

**Complete ATF F 3310.4 For Multiple Purchases Of Handguns (See Instruction to Transferor 11.)**

29. Trade/corporate name and address of transferor *(Hand stamp may be used.)*

JOHN'S GUN & TACKLE ROOM
2604 Freemansburg Ave.
Easton PA 18045-6089

30. Federal Firearms License Number *(Hand stamp may be used.)*

8-23-095-01-5D-06495

On the basis of (1) the statements in Section A; (2) my verification of identity noted in question 18a and my verification again at the time of transfer *(if the transfer does not occur on the same day the verification was noted in question 18a)*; and (3) the information in the current State Laws and published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

**The Person Actually Transferring The Firearm(s) Must Complete Questions 31-34.**

| 31. Transferor's Name *(Please print)* | 32. Transferor's Signature | 33. Transferor's Title | 34. Date Transfer is completed |
|---|---|---|---|
| John Casaro | _____  031158 | Owner | 4-26-04 |

*U.S. Government Printing Office: 2003—495-853/65081

ATF F 4473 (5300.9) PART I (10-2001)

Da283

**TRIAL EXHIBIT S-232: RECEIPT FROM JOHN'S GUN & TACKLE ROOM, DATED APRIL 26, 2004**

**TRIAL EXHIBIT D340: STATEMENTS FROM FIRST SAVINGS BANK**

# First Savings Bank

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

```
    7      WILLIAM  MCGUIRE OR                    Statement Date:    01/10/04
   Trnc     MELANIE L MCGUIRE
            2902 PLAZA DR                         Account Number:    18006454
            WOODBRIDGE NJ 07095
```

```
********************** Checking Account   18006454 **********************
All Transactions by Date
  Date Description                                    Amount        Balance
  12/10 Balance Forward ------------------------------------->       5,852.39
  12/15 POS Purchase    SHOPRITE #522                 153.98-        5,698.41
        877 GEORGE AVE           WOODBRIDGE    NJ
        Seq#56007675     Date 12/14/03 Time 12:51
  12/15 AMERICAN EXPRESS ELEC REMIT                 1,000.00-        4,698.41
  12/15 Check Number      441                         200.00-        4,498.41
  12/15 Check Number      442                         625.00-        3,873.41
  12/19 RMA OF NEW JERSE PAYROLL                    1,756.33         5,629.74
  12/29 Check Number      444                         417.73-        5,212.01
  12/30 Check Number      443                          99.71-        5,112.30
  01/02 RMA OF NEW JERSE PAYROLL                    1,644.55         6,756.85
  01/02 TIAA-CREF LOAN    LOAN REPAY                  579.89-        6,176.96
  01/06 PROVIDIAN PAYMT   CREDITCARD                  250.00-        5,926.96
  01/06 Check Number      446                       1,246.00-        4,680.96
  01/08 POS Purchase    TOWN & COUNTRY                 39.20-        4,641.76
        TOWN & COUNTRY WIN       WOODBRIDGE    NJ
        Seq#00777785     Date 1/08/04 Time 17:14
  01/08 Check Number      445                       1,709.90-        2,931.86
  01/09 Check Number      449                         143.07-        2,788.79
  01/10 Interest Paid                                   1.08         2,789.87
```

```
Checks in Order
 Date Number     Amount  Date Number     Amount  Date Number       Amount
 12/15   441     200.00  12/29   444     417.73  01/09   449      143.07*
 12/15   442     625.00  01/08   445   1,709.90
 12/30   443      99.71  01/06   446   1,246.00
   (*) Check Numbers Missing
```

```
Account Summary
Previous Statement Date: 12/10/03
      Beginning            Interest            Service          Ending
       Balance   +  Deposits  + Paid - Withdrawals - Charge   =  Balance
      5,852.39     3,400.88     1.08    6,464.48      .00       2,789.87

Statement from 12/11/03 Thru 01/10/04    Average Stmt Balance     5,107.38
Interest Earned          1.08            *Annual Percentage Yield Earned  0.25%
```

000821

Da285

# First Savings Bank

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

Page 2

WILLIAM  MCGUIRE OR
MELANIE L MCGUIRE
2902 PLAZA DR
WOODBRIDGE NJ 07095

Statement Date:     01/10/04

Account Number:     18006454

*********************** Savings Account    839441 ***********************

| Date | Description | Amount | Balance |
|------|-------------|--------|---------|
| 12/10 | Balance Forward --------------------------------------> | | 37,878.09 |
| 12/11 | ATM Withdrawal   TR2230 | 200.00- | 37,678.09 |
| | 980 AMBOY AVE          EDISON        NJ | | |
| | Seq#00005553      Date 12/11/03 Time 08:23 | | |
| 12/13 | ATM Withdrawal   TR2230 | 200.00- | 37,478.09 |
| | 980 AMBOY AVE          EDISON        NJ | | |
| | Seq#00006037      Date 12/13/03 Time 13:54 | | |
| 12/17 | ATM Deposit      TR2230 | 217.40 | 37,695.49 |
| | 980 AMBOY AVE          EDISON        NJ | | |
| | Seq#00006486      Date 12/17/03 Time 08:18 | | |
| | ATM Withdrawal   TR2230 | 60.00- | 37,635.49 |
| | 980 AMBOY AVE          EDISON        NJ | | |
| | Seq#00006487      Date 12/17/03 Time 08:18 | | |
| 12/18 | ATM Withdrawal   TR2230 | 140.00- | 37,495.49 |
| | 980 AMBOY AVE          EDISON        NJ | | |
| | Seq#00006624      Date 12/18/03 Time 08:17 | | |
| 12/19 | N J INST OF TECH PAYROLL | 1,490.17 | 38,985.66 |
| | Withdrawal | 1,500.00- | 37,485.66 |
| | Deposit | 1,000.00 | 38,485.66 |
| 12/20 | Withdrawal | 500.00- | 37,985.66 |
| 12/22 | ATM Withdrawal   PD9108 | 231.85- | 37,753.81 |
| | MENLO PARK 3 9300      EDISON        NJ | | |
| | Seq#00003972      Date 12/21/03 Time 20:16 | | |
| | Withdrawal | 500.00- | 37,253.81 |
| 12/29 | Interest Paid | 31.79 | 37,285.60 |
| | ATM Withdrawal   TR2231 | 220.00- | 37,065.60 |
| | LAFAYETTE ROAD & FORD A FORDS      NJ | | |
| | Seq#00000542      Date 12/27/03 Time 20:14 | | |
| 01/02 | ATM Withdrawal   TR7582 | 200.00- | 36,865.60 |
| | 1000 WOODBRIDGE CENTER  WOODBRIDGE   NJ | | |
| | Seq#00002495      Date 1/01/04 Time 18:19 | | |
| | ATM Deposit      TR7582 | 217.20 | 37,082.80 |
| | 1000 WOODBRIDGE CENTER  WOODBRIDGE   NJ | | |
| | Seq#00002496      Date 1/01/04 Time 18:21 | | |
| | N J INST OF TECH PAYROLL | 1,642.82 | 38,725.62 |

000822

Da286

# First Savings Bank

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

Page
3

WILLIAM MCGUIRE OR
MELANIE L MCGUIRE
2902 PLAZA DR
WOODBRIDGE NJ 07095

Statement Date:     01/10/04

Account Number:     18006454

```
************************* Savings Account     839441 *************************
   Date_Description_                                      Amount_____Balance
          Balance Forward from Previous Page -------------->      38,725.62
   01/05 ATM Withdrawal  TR2230                        220.00-       38,505.62
          980 AMBOY AVE          EDISON        NJ
          Seq#00009346     Date 1/04/04 Time 10:43
   01/06 ATM Withdrawal  TR7582                        100.00-       38,405.62
          1000 WOODBRIDGE CENTER  WOODBRIDGE   NJ
          Seq#00002790     Date 1/06/04 Time 16:12
   01/07 PAYMENT TO LOAN :  IL 0005107388             492.09-       37,913.53
   01/08 ATM Withdrawal  TR2230                        100.00-       37,813.53
          980 AMBOY AVE          EDISON        NJ
          Seq#00009839     Date 1/08/04 Time 09:13
```

```
 Interest Rate Summary
   DATE  0-       $249          $9,999        $24,999       $49,999      and up
  12/11   0.00000%      0.55000%      0.80000%      1.00000%     1.14000%
```

```
Previous Statement Date: 12/10/03
      Beginning                Interest                 Service          Ending
      Balance   +  Deposits  + Paid   - Deductions - Charge    =      Balance
      37,878.09    4,567.59    31.79    4,663.94      .00             37,813.53
```

```
Statement from 12/11/03 thru 01/10/04    Average Stmt Balance       37,685.24
Interest Earned          31.98    *Annual Percentage Yield Earned    1.00%
```

```
**************Summary of Deposit Accounts **************************************
AP    ACCOUNT                 BALANCE INT-RATE%   YTD-INT YTD-PENALTY  MATURITY
CK   18006454                2,789.87   .250       1.08
SV     839441               37,813.53  1.000
```

000823

# First Savings Bank

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

```
19      WILLIAM  MCGUIRE OR                    Statement Date:      02/10/04
Trnc    MELANIE L MCGUIRE
        2902 PLAZA DR                          Account Number:      18006454
        WOODBRIDGE NJ 07095
```

```
*********************** Checking Account   18006454 ***********************
All Transactions by Date
 Date_Description_____Amount_____Balance
01/10 Balance Forward ------------------------------------>    2,789.87
01/12 Check Number         447               222.99-          2,566.88
01/12 Check Number         448               350.00-          2,216.88
01/14 AMERICAN EXPRESS ELEC REMIT          1,000.00-          1,216.88
01/15 IB  TFR From 00-0000839441 WW0001438 15,000.00         16,216.88
      FSB Online
      Seq#00046312     Date  1/15/04 Time 10:21
01/16 RMA OF NEW JERSE PAYROLL             1,644.55          17,861.43
01/20 ATM Withdrawal  AH0463                  61.50-         17,799.93
      RT 9 S/B 1 HESS PL     WOODBRIDGE     NJ
      Seq#00001229     Date  1/18/04 Time 11:51
01/22 Check Number         457                45.00-         17,754.93
01/22 Check Number         451               102.74-         17,652.19
01/23 Check Number         451            15,000.00-          2,652.19
01/26 Check Number         450                50.39-          2,601.80
01/26 Check Number         455               110.00-          2,491.80
01/26 Check Number         456               110.00-          2,381.80
01/26 Check Number         454               225.00-          2,156.80
01/28 Check Number         452                92.07-          2,064.73
01/29 IB  TFR From 00-0000839441 WW0001438 15,000.00         17,064.73
      FSB Online
      Seq#00046401     Date  1/29/04 Time 10:49
01/30 RMA OF NEW JERSE PAYROLL             1,748.66          18,813.39
01/30 Check Number         459               100.00-         18,713.39
01/31 IB  TFR From 00-0000839441 WW0001438  7,000.00         25,713.39
      FSB Online
      Seq#00068086     Date  1/30/04 Time 22:40
02/02 Check Number         460            15,500.00-         10,213.39
02/03 PROVIDIAN PAYMT  CREDITCARD            350.00-          9,863.39
02/03 Check Number         458               784.00-          9,079.39
02/04 Check Number         465             5,000.00-          4,079.39
02/05 US DEPT OF EDUC  DOED                  350.00-          3,729.39
02/06 Check Number         461               103.15-          3,626.24
02/06 Check Number         464             1,271.10-          2,355.14
02/06 Check Number         462             1,725.00-            630.14
02/09 Check Number         465                89.00-            541.14
           ------ Continued on next page ------
```

000824

Da288

# First Savings Bank

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

Page 2

WILLIAM  MCGUIRE OR
MELANIE L MCGUIRE
2902 PLAZA DR
WOODBRIDGE NJ 07095

Statement Date:      02/10/04

Account Number:     18006454

```
************************ Checking Account   18006454 ************************
    Date_Description_____Amount_____Balance
         Balance Forward from Previous Page --------------->      541.14
02/10 POS Purchase    A & P #760              36.91-          504.23
      1185 AMBOY AVENUE        EDISON       NJ
      Seq#56062700    Date  2/10/04 Time 17:57
02/10 Check Number        463                350.00-         154.23
02/10 Interest Paid                            1.92          156.15

Checks in Order
   Date_Number        Amount  Date_Number        Amount  Date_Number        Amount
01/12    447       222.99 01/26    455       110.00 02/06    462     1,725.00
01/12    448       350.00 01/26    456       110.00 02/10    463       350.00
01/26    450        50.39 01/22    457        45.00 02/06    464     1,271.10
01/22    451       102.74 02/03    458       784.00 02/04    465     5,000.00
01/23    451    15,000.00 01/30    459       100.00 02/09    465        89.00*
01/28    452        92.07 02/02    460    15,500.00
01/26    454       225.00 02/06    461       103.15
     (*) Check Numbers Missing

Account Summary
Previous Statement Date: 01/10/04
      Beginning              Interest             Service              Ending
      Balance   +  Deposits + Paid - Withdrawals - Charge   =        Balance
      2,789.87    40,393.21   1.92   43,028.85      .00               156.15

Statement from 01/11/04 Thru 02/10/04    Average Stmt Balance      9,051.04
Interest Earned     1.92                 *Annual Percentage Yield Earned  0.25%

************************ Savings Account   839441 ************************
    Date_Description_____Amount_____Balance
01/10 Balance Forward -------------------------------------->    37,813.53
01/12 ATM Withdrawal   TR7582                220.00-         37,593.53
      1000 WOODBRIDGE CENTER  WOODBRIDGE    NJ
      Seq#00003063    Date  1/11/04 Time 09:22
      ATM Withdrawal   TR2230                 20.00-         37,573.53
      980 AMBOY AVE           EDISON        NJ
      Seq#00000377    Date  1/11/04 Time 15:33
```

000825

Da289

# First Savings Bank

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

Page 3

WILLIAM  MCGUIRE OR
MELANIE L MCGUIRE
2902 PLAZA DR
WOODBRIDGE NJ 07095

Statement Date:     02/10/04

Account Number:     18006454

************************* Savings Account     839441 *************************

| Date | Description | Amount | Balance |
|------|-------------|--------|---------|
| | Balance Forward from Previous Page --------------> | | 37,573.53 |
| 01/13 | ATM Withdrawal   TR2230 | 200.00- | 37,373.53 |
| | 980 AMBOY AVE               EDISON          NJ | | |
| | Seq#00000539     Date  1/13/04 Time 08:00 | | |
| | ATM Withdrawal   TR2230 | 20.00- | 37,353.53 |
| | 980 AMBOY AVE               EDISON          NJ | | |
| | Seq#00000543     Date  1/13/04 Time 08:17 | | |
| 01/15 | IB  TFR To 10-0018006454 WW00014387 | 15,000.00- | 22,353.53 |
| | FSB Online | | |
| | Seq#00046312     Date  1/15/04 Time 10:21 | | |
| 01/16 | N J INST OF TECH PAYROLL | 1,643.22 | 23,996.75 |
| 01/20 | ATM Withdrawal   TR7582 | 240.00- | 23,756.75 |
| | 1000 WOODBRIDGE CENTER  WOODBRIDGE    NJ | | |
| | Seq#00003498     Date  1/17/04 Time 16:03 | | |
| | ATM Withdrawal   TR7582 | 200.00- | 23,556.75 |
| | 1000 WOODBRIDGE CENTER  WOODBRIDGE    NJ | | |
| | Seq#00003524     Date  1/18/04 Time 10:54 | | |
| 01/21 | ATM Withdrawal   TR2230 | 100.00- | 23,456.75 |
| | 980 AMBOY AVE               EDISON          NJ | | |
| | Seq#00001660     Date  1/21/04 Time 08:16 | | |
| 01/24 | ATM Withdrawal   TR2230 | 60.00- | 23,396.75 |
| | 980 AMBOY AVE               EDISON          NJ | | |
| | Seq#00002249     Date  1/24/04 Time 14:14 | | |
| 01/26 | ATM Withdrawal   TR2231 | 60.00- | 23,336.75 |
| | LAFAYETTE ROAD & FORD A FORDS          NJ | | |
| | Seq#00004878     Date  1/24/04 Time 17:57 | | |
| | ATM Withdrawal   TR2230 | 260.00- | 23,076.75 |
| | 980 AMBOY AVE               EDISON          NJ | | |
| | Seq#00002354     Date  1/25/04 Time 11:04 | | |
| 01/27 | ATM Withdrawal   TR2231 | 100.00- | 22,976.75 |
| | LAFAYETTE ROAD & FORD A FORDS          NJ | | |
| | Seq#00005258     Date  1/27/04 Time 16:12 | | |
| | ATM Withdrawal   TR2231 | 100.00- | 22,876.75 |
| | LAFAYETTE ROAD & FORD A FORDS          NJ | | |
| | Seq#00005279     Date  1/27/04 Time 17:49 | | |
| 01/29 | Interest Paid | 23.17 | 22,899.92 |

000826

Da290

# First Savings Bank

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

Page
4

WILLIAM  MCGUIRE OR
MELANIE L MCGUIRE
2902 PLAZA DR
WOODBRIDGE NJ 07095

Statement Date:     02/10/04

Account Number:     18006454

```
*************************** Savings Account      839441 ***************************
Date_Description                                        Amount            Balance
         Balance Forward from Previous Page --------------->              22,899.92
         ATM Withdrawal  TR7582                          80.00-           22,819.92
         1000 WOODBRIDGE CENTER   WOODBRIDGE      NJ
         Seq#00004212     Date  1/29/04 Time 08:57
         IB  TFR To 10-0018006454 WW00014387    15,000.00-                7,819.92
         FSB Online
         Seq#00046401     Date  1/29/04 Time 10:49
01/30 N J INST OF TECH PAYROLL                        1,757.47            9,577.39
01/31 IB  TFR To 10-0018006454 WW00014387            7,000.00-            2,577.39
         FSB Online
         Seq#00068086     Date  1/30/04 Time 22:40
02/02 ATM Withdrawal  TR2230                           200.00-            2,377.39
         980 AMBOY AVE              EDISON      NJ
         Seq#00003270     Date  2/01/04 Time 11:27
02/04 ATM Withdrawal  TR7582                            20.00-            2,357.39
         1000 WOODBRIDGE CENTER   WOODBRIDGE      NJ
         Seq#00004620     Date  2/04/04 Time 06:29
02/05 ATM Withdrawal  TR8594                            41.50-            2,315.89
         ROUTE 4 EAST              PARAMUS      NJ
         Seq#00005735     Date  2/05/04 Time 11:40
02/07 PAYMENT TO LOAN :  IL 0005107388                492.09-            1,823.80
         ATM Withdrawal  TR2231                        200.00-            1,623.80
         LAFAYETTE ROAD & FORD A FORDS      NJ
         Seq#00006973     Date  2/07/04 Time 12:50
02/09 ATM Withdrawal  TR2231                           300.00-            1,323.80
         LAFAYETTE ROAD & FORD A FORDS      NJ
         Seq#00007129     Date  2/08/04 Time 09:56
```

Interest Rate Summary

| DATE | 0-$249 | $9,999 | $24,999 | $49,999 | and up |
|------|--------|--------|---------|---------|--------|
| 01/11 | 0.00000% | 0.55000% | 0.80000% | 1.00000% | 1.14000% |

Previous Statement Date: 01/10/04

| Beginning Balance | + | Interest Deposits | + | Paid | - | Deductions | - | Service Charge | = | Ending Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 37,813.53 | | 3,400.69 | | 23.17 | | 39,913.59 | | .00 | | 1,323.80 |

000827

# First Savings Bank

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

Page
5

WILLIAM  MCGUIRE OR
MELANIE L MCGUIRE
2902 PLAZA DR
WOODBRIDGE NJ 07095

Statement Date:      02/10/04

Account Number:      18006454

************************** Savings Account     839441 **************************

Statement from 01/11/04 thru 02/10/04   Average Stmt Balance      16,713.13
Interest Earned        11.87      *Annual Percentage Yield Earned    0.84%

***************Summary of Deposit Accounts *************************************

| AP | ACCOUNT | BALANCE | INT-RATE% | YTD-INT | YTD-PENALTY | MATURITY |
|----|---------|---------|-----------|---------|-------------|----------|
| CK | 18006454 | 156.15 | .250 | 3.00 | | |
| SV | 839441 | 1,323.80 | .550 | 23.17 | | |

000828

Da292

# First Savings Bank

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

```
12      WILLIAM  MCGUIRE OR
Trnc    MELANIE L MCGUIRE                   Statement Date:      03/10/04
        2902 PLAZA DR
        WOODBRIDGE NJ 07095                 Account Number:      18006454
```

```
*********************** Checking Account    18006454 ***********************
All Transactions by Date
    Date Description                          Amount            Balance
    02/10 Balance Forward -------------------------------------->    156.15
    02/13 RMA OF NEW JERSE PAYROLL            1,554.29          1,710.44
    02/17 POS Purchase    STAPLES #77            74.09-         1,636.35
         801 RTE 1 & GREEN    ISELIN    NJ
         Seq#56012957    Date  2/16/04 Time 19:30
    02/17 AMERICAN EXPRESS ELEC REMIT           600.00-         1,036.35
    02/17 Check Number     466                   20.00-         1,016.35
    02/17 Check Number     467                   89.00-           927.35
    02/18 Check Number     453                   25.00-           902.35
    02/19 POS Purchase    A & P LIQOURS          50.86-           851.49
         45 PEARL ST          METUCHEN    NJ
         Seq#56160952    Date  2/19/04 Time 18:24
    02/20 RMA OF NEW JERSE PAYROLL            2,124.37          2,975.86
    02/20 Check Number     469                  105.00-         2,870.86
    02/20 Check Number    1000                  200.00-         2,670.86
    02/23 POS Purchase    A & P #760            150.00-         2,520.86
         1185 AMBOY AVENUE     EDISON      NJ
         Seq#56261287    Date  2/22/04 Time 11:40
    02/24 Check Number     470                   81.00-         2,439.86
    02/24 Check Number     471                   89.00-         2,350.86
    02/26 ATM Deposit     TR7582              6,500.00          8,850.86
         1000 WOODBRIDGE CENTER  WOODBRIDGE    NJ
         Seq#00006154    Date  2/26/04 Time 06:27
    02/27 RMA OF NEW JERSE PAYROLL            1,714.16         10,565.02
    02/27 Check Number     470                   36.00-        10,529.02
    03/05 PROVIDIAN PAYMT  CREDITCARD           100.00-        10,429.02
    03/05 Check Number     474                1,317.10-         9,111.92
    03/10 ATM Deposit     TR7582             34,457.35         43,569.27
         1000 WOODBRIDGE CENTER  WOODBRIDGE    NJ
         Seq#00007179    Date  3/10/04 Time 15:58
    03/10 Check Number     472                   50.00-        43,519.27
    03/10 Check Number     478                  102.00-        43,417.27
    03/10 Check Number     479                  750.00-        42,667.27
    03/10 Interest Paid                           1.34         42,668.61
```

000829

Da293

# First Savings Bank

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

Page 2

WILLIAM MCGUIRE OR
MELANIE L MCGUIRE
2902 PLAZA DR
WOODBRIDGE NJ 07095

Statement Date:      03/10/04

Account Number:      18006454

```
*********************** Checking Account    18006454 ***********************
Checks in Order
Date_Number_____Amount  Date_Number_____Amount  Date_Number_____Amount
02/18  453      25.00 02/20  469     105.00 03/05  474    1,317.10*
02/17  466      20.00*02/27  470      36.00 03/10  478     102.00*
02/17  467      89.00 02/24  471      89.00 03/10  479     750.00
02/24  468      81.00 03/10  472      50.00 02/20  1000    200.00*
     (*) Check Numbers Missing

Account Summary
Previous Statement Date: 02/10/04
     Beginning                Interest              Service          Ending
      Balance   +   Deposits  + Paid - Withdrawals - Charge    =     Balance
      156.15      46,350.17     1.34   3,839.05       .00         42,668.61

Statement from 02/11/04 Thru 03/10/04    Average Stmt Balance       6,753.49
Interest Earned        1.34             *Annual Percentage Yield Earned  0.25%

*********************** Savings Account    839441 ***********************
  Date_Description_____Amount_____Balance
  02/10 Balance Forward ----------------------------------->      1,323.80
  02/11 ATM Withdrawal   TR2230                     160.00-        1,163.80
        980 AMBOY AVE              EDISON         NJ
        Seq#00004659         Date  2/10/04 Time 20:59
  02/13 N J INST OF TECH PAYROLL                  1,642.81        2,806.61
  02/17 ATM Withdrawal   TR7582                     200.00-        2,606.61
        1000 WOODBRIDGE CENTER   WOODBRIDGE       NJ
        Seq#00005492         Date  2/14/04 Time 18:12
        ATM Withdrawal   NJ222032                   161.00-        2,445.61
        1185 AMBOY ROAD           EDISON,        NJ
        Seq#00179126         Date  2/15/04 Time 12:45
        ATM Withdrawal   TR2230                     100.00-        2,345.61
        980 AMBOY AVE             EDISON         NJ
        Seq#00005541         Date  2/16/04 Time 11:17
  02/21 ATM Withdrawal   TR2230                     200.00-        2,145.61
        980 AMBOY AVE             EDISON         NJ
        Seq#00006316         Date  2/21/04 Time 09:50
```

000830

# First Savings Bank

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

Page 3

WILLIAM  MCGUIRE OR
MELANIE L MCGUIRE
2902 PLAZA DR
WOODBRIDGE NJ 07095

Statement Date:      03/10/04

Account Number:      18006454

```
************************* Savings Account    839441 *************************
Date Description                                    Amount              Balance
         Balance Forward from Previous Page --------------->           2,145.61
02/25 ATM Withdrawal  TR2231                         40.00-            2,105.61
      LAFAYETTE ROAD & FORD A FORDS        NJ
      Seq#00009945    Date 2/24/04 Time 20:44
02/26 ATM Withdrawal  TR7582                         60.00-            2,045.61
      1000 WOODBRIDGE CENTER  WOODBRIDGE   NJ
      Seq#00006155    Date 2/26/04 Time 06:28
02/27 N J INST OF TECH PAYROLL                    1,643.23            3,688.84
02/28 Withdrawal                                    300.00-           3,388.84
03/01 ATM Withdrawal  TR7582                        200.00-           3,188.84
      1000 WOODBRIDGE CENTER  WOODBRIDGE   NJ
      Seq#00006414    Date 2/29/04 Time 11:16
03/08 ATM Withdrawal  TR7582                        200.00-           2,988.84
      1000 WOODBRIDGE CENTER  WOODBRIDGE   NJ
      Seq#00006935    Date 3/06/04 Time 15:42
      ATM Withdrawal  NJ222640                      101.50-           2,887.34
      60 EDWARDS ST            ISELIN,     NJ
      Seq#00267727    Date 3/07/04 Time 09:38
      ATM Withdrawal  TR2231                        260.00-           2,627.34
      LAFAYETTE ROAD & FORD A FORDS        NJ
      Seq#00001917    Date 3/07/04 Time 11:37
      PAYMENT TO LOAN : IL 0005107388              492.09-           2,135.25
```

```
Interest Rate Summary
 DATE  0-        $249       $9,999      $24,999     $49,999     and up
02/11   0.00000%  0.55000%   0.80000%    1.00000%    1.14000%
```

```
Previous Statement Date: 02/10/04
     Beginning                  Interest              Service           Ending
     Balance   +  Deposits  +  Paid  - Deductions  - Charge    =      Balance
     1,323.80     3,286.04      .00    2,474.59       .00            2,135.25
```

```
Statement from 02/11/04 thru 03/10/04     Average Stmt Balance      2,581.53
Interest Earned            1.12           *Annual Percentage Yield Earned   0.55%
```

000831

# First Savings Bank

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

Page
4

WILLIAM  MCGUIRE OR
MELANIE L MCGUIRE
2902 PLAZA DR
WOODBRIDGE NJ 07095

Statement Date:    03/10/04

Account Number:    18006454

```
**************Summary of Deposit Accounts ********************************
AP   ACCOUNT              BALANCE INT-RATE%    YTD-INT YTD-PENALTY  MATURITY
CK   18006454            42,668.61   .250        4.34
SV    839441              2,135.25   .550       23.17
```

000832

# First Savings Bank

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

```
13        WILLIAM  MCGUIRE OR
Trnc      MELANIE L MCGUIRE                    Statement Date:      04/10/04
          2902 PLAZA DR
          WOODBRIDGE NJ 07095                  Account Number:      18006454
```

```
*********************** Checking Account   18006454 ***********************
All Transactions by Date
  Date Description                            Amount            Balance
  03/10 Balance Forward -------------------------------->      42,668.61
  03/11 NUI RAPID PAY    DIRECT PAY            436.39-          42,232.22
  03/11 Check Number        475             1,725.00-          40,507.22
  03/12 RMA OF NEW JERSE PAYROLL             1,714.16          42,221.38
  03/12 POS Purchase     Target 1055 Me         56.65-         42,164.73
        100 Parsonage Road      Edison       NJ
        Seq#00530664     Date  3/12/04 Time 17:48
  03/12 Check Number        477                 84.27-         42,080.46
  03/12 Check Number        480                150.00-         41,930.46
  03/13 Withdrawal                           5,000.00-         36,930.46
  03/15 Check Number        476                260.00-         36,670.46
  03/16 Check Number        473                 75.00-         36,595.46
  03/22 POS Purchase     Target 1055 Me         89.65-         36,505.81
        100 Parsonage Road      Edison       NJ
        Seq#60535593     Date  3/20/04 Time 16:08
  03/25 Check Number        486                512.27-         35,993.54
  03/26 RMA OF NEW JERSE PAYROLL             1,896.48          37,890.02
  03/26 Check Number        484                 89.17-         37,800.85
  03/27 POS Purchase     READY WINE & L         37.25-         37,763.60
        READY WINE & LIQ        ISELIN       NJ
        Seq#00997909     Date  3/26/04 Time 19:33
  03/29 Check Number        481                236.00-         37,527.60
  03/30 Check Number        487                225.00-         37,302.60
  04/01 TIAA-CREF LOAN    LOAN REPAY           578.31-         36,724.29
  04/02 Check Number        488                 89.00-         36,635.29
  04/02 Check Number        483                275.00-         36,360.29
  04/06 ATM Deposit      TR7582              1,937.56          38,297.85
        1000 WOODBRIDGE CENTER  WOODBRIDGE   NJ
        Seq#00008991     Date  4/06/04 Time 17:48
  04/07 HOMESITE INS CO   INS PREM            706.00-          37,591.85
  04/07 DOED TREAS  310   FEDPREAUTH          325.18-          37,266.67
  04/07 Check Number        491             1,775.00-          35,491.67
  04/08 WIRE 1443                           27,566.73          63,058.40
  04/08 WIRE FEE                                10.00-         63,048.40
  04/08 Check Number        493             1,000.00-         62,048.40
  04/09 RMA OF NEW JERSE PAYROLL             1,738.71          63,787.11
```

cc0833

# First Savings Bank

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

Page 2

WILLIAM  MCGUIRE OR
MELANIE L MCGUIRE
2902 PLAZA DR
WOODBRIDGE NJ 07095

Statement Date:      04/10/04

Account Number:      18006454

```
*********************** Checking Account   18006454 ***********************
Date_Description                              Amount              Balance
        Balance Forward from Previous Page --------------->      63,787.11
04/10 Interest Paid                             8.58             63,795.69
```

Checks in Order

| Date | Number | Amount | Date | Number | Amount | Date | Number | Amount |
|---|---|---|---|---|---|---|---|---|
| 03/16 | 473 | 75.00 | 03/29 | 481 | 236.00 | 04/02 | 488 | 89.00 |
| 03/11 | 475 | 1,725.00* | 04/02 | 483 | 275.00* | 04/07 | 491 | 1,775.00* |
| 03/15 | 476 | 260.00 | 03/26 | 484 | 89.17 | 04/08 | 493 | 1,000.00* |
| 03/12 | 477 | 84.27 | 03/25 | 486 | 512.27* | | | |
| 03/12 | 480 | 150.00* | 03/30 | 487 | 225.00 | | | |

(*) Check Numbers Missing

Account Summary
Previous Statement Date: 03/10/04

| Beginning Balance | + | Deposits | Interest + Paid | - Withdrawals | Service - Charge | = | Ending Balance |
|---|---|---|---|---|---|---|---|
| 42,668.61 | | 34,853.64 | 8.58 | 13,735.14 | .00 | | 63,795.69 |

Statement from 03/11/04 Thru 04/10/04    Average Stmt Balance      40,537.03
Interest Earned        8.58     *Annual Percentage Yield Earned    0.25%

```
*********************** Savings Account   839441 ***********************
Date_Description                              Amount              Balance
03/10 Balance Forward -------------------------------------->     2,135.25
03/11 ATM Withdrawal  TR5315                   100.00-           2,035.25
      599 MIDDLESEX AVE      METUCHEN     NJ
      Seq#00005298      Date  3/11/04 Time 16:40
03/12 ATM Withdrawal  TR7582                    80.00-           1,955.25
      1000 WOODBRIDGE CENTER  WOODBRIDGE   NJ
      Seq#00007282      Date  3/11/04 Time 20:50
      N J INST OF TECH PAYROLL              1,612.79            3,568.04
03/15 ATM Withdrawal  TR2230                   260.00-           3,308.04
      980 AMBOY AVE           EDISON       NJ
      Seq#00009791      Date  3/14/04 Time 16:59
03/18 ATM Withdrawal  TR7582                    20.00-           3,288.04
      1000 WOODBRIDGE CENTER  WOODBRIDGE   NJ
      Seq#00007678      Date  3/18/04 Time 07:01
```

000834

# First Savings Bank

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

Page     WILLIAM MCGUIRE OR                    Statement Date:      04/10/04
3        MELANIE L MCGUIRE
         2902 PLAZA DR                         Account Number:     18006454
         WOODBRIDGE NJ 07095

************************ Savings Account    839441 ************************

| Date | Description | Amount | Balance |
|------|-------------|--------|---------|
| | Balance Forward from Previous Page ---------------> | | 3,288.04 |
| | ATM Withdrawal  PN2182 | 41.75- | 3,246.29 |
| | 161 MADISON AVE          MORRISTOWN    NJ | | |
| | Seq#00003498     Date  3/18/04 Time 12:16 | | |
| | Deposit | 10,000.00 | 13,246.29 |
| 03/20 | ATM Withdrawal  TR7582 | 200.00- | 13,046.29 |
| | 1000 WOODBRIDGE CENTER   WOODBRIDGE    NJ | | |
| | Seq#00007871     Date  3/20/04 Time 12:52 | | |
| 03/22 | ATM Withdrawal  TR2231 | 100.00- | 12,946.29 |
| | LAFAYETTE ROAD & FORD A FORDS          NJ | | |
| | Seq#00004322     Date  3/21/04 Time 12:17 | | |
| | ATM Withdrawal  TR7582 | 200.00- | 12,746.29 |
| | 1000 WOODBRIDGE CENTER   WOODBRIDGE    NJ | | |
| | Seq#00007946     Date  3/21/04 Time 14:06 | | |
| 03/25 | ATM Withdrawal  SV7957 | 42.00- | 12,704.29 |
| | 1197 AMBOY AVE 2         EDISON        NJ | | |
| | Seq#00009684     Date  3/24/04 Time 21:25 | | |
| | ATM Withdrawal  LK252107 | 101.00- | 12,603.29 |
| | 3 STEPHENVILLE PAR       EDISON        NJ | | |
| | Seq#00610329     Date  3/25/04 Time 17:18 | | |
| 03/26 | N J INST OF TECH PAYROLL | 1,613.23 | 14,216.52 |
| 03/27 | ATM Withdrawal  TR2230 | 260.00- | 13,956.52 |
| | 980 AMBOY AVE            EDISON        NJ | | |
| | Seq#00001583     Date  3/27/04 Time 09:25 | | |
| 03/29 | Interest Paid | 4.66 | 13,961.18 |
| | ATM Withdrawal  TR2231 | 40.00- | 13,921.18 |
| | LAFAYETTE ROAD & FORD A FORDS          NJ | | |
| | Seq#00005624     Date  3/29/04 Time 16:26 | | |
| 03/30 | ATM Withdrawal  TD005834 | 61.50- | 13,859.68 |
| | 100 Paronage Road        Edison        NJ | | |
| | Seq#00009029     Date  3/29/04 Time 20:58 | | |
| 03/31 | ATM Withdrawal  TR2230 | 20.00- | 13,839.68 |
| | 980 AMBOY AVE            EDISON        NJ | | |
| | Seq#00002298     Date  3/31/04 Time 16:29 | | |
| | ATM Withdrawal  NJ222032 | 41.00- | 13,798.68 |
| | 1185 AMBOY ROAD          EDISON,       NJ | | |
| | Seq#00290805     Date  3/31/04 Time 17:47 | | |

OCF 835

# First Savings Bank

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

Page    WILLIAM  MCGUIRE OR
4       MELANIE L MCGUIRE                    Statement Date:      04/10/04
        2902 PLAZA DR
        WOODBRIDGE NJ 07095                  Account Number:      18006454

```
************************ Savings Account    839441 ************************
Date_Description_____Amount_____Balance
        Balance Forward from Previous Page --------------->      13,798.68
04/03 ATM Withdrawal  748546                       60.00-          13,738.68
      65 JAMES STREET            EDISON        NJ
      Seq#00006168        Date 4/02/04 Time 19:50
      ATM Withdrawal  TR2231                      160.00-          13,578.68
      LAFAYETTE ROAD & FORD A FORDS           NJ
      Seq#00006477     Date  4/03/04 Time 12:29
04/06 ATM Withdrawal  TR7582                       40.00-          13,538.68
      1000 WOODBRIDGE CENTER  WOODBRIDGE     NJ
      Seq#00008992     Date  4/06/04 Time 17:49
04/07 PAYMENT TO LOAN :  IL 0005107388            492.09-          13,046.59
04/09 N J INST OF TECH PAYROLL                  1,622.58           14,669.17
      Withdrawal                               1,000.00-          13,669.17
04/10 ATM Withdrawal  TR7582                      240.00-          13,429.17
      1000 WOODBRIDGE CENTER  WOODBRIDGE     NJ
      Seq#00009274     Date  4/10/04 Time 09:07
```

```
Interest Rate Summary
   DATE      $249            $9,999         $24,999        $49,999       and up
   03/11    0.00000%        0.55000%       0.80000%       1.00000%      1.14000%
```

```
Previous Statement Date: 03/10/04
     Beginning                  Interest              Service            Ending
     Balance   +  Deposits  + Paid - Deductions - Charge    =         Balance
     2,135.25    14,848.60    4.66   3,559.34      .00                13,429.17
```

```
Statement from 03/11/04 thru 04/10/04    Average Stmt Balance        11,124.18
Interest Earned              7.38        *Annual Percentage Yield Earned   0.78%
```

```
*************Summary of Deposit Accounts ************************************
AP    ACCOUNT              BALANCE INT-RATE%    YTD-INT YTD-PENALTY  MATURITY
CK  18006454              63,795.69   .250         12.92
SV    839441              13,429.17   .800         27.83
```

000836

# First Savings Bank

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

```
14       WILLIAM  MCGUIRE OR
Trnc     MELANIE L MCGUIRE                    Statement Date:      05/10/04
         29 HALLS MILL RD
         ASBURY NJ 08802-1096                Account Number:      18006454
```

```
*********************** Checking Account   18006454 ***********************
All Transactions by Date
  Date Description                              Amount              Balance
04/10 Balance Forward -------------------------------------->      63,795.69
04/12 NUI RAPID PAY       DIRECT PAY          151.72-              63,643.97
04/12 Check Number        490                 658.55-             *62,985.42
04/14 Check Number        496                 103.21-              62,882.21
04/14 Check Number        499                 700.00-              62,182.21
04/15 Check Number        495                  65.79-              62,116.42
04/15 Check Number        494                 151.72-              61,964.70
04/16 POS Purchase        Target 1055 Me       27.54-              61,937.16
      100 Parsonage Road        Edison      NJ
      Seq#90537619      Date   4/15/04 Time 20:43
04/16 Check Number        500                  89.00-              61,848.16
04/16 Check Number        498                 110.00-              61,738.16
04/16 Check Number        497                 700.00-              61,038.16
04/17 Deposit                                 794.59               61,832.75
04/19 Check Number        501               4,120.00-              57,712.75
04/20 Check Number        492                 272.55-              57,440.20
04/22 ATM Deposit      TR7582               5,697.69               63,137.89
      1000 WOODBRIDGE CENTER  WOODBRIDGE    NJ
      Seq#00009997      Date   4/22/04 Time 07:20
04/23 RMA OF NEW JERSE PAYROLL              1,738.70               64,876.59
04/28 TELLER TRANS                          7,500.00-              57,376.59
04/28 TELLER TRANS                         53,433.02-               3,943.57
04/28 Check Number        502                  91.27-               3,852.30
05/03 TIAA-CREF LOAN      LOAN REPAY          395.32-               3,456.98
05/04 PROVIDIAN PAYMT     CREDITCARD          250.00-               3,206.98
05/05 Check Number        504               1,317.10-               1,889.88
05/06 ATM TFR From 00-0000839441 TR7582       300.00                2,189.88
      1000 WOODBRIDGE CENTER  WOODBRIDGE    NJ
      Seq#00001062      Date   5/06/04 Time 11:19
05/06 Check Number        503               1,725.00-                 464.88
05/07 US TREASURY 220     TAX REFUND        4,246.40                4,711.28
05/07 DOED TREAS  310     FEDPREAUTH          325.18-               4,386.10
05/07 ATM TFR From 00-0000839441 TR5315       100.00                4,486.10
      599 MIDDLESEX AVE         METUCHEN      NJ
      Seq#00001734      Date   5/07/04 Time 10:06
```

4C8000

# First Savings Bank

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

```
Page        WILLIAM  MCGUIRE OR                    Statement Date:      05/10/04
  2         MELANIE L MCGUIRE
            29 HALLS MILL RD                        Account Number:      18006454
            ASBURY NJ 08802-1096
```

```
*********************** Checking Account    18006454 ***********************
      Date_Description_                           Amount_              Balance
            Balance Forward from Previous Page --------------->         4,486.10
      05/07 ATM TFR From 00-0000839441 TR5315       500.00             4,986.10
            599 MIDDLESEX AVE      METUCHEN     NJ
            Seq#00001735    Date  5/07/04 Time 10:07
      05/07 Withdrawal                            4,000.00-              986.10
      05/10 Check Number         505               295.00-              691.10
      05/10 Interest Paid                            7.45               698.55

Checks in Order
  Date_Number_   Amount  Date_Number_   Amount  Date_Number_   Amount
  04/12   490    658.55  04/16   497    700.00  04/28   502     91.27
  04/20   492    272.15* 04/16   498    110.00  05/06   503  1,725.00
  04/15   494    151.72* 04/14   499    700.00  05/05   504  1,317.10
  04/15   495     65.79  04/16   500     89.00  05/10   505    295.00
  04/14   496    103.21  04/19   501  4,120.00
      (*) Check Numbers Missing

Account Summary
Previous Statement Date: 04/10/04
      Beginning              Interest              Service              Ending
       Balance   +  Deposits  + Paid - Withdrawals - Charge    =       Balance
      63,795.69    13,377.38    7.45   76,481.97      .00               698.55

Statement from 04/11/04 Thru 05/10/04      Average Stmt Balance         36,355.36
Interest Earned         7.45               *Annual Percentage Yield Earned   0.25%

********************* Savings Account    839441 ***********************
      Date_Description_                           Amount_              Balance
      04/10 Balance Forward --------------------------------->        13,429.17
      04/17 ATM Withdrawal  TR7582                  200.00-           13,229.17
            1000 WOODBRIDGE CENTER  WOODBRIDGE    NJ
            Seq#00009709    Date  4/17/04 Time 11:25
      04/22 ATM Withdrawal  LK252107               101.00-           13,128.17
            3 STEPHENVILLE PAR       EDISON       NJ
            Seq#00639137    Date  4/22/04 Time 17:11
      04/23 N J INST OF TECH PAYROLL             1,623.04            14,751.21
```

000838

Da302

# First Savings Bank

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

| Page 3 | WILLIAM MCGUIRE OR MELANIE L MCGUIRE 29 HALLS MILL RD ASBURY NJ 08802-1096 | Statement Date: | 05/10/04 |
|---|---|---|---|
| | | Account Number: | 18006454 |

```
************************ Savings Account      839441 ************************
 Date_Description_____Amount_____Balance
          Balance Forward from Previous Page --------------->         14,751.21
          ATM Deposit       TR7582                    361.99           15,113.20
          1000 WOODBRIDGE CENTER   WOODBRIDGE   NJ
          Seq#00000141     Date  4/23/04 Time 17:04
 04/24   ATM Deposit       TR2230                    192.30           15,305.50
          980 AMBOY AVE              EDISON     NJ
          Seq#00005946     Date  4/24/04 Time 09:49
          ATM Withdrawal    TR2230                    200.00-          15,105.50
          980 AMBOY AVE              EDISON     NJ
          Seq#00005947     Date  4/24/04 Time 09:50
 04/26   ATM Withdrawal    NJ222032                   101.00-          15,004.50
          1185 AMBOY ROAD           EDISON,    NJ
          Seq#00005527     Date  4/25/04 Time 09:46
          ATM Withdrawal    TR7582                    100.00-          14,904.50
          1000 WOODBRIDGE CENTER   WOODBRIDGE   NJ
          Seq#00000319     Date  4/26/04 Time 09:00
 04/28   Interest Paid                                  9.06           14,913.56
          Deposit                                      70.00           14,983.56
 04/29   Interest Adjustment                            .44-           14,983.12
          Withdrawal                               10,000.00-           4,983.12
          Interest Adjustment                            .04-           4,983.08
          Withdrawal                                1,000.00-           3,983.08
 05/06   ATM TFR To 10-0018006454 TR7582             300.00-           3,683.08
          1000 WOODBRIDGE CENTER   WOODBRIDGE   NJ
          Seq#00001062     Date  5/06/04 Time 11:19
 05/07   PAYMENT TO LOAN :   IL 0005107388            492.09-           3,190.99
          N J INST OF TECH PAYROLL                  1,630.06           4,821.05
          ATM TFR To 10-0018006454 TR5315            100.00-           4,721.05
          599 MIDDLESEX AVE          METUCHEN    NJ
          Seq#00001734     Date  5/07/04 Time 10:06
          ATM TFR To 10-0018006454 TR5315            500.00-           4,221.05
          599 MIDDLESEX AVE          METUCHEN    NJ
          Seq#00001735     Date  5/07/04 Time 10:07
```

000839

Da303

# First Savings Bank

REORDER CHECKS THE FAST, CON-
VENIENT WAY, 24 HOURS-A-DAY,
7 DAYS-A-WEEK. JUST CALL
1-800-355-8123, OR GO TO
WWW.FIRSTSAVINGS.COM AND
CLICK ON "RE-ORDER CHECKS"
ON OUR QUICK LINKS MENU.

1000 Woodbridge Center Drive, P.O. Box 5003
Woodbridge, New Jersey 07095-5003
(732) 726-9700

Page    WILLIAM  MCGUIRE OR                          Statement Date:     05/10/04
  4     MELANIE L MCGUIRE
        29 HALLS MILL RD                             Account Number:     18006454
        ASBURY NJ 08802-1096

************************** Savings Account    839441 **************************
  Interest Rate Summary
     DATE   0-        $249         $9,999        $24,999        $49,999        and up
     04/11   0.00000%     0.55000%     0.80000%     1.00000%     1.14000%
Previous Statement Date: 04/10/04
        Beginning                    Interest              Service              Ending
        Balance   +  Deposits  +  Paid  - Deductions - Charge   =  Balance
        13,429.17    3,877.39    8.58    13,094.09    .00        4,221.05

Statement from 04/11/04 thru 05/10/04    Average Stmt Balance        9,946.25
Interest Earned          6.19    *Annual Percentage Yield Earned    0.76%

*************Summary of Deposit Accounts **************************************
AP   ACCOUNT                    BALANCE INT-RATE%    YTD-INT YTD-PENALTY  MATURITY
CK   18006454                    698.55    .250       20.37
SV    839441                   4,221.05    .550       36.41

000840

Da304

**LETTER FROM CHRISTOPHER S. ROMANYSHYN, ESQ., DEPUTY ATTORNEY
GENERAL TO STEPHEN TURANO, ESQ., DATED OCTOBER 4, 2007**



*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF CRIMINAL JUSTICE
PO Box 085
TRENTON, NJ 08625-0085
TELEPHONE: (609) 984-6500

JON S. CORZINE
*Governor*

ANNE MILGRAM
*Attorney General*

GREGORY A. PAW
*Director*

October 4, 2007

**VIA ELECTRONIC AND REGULAR MAIL**

Stephen Turano, Esq.
275 Madison Avenue
35th Floor
New York, New York 10016

      Re:    <u>State v. Melanie McGuire</u>
                Ind. Nos. 05-10-154-S and 056-10-00119-S

Dear Mr. Turano:

    I am writing to update you on two continuing issues. Firstly, regarding allegations that Dr. Miller was under criminal investigation for something relating to selling or illegally disposing of embryos, our inquiries have revealed no such investigation. We also checked to see if the practice was aware of any civil lawsuits with regard to any such issue, and again, there were none.

    In regard to the Blog that allegedly was written by someone purporting to be a deliberating juror, we have been working with Time/Warner to investigate. Time/Warner has advised the State that their search revealed no record of the posting and no further information is available.

    Please feel free to contact me at (973) 599-5922 if you wish to discuss the above.

                    Sincerely,

                    Christopher S. Romanyshyn
                    Deputy Attorney General
                    New Jersey Division of Criminal Justice

cc.    Joseph Tacopina
      DAG Dan Bornstein
      Honorable Frederick DeVesa

 *New Jersey Is An Equal Opportunity Employer · Printed on Recycled Paper and Is Recyclable* 

**LETTER FROM STEPHEN TURANO, ESQ. TO CHRISTOPHER S. ROMANYSHYN, ESQ., DEPUTY ATTORNEY GENERAL, DATED AUGUST 22, 2008**

LAW OFFICES OF

## TACOPINA SEIGEL & TURANO

A PROFESSIONAL CORPORATION

275 MADISON AVENUE
35TH FLOOR
NEW YORK, NEW YORK 10016

JOSEPH TACOPINA
CHAD D. SEIGEL♦
STEPHEN TURANO◊

BRIAN KING

GEORGE VOMVOLAKIS
FRANCESCO PENTA***
VICTOR SHERMAN✦

♦   ALSO ADMITTED IN NEW JERSEY
✦   ALSO ADMITTED IN CALIFORNIA
***ONLY ADMITTED IN ITALY

TELEPHONE (212) 227-8877
FACSIMILE (212) 619-1028
WWW.TACOPINALAW.COM

August 22, 2008

MILAN OFFICE:
20149 MILANO
VIA DOMENICHINO, N. 35
MILAN, ITALY
TEL (02) 48012455

NEW JERSEY OFFICE:
50 PARK PLACE
SUITE 1400
NEWARK, NEW JERSEY 07102
TEL (973) 236-0119

Christopher S. Romanyshyn, Esq.
Deputy Attorney General
New Jersey Division of Criminal Justice
One Apollo Drive
Whippany, N.J.  07981

      Re:    <u>State of New Jersey v. Melanie McGuire</u>
             Ind. Nos. 02-10-164-S and 06-10-00119-S

Dear Mr. Romanyshyn:

      On October 9, 2007, I responded by letter to your October 4, 2007 letter regarding the CourtTV blog posting potentially from a deliberating juror.  As you recall, this potential misconduct came to light when the defense discovered a subsequent blog entry, making note of the deliberating juror's blog posting, and noting that the offending posting had since been removed from the website.

      On June 18, 2007, Judge DeVesa ordered the Attorney General's office to investigate whether, in fact, the offending blogger was a deliberating juror.  Judge DeVesa made clear that the outcome of that investigation was relevant to whether the Court would revisit Ms. McGuire's motion for a new trial based on juror misconduct.

      In your letter, you state that the Attorney General's office has been "working with Time/Warner to investigate," and that "Time/Warner has advised the State that their search revealed no record of the posting and no further information is available."  What is not clear from your letter, however, are the actual investigative steps taken by either the Attorney General or Time Warner, at the request of the State, to investigate this important matter.  For instance, it is not clear what information the State shared with Time Warner to assist it in its investigation (including the name, date, and time of the separate blog entry that described the offending blog entry); what steps Time Warner took to investigate (including any indication of the extent of Time Warner's actual "search," which data was reviewed, whether all reasonable steps were taken to search archived data, whether the blog administrator who is responsible for removing controversial blog entries was contacted, etc.); what the actual outcome of those investigative steps was; and whether more investigation is forthcoming.

      The culmination of State's investigation appears to be that the search Time Warner chose to do reveal "no record" and that "no further information is available."  Without more, those

TACOPINA SEIGEL & TURANO, P.C.

findings are not helpful in determining whether the Court or the defense need to take further action in this matter.

I renew my request of October 9, 2007, that you provide further information regarding the investigative steps taken, or provide details as to what steps the State intends to take to follow-up on Time Warner's assertions.

Very truly yours,

Stephen Turano

cc:    Jamie Kilberg, Esq.

**LETTER FROM STEPHEN TURANO, ESQ. TO THE HONORABLE FREDERICK P. DEVESA, PR.J.CR., DATED NOVEMBER 14, 2008**

LAW OFFICES OF

## TACOPINA SEIGEL & TURANO

A PROFESSIONAL CORPORATION

275 MADISON AVENUE
35TH FLOOR
NEW YORK, NEW YORK 10016

TELEPHONE (212) 227-8877
FACSIMILE (212) 619-1028
WWW.TACOPINALAW.COM

JOSEPH TACOPINA
CHAD D. SEIGEL✦
STEPHEN TURANO✦

BRIAN KING

GEORGE VOMVOLAKIS
FRANCESCO PENTA✦✦✦
VICTOR SHERMAN✦

✦   ALSO ADMITTED IN NEW JERSEY
✦   ALSO ADMITTED IN CALIFORNIA
✦✦✦ONLY ADMITTED IN ITALY

MILAN OFFICE:
20149 MILANO
VIA DOMENICHINO, N. 35
MILAN, ITALY
TEL (02) 48012455

NEW JERSEY OFFICE:
50 PARK PLACE
SUITE 1400
NEWARK, NEW JERSEY 07102
TEL (973) 236-0119

November 14, 2008

Honorable Frederick P. DeVesa, Pr.J.S.C.
Presiding Judge, Criminal Part
Middlesex County Superior Court
Middlesex County Courthouse
1 John F. Kennedy Square
P.O. Box 964
New Brunswick, NJ  08903-0964

Re:   State of New Jersey v. Melanie McGuire
      Ind. Nos. 05-10-0164-S and 06-10-0119-S

Dear Judge DeVesa:

I write in connection with the above-referenced case, now currently pending on appeal. At the end of the trial, this Court ordered the State to investigate potential jury misconduct—including participation in on-line message boards—that threatens the fairness of the trial. Despite repeated requests from us, the State has refused to explain what has been done in response to that order.  We write to request the Court's guidance on whether to seek a limited remand so that the Court may address the State's failure to comply with this Court's order.

In the course of preparing Ms. McGuire's motion for a new trial, defense counsel discovered references on a Court TV message board, suggesting that a juror had been not only reviewing—but also contributing to—those message boards during deliberations.  As Ms. McGuire's motion made clear, the Court TV message boards contained highly prejudicial material.  On June 18, 2007, this Court ordered the Attorney General's office to investigate whether, in fact, a deliberating juror had been accessing and contributing to the Court TV message boards.

On October 4, 2007, well after Ms. McGuire's Notice of Appeal was due and timely filed, the Attorney General's office sent a brief letter, two sentences of which provided its explanation of the status of its court-ordered investigation: "In regard to the Blog that allegedly

Da308

TACOPINA SEIGEL & TURANO, P.C.

Honorable Frederick P. DeVesa, Pr.J.S.C.
November 14, 2008
Page 2

was written by someone purporting to be a deliberating juror, we have been working with Time/Warner [which owns the then-Court TV, now known as truTV] to investigate. Time/Warner has advised the State that their search revealed no record of the posting and no further information is available."

The State's brief explanation did not describe what, if any, actual investigative steps were taken by either the Attorney General or Time Warner at the request of the State to investigate this important matter. For instance, it is not clear what information the State shared with Time Warner to assist it in its investigation (including the name, date, and time of the separate message board entry that described the offending entry); what steps Time Warner took to investigate (including any indication of the extent of Time Warner's actual "search," which data was reviewed, whether all reasonable steps were taken to search archived data, whether the message board administrator who is responsible for removing controversial entries was contacted); what the actual outcome of those investigative steps was; and whether more investigation would be forthcoming.

We immediately asked the State for more information. The State has provided none. Following the latest unanswered letter, I called the State on September 10, 2008, but did not receive a timeframe for when we could expect a response. The State has had nearly 17 months to complete its investigation and more than a year to respond to Ms. McGuire's request for clarification. We can no longer wait for the State's response.

We recognize that, with the filing of Ms. McGuire's notice of appeal, this Court likely lacks jurisdiction to further address the State's failure to comply with the Court's order. If the Court is willing to address this issue, we believe the next step would be to ask the Appellate Division for a limited remand. Should that court grant the request, and given the State's complete failure to adequately follow this Court's order or to timely respond to defense requests for more information, we would then ask Your Honor to either immediately grant a new trial or provide Ms. McGuire's defense team with the power to separately investigate the allegations—including the power of compulsory process through subpoenas.

As Your Honor knows, when there are colorable allegations of juror misconduct, the burden is on the State to prove, *beyond a reasonable doubt*, that such misconduct could not possibly have affected the outcome of the trial. *Panko v. Flintoke Co.*, 7 N.J. 55, 61, 80 A.2d 302, 305-306 (1951); *State v. Basaccia*, 319 N.J. Super. 1, 19, 724 A.2d 836, 846 (App. Div. 1999). By ordering the State to investigate, the Court clearly saw merit to Ms. McGuire's argument that a deliberating juror should not have been participating in on-line message boards. The State has failed to show that it performed an adequate investigation pursuant to this Court's order of June 18, 2007.

TACOPINA SEIGEL & TURANO, P.C.

Honorable Frederick P. DeVesa, Pr.J.S.C.
November 14, 2008
Page 3

     Accordingly, we respectfully request a hearing with the Court to further address this issue.

Respectfully,

Stephen Turano

cc:    Christopher Romanyshyn, Esq.
       Daniel Bornstein, Esq.
       Jamie S. Kilberg, Esq.

FACSIMILE LETTER FROM CHRISTOPHER S. ROMANYSHYN, ESQ., DEPUTY
ATTORNEY GENERAL TO THE HONORABLE FREDERICK P. DEVESA, PR.J.CR.,
DATED JANUARY 13, 2009, WITH ATTACHED CORRESPONDENCE



**New Jersey Division of Criminal Justice**
**One Apollo Drive, Whippany, New Jersey 07981**
Phone:  (973) 599-5900      Fax:    (973) 599-5982

Deputy Attorney General Christopher S. Romanyshyn
Gangs & Organized Crime Bureau
Writer's Direct Line: (973) 599-5922

---

## FACSIMILE TRANSMITTAL SHEET

| | | | |
|---|---|---|---|
| To: | Honorable Frederick P. DeVesa, P.J.S.C. | Date: | 1/13/09 |
| Company: | | Your Reference Number: | |
| Phone: | | Sender's Reference Number: | |
| Fax: | 732-519-3794 | Total Pages (Including cover): | 7 |

RE:   State v. Melanie McGuire
        Indictment No: 05-10-164-S

Notes/Comments:

        Please see attached.  If you have any further questions, please contact me.

cc:    Steven Turano, Esq. (212) 619-1028

* * * CONFIDENTIALITY NOTICE * * *

THE INFORMATION CONTAINED IN THIS FACSIMILE TRANSMISSION FROM THE DIVISION OF CRIMINAL JUSTICE
MAY BE PRIVILEGED AND CONFIDENTIAL AND IS INTENDED FOR THE SOLE USE OF THE PERSONS OR ENTITIES
NAMED ON THIS TRANSMITTAL COVER SHEET.   IF YOU ARE NOT AN INTENDED RECIPIENT OF THIS
TRANSMISSION, THE DISSEMINATION, DISTRIBUTION, COPYING OR USE OF THE INFORMATION IT CONTAINS
IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE CALL THE SENDER
IMMEDIATELY TO ARRANGE FOR THE RETURN OF THIS INFORMATION.

* * * * * *



*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF CRIMINAL JUSTICE
ONE APOLLO DRIVE
WHIPPANY, NJ 07981
TELEPHONE: (973) 599-5900

JON S. CORZINE
*Governor*

ANNE MILGRAM
*Attorney General*

DEBORAH L. GRAMICCIONI
*Director*

January 13, 2009

Honorable Frederick P. DeVesa, P.J.S.C.
Superior Court of New Jersey
Middlesex County Courthouse
56 Patterson Street, P.O. Box 964
New Brunswick, New Jersey 08903

RE:   State v. Melanie McGuire
       Indictment No: 05-10-164-S

Dear Judge DeVesa:

Please accept this letter in response to Steven Turano, Esq.'s letter dated November 14, 2008.

As noted in the State's letter to Mr. Turano dated October 4, 2007, the State did inquire of Time Warner about the alleged offending blogs cited in the defendant's May 14, 2007 motion for a new trial. The State made inquiry, at the Court's request, at the time the defendant's motion for a new trial was denied. On June 21, 2007, the State forwarded a letter to Time Warner requesting that any records they had of the alleged blog be preserved for 90 days, subject to an extension. (See attached letter dated June 21, 2007) On September 18, 2008 the State forwarded a complete copy of the defense motion with all attachments to Time Warner. (See attached letter dated September 18, 2007). Time Warner was provided with all of the information in the State's possession relative to the alleged blog post.

Time Warner reported to the State, and the State in turn reported to the defense by letter dated October 4, 2007 (attached), that Time Warner had no record of the blog posting. The State did exactly as requested, though it was under no obligation to do so. The defense has made no effort to substantiate their own claims, other than to criticize the State because the State can't prove a negative.

The State addressed the defense's assertions in detail in the State's reply to the motion for a new trial. There is not a scintilla of evidence that any juror either posted or read the alleged blog. In fact, given the times of the posted references to the alleged blog, beginning at around 8:00 p.m. on April 20, 2007, the discussion reveals that the alleged blog was present sometime



*New Jersey Is An Equal Opportunity Employer · Printed on Recycled Paper and is Recyclable*



earlier on April 20, 2007, though no time is specified, and removed sometime prior to 8:00 p.m. on April 20, 2007.  The jury spent the better part of the day in court being questioned by the Court and counsel on the afternoon of April 20, 2008, presumably *after* any exposure to such a blog could possibly have taken place.  This Court made factual findings relative to juror taint on April 23, 2007.  Specifically, the Court found:

> I'm also very satisfied that the remarks or comments that were made were clearly not that significant to them because most didn't even remember how they came about.  It was just like a passing remark by someone.  No one could even remember or identify the source, the original source, of the brief comment.  And again, this was universally their position, if you will, even though each person was individually and privately interviewed without any notice to any other jurors, but to a person it was clear that this had to be nothing more than some passing insignificant casual type of communication or conversation.  Most importantly-- most importantly, all the jurors clearly and unequivocally reported to the Court that they did not discuss and **have not been made aware of any information relating to the facts or merits of the case.**  All the jurors unequivocally and very vigorously stated that they could be fair and they could decide the case based solely on the evidence and the law that the Court has instructed them on.

See Transcript of Decision dated April 23, 2007, at pp.4-5. (Emphasis added)

    This Court denied the new trial motion, which included these allegations, in June, 2008.  There are no additional facts sufficient to disturb those findings.  The defense merely continues to reiterate the rank speculation first asserted in the new trial motion and criticize the State.  The State submits that the defense assertion that "By ordering the State to investigate, the Court clearly saw merit to Ms. McGuire's argument that a deliberating juror should not have been participating in on-line message boards," mischaracterizes the Court's comments.  The State's recollection, absent a copy of the transcript, is that the Court requested that the State inquire of Time Warner and that if there was any further evidence to indicate a juror issue, the Court would revisit the motion.  If the State is correct, that is hardly an endorsement of the defendant's argument on the merits and in any event presupposes that a juror actually participated on a blog site.  The Court's factual findings, based on the extensive April 20, 2008 *voir dire*, were to the contrary.

    For these reasons, the State submits that there is no additional evidence available to disturb the Court's prior findings.

Respectfully submitted,

Christopher S. Romanyshyn
Deputy Attorney General
New Jersey Division of Criminal Justice

cc:   Steven Turano, Esq.



*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF CRIMINAL JUSTICE
ONE APOLLO DRIVE
WHIPPANY, NJ 07981
TELEPHONE: (973) 599-5900

JON S. CORZINE
*Governor*

STUART RABNER
*Attorney General*

GREGORY A. PAW
*Director*

June 21, 2007

**VIA FACSIMILE (404) 878-5253**
**AND REGULAR MAIL**

Mr. Chico Robinson
One CNN Center
Atlanta, GA 30303

I am writing in connection with your earlier telephone conversation with Detective Timothy Coyle of the New Jersey State Police Major Crime Unit. As you are aware, the State is seeking your assistance in locating a message thread previously posted on the COURT TV web site, message board page.

The message thread centered upon the Melanie McGuire Trial and more specifically relates to a possible post by a juror during deliberations. It is believed that the thread was created between the dates of April 15, 2007, and April 21, 2007. Additionally, it is believed personnel from Court TV removed the message thread and all posts contained within. I do not know the specific name of the message thread but apparently the title directly referred to the jury deliberations in the McGuire Trial. It is possible that the message thread was titled "To all the jurors who are reading this....." or "To all the jurors illegally reading this board," or words to that effect. There were other threads that referred to the subject posting, copies of which are enclosed for your reference.

I am requesting your assistance in locating and preserving this message thread and all posts contained within it, pursuant to N.J.S.A. 2A:156A-29g, for a period of 90 days. In addition, I am requesting any and all identifying information be preserved including but not limited to: originating internet protocol addresses of individual posts and the message thread; screen names attached to the posts and the message thread, originating registration information, originating internet protocol addresses for each screen name, and time and date information related to all internet protocol information, including the time standard for the information stored.

If the message thread is located, kindly take the appropriate steps to preserve the information and notify me of its existence. I will then have the appropriate legal process issued.



*New Jersey Is An Equal Opportunity Employer · Printed on Recycled Paper and is Recyclable*



Jan 13 2009 18:06                                                                          P.04

Da314

Page 2

If your require any further information, please contact me at (973) 599-5922.  I thank you in advance for your cooperation in this matter and trust that since this is a sensitive ongoing investigation this inquiry will remain confidential.

Very truly yours,


Christopher S. Romanyshyn
Deputy Attorney General
New Jersey Division of Criminal Justice

Enclosures



**COPY**

*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF CRIMINAL JUSTICE
ONE APOLLO DRIVE
WHIPPANY, NJ 07981
TELEPHONE: (973) 599-5900

JON S. CORZINE
*Governor*

ANNE MILGRAM
*Attorney General*

GREGORY A. PAW
*Director*

September 18, 2007

**VIA UPS OVERNIGHT**
**1Z X87 3W2 22 1015 395 4**

Kelly S. Black-Holmes, Esq.
Counsel
Turner Broadcasting System, Inc.
One CNN Center, NT
Atlanta, GA 30303

Re:   <u>State v. Melanie McGuire</u>

Dear Ms. Black-Holmes:

In accordance with your discussions with Assistant Attorney General Patricia Prezioso, enclosed please find a copy of the defendant's motion dated May 14, 2007, together with a copy of all exhibits thereto.

The references in the motion to the blogs pertaining to posts allegedly made by someone purporting to be a juror (<u>See</u> page 23 of Defendant's Motion) refers to Exhibit H attached to the motion. Exhibit H contains copies of the other blogs referring to the allegedly removed postings. However, several other exhibits are copies of blogs as well.

If you have any questions or require any further information, please contact me at (973) 599-5922.

Very truly yours,

Christopher S. Romanyshyn
Deputy Attorney General
New Jersey Division of Criminal Justice

Enclosures

   *New Jersey Is An Equal Opportunity Employer · Printed on Recycled Paper and is Recyclable*   



*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF CRIMINAL JUSTICE
PO BOX 085
TRENTON, NJ 08625-0085
TELEPHONE: (609) 984-6500

JON S. CORZINE
*Governor*

ANNE MILGRAM
*Attorney General*

GREGORY A. PAW
*Director*

October 4, 2007

**VIA ELECTRONIC AND REGULAR MAIL**

Stephen Turano, Esq.
275 Madison Avenue
35th Floor
New York, New York 10016

    Re:    State v. Melanie McGuire
           Ind. Nos. 05-10-154-S and 056-10-00119-S

Dear Mr. Turano:

        I am writing to update you on two continuing issues. Firstly, regarding allegations that Dr. Miller was under criminal investigation for something relating to selling or illegally disposing of embryos, our inquiries have revealed no such investigation. We also checked to see if the practice was aware of any civil lawsuits with regard to any such issue, and again, there were none.

        In regard to the Blog that allegedly was written by someone purporting to be a deliberating juror, we have been working with Time/Warner to investigate. Time/Warner has advised the State that their search revealed no record of the posting and no further information is available.

        Please feel free to contact me at (973) 599-5922 if you wish to discuss the above.

                            Sincerely,

                            Christopher S. Romanyshyn
                            Deputy Attorney General
                            New Jersey Division of Criminal Justice

cc.    Joseph Tacopina
       DAG Dan Bornstein
       Honorable Frederick DeVesa



*New Jersey Is An Equal Opportunity Employer · Printed on Recycled Paper and is Recyclable*



**LETTER FROM THE HONORABLE FREDERICK P. DEVESA, PR.J.CR. TO STEPHEN TURANO, ESQ. AND CHRISTOPHER ROMANYSHYN, ESQ., DEPUTY ATTORNEY GENERAL, DATED JANUARY 28, 2009**

### SUPERIOR COURT OF NEW JERSEY



CHAMBERS OF
FREDERICK P. DE VESA
PRESIDING JUDGE CRIMINAL

MIDDLESEX COUNTY COURT HOUSE
P.O. BOX 964
NEW BRUNSWICK, NEW JERSEY 08903 - 0964

January 28, 2009

Stephen Turano, Esq.
50 Park Pl.
Suite 1400
Newark, NJ 07102

Christopher Romanyshyn, Esq.
One Apollo Dr.
Whippany, NJ 07981

Re: <u>State v. Melanie McGuire</u>
Indict. # 05-10-00164-S and 06-10-00119-S
Case # 05-001293 and 06-003010

Dear Counselors:

The Court has reviewed Mr. Turano's letter of November 14, 2008, as well as the State's reply dated January 13, 2009. Based on the representations therein the Court sees no reason to revisit the Motion for a New Trial previously denied on June 18, 2007. Additionally, the Court notes that it lacks jurisdiction over this matter due to the pendency of Ms. McGuire's appeal.

Thank you for your attention to this matter.

Very Truly Yours,

Hon. Frederick P. De Vesa P.J.Cr.

Cc: file

&#9855; If you require any accommodations as a result of a disability, please call 732-519-3430

Da318

UNPUBLISHED OPINION IN STATE OF NEW JERSEY V. GEORGE JENEWICZ,
SUPERIOR COURT OF NEW JERSEY, APPELLATE DIVISION, DECIDED AUGUST 8,
2006, 2006 WL 2590114(N.J.SUPER.A.D.)

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2590114 (N.J.Super.A.D.)
   (Cite as: 2006 WL 2590114 (N.J.Super.A.D.))

Page 1

▶Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.
STATE of New Jersey, Plaintiff-Respondent,
v.
George JENEWICZ, Defendant-Appellant.
Argued Nov. 2, 2005.
Decided Aug. 8, 2006.

On appeal from Superior Court of New Jersey, Law
Division, Middlesex County, No. 99-01-0031.
Daniel V. Gautieri, Assistant Deputy Public De-
fender, argued the cause for appellant (Yvonne Smith
Segars, Public Defender, attorney; Mr. Gautieri, of
counsel and on the brief).

Nancy A. Hulett, Deputy Attorney General, argued
the cause for respondent (Bruce J. Kaplan, Middlesex
County Prosecutor, attorney; Ms. Hulett, of counsel
and on the brief).

Before Judges WEFING, WECKER and FUENTES.

PER CURIAM.

*1 Tried to a jury, defendant was convicted of first-
degree murder, N.J.S.A. 2C:11-3(a)(1),(2); second-
degree possession of a weapon for an unlawful pur-
pose, N.J.S.A. 2C:39-4(a); and third-degree hindering
apprehension or prosecution, N.J.S.A. 2C:29-3(b).
Defendant had been indicted for capital murder but
following the penalty phase of the trial, the jury was
unable to reach a unanimous verdict. N.J.S.A. 2C:11-
3(c)(3)(c). At sentencing, the trial court merged de-
fendant's conviction for possession of a weapon for
an unlawful purpose into his conviction for murder
and sentenced defendant to life in prison, with a
thirty-year period of parole ineligibility. It also sen-
tenced defendant to five years in prison, with a two
and one-half year period of parole ineligibility, for
the hindering conviction and specified that this be
served consecutively, not concurrently. Defendant
has appealed. After reviewing the record in light of

the contentions advanced on appeal, we affirm de-
fendant's convictions but remand for resentencing.

Defendant admitted shooting the victim, Eunice
Gillens, who had been living with him for several
months, but asserted he had acted in self-defense
when she threatened to shoot him with a rifle. The
relationship between defendant and Ms. Gillens can
fairly be described as dysfunctional. The two met
while both were participating in an out-patient reha-
bilitation program; both were unsuccessful in their
attempts to end their addictions.

Defendant is an alcoholic who had abused alcohol for
many years. He had worked as a biological technician
at Bristol-Myers Squibb, which several times ar-
ranged for him to attend inpatient alcohol rehabilita-
tion programs. After working for Bristol-Myers
Squibb for nineteen years, he was eventually termi-
nated because of absenteeism caused by his drinking.
Defendant testified that his marriage broke up over
his drinking. He also said that his drinking increased
over the years, with the deaths of his father, his ex-
wife and, finally, his mother in May 1997. After his
mother's death, he received three separate charges for
driving while intoxicated, N.J.S.A. 39:4-50, in ap-
proximately one week's time and lost his driver's li-
cense for ten years.

Ms. Gillens, on the other hand, was addicted to co-
caine. In addition to using cocaine, Ms. Gillens
would also drink with defendant. After Ms. Gillens
moved into defendant's house, he would give her
money that she used to purchase cocaine.

Ms. Gillens moved into defendant's home on May 31,
1998. Defendant's bank records showed that from
January 29 to June 22 1998 he withdrew slightly
more than $8,000, while from June 22 to August 5,
1998, he withdrew more than $31,000, and from Au-
gust 10 to September 15, 1998, he withdrew an addi-
tional $35,190. These large withdrawals, he testified,
were to finance Ms. Gillens's cocaine addiction.

Defendant said that the two began to argue and that
their arguments became increasingly angry. Defen-
dant said she would attack him during these argu-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2590114 (N.J.Super.A.D.)
(Cite as: 2006 WL 2590114 (N.J.Super.A.D.))

Page 2

ments and throw things at him, damaging the walls and the contents of the house.

*2 After defendant was arrested, the police found two handguns, two shotguns and two rifles in the house, all of which defendant legally possessed, together with a large quantity of ammunition. Originally, the weapons had been kept in the basement. After Ms. Gillens moved in, defendant showed them to her and explained how they worked.

Defendant also testified that Ms. Gillens became extremely fearful of people entering the house. When they used the downstairs bedroom, they slept with a hammer next to the bed because she would hear noises and become afraid. When they switched to the upstairs bedroom, she replaced the hammer with a twelve-gauge shotgun.

As Ms. Gillens became more and more fearful, she would carry a weapon around the house with her. Defendant said he eventually moved all of the weapons to the second floor because other drug users began to frequent the house and he did not want the weapons taken. He said that Ms. Gillens would routinely place a chair against a door to prevent anyone from entering, even with the interior doors within the house. Defendant testified that she became more and more fearful, kept the curtains drawn, the house dark, and was reluctant to leave the house at all. She had less and less need to leave the house because she had found a drug dealer who would make deliveries to the house for her.

Defendant said they had a major argument toward the end of September or the beginning of October during which Ms. Gillens threatened him with the twelve gauge shotgun. He said he retreated upstairs and that when he felt it was safe to come down, he found that she had fallen, breaking part of the staircase and receiving a large gash on her arm. He took the shotgun and saw that the barrel was bent and that the weapon was no longer safe to use. He said that he told Ms. Gillens she would have to leave and find another place to stay. He said he did not make her leave immediately because she had no place to go. However, she replaced the damaged twelve gauge shotgun with his .22 rifle and also took to threatening him with knives. He said that on several occasions she slashed him with a knife and also struck him in the head with a chair leg.

The shooting occurred on October 22, 1998. Defendant testified that they were arguing because he told her he did not have the money to buy more cocaine but had gone to the liquor store to buy vodka for himself. When he returned, he made himself a drink and went upstairs to see if she wanted one. She began to scream at him, and he went back downstairs. He heard her continuing to yell, and he went back upstairs. When he entered the bedroom, she grabbed the .22 rifle and pointed it at him. He reached for a .357 pistol in a drawer and fired one shot and killed her. The prosecution presented evidence based upon the autopsy that the gun was fired from a very close distance.

The charge of hindering prosecution rested upon subsequent events. Defendant did not notify the police of what had occurred. Rather, he remained in the house with Ms. Gillens's body. He said he drank almost continuously for approximately a week and then dismembered her body. He discarded her severed arms in a nearby field. He placed her head in a pot filled with water and attempted to boil it down. He wrapped the rest of her remains in plastic bags and put them in a garbage can in his basement.

*3 After some time had elapsed, he called a friend, Iwan Terenin, and asked him for help in disposing of her body. Mr. Terenin arrived at the house with a friend of his, Leonid Chernyavskiy. When they learned what had occurred, they told defendant they had to leave to get a truck. Instead, they drove to the police station.

On appeal, defendant raises the following arguments:

**POINT I**

THE PROSECUTOR IMPROPERLY CROSS-EXAMINED DEFENSE PSYCHIATRIST DR. TRENT ABOUT DEFENDANT'S STATEMENTS TO HIM REGARDING THE CRIME WHERE NO MENTAL-HEALTH DEFENSE WAS PRESENTED AND THE EXPERT'S OPINION WAS LIMITED TO THE DECEDENT; AND THE PROSECUTOR'S SUMMATION DISPARAGED TRENT AND THE DEFENSE

**POINT II**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2590114 (N.J.Super.A.D.)
(Cite as: 2006 WL 2590114 (N.J.Super.A.D.))

Page 3

THE SELF-DEFENSE INSTRUCTION WAS FLAWED AS IT WAS NOT TAILORED TO THE TRIAL FACTS, FAILING TO REFLECT THAT THE JURORS SHOULD CONSIDER PRIOR ACTS OF ABUSE BY THE DECEDENT AGAINST THE DEFENDANT IN DETERMINING WHETHER HIS BELIEF IN THE NECESSITY OF USING DEADLY FORCE WAS HONEST AND REASONABLE

**POINT III**

DEFENDANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO USE THE GRAND-JURY MINUTES TO REFUTE THE MEDICAL EXAMINER'S REBUTTAL EVIDENCE. *U.S. CONST.* AMEND. VI; *N.J. CONST.* ART. 1, ¶ 10

**POINT IV**

THE COURT ERRED IN DENYING DEFENDANT'S MOTION TO SEVER COUNT THREE, BECAUSE DEFENDANT'S GRUESOME POST-SHOOTING ATTEMPT TO HINDER HIS OWN APPREHENSION MADE THE JURY MUCH LESS LIKELY TO ACCEPT THE POSSIBILITY THAT HE SHOT THE DECEDENT IN SELF-DEFENSE

**POINT V**

THE RULING EXCLUDING THE TESTIMONY OF DEFENSE WITNESS JOHN KELLY VIOLATED DEFENDANT'S RIGHTS TO PRESENT A DEFENSE AND DUE PROCESS

**POINT VI**

THE COURT ERRED IN DENYING DEFENDANT THE RIGHT TO CALL THE DECEDENT'S MOTHER TO TESTIFY ABOUT VIOLENT ACTIONS THE DECEDENT HAD ADMITTEDLY COMMITTED AGAINST DEFENDANT

**POINT VII**

THE COURT ERRED IN FAILING TO CHARGE THAT VOLUNTARY INTOXICATION COULD NEGATE AN ELEMENT OF THE MURDER AND POSSESSION-OF-A-WEAPON-FOR-AN-UNLAWFUL-PURPOSE OFFENSES

**POINT VIII**

THE MURDER SENTENCE SHOULD BE REDUCED FROM LIFE TO 30 YEARS BECAUSE IT WAS THE HINDERING OFFENSE, NOT THE MURDER, THAT WAS DEPRAVED

**I**

Defendant first complains of the prosecutor's comments with regard to one of his experts, Dr. Trent. Dr. Trent was originally retained to examine defendant to determine the viability of either a defense of insanity, *N.J.S.A.* 2C:4-1, or of diminished capacity, *N.J.S.A.* 2C:4-2. After conducting his examination, Dr. Trent was unable to provide an opinion that defendant was insane or suffered from diminished capacity. After reviewing the material in the case, however, Dr. Trent did form the opinion that at the time of the shooting, Ms. Gillens was drunk and probably undergoing cocaine withdrawal, that the symptoms of such withdrawal include violent behavior, and that those who are withdrawing from such substances "may be at higher risk for involvement in deadly interpersonal violence."Dr. Trent testified for defendant as to those opinions.

*4 The prosecution, both in cross-examination and in summation, clearly put before the jury the fact that Dr. Trent was unable to opine that defendant was either insane or suffered from diminished capacity. In the course of that cross-examination, the prosecution also questioned Dr. Trent about his interviews of defendant and how defendant's recounting of the incident to Dr. Trent varied in certain respects from what defendant had told the police.

Defendant complains that this cross-examination was unfair because it dealt with areas upon which Dr. Trent was not opining. We perceive no reversible error in the trial court permitting such examination. The topic was only touched upon briefly during the course of an extensive cross-examination. Nor do we see any error in the cross-examination of Dr. Trent on defendant's statements to him. Dr. Trent's testimony raised an issue of defendant's credibility because Dr. Trent's opinion rested, among other factors, on what

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2590114 (N.J.Super.A.D.)
(Cite as: 2006 WL 2590114 (N.J.Super.A.D.))

defendant told him had occurred. To the extent that Dr. Trent's opinion about Ms. Gillens's potential for violence was based upon what defendant told him, the prosecution was entitled to challenge the validity of that foundational basis. *State v. Pillar,* 359 *N.J.Super.* 249, 290 (App.Div.) (noting that the jury must determine whether "the predicate facts" underlying an expert's opinion are true), *certif. denied,* 177 *N.J.* 572 (2003).

Defendant also puts forth an additional ground upon which the prosecution should not have been permitted to cross-examine Dr. Trent about defendant's statements. He asserts that because Dr. Trent received these statements from defendant's attorney, they were subject to the attorney-client privilege. That privilege, however, is subject to waiver when a defendant produces an expert at trial. *State v. Mingo,* 77 *N.J.* 576, 585 (1978); *Coyle v. Estate of Simon,* 247 *N.J.Super.* 277 (App.Div.1991).

We have carefully reviewed the summation by the State and reject defendant's argument of prosecutorial misconduct. The prosecutor attacked Dr. Trent's testimony, as he was permitted to do. The blows that he struck against defendant's case in his summation were hard, but they were not fouls. *State v. Feaster,* 156 *N.J.* 1, 59 (1998) (noting that a prosecutor "may strike hard blows [but] he is not at liberty to strike foul ones."(quoting *Berger v. United States,* 205 *U.S.* 78, 88, 55 *S.Ct.* 629, 633, 79 *L. Ed.* 1314, 1321 (1935))). They were, moreover, grounded in the evidence and thus were not an improper assertion of personal belief. The trial court, moreover, gave a proper limiting instruction after defense counsel objected to the comment that Dr. Trent had taken the "insanity [defense] for a test drive."The curative instruction accorded with defense counsel's request at the time.

## II

Defendant also contends that the trial court committed reversible error in its charge with respect to self-defense in three regards. He first argues that the court erred in not reviewing for the jury the facts that bore upon self-defense. The extent of the trial court's remarks in this regard were, at several points, to tell the jury that it could "take into consideration the nature of the relationship between the defendant and Miss Gillens and the presence of firearms in the home and all the circumstances surrounding those firearms."

*5 Defendant correctly cites to cases stressing the need for a trial court to tailor its charge to the specific case at hand. *State v. Concepcion,* 111 *N.J.* 373, 379 (1988) ("Ordinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case."). While the trial court would have been well within bounds to amplify upon its remarks, we cannot consider its failure to do so reversible error. *State v. T.C.,* 347 *N.J.Super.* 219, 240 (App.Div.2002) ( "[T]here is no principle requiring that in every case a court must deliver a specifically tailored instruction relating the facts of the case to the applicable law."), *certif. denied,* 177 *N.J.* 222 (2003). Although the case consumed a number of trial days, the facts surrounding the killing were not particularly complex.

Defendant's attorney argued strongly to the jury, outlining the defense theory that defendant had been subjected to ever-increasing attacks, fueled by her cocaine addiction, which culminated in Ms. Gillens pointing a rifle at him in a rage when he purchased alcohol for himself. The prosecution responded with equal vigor, pointing out why, in its view, defendant had not acted in self-defense at all. "[N]ot every failure to [mold the charge] is fatal." *State v. Bilek,* 308 *N.J.Super.* 1, 10 (App.Div.1998). In an analogous context, we stated:

In view of the evidence presented and arguments made by both parties, and the charge given, we are satisfied the jury understood the significance of the alleged prior abuse and battered woman's syndrome. Any suggestions defendant now makes that could have improved the charge by making it more detailed and specific do not render the charge erroneous.

[ *State v. Tierney,* 356 *N.J.Super.* 468, 482 (App.Div.), *certif. denied,* 176 *N.J.* 72 (2003).]

We cannot fairly conclude that defendant was prejudiced by the trial court's brevity.

Defendant also complains that the trial court erred in explaining to the jury the concept of the duty to retreat. Defendant did not make this objection at the time of trial. *R.* 2:10-2. In the course of originally instructing the jury on this question, the trial court

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

stated:

> If you find that the defendant knew that he could avoid the necessity of using deadly force by retreating, provided that the defendant knew he could do so with complete safety, then the defense [of self-defense] is not available to him. An exception to the rule of retreat, however, is that a person need not retreat from his own dwelling, unless he was the initial aggressor.
>
> In your inquiry as to whether a defendant who resorted to deadly force knew that an opportunity to retreat with complete safety was available, the total circumstances including the attendant excitement accompanying the situation must be considered.

The trial court also clearly instructed the jury that the State bore the burden of proof on this question. It told the jury:

> *6 The burden of proof is upon the State to prove beyond a reasonable doubt that the defendant knew he could have retreated with complete safety. If the State carries its burden then you must disallow the defense. If the State does not satisfy this burden and you do have a reasonable doubt, then it must be resolved in favor of the defendant and you must allow the claim of self-defense and acquit the defendant.

Defendant's contention that the trial court did not give a proper instruction in this respect is not supported by the record.

At the conclusion of the charge, the prosecution objected that the trial court did not charge in accordance with the law in effect at the time of the killing. Based upon that objection the trial court gave a supplemental instruction to the jury, charging it that there was an additional exception to the duty to retreat, that is, if the defendant was attacked by someone "who the defendant knew lived in the same dwelling."The trial court did not repeat in this connection the instructions it had earlier provided on the burden of proof; we have no basis, however, to conclude that the jury was misled in any way in this regard.

The State in its brief states that the trial court erred when it gave this supplemental charge. The charge as originally given by the trial court reflected the state of the law at the time of defendant's trial. In 1999, the Legislature, in response to *State v. Gartland,* 149 *N.J.* 456 (1997), amended *N.J.S.A.* 2C:3-4(b)(2)(b)(i) and deleted the language imposing a duty to retreat if an individual were "assailed in his dwelling by another person whose dwelling the actor knows it to be[.]" This amendment became effective April 30, 1999, while this matter was pending.

The State asserts that because this amendment was ameliorative, it is to be applied retroactively. The State also asserts that any error by the trial court in giving the supplemental charge was harmless.

Defendant has taken no position on this question of retroactive application of the amended statute. He neither raised the issue in his original brief nor filed a supplemental brief on the issue. In this posture, we deem the issue waived, and we decline to address it. *Liebling v. Garden State Indemn.,* 337 *N.J.Super.* 447, 465-66 (App.Div.), *certif. denied,* 169 *N.J.* 606 (2001); *In re Bloomingdale Convalescent Ctr.,* 233 *N.J.Super.* 46, 48 n. 1 (App.Div.1989).

Defendant's final argument with regard to the court's charge on self-defense relates to one sentence in its charge on the use of deadly force. Again, defendant did not raise an objection on this basis at the time of trial. *R.* 2:10-2. Read in context, we see no error. A reviewing court should read a trial court's charge as a whole. *State v. Koskovich,* 168 *N.J.* 448 (2001); *State v. Simon,* 161 *N.J.* 416, 477 (1999).

### III

In support of his claim of self-defense, defendant testified that Ms. Gillens had attacked him on several occasions. He testified about the injuries he received at her hand and that pictures taken of him on November 6, 1998, some days after his arrest, showed such injuries. Some, he said, were the result of Ms. Gillens slashing him with a knife; another was due to Ms. Gillens having struck him on the head with a chair leg. He also said that she had bitten him. In rebuttal, the prosecution recalled the medical examiner. After studying the pictures, she testified that the wounds shown in the pictures were of recent origin, received after defendant was arrested. She also said the marks that defendant attributed to Ms. Gillens having bitten him were not bite marks. She was unable to express an opinion whether the injuries were self-inflicted.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Da323

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2590114 (N.J.Super.A.D.)
(Cite as: 2006 WL 2590114 (N.J.Super.A.D.))

*7 Defendant countered this testimony by calling an administrator at the county jail where defendant was housed. This witness testified about the close supervision which defendant experienced at the jail and that the jail records did not contain any reference to defendant receiving any injuries while he was in custody.

On appeal, defendant contends that his trial attorney was ineffective in handling this issue because he did not utilize the grand jury testimony of one of the arresting officers, Investigator John Maslak, to the effect that at the time defendant was arrested, he had a fresh scratch on the top of his head.

A defendant alleging ineffective assistance of counsel must establish that his "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 *U.S.* 668, 686, 104 *S.Ct.* 2052, 2064, 80 *L. Ed.*2d 674, 692-93 (1984). In *State v. Fritz*, 105 *N.J.* 42 (1987), our Supreme Court adopted the *Strickland* standards.

[A] defendant whose counsel performed below a level of reasonable competence must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

[*Id.* at 60-61 (quoting *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L. Ed.*2d at 698).]

Thus, to establish a prima facie claim of ineffective assistance of counsel, defendant must meet both prongs of the *Strickland/Fritz* test. *Fritz, supra,* 105 *N.J.* at 52 (quoting *Strickland, supra,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L. Ed.*2d at 693). First, he must show that the actions of his trial counsel were deficient in performance and not objectively reasonable. *Ibid.* Second, defendant must establish that this deficient performance materially affected the outcome of his trial. *Ibid.* In determining whether defendant has met the first prong of the *Strickland/Fritz* test, an appellate court will not second-guess defense counsel's trial decisions which rest upon strategic or tactical considerations. *State v. Buonadonna,* 122 *N.J.* 22, 38 (1991).

We consider defendant's argument entirely unpersuasive. The presence of a "fresh" scratch, noted by Investigator Maslak when defendant was arrested on October 30, hardly supports defendant's assertion that Ms. Gillens repeatedly attacked him because she had been dead for approximately one week by the time he was arrested.

IV

Defendant also contends the trial court committed reversible error when it denied his pretrial motion to sever for purposes of trial, count three, charging hindering apprehension, from the remaining counts in the indictment. Defendant maintains that any jury hearing the details of his post-shooting conduct would be so inflamed against him that it would be impossible for it to deliberate fairly on other charges against him.

*8 Rule 3:7-6 provides:

Two or more offenses may be charged in the same indictment or accusation in a separate count for each offense if the offenses charged are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan. Relief from prejudicial joinder shall be afforded as provided by *R.* 3:15-2.

Rule 3:15-2(b) states:

If ... it appears that a defendant ... is prejudiced by a permissible or mandatory joinder of offenses ... in an indictment or accusation the court may order ... separate trials of counts ... or direct other appropriate relief.

Central to the question whether to grant a defendant's motion to sever under *R.* 3:15-2(b) is " 'whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [*N.J.R.E.* 404(b) ] in the trial of the remaining charges.' " *State v. Chenique-Puey,* 145 *N.J.* 334, 341 (1996) (quoting *State v. Pitts,* 116 *N.J.* 580, 601-02 (1989)) (alteration in original). If the evidence would be admissible, the charges may be tried together because to do so would not expose a defendant to additional prejudice. *Id.* at 341; *State v. Urcinoli,* 321 *N.J.Super.* 519, 542 (App.Div.), *certif. denied,* 162 *N.J.* 132 (1999).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                          Page 7
Not Reported in A.2d, 2006 WL 2590114 (N.J.Super.A.D.)
(Cite as: 2006 WL 2590114 (N.J.Super.A.D.))

Further, the determination whether to grant a motion for such severance rests in the trial court's sound discretion. As we noted in *State v. Krivacska, 341 N.J.Super. 1, 40 (App.Div.), certif. denied, 170 N.J. 206 (2001), cert. denied, 535 U.S. 1012, 122 S.Ct. 1594, 152 L. Ed.2d 510 (2002)*, we review the matter, not from the perspective whether we would decide the question in the same manner, but whether the trial court abused its discretion in deciding the matter as it did. "An appellate court will defer to the trial court's decision, absent an abuse of discretion." *Chenique-Puey, supra, 145 N.J. at 341.*

Defendant contends that evidence relating to his dismemberment of Ms. Gillens would not be admissible if he were tried separately on the homicide charge. Because it occurred after the death of Ms. Gillens, he contends it is irrelevant to his motive at the time of the shooting. We agree, however, with the State's contention that evidence of the dismemberment would be admissible if the offenses were tried separately because it would go to refute defendant's contention that he acted in self-defense when he shot Ms. Gillens. And clearly, evidence of the homicide would be admissible against defendant in a separate trial on a charge of hindering because the homicide was a predicate fact to the hindering charge.

In his brief, defendant merges the analysis of a motion for severance with a claim that evidence relating to the dismemberment should have been sanitized. Defendant points to *State v. Collier, 316 N.J.Super. 181 (App.Div.1998), aff'd o.b., 162 N.J. 27 (1999)*, to support his claim of unfair prejudice. That case, however, was decided not upon severance grounds but upon our determination that certain of the evidence upon which the prosecution relied should have been sanitized because of its potentially prejudicial impact. *Collier, supra, 316 N.J.Super. at 195.*

*9 We have carefully reviewed the trial transcript in this regard. At various points, defendant did object when, in his view, the testimony dealing with the dismemberment became unduly prejudicial. The trial court upheld certain of these objections and overruled others. None of those rulings provides a basis to reverse defendant's convictions.

V

Defendant, in preparation for trial, retained as an ex-

pert John Kelly, a former cocaine addict who ran a drug-counseling center. Kelly, after overcoming his own cocaine addiction, became a certified drug counselor. He is neither a licensed clinical social worker nor a licensed social worker. He eventually formed an out-patient counseling agency at which he would conduct in-take evaluations and develop treatment plans. Kelly did not make any psychiatric or psychological diagnosis, but consulted with a psychiatrist and a psychologist in formulating a treatment plan.

After interviewing defendant, and reviewing the written statements of Ms. Gillens's cocaine dealers and mother, Kelly provided a written report, stating that Ms. Gillens's behavior, with its "severe paranoia, intense anger, explosive rage and violence[ ]" was "symptomatic of severe cocaine dependency."

The State moved to bar Kelly as an expert witness, arguing he lacked the necessary credentials to serve in that capacity. After a *N.J.R.E. 104* hearing, the trial court agreed and granted the State's motion. In explaining its ruling, the trial court said that Kelly's background and credentials qualified him in the area of treatment and counseling, but not as an expert on the effects of cocaine abuse upon the addict. Defendant contends the trial court erred in its ruling and that he is entitled to a new trial as a result.

The decision whether an individual has the requisite qualifications to testify as an expert rests within the discretion of the trial court. *Krivacska, supra, 341 N.J.Super. at 32-33.*Here, while we are satisfied that the trial court erred in excluding Kelly as a witness, we are unable to conclude that the error warrants a new trial.

Kelly was not proffered as an expert witness to give a psychological or psychiatric diagnosis.[FN1]Rather, defendant wanted to present Kelly as a witness to explain to the jury the effects of cocaine usage upon an addict in order to support defendant's testimony about Ms. Gillens's excessive fearfulness, her anger and her volatility. Kelly's background and experience, in our judgment, provided an ample basis to admit him as an expert witness in this area.

FN1. The State within its brief contends that Kelly was offered to give a DSM diagnosis of co-dependency. We recognize that at one portion of the transcript of the *N.J.R.E. 104*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2590114 (N.J.Super.A.D.)
(Cite as: 2006 WL 2590114 (N.J.Super.A.D.))

hearing, there was a reference to a diagnosis of co-dependency. We infer this to be an error in transcription, that the witness was referring to cocaine-dependency. Co-dependency has been defined as "a set of maladaptive, compulsive behaviors learned by family members in order to survive in a family which is experiencing great emotional pain and stress." http://www.all aboutcounseling.com/codependency.htm#whatis (last visited July 24, 2006). That term has no bearing in the context of this case. Kelly in his written report refers not to co-dependency but to cocaine-dependence.

Having reviewed the trial transcript, however, it is apparent that defendant presented that same testimony through Dr. Trent. That Dr. Trent apparently did not withstand cross-examination well does not lead to a conclusion that defendant is entitled to a second trial, with a witness who may perform more strongly on the stand.

### VI

Defendant sought to call Ms. Gillens's mother as a witness to testify that her daughter had told her of an incident in which Ms. Gillens pursued defendant with a gun and fell down the stairs and of another incident in which Ms. Gillens kicked defendant down the stairs. The trial court denied the application, citing our opinion in *State v. Aguiar, 322 N.J.Super. 175* (App.Div.1999), and *United States v. Keiser, 57 F.3d 847* (9th Cir.), *cert. denied,* 516 U.S. 1029, 116 S.Ct. 676, 133 L. Ed.2d 525 (1995).

*10 The defendant in *Aguiar* was convicted of aggravated manslaughter; after his conviction was affirmed, he sought post-conviction relief on the basis that the State had withheld the fact that the victim, who at trial had been portrayed as peaceful, in fact had been convicted of murder. *Aguiar, supra, 322 N.J.Super.* at 178-79.The trial court had denied the defendant's application, finding the evidence irrelevant unless the defendant had known of the victim's violent tendencies. *Id.* at 178.We reversed. *Ibid.* We noted that under the federal evidence rules, "a victim's character is admissible to show that the victim was the aggressor." *Id.* at 183.We also noted that under *N.J.R.E. 405,* "[w]hen evidence of character or a trait of character of a person is admissible, it may

be proved by evidence of reputation, evidence in the form of opinion, or evidence of conviction of a crime which tends to prove the trait." *Aguiar, 322 N.J.Super.* at 183.We concluded that the defendant's proffer of the victim's prior conviction for murder was admissible under *N.J.R.E. 405. Ibid.*

The defendant in *Keiser,* believing that a group of assailants was attacking his brother with a gun, fired his rifle; the bullet struck one of the group, paralyzing him below the waist. *Keiser, supra,* 57 F.3d at 849.Defendant sought to introduce evidence of an incident that occurred during the trial, in which the victim had to be removed from the lobby after screaming at the defendant's brother, apparently threatening revenge. *Id.* at 849-50.This, defendant alleged, tended to show the victim's aggressive nature and bolstered defendant's claim that he acted in defense of his brother. *Id.* at 852.The Court of Appeals held the evidence was properly excluded because it was evidence of a specific act which is admissible under *Fed.R.Evid. 405*(b) only if a person's character is an essential element of a defense. *Id.* at 856-57.

Defendant urges before us that we should not adopt the *Keiser* approach, but, rather, follow *State v. Lewchuk,* 539 N.W.2d 847 (Neb.Ct.App.1995), and *State v. Dunson,* 433 N.W.2d 676 (Iowa 1988), both of which admitted into evidence specific instances of the victim's violent acts in the context of a claim of self-defense, finding it relevant to the question who was the first aggressor.

We reject the analytical framework that defendant has presented to us, which poses the issue as if the ruling of the court deprived defendant entirely of the ability to present evidence of Ms. Gillens's conduct and behavior. In reviewing the trial transcript, it is apparent that the trial court did permit introduction of evidence of Ms. Gillens's prior violent acts and defendant argued to the jury from that evidence that she was the first aggressor. That evidence came both from defendant and from Zoromae Glenngrant, who told the jury in detail of Ms. Gillens's conduct. She said that Ms. Gillens would bully defendant and strike him. She said that she had seen defendant with two black eyes that Ms. Gillens had given him and that Ms. Gillens, during her tantrums, destroyed furniture in the house. She said that on one occasion when she was staying at the house, she heard defendant and Ms. Gillens arguing upstairs and that Ms.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2590114 (N.J.Super.A.D.)
(Cite as: 2006 WL 2590114 (N.J.Super.A.D.))

Page 9

Gillens ran into her room carrying a shotgun and blocked the door and yelled to defendant, "If you come through the door I'll blow a cap in your ass."Her testimony was replete with examples of such conduct.

**\*11** In addition, it is uncertain how much the testimony of Ms. Gillens's mother, Lillie Tankard, would have supported defendant's assertion that Ms. Gillens was the initial aggressor. The parties have not supplied us with copies of the statements Ms. Tankard provided to the police. They are referred to in detail in the transcripts of the arguments before the trial court on the admissibility of her testimony. According to those transcripts, defendant wished to question her about two incidents. One is described in the following manner:

Miss Tankard was told by her daughter that George tied her up and that she walked away and George walked away and then George came back and she kicked George and when she kicked George he fell down the steps....

The second incident is described in the following manner:
[T]hey [defendant and Ms. Gillens] arrived after drinking and doing cocaine and she ran up the stairs, I assume the first floor to the second floor, with a shotgun and the shotgun got caught in the spokes, she calls them, of the railing causing her to fall on the shotgun and cut her arm.

We are unable to conclude from these references that the trial court's ruling unfairly prejudiced defendant. In the first statement, defendant is cast as the initial aggressor and in the second, there is no indication at all that Ms. Gillens was pursuing defendant.

**VII**

We reject defendant's assertion that the trial court erred in not charging defendant's intoxication as a defense to the charge of murder and possession of a weapon for an unlawful purpose. The only evidence of defendant's ingestion of alcohol prior to the shooting is his testimony that after going to the store to purchase a bottle of vodka, he returned home and made himself a drink. That falls far short of the required level of proof. *State v. Cameron,* 104 N .J. 42, 54 (1986); *State v. Micheliche,* 220 N.J.Super. 532,

543 (App.Div.) ("[T]he degree of intoxication must be such as to bring about so great a prostration of the faculties that the requisite mental state was totally lacking."), *certif. denied,* 109 N.J. 40 (1987).

**VIII**

Defendant's remaining arguments are addressed to his sentence. He challenges the five-year term, with a parole disqualifier, imposed by the trial court on the hindering conviction as a violation of the sentencing principles announced in *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L. Ed.2d 403 (2004), and *State v. Natale,* 184 N.J. 458 (2005). We are compelled to agree. The trial court imposed the maximum sentence and, in doing so, cited aggravating factors not necessarily encompassed within the jury's verdict. In light of *Natale,* defendant is entitled to a resentencing.

He also argues that the life sentence, with a thirty-year parole disqualifier for his murder conviction, is similarly invalid. We reject this aspect of defendant's argument. *State v. Abdullah,* 184 N.J. 497, 508 (2005) (holding that trial court did not violate defendant's Sixth Amendment rights when it imposed a life sentence for murder).

**\*12** We do, however, agree with one portion of defendant's argument with regard to his sentence for murder. In imposing a life term, the trial court cited aggravating factor number one, that the crime was committed in a particularly heinous manner. *N.J.S.A.* 2C:44-1(a)(1). It was the subsequent dismemberment, however, that was particularly heinous, not the shooting itself. The evidence indicated that the victim died immediately from one bullet fired at close range. Because that aggravating factor is not supported by the record, defendant must be resentenced on that conviction as well.

Defendant's convictions are affirmed. The matter is remanded for resentencing. We do not retain jurisdiction.

N.J.Super.A.D.,2006.
State v. Jenewicz
Not Reported in A.2d, 2006 WL 2590114 (N.J.Super.A.D.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2590114 (N.J.Super.A.D.)
(Cite as: 2006 WL 2590114 (N.J.Super.A.D.))

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

UNPUBLISHED OPINION IN STATE OF NEW JERSEY V. PAUL CIBELLI, JR.,
SUPERIOR COURT OF NEW JERSEY, APPELLATE DIVISION, A-6422-06T4,
DECIDED JUNE 12, 2009

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.   A-6422-06T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

PAUL CIBELLI, JR.,

     Defendant-Appellant.

---

Argued March 17, 2009 - Decided June 12, 2009

Before Judges Skillman, Grall and Espinosa.

On appeal from Superior Court of New Jersey,
Law Division, Middlesex County, Indictment No.
06-01-00106.

Paul Casteleiro argued the cause for appellant.

Simon Louis Rosenbach, Assistant Prosecutor,
argued the cause for respondent (Bruce J.
Kaplan, Middlesex County Prosecutor,
attorney; Mr. Rosenbach, of counsel and on
the brief).

PER CURIAM

    Defendant Paul Cibelli, Jr., was convicted of first degree
murder, $N.J.S.A.$ 2C:11-3 (count one), third degree hindering
apprehension or prosecution, $N.J.S.A.$ 2C:29-3(b) (count two),
and possession of a weapon (construction stapler) for an
unlawful purpose, $N.J.S.A.$ 2C:39-4(d) (count three).  The court

merged count three with count one and sentenced defendant on count one to a fifty-year term with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2, with five years' parole supervision. The court sentenced defendant on count two to a consecutive five-year term.

Tania Silva, defendant's girlfriend, was last seen alive at defendant's home on the night before she planned to leave him. Her body was found five days later at a recycling plant in Pennsylvania.  There was, however, no forensic evidence which established that the murder was committed at defendant's home, and the central issue at trial was the identity of the person who killed her.

At trial, defendant's former wife was permitted to testify that, seven years earlier, defendant had threatened to kill her if she left him and that her body would never be found.  The State also presented hearsay evidence, which it now concedes was inadmissible, for the purpose of showing that defendant had been untruthful in a statement to police, a violation of defendant's Sixth Amendment right to confront the witnesses against him.  We conclude that the trial court abused its discretion in admitting this evidence and that these errors had the clear capacity to bring about an unjust result.  Moreover, the potential for prejudice inherent in each of these errors was exploited in the

2                                    A-6422-06T4

Da330

prosecutor's arguments in summation.  Accordingly, we reverse defendant's conviction and remand for a new trial.  We affirm the trial court's denial of defendant's motion to suppress evidence.

In April 2005, defendant and Silva moved into the home of defendant's father, Paul Cibelli ("Cibelli"), in South Plainfield.  By July 2005, the relationship between defendant and Silva became strained.  Silva complained to her stepmother, Elvira Silva, that defendant was trying to control her and also complained about the relationship to her boss, Lawrence Dondero, co-workers, Anya Allara and Arlisa Smith, a classmate, Maggie Vargas, and a friend, Fernando Barrientos.

In late summer or early fall, Silva ended her relationship with defendant.  She located an apartment in Monroe Township on October 6, 2005, and made plans to take the next day as a vacation day so she could move.  Silva shared her excitement and her plans with Smith, her stepmother and Barrientos.  She asked Barrientos to help her move "right away the next day in the morning."  She also asked Barrientos to keep the location of her new apartment "a secret" because she did not plan on telling defendant where she was moving.  It was agreed that Barrientos would call Silva the following day to finalize arrangements.

On October 6, 2005, defendant accompanied Silva to a U-Haul rental location in Iselin.  Silva took the key for the rental

3

A-6422-06T4

Da331

truck that evening because, as she told the U-Haul employee, she wanted to pick the truck up before the office opened at 8:00 a.m. the following day.  Silva and defendant arrived home at approximately 7:00 p.m.  Defendant, Silva, and Cibelli ate dinner together.  Shortly thereafter, Silva told Cibelli that she was moving out in the morning.  Defendant and Silva carried boxes and other items to the garage and to Silva's car until approximately 1:00 a.m., when one of them told Cibelli that they were going to bed.  With the house secured for the night, Cibelli retired to his bedroom on the first floor where he slept through the night, undisturbed.  This was the last time anyone other than defendant spoke to Silva or saw her alive.

On the following morning at approximately 6:30 a.m., Cibelli noticed that defendant's and Silva's cars were parked in front of the house when he left to buy items for breakfast.  He did not see either of them and saw no signs of an intruder or a struggle within the house.  When Cibelli returned, he asked defendant if Silva was awake.  Defendant responded, "Tania's not here.  She's not around," and he told Cibelli he did not know where Silva was.

A number of people tried unsuccessfully to reach Silva on her cellphone throughout that morning: her boss, Barrientos, the U-Haul employee and her new landlord.  In response to one call, a man answered Silva's cellphone, stated that he would pass the

Da332

message along and hung up.  Defendant told Barrientos and
another friend who came to help Silva move as well as the two
co-workers who came to the residence that he did not know where
Silva was and had not seen her since the prior evening.  He
suggested to Barrientos that Silva may have gone to work.  To
her co-workers, he suggested that she might have left the house
to smoke a cigarette, as smoking was not allowed in the house.
He admitted to her co-workers that her cell phone, keys and
purse were still in the house.  Silva's friends and co-workers
met at the South Plainfield Police Department to file a missing
persons report.

During the course of the day, three pairs of police
officers from the South Plainfield Police Department arrived at
the house at different times in response to the missing persons
report.  Defendant denied any knowledge of Silva's whereabouts
to each of them.  He stated that he had last seen her at about
1:00 a.m., when he finished helping her pack and went to bed.
Officer Robert Rogers testified that defendant did not "seem too
upset about anything."  Defendant stated that Silva's cell phone
and purse were still in the house and gave the officers
permission to look for her in the residence.  He suggested that
she might have gone for a walk, although he noted she had "never
done that before."

The officers searched the house twice, walked around the exterior and searched Silva's vehicle.  They found no signs of a struggle or evidence of blood.  Defendant pointed out that all of Silva's shoes were in the house.  Several black plastic bags with red drawstring ties, filled with her clothes, were recovered from Silva's car.  The police also took possession of Silva's purse, which contained her wallet, checkbook, driver's license, credit cards, work and school identification cards, cell phone, a Drug Fair receipt for "Glad" garbage bags and the U-Haul truck rental contract.

Defendant told Detectives Gene Bataille and James Foran that he had met Silva at the YMCA the prior evening and then accompanied her to a U-Haul rental facility in Iselin. Bataille asked defendant to come to headquarters to further the investigation.  Defendant agreed and asked the detectives to contact George Graves, a friend who was an FBI agent.  Although defendant went to headquarters with Graves later that afternoon, he became angry after waiting for an hour for Bataille and left.

On the following day, October 8, 2005, defendant made purchases of an over-the-counter sleep medication, Advil, and Nytol, and did not return home that night.  Cibelli notified the police and filed a missing persons report.

At approximately 9:30 a.m. on October 9, 2005, Sergeant Donald Lapp, of the New Paltz, New York Police Department,

A-6422-06T4

received a report that a man was running in the hallway of the Super 8 motel with no clothes on, and that the management wanted him removed from the premises. Lapp and Keith Lewis, another New Paltz police officer, knocked on the door of room 220. Defendant opened the door, wearing a towel wrapped around his waist. Lapp testified that defendant seemed "disorientated, confused, just kind of out of it." He was "babbling" that he was in New Paltz to look "at foliage" and did not make sense.

The room was a mess. There was human excrement smeared on the bed and on the wall above the bed. The officers asked defendant to gather his things and brought him to the motel desk to settle his account. At this point, the officers were considering having defendant evaluated by a psychiatrist and believed that he was unfit to drive. When they arrived at defendant's vehicle, they asked him for his car keys. Defendant told the officers he might have left his keys in a backpack in the motel room.

Lewis returned to the room and retrieved a backpack belonging to defendant. The officer searched the backpack, without defendant's consent, and found defendant's car keys, together with a legal pad that contained a "Last Will & Testament," in which defendant described how he wanted to be buried, and three letters to his daughters, his father, and "George." In the letter to Cibelli, defendant wrote "[p]lease

7

A-6422-06T4

pray for me & Tania."  Lapp decided to send defendant by

ambulance to a hospital in Kingston, New York for a psychiatric

evaluation, and defendant agreed to undergo the examination.

At approximately 2:00 p.m. that afternoon, Lapp learned

that missing persons reports had been filed in South Plainfield

for defendant and Silva.  After speaking to the South Plainfield

detectives, he returned to the motel with another detective.

They retrieved a note that said, "When I am found please call

George Graves first."  The officers arrested defendant on a

charge of public lewdness to "hold" defendant in custody until

the South Plainfield police arrived.

On October 12, 2005, Silva's body was found in three black

plastic garbage bags at a recycling plant in Northeast

Philadelphia.  The driver who delivered the bags containing

Silva's body had picked up recyclables from dumpsters at various

locations between Philadelphia and Morrisville, Pennsylvania and

compacted the load after every pick-up.  The last stop on the

route that day was in Morrisville, a fifty-five minute drive

from defendant's home.

The black plastic garbage bags in which Silva's body was

found tested positive for the presence of blood.  Her head was

in a black plastic garbage bag, tied with red drawstring and

sealed with duct tape.  Her hands were secured behind her back

with duct tape, and her legs were bent at the knees with her

8                          A-6422-06T4

Da336

feet against her buttocks.  She was wearing only a gray Oxford University sweatshirt and a bracelet.

The bags also contained a number of items that were later associated with defendant or his residence.  A Bostitch H30 hammer stapler, identified by George Graves as defendant's, tested positive for the presence of Silva's blood.  A large yellow bath towel bore a pubic hair that, according to mitochondrial DNA testing, belonged to defendant.  DNA testing showed that a yellow tee-shirt with the logo "Corona Extra Cancun" was stained with Silva's blood.  In the subsequent search of the Cibelli residence, there were photographs of defendant in a similar tee-shirt but the tee-shirt itself was not in the house.  A small blue hand towel and a large blue bath towel with the brand name "Bathroom Basics" matched towels found in the Cibelli residence.  Among the other items found in the bag was a wooden dowel.  No shoes were found on Silva or in the bag.

The pathologists called by the State and defendant agreed that the cause of death was asphyxiation by manual strangulation.  Edward Chmara, the forensic pathologist with the Philadephia Medical Examiner's Office who conducted the autopsy, described the condition of the body as "quite decomposed" and said it was consistent with Silva having last been seen on October 7, 2005.  Chmara further testified that Silva had

A-6422-06T4

Da337

suffered multiple injuries, some of which had been inflicted before her death and some thereafter, presumably while her body was being crushed in the recycling truck.  Chmara identified a number of injuries as occurring before Silva's death: a laceration in an L-shaped pattern above her right eyebrow, which, Chmara stated, was consistent with being struck by the Bostitch stapler; multiple abrasions on her hands and forearms, characteristic of defensive injuries; a left clavicular fracture; and a blunt force injury below her right eye.  There was also a two-and-one-eighth inch laceration on the crown of her head which would have caused a substantial amount of bleeding if inflicted before Silva's death.

Nicholas Petraco, defendant's expert in crime scene analysis and trace evidence, testified that because there had been a "very violent struggle," "lots of blood" would have been detectable at the Cibelli residence if Silva had been murdered there.

For two days after the body was found, law enforcement officers conducted a search of the Cibelli residence pursuant to a search warrant.  Although thorough, the search was hampered by heavy rain.  There was no evidence of forced entry.  Despite the use of sophisticated detection methods, no evidence of blood was found anywhere within the residence or in the Cibelli vehicles. No forensic evidence was obtained to confirm that a crime had

10                          A-6422-06T4

Da338

been committed in the residence or anywhere in the yard. However, several items were removed from the residence which had a nexus to Silva's murder.  In addition to the towels and photograph of defendant in a yellow "Corona Extra Cancun" tee-shirt like that found with Silva's body and stained with her blood, the officers recovered a sheath that the Bostitch stapler fit into and boxes of garbage bags that were similar both to the bag wrapped around Silva's head and to the four bags in which her body had been placed.

Defendant filed motions in limine to suppress evidence recovered from his backpack, to exclude testimony from his ex-wife that he had threatened her and to exclude statements made by Silva regarding her relationship with defendant.  After an evidentiary hearing, the court denied the motion to suppress, granted defendant's motion to exclude some of Silva's statements and denied the remainder of the relief sought.

At trial, Michelle Cibelli testified that she and defendant were married in 1984, separated in 2003, and divorced in 2004. On direct examination, Ms. Cibelli testified in response to leading questions as follows:

> Q.  Did the defendant ever threaten to kill you if you left him?
> A.  Yes.
> Q.  And that if you did and he killed you that they would never find your body?
> A.  Yes.

A-6422-06T4

```
Q.   How often did he render that threat to
     you?
A.   I don't have a number of times.
Q.   More than once?
A.   Yes.
Q.   Repeatedly?  More than five times?
A.   Yes.
```

On re-direct examination, Ms. Cibelli was asked what she had told her mother about these threats.  She said, "I told my mother that I was not suicidal, I would never leave my children with him, and that if something happened to me he did it and to come look for me because I didn't want to be in a swamp somewhere."

Defendant raises the following issues on appeal:

### POINT ONE

THE MISCONDUCT OF THE PROSECUTOR DURING SUMMATION DEPRIVED THE DEFENDANT OF HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW UNDER BOTH THE UNITED STATES AND NEW JERSEY CONSTITUTIONS (Partially raised).

### POINT TWO

THE EVIDENCE WAS LEGALLY INSUFFICIENT AND THE TRIAL JUDGE ERRED IN DENYING THE DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL.

### POINT THREE

THE CLOSING OF THE COURTOOM TO THE PUBLIC AND THE DEFENDANT VIOLATED THE DEFENDANT'S RIGHT TO A PUBLIC TRIAL, THE PUBLIC'S RIGHT TO ATTEND THE TRIAL, AND THE DEFENDANT'S RIGHT TO BE PRESENT AT ALL STAGES OF HIS TRIAL, UNDER BOTH THE UNITED STATES AND NEW JERSEY CONSTITUTIONS AND RULE 3:16,

Da340

MANDATING REVERSAL OF THE DEFENDANT'S CONVICTIONS.

POINT FOUR

THE ADMISSION OF HEARSAY TESTIMONY RELATING TO THE DEFENDANT'S ALLEGED CONDUCT IN THE NEW PALTZ MOTEL AND HIS ALLEGED LIE TO THE POLICE IN SAYING HE MET THE DECEDENT AT THE YMCA CONSTITUTED INADMISSIBLE HEARSAY AND VIOLATED THE DEFENDANT'S CONFRONTATION RIGHTS UNDER THE SIXTH AMENDMENT OF THE U.S. CONSTITUTION AND ARTICLE 1, PARAGRAPH 10 OF THE CONSTITUTION OF NEW JERSEY (Partially raised).

POINT FIVE

THE ADMISSION OF OTHER CRIME EVIDENCE IN THE FORM OF THE TESTIMONY OF MICHELLE CIBELLI, AND/OR SERGEANT DONALD LAPP AND DETECTIVE DAVID DUGATKIN DEPRIVED THE DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.

POINT SIX

THE ADMISSION OF EVIDENCE OF THE DEFENDANT'S SILENCE AT POLICE HEADQUARTERS VIOLATED THE DEFENDANT'S RIGHT AGAINST SELF-INCRIMINATION.

POINT SEVEN

THE WARRANTLESS SEARCH AND SEIZURE OF THE DEFENDANT'S BACKPACK CONTAINING HIS WRITINGS VIOLATED HIS RIGHTS AND THE TRIAL COURT ERRED IN DENYING HIS MOTION TO SUPPRESS.

POINT EIGHT

THE CUMULATIVE EFFECT OF THE ERRORS IN THE TRIAL COURT DENIED THE DEFENDANT A FAIR TRIAL.

Our review of these contentions leads us to conclude that the trial court abused its discretion in admitting certain

A-6422-06T4

Da341

evidence, that these errors were exacerbated by the prosecutor's arguments in summation, and therefore a reversal of defendant's conviction is required.

I.

We turn first to defendant's argument regarding the introduction of other crimes evidence.  Defendant contends that the court erred in permitting his ex-wife to testify that he had threatened that he would kill her if she left him and that her body would never be found.  After reviewing the record, we conclude that the court abused its discretion in permitting this evidence, State v. Barden, 195 N.J. 375, 390-91 (2008), and that, as a result, defendant's convictions must be reversed.

N.J.R.E. 404(b) provides:

> [E]vidence of other crimes, wrongs or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith.  Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

The trial court conducted a hearing to determine the admissibility of the proffered other crimes evidence.  The determination whether such evidence is properly admissible is guided by the four-part test set forth in State v. Cofield, 127 N.J. 328, 338 (1992):

14

A-6422-06T4

Da342

1.  The evidence of the other crime must be admissible as relevant to a material issue;

2.  It must be similar in kind and reasonably close in time to the offense charged;

3.  The evidence of the other crime must be clear and convincing; and

4.  The probative value of the evidence must not be outweighed by its apparent prejudice.

In applying the Cofield test, the trial court found that the first factor was satisfied because defendant's threat to kill Michelle if she left "demonstrates [an] indication of similar threats in this case, where Tania was leaving within a matter of hours, that there was this pre-formulated plan, and that the evidence is also relevant to intent. So, it meets factor number one as to being relevant." As to the second factor, the court found the threats were "[s]imilar in kind and reasonably close in time because the threats . . . could have been as late as 1998, only seven years before the murder of Tania Silva."[1] The court found the third factor satisfied as well: "Michelle Cibelli's testimony was extremely credible, and

---

[1] At the pretrial hearing, Ms. Cibelli testified that these threats occurred between 1986 and 1998. At trial, she testified that these threats occurred "[t]hroughout the course of our marriage," which lasted from 1986 until their 2003 separation and 2004 divorce.

A-6422-06T4

Da343

that evidence is clear and convincing." Finally, the court made the following comment regarding the fourth factor, "[T]he court finds that the probative value of this evidence is not outweighed by the danger of undue prejudice and thus is admissible."

We defer to the trial court's findings as to Michelle Cibelli's credibility, State v. Locurto, 157 N.J. 463 (1999), and the conclusion that the evidence of the threats was, therefore, clear and convincing. However, the remainder of the trial court's analysis was flawed.

In evaluating the first factor, the court misapplied the law in determining that the legally permitted purposes of "plan" and "intent" were material issues here.

As noted, the trial court found that the earlier threats demonstrated that "there was this pre-formulated plan." However, "plan" as used in N.J.R.E. 404(b) is not designed to permit the introduction of other crimes evidence to prove a "plan" in the sense that the indicted offense was premeditated. "Plan" refers instead to a continuing scheme that includes both the indicted offense and the prior conduct. To admit other crimes evidence as probative of a "plan," the evidence must prove "the existence of an integrated plan, of which the other crimes and the indicted offense are components." State v. Stevens, 115 N.J. 289, 305-06 (1989); see also State v. Louf, 64

16                                      A-6422-06T4

Da344

N.J. 172, 178 (1973) (holding "plan" exception applicable when other crimes evidence "tends to establish the existence of a larger continuing plan of which the crime on trial is a part"); State v. Lumumba, 253 N.J. Super. 375, 387 (App. Div. 1992). There was no evidence here that the threats to Michelle and the murder of Tania were components of any larger, continuing plan. The trial court's conclusion that the proffered evidence tended to prove the existence of a plan for purposes of N.J.R.E. 404(b) was, therefore, erroneous.

The trial court also found that the evidence was admissible as probative of intent. To constitute a basis for the introduction of this evidence, defendant's intent must be "a material issue in dispute." N.J.R.E. 404(b). In State v. Pierro, 355 N.J. Super. 109, 121 n.1 (App. Div. 2002), certif. denied, 175 N.J. 434 (2003), this court observed that intent was not a disputed issue when the suspect's defense was that he was not present at the crime scene. Similarly, the theory of the defense here was that Tania was neither killed at the Cibelli residence nor killed by defendant, not that he killed her by mistake or accident. Moreover, Tania died from strangulation. The medical testimony revealed that she suffered both traumatic and defensive injuries prior to her death. It was the identity of the person who committed the homicide, and not the killer's intent, that was the material issue in this case. Therefore,

A-6422-06T4

the testimony regarding defendant's threats to his ex-wife could not be admitted for the purpose of establishing intent.

Although the trial court did not rely upon identity as a basis for the admission of this evidence, the State has suggested on appeal that the evidence of defendant's prior threats was admissible to prove the identity of the killer. The use of other crimes evidence to prove identity is appropriate in "signature crimes, in which some distinct feature about the two crimes clearly allows the jury to make an inference other than propensity to commit crime." State v. Fortin, 162 N.J. 517, 529 (2000) (emphasis added). However, the very argument advanced by the State reveals an impermissible purpose to demonstrate a propensity as the prosecutor argued in his summation. Conceding that identity was the contested aspect of the case, the State argues, "[T]he fact that [defendant] had threatened to kill somebody if that somebody did exactly what Tania did is important, and there was no other way that the State could make that point." The fact that such evidence had the capacity to persuade the jury that defendant killed Silva does not mean that the evidence was properly admissible to prove identity. The distinctive nature of the defendant's criminal behavior in both crimes must meet a high threshold to qualify as "signature" crimes. "[T]he other crimes must bear peculiar, unique, or bizarre similarities." Id. at 530. The Supreme Court has

18

A-6422-06T4

identified the standard for such evidence to be admissible on
the issue of identity:

> [T]he prior criminal activity with which
> defendant is identified must be so nearly
> identical in method as to earmark the crime
> as defendant's handiwork.  The conduct in
> question must be unusual and distinctive so
> as to be like a signature, and there must be
> proof of sufficient facts in both crimes to
> establish an unusual pattern.
>
> [Id. at 532 (quoting State v. Reldan, 185
> N.J. Super. 494, 502-03 (App. Div.), certif.
> denied, 91 N.J. 543 (1982).]

While defendant's prior threats had the capacity to
convince jurors that he had a propensity to threaten to kill
women who left him, his conduct was not so "unusual and
distinctive so as to be like a signature."  Moreover, the facts
regarding the unfulfilled threats to defendant's former wife and
the murder of Tania Silva are too dissimilar to establish a
signature pattern of criminal conduct.  Therefore, this evidence
would not have been admissible to prove identity pursuant to
N.J.R.E. 404(b).

As to the second factor, the threats were made to a person
unrelated to the homicide, approximately seven years earlier,
within the context of a divorce that would cause the defendant
to be separated from his children.  Therefore, the threats were
neither similar in kind to the offense charged nor reasonably

A-6422-06T4

Da347

close in time.   See State v. Sanders, 320 N.J. Super. 574, 580-82 (App. Div. 1999), aff'd o.b., 163 N.J. 2 (2000).

Finally, since the other crimes evidence lacked any legitimate probative value, the trial court's conclusion that such value was not outweighed by any prejudice to the defendant was erroneous.   "Other-crimes evidence is considered highly prejudicial," State v. Vallejo, 198 N.J. 122, 133 (2009), having "a unique tendency to turn a jury against the defendant." Stevens, supra, 115 N.J. at 302; State v. Hernandez, 334 N.J. Super. 264, 269-70 (App. Div. 2000), aff'd as modified, 170 N.J. 106 (2001).  When the erroneous reliance upon "plan" and "intent" is set aside, the court's reasoning reveals that it found the purported similarity between the threats and the circumstances of the homicide to be persuasive in admitting this evidence.  The danger to be guarded against here was that this similarity would be used by the jury for the prohibited purpose: to show that defendant was predisposed to kill women who dared to leave him.  This, in fact, was the argument made by the prosecutor in summation:

> The defendant [did] to Tania what he had previously threatened to do to another woman who had thoughts about leaving him, Michelle, his former wife.  . . .  The defendant told Michelle if you ever think about leaving I will kill you and they will never find your body.   And what the defendant threatened to do to Michelle is what he did to Tania . . . .

A-6422-06T4

Da348

In reviewing a prosecutor's argument that a defendant's similar prior acts demonstrated "just the way [the defendant] operates," the Supreme Court commented, "If that is not an allusion to propensity, then we do not know what would be." State v. G.V., 162 N.J. 252, 260 (2000).  The same can be said here.

We therefore conclude that the trial court made a clear error in judgment in evaluating and weighing the Cofield factors.  Once admitted, the evidence of defendant's threats to his ex-wife did not merely have a potential for prejudice; the evidence was actually used to persuade the jury that defendant was predisposed to kill women who left him and acted in conformity with that predisposition, a use expressly prohibited by N.J.R.E. 404(b).  Although the trial court gave a limiting instruction, the prejudice that resulted from the introduction of this evidence requires a new trial.

Our conclusion that a new trial is required is further supported by additional errors in the trial that had the capacity to bring about an unjust result.

II.

When interviewed, defendant stated that he met Tania Silva at the YMCA the evening before her disappearance and the two of them had gone from there to the U-Haul rental location.

21                              A-6422-06T4

Da349

Bataille testified that during the course of the investigation, he went to the YMCA as part of "checking into stories [defendant] told" to "see if anything doesn't fit."  When asked what he found out at the YMCA, Bataille stated that it "was not the case" that defendant and Tania had met there.  He began to describe the information a secretary obtained from computer records when defense counsel objected on hearsay grounds.  The court initially overruled the objection but, after the witness continued with his answer, there was a second objection, which was sustained.  The court then questioned the witness directly:

> THE COURT:    In other words, your investigation showed that she had not been at the YMCA on October 7, 2005?
>
> THE WITNESS:  The initial information given to me she was there when I went there and they checked the computer that was not true.

The State concedes that this testimony constituted inadmissible hearsay evidence and, further, that the prosecutor commented in his summation that the disparity between defendant's statement and the hearsay evidence refuting his statement was evidence of defendant's guilt.  Bataille's description of the information received from the YMCA secretary entailed "the use of testimonial statements, taken in the course of police questioning and unchallenged by cross-examination, as

22                           A-6422-06T4

a substitute for in-court testimony," and should have been

barred pursuant to Crawford v. Washington, 541 U.S. 36, 50-52,

124 S. Ct. 1354, 1363-64, 158 L. Ed. 2d 177, 192-93 (2004).  See

State ex rel. J.A., 195 N.J. 324, 328 (2008).  The admission of

this evidence violated defendant's Sixth Amendment right to

confront the witnesses against him.  Ibid.  In his summation,

the prosecutor exacerbated this error by using the statement to

argue that defendant's statement was false and therefore,

evidence of his guilt.  Therefore, we reject the State's

contention that the error was harmless beyond a reasonable

doubt.

III.

Defendant also alleges that the prosecutor's comments

during summation constituted prosecutorial misconduct.  As we

have stated elsewhere in this opinion, in each case in which the

admission of evidence constituted an abuse of discretion, the

prejudicial impact of the evidence was exacerbated by

corresponding arguments made by the prosecutor in summation.

Because a new trial is required based upon those errors, we will

limit our discussion of the remaining challenges to the

prosecutor's summation to the following.

The prosecutor told the jury that it was his "suspicion"

that the green wood dowel found in the bag with Silva's body was

used to plug her anus to prevent bodily fluids from leaking out.

23

A-6422-06T4

An objection made by defense counsel immediately after the prosecutor began to articulate his suspicion was overruled.  We acknowledge that prosecutors are "expected to make vigorous and forceful closing arguments to juries," State v. Frost, 158 N.J. 76, 82 (1999), and "are afforded considerable leeway in that endeavor." State v. Jenewicz, 193 N.J. 440, 471 (2008). However, the prosecutor commits misconduct if he presents a theory of the case that "draws unreasonable inferences from the evidence adduced at trial." State v. Papasavvas, 163 N.J. 565, 616 (2000).

The State did not present any evidence during its case in chief to support an inference that the dowel had been inserted into Silva's anus.  In fact, the forensic evidence available to the State indicated that there was no trace evidence on the dowel that might have supported such an inference.  Although the pathologist called by defendant conceded on cross-examination that it was possible, based upon the sizes of the anus and the dowel, for the dowel to be inserted into the anus, he added, "It doesn't smell like anus."  This evidence did not fairly support the inference that the dowel was inserted into Silva's anus. Given the potential prejudice from suggesting that Silva's body was subjected to this additional indignity after death, the prosecutor should not have shared this "suspicion" with the jury.  While this error, standing alone, would have been

24                          A-6422-06T4

insufficient to require a reversal, it exacerbated the prejudicial effect of the court's admission of Michelle Cibelli's testimony and the hearsay evidence that Tania Silva had not been at the YMCA the day before her murder.

IV.

Defendant also challenges for the first time on appeal the admission of evidence regarding the events that occurred in New Paltz, New York.  Specifically, he contends it was error to admit into evidence the fact that defendant was charged with lewdness and the police officer's testimony that defendant's motel room was soiled with feces on the bed and walls. Defendant contends that a Cofield analysis was required before this evidence could be introduced.  There was, however, neither a Cofield analysis nor a limiting instruction as to this evidence.  The State contends that this evidence was properly introduced to demonstrate defendant's consciousness of guilt.

On retrial, an analysis of the evidence pursuant to the Cofield factors should be conducted to determine its admissibility.[2]  In its analysis, the court should consider the availability of other evidence that can be used to prove a permitted purpose, State v. Jenkins, 178 N.J. 347, 365 (2004), the degree to which the evidence can be sanitized to reduce its

---

[2]  We assume that defendant's challenges to this evidence as inadmissible hearsay will be addressed as well.

25

A-6422-06T4

Da353

inherent prejudice, Barden, supra, 195 N.J. at 390; State v. Collier, 316 N.J. Super. 181, 185 (App. Div. 1998), aff'd o.b., 162 N.J. 27 (1999), and limiting admissibility to those facts reasonably necessary for the probative purpose, State v. Chenique-Puey, 145 N.J. 334, 341-43 (1996); State v. Fortin, 318 N.J. Super. 577, 598 (App. Div. 1999), aff'd, 162 N.J. 517 (2000). If the evidence is deemed admissible, an appropriate limiting instruction should be given. Stevens, supra, 115 N.J. at 304.

V.

Defendant claims that the trial court erred in denying his motion to suppress the seizure of items from his backpack in New Paltz. At the time of the search, the police officers knew nothing of Tania Silva's disappearance and defendant's possible involvement. They were responding to a citizen's complaint regarding a man acting in a bizarre manner. Their own observations and conversation with defendant provided further evidence of irrational behavior and supported their views that they were dealing with someone in need of psychiatric evaluation who posed a danger to himself.

In Brigham City v. Stuart, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947, 164 L. Ed. 2d 650, 657 (2006), the Supreme Court addressed the nature of exigent circumstances "obviating the requirement of a warrant [where there] is a need to assist

26                                    A-6422-06T4

Da354

persons who are seriously injured or threatened with such
injury."  Noting that "the ultimate touchstone of the Fourth
Amendment is 'reasonableness,'" the Court required that need to
act to be objectively reasonable.  <u>Ibid.</u>  Based upon the
undisputed facts here, it was objectively reasonable for the
officers to conclude that defendant posed a danger to himself,
was in imminent need of psychiatric evaluation, and needed their
assistance in transporting him to a facility where he would
receive such attention.  Although the officers' subjective
intent was irrelevant to the applicability of this exception,
<u>id.</u> at 404-05, 126 <u>S. Ct.</u> at 1948, 164 <u>L. Ed.</u> 2d at 658, the
officers' lack of knowledge regarding Silva's murder and their
conduct in obtaining medical assistance for defendant supports
the conclusion that their actions in responding to what they
believed to be an emergent need to assist defendant were
objectively reasonable.  Therefore, we conclude that the trial
court properly denied the motion to suppress.  <u>See also</u> <u>People</u>
<u>v. Molnar</u>, 774 <u>N.E.</u>2d 738, 740 (N.Y. 2002).

After carefully considering the record and briefs, we are
satisfied that defendant's remaining arguments are without
sufficient merit to warrant discussion in a written opinion.  <u>R.</u>
2:11-3(e)(2).

We affirm the denial of defendant's motion to suppress
evidence.  We reverse his conviction and remand for a new trial.

27                                A-6422-06T4

I hereby certify that the foregoing
is a true copy of the original on

Da355

**AFFIDAVIT OF SERVICE**
A-6576-06T4
--------------------------------------------------------------------------------X
State of New Jersey,
          vs.

Melanie McGuire.
--------------------------------------------------------------------------------X

EDWARD T. O'CONNELL
13 WILLIAM ST. APT. 2
GARFIELD, N J 07026

I,                                             , swear under the pain and penalty of perjury,  that according to law and being over the age of 18, upon my oath depose and say that:

          on August 14, 2009

          I served the within Appendix on Behalf of Defendant-Appellant Melanie McGuire in the above captioned matter upon:

          Daniel Bornstein
          Deputy Attorney General
          New Jersey Division of Criminal Justice
          Richard J. Hughes Justice Complex
          25 West Market Street, 5th Floor
          Trenton, NJ  08625

via **Hand Delivery.**

Unless otherwise noted, copies have been sent to the court on the same date as above for filing via Hand Delivery.

**Sworn to before me on August 14, 2009**

Robyn Cocho
Notary Public State of New Jersey
No. 2193491
Commission Expires January 8, 2012

Edward T O'Connell

Job # 223242