# Superior Court of New Jersey

## Appellate Division

DOCKET NO. A-6576-06T4

|  |  |  |
|---|---|---|
| STATE OF NEW JERSEY, | : | <u>CRIMINAL ACTION</u> |
|    Plaintiff-Respondent, | : | On Appeal From a Final Judgment of Conviction of the Superior Court |
| v. | : | of New Jersey, Law Division, Middlesex County. |
| MELANIE MCGUIRE, | : | Sat Below: |
|    Defendant-Appellant. | : | Hon. Frederick P. DeVesa, P.J.S.C., and a jury. |

BRIEF AND APPENDIX ON BEHALF OF THE STATE OF NEW JERSEY

PAULA T. DOW
ATTORNEY GENERAL OF NEW JERSEY
ATTORNEY FOR PLAINTIFF-RESPONDENT
STATE OF NEW JERSEY
RICHARD J. HUGHES JUSTICE COMPLEX
TRENTON, NEW JERSEY  08625

DANIEL I. BORNSTEIN
DEPUTY ATTORNEY GENERAL
DIVISION OF CRIMINAL JUSTICE
P.O. BOX 086
TRENTON, NEW JERSEY  08625
(609) 292-9086
DCJAppellate@njdcj.org

   OF COUNSEL AND ON THE BRIEF

TABLE OF CONTENTS

PAGE

COUNTER-STATEMENT OF PROCEDURAL HISTORY . . . . . . . . . . . 1

COUNTER-STATEMENT OF FACTS   . . . . . . . . . . . . . . . 2

LEGAL ARGUMENT

    POINT I

        DEFENDANT WAS CONVICTED BY A FAIR AND
        IMPARTIAL JURY THAT WAS NOT TAINTED BY
        OUTSIDE INFLUENCES OF ANY KIND . . . . . . . . . . 13

        A.   The Trial Court, With Assistance From
            the Attorneys, Adequately Voir Dired the
            Jurors. . . . . . . . . . . . . . . . . 36

        B.   There is No Evidence That Any Juror
            Posted to Internet Message Boards During
            Deliberations. . . . . . . . . . . . . . 39

        C.   The Trial Court Employed the Proper
            Standard of Review. . . . . . . . . . . . 41

    POINT II

        THE PROSECUTOR DID NOT ENGAGE IN MISCONDUCT
        OR DEPRIVE DEFENDANT OF A FAIR TRIAL . . . . . . 42

        A.   The Prosecutor Did Not Engage in
            Prosecutorial Misconduct During Her
            Summation . . . . . . . . . . . . . . . 42

        B.   The Prosecutor Did Not Engage in So-
            Called "Inflammatory Questioning. . . . . . 52

        C.   Conclusion . . . . . . . . . . . . . . . 57

    POINT III

        THE TRIAL COURT PROPERLY QUALIFIED THOMAS
        LESNIAK AND FRANK RUIZ AS EXPERT WITNESSES,
        AND PROPERLY PRECLUDED THE DEFENSE FROM
        INTRODUCING INCOMPETENT EVIDENCE AT TRIAL. . . . . 58

        A.   The Trial Court Properly Permitted the
            State to Introduce Expert Testimony from
            Thomas Lesniak and Frank Ruiz. . . . . . . . 58

i

B. The Trial Court Properly Precluded the Defense from Eliciting Hearsay Testimony From the Victim's Former Co-Worker, George Lowery . . . . . . . . . . . . . 72

C. The Trial Court Properly Precluded the Defense From Eliciting Irrelevant Testimony From William McGuire's Ex-Wife, Marcie Paulk . . . . . . . . . . . 76

POINT IV

DEFENDANT'S LIFE SENTENCE FOR THE DEPRAVED KILLING OF WILLIAM McGUIRE IS JUSTLY DESERVED . . . . . . . . . . . . . . . . 79

A. The Sentencing Court Properly Found Aggravating Factor (1) . . . . . . . . . 82

B. The Sentencing Court Properly Rejected Mitigating Factor (11) . . . . . . . . 85

C. Conclusion . . . . . . . . . . . . . 86

CONCLUSION . . . . . . . . . . . . . . . . . . 86

## TABLE OF APPENDIX

State's Exhibit 883 (Transcript of Consensual Recording of Telephone Conversation Between Brad Miller and Defendant, Dated ) . . . . . . . . . . . . . . . . Pa1-9

State's Exhibit 884 (Transcript of Consensual Recording of Telephone Conversation Between Brad Miller and Defendant, Dated May 31, 2005 . . . . . . . . . . . Pa10-20

State's Exhibit 885 (Transcript of Consensual Recording of Telephone Conversation Between James Finn and Defendant, Dated April 15, 2005 . . . . . . . . . Pa21-46

## TABLE OF AUTHORITIES

### CASES

Berger v. United States, 295 U.S. 78 (1935) . . . . . . 43, 48

Bonnet v. Stewart, 68 N.J. 287 (1975) . . . . . . . . . 79

Commonwealth v. Foreman, 797 A.2d 1005 (Pa. Super. Ct. 2002) 68

ii

Darden v. Wainwright, 477 U.S. 168 (1986)   . . . . . . . . .   44

Green v. New Jersey Mfrs. Ins. Co., 160 N.J. 480 (1999) .   78,79

Johnston v. State, 27 So.3d 11, 21 (Fla. 2010)   . . . . . .   69

Lutwak v. United States, 344 U.S. 604 (1953)   . . . . . . .   58

Panko v. Flintkote Co., 7 N.J. 55 (1951)   . . . . . . .   31,33
                                                              41

Ramirez v. State, 810 So.2d 836 (Fla. 2002)   . . . . . .   70

Sheppard v. Maxwell, 384 U.S. 333 (1966)   . . . . . . . .   30

Smith v. Phillips, 455 U.S. 209 (1982)   . . . . . . . . .   32

State v. Abrams, 140 N.J. Super. 232 (App. Div. 1976),
   aff'd o.b., 72 N.J. 342 (1977)   . . . . . . . . . . . ,   75

State v. Bealor, 187 N.J. 574 (2006)   . . . . . . . . . .   68

State v. Behn, 375 N.J. Super. 409 (App. Div. 2005)   . . .   68

State v. Bey, 112 N.J. 45 (1988)   . . . . . . . . . . .   30,31
                                                              32

State v. Brown, 170 N.J. 138 (2000)   . . . . . . . . . .   75

State v. Bucanis, 26 N.J. 45 (1958), cert. denied,
   357 U.S. 910 (1958)   . . . . . . . . . . . . . . . .   44

State v. C.H., 264 N.J. Super. 112 (App. Div.),
   certif. denied, 134 N.J. 479 (1993)   . . . . . . . . .   46

State v. Carter, 91 N.J. 86 (1982)   . . . . . . . . . .   78,79

State v. Catlow, 206 N.J. Super. 186 (App. Div. 1985),
   certif. denied, 103 N.J. 465-66 (1986)   . . . . . . . .   77

State v. Chavies, 345 N.J. Super. 254 (App. Div. 2001)   . . .   74

State v. Cito, 196 N.J. Super. 220 (Law Div. 1984)   . . . .   69

State v. Clark, 287 P. 18 (Wash. 1930)   . . . . . . . . .   69

State v. Crumb, 277 N.J. Super. 311 (App. Div. 1994)   . .   56,57

State v. Darby, 174 N.J. 509 (2002)   . . . . . . . . . .   77

State v. Davis, 96 N.J. 611 (1984)   . . . . . . . . . . .   77

State v. Deatore, 70 N.J. 100 (1976) . . . . . . . . . . . 77

State v. Downey, 206 N.J. Super. 382 (App. Div. 1986) . 73,74

State v. Dreher, 251 N.J. Super. 300 (App. Div.),
    certif. denied, 127 N.J. 564 (1992) . . . . . . . . 73,75

State v. Engel, 249 N.J. Super. 336 (App. Div.),
    certif. denied, 130 N.J. 393 (1991) . . . . . . . . 45,48

State v. Feaster, 156 N.J. 1 (1998) . . . . . . . . . . . 58

State v. Fortin, 189 N.J. 579 (2007) . . . . . . . . . . 66

State v. G.V., 162 N.J. 252 (2000) . . . . . . . . . . . 77

State v. Gardner, 113 N.J. 510 (1989) . . . . . . . . . 79

State v. Ghertler, 114 N.J. 383 (1989) . . . . . . . . 80,86

State v. Gomez, 246 N.J. Super. 209 (App. Div. 1991) . . . . 75

State v. Harris, 141 N.J. 525 (1995) . . . . . . . . . . 43

State v. Harvey, 151 N.J. 117 (1997) . . . . . . . . . 43,44

State v. Hutchins, 241 N.J. Super. 353 (App. Div. 1990) 77,78

State v. Irving, 114 N.J. 427 (1989) . . . . . . . . . . 45

State v. Jenewicz, 193 N.J. 440 (2008) . . . . . . . . 66,67
                                                       68,71

State v. Jenewicz, Docket No. A-0013-02T4
    (App. Div. Aug. 8, 2006), rev'd, 193 N.J. 440 (2008) . . . 84

State v. Johnson, 31 N.J. 489 (1960) . . . . . . . . . . 44

State v. Kelly, 97 N.J. 178 (1984) . . . . . . . . . . . 66

State v. Koedatich, 112 N.J. 225 (1988), cert. denied,
    488 U.S. 1017 (1989) . . . . . . . . . . . . . . . 78,79

State v. Koskovich, 168 N.J. 448 (2001) . . . . . . . . 44,77

State v. Krivacska, 341 N.J. Super. 1 (App. Div.),
    certif. denied, 170 N.J. 206 (2001), cert. denied,
    535 U.S. 1012 (2002) . . . . . . . . . . . . . . . . 67

State v. Loftin, 146 N.J. 295 (1996) . . . . . . . . . . 58

State v. M.L., 253 N.J. Super. 13 (App. Div. 1991),
    certif. denied, 127 N.J. 560 (1992) . . . . . . . . . . 57

State v. Machado, 111 N.J. 480 (1988) . . . . . . . . . . 74

State v. Macon, 57 N.J. 325 (1971) . . . . . . . . . . 46,53
                                                          55

State v. Malik, 365 N.J. Super. 267 (App. Div. 2003),
    certif. denied, 180 N.J. 354 (2004) . . . . . . . . . 85

State v. Mance, 300 N.J. Super. 37 (App. Div. 1997) . . . . 54

State v. Manley, 54 N.J. 259 (1969) . . . . . . . . . . . 54

State v. Marshall, 123 N.J. 1 (1991) . . . . . . . . . . 58

State v. Moore, 122 N.J. 420 (1991) . . . . . . . . . . 67

State v. Munoz, 340 N.J. Super. 204 (App. Div.),
    certif. denied, 169 N.J. 610 (2001) . . . . . . . . 45,48

State v. O'Donnell, 117 N.J. 210 (1989) . . . . . . . 80,86

State v. Papasavvas, 163 N.J. 565 (2000) . . . . . . . 43,44

State v. Prudden, 212 N.J. Super. 608 (App. Div. 1986) . . . 74

State v. R.D., 169 N.J. at 557 . . . . . . . . . . . 30,31
                                                       32,42

State v. Radziwil, 235 N.J. Super. 557 (App. Div. 1990),
    aff'd o.b., 121 N.J. 527 (1990) . . . . . . . . . . 84

State v. Reeds, 197 N.J. 280 (2009) . . . . . . . . . . 66

State v. Rogers, 19 N.J. 218 (1955) . . . . . . . . . 56,57

State v. Roth, 95 N.J. 334 (1984) . . . . . . . . . . 80,86

State v. Sachs, 69 N.J. Super. 566 (App. Div. 1961) . . 32,33

State v. Swint, 328 N.J. Super. 236 (App. Div.),
    certif. denied, 165 N.J. 492 (2000) . . . . . . . 77,78

State v. Timmendequas, 161 N.J. 515 (1999) . . . . . . 43,44
                                                          45

State v. Torres, 183 N.J. 554 (2005) . . . . . . . . 66,67
                                                       68

State v. Townsend, 186 N.J. 473 (2006) . . . . . . . 66,67
                                                       68,70
                                                       71

<u>State v. White</u>, 158 <u>N.J.</u> 230 (1999)  . . . . . . . . . .  75

<u>State v. Williams</u>, 93 <u>N.J.</u> 39 (1983)  . . . . . . . . . .  30

<u>State v. Wormley</u>, 305 <u>N.J. Super.</u> 57 (App. Div. 1997)  . . .  38

<u>United States v. Bowers</u>, 534 <u>F.</u>2d 186 (9th Cir.),
    <u>cert. denied</u>, 429 <u>U.S.</u> 942 (1976)  . . . . . . . . .  68

<u>United States v. Edwards</u>, 696 <u>F.</u>2d 1277 (11th Cir.),
    <u>cert. denied</u>, 461 <u>U.S.</u> 909 (1983)  . . . . . . . . .  36

<u>United States v. Rose</u>, 672 <u>F.Supp.</u>2d 723, 725 (D. Md. 2009)  .  69

<u>United States v. Young</u>, 470 <u>U.S.</u> 1 (1985)  . . . . . . . .  43,48


## STATUTES

<u>N.J.S.A.</u> 2C:2-6  . . . . . . . . . . . . . . . . . .  1

<u>N.J.S.A.</u> 2C:11-3  . . . . . . . . . . . . . . . . .  1

<u>N.J.S.A.</u> 2C:22-1  . . . . . . . . . . . . . . . . .  1

<u>N.J.S.A.</u> 2C:28-1  . . . . . . . . . . . . . . . . .  1

<u>N.J.S.A.</u> 2C:28-4a  . . . . . . . . . . . . . . . . .  1

<u>N.J.S.A.</u> 2C:28-6(2)  . . . . . . . . . . . . . . . .  1

<u>N.J.S.A.</u> 2C:29-3b(4)  . . . . . . . . . . . . . . . .  1

<u>N.J.S.A.</u> 2C:35-10a(1)  . . . . . . . . . . . . . . . .  1

<u>N.J.S.A.</u> 2C:39-4a  . . . . . . . . . . . . . . . . .  1

<u>N.J.S.A.</u> 2C:43-7.2  . . . . . . . . . . . . . . . . .  2

<u>N.J.S.A.</u> 2C:44-a(1)  . . . . . . . . . . . . . . . .  80,83
                                                       84

<u>N.J.S.A.</u> 2C:44-1a(9)  . . . . . . . . . . . . . . . .  81

<u>N.J.S.A.</u> 2C:44-1b(11)  . . . . . . . . . . . . . . . .  82,85


## RULES

<u>N.J.R.E.</u> 104  . . . . . . . . . . . . . . . . . . .  58

<u>N.J.R.E.</u> 401  . . . . . . . . . . . . . . . . . . .  74,77
                                                       78

N.J.R.E. 403  . . . . . . . . . . . . . . . . . . . . .  58,77
                                                          78,79

N.J.R.E. 702  . . . . . . . . . . . . . . . . . . . . . .  65

N.J.R.E. 803(c)(3)  . . . . . . . . . . . . . . . . . .  73,74

N.J.R.E. 803(c)(25)  . . . . . . . . . . . . . . . . . .  75

R. 1:36-3  . . . . . . . . . . . . . . . . . . . . . . .  84

R. 2:9-1(a)  . . . . . . . . . . . . . . . . . . . . . .  40

R. 2:10-2  . . . . . . . . . . . . . . . . . . . . . .  43,46
                                                         48,50
                                                         53,53
                                                         55,57

### OTHER SOURCES CITED

Biunno, Current N.J. Rules of Evidence (Gann 2009)  . . . . .  73

Hon. Harry T. Edwards, Statement before U.S. Senate Judiciary
     Committee (Mar. 18, 2009)  . . . . . . . . . . . . . . .  69

N.J. Const., art. 1, par. 10  . . . . . . . . . . . . . . . .  30

### TABLE OF TRANSCRIPTS

```
 1T refers to transcript dated October 12, 2005.
 2T refers to transcript dated November 18, 2005.
 3T refers to transcript dated December 1, 2005.
 4T refers to transcript dated February 14, 2006.
 5T refers to transcript dated March 13, 2006.
 6T refers to transcript dated March 22, 2006.
 7T refers to transcript dated May 12, 2006.
 8T refers to transcript dated June 19, 2006.
 9T refers to transcript dated July 27, 2006.
10T refers to transcript dated September 28, 2006.
11T refers to transcript dated October 17, 2006.
12T refers to transcript dated October 30, 2006.
13T refers to transcript dated November 9, 2006.
14T refers to transcript dated December 20, 2006.
15T refers to transcript dated January 16, 2007.
16T refers to transcript dated January 18, 2007.
17T refers to transcript dated January 22, 2007.
18T refers to transcript dated January 23, 2007.
19T refers to transcript dated January 24, 2007.
20T refers to transcript dated January 25, 2007.
21T refers to transcript dated January 31, 2007 (Vol. I).
22T refers to transcript dated January 31, 2007 (Vol. II).
23T refers to transcript dated February 2, 2007.
```

```
24T refers to transcript dated February 7, 2007.
25T refers to transcript dated February 16, 2007.
26T refers to transcript dated February 26, 2007.
27T refers to transcript dated February 27, 2007.
28T refers to transcript dated March 5, 2007.
29T refers to transcript dated March 6, 2007.
30T refers to transcript dated March 7, 2007.
31T refers to transcript dated March 12, 2007.
32T refers to transcript dated March 13, 2007.
33T refers to transcript dated March 14, 2007.
34T refers to transcript dated March 15, 2007.
35T refers to transcript dated March 19, 2007.
36T refers to transcript dated March 20, 2007.
37T refers to transcript dated March 21, 2007.
38T refers to transcript dated March 22, 2007.
39T refers to transcript dated March 26, 2007.
40T refers to transcript dated March 27, 2007.
41T refers to transcript dated March 28, 2007.
42T refers to transcript dated March 29, 2007.
43T refers to transcript dated March 30, 2007.
44T refers to transcript dated April 2, 2007.
45T refers to transcript dated April 3, 2007.
46T refers to transcript dated April 4, 2007.
47T refers to transcript dated April 5, 2007.
48T refers to transcript dated April 9, 2007 (Vol. I).
49T refers to transcript dated April 9, 2007 (Vol. II).
50T refers to transcript dated April 10, 2007.
51T refers to transcript dated April 11, 2007 (Vol. I).
52T refers to transcript dated April 11, 2007 (Vol. II).
53T refers to transcript dated April 12, 2007 (Vol. I).
54T refers to transcript dated April 12, 2007 (Vol. II).
55T refers to transcript dated April 16, 2007.
56T refers to transcript dated April 17, 2007.
57T refers to transcript dated April 18, 2007.
58T refers to transcript dated April 19, 2007.
59T refers to transcript dated April 20, 2007.
60T refers to transcript dated April 23, 2007.
61T refers to transcript dated June 18, 2007.
62T refers to transcript dated July 19, 2007.
```

COUNTER-STATEMENT OF PROCEDURAL HISTORY

On October 11, 2005, a State Grand Jury returned Indictment No. 05-10-00164-I, charging defendant, Melanie McGuire, with first-degree murder, N.J.S.A. 2C:11-3 and N.J.S.A. 2C:2-6 (Count One); second-degree possession of a weapon, a firearm, for an unlawful purpose, N.J.S.A. 2C:39-4a and N.J.S.A. 2C:2-6 (Count Two); second-degree desecrating human remains, N.J.S.A. 2C:22-1 and N.J.S.A. 2C:2-6 (Count Three); and third-degree perjury, N.J.S.A. 2C:28-1 (Count Four). (Da1-5).

On October 26, 2006, a State Grand Jury returned Indictment No. 06-10-00119-S, charging defendant with the following additional crimes: third-degree hindering prosecution, N.J.S.A. 2C:29-3b(4) and N.J.S.A. 2C:2-6 (Count One); third-degree hindering prosecution, N.J.S.A. 2C:29-3b(4) (Count Two); fourth-degree tampering with or fabricating physical evidence, N.J.S.A. 2C:28-6(2) (Count Three); fourth-degree false reports to law enforcement authorities, N.J.S.A. 2C:28-4a (Count Four); and four counts of third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10a(1) (Counts Five, Six, Seven, and Eight). (Da6-13).

On January 24, 2007, the Honorable Frederick P. DeVesa, P.J.S.C., granted the State's motion to consolidate the two indictments for trial. (Da17).

Defendant was tried before Judge DeVesa and a jury from March 5, 2007 through April 23, 2007. At the close of the State's case, Judge DeVesa granted the State's motion to dismiss

1

Counts Four, Five, Six, and Eight of the second indictment.
(47T9-22 to 11-9).

On April 23, 2007, the jury convicted defendant of the four
charges in the first indictment (murder, possession of a weapon
for an unlawful purpose, desecrating human remains, and perjury).
The jury acquitted defendant of the four charges remaining from
the second indictment (renumbered as Counts Five through Eight).

On June 18, 2007, Judge DeVesa denied defendant's motion for
a new trial. (61T).

On July 19, 2007, Judge DeVesa sentenced defendant as
follows: on Count One of the first indictment (murder), to a term
of life imprisonment, with an 85 percent parole disqualifier
under the No Early Release Act, N.J.S.A. 2C:43-7.2; on Count
Three of the first indictment (desecrating human remains), to a
concurrent term of ten years, with five years of parole
ineligibility; and on Count Four of the first indictment
(perjury), to a consecutive term of five years, with two and one-
half years of parole ineligibility. Count Two was merged into
Count One and dismissed. (62T47-1 to 55-6; Da267-276).

Defendant's Notice of Appeal was filed on August 22, 2007.
(Da277-280).

## COUNTER-STATEMENT OF FACTS

The night of April 28, 2004 should have been one of the
happiest nights of Bill McGuire's life. He was 39 years old, he
was married with two young children, and he and his wife had just
closed on their dream house: a $500,000 home in Warren County,

2

New Jersey.  But the night of April 28, 2004 was the last time Bill McGuire was seen alive.  He never got to move into his dream house.  And he never got to see his children grow up.  Instead of celebrating the single largest purchase of his life, he was murdered and brutally dismembered.  The evidence indicates he was drugged with chloral hydrate and shot at least three times before his body was cut into pieces with a reciprocating saw.  His body parts were then dumped into plastic garbage bags, stuffed into three suitcases, and tossed into the Chesapeake Bay in Virginia like unwanted trash.  It was a gory and gruesome killing, and the ensuing investigation uncovered overwhelming evidence identifying defendant, the victim's wife, as the murderer.

On May 5, 11, and 16, 2004, three green and black Kenneth Cole "Reaction" suitcases containing the victim's body parts were recovered from the area of the Chesapeake Bay.  The first and third suitcases were found floating in the water near the Chesapeake Bay Bridge and Tunnel, the bridge that connects the eastern shore of Virginia to the City of Virginia Beach.  The second suitcase was found on the shore of nearby Fisherman's Island.  (28T111-11 to 131-14; 28T135-1 to 146-18; 28T151-18 to 175-18; 29T3-20 to 33-15; 29T55-16 to 59-6).  In the first suitcase were black plastic garbage bags containing Bill McGuire's legs, from his knees down to his feet.  (28T102-22 to 104-21; 28T112-15 to 113-21; 28T135-1 to 146-14; 28T151-24 to 156-25).  In the second suitcase were black plastic garbage bags containing Bill McGuire's upper torso, from the waist up, as well

3

as a hospital blanket and a 5.5 pound Weider weight.  (28T104-22
to 106-23; 28T157-1 to 175-18; 29T3-22 to 22-21).  In the third
suitcase were black plastic garbage bags containing Bill
McGuire's midsection, from his waist down to his knees.  (28T106-
24 to 108-20; 28T111-11 to 116-21; 29T22-22 to 33-7).

While the suitcases were being recovered in Virginia, Bill
McGuire's relatives, friends, and co-workers were frantically
searching for him in New Jersey.  They had neither seen nor heard
from him since April 28, 2004, the day he and defendant had
closed on their new house.  They knew it was unlike Bill to
ignore phone calls, emails, and messages, especially since he had
been so excited about the house, and as each day passed, they
grew more and more worried.  (31T7-16 to 23-14; 31T109-22 to 118-
24; 45T4-17 to 14-7; 46T17-15 to 20-21).

The only person who did not seem concerned was defendant.
She was telling everyone that she and Bill had had a big fight on
the night of the closing, and that Bill had physically assaulted
her by slapping her and stuffing a dryer sheet in her mouth.  She
claimed that Bill's behavior had frightened her so much that she
had taken refuge in the bathroom with one of her sons, and that
while in the bathroom, she had heard Bill gather up his
belongings, announce he was leaving the marriage, tell her she
would never see him again, and accuse her of being the reason why
the children would grow up without a father.  Defendant also
claimed she stayed in the bathroom until she heard defendant slam
the door and drive away.  Two days later, she filed for a

4

restraining order and shortly after that, she filed for divorce.
She told Bill's friends that she was moving on with her life, and
that if Bill ever "returned," she would not accept him back.
(45T12-10 to 13-13; 46T18-20 to 23; 46T20-3 to 12).

But the truth is that defendant had made plans to leave Bill
long before April of 2004.  For years, she had been involved in a
serious extra-marital affair with Dr. Bradley Miller, a
reproductive endocrinologist at Reproductive Medical Associates
("RMA") in Morristown, the fertility clinic where she worked as a
nurse.  Defendant and Dr. Miller had fallen in love with each
other, and they had made plans to end their respective marriages,
marry each other, and raise a family together.  (37T5-12 to 14-
2).

It took some time before the police in Virginia found out
that the body parts recovered from the suitcases belonged to
William Maguire.  A break in the case occurred when Detective Ray
Pickell released a sketch of the victim to the media on May 21,
2004. (29T55-6 to 24).  Bill's best friend, John Rice, was living
in Chesapeake, Virginia at the time, and when he and his wife,
Susan, saw the sketch on the news, Susan thought it looked like
Bill.  The Rices contacted the police and said they thought the
sketch resembled Bill McGuire.  They also disclosed what they
knew about Bill and his disappearance.  Based on the information
they provided, the police obtained samples of Bill McGuire's
fingerprints, which were on file, and when a fingerprint expert
compared those fingerprint samples to the fingerprints of the

victim, there was a match.  (29T55-25 61-23; 29T62-24 to 63-1;
46T14-15 to 24-1).

Now that the victim had been identified, Detective Pickell
decided to travel to New Jersey to investigate further.  But
before leaving for New Jersey, he authorized the Barnegat Police
Department to go to defendant's parent's house to notify
defendant of her husband's death.  When Officer Richard Nowak of
the Barnegat Police Department conveyed the news to defendant and
her stepfather on May 26, 2004, defendant immediately gave the
impression that she was crying, but the officer did not recall
seeing tears coming out of her eyes.  (29T63-9 to 15; 35T62-19 to
66-22).

On June 1, 2004, Detective Pickell and Detective Thomas
Shattuck drove to New Jersey, and the next day, they interviewed
defendant at her divorce attorney's law office.  (29T67-14 to 76-
12; 35T141-8 to 143-9).  During the interview, defendant repeated
the story about the fight she claimed she had with Bill and his
subsequent departure.  (29T70-7 to 71-3; 35T142-16 to 143-9).
She also said that her marriage was not a "very happy marriage,"
that Bill's behavior had become erratic over the past three or
four months, that Bill was a "jerk" who was "unfriendly and
"unliked," and that Bill had a habit of "pissing people off"
because he had a "big mouth."  (29T69-22 to 23; 29T71-21 to 24;
35T145-7 to 15).

Under questioning, defendant appeared nervous and was
"visibly shaking."  At times, she made facial expressions that

suggested she might be crying, but Detective Pickell did not see any tears.  (29T75-5 to 16).  When asked if she and Bill owned any luggage, defendant replied that they did not travel much and only had some mixed pieces of luggage, not a matching set. (29T72-6 to 11; 35T143-19 to 22).  When asked if there were any guns in the house, she said there were none.  (35T143-11 to 15).

At one point, defendant asked if the police had found Bill's car.  When Pickell said they had not found the car, defendant said they were likely to find it in Atlantic City because Bill was "heavily comped" by a couple casinos there.  (29T70-3 to 7; 29T75-17 to 25).  Defendant also said she had moved out of the apartment, with help from friends and family, and was storing her belongings in a storage unit.  Pickell asked defendant for permission to search the storage unit, and defendant agreed. (29T74-1 to 8; 29T76-8 to 12).

The next morning, Detective Pickell and Detective Shattuck met defendant and her attorney at the storage facility where defendant was renting two storage units.  In the larger of the two storage units, they found a small plastic container that, according to defendant, contained what was left of Bill's possessions.  In the smaller of the two storage units, they found William's wallet.  (29T76-13 to 82-12).

When Detective Pickell asked about the rest of Bill's clothing and possessions, defendant said she had given away all of Bill's clothes, and that the only property left was in the container.  (29T77-20 to 25).  She also indicated she had been

7

thinking about the interview from the day before and now recalled that she and Bill did own a matching set of name-brand luggage that was green in color. At that point, Detective Pickell showed defendant a photograph of the first suitcase, and she admitted it "looked like the luggage they owned." (29T78-1 to 22).

The autopsy revealed that the victim had been shot three or four times. At least two of those shots were fatal. The first fatal shot struck the victim in the forehead and passed through his skull and brain before exiting through the back of the head. The second fatal shot struck the victim in the chest and passed through the abdominal wall and lung before exiting through the back. (30T55-8 to 58-17; 30T64-8 to 16). The medical examiner also recovered two bullets from the victim's body, but could not establish a bullet path for either of those bullets. The first bullet was found in the victim's left upper quadrant, below the chest in the upper belly, and the second was found near the victim's midsection, around the area where the victim's guts were "hanging out." (30T55-13 to 21; 30T58-18 to 64-7). The bullet found near the midsection resembled a bezoar because it was covered with a mass of cloth-like fibers. (30T58-18 to 59-21).

When the police investigated whether defendant had ever purchased a gun, they learned that on April 26, 2004, just two days before the victim's disappearance, she had traveled to a gun shop in Pennsylvania and purchased a Taurus .38 Special handgun and a box of .38 Special wad cutter bullets, typically used for target practice. (29T143-22 to 158-12).

When the bullets recovered from the victim were tested by
two independent ballistics experts, it was determined that they
were .38 Special wad cutter bullets, just like the ones defendant
had purchased.  It was also determined that the bullets had been
fired from a single gun having six lands and grooves with a right
twist.  Given the rifling characteristics of those bullets, one
of the possible manufacturers of the murder was Taurus, the
manufacturer of the gun defendant purchased.  (30T94-2 to 101-18;
30T178-24 to 186-6).

When the police conducted a search for the victim's 2002
Nissan Maxima, they learned that it had been towed from the
Flamingo Motel in Atlantic City.  (29T83-15 to 84-16).  Detective
Pickell then went to the Flamingo Motel and secured a
surveillance tape of the parking lot.  The tape confirmed that
someone parked the Maxima in the hotel parking lot on April 30,
2004 at 12:41 a.m.  Immediately thereafter, a car matching the
general description of defendant's Nissan Pathfinder pulled into
the parking lot, and the driver of the Maxima exited that car and
entered the passenger side of the Pathfinder, which then left the
scene.  The Maxima remained in the same parking space for more
than a week, until it was towed away on May 8, 2004.  (29T84-17
to 90-3; 29T3-15 to 21).

Detective Pickell subsequently found the Maxima in a tow
yard and obtained defendant's consent to search it.  A subsequent
search revealed a syringe and a small vial containing a pinkish-
clear liquid in the glove box, as well as a blackberry

9

communication device and a computer in the trunk.   The police
then swept the carpet on the floor of the car to gather trace
evidence.   (29T93-22 to 100-19).   The vial containing the
pinkish-clear liquid tested positive for chloral hydrate, a
powerful sedative available only by prescription, (48T35-6 to
10), and the trace evidence swept up from the floor was
determined to contain Bill McGuire's fibrous connective tissue.
Dr. Zhongxue Hua, an expert in forensic and anatomical pathology,
testified that such tissue cannot be shed from a live human being
and will be found only when a person is cut up the way Bill
McGuire was cut up.   (42T144-4 to 158-17).

When the police obtained the McGuires' computer, they
submitted it for forensic analysis and discovered that in the
days leading up to Bill McGuire's murder, the computer had been
used to conduct internet searches for words and phrases such as
"undetectable poisons," "instant poisons," "instant undetectable
poisons," "how to commit murder," "chloral hydrate," "state gun
laws," "how to purchase guns in Pennsylvania," "gun laws in
Pennsylvania," "purchase guns in New Jersey," "how to purchase
guns illegally," "how to purchase hunting rifles in N.J.,"
"insulin as a poison," "diuretic and poisoning," "poisoning
deaths," "morphine poisoning," "sedatives," "insulin as a
poison," "toxic insulin levels," "fatal insulin doses," "fatal
digoxin doses," and "chloral and side-effects."   There was also a
search for "Walgreens" on April 26, 2004.   (32T100-10 to 109-23).

Further investigation revealed that on April 28, 2004, the

10

day Bill McGuire disappeared, defendant filled a prescription for chloral hydrate at a Wahlgreen's pharmacy near the daycare facility attended by the McGuire children. She used a forged RMA prescription that purported to be signed by Dr. Miller for a patient named Tiffany Baim. Although Tiffany Bain was an actual patient at RMA, Dr. Miller never prescribed chloral hydrate for her and never signed the prescription. (31T60-8 to 164-8; 32T151-2 to 152-13).

Further investigation revealed that in the weeks leading up to the murder, defendant had reached out to James Finn, a former nursing school classmate and gun enthusiast. Defendant told Finn she wanted to get a gun because her husband was acting strange and she was growing afraid of him. Finn told defendant it was easier to get a gun in Pennsylvania, where there was no waiting period if you could show proof of residency. (27T15-6 to 18-6).

Almost a year after the killing, in a consensually recorded telephone conversation, defendant admitted to Finn that she had bought a gun, but she claimed she bought it because her husband wanted her to get it. Defendant also admitted, in that same conversation, that she was the one who parked Bill's car in the Flamingo Hotel. In particular, she claimed she had traveled to Atlantic City to look for Bill on the night he left, that she happened to find the car, and that she moved it to the Flamingo Hotel for spite. (Pa21-46).

When the police learned that defendant had given about six black plastic garbage bags containing the victim's clothing to

Justin Marrero, they seized those bags and compared them to the bags recovered with the victim's body parts.  A variety of scientific tests, including an infrared spectroscopy test, a differential scanning calorimetry test, an ash test, and tool mark analyis, proved that the two sets of bags had been made in the same facility and produced on the same production line, within a maximum of several hours apart.  (46T104-25 to 105-14).

Additional evidence linked the bags to defendant.  For instance, a blanket found in the suitcase containing Bill McGuire's torso had a tag for HCSC, the health care co-op that provided blankets to RMA.  (30T102-21 to 109-17).  Also, one of the bags contained a tiny specimen of nail polish and a hair that was confirmed had defendant's mitochondrial DNA.  (44T160-10 to 24).

Defendant's EZ Pass account indicated that her car drove through tolls on the Atlantic City Expressway ("ACE") on May 2, 2004 at 12:54 a.m. and May 18, 2004 at 5:47 a.m.  The two charges were for forty-five cents each.  On June 3, 2004, defendant used her personal cell phone to dispute those two charges, claiming she had not traveled on the ACE, but EZ Pass refused to reverse the charges because the charges reflected EZ Pass transponder hits.  (45T129-24 to 136-22).

Based upon all this evidence, and a host of other evidence adduced at trial, defendant was convicted of murder, possession of a weapon for an unlawful purpose, desecrating human remains, and perjury.  This appeal follows.

12

LEGAL ARGUMENT

POINT I

DEFENDANT WAS CONVICTED BY A FAIR AND
IMPARTIAL JURY THAT WAS NOT TAINTED BY
OUTSIDE INFLUENCES OF ANY KIND.

Without factual support, defendant asserts that the jurors "were keenly aware of, and exposed to, the media frenzy surrounding the trial." (Db20). And without factual support, defendant asserts that media coverage "infected the process, exposing the jurors to highly inflammatory materials." (Db19). Defendant's claims are inaccurate and misleading. The jurors faithfully followed the trial court's repeated admonitions to avoid all media accounts of the case. As a result, the jurors were not exposed to, or influenced by, extra-judicial information concerning the facts, the crime, the defendant, or the victim. Their ability to render a fair and impartial verdict was not compromised in any way.

Defendant's argument stems from the fact that on or about April 18, 2007, the first day of jury deliberations, the jurors received a personal note from a recently-excused juror. The excused juror (Juror No. 14) had been excused two days earlier because her home was flooded and she could not make it to court. (55T4-10 TO 20). She left the note on Juror No. 5's windshield. Juror No. 5 then brought the note to the courthouse and shared it with the other jurors. (60T2-17 to 3-9).

The outside of the note was addressed "To the Jurors." Inside, the note read as follows:

13

To all --

I cannot believe I am not there to see this
through with all of you.  I feel a little
disappointed, although I can't say I'm not
relieved as well.  I had prayed on Sunday for
help with the awesome task ahead of me this
week and he sent wind and rain and I was
excused.  Careful what you pray for, right?

I am praying for all of you today, that you
will have the wisdom to do what is right.

I have to tell you I spent all day yesterday
reading blogs and watching arguments.  It was
so tempting to blog back, but I did not.

Linda -- I am the one w/ hard eyes :) and I
intrigue the bloggers.  They talk about us,
but nothing terrible.

Deb & Rafik -- you must feel some relief
today too.  Deb, if you get a moment (like
you won't have all day) call (XXX)XXX-XXXX.[1]

Good luck to you all.  You are in my
thoughts.

[Da117-119.]

On Friday morning, April 20, a court clerk discovered the
note in the jury room.  It had been left there the day before.
Judge DeVesa reviewed the note with counsel, and it was decided
that the court would question all the jurors, as well as the
excused juror, in the presence of counsel.  (60T2-17 to 3-9).

When Judge DeVesa questioned Juror No. 14, she said she
wrote the note and left it on Juror No. 5's windshield the
previous Wednesday morning.  (59T3-14 to 4-5; 59T9-18 to 10-1;
59T14-12 to 21).  She also indicated that Juror No. 5 lived a
couple blocks from her, and that after she left the note, she

---

[1]     The actual telephone number is not reproduced here.

received a brief telephone call from Juror No. 5, who thanked her for her support and said they would be in touch when the trial was over.  (59T2-23 to 24; 59T10-2 to 11-2).

Juror No. 14 told the court that after getting excused as a juror, she started watching television coverage of the trial and reading about the case on the internet.  (59T4-20 to 6-6).  She insisted, however, that she never told the other jurors what she had seen on television or read on the internet.  (59T7-8 to 19).

When Judge DeVesa asked about the reference to the juror with the "hard eyes," Juror No. 14 said that at some point during the trial, one of the jurors heard about a blog on the internet that described a "tough-looking" juror with "hard eyes."  The jurors discussed who the blogger was describing, and they speculated it was Juror No. 14.  (59T6-7 to 7-7; 59T11-23 to 14-3).  Nevertheless, Juror No. 14 did not look at the blogs until after she was excused as a juror.  It was then that she realized she was the juror with the "hard eyes" because the blogger mentioned that the juror with the "hard eyes" had been excused. (59T6-7 to 7-7).

Juror No. 14 said that aside from the discussion about the juror with the "hard eyes," she and the other jurors never discussed what was on the internet or on television.  Juror No. 14 also expressed her personal belief that none of the jurors had looked at the blogs.  (59T7-20 to 9-2; 59T13-21 to 23; 59T14-22 to 15-9).

Juror No. 14 told the court that she had acted with the best

15

of intentions when she wrote the note.  She simply wanted to
convey to the jurors that she was praying for them and wished she
could be with them.  She described herself as a "very religious
person," and said that when she was on the jury, she had "prayed
for help in making the right decision."  Then, after getting
excused as a juror, she had prayed for guidance for the remaining
jurors.  The note was not intended to "get a message" to the
jury.  In fact, she did not know what decision was the right
decision, and she had never discussed the merits of the case with
the other jurors.  (59T7-15 to 19; 59T8-5 to 7; 59T11-2 to 22).

After speaking with Juror No. 14, Judge DeVesa interviewed
each of the remaining jurors, one at a time, in the presence of
counsel.  The judge asked all the initial questions, and each of
the attorneys was permitted to ask supplemental questions.

Juror No. 1 indicated that when he and the other jurors saw
Juror No. 14's note, they thought it was "really nice of her,"
but they "didn't make too much of it."  (59T21-3 to 22-23).  When
asked what Juror No. 14 meant when she indicated she was the
juror with the "hard eyes," Juror No. 1 said that someone had
told one of the jurors about a blog that portrayed one of the
jurors as having "hard eyes."  (59T22-24 to 23-16).  He insisted,
however, that none of the jurors had made any comments
"pertaining to the case," and that none of the jurors had
discussed information "posted on the internet or by the media
about the case."  (59T23-17 to 24-20).

Juror No. 1 said that although some of the jurors were

16

interested in how the media was portraying them, he believed that all the jurors were being honest about not getting information about the case from outside sources.  (59T23-21 to 24-5).  He also indicated he had not heard, read, or been told anything about the case other than what had been presented as evidence in the courtroom.  (59T24-21 to 25).

Juror No. 1 said he had not participated in any conversations that "would have caused [him] to form an opinion" or "made it difficult for [him] ... to be fair and impartial." (59T25-1 to 6).  He also said he had no reason to believe that any juror had learned about the case from an outside source, and no reason to believe that any juror had acted improperly. (59T25-7 to 26-21).  Instead, he believed that all the jurors were taking their responsibilities "very, very seriously" and were making every effort to reach the right decision.  (59T27-12 to 25).

Juror No. 2 said she did not personally read Juror No. 14's note but was present when the note was read aloud downstairs. (59T35-20 to 37-18).  She remembered that Juror No. 14 had wished the jurors "good luck," but other than that, "she really didn't make much of it."  (59T36-5 to 37-18).

Juror No. 2 told the court that the note had no effect on the jury's deliberations.  (59T40-17 to 20).  She also said she did not interpret the note as an effort to communicate an opinion about how the jurors should vote.  (59T37-19 to 24; 59T40-3 to 8).

When asked about the reference to the juror with the "hard eyes," Juror No. 2 said that "somebody told somebody that somebody was writing a blog and that one of the jurors had hard eyes." (59T37-25 to 38-22). Other than that one comment, and a time when someone mentioned that the jurors' names, ages, and hometowns had been published in the newspaper, Juror No. 2 could not recall any time when the jurors discussed information from an outside media source. (59T38-25 to 39-8).

Juror No. 2 said she had not heard anything from anyone "about the facts of the case or the merits of the case that [had] been reported from outside the courtroom." (59T39-9 to 13). She also said she had not heard any juror mention information "from outside the courtroom about the merits of the case or ... about the case." (59T39-14 to 19). She insisted she had not been "exposed to any information that would prevent [her] from following the law and being an impartial juror." (59T39-20 to 23). She also indicated she had no knowledge that any other juror had "reported information or been exposed to information outside the courtroom." (59T39-24 to 40-2).

Juror No. 3 said she had read Juror No. 14's note downstairs in the lobby and remembered someone else reading it in the jury room. (59T47-21 to 50-5). She recalled that Juror No. 14 expressed being sorry that she could not be with the other jurors, and she also recalled that Juror No. 14 said her thoughts and prayers were with them to "make the right decision." (59T50-6 to 19).

18

Regarding the reference to the juror with the "hard eyes," Juror No. 3 said that her sister once told her that one of the jurors was being described as having "hard eyes." Juror No. 3 then relayed this information to the other jurors. (59T50-16 to 52-15).

Like Juror No. 2, Juror No. 3 recalled a time when someone mentioned that the jurors' names, ages, and hometowns had been reported in a newspaper. (59T51-4 to 23). Juror No. 3 also mentioned that on the first day of trial, "somebody said they were saying there was a comment made about even a caveman can do it or something." (59T55-7 to 56-4). The comment referred to the jurors as "like cavemen," but Juror No. 3 did not know what the comment meant. (59T55-20 to 56-4).

Juror No. 3 said that nothing had been brought to her attention that "would in any way have an influence as to how [she] would decide [the] case." (59T56-5 to 11). She also said she could "continue to deliberate and decide the case based only on the evidence that's presented in the courtroom." (59T56-12 to 15). When asked if she ever "talked about the merits of the case or the facts of the case", or if anyone had "reported anything like that" to her, Juror No. 3 replied, "Absolutely not. Nothing about the case, no." (59T52-16 to 22).

Juror No. 4 said she first became aware of the note downstairs, and that Juror No. 5 subsequently read the note aloud in the jury room. (59T59-20 to 60-22). Juror No. 4 recalled that Juror No. 14 wished them good luck, was "sorry she wasn't

19

there," and was "praying for all of us."   (59T59-20 to 60-2;
59T60-23 to 61-2).

When asked about the reference to the juror with the "hard
eyes," Juror No. 4 indicated that someone once said something
about a juror having "hard eyes."  She interpreted the comment to
mean that the juror was "just looking intently at everything."
(59T61-3 to 62-2).

Juror No. 4 insisted that the jurors had not discussed
extra-judicial information about the case.  They had only
discussed the comment about the "hard eyes," as well as the fact
that their names, ages, and hometowns had been reported in the
newspaper.  (59T62-3 to 63-8).  They had not discussed "the case
or the evidence or anything like that."  (59T63-9 to 14).

When asked about the reference in the note that they should
"do the right thing," Juror No. 4 said that the comment did not
mean anything to her and did not relate to any prior
conversations.  She also said she did not interpret the comment
as a suggestion that the jurors should reach a particular
verdict.  (59T63-15 to 64-2).

Juror No. 4 insisted there had been no discussions that
"would in any way make it difficult for [her] to follow the law
and ... try to reach a verdict simply on the evidence that's been
produced in court."  (59T64-3 to 7).  She also said she had not
been "exposed to any information that would possibly influence"
her in a way that was contrary to her duties as a juror.  (59T64-
8 to 12).

20

Juror No. 5 said she retrieved the note from her car windshield, brought it to court, and shared it with the other jurors.  (59T66-14 to 68-7).  She also said that Juror No. 14 lived a couple blocks from her, but that she did not know Juror No. 14 was going to contact her or leave the note.  (59T68-8 to 14).

Regarding the portion of the note indicating that Juror No. 14 was praying for the jurors to "have the wisdom to do what is right," Juror No. 5 said that Juror No. 14 never "communicated to [her] or anyone else anything about how [the jury] should vote or what kind of verdict [the jury] should reach."  (59T68-19 to 69-11).  She also said that Juror No. 14 never indicated how she would vote if she were on the deliberating jury.  The note, in Juror No. 5's opinion, was simply emblematic of Juror No. 14's "good nature of wishing us like the best on something that's so difficult like this."  (59T68-23 to 69-11).

Regarding the portion of the note referencing the juror with the "hard eyes," Juror No. 5 said, "I don't remember how it came to us, but, you know, one of the people like the news in the courtroom, just said that, you know , somebody -- one of the jurors has hard eyes, you know, so we were discussing like who do you think it is."  Juror No. 5 also indicated that some of the jurors were curious, not about how the media was covering the facts of the case, but about whether and how the media was portraying the jurors.  She and some other jurors had heard that CourtTV occasionally gave nicknames to jurors, and they wondered

21

whether CourtTV had given them nicknames like "Tweedledee and Tweedledum." (59T69-12 to 72-17).

Juror No. 5 said that these discussions about how the jurors might be portrayed in the media had not influenced her in any way, had not impacted the jury's deliberations, and would have no effect on her ability to decide the case based solely on the evidence and the law. Juror No. 5 also said that although the jurors had discussed how the media might be portraying them, they had not discussed the facts, and she had no information that any juror was aware how the media was commenting on the facts. (59T70-5 to 16; 59T72-1 to 25).

Juror No. 6 described the note as "just general" and said that Juror No. 14 "was just thanking everyone." (59T73-24 to 75-17). When asked about the reference to the juror with the "hard eyes," Juror No. 6 said she did not know what that meant. She recalled that Juror No. 14 had mentioned being the juror with the "hard eyes" in her note, but she did not understand the reference and did not recall any talk among the jurors about a juror having "hard eyes." (59T75-18 to 76-10).

Juror No. 6 said she was not aware of any conversation among the jurors about how the case had been reported in the newspapers and the internet. (59T76-11 to 16). When asked if she had overheard any other jurors mentioning the way the case was portrayed in the media, Juror No. 6 said that one of the jurors had mentioned that the jurors' names, ages, and hometowns had been reported in the newspaper. Other than that, there was

nothing.   (59T76-17 to 25).

Juror No. 6 said she had not learned any information about
the case from a source outside the courtroom that "would in any
way influence [her] judgment or deliberations about the case."
(59T77-1 to 8).  As a result, she could follow the law and decide
the case based solely on the evidence presented in the courtroom.
(59T77-9 to 12).

Juror No. 8 said he did not interpret the note as an
expression of an opinion concerning the verdict they should
reach.  Rather, he interpreted the note to mean that the jurors
had heard the case and now had to apply the law to the facts.  He
added that Juror No. 14 had never indicated what she thought the
verdict should be.  (59T78-15 to 80-1).

When asked about the reference to the juror with the "hard
eyes" and what he remembered about that, Juror No. 8 said,
"Really nothing, tell you the truth."  (59T80-2 to 12).  He said
he did not recall any discussions about a juror with "hard eyes,"
adding that "it just went over [his] head" and was "not something
[he] entertained."  (59T80-11 to 18).

Juror No. 8 insisted there had been no discussions among the
jurors about "the facts of the case or the merits of the case,"
as reported "on the television or on the internet or in the
newspapers."  (59T80-19 to 81-25).  He also said he had not been
exposed to any information that would prevent him from being able
to decide the case based solely on the evidence.  (59T82-1 to 8).

Juror No. 10 said she did not remember anything about the

note other than that Juror No. 14 was "just wishing us all well and that she misses us." (59T82-23 to 83-11). When asked about the part of the note in which Juror No. 14 indicated she was praying that all the jurors would have the "wisdom to do the right thing," Juror No. 10 said she did not interpret the note to mean that Juror No. 14 had an opinion about how the jurors should decide the case. (59T84-2 to 14). Rather, she interpreted the note to mean that the jurors "had to do what we felt was right." (59T84-15 to 18). She did not know if Juror No. 14 had an opinion about what verdict the jurors should reach, adding that she "really didn't talk to [Juror No. 14] much." (59T84-19 to 22).

When asked about the reference to the juror with the "hard eyes," Juror No. 10 said she had not heard anything about a juror having "hard eyes" before seeing the note. (59T84-23 to 85-11). When asked if the jurors had discussed how the case was being reported on television, on the internet, or in the newspapers, Juror No. 10 said that the jurors had not discussed anything that was relevant to the merits of the case. They had only discussed the fact that their names, ages, and hometowns had been reported in the newspaper. (59T85-12 to 86-20).

Juror No. 10 assured the court that she had not been influenced by the note, or by the fact that juror information had been reported in the newspaper. Neither the note nor the publicity of juror information would affect her ability to decide the case fairly and impartially. (59T86-21 to 87-5). In fact,

24

when she first found out that her name was in the newspaper, she was not concerned at all and "couldn't be bothered."  (59T86-10 to 14).

Juror No. 11 said that Juror No. 14 was "just basically saying that she had prayed for us that we would make the right decision and -- and that was it really, you know, that she had prayed for us and just God be with you and -- something to that effect."  (59T88-25 to 90-3).  Juror No. 11 also said that Juror No. 14 never communicated or tried to suggest what the "right decision" might be.  (59T90-4 to 7).  Therefore, Juror No. 11 interpreted the note to mean that Juror No. 14 was "just talking generally about making the right decision."  (59T90-8 to 11).

When asked about the reference to the juror with the "hard eyes," Juror No. 11 said she "didn't know anything about the hard eyes thing" until she saw Juror No. 14's note.  (59T90-12 to 91-10).  She believed that one of the jurors may have mentioned something about a blogger who sat in the courtroom and depicted the jurors, but she said she "didn't know anything about the hard eyes" until she saw Juror No. 14's note.

Juror No. 11 insisted that the discussions about the blogger did not concern the facts of the case or whether defendant was guilty of the charged crimes.  (59T92-14 to 19).  Instead, the discussion was limited to how the jurors were being portrayed.  (59T92-20 to 22).  There was no discussion about the facts of the case or the media's reporting of the case, and there was no discussion about information from outside the courtroom.  (59T92-

23 to 93-3).

Juror No. 12 recalled that Juror No. 14 indicated in her note that she was sorry she was not there and had the jurors in her prayers.  He also recalled that Juror No. 14 said she had seen blogs about the case since being excused as a juror but did not reveal to the other jurors what was on those blogs.  (59T94-12 to 95-7).

When asked about the reference to the juror with the "hard eyes," Juror No. 12 said, "I don't know who it was, but I guess someone told them that they referred to a juror as a hard-eyed person."  (59T95-8 to 18).  She believed the information had been reported to a juror by a friend, but he did not recall which juror.  (59T95-19 to 25).

Juror No. 12 said there had been no discussion among the jurors about anything that had been reported on the internet, on television, or in the newspapers, other than that they had heard the media was publishing their names, ages, and hometowns.  She also said she had not been exposed to any information from "outside the courtroom that would in any way influence [her] or make it difficult for [her] to follow the law and be a fair juror."  (59T96-24 to 97-4).

Juror No. 13 said he was present when Juror No. 5 read the note and recalled that Juror No. 14 indicated in the note that she missed her fellow jurors, had said a prayer for them, and wished them all the best.  (59T98-25 to 100-1).  Regarding the portion of the note indicating that Juror No. 14 was praying that

the jurors would have the "wisdom to do what is right," Juror No. 13 said that Juror No. 14 never suggested how the jurors should decide the case or what the "right thing" was.  (59T100-2 to 10). He therefore did not interpret the note to mean that Juror No. 14 was suggesting how they should decide the case.  Instead, he interpreted the note as "just a general do the right thing." (59T100-11 to 13).

When asked about the reference to the juror with the "hard eyes," Juror No. 13 said, "I have no idea what she meant by that."  (59T100-14 to 23).  When asked if he remembered any discussion among the jurors about someone being characterized as having "hard eyes," Juror No. 13 replied, "It might have been mentioned and nobody didn't know who they were talking about, could have been myself, so ... I don't remember the contents and what it was used."  (59T100-23 to 101-10).  Juror No. 13 also indicated that none of the jurors had said anything about being exposed to accounts of the case on the internet, in the newspapers, or on television.  (59T100-11 to 102-11).

Juror No. 15 said she read the note and recalled that Juror No. 14 "said something like I wish I could be there with you or something to that effect."  (59T102-16 to 104-4).  Regarding the reference to having the "wisdom to do what is right," Juror No. 15 said that Juror No. 14 never communicated what the jurors should do or what kind of verdict they should reach.  (59T104-5 to 13).  Regarding the reference to a juror having "hard eyes," Juror No. 15 recalled that Juror No. 14 said she was the one with

the "hard eyes," but Juror No. 15 did not know the background for that comment and "didn't know anything about that." (59T104-14 to 105-6).

Juror No. 15 told the court that one of the jurors had once mentioned that their names, ages, and hometowns had been published in "some newspaper," but she did not recall who "mentioned it, ... what [it] meant, or how [it] came about." (59T105-7 to 23). She also said she had not heard anything about the case that would in any way influence her deliberations or make it difficult for her to be fair and impartial. (59T105-24 to 106-3). She was satisfied she could decide the case based on the evidence presented in court. (59T106-4 to 6).

At the conclusion of all the juror interviews, Judge DeVesa found there was no "intentional circumvention" of the court's instructions. The judge was satisfied that the jurors understood they could not be exposed to extra-judicial information about the case, but that they simply did not equate information about themselves as being equivalent to information about the case. Accordingly, the judge believed that the jurors did not feel they were circumventing the court's instructions by commenting about how their names, ages, and hometowns were being reported in the newspaper. (60T2-6 to 4-25).

Furthermore, Judge DeVesa was satisfied that the comments were "clearly not that significant" to the jurors because none of them could remember the source of the information or the manner in which the information had come to light. The judge said that

28

the conversation apparently started with a "passing remark," and the judge characterized the conversation as "passing insignificant casual type communication or conversation." (60T4-25 to 5-12).

Judge DeVesa emphasized that all the jurors "clearly and unequivocally reported" that they had not discussed or been made aware of "any information relating to the facts or the merits of the case." (60T5-12 to 16). The judge also observed that all the jurors "unequivocally and very vigorously stated that they could be fair and they could decide the case based solely on the evidence and the law." (60T5-16 to 19). Given the jurors' comments and demeanor during the voir dire, the judge was convinced that every juror was capable of following the law and reaching a verdict based on the evidence and the law. (60T9-14 to 17).

Defendant did not move for a mistrial, which is the functional equivalent of the remedy she is seeking now. Nor did she ask the court to ask any additional questions, conduct any additional investigation, give any additional instructions, or take other corrective action. Instead, she allowed the jurors to continue with their deliberations, and she expressed no concerns about jury misconduct until after she was convicted, when she promptly moved for a new trial.

In denying defendant's motion, Judge DeVesa noted that although the jurors indicated that "they did hear comments about themselves from other jurors," it was clear that their curiosity

29

about how they were being portrayed in the media "did not influence them in their deliberations." Nor did it have any capacity to do so. (61T130-18 to 131-17).

Given the jurors' responses to the questions posed on <u>voir dire</u>, and given the court's opportunity to evaluate the credibility and demeanor of each juror, Judge DeVesa was "really satisfied that each juror was not unduly influenced by any outside information." (61T130-25 to 134-13). The judge added that any extra-judicial information obtained by the jurors had no tendency to prejudice defendant. (61T134-13 to 22).

The Sixth Amendment to the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee criminal defendants "the right to ... trial by an impartial jury." <u>U.S. Const.</u>, Amendments VI, XIV; <u>N.J. Const.</u>, art. 1, par. 10; <u>see also</u> <u>Sheppard v. Maxwell</u>, 384 <u>U.S.</u> 333, 362-63 (1966) (stating that due process requires that an accused receive a trial by an impartial jury free from outside influences); <u>State v. Williams</u>, 93 <u>N.J.</u> 39, 60 (1983) (same). That constitutional privilege "includes the right to have the jury decide the case based solely on the evidence presented at trial, free from the taint of outside influences and extraneous matters." <u>State v. R.D.</u>, 169 <u>N.J.</u> at 557; <u>accord</u> <u>State v. Bey</u>, 112 <u>N.J.</u> 45, 75 (1988).

If during the course of the trial it becomes apparent that a juror may have been exposed to extraneous information, the trial court "must act swiftly to overcome any potential bias and to

expose factors impinging on the juror's impartiality." R.D., 169 N.J. at 557-58, citing Bey, 112 N.J. at 83-84.  That means that the trial court "must use appropriate discretion to determine whether the individual juror, or jurors, 'are capable of fulfilling their duty to judge the facts in an impartial and unbiased manner, based strictly on the evidence presented in court.'" R.D., 169 N.J. at 558, quoting Bey, 112 N.J. at 87.

If a juror has been exposed to extraneous information, the court is generally obliged to interrogate the juror, in the presence of counsel, to determine if there is taint.  If so, the inquiry must expand to determine whether any other jurors have been tainted.  The trial court must then determine whether the trial may proceed, whether one or more jurors must be excused, or whether a mistrial is necessary. R.D., 169 N.J. at 558; Bey, 112 N.J. at 85-88.

The test for determining whether a new trial should be granted because of juror misconduct or intrusion of irregular influences is whether such matters "could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge." Panko v. Flintkote Co., 7 N.J. 55, 61 (1951).  The test is "not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so." Ibid.  If the irregular matter has that tendency on its face, then a new trial should be granted without further inquiry as to its actual effect. Ibid.  If, however, the irregular matter is

31

"affirmatively shown to have had no tendency to influence the verdict," a reversal is not required. State v. Sachs, 69 N.J. Super. 566, 588 (App. Div. 1961).

Our Supreme Court has long recognized that a new trial is "not necessary in every instance where it appears an individual juror has been exposed to outside influence." R.D., 169 N.J. at 558. Likewise, the United States Supreme Court has held that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." Smith v. Phillips, 455 U.S. 209, 217 (1982). If the rule were otherwise, almost no verdict could survive judicial scrutiny because "[i]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Bey, 112 N.J. at 81, quoting Smith v. Phillips, 455 U.S. at 217.

The decision to grant or deny a motion for a new trial based on allegations of jury taint resides in the sound discretion of the trial court. R.D., 169 N.J. at 558. That is because the trial court is "in the best position to determine whether the jury has been tainted." Id. at 559. In making that determination, the trial court should consider "the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings." Ibid.

If a trial court denies a motion for a new trial based on juror misconduct or extrajudicial influences, a reviewing court

32

cannot overturn that decision in the absence of a showing of an
abuse of discretion.  Ibid.  That standard of review "respects
the trial court's unique perspective" and is consistent with our
tradition of according deference to trial courts in "matters
pertaining to the jury."  Ibid.

In this case, the trial court did not abuse its discretion
in finding that the jurors were not exposed to extra-judicial
information having a "tendency to influence the jury in arriving
at its verdict in a manner inconsistent with the legal proofs and
the court's charge."  Panko v. Flintkote Co., 7 N.J. at 61.
Indeed, the insignificant information to which the jurors were
exposed had no tendency to affect the jurors' ability to be fair
and impartial in any way.

As the record makes clear, most of the jurors were generally
aware that there was a blogger who had referred to one of them as
having "hard eyes."  And most of the jurors were generally aware
that a newspaper had published their names, ages, and hometowns.
But these incidental points of information were plainly
immaterial to the merits of the case.  They had nothing to do
with the facts, the evidence, the defendant, or the victim, and
they obviously had "no tendency to influence the verdict."  State
v. Sachs, 69 N.J. Super. at 588.

Furthermore, all the jurors related the same basic facts
about the note they received from Juror No. 14.  Each juror was
aware of the note; each juror knew the basic contents of the note
and recalled that Juror No. 14 was praying for them and wishing

33

them luck; each juror (with two exceptions) was aware that one of the jurors had been described by a blogger as having "hard eyes"; each juror stated that there had been no prior discussion with Juror No. 14 concerning her opinion on the evidence; each juror indicated that he or she had not read, heard, or watched any accounts of the case on television, in the newspapers, or on the internet; each juror indicated that Juror No. 14's note had not affected the deliberations; and each juror answered without hesitation that he or she could decide the case fairly and impartially, based on the evidence presented in the courtroom.

The note sent to the jurors by Juror No. 14 was nothing more than a general farewell letter and an expression of good luck and good wishes to the remaining jurors.  It contained no outside information concerning the facts of the case, no outside information concerning the way the case was being reported in the media, and no expression of an opinion as to how the jurors should vote.  Indeed, even though Juror No. 14 indicated she was praying for the jurors to "have the wisdom to do what is right," Juror No. 14 made clear that she was not trying to send a message to the jurors concerning how they should vote.  Rather, she was simply conveying the fact that she was praying for them to reach the right decision, whatever that right decision might be.  And because Juror No. 14 and the other jurors never previously shared opinions concerning the facts of the case, none of the other jurors interpreted the note to mean that Juror No. 14 was advocating a particular verdict.

34

On the issue of the jurors having nicknames, Juror No. 5
explained that these discussions were general among the jurors
and indicated, "I can't remember exactly like who had said it,
but you know, people that do watch Court TV--like I don't really
watch Court TV, me personally, but I remember somebody saying
like yeah, you know, its known that you, know, when they do cover
trials, jurors get nicknames, like that sort of thing, so..."
(59T69-12 to 72-17).  This evidences a general knowledge among
the jurors that CourtTV has a reputation for nicknaming the
jurors in trials they cover.  But other than the "hard eyes"
comment, none of the jurors reported any knowledge of nicknames
being given in this case.

Furthermore, although defendant claims to have been
prejudiced by a comment likening jurors to cavemen, the record
fails to disclose who made the comment and in what context.  Only
one juror (Juror No. 3) mentioned the comment, and she had no
idea what it meant. (59T55-20 to 56-4).  She did say, however,
that nothing had been brought to her attention that "would in any
way have an influence as to how [she] would decide [the] case."
(59T56-5 to 11).

Finally, the State emphasizes that defendant did not move
for a mistrial or request the disqualification of jurors at any
time prior to the verdict.  For that reason, this Court should
view with skepticism her claim that she was deprived of her right
to a trial before an impartial jury untainted by extrinsic
influences.  If defendant had truly believed that the ability of

the jurors to render a fair and just verdict had been
compromised, then she should have moved for a mistrial.  At the
very least, she should have asked that particular jurors be
excused.  But she took no action whatsoever, preferring to stand
mute and keep such arguments in her "back pocket" as insurance n
the event of a guilty verdict.  This Court should not countenance
such behavior.  When defendant elected not to seek relief
concerning the jurors <u>before</u> the verdict, she made clear she had
faith and confidence in the ability of the jurors to perform
their functions properly.  She should not be permitted to take a
contrary position now.  <u>See</u> <u>United States v. Edwards</u>, 696 <u>F.</u>2d
1277, 1282 (11th Cir.), <u>cert. denied</u>, 461 <u>U.S.</u> 909 (1983) ("the
defendant cannot wait to hear the verdict before contesting the
impartiality of the jury and then attack the court's refusal to
investigate his allegation").

In sum, Judge DeVesa did not abuse his discretion in denying
defendant's motion for a new trial.  Indeed, the judge's factual
findings concerning the absence of taint are well-supported by
sufficient credible evidence in the record.  Accordingly, this
Court should affirm the denial of defendant's motion for a new
trial.

A.   <u>The Trial Court, With Assistance From the Attorneys,</u>
     <u>Adequately Voir Dired the Jurors.</u>

As noted above, both defense attorneys and both prosecutors
were present during the <u>voir</u> <u>dire</u> of the jurors.  And as noted
above, the defense and the prosecution had every opportunity to
supplement the court's questions with questions of their own.

36

Sometimes, the attorneys asked questions of the jurors.  Other times, they did not.

On appeal, defendant complains that even though her attorneys were fully involved in the process, she is entitled to a new trial because the voir dire was insufficient.  This argument is without merit.  The voir dire was thorough and comprehensive, resulting in an exhaustive inquiry of each of the deliberating jurors.  And if the defense attorneys felt there were additional questions the court should have asked, they had every opportunity to ask those additional questions when it was their turn to do so.  Defendant cannot rely on her attorneys' failure to ask additional questions as a basis for a reversal of her convictions.

In any event, there is no support for defendant's claim that the trial court "cut off the jurors' explanations of the blog postings they had discussed."  (Db24).  In fact, there is no evidence that the jurors saw, read, or discussed any blog postings, articles, or other extra-judicial accounts of the case.  And if the defense attorneys felt that any juror had been interrupted in any way, they had every opportunity to ask follow-up questions when the court's voir dire was complete.

Similarly unpersuasive is defendant's complaint that the trial court declined to voir dire the first three jurors about how they interpreted the portion of the note urging them to "do what is right," and whether they discussed opinions regarding guilt or innocence before deliberations.  (Db25-26).  The judge

37

repeatedly advised the jurors not to discuss the case until after they had been instructed on the law following the attorneys' summations.  There is no reason to believe the jurors disregarded those instructions, especially since all the other jurors unanimously stated that Juror No. 14 never told them what verdict she thought they should reach and they therefore did not interpret the note as an effort to communicate an opinion about how the jurors should vote.  In fact, Juror No. 14 herself insisted that the note was not intended to get a message to the jury.  She did not know what verdict was the right verdict, and she had never disclosed with the other jurors what the verdict should be.  (59T7-15 to 19; 59T8-5 to 7; 59T11-2 to 22).

Also without merit is defendant's belated complaint that the trial court did not adequately inquire about the fact that Juror No. 14 admitted to speaking with Juror No. 5 on the telephone after she was excused.  (Db26).  Juror No. 14 was asked about the conversation, and she made clear that it was brief, innocuous, and insignificant.  According to Juror No. 14, Juror No. 5 called her, thanked her for her note, and indicated they would be in touch when the trial was over.  They did not have any additional conversation because Juror No. 5 was still a sitting juror. (59T10-2 to 11-1).  Defense counsel had every opportunity to ask Juror No. 5 about the call but he chose not to do so, presumably because Juror No. 14's responses made clear that the conversation was innocuous and significant.

This case is distinguishable from State v. Wormley, 305 N.J.

38

Super. 57 (App. Div. 1997), and defendant's reliance on that case is misplaced.  In Wormley, a juror advised the court that she knew one of the witnesses as a former co-worker, had seen another witness in the vicinity of the crime scene, and knew all about the case because she lived in the area and had "heard things." The judge excused the juror, but this Court reversed because the judge never voir dired the remaining jurors to determine whether the excused juror directly or indirectly imparted any impermissible extraneous information to them.  Unlike Wormley, where there was no voir dire of the jurors who ultimately deliberated on the case, the court thoroughly questioned all the deliberating jurors in this case, and the defense had every opportunity to ask supplemental questions.  Moreover, unlike Wormley, where the court never knew whether the jurors were tainted by the excused juror's knowledge of the case, the voir dire in this case confirmed that the deliberating jurors were not exposed to, or influenced by, extraneous information about the crime, the facts, the defendant, or the victim.

B.    There is No Evidence That Any Juror Posted to Internet Message Boards During Deliberations.

After the jury returned its verdict, the defense alerted the court that someone purporting to be a juror may have posted a comment on a CourtTV internet message board.  Apparently, the post had been deleted, but there were other posts that referred to it.  Those posts indicated that on or about Friday, April 20, someone had posted a message "to all the jurors," asking them to return a verdict on Friday, and someone else had replied, "Ok,

and we are leaning toward guilty."

Judge DeVesa asked the State to investigate the matter and make reasonable efforts to determine whether there was such a blog entry, and if so, who posted it. (61T107-18 to 110-23). The prosecutor agreed to cooperate and subsequently asked Time/Warner, the administrator of the blog, to preserve all records of the blog. (Da307-309). But Time/Warner's search "revealed "no record of the posting," and "no further information." Ibid.

Months after filing a Notice of Appeal to this Court, defense counsel sent a letter to Judge DeVesa, requesting a hearing to further address the issue. Counsel acknowledged, however, that it was "likely" Judge DeVesa lacked jurisdiction, given the filing of the Notice of Appeal. (Da301-303).

Judge DeVesa found no reason to revisit the motion for a new trial, given that Time/Warner's investigation had uncovered no evidence of the posting. (Da311). Also, the judge noted that he lacked jurisdiction due to the pendency of defendant's appeal. Ibid.

Defendant now criticizes the trial court for failing to conduct a hearing to further investigate the deleted posting. But Judge DeVesa had no jurisdiction to conduct a hearing once defendant filed her Notice of Appeal. Indeed, the ordinary effect of the filing of a Notice of Appeal is to deprive the trial court of jurisdiction to act unless directed to do so by the appellate court. R. 2:9-1(a).

40

In any event, the State did investigate the matter and did make reasonable efforts to locate, preserve, and secure any and all information concerning the subject blog posting.  The investigation revealed that Time/Warner had no record of the blog posting, and that no further information was available.  Once the State conveyed such information to defense counsel and the court, there was nothing more that the State or the court could do.

Finally, there is no reason to believe that any juror authored the post on the blog.  On the contrary, every indication is that the post was a joke left by someone who was pretending to be a juror.  Indeed, it is significant that the post was left on the very day the court voir dired the jurors, when the jurors unanimously stated that they had not seen or visited any internet blogs concerning the case.

C.  The Trial Court Employed the Proper Standard of Review.

The trial court relied on the correct legal principles in denying defendant's motion for a new trial.  In fact, the judge indicated that he agreed with the defense that in deciding whether to grant a motion for a new trial because of jury misconduct or intrusion of irregular influences into the jury's deliberations, the issue was whether such matters "could have had a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge."  (61T124-18 to 25).  This is the language used by our Supreme Court in Panko v. Flintkote Co., 7 N.J. at 61.

The judge also noted that if the irregularity had such a

41

tendency, then defendant was entitled to a new trial.  The judge also explained that in making its determination, the court had "a responsibility to consider the gravity of the information in relation to the case, the demeanor and the credibility of the jurors who are exposed to the information, and the overall impact of the matter on the proceedings."  (61T125-4 to 9).  This is the language used by our Supreme Court in State v. R.D., 169 N.J. at 559.

Finally, the judge applied these correct principles of law to the facts before him when he concluded that any extra-judicial information obtained by the jurors had no tendency or capacity to prejudice defendant.  (61T134-13 to 22).  Given that the judge's recitation of the law tracked the applicable legal standards articulated by the New Jersey Supreme Court, defendant has no basis to complain.

<u>POINT II</u>

THE PROSECUTOR DID NOT ENGAGE IN MISCONDUCT
OR DEPRIVE DEFENDANT OF A FAIR TRIAL.

For the first time on appeal, defendant belatedly contends she is entitled to a new trial because she was prejudiced by various forms of prosecutorial misconduct.  (Db32-49). Defendant's argument is without merit.  The prosecutor did not engage in misconduct, and defendant received a fair trial.

A.  <u>The Prosecutor Did Not Engage in Prosecutorial Misconduct During Her Summation.</u>

The prosecutor devoted her lengthy summation, comprised of over 100 pages of transcript, to a thorough and meticulous

discussion of the evidence, the reasonable inferences that could be drawn from the evidence, and the applicable law. But now, for the first time on appeal, defendant parses through the lengthy summation, picks out certain isolated comments, and belatedly argues that those comments deprived her of a fair trial. Defendant is wrong. When the prosecutor's comments are considered in context with the entire record, including defense counsel's opening statement, it is clear that there were no improprieties. The prosecutor's comments were responsive to defense counsel's summation and were fair comment on the evidence. There was no error, let alone plain error. R. 2:10-2.

Prosecutors are afforded "considerable leeway" on summation, so long as their comments are reasonably related to the evidence. State v. Timmendequas, 161 N.J. 515, 587 (1999); State v. Harvey, 151 N.J. 117, 216 (1997); State v. Harris, 141 N.J. 525, 559 (1995). Indeed, prosecutors in criminal cases are expected to make "vigorous and forceful closing arguments to juries." Timmendequas, 161 N.J. at 587; accord State v. Papasavvas, 163 N.J. 565, 616 (2000); Harris, 141 N.J. at 559.

Any allegations of prosecutorial misconduct must be evaluated in light of "the unique responsibilities of a prosecutor." Harvey, 151 N.J. at 216. That is because prosecutors are required to "pursue their duties 'with earnestness and vigor.'" Ibid., quoting United States v. Young, 470 U.S. 1, 7 (1985), quoting Berger v. United States, 295 U.S. 78, 88 (1935). They are also expected to make a "forceful

43

presentation of the State's case." <u>Harvey</u>, 151 <u>N.J.</u> at 216,
quoting <u>Ramseur</u>, 106 <u>N.J.</u> 123, 320 (1987).  And although a
prosecutor's summation must be limited to the evidence and
inferences reasonably drawn therefrom, a prosecutor "is entitled
to sum up the State's case graphically and forcefully." <u>State v.</u>
<u>Johnson</u>, 31 <u>N.J.</u> 489, 510 (1960).

Furthermore, "not every suspected deviation from perfection
on the part of a prosecutor will warrant the reversal of a
conviction." <u>State v. Bucanis</u>, 26 <u>N.J.</u> 45, 56 (1958), <u>cert.</u>
<u>denied</u>, 357 <u>U.S.</u> 910 (1958).  Even when a remark is of
questionable propriety, it will not be grounds for reversal
unless it was so egregious that it deprived the defendant of a
fair trial. <u>State v. Koskovich</u>, 168 <u>N.J.</u> 448, 488 (2001);
<u>Papasavvas</u>, 163 <u>N.J.</u> at 616; <u>Timmendequas</u>, 161 <u>N.J.</u> at 575;
<u>Harvey</u>, 151 <u>N.J.</u> at 216; <u>Ramseur</u>, 106 <u>N.J.</u> 123, 322 (1987).  The
challenged comment "must have been clearly and unmistakably
improper, and must have substantially prejudiced defendant's
fundamental right to have a jury fairly evaluate the merits of
his defense." <u>Papasavvas</u>, 163 <u>N.J.</u> at 616, quoting <u>Timmendequas</u>,
161 <u>N.J.</u> at 575; <u>accord</u> <u>Koskovich</u>, 168 <u>N.J.</u> at 488; <u>Bucanis</u>, 26
<u>N.J.</u> at 56; <u>see</u> <u>also</u> <u>Darden v. Wainwright</u>, 477 <u>U.S.</u> 168, 181
(1986) (the issue is "whether the prosecutor's comments so
infected the trial with unfairness as to make the resulting
conviction a denial of due process").

In deciding whether a prosecutor's conduct was sufficiently
egregious to require a reversal of a criminal conviction, an

appellate court must consider whether defense counsel objected to the allegedly impermissible remarks. <u>Timmendequas</u>, 161 <u>N.J.</u> at 575-76; <u>Ramseur</u>, 106 <u>N.J.</u> at 322-23. If the defense did not object to the prosecutor's remarks, the remarks will generally not be deemed prejudicial on appeal. <u>Timmendequas</u>, 161 <u>N.J.</u> at 576; <u>Ramseur</u>, 106 <u>N.J.</u> at 323. That is because the failure to object suggests that defense counsel "did not believe the remarks were prejudicial at the time they were made." <u>Timmendequas</u>, 161 <u>N.J.</u> at 576; <u>State v. Irving</u>, 114 <u>N.J.</u> 427, 444 (1989). The failure to object also "deprives the court of an opportunity to take correction action." <u>Ibid.</u>

Finally, a reviewing court should never consider a prosecutor's summation in a vacuum. Rather, a reviewing court should evaluate the prosecutor's summation in context with defense counsel's "opening salvo." <u>State v. Munoz</u>, 340 <u>N.J. Super.</u> 204, 216 (App. Div.), <u>certif. denied</u>, 169 <u>N.J.</u> 610 (2001), quoting <u>Young</u>, 470 <u>U.S.</u> at 12; <u>State v. Engel</u>, 249 <u>N.J. Super.</u> 336, 379 (App. Div.), <u>certif. denied</u>, 130 <u>N.J.</u> 393 (1991). A prosecutor "is permitted to respond to an argument raised by the defense so long as [the response] does not constitute a foray beyond the evidence adduced at trial." <u>Munoz</u>, 340 <u>N.J. Super.</u> at 216. If the prosecutor's remarks "did no more than respond substantially in order to 'right the scale[,]'" then the remarks should not be considered improper. <u>Engel</u>, 249 <u>N.J. Super.</u> at 379, quoting <u>Young</u>, 470 <u>U.S.</u> at 13. In fact, the general rule is that "remarks by a prosecutor, made in response to remarks by

45

opposing counsel, are harmless." State v. C.H., 264 N.J. Super. 112, 135 (App. Div.), certif. denied, 134 N.J. 479 (1993).

In this case, defendant takes issue with several isolated comments in the prosecutor's lengthy summation. But the defense did not object to these comments below. Therefore, defendant now bears the burden of demonstrating plain error - i.e., error that was "clearly capable of producing an unjust result." R. 2:10-2. The possibility of injustice must be so substantial as to "raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971). Defendant cannot meet this heavy burden.

First, defendant belatedly complains about the manner in which the prosecutor commented on the testimony of a defense witness, George Lowery. In particular, defendant argues that the prosecutor improperly commented on the absence of evidence that William McGuire wanted to purchase a gun after having successfully precluded the defense from eliciting such testimony through Lowery. (Db33-39). This argument is without merit. When the prosecutor's comments are considered in context with the entire record, including defense counsel's summation, it is clear that the prosecutor's comments were within the bounds of fair play.

The night before the State rested, defense counsel advised the prosecutor of a last-minute addition to the defense witness list. Defense counsel indicated that George Lowery, who had worked with William McGuire, was prepared to testify that he had

46

had a conversation with William McGuire, and that McGuire told Lowery he wanted to purchase a gun but could not get a permit and was going to have his wife get a gun for him.  (48T11-20 to 23-20).

Judge DeVesa agreed with the prosecutor that Lowery's anticipated testimony was hearsay and did not fall under a recognized hearsay exception. (48T16-11 to 18-25).  The judge said he would allow Lowery to testify that he and William McGuire discussed the purchase of a gun, but would not allow Lowery to testify regarding the specific nature of the conversation, i.e., that William McGuire wanted to purchase a gun.  (48T19-1 to 23-7).  Accordingly, Lowery testified that, two or three months before April of 2004, he and William McGuire spoke about the purchase of a firearm.  (48T75-20 to 76-7).

During his summation, defense counsel misrepresented Lowery's testimony.  Defense counsel told the jurors that Lowery and William McGuire had spoken about the purchase of a gun, and that according to Lowery, William McGuire wanted to purchase a gun in April of 2004. (55T81-12 to 82-16).  The prosecutor responded to this mischaracterization during her closing argument.  She told the jurors that although Lowery had testified that he and William McGuire spoke about purchasing a gun, Lowery never said that William McGuire wanted to purchase a gun. (56T42-8 to 43-13.)

This Court should not consider these comments in a vacuum. Rather, this Court should consider the comments in context with

47

defense counsel "opening salvo." <u>Munoz</u>, 340 <u>N.J. Super.</u> at 216;
<u>Engel</u>, 249 <u>N.J. Super.</u> at 379; <u>Young</u>, 470 <u>U.S.</u> at 12.   The
prosecutor had every right to respond to and correct defense
counsel's factually inaccurate recitation of Lowery's testimony.
In fact, under the circumstances, the prosecutor remarks "did no
more than respond substantially in order to 'right the scale.'"
<u>Engel</u>, 249 <u>N.J. Super.</u> at 379, quoting <u>Young</u>, 470 <u>U.S.</u> at 13.
There was no error, let alone plain error.   <u>R.</u> 2:10-2.

Next, defendant claims, also for the first time on appeal,
that the prosecutor "committed reversible misconduct" when she
noted that the gun defendant purchased two days before the
victim's disappearance was consistent with the murder weapon.
(Db39-42).   This argument is similarly unpersuasive.   The
prosecutor's summation constituted fair comment on the evidence
because there was compelling proof that defendant's gun was, in
fact, consistent with the murder weapon.

At trial, the State introduced testimony that on April 26,
2004, defendant purchased a Taurus .38 Special handgun and a box
of .38 Special wad cutter bullets.   (29T143-22 to 158-12).   The
State also introduced testimony from two ballistics experts:
John Ward and James Ryan.   Ward and Ryan testified that they
examined the bullets recovered from the victim's body and
identified them as .38 Special wad cutter bullets.   They also
testified that the two bullets had been fired from a single gun
having six lands and grooves with a right twist.   Finally, they
testified that they used an F.B.I. computer database to compile a

list of manufacturers that made guns with rifling characteristics
akin to the murder weapon.  One of the manufacturers was Taurus,
the manufacturer of the gun defendant purchased.  (30T94-2 to
101-18; 30T178-24 to 186-6).

Highlighting all this evidence in her summation, the
prosecutor argued that the gun and bullets purchased by defendant
were "consistent" with the gun and bullets used to commit the
murder.  (See 56T10-1 to 3).  This argument was permissible
because it was fair comment on the evidence.  The bullets that
were recovered from the victim's body were the same caliber as
the gun and bullets purchased by defendant, and the bullets
recovered from the victim, like the bullets purchased by
defendant, were wad cutter bullets.  Also, the jury heard expert
testimony from two expert witnesses that Taurus, the manufacturer
of the gun purchased by defendant, was one of the possible
manufacturers of the murder weapon.

Nonetheless, defendant belatedly claims she was denied a
fair trial due to a single unobjected-to line in the prosecutor's
opening statement, in which the prosecutor said that defendant
purchased a gun of a "make and model" that was consistent with
the gun used to kill the victim.  (Db40; 28T14-9 to 13).  This
argument is similarly unavailing because the prosecutor's
comments are buttressed by the trial record.  Again, the State's
experts not only testified that Taurus was one of the possible
manufacturers of the gun used to kill the victim, but they also
testified that the bullets recovered from the victim's body were

.38 caliber bullets.  Given that evidence, and given that
defendant purchased a Taurus .38 caliber handgun and a box of .38
caliber bullets two days before the victim's disappearance, there
is strong support for the prosecutor's statement that defendant's
gun was "consistent" with the make and model of the gun used to
kill the victim.  The prosecutor's remarks were permissible, and
there was no error, let alone plain error.  R. 2:10-2.

Finally, defendant contends, again for the first time on
appeal, that at various points during her closing argument, the
prosecutor engaged in "speculation."  (Db45-49).  Defendant is
wrong.  The remarks at issue were responsive to defendant's
summation and constituted fair comment on the evidence.

Defense counsel argued during his summation that the absence
of noise at the McGuire apartment on the night of the murder,
coupled with the absence of blood, body matter, and DNA,
conclusively proved that the murder could not have happened
there.  Defense counsel also argued that it was William McGuire,
not defendant, who performed the searches on the home computer
for "how to commit murder" and "undetectable poisons" and
"chloral hydrate" because those searches were performed near the
time when William McGuire's retirement accounts, email accounts,
and gambling websites were accessed.

In her summation, the prosecutor countered these arguments
in several ways.  First, the prosecutor made clear that she did
not have to prove the murder occurred in the apartment.  She only
had to prove the elements of the crime.  Second, the prosecutor

50

argued that the killing could have occurred in the apartment, notwithstanding the absence of noise, blood, body matter, and DNA. The absence of noise was explainable, in part, because the defendant may have used a towel to muffle the sound. The absence of blood and body matter was explainable, in part, because defendant may have shot the victim in the bathtub and used a drop cloth. The absence of DNA was explainable because the apartment, including the bathroom, had been thoroughly cleaned with bleach long before the police arrived.

The prosecutor went on to argue that the absence of DNA in the apartment was evidence of guilt because only someone who wanted to hide evidence would have cleaned an apartment she was vacating so thoroughly as to completely eliminate all traces of DNA. And as for the computer searches, the prosecutor argued it was possible that defendant accessed William McGuire's accounts around the time she was searching for "undetectable poisons" and "how to commit murder," to make it seem as though he was doing the searching.

At no time did the prosecutor suggest she was making certain arguments because she was aware of facts about the case that were not in evidence. Rather, she made clear she was offering explanations for the evidence as it existed. Ultimately, it was for the jury, not defendant or the court, to decide whether the prosecutor's explanations were reasonable and believable.

Moreover, the prosecutor's comments were based upon facts in evidence, not speculation. For instance, the prosecutor's

argument that defendant could have used a towel to muffle the sound of the gun is consistent with the fact that one of the bullets was embedded in a cloth.  (See 30T58-18 to 59-21).  And when the prosecutor discussed the reason for the absence of DNA in the apartment, she referred to Lori Thomas's testimony that when she went to the apartment, the smell of bleach made it smell like a morgue.  (See 34T13-9 to 15-11).

In sum, the prosecutor did not engage in prosecutorial misconduct during her opening statement or summation.  Rather, the prosecutor properly tailored her remarks to the evidence and the reasonable inferences that could be drawn from such evidence. There was no error, let alone plain error.  R. 2:10-2.

    B.   <u>The Prosecutor Did Not Engage in So-Called<br>"Inflammatory Questioning."</u>

The circumstances surrounding the murder of William McGuire were gory and gruesome.  The victim was shot in the chest and forehead.  His body was then cut into pieces with a reciprocating saw, and his body parts were stuffed into trashed bags, crammed into suitcases, and dumped into the Chesapeake Bay.  But despite the shocking brutality and horrific nature of the crime, the trial was surprisingly unemotional because the State took great pains to shield the jury from graphic testimony and photographs.

Nonetheless, for the first time on appeal, defendant insists there was plain error requiring a new trial because John Rice, the victim's friend, gave a one-sentence response to a prosecutor's question in which he mentioned that when he looked at photographs of William McGuire's body, the body appeared

"bloated." (Db43). Defendant's argument is without merit.

Rice testified that he was living in Virginia at the time of William McGuire's disappearance, and that there was significant news coverage when the suitcases were recovered in the Chesapeake Bay. (46T20-22 to 25). Later, a sketch was released, and Rice's wife told Rice that she thought the sketch resembled William McGuire. Rice then contacted the police and went to police headquarters to look at photographs of the victim's body. When asked by the prosecutor at trial if he thought those photographs were of William McGuire, Rice replied, "They were bloated. No, I did not think." (46T23-2 to 4).

The defense did not object, move to strike, or ask for a curative instruction. They certainly did not move for a mistrial, which is the functional equivalent of the remedy defendant is seeking now. The clear inference is that the defense did not find the testimony to be unduly prejudicial. Now, defendant bears the burden of proving that this fleeting reference to the victim's body being "bloated" was so prejudicial that it constituted plain error that was "clearly capable of producing an unjust result." R. 2:10-2. The possibility of injustice must be sufficient to "raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Macon, 57 N.J. at 336.

Defendant cannot meet this burden. The jury was well aware that the suitcases containing the victim's body parts had been floating in the Chesapeake Bay for days before they were

recovered. That those body parts were somewhat bloated when the
suitcases were discovered was to be expected, and such testimony
was hardly the type of emotional appeal that could have diverted
the jury from a dispassionate evaluation of the evidence.

In any event, there was no bad faith because the prosecutor
did not ask Rice whether the victim's body was bloated. She
simply asked Rice whether he thought the photographs were of
William McGuire. When she asked that question, she did not know
that Rice would answer by saying "[t]hey were bloated." (46T25-
21 to 22).

In any event, the trial court told the jurors that they had
to decide the case based upon the evidence and could not be
influenced or affected by passion, prejudice, emotion, or
sympathy. (See 56T155-13 to 20). The jurors are presumed to
have followed these instructions, see State v. Manley, 54 N.J.
259, 271 (1969), and there is no reason to doubt that they did
so. In fact, the record confirms that the jury took their
responsibilities seriously. They deliberated for several days,
asked a number of intelligent questions, and ultimately acquitted
defendant of four of the eight charges. These verdicts "show the
jury was not prejudiced." State v. Mance, 300 N.J. Super. 37, 52
(App. Div. 1997).

Given the innocuous nature of Rice's unanticipated and
unobjected-to testimony, given the court's instructions to the
jury concerning the need to avoid passion, prejudice, emotion,
and sympathy, and given the jury's reasoned decision to acquit

defendant of four of the eight charges, Rice's testimony was not "clearly capable of producing an unjust result."  R. 2:10-2. There was no substantial injustice sufficient to raise a reasonable doubt as to whether the testimony "led the jury to a result it otherwise might not have reached."  Macon, 57 N.J. at 336.

Similarly unavailing is defendant's belated criticism of the prosecutor for eliciting testimony concerning the nature of defendant's affair with Dr. Bradley Miller.  (Db43-45).  This testimony, which was not objected to below, was relevant and hardly inflammatory, especially in light of the court's careful limiting instructions.  There was no error, let alone plain error.  R. 2:10-2.

At trial, the prosecutor asked Dr. Miller if there came a time when his relationship with defendant became intimate, and Dr. Miller replied, "Yes, it did."  (37T8-18 to 20).  The prosecutor then asked when the affair began, and Dr. Miller replied, "It was towards the end of her second pregnancy.  She was about 38 weeks pregnant, and before she went on maternity leave, we had oral sex in the office."  (37T8-21 to 9-2).

Dr. Miller further testified that the affair continued after the child was born and did not end until after the police investigation.  (37T9-24 to 10-10).  Dr. Miller also said that he and defendant were in love with each other, and that by April of 2004, they were making plans to divorce their respective spouses, buy a house together, and have children.  (37T11-19 to 13-16).

55

The testimony that defendant was having an affair with Dr. Miller was relevant to defendant's motive. The State's theory was that defendant killed William McGuire because she was having an intimate relationship with Dr. Miller and wanted to pursue her relationship with Dr. Miller unfettered. The State had to elicit certain details concerning the affair, including the timing of the affair, the general nature of the affair, and the overall intensity of the affair, to prove that defendant and Dr. Miller were seriously involved with one another, so much so that defendant strongly desired for her husband to disappear.

It is well settled that a wider range of evidence is admissible to establish motive and intent than is permitted in support of other issues. State v. Rogers, 19 N.J. 218, 228 (1955). Otherwise, "there would often be no means to reach and disclose the secret design or purpose of the act charged in which the very gist of the offense may consist." Ibid.; State v. Crumb, 277 N.J. Super. 311, 317 (App. Div. 1994). Therefore, "[a]ll evidentiary circumstances which are relevant to or tend to show light on the motive or intent of the defendant or which tend fairly to explain [her] actions are admissible in evidence against [her] although they may have occurred previous to the commission of the offense." Rogers, 19 N.J. at 228; Crumb, 277 N.J. Super. at 317.

In this case, evidence of the affair was directly relevant to the issue of motive. Because Dr. Miller's testimony "tend[ed] to show light on [defendant's] motive," and "tend[ed] fairly to

explain [defendant's] actions," it was properly admitted without objection. Rogers, 19 N.J. at 228; Crumb, 277 N.J. Super. at 317.

Furthermore, the trial court provided the jurors with a proper limiting instruction. The judge told the jurors that evidence of defendant's marital problems was admitted for the limited purpose of allowing the jurors to determine defendant's state of mind at or about the time of the victim's death. The jurors could consider the evidence for that purpose only. They could not consider the evidence to conclude that defendant or William McGuire was a bad person. (56T117-16 to 118-16).

This limiting instruction prevented the possibility of undue prejudice. See State v. M.L., 253 N.J. Super. 13, 25 (App. Div. 1991), certif. denied, 127 N.J. 560 (1992). Given the limiting instruction, and given the court's admonishment that the jurors not be influenced by passion, prejudice, emotion, or sympathy, (see 556T155-13 to 20), Dr. Miller's relevant and unobjected-to testimony concerning the affair was not "clearly capable of producing an unjust result" and did not amount to plain error. R. 2:10-2.

  C.  Conclusion

A review of the entire trial record reveals no evidence of prosecutorial misconduct prejudicing defendant's right to a fair trial. In fact, when the alleged improprieties are viewed in the context of the entire trial, which lasted seven weeks and reeked of defendant's guilt, it is clear there was no plain error.

Defendant was entitled to a fair trial, not a "perfect trial," and the record leaves no doubt that the trial was fair.  <u>Lutwak v. United States</u>, 344 <u>U.S.</u> 604, 619 (1953); <u>State v. Feaster</u>, 156 <u>N.J.</u> 1, 84 (1998); <u>State v. Loftin</u>, 146 <u>N.J.</u> 295, 397 (1996); <u>State v. Marshall</u>, 123 <u>N.J.</u> 1, 170 (1991).  Accordingly, this Court should reject defendant's arguments and affirm defendant's convictions.

POINT III

> THE TRIAL COURT PROPERLY QUALIFIED THOMAS
> LESNIAK AND FRANK RUIZ AS EXPERT WITNESSES,
> AND PROPERLY PRECLUDED THE DEFENSE FROM
> INTRODUCING INCOMPETENT EVIDENCE AT TRIAL.

The trial court properly admitted expert testimony from Thomas Lesniak and Frank Ruiz regarding their comparisons of the trash bags found with the victim's body parts and the trash bags known to have come from defendant's home.  Also, the trial court properly precluded the defense from introducing hearsay testimony concerning an out-of-court statement allegedly made by the victim, to corroborate defendant's explanation for why she purchased the gun.  Finally, the trial court did not abuse its discretion in using <u>N.J.R.E.</u> 403 to preclude the defense from introducing testimony that William McGuire allegedly walked out on his first wife more than ten years before he was murdered.

> A.   <u>The Trial Court Properly Permitted the State to
> Introduce Expert Testimony from Thomas Lesniak and
> Frank Ruiz.</u>

Before permitting Thomas Lesniak and Frank Ruiz to testify as expert witnesses at defendant's trial, the trial court conducted a pre-trial hearing under <u>N.J.R.E.</u> 104.  At the

58

hearing, the court heard testimony from Lesniak and Ruiz.

<u>Thomas Lesniak</u>

At the pre-trial hearing, Lesniak testified that he was a forensic scientist assigned to the Criminalistics Section of the Office of Forensic Sciences of the New Jersey State Police. (20T41-7 to 43-8). He had worked in the Criminalistics Section for 27 years, and he had received specialized training in tool mark analysis. (20T41-13 to 14; 20T43-9 to 13; 20T45-23 to 47-6). Previously, he had obtained his bachelor's degree in forensic science and worked for the Union County Prosecutor's Office as a laboratory analyst. (20T43-14 to 45-10; 20T45-11 to 22).

Lesniak was certified by the American Society of Crime Lab Directors (ASCLD) in tool mark analysis. To maintain his certification, he regularly took and passed proficiency and competency examinations in tool mark analysis and other disciplines. In fact, to maintain his ASCLD certification in tool mark analysis, he was required to pass a proficiency examination in tool marks every year. During his entire career, he had never failed a competency or proficiency examination. (20T47-7 to 52-7).

Throughout his career, Lesniak had performed hundreds of tool mark analyses, and on several occasions, he had testified as an expert witness in forensic tool mark analysis. He also had testified about 200 times as an expert in forensic science. In his entire career, he had never been rejected as unqualified to

testify as an expert witness.  (20T52-8 to 54-8; 20T61-21 to 63-9; 20T65-18 to 66-3; 21T20-24 to 19).

Lesniak explained that plastic garbage bags are subject to tool mark analysis because the tools used in manufacturing plastic garbage bags leave unique tool marks, striae, and patterns on the bags.  (20T54-9 to 56-5).  In fact, Lesniak had used tool mark analysis to conduct comparisons of plastic garbage bags in about ten cases before becoming involved in the McGuire case.  (20T56-6 to 57-7).

Lesniak compared the trash bags recovered with the victim's body parts with the trash bags known to have come from defendant's apartment.  He did so using several different techniques.  (20T57-8 to 61-20; 21T13-20 to 34-1).  First, Lesniak examined, measured, and physically compared various parts of the bags, including the length, width, thickness, skirt, folds, perforation marks, chads, and seals on the bags.  After that visual inspection, Lesniak found no differences between the bags and determined that they were all comparable.  (20T57-22 to 59-14; 21T13-20 to 14-24).

Next, Lesniak cut the bags open and laid them flat across a light box so he could examine the die patterns and die striations created when the die comes in contact with the plastic during the extrusion process.  He found that the die patterns and die striations on the various bags were consistent because they had the same "wood grain pattern."  (20T59-13 to 60-21; 21T15-5 to 26-6; 21T30-13 to 34-1).  He concluded that all the bags had been

60

manufactured on the same extruder, at approximately the same time, using the same die.   (21T20-7 to 13; 21T25-3 to 11; 21T32-23 to 25; 21T33-24 to 34-1).

Finally, Lesniak compared the top and bottom edges of all the bags and determined that they all had what Lesniak described as a "little cliff."  The presence of the cliff indicated that one of the knives used to cut the bags had been inserted backwards, causing a shift on the cutting line.  (20T60-22 to 61-20; 21T26-7 to 30-12).

After considering Lesniak's testimony at the pre-trial hearing, Judge DeVesa ruled that Lesniak would be permitted to testify as an expert in the field of criminalistics and tool marks.  The judge emphasized that Lesniak had been with the State Police for about 27 years, had performed thousands of tool mark comparisons, and had a "vast amount of experience" and training in tool mark analysis.  The judge also explained that Lesniak had "technical and specialized knowledge," as well as scientific knowledge, that could assist the jury in understanding the evidence.  In addition, the judge was satisfied that Lesniak was qualified to give an expert opinion on whether the tool marks on the plastic bags had been made by the same tool.  (20T129-24 to 133-24; 22T71-23 to 72-13).

Frank Ruiz

At the time of trial, Frank Ruiz was the Technical Director of the Heritage Bag Company.  He had worked for that company for over 20 years.  (22T3-14 to 22; 22T4-6 to 16; 22T8-13 to 15).

61

Previously, he had been employed by Union Carbide Corporation for almost six years. (22T3-23 to 4-2). Overall, he had 27 years of experience in the plastics industry. (22T4-3 to 5; 22T8-16 to 19).

Ruiz earned a degree in chemistry from the Massachusetts Institute of Technology in 1976, he was a member of many professional associations related to the plastics industry, he regularly presented at "numerous conferences" around the country, and he had published many articles and technical papers about plastics. (22T4-17 to 5-14; 22T5-15 to 6-1). He also had testified as an expert in two prior homicide trials. In both cases, he testified that plastic bags found with the victims' bodies matched plastic bags found at the suspects' residences. (22T6-2 to 21).

For the McGuire case, Ruiz conducted various tests to determine whether the plastic bags found with the victim's body parts matched the plastic bags determined to have come from defendant's apartment. Those tests included the following: (1) a visual examination of the bags; (2) infrared spectroscopy; (3) differential scanning calorimetry; and (4) ash testing to determine the presence of additives. (22T8-20 to 10-20).

During the visual examination, Ruiz determined that all the bags were made of reprocessed polyethylene and shared the same physical characteristics. They were the same size, length, width, thickness, and color. They also had the same sealing characteristics and "flat bottom seal design." Most

significantly, there were matching striations or die lines on each of the bags.  These striations or die lines are "defects imparted to the film as it is extruded out of the die of the bag manufacturing line," and Ruiz noticed that the striations and die lines on the various bags "lined up perfectly."  That was significant, according to Ruiz, because striations and die lines "will vary over time," especially when reprocessed material is used.  Ruiz concluded that all the bags had been manufactured within the same three-hour period.  (22T10-21 to 18-23).

The second test was an infrared spectroscopy test.  That test involves shining a beam of infrared light through the film of the bags and then using a spectrograph to determine the chemical content and molecular structure of the film.  This test revealed that the raw material used for all the bags was identical.  Due to the variable nature of reprocessed material, Ruiz concluded that all the bags had been manufactured from "the identical box of reprocessed material."  (22T18-24 to 22-7).

The third test was a differential scanning calorimetry (DSC) test.  That test consists of taking a small sample of a plastic bag, placing it in a thermal analyzer, heating the sample, and measuring the melting points to determine the crystalline structure.  Ruiz used a sample from one of the bags recovered with the victim, and a sample from one of the bags from defendant's apartment.  When he conducted the DSC tests on these two samples, the results were "identical," indicating that the two specimens had the same crystalline structure.  This was

63

significant to Ruiz, because the melting points for bags produced by different corporations are typically different, especially when the bags are composed of reprocessed material. The results of the DSC tests further confirmed that the bags had been "processed from the same batch of reprocessed material." (22T25-2 to 27-7).

The last test was an ash test. The ash test involves taking a sample of a plastic bag and heating it in a small oven to burn the polyethylene away and leave only the inorganic material. This test revealed that the various bags had "very similar" ash numbers, and that the ash was "comprised of the same materials (calcium carbonate and talc). Because the various bags had "the same amount of ash" and "the same relative composition of the ash," the ash tests provided Ruiz additional proof that the various bags were "made from the same raw material." (22T22-8 to 25-1).

Having testified that the bags found with the victim's body parts and the bags from defendant's apartment came from the same batch of reprocessed material, Ruiz went on to testify that reprocessed material is sold in 1,000-pound boxes, and that 3,290 garbage bags could be produced from a single 1,000-pound box of reprocessed material. Ruiz also testified that, because garbage bags are typically sold to individual consumers in boxes containing 50 bags, a single 1,000-pound box of reprocessed material typically produces about 62 boxes of garbage bags. (22T28-7 to 31-22).

Due to the physical similarities of the bags, the "exact correlation of all the die lines and tool marks," and the "identical nature" of the infrared spectroscopy and differential scanning calorimetry, Ruiz concluded that the bags were not only made from the same batch of reprocessed material, but were made at about the same time during the same production run.  In this regard, Ruiz noted that there is a "very rapid die line buildup" with reprocessed material which changes the pattern of striations and markings on the plastic at a rapid rate.  If the bags had been produced at opposite ends of the same production run, he would have expected "a much different pattern to have appeared on the surface and in the structure of the bags."  (22T31-18 to 33-3).

Judge DeVesa found Ruiz to be qualified to testify as an expert in the field of plastic bag technology and manufacturing. The judge found that Ruiz was "highly qualified by virtue of his training and experience to assist the jury in its fact-finding mission with respect to the probative value and the relevance of his plastic bag comparisons."  (22T67-19 to 70-15).

The admissibility of expert testimony is governed by N.J.R.E. 702.  That rule provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

There are three basic requirements for the admission of

expert testimony: (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art that such an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.  State v. Reeds, 197 N.J. 280, 290 (2009); State v. Jenewicz, 193 N.J. 440, 454 (2008); State v. Townsend, 186 N.J. 473, 491 (2006); State v. Torres, 183 N.J. 554, 567-68 (2005); State v. Kelly, 97 N.J. 178, 208 (1984).  Those requirements are "construed liberally in light of Rule 702's tilt in favor of the admissibility of expert testimony."  Jenewicz, 193 N.J. at 454.

"The primary justification for permitting expert testimony is that the average juror is relatively helpless in dealing with a subject that is not a matter of common knowledge."  State v. Fortin, 189 N.J. 579, 596 (2007), quoting Kelly, 97 N.J. at 209. Thus, a party seeking to introduce expert testimony must demonstrate that the testimony will "enhance the knowledge and understanding of lay jurors with respect to other testimony of a special nature normally outside of the usual lay sphere."  Kelly, 97 N.J. at 209 (quotation omitted).

The first requirement for the admission of expert testimony is that the evidence "relates to a relevant subject that is beyond the understanding of the average person of ordinary experience, education, and knowledge."  Torres, 183 N.J. at 568, quoting State v. Odom, 116 N.J. 65, 71 (1981).  If the expert's testimony will "help the jury understand the evidence presented

and determine the facts," it will satisfy the first requirement for admissibility.   <u>Ibid.</u>

The second requirement that must be met before expert testimony is permitted is a showing that the proposed expert's testimony is sufficiently reliable.   Generally, there are three ways a proponent of expert testimony can prove its reliability in terms of its general acceptance within the professional community.   The first is "by the testimony of knowledgeable experts"; the second is by the use of "authoritative scientific literature"; and the third is by "persuasive judicial decisions that acknowledge such general acceptance of expert testimony." <u>Townsend</u>, 186 <u>N.J.</u> at 491, quoting <u>Kelly</u>, 97 <u>N.J.</u> at 224; <u>Torres</u>, 183 <u>N.J.</u> at 568.

The final requirement for admissibility is that the expert has sufficient expertise to offer the proposed testimony.   This requires a finding that the expert is "qualified by knowledge, skill, experience, training, or education."   <u>Townsend</u>, 186 <u>N.J.</u> at 493, quoting <u>Torres</u>, 183 <u>N.J.</u> at 572.

Generally, our courts "take a liberal approach when assessing a person's qualifications," <u>Jenewicz</u>, 193 <u>N.J.</u> at 454, and an expert "may be qualified on the basis of his experience, even when it is limited." <u>Torres</u>, 183 <u>N.J.</u> at 572.   <u>See</u> <u>State v. Moore</u>, 122 <u>N.J.</u> 420, 457-60 (1991) (holding that the trial court did not err in qualifying a blood-splatter expert with only two days of experience analyzing blood-splatter); <u>State v. Krivacska</u>, 341 <u>N.J. Super.</u> 1, 32-33 (App. Div.), <u>certif. denied</u>, 170 <u>N.J.</u>

206 (2001) (permitting a psychologist to offer an expert opinion about a mentally handicapped individual even though he did not specialize in evaluating mentally handicapped patients and had no experience with the victim's particular cognitive impairment), cert. denied, 535 U.S. 1012 (2002); State v. Bealor, 187 N.J. 574, 592-93 (2006) (recognizing that police officers generally are qualified to offer expert testimony on marijuana intoxication based upon basic pre-commission training).

A trial court has broad discretion in determining the adequacy of an expert's qualifications. Townsend, 186 N.J. at 493. Moreover, a reviewing court must give "substantial deference" to a trial court's decision to qualify a proposed expert. Jenewicz, 193 N.J. at 455. Such a decision can be reversed only for "manifest error and injustice." Ibid., quoting Torres, 183 N.J. at 572, 579, quoting State v. Ravenell, 43 N.J. 171, 182 (1964), cert. denied, 379 U.S. 982 (1965); Townsend, 186 N.J. at 493.

In this case, defendant challenges the reliability of tool mark analysis, but tool mark analysis has long been accepted by courts throughout the country as a permissible "scientifically recognized area for expert testimony." Commonwealth v. Foreman, 797 A.2d 1005 (Pa. Super. Ct. 2002). In fact, courts routinely recognize that tool mark analysis "rests upon a scientific basis and is a reliable and generally accepted procedure." United States v. Bowers, 534 F.2d 186, 193 (9th Cir.), cert. denied, 429 U.S. 942 (1976); see State v. Behn, 375 N.J. Super. 409, 419

68

(App. Div. 2005); <u>State v. Cito</u>, 196 <u>N.J. Super.</u> 220, 222 (Law Div. 1984); <u>see also</u> <u>State v. Clark</u>, 287 <u>P.</u> 18 (Wash. 1930) (equating the reliability of tool mark analysis with the reliability of fingerprint analysis).

Defendant fails to cite to a single New Jersey case questioning the reliability of tool mark analysis. Instead, she relies on a 2009 report prepared by the National Academy of Science ("NAS") entitled <u>Strengthening Forensic Science in the United States: A Path Forward</u>." But the NAS Report does not "render[] the forensic techniques used in [defendant's] case unreliable." <u>Johnston v. State</u>, 27 <u>So.</u>3d 11, 21 (Fla. 2010). Nor does it "demonstrate, in any specific way, that the testing methods or opinions in [defendant's] case were deficient." <u>Id.</u> at 22.

Judge Harry T. Edwards, who co-chaired the project that led to the NAS Report, testified before the United States Congress that "nothing in the Report was intended to answer the 'question whether forensic evidence in a particular case is admissible under applicable law.'" <u>United States v. Rose</u>, 672 <u>F.Supp.</u>2d 723, 725 (D. Md. 2009), quoting Hon. Harry T. Edwards, <u>Statement before U.S. Senate Judiciary Committee</u> (Mar. 18, 2009). In fact, the Committee that issued the NAS Report did not even attempt to "develop a detailed evaluation of each discipline in terms of its scientific underpinning, level of development, and ability to provide evidence to address the major types of questions raised in criminal prosecutions and civil litigation." <u>Ibid.</u>, quoting

69

the Committee Statement in the Report's Executive Summary.

Similarly unavailing is defendant's reliance upon Ramirez v. State, 810 So.2d 836 (Fla. 2002). In Ramirez, the Supreme Court of Florida recognized that tool mark evidence is "generally accepted in the scientific community and has long been upheld by courts." Id. at 845. Thus, although the Ramirez court held that the trial judge in that case erroneously admitted expert testimony that the victim's wounds were caused by a particular knife, id. at 845-52, the court did not impugn tool mark analysis in general.803(c)(3)

As Lesniak indicated, there is no significant difference between tool mark analysis of plastic garbage bags and tool mark analysis of other objects. Just like other objects, plastic garbage bags are subject to tool mark analysis because the tools used in manufacturing plastic garbage bags leave unique tool marks, striae, and patterns on the bags. (20T54-9 to 56-5). In fact, Lesniak had used tool mark analysis to conduct comparisons of plastic garbage bags in about ten cases before becoming involved in the McGuire case. (20T56-6 to 57-7).

Furthermore, the evidence was overwhelming that Lesniak and Ruiz were qualified to offer the proffered testimony. Even defense counsel acknowledged that Ruiz "sure seemed like a plastic bag expert to me." (22T67-7 to 8).

As noted above, a trial court has broad discretion in determining the sufficiency of an expert's qualifications, Townsend, 186 N.J. at 493, and our courts "take a liberal

approach when assessing a person's qualifications." Jenewicz,
193 N.J. at 454.  Given that liberal approach, and given the
"substantial deference" that must be given to a trial court's
determination to qualify a proposed expert, the judge's decision
to qualify Lesniak and Ruiz as expert witnesses was not an abuse
of discretion resulting in "manifest error and injustice."
Jenewicz, 193 N.J. at 455, quoting Torres, 183 N.J. at 572, 579,
quoting State v. Ravenell, 43 N.J. 171, 182 (1964), cert. denied,
379 U.S. 982 (1965); Townsend, 186 N.J. at 493.

Next, defendant criticizes Ruiz for comparing only the two
sets of garbage bags provided by the State, rather than utilizing
additional garbage bags as "control samples."  (Db56-57).  But
Ruiz testified that he did not have to test additional garbage
bags because he had tested thousands of bags in the past and knew
"how much variation there can be even within one manufacturer."
(46T133-24 to 135-1).

Finally, defendant's assorted attacks on the methodology
employed by Lesniak and Ruiz were met by Lesniak and Ruiz when
questioned on cross-examination.  Those attacks went to the
weight, not the admissibility, of their testimony.  As our
Supreme Court stated in Jenewicz, courts generally allow
perceived weaknesses of expert witnesses to be "explored in
cross-examination," rather than using such weaknesses as "a
reason to exclude a party's choice of expert witness to advance a
claim or defense."  193 N.J. at 455.   For all the foregoing
reasons, Judge DeVesa properly permitted Thomas Lesniak and Frank

Ruiz to offer expert testimony in this case.   Accordingly,
defendant's convictions should be affirmed.

B.   The Trial Court Properly Precluded the Defense from
     Eliciting Hearsay Testimony From the Victim's Former
     Co-Worker, George Lowery.

At trial, the defense attempted to introduce testimony from
George Lowery, William McGuire's former co-worker.   According to
defense counsel, Lowery was prepared to testify that he had had a
conversation with William McGuire, and that McGuire told Lowery
he wanted to purchase a gun but could not get a permit and was
going to have his wife get a gun for him.   (48T11-20 to 23-20).

Judge DeVesa ruled that any testimony by Lowery concerning
statements attributable to William McGuire would be inadmissible
hearsay.   (48T16-11 to 18-25).   In rejecting defendant's argument
that the statement was admissible as proof of William McGuire's
state of mind, the judge noted that William McGuire's state of
mind prior to the murder was "not really that significant" and
had nothing "to do with the case."   (48T16-14 to 16; 48T18-7 to
9).

Judge DeVesa also rejected defendant's argument that the
statement was admissible as a statement-against-interest.   The
judge noted that if William McGuire said he wanted his wife to
purchase a gun because he was not able to do so, such a statement
was not contrary to his penal interest.   (48T17-23 to 18-6).

Because Lowery's testimony was hearsay and not covered by a
recognized hearsay exception, the court allowed Lowery to testify
only that he and William McGuire discussed the purchase of a gun,

72

without mentioning the specific nature of their conversation. (48T19-1 to 23-7).   Accordingly, Lowery testified that, two or three months before April of 2004, he and William McGuire spoke about the purchase of a firearm.   (48T75-20 to 76-7).

Defendant now contends that the trial court's decision to limit Lowery's testimony was reversible error because William McGuire's entire out-of-court statement was admissible under N.J.R.E. 803(c)(3).   That rule provides for the admission of:

> [a] statement made in good faith of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily healthy), but not including a statement of memory or belief to prove the fact remembered or believed ...

Generally, "a decedent's hearsay statements are not admissible to prove the defendant's motivation or conduct, and convictions have been reversed where such statements were admitted." State v. Dreher, 251 N.J. Super. 300, 317 (App. Div.), certif. denied, 127 N.J. 564 (1992); see also Biunno, Current N.J. Rules of Evidence, comment 3 to N.J.R.E. 803(c)(3), at 781-82 (Gann 2009).   There are only three exceptions to this general rule: (1) where the defendant asserts a claim of self-defense as justification for the killing; (2) where the defendant claims that the deceased committed suicide; and (3) where the defendant claims that the deceased died as a result of an accident.   Dreher, 251 N.J. Super. at 317-18; State v. Downey, 206 N.J. Super. 382, 392-93 (App. Div. 1986).   In the absence of one of these exceptions, a court cannot admit a victim's hearsay

73

statement as proof of the defendant's motivation or conduct.
Ibid.; accord State v. Machado, 111 N.J. 480, 489 (1988)
("[d]eclarations of the victim's state of mind ... should not be
used to prove the defendant's motivation or conduct"); State v.
Prudden, 212 N.J. Super. 608, 613-14 (App. Div. 1986); State v.
Downey, 206 N.J. Super. at 391 ("[t]he rule is limited to
statements offered to prove the declarant's conduct, not that of
another person").

Furthermore, to be admissible under N.J.R.E. 803(c)(3), the
declarant's state of mind must be an issue in the case.  If the
trial court determines that the declarant's state of mind is not
a relevant issue, evidence of the declarant's hearsay statements
is inadmissible.  See N.J.R.E. 401.  See also State v. Chavies,
345 N.J. Super. 254, 273-74 (App. Div. 2001) (indicating that
evidence admitted under this rule is necessarily offered for the
truth of the matter asserted, and suggesting that if the truth of
the matter, i.e., the declarant's state of mind, is irrelevant to
the case, the statement itself is irrelevant); State v. Downey,
212 N.J. Super. at 391 (evidence of the victim's hearsay
statements was inadmissible under the precursor to N.J.R.E.
803(c)(3) because the victim's "state of mind was not a relevant
issue to be decided by the jury," and because the "important fact
... was the state of mind of the defendant, not that of the
deceased").

Here, the defense was seeking to introduce "a decedent's
hearsay statements ... to prove the defendant's motivation or

74

conduct." <u>Dreher</u>, 251 <u>N.J. Super.</u> at 317.  More specifically,
the defense was seeking to admit William McGuire's hearsay
statement to Lowery not to prove that the declarant acted in
conformity with his stated intent, but for a purpose that was one
step removed, <u>i.e.</u>, to corroborate defendant's story that she
purchased the gun because William McGuire wanted her to do so and
asked her to do so.  Such misuse of a decedent's out-of-court
statement was condemned by this Court in <u>Dreher</u>, <u>Prudden</u>, and
<u>Downey</u>.

Likewise, William McGuire's statement to Lowery was not
admissible as a statement against interest under <u>N.J.R.E</u>.
803(c)(25).  That rule allows for the admission of:

> [a] statement which was at the time of its
> making so far contrary to the·declarant's
> pecuniary, proprietary, or social interest,
> or so far tended to subject declarant to
> civil or criminal liability ... that a
> reasonable person in declarant's position
> would not have made the statement unless the
> person believed it to be true.

To qualify as a declaration against interest, the statement
must have "so far subjected [the declarant] to ... criminal
liability ... that a reasonable man in his position would not
have made the statement unless he believed it to be true." <u>State</u>
<u>v. Abrams</u>, 140 <u>N.J. Super</u>. 232, 235 (App. Div. 1976), <u>aff'd o.b.</u>,
72 <u>N.J.</u> 342 (1977); <u>accord</u> <u>State v. Brown</u>, 170 <u>N.J.</u> 138, 148-49
(2000); <u>State v. White</u>, 158 <u>N.J.</u> 230, 238-239 (1999).  In other
words, the issue is whether the statement so far exposed the
declarant to criminal liability that "but for [its] truth [it]
would not have been made." <u>State v. Gomez</u>, 246 <u>N.J. Super.</u> 209,

75

215 (App. Div. 1991).

William McGuire's alleged statement to Lowery, i.e., that he wanted a gun but could not get a permit and was going to have his wife get a gun, was not contrary to William McGuire's penal interest.   That type of statement was not evidence of a crime and did not expose William McGuire to criminal or civil liability.

For the foregoing reasons, Lowery's testimony concerning the victim's out-of-court statement was hearsay and did not fall under any applicable hearsay exception.   Therefore, the trial court properly precluded Lowery from offering such testimony at trial.

In any event, defendant was not prejudiced, and any perceived error was harmless beyond a reasonable doubt.   Notably, the trial court permitted Lowery to testify that he and William McGuire spoke about purchasing a gun about two or three months before April of 2004.   And defense counsel argued during summation that the clear inference to be drawn from Lowery's testimony was that William McGuire wanted to purchase a gun. Given defense counsel's expansive interpretation of Lowery's testimony, and given defendant's own statements to Jim Finn and Dr. Miller that she got the gun because her husband wanted it, the jury ultimately heard everything that defendant wanted Lowery to testify about.   There was no prejudice whatsoever.

    C.    <u>The Trial Court Properly Precluded the Defense From</u>
          <u>Eliciting Irrelevant Testimony From William McGuire's</u>
          <u>Ex-Wife, Marcie Paulk.</u>

The trial court properly precluded the defense from

76

introducing testimony from William McGuire's ex-wife, Marcie
Paulk, that William McGuire abandoned their marriage and maxed
out their credit cards in 1992.   This testimony was irrelevant to
any fact in issue, and it was nothing more than a poorly-
disguised attempt to attack the victim's character.

Evidence is relevant only if it has a "tendency in reason to
prove or disprove any fact of consequence to the determination of
the action." N.J.R.E. 401.   In determining whether evidence is
relevant, the issue is whether there is a "logical connection
between the proffered evidence and a fact in issue." State v.
Swint, 328 N.J. Super. 236, 252 (App. Div.), certif. denied, 165
N.J. 492 (2000), quoting State v. Hutchins, 241 N.J. Super. 353,
358 (App. Div. 1990); accord State v. Darby, 174 N.J. 509, 519
(2002); State v. Koskovich, 168 N.J. 448, 480 (2001); State v.
G.V., 162 N.J. 252, 263 (2000).   If the evidence does not
"'render[] the desired inference more probable than it would be
without the evidence,'" then the evidence is irrelevant and must
be excluded.   State v. Davis, 96 N.J. 611, 619 (1984), quoting
State v. Deatore, 70 N.J. 100, 116 (1976); accord G.V., 162 N.J.
at 263; Swint, 328 N.J. Super. at 252.

But even when there is logical relevancy between the
evidence offered and a material issue in the case, the
admissibility of such evidence still falls largely within the
discretion of the trial judge.   State v. Catlow, 206 N.J. Super.
186, 193 (App. Div. 1985), certif. denied, 103 N.J. 465-66
(1986).   Furthermore, N.J.R.E. 403 allows a trial court to

77

exclude relevant evidence if the trial court, in its discretion, finds that the probative value of the evidence is "substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence."

In performing the weighing process required by N.J.R.E. 403, the trial court's discretion is broad.  A determination to exclude evidence under N.J.R.E. 403 will not be overturned on appeal unless it can be shown that there was a palpable abuse of discretion, i.e., a "finding so wide of the mark that a manifest denial of justice resulted."  Green v. New Jersey Mfrs. Ins. Co., 160 N.J. 480, 492 (1999); State v. Koedatich, 112 N.J. 225, 313 (1988), cert. denied, 488 U.S. 1017 (1989); State v. Carter, 91 N.J. 86, 106 (1982).

In this case, defendant sought to call Paulk to testify that William McGuire "walked out on her" more than ten years earlier.  This testimony was irrelevant to whether William McGuire walked out on defendant shortly before he was killed.  Even assuming that William McGuire walked out on his ex-wife ten years before he was murdered, that evidence had "no tendency in reason" to prove that William McGuire walked out on the defendant.  N.J.R.E. 401.  It also had "no tendency in reason" to prove that defendant thought William McGuire was going to walk out on her.  There simply was no "logical connection between the proffered evidence and any fact in issue."  Swint, 328 N.J. Super. at 252, quoting Hutchins, 241 N.J. Super. at 358.

78

Admission of Marci Paulk's testimony would have generated a mini-trial on a collateral issue, i.e., the nature of William McGuire's previous marriage and the manner in which it ended. But the facts underlying the dissolution of William McGuire's previous marriage were unique to that relationship. They shed no light on whether William McGuire acted in similar fashion during his marriage to defendant. Bonnet v. Stewart, 68 N.J. 287, 299 (1975).

Judge DeVesa properly recognized that this evidence as irrelevant, inappropriate, and inflammatory. And Judge DeVesa properly characterized defendant's attempt to use such evidence as a veiled attempt to attack the victim's character. Thus, the court did not abuse its discretion in determining that the probative value of the evidence was substantially outweighed by factors favoring exclusion under N.J.R.E. 403. There is no basis to conclude that the court's analysis was a palpable abuse of discretion, or that a "manifest denial of justice resulted." Green v. New Jersey Mfrs. Ins. Co., 160 N.J. at 492; Koedatich, 112 N.J. at 313; Carter, 91 N.J. at 106. Accordingly, this Court should reject defendant's argument and affirm defendant's conviction.

<u>POINT IV</u>

DEFENDANT'S LIFE SENTENCE FOR THE DEPRAVED KILLING OF WILLIAM McGUIRE IS JUSTLY DESERVED.

A sentence imposed by a trial court is not to be disturbed on appeal unless it represents an abuse of discretion. State v.

79

Gardner, 113 N.J. 510, 516 (1989).  If the sentencing court's findings of fact are based upon competent credible evidence in the record and the court has applied the correct sentencing guidelines, then an appellate court can modify the sentence only if "the application of the facts to the law is such a clear error of judgment that it shocks the judicial conscience." State v. Ghertler, 114 N.J. 383, 387-88 (1989); accord State v. O'Donnell, 117 N.J. 210, 215-16 (1989); State v. Roth, 95 N.J. 334, 363-66 (1984).  The appropriate inquiry is not whether a reviewing court would have reached a different conclusion as to what the sentence should be, but whether, on the basis of the evidence, "no reasonable sentencing court could have imposed the sentence under review." Ghertler, 114 N.J. at 388; accord O'Donnell, 117 N.J. at 215; Roth, 95 N.J. at 365.

In this case, Judge DeVesa sentenced defendant as follows: on Count One (first-degree murder), to a term of life imprisonment, with an 85 percent parole disqualifier; on Count Three (second-degree desecrating human remains), to a concurrent term of ten years, with five years of parole ineligibility; and on Count Four (third-degree perjury), to a consecutive term of five years, with two-and-one-half years of parole ineligibility. (62T47-1 to 55-4; Da267-276).

In fashioning this sentence, the court found two aggravating factors: the nature and circumstances of the offense, including the fact that it was committed in an especially heinous, cruel, or depraved manner, N.J.S.A. 2C:44-a(1); and the need for

80

deterring defendant and others from violating the law.  N.J.S.A.
2C:44-1a(9).  (62T47-1 to 50-4).

In finding aggravating factor (1), Judge DeVesa described
the nature and circumstances of the offense as a "very
significant" aggravating factor. (62T47-19 to 23).  First, the
judge found that "[t]he nature and the complexity and the scope
of this criminal episode involved many overt actions committed
over a three-week period spanning four different states and
reflected a willfulness and a malice that goes beyond the
elements of the crime of murder in our law."  (62T47-23 to 48-3).
Second, the judge said that the desecration of William McGuire's
remains was "particularly heinous and depraved."  (62T48-4 to
11).  Third, the judge explained that the "depravity of the
murder was further manifested by [defendant's] efforts to portray
[the victim] as an abusive husband and chronic gambler who was
indebted to organized crime figures."  (62T48-12 to 21).  Fourth,
the judge commented on the "grave harm" to the victim's children,
noting that the children were going to grow up without a father
or mother, with memories of both parents forever "distorted and
confused by [defendant's] web of deception."  (62T48-21 to 49-1).

In finding aggravating factor (9), Judge DeVesa said there
was a need to deter defendant and others from committing "this
type of horrendous criminality."  (62T49-4 to 7).  The judge
noted that deterrence is "particularly important in cases of
calculated premeditated murder."  (62T49-8 to 18).

Against those aggravating factors, which the court weighted

81

as "significant," the court found a single mitigating factor: that defendant had led a law-abiding life for a substantial period of time before the commission of the crime. But the court discounted this mitigating factor as "largely insignificant" because defendant had been diverted into PTI for perjury in 1998. (62T51-24 to 52-11).

Judge DeVesa rejected mitigating factor (11), *i.e.*, that defendant's imprisonment would cause excessive hardship to her children. N.J.S.A. 2C:44-1b(11). The judge was satisfied that the children were "being well cared for" by the victim's family. (61T50-12 to 13). The judge also noted that defendant's "cruel and deliberate" actions had deprived the children of both parents. (62T50-6 to 12). For that reason, the judge felt that giving defendant favorable consideration for the hardship to the children would make a "mockery of our system of justice." (62T50-14 to 17).

Judge DeVesa concluded that the two "very significant" aggravating factors substantially outweighed the single "insignificant" mitigating factor. (62T52-12 to 16). The court also emphasized that the circumstances of the offense was the single most important sentencing factor, and that defendant's crime was "so heinous, so cruel, and so depraved" that it "shock[ed] the conscience of the court," justifying the maximum sentence allowable by law. (62T49-2 to 3; 62T52-17 to 21).

A.   The Sentencing Court Properly Found Aggravating Factor (1).

Judge DeVesa properly identified the nature and

82

circumstances of defendant's offense as an aggravating factor under <u>N.J.S.A.</u> 2C:44-1a(1). This crime was not committed during a momentary lapse of judgment, but rather was the result of careful planning and execution. The complexity of the crime, the degree of premeditation, and the level of planning indicated coldness, willfulness, and viciousness that went far beyond the elements of the crime. Likewise, defendant's extraordinary efforts to cover up the murder by dismembering the victim's body, disposing of the victim's body parts, moving the victim's car to Atlantic City, and perjuring herself in a court of law, all to create the illusion that the victim was still alive, was indicative of a detailed plan to avoid apprehension, prosecution, and punishment. Judge DeVesa properly recognized that the complexity of the murder, the brutal and disgusting desecration of the victim's remains, and the degree of planning and manipulation involved in the crime and its coverup, was "so heinous, so cruel, and so depraved" that it "shock[ed] the conscience of the court." (62T49-2 TO 3; 62T52-17 to 21).

Defendant nonetheless argues that the sentencing court erred by considering the fact that she dismembered the victim's body. (Db65-67). Essentially, she maintains that the court was required to ignore such evidence for purposes of sentencing and treat her as if she had never dismembered the victim. The State disagrees. Judge DeVesa properly considered defendant's outrageous conduct in desecrating the victim's remains as one of the reasons justifying a finding of the nature and circumstances

83

of the offense as an aggravating factor.

N.J.S.A. 2C:44-1a(1) is broadly written, and it allows a sentencing court to consider conduct committed in aftermath of the substantive crime. See State v. Radziwil, 235 N.J. Super. 557, 575 (App. Div. 1990), aff'd o.b., 121 N.J. 527 (1990) (in sentencing the defendant for aggravated manslaughter and death by auto, the sentencing court "properly identified the nature and circumstances of the offense as an aggravating factor based upon defendant's failure to stop" after colliding with the victim's vehicle).

Defendant relies upon State v. Jenewicz, Docket No. A-0013-02T4 (App. Div. Aug. 8, 2006), rev'd, 193 N.J. 440 (2008), as support for her claim that the sentencing court should have ignored the fact that she dismembered the victim. But Jenewicz is an unpublished decision that was reversed by the Supreme Court on grounds other than sentencing and has no precedential value. R. 1:36-3. Also, to the extent that Jenewicz stands for the proposition that a sentencing court cannot consider post-crime behavior as an aggravating factor, it should be rejected because it is inconsistent with published precedent. If a defendant's failure to stop after a motor vehicle accident will support a finding of the aggravating factor in N.J.S.A. 2C:44-1a(1), see Radziwil, 235 N.J. Super. at 575, so will the dismemberment of a murder victim's body after the killing. That is especially true where, as here, the defendant receives a concurrent sentence for desecrating human remains.

84

In any event, <u>Jenewicz</u> is distinguishable because in that case, the only fact justifying a finding of aggravating factor (1) was the dismemberment of the victim.  Here, the judge listed at least four reasons for finding that aggravating factor. (62T47-1 to 49-3).  Most significant was the fact that the crime was carefully planned and orchestrated over the course of weeks and "reflected a willfulness and a malice" that went far beyond the elements of the crime.  (62T47-23 to 48-3).  <u>See</u> <u>State v.</u> <u>Malik</u>, 365 <u>N.J. Super.</u> 267, 283 (App. Div. 2003), <u>certif. denied</u>, 180 <u>N.J.</u> 354 (2004) (because the complexity and duration of defendant's medicaid fraud scheme "far exceeded the elements required to prove the offense," the court properly considered the pervasive and extensive nature of the criminal fraud as an aggravating factor under <u>N.J.S.A.</u> 2C:44-1a(1)).

B.   <u>The Sentencing Court Properly Rejected Mitigating Factor (11).</u>

Also unpersuasive is defendant's argument that Judge DeVesa erred in failing to find, as a mitigating factor under <u>N.J.S.A.</u> 2C:44-1b(11), that her imprisonment would entail excessive hardship to the victim's children.  (Db68-69).  There is no basis to conclude that a sentence of life imprisonment with an 85 percent parole disqualifier, as opposed to the mandatory minimum sentence of thirty years without parole, will cause the children to suffer "excessive hardship."  <u>N.J.S.A.</u> 2C:44-1b(11).  As the judge recognized, the children are "being well cared for" by the victim's family, (62T50-12 to 13), and as the judge also recognized, defendant's heinous actions are the reason why the

85

children are growing up without parents.   To now consider the hardship to those children as a mitigating factor benefitting defendant would make "a mockery of our system of justice." (62T50-14 to 17).

    C.   <u>Conclusion</u>

    The court's findings regarding the aggravating and mitigating factors are well-supported by the record, and defendant's sentence does not "shock the judicial conscience." <u>O'Donnell</u>, 117 <u>N.J.</u> at 215-16; <u>Ghertler</u>, 114 <u>N.J.</u> at 387-88; <u>Roth</u>, 95 <u>N.J.</u> at 363-66.   This Court should affirm.

CONCLUSION

    For the foregoing reasons, the State respectfully urges this Court to affirm the convictions and sentence below.

                Respectfully submitted,

                PAULA T. DOW
                ATTORNEY GENERAL OF NEW JERSEY
                ATTORNEY FOR PLAINTIFF RESPONDENT

BY:    _____
                Daniel I. Bornstein
                Deputy Attorney General
                bornsteind@njdcj.org

DANIEL I. BORNSTEIN
DEPUTY ATTORNEY GENERAL
DIVISION OF CRIMINAL JUSTICE


OF COUNSEL AND ON THE BRIEF


DATED: May 3, 2010

86

STATE'S
EXHIBIT
883

1
2   Consensual #:            C-57-2005-S
3
4   Consensual Recording:    Brad Miller and Melanie McGuire
5
6   Transcribed By:          Margaret Straccio
7
8   Legend:                  MM:  Melanie McGuire
9                            BM:  Brad Miller
10
11          (I/A) Yeah that'll be good to, you know how to set things up oh shit, alright
12
13          (I/A) RMA
14
15   BM:   Hi Denise this is (I/A) how are you?
16
17         Good how are you?
18
19   BM:   Good um could you uh patch me through to Melanie please.
20
21         Yes hold on a second
22
23   BM:   Thanks
24
25         RMA has offices at Englewood, Morristown, Somerset and West Orange to conveniently
26         serve patients in the tri-state area.  Since timing is critical for successful fertility
27         treatments RMA offices are open 365
28
29
30   MM:   Alright how are you?
31
32   BM:   I'm uh done I'm on my way home
33
34   MM:   Ok
35
36   BM:   Um can you um call me back?
37
38   MM:   Yeah
39
40   BM:   Ok, alright once you um, we'll discuss it when you call back
41
42   MM:   Alright will do bye
43
44   BM:   Alright bye, bye

- 1 -

Pa1

45        So she should go to a different phone and she should call me back.

46

47        I turned it down.

48

49  BM:   Hello

50

51  MM:   What's up

52

53  BM:   Hey, so I'm done for the day um I saw Paul they were just bringing him in so they had
54        me there for uh about 2 hours.  Ok, what's going on with you?

55

56  MM:   Nothing, so are you done, done?

57

58  BM:   No they said they still want me to come back again and um

59

60  MM:   Your joking

61

62  BM:   No, I, I don't know how much more I can take of this, I mean I, you know, (I/A) they
63        really um, think I am involved and um, um I mean they talk about uh the gun and that we,
64        the day you bought the gun that we were on the phone for I don't know 100 minutes or
65        something and that um you know I know where the gun is etc. etc. so and I already told
66        them that, that um you know the gun was uh gone from the lock box.  And um and then
67        they're hammering about ah one other thing too, but any ways

68

69  MM:   What's that?

70

71  BM:   The um the trip to Delaware.

72

73  MM:   What about it?

74

75  BM:   You know they want to know what you were going there for and what furniture stores
76        you were looking for there and believe you went there with your father

77

78  MM:   Really

79

80  BM:   So yeah, I thought you went by yourself and that's what I told them.  And that's um and
81        those were the two things they were hounding me on and you know they're like Do you
82        know where the gun is?  Can you produce the gun? Have you ever seen the gun?  I mean
83        all these questions all over again.  So, they want to know do you have the gun? She's
84        never, I mean she's had the gun.  I just don't know how much more I can take of it.  How
85        are the kids doing?

86

87  MM:   (I/A)

88

Pa2

| 89 | BM: | Are you there? |
| 90 | | |
| 91 | MM: | Yeah, yeah they're fine |
| 92 | | |
| 93 | BM: | So |
| 94 | | |
| 95 | MM: | (I/A) go back |
| 96 | | |
| 97 | BM: | What's that? |
| 98 | | |
| 99 | MM: | When are you suppose to go back? |
| 100 | | |
| 101 | BM: | They haven't told me um and Charla is on for the uh14th and they're trying to get that |
| 102 | | moved til the 22, 21st.  So, |
| 103 | | |
| 104 | MM: | So it's nothing new its the same shit over and over and over. |
| 105 | | |
| 106 | BM: | Pretty much, yeah pretty much. |
| 107 | | |
| 108 | MM: | I mean can you honestly say they've asked you anything that they haven't asked you |
| 109 | | before? |
| 110 | | |
| 111 | BM: | No |
| 112 | | |
| 113 | MM: | I mean in, asked it in a different way or you know what ever but I mean it's not like |
| 114 | | there's anything new coming up here |
| 115 | | |
| 116 | BM: | No that they say um you know implying that I know more then I'm telling them and um |
| 117 | | you know that um some how I'm, I'm involved so |
| 118 | | |
| 119 | MM: | Well they can imply that til the cows come home but you and Selene are telling them the |
| 120 | | same thing. |
| 121 | | |
| 122 | BM: | (I/A) |
| 123 | | |
| 124 | MM: | You know, there may be nuances in detail here and there but you know the basic gist of |
| 125 | | the, the story is, is the same. |
| 126 | | |
| 127 | BM: | Right, well I mean I keep telling them the same thing but um you know.  The gun, the |
| 128 | | gun is gone right? |
| 129 | | |
| 130 | MM: | I, I'm sorry I even told you because you're the only one who knew. |
| 131 | | |
| 132 | BM: | I thought Selene knew about it? |

- 3 -

Pa3

133

134  MM:  About it being gone?  No

135

136  BM:  Alright

137

138  MM:  Selene doesn't want to talk about it anymore.

139

140  BM:  What's that?

141

142  MM:  I said Selene doesn't want to talk about it anymore.

143

144  BM:  Talk about the gun you mean?

145

146  MM:  In general, everything

147

148  BM:  Alright, alright.  I sort of wish it was there so they could prove that uh it wasn't the gun.

149

150  MM:  Me too.  Oh I wish it was there for so many reasons I can't begin to count.

151

152  BM:  Alright

153

154  MM:  That's obvious.

155

156  BM:  Right, any ways, so, but um that's what's going on today

157

158  MM:  They took Paul after you I thought Richard was going to be their next one

159

160  BM:  No, I saw Paul I don't know who went in the door was already shut but Paul was using
161       the bathroom or something so, I guess they have them for the rest of the day.  But uh any
162       ways how's your day going?

163

164  MM:  Pretty bad.

165

166  BM:  Why what's going on there?

167

168  BM:  I mean when you went to um, when you went to Delaware did you stop at any stores did
169       anyone see you?

170

171  MM:  hummm, not that that I would recall.  I have a list or Mike I should say has a list of all the
172       stores you know

173  BM:  Right

174

175  MM:  That I was going to go to and phone numbers blah, blah, blah you know, I mean I have a,
176       a lengthy list you know and they have a big area there you know that's it's like all

- 4 -

## Pa4

| | | |
|---|---|---|
| 177 | | furniture warehouses and furniture stores and stuff like that. So I'm like I'm not pulling |
| 178 | | that out of my head. |
| 179 | | |
| 180 | BM: | Right, right |
| 181 | | |
| 182 | MM: | It's, It's not like I said oh I went uh you know blue scarf shopping you know, no |
| 183 | | |
| 184 | BM: | Right, they also said that um they saw your car on the, on the bridge, the bridge that you |
| 185 | | take across the Delaware, why would they think your father went along? |
| 186 | | |
| 187 | MM: | I don't know. |
| 188 | | |
| 189 | BM: | I mean |
| 190 | | |
| 191 | MM: | You said they saw my car coming, oh maybe back from Delaware |
| 192 | | |
| 193 | BM: | Right |
| 194 | | |
| 195 | MM: | Do you think? |
| 196 | | |
| 197 | BM: | Right, exactly so, are you |
| 198 | | |
| 199 | MM: | I don't know, I don't know why they think my father was along but you know what (I/A) |
| 200 | | you know I'm sure they see my plate or what ever |
| 201 | | |
| 202 | BM: | Right |
| 203 | | |
| 204 | MM: | You know |
| 205 | | |
| 206 | BM: | I don't know if they would see two people in the car or, or one. I don't know |
| 207 | | |
| 208 | MM: | I guess that was coming back that morning |
| 209 | | |
| 210 | BM: | Was, was he working that day, I mean |
| 211 | | |
| 212 | MM: | I have no idea, I don't remember |
| 213 | | |
| 214 | BM: | But um you know Mike told you uh cause Mike, Mike doesn't know that you know about |
| 215 | | the gun, right? |
| 216 | MM: | I, I don't even remember any more. |
| 217 | | Mike didn't even want me to look for it cause its mine |
| 218 | | |
| 219 | BM: | Right |
| 220 | | |

- 5 -

# Pa5

221  MM:  Every body thought (I/A)
222
223  BM:  They um, they believe that  you have it stashed somewhere.
224
225  MM:  Which is asinine.
226
227  BM:  Right, but um I, I know what you told me you said that you didn't want to report the gun
228       stolen cause of the uh cause if it was missing cause you put it down in TRO that you
229       didn't have a gun, right?
230
231  MM:  Oh because he didn't to my knowledge.
232
233  BM:  Right.  Or else you could uh face weapons charges for transferring across state lines.
234
235  MM:  Of course.
236
237  BM:  That's what they're
238
239  MM:  You know what but it
240
241  BM:  hammering me on
242
243  MM:  You know what it's crazy, cause they think the second person was with me in the car in
244       AC
245
246  BM:  Where?
247
248  MM:  When I moved his car
249
250  BM:  Oh they said there was two people?
251
252  MM:  Yeah, weren't you the one who told me that? and a couple other people told me
253
254  BM:  Right, right, they did,  they did tell me that it was the last uh, the last grand jury.
255
256  MM:  Yeah and believe me when I tell you there was, nobody else in that fucking car with me
257       on my kids lives
258
259  BM:  Right
260
261  MM:  So I, I think that there when it comes to like the mythical second person I think it's
262       fucking shit.
263
264  BM:  Right.  I don't know, they, I mean I think that they're either come down on me or come

- 6 -

# Pa6

265  down on your father.  So it's going to be one or the other, that it was the one that helped
266  you uh do the murder.
267

268  MM:  Well if you were at work all weekend and you were at work on Monday, I guess it ain't
269       gonna be you or Tuesday, what ever day it was.
270

271  BM:  No but they, they already said that, the only one that can vouch for my whereabouts on
272       the night of the 28th is my wife, so they say without Charla umm I could have been there
273       helping you.
274

275  MM:  Yeah well, guess what
276

277  BM:  So, you know, but uh, I don't know, it just, it just never ends
278

279  MM:  And it's really funny that you know now that, now my car and the, the Delaware
280       Memorial Bridge has come up
281

282  BM:  Yeah they, they let me know that one too.
283

284  MM:  hum
285

286  BM:  They let me know that they saw your car on the bridge.  So they've been giving me um
287       little um you know hints
288

289  MM:  Yeah but me coming over the Delaware Memorial Bridge means nothing.
290

291  BM:  I know
292

293  MM:  It means I was coming back from Delaware.  You know what I mean?
294

295  BM:  Right
296

297  MM:  And since I told a couple of people I went to Delaware I guess that's pretty consistent
298       with what I said
299

300  BM:  Oh the other thing too is if they had you going across the bridge they should have you
301       coming back right (I/A) there should be a time span between both ways, right?
302  MM:  I don't know
303

304  BM:  I mean how much time did you spend in Delaware?
305

306  MM:  Yeah but I didn't go down the same way that I came back.
307

308  BM:  Ok, so you only came back on the bridge th one way

- 7 -

# Pa7

309
310  MM:  I don't remember exactly how I went and how I came, I went down a different way
311       because I was leaving from my parents house and I came back up a different way.
312
313  BM:  Hun, you know honestly I told them I didn't really remember much about you telling me
314       about going to Delaware and um I remember that it was still before that he was found.
315       So I just, I just didn't
316
317  MM:  By like a day
318
319  BM:  Right, so
320
321  MM:  That was Tuesday, he was found on Wednesday
322
323  BM:  Right
324
325  MM:  I'm sure they can tell how long that body's been in the water.
326
327  BM:  Right, that's true but um, I going to uh head to uh Mike's office and uh he wants to uh
328       debrief me and then also get me um setup for the return (I/A) get it off for the 14th, so
329
330  MM:  (I/A)
331
332  BM:  You want to try to get a hold of me later?
333
334  MM:  (I/A) 8:00.
335
336  BM:  Well I'll probably stop in the office and read my e-mails and all that kind of crap.
337       Alright?
338
339  MM:  I just want this to stop
340
341  BM:  It's not going to and they're just, they're going to keep going and um I don't see this
342       stopping, they don't care uh who they take down whether it's me or the partner or the
343       practice they're gonna, they're gonna keep coming.
344
345  MM:  Oh my god, what day did they uh I'm can't even think straight (I/A)
346
347  BM:  Call me
348
349  MM:  (I/A) so they said they have my car on the Delaware Memor(I/A)l Bridge coming back
350       from Delaware?
351
352  BM:  I honestly don't remember what they said going or coming back but they said your car

- 8 -

353  was seen on the bridge.  They didn't tell me the time or what direction cause I just
354  assumed that you went back and forth on the bridge, you know, it's, it's like they just
355  give me little tid bits during the Grand Jury and you know like um
356
357  MM:  To see what you do with it
358
359  BM:  Right see what I do with it but um, alright well I'll um want me to try and call you later
360
361  MM:  Yeah
362
363  BM:  Alright, hang in there
364
365  MM:  I'll try
366
367  BM:  Alright
368
369  MM:  (I/A)
370
371  BM:  Alright bye, bye

Pa9



STATE'S
EXHIBIT
884

1
2
3
4

Division of Criminal Justice
Law Enforcement Services

5  Consensual #:              C-57-2005-S
6
7  Consensual Recording:      Brad Miller and Melanie McGuire
8
9  Location:                  RMA Associates
10
11 Transcribed By:            Margaret Straccio
12
13 Legend:                    MM:  Melanie McGuire
14                            BM:  Brad Miller
15                            JK:  Detective Sergeant Jeff Kronenfeld
16
17
18     K-R-O-N-E-N F as in Frank E-L-D, badge 4811 with the New Jersey State Police Major
19     Crime Unit.  Uh this is in reference to consensual recordings between Brad Miller and
20     Melanie McGuire Consensual # Charlie 5-7-2005S authorized by AAG David Brody.
21     We will attempt to contact Melanie McGuire via telephone at RMA Associate,
22     Associates in Morristown New Jersey.  It is May 31, 2005.
23
24     This is Detective Sergeant Jeff Kronenfeld it is now 2:30 pm May 31, 2005 uh we
25     anticipate Brad Miller making an out going call to RMA Associates in Morristown 973-
26     656-2815 to Melanie McGuire uh we anticipate her calling Brad Miller back at 732-537-
27     4310 and that would be the RMA Associates located in Somerset New Jersey.  The call
28     back number 732-537-4310.
29
30 MM:   Hello
31
32 BM:   Um can you uh (I/A) on the telephone?
33
34 MM:   uh huh
35
36 BM:   Ok
37
38 MM:   10
39
40 BM:   Yup
41
42 MM:   bye
43
44 BM:   bye, she's suppose to call back

45
46   JK:   Alright that was Brad Miller making contact with Melanie McGuire we are anticipating a
47         call back from Melanie McGuire.
48
49   BM:   Hello
50
51   MM:   Hi
52
53   BM:   Hi, how are you?
54
55   MM:   Alright, how about you?
56
57   BM:   I don't know, I mean it's just uh, it's (I/A) are you doing alright?
58
59   MM:   Pretty much sick to my stomach all night
60
61   BM:   I tried to get a hold of you as soon as I could, but uh you know one thing I had no time on
62         cell phone today. They also put me on grand jury list the um easy pass thing. They said
63         um you tried to dispute uh easy pass uh charge and then someone else called and they
64         said  that's your wife confirmed that, that was me.
65
66   MM:   Somebody else called?
67
68   BM:   um huh on your behalf
69
70   MM:   That's a lie, can they lie to the grand jury?
71
72   BM:   I don't know but I'm just telling you, you know (I/A) question was you didn't make that
73         call to uh easy pass, I go no. I said I didn't even know that you know that you had made
74         a call to easy pass disputing these charges.
75
76   MM:   That's a lie
77
78   BM:   Mel you know it this is what I'm going through, you know and I, I just don't know how
79         much more of this I can take. You know between that and they were drilling me on the
80         gun again and then, and the um and the trip to um Delaware (I/A) you know for a year
81
82   MM:   (I/A) thinking know for anything, but ok I mean what ever you know um the bridge to
83         Delaware or from Delaware what ever how ever I'm sittin here thinking it's kind of
84         funny that this is the first time they've brought that up.
85
86   BM:   Yeah I know
87
88   MM:   And they never brought that up to anybody and you mean to tell me the Delaware

| | | |
|---|---|---|
| 89 | | Memorial Bridge has already like has tape from a year ago. |
| 90 | | |
| 91 | BM: | Yeah |
| 92 | | |
| 93 | MM: | And than I'm sitting there I'm thinking no they can't lie to a grand jury, they won't lie in |
| 94 | | front of a grand jury. |
| 95 | | |
| 96 | BM: | Yeah I don't know, I don't know but um they're basically you know saying that you |
| 97 | | know I really don't have a alibi the 28th just because of um you know Charlottes the only |
| 98 | | one that can uh vouch for me. |
| 99 | | |
| 100 | MM: | The proof is on them to put you any where near me on the 28th |
| 101 | | |
| 102 | BM: | Well I know I just don't think that they're targeting you and |
| 103 | | |
| 104 | MM: | But don't you have a non target statement? |
| 105 | | |
| 106 | BM: | I don't think that matters if they think that I've you know lied to them and not told them |
| 107 | | the truth I think that uh that goes out the window. |
| 108 | | |
| 109 | MM: | Wait but if you had a non target statement short of like pulling the trigger couldn't you |
| 110 | | have basically told them just about anything. |
| 111 | | |
| 112 | BM: | That's what I understand yeah, that's what I understand |
| 113 | | |
| 114 | MM: | This just doesn't make sense. |
| 115 | | |
| 116 | BM: | But I you know told um that I know you know everything that I know about what you |
| 117 | | told me but and then they're saying you know we talked almost 130 minutes on the day |
| 118 | | you bought the gun, you talked to me right before you bought the gun, you talked to me |
| 119 | | after you bought the gun and then you they find it unbelievable that you didn't tell me |
| 120 | | that you went to uh to buy this gun. |
| 121 | | |
| 122 | MM: | Well and in between I was also talking to my husband on the phone did they say that to. |
| 123 | | |
| 124 | BM: | Well they said something about that he was trying to make arrangements to close on the |
| 125 | | house at that time. |
| 126 | | |
| 127 | MM: | hum |
| 128 | | |
| 129 | BM: | But uh the most time was, was spent talking between the two of us. |
| 130 | | |
| 131 | MM: | Yeah as it, as it is it's nothing person should talk 130 minutes on any given day |
| 132 | | |

Page 3 of 11

Pa12

| | | |
|---|---|---|
| 133 | BM: | True |
| 134 | | |
| 135 | MM: | But they make it sound like you know what I mean that's the slant they put on it. |
| 136 | | |
| 137 | BM: | I know, I, can't explain where they're going, what they're trying to do I'm just telling |
| 138 | | you in that they're saying well you know you had to come back you know I don't know |
| 139 | | what else I can tell them. I mean I've told them everything that I know but they're you |
| 140 | | know they just don't |
| 141 | | |
| 142 | MM: | They, they want you to break. |
| 143 | | |
| 144 | BM: | Well there's, I mean there's nothing to break |
| 145 | | |
| 146 | MM: | No I realize that but that's what I'm saying they want you, they want to break you. |
| 147 | | Meanwhile if they were any type of judge of character what so ever they would know that |
| 148 | | you don't have it in you to sustain, you know what I mean like if you, if you had anything |
| 149 | | y-you'd have given it to them by now, cause you can't take it any more. |
| 150 | | |
| 151 | BM: | Alright, I don't know how much more I can take |
| 152 | | |
| 153 | MM: | What did Mike say? |
| 154 | | |
| 155 | BM: | Well he still thinks that they're fishing and that you know they certainly um think I, |
| 156 | | what's that? |
| 157 | | |
| 158 | MM: | Aren't they going to great lengths to fish? |
| 159 | | |
| 160 | BM: | I guess |
| 161 | | |
| 162 | MM: | Doesn't it seem a little excessive? |
| 163 | | |
| 164 | BM: | Yeah, and again they think that um you know that you are and you know where the gun is |
| 165 | | and they want us to you know give up where the gun is. And I did, and I did tell them |
| 166 | | that you went back to the (I/A) and looked and um you said the lock box was empty and |
| 167 | | it wasn't there. |
| 168 | | |
| 169 | MM: | I didn't say it was empty cause there's something else in it. |
| 170 | | |
| 171 | BM: | Well what else is in it? |
| 172 | | |
| 173 | MM: | A different box I told you that, batteries and other stuff the box is not empty. |
| 174 | | |
| 175 | BM: | But you looked for the gun right? |
| 176 | | |

Page 4 of 11

## Pa13

177  MM:  Right.  The gun is not in there.
178
179  BM:  Ok, but there's other stuff in there
180
181  MM:  Right
182
183  BM:  Ok but you don't know where it is?
184
185  MM:  No I don't know where it is.
186
187  BM:  Cause it's the best thing to do is turn it over for them and let them you know show that it
188       wasn't you (I/A) in the murder.  I mean there's gotta be some way to show that you
189       weren't involved.
190
191  MM:  Well they basically don't want to (I/A).  So if they got footage of me on the Delaware
192       Memorial Bridge why don't they have it on the Chesapeake bay bridge tunnel or what
193       ever?
194
195  BM:  I don't know, I don't know.
196
197  MM:  They want to hear what they want to hear.
198
199  BM:  Well
200
201  MM:  (I/A)
202
203  BM:  I don't know what more to do
204
205  MM:  There's nothing honey you can't make something up.  You can't make something up.
206
207  BM:  You swear you had nothing to do with this?
208
209  MM:  Yes
210
211  BM:  On your children's lives, if I'm standing by you
212
213  MM:  Yes
214
215  BM:  I will loose everything my kids, my job
216
217  MM:  Why are you saying that
218
219  BM:  Just because some of the things that are going to become public (I/A) and um I just am,
220       I'm just gonna get everything taken away and I'm going to loose you in the process.

Pa14

221

222    MM:    You don't know anymore really than Celine does, ok now granted the affair why are they
223             doing this to you and not to her.

224

225    BM:    Because I think they, they ultimately believe from the amount of contact we've had and
226             the closeness we've had that you've told me things that havn't told and that I'm not being
227             honest with them, not being (I/A) with them.  You know I

228

229    MM:    You know that you're telling them everything you know

230

231    BM:    I know that

232

233    MM:    You know where you were those days

234

235    BM:    I know I , I know I'm innocent of anything I, I mean that isn't the issue it doesn't, the
236             things to do the fact it doesn't matter in this situation unless I can have proof of the
237             patient that I saw or somebody I was with and they, they still thing that I had some part.
238             Or in a minimum know something about it.  You know like I've told them when the
239             police first interviewed me I said I asked you, a thousand times you know did you do it,
240             did you have anything to do with it.  I get the same response, I, you know I, I want us to
241             be together I, but I just don't see how we'll get through this.  And they, they want to
242             make them believe that we were the ones that, that did all this.  And made it happen.  You
243             all right?

244

245    MM:    I don't even know what that is anymore

246

247    BM:    And if we do make it through this and I'll have to take what ever money I can get and get
248             away.  I'll have to just start some where else.  Are you still there?  Sorry (I/A) I just, I
249             don't know, I don't know what else to do I have, I'm at my wits end.  It's all the things
250             you told me today are a bunch of bullshit too

251

252    MM:    Like what?

253

254    BM:    Well you, you calling to dispute a easy pass charge.

255

256    MM:    I don't remember but that I called about a couple of different charges on there.

257

258    BM:    Alright

259

260    MM:    But I called who else would call for me.

261

262    BM:    I don't know but they said there was another call and the thing about your father going
263             with you to Delaware, that's not true either.

264

**Pa15**

265   MM:   No

266

267   BM:   See I don't know who to believe anymore.

268

269   MM:   Well what did they say exactly.

270

271   BM:   Well they first asked me did um, did she tell you she went down to Delaware alone and I
272         said yes, I said that's what (I/A), wasn't it true that her father you know accompanied her
273         and I said no.  I said I didn't know that her father went down there and then the easy pass
274         thing they said she called to dispute a charge on the easy pass and then someone else
275         called to dispute the same charge and was that you?  And I told Patti no I didn't do that.

276

277   MM:   How could anybody else

278

279   BM:   I don't know

280

281   MM:   And then what did they say about the, the truck on, on where the video

282

283   BM:   Yeah, yeah that there was, the tape was um your truck on the um Delaware Bridge when
284         you went to um Delaware

285

286   MM:   And that's it?

287

288   BM:   Well why did you have to go buy furniture that day and other things that I don't
289         remember what you told me.

290

291   MM:   Right, Why would I go to Delaware and that yeah, uh cause there's no sales tax.

292

293   BM:   Well I guess that makes sense.  That um I mean if you want us to stick together I got to
294         know everything now before this goes any further.

295

296   MM:   What do you mean you have to know everything now?

297

298   BM:   I mean there's no other secrets between us right?

299

300   MM:   None that I can think of

301

302   BM:   I mean, I mean wouldn't be easy but um we could probably make it you know (I/A)
303         what's that?

304

305   MM:   What do you mean?

306

307   BM:   You know after uh the divorce and she gets half the money I mean it's still be something
308         to live on.

Page 7 of 11

# Pa16

309
310  MM:  Why are you talking about all of this all the sudden?
311
312  BM:  I just, I feel like what I want to know when we are together what's going to happen with
313      us.
314
315  MM:  I'm thinking I'm confused because you've been the one who stressed to me that we have
316      to wait and see how everything plays out.
317
318  BM:  I guess, I mean I don't know now I guess I have to see when everything's done
319
320  MM:  I mean why are you talking about a divorce all of the sudden when you weren't before?
321
322  BM:  Cause I'm tired of living this way
323
324  MM:  Which way?  Fairness to her you could probably attribute a fair amount of your misery to
325      knowing me.
326
327  BM:  I know, I mean if you didn't do it or nobody we know did it then I'm going to stick with
328      you.
329
330  MM:  What was the (I/A) different today knowing that you weren't done.
331
332  BM:  Yeah I think, I mean I just.
333
334  MM:  Your just that much more rattled this time
335
336  BM:  No I think that there, there once again
337
338  MM:  Targeting you
339
340  BM:  Yeah exactly even thought I'm called the witness that
341
342  MM:  Well you came out of there feeling that way last time too I remember you telling me that.
343      That you felt like it was starting all over again that you were just as much of a target as
344      you were on day one
345
346  BM:  And then you know there asking you know again they think your fathers involved or
347      Alex
348
349  MM:  Alex, I mean are we not done with this?
350
351  BM:  No put it this way they, they're the ones they think you did it and that you had someone
352      helping you so it's going to be me, your father or um you know, you know or Alex

Page 8 of 11

**Pa17**

| | | |
|---|---|---|
| 353 | | someone or somebody that's the just of it, but uh I don't know |
| 354 | | |
| 355 | MM: | Talking to Mike didn't calm you down at all |
| 356 | | |
| 357 | BM: | No he, he just again says that they're (I/A) and he still thinks that this is uh bazaar |
| 358 | | investigation and the same old stuff they said before and, and (I/A) they just continued to |
| 359 | | ask the questions tell the truth etc. etc. so |
| 360 | | |
| 361 | MM: | I just I don't know |
| 362 | | |
| 363 | BM: | What time you getting out of there today? |
| 364 | | |
| 365 | MM: | I can't really leave before 5:00 cause there's a patient I have to give a shot to. |
| 366 | | |
| 367 | BM: | Alright |
| 368 | | |
| 369 | MM: | I feel awful I just |
| 370 | | |
| 371 | BM: | Alright I think I'm gonna get out of here I haven't eaten anything all day |
| 372 | | |
| 373 | MM: | (I/A) I think you should go eat something, can you eat (I/A) |
| 374 | | |
| 375 | BM: | I'll try, I'll try and eat something |
| 376 | | |
| 377 | MM: | So what did Mike say about the (I/A) |
| 378 | | |
| 379 | BM: | We're gonna request the June 14 to be off so he can go on vacation and then we're gonna |
| 380 | | schedule (I/A) first. |
| 381 | | |
| 382 | MM: | (I/A) you |
| 383 | | |
| 384 | BM: | Possibly but they haven't confirmed me yet. So, I think they were being rushed today |
| 385 | | because they wanted to get all 3 boys in |
| 386 | | |
| 387 | MM: | What time do they go to in the afternoon |
| 388 | | |
| 389 | BM: | I, I don't know what the latest is, the latest I've been there is like 2:00 but I think they can |
| 390 | | go to like 4:00, 4:30. |
| 391 | | |
| 392 | MM: | Well I think they probably also want a recap they probably want a period of time after the |
| 393 | | last witness call to re address the |
| 394 | | |
| 395 | BM: | Right |
| 396 | | |

| | | |
|---|---|---|
| 397 | MM: | I mean I just don't understand if there out they're slinging all of this shit then they're |
| 398 | | basically trying their version of their case of their. |
| 399 | | |
| 400 | BM: | And |
| 401 | | |
| 402 | MM: | Just fucking indict me. |
| 403 | | |
| 404 | BM: | huh |
| 405 | | |
| 406 | MM: | Lets just do it |
| 407 | | |
| 408 | BM: | Mike thinks there's enough to. |
| 409 | | |
| 410 | MM: | Of course there is.  My Mike has been telling me that from day one. |
| 411 | | |
| 412 | BM: | Ok |
| 413 | | |
| 414 | MM: | Every time I walk in there he leans across the desk and looks at me and says you're going |
| 415 | | to be indicted. |
| 416 | | |
| 417 | BM: | Alright well I will um catch up with you tomorrow I got a pretty full schedule and I'll call |
| 418 | | you same time?  Hang in there. |
| 419 | | |
| 420 | MM: | You too I'm worried about you. |
| 421 | | |
| 422 | BM: | I'll be alright, you know I think said, I think you said the last time just, just (I/A) |
| 423 | | |
| 424 | MM: | (I/A) every time |
| 425 | | |
| 426 | BM: | Um hum, alright |
| 427 | | |
| 428 | MM: | (I/A) do in there |
| 429 | | |
| 430 | BM: | It doesn't matter, she doesn't (I/A) |
| 431 | | |
| 432 | MM: | Alright |
| 433 | | |
| 434 | BM: | Alright, hang in there |
| 435 | | |
| 436 | MM: | You too honey |
| 437 | | |
| 438 | BM: | Alright, bye, bye |
| 439 | | |
| 440 | MM: | Bye |

Pa19

441
442    JK:    The time is now 2:56 pm the consensual recording between Brad Miller and Melanie
443            McGuire is complete.
444
445
446

Pa20

STATES
EXHIBIT
885

| Date: | April 15, 2005 | | C-45-2005-S JK1A |
|---|---|---|---|

Time:          12:03 p.m.

Place:         New Jersey State Police Major Crime Unit

Consensual#:   C-452005-S

Recording of:  James Finn

Authorized by: David Brody

Transcribed by: Margaret Straccio

Legend:        MM: Melanie McGuire
               JF: James Finn
               JK: Jeff Kronenfeld

JK:   (IA)Jeff K-R-O-N-E-N-F-E-L-D Badge 4811 with the New Jersey State Police
      Major Crime Unit this is the consensual recording of James Finn.  Consensual #
      C-452005-S authorized by Deputy Attorney General David Brody.  It is April 15,
      2005 we will attempt to call Melanie McGuire cellular phone 732-429-4400.  The
      time now is 12:03 p.m.  (phone is ringing)

MM:   Hello

JF:   Hey, Mel

MM:   Hey

JF:   How ya doing?

MM:   Good, how are you?

JF:   I'm not good, uh they were here... and I got to go to the, I'm in Howell I gotta go
      to the Howell Police station at freaking 2:00.  You know I thought I was Mr. tough
      guy but pffff dude these guys scare the shit out of me.  They're all tall, why are
      cops so tall you know pfff I'm not used to looking up at people.  Dude I'm a gun
      owner pffff.

MM:   Where'd they come to you, work?

Pa21

1   JF:   Yeah I'm in Howell.  Surprised they didn't haul my ass out of here.  Uh Mel I'm
2         really scared dude.  You know what, what do I say to these people?  You know
3         we talked about buying a gun I mean what if they ask me about that?  I still think
4         you should have one but like what, what if they ask me about that?
5
6   MM:   (IA)
7
8   JF:   What
9
10  MM:   You, you have to uh, you have to tell them the truth.  You know, we, most of our
11        conversations about that after the fact.  You know
12
13  JF:   Yeah, I did tell you before though cause you told me he was acting like a nut and
14        you know I'm, I was worried about you, you know but I mean what should I tell
15        them?
16
17  MM:   Is there a number that I could call you back at?
18
19  JF:   Yeah uh
20
21  MM:   (IA)
22
23  JF:   Yeah Howell's uh 732-901-0720 I always remember that cause that was the day
24        of the moon landing in 69, funny how shit pops into your head huh (laughing)
25
26  MM:   Okay I'll call you right back on a land line.
27
28  JF:   Okay
29
30  MM:   Alright bye
31
32  JF:   Bye, bye.
33
34  **Phone conversation ends**
35
36  JF:   (opens a door) Hey guys if my phone rings don't answer it okay.
37
38  JK:   What's the time, the time, the time
39
40  ?     12:11
41
42  JK:   Alright the time is now 12:11 we were, we are anticipating a return phone call
43        from Melanie McGuire we'll be standing by for that phone call.
44

**Pa22**

```
 1     **Phone ringing**
 2
 3     JF:    (IA) Center, hey, hey it's me.
 4
 5     MM:    Hi
 6
 7     JF:    Ahhh, give, give me one second I, I
 8
 9     MM:    (IA)
10
11     JF:    I'll be right back.  Alright um ahhh shit (laughing)
12
13     MM:    Calm down
14
15     JF:    I know I'm trying
16
17     MM:    I know believe me when I tell you I know
18
19     JF:    It's just uh, dude I have so much shit going through my head right now.  I mean
20
21     MM:    What
22
23     JF:    Cause I'm, I talked to you about buying a gun
24
25     MM:    The reason I asked you about buying a gun is because my husband wanted one.
26
27     JF:    He wanted one?
28
29     MM:    Yes, not only did he want one, I bought one for him.  This is stuff I couldn't tell
30            you on my cell phone.
31
32     JF:    Why didn't you tell me?
33
34     MM:    I wasn't gonna tell you over the phone.
35
36     JF:    Uh well, I assume you got it legally.
37
38     MM:    In Pennsylvania?
39
40     JF:    Yeah because you know uh if you could show proof of residency you walk into
41            the store and you walk out.
42
43     MM;    Yeah that's, that's what I did.
44
```

Page 3 of 26

**Pa23**

| | | |
|---|---|---|
| 1 | JF: | But you got to pass the background check. |
| 2 | | |
| 3 | MM: | And that's what I did because he couldn't buy one cause he was a convicted |
| 4 | | felon. |
| 5 | | |
| 6 | JF: | What'd you get? |
| 7 | | |
| 8 | MM: | A 38. |
| 9 | | |
| 10 | JF: | Nice, where is it? |
| 11 | | |
| 12 | MM: | Don't know. |
| 13 | | |
| 14 | JF: | Shit man I am fucking, I'm, I'm about to say I'm under the gun. |
| 15 | | |
| 16 | MM: | Laughing |
| 17 | | |
| 18 | JF: | (laughing) Is that funny and slick or what. |
| 19 | | |
| 20 | MM: | (IA) yeah exactly I don't know. |
| 21 | | |
| 22 | JF: | Oh man |
| 23 | | |
| 24 | MM: | So I think yeah you tell them that I asked you how to buy a gun, absolutely. You |
| 25 | | didn't do anything wrong. |
| 26 | | |
| 27 | JF: | I know, of course I didn't do anything wrong. I mean I |
| 28 | | |
| 29 | MM: | Not only did you not do it and believe me when I tell you they're going to have |
| 30 | | you convinced that I killed him 6 days, 6 ways to Sunday. |
| 31 | | |
| 32 | JF: | You think that they're that manipulative. |
| 33 | | |
| 34 | MM: | I know they're that manipulative, because I've heard what they've told everybody |
| 35 | | else. They've told (IA) and Selene straight up I did it no questions asked they |
| 36 | | just have to figure out how and with whom. |
| 37 | | |
| 38 | JF: | I've and what's their evidence? |
| 39 | | |
| 40 | MM: | Their evidence is that I bought a gun |
| 41 | | |
| 42 | JF: | Oh is that ironic. |
| 43 | | |
| 44 | MM: | I've bought a gun you know and I, I'm assuming though I don't know (IA) it's |

Pa24

1       because of the caliber match.

2

3     JF:    Yeah

4

5     MM:   I don't know that it does but I would assume certainly that, that's the case.

6

7     JF:    Well can I just tell you I'm really happy that, that's not a caliber gun

8

9     MM:   That you own

10

11    JF:    That I own (laughing)

12

13   MM:   (IA) That's the only reason I'm telling you that to help calm you down.

14

15   JF:    Alright well that makes me feel a lot better

16

17   MM:   That I'm assuming again I'm assuming I don't know but it certainly would stand to
18        reason.

19

20   JF:    Now what do you want, what do you want me to tell them about uh we had the
21        fight right

22

23   MM:   Don't uh you know what you don't, if you don't remember, you don't remember.
24        You don't need(IA)

25

26   JF:    (IA)

27

28   MM:   I know it but you know what just listen to me you don't need to be coached, you
29        don't, I can't coach you it's better you did nothing you have no knowledge of
30        anything it is better for you that, that you don't.  The more you know the more
31        you're going to get dragged in take it from Brad and Selene

32

33   JF:    Huhh So you're trying to protect me I, I, I appreciate that

34

35   MM:   It's got nothing to do, it's got nothing to do with, with protecting you it's the truth
36        Jim.

37

38   JF:    Oh man dude well what about th, the suitcase, (IA) about the suitcases

39

40   MM:   No I don't even remember what I fucking said to you about the suitcases.

41

42   JF:    Huhhhhh

43

44   MM:   You don't know, I am your friend (IA) seriously don't you know believe me when I

Pa25

1            tell you what they're going to try and do is corner you into a story and then get
2            you to change that story.
3

4    **JF:**    uhhhh
5

6    **MM:**    So you know be, the key is just to be honest that you had nothing to do with
7

8    **JF:**    I'm, I'm just going to tell them what I know, you know he, he hit you in the head,
9            knocked you to the ground, he stuffed a sheet in your mouth right?
10

11    **MM:**    a dryer sheet
12

13    **JF:**    What the fuck was that all about? And, what, no, where did you go after that?
14

15    **MM:**    Exactly why would you know this, why would you know this unless we were
16            getting our story straight?
17

18    **JF:**    I don't know
19

20    **MM:**    You know what you don't know, you know we had a fight you know that he hit me
21            you know I left you know I filed for divorce and you know he turned up dead after
22            that.
23

24    **JF:**    Yeah but they think I know a lot and they said that, and they said tell me more
25            and I said I can't talk right now so they said you're going to the Howell Station
26            after that. They think I know more what am I going to say.
27

28    **MM:**    Of course they think you know more, but you know what you know, they're going
29            to want to know about me as a person. They're going to want to know what I told
30            you about things and you know what, what we talked about, we didn't talk about
31            the particulars we didn't talk about the details. You know we talked about his
32            family sucks, we talked about, you know what I mean we talked differently.
33

34    **JF:**    Well yeah but we talked about his, his mental state and uh
35

36    **MM:**    Well exactly
37

38    **JF:**    You know
39

40    **MM:**    But that's different then people and places and stuff like that don't, you know and
41            they're gonna try that's what they are gonna try to get you mired into
42

43    **JF:**    Right, oh man dude
44

**Pa26**

MM:   And if at any point you think that they're out of control you tell that you need a lawyer.

JF:   I don't have the money for a lawyer, my car yesterday $1600 bucks can you fucking believe that, I don't have, I can't do a lawyer.

MM:   Well (IA)

JF:   And a public defender ain't going to give a shit.

MM:   You need to huhhhh ya, you know you don't know anything, you don't know anything you really don't

JF:   No look there's something I wanted to say to you and aww fuck, look you, you know I know you hate it when I say this but I care about you. And ever since you said you had an affair with the doctor, I like, I'll just be blunt

MM:   I know you're angry

JF:   I wondered, yeah I'm angry about it and, and I'll be honest with you I felt a little betrayed. Why didn't you tell me?

MM:   Cause I was instructed not to tell anybody anything.

JF:   By whom

MM:   My lawyer

JF:   I suppose that makes sense.

MM:   You think now, looking back.

JF:   Oh man dude, do you think he did it?

MM:   Who

JF:   Brad

MM:   No, get the fuck out of here he didn't do it any more than I fucking did it.

JF:   Yeah

MM:   Come on it doesn't make any sense at all

Pa27

1     JF:    Look, don't hate my guts for this, you didn't tell me about him.  Is there anything
2             else you're not telling me?
3

4    MM:   Like what, like I killed my husband
5

6     JF:    Did you?
7

8    MM:   No (laugh) but thanks for asking.
9

10    JF:    Mel can you blame me?
11

12   MM:   I think having an affair is a little bit different then murder.  You should know aren't
13           you seeing a married women?
14

15    JF:    Yeah well I told you.
16

17   MM:   Right were you a suspect in a murder investigation at the time?
18

19    JF:    No but maybe I am now.  Look dude I don't want to get roped in I mean huhh
20           look w-we got to be straight with each other right now and we got to be on the
21           same page.  What are you not telling me?
22

23   MM:   What I am not telling you is that, that night that he left I went to um to AC um to
24           look for him and found his car and moved his car cause I figured he was there at
25           some shitty hotel, he was there with somebody and just out of spite cause
26           honestly I looked in my car for a screw driver to pop his tires and I didn't have
27           one.  Um I moved his car out of spite and so the video that they have is me
28           moving his car.
29

30    JF:    I think you're lying
31

32   MM:   Excuse me.
33

34    JF:    Honey I'm sorry I, I think you're lying to me, your voice just got real low.
35

36   MM:   Because I'm in my office.
37

38    JF:    No, if you did it, just tell me what to say.  I'll do anything for you, you know that
39           and I've always said it.  Just tell me.
40

41   MM:   Jim
42

43    JF:    Help me get out of this
44

**Pa28**

| | | |
|---|---|---|
| 1 | MM: | Jim I didn't do it |
| 2 | | |
| 3 | JF: | Mel my ass is on the fucking line here. |
| 4 | | |
| 5 | MM: | How is your ass on the fucking line if you didn't do anything. |
| 6 | | |
| 7 | JF: | Well you know how these people work, you see |
| 8 | | |
| 9 | MM: | I do |
| 10 | | |
| 11 | JF: | you say the wrong think and oh yeah and then they, they create this whole frame |
| 12 | | work around you and next thing you know they got you thinking you're fucking |
| 13 | | guilty. |
| 14 | | |
| 15 | MM: | I did not do it. |
| 16 | | |
| 17 | JF: | Honey I love you, I'll do anything for you. |
| 18 | | |
| 19 | MM: | Jim |
| 20 | | |
| 21 | JF: | Help me |
| 22 | | |
| 23 | MM: | Jim I didn't fucking do it.  Does it make sense that I would do it, If I had an affair |
| 24 | | with Brad for 3 years do you think I would fucking pop my husband after 3 years? |
| 25 | | |
| 26 | JF: | I gonna be blunt but it happens everyday doesn't it? |
| 27 | | |
| 28 | MM: | I don't believe it |
| 29 | | |
| 30 | JF: | Mel, what's going on? |
| 31 | | |
| 32 | MM: | I don't believe this |
| 33 | | |
| 34 | JF: | Honey what, look I've been loyal to you I want to help.  You got to step up here. |
| 35 | | |
| 36 | MM: | So you want me to tell you I did it when I didn't. |
| 37 | | |
| 38 | JF: | I, I want you to tell me the truth, I don't want to hear that you did it but if you did I |
| 39 | | gotta know. |
| 40 | | |
| 41 | MM: | I'm telling you the fucking truth.  I'm telling you the truth all this time I said it was |
| 42 | | circumstantial evidence, circumstantial evidence, think, think , think and you |
| 43 | | know your like, like what, Hello I bought a fucking gun, Hello I'm on video tape |
| 44 | | moving a fucking car. |

1    JF:    Hey wait a minute Mel alright number 1 you never told me you bought a gun

2

3    MM:    No I didn't

4

5    JF:    And number 2 no, no I remember this specifically when you said you, they that

6           they had that video you said the person getting out of it, it was fuzzy and it was

7           grainy and they didn't even know if it was a man or a woman.  Mel you're lying to

8           me.

9

10   MM:    No I'm not what are you talking about they didn't know if it was a man or a

11          women on the tape

12

13   JF:    You just told me they saw you on the tape

14

15   MM:    Cause now they've enhanced it.

16

17   JF:    Well what about the gun?

18

19   MM:    What about the fucking gun, I don't have it

20

21   JF:    Well who does?

22

23   MM:    I don't know, I don't know

24

25   JF:    You, you see now (IA) you don't trust me at all and I'm about to go into the

26          fucking lions den a

27

28   MM:    That's (IA)

29

30   JF:    And these guys are going to rip my fucking guts out.

31

32   MM:    That is not true what do you mean I don't trust you

33

34   JF:    What's the deal, tell me, I told you how to buy it

35

36   MM:    Yeah

37

38   JF:    Tell me about it

39

40   MM:    What do you want me to fucking say

41

42   JF:    I don't know give me some fucking information what am I going to tell these

43          people?

44

Pa30

| | | |
|---|---|---|
| 1 | MM: | You're going to tell them the truth Jim, you're going to tell them that I asked you |
| 2 | | about buying it and you mentioned that, that like you could, you've lived in |
| 3 | | Pennsylvania that's how you bought it period, did you do anything else?  You |
| 4 | | didn't do anything else Jim. |
| 5 | | |
| 6 | JF: | Yeah I didn't |
| 7 | | |
| 8 | MM: | You didn't go with me to buy you didn't help me buy it, you didn't talk to me about |
| 9 | | it, I didn't tell you that I bought it. |
| 10 | | |
| 11 | JF: | Why not? |
| 12 | | |
| 13 | MM: | Well |
| 14 | | |
| 15 | JF: | Hey why not? |
| 16 | | |
| 17 | MM: | Why not, because I was told not to, again gee I fucking wonder why.  Weren't |
| 18 | | you happier not knowing |
| 19 | | |
| 20 | JF: | Hey hold on.  Told, told by who your lawyer well when did you start seeing a |
| 21 | | lawyer? |
| 22 | | |
| 23 | MM: | I started seeing a lawyer before I even knew my husband was even dead, when I |
| 24 | | filed for divorce.  My divorce Attorney knew about it |
| 25 | | |
| 26 | JF: | Yeah well you bought the gun when? |
| 27 | | |
| 28 | MM: | Right before he left, a few days before he left. |
| 29 | | |
| 30 | JF: | And, and you didn't tell me that?  I was like adamant, I was screaming for you to |
| 31 | | buy a gun.  I was worried about him I was worried about you.  I thought he was |
| 32 | | going to do something to you, you know the cops are good they do a great job |
| 33 | | but they can't be everywhere.  You know and when someone's got their hands |
| 34 | | around your neck 911 doesn't work and I was adamant about you to buy a |
| 35 | | freaking gun. |
| 36 | | |
| 37 | MM: | (IA) |
| 38 | | |
| 39 | JF: | And you were like, and you were resisting it |
| 40 | | |
| 41 | MM: | (IA) |
| 42 | | |
| 43 | JF: | and what, suddenly you bought it and you didn't tell me. |
| 44 | | |

**Pa31**

1     **MM:**   Yeah that's exactly right

3     **JF:**    Why?

5     **MM:**   You gotta calm down, you gotta calm down.

7     **JF:**    Easy for you to say

9     **MM:**   Oh is it I've been living my life this way for a fucking year pal.

11    **JF:**    Yeah well now I know why you lose weight.  What else aren't you telling me?

13    **MM:**   Nothing

15    **JF:**    Honey

17    **MM:**   Jim

19    **JF:**    Mel

21    **MM:**   Jim

23    **JF:**    Getting a little nervous here.  What kind of gun was it?

25    **MM:**   I told you a 38

27    **JF:**    What an HK, Smith and Wesson, what?

29    **MM:**   I don't fucking know, pffff

31    **JF:**    I'm a fucking gun nut, I uh (laugh) shit

33    **MM:**   How the fuck do I know

35    **JF:**    What a mean, ya, you bought it right gotta know what kind of gun you bought for
36             christ sake.

38    **MM:**   I don't have any fucking idea

40    **JF:**    Oh who cares, (sigh)

42    **MM:**   You didn't do anything wrong calm down, you didn't do anything.

44    **JF:**    I ya, kn (sigh) honey there's a certain tone in your voice that's really starting to

Pa32

scare the shit out of me.  Look Mel we, we've gone back a long way and you
know how I feel about ya, and I want to help, but look this whole thing with the
doctor I really started to wonder what else aren't you telling me.   Look I, I'm
sorry I gotta put you on the spot, what aren't you telling me I want to know now.

MM:   I just told you

JF:   I want to know now

MM:   I just told you, if you don't want

JF:   Are we gonna play tennis, I want to know now.

MM:   Hey if you don't believe me ok I'm telling the truth right.  What the fuck else do
you want me to say?  Did I have to tell you about moving the car

JF:   You never told me that

MM:   Exactly because I was fucking told not to and you know what as far as your
concerned you still don't fucking know that.  Do you understand that the more
people know, the more they are getting implicated in this.

JF:   I don't want to be

MM:   I told

JF:   implicated

MM:   I, exactly and I don't want you to be

JF:   But, th, shhhh, yeah but these guys are gonna go in there and there I don't know
how long I'm gonna be in there and look dude you gotta give it to me now.  You
tell me now or this, this friendship's over if you don't tell me right now.

MM:   I told you everything Jim

JF:   Melanie, Melanie don't make me hang this phone up.

MM:   So you're not gonna believe me unless I say I did it, is that what you're telling
me?

JF:   I'm not going to believe you until you tell me something wr, I can believe you.

MM:   I don't believe your doing this.

Page 13 of 26

**Pa33**

1     JF:    I don't believe your doing this.  Dude the clocks ticking, I gotta go soon.
2
3     MM:    Jim on my kids I'm telling you.  On my kids (IA) now do you believe me?
4
5     JF:    No
6
7     MM:    What
8
9     JF:    No, I don't there I said it.  Alright look if you didn't do it and I hope to god you
10            didn't.  Who did?
11
12     MM:    I don't know, I didn't hire anybody, I didn't ask anybody.  I didn't involve anybody
13            cause I didn't do anything.
14
15     JF:    You know you, you're talking like this line is tapped.
16
17     MM:    No I'm not
18
19     JF:    Yeah you are
20
21     MM:    Excuse me I went into, why do you think it took me so long to call you back, I
22            found a fucking conference room where nobody was sitting.
23
24     JF:    So you're convinced this line is secure?
25
26     MM:    Yeah, it's a land line here, what are you on?
27
28     JF:    I'm on our land line at work.
29
30     MM:    Ok so
31
32     JF:    I'm, ya know that's good though cause I'm not always here so they wouldn't think
33            to tap it here.
34
35     MM:    But, exactly and I
36
37     JF:    And you called me
38
39     MM:    And I called you from a different extension
40
41     JF:    Right, right
42
43     MM:    That's why I walked around to find an empty office
44

Pa34

| | | |
|---|---|---|
| 1 | JF: | Alright so at least I feel better about that |
| 2 | | |
| 3 | MM: | Yeah, no I'm not uh you know |
| 4 | | |
| 5 | JF: | Ok |
| 6 | | |
| 7 | MM: | I wasn't going to talk to you on the cell phone |
| 8 | | |
| 9 | JF: | Did he do it, did Brad do it? |
| 10 | | |
| 11 | MM: | No |
| 12 | | |
| 13 | JF: | Mel, Mel we don't have, we don't have to do this.  Who did it? |
| 14 | | |
| 15 | MM: | I don't know |
| 16 | | |
| 17 | JF: | Mel who did it? |
| 18 | | |
| 19 | MM: | Jim I don't know |
| 20 | | |
| 21 | JF: | Mel your, your talk, I've never talk like this, ever in my life I've never heard you |
| 22 | | talk like this. |
| 23 | | |
| 24 | MM: | And never in my life |
| 25 | | |
| 26 | JF: | I think you know. |
| 27 | | |
| 28 | MM: | And never in my life have I heard you talk like this. |
| 29 | | |
| 30 | JF: | Well never in my life was I about to go into the lion's den. |
| 31 | | |
| 32 | MM: | Hello, I know that you don't think I'm worried about you.  You don't think I'm |
| 33 | | concerned, you don't think I'm upset that you're being dragged into this now too. |
| 34 | | |
| 35 | JF: | Well give me something to say to these people. |
| 36 | | |
| 37 | MM: | There is nothing for you to fucking say to these people because you don't know |
| 38 | | anything Jim.  You don't know anything I asked |
| 39 | | |
| 40 | JF: | I know I don't know anything but |
| 41 | | |
| 42 | MM: | But what give you something to say to pull out of your ass that's gonna get you |
| 43 | | backed into a corner cause you don't know. |
| 44 | | |

## Pa35

| | | |
|---|---|---|
| 1 | JF: | (Sigh) ahhh man |
| 2 | | |
| 3 | MM: | Do you understand that, what do you want me to do, I, make something up or, or |
| 4 | | tell you some mundane details so they're gonna sit there and say oh well how |
| 5 | | the fuck did he know that.  You don't know anything, you had |
| 6 | | |
| 7 | JF: | What do you mean I don't anything, I, I know about the gun, I, I know about the |
| 8 | | suitcase, I know about the affair. |
| 9 | | |
| 10 | MM: | What about the suitcase? |
| 11 | | |
| 12 | JF: | What if they make me take a lie detector test. |
| 13 | | |
| 14 | MM: | What about the suitcase? |
| 15 | | |
| 16 | JF: | You know |
| 17 | | |
| 18 | MM: | What about the suitcase? |
| 19 | | |
| 20 | JF: | Well hold on dude.  We got a gun we got suitcases and an affair with a doctor. |
| 21 | | |
| 22 | MM: | Yeah |
| 23 | | |
| 24 | JF: | Maybe I'm starting to put two and two together. |
| 25 | | |
| 26 | MM: | Oh (I/A) |
| 27 | | |
| 28 | JF: | You talk to me now |
| 29 | | |
| 30 | MM: | I am talking to you, you need to understand something my parents know the |
| 31 | | whole story, Brad knows the whole story, Selene knows the whole story those |
| 32 | | are the people who are physically around me in the days following him leaving |
| 33 | | ok, they all believe me |
| 34 | | |
| 35 | JF: | Look, w-wh, if they don't, how come I can't know the whole story.  You trust me |
| 36 | | |
| 37 | MM: | You do now. |
| 38 | | |
| 39 | JF: | Throw me a bone, where's the gun? |
| 40 | | |
| 41 | MM: | You do now, I |
| 42 | | |
| 43 | JF: | Throw me a bone where is it?  Make me believe.  Make me believe.  Where, |
| 44 | | where's it at and I'll let you go I'll stop it, I'll believe in you again.  I really need |

**Pa36**

| | | |
|---|---|---|
| 1 | | you to believe in me. |
| 3 | MM: | First and last time, it was,  the gun was in lock box when he first left I picked up |
| 4 | | the lock box which had something in it, I didn't stop to take inventory and I |
| 5 | | packed everything up and I put into the storage unit.  I was told by my attorney |
| 6 | | not to go look to see if the gun was in there ok.  Of course I went later and I |
| 7 | | looked and it's not in there.  It's not in there, they don't have the gun because |
| 8 | | they were asking Selene where the gun is, they were asking Selene did I give |
| 9 | | her something to hold.  Like I'd say oh yeah here hold this. |
| 11 | JF: | Yeah but if you did it you wouldn't keep it. |
| 13 | MM: | If anybody did it they wouldn't keep it, that's just asinine. |
| 15 | JF: | Yeah but w, well if you have it then I know you didn't do it and if you don't have it |
| 17 | MM: | Then I absolutely did it, he didn't take it with him.  He was the one who wanted it, |
| 18 | | why do you think he wanted it. |
| 20 | JF: | Well I don't know, all I know is he's the one who got shot |
| 22 | MM: | Yeah ok so I shot him in my apartment alright with ne, like six neighbors around |
| 23 | | me, nobody heard anything. |
| 25 | JF: | Did you? |
| 27 | MM: | And I cut him up with what a butter knife and carried him out by myself. |
| 29 | JF: | Well |
| 31 | MM: | Does that make sense to you |
| 33 | JF: | Uh I don't know what makes sense anymore.  I can't believe, I don't know what's |
| 34 | | going on here Mel and now you're telling me all these other people know and, |
| 35 | | and suddenly I'm out of the loop. |
| 37 | MM: | They know because they were physically with me those days afterward and I |
| 38 | | was told by my attorney do not tell anybody else, you've got these people in |
| 39 | | enough hot water by them knowing. |
| 41 | JF: | Well what do they know? |
| 43 | MM: | They know exactly what I just told you.  About buying the gun, about |

Page 17 of 26

**Pa37**

1   JF:   Who

2

3   MM:   My parents, Selene and Brad.

4

5   JF:   Well where's Jim in all this?

6

7   MM:   Were you physically there?

8

9   JF:   No

10

11   MM:   Where's Jackie in all this, where's Francine in all this and even if

12

13   JF:   I don't care about Jackie or Francine I'm talking about me.

14

15   MM:   Honey

16

17   JF:   And the clock is still ticking by the way.  I gotta leave here in like an hour.

18

19   MM:   Calm down for a minute ok.

20

21   JF:   Calm down yeah right.  Mel now's the time, you need to be straight with me.

22

23   MM:   I am being straight with you and swearing on my kids isn't enough to convince
          you of that well then

25

26   JF:   Then what

27

28   MM:   I don't know what to fucking tell you

29

30   JF:   Then what fuck me

31

32   MM:   No, not fuck you you're breaking my heart.

33

34   JF:   You're breaking mine, look you know I'll cover for you.

35

36   MM:   Jim I know you would, I wish it were that easy.

37

38   JF:   How come it's not that easy, why isn't it that easy

39

40   MM:   Because it not that easy cause I didn't fucking do anything.  I didn't fucking do
          anything Jim.

42

43   JF:   Then why are they all over you?

44

Page 18 of  26

**Pa38**

1     **MM:**     Hello cause I bought a gun, because I had an affair.

3     **JF:**     Well it's kinda compelling don't you think?

5     **MM:**     Really you own a gun and you have an affair are you a murderer

7     **JF:**     Yeah well no one died around me

9     **MM:**     Thanks

11     **JF:**     (sigh) Well hey I told you it's time to be blunt

13     **MM:**     What ever

15     **JF:**     Yeah so that's it fuck Jim see ya later

17     **MM:**     Not even close.

19     **JF:**     Yeah ok have fun talking to the police, bye.  Is that what it is?

21     **MM:**     Do I sound flippant about this

23     **JF:**     It's not sounding flippant it is flippant.

25     **MM:**     What should I be doing this minute that I'm not doing

27     **JF:**     I, you need to be making me think that I can believe you.  I'm on your side, I've
28             always been on your side and I've always said no matter what talk to me.

30     **MM:**     I know and I can't make you believe me if you don't.

32     **JF:**     Only you can make me believe you, you're the only one.

34     **MM:**     I'm telling you the truth and you're not believing it.  I don't know what else to say
35             to compel you to believe me, do you understand what I'm saying?  I don't know if
36             that's coming out intelligible or not

38     **JF:**     If you didn't do it then you know where the gun is.  Th, uh you know what dude

40     (IA)

42     **MM:**     I don't know

44     **JF:**     Tell me where it is, I can go in there and not say a word and I know that I can

|     |      |                                                                                                                    |
| --- | ---- | ------------------------------------------------------------------------------------------------------------------ |
| 1   |      | trust you cause I have to go in there believing in you cause I'm gonna put my ass                                  |
| 2   |      | on the fucking line I need to go in there and I need to believe in you.                                            |
| 3   |      |                                                                                                                    |
| 4   | MM:  | Honey I know you're putting your ass on the line but I didn't do anything.  I'm not                                |
| 5   |      | saying that, th, that didn't sound right but I'm saying I didn't do anything Jim, you                              |
| 6   |      | weren't even around me all that time.                                                                              |
| 7   |      |                                                                                                                    |
| 8   | JF:  | Tell me where it is and I'll take care of this.                                                                    |
| 9   |      |                                                                                                                    |
| 10  | MM:  | Jim I wish I knew, don't you think I wish I knew if it was sitting there tucked under                              |
| 11  |      | my fucking pillow                                                                                                  |
| 12  |      |                                                                                                                    |
| 13  | JF:  | Oh my god, oh my god                                                                                               |
| 14  |      |                                                                                                                    |
| 15  | MM:  | And I could turn                                                                                                   |
| 16  |      |                                                                                                                    |
| 17  | JF:  | Oh my god I can't, I can't believe this, I can't believe this is happening here                                   |
| 18  |      |                                                                                                                    |
| 19  | MM:  | I can't make something up ok, I can't make                                                                         |
| 20  |      |                                                                                                                    |
| 21  | JF:  | I don't believe it                                                                                                 |
| 22  |      |                                                                                                                    |
| 23  | MM:  | something up                                                                                                       |
| 24  |      |                                                                                                                    |
| 25  | JF:  | I don't believe it                                                                                                 |
| 26  |      |                                                                                                                    |
| 27  | MM:  | I can't make something up Jim, I'm telling you right fucking now I can't make                                      |
| 28  |      | something up unless                                                                                                |
| 29  |      |                                                                                                                    |
| 30  | JF:  | I'm going in there, I'm going to get grilled and now I'm starting to doubt you and                                 |
| 31  |      | here you are telling me ahhh I can't make something up right now.  Dude you                                        |
| 32  |      | need to give me something for real (sigh) christ I mean you know how I feel                                        |
| 33  |      | about you let me help you                                                                                          |
| 34  |      |                                                                                                                    |
| 35  | MM:  | Jim there's nothing you have no choice (crying)                                                                    |
| 36  |      |                                                                                                                    |
| 37  | JF:  | Tell me something, hey don't do this you've got to help me.                                                        |
| 38  |      |                                                                                                                    |
| 39  | MM:  | (crying) Jim I (IA) for one minute okay.  I know how you feel ok if I had done it A:                               |
| 40  |      | do you think I could have done it alone                                                                            |
| 41  |      |                                                                                                                    |
| 42  | JF:  | No                                                                                                                 |
| 43  |      |                                                                                                                    |
| 44  | MM:  | Ok that means that do you think that I wouldn't ask for your help if I had done                                    |

Pa40

1        something, don't you think I know that you would help me.

3    **JF:**    You might not say anything to me to protect me.  You might have, you might
4        have done it and to protect me you wouldn't have told me.  That's what
5        happened isn't it?

7    **MM:**  No, for you to think this of me, that I'm not a whore (IA) an opportunist whatever,
8        but how could you think (IA) I can't believe

10    **JF:**    Honey I'm sorry I don't want to make you cry, my life, I, I have to say it , I have to
11       say it if you don't tell me where that gun is I'm gonna think you did it.

13    **MM:**  And what if I don't know, what if I really and truly don't know and you're just
14        gonna think that I did it right?  Let's just say

16    **JF:**    Yes

18    **MM:**  for a minute let's just assume that I'm telling the truth so fuck me then right.
19        Fuck

21    **JF:**    Your in the hypothetical I'm in the reality.

23    **MM:**  I didn't

25    **JF:**    I'm not sure, I don't know, I want to know I want to help.  And you're not letting
26        me and now I, it's getting to the point where I don't know about you anymore, I
27        can't believe, this can't be fucking happening.

29    **MM:**  (IA)

31    **JF:**    If you didn't do it you'd have the gun and you'd know where it is.  And that's how
32        I see it I'm sorry that's how I see it.  And if you tell me

34    **MM:**  Well then you know what I guess you go in your interview and tell them that.
35        And you tell my sons they don't have a mother. (crying)

37    **JF:**    Mel just stop it, look the whole Brad thing, the whole affair can't you understand
38        that, that's confusing to me. W, what do your parents think about this?

40    **MM:**  What, about the affair.

42    **JF:**    What

44    **MM:**  What about the affair

**Pa41**

| | | |
|---|---|---|
| 1 | JF: | Yeah |
| 3 | MM: | My parents think I was married to a monster and that their not perfect |
| 5 | JF: | And they're ok with that? |
| 7 | MM: | Their not ok with it but that's how my parents got together.  They can't exactly |
| 8 | | (laughing) (IA) |
| 10 | JF: | I remember the story |
| 12 | MM: | Ok so think about it for a minute |
| 14 | JF: | I remember the story |
| 16 | MM: | Ok so got to admit that's a little (IA) skewed |
| 18 | JF: | Alright look I think I know the answer to this question and it's probably going to |
| 19 | | be something I don't want to hear, but your not no, what I want to hear is the |
| 20 | | truth. |
| 22 | MM: | umhuh |
| 24 | JF: | Do you love him? |
| 26 | MM: | Yes (IA) |
| 28 | JF: | Do you want to marry him? |
| 30 | MM: | Not really a possibility. |
| 32 | JF: | Well if you love why wouldn't you want to marry him. |
| 34 | MM: | Cause he's kind of married to somebody else. |
| 36 | JF: | You mean he doesn't want a, uh does he love you |
| 38 | MM: | I don't know anymore |
| 40 | JF: | Did he help you in all this? |
| 42 | MM: | He did nothing for it and now (IA) apartment, he's lost his partnership, he's lost |
| 43 | | millions of dollars, he's lost peace you know |

Page 22 of 26

**Pa42**

| | | |
|---|---|---|
| 1 | JF: | Does he know about the gun and everything else? |
| 2 | | |
| 3 | MM: | Yes he was around me |
| 4 | | |
| 5 | JF: | What |
| 6 | | |
| 7 | MM: | Yes he does he was around me (IA) I didn't tell him (IA), I was ashamed, how |
| 8 | | stupid I am (crying) |
| 9 | | |
| 10 | JF: | Honey (IA) sweetheart, sweetheart, |
| 11 | | |
| 12 | MM: | I'm going to sit in jail |
| 13 | | |
| 14 | JF: | well who else, who else knows everything |
| 15 | | |
| 16 | MM: | for the rest of my life for something I didn't do. |
| 17 | | |
| 18 | JF: | If you didn't do it you're not going to jail come on |
| 19 | | |
| 20 | MM: | Do you understand that they went back into my old apartment I didn't sleep there |
| 21 | | for the 3 nights after he left, uh, before I uh, before I (IA) myself I stayed in a |
| 22 | | hotel cause I was afraid and I even these guys are so, so rabid, so rabid, so |
| 23 | | rabid and Selene said to me you know what they were in the apartment and once |
| 24 | | we said nothing happened there then they go back in he was like you know, |
| 25 | | watch them they could be planting evidence you know what I, I didn't sleep in the |
| 26 | | apartment. I didn't know that he didn't come home with somebody or, or looking |
| 27 | | for me or what, I don't know something didn't happen there, you know, I'm so |
| 28 | | fucking scared to stay. You know how scared I am Jim, all I want to do is raise |
| 29 | | my kids and I betrayed so many people and, and lied and withheld stuff from so |
| 30 | | many people, not because I was looking to deceive anybody but because I was |
| 31 | | embarrassed and ashamed I mean cause I didn't want anybody to be anymore |
| 32 | | disappointed in me then they are anymore. |
| 33 | | |
| 34 | JF: | (groan) |
| 35 | | |
| 36 | MM: | Jim I have tried for years to close my eyes to how I know you feel about me (IA) |
| 37 | | cause I know it's going to hurt you |
| 38 | | |
| 39 | JF: | I don't, I don't care, I don't care I just want a tru, I want the truth I gotta know |
| 40 | | where you're at, I don't, I don't think you trust me. You don't trust me. |
| 41 | | |
| 42 | MM: | I do trust you |
| 43 | | |
| 44 | JF: | No you don't |
| 45 | | |

Page 23 of 26

**Pa43**

1  MM:   I do trust you

3  JF:   Look I'm confused about the gun, you would still have it if you didn't do it right?

5  MM:   When he left that morning, I was not down stairs I didn't see what he took, see
6        what he left with, his luggage was still (IA) luggage (IA) I was on the floor in the
7        bathroom with my baby crying cause he locked me outside the door.  Could I
8        have killed him I would be lying if I said I didn't think about it.  Do you think I have
9        the strength and wherewithal to shoot somebody, carve them up, carry them out
10       of the house, do you honestly think that I'm capable.  I can't believe that you're
11       saying these things to me and I know why you are and I wouldn't be hurt and I
12       wouldn't be angry and I don't have any right to be, because why would you
13       believe me.  Damage that I've done and I have to live with but I can't, I can't tell
14       you something good or something compromising enough to be believable to
15       justify that to you I can't make something up

17 JF:   Mel you gotta understand there are so many things that are getting thrown at me
18       right now.

20 MM:   I (IA) Jim I (IA)

22 JF:   Like it had to, how did, how did he end up in Virginia and his car in Atlantic City?
23       Mel

25 MM:   I don't know

27 JF:   Is it all just an accident?

29 MM:   I don't (IA) fucking (IA) about Virginia ok

31 JF:   What a, what about the video?

33 MM:   What about the video?

35 JF:   You, you were on it, you moved his car.

37 MM:   That's right (IA)

39 JF:   Do you know how damaging that is.  You know what that suggests.

41 MM:   Of course I know exactly

43 Tape went blank for 2 minutes

**Pa44**

JF:   (IA)

MM:   (IA) he used cheap motels like on the strip leading into (IA)

JF:   (IA) all right, shit, how about, what, you told me you went to your parents after he disappeared did you go anywhere else?  you know that night?

MM:   What the night that he left I was in a hotel for the first 3 days.

JF:   What, what hotel?

MM:   A place up in uh, in Metuchen, my parents said they would take the kids they wanted me to stay up there so I could pull money out of the bank accounts (IA) find an apartment do what I have to do without worrying about the kids.

JF:   So you, pfff, you told me you went to your parents.

MM:   I did after that.

JF:   Yeah but you kind of made the impression that you were staying there.

MM:   I did stay there after that

JF:   Yeah but I meant that night.

MM:   Well I mean the hotel is no secret, it's right there in the fucking register.

JF:   Why the hell would you stay at a hotel instead of your parents house, who was with you?

MM:   Because the hotel is up in the Woodbridge area my parents were down in Barnegat this was before I was doing 4 hour commutes everyday, my parents thought it would be easier (IA) my friend Armen who's an attorney, my, my general counsel, talked about divorce (IA)

JF:   So he was with you there?

MM:   He was with me not at the hotel but we met for dinner down the road from that

JF:   Well were you with anyone else at the hotel?  Make me believe.

MM:   The first or second night but I don't, hell I don't even remember right now (IA) one of the (IA) Brad (IA)

Page 25 of  26

Pa45

JF:    Uh say, say that again I didn't hear you.

MM:    I said one of those mornings Brad had to be at work (IA) and he rang my cell phone at 4:30 (IA) he just was worried about me came in, just laid down next to me and watched me sleep til he had to get up and go to work but so he knows I was there.

JF:    Right

MM:    Yeah

JF:    So Brad was with you at the hotel?

MM:    Oh that sounds great, not like that.  For an hour, for an hour.

JF:    Well yeah but he was there, you know I mean

MM:    Yeah the cops know that already.

JF:    Can you hold on one sec.

MM:    Yeah

JF:    I need to (IA).

Pa46