# Superior Court of New Jersey

## Appellate Division

Docket No. A-6576-06T4

| | | |
|---|---|---|
| STATE OF NEW JERSEY, | : | CRIMINAL ACTION |
| | : | |
| | : | ON APPEAL FROM A |
| *Plaintiff-Respondent,* | : | JUDGMENT OF CONVICTION, |
| | : | SUPERIOR COURT |
| | : | OF NEW JERSEY, |
| vs. | : | LAW DIVISION, |
| | : | MIDDLESEX COUNTY |
| | : | |
| MELANIE McGUIRE, | : | Sat Below: |
| | : | |
| | : | HON. FREDERICK P. DeVESA, |
| *Defendant-Appellant.* | : | Pr.J.Cr. |

---

## REPLY BRIEF AND APPENDIX ON BEHALF OF DEFENDANT-APPELLANT MELANIE McGUIRE

---

**OF COUNSEL**

JAMIE S. KILBERG, ESQ.
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 639-7700

**ATTORNEY OF RECORD**

STEPHEN TURANO, ESQ.
TACOPINA SEIGEL & TURANO, P.C.
275 Madison Avenue, 35th Floor
New York, New York 10016
(212) 227-8877
sturano@tacopinalaw.com

*Attorneys for Defendant-Appellant Melanie McGuire*

---

 COUNSEL PRESS • (800) 5 APPEAL

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................ i

TABLE OF AUTHORITIES ...................................... iii

ARGUMENT ...................................................... 1

I.   THE STATE MISREPRESENTS KEY FACTUAL ISSUES ............. 1

II.  THE TRIAL COURT SHOULD HAVE GRANTED A NEW TRIAL BASED
     ON JURY TAINT, AND THE STATE'S ARGUMENTS TO THE
     CONTRARY MISREPRESENT THE RECORD ...................... 4

     A. The State's Assertion That The Jurors Were Not
        Exposed To Highly Inflammatory Media Accounts Has
        No Merit ........................................... 4

     B. The State's Assertion That The Trial Court
        Adequately Questioned Jurors 1-3 Regarding Former
        Juror 14's Plea That The Jury "Do What Is Right" Is
        Specious ........................................... 6

     C. The Trial Court Should Have Addressed The State's
        Failure To Show "Reasonable Efforts" To Determine
        Whether A Deliberating Juror Had Posted To An
        Internet Message Board During Deliberations ........ 9

III. THE STATE MISREPRESENTS THE RECORD REGARDING, AND
     FAILS TO RESPOND TO MUCH OF, THE PROSECUTORIAL
     MISCONDUCT BELOW ..................................... 11

     A. The State Misrepresents The Record Below .......... 12

     B. The State Has No Answer For Much Of The
        Prosecutor's Misconduct ........................... 15

IV.  THE TRIAL COURT COMMITTED NUMEROUS EVIDENTIARY ERRORS
     REQUIRING REVERSAL ................................... 18

     A. The State Ignores The Impact Of The NAS Report On
        The Reliability Of Its Garbage-Bag Experts ........ 18

     B. The State Distorts Ms. McGuire's Arguments For The
        Admission Of Certain Exculpatory Evidence ......... 24

V.   MS. McGUIRE IS ENTITLED TO RESENTENCING .............. 27

CONCLUSION ................................................... 30

APPENDIX TABLE OF CONTENTS

Page

Unpublished Opinion in <u>State of New Jersey v. Justin A. Scott</u>, Superior Court of New Jersey, Appellate Division, Decided July 20, 2009, 2009 WL 2136273 (N.J.Super.A.D.) .................................   Da356

Unpublished Opinion in <u>In re Wolverine, Proctor & Schwartz, LLC</u>, United States District Court, District of Massachusetts, Civil Action No. 09-11038, Decided March 12, 2010, 2010 WL 1236298 (D.Mass.) ......................................   Da376

Unpublished Opinion in <u>U.S.A. v. Ronald Mikos</u>, United States District Court, Northern District of Illinois, Eastern Division, No. 02 CR 137, Decided December 9, 2003, 2003 WL 22922197 (N.D.Ill.) ......................................   Da386

TABLE OF AUTHORITIES

Page(s)

CASES

D.Y.F.S. v. B.M.,
   413 N.J. Super. 118 (App. Div. 2010) ........................8

Green v. N.J. Mfrs. Ins. Co.,
   160 N.J. 480 (1999) .......................................27

In re Wolverine, Proctor & Schwartz, LLC,
   No. 09-11038, 2010 WL 1236298 (D. Mass. Mar. 12, 2010) .......9

Melendez-Diaz v. Massachusetts,
   129 S. Ct. 2527 (2009) ....................................18

Nicholls v. Tufenkian Import/Export Ventures, Inc.,
   367 F. Supp. 2d 514 (S.D.N.Y. 2005) .........................9

People v. Wadle,
   77 P.3d 764 (Colo. App. 2003) ..............................9

Ragland v. Kentucky,
   191 S.W.3d 569 (Ky. 2006) .................................18

State v. Behn,
   375 N.J. Super. 409 (App. Div. 2005) ...............19, 20, 21

State v. Bey,
   112 N.J. 45 (1988) .........................................8

State v. Bogen,
   13 N.J. 137 (1953) ........................................12

State v. Boratto,
   80 N.J. 506 (1979) ........................................24

State v. Cavallo,
   88 N.J. 508 (1982) .....................................18, 23

State v. Cito,
   196 N.J. Super. 220 (Law Div. 1984) .......................20

State v. Daniels,
   182 N.J. 80 (2004) ........................................11

State v. Harvey,
   151 N.J. 117 (1997) ....................................19, 23

iii

State v. Hightower,
   146 N.J. 239 (1996) ...................................... 6

State v. Irving,
   114 N.J. 427 (1989) ..................................... 12

State v. Jenewicz,
   193 N.J. 440 (2008) ..................................... 27

State v. Jenewicz,
   No. A-0013-02T4, 2006 WL 2590114, at *12 (App. Div. Aug.
   8, 2006) (unpub. op.) ................................... 28

State v. Koskovich,
   168 N.J. 448 (2001) ..................................... 17

State v. Long,
   173 N.J. 138 (2002) ..................................... 25

State v. Noel,
   157 N.J. 141 (1999) ..................................... 20

State v. Palmieri,
   2 N.J. Super. 88 (App. Div. 1949) ....................... 26

State v. Radziwil,
   235 N.J. Super. 557 (App. Div. 1989) .................... 28

State v. Scott,
   No. A-4147-05T4, 2009 WL 2136273 (App. Div. July 29,
   2009) .................................................... 9

State v. Thornton,
   38 N.J. 380 (1962) ...................................... 25

State v. Young,
   93 N.J.L. 396 (1919) ..................................... 8

United States v. Mikos,
   No. 02 CR 137, 2003 WL 22922197 (N.D. Ill. Dec. 9, 2003) ... 23

United States v. Miles,
   207 F.3d 988 (7th Cir. 2000) ............................ 14

Wardlaw v. Maryland,
   971 A.2d 331 (Md. Ct. Special App. 2009) ................. 9

STATUTES AND RULES

N.J. R. Evid. 803(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

N.J. Stat. Ann. § 2C:44-1a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

Rule 2:9-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Rule 1:36-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

OTHER AUTHORITIES

Daniel J. Capra, <u>The Daubert Puzzle</u>, 32 Ga. L. Rev. 699,
     702 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Nat'l Research Council of the Nat'l Acad. of Sci.,
     <u>Strengthening Forensic Science in the United States: A
     Path Forward</u> (2009) (prepub. copy) . . . . . . . . . . . . . 18, 19, 20, 21

<u>Need to Strengthen Forensic Science in the United States:
     The National Academy of Sciences' Report on a Path For-
     ward: Hearing Before the Sen. Comm. on the Judiciary</u>,
     111th Cong. (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## ARGUMENT

To secure a conviction in the face of substantial evidentiary gaps, the prosecution overreached. It invented facts during summation for which there was no support in the record. It engaged in improper examination techniques. It argued that the absence of evidence it successfully excluded proved guilt. And it offered unreliable expert testimony. Making matters worse, the trial court erroneously excluded exculpatory evidence. It failed to appreciate the severity of prejudicial extraneous influences on the jury. And it failed to investigate adequately multiple jury irregularities, despite pleas from the defense.

Rather than addressing these deficiencies, the State obfuscates. It misrepresents the record to fit its theories on appeal (§§ I, II, & III.A, _infra_); ignores arguments to which it cannot respond (§§ III.B, IV.A, & V, _infra_); and distorts arguments it apparently does not understand (§ IV.B, _infra_). Those tactics notwithstanding, the combination of errors identified in Ms. McGuire's opening brief compels reversal. Db18.

## I.   THE STATE MISREPRESENTS KEY FACTUAL ISSUES

The State's Counter-Statement of Facts presents a compelling story -- but it blatantly misrepresents the record.

1. For example, the State overtly misrepresents the contents of a video it asserts was key to showing Ms. McGuire's calculated plan to cover-up her alleged crimes. At trial the

1

State argued that Ms. McGuire and an accomplice drove to Atlantic City and planted Mr. McGuire's car at the Flamingo Motel. 56T 12:5-12, 45:1-4, 47:15 - 48:4.  The State relied on video from the Flamingo Motel, which it argued showed both Mr. McGuire's Nissan Maxima and a vehicle whose lights and "very dark . . . tone" supposedly were consistent with Ms. McGuire's Nissan Pathfinder. 39T 155:12 - 158:17.  On appeal, the State creates events on the video that do not exist -- and that not even the prosecutors at trial argued.  The State now asserts that the Flamingo video shows the supposed Pathfinder pull "into the [Flamingo] parking lot" "[i]mmediately" after Mr. McGuire's Maxima.  Pb9.  Not so.  Over three minutes after the Maxima entered the Flamingo lot (39T 169:15-22), an unknown vehicle, coming from the opposite direction as the Maxima (39T 170:5-15), drove down the street adjacent to the Flamingo lot (39T 159:2-11).  It never entered the lot.  The State also asserts that the video shows that the driver of the Maxima "entered the passenger side of the Pathfinder." Pb9.  Absolutely false.  The video merely shows someone exit the Maxima and walk off screen. Nothing on the tape suggests that person at any time entered the second vehicle.  The State's own video expert admitted as much repeatedly.  39T 168:17-19, 183:18-25.

2.  To support its theory that Ms. McGuire must have dismembered (and thus killed) her husband, the State offered

evidence of small pieces of Mr. McGuire's tissue recovered from the floor of his Maxima. On appeal, the State asserts that such tissue "cannot be shed from a live human being and will be found only when a person is cut up the way Bill McGuire was." Pb10. To the contrary, the State's expert, Dr. Zhongxue Hua, admitted that a live person could easily lose such tissue -- for example, if a watch band were to pinch the skin. 42T 160:1-24.

3.    Central to the State's theory was the notion that Mr. McGuire was drugged and rendered unconscious for some period of time before his death. 56T 22:7-18, 60:18 - 61:4. As support, the State offered evidence of a prescription for the sedative chloral hydrate, and a vial of chloral hydrate found in Mr. Mc-Guire's Maxima. On appeal, the State asserts that "defendant filled a prescription for chloral hydrate." Pb11. But there was no evidence Ms. McGuire filled any prescription, and a hand-writing expert could not identify the writing on the prescrip-tion as Ms. McGuire's. 43T 114:3-5, 124:5-20; 44T 30:22-24.

4.    Finally, the State selectively describes portions of relevant evidence, distorting the truth to suggest guilt. For example, the State argues that a hair found with the bags con-taining Mr. McGuire's body "was confirmed [to have] defendant's mitochondrial DNA." Pb12. In fact, testing only revealed that Ms. McGuire "cannot be excluded as the source" of the hair -- but nor could millions of other people. 44T 157:15-16, 158:14-

3

20.   Likewise, the State repeatedly asserts that the bullets Ms. McGuire purchased were wad-cutter bullets, identical to the kind recovered from Mr. McGuire's body.   Pb8-9, 48-49.   In fact, the evidence showed that no one knows which kind of bullets Ms. McGuire purchased -- wad-cutter or round-nose.   29T 145:5-7.

The State's remarkably cavalier misrepresentations of the facts render suspect its entire presentation.   Indeed, as shown infra, the State's misrepresentations of both the record and of Ms. McGuire's arguments on appeal infect its entire brief.

II.   **THE TRIAL COURT SHOULD HAVE GRANTED A NEW TRIAL BASED ON JURY TAINT, AND THE STATE'S ARGUMENTS TO THE CONTRARY MISREPRESENT THE RECORD**

A.   **The State's Assertion That The Jurors Were Not Exposed To Highly Inflammatory Media Accounts Has No Merit**

The State asserts that Ms. McGuire's argument that the jurors were aware of and exposed to the media frenzy surrounding this case is "[w]ithout factual support."   Pb13.   It is difficult to take seriously the State's argument, given that it spends the following 23 pages identifying, in great detail, and responding to the jurors' admissions that they were aware:

- of internet blogs discussing the case, Pb14, 15, 18;

- that an internet message board described one juror as having "hard eyes," Pb15, 16, 18-21, 26;

- that newspapers printed identifying information about the jurors, Pb18-20, 22, 24-26, 28;

- that a media account referred to the jury's job as so easy, "even a caveman can do it," Pb19; and

- that Court TV had given the jurors nicknames, Pb21, 22.[1]

Moreover, the State omits from its own recounting of the media frenzy that several jurors admitted seeing newspaper headlines and articles about the case.  49T 16:10 - 17:2, 52:12 - 53:21, 68:15 - 69:2.  Nor does the State have any response to the argument that, if the jurors -- by their own admission -- were exposed to the message board describing one juror as having "hard eyes," then it would have been impossible for them not to also have been exposed to the invective and prejudicial rants that surrounded that comment.  Db23-24.[2]

These irregularities clearly had the <u>capacity</u> to influence the jury.  It was thus the State's burden to prove beyond a reasonable doubt that the exposure did not influence the outcome. Db19-20.  The trial court did not hold the State to that burden.

---

[1] The State selectively cites to the record for its false assertion that the issue of Court TV nicknames was "general" and that "none of the jurors reported any knowledge of nicknames being given in this case."  Pb35.  The full record speaks otherwise.  59T 56:1 ("[S]omebody said they nicknamed the jurors."), 65:7-8 ("I am concerned, kind of upset, having a Court TV nickname like everybody has."), 71:7-13 (juror trying to recall which juror told her about Court TV "nicknames in this case").

[2] This exposure to prejudicial comments specifically about Ms. McGuire, and the jurors' admitted exposure to media comments that their job was so easy that "even a caveman" could do it, expose the lie that is the State's argument that the exposure here was "incidental," "immaterial to the merits of the case," and "had nothing to do with the facts, the evidence, the defendant, or the victim."  Pb33.

Id. 31-32.[3]  Its failure to do so and its failure to grant a new trial was an abuse of discretion.  State v. Hightower, 146 N.J. 239, 266 (1996) (failure to grant new trial was abuse of discretion when jury taint "could have, in all likelihood, affected the result").  Reversal is required.

**B.   The State's Assertion That The Trial Court Adequately Questioned Jurors 1-3 Regarding Former Juror 14's Plea That The Jury "Do What Is Right" Is Specious**

1.   In her opening brief, Ms. McGuire argued that the trial court failed to adequately voir dire the jurors regarding (then-excused) Juror 14's plea to the deliberating jury to "do what is right."  Db24-27.  In particular, the trial court re-fused to ask Jurors 1-3, despite repeated requests from defense counsel, about how they interpreted the note and whether the jurors discussed opinions regarding guilt or innocence before the beginning of deliberations.  Id. at 25-26.

The State's response is remarkable: It urges this Court to assume that Jurors 1-3 did not interpret the note as "an effort to communicate an opinion about how the jurors should vote" because, after all, that is how "all the other jurors" re-

_____

[3] The trial court required the "defense" (and not the State) to prove its position, and was otherwise satisfied by "clear" proof (rather than by proof beyond a reasonable doubt).  Db31-32 (emphasis added).  The State's response -- that, at the outset of its decision, the trial court set forth the correct standard, Pb41-42 -- misses the point.  The issue is how -- and whether -- the trial court actually applied that standard.

6

sponded.   Pb38 (emphasis added).   The State offers no support for its notion that the court can assume how one juror would respond to an unasked question based on other jurors' responses.

2.   The State also argues that defense counsel was present during the voir dire and "had every opportunity to supplement the court's questions."   Pb36-37.   That is a gross misrepresentation of the record.   Counsel repeatedly urged the trial court to ask Jurors 1-3 how they interpreted Juror 14's note urging them to "do what is right," and whether the jurors discussed opinions regarding guilt or innocence before the beginning of deliberations.   The trial court refused, deeming such questions inappropriate and unnecessary.   59T 29:19 - 33:24 (court refusing defense counsel request, after interview of Juror 1, to inquire whether the jury had, "[p]rior to deliberation[s]," discussed "this thing about wisdom to do the right thing"); 59T 41:20 - 46:19 (court refusing defense counsel request, after interview of Juror 2, to inquire whether jurors had "discussions before deliberations with [Juror 14] about her opinion" regarding what she "thinks they should do").   It was not until Juror 4 that the trial court began asking the questions requested by defense counsel.   59T 63:15-19.[4]

_____

[4] The State also argues that "there is no support" for Ms. McGuire's argument that the trial court cut off at least one juror as he was trying to explain "a couple other" instances of

7

3.   Finally, the State criticizes Ms. McGuire for not formally requesting a mistrial.  Pb35-36.  The trial court, however, effectively treated its inquiry into Juror 14's note as a motion for mistrial.  To determine whether to declare a mistrial in these circumstances, the trial court must determine through <u>voir</u> <u>dire</u> "whether the[] [jurors] are capable of fulfilling their duty to judge the facts in an impartial and unbiased manner, based strictly on the evidence presented in court."  <u>State v. Bey</u>, 112 N.J. 45, 87 (1988).  Here, on the next trial day following the lengthy <u>voir</u> <u>dire</u>, the trial court announced a detailed decision, conforming precisely to that standard:

> I am satisfied that this jury remains capable of following the law and giving the State and the defendant a fair trial, so I am satisfied that this matter can go forward and that the jury can continue to deliberate . . . .

60T 10:4-11.  A formal mistrial motion would have been futile. <u>State v. Young</u>, 93 N.J.L. 396, 405 (1919) (when court had already overruled objection to question, failure to move to strike answer excused as futile); <u>D.Y.F.S. v. B.M.</u>, 413 N.J. Super. 118, 128 (App. Div. 2010) (futility excuses failure to object).

---

extraneous information.  Pb37.  Ms. McGuire's citation to the record, however, supports her argument.  Db24-25.

C.   The Trial Court Should Have Addressed The State's Failure To Show "Reasonable Efforts" To Determine Whether A Deliberating Juror Had Posted To An Internet Message Board During Deliberations

The State does not contest that, had a deliberating juror participated in Court TV Internet message boards, it would have been serious misconduct.  Indeed, jurors improperly accessing the Internet is a problem all courts -- including this one -- are increasingly encountering.  See, e.g., State v. Scott, No. A-4147-05T4, 2009 WL 2136273, at *5-10 (App. Div. July 29, 2009) (reversing conviction because juror conducted Internet research) (attached hereto as Da356-Da375); see also In re Wolverine, Proctor & Schwartz, LLC, No. 09-11038, 2010 WL 1236298, at *6 (D. Mass. Mar. 12, 2010) (same) (attached hereto as Da376-Da385); Nicholls v. Tufenkian Import/Export Ventures, Inc., 367 F. Supp. 2d 514, 516-17 (S.D.N.Y. 2005) (same); Wardlaw v. Maryland, 971 A.2d 331, 333-39 (Md. Ct. Special App. 2009) (same); People v. Wadle, 77 P.3d 764, 769-71 (Colo. App. 2003) (same).

Thus, despite the trial court's lament that exposure to publicity is nearly impossible to avoid "in today's modern age of electronic communications," 61T 137:23 - 138:7, courts will not hesitate to take corrective action when jurors access the Internet.  Here, especially given the highly prejudicial comments populating the Court TV message boards, Db22-24 & n.4, the trial court erred in not taking appropriate remedial action.

9

In response, the State argues that its investigation was sufficient, and that "every indication is that the post was a joke left by someone who was pretending to be a juror." Pb41. Neither of those arguments has any support in the record.[5]

First, the State's assertion that its one-sentence, belated "report" -- that no information was available -- sufficed is ludicrous. It claims it "did make reasonable efforts," Pb41, but nowhere describes what those efforts were, or what follow-up, if any, it made to Time/Warner's response. In short, neither the defense nor the trial court knows whether Time/Warner in fact did anything to determine the identity of the poster, let alone whether such actions were "reasonable." The State laments that "there was nothing more that the State or the court could do." Id. To the contrary, the trial court could have held a hearing to determine exactly what the State asked Time/Warner to do; what Time/Warner's actual response was; how

---

[5] The State also argues that the trial court lacked jurisdiction to address the problem. Pb40. Of course, it was the State's failure to investigate and report back to the court until after Ms. McGuire was statutorily required to file her Notice of Appeal that created the jurisdictional issue. More-over, Rule 2:9-1 directs that the trial court "shall have continuing jurisdiction to enforce judgments and orders" through contempt proceedings or otherwise. The trial court arguably retained jurisdiction to enforce its order that the State make "all reasonable efforts" to investigate and to promptly produce "a report." 61T 110:20-23. In any event, Ms. McGuire offered to obtain a limited remand if the trial court believed that jurisdiction was lacking. Db29 n.5.

Time/Warner monitored and policed, if at all, its message boards; who was responsible for deleting posts; and what efforts were made to locate the offending post and determine its author.

Second, the State cites no support (because there is none) for its assertion that "every indication is that the post was a joke left by someone who was pretending to be a juror." Pb41. The "indication[s]" suggest otherwise: The post apparently appeared in the evening, when jurors would not have been deliberating; it assured that the jury was close to a verdict; and, indeed, the verdict was announced the very next court day. Db27-28.

### III. THE STATE MISREPRESENTS THE RECORD REGARDING, AND FAILS TO RESPOND TO MUCH OF, THE PROSECUTORIAL MISCONDUCT BELOW

Prosecutors may be permitted to "sum up the State's case graphically and forcefully." Pb44. But "graphic[] and force-ful[]" advocacy is not a license to make improper arguments, ask the jury to draw unsuppportable inferences, or invent facts to fill evidentiary gaps. The State's job is to "see that justice is done." State v. Daniels, 182 N.J. 80, 96 (2004). It is not simply to do what it takes to secure a conviction. On appeal, in the name of minimizing the prosecutor's misconduct below, the State misrepresents the record and completely ignores several of

Ms. McGuire's arguments.[6]

A.   **The State Misrepresents The Record Below**

To divert attention from the prosecutor's misconduct regarding a key component of the State's theory -- Ms. McGuire's purchase of a gun -- the State simply rewrites what happened. But the State's distortions do not withstand scrutiny.

1.   <u>George Lowery Testimony</u>.   Mr. McGuire's former colleague, George Lowery, was prepared to debunk the State's entire theory regarding Ms. McGuire's purchase of a gun -- he was prepared to testify that he and Mr. McGuire had discussed <u>Mr. McGuire's</u> desire to purchase a gun, his inability to get a permit, and his intent to have Ms. McGuire buy it for him. Db35-36.   The trial court, however, only allowed the defense to elicit from Lowery the general statement that he and Mr. McGuire "discuss[ed] . . . the purchase of a firearm."   <u>Id.</u>

In her summation, the prosecutor pointed squarely to Lowery's general statement and noted that Lowery did "not [testify] that Bill McGuire wanted to purchase a gun," an omission,

---

[6] The State also asks the Court to rule that the supposed absence of a contemporaneous defense objection alone is enough to deny Ms. McGuire's appeal.   Pb45.   But defense counsel repeatedly objected to the prosecutor's mischaracterizations of the record. Db49.   Moreover, even if defense counsel had failed to object, the normal plain-error rule still applies.   <u>State v. Irving</u>, 114 N.J. 427, 444 (1989); <u>State v. Bogen</u>, 13 N.J. 137, 142 (1953) (the court is "at liberty to upset the verdict if the prejudice done the defendant is apparent . . . even when the improper remarks have not been objected to by defense counsel").

she argued, that proved there was "no evidence" to corroborate Ms. McGuire's argument "that Bill McGuire wanted that gun." 56T 43:7-13.   The State contends that the prosecutor "had every right" to focus on the absence of the very evidence the State successfully excluded, to clarify a supposed misrepresentation by defense counsel that Lowery had, in fact, specifically testi-fied that Mr. McGuire "wanted to purchase a gun." Pb47-48.

The State's argument is patently false and misrepresents the record below.   In his summation, defense counsel first sum-marized (correctly) Lowery's general testimony:

> And lastly, you know, in April of 2004, Bill McGuire was talking about the purchase of a gun, undisputed. Well, the State will dispute it, but a co-worker of his, George Lowery came in here and said he told them, he told law enforcement October of 2005 that <u>Bill McGuire and he had a conversation about the purchase of a gun</u>, and they never reached out to [Lowery] again.   Once he said that [law enforcement] lost his phone number, they lost his phone number, why? Because it didn't fit their theory.

55T 81:12-20 (emphasis added).   Defense counsel continued, noting (correctly) that Lowery's general testimony about a "conversation about the purchase of a gun" corroborated <u>other</u> defense evidence:

> [Law enforcement] wanted nothing to do with this guy, because that also <u>corroborates everything Melanie McGuire has been saying on these tapes</u> . . . about Bill wanted a gun and he couldn't get one because he was a convicted felon and she had to buy one for him.

55T 81:21-25.   There was no justification for the prosecutor's

13

reliance on the omission of excluded evidence.   And there is no support for the State's distortions of the record on appeal.[7]

2.   <u>The Murder Weapon</u>.   The prosecutor committed further misconduct by urging the jury to accept that the murder weapon was the specific gun Ms. McGuire purchased.   Db39-42.   Again, the State misrepresents the record, claiming that all the prosecutor did was argue that the murder weapon was "consistent with" the "gun defendant purchased."   Pb48.   But she did much more.

In her opening statement, the prosecutor promised the jury she would prove that the murder weapon was consistent with the particular "make and <u>model</u>" gun that Ms. McGuire purchased.   28T 14:11-13 (emphasis added).   That turned out to be false.   The State presented <u>no</u> evidence regarding model 85 Taurus revolvers (like the one Ms. McGuire purchased) and <u>no</u> evidence that the murder weapon was "consistent with" such a model.   Db40-41.[8]

More importantly, in <u>summation</u>, the prosecutor went even

_____

[7] The State does not even take its own argument seriously. It later concedes defense counsel was merely arguing the "clear inference" that could be "drawn" from Lowery's testimony.   Pb76.

[8] The State relies on its experts' testimony that Taurus was one of the numerous <u>manufacturers</u> which made guns capable of leaving marks on bullets similar to those on the recovered bullets.   Pb49.   But the usefulness of rifling characteristics depends on knowing the "make <u>and model</u> of gun that fired the bullet."   <u>United States v. Miles</u>, 207 F.3d 988, 990 (7th Cir. 2000) (emphasis added).   Moreover, as the State well knows, <u>none</u> of the potential firearms identified by the State's experts was, in fact, a Taurus model 85 .38 Special.   Db41 n.10.

further: "The means [of the murder], ladies and gentlemen, was the gun she purchased in Pennsylvania."   56T 108:8-9; <u>see also</u> 56T 34:17-18 ("[S]he bought that gun and she killed him."). Such unsupportable assertions were improper.

*   *   *

The State placed tremendous emphasis on Ms. McGuire's purchase of the gun -- in its case and in summation.   Db37-39 & nn.7-9.   The prosecutor's misconduct regarding Lowery's testimony and the identification of the murder weapon constituted plain error, notwithstanding the State's efforts to rewrite the record below.   Reversal is required.

**B.   The State Has No Answer For Much Of The Prosecutor's Misconduct**

The State not only rewrites the record, it also ignores, and offers <u>no argument</u> to explain, many wholly unsupported inferences the prosecutor asked the jury to draw in her summation:

- <u>Saw-silencer</u>.   To explain how a neighbor heard an argument, but no one heard Mr. McGuire being cut into pieces with a loud reciprocating saw, the prosecutor offered her personal testimony that a "towel or blanket can be wrapped around a saw" to silence it.   56T 26:24 – 27:9; Db45-46.[9]

- <u>Phantom Refrigeration</u>.   Faced with evidence that the lack of decomposition was not consistent with the State's theory that Mr. McGuire had been dead for

---

[9] The State does not even appear to understand Ms. McGuire's argument, and attempts to explain the lack of noise from the <u>saw</u> by describing how a "towel" or other "cloth" could be used "to muffle the sound of the <u>gun</u>."   Pb51-52 (emphasis added).

15

more than a week, the prosecutor speculated to the jury that Ms. McGuire "could have simply surrounded [the body parts] with bags of ice," 56T 35:2-4, and used "some refrigeration," 56T 82:6-7; Db47-48.

- <u>Non-existent Drop Cloths and Distorted DNA</u>.  With no evidence to support her theory that the murder occurred in the McGuires' bathroom -- because, after repeated searches, the State could not locate any evidence of any crime occurring anywhere in the apartment -- the prosecutor improperly speculated that Ms. McGuire must have used drop cloths to prevent blood spatter and make clean-up possible. 56T 25:12-16; Db46-47.  The State's retort -- that "only someone who wanted to hide evidence would have cleaned an apartment she was vacating so thoroughly as to completely eliminate all traces of DNA," Pb51 -- is belied by the fact that the apartment was searched multiple times -- including at least once <u>long after</u> another family had moved in.  29T 111:1 - 112:17; 38T 149:9 - 152:19.  <u>None</u> of those searches resulted in any DNA.

- <u>Personal Assurance Regarding Computer Searches</u>.  To divert attention from the fact that the supposedly incriminating computer Internet searches were more likely done by Mr. McGuire, the prosecutor told the jury she was "certain" that Mr. McGuire had the necessary training and wherewithal that, if he had been conducting those searches, he would have surely "erase[d]" anything "untoward."  56T 99:3-8; Db48.

The most the State can muster to justify each of its complete fabrications is to summarily dismiss them as "explanations for the evidence as it existed."  Pb51.  But nowhere does it identify what evidence in the record supports these supposed "fair comment[s] on the evidence."  Pb50.

The State also argues that the prosecutor's comments are forgivable because "she did not have to prove the murder occurred in the apartment" on the night in question.  <u>Id.</u>

16

Nevertheless, the State presented a very particular theory of the facts and relied heavily on that theory.  Db12-16.  It was perfectly within defense counsel's right, indeed obligation, to cast reasonable doubt on the State's case as a whole by exposing the logical, inferential, and evidentiary gaps in the State's theory of the crimes.  That does not, in turn, give the prosecutors license to make up facts and shrug them off as irrelevant to the State's legal burden and thus acceptable deviations from the evidence.  That is not "comment[ing]" on the evidence.  Pb43.  That is creating "evidence" that does not exist.

Ms. McGuire could not "have [had] a jury fairly evaluate the merits" of her case, State v. Koskovich, 168 N.J. 448, 488 (2001) (quotations omitted), when the prosecutor took advantage of her opportunity to have the last word to postulate unsupportable speculation in the minds of the jurors.[10]

_____

[10] The State also attempts to explain its prejudicial testimony from Brad Miller regarding the lascivious details of his affair with Ms. McGuire, Db43-45, by suggesting that graphic details were somehow relevant to the duration and "overall intensity of the affair," which in turn was relevant to motive. Pb55-56.  That rationale is a curious deviation from the State's prior position: When cross-examination revealed that Dr. Miller committed perjury before the grand jury regarding the duration and nature of the affair, the prosecutors argued that their failure to disclose the perjury was not a Brady violation because the affair itself was not "material" to the grand jury's "homicide investigation."  37T 211:2 - 214:12.

IV.   THE   TRIAL   COURT   COMMITTED   NUMEROUS   EVIDENTIARY   ERRORS
      REQUIRING REVERSAL

Whether viewed singly or in combination, the series of evidentiary errors by the trial court also mandate reversal. Db62-65.  The State's arguments to the contrary are meritless.

   A.   The State Ignores The Impact Of The NAS Report On The
        Reliability Of Its Garbage-Bag Experts

The improper admission of supposed expert forensic testimony can be devastating.  As the U.S. Supreme Court recently noted, in "cases in which exonerating evidence resulted in the overturning of criminal convictions[,] . . . invalid forensic testimony contributed to the convictions in 60% of the cases." Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527, 2537 (2009).

   1.   The National Academy of Sciences' scathing report on several supposedly scientific forensic disciplines,[11] including tool-mark analysis, is evidence of "[s]erious deficiencies . . . in the forensic evidence used in criminal trials." Id.  The NAS Report demonstrates precisely why the "long . . . accept[ance]" of certain forensic disciplines "by courts throughout the country," Pb68, does not necessarily mean they have, in fact, achieved the level of "general acceptance" in the scientific community that is required for admission into evidence.  State

---

[11] See Nat'l Research Council of the Nat'l Acad. of Sci., Strengthening Forensic Science in the United States: A Path Forward (2009) (prepub. copy, available at http://ag.ca.gov/ meetings/tf/pdf/2009_NAS_report.pdf) (hereinafter "NAS Report").

v. Cavallo, 88 N.J. 508, 520-21 (1982); see also Ragland v. Kentucky, 191 S.W.3d 569, 579 (Ky. 2006) (noting that "[t]he fact that courts have generally admitted this testimony is not the equivalent of scientific acceptance").   Indeed, reviewing courts must "scrutinize the record and independently review the relevant authorities, including judicial opinions and scientific literature," and consider that "general acceptance may change between the time of trial and the time of appellate review." State v. Harvey, 151 N.J. 117, 167-68 (1997).[12]   The State's failure to recognize this basic principle is fatal to its argument.

Tool-mark analysis is a wholly "subjective" discipline that "does not even consider, let alone address, questions regarding variability, reliability, repeatability, or the number of correlations needed to achieve a given degree of confidence [in a conclusion]."   NAS Report at 5-21.   In arguing that this forensic "science" has long been accepted by New Jersey courts, the State (relying principally on cases from Pennsylvania and

---

[12] The State argues this Court must give "substantial deference" to the trial court's Rule 702 determination.   Pb68.   That deference applies only to the adequacy of an expert's qualifications, and is "less appropriate" in reviewing the trial court's determination that an expert's methodology is reliable.   Harvey, 151 N.J. at 167.   The Court must independently determine that an expert's "test[s] and [his] interpretation of [their] results are . . . demonstrable techniques that the relevant scientific community widely . . . accepts as reliable."   Id. at 171.

the U.S. Court of Appeals for the Ninth Circuit) cites only two cases from New Jersey.  Pb68-69 (citing State v. Behn, 375 N.J. Super. 409 (App. Div. 2005); State v. Cito, 196 N.J. Super. 220 (Law Div. 1984)).  Neither of those cases engage in any analysis of the reliability vel non of tool-mark analysis.  In Cito, the court merely mentioned the use of tool-mark analysis in passing; it was not raised as an issue.  196 N.J. Super. at 222.  And Behn was about an entirely different forensic discipline.

Moreover, Behn actually proves why this Court must reverse Ms. McGuire's conviction.  The defendant in Behn was convicted, partly on the basis of a forensic analysis called composition (or comparative) bullet-lead analysis, or "CBLA."  Behn, 375 N.J. Super. at 413.  CBLA posits that the metallurgical compo-sition of a lead bullet can help investigators determine whether it was made in the same batch of molten lead as other bullets against which it is compared.  Id. at 419-20.  Courts in New Jersey had long-recognized CBLA as "an accepted method of bullet lead analysis."  State v. Noel, 157 N.J. 141, 149 (1999).

Nevertheless, significant post-trial research revealed that "all . . . of the assumptions" underlying CBLA conclusions were "flawed and scientifically invalid."  Behn, 375 N.J. Super. at 425.  In particular, as is the case with tool-mark analysis (NAS Report at 5-21), there were no available "[w]ritten protocol[s] defining the composition 'match' criterion," and no "meaningful

20

or comprehensive studies," that would "permit interpretation of the forensic significance of an alleged 'match' of bullet compositions." Behn, 375 N.J. Super. at 426. Based on that research -- which, importantly, culminated in an NAS report rejecting CBLA as an unreliable forensic science -- this Court rejected the proffered CBLA testimony.[13] It should do likewise here: The NAS specifically found that "the scientific knowledge base for toolmark . . . analysis is fairly limited," and tool-mark analyses are plagued with "heavy reliance on the subjective findings of examiners rather than on the rigorous quantification and analysis of sources of variability." NAS Report at 5-21.

2.    The State also entirely ignores the methodological deficiencies of its garbage-bag experts. For example, Thomas Lesniak relied on the presence of "cliffs" to conclude that the bags were made on the same extrusion line. Db54-55. But there was no testimony whatsoever that such "cliffs" -- a term that, like his methodology itself, Lesniak seemed to have invented for this case, Db55 -- are generally accepted indicators of a match. In that Lesniak had to rely on one unnamed employee of one bag manufacturer who allegedly said "one of the explanations" for

---

[13] Because the NAS's report regarding CBLA was not put before the PCR court, and was not discussed in the briefs on appeal, this Court opted not to address the report's specific conclusions, but rather relied on the underlying research itself. Behn, 375 N.J. Super. at 430 n.3.

the cliff "could be the reversal of the cutting tool," 21T 45:7-11 (emphasis added), it is clear that "cliffs" were something Lesniak had never encountered before.   The State offers no response in its brief.

Similarly, the State ignores that Frank Ruiz's belief in his own infallibility alone makes his opinions unreliable.   Ruiz believed that his observations showed that all the bags "had to have come from a single line," 46T 129:23 – 130:1, and that the likelihood the bags were manufactured on different lines was "zero," 46T 131:17-21.   But the congressional testimony of Judge Harry Edwards -- the co-chair of the committee that wrote the NAS Report, and whose testimony the State relied on elsewhere, Pb69 -- proves the point: "There is no such concept as a 'zero error rate' in good scientific methodology," and such claims are "scientifically implausible," a "myth," and usually betray that there is "no good scientific basis to support a forensic discipline."   The Need to Strengthen Forensic Science in the United States: The National Academy of Sciences' Report on a Path Forward: Hearing Before the Sen. Comm. on the Judiciary, 111th Cong., 7, 10, 33 (2009).   Judge Edwards went on to say that "such claims of absolute, certain confidence in identification are unjustified, the product of hubris more than established knowledge."   Id. at 18 (quotation omitted).   The State does not even try to mount a justification.

The lone methodological flaw the State sees fit to address is Ruiz's failure to employ a control -- his failure to test bags <u>other than</u> those which he was seeking to match. Db56-57; Pb71. The State offers the <u>ipse dixit</u> that because Ruiz knows -- apparently without the need for any further tests -- how much variation there can be between unrelated bags, if he says the relevant bags match, then everyone should simply accept that to be so. Pb71. But the lack of an adequate control, and the reliance on mere "anecdotal" suggestion that a control is not necessary, is precisely why Ruiz's testimony was inadmissible. <u>United States v. Mikos</u>, No. 02 CR 137, 2003 WL 22922197, at *4-*5 (N.D. Ill. Dec. 9, 2003) (attached hereto as Da386-Da390).[14]

Instead of defending its experts, the State suggests that methodological arguments go to the weight of the expert testimony, rather than its admissibility. Pb71. To the contrary, it is the <u>trial court's</u> responsibility to ensure that purported experts employ a reliable methodology. <u>Harvey</u>, 151 N.J. at 171. This is particularly true given the "danger of prejudice through [the] introduction of unreliable expert evidence," and the "substantial danger" that juries will "accord excessive weight

---

[14] The State also argues that Ruiz's ash-test results showed the bags were "very similar." Pb64. But Ruiz himself admitted that his explanations for dismissing the differences between the ash-test results were pure speculation, and that it could have just as easily been the case that the results were different because the bags were different. 22T 43:1 - 45:23.

to unreliable expert testimony." <u>Cavallo</u>, 88 N.J. at 518; <u>see also</u> Daniel J. Capra, <u>The Daubert Puzzle</u>, 32 Ga. L. Rev. 699, 702 (1998) ("[C]oncerns about expert testimony cannot simply be referred to the jury as a question of weight.").

*     *     *

The State repeatedly relied on the forensic analysis of the garbage bags in summation, calling it "powerful" evidence of guilt.  Db63.  But it was flawed evidence from the outset; it should have been excluded; and it could easily have led the jury to a result it otherwise might not have reached, <u>State v. Boratto</u>, 80 N.J. 506, 514 (1979).  Reversal is necessary.

**B.    The State Distorts Ms. McGuire's Arguments For The Admission Of Certain Exculpatory Evidence**

In addition to improperly admitting bogus "expert" testimony, the trial court improperly excluded testimony proffered by the defense that would have both corroborated Ms. McGuire's defense and rebutted the State's explanation of certain evidence.  The State, however, entirely distorts Ms. McGuire's arguments, or appears not to understand them.

1.    <u>George Lowery's Testimony</u>.  The State argues that the trial court properly excluded George Lowery's testimony that Mr. McGuire planned to have Ms. McGuire buy a gun for him because "a decedent's hearsay statements are not admissible to prove the defendant's motivation or conduct."  Pb73.  The State entirely

misses the point. Ms. McGuire did not seek to admit Lowery's testimony to prove her conduct. Lowery's testimony was admissible as evidence of Mr. McGuire's "then existing state of mind," including his "intent" and "plan." N.J. R. Evid. 803(c)(3); State v. Long, 173 N.J. 138, 154-55 (2002); Db58-59.

Ms. McGuire argued that her purchase of the gun was innocent because Mr. McGuire asked her to buy it for him. The State repeatedly asserted there was no evidence he ever asked her to buy the gun. 28T 20:24 - 21:9; Db36. But it is "firmly established" that a declarant's intent to act in the future is "competent, substantive, and original evidence of his probable engagement in the course of conduct or act." State v. Thornton, 38 N.J. 380, 389 (1962). Thus, Mr. McGuire's statements to Lowery were persuasive evidence that he did, in fact, ask Ms. McGuire to obtain the gun, corroborating Ms. McGuire's defense and putting Mr. McGuire's state of mind very much at issue.[15]

The State also argues that Ms. McGuire suffered no prejudice because the jury heard the essence of Lowery's excluded testimony through Ms. McGuire's secretly recorded phone calls.

---

[15] The cases cited by the State (Pb74-75) are inapposite. In each, the courts rejected the State's attempts to admit hearsay letters written by decedents predicting that any future harm would be at the hands of the defendants. Those cases are far removed from this case, where the decedent's statements were offered to show that he conformed his own future action to his own stated intent and plan. Under Thornton, such evidence should have been received.

25

Pb76.   But the State repeatedly took the position that Ms. McGuire's explanation was a lie and that there was no evidence to support it.   See pp. 12, 25, supra.   It is absurd to suggest that Ms. McGuire was not prejudiced by the improper exclusion of evidence from a neutral third party that corroborated her own statements, when the credibility of those statements was a central issue in the case.   Cf. State v. Palmieri, 2 N.J. Super. 88, 91-92 (App. Div. 1949) (no abuse of discretion in excluding evidence from neutral third parties corroborating portions of defendant's testimony because State did not dispute those assertions).   The State cites no authority to support its position.

2.   Marcie Paulk's Testimony.   The State also argues that the trial court properly excluded the testimony of Mr. McGuire's first wife, Marcie Paulk, that she told Ms. McGuire that Mr. McGuire abandoned their marriage by simply walking out the door, never to return.   The State contends that ruling was correct because the manner in which Mr. McGuire ended his first marriage did not tend to prove whether he walked out on Ms. McGuire, too. Pb78.   Once again, the State completely misses the point.   Ms. Paulk's testimony had one principal purpose: as evidence of Ms. McGuire's state of mind in the days following Mr. McGuire's disappearance.   As the trial court itself acknowledged, "the State [took] the position early on that the defendant's reactions to [Mr. McGuire's] death show[ed] consciousness of

guilt." 31T 33:6-12. Ms. Paulk's statements to Ms. McGuire, however, explain that behavior. Db60-62.

Nor was Ms. Paulk's testimony properly excludable under Rule 403. Pb78-79. It would not have "generated a mini-trial" on the "manner in which [Mr. McGuire's first marriage] ended." Pb79. The proffered testimony could have been obtained in a few questions, and the truth of Ms. Paulk's accusations would have been totally irrelevant. Any concern that her allegations would paint Mr. McGuire in a negative light could have been cured by a limited-use instruction, an approach the State elsewhere endorses as "prevent[ing] the possibility of undue prejudice." Pb57.

The trial court "eliminated evidence . . . that would have buttressed defendant's claim" and it allowed the prosecution to "denigrate[]" the remaining evidence "in support of that claim." State v. Jenewicz, 193 N.J. 440, 473-74 (2008). That error was "so wide off the mark," Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999) (quotations omitted), that reversal is required.

## V.   MS. McGUIRE IS ENTITLED TO RESENTENCING

The trial court aggravated Ms. McGuire's sentence for murder under Section 2C:44-1a(1) -- and sentenced her to life imprisonment -- based principally on the separately charged,

post-murder dismemberment of Mr. McGuire's remains.[16]  Such boot-strapping is inappropriate and resentencing is required.

In State v. Jenewicz, this court persuasively held that separately charged post-murder dismemberment cannot justify a finding that a murder was "especially heinous, cruel, or depraved" under N.J. Stat. Ann. § 2C:44-1a(1).  No. A-0013-02T4, 2006 WL 2590114, at *12 (App. Div. Aug. 8, 2006) (unpub. op.) ("It was the subsequent dismemberment . . . that was particularly heinous, not the [fatal] shooting itself.").[17]

The State argues that Jenewicz is "inconsistent with published precedent," citing only State v. Radziwil, 235 N.J. Super. 557 (App. Div. 1989).  Pb84.  The State describes Radziwil as holding that "a defendant's failure to stop after a motor vehicle accident will support a finding of the aggravating factor in N.J.S.A. 2C:44-1a(1)."  Id.  But Radziwil is far from

_____

[16] Although the State mentions that the trial court also found a need to deter under Section 2C:44-1a(9), Pb80-81, the State does not seriously contest that the trial court imposed a life sentence based on its finding of heinousness under Section 2C:44-1a(1).  Without support, however, the State does argue that the trial court found that the "[m]ost significant" heinousness factor was not the dismemberment, but "the fact that the crime was carefully planned and orchestrated over the course of weeks."  Pb85.  The State cites nothing to support that supposition.  Indeed, it was the dismemberment that the court found "particularly heinous and depraved."  62T 48:4-5 (emphasis added).

[17] Pursuant to R. 1:36-3, the Jenewicz opinion was included as part of the Appellant's Appendix at Da319-Da328.

on-point.  In that hit-and-run case, the defendant was convicted of aggravated manslaughter.  _Radziwil_, 235 N.J. Super. at 569. He was not separately charged with failure to stop following the accident.  Here, like in _Jenewicz_, Ms. McGuire was separately charged with, convicted of, and sentenced for both murder and dismemberment.[18]  _Radziwil_ is, simply, unhelpful to the State.

In any event, even if the State were correct that _Jenewicz_'s clear holding were not applicable here, the State completely ignores Ms. McGuire's alternative argument: There was no justification for the trial court to further base its "depravity" finding on Ms. McGuire's trial strategy asserted three years after her husband's death.  Db67-68.  Ms. McGuire -- who has maintained her innocence -- is constitutionally entitled to present a defense, including arguing that evidence suggested others may have had a motive to kill her husband.  _Id._  The trial court cannot aggravate her sentence, finding the "nature and circumstances" of the _murder itself_ "heinous" and "depraved," based on her legal and factual defense years later at trial.  At a minimum, resentencing is required.

---

[18] Nor is it clear from the record in _Radziwil_ whether it was the accident itself or the defendant's subsequent failure to stop that actually led to the victim's death and thus the aggravated manslaughter charge.

## CONCLUSION

Substantial errors permeated this highly publicized trial. Rather than address the errors, the State ignores most of them and misrepresents the others. Throughout this case, the State has shown both that it places securing and affirming a conviction ahead of ensuring justice, and that it believes it can make up facts and arguments when the law and record do not support its position. Whether considered individually or in combination, the errors identified in Ms. McGuire's opening brief, and reiterated herein, denied Ms. McGuire her right to a fair trial under New Jersey law and the U.S. Constitution. Her sentence must set aside, and her conviction must be reversed.

Dated: July 2, 2010             Respectfully submitted,

                                TACOPINA SEIGEL & TURANO, P.C.


                                /Stephen Turano

Of Counsel:

Jamie S. Kilberg
BAKER BOTTS L.L.P.

30

UNPUBLISHED OPINION IN STATE OF NEW JERSEY V. JUSTIN A. SCOTT, SUPERIOR COURT OF NEW JERSEY, APPELLATE DIVISION, DECIDED JULY 20, 2009, 2009 WL 2136273 (N.J.SUPER.A.D.)

Westlaw.

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

**H**Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.
STATE of New Jersey, Plaintiff-Respondent,
v.
Justin A. SCOTT, Defendant-Appellant.
State of New Jersey, Plaintiff-Respondent,
v.
Damian Free, Defendant-Appellant.
State of New Jersey, Plaintiff-Respondent,
v.
Herbert Mays, Defendant-Appellant.
Argued Jan. 5, 2009.
Decided July 20, 2009.

West KeySummary
**Criminal Law 110 ☞778(11)**

110 Criminal Law
  110XX Trial
    110XX(G) Instructions: Necessity, Requisites, and Sufficiency
      110k778 Presumptions and Burden of Proof
        110k778(11) k. Flight or Surrender.
Most Cited Cases
Evidence supported a jury charge on flight. Defendants contended that no evidence existed that they knew police were looking for them and that, upon learning police were searching for them, they turned themselves in thereby effectively extinguishing a viable flight charge. Counsel of one of the defendants admitted that flight was "fairly in the case," and his opening statement that his client knew of the murder and fled, belied defendants' claim that there was no evidence of flight or that they were unaware that the police were looking for them. Further, it was undisputed that defendants surrendered to police in South Carolina after police searched for them in New Jersey.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 04-02-

0153.

Steven M. Gilson, Designated Counsel, argued the cause for appellant Justin A. Scott (Yvonne Smith Segars, Public Defender, attorney; Mr. Gilson, on the brief).

Alison Perrone, Designated Counsel, argued the cause for appellant Damian Free (Yvonne Smith Segars, Public Defender, attorney; Ms. Perrone, on the brief).

Alan I. Smith, Designated Counsel, argued the cause for appellant Herbert Mays (Yvonne Smith Segars, Public Defender, attorney; Mr. Smith, on the brief).

Steven E. Braun, Assistant Prosecutor, argued the cause for respondent State of New Jersey in A-4147-05T4 and A-5237-05T4 (James F. Avigliano, Passaic County Prosecutor, attorney; Jason F. Statuto, Assistant Prosecutor, of counsel and on the briefs).

Mary E. McNally, Deputy Attorney General, argued the cause for respondent State of New Jersey in A-4591-05T4 (Anne Milgram, Attorney General, attorney; Ms. McNally, of counsel and on the brief).

Before Judges R.B. COLEMAN, SABATINO and SIMONELLI.

PER CURIAM.

*1 These back-to-back appeals involve the murder of Ramod "Lamet" Gilchrist on October 4, 2003. A grand jury indicted co-defendants Justin Scott, Damian Free and Herbert Mays, who are cousins, for first-degree murder, N.J.S.A. 2C:11-3a(1) and (2) (count one); first-degree robbery, N.J.S.A. 2C:15-1a(1) or (3) and N.J.S.A. 2C:2-6 (count two); third-degree possession of a weapon (knife) for an unlawful purpose, N.J.S.A. 2C:39-4d (count three); and fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5d (count four). The grand jury also indicted Scott and Free for third-degree [FN1] tampering with a witness, N.J.S.A. 2C:28-5(a)(1) and/or (2) and N.J.S.A. 2C:2-6 (counts five, six and seven). The State maintained that jealousy motivated the murder because Gilchrist was dating Zwwiyya Moore, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Da356

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

mother of Free's two children.

FN1. Although the indictment has this as a second-degree charge, the State indicated at trial that it is a third-degree charge.

A jury acquitted defendants of murder, robbery, and witness tampering, and convicted them of the lesser included offense of first-degree aggravated manslaughter, *N.J.S.A.* 2C:11-4a. Additionally, the jury convicted Scott and Mays, but acquitted Free, of the weapons offenses. The trial judge merged the weapons offenses into the aggravated manslaughter offense and sentenced each defendant to a thirty-year term of imprisonment with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, *N.J.S.A.* 2C:43-7.2. The judge also imposed the appropriate assessments and penalties.

On appeal, all three defendants challenge (1) the trial judge's substitution of a juror with an alternate juror after deliberations began, based on juror misconduct, instead of granting a mistrial; (2) the admission of certain statements made by Gilchrist as a dying declaration and an excited utterance; and (3) their sentences. Separately, Scott challenges the admission of evidence that he possessed the knife used in the attack on Gilchrist, and Scott and Free challenge the jury charge on flight. Mays challenges the trial judge's finding that he voluntarily waived his *Miranda*[FN2] rights. Mays also challenges the jury charge on accomplice liability, and the denial of his motion for acquittal on the murder charge. Because we conclude that the trial judge should have granted a mistrial due to juror misconduct, we are constrained to reverse and remand for a new trial on the charges that resulted in convictions.

FN2. *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L. Ed.*2d 694 (1966).

The following relevant facts are adduced from pretrial and trial testimony. Moore had a dating relationship with Free "off and on" for seven years. Gilchrist had been Moore's boyfriend "[f]or like three years off and on" and they had been together exclusively as of October 4, 2003.

Latonya Jackson knew Gilchrist for the period he dated Moore. She had known Free and Scott for about ten years and Mays for a few years less than

that. According to Jackson, at 8:30 p.m., on October 4, 2003, she was at her apartment in the Alabama Housing Projects (AHP) in Paterson with Gilchrist and other friends, including Diamond Free (Diamond). Diamond is Free's brother and Scott's and Mays's cousin. The group was drinking alcohol and playing cards. According to Moore, Gilchrist was wearing a Yankees cap and a gold chain with "a Jesus head" on it that he wore everyday, which cost approximately $1500.

*2 Jackson continued that at one point, Free and Scott came into her apartment and went into her bathroom with Diamond to talk. According to Diamond, Free asked him questions about what Gilchrist was "doing with" Moore. Because Free "did not go with [Moore] no more" and because Free already had a new girlfriend, Diamond replied to Free, "just leave that alone, it's over with." Jackson said that as Free and Scott left her apartment, Scott raised his shirt to show Gilchrist the handle of a knife he was carrying but said nothing to Gilchrist. Jackson saw a leather case with a knife inside it that had a black handle with a "little grip thing." She did not see the blade. She testified that the knife she saw that night was similar to the replica knife the State used as an exhibit at trial.

Diamond testified that after Scott and Free left Jackson's apartment, he left "[r]ight away" to get Mays. After finding Mays, Diamond said to him, "if they thinking about doing something stupid, don't get involved because it wasn't worth it." Mays said he wasn't "gonna do nothing." The two men then went downstairs and met Free and Scott in the first floor hallway. Diamond saw Mays pull a black-handled knife from his front pocket and say, "Yo, come on, I'm ready to do this now." Diamond told Mays to "chill." Mays then put the knife back in his front pocket.

Gilchrist left Jackson's apartment after Scott and Free had left. He saw the men in the hallway and continued heading in their direction. No one said anything to Gilchrist right away. According to Diamond, as Gilchrist approached the men, Diamond noticed that Scott "had his hand on his back pocket" grabbing for "the end of the knife" in his pocket. Diamond did not see the blade of the knife but he "recognized that knife as being a knife [he] had seen [Scott] with on other occasions." Diamond grabbed Scott's arm, but

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

Scott pushed him away saying either "get off," or "[g]et out, move out the way." Diamond said, "yo, chill," and then "hopped on the elevator" because he "wanted to get help." At some point from inside the elevator, Diamond heard Free say to Gilchrist, "[w]hat's going on between you and my babies' mother?" Gilchrist replied, "[w]hy you can't ask me outside, and why do you have to ask me in front of your boys." When Diamond reached the third floor, he heard Free say to Gilchrist, "[i]f you run, I'll kill you ."

Diamond went to another apartment and said to those inside, "[y]o, come downstairs right now. I think that they did something to [Gilchrist]. Come on, hurry up. Come, we have to go help him." Adrian Tuck, a resident of the AHP and the boyfriend of Cameen Free,[FN3] was in the apartment with other friends and family members when Diamond "busted in the door." According to Tuck, Diamond was stuttering and "talking real fast and real loud." Diamond said, "[c]ome break up the fight between Ramod Gilchrist and Damien Free." Diamond and Tuck ran down the stairs, arriving at around 9:15 p.m. No one was in the hallway, but Diamond saw on the floor a Yankees cap like the one Gilchrist was wearing that night.

FN3. Cameen Free is the sister of Kellisha Free, who lived in that apartment.

*3 Tuck testified that he and Diamond walked outside the front of the building and looked in "[b]oth directions." They remained outside for about five minutes but did not see Gilchrist or any of the defendants. They also looked down in the basement of building three for two or three minutes. After not seeing anyone, they returned to the apartment.

According to Jackson, Gilchrist called her about three or four minutes after he left her apartment and said, "come get me." The phone was then disconnected. Jackson called back "[i]mmediately" and Gilchrist again asked her to come get him, that he was "outside in between the buildings" and that " 'Damien and them stabbed me,' " which he repeated "[a] couple of times." Gilchrist's voice was "dragging a little bit" and he sounded "weak, like he was tired." Jackson kept him on the phone while she ran outside to find him.

Jackson also testified that Gilchrist did not know

Scott "by name" and she did not ask Gilchrist who he meant by "them" when he told her on the phone that "Damien and them stabbed me." She also said that after finding Gilchrist, she stood as close as "right over the top of him" and heard him repeat three to five times that "Damien and them stabbed me."

Diamond testified that after he ran outside, he found Jackson but they did not see Gilchrist. After Jackson told him about the phone call, the two went to find Moore. Moore testified that she was at Juanita Dunn's apartment when Jackson and Diamond "bust in the door[,]" they looked "[l]ike shocked like or scared like" and said, "[h]elp us find [Gilchrist]. Damien had stabbed him." They then went to the parking lot area by building five where they saw police and medical personnel.

Officer Jose Valentin of the Paterson Police Department testified that he was the first officer to arrive on the scene. When he arrived, he saw "a crowd" of five to ten people standing at the scene, and a man "laying on the ground" "bleeding heavily from the T-shirt that he was wearing underneath a green leather Army coat ." The officer tried to "get as much information as [he] could, not knowing whether [the victim] was going to make it or not." The victim was "going in and out of consciousness," his eyes were "kind of squinting," and he was having trouble speaking because "he was in agony and pain." The victim was not able to respond to questions about who stabbed him; he only told the officer that his name was Ramod and that the incident happened in building three.

Valentin continued that he spoke to Jackson at the scene and she "seemed overly excited" and "had alcohol protruding from her breath." He felt that Jackson "appeared to be intoxicated, but she knew what she had been saying." Jackson testified that she was not intoxicated when she spoke to the police that night.

Detective Akram Abdellatif, the lead detective, testified that he spoke to Jackson and Moore separately at the scene. He did not detect the odor of alcohol on Jackson's breath or observe her being "under the influence" of alcohol or other "type of substance."

*4 Officer Frank Belton testified that he was also dispatched to the scene and that other officers and medical personnel were there when he arrived. He

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Da358

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

saw blood on Gilchrist's "jacket area" and that Gilchrist appeared to "be conscious but in a lot of pain." During the ten-minute period after Belton arrived on the scene, he did not hear Gilchrist say anything.

Jackson testified that police and paramedics surrounded Gilchrist. She saw "a lot" of blood around Gilchrist's stomach area. Gilchrist's voice was "kind of low" and Jackson thought he was going to die because she had never seen that much blood. She also testified that Gilchrist was not wearing his gold chain.

Moore testified that she saw Gilchrist "laying down in the bushes[ ]" and went right up to the yellow crime scene tape and stood about four to six feet from him. Jackson, Diamond, and Dunn were with her until an ambulance took Gilchrist away. Moore did not see Gilchrist's injuries until the paramedics cut away his shirt. She described the wounds as "deep, and like you could see some of his meat out of him." Moore heard one of the police officers ask Gilchrist if he knew who stabbed him. She heard Gilchrist respond, "Damien," "Damien did it."

Desiree Griffin, an E.M.S. worker with the Paterson Fire Department who treated Gilchrist in the ambulance, testified as an expert witness in emergency medical services. Griffin noted that Gilchrist had sustained several stab wounds to his right arm, abdomen, and the area right below the breastbone; and that a "trauma dressing" was used because of the heavy bleeding. During treatment, Gilchrist's blood pressure was dropping and his heart rate was increasing, indicating significant blood loss. Griffin also administered oxygen to Gilchrist. She testified that she "would assume that any stab wound to the torso would be life threatening" because "[t]here's vital organs there." She opined that Gilchrist sustained life threatening injuries, especially to his torso.

Griffin also testified that she heard Gilchrist talk to the police during treatment and mentioned "names" but she did not recall what he said or what names he used. She said that although Gilchrist was wearing an oxygen mask that covered his mouth and nose at the time, the mask would not muffle his voice, and that "[y]ou can speak and we can understand with a mask on." During treatment, Griffin reassured Gilchrist and did not mention his chances of survival.

Joanne Thompson, an emergency medical technician and paramedic who also treated Gilchrist in the ambulance, testified as an expert in advanced life support. Thompson noted that Gilchrist was "alert and oriented times three," which means that he was able to talk and was aware of everything that happened. Gilchrist was administered "100 percent oxygen" using a "non re-breather which is a face mask with a reservoir bag." No medication was administered during transport. Thompson also described the various "dressings" and care provided to Gilchrist before he reached the hospital.

*5 Upon arriving at the hospital, Gilchrist was rushed into the trauma room area. According to hospital records, he was responsive, oriented, and conscious at the time of treatment. Belton testified that he saw Gilchrist within ten minutes of his arrival at the hospital, and also saw eight or nine individuals treating him. Belton observed "a couple of stab wounds in [Gilchrist's] stomach area." Gilchrist also "appeared to be in severe pain with his face frowning," and his "eyes opening and closing."

Belton asked Gilchrist his name and who stabbed him. According to Belton, Gilchrist said three times that "Damian Freeman" stabbed him, that there were "three other guys there[,]" and that one of them took his gold chain. Belton had to lean down to less than an inch from Gilchrist in order to hear him because he was speaking in a "low tone." Based on his experience with stomach injuries, Belton believed that Gilchrist's injuries were severe. He testified that an individual, who he believed was a doctor, said that abdomen wound was "life-threatening" and that Gilchrist was ten to fifteen feet away when this individual made the statement. Gilchrist was taken to the operating room, where he died during surgery. The medical examiner's report listed the cause of death as "[m]ultiple stab wounds" and the manner of death as "[h]omicide."

Dr. Chase Blanchard, an associate medical examiner, testified as an expert in forensic, anatomy, and clinical pathology. Dr. Blanchard described that the "paired defects" on Gilchrist's clothing corresponded to the wounds on his right forearm. The doctor opined that two of the paired wounds were caused by "a paired or double blade [knife] with a space in between the blade of a quarter of an inch" and that the various stab wounds to the abdomen were "life-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

threatening" injuries. In total, the doctor noted eight stab wounds but cautioned that some of the "paired wounds" could be two separate wounds or one wound. To a reasonable degree of medical certainty, the doctor concluded that at least two separate knives were used in the attack on Gilchrist, that the double-bladed knife caused the wounds on his right forearm, and that the single-bladed knife caused most of the other wounds.

I.

We first address defendants' contentions relating to juror misconduct. Because of the consequences of our decision on this issue, we detail what occurred.

Before deliberations began, the judge spoke in chambers to juror number fourteen (juror 14) because he noticed that she was leaning forward in the jury box, she appeared to be crying or sobbing and another juror was comforting her. Juror 14 apologized and said that she was "just a little anxious" but was "able to proceed" and felt "well enough to deliberate." Having previously observed juror 14 leave the courtroom numerous times with obvious back pain, and having observed her using a heating pad during the trial, the judge also asked if she was in pain. The juror responded, "No."

*6 The State requested juror 14's removal due to her anxiety. Free's counsel agreed. Scott's and Mays's counsel saw no grounds for removal. The judge did not remove the juror at that point because of his understanding of case law on the issue of replacing a deliberating juror, and because the juror had not expressed a desire not to deliberate.

The next day, after deliberations began, Mays' counsel reported to the judge that during a break, he saw juror 14 leave the jury room and that her "eyes were swollen, her face was red, indicating [that] she was crying." The judge accepted counsel's representations but, without more, decided not to "put any added pressure upon [juror 14]" by asking her how she was doing.

After a weekend break, the judge reported to counsel that juror number two (juror 2), the foreperson, left a message in chambers over the weekend, which he played for counsel. After hearing the message, Free's counsel argued that the entire panel was tainted. The

judge then summarized the message on the record as follows:

But in effect she said I'm nervous; I'm not sure if I should be calling you; it's Saturday morning at 10:30 a.m. and I want to tell you that I need to step down, I don't want to serve on the jury anymore due to some of the actions taken by another juror prior to the commencement of deliberations. So she's saying there's a juror who did something before the deliberations began.

She went on to say we have all invested a lot of time, but I cannot continue to deliberate with people who may have taken these actions. She said she wasn't sure if it was the right thing to call me or not, but she felt she had to tell me. She said it has nothing to do with differences of opinions. She says it's just that I don't feel I should be deliberating with jurors where these actions have been taken.

The judge also advised counsel that he called juror 2, instructed her to report on Monday, and asked her which juror she referred to in her message. The juror 2 said she was referring to juror 14.

On Monday, juror 2 reported under oath that that juror 14 said that she went on the internet and looked up defendants' and the victim's names and what defendants' sentence would be if they were convicted. Juror 2 also reported that juror 14 said before the start of deliberations, that "I can tell you right now what ... my verdict is" and she held up a piece of paper with her verdict written on it. Juror 2 also saw juror 14 reading a newspaper in the jury room and then she hid it. Juror 2 did not hear juror 14 tell anyone what she had learned from the internet or the newspaper. Juror 2 stated that she could still be "a fair and impartial juror" and was willing to continue deliberating.

The judge was most concerned that juror 14 had violated her oath and his instructions by looking up information on the internet. He calculated that the jury had been deliberating for about two-and-a-half hours at that point. Free's counsel continued to argue that the entire panel was tainted.

*7 Under oath, juror 14 denied looking up information on the internet. She admitted reading a headline in the newspaper about the case, but not the article

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

itself. She also admitted to holding up a piece of pa-
per with "something written on it" but claimed that
she was "told to" do that "specific thing."

The State again requested juror 14's removal. Scott's
counsel found the situation problematic but did not
request a mistrial. After a lengthy discussion with
counsel about how to proceed, the judge decided to
voir dire the entire jury panel. All counsel agreed to a
"very limited" voir dire "just to make sure nothing
occurred that would prevent [the panel] from going
on and being fair and impartial[.]"

The judge then questioned each juror under oath
about whether "anything occur[ed] which in [his or
her] opinion has infected or affected [his or her]
thinking so that [he or she] could not be able to reach
a fair and impartial verdict in this case based on the
facts and law[,]" and whether he or she could con-
tinue deliberating. All jurors said that they could con-
tinue to deliberate and be impartial.

When specifically asked if a juror said something
about researching the internet, jurors number four
(juror 4), five (juror 5), eight (juror 8) and twelve
(juror 12) confirmed that juror 14 said either that she
knew you could obtain, or that she had obtained in-
formation about the case on the internet. Jurors 4, 5,
and 12 did not hear juror 14 say what she learned
from her internet search; however, juror 8 heard juror
14 say that "you can get 30 years to life." Juror num-
ber six (juror 6) heard someone, but he did not re-
member who, say that you could go on a website to
read about the case; however, this juror "followed
[the court's] instructions" and did not do so. Other
jurors said that they did not hear anything.

After this initial questioning, the judge found that, of
the ten other deliberating jurors, none had expressed
a problem with continuing to deliberate, that they did
not feel well, or that anything occurred that would
prevent them from being fair and impartial. The
judge saw no need to further question juror 8, who
heard about the possible thirty-year sentence. Instead,
he decided to give a curative instruction.

The State continued to press for juror 14's removal.
Scott's counsel took no specific position but argued
that if the judge removed juror 14, he should remove
juror 2 as well. Free's counsel agreed with juror 14's
removal but again requested a mistrial, claiming the

entire jury was tainted. Mays' counsel requested a
mistrial.

The judge found juror 2 credible and determined that
juror 14 violated his instructions. The judge would
have permitted juror 14 to continue if she had admit-
ted to what she had done; however, he decided to
remove her and replace her with an alternate because
she disregarded and violated his instructions, because
she tried to pass the outside information she obtained
to other jurors, and because she lied under oath.
When combined with her emotional reactions during
and after the trial, and based on the totality of the
circumstances, the judge concluded that juror 14
could no longer be fair and impartial. He also denied
a mistrial, concluding that the rest of the panel
showed no evidence of taint.

*8 The judge then instructed the remaining jurors
about their obligation to render a fair and impartial
verdict. He also advised them of juror 14's removal,
added one of the alternate jurors to the deliberating
panel, and instructed the newly configured jury panel
to begin their deliberations anew. The reconstituted
jury then rendered their verdict several days later.

Defendants contend that the judge erred in substitut-
ing juror 14 with an alternate juror after deliberations
began, and should have declared a mistrial. Sepa-
rately, Free contends that the integrity of the delibera-
tive process was compromised; Scott contends that he
was deprived of his right to an impartial jury; and
Mays contends that it is improper to remove a delib-
erating juror when the removal is in any way related
to the deliberative process.

The State counters that the judge took appropriate
remedial measures to ensure defendants' right to a
fair and impartial verdict; that it was within the
judge's discretion to deny a mistrial; that the judge
voir dired the entire panel and avoided any questions
that would reveal the status of the deliberations,
which had not yet proceeded too far; that the judge
removed juror 14 after the voir dire revealed that she
had lied under oath; and that there was no juror taint
as evidenced by the fact that the jury acquitted defen-
dants of the most serious charges of murder, robbery
and witness tampering.

The Sixth Amendment of the United States Constitu-
tion and Article I, paragraph 10 of the New Jersey

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

Constitution "ensure that 'everyone charged with [a] crime has an absolute constitutional right to a fair trial in an atmosphere of judicial calm, before an impartial judge and an unprejudiced jury.' " *State v. Tyler*, 176 *N.J.* 171, 181, 821 *A.2d* 1139 (2003) (quoting *State v. Marchand*, 31 *N.J.* 223, 232, 156 *A.2d* 245 (1959)). "Trial judges in their gatekeeping role have a duty 'to take all appropriate measures to ensure the fair and proper administration of a criminal trial,' including 'preserv[ing] the jury's impartiality throughout the trial process.' " *Ibid.* (quoting *State v. Williams*, 93 *N.J.* 39, 62, 459 *A.2d* 641 (1983)). "If juror bias is discovered or the jury's deliberations have been tainted by the introduction of extraneous material, the correct remedy depends on the stage of the proceedings that has been reached." *State v. Adams*, 320 *N.J.Super.* 360, 366, 727 *A.2d* 468 (App.Div.), *certif. denied*, 161 *N.J.* 333, 736 *A.2d* 526 (1999).

"Substitution of an alternate juror during deliberation does not in and of itself offend a defendant's constitutional guarantee of a trial by jury." *State v. Williams*, 171 *N.J.* 151, 162, 793 *A.2d* 594 (2002) (citing *State v. Miller*, 76 *N.J.* 392, 406-07, 388 *A.2d* 218 (1978)). However, removal may be used only in limited circumstances. *State v. Hightower*, 146 *N.J.* 239, 253, 680 *A.2d* 649 (1996). " 'Because juror substitution poses a clear potential for prejudicing the integrity of the jury's deliberative process, it should be invoked only as a last resort to avoid the deplorable waste of time, effort, money, and judicial resources inherent in a mistrial.' " *Williams, supra*, 171 *N.J.* at 162, 793 *A.2d* 594 (quoting *Hightower, supra*, 146 *N.J.* at 254, 680 *A.2d* 649).

*9 "Substitution of an alternate for a deliberating juror involves two distinct inquir[i]es." *State v. Banks*, 395 *N.J.Super.* 205, 215, 928 *A.2d* 842 (App.Div.), *certif. denied*, 192 *N.J.* 598, 934 *A.2d* 639 (2007). "The first question is whether there are grounds for removal of the deliberating juror. [ ] The second is whether substitution of an alternate or grant of a mistrial is required." *Ibid.* (internal citations omitted). Once, as here, the case has been submitted to the jury for deliberation, "a deliberating juror may be replaced with an alternate juror only in specifically defined circumstances." *State v. Jenkins*, 182 *N.J.* 112, 123-24, 861 *A.2d* 827 (2004). "Rule 1:8-2(d)(1) and case law delineate the circumstances in which juror substitution will not undermine the sanc-

tity of the jury's deliberative process." *Id.* at 124, 861 *A.2d* 827. Specifically, *Rule* 1:8-2(d)(1) provides, in relevant part:

> If the alternate jurors are not discharged and if at any time after submission of the case to the jury, *a juror dies or is discharged by the court because of illness or other inability to continue*, the court may direct the clerk to draw the name of an alternate juror to take the place of the juror who is deceased or discharged. When such a substitution of an alternate juror is made, the court shall instruct the jury to recommence deliberations and shall give the jury such other supplemental instructions as may be appropriate.

[ (Emphasis added.]

Because juror 14 did not die and was not discharged because of illness, we focus on whether there existed "other inability [for her] to continue." The inability-to-continue standard "must be narrowly construed and sparingly applied." *Hightower, supra*, 146 *N.J.* at 254, 680 *A.2d* 649 (citing *State v. Valenzuela*, 136 *N.J.* 458, 468, 643 *A.2d* 582 (1994); *State v. Trent*, 157 *N.J.Super.* 231, 240, 384 *A.2d* 888 (App.Div.1978), *rev'd on other grounds*, 79 *N.J.* 251, 398 *A.2d* 1271 (1979)). The phrase "inability to continue" has been "restrictively interpreted ... to protect a defendant's right to a fair jury trial, forbidding juror substitution when a deliberating juror's removal is in any way related to the deliberative process." *Jenkins, supra*, 182 *N.J.* at 124, 861 *A.2d* 827. See also *Williams, supra*, 171 *N.J.* at 163, 793 *A.2d* 594.

"A deliberating juror may not be discharged and replaced with an alternate unless the record 'adequately establish[es] that the juror suffers from an inability to function that is personal and unrelated to the juror's interaction with the other jury members.' " *Jenkins, supra*, 182 *N.J.* at 124-25, 861 *A.2d* 827 (quoting *Hightower, supra*, 146 *N.J.* at 254, 680 *A.2d* 649). A deliberating juror may not be removed under the inability-to-continue standard merely because he or she has a different position than other jurors or if he or she has a problem that is both personal and related to interactions with the rest of the panel; "the reason must be exclusively personal." *Hightower, supra*, 146 *N.J.* at 255, 680 *A.2d* 649. "Conversely, the standard may be invoked to remove a juror when the record reveals that the juror's emotional condition renders

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

him or her unable to render a fair verdict." *Ibid.* (citing *Miller, supra,* 76 *N .J.* at 406-07, 388 A.2d 218; *Trent, supra,* 157 *N.J.Super.* at 240, 384 A.2d 888).

**\*10** In deciding to replace juror 14, the judge relied on *State v. Holloway,* 288 *N.J.Super.* 390, 672 A.2d 734 (App.Div.1996), *overruled in part by, Jenkins, supra,* 182 *N.J.* at 133 n. 2, 861 A.2d 827. There, we found that the trial judge properly removed a juror after the jury announced its verdict because the removed juror had a "conversation with a relative [that] patently influenced [her]" and who, as such, "disregarded the court's unambiguous admonitions [not to talk about the case with others]." *Id. at 404, 672 A.2d 734.* However, the Jenkins Court disapproved "of that part of the holding in [*Holloway, supra,*] that allowed a substitute juror to join a jury that had announced its verdict to convict." *Jenkins, supra,* 182 *N.J.* at 133, 861 A.2d 827 n .2. Instead, the Court concluded that "judicial economy had to bow to defendant's fair trial rights and a mistrial should have been declared." *Id. at 133, 861 A.2d 827.*

The case here is analogous to *Hightower, supra,* 146 *N.J.* at 244-52, 680 A.2d 649. There, the Court reversed a death penalty verdict, holding that the trial judge should have declared a mistrial rather than substitute a juror who had brought in extraneous information that the victim had three children. The Court held that "the trial court improperly expanded the scope of *Rule* 1:8-2(d)'s inability-to-continue standard when it removed Juror Number 7 from the deliberating jury." *Id. at 255, 680 A.2d 649.* The Court explained:

> Although the juror did not follow the trial court's instructions to report to the court any information he overheard outside of the courtroom, and violated his oath by informing other jurors that the victim had children, that misconduct does not fall within the scope of *Rule* 1:8-2(d)'s inability-to-continue standard. That standard requires exclusively personal circumstances to justify removal of a deliberating juror. Juror Number 7 did not satisfy that standard because his misconduct was related to the case and to his interactions with the other jurors.

> [*Ibid.*]

Similarly, although juror 14 denied conducting out-

side research, her misconduct in using the internet to research and obtain extraneous information, as the judge found had occurred, was related to the case and to her interactions with her fellow jurors, with whom she shared that information. Thus, juror 14's conduct did not fall within the inability-to-continue standard, and she should not have been singularly removed from the panel for her behavior.

Also, there is no evidence that juror 14 was too ill, anxious, or otherwise unable to continue for any reason exclusively personal to her. Although she suffered back pain and anxiety during the trial, that was not the reason for her removal. Nor did she ever indicate an inability or unwillingness to continue. The problem was not personal, but pervasive, i.e., juror 14's misconduct tainted the jury as a whole. Accordingly, a mistrial should have been declared. Failure to do so constitutes reversible error. The error requires a new trial.

II.

**\*11** Although we need not do so, we address the other substantive issues raised on appeal so as to provide guidance on the retrial.

*Admission of Gilchrist's Statements As A Dying Declaration and Excited Utterance*

Defendants contend that the judge improperly admitted as a dying declaration Gilchrist's statement to Belton in the hospital that "Damien Freeman" and three other males had stabbed him. They argue that there was no evidence that Gilchrist believed he was dying. Separately, Free contends that dying declarations are no longer admissible under *Crawford v. Washington,* 541 *U.S.* 36, 124 *S.Ct.* 1354, 158 *L. Ed.2d* 177 (2004); and Mays contends that the police induced the statement and it was not voluntarily made.

The judge admitted Gilchrist's statement to Belton as a dying declaration under *N.J.R.E.* 804(b)(2), finding that although no one told Gilchrist that he was going to die, and although Gilchrist did not acknowledge a belief that he was about to die, under the totality of circumstances Gilchrist was aware at the hospital of his imminent or impending death.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

We review a trial court's evidentiary determinations under an abuse of discretion standard. *State v. Buda,* 195 N.J. 278, 294, 949 A.2d 761 (2008) (citing *Hisenaj v. Kuehner,* 194 N.J. 6, 12, 942 A.2d 769 (2008)). An abuse of discretion only arises on demonstration of "manifest error or injustice." *Hisenaj, supra,* 195 N.J. at 20, 947 A.2d 1217 (citations omitted). An abuse of discretion occurs when the trial judge's "decision [was] made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." *United States v. Scurry,* 193 N.J. 492, 504, 940 A.2d 1164 (2008) (citations omitted). Applying these standards, we continue our analysis.

"In a criminal proceeding, a statement made by a victim unavailable as a witness is admissible if it was made voluntarily and in good faith and while the declarant believed in the imminence of declarant's impending death." *N.J.R.E.* 804(b)(2). *See also State v. Graham,* 59 N.J. 366, 370, 283 A.2d 321 (1971). In evaluating the admissibility of a dying declaration, the trial court should consider " 'all the attendant circumstances ... including the weapon which wounded [the declarant], the nature and extent of the [the declarant's] injuries, [the declarant's] physical condition, [the declarant's] conduct, and what was said to and by [the declarant].' " *State v. Hegel,* 113 N.J.Super. 193, 201, 273 A.2d 383 (App.Div.), *certif. denied,* 58 N.J. 596, 279 A.2d 681 (1971) (citation omitted). To ensure reliability, "the statement must have been made while the declarant believed his death was imminent." Biunno, *Current N.J. Rules of Evidence,* comment 3 on *N.J.R.E.* 804(b)(2) (2008). Also, although "[a] statement is clearly inadmissible if it was the product of undue pressure" and "voluntariness will depend upon the pertinent facts of the case ... the mere fact that a statement is made in response to police interrogation will not render the statement inadmissible." *Ibid.*

\*12 Further, "[i]n *Crawford* ... the United State Supreme Court ... [rendered] unconstitutional the admission of an out-of-court 'testimonial' statement permitted by state hearsay rules, *unless* the person who made the statement is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine that person." *State v. J.A.,* 195 N.J. 324, 328, 949 A.2d 790 (2008) (citing *Crawford, supra,* 541 U.S. at 50-52, 124 S.Ct. at 1363-64, 158 L. Ed.2d at 192-93). In a footnote, the Supreme Court

recognized dying declarations as an exception and that "[t]he existence of that exception as a general rule of criminal hearsay law cannot be disputed." *Crawford, supra,* 541 U.S. at 56, 124 S.Ct. at 1367, 158 L. Ed.2d at 196. Indeed, in *State v. Townsend,* 186 N.J. 473, 490, 897 A.2d 316 (2006), decided after *Crawford,* our Supreme Court concluded that the trial court properly admitted as a dying declaration the victim's testimony that purported to exonerate the defendant. Further, the United States Supreme Court, albeit in dicta, observed in *Giles v. California,* --- U.S. ----, 128 S.Ct. 2678, 2683, 171 L. Ed.2d 488, 495 (2008) that the dying declaration hearsay exception does not violate the Confrontation Clause or the *Crawford* precepts.

Based on our careful review of the record, we are satisfied that the judge properly admitted Gilchrist's statement to Belton as a dying declaration, and that the statement was voluntary and not the result of undue pressure. All of the attendant circumstances indicated that Gilchrist was aware of the imminence of his impending death when he spoke to Belton. Notwithstanding that Gilchrist did not verbally state his awareness, and that no medical personnel specifically told him that he was about to die, the totality of circumstances and nature and extent of Gilchrist's injuries support the judge's conclusion that Gilchrist believed his death was imminent when he told Belton who stabbed him. Under our limited scope of review, we conclude that the judge did not abuse his discretion in admitting Gilchrist's statement to Belton as a dying declaration.

Defendants also contend that the judge improperly admitted as an excited utterance Gilchrist's statement to Jackson on the phone that "Damien and them stabbed me." Separately, Scott and Free argue that Gilchrist's weak voice failed to satisfy the requisite stress of excitement under the excited utterance rule; Free and Mays argue that the circumstances surrounding the statement demonstrate their unreliability because it was not established whether Gilchrist had the opportunity to deliberate; Free argues that the statement implicating him should be viewed with skepticism because of the previous conflict between him and Gilchrist; and Mays argues that the judge failed to account for Jackson's inebriated state at the time of the phone call, and that the statement was an unreliable identification without the opportunity for cross-examination.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Da364

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

*13 The judge admitted Gilchrist's statement to Jackson as an excited utterance under _N.J.R.E._ 802(c)(2). He found credible Jackson's recollection of the phone call. He also found Gilchrist's statement to Jackson highly trustworthy because Gilchrist was "crying out for help," and "not reflecting upon what he was saying in terms of who stabbed him." The judge emphasized that the phone call came within moments of a "highly alarming, frightening, terrifying ordeal."

An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate." _N.J.R.E._ 803(c)(2); _see also Buda, supra,_ 195 _N.J._ at 293, 949 A.2d 761. Such hearsay statements are admissible because the excitement created by the startling event "minimize[s] the possibility that the utterance will be influenced by self interest and therefore rendered unreliable." _State v. Long,_ 173 _N.J._ 138, 158, 801 A.2d 221 (2002). _See also State v. Cotto,_ 182 _N.J._ 316, 328, 865 A.2d 660 (2005). "An essential inquiry as to the admissibility of a statement as an excited utterance is whether the declarant had the opportunity to deliberate, reflect or misrepresent before making the statement or whether it was made spontaneously and in a state of excitement so as to negate fabrication." _State v. Clark,_ 347 _N.J.Super._ 497, 506, 790 A.2d 945 (App.Div.2002). _See also State v. Branch,_ 182 _N.J._ 338, 365, 865 A.2d 673 (2005).

We are satisfied that the record amply supports the judge's discretionary ruling that Gilchrist's statement to Jackson was an excited utterance. Gilchrist called Jackson within minutes of leaving her apartment and said that "Damian and them" stabbed him. Thus, the phone call was very close in time, if not immediately after, the stabbing, indicating little or no time for Gilchrist to deliberate, reflect, misrepresent or fabricate his statement.

Further, we find no merit in Scott's contention that Gilchrist's "weak" or "dragging" voice failed to satisfy the requisite 'stress of excitement' under _N.J.R.E._ 803(c)(2). To the contrary, the weakness of Gilchrist's voice supports the conclusion that he made the statement to Jackson immediately after the startling or shocking event of being stabbed several times by Damien and others.

## Admission of Other Crimes Evidence

Scott contends for the first time on appeal that the judge improperly admitted other-crimes or wrongs evidence that he possessed a double-bladed knife, like the one used in the attack, prior to Gilchrist's stabbing. Scott posits that the State failed to satisfy three of the four _Cofield_ [FN4] criteria. We review Scott's contention under the plain error standard of review. _See R._ 1:7-2 and _R._ 2:10-2; _see also State v. Macon,_ 57 _N.J._ 325, 336, 273 A.2d 1 (1971). Under that standard, "we must disregard any error unless it is 'clearly capable of producing an unjust result.' Reversal of defendant's conviction is required only if there was error 'sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached.' " _State v. Atwater,_ 400 _N.J.Super._ 319, 336, 947 A.2d 175 (App.Div.2008) (quoting _State v. Daniels,_ 182 _N.J._ 80, 95, 861 A.2d 808, (2004)); _Macon, supra,_ 57 _N.J._ at 333, 273 A.2d 1; _R._ 2:10-2.

> FN4. _State v. Cofield,_ 127 _N.J._ 328, 605 A.2d 230 (1992).

*14 Diamond testified about a picture he had drawn for the police of a double-bladed knife that he claimed Scott possessed. He described an image on the knife's handle as "something on a card, like a Dungeons and Dragons [,]" explaining that he used to play the Dungeons and Dragons game and that the type of dragon from the game, a "Griffendor," was on the handle of Scott's knife. He also said that the knife had "[t]wo blades going straight up, sharp. Dragon emblem, handle with circles, twisted."

Moore testified that she had drawn a picture for the police of "[a] crazy looking knife" with "two tips" that she had seen on Scott and Free prior to Gilchrist's stabbing. Moore drew only a single blade with two tips but not the handle. She also testified that Free carried different kinds of knives, one of which had a black handle and an eight-inch blade.

Detective Michael Ventrella, another investigator, testified that about two months before the trial he decided to research the internet for "a double blade or a fantasy type like dragon-style knife." He printed out seven color pictures of his search results to show to Diamond. The detective said that after looking at the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

pictures for "about a minute," Diamond "stopped on one picture and ... said that's the knife." Diamond was "pretty upset" but he showed no doubt about the knife he identified. Ventrella purchased that knife from Ebay.

Diamond identified the knife that Ventrella had purchased as the one he saw Scott possess. Although the handle of Scott's knife was a little different, the blades were the same. Diamond also testified that he had seen Scott with a double-bladed knife on at least three occasions prior to Gilchrist's stabbing, and that Scott had teased him with that knife.

Moore testified that she had seen Free carrying a double-bladed knife, similar to the replica, on several occasions prior to Gilchrist's stabbing.[FN5]

> FN5. At trial, Dr. Blanchard examined the replica knife and opined that it was, "to a reasonable degree of medical certainty, consistent with the weapon that caused the paired wounds on [Gilchrist's] right forearm."

In finding the replica knife admissible, the judge concluded that there was no suggestivity, that Diamond looked at the photograph and identified the knife, and that Diamond reaffirmed his identification of the style of blade. The judge also ruled that Moore could be asked to identify the replica knife at trial and could be questioned about knives she had seen on Free in the past.

Defense counsel did not specifically object pursuant to *N.J.R.E.* 404(b) to testimony that Scott had been previously seen with a knife. As such, the judge conducted no *Cofield* hearing, he did not apply the *N.J.R.E.* 403 balancing test, and he did not make any findings on those grounds. Nonetheless, the judge gave the jury the following limiting instruction:

> There was testimony or evidence in this case that on dates other than the date in question one or more of the defendants carried a knife or was seen carrying a knife. This was admitted so that you could decide if the defendant possessed a knife on October 4th, 2003, with the specific purpose to use it unlawfully as a weapon against Ramod Gilchrist and for no other purpose.

*15 Normally such evidence is not permitted under our rules of evidence. Our rules specifically exclude evidence that a defendant may have committed other wrongs or acts when it is offered only to show that he has a disposition or tendency to do wrong and therefore must be guilty of the charged offense.

Before you can give any weight to this evidence, meaning that the defendant may have carried a knife on prior occasions, you must be satisfied that the defendant committed the other wrong, carrying the knife. In your determination if you are not so satisfied, you may not consider it for any purpose.

However, our rules do permit evidence of other wrongs or acts when the evidence is used for a certain specific, narrow purpose. And in this case, as I said, this was admitted so that you could decide if the defendant possessed the knife on October 4th, 2003, with the specific purpose to use it unlawfully as a weapon against Ramod Gilchrist and, again, for no other purpose.

Whether this evidence does, in fact, demonstrate the point for which it was offered is for you to decide. You may decide that the evidence does not demonstrate that purpose and is not helpful to you at all. In that case you must disregard the evidence.

On the other hand, you may decide that the evidence does demonstrate the lack of a specific purpose to carry a knife on 10/4/03 with the purpose to use it unlawfully as a weapon against Ramod Gilchrist and use it for that specific purpose.

However, you may not use this evidence to decide that the particular defendant has a tendency to commit crimes or that he is a bad person; that is, you may not decide that just because the defendant has carried a knife in the past, that he must be guilty of the present crime or crimes. I have admitted this evidence only to help you decide the specific question of whether the defendant carried the knife on October 4th, 2003, with the specific purpose to use it unlawfully against Ramod Gilchrist. You may not consider it for any other purpose and may not find a defendant guilty now simply because the State or defense has offered evidence that he carried a knife in the past.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

After the judge read this instruction, Free's counsel objected, arguing that there had to be a showing that Free and Scott had carried the knife previously for an unlawful purpose and not simply just to carry it. The judge responded that he modified the instruction because "more came from the defense side, brought out from witnesses that on prior occasions particular defendants were seen with knives." The judge had also modified the instruction because of Scott's counsel's closing statements that the State had to prove that defendants possessed a knife not just for an unlawful purpose, but for the specific and unlawful purpose to use it as a weapon against Gilchrist; and counsel's closing statement that the jury could not conclude that Scott carried the knife on the night of the incident with the specific purpose to use it as a weapon against Gilchrist, but that he instead carried it "for his own protection, almost as a self-defense item in case he was ever attacked in this dangerous neighborhood he's living in." Counsel also stated in summation that "the State does not have enough information for you to draw the inference that because Mr. Scott may have had a knife on his person at some point in time that evening that that meant that he was one of the people that stabbed Ramod Gilchrist[.]"

*16 The judge invited Free's counsel to submit different language so that he could recharge the jury because he was "trying to prevent, the prejudice that would flow from this information" and "[h]ad there been an objection, [he] could have strongly considered sustaining the objection and saying what difference does it make if someone carried a knife on a prior occasion other than to prejudice the jury." Finally, the judge stated:

[N]o one said I'd like to get this knife business in under [N.J.R.E.] 404(b), then I make a ruling and give the charge. It just went in.

And now looking back on it, I said the only theory under which it could have gone in-actually I didn't say that. I said I have to remove the prejudice. Then when [Scott's counsel] argued it, what he was in effect convincing me was if-and let me digress.

It's defense [N.J.R.E.] 404(b) material. In other words, I don't think you were seeking to put in carrying a knife on prior occasion to show intent and

what have you. If that were the case, I wouldn't allow it in, because one of the prongs under Cofield/Marrero[FN6] is that the prejudicial effect cannot outweigh the probative value.

FN6. State v. Marrero, 148 N.J. 469, 691 A.2d 293 (1997).

Here it was the defense seeking [N.J.R.E.] 404(b) material saying I'd like to put in the fact that my client had a habit or custom of engaging in a bad act, i.e., carrying a knife to show that he didn't arm himself on October 4th for the first time with a knife with the specific intent to use it as a weapon against Ramod Gilchrist; he always carries a knife, therefore he's not guilty-he may be guilty of unlawful possession of a weapon, but not possession of a weapon for an unlawful purpose, ... he always carried it; more for a lawful purpose, such as self-protection. So we didn't develop it during the trial. But it hit me that if we had developed it that way, that charge would have went in, should go in anyway.

The record reveals no further discussion of this issue, and the judge did not recharge the jury with any alternate language. Instead, the judge instructed the jury on the elements of unlawful possession of a weapon and possession of a weapon for an unlawful purpose, repeating that the State must prove whether the weapon was possessed for use against Gilchrist. Significantly, Scott's counsel did not object to the charge and did not comment on Free's objection to the limiting instruction or the judge's explanation thereof.

On appeal, however, Scott now specifically objects to Diamond's and Moore's testimony about seeing Scott with a double-bladed knife prior to Gilchrist's stabbing. Interestingly, Scott does not include in his list of objectionable testimony Jackson's testimony that she saw him lift his shirt to reveal to Gilchrist the handle of a knife as Scott was leaving her apartment just before the stabbing occurred, or her testimony that she had seen Scott with that same knife on prior occasions.

The State counters that the evidence was properly admitted as res gestae because it was part of the "total criminal conduct that occurred during the incident." It points to the medical examiner's testimony

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

about wounds caused by a distinct doublebladed weapon. Accordingly, the State concludes that testimony of Scott's previous and repeated possession of the double-bladed knife, including that he possessed a knife just moments before the attack, established a continuous course of conduct that linked him to the murder weapon and the fatal stabbing, and served as a foundation for admission of the replica knife. The State maintains that the judge properly admitted the evidence without applying the four-prong *Cofield* test. Alternatively, it argues that the evidence was properly admitted under *N.J.R.E.* 404(b) and the judge properly gave a lengthy and detailed limiting instruction.

*17 *N.J.R.E.* 404(b) "prohibits the introduction of evidence of past acts of misconduct as a basis for an inference that defendant committed the acts for which he or she is then standing trial." *State v. Martini,* 131 *N.J.* 176, 240, 619 A.2d 1208 (1993), *cert. denied,* 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L. Ed.*2d 137 (1995). However, the prohibition under *N.J.R.E.* 404(b) does not apply to acts or misconduct that are components of the crime that is the subject of the trial. *Long, supra,* 173 *N.J.* at 161, 801 A.2d 221; *Martini, supra,* 131 *N.J.* at 240-42, 619 A.2d 1208. Specifically,

> where the alleged bad act is part of the full picture of the crime charged it has sometimes been considered res gestae evidence to which *N.J.R.E.* 404(b) is not applicable.

> "Other crimes" evidence which relates directly to the crimes for which the defendant is on trial is admissible if it "serves to paint a complete picture of the relevant criminal transaction," " 'furnishes part of the context of the crime,' " or " 'is necessary to a full presentation of the case.' "

[ *State v. Burden,* 393 *N.J.Super.* 159, 169, 922 A.2d 844 (App.Div.2007) (quoting *State v. Torres,* 313 *N.J.Super.* 129, 160-61, 713 A.2d 1 (App.Div.), *certif. denied,* 156 *N.J.* 425, 719 A.2d 1023 (1998)), *certif. denied,* 196 *N.J.* 344 (2008) (other internal citations omitted).]

*See also State v. Pierro,* 355 *N.J.Super.* 109, 118, 809 A.2d 804 (App.Div.2002), *certif. denied,* 175 *N.J.* 434, 815 A.2d 479 (2003); *State v. Cherry,* 289 *N.J.Super.* 503, 522, 674 A.2d 589 (App.Div.1995).

Determination as to the admissibility of other crimes, wrongs or acts evidence is ordinarily left to the discretion of the trial court and, as such, is reviewed under an abuse of discretion standard. *Torres, supra,* 313 *N.J.Super.* at 160, 713 A.2d 1. However, when the trial court fails to analyze the admissibility of other crime evidence, where such analysis is called for, under the test set forth by the Court, no discretion is afforded and the trial court's determination is subject to *de novo* review. *State v. Reddish,* 181 *N.J.* 553, 609, 859 A.2d 1173 (2004).

"[R]es gestae evidence is subject to Rule 403 balancing." *State v. Jenkins,* 356 *N.J.Super.* 413, 429, 812 A.2d 1143 (App.Div.2003), *aff'd and remanded,* 178 *N.J.* 347, 840 A.2d 242 (2004). Because Scott did not raise the issue or object to the knife testimony pursuant to *N.J.R.E.* 404(b), the trial judge did not make any findings as to the balancing test or a finding that the testimony was admissible as res gestae evidence. "The burden is on the party urging exclusion of the evidence to convince the court that the *N.J.R.E.* 403 considerations control." *Ibid.*

Scott also does not address the res gestae issue here. Rather, he argues that three of the four *Cofield* criteria were not satisfied. However, we do not conclude that the judge would have been obligated to exclude the testimony to which Scott now objects as unduly prejudicial. First, as previously noted, Scott did not object to the knife testimony. Therefore, the information that Scott possessed such a double-bladed knife, similar to the replica knife, was already before the jury.

*18 Second, Scott's counsel highlighted on cross-examination much of the testimony Scott now challenges and, therefore invited the error. *Jenkins, supra,* 178 *N.J.* at 358, 840 A.2d 242 (invited error is "error that defense counsel has 'induced' "). For example, on cross-examination by Scott's counsel, Diamond again testified that he knew what Scott's knife looked like because he saw it on Scott at least three times prior to Gilchrist's stabbing, and that Scott had teased him with the knife. Similarly, on cross-examination by Scott's counsel, Moore testified that she saw Scott with the double-bladed knife on other occasions prior to Gilchrist's stabbing. Over Free's objection, but on cross-examination by Scott's counsel, Moore also testified that Free carried "different kinds of knives"

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

and that she had seen Free carrying the knife described as Scott's "a couple of times."

Indeed, Scott's counsel acknowledged that it had been "well-developed" in the case that the AHP was a "high crime area, high drug area" and that "it's very customary for individuals to carry knives." As previously noted, Scott's counsel argued in summation that Scott carried a knife all the time for protection, and that there was no evidence that he carried the knife that night in order to stab Gilchrist. In that context, the fact that the jury heard that Scott had carried a knife on several occasions prior to the stabbing cannot be considered unduly prejudicial.

Further, the jury learned about the knife from other witnesses and the trial judge gave a specific and appropriate limiting instruction on the use of that testimony. There is no indication that the jury failed to follow that instruction.

Traditionally, res gestae evidence has been deemed admissible if it "serves to paint a complete picture of the relevant criminal transaction," describes part of the context of the case, or is otherwise needed to fully present the case. _Martini, supra,_ 131 _N.J._ at 242, 619 _A.2d_ 1208. _See also State v. Cherry,_ 289 _N.J.Super._ 503, 522, 674 A.2d 589 (App.Div.1995) ("Evidence of events that take place during the same time frame as the crime charged in the indictment will not be excluded if the evidence establishes the context of the criminal event, explains the nature of, or presents a full picture of the crime to the jury."); _State v. Byard,_ 328 _N.J.Super._ 106, 144, 744 A.2d 1213 (App.Div.) (holding that evidence that paints a complete picture of events is admissible res gestae evidence, rather than _N.J.R.E._ 404(b) evidence), _certif. denied,_ 165 _N.J._ 490, 758 A.2d 649 (2000).

We recognize that some members of our Supreme Court view res gestae as "the moldy cardboard box in the basement, whose contents no longer have any utility but which we nevertheless fear discarding ." _State v. Kemp,_ 195 _N.J._ 136, 163, 948 A.2d 636 (2008) (Albin, J. concurring). However, unless and until a majority of the Court repudiates res gestae, it remains a viable doctrine under the present law of New Jersey.

**\*19** In any event, with or without the res gestae label, we find that testimony about the double-bladed knife

was relevant pursuant to _N .J.R.E._ 401, as it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." _See State v. Deatore,_ 70 _N.J._ 100, 116, 358 A.2d 163 (1976) (noting that our courts' test of relevance is "broad and favors admissibility"). Nor do we find that this evidence was unduly prejudicial under _N.J.R.E._ 403.

*The Flight Charge*

The next issue concerns the jury charge on flight. Free and Scott had turned themselves in to the Greensville County Sheriff's Department in South Carolina three days after the murder. They contend that the judge improperly charged the jury on flight because there was no evidence that their departure to South Carolina reasonably justified an inference that they did so with a consciousness of guilt and to avoid an accusation of that guilt. They argue that there was no evidence that they knew that the police were looking for them and that, upon learning police were searching for them, they turned themselves in thereby effectively extinguishing a viable flight charge. Scott also contends that the prosecutor's statements in his summation about the consciousness of guilt exacerbated the error.

Significantly, in his opening statement, Scott's counsel stated the following regarding flight:

As [the prosecutor] mentioned already, Mr. Scott surrendered sometime after the incident in South Carolina and not here in New Jersey. I am sure that [the prosecutor] will argue to you that that was evidence that Mr. Scott was involved in this matter.

Well, again, ladies and gentlemen, that's an interpretation. I think the evidence is going to show and I think you will hear *Mr. Scott stayed around this area for sometime after the incident happened, and it was only after he learned he was actually being charged with murder-falsely, I submit to you, charged with murder-that he left.* At some point in time I will ask you, when you deliberate regarding that specific issue, to look within yourselves and ask yourselves what exactly would I do in a situation like that?

You see, ladies and gentlemen, I have a lot of trust in our system of justice and confidence that it

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

works most of the time[ ]. Obviously, not all of the time[ ], because no system is perfect. So far, luckily, I've only dealt with the criminal justice system standing in this position here and not sitting there. I wonder how strong a trust or confidence I would have if I found out that I was falsely being charged with a crime, especially a crime of such magnitude, and whether or not it's understandable that an initial reaction might be made to run away from it. Don't we all many times run away from our problems? Perhaps, and again this will be something for you to consider the perspective of some individuals as to the criminal justice system is because of experiences and stories they have heard from others.

*20 [ (Emphasis added).]

In his summation, the prosecutor stated the following, to which Free and Scott now object:

You're confronted with two different scenarios in terms of what happens after October the 4th of 2003. And I submit to you, ladies and gentlemen, they are two directly opposed scenarios, one which I'm going to term the smarter scenario, and one which I'm going to term the flag-in-the-air scenario.

In the law, you're going to be charged on this concept of flight ... if you find that the defendant or defendants fearing that an accusation or arrest would be made against him took refuge in flight then you may consider such flight as consciousness of guilt. If there is flight you may infer consciousness of guilt. It's part of something that you can consider in the law. And in this case, you have the smarter approach and you've got the flag of consciousness-of-guilt approach.

Because of the three defendants, two of them have this consciousness of guilt, flowing from their hands as they leave the State of New Jersey, flee down south to South Carolina because they know, they know that their families are giving statements on them. They know it's not a secret. They know they are going to be found. They know they're going to be charged. They know one day there is going to be people like you deciding this case. And they took refuge in flight. They tried to run.

And after a few days, they realized they couldn't

get away. Their families' houses, their girlfriends, everybody is being interviewed, everybody is being talked to. All of their locations are being sought. And then consciousness of guilt by running is abundantly clear.

During the charge conference, the prosecutor had requested a flight charge as to all three defendants. Scott's counsel did not object because, as he admitted, flight was "fairly in the case." Free's counsel objected. The judge ruled that flight was "in the case clearly" as to Free and Scott. Free's counsel agreed that the judge should include in the charge defendants' claim that their acts did not constitute flight. The judge then gave the following instruction on flight:

There has been some testimony in this case from which you may infer that the defendants Justin Scott and/or [Damian] Free fled shortly after the alleged commission of the crime. The defense position is that these acts do not constitute flight.

The question of whether the defendants or a defendant fled after the commission of the crime is another question of fact for your determination.

Mere departure from a place where a crime has been committed does not constitute flight. If you find that one or more of the defendants fearing that an accusation or arrest would be made against him on the charges involved in this case took refuge in flight for the purpose of evading the accusation or arrest, then you may consider such flight in connection with all the other evidence in this case as an indication or proof of consciousness of guilt. Flight may only be considered as evidence of consciousness of guilt if you should determine that the defendant's purpose in leaving was to evade accusation or arrest or for the purpose of avoiding the charges that would be brought in the indictment.

*21 ....

On the other hand, if you find the defendant's attorney's explanation for the defendant's action in this regard to be credible, you should not draw any inference of the defendant's consciousness of guilt from the defendant's departure.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

This charge follows the model jury charge on flight, except it did not include the last sentence: "It is for you as judges of the facts to decide whether or not evidence of flight shows a consciousness of guilt and the weight to be given such evidence in light of all the other evidence in the case." *Model Jury Charge (Criminal)*, Flight (2000).

Scott's and Free's argument that the record does not support the flight charge lacks merit. First, Scott's counsel's admission that flight was "fairly in the case[,]" and his opening statement that his client knew about the murder and fled, belies Scott's and Free's claim that there was no evidence of flight or that they were unaware that the police were looking for them. Further, it was undisputed that Scott and Free surrendered to the police in South Carolina after police searched for them in New Jersey.

The Court's holding in *State v. Ingram, 196 N.J. 23, 951 A.2d 1000 (2008)* does not change this result. There, the Court discussed whether a defendant's voluntary but unexplained absence from trial, without more, should give rise to a jury charge that the absence constitutes evidence of consciousness of guilt. *Id.* at 47, 951 A.2d 1000. The Court concluded that a "flight charge should not lie when a defendant absents himself from trial unless separate proofs are tendered to sustain the claim that the defendant's absence was designed to avoid detection, arrest, or the imposition of punishment ." *Ibid.* Here, the action giving rise to the flight charge occurred prior to trial and did not involve any defendant voluntarily absenting himself from the trial.

We are satisfied from our careful review of the record that sufficient evidence existed to support the flight charge. The charge, as given, closely followed the model charge and appropriately instructed the jury that Scott and Free claimed that their acts did not constitute flight, and that if the jury agreed, then they could not infer guilt. In any event, the charge was not likely to cause an unjust verdict, given other compelling evidence of Scott's and Free's guilt.

### Mays' Waiver of Miranda Rights

Mays contends that the judge improperly admitted an oral statement he gave to the police without a proper foundation from the State as to the specific rights he had waived. We disagree.

Abdellatif testified that he interviewed Mays on October 7, 2003, after Mays turned himself in to the police. Abdellatif advised Mays of the charges he was facing relating to Gilchrist's murder, he read to Mays each sentence of a *Miranda* form advising him of his rights, and he read to Mays the waiver of rights section. The detective also testified that Mays "clearly stated that he understood these rights" and read each right out loud before initialing each line indicating that he understood them. Mays also signed the *Miranda* form in two places.

*22 Abdellatif continued that Mays then gave a recorded statement and that he did not request an attorney at any time. Mays first denied any involvement in the crime and indicated that he wanted to cooperate with investigators. He stated that he was not at AHP the night of the murder, and was at work the entire evening. When told that witnesses saw him at AHP moments before the stabbing, and identified him as one of the three males involved, Mays admitted being there but claimed he was visiting family members and was not involved in the stabbing. When confronted with his time card from work, which showed that he did not "punch in" until 10:56 p.m., Mays stated that he was at home with his fiancée, Bridgette Freeman, at 9:10 p.m. When informed that Bridgette was on her way to the police station and would be asked to corroborate his story, Mays asked to speak with her when she arrived. Abdellatif intended to allow the two to speak privately after Bridgette gave a written statement to the police but she "said she had nothing to say to [Mays] and wanted to leave[,]" and "wanted nothing to do with" him. After being told that Bridgette refused to speak with him, Mays "became nervous" and "upset."

The judge found Abdellatif's testimony credible. Based on that testimony, the judge found that the detective read Mays his *Miranda* rights, that Mays read his rights before initialing and signing the *Miranda* form, that Mays knowingly and intelligently waived his rights, and that he had knowledge of his rights by virtue of the *Miranda* form. Based on the circumstances surrounding Mays' voluntary decision to turn himself in, the judge also found that giving the oral statement was a voluntary decision, and that Mays "was well-aware of the fact that he did not have to speak." Accordingly, the judge ruled the oral statement admissible.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

It has long been settled that warnings about a person's constitutional rights are required when a person is subject to custodial interrogation. *Miranda, supra, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L. Ed.2d at 706.* A valid waiver of those rights must be made voluntarily, knowingly, and intelligently. *Id. at 444, 86 S.Ct. at 1612, 16 L. Ed.2d at 707; State v. Bey, 112 N.J. 123, 134, 548 A.2d 887 (1988).* The State bears the burden of proof in this regard beyond a reasonable doubt. *Bey, supra, 112 N.J. at 134, 548 A.2d 887.*

The trial court must look into the totality of the circumstances to ascertain whether the accused in fact knowingly and voluntarily decided to forego his or her rights. *Oregon v. Bradshaw, 462 U .S. 1039, 1045, 103 S.Ct. 2830, 2834, 77 L. Ed.2d 405, 412 (1983); State v. Miller, 76 N.J. 392, 402, 388 A.2d 218 (1978).* Courts consider the characteristics of the accused, as well as the details of the interrogation. *Bey, supra, 112 N.J. at 134-35, 548 A.2d 887; Miller, supra, 76 N.J. at 402, 388 A.2d 218.* Relevant factors include the defendant's age, education, intelligence, previous encounters with the law, advice concerning his or her constitutional rights, length of detention, whether the questioning was repeated or prolonged, and whether physical punishment or mental exhaustion was involved. *Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L. Ed.2d 854, 862 (1973); Bey, supra, 112 N.J. at 135, 548 A.2d 887; Miller, supra, 76 N.J. at 402, 388 A.2d 218.* A "waiver of the right against self-incrimination which, by all subjective indicia, appears knowing, intelligent, and voluntary, may still be deemed invalid when elicited in an atmosphere of coercion." *State v. Reed, 133 N.J. 237, 256, 627 A.2d 630 (1993).* We must determine whether there was sufficient credible evidence to uphold the fact-findings made by the trial court. *State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964).*

**\*23** Mays misapplies *State v. Elkwisni, 384 N.J.Super. 351, 894 A.2d 1180 (App.Div.2006), aff'd, 190 N.J. 169, 919 A.2d 122 (2007),* to support his argument that the record was insufficient to establish a knowing and voluntary waiver of rights. In that case, we remanded because we were "unable to discern from the phrases 'I read him his rights,' or 'I advised him of his rights,'" what information [the police officer] conveyed to the handcuffed defendant when [the police officer] began to question him in the back of the police car." *Id . at 366, 894 A.2d 1180.* Here, Abdellatif advised Mays of his *Miranda* rights and used a written *Miranda* form, which is included in the record. A review of the form clearly indicates exactly what rights the detective conveyed to Mays. Mays initialed each right and signed the form indicating that he understood them. Also, Mays had an extensive juvenile record as well as four prior arrests as an adult. He was no stranger to the criminal justice system at the time he received his *Miranda* rights in this case.

Based upon our review of the record, we are satisfied that the judge properly concluded that Mays voluntarily waived his *Miranda* rights before giving the oral statement to police.

*The Accomplice Liability Charge*

Mays contends for the first time that the judge improperly instructed the jury on accomplice liability by failing to incorporate the facts of the case and by failing to charge that each defendant may have a different mental state and/or criminal culpability. Mays argues that the judge failed to adequately clarify for the jury that it could find him not guilty of aggravated manslaughter, and/or guilty of reckless manslaughter, even if it found his co-defendants guilty of aggravated manslaughter.

Just before giving the *Model Jury Charge (Criminal)*, "Liability for Another's Conduct" (1995), the judge instructed the jury as follows:

In this case the defendants are charged as direct defendants or principals and alternatively as accomplices. A principal or direct defendant is someone who actually performed the act.

If you find, for example, that one, two or all three defendants directly committed the acts constituting a crime, meaning if all elements are proven beyond a reasonable doubt, that defendant can be found guilty as a direct defendant.

Now, again, considering the following charges, in these charges the defendants can be considered as an accomplice to one another, and that would now include murder, passion/provocation man-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

slaughter, aggravated manslaughter, reckless manslaughter, robbery, theft.

The judge did not repeat the elements of each crime charged but noted that he had already explained the elements of the crimes. The judge twice stated that "[a]ccomplice status must be considered separately as to each defendant as to each charge[ ]" and that "[m]ere presence at or near the scene does not make one a participant in the crime."

The judge twice included the following language from the model charge, "[r]emember that a defendant can be held to be accountable with equal responsibility only if you find as a fact that he possessed the criminal state of mind that is required to be proved against the person who actually committed the criminal act." Significantly, the judge also stated:

*24 Our law recognizes that two or more persons may participate in the commission of an offense, but each may participate therein with a different state of mind. The liability or responsibility of each participant for any offense is dependant upon his own state of mind and not anyone else's.

Guided by these legal principles, if you find a defendant as an accomplice to be not guilty of a specific crime charged, you should then consider whether the defendant is guilty or not guilty as an accomplice on another charge or the lesser charge.

I want to read that back to you again. Guided by these legal principles, if you find that a defendant starts off confusing. I want to make sure you understand it. Guided by these legal principles, if you find a defendant not guilty as an accomplice of a specific crime charged, you should then consider whether the defendant is guilty or not guilty as an accomplice on another charge or the lesser charge.

For example-I'm going to just briefly paraphrase something-you'll recall what I told you earlier, that murder would require a showing that the defendant purposely or knowingly caused death or caused serious bodily injury resulting in death while not acting in the heat of passion resulting from reasonable provocation.

Passion/provocation manslaughter would be a

situation where you find that a defendant purposely or knowingly caused death or caused serious bodily injury resulting in death while acting in the heat of passion resulting from reasonable provocation.

Aggravated manslaughter would be where a defendant recklessly causes death under circumstances manifesting an extreme indifference to the value of human life. And then reckless manslaughter would be where a defendant recklessly causes death. Now that's not to substitute for the full charge that I gave you; I'm just paraphrasing.

You could, when you go through your deliberation process, conclude that a particular defendant, for example-I'm only giving you this an example-a particular defendant could be guilty of murder and yet another defendant could be guilty of not murder, but as an accomplice to the defendant that you found guilty of murder, this other defendant could be found guilty as an accomplice but only to the level of aggravated manslaughter; if you find that the one defendant, the direct defendant, had the state of mind that's required to be found guilty of murder, but the accomplice did not have that state of mind, that the accomplice's state of mind was only for that state of mind that would be necessary for the charge of aggravated manslaughter.

The point I'm trying to make, if you find the defendant guilty of a particular crime and then you find another defendant guilty as an accomplice, it doesn't have to be to the same level if that accomplice's state of mind was of a different level than that of the direct participant.

Finally, the judge gave one additional example of the differing states of mind possible under the theory of accomplice liability:

*25 For example, you would have to find that the direct defendant committed the crime of, for example, murder or passion/provocation manslaughter as alleged in the indictment or the lesser included or different offense of aggravated manslaughter; that the defendant who's the accomplice solicited the direct defendant to commit the lesser included offense and/or did agree to aid or attempt to aid him in committing the lesser included offense, like, for example, say reckless manslaughter; and that this defendant, the accomplice's purpose was to promote or facilitate the commission of only the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))

lesser included offense-against the example I'm giving you would be like, say, reckless manslaughter; and that this defendant, meaning this accomplice defendant, possessed only the state of mind that is required for the lesser offense.

During deliberations, the jury sent a note asking whether "[t]o find any defendant guilty as an accomplice, do we need to find a defendant guilty of the crime." Because "the law does not require them to declare whether they found someone guilty as either a principal or an accomplice," the judge chose not to answer the question with a yes or no. Instead, he recharged the jury using the model charge, to which Mays agreed.

"When a prosecution is based on the theory that a defendant acted as an accomplice, the trial court is required to provide the jury with understandable instructions regarding accomplice liability ." *State v. Savage,* 172 *N.J.* 374, 388, 799 *A.2d* 477 (2002). "By definition an accomplice must be a person who acts with the purpose of promoting or facilitating the commission of the substantive offense for which he is charged as an accomplice." *State v. White,* 98 *N.J.* 122, 129, 484 *A.2d* 691 (1984). We have found proper jury instructions on accomplice liability to be " 'particularly important where multiple participants engage in a violent attack with the potential for differing states of mind.' " *State v. Harrington,* 310 *N.J.Super.* 272, 278, 708 *A.2d* 731 (App.Div.1998) (quoting *State v. Cook,* 300 *N.J.Super.* 476, 486, 693 *A.2d* 483 (App.Div.1996)), *certif. denied,* 156 *N.J.* 387 (1998). "In such cases, '[t]he liability of each participant for any ensuing crime is dependent on his own state of mind, not on anyone else's.' " *Ibid* . (quoting *State v. Bridges,* 254 *N.J.Super.* 541, 566, 604 *A.2d* 131, (App.Div.1992), *aff'd in part, rev'd in part on other grounds,* 133 *N.J.* 447, 628 *A.2d* 270 (1993)).

Further, under the standard set forth in *State v. Bielkiewicz,* 267 *N.J.Super.* 520, 632 *A.2d* 277 (App.Div.1993), "jury instructions on accomplice liability must include an instruction that a defendant can be found guilty as an accomplice of a lesser[-]included offense event though the principal is found guilty of the more serious offense." *Ingram, supra,* 196 *N.J.* at 39, 951 *A.2d* 1000.

Here, defendants were charged with murder and rob-

bery but not with the lesser-included offenses of each. Accordingly, the judge was required to give proper jury instructions on the elements of the crimes and that accomplices can have different mental states. In the context of the entire charge given here, we are satisfied that the judge properly instructed the jury on the elements of accomplice liability. He instructed them to separately consider each defendant and each crime, and said that the three defendants could have different mental states. The judge also gave several lengthy examples whereby one defendant could be found guilty as a direct defendant of one offense requiring one mental state, and the other one or two defendants could be found guilty as accomplices to that direct defendant, but of a lesser included offense requiring "only the state of mind that is required for the lesser offense." Accordingly, we discern no error in the accomplice liability charge.

*Mays' Motion for Judgment of Acquittal*

\*26 Mays contends that the judge improperly denied his motion for a judgment of acquittal on the murder charge. He argues that there existed only speculative proofs, which do not satisfy the reasonable inference of guilt standard. Mays' contention lacks merit.

The well-established standard to be applied in determining a motion for a judgment of acquittal at the conclusion of the State's case, as set forth in *State v. Reyes,* 50 *N.J.* 454, 458-59, 236 *A.2d* 385 (1967):

[R]equires the trial court to determine "whether, viewing the State's evidence in its entirety ... and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt ... beyond a reasonable doubt."

[ *State v. Wilder,* 193 *N.J.* 398, 406, 939 *A.2d* 781 (2008) (quoting *State v. Reyes, supra,* 50 *N.J.* at 459, 236 *A.2d* 385).]

We "will apply the same standard as the trial court to decide if a judgment of acquittal was warranted." *State v. Felsen,* 383 *N.J.Super.* 154, 159, 890 *A.2d* 1029 (App.Div.2006).

Viewing the State's evidence in its entirety, and giv-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)
**(Cite as: 2009 WL 2136273 (N.J.Super.A.D.))**

ing the State all favorable inferences which could be reasonably drawn therefrom, we are satisfied that the judge properly denied the motion.

Having concluded that this matter must be reversed and remanded for a new trial, we need not address defendants' challenge to their sentences.

Affirmed in part, reversed in part and remanded for a new trial.

N.J.Super.A.D.,2009.
State v. Scott
Not Reported in A.2d, 2009 WL 2136273 (N.J.Super.A.D.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Da375

UNPUBLISHED OPINION IN IN RE WOLVERINE, PROCTOR & SCHWARTZ, LLC,
UNITED STATES DISTRICT COURT, DISTRICT OF MASSACHUSETTS, CIVIL ACTION
NO. 09-11038, DECIDED MARCH 12, 2010, 2010 WL 1236298 (D.MASS.)

Westlaw.

Slip Copy, 2010 WL 1236298 (D.Mass.), 49 Employee Benefits Cas. 1181
(Cite as: 2010 WL 1236298 (D.Mass.))

**H**Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
In re WOLVERINE, PROCTOR & SCHWARTZ,
LLC, Debtor.
Peter A. Crawford, pro se, Appellant,
v.
Lynne F. Riley, Chapter 7 Trustee of Wolverine,
Proctor & Schwartz, LLC, and the Pension Benefit
Guaranty Corporation, Appellees.
Civil Action No. 09-11038-DPW.

March 12, 2010.

*MEMORANDUM AND ORDER*

DOUGLAS P. WOODLOCK, District Judge.

*1 This is an appeal from the Bankruptcy Court's
Order [FN1] approving a settlement agreement (the
"Settlement Agreement") between the Pension Bene-
fit Guaranty Corporation ("PBGC") and the Trustee
of Wolverine Proctor & Schwartz, LLC (the
"Debtor"),[FN2] Lynne F. Riley (the "Trustee"). In ap-
proving the Settlement Agreement, Judge Feeney
overruled objections filed by a putative creditor and
former employee of a predecessor to the Debtor, Pe-
ter A. Crawford ("Crawford"), the pro se appellant in
this matter. For the reasons stated below, I affirm the
Bankruptcy Court's Order.

> FN1. *In re Wolverine Proctor & Schwartz,
> LLC,* No. 06-10815, 2009 WL 1271953
> (Bankr.D.Mass. May 5, 2009).

> FN2. Proctor & Schwartz was acquired by
> Wolverine Corporation in 1994 and the sur-
> viving company was named Wolverine,
> Proctor & Schwartz, Inc. ("Wolverine Inc.")
> in 1999. On February 11, 2005, Wolverine
> Inc. was dissolved and some of its assets and
> liabilities, including the pension liabilities,
> were transferred to Wolverine, Proctor &
> Schwartz, LLC.

**I. BACKGROUND**

*A. The Debtor and the Pension Plan*

On January 1, 1964, the Debtor established the Proc-
tor & Schwartz Salaried Employees Retirement Plan
(the "Plan") to provide retirements benefits for cer-
tain employees. The Plan was an employee pension
benefit plan to which Title IV of the Employee Re-
tirement Income Security Act of 1974 ("ERISA"), 29
U.S.C. § 1001, *et seq.,* applied. Ultimately, the
Debtor became the administrator of the Plan within
the meaning of 29 U.S.C. §§ 1002(16) and
1301(a)(1).

On April 1, 2006 (the "Petition Date"), the Debtor
filed a voluntary petition under Chapter 7 of the
Bankruptcy Code. As of the Petition Date, most of
the Debtor's operations had ceased and all employees
were terminated, with the exception of certain em-
ployees who were retained for a brief period without
benefits. The Bankruptcy Court approved the Trus-
tee's sale of substantially all of the Debtor's assets to
CPM Holdings for a purchase price of $8.7 million
on June 28, 2006.

In January 2007, the PBGC advised the Trustee that
the administrative process to terminate the Plan was
underway. Shortly thereafter, the PBGC issued a No-
tice of Determination under 29 U.S.C. § 1342(a) that
the Plan had not met the minimum funding standard
required under § 412 of the Internal Revenue Code.
The PBGC also informed the Trustee that the Plan
would be unable to pay benefits when due and that it
was required to be terminated under 29 U.S.C. §
1342(c).

The PBGC subsequently forwarded to the Trustee for
execution an Agreement for Appointment of Trustee
and Termination of the Plan, pursuant to which the
Plan was terminated as of April 1, 2006. Under this
Agreement, which was later executed with an effec-
tive date of March 26, 2007, the PBGC was ap-
pointed trustee of the Plan, and the Trustee of the
Debtor agreed to deliver all records, assets or prop-
erty of the Plan to the PBGC.

*B. The PBGC Claims*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1236298 (D.Mass.), 49 Employee Benefits Cas. 1181
(Cite as: 2010 WL 1236298 (D.Mass.))

On July 26, 2006, shortly before the expiration of the applicable bar date for proofs of claim, the PBGC filed three proofs of claim (collectively, the "PBGC Claims"):

Claim No. 70 pursuant to which the PBGC asserted a claim, contingent upon plan termination, estimated in the amount of $6,991,500 for unfunded benefit liabilities, including an unliquidated amount as a priority claim ("Claim No. 70");

Claim No. 71 pursuant to which the PBGC asserted a claim in the amount of $2,012,393 for minimum funding contributions, of which $1,340,217 was entitled to priority ("Claim No. 71"); and

*2 Claim No. 72 pursuant to which the PBGC asserted entitlement to an unliquidated priority amount for premiums on account of the Plan ("Claim No. 72").

In attachments to each of these claims, the PBGC noted that its investigation was "continuing" and that it reserved "the right to amend, modify and supplement th[ese] proof[s] of claim and/or to file additional proofs of claim."

### C. The Trustee's Objections to the PBGC Claims

On December 15, 2006, the PBGC produced, in response to the Trustee's request for documentation, certain reports, including data, calculations and actuarial analysis with respect to the PBGC Claims (the "Actuarial Reports").

While admitting that the PBGC had claims in these bankruptcy proceedings, the Trustee filed objections to the PBGC Claims on October 28, 2008. The Trustee disputed the PBGC's classification of portions of the PBGC Claims as being either administrative expenses or priority claims, the method of calculation and the lack of documentation supporting the PBGC Claims, and the potential overlap and duplication such claims. Specifically with respect to Claim No. 70, the Trustee objected to "the form of the proof of claim as she [wa]s unable to determine with any certainty the amount claimed by the PBGC, and call[ed] upon the PBGC to formally amend the proof of claim."

The Trustee subsequently requested further documentation to support Claim 72. On November 10, 2008, the PBGC produced two premium statements asserting a total amount due of $129,409.37 (the "Premium Statements").

### D. The Trustee's Motion to Approve Settlement Agreement

After their respective investigations and negotiations, the Trustee and the PBGC entered into the Settlement Agreement and the Trustee filed a motion seeking approval of the Settlement Agreement on December 9, 2008. In the motion, the Trustee contended that the Settlement Agreement was reasonable because it was based upon further investigation of the PBGC Claims and the various reports prepared by the PBGC and would avoid the costs, delay and complexity of litigating the issues raised by such claims.

The terms of the Settlement Agreement provide for the allowance of the PBGC Claims as follows:

Claim No. 70 to be settled as an "Unfunded Benefit Liabilities Claim" (the "UBL Claim") in the amount of $8,399,500; it would be a general unsecured claim;

Claim No. 71 to be settled as an "Unpaid Minimum Funding Contribution Claim" (the "UMFC Claim") in the amount of $50,000; it would be an unsecured priority claim; and

Claim No. 72 to be settled as a "Plan Premiums Claim" (the "PP Claim") in the amount of $101,084.25; it would be a general unsecured claim.

### E. Crawford's Objections to the Trustee's Motion to Approve Settlement Agreement

On January 5, 2009, Crawford filed objections to the Trustee's motion for approval of the Settlement Agreement. In essence, Crawford alleged that the Trustee failed to investigate the PBGC Claims adequately and to obtain sufficient documentation to support such claims.[FN3] Crawford did not, however, object to the Trustee's decision to settle the UMFC Claim and the PP Claim,[FN4] rather he focused his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1236298 (D.Mass.), 49 Employee Benefits Cas. 1181
(Cite as: 2010 WL 1236298 (D.Mass.))

objection on the UBL Claim.

> FN3. In particular, Crawford contended that there was no indication that the extensive document review conducted by the Trustee's accountants resulted in any changes to the PBGC Claims and that the PBGC ever provided the Trustee with any documents other than the Actuarial Reports or the Premium Statements to support the PBGC Claims.

> FN4. While Crawford did not formally contest the Trustee's decision to settle the UMFC Claim or the PP Claim, he did suggest that the UMFC Claim might have been settled at a large reduction due to a $130,000 discrepancy between the 2005 expected contribution of $482,500 and the 2005 actual contribution of $352,500.

*3 More specifically, Crawford pointed to a $1.458 million difference between the amount of Claim No. 70 and the amount of the UBL Claim.[FN5] Crawford alleged that the PBGC's failure to file amended proofs of claim to reflect the difference was indicative that "the PBGC has coerced the Trustee into settlement by stonewalling, inducing settlement for an inflated amount by largely giving up its essentially frivolous assertions of administrative and tax priorities."

> FN5. Under the Settlement Agreement, the PBGC is entitled to the full amount of the UBL Claim (i.e.$8,449,500), minus the $50,000 allowed amount of the UMFC Claim (i.e., $8,399,500). To calculate the $1.458 million difference referred to above, it appears that Crawford substituted the amount of Claim No. 70 (i.e., $6,991,500) to the full amount of the UBL Claim (i.e., $8,449,500).

In addition, Crawford pointed to a $2.564 million difference between the amount of unfunded liabilities reported in the 2004 financial statement of the Debtor's predecessor and the amount asserted by the PBGC as of January 1, 2005. In addition, Crawford contended that the PBGC's estimate was erroneous because it was based on the false assumption that the Plan participants were half male and half female whereas Plan participants were predominantly male.

Finally, Crawford objected to the method of calculation of the UBL Claim, arguing that the discount rate used by the PBGC should be higher and determined with reference to bankruptcy law principles.

*F. The PBGC and the Trustee's Responses*

On February 12, 2009, the PBGC submitted Claim Nos. 70-2 and 70-3, which amended Claim No. 70 by increasing its amount from $6,991,500 to $8,449,471. On the same day, the PBGC submitted Claim No. 72-2 amending Claim No. 72 by setting forth an amount of $129,409.37, where no amount had been specified initially.

On February 18, 2009, the PBGC and the Trustee submitted their respective responses to Crawford's objections. The Trustee argued that she properly investigated the PBGC Claims and the underlying documentation and that, contrary to Crawford's assumptions, "there were not [sic] significant errors in the calculations." Specifically, the Trustee asserted that the valuation of the Plan set forth in the Actuarial Reports was consistent with the Trustee's valuation of the Plan.

For its part, the PBGC argued that its methodology in calculating the UBL Claim had the force of the law and supported a business justification for the Settlement Agreement. The PBGC further contended that the PBGC's assumptions regarding gender of participants did not improperly increase the amount of the UBL Claim. In support of this assertion, the PBGC explained that new mortality tables effective as of January 1, 2006 resulted in a reduction in the difference in life expectancies between males and females. The PBGC therefore concluded that "to calculate PBGC's unfunded benefit liabilities using the 2005 AVR [Actuarial Valuation Report] to the date of the bankruptcy filing, an increase in the assumed amount of male participants would result in a larger UBL Claim," rather than in a lower amount as suggested by Crawford.

Both the PBGC and the Trustee contended that, under the circumstances, the Settlement Agreement was fair and reasonable.

*G. The Bankruptcy Court Hearing and Order*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1236298 (D.Mass.), 49 Employee Benefits Cas. 1181
(Cite as: 2010 WL 1236298 (D.Mass.))

\*4 The Bankruptcy Court held a hearing on the Trustee's motion for approval of the Settlement Agreement and Crawford's objections on February 24, 2009. In addressing Crawford's objection with respect to valuation of the PBGC Claims, the Trustee contended:

> the valuation was based on the actuarial report attached as Exhibit 1 to the settlement. The amount in the valuation had been extrapolated utilizing the 2005 Hewitt Report; however, it did correspond with a valuation report that I received from Citigroup Smith Barney dated March 31, 2006 .... showing the plan assets as of March 31, the day before the filing, were ten thousand [sic] 689 thousand dollars .... as of the filing date, there were approximately $16,400 in outstanding charges to money managers in the Bank of New York which redu-[sic] would have reduced that value to 10,672; and inasmuch this was very close to what the actuary had found in her report, I find that they were substantially the same, and that the calculation was not deficient.

More specifically, with respect to the discount rate applicable to the UBL Claim, the Trustee contended that it would not be appropriate for her to:

> be prosecuting the UBL claim based on the two decisions in other Circuits, namely, the Sixth Circuit's *CSC Industries* case, and the Tenth Circuit's *CFI* case .... [when] [w]e have four decisions subsequent, including this Court's decision in *High Voltage* ... And in all of these, the UBL claim is calculated in accordance with ERISA and the regulations found in 29 CFR Section 4044.

The PBGC explained the increase in the amount of the UBL Claim as follows:

> the principal reason the unfunded benefit liability did rise, as the Trustee says, is the change in discount rate from the valuation date of July '06 to April '06, which is the Chapter 7 filing date, and the difference in those months results in a difference in discount rates from 6.3 per cent downward to 5.6 per cent ... So that's the principal reason the numbers have been adjusted.

The Trustee addressed Crawford's objection with respect to the gender ratio as follows:

> if we take the assumption of 80 per cent male and we insert it into the PBGC's actuarial reporting, it actually results in a higher amount. And the PBGC explains that in their response; and what they say is that in-as of January 2006 they were-they had updated mortality tables which they were required to apply ... and because the life expectancy of males when compared to females under the updated tables is less than the prior gap that existed under the 1983 GAM [Group Annuity Mortality] tables, an increase assumed amount of the male participants resulted in a larger UBL claim.

During this hearing, Crawford introduced a new argument regarding co-debtor liability suggesting the Trustee's duty to seek disallowance of the entire UBL Claim based on his interpretation of *In re Hemingway Transport, Inc.* 993 F.2d 915 (1st Cir.1993) and 11 U.S.C. § 502(e)(1)(B) and his assertion that the PBGC was actually a co-debtor.

\*5 The Bankruptcy Court granted the Trustee's motion to approve the Settlement Agreement and overruled Crawford's objections in a May 5, 2009 decision. *In re Wolverine Proctor & Schwartz, LLC,* No. 06-10815, 2009 WL 1271953 (Bankr.D.Mass. May 5, 2009). In doing so, Judge Feeney found that the Settlement Agreement was fair and reasonable because "[t]he Trustee evaluated the merits of the PBGC's various claims, achieved a sizeable reduction in the amount of its priority claims, and avoided protracted and complex litigation with respect to the merits of the claims." *Id.* at \*4. She also noted that the Trustee and the PBGC had appropriately addressed the gender ratio issue and had correctly applied the emerging line of cases with respect to the applicable discount rate. *Id.* at \*5. Judge Feeney found Crawford's remaining arguments speculative and without evidentiary support. *Id.* Finally, Judge Feeney gave recognition to her view that the Trustee was an experienced attorney known for competence and integrity, who she found had properly performed her duties under 11 U.S.C. § 704.

### *H. Crawford's Motion to Reconsider the Bankruptcy Court's Order and the Bankruptcy Court's Subsequent Denial*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Da379

Slip Copy, 2010 WL 1236298 (D.Mass.), 49 Employee Benefits Cas. 1181
(Cite as: 2010 WL 1236298 (D.Mass.))

On May 15, 2009, Crawford filed a motion to reconsider the Bankruptcy Court's ruling approving the Settlement Agreement. As the basis for reconsideration, Crawford contended that the Bankruptcy Court failed to address his newly raised argument at the February 24, 2009 hearing regarding co-debtor liability.

The Trustee filed an opposition to Crawford's motion for reconsideration on May 22, 2009. The PBGC subsequently adopted the Trustee's position. On June 8, 2009, the Bankruptcy Court issued an order denying Crawford's motion for reconsideration.

Crawford filed a notice of appeal under 28 U.S.C. § 158(c) on June 10, 2009, bringing the appeal to this Court.

*I. Other Associated Proceedings*

Between 2005 and 2008, Crawford filed four civil actions in this Court arising from themes and variations on the basic claim that he is owed additional compensation from the Debtor and its affiliates. *Crawford v. Wolverine Proctor & Schwartz, Inc. et al.,* Nos. 05-10078, 07-10279, 08-10048, and 08-11886 (D.Mass.). These four civil actions (the "consolidated matters") were assigned to me and were later treated in a consolidated manner for efficiency of proceeding. The consolidated matters have followed a tortured and tortuous path to disposition before me. The first case filed, 05-10078, was automatically stayed as to the Debtor in April 2006. Given the pending bankruptcy, I deferred ruling on summary judgment motions filed by the non-debtor defendants until the dispute in all its dimensions was before me. The claims against the Debtor returned to me when, on the motion of the parties in 07-10279, I withdrew the reference to the bankruptcy court with respect to Crawford's claims in order to permit orderly disposition of the merits on such claims against the Debtor and others. In August 2007, I granted summary judgment as to all claims, except those related to any express contract as to a bonus for Crawford.

*6 Shortly before the trial on the bonus issues was set to begin in January 2008, Crawford attempted to introduce a new quantum meruit theory of bonus entitlement through amendment of pleadings. I rejected the amendment and the matters went to trial during January and February 2008. Meanwhile, Crawford filed 08-10048 essentially to assert his belated asserted quantum meruit theory. For her part, the Trustee later moved in 08-11886 to withdraw the bankruptcy reference concerning Crawford's amended claim filed in the Bankruptcy Court and asserting a quantum meruit theory. The first trial, however, ended in mistrial when it was discovered during deliberations that jurors, in violation of instructions, undertook to supplement the evidence with their own internet searches.

I reset the matter for a second trial in June 2009 and rejected on summary judgment the quantum meruit theory newly framed in 08-10048. The jury verdict in the second trial on June 22, 2009 supported judgment on the merits for the defendants. On December 4, 2009, I entered two separate judgments in the consolidated cases. In 05-10078 and 08-10048, a judgment was entered for all defendants against the claims brought by Crawford. As to the two bankruptcy reference withdrawal matters, 07-10279 and 08-11886, I entered judgment disallowing Crawford's claims against the Debtor, essentially holding there was no liability of the Debtor and its affiliates to Crawford.

Crawford has since filed Motions for Judgment as a Matter of Law and for New Trial in the four civil actions. They are currently pending before me. Crawford also filed an appeal of the judgments I entered in the bankruptcy reference withdrawal proceedings. Those appeals are also pending.[FN6]

> FN6. The appeals filed in these bankruptcy referral withdrawal matters were prophylactic. Despite a stipulation between the parties, there is uncertainty as to whether the appeal period for a motion, such as that presented by Crawford's motions for reconsideration of his claims, under Bankruptcy Rule 3008 would be tolled by the filing of post judgment motions as it would be under Bankruptcy Rule 9023, which incorporates Federal Rule of Civil Procedure 59. In order to avoid any question of timely appeal, given this uncertainty, Crawford promptly noticed his appeal in the bankruptcy referral withdrawal matters while also submitting post judgment motions in this Court.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1236298 (D.Mass.), 49 Employee Benefits Cas. 1181
(Cite as: 2010 WL 1236298 (D.Mass.))

## II. STANDARD OF REVIEW

Review of the Bankruptcy Court order on appeal be-
fore me is governed by Rule 8013 of the Federal
Rules of Bankruptcy, which provides a District Court
"may affirm, modify or reverse a bankruptcy judge's
judgment, order, or decree or remand with instruc-
tions for further proceedings." FED. R. BANKR. P.
8013.

When a District Court reviews a decision of the bank-
ruptcy court, findings of fact are disregarded only if
clearly erroneous, but questions of law are subject to
*de novo* evaluation. *See* FED. R. BANKR. P. 8013;
*Groman v. Watman (In re Watman )*, 301 F.3d 3, 7
(1st Cir.2002). Specifically, the standard of review
regarding bankruptcy court approval of a settlement
is abuse of discretion. *See Jeffrey v. Desmond*, 70
F.3d 183, 185 (1st Cir.1995) ("The approval of a
compromise is within the sound discretion of the
bankruptcy judge ... this court will not overturn a
decision to approve a compromise absent a clear
showing that the bankruptcy judge abused her discre-
tion.") (citing *In re Anolik*, 107 B.R. 426, 429
(D.Mass.1989)).

## III. DISCUSSION

Before addressing the merits of the appeal, I must
first determine whether Crawford has standing to
prosecute the appeal. While I find Crawford has
standing, I nevertheless conclude his appeal is un-
availing on the merits.

### A. Standing

*7 The issue of standing is a "threshold question in
every federal case, determining the power of the
court to entertain the suit." *Warth v. Seldin*, 422 U.S.
490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In
order to have standing to appeal a final bankruptcy
order, an appellant must be a "person aggrieved,"
which means that the bankruptcy order must "directly
and adversely affect ... [the appellant's] pecuniary
interests." *In re High Voltage Eng'g Corp.*, 403 B.R.
163, 166-67 (D.Mass.2009) (quoting *Spenlinhauer v.
O'Donnell*, 261 F.3d 113, 117-18 (1st Cir.2001)).
Specifically, the order must "diminish the [appel-
lant's] property, increase [the appellant's] burdens, or
detrimentally affect [the appellant's] rights." *Id.*
(quoting *Kehoe v. Schindler (In re Kehoe )*, 221 B.R.

285, 287 (1st Cir.BAP1998)).

The Trustee contends that Crawford lacks standing to
appeal the Bankruptcy Court's Order because the
breach of contract claim, through which he purports
to have creditor status, was rejected by the jury ver-
dict rendered in the consolidated matters, thereby
preventing Crawford from qualifying as a "person
aggrieved." I find this argument borderline frivolous.
Crawford's claims remain alive, he has post-trial mo-
tions pending in this court and there is no reason to
doubt he will prosecute appeals should the post-trial
motions be decided adversely to him. Indeed, after
the Trustee filed its brief and I entered judgment in
the several consolidated matters, Crawford filed ap-
peals in the bankruptcy referral withdrawal cases. *See*
Note 6 *supra.* Because the judgments as to Craw-
ford's multiple claims are not yet fully final and ave-
nues of appeal remain open to and are being pursued
by him, I find Crawford has not lost standing to
prosecute the present appeal.

### B. The Merits

Crawford raises five grounds as support for his con-
tention that approval of the Settlement Agreement
was erroneous: (1) the Trustee did not properly inves-
tigate the PBGC Claims, (2) the PBGC failed to ap-
ply the proper discount rate in calculating the UBL
Claim, (3) the PBGC did not follow its own regula-
tion and relied on erroneous assumptions in calculat-
ing the UBL Claim, (4) the UBL Claim is subject to
disallowance under Section 502(e) of the Bankruptcy
Code, and ultimately (5) the Bankruptcy Court failed
to apprise itself of all facts necessary for an informed
opinion regarding the Settlement Agreement. The
first three grounds are most usefully addressed in this
Memorandum as separate settlement choices made by
the Trustee. The fourth and fifth grounds concern the
Bankruptcy Court's review of the ultimate settlement
choice.

### I. Investigation by the Trustee

Crawford's argument that the Trustee failed to con-
duct adequately any meaningful investigation of the
PBGC Claims before entering into the Settlement
Agreement is without merit. The evidence shows to
the contrary. The Trustee thoroughly reviewed the
documentation produced by the PBGC as well as the
case law pertaining to the classification and the cal-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1236298 (D.Mass.), 49 Employee Benefits Cas. 1181
(Cite as: 2010 WL 1236298 (D.Mass.))

culation of the PBGC Claims. As noted by the Bankruptcy Court, and as Crawford conceded, the Trustee engaged her accountant to assist her in evaluating the claims. *In re Wolverine, 2009 WL 1271953, at \*4.* It was only after conducting appropriate investigation of the PBGC Claims and undertaking careful consideration of the implications of the Settlement Agreement that the Trustee agreed to its terms. This fact is further supported by the PBGC's declaration during the February 24, 2009 hearing that the Trustee and the PBGC "had a vigorous and very detailed exchange of information prior to reaching our settlement."

**\*8** More specifically, I find that the Trustee has properly addressed the issue regarding the valuation of the pension plan assets set forth in the Actuarial Reports both in her initial response to Crawford's objections, as well as during the February 24, 2009 hearing. I make this finding in light of the First Circuit's instruction that a trustee need not fix the value of a claim "with near mathematical precision" before it can be settled. *In re Healthco Int'l, Inc.,* 136 F.3d 45, 51 (1st Cir.1998) (citing *Kowal v. Malkemus ( In re Thompson ),* 965 F.2d 1136, 1145 (1st Cir.1992) ("[A] chapter 7 trustee ... realistically cannot be required to demonstrate to the satisfaction of every individual creditor and the debtor, or to any compelling degree of certitude, that the settlement benefit to the chapter 7 estate and the value of the settled claim comprise a matched set.").

Accordingly, I share the conclusion of the Bankruptcy Court that the Trustee properly "evaluated the merits of the PBGC's various claims." *In re Wolverine, 2009 WL 1271953, at \*4.*

*2. Discount Rate*

Crawford's argument is that the Settlement Agreement rests upon an inappropriate discount rate with respect to the UBL Claim, which implicates a legal question concerning the role of non bankruptcy substantive law in bankruptcy proceedings. Specifically, Crawford contends that the Bankruptcy Court should have rejected the application of the PBGC's regulation regarding the discount rate in favor of a so-called "prudent investor" discount rate found in opinions of two Circuit Courts. *See In re CSC Indus., Inc.,* 232 F.3d 505, 509 (6th Cir.2000) ("[w]hile the *validity* of a claim might be a matter for non bankruptcy law,

bankruptcy courts have the statutory authority to determine the *allowability* and *amount* of the claim"); *In re CF & I Fabricators of Utah, Inc.,* 153 F.3d 1293, 1301 (10th Cir.1998) ("Nothing in the ERISA sections relied upon by PBGC implies a carry-over into the realm of bankruptcy to allow PBGC to set its own valuation methodology. Even though that methodology was adopted in the exercise of PBGC's administrative authority, we have no doubt of its inapplicability in the world of bankruptcy.").

This issue is framed and governed by the Supreme Court's opinion in *Raleigh v. Ill. Dept. of Revenue,* 530 U.S. 15, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000), which held that, absent some particular direction from the Bankruptcy Code, the underlying substantive law governs entitlements in the bankruptcy context. The Sixth Circuit's opinion in *CSC Industries* was issued shortly after *Raleigh* was handed down, and the Tenth Circuit's decision in *CF & I Fabricators* substantially predated *Raleigh.* Neither, in my view, adequately incorporated the approach adopted in *Raleigh.*

I find more persuasive the reasoning of *In re U.S. Airways Group, Inc.,* 303 B.R. 784, 792-93 (Bankr.E.D.Va.2003) (expressing disagreement with the Sixth and Tenth Circuits and concluding that "*Raleigh* is very clear that a creditor's claim 'in the first instance' is a function of the nonbankruptcy law giving rise to the claim" and that "it is simply not a correct reading of *Raleigh* to say that nonbankruptcy law determines only the abstract validity of the claim ... as divorced from the *amount* of the claim."). As noted by the Bankruptcy Court in this matter, more recent cases have similarly rejected the position held in *CSC Industries* and *CF & I Fabricators* and concluded that *Raleigh* requires the amount of the claim to be determined by nonbankruptcy law. *See Dugan v. PBGC (In re Rhodes, Inc.),* 382 B.R. 550, 560 (Bankr.N.D.Ga.2008) ("PBGC is authorized by law to make a determination of the amount of its claim that is binding on Debtors and therefore on this Court."); *In re High Voltage Eng'g Corp.,* No. 05-10787-JNF, slip op. at 2 (Bankr.D.Mass. July 26, 2006) ("ERISA and the regulations found in 29 C.F.R. § 4044 control the calculation of the PBGC's claim in these solvent Chapter 11 cases."); *see also In re Kaiser Aluminum Corp.,* 339 B.R. 91, 96 (D.Del.2006) (agreeing with the Bankruptcy Court that "it is difficult to envision who would succeed" in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1236298 (D.Mass.), 49 Employee Benefits Cas. 1181
(Cite as: 2010 WL 1236298 (D.Mass.))

the face of a conflict in the applicable law on dis-count rates, but holding that the Bankruptcy Court did not abuse its discretion in approving the settle-ment of a claim calculated pursuant to PBGC's regu-lation).

**\*9** Even in the absence of any decisions from the First Circuit to the contrary, I share the conclusion of Judge Feeney that "the Trustee['s] decision to adopt the emerging line of cases was reasonable." *In re Wolverine,* 2009 WL 1271953, at \*5. Judge Feeney herself had provided precedent for the Trustee's posi-tion in a previous ruling. *High Voltage,* slip op. at 1-2. No doubt the Trustee could have acted within her responsibilities by challenging Judge Feeney's hold-ing in *High Voltage.* Unlike Judge Farnan in *Kaiser Aluminum,* however, I have no difficulty concluding that Judge Feeney's opinion in *High Voltage* properly states the law and the Trustee was correct in follow-ing that holding on the merits. Moreover, even if the issue were in doubt, the Trustee acted reasonably by choosing to settle the dispute in the face of an unset-tled question. The issue involves a core contention by the PBGC, an institutional litigant intent-as a matter of precedent-on not compromising the integrity of its regulations. Litigation with the PBGC would lead to lengthy delay, increased litigation costs and uncertain risks of further exposure for the bankrupt estate. The Trustee acted reasonably in avoiding litigation with the PBGC as a result of dispute over this issue.

3. Method of Calculation

Crawford contends that the method used by the PBGC to calculate the UBL Claim is invalid because the PBGC failed to follow its own regulation by not calculating the UBL Claim participant by participant [FN7] and relied on false assumptions, in particular with respect to the gender of the participants.

> FN7. To support this assertion, Crawford re-lies on 29 C.F.R. § 4044.51, which provides that "[t]he plan administrator shall deter-mine the form of *each* benefit to be valued." 29 C.F.R. § 4044.51 (emphasis added). Crawford argues that the term "each" in this section manifestly indicates that the PBGC should have calculated the UBL Claim par-ticipant by participant. (*Id.*) Crawford does not, however, produce any authority sup-porting his interpretation of 29 C.F.R.

4044.51 in the bankruptcy claim process or the settlement process for such claims. I find this argument to be without merit.

As noted by the Bankruptcy Court, "[t]he method used by the PBGC in determining the amount of un-funded benefit liabilities is complicated." *In re Wol-verine,* 2009 WL 1271953, at \*4 (quoting *In re Rho-des, Inc.* 382 B.R. at 554). For purposes of calculat-ing the UBL Claim, the PBGC assumed that the Plan participants were half male and half female although it is likely the participants were predominantly male. Crawford argues that this erroneous assumption may have resulted in an increase of the UBL Claim amount because life expectancy is higher for females than for males. The PBGC has explained, however, that under the 2006 mortality tables, the difference between the life expectancy of females and males was lower than the gap that existed under the 2005 mortality tables and therefore concluded that an in-crease in the assumed number of male participants would result in a larger UBL Claim.

The issue, of course, is one of estimates and com-promise and not one of precise benefit calculation. I share the view of the Bankruptcy Court that "the Trustee and the PBGC ably addressed and rebutted the points made in [Crawford's] Objection, in particu-lar his assertion that the gender allocation increased the amount of the UBL claim." *In re Wolverine,* 2009 WL 1271953, at \*5. The Trustees choice to settle despite this Objection was reasonable.

4. *Claim Disallowance under Section 502(e)(1)(B)*

**\*10** Crawford argues that the UBL Claim is subject to disallowance pursuant to the liability of co-debtors set forth in Section 502(e) (1)(B) of the Bankruptcy Code.[FN8]

> FN8. As discussed in Section I.G. *supra,* Crawford raised this argument for the first time during the February 24, 2009 hearing. The Bankruptcy Court did not expressly ad-dress this contention in the May 5, 2009 Or-der granting the Trustee's motion, but merely noted that "Crawford's remaining ar-guments ... [we]re speculative and without evidentiary support." *In re Wolverine,* 2009 WL 1271953, at \*5.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1236298 (D.Mass.), 49 Employee Benefits Cas. 1181
(Cite as: 2010 WL 1236298 (D.Mass.))

Section 502(e) (1)(B) of the Bankruptcy Code provides as follows:

Notwithstanding subsections (a), (b), and (c) of this section and paragraph (2) of this subsection, the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that ...

(B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution.

11 U.S.C. § 502(e)(1)(B). Thus, three elements need to be present for a claim to fall within this provision: (1) the claim must be one "for reimbursement or contribution;" (2) the entity asserting the claim must be "liable with the debtor on or ha[ve] secured the claim of a creditor;" and (3) the claim must be "contingent at the time of its allowance or disallowance." *Id.* Section 502(e)(1)(B) was enacted "to prevent ... *competition between a creditor and his guarantor* for the limited proceeds of the estate." *Hemingway*, 993 F.3d at 923 (quoting S. REP. NO. 95.989, at 65 (1978)).

To support his assertion that the UBL Claim should be disallowed under Section 502(e)(1)(B), Crawford mainly relies on *Hemingway*, where the First Circuit vacated a district court's order FN9 disallowing the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") claims brought by the purchaser of a contaminated real property from a Chapter 11 estate, after the conversion of the case to Chapter 7. *Id.* at 936. In adopting this position, the First Circuit's focus turned on whether the purchaser was "liable with" the debtors on the claims brought by the United States Environmental Protection Agency ("EPA") against them. *Id.* at 925-34. Specifically, the First Circuit declared that the purchaser "cannot escape the consequences of section 502(e)(1)(B) unless it is not strictly and jointly 'liable' with [the debtors] on the EPA debt." *Id.* at 930. The First Circuit ultimately remanded this issue observing that, under Section 502(e)(1)(B), "[the purchaser]'s participation in any distribution from the chapter 7 estate hinge[d] entirely on the validity of its 'innocent landowner' defense." *Id.* at 933. Contrary to Crawford's contention, the First Circuit in *Hemingway* did not disallow the claim of a co-debtor

under Section 502(e)(1)(B) but rather ruled that the disallowance of a claim under this section may depend on several factors, including in this specific instance on the "innocent landowner" defense.

FN9. *In re Hemingway Transp., Inc.,* 126 B.R. 656 (D.Mass.1991).

In any event, the First Circuit in *Hemingway* did not address the present situation concerning whether the PBGC was "liable with" the debtor for purposes of claim disallowance under Section 502(e)(1)(B). FN10 *Hemingway* did nothing to settle the law in this circuit on this issue. Moreover, other courts have held that ERISA preemption prevents plan participants from recovering directly from the plan sponsor. *United Steelworkers of Am. v. United Eng'g, Inc.* 52 F.3d 1386, 1393 (6th Cir.1995) (discussing federal common law actions brought directly against the employer under § 301 of the Labor Management Relations Act after the 1986 and 1987 amendments to ERISA and observing that "detailed provisions [by which the PBGC disburses non-guaranteed benefits] seem to allocate responsibility for disbursement of nonguaranteed benefits to the PBGC, strongly suggesting that suits against plan sponsors to recover those same benefits are precluded."); *In re Adams Hard Facing Co.,* 129 B.R. 662, 663 (W.D.Okla.1991) ("Under ERISA, the PBGC must collect the employer's unfunded benefit liabilities and distribute those amounts to plan participants within the priority scheme of § 4044(a). The direct claims of the participants in the Adams Plan are therefore disallowed.").

FN10. As it happens, it was Judge Feeney on remand in the Bankruptcy Court who ruled that the purchaser had failed to establish that it made "all appropriate inquiry" for acquiring property, as required for "innocent landowner" defense under the Comprehensive Environmental Response, Compensation, and Liability Act. *In re Hemingway Transp., Inc.,* 174 B.R. 148, 169 (Bankr.D.Mass.1994) ("while representing it made all appropriate inquiries, [purchaser] did not in fact make such inquiries."). Under the circumstances, it is apparent Judge Feeney was fully conversant with the limitations to the application of *Hemingway* in the instant context.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Da384

Slip Copy, 2010 WL 1236298 (D.Mass.), 49 Employee Benefits Cas. 1181
**(Cite as: 2010 WL 1236298 (D.Mass.))**

**\*11** Under the circumstances, I conclude that the PBGC cannot be held "liable with" the Debtor for purposes of Section 502(e)(1)(B). There was no error in the Bankruptcy Court's implicit refusal to disallow the UBL Claim under Section 502(e)(1)(B).

*5. Appeal*

Crawford's argument that the Bankruptcy Court failed to apprise itself of all facts necessary for an informed opinion, illustrates his misguided approach to the settlement review process generally. Crawford misconceives the legal standard applicable to the approval of settlement agreements by a bankruptcy court and seeks to burden a practical business judgment with demands for costly, overly time consuming and highly detailed assessments.

In deciding whether to accept a settlement agreement that discharges legal claims held by the debtor, a bankruptcy court should consider the following factors:

> (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.

*High Voltage,* 403 B.R. at 167 (quoting *Jeffrey,* 70 F.3d at 185). Other factors may also include the experience and competence of the trustee and public policy considerations. *Id.*

As noted by the First Circuit, in reviewing a settlement agreement for approval purposes, "[t]he [bankruptcy] judge ... is not to substitute her judgment for that of the trustee, and the trustee's judgment is to be accorded some deference." *In re Healthco,* 136 F.3d at 50 n. 5 (quoting *Hill v. Burdick (In re Moorehead Corp.),* 208 B.R. 87, 89 (1st Cir.BAP1997)); *In re 110 Beaver St. P'ship,* No. 08-2408, 2009 WL 4874783, at \*4 (1st Cir. Dec.17, 2009) ("the trustee is accorded a significant range of discretion in the prudent exercise of business judgment."). Instead, the task of the court is to determine whether the settlement meets at least the "lowest point in the range of

reasonableness." *In re Healthco,* 136 F.3d at 51 (quoting *Cosoff v. Rodman ( In re W.T. Grant Co.),* 699 F.2d 599, 608 (2d Cir.1983)).

Here, the Bankruptcy Court did not abuse its discretion in approving the Settlement Agreement but rather correctly applied the relevant legal standard. In doing so, the Bankruptcy Court weighed the probability of success in litigation being compromised taking into consideration the complexity of the factual and legal issues related to this case. *In re Wolverine,* 2009 WL 1271953, at \*4-5. Specifically, the court noted that the complex nature of the method used by the PBGC in determining the amount of unfunded liabilities and the existence of competing public policies under ERISA and the Bankruptcy Code. *Id.* at \*4. In addition, the court found that the Trustee was an experienced attorney known for competence and integrity who, the court concluded, had ably performed her duties under 11 U.S.C. § 704. *Id.* at 5. Ultimately, the court concluded that the Trustee had properly exercised her business judgment in reaching the Settlement Agreement. *Id.* The Bankruptcy Court properly exercised its review role in reaching the conclusion that the Settlement Agreement is fair and reasonable.

### IV. CONCLUSION

**\*12** For the reasons set forth more fully above, the Bankruptcy Court's Order overruling the objections to the Settlement Agreement filed by Crawford and approving the Settlement Agreement is AFFIRMED.

D.Mass.,2010.
In re Wolverine, Proctor & Schwartz, LLC
Slip Copy, 2010 WL 1236298 (D.Mass.), 49 Employee Benefits Cas. 1181

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

UNPUBLISHED OPINION IN U.S.A. V. RONALD MIKOS, UNITED STATES DISTRICT
COURT, NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, NO. 02 CR 137,
DECIDED DECEMBER 9, 2003, 2003 WL 22922197 (N.D.ILL.)

Westlaw.

Not Reported in F.Supp.2d, 2003 WL 22922197 (N.D.Ill.)
(Cite as: 2003 WL 22922197 (N.D.Ill.))

**H**Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
UNITED STATES OF AMERICA, Plaintiff
v.
Ronald MIKOS, Defendant
No. 02 CR 137.

Dec. 9, 2003.

Ronald Mikos, pro se, John M. Beal, Cynthia Louise Giacchetti, Law Office of Cynthia Giacchetti, Richard H. McLeese, Attorney at Law, Chicago, IL, for Defendants.

MEMORANDUM OPINION AND ORDER RE-GARDING DEFENDANT'S MOTION IN LIMINE TO EXCLUDE GOVERNMENT'S PROPOSED EXPERT TESTIMONY OF CHARLES PETERS RELATING TO COMPARATIVE BULLET LEAD ANALYSIS

GUZMÁN, J.

*1 Defendant moves this Court to preclude the government from introducing at trial expert evidence or testimony regarding the comparison of bullets or bullet fragments recovered from the victim with bullets allegedly seized from the vehicle of the Defendant, in particular the proposed expert testimony of Charles Peters. In support of this motion, the Defendant argues that admission of such unreliable expert opinion testimony would violate Mr. Mikos' Fifth Amendment right to due process, Sixth Amendment right to a fair trial, and Eighth Amendment right to be free from cruel and unusual punishment.

The Defendant Ronald Mikos is charged in this case with the murder of Joyce Brannon. Ms. Brannon's body was discovered on January 27, 2002. She had been shot six times. Another potential government expert, Robert Tangren, has identified these six bullets/bullet fragments as being .22 caliber bullets. On February 6, 2002, federal agents searched a vehicle which the Defendant was driving at the time of his arrest. Allegedly taken from that vehicle was a Rem-

ington ammunition box containing eighty .22 caliber cartridges. These items were sent to the FBI Laboratory in Washington, D.C.

Pursuant to Rule 16(a)(1)(E) the government has identified Charles Peters, an examiner for the FBI laboratory, as an expert witness. Peter's one-page Report of Examination (Exhibit 1) indicates that he has used Inductively Coupled Plasma Optical Emission Spectroscopy (ICP-OES) to measure the presence of seven elements in lead samples taken from bullets from the victim and bullets in twenty-five of the cartridges from the box. Based on those measurements, and using an FBI definition of what is "analytically indistinguishable" Peters claims that the bullets from the victim and all but one of the bullets from the box recovered in the Defendant's car are analytically indistinguishable from one another. Peters then concludes that because the bullets from the victim and the bullets from the ammunition box are "analytically indistinguishable," these bullets "likely originated from the same manufacturers' source (melt) of lead." Peters' Report then goes further to indicate that the cartridges originally in the ammunition box were assembled and packaged on or about November 23, 1988, suggesting that all the analyzed bullets came from the box and were assembled and packaged on that date. In addition to the one page "Report of Examination" the Government has provided written notes, pictures, and 70 pages of the printout from the ICP-OES analysis. This documentation appears to support the ICP-OES measurements done by Peters and that the bullets are "analytically indistinguishable" using the FBI's definition.

The defense is not at this time challenging the measurements themselves. However, the defense claims that the Government has supplied no underlying basis or support for Peters' conclusion that, because these lead samples are "analytically indistinguishable," the bullets from the victim and the bullets from the cartridges in the box "likely originated from the same manufacturers' source (melt) of lead." This last conclusion is important because, if true, it serves to limit the number of bullets which have the same composition and therefore makes it more likely that the bullets found in the victim's body came from the Defendant's box of bullets of indistinguishable composi-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22922197 (N.D.Ill.)
(Cite as: 2003 WL 22922197 (N.D.Ill.))

tion. However, this is only true if all bullets which come from the same batch have the same composition and if bullets from other batches do not.[FN1] The probative impact of such a conclusion is also limited by the extent to which only a relatively small number of bullets came from the batch in question. Thus, the danger, the defense argues, is that the jury will assume that it is very likely that the bullets which killed the victim came from the Defendant's box of bullets when in fact and science, such a conclusion is not warranted.

> FN1. "One of the important premises underlying comparative bullet lead analysis is that different sources of lead have a different elemental composition. This premise is an important one for comparative bullet lead analysis because if most or all sources of lead had the same elemental composition, then a match between bullets would have little significance." *Government's Memorandum in Opposition to Defednat's Motion In Limine on Proposed Bullet Lead Expert Under Rule 702 of The Federal Rules of Evidence* (Government's Memorandum), at 17. "Another important premise underlying comparative bullet lead analysis is that sources of lead are homogeneous, i.e. that bullets produced at or around the same time will have analytically indistinguishable lead content. This premise is an important one for comparative bullet lead analysis because if bullets manufactured at or around the same time were not homogeneous, then no significance could be drawn from the fact that known and questioned bullets were analytically indistinguishable." Government's Memorandum at 25.

*2 The lead that is used by manufacturers to make bullets is supplied by secondary lead smelters. These smelters generally obtain lead from recycled lead-acid batteries. During the smelting process the lead is melted and purified or refined in a molten state. Antimony is added if needed for purposes of hardening. Defendant argues that the lead is processed so as to keep the amount of these elements at certain acceptable and carefully controlled levels. While, as explained above, the government contends that the amount of other elements besides lead is not so closely controlled but rather depends upon whatever

scrap lead and other elements the manufacturer might have on hand at the time of the melt. After melting, the lead is cast into ingots (commonly called pigs) or into cylindrical billets. The ammunition manufacturer receives the lead in this form. Manufacturers who receive ingots (pigs) remelt the lead and cast it into billets. Manufacturers who receive billets produce bullets without remelting. The billets are inserted into an extruder where the lead is formed into lead wire. The wire is cut into pieces which are then formed into individual bullets. After they are made, the bullets are then stored until they are required to fill an order. At that time, they are assembled into cartridges and packaged into boxes. The date code on the box reflects when the cartridges are packaged into boxes.

Absent some scientifically sound basis for concluding that the composition of all bullets coming from the same batch is indistinguishable, (even by the FBI's own definition of "indistinguishable"), Peters would have no basis for giving an opinion that assumes this as true, i.e., that the bullets from the body and the bullets from the Defendants box of ammunition came from the same batch because they are of indistinguishable composition. The government offers as support for Peters' conclusion that bullets with the same composition must come from the same batch, the fact that theoretically there is an infinite number of permutations which can result from the mixing of the seven elements normally found in bullet lead and that it is therefore extremely unlikely that any two batches made at separate times would, by chance, have the same composition. The government also argues that thirty years of real world experience in this field, the scientific data that lead batches are extraordinarily unusual, and the case law recognizing both the relevance and significance of such testimony also support Peters' opinion. Further, the government points out that the process by which bullets are made is not tightly controlled. Bullet manufacturers will throw into the melt whatever odds and ends of scrap metal they happen to have in addition to the actual lead. This largely random process is even more likely to lead to a unique composition of elements for every batch. However, it is undisputed that at least some manufacturing quality control exists with respect to the composition of elements which any given bullet may have. Therefore, the number of different compositions to be found emanating from any batch of molten lead may not number in the millions, but rather may be limited by the quality control parameters of the manufacturer. To what extent such controls or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22922197 (N.D.Ill.)
(Cite as: 2003 WL 22922197 (N.D.Ill.))

other consistencies practiced in bullet manufacturing limit the actual variations in composition of bullet lead, is unknown.

**\*3** It appears to us that Peters' opinions are grounded in two separate areas of expertise. The actual analysis of the two lead bullet compositions is a question of chemistry or chemical engineering. As pointed out above, this part of Peters' proposed testimony is not challenged at this time. The second portion of Peters' proposed testimony is essentially a statistical conclusion, i.e., Peters proposes an opinion as to a problem of probability. How probable is it that bullets having compositions so nearly identical as to be deemed "analytically indistinguishable" came from the same "source"? The answer to this question·lies in statistical analysis. Given sufficient information a mathematician or statistician can accurately determine the probability of a given event, such as the likelihood that two bullets with the same elemental composition would have been manufactured from the same source. Herein, however, lies the government's problem. It is best stated in the government's own brief: "Indeed, the fact that no quantitative estimates can be made does not mean that the evidence has no value, only that the process of attempting to put a quantitative estimate on this value contains so many variables that such an estimate cannot now reasonably be made." Government's Memorandum at 17. If a scientifically valid estimate cannot reasonably be made, how then can an expert give an opinion? The government's response, as we see it, is that even though an opinion cannot be given as to the precise probability of such an event, there is sufficient data from the few studies that have been made, the fact that theoretically there is an almost infinite number of permutations which can result from the mixing of the seven elements normally found in bullets as well as thirty years of real world experience in this field, and the case law recognizing both the relevance and significance of such testimony to support the conclusion that indistinguishable lead batches are extraordinarily unusual. We are not persuaded by this reasoning. It is precisely as the government states-there are too many variables, each of which could greatly affect the probability of the predicted event, to conclude that any one result is more likely than the other. Peters' ultimate conclusion is based upon a series of determinations that lack scientific accuracy. For example-on a very basic level, there is no precise or even generally accepted definition of what a "source" of lead for bullets is. Is a "source" defined in terms of weight

of melted bullet lead from which the bullets are finally extruded or is it defined by the length of time during which the manufacturing process runs, or is it a combination of both? The likelihood of homogeneity in elemental composition of all bullets coming from a batch which is poured over the course of several days and consists of tens of thousands of pounds of molten lead may be quite different from the likelihood of homogeneity in composition of bullets coming from a batch which is poured over the course of only a few hours and consists of only 1,000 pounds of molten lead. How often does the composition of available scrap metal which some manufacturers mix in with their bullet lead change? Is it the same over a long period of time for any particular manufacturing facility or does it change from day to day? If a source is poured over a substantial period of time, how often during this process does the mix of trace elements thrown into the melt change? Is it different for each manufacturer, or even for each batch of bullets produced? Do results differ when the "source" is from a secondary smelter from which ingots or billets are made and shipped to the manufacturer as opposed to the remelting of ingots by the bullet manufacturer itself?

**\*4** Further, the reports cited by the opposing parties appear to reach contradictory results regarding both the uniqueness of the element composition of bullets prepared from the same "source" and the homogeneity of the element composition of bullets prepared from the same source. None of these studies involve an adequately representative and randomly selected sample which could support or rebut general conclusions as to the validity of the government's underlying principles for all lead bullet analysis situations. Both sides agree that bullets with the same elemental composition can result from different sources or melts of lead. The government argues that this is a random occurrence with an extremely small probability. But, in truth, no one can say with any reasonable degree of scientific certainty what the probability or even the range of probabilities is.

The government references the FBI's "historical data base" as support for its position here. According to the Government's Memorandum, the FBI database contains 27,000 samples from approximately 1,837 different sources. (Government's Memorandum at 22, fn 20.) As Defendant points out the government fails to provide information about the source of these

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22922197 (N.D.Ill.)
(Cite as: 2003 WL 22922197 (N.D.Ill.))

27,000 samples, how they were selected, and, assuming they were gathered over the last thirty years, whether they were collected at the same rate during the last thirty years, or whether their collection concentrated in a certain time period or came from any particular geographic location. The defense argues that the 27,000 samples actually come from only 9,000 bullets. (Three samples are taken of each bullet, resulting in 27,000 samples.) Further, the defense argues the 9,000 bullets consist of bullets, bullet fragments, or shotgun pellets sent in by various law enforcement offices for analysis. The important point, however, is that the record before us does not reflect that the samples were gathered in any approved scientific manner so as to be considered as representative of the bullet population as a whole. The samples were not randomly collected according to any scientifically accepted sampling method. For these reasons, Defendant concludes, the FBI's historical database fails to satisfy accepted scientific methodology and, consequently, cannot form the basis for expert opinion testimony under the requirements of *Daubert*. The court agrees.

Moreover, if Defendant's statistics are correct, a sample of 1,837 is extremely small to be used to reliably extrapolate principles as to the total bullet population. According to the Defendant, the United States produces approximately 5,000,000,000 bullets per year, so the bullet production over the thirty years represented by the FBI database equals 150 billion bullets. While an expert in statistics may be able, once the precise variables in the manufacturing process have been established, to design a study which need only utilize a seemingly very small sample size, that is not the case before us. The Court is not convinced that general conclusions upon which to base an expert opinion as to the source of bullets can be based upon results documented in the FBI's historical database. An expert opinion can carry a great deal of weight with the trier of fact. For this reason expert opinions must be based upon reliable data. In this case, which involves an opinion as to probability, that means that there must be some basis in support of the opinion that a statistician or mathematician would consider to be at least arguably scientifically valid. Peters' experience in the field and the FBI's experience over the last 30 years as reflected by its database lack scientific methodology and are therefore, in essence, anecdotal evidence. As such they ought not to be utilized as a basis upon which to construct an expert opinion. The number of samples collected and comparisons

done by both Peters and the FBI may seem great, but given the number of bullets produced every year and the fact that the FBI database spans thirty years, the relevant population is huge. It is therefore not safe, no matter how tempting, to draw conclusions from such prior experiences unless scientific standards have been incorporated to assure that a representative sample has been obtained. As pointed out above, that has not been done in this case. For this reason, the government's argument that the Defendant's criticisms go to the weight of the proposed expert testimony and not its admissibility is not convincing. Because the testimony comes in the form of an opinion from an expert in chemical analysis, the jury is quite likely to believe that his opinion as to the source of the bullets also comes from the application of rigorous scientific standards. That is not so. Nor is it sufficient to rely upon cross-examination to counter the effects of an opinion that is not founded upon facts established by valid scientific methodology.

*5 The inability of these "studies" to provide a basis for Peters' testimony is illustrated by the government's argument that "the level of bismuth in the questioned and known bullets in this case is remarkably unusual." (Government's. Memorandum at 21) But as the defense points out, "remarkably unusual" as compared to what? The government admits that it has no data from Remington as to the bismuth levels in the .22 caliber bullets they have manufactured over many years. Moreover, bismuth contents in the range of 330-370 ppm up to 500 ppm can be found in the FBI's own database. There is, therefore, absolutely no way to know if the bismuth level in these bullets is in fact "remarkably unusual". It may be so in Peters' experience, but as we have pointed out, given the huge population with which we are concerned (in the billions), Mr. Peters' experience is no more than anecdotal evidence. Such evidence can be particularly misleading because it appears logical and reasonable. If agent Peters has not, in years of experience and after hundreds of analyses, previously encountered such a high quantity of bismuth, then why should we not conclude that this is a highly unusual occurrence? The answer to that question lies in the huge size of the bullet population and the relative insignificance of agent Peters' own personal experience in such a huge population. An expert witness opinion on an issue of chemical analysis and comparisons can carry with it the imprimatur of great learning, advanced technology and scientific validity in the mind of the trier of facts. Juries often tend to give such testimony

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22922197 (N.D.Ill.)
(Cite as: 2003 WL 22922197 (N.D.Ill.))

great weight. Given the lack of scientific foundation for the opinion, the government's expert ought not to be allowed to opine as to a common source for the bullets recovered from the Defendant and those recovered from the body of the victim.

Rule 702 of the Federal Rules of Evidence provides

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702, trial courts act as gatekeepers, to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Rule 702 inquiry focuses on the "scientific validity of the principles that underlie" the proposed testimony. *Id.* at 594-95. Such "scientific validity" is required to satisfy the Rule's requirements of relevance and reliability. *Id.*

To be reliable under Rule 702, expert testimony must constitute "scientific knowledge." As the United States Supreme Court explained:

*6 The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation-i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

Id. at 590. (Footnote omitted).

We understand that the FBI Laboratory has performed comparative bullet lead analysis (CBLA) for

many years. Furthermore, we understand that persons from the FBI Laboratory, including Charles Peters, have for years been allowed to testify at trials as to their opinions regarding the source of tested bullets based on CBLA. In our opinion, however, the required standard of scientific reliability is met only as to the proposed opinion testimony that the elements composition of the bullets recovered from the body is indistinguishable from the composition of the bullets found in the Defendant's car. There is no body of data to corroborate the government's expert's further opinion that from this finding it follows that the bullets must or even likely came from the same batch or melt. The motion to exclude the expert testimony of Charles Peters relating to comparative bullet lead analysis is therefore granted in part and denied in part.

SO ORDERED

N.D.Ill.,2003.
U.S. v. Mikos
Not Reported in F.Supp.2d, 2003 WL 22922197 (N.D.Ill.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**AFFIDAVIT OF SERVICE**
A-6576-06T4
-------------------------------------------------------------------------X
State of New Jersey,
      vs.

Melanie McGuire.
-------------------------------------------------------------------------X

    EDWARD T. O'CONNELL
    13 WILLIAM ST. APT. 2
    GARFIELD, N J 07026
    I,       , swear under the pain and penalty of perjury,  that according to law and being over the age of 18, upon my oath depose and say that:

      on July 2, 2010

      I served the within Reply Brief and Appendix on Behalf of Defendant-Appellant Melanie McGuire in the above captioned matter upon:

    Daniel Bornstein
    Deputy Attorney General
    New Jersey Division of Criminal Justice
    Richard J. Hughes Justice Complex
    25 West Market Street, 5th Floor
    P.O. Box 085
    Trenton, NJ  08625

via **Express Mail** by depositing  **2** copies of same, enclosed in a post-paid, properly addressed wrapper, in an official depository maintained by United States Postal Service.

Unless otherwise noted, copies have been sent to the court on the same date as above for filing via Hand Delivery.

**Sworn to before me on July 2, 2010**

Robyn Cocho
Notary Public State of New Jersey
No. 2193491
Commission Expires January 8, 2012

Edward T. O'Connell

Job # 230811