MICHAEL A. PRIARONE, Attorney Id. 024301980
P.O. BOX 933
DENVILLE, NEW JERSEY 07834-0933
973-625-2187
Email: Michael.Priarone@verizon.net
Designated Counsel for
Defendant-Appellant

JOSEPH E. KRAKORA
PUBLIC DEFENDER
Attorney for Defendant-Appellant
31 Clinton Street
Newark, New Jersey 07101

| | |
|---|---|
| **STATE OF NEW JERSEY** | **SUPERIOR COURT OF NEW JERSEY**<br>**APPELLATE DIVISION** |
| **Plaintiff-Respondent** | **Docket No. A-2150-14T4** |
| **v.** | **Criminal Action** |
| **MELANIE MCGUIRE** | |
| **Defendant-Appellant** | **ON APPEAL FROM A DENIAL OF**<br>**POST CONVICTION RELIEF IN THE**<br>**SUPERIOR COURT, LAW DIVISION**<br>**MIDDLESEX COUNTY** |

**Sat below:  Hon. Bradley J. Ferencz, J.S.C.**

---

**APPENDIX ON BEHALF OF THE DEFENDANT, MELANIE MCGUIRE**

---

Confined

# INDEX TO APPENDIX

page

State Grand Jury Ind. No. 05-10-164-S . . . . . .  Da 1-5

Judgment of Conviction . . . . . . . . . . . .  Da 6-9

State Grand Jury Ind. No. 06-10-119-S . . . . . . Da 10-17

Order Consolidating Indictments for Trial . . . .  Da 18

Certification of Jamie S. Kilberg, Esq. . . . . . Da 19-27

Certification of Stephen Turano, Esq. . . . . . . Da 28-29

Affidavit of Robert Morrison . . . . . . . . . .Da 30-33

Police Report of Donald Macciocca (6/20/2005). .  Da 34-40

Transcript of Statement of Dawn Zhu. . . . . . .  Da 41-49

Certification of Dawn Zhu . . . . . . . . . .  Da 50-51

Certification of Investigator Fleurimond. . . .  Da 52-53

Police Report of Matthew Kuehn (4/18/2005). . . . Da 54-58

Apartment Lease . . . . . . . . . . . . . . .  Da 59-63

Certification of Ronald Chwala, Jr. . . . . .  Da 64-65

Certification of Lois De Julio, Esq. . . . .  Da 66-67

Retainer Agreement, 11/18/2005 . . . . . . . .  Da 68-69

Supplemental Retainer Agreement, 3/9/2007. . .  Da 70-71

Certification of Richard Scott . . . . . . . .  Da 72-73

Certification of Ann McGuire . . . . . . . . .  Da 74-75

Certification of David M. Benjamin, Ph.D. . .  Da 76-77

Report and CV of David M. Benjamin, Ph.D. . .  Da 78-112

Certification of Investigator Francis J. Reilly Da 113-115

Rutgers Academic Records of William McGuire. .    Da 116-119

Certification of Peter R. DeForest, D.Crim. . .      Da 120

Report and CV of Peter R. DeForest, D.Crim. . . Da 121-149

Certification of Investigator Paul Ibsen. . . . Da 150-151

Order Denying Motion to Supplement the Record on
Direct Appeal . . . . . . . . . . . . . . . .      Da 152

Excerpt Pro Se Verified Petition for P.C.R. . .      Da 153

Notice of Motion for Discovery on P.C.R. . . . Da 154-155

Order Denying Motion for Discovery . . . . . .      Da 156

Opinion Denying Motion for Discovery . . . . . Da 157-164

Order Denying Post Conviction Relief . . . . .      Da 165

Opinion Denying Post Conviction Relief . . . . Da 166-189

Notice of Appeal . . . . . . . . . . . . . . Da 190-191

SUPERIOR COURT OF N.J.
**FILED**

**OCT 1 1 2005**

**DONALD F. PHELAN**
CLERK

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - CRIMINAL

State Grand Jury
    Number  SGJ507-05-4
Superior Court  **03-10-00164-05**
Docket Number

STATE OF NEW JERSEY )

                v.        )                    INDICTMENT

MELANIE MCGUIRE        )


The Grand Jurors of and for the State of New Jersey, upon their

oaths, present that:

### COUNT ONE

(Murder - First Degree)

MELANIE MCGUIRE

between on or about April 28, 2004 and on or about May 5, 2004, at

the Township of Woodbridge in the County of Middlesex, elsewhere and

within the jurisdiction of this Court, did purposefully cause the

death of William McGuire and did aid or agree or attempt to aid in

the planning or commission of said crime, contrary to the provisions

of N.J.S.A. 2C:11-3 and N.J.S.A. 2C:2-6 and against the peace of

this State, the government and the dignity of the same.

014373

Da 1

## COUNT TWO

(Possession of a Weapon for an Unlawful Purpose - Second Degree)

### MELANIE MCGUIRE

between on or about April 26, 2004 and on or about May 5, 2004, at the Township of Woodbridge, elsewhere and within the jurisdiction of this Court, did possess a certain weapon, a firearm, with purpose to use it unlawfully against the person of another, that is William McGuire, contrary to the provisions of N.J.S.A. 2C:39-4a and N.J.S.A. 2C:2-6 and against the peace of this State, the government and the dignity of the same.

Da 2

014274

<u>COUNT THREE</u>

(Desecrating Human Remains - Second Degree)

MELANIE MCGUIRE

between on or about April 28, 2004 and on or about May 5, 2004, at the Township of Woodbridge, elsewhere and within the jurisdiction of this Court, did purposefully, knowingly and unlawfully desecrate, damage or destroy the human remains of William McGuire and did aid or agree or attempt to aid in the planning or commission of said crime, contrary to the provisions of <u>N.J.S.A.</u> 2C:22-1 and <u>N.J.S.A.</u> 2C:2-6 and against the peace of this State, the government and the dignity of the same.

- 3 -




014375

## COUNT FOUR

### (Perjury - Third Degree)

### MELANIE MCGUIRE

on or about April 30, 2004, in the City of New Brunswick, in the County of Middlesex, elsewhere and within the jurisdiction of this Court, knowingly did appear at an official proceeding, namely in the matter of <u>McGuire v. McGuire</u>, was duly sworn under oath or equivalent affirmation and at such proceeding Melanie McGuire did make false material statements, in sum and substance, by advising the Superior Court of New Jersey, Law Division, Family Part, that William McGuire was a threat to her health and safety, that she required the protection of a restraining order, that her husband left their home by his own volition, and more specifically by stating that:

> I mean, he wasn't in any rush, he didn't bolt
> out the door or anything and I just stayed in
> there and stayed away from him until he left;



014376

all of which Melanie McGuire did not believe to be true, contrary to the provisions of <u>N.J.S.A.</u> 2C:28-1 and against the peace of this State, the government and the dignity of the same.

Vaughn L. McKoy
Director
Division of Criminal Justice

A TRUE BILL:

Foreperson

Dated: Oct 11, 2005

- 5 -

014377

Da 5

| 05O01293-001 | State of New Jersey | New Jersey Superior Court Law Division - Criminal |
|---|---|---|

**v.**

**MCGUIRE, MELANIE**

Defendant:
(Specify Complete Name)

- ● JUDGEMENT OF CONVICTION
- ○ CHANGE OF JUDGEMENT
- ● ORDER FOR COMMITMENT
- ○ INDICTMENT / ACCUSATION DISMISSED
- ○ JUDGEMENT OF ACQUITTAL
- ○

| DATE OF BIRTH 10/08/1972 | SBI NUMBER 319833C |
|---|---|
| DATE OF ARREST 06/02/2005 | DATE INDICTMENT/ ACCUSATION FILED |
| DATE OF ORIGINAL PLEA | ORIGINAL PLEA ○ NOT GUILTY ○ GUILTY |

| ADJUDICATION BY | ○ GUILTY PLEA | DATE: | ○ NON-JURY TRIAL | DATE: |
|---|---|---|---|---|
| | ● JURY TRIAL | DATE: 04/23/2007 | ○ Dismissal/Acquittal | DATE: |

### ORIGINAL CHARGES

| IND.ACC NO. | COUNT | DESCRIPTION | DEGREE | STATUTE |
|---|---|---|---|---|
| 05-10-00164-S | 1 | Murder | 1 | NJSA 2C:11-3; 2C:2-6 |
| | 2 | Possession of Weapon for Unlawful Purposes | 2 | NJSA 2C:39-4a; 2C:2-6 |
| | 3 | Desecrating Human Remains | 2 | NJSA 2C:22-1; 2C:2-6 |
| | 4 | Perjury | 3 | NJSA 2C:28-1 |

### FINAL CHARGES

| COUNT | DESCRIPTION | DEGREE | STATUTE |
|---|---|---|---|
| 1 | Murder | 1 | NJSA 2C:11-3 |
| 2 | Possession of Weapon for Unlawful Purposes | 2 | NJSA 2C:39-4A & 2C:2-6 |

Continued on Page 3

It is, therefore, on   07/19/2007   ORDERED and ADJUDGED that the defendant is sentenced as follows.
As to Count 1 of the Indictment, the Defendant is committed to the custody of the Commissioner of the Department of Corrections to serve a term of life imprisonment and the Defendant must serve 85% of the term before being eligible for parole. In addition, the defendant is Ordered to pay SNSF $75, VCCB $1000, LEO $30. Parole supervision for 5 years. Count 2 merges with Count 1.

CONTINUED ON PAGE 3 ......

JAIL CREDIT: 6/2/05 to 6/7/05; 10/12/05 to 12/3/05; 10/30/06 - 10/31/06; 4/23/07 to 7/18/07 = 148 days.

- ○ You are hereby sentenced to community supervision for life.
- ○ The defendant is hereby ordered to serve a     year term of parole supervision which term shall begin as soon as defendant completes the sentence of incarceration.
- ○ The court finds that the defendant's conduct was characterized by a pattern of repetitive and compulsive behavior.
- ○ The court finds that the defendant is amenable to sex offender treatment.
- ○ The court finds that the defendant is willing to participate in sex offender treatment.
- ● The defendant is hereby ordered to provide a DNA sample and ordered to pay the costs for testing of the sample provided.
- ● It is further ORDERED that the sheriff deliver the defendant to the appropriate correctional authority.

| ● Defendant is to receive credit for time spent in custody (R. 3:210-8). | Total Number of Days | DATE (From/To) |
|---|---|---|
| | | DATE (From/To) |
| | 148 | DATE (From/To) |
| ○ Defendant is to receive gap time credit for time spent in custody (N.J.S.A. 2C:44-5b(2)). | Total Number of Days | DATE (From/To) |

| TOTAL CUSTODIAL TERM | life | INSTITUTION | CCDC | TOTAL PROBATION TERM |
|---|---|---|---|---|



State of New Jersey v. **McGUIRE, MELANIE**    S.B.I. # 319833C    IND/ACC # 05-10-00164-S

| Total FINE | If any of the offenses occurred on or after July 9, 1987, and is for violation of Chapter 35 or 36 of Title 2C, |
|---|---|
| Total RESTITUTION | 1) A mandatory Drug Enforcement Demand Reduction (DEDR) penalty is imposed for each count. (Write in $ fines for each.) |

If the offense occurred on or after December 23, 1991 an assessment of $50 is imposed on each count on which the defendant was convicted unless the below indicates a higher assessment to N.J.S.A. 2C:43-3.1. (Assessment is $30 if offense is on or after January 9, 1986 but before December 23, 1991, unless a higher penalty is noted. Assessment is $25 if offense is before January 9, 1986.)

1st Degree @$3000    4th Degree @$750
2nd Degree @$2000    Disorderly Persons or Petty
3rd Degree @$1000    Disorderly Persons @ $500

Total D.E.D.R. Penalty

◯ Court further ORDERS that collection of the DEDR penalty be suspended upon defendant's entry into a residential drug program for a term of the program

☒ Assessment imposed on

count(s)    **3**

is    **each.**

Total VCCB Assessment    **$1,100.00**

2) A forensic laboratory fee of $50 per offense is ORDERED.    Offenses @ $50.

Total Lab FEE

3) Name of Drugs involved

4) A mandatory driver's license suspension of    months is ORDERED.

The suspension shall begin today,    and end

Driver's license number

(IF THE COURT IS UNABLE TO COLLECT LICENSE, PLEASE ALSO COMPLETE THE FOLLOWING.)

◯ Installment payments are due at the rate

of    per

beginning

(DATE)

Defendant's address

Eye Color    Sex    Date of Birth    **10/08/1972**

The defendant is the holder of an out-of-state driver's license from the following jurisdiction    Driver's License

Defendant's non-resident driving privileges are hereby revoked for    months.

If the offense occurred on or after February 1, 1993 but before March 13, 1995 and the sentence is to probation or to a State Correctional Facility, a transaction fee of up to $1.00 is ordered for each occasion when a payment or installment is made. (P.L. 1992, c.189). If the offense occurred on or after March 13, 1995 and the sentence is to probation, or the sentence otherwise requires payments of financial obligations to the probation division, a transaction fee of up to $2.00 is ordered for each occasion when a payment is made (P.L. 1995, c.9).

If the offense occurred on or after August 2, 1993, a $75.00 Safe Neighborhood Services Fund assessment is ordered for each conviction. P.L. 1993, c. 220    TOTAL    **$225.00**

If the offense occurred on or after January 9, 1994 and the sentence is to probation, a fee of up to $25 per month for the probationary term is ordered. (P.L. 1993, c. 275)    Amount per month

If the crime occurred on or after January 9, 1997, a $30 Law Enforcement Officers Training and Equipment Fund penalty is ordered. Total    **$30.00**

If the crime occurred on or after May 4, 2001, and the defendant has been convicted of aggravated sexual assault, sexual assault, aggravated criminal sexual contact, kidnapping under 2C:13-1c(2), endangering the welfare of a child by engaging in sexual conduct which would impair or debauch the morals of a minor under 2C:24-4a, endangering the welfare of a child pursuant to 2C:24-4b(4), luring or enticing a child pursuant to 2C:13-6, criminal sexual contact pursuant to 2C:14-3b if victim is a minor, kidnapping pursuant to 2C:13-1, criminal restraint pursuant to 2C:13-2 or false imprisonment pursuant to 2C:13-3 if the victim is a minor and the offender is not the parent,

| NAME (Court Clerk or Person who prepares this form) | TELEPHONE NUMBER | NAME (Attorney for defendant at Sentencing) |
|---|---|---|
| A.C. | (732) 981-3198 | Stephen Turano, Esq. |

STATEMENT OF REASONS - include all applicable aggravating and mitigating factors

A jury found defendant guilty of Murder in the first degree, Possession of a Weapon for an Unlawful Purpose, Desecrating Human Remains, and Perjury. The No Early Release Act applies to the Murder Conviction. The Court has reviewed the Presentence Report, certain psychological evaluations received in connection with the Presentence Report, various letters from family and friends of the victim and the defendant, the arguments of counsel, and the statements made to the Court today by victims, witnesses, and the defendant. After reviewing all this information, the Court finds the following aggravating factors with respect to the murder conviction.

CONTINUED ON PAGE 3 .................

| JUDGES NAME | JUDGE (Signature) | DATE |
|---|---|---|
| Hon. Frederick P. DeVesa, PJCr. | | 07/19/2007 |

Administrative Office Of The Courts
State Bureau Of Identification
COPIES TO: CHIEF PROBATION OFFICER    STATE POLICE    AOC CRIMINAL PRACTICE DIVISION    DEPARTMENT OF CORRECTIONS OR COUNTY PENAL INSTITUTION    CPC108(rev. 12/98)



Da 7

State of New Jersey v.  MCGUIRE, MELANIE        S.B.I. #      319833C        IND/ACC #      05-10-00164-S

Final Charges Continued....

| Count 3 | Desecrating Human Remains | 2nd Degree | NJSA 2C:22-1 & 2C:2-6 |
| Count 4 | Perjury | 3rd Degree | NJSA 2C:28-1 |

SENTENCING ORDER CONTINUED .....

As to Count 3 of Indictment, the Defendant is committed to the custody of the Commissioner of the Department of Corrections to serve a term of imprisonment of 10 years with a period of parole ineligibility of 5 years.  Since the desecration of the remains of William was an integral part and continuation of the same criminal episode that included this heinous murder, the sentence must run concurrent to Count 1.  In addition, the Defendant is Ordered to pay SNSF $75, VCCB $50  Parole supervision for 3 years.

As to Count 4, Defendant is committed to the custody of the Commissioner of the Department of Corrections to serve a term of imprisonment of 5 years with a period of parole ineligibility of 2.5 years.  The sentence for Count 4 shall be served consecutive to Counts 1 and 2.  In addition, Defendant is Ordered to pay SNSF $75 and VCCB $50.

STATEMENT OF REASONS CONTINUED .....

The Nature and Circumstances of the Offense constitutes an aggravating factor in that the crime was committed in an especially heinous, cruel or depraved manner. The nature, complexity and scope of the criminal episode involving numerous overt acts committed over a three week period and spanning four different states reflects willfulness and malice that goes far beyond the elements of murder. The desecration of William McGuire's remains was particularly heinous and depraved. His body was treated as trash, cut and sawed apart and then packaged in garbage bags. His remains were left to rot in the waters of a foreign state, without identification, so that his family and friends would be deprived of a dignified funeral service and burial.

The depravity of the murder was further manifested by the efforts on the part of the defendant to portray William McGuire as an abusive husband and chronic gambler who was indebted to organize crime figures as part of her attempt to shift the blame for his murder to others.

Most tragically, the murder of William McGuire and the attack on his character has surely caused grave harm to his children. They must now grow up without a mother or father and their memories of both will be distorted and confused by the web of deception created by the defendant.  The depravity of this murder simply shocks the conscience.

Clearly the need to deter this defendant and others from this type of horrendous criminality is also an aggravating factor Evidence was presented that defendant was carrying on a long term, intimate affair with a colleague with whom she was planning a future. The need for deterrence is particulary important in cases of calculated premeditated murder.  This Court must impose a sentence that makes it clear that one who callously destroys a family by resorting to violence and murder to accomplish her own selfish ends must face the most severe consequences that the law provides.

Incredibly, the defendant argues that her imprisonment and the resultant excessive hardship to her children should be considered as a mitigating factor.  There is no doubt that because of her cruel and deliberate actions, the McGuire children have been deprived of both of their parents but they are being well cared for by their father's family.  To consider this hardship imposed on them as a mitigating factor that should benefit the defendant would make a mockery of our system of justice.

Counsel for the defense also argue that the character and attitude of the defendant indicate that she is unlikely to commit another offense and have provided the court with numerous letters of support for her. Ironically the State argues that defendant's character is an aggravating factor and offers equally persuasive evidence. Given the mandatory term of imprisonment, neither of these factors seem quite significant.  In any event, the Court simply cannot conclude that the defendant's character is a mitigating factor.  While it does appear that the defendant has done  some good deeds, the record in this case also reveals that she has been a ruthless, calculating and  manipulative individual,. History is replete with evil doers who have also done good deeds and  have their supporters.

CONTINUED ON PAGE 4. ....

Da  8

State vs. MCGUIRE, MELANIE          Page 4          Ind. # 05-10-00164-S

STATEMENT OF REASONS CONTINUED ....

Before the murder of her husband and the desecration of his remains, the defendant
carried on extramarital affairs even while expecting one of her children. After the
murder, the defendant callously ridiculed her husband and even joked about his death on
intercepted telephone conversations with friends and relatives. As she orchestrated her
web of deception, she manipulated friends like Jim Finn and relatives to help her and she
discouraged them from cooperating with the investigation. Her character cannot be
considered a mitigating factor.

Finally, the defense argues that defendant has led a law-abiding life for a substantial
period of time before the commission of the present offense. While this is technically
accurate, the Court finds this factor to be relatively insignificant since the defendant was
previously charged with perjury before a municipal court in Union County but allowed
Pre Trial Intervention as recently as 1998. Despite the second chance afforded the
defendant through PTI, she once again made false statements to obtain a handgun in
Pennsylvania in 2004 and has now also been convicted of perjury in connection with this
criminal episode.

After careful consideration, the Court is clearly convinced that the two very significant
aggravating factors substantially outweigh the one mitigating factor. The overall
circumstances of a crime has been described to be the single most important sentencing
factor under our law. In this case crime was so heinous, so cruel and depraved that the
Court finds that the maximum sentence should be imposed.



Da 9

SUPERIOR COURT OF NJ.
REC'D

OCT 26 2006

*Phoebe J. Fitz*
Acting Clerk

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - CRIMINAL

State Grand Jury
    Number  SGJ 529-06-7(2)
Superior Court  06-10-00119-S
Docket Number _____

STATE OF NEW JERSEY        )

        v.                 )                    INDICTMENT

MELANIE MCGUIRE           )


        The Grand Jurors of and for the State of New Jersey, upon

their oaths, present that:

### COUNT ONE

(Hindering Prosecution - Third Degree)

### MELANIE MCGUIRE

on or about August 11, 2005, at the City of Trenton, in the

County of Mercer, elsewhere, and within the jurisdiction of this

Court, with purpose to hinder her own detention, apprehension,

investigation, prosecution, conviction or punishment, did give

false information to a law enforcement officer, via a letter

addressed to New Jersey Attorney General Peter Harvey and mailed

to the Trentonian newspaper, contrary to the provisions of

N.J.S.A. 2C:29-3b(4) and N.J.S.A. 2C:2-6, and against the peace

of this State, the government and dignity of the same.

Da 10

<u>COUNT TWO</u>

(Hindering Prosecution - Third Degree)

MELANIE MCGUIRE

between on or about October 9, 2005 and on or about October 11, 2005, at the City of Passaic and at the City of Clifton, in the County of Passaic, at the City of Trenton, in the County of Mercer, elsewhere, and within the jurisdiction of this Court, with purpose to hinder her own detention, apprehension, investigation, prosecution, conviction or punishment, did give false information to a law enforcement officer via a Federal Express package sent to the New Jersey Attorney General's Office, contrary to the provisions of <u>N.J.S.A.</u> 2C:29-3b(4), and against the peace of this State, the government and dignity of the same.

<u>COUNT THREE</u>

(Tampering With or Fabricating Physical Evidence - Fourth Degree)

MELANIE MCGUIRE

between on or about October 9 and on or about October 11, 2005,

at the City of Passaic and at the City of Clifton, in the County

of Passaic, at the City of Trenton, in the County of Mercer,

elsewhere, and within the jurisdiction of this Court, believing

that an official proceeding or investigation was pending or about

to be instituted, knowingly did make, devise, prepare, present,

offer or use an article, object, record, document, or other thing

of physical substance, knowing it to be false and with purpose to

mislead a public servant who is engaged in such proceeding or

investigation via a Federal Express package sent to the New

Jersey Attorney General's Office, contrary to the provisions of

<u>N.J.S.A.</u> 2C:28-6(2), and against the peace of this State, the

government and dignity of the same.

Da R

- 3 -

## COUNT FOUR

(False Reports to Law Enforcement Authorities - Fourth Degree)

MELANIE MCGUIRE

between on or about October 9, 2005 and on or about October 11, 2005, at the City of Passaic and at the City of Clifton, in the County of Passaic, at the City of Trenton, in the County of Mercer, elsewhere, and within the jurisdiction of this Court, knowingly did give or cause to be given false information to a law enforcement officer via a Federal Express package sent to the New Jersey Attorney General's Office, with purpose to implicate another in the murder of William McGuire, contrary to the provisions of N.J.S.A. 2C:28-4a, and against the peace of this State; the government and dignity of the same.

Da 13

<u>COUNT FIVE</u>

(Possession of a Controlled Dangerous Substance - Third Degree)

MELANIE MCGUIRE

on or about October 9, 2005, at the City of Passaic and at the City of Clifton, in the County of Passaic, elsewhere and within the jurisdiction of this Court, knowingly or purposely did possess a controlled dangerous substance, that is Adderall XR (Dextroamphetamine Saccharate, Amphetamine Aspartate, Dextroamphetamine Sulfate, Amphetamine Sulfate), a Schedule II narcotic drug, contrary to the provisions of <u>N.J.S.A.</u> 2C:35-10a(1), and against the peace of this State, the government and dignity of the same.

Da 14

## COUNT SIX

(Possession of a Controlled Dangerous Substance - Third Degree)

### MELANIE MCGUIRE

on or about October 9, 2005, at the City of Passaic and at the City of Clifton, in the County of Passaic, elsewhere, and within the jurisdiction of this Court, knowingly or purposely did possess a controlled dangerous substance, that is Ambien (Zolpidem), a Schedule IV substance, contrary to the provisions of N.J.S.A. 2C:35-10a(1), and against the peace of this State, the government and dignity of the same.

Da 15

## COUNT SEVEN

(Possession of a Controlled Dangerous Substance - Third Degree)

### MELANIE MCGUIRE

on or about October 9, 2005, at the City of Passaic and at the
City of Clifton, in the County of Passaic, elsewhere, and within
the jurisdiction of this Court, knowingly or purposely did
possess a controlled dangerous substance, that is Alprazolam, a
Schedule IV substance, contrary to the provisions of N.J.S.A.
2C:35-10a(1), and against the peace of this State, the government
and dignity of the same.

Da 16

COUNT EIGHT

(Possession of a Controlled Dangerous Substance - Third Degree)

MELANIE MCGUIRE

on or about October 9, 2005, at the City of Passaic and at the City of Clifton, in the County of Passaic, elsewhere, and within the jurisdiction of this Court, knowingly or purposely did possess a controlled dangerous substance, that is Temazepam, a Schedule IV substance, contrary to the provisions of N.J.S.A. 2C:35-10a(1), and against the peace of this State, the government and dignity of the same.

Gregory A. Paw, Director

BY: _Jennifer L. Gottschalk_

Jennifer L. Gottschalk, S.D.A.G.
Division of Criminal Justice

A TRUE BILL:

_Dep,_ Foreperson

Dated: 10/26/05

Da 17

- 8 -

**F I L E D**

JAN 2 5 2007

HON. FREDERICK P. DE VESA

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY

STATE OF NEW JERSEY,                  :

    Plaintiff,                        :

      v.                             :

MELANIE MCGUIRE                       :

    Defendants.                       :

CRIMINAL ACTION

Docket Nos.: 05-10-164-S and 06-10-116-S

**ORDER JOINING INDICTMENTS FOR
TRIAL**

This matter having been opened to the Court on motion by the State of New Jersey,

Assistant Attorney General Patricia Prezioso, appearing, on notice to Stephen Turano, Esq., and

the Court having had the opportunity to consider the certifications, briefs and arguments of

counsel and for other good cause shown;

IT IS on this __24__ day of January, 2007,

ORDERED that the motion to consolidate the captioned indictments is hereby granted,

and it is further

ORDERED that Indictments 05-10-164-S and 06-10-116-S are hereby joined for trial

consistent with the Opinion of this Court issued on January 22, 2007; and it is further

ORDERED that a copy of this Order shall be served upon all counsel of record within 7

days of the date of this Order.

FREDERICK P. DEVESA, P.J.S.C.

D 18

IN THE SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION

| | |
|---|---|
| STATE OF NEW JERSEY, Respondent, | ) Docket No. A-006576-06T4 ) ) ON APPEAL FROM: ) Middlesex County, Law Division |
| v. | ) Indictment Nos. 06-10-00119-S, ) 05-10-00164-S |
| MELANIE McGUIRE, Appellant. | ) ) SAT BELOW: ) Hon. Frederick DeVesa, J.S.C. |

## CERTIFICATION OF COUNSEL IN SUPPORT OF APPELLANT'S MOTION TO SUPPLEMENT THE RECORD OR FOR A LIMITED REMAND

JAMIE S. KILBERG, being duly sworn, deposes and says:

1.    I am a member of the bar of the District of Columbia and the State of Michigan, and I am an associate of the law firm of Baker Botts L.L.P., counsel for Defendant-Appellant Melanie McGuire in the above-captioned proceeding.  I am over the age of 18, and I submit this affidavit in support of appellant's Motion To Supplement The Record Or For A Limited Remand, based on my personal knowledge of the facts herein.

2.    Subsequent to the filing of Ms. McGuire's appeal, I learned of the existence of a database at the website of Taurus International Manufacturing, Inc., a firearms manufacturer.  The website, located at http://www.taurususa.com/products/findmodel .cfm, permits a user to input a serial number of a Taurus firearm and retrieve identifying information about that firearm.

The material sought to be added to the record -- print-outs from Taurus' website -- are included as Attachment A hereto.

3.  Based on notations in the trial record that the serial number of the firearm Ms. McGuire purchased in 2004 was "XA53389," I input that number into the Taurus database.  The information that was returned is included in Attachment A at 3A-4A.  That page further allowed me to obtain "more information on your Taurus Model."  The "more information" returned is included in Attachment A at 5A-6A, and indicates that a model 85B2 .38 special gun has five grooves.

4.  On April 29, 2009, I telephoned Taurus' published customer service number: (305) 624-1115.  I provided the representative the serial number from the evidence at trial ("XA53389"), and asked when that particular gun was made and how many lands and grooves that firearm had.  The representative told me the gun was manufactured in January 2004, and that it had five grooves.  I also inquired whether that model gun always had five lands and grooves, or whether it was ever changed.  He told me that it always had only five grooves.

5.  While not dispositive of the current motion, in April 2009 I spoke with two different ballistics experts.  I asked both whether a gun with only five grooves could ever fire a bullet showing six lands and grooves.  Both said that it could not.

2

Da 20.

6.   I certify that the foregoing statements made by me are true.   I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
Jamie S. Kilberg

FILED, Clerk of the Appellate Division, July 16, 2015, A-002150-14

Taurus International Manufacturing Inc

Page 1 of 2



HOME | CONTACT US | 305.624.1115

**PRODUCTS**

**LAW ENFORCEMENT AND MILITARY**

**NEWS AND REVIEWS**

**DEALER SERVICES**

**CUSTOMER CARE**

**SAFETY**

**COMPANY**

**CATALOG REQUEST**

**MANUALS**

**CONTRACT MANUFACTURING**

**PRESS ROOM**

**PRODUCT SEARCH**



## FIND MY MODEL
**MODEL NUMBER LOOKUP SYSTEM**

Serial Number  XA53389        Search

**The Taurus Model Number Lookup System will help you find detailed information about your Taurus Gun. Enter the serial number (no spaces) of your firearm and click on "Search" to identify your model. (You must click the "search" button to get your results. The "enter" or "return" buttons will not initiate your inquiry). Please note that specific information may not be available, especially on older models. If your serial number does not return a result, please call Customer Service at 305-624-1115**

1 A

Da 22

**Attachment A**

http://www.taurususa.com/products/findmodel.cfm

6/2/2009

Case 3:18-cv-02341-MAS Document 10-15 Filed 09/14/18 Page 26 of 194 PageID: 1146

# Attachment A

Page 2 of 2

Taurus International Manufacturing Inc

6/2/2009

Privacy disclaimer: Taurus does not share, sell or reveal customer information. This information is for our records only. We will periodically send an e-mail to our customers advising them of new products. Your e-mail address, street address, street address, telephone number and purchase information will be kept strictly confidential. Prices Listed are M.S.R.P. and are a guide to the price you may expect to be charged locally for those products. Products may vary from those depicted, and Taurus reserve the right to modify, change or discontinue product, pricing or features at any time without prior notice.

Home | Revolvers | Pistols | Rifles | Contact Us
2006 © Taurus International MFG, Inc. USA | Website Design by W4Q

http://www.taurususa.com/products/findmodel.cfm

2 A

Da 23

Taurus International Manufacturing Inc

**Page 1 of 2**



HOME | CONTACT US | 305.624.1115

**PRODUCTS**

**LAW ENFORCEMENT AND MILITARY**

**NEWS AND REVIEWS**

**DEALER SERVICES**

**CUSTOMER CARE**

**SAFETY**

**COMPANY**

**CATALOG REQUEST**

**MANUALS**

**CONTRACT MANUFACTURING**

**PRESS ROOM**

**PRODUCT SEARCH**

GO

## FIND MY MODEL

**MODEL NUMBER LOOKUP SYSTEM**

Please scroll down to find your results information.

Serial Number      [ Search ]

The Taurus Model Number Lookup System will help you find detailed information about your Taurus Gun. Enter the serial number (no spaces) of your firearm and click on "Search" to identify your model. (You must click the "search" button to get your results. The "enter" or "return" buttons will not initiate your inquiry). Please note that specific information may not be available, especially on older models. If your serial number does not return a result, please call Customer Service at 305-624-1115

**SEARCH RESULTS**

| YOUR MODEL IS | 85B2 |
| PRODUCTION YEAR: | 2004 |

Click here for more information on your Taurus Model.

[ Go ]



6/2/2009

Attachment A

3 A

FILED, Clerk of the Appellate Division, July 16, 2015, A-002150-14

Taurus International Manufacturing Inc

Page 2 of 2

Privacy disclaimer: Taurus does not share, sell or reveal customer information. This information is for our records only. We will periodically send an e-mail to our customers advising them of new products. Your e-mail address, street address, telephone number and purchase information will be kept strictly confidential. Prices Listed are M.S.R P. and are a guide to the price you may expect to be charged locally for those products. Products may vary from those depicted, and Taurus reserve the right to modify, change or discontinue product, pricing or features at any time without prior notice.

Home | Revolvers | Pistols | Rifles | Contact Us

2006 © Taurus International MFG, Inc. USA | Website Design by WFG FL ...

**FILED, Clerk of the Appellate Division, July 16, 2015, A-002150-14**

4 A
Da 25

**Attachment A**

FILED, Clerk of the Appellate Division, July 16, 2015, A-002150-14

Taurus International Manufacturing Inc

Page 1 of 2



HOME | CONTACT US | 305.624.1115

PRODUCTS

LAW ENFORCEMENT
AND MILITARY

NEWS AND REVIEWS

DEALER SERVICES

CUSTOMER CARE

SAFETY

COMPANY

CATALOG REQUEST

MANUALS

CONTRACT
MANUFACTURING

PRESS ROOM

PRODUCT SEARCH

GO

## MODEL 85 .38 SPL. REVOLVER IN BLUE STEEL



### SPECIFICATIONS

| | |
|---|---|
| Model: | 85B2 |
| Caliber: | .38 SPL +P RATED |
| Capacity: | 5 |
| Barrel Length: | 2" |
| Action: | DA/SA |
| Finish: | Blue |
| Grips: | Rubber |
| Weight: | 21 oz |
| Construction: | Steel |
| Frame: | Small |
| Front Sight: | Fixed |
| Rear Sight: | Fixed |
| Trigger Type: | Smooth |
| Length: | 0 |
| Width: | 1.346" |
| Height: | 4.28" |
| Rate of Twist: | 1:16" |
| Grooves: | 5 |
| Safety: | Transfer Bar |
| UPC: | 7-25327-20080-1 |

Attachment A

### PRODUCT DESCRIPTION

Ultra-fast. Ultra-reliable. Ultra-lightweight. It's no wonder the 85s are our most popular family. We pack them with a combination of customer-requested features and pair them with the .38 Special +P ammo - making them powerful, easy to carry - and lightning-quick to use. To many of our friends in Law Enforcement, these are must-have revolvers. New for 2008, we're pushing our 85s to the next level. Check out our new light-as-a-feather HY-LITE Magnesium

Taurus International Manufacturing Inc                                    Page 2 of 2

model. New colors are also available. New fiber optic front sights, too.

**FEATURES | PARTS | MANUAL**

| | |
|---|---|
| Order #: | 2-850021 |
| MSRP: | $425.00 |
| Status: | Available |

Privacy disclaimer: Taurus does not share, sell or reveal customer information. This information is for our records only. We will periodically send an e-mail to our customers advising them of new products. Your e-mail address, street address, telephone number and purchase information will be kept strictly confidential. Prices Listed are M.S.R.P. and are a guide to the price you may expect to be charged locally for those products. Products may vary from those depicted, and Taurus reserve the right to modify, change or discontinue product, pricing or features at any time without prior notice.

Home | Revolvers | Pistols | Rifles | Contact Us
2006 © Taurus International MFG, Inc. USA | Website Design by WFG

IN THE SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION

| | |
|---|---|
| STATE OF NEW JERSEY,<br>　　　Respondent,<br><br>　　　v.<br><br>MELANIE McGUIRE,<br>　　　Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Docket No. A-006576-06T4

ON APPEAL FROM:
 Middlesex County, Law Division
 Indictment Nos. 06-10-00119-S,
 05-10-00164-S

SAT BELOW:
 Hon. Frederick DeVesa, J.S.C.

## CERTIFICATION OF STEPHEN TURANO IN SUPPORT OF APPELLANT'S MOTION TO SUPPLEMENT THE RECORD OR FOR A LIMITED REMAND

STEPHEN TURANO, being duly sworn, deposes and says:

1.　I am a member of the bars of the State of New York and the State of New Jersey, and I am a partner of the law firm of Tacopina Seigel & Turano, P.C., counsel for Defendant-Appellant Melanie McGuire in the above-captioned proceeding. I am over the age of 18, and I submit this affidavit in support of appellant's Motion To Supplement The Record Or For A Limited Remand, based on my personal knowledge of the facts herein.

2.　At the time of Ms. McGuire's trial in 2007, neither Ms. McGuire nor any of her trial counsel knew that the particular gun she purchased in 2004 had only five grooves in the barrel.

3.　In fact, the State repeatedly represented to trial counsel that ballistics examination revealed that the bullets found in Mr. McGuire's body were consistent with having been

1

Da 28

fired from a Taurus gun, like the gun Ms. McGuire had previously purchased.

4.   If I or any of her trial counsel had known that the particular gun she purchased in 2004 had only five grooves in the barrel, we would have forcefully argued to the trial court and the jury that, based on the State's experts' testimony that the bullets recovered from Mr. McGuire's remains had six lands and grooves, Ms. McGuire's gun could not have been the murder weapon.

5.   I certify that the foregoing statements made by me are true.   I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Stephen Turano

Da 29.

ANNE MILGAM
ATTORNEY GENERAL OF NEW JERSEY
ATTORNEY FOR PLAINTIFF-RESPONDENT
BY:   DANIEL I. BORNSTEIN
      DEPUTY ATTORNEY GENERAL
      DIVISION OF CRIMINAL JUSTICE
      APPELLATE BUREAU
      P.O. BOX 086
      TRENTON, NEW JERSEY 08625
      (609) 292-9086

                                   SUPERIOR COURT OF NEW JERSEY
                                   APPELLATE DIVISION
                                   DOCKET NO. A-6576-06T4

| | | |
|---|---|---|
| STATE OF NEW JERSEY, | : | |
|   Plaintiff-Respondent, | : | CRIMINAL ACTION |
| v. | : | AFFIDAVIT IN OPPOSITION TO DEFENDANT'S MOTION TO |
| MELANIE McGUIRE, | : | SUPPLEMENT THE RECORD OR FOR A LIMITED REMAND |
|   Defendant-Movant. | : | |

STATE OF *Florida*   :
               : SS
COUNTY OF *Miami-Dade* :

### Affidavit of Robert Morrison

    Personally appeared before the undersigned officer, duly

authorized by law to administer oaths, Robert Morrison, who

after first being duly sworn deposes and states that he has

personal knowledge of the following facts and that they are true

and correct.

Da 30

1.  My name is Robert Morrison. I am over 18 years of age and under no disabilities which would make me incompetent to testify. The facts attested to are of my own personal knowledge.

2.  I am President of Taurus International Manufacturing, Inc. (TIMI) and as such, am responsible for day to day operations of TIMI including but not limited to production, quality control, computer systems, repairs, imports, exports, shipping and receiving and regulatory compliance. I have been the Chief Executive officer of TIMI since 1997.

3.  I have worked in the firearms industry for over 40 years. Prior to coming to TIMI in 1997, I worked for Smith & Wesson, Colt, Bianchi, and myself. I am very familiar with firearms and the manufacturing processes for rifles, pistols, shotguns and revolvers.

4.  My personal experience and knowledge of Taurus Manufacturing, including the specifics set forth below, are applicable and valid for Taurus .38 caliber revolvers, including Taurus Model 85 revolver Serial Number XA53389, which was manufactured in January 2004. Additionally, in preparation for this affidavit, I have reviewed all information available to TIMI relative to this particular handgun.

5.  Model 85 revolvers are manufactured in Brazil by Forjas Taurus, S.A. (Taurus). Because TIMI is the North American importer for the Model 85 revolver, it secures all BATFE and State Department approvals for the product, and is the warranty servicing agent in North America for Taurus. I am fully familiar with the manufacturing processes involved and employed by Taurus in the manufacturing of its handguns. I travel to Brazil several times a year to the production facility where the Model 85 is manufactured and am thoroughly familiar with the design and manufacture of the Model 85.

6.  Taurus Model 85 revolver Serial Number XA53389 had a steel frame and barrel. It was manufactured at the Taurus facility in Brazil during January 2004. The Model 85 is a popular product with both civilians and law enforcement. Many police officers choose the Model 85 as their "backup" weapon, carrying them while off-duty and in plain clothes. In 2004,

Da 31

roughly 23,000 Model 85 revolvers were sold in the United States.

7. The Model 85 revolver has a 2-inch "snub nose" barrel chambered for .38 Special cartridges. It has a capacity of 5 rounds. The Model 85 family of products is manufactured in a variety of materials and finishes and with different features to meet customer needs.

8. Depending on tooling availability, either 5 or 6 lands and grooves may be cut in the bore (barrel) in the Model 85. The initial design for steel frame Model 85 handguns included 5 lands and grooves. However, because of the Model 85's relatively short barrel, and the .38 Special's moderate caliber and chamber pressures, the number of lands and grooves has very little effect on the accuracy of the gun. Therefore, depending on production needs, tool wear, and availability, parts and tools containing 5 and 6 lands and grooves were, and are, used interchangeably in Model 85 production. As such, all Model 85 handguns have either 5 or 6 lands and grooves, but because the factory sometimes uses tools and parts that contain 5 lands and grooves and sometimes uses tools and parts that contain 6 lands and grooves, there is no way of knowing whether the revolver at issue had 5 lands and grooves or 6 lands and grooves. However, lands and grooves are cut in manufacturing to have either a left or right twist. All Taurus revolvers have right twists.

9. During the manufacturing process, lands and grooves are cut into the barrel of the gun with either a "broach" or a "button." Buttons are forced down a previously cut center hole in the barrel blank. Broaches are more like very special drill bits that cut the walls of an existing center hole in the barrel blank. Buttons and broaches dull with use and have to be replaced regularly during the manufacturing process on the machines used to manufacture barrels.

10. In firearms used for shooting at longer ranges, the type of tool used to cut the lands and grooves, the rate of "twist" (the distance the bullet has to travel down the barrel to make one full revolution), and the number of lands and grooves can affect accuracy. This is because the caliber of the bullet, its physical shape, design velocity, and chamber pressure are all factors that work together with twist rate, method of manufacture, and barrel length to stabilize the bullet in flight. Changing one factor changes the overall balance and

Da 32.

therefore affects accuracy. However, as stated above, given the relatively short barrel and other physical characteristics of the .38 Special revolver, parts and tools containing either 5 or 6 grooves conform with our manufacturing process. As such, these parts and tools are considered fungible, are equally appropriate, and hence are used interchangeably in the manufacturing of the Model 85 family of handguns.

11. Further, because neither the tooling nor the barrels used in the Model 85 are serialized, it is not possible to determine the number of lands and grooves which were cut into the barrel of the revolver at issue (Model 85 Serial Number XA53389). The subject revolver could have had either 5 or 6 lands and grooves when it left the factory.

12. I am aware that the TIMI website indicates that the revolver at issue (Model 85 Serial Number XA53389) had five lands and grooves cut in its barrel. Any technical information listed on TIMI's website is subject to change and should not be relied on as accurate. The website is under constant revision and the "serial number lookup" page data contains errors.

FURTHER AFFIANT SAYETH NOT, this 29ᵗʰ day of JUNE, 2009.

_____
Robert Morrison

Sworn to and subscribed before me this 29ᵗʰ day of June, 2009.

_____
Notary Public

My commission expires: _____



DEIDRE OWENS
Notary Public - State of Florida
My Commission Expires Mar 18, 2010
Commission # DD 505980
Bonded By National Notary Assn.

Da 33

STATE OF NEW JERSEY
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF CRIMINAL JUSTICE

# INVESTIGATION REPORT

| Bureau/Unit: Law Enforcement Services | Division Case Number: 04-7473-LES | Case Title: McGuire Homicide |
|---|---|---|

Narrative:

## MEMORANDUM OF INTERVIEW

Cindy Ligosh
383 Hillview Terrace
Franklin Lakes, New Jersey 07417
201-960-1397 (Cell)
201-337-4797 (Home)

**DATE:**  March 9, 2005

**LOCATION:**  Point Conference Room
Hughes Justice Complex
Trenton, NJ

**PRESENT:**  AAG. Patricia Prezioso, SDAG. Lewis Korngut, DCI. Joseph Buttich, VFC. Gail Faille, SI. Donald R. Macciocca

**PURPOSE:**  Background information concerning the McGuire family and matters related to the homicide investigation.

This date William McGuire's sister, Cindy Ligosh, came to the Hughes Justice Complex to speak with members of the Division of Criminal Justice assigned to the McGuire Homicide Investigation. Those available to speak to her are listed above.   Due to other commitments, AAG. Prezioso and SDAG. Korngut left the meeting after a short time. AAG. Prezioso opened the meeting by informing Mrs. Ligosh that we appreciated her presence and invited her to provide any information she feels will assist in the investigation.  However, no specific information about the investigation can be released to her.

| Investigator Name, Badge # | Page 1 | Supervisor Approval | Review Date |
|---|---|---|---|
| **S.I. Donald R. Macciocca, # 1772** Date: **June 20, 2005** | | | 10/27/05 |

Signature of Donald R. Macciocca, # 1772

Da 34

C17592



| Bureau/Unit:<br>**Law Enforcement Services** | Division Case Number:<br>04-7473-LES | Case Title:<br>**McGuire Homicide** |
|---|---|---|

Narrative Continued:

Mrs. Ligosh questioned why we haven't done any interviews yet. She said we haven't even interviewed Larry Sheller (William McGuire's real estate attorney). I asked her when she last spoke to Mr. Sheller. She said last week. I told her Mr. Sheller was interviewed yesterday. He wasn't very cooperative, and he told the NJSP he represents Cindy Ligosh and they should speak to her. Mrs. Ligosh denied she was represented by Mr. Sheller. She had previously asked him to represent her but he told her he could not because he represents Melanie McGuire. Mrs. Ligosh said her brother used Mr. Sheller for everything - tickets, real estate, etc.

Cindy provided the following information:



William was previously married. Cindy was not speaking to William during that time. William and Melanie said they didn't start their relationship until after William's divorce. William has no other children (out of wedlock or otherwise).

Cindy had no knowledge of any drug use by William. William did not sell drugs. He had no money from illegitimate sources. William had no outstanding loans or bad debts. He did dabble in day trading. William had gained weight. She thought his head got bigger (ala Jason Giambi). He was not in too good of shape anymore. He got a good deal on a weight set last year but she never knew if he used it.



William was a fast driver. He got tickets frequently. He had a Pennsylvania driver license due to insurance surcharges and insurance costs. He was arrested and put in jail for insurance violations. The Pathfinder and Maxima were both purchased as new vehicles.



William had one "fling" with a part-time opera singer while employed at the Park Ridge Steak House. It happened before JT. was born. They did it in the car and William got a rash on his rear end. He asked Cindy's husband (pharmacist) for ointment. He admitted the affair to Cindy.

William's relationship with Melanie was good. Cindy thought William and Melanie were very much in love. Both were alike (A-type personalities). Their arguments were "witty and fun" but not cruel. William walked out of Jack's first birthday party after an argument. He left before the birthday cake.

William's best friends were John Rice and James Carmichael. William and Melanie met the Rices in Atlantic City. They would get together as couples.



William liked his job at NJIT. He was close to his boss (Tom Terry) at NJIT. Ellen (coworker) babysat for his kids. William did not socialize with his coworkers during off hours. William did field work on a Health Department grant. He was working on a program to tie all 21 counties together in the event of a disaster. He saw waste in state government spending. He used his inside knowledge from his job to start a software company with Tandava. They wanted to get a contract for the same thing (connecting the 21 counties in the event of a disaster).

*NPM*

*25*

017594

FILED, Clerk of the Appellate Division, July 2018, A-002150-14



| Bureau/Unit: | Division Case Number: | Case Title: |
|---|---|---|
| **Law Enforcement Services** | 04-7473-LES | **McGuire Homicide** |

Narrative Continued:

William wanted to buy a house to give his kids more room to run. William wanted to live in Virginia. More house for the money.

Melanie was not suspected of having an affair. She went out every night to buy things. She returned them several days later. Melanie came first (in Melanie's mind). She was very selfish. Cindy spoke with Melanie about that. The children were not developing. The oldest son (Jack) was four years old and not potty trained. Melanie was concerned about her own life. The kids came second. William told Cindy that Melanie never thought like a mother - she left knives out, etc.



A daycare center was used for the children. Not family-based childcare. Melanie delivered the children. Melanie or William would pick them up. They rotated the responsibility for the pickup. They claimed they paid $20K per year for daycare.

Melanie's father had an office supply business. Her mother did the bookkeeping. Cindy was told by a Newark Star Ledger reporter that Michael Cappararo (Sr.) had a criminal record. We would not confirm that.



Selene is Melanie's best friend from childhood. They grew up together in Middletown. Cindy doesn't know her too well. Selene and her husband would visit William and Melanie at their house. Selene just had twins. Melanie's parents sold the house in Middletown and moved to Barnegat.

Melanie attended a yearly convention/seminar in connection with her job. The doctors and nurses would go. Cindy does not know the location of the most recent one but believes it was either California or Florida. William didn't travel.



Regarding the purchase of the house: They didn't have any money problems. It would have been a squeeze, but they could handle it. But it was not the house that William wanted. They put an offer in on another house but didn't get it. Melanie checked the tax records of that house. She didn't like the neighbors (racial/ethnic issues). The house was located in Franklin Township, Warren County, NJ. William was happy with his job and new house. Melanie loved her job and was very content.

William took a little glee in moving Melanie so far away from her parents. He resented that Melanie's parents never offered to watch his kids as Melanie's grandmother did for the Cappararos.

Day of the Closing: Cindy was called by Melanie after the closing. Cindy doesn't remember hearing William or the children in the background. It was a short call with the details of the closing. There were no other calls from them that day.



The next contact with Melanie was the following Sunday. Melanie stated they fell asleep and woke up at 1 A.M.. Melanie told William he should be happy about buying the house. There was laundry stacked up on the floor outside the kids' rooms. William saw a dryer sheet on the floor and went into

*NM*



| Bureau/Unit:<br>**Law Enforcement Services** | Division Case Number:<br>**04-7473-LES** | Case Title:<br>**McGuire Homicide** |
|---|---|---|

Narrative Continued:

a tirade. Melanie told Cindy this was the first physical incident with William. There had been a lot of fights last year - more frequent than usual. Cindy told us she would have no sympathy for William if he hit Melanie.

Prior to learning of William's death (while William was still missing), Cindy called Melanie for Jonathan Rice's address and phone number. Jonathan told her William was not there. They knew William was missing. One morning Jonathan Rice called Cindy at 6:38 A.M. to advise her William was dead. She thought the cause of death was drowning. She found out via the computer that it was a homicide.



Cindy said as soon as she found out about William's death, she knew Melanie did it. Melanie told Cindy that when William left he told her she will never see him again. Cindy knew William would never give up his kids.

In the beginning, Cindy and Melanie would talk every day. They rarely spoke about the case. They talked about work and the kids. Melanie moved from Woodbridge to her parent's house in Barnegat. Melanie put their furniture on eBay. Their contact started to dwindle. The last contact was August 2004.



Cindy attempted to keep Det. Pickell (VBPD) appraised of what she knew. She left him a message that Melanie was moving out. He never called back. She met with Det. Pickell the following Tuesday. He said they had been at the townhouse the previous day.

Melanie was not a big help with the search for William. Cindy went to Atlantic City and checked hotels and the airport for William. Melanie didn't go and didn't remember the license plate number of William's car. Cindy said Melanie had a good memory for numbers and could remember VIN numbers of their cars.

Melanie complained about the "busy little bees" (meaning the police). Melanie said that's what they do - they ambush you. Melanie said she met the police at her attorney's office. They (police) ambushed her. Not much info was given by the police. Melanie asked them if the wedding ring and identification were recovered.

Melanie told Cindy her divorce attorney said not to open William's bills or mail. Cindy opened the mail but didn't find anything significant.

Melanie told Cindy she returned to the townhouse with her parents who told her to take a picture of the Caller ID box with William's phone number on it.

Cindy has a tape of a conversation between her and Melanie McGuire. She said there is nothing of evidential value on the tape.



*MM*

No  37

017596

| Bureau/Unit: | Division Case Number: | Case Title: |
|---|---|---|
| **Law Enforcement Services** | **04-7473-LES** | **McGuire Homicide** |

Narrative Continued:

William's funeral: It was a military service at a cemetery in Jackson, NJ. Present was Melanie, her parents, and brothers; Cindy, her husband, and children; Mustafa Shams, NJIT coworkers Tom, Jay, Ellen; and John and Susan Rice. Melanie said if one press person shows, "She's gone!" Melanie did not go to the grave site because she had to pick up the kids from daycare. The only life insurance was from William's job. He had no will.

Cindy provided the following description of the furniture in the McGuire apartment. The living room contained a green velvet couch with green velvet pillows and a white leather couch with tapestry pillows. A blanket was kept on the leather couch. The bedding in the master bedroom was neutral/washed out beige tones. Floral sheets. Solid tan blanket. Cindy provided us with a handwritten sketch of the layout of the apartment and placement of furniture. A copy of her diagram is appended to this report.

At the conclusion of the meeting, Mrs. Ligosh was invited to call at anytime if she remembers additional information.


Investigation continuing.

017507

CD 1508
3/9/05

017598

017599

$\partial a$ 40

## WITNESS STATEMENT — DAWN ZHU

**DET:** Testing 1-2..testing 1-2.. testing 1-2..

Investigator Ivan Scott from the Middlesex County Prosecutor's Office. I'm about to take a statement from Ms. Dawn Zhu..

Uhh, the day is Monday, March 14, 2005. The time is approximately 2:15pm. My badge number is Badge number 103.

Your statement is being tape-recorded and the information you have to offer is very important. It's necessary for you to speak loud and slow and clear. If necessary it's suggested that you wait a moment to compose your thoughts prior to answering any questions. At this time I would like all other persons in the room to introduce themselves on tape starting with the spelling of their names and stating their affiliations with this investigation.

It is my duty to ask you certain questions regarding the circumstances on the tape, the type of incident which occurred at location, the apartment complex, the apartment next to yours.

Right now, can I just have the officers identify themselves.

**DET.:** Sergeant Joseph Joraskie with Woodbridge Township Police Department-Last Name - J-O-R-A-S-K-I-E.

**DET.:** Sergeant David Dalrymple-D-A-L-R-Y-M-P-L-E, Badge 4515, New Jersey State Police.

**ZHU:** Dawn Zhu

**DET:** Can you spell your last name?

**ZHU:** Z-H-U

**DET.:** What's your Date of Birth?

**ZHU:** May 26, 1970

**DET.:** Now do you voluntarily desire to provide a statement regarding this matter of your own free will and accord, fully realizing the importance of this statement of the State, at all concerned?

1


Da 41

ZHU: Yes

DET.: Do you have any disabilities, which will preclude you from giving or reviewing your statement?

ZHU: No.

DET.: Did we discuss the issue surrounding this incident in detail prior to beginning this tape-recorded statement?

ZHU: Yes

DET.: Ok. What's your address here?

ZHU: 2910 Plaza Drive, Woodbridge, New Jersey, zip code 07095

DET.: What is your age and date of birth?

DET.: Your age and date of birth

ZHU: Age-35. Date of birth May 26, 1970

DET.: And What is your social security number?

ZHU: I don't have social, I have Tax I.D.

DET.: Tax I.D.? Do you know that number off the top of your head?

ZHU: I need to check

DET.: O.K. We'll get it later

DET.: What is your occupation?

ZHU: House wife

DET.: House wife? O.K. With whom do you reside here with?

ZHU: Pardon?

DET.: Who do you live here with?

ZHU: My husband, my son and daughter.

DET.: And what's your husband's name?

ZHU: Inaudible

2

Da 42

**DET.:** What is the highest level of education you've obtained?

**ZHU:** Two Bachelor's Degree

**DET.:** Can you read, write and understand English language?

**ZHU:** Yes

**DET.:**  Regarding this incident that we are about to discuss, are you familiar with any of the individuals involved in this incident? The person that is missing.

**ZHU:** No

**DET.:** O.k. In your own words, when I talked to you earlier, can you state to me what you told me before?

**ZHU:** O.K., I moved into this apartment on May 17, 2003 and around early last year, I could not remember the exact date, but definitely before June 2004, I heard a fight from seems above level, (inaudible) what is the lady words pretty high wordings, another one was not umm..so visible?, Not clear. Uhh, it was around 5am in the morning, weekday, Umm the lady was very angry and she mentions something that I've been with you for 5 years? And, umm, I could not remember the details, but my feeling was the other side was blaming her and she was pretty angry, and..and that's it. The fight was so early in the morning and the lady's words was in high volumes, so we were woken.

**DET.:** O.K.

**ZHU:** And later on there was an Officer, maybe a couple of months later, two months later, there was an officer here and I told him some, you know.. almost the same thing, but maybe the memory at that time was fresh, so maybe you can get more details from him.

**DET.:** Did he take a taped statement from you?

**ZHU:** No.

**DET.:** O.K. In reference to William and Melanie McGuire, Did you know them?

**ZHU:** Who?

3


Da 43

**DET:** William and Melanie McGuire, the people that live in the apartment next door,.. did you know them?

**ZHU:** No.

**DET:** Did you ever hear any arguments before this one incident?

**ZHU:** Umm., No. I cannot remember anything.

**DET:** Did you ever hear any after?

**ZHU:** No.

**DET:** No?, O.K. Did anybody else hear this argument?

**ZHU:** My husband, may, he was there too, but after that officer visit, I ask him if he can give more details, but he cannot remember any more than me.

**DET:** O.K. and..the argument was loud enough to wake you out of your sleep?

**ZHU:** Yeah.

**DET:** O.K. and did you hear any loud noises like anything falling, furniture moving or anything like that?

**ZHU:** Umm.. I could not remember.

**DET:** O.K.

**ZHU:** I don't think so.

**DET:** O.K. Anything? (He's asking the other detectives if they have any questions for Ms. Zhu)

**DET:** Yes, where did this..this argument and you were in your bedroom?

**ZHU:** Yeah, I was sleeping.

**DET:** Does that bedroom share a wall with the unit?

**ZHU:** I don't know

**DET:** but it doesn't..That..the wall where your bedroom is?

**ZHU:** Yeah..it..was.. the one close to the..townhouse

4



DET: Right..and, do you have a living space in the other side of that wall, or is the other side of that wall is someone's else's home? That particular wall that you heard the argument?

ZHU: Well, I thought the words was from above.

DET: O.K.

ZHU: So, I..at that time I didn't think it was from the other side of the wall.

DET: Where did you think the argument was coming from?

ZHU: I thought it was from above apartment..I don't know the exact number.

DET: That would be the same level you were on? You were on the 2nd floor?

ZHU: No..I thought it was from the 3rd floor, above.

DET: O.K. So, you thought it was from above?

ZHU: Yeah

DET: But you can still make out a woman? You said a woman's voice..

ZHU: Yeah. Yeah.

DET: What exactly did she say? If you recall, you stated something earlier..

ZHU: I cannot remember, because English is not my original language, so I was slow in catching the English speaking..you know.

DET: But you remarked on her tone, that you felt

ZHU: Yes..I felt that she was angry.

DET: Angry?..The person she was arguing with? Was there another voice that you heard?

ZHU: Yes. There was another voice.

DET: Was that another woman or was it a man?

5

 45

**ZHU:** Not so sure..I thought it was a woman..but that voice was low..so..I'm not sure.

**DET:** And you stated that the female voice said something to the effect.. "I've been with you for five years".

**ZHU:** Yes..something like..but maybe five, or maybe..

**DET:** O.K. the way that was said, the way that person said that..What do you think kind of message they were getting across? Was it a begging..like "I've been with you for five years"..or was it a demonstrative angry.. "I've been with you for five years" How would you categorized it?

**ZHU:** Well, my feeling was that.. "I've been with you for five years" you know..like, enough! Like I've been doing a lot of things. Enough. You wouldn't call it love to the other side..something like that..

**DET:** So..it was almost like a.. she was exhausted with this person, or she was..

**ZHU:** Seems to be that she got blamed from the other side..and she's not..you know.. happy with that. She thought she's been doing a lot.

**DET:** O.K.

**ZHU:** But that was only my feeling, at that time.

**DET:** Did you hear..Did you make out anything else that was being verbalized..being yelled or said?

**DET:** First all, would you describe this..was this woman yelling, or was she talking loud, what did you make it?

**ZHU:** I think it was kind of yelling.

**DET:** Yelling? And it was enough, you said, to wake you up? Out of the sound..you sleep soundly?

**ZHU:** No. It was in the morning..it was easy to wake up.

**DET:** This argument..how long did it go on for? Do you remember?

**ZHU:** I think for about an hour.

6


Da 46.

**DET:** An hour?

**ZHU:** One hour..yeah

**DET:** Did you make out anything else that was said during that hour, or was that the only statement that you remember?

**ZHU:** I mentioned that the English..I was slow in catching English..so..even though she said a lot, but I couldn't catch it quickly, so I could not remember.

**DET:** For that hour, who was doing most of the talking? Whose voice were you hearing more?

**ZHU:** The lady's

**DET:** The lady?

**ZHU:** But I suggest you to talk with above apartment because..I don't know what they remember..but if they were English original people, they would probably get more.

**DET:** And did you ever find out the source of those voices?

**ZHU:** No.

**ZHU:** I thought it was just maybe..you know.. from the two ladies above..some small (Inaudible) I never thought there would be something serious.

**DET:** (talking to the other detectives present) Joe, Do you have anything?

**DET's:** No. Do you have anything else?

**DET:** At any time were you coerced into making this statement?

**ZHU:** Pardon?

**DET:** At any time were you coerced into making this statement?

**ZHU:** What does that mean?

**DET:** Did anybody force you to make this statement?

**ZHU:** No.

**DET:** O.K.

7

Da 47

**ZHU:** At any time were you made any promises or offered any rewards for making this statement?

**ZHU:** Yes. You mean..I'm responsible for this statement?

**DET:** No. did I make you any promises..

**ZHU:** No. No.

**DET:** O.K. was there anything regarding this investigation that we have not asked you that you feel we should have?

**ZHU:** No.

**DET:** Is this statement a true and accurate account of what occurred to the best of your knowledge?

**ZHU:** Yes.

**DET:** O.K. at this time we are preparing to end your tape-recorded statement. In a few moments I will turn off the tape-recorder and rewind the tape and you will be given the opportunity, if you desire, to listen to the tape recorded statement you have just given. You may review your tape-recorded statement in whole or in part. Once you have reviewed the tape-recorded statement, you will be given the opportunity to make any additions or corrections, which you feel are necessary. Do you wish to review this tape-recorded statement?

**ZHU:** Yeah..I think that be good. In case..(Inaudible)

**DET:** O.K. the time is approximately 2:20pm, Monday, March 14, 2005 and I'm going to stop the tape recorder. (STOPS TAPE-RECORDER)


**DET:** The time is approximately 2:35pm, Monday, March 14, 2005. Ms. Zhu, have you had the opportunity to review the tape recording statement you have given?

**ZHU:** Yes..I have.

**DET:** Are there any additions or corrections, which you feel are necessary?

8



**ZHU:** NO.

**DET:** Sergeant Dalrymple, you have other questions?

**DET:** No. I don't.

**DET:** Sergeant Joraskie?

**DET:** No sir.

**DET:** This statement is a true and accurate account of what occurred to the best of your knowledge?

**ZHU:** Yes.

**DET:** Your statement will be completed in several moments. Will you sign and date and record the time on the cassette tape once it has been removed from the recorder?

**ZHU:** Yes.

**DET:** O.K. the time is approximately 2:37pm and that concludes the taped statement.

JOSEPH E. KRAKORA, PUBLIC DEFENDER
POST-CONVICTION RELIEF UNIT
P.O. BOX 46010
31 CLINTON STREET, 5th FLOOR
NEWARK, NEW JERSEY 07101
(973) 648-7651

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION (MIDDLESEX COUNTY)
IND. NO. 05-10-164

Criminal Action

STATE OF NEW JERSEY,           :
*Plaintiff-Respondent*          :                Certification
                                :
              v.                :
                                :
                                :
MELANIE MCGUIRE,                :
*Defendant-Petitioner*          :
-------------------------------------------- :
                                :

DAWN ZHU, of full age, hereby certifies that:

    1. I reside at 2 Deerfield Road, Short Hills, New Jersey, 07078. My date of birth is May 26, 1970.

    2. In 2004, I lived at 2910 Plaza Drive, Woodbridge, New Jersey, 07095 with my husband and daughter. We moved into the apartment on May 17, 2003.

    3. On March 14, 2005, I gave a statement to an investigator from the Middlesex County Prosecutor's Office regarding an argument that I had heard, coming from a neighboring apartment on Plaza Drive. The statement was recorded on tape. All of the information which I gave in that statement was truthful and accurate to the best of my ability.



Da 50

4. Although I could not remember the exact date of the argument, it definitely happened before June of 2004. I also remember that about two months after the argument, a police officer came to my apartment, and I told him about it.

5. The argument occurred around 5:00 A.M. on a weekday morning, and went on for about an hour. I was asleep, and was awakened by the sound of a woman yelling. There was another voice, but it was so low that I was not sure if it was a man or another woman.

6. The woman was pretty angry and said something like "I've been with you for five years." It sounded like she was being blamed for something by the other party, and she was not happy about that. She thought that she had been doing a lot. A lot more was said, but because English is not my native language I could not catch it.

7. I did not hear any other loud noises. I only heard voices.

8. At the time, I thought the argument was coming from the apartment above mine, but I never found out the source of the voices.

9. No one contacted me to ask me to be a witness in court regarding what I heard.

10. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Dated: 10/20/2012

DAWN ZHU

Da 51.

JOSEPH E. KRAKORA, PUBLIC DEFENDER
POST-CONVICTION RELIEF UNIT
P.O. BOX 46010
31 CLINTON STREET, 5ᵗʰ FLOOR
NEWARK, NEW JERSEY 07101
(973) 648-7651

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION (MIDDLESEX COUNTY)
IND. NO. 05-10-164

Criminal Action

| | | |
|---|---|---|
| STATE OF NEW JERSEY, | : | Certification |
| *Plaintiff-Respondent* | : | |
| | : | |
| V. | : | |
| | : | |
| MELANIE MCGUIRE, | : | |
| *Defendant-Petitioner* | : | |
| ------------------------------------------- | : | |

SABINE FLEURIMOND, of full age, hereby certifies that:

1. I am an investigator employed by the Office of the Public Defender, assigned to the Middlesex Trial Region.

2. I was asked by Assistant Deputy Public Defender Lois De Julio to locate Dawn Zhu. The only information that she could give me was Ms. Zhu's date of birth (5/26/1970), and her last known address (2910 Plaza Drive, Woodbridge, New Jersey).

3. On August 21, 2012, I conducted a "Lexis" search which resulted in several addresses for Ms. Zhu.

4. I visited the first address on the list which was 2 Deerfield Avenue, Short Hills, New

Da 52

Jersey. Upon my arrival, I was greeted by a resident of the home who advised that he was Ms. Zhu's husband. He confirmed that she lived there. I left my business contact information, and Ms. Zhu subsequently contacted me.

5. I was then able to question her about a statement she gave to officers investigating the homicide of William McGuire.

6 . I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Dated: 10/10/12

SABINE FLEURIMOND



JERSEY STATE POLICE

CONTINUATION PAGE

| /Unit | 2. Code | 4. Prosecutor's Case Number | 5. Division Case Number |
|---|---|---|---|
| Major Crime | H024 | | H02405-01 |

wall the McGuire's townhouse. She said she never had a conversation with either Melanie or

William McGuire and just would say hello when she saw either of them. Sharlene Sturman said she

ever heard any arguments coming from the McGuire's townhouse. She had no idea that Melanie

McGuire moved out of the townhouse. She heard through the news media of William McGuire's

death. She concluded that one day while standing out on her apartment balcony, a guy (detective) with

"a gun and badge" was standing in the parking lot and asked her if she knew William McGuire. When

he replied no, the guy (detective) just said well he's missing, if you see him give me a call. The

detective did not identify himself or leave any call back number. Sharlene Sturman could provide no

information to aid this investigation.


3:56 PM

We then interviewed:

> Ronald J. Chwala Jr., AKA: Joey
> W/M/31
> 2325 Carpenter Road
> Wilmington, De. 19810
> DOB: 2/22/74
> SS#: 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
> Employed by: Modern Equipment Handling
>                      New Castle, De.
> Position: Mechanic
> Telephone #: 302-420-6575 (Work)

Ronald Chwala said he moved to his current residence on June 26, 2004. He said he previously

resided at 2906 Plaza Drive, Woodbridge, New Jersey, for approximately three years (2001 through

2004) with his girlfriend, Sharlene Sturman. He said he resided at 2906 Plaza Drive prior to the

McGuire's moving there. Ronald Chwala said for the three years at the Plaza Drive residence, he was

| Rank/ Type (Print or Type) | 78S. Badge No. | 79S. Page | 80S. Date of Report | 81S. Reviewer & Badge Number |
|---|---|---|---|---|
| DSFC Matthew Kuehn | 3984 | 13 of 17 | 4/18/05 | 009575 |
| nature X M. Kuehn | | 82S. | | 83S. |

. 310B (Rev. 1/91) (S.O.P. D7)

a 54

017527

JERSEY STATE POLICE                                      CONTINUATION PAGE

| Unit | 2. Code | 4. Prosecutor's Case Number | 5. Division Case Number |
|------|---------|---------------------------|------------------------|
| Major Crime | H024 | | H02405-01 |

...ployed as the Superintendent of General Maintenance for Plaza-Tower Apartments. He added that ...was responsible for the maintenance for the McGuire's apartment.

Ronald Chwala said he was informed of William McGuire's death through the news media. ...ometime after William McGuire's death, he was approached by an unknown detective and just asked ...he had seen McGuire which he replied, no. No other questions were asked of Ronald Chwala by ...vestigating detectives. Ronald Chwala said the detective said if he happened to see William McGuire ...o contact the him (police).

Ronald Chwala said William McGuire was extremely polite and considerate. He said William McGuire always had a big smile on his face and always said hello to him. Ronald Chwala said he ...ever saw William McGuire lose his temper or act in a strange way. According to Ronald Chwala, he ...ought the McGuire's were the perfect couple.

Ronald Chwala said he occasionally performed repairs in the McGuire apartment. When the McGuire's first moved into the apartment, their basement had a water problem which was eventually resolved. The McGuire's experienced a heating problem and a roof leak. During each problem the ...Guire's encountered, William McGuire remained calm. Ronald Chwala said there were no ma...tenance records kept that could be checked to determine the dates and times of the maintenance calls.

The only time Ronald Chwala said William McGuire was somewhat upset was when the Halogen headlights were repeatedly stolen from his (McGuire's) blue Nissan Maxima. He said William McGuire had a problem with a paint job that was completed on his Nissan Maxima. The paint job was performed by Melanie McGuire's brother or uncle and he was extremely unhappy about the quality of ...paint job.

| Rank/ Name (Print or Type) | 78S. Badge No. | 79S. Page | 80S. Date of Report | 81S. Reviewer & Badge Number |
|---------------------------|----------------|-----------|---------------------|------------------------------|
| DSFC Matthew Kuehn | 3984 | 14 of 17 | 4/18/05 | DO 9575 |
| ...nature X | | 82S. | | 83S. |

3108 (Rev. 1/91) (S.O.P. D7)

Δa 55                                                    017528

JERSEY STATE POLICE

CONTINUATION PAGE

| Unit | 2. Code | 4. Prosecutor's Case Number | 5. Division Case Number |
|---|---|---|---|
| Major Crime | H024 | | H02405-01 |

Ronald Chwala said the only odd occurrence that he could remember was when he was inside of McGuire's apartment for a roof leak. Ronald Chwala said the living room and basement were filled with boxes of new computers and computer equipment which William McGuire said was destined for an unknown school. He thought this incident occurred at the half way point of the McGuire's stay at the Plaza Apartments. He also recalled seeing a large set of weight/gym equipment located in the basement which William McGuire said he had received from Melanie McGuire. He said the weight/gym equipment was either a Christmas or a birthday gift from Melanie McGuire. Ronald Chwala described the weight machine as being framed in white with black weights.

Ronald Chwala said the last time in was inside of the McGuire's apartment was probably to attend to a heating problem which he thought happened this past winter. When he entered the apartment, Melanie McGuire was seated in the living room watching television. The heat was throwing off a funny smell and Ronald Chwala said they turned the heat off and he provided them with portable heaters until the heating company could respond to correct the problem. On this occasion, Melanie and William McGuire were perfectly fine with the situation.

Ronald Chwala said after speaking with the detective concerning William McGuire, he said everyday he checked the parking lot looking for his vehicle. While standing in the office one day, he said overheard other Plaza Office employees talking that the McGuire's had bought a house in Warren County. However, he did not recall if this occurred before or after McGuire was missing.

Approximately one month before Ronald Chwala moved to his present apartment, he said he was returning to his apartment to have lunch at approximately 1:00 pm. He said he observed a small box truck parked in front of the McGuire's apartment. He noted that the truck was so small that it could not handle the contents of the McGuire's residence with one move. Ronald Chwala said he had a brief

| Rank/ Name (Print or Type) | | 78S. Badge No. | 79S. Page | 80S. Date of Report | 81S. Reviewer & Badge Number |
|---|---|---|---|---|---|
| DSFC Matthew Kuehn | | 3984 | 15 of 17 | 4/18/05 | 004575 |
| nature X | | 82S. | | 83S. | |

.3108 (Rev. 1/91) (S.O.P. D7)

Da 56

017529

JERSEY STATE POLICE

CONTINUATION PAGE

| Unit | 2. Code | 4. Prosecutor's Case Number | 5. Division Case Number |
|------|---------|------------------------------|--------------------------|
| Major Crime | H024 | | H02405-01 |

onversation with Melanie McGuire. He said to Melanie that detectives were at the apartment complex ooking for William. Melanie McGuire responded if you see him, let me know because I'm filing for a ivorce. Melanie McGuire then said to Chwala, he left me, he didn't even leave me a note. We had a ig fight and I haven't heard from him, she then said, no one has heard from him. Melanie continued y saying we bought a house and put down a ton of money and I cannot afford the bills, so I'm going to ave to sell the house. Ronald Chwala said Melanie McGuire told him she was not upset he (McGuire) left, but she was very pissed and worried about losing the new house and getting bad credit. He said Melanie McGuire did not offer any information that she attempted to contact him (William McGuire), other then to say that no one has heard from him. She concluded the conversation with Ronald Chwala, by telling him, William was always nice to her in public but when inside and out of the public eye, he did not treat her that way. Melanie McGuire said the girls in the bank always told me that he (William) always spoke highly of her (Melanie) when speaking with them, but he (William) never complimented her in person. Ronlad Chwala said the conversation ended and it was the last time he saw Melanie McGuire.

Ronald Chwala said Melanie McGuire had two or three males and an older female assisting her with the move. The move occurred during the week and it was the only time he ever saw Melanie McGuire moving from the apartment. Approximately two to four days after he saw the moving van, Ronald Chwala said the police arrived at the apartment and refused to allow anyone inside of the apartment.

Ronald Chwala said after the police searched the apartment, he entered the apartment for the first time since the heating repair call. He noticed the walls in the living room and dining room had recently been primed white and he added the walls could have used another coat of priming. Prior to being primed white, Ronald Chwala said the McGuire's had painted the living room and dining room walls a

| S. Rank / Name (Print or Type) | 78S. Badge No. | 79S. Page | 80S. Date of Report | 81S. Reviewer & Badge Number |
|-------------------------------|----------------|-----------|----------------------|-------------------------------|
| DSFC Matthew Kuehn | 3984 | 16 of 17 | 4/18/05 | 004575 |
| gnature X | | 82S. | | 83S. |

P. 310B (Rev. 1/91) (S.O.P. D7)

Da 57

017530

NEW JERSEY STATE POLICE · · · · · · · · · · · · · · · · · · · · · · · · CONTINUATION PAGE

| n/Unit | 2. Code | 4. Prosecutor's Case Number | 6. Division Case Number |
|---|---|---|---|
| /Major Crime | H024 | | H02405-01 |

natt..ip gray color. He said it is the responsibility of the occupants to prime the walls white prior to moving out. Every lease contains an agreement that the walls must remain a neutral-color which if not adhered to could cost the occupant their security deposit.

Ronald Chwala said his last conversation with William McGuire was during the last snow storm in 2004. He said William McGuire called to report a tree branch that was positioned by their front door being weighed down by the ice. Ronald Chwala said he just shook the ice off the branch and departed.

Ronald Chwala described the McGuire's residence as always neat and immaculate. He never saw any drugs, weapons, or anything unusual inside of their apartment. He never saw anyone visiting the McGuire's. He never heard any gossip from any of the other tenants concerning the McGuire's.

Ronald Chwala said William McGuire worked various hours of the day, and sometimes worked out of his apartment. He said Melanie McGuire worked five days per week and departed in the morning. He was aware that Melanie McGuire was a nurse and added that William McGuire remarked to him that "if I (William) made the money she made, we'd be set for life." He could provide no additional information to aid this investigation.



N. RCH 22, 2005 (TUESDAY):

Inv. Robert Stemmer and I served a grand jury subpoena on Photon Tech, 1009 Lennox Drive, Suite 104, Lawrenceville, New Jersey. For details refer to the Supplementary Investigation Report of Inv. Robert Stemmer.

| 3. Rank / Name (Print or Type) | 78S. Badge No. | 79S. Page | 80S. Date of Report | 81S. Reviewer & Badge Number |
|---|---|---|---|---|
| DSFC Matthew Kuehn | 3984 | 17 of 17 | 4/18/05 | DD4525 |
| gnature X | | 82S. | | 83S. |

P. 310B (Rev. 1/91) (S.O.P. D7)

Da 5B

017531

# CERTIFICATION OF RECORDS

NAME OF BUSINESS: Middlesex Management

ADDRESS OF BUSINESS:  90 Woodbridge Center Drive, 6th Floor
Woodbridge, New Jersey 07095

DESCRIPTION OF RECORDS: Lease Agreement between Woodbridge Center Plaza and William and Melanie McGuire for property located at Apt. #2902 Plaza Drive, Woodbridge, New Jersey

DATE OF RECORD(S): May, 2002

The copies of records for which this certification is made are true and complete reproductions of the original or microfilmed records which are maintained by this office. The original records were made in the regular course of business at or near the time of the matter recorded. This certification is given by the custodian of the records in lieu of his/her personal appearance.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Dated: 1/8/13

_____
Richard Sobin, Real Estate Manager

**Richard Sobin**
**Rental Department Manager**
**Middlesex Management Company**
**90 Woodbridge Center Drive - Suite 600**
**Woodbridge, NJ 07095**
**(732-) 750 -1111 ext 1241**
**RichardS@AtlanticRDC.com**

Da 59.

REL 000523

# LEASE AGREEMENT

## INDEX

| | | | | |
|---|---|---|---|---|
| 1. | RENT PAYMENTS | | 16. | APPLIANCES AND OTHER ITEMS NOT PERMITTED |
| 2. | ADDITIONAL PAYMENTS | | 17. | PETS NOT PERMITTED |
| 3. | OCCUPANTS AND USE | | 18. | STORAGE AREAS AND PERSONAL PROPERTY |
| 4. | SECURITY DEPOSIT | | 19. | RENEWAL OF LEASE |
| 5. | SUBLETTING AND ASSIGNMENT | | 20. | FIRE OR INTENSIVE DAMAGE |
| 6. | LATE FEES | | 21. | APPLIANCES SUPPLIED WITH APARTMENT |
| 7. | RETURNED CHECKS | | 22. | SEVERABILITY |
| 8. | REMEDIES OF LANDLORD | | 23. | CONDITION OF PREMISES |
| 9. | DAMAGES FROM TENANTS BREACH | | 24. | FAILURE OF LANDLORD TO DELIVER POSSESSION |
| 10. | REPAIRS AND MAINTENANCE | | 25. | APPLICATION OF PROPERTY |
| 11. | ALTERATIONS | | 26. | ABANDONMENT OF PROPERTY |
| 12. | FIXTURES | | 27. | ACCEPTANCE OF DOCUMENTS |
| 13. | LANDLORD'S LIMITED LIABILITY | | 28. | SUBORDINATION TO MORTGAGES |
| 14. | NOTICES | | 29. | KEY DEPOSIT |
| 15. | UTILITIES NOT INCLUDED | | 30. | RULES AND REGULATIONS |

THIS is a lease agreement of 5/22/02 between WOODBRIDGE CENTER PLAZA hereafter referred to as LANDLORD and MELANIE L. MCGUIRE, WILLIAM T. MCGUIRE hereafter referred to as TENANT. The lease is for property located at PLAZA DRIVE, WOODBRIDGE, NJ 07095 and known as APT #2902 (3 BDRM T/H).

The term of this lease agreement is one year commencing on 6/1/02 and ending on 5/31/03 at a yearly rental of $20,700.00 to be paid in equal monthly installments of $1,725.00.

*The following are the full covenants and conditions of this lease agreement.*

### 1. RENT PAYMENTS

The rent shall be paid by the Tenant at the monthly rental of $1,725.00 and shall be due and payable in advance. All rents shall be received by the Landlord on the first day of each month.

### 2. ADDITIONAL PAYMENTS

The Landlord reserves the right to charge any and all surcharges in addition to the rent as the Landlord is permitted to charge by statute or local ordinance.

### 3. OCCUPANTS AND USE RESTRICTIONS

The number of occupants of the premises shall be 2 Adults and 2 Minors only. If additional occupants, other than as represented by the Tenant in this lease, shall occupy the apartment, the Tenant shall have breached the lease agreement. Basements and recreation rooms shall not be used as sleeping quarters. The Tenant agrees that the premises shall be used as a private dwelling only.

### 4. SECURITY DEPOSIT

The Landlord has received from the Tenant a security deposit of $2,587.50. Said security deposit shall be deposited in an interest bearing account as required by law at FIRST UNION BANK, WOODBRIDGE, NJ 07095. The Tenant shall not apply any portion of the security deposit toward the payment of rent. The security deposit shall not be assigned or mortgaged by the Tenant. The Landlord shall, upon termination of the lease, return the security deposit or send the Tenant notice of application of the security deposit within the time and in the manner required by New Jersey Law. In the event there is outstanding rent due or other charges due from the Tenant upon termination of the lease, these charges shall be deducted from the security deposit.

### 5. SUBLETTING OR ASSIGNMENT

The Tenant shall not assign this lease to any party. The Tenant shall not sublet the premises without prior written consent of the Landlord.

### 6. LATE FEES

If the rental payment is not received by the Landlord on or before the 5th day of the month when due, the Tenant shall be charged a late fee of $50.00. The late fee shall be considered additional rent and shall be collectible as rent. Any Tenant who has not tendered the rental payment due on or before the 5th day of the month when due, shall be in default in performance of this lease. Payment of the late fee does not prevent the Landlord from instituting summary dispossess action for nonpayment of rent.

### 7. RETURNED CHECKS

If a check is returned unpaid, the Tenant shall be charged $25.00. Said charge shall be added to the rent and shall be collectible as rent. If any check is returned for insufficient funds all subsequent payments shall be paid by money order or certified check.

### 8. REMEDIES OF LANDLORD

If the Tenant defaults with regard to any of the terms and conditions set forth in this lease and Rules and Regulations, the Landlord may terminate the lease and seek other remedies for such cause and upon such grounds as may be permitted by law. If the Landlord institutes a dispossess action due to the Tenant's failure to pay rent or any other breach of the terms and conditions of the lease, the Tenant shall be responsible for paying the sum of $250.00 as reasonable attorney's fees, plus all court costs. The Landlord shall institute a summary dispossess action if the Tenant fails to pay rent before the 10th day of the month when due. The Tenant shall also be responsible to pay all reasonable costs related to the issuance of a warrant of removal if required by the Landlord. Said cost shall also be collectible as rent. If the Landlord sues the Tenant to collect the rent or for any default arising from the lease agreement, the Tenant shall pay all of the Landlord's reasonable attorney's fees and court costs, in addition to damages. Said reasonable attorney's fees and court costs shall be in addition to any previous attorney's fees from a summary dispossess action.

### 9. DAMAGES FROM TENANTS BREACH-Liquidated Damages

In the event the Tenant breaches the lease agreement or terminates the lease agreement before the expiration of the lease term, the Tenant shall be liable for the entire balance of the rent due for the entire remainder of the lease term or until the apartment is rerented by the Landlord. The Landlord shall make efforts to rerent the premises as quickly as possible. The Landlord agrees that in the event of any breach or early termination of the lease agreement, the Tenant shall also pay to the Landlord as liquidated damages, the sum of $400.00 to cover repainting, redecoration, rerenting and administrative fees plus any Real Estate Fees incurred from the rerental of the demised premises These charges shall not be considered a waiver of any other rights of the Landlord.

### 10. REPAIRS AND MAINTENANCE

The Tenant shall take good care of the premises and its fixtures. The Tenant shall be responsible for any damage caused to the premises through misuse, neglect or negligence of the Tenant. The Tenant shall not refuse the Landlord reasonable access to the premises for the purpose of repairs, maintenance or for any emergency. Any failure of the Tenant to provide reasonable access shall be a breach of the lease.

### 11. ALTERATIONS

The Tenant shall not make any alterations or improvements to the property without prior written consent from the Landlord. Any permanent improvement or addition made to the premises shall become the property of the Landlord when the Tenant vacates the premises.

### 12. FIXTURES

All fixtures and personal property in the premises at the time of taking possession by the Tenant, shall remain at the expiration of the term and if lost, broken or damaged by the Tenant, shall be replaced or paid for by the Tenant.

1

De 60

### 13. LANDLORD'S LIMITED LIABILITY

The Landlord is not responsible for any damage or injury caused to the Tenant or to the Tenant's property or to the persons or property of any individuals at or on the leased premises for any purpose whatsoever unless said damage or injury is caused by the negligence of the Landlord. The Tenants should obtain insurance coverage to protect Tenant against loss and liability at the renter's own cost.

### 14. NOTICES

Service of any notice as required by law or under this agreement shall be sent by certified mail, hand delivered, or by regular mail with proof of mailing. Notices from the Landlord to the Tenant shall be sent to Tenant's last known address, and notices from the Tenant to the Landlord shall be addressed to the Landlord's Post Office Box 457, Woodbridge, New Jersey, 07095. Upon termination of the lease, notices from the Landlord to the Tenant may be sent to the address of the leased premises or to a forwarding address provided to the Landlord by the Tenant. The Tenant shall provide a forwarding address to the appropriate post office so that all notices may be forwarded. Notices to cease or quit, shall be at the tenant's expense.

### 15. UTILITIES

The Tenant shall be fully responsible for the cost of all heat, whether gas, electric or water and sewer, for all costs of electricity used for the operation of refrigerators, air-conditioning, sump pump, lighting, etc. The Tenant shall pay all utility bills as they become due. The Landlord has no obligation whatsoever with regard to the furnishing of heat hot water or the supply of electric current for lighting, air-conditioning, etc. The Tenant shall apply to the necessary utility companies for ELECTRIC AND GAS service, provide all necessary deposits required from those companies, and be fully responsible for all utility payments from date of move-in through date of move-out. In the event the Tenant vacate the premises without advising the utility companies of the date of moving from the premises, the Tenant shall continue to be responsible for all gas and electric bills until the accounts are terminated by the utility companies. In the event the Tenant fails to pay any utility bills which results in termination of services, it shall be the Tenant's full responsibility to pay all reconnection fees. In the event the Landlord is obligated to pay any outstanding utility bills incurred by the Tenant, the Tenant shall reimburse the Landlord for any such charges and said charges shall be collectable as rent in the event of the institution of a summary dispossess action. The Landlord further retains the right to pay any outstanding balances due for the utility services by deducting said monies due from the Tenant's security deposit. THE TENANT SHALL BE HELD FULLY RESPONSIBLE MAINTAINING THE ROOM TEMPERATURE OF THE APARTMENT NO LOWER THAN 55 DEGREES FAHRENHEIT IN ORDER TO PREVENT FREEZING OF PIPES. IN THE EVENT ANY PIPE SHALL FREEZE AS A RESULT OF THE TENANT'S FAILURE TO MAINTAIN ADEQUATE HEAT IN THE APARTMENT, THE TENANT SHALL BE LIABLE TO THE LANDLORD FOR ANY AND ALL DAMAGES ARISING THEREFROM.

### 16. APPLIANCES AND OTHER ITEMS NOT PERMITTED

The Tenant shall not install or bring onto the premises his own washing machine, clothes dryer, dishwasher, or refrigerator on the leased premises without prior written consent of the Landlord, or provided by Landlord.

### 17. PETS NOT PERMITTED

No pets of any kind are permitted to be kept by the Tenant on the premises.

### 18. STORAGE AREAS AND PERSONAL PROPERTY

The Landlord or its agents are not responsible for the property or personal items of the Tenant which Tenant chooses to place in the storage facility of the Tenant's apartment building. Any personal property left in the apartment after the date this lease terminates by operation of law or eviction by the Tenant vacating the premises shall be considered abandoned by the Tenant and shall be disposed of as the Landlord sees fit without any further claim to such property against the Landlord.

### 19. RENEWAL OF LEASE

At least forty (40) days prior to the expiration date of the Tenant's lease term, the Landlord shall provide to the Tenant a Notice of Renewal of the lease. Unless the Tenant provides written notice to the Landlord at least thirty (30) days prior to the termination of the lease term of his intention to vacate the premises on the expiration date of the lease term, said failure to notify shall be considered as the intention of the Tenant to renew the lease agreement for a new term at a new rent, as specified by the Landlord. Except for reasonable changes and allowable rent increased, all covenants, terms and conditions of the original lease shall remain in full force and effect for all additional lease terms.

### 20. FIRE OR INTENSIVE DAMAGE

In case of fire or intensive damage to the apartment and/or building, the Tenant shall give immediate notice of said fire or damage to the Landlord immediately; and the Landlord shall make repairs as soon as they are able to do so. However, in the event that the apartment and/or building are so damaged that the Landlord shall decide to rebuild or tear down, the tenancy shall be terminated and the accrued rent shall be due and paid up to the time of the fire and/or damage. The Tenant shall not be entitled to compensation arising from the repairing or alterations of any portion of the premises.

### 21. APPLIANCES SUPPLIED WITH RENTAL UNIT

Each rental unit shall be supplied by owner at owner's expense in good working condition: A) 30 inch Gas Oven B) Frost Free Refrigerator C) Under Counter Dishwasher (if available) D) Washing Machine & Gas Dryer (if applicable) E) Sleeve Air Conditioner or Central Air Heat & Air Conditioning Unit F) Microwave (if applicable). Tenant shall maintain in good condition.

### 22. SEVERABILITY

In the event any terms or conditions of the lease agreement are found to be illegal or unenforceable, all other lease terms and conditions shall remain in full force and effect.

### 23. CONDITION OF PREMISES

The Tenant's acceptance of possession of the premises is also the Tenant's acknowledgement that the Tenant has examined the premises and that said premises are in good condition and repair.

### 24. FAILURE OF LANDLORD TO DELIVER POSSESSION

If the Landlord cannot deliver possession of the premises to the Tenant on the date of the commencement of the lease agreement, the Landlord is not responsible or liable to the Tenant for such failure. The Tenant will be responsible for rent only from the date when the Landlord is able to deliver possession. If the premises are not completed by the date of the commencement of the lease, the Landlord shall not be responsible or liable to the Tenant. The tenancy will commence on the date fixed for occupancy. If the Landlord cannot deliver possession to the Tenant for a period in excess of thirty (30) days, the Tenant may cancel the lease agreement upon immediate notice to the Landlord in writing.

### 25. APPLICATION OF TENANT

The Tenant's application for tenancy is incorporated into and made a part of the lease agreement. Any false representation made in the lease application shall be a breach of the lease and grounds for eviction..

### 26. ABANDONMENT OF PROPERTY

Landlord shall not be responsible for personal property left by the Tenant on the premises after Tenant vacates the apartment.

### 27. ACCEPTANCE OF DOCUMENTS

The Tenant acknowledges receipt from the Landlord of the following documents and information: A) A copy of the Landlord's registration statement. B) A copy of the Truth in Renting booklet. C) Information indicating the availability of "crime insurance" under the Federal Crime Insurance Program and information as to where to seek information about the program and how to apply for such insurance. D) Information regarding the amount of and place where security deposit paid by Tenant, in connection herewith, is being held. E) Child Protection Window Guard Notification. F) Lead Information Booklets.

### 28. SUBORDINATION TO MORTGAGE

This lease is subordinate to the lien of any mortgages now or in the future placed on the land and building. Tenant agrees to sign all documents necessary to subordinate this lease to any mortgage and to allow Landlord to sign on Tenant's behalf.

### 29. KEY DEPOSIT

The Tenant has executed a key deposit form acknowledging receipt of the key to the apartment. If the Tenant executes the key deposit form and receives the key to the apartment on a date prior to the commencement of the lease agreement, the Tenant shall be liable for rent due commencing with the date the Tenant executes said key deposit form.

### 30. RULES AND REGULATIONS

The Tenant agrees to comply with the following Landlord's Rules and Regulations which are attached to the lease agreement and which are incorporated into and made part of the lease agreement.

2

Da 61

## RULES AND REGULATIONS
### ALL THE TENANTS AND OCCUPANTS AGREE:

1. Not to make or permit any disturbing noises in the premises or on the grounds, by himself, his family or guests, not do or permit to be done anything which will interfere with the rights, comforts or conveniences of other tenants; not to play upon or suffer to be played upon any musical instruments nor to operate a radio, television, or engage in any outdoor sports between the hours of ten o'clock in the evening and the following nine o'clock in the morning; or eleven A.M. on Saturday's and Sunday's if same will disturb or annoy other tenants or occupants of the same or other units.

2. They shall only use such shades, window ventilators or guards in the windows of said apartment as are put up or approved by the Landlord. No awnings permitted.

3. No animal shall be permitted in the herein-leased apartment or visiting in or about the building or grounds of the Landlord.

4. If the Tenant desires telephone connections, the wire so introduced shall be without injury or damage to the premises and the Tenant will be responsible for any damage occasioned by the installation, use or removal of such instruments.

5. Tenant shall comply with all Municipal, City, State, and Federal recycling ordinances, regulations and requirements.

6. They shall not install, affix, paint on or expose any sign, notice, advertisement, illumination or projection out of the windows or on the exterior, or from the said building, or upon it in any place.

7. The sidewalks, halls, passages or stairs shall not be obstructed by the Tenants or their goods, or used by them for any purpose other than ingress or egress from and to their respective apartments. No items permitted in halls or at apartment entrance doors or on lawns or walks. Tenants shall not sweep or throw or permit to be swept or thrown from the premises leased, any dirt or other substance into any of the corridors or halls, stairways or sidewalks of said building.

8. Bicycles, tricycles, baby carriages, go-carts and other vehicles of like nature shall be kept in the basement or in demised premises and not left in the hall or on the sidewalks or grounds at any time.

9. The toilet rooms, watercloset and other water apparatus shall not be used for any other purpose than those for which they were constructed, and no sweepings, rubbish, rags, ashes, ink, chemicals, garbage, refuse matter from electric batteries or other obnoxious substances, shall be thrown therein. Any damage resulting from such misuse or abuse shall be borne and paid for by the Tenant by whom, or by whose employees, such damage is caused.

10. Pianos, furniture, goods and freight shall be brought, delivered and received into said building and taken out by arrangement with the Landlord or agent in charge of said building.

11. They shall see that the windows and doors of their apartments are closed and securely fastened before leaving the premises, and will be held responsible for any damage resulting from frost, rain or other causes in violation of this rule.

12. They shall not use or keep in this building any explosives or illuminating material except electric light or candle.

13. They shall not waste or unreasonably use water. All water leaks must be reported immediately to the super.

14. They shall at all times keep the dwelling and fixtures therein in a clean and sanitary condition.

15. They shall report to the Landlord at once, any accidents or injury to guests or occupants, or any damage to water pipes, toilets, drains, or fixtures, or other property of the Landlord and all breakage, damage or loss of any kind.

16. They shall not permit their children to play in public halls, on roofs, stairways, elevators, cellars, walks, grounds or areas, except in the regular playground area that may be provided for children's use.

17. They shall not use any tacks, nails or other fasteners or cement in laying carpets, rugs or linoleum on the floors.

18. They shall not place any nails, bolts or screws in walls, floors, doors or trim, nor shall they apply wallpaper and/or contact paper or colors on any wall, with the exception of pictures and window treatments.

19. They shall not install any radio or television aerial wires or satellite dishes of any description on or in the building, or hang them from windows. They shall, upon termination of this lease, return all keys for the apartment or pay for the same. Landlord may require security deposit for keys.

20. They shall report to the Landlord the presence of insect or vermin in the premises. They shall permit the Landlord or its agents or employees to enter the premises at any reasonable hour for the purpose of exterminating insects or vermin, and to allow the Landlord to take all materials into the premises that may be permitted therefor, without the same constituting an eviction, and that the rent shall not abate while such work is being done.

21. The Landlord in all cases shall retain the right to control and prevent access into the building and grounds of all persons whom it considers undesirable.

22. All personal property placed in the premises or stored in trunk rooms and storage rooms and garages shall be at the risk of the Tenant or owner of such personal property and the Landlord will not be responsible for any damage or injury to or loss of such personal property from any cause.

23. The Landlord shall not be responsible for articles left with any employee of Landlord.

24. The Tenant will not hang or permit to be hung any article on the outside of the premises or out of the windows or make or permit to be made any disturbance or noises detrimental to the premises or to the comfort of other inhabitants of the said premises nor any act or thing which may be or grow to be an annoyance, damage and disturbance to the Landlord or any other Tenant.

25. The use of play areas by the children of the Tenant is at their own risk and the children shall at all times be under the supervision of the Tenant or their appointee.



26. Children may not be permitted to destroy lawns or shrubs, dig or in any way molest or destroy buildings or grounds.

27. It is positively understood and agreed that no air-conditioning units are permitted in the windows.

28. The use of washing machines and/or dryers is specifically prohibited. Presence of either of those machines in the apartment shall constitute a material breach of this lease. Tenant agrees herewith not to install, or cause to be installed, washing machines and dryers. Washing machines and drying apparatus will be installed in laundry area and Tenant shall use these facilities only at such times as the Landlord designates. The exception to this rule is in the event that a washing machine and/or dryer is provided by the Landlord with the apartment. Tenant shall keep said machines in good condition.

29.  a. The Tenant shall not hang any laundry on or from the balconies or porches of their apartment, or on the grounds.
b. The Tenant shall not store any unsightly items on the balconies or porches, only items for express use of same.
c. The Tenant shall abide by all Condominium rules, if applicable. All local municipal laws apply.

30. No parking is permitted in any driveway. Only designated parking areas may be so used. Parking is limited to cars, station wagons and small vans only.

31. Abandoned vehicles will be removed or towed away by the Landlord at the Tenant's expense. Any auto will be towed at the auto owner's expense if the vehicle blocks a roadway or parking lot area for any reason whatsoever.

32. No trucks, boats or any other commercial vehicles are permitted to park on the premises. Any such vehicles will be towed off the premises at the owner's expense. The owner shall also be obligated to pay any storage fees incurred as a result of towing.

33. No abandoned, inoperable, unlicensed, or unregistered vehicles are permitted to be stored on the Landlord's property. All said vehicles shall be towed off the premises at the vehicle owner's expense. The vehicle owner shall also be obligated to pay any storage fees incurred as a result of towing.

34. The Tenant shall not cause any automobiles or other vehicles to be worked on or repaired on the premises, including but not limited to the parking lots, garages, driveways, etc. No washing of cars or other vehicles allowed on premises.

35. Use of the recreation room for sleeping quarters is strictly prohibited. Electric outlets provided for sump pumps are dedicated only for that purpose. No sharing of this electricity is allowed.

36. Tenants are forbidden to trespass or enter any storage area, whether locked or unlocked, unless accompanied by a representative of the Landlord.

37. No additional lock other than those provided by the Landlord shall be permitted unless keys to said lock are provided to the superintendent or other Landlord agent.

38. Waterbeds are not permitted in the leased premises. No running of electric lines outside apartment unit.

MEGAN'S LAW STATEMENT: Under New Jersey law, the county prosecutor determines whether and how to provide notice of the presence of convicted sex offenders in an area. In their professional capacity, real estate licensees are not entitled to notification by the county prosecutor under Megan's Law and are unable to obtain such information for you. Upon closing, the county prosecutor may be contacted for such further information as may be disclosable to you.

The Landlord reserves the right to make such other rules and regulations from time to time as it deems necessary for the safety, care and cleanliness of the premises and for securing the comfort and convenience of all Tenants.

**Any request for money other than set forth in this lease agreement, plus credit report and key deposit fee, should be reported to the management office at 732-855-2990, Monday - Friday 9:00AM - 5:00PM.**

Tenant has read all of the foregoing terms and conditions and accompanying rules and regulations of his tenancy and agrees to abide by them and further agrees that a breach of any of the terms, covenants, rules or regulations shall be a breach of the entire lease. Tenant further acknowledges that no oral representations have been made to him by the Landlord or agent and the foregoing contains every representation upon which he relies.

**IN WITNESS THEREOF, the parties hereunto signed this lease:**

By: _____ DATE: _____
WOODBRIDGE CENTER PLAZA

_____ DATE: 5/29/02          JACK MCGUIRE
MELANIE L. MCGUIRE                                DOB: 2/11/00
DOB: 10/8/72

_____ DATE: 5/31/02          JASON MCGUIRE
WILLIAM T. MCGUIRE                                DOB: 3/11/02
DOB: 9/21/64

_____ DATE: _____

DOB:                                             DOB:

_____ DATE: _____

DOB:                                             DOB:

Da 63

JOSEPH E. KRAKORA, PUBLIC DEFENDER
POST-CONVICTION RELIEF UNIT
P.O. BOX 46010
31 CLINTON STREET, 5th FLOOR
NEWARK, NEW JERSEY 07101
(973) 648-7651

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION (MIDDLESEX COUNTY)
IND. NO. 05-10-164

STATE OF NEW JERSEY,     :     <u>Criminal Action</u>
   *Plaintiff-Respondent*    :
            :     Certification
     V.        :
            :
MELANIE MCGUIRE,      :
   *Defendant-Petitioner*    :

RONALD CHWALA, Jr., of full age, hereby certifies that:

  1. From 2001 through 2004, I was the superintendent of general maintenance for the Plaza Drive apartment complex. In that capacity I was responsible for the maintenance of the apartment occupied by Melanie and William McGuire.

  2. After William McGuire's death, I was interviewed by detectives. They asked me questions about the couple and about their apartment. My answers to their questions were truthful and accurate to the best of my knowledge.

  3. About two to four days after Ms. McGuire vacated the apartment, the detectives arrived and refused to allow anyone inside. I entered the apartment, after the detectives had searched it.

  4. As I later told the detectives, I saw that the walls of the apartment had recently been



Da 64.

primed white.  While living there, the McGuires had painted the walls of the living room and dining room a shade of gray.  It was the responsibility of the tenants to return the walls of their apartments to their original color of white or "eggshell."  If the tenants failed to do so, the management of the complex would consider it to be "property damage" and would withhold the tenant's security deposit.

5. I told the detectives that I thought that the walls could have used another coat of priming.

6. All of the information which I gave to the detectives was truthful and accurate to the best of my knowledge.

7. I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Dated: 7/14/13

RONALD CHWALA, Jr.

Aa 65

JOSEPH E. KRAKORA, PUBLIC DEFENDER
POST-CONVICTION RELIEF UNIT
P.O. BOX 46010
31 CLINTON STREET, 5th FLOOR
NEWARK, NEW JERSEY 07101
(973) 648-7651

                                        SUPERIOR COURT OF NEW JERSEY
                                        LAW DIVISION (MIDDLESEX COUNTY)
                                        IND. NO. 05-10-164

-------------------------------------------

                                    :
STATE OF NEW JERSEY,                :       <u>Criminal Action</u>
    *Plaintiff-Respondent*          :
                                    :       Certification
                                    :
        v.                          :
                                    :
MELANIE MCGUIRE,                    :
    *Defendant-Petitioner*          :

-------------------------------------------

LOIS DE JULIO, of full age, hereby certifies that:

    1. I am an attorney-at-law of the State of New Jersey, and an Assistant Deputy Public

Defender in the Post-Conviction Relief Unit. I was assigned to represent Melanie McGuire on post-

conviction relief.

    2. The Office of the Public Defender did not represent Ms. McGuire either at the trial of this

matter or on the direct appeal.

    3. Most of the contents of her trial file were shipped to my office by Jamie S. Kilberg, Esq.,

one of the privately retained attorneys who represented Ms. McGuire on her direct appeal.

    4. In the trial file, I found the attached documents: An "Agreement to Provide Legal

Services," dated November 18, 2005, and a "Supplemental Agreement to Provide Legal Services,"



Da 66

dated March 9, 2007.

    5. I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Dated: 6/14/13

LOIS DE JULIO

Ɖa 67

LAW OFFICES OF

JOSEPH TACOPINA, P.C.

A PROFESSIONAL CORPORATION

275 MADISON AVENUE
35TH FLOOR
NEW YORK, NEW YORK 10016

TELEPHONE (2I2) 227-8877
FACSIMILE (2I2) 6I9-1028
www.tacopinalaw.com

JOSEPH TACOPINA
———
CHAD D. SEIGEL
GEORGE VOMVOLAKIS
———
ANDREW C. LAUFER
FRANCESCO PENTA***
VICTOR SHERMAN+
+   ALSO ADMITTED IN CALIFORNIA
*** ONLY ADMITTED IN ITALY

MILAN OFFICE:
I-20123 MILANO
VIA OLMETTO, 21
MILAN, ITALY
TEL (02) 72020070
FAX (02) 875-883

## AGREEMENT TO PROVIDE LEGAL SERVICES

**THIS AGREEMENT**, dated November 18, 2005, is made between Melanie McGuire ("Client"), and The Law Offices Of Joseph Tacopina, P.C. ("The Law Firm") whose address is 275 Madison Avenue, 35th Floor, New York, New York 10016. The Law Firm agrees to represent the Client, pre-trial, in connection with <u>State of New Jersey v. Melanie McGuire</u>, pending in Middlesex County, New Jersey, Ind. No. 05-10-164-S.

**Legal Services.** The Law Firm will protect client's legal rights and do all necessary legal work to properly represent the client in this matter. This legal work includes all necessary Court appearances, research, investigation, correspondence, preparation and drafting of pleading and other legal documents, trial preparation and related work to properly represent the client in this matter.

**Cost and Expenses.** In addition to legal fees, client may be required to pay for expenses in connection with client's representation. Such expenses may include, among other things, experts' fees and expenses for other testimony or evidence, court costs, accountants' fees, appraisers' fees, service fees, investigators' fees, deposition costs, costs of briefs, transcripts on appeal and extraordinary photocopying, long-distance telephone, postage expenses, and overnight mail. The Client will not be required to pay for usual and customary law office overhead expenses, such as local telephone charges, routine photocopying and normal postage costs. The Client will be charged a flat rate of $75,000.00 for all services rendered prior to trial in connection with <u>State v. Melanie McGuire</u>, pending in Middlesex County, New Jersey. The fee shall be paid as follows: <u>$25,000</u> upon executing the retainer agreement, <u>$25,000</u> payable no later than March 15, 2006, and <u>$25,000</u> payable no later than July 15, 2006. Additionally the client will also be charged an additional fee of <u>$50,000</u> for the first four weeks of trial.



JOSEPH TACOPINA, P.C.

McGuire Retainer Agreement
November 18, 2005
Page -2-

**Termination of representation.**   In the event the Client terminates
the Law Firm's representation in this matter, the Law Firm will
retain from the monies provided $600 per hour for the legal
services rendered by Joseph Tacopina, Esq., and $400 per hour for
the legal services rendered by associates.

**No guarantee.**   The Law Firm agrees to provide conscientious,
competent and diligent services and at all times will seek to
achieve solutions which are just and reasonable for the client.
However, because of the uncertainty of legal proceedings, the
interpretation and changes in the law and many unknown factors, the
Law Firm cannot and does not warrant, predict or guarantee results
or the final outcome of any case.

**Signatures.**   Upon signing this agreement, the Client affirms that
she has read this Agreement and that this Law Firm has answered all
of her questions and fully explained this Agreement to her complete
satisfaction. The client shall also be furnished with a signed copy
of this Agreement.

Dated:     New York, New York
           November 18, 2005


LAW OFFICES OF JOSEPH TACOPINA, P.C.

By: _____          _____
      Joseph Tacopina, Esq.                  Melanie McGuire


Da 69

LAW OFFICES OF
### TACOPINA & SEIGEL
A PROFESSIONAL CORPORATION
275 MADISON AVENUE
35TH FLOOR
NEW YORK, NEW YORK 10016

TELEPHONE (212) 227-8877
FACSIMILE (212) 619-1028
WWW.TACOPINALAW.COM

JOSEPH TACOPINA
CHAD D. SEIGEL

BRIAN KING
MARC R. WARD

GEORGE VOMVOLAKIS
FRANCESCO PENTA***
VICTOR SHERMAN+
+ ALSO ADMITTED IN CALIFORNIA
***ONLY ADMITTED IN ITALY

MILAN OFFICE:
20149 MILANO
VIA DOMENICHINO, N. 35
MILAN, ITALY
TEL (02) 48012455

## SUPPLEMENTAL AGREEMENT TO PROVIDE LEGAL SERVICES

**THIS SUPPLEMENTAL AGREEMENT**, dated March 9, 2007, is made between Melanie McGuire ("Client"), and The Law Offices Of Joseph Tacopina, P.C. (The "Law Firm"), whose address is 275 Madison Avenue, 35th Floor, New York, New York 10016. The Law Firm agrees to continue representing the Client in connection with <u>State of New Jersey v. Melanie McGuire</u>, pending in Middlesex County, New Jersey, Ind. No. 05-10-164-S and 06-10-119-S. This Agreement supercedes any and all agreements between the Client and the Law Firm, including an agreement dated **November 14, 2005.**

**Legal Services.** The Law Firm will protect client's legal rights and do all necessary legal work to properly represent the client in this matter. This legal work includes all necessary Court appearances, research, investigation, correspondence, preparation and drafting of pleading and other legal documents, trial preparation and related work to properly represent the client in this matter.

**Cost and Expenses.** Whereas (1) the Client breached the **November 14, 2005** agreement by failing to satisfy the entire retainer in accordance with the terms set forth therein, and (2) legal fees already paid by the Client or any others person on the Client's behalf have been earned by the Law Firm, the Client will be charged an additional flat rate retainer of <u>$180,000.00</u> in connection with <u>State v. Melanie McGuire</u>, pending in Middlesex County, New Jersey. This retainer shall include all fees for services rendered during the pretrial and trial stages of this matter, as well as any and all remaining expenses and costs associated with the trial not already paid by the Client or any other person on the Client's behalf. Such remaining expenses and costs, which the Law Firm agrees to advance on behalf of the Client, include, but are not limited to, those associated with investigators, experts, paralegals, accommodations in New Jersey, service of subpoenas, and preparation of exhibits. This retainer shall be secured by (1) a judgment of confession, dated **March** _____



TACOPINA & SEIGEL, P.C.

McGuire Retainer Agreement
March 9, 2007
Page -2-

**2007**, entered by the Client's grandmother, Ann M. Moritz ("Moritz")
in favor of the Law Firm, and (2) a stock pledge agreement between
the Law Firm and Moritz, dated **March _____, 2007**. The terms of
those documents shall be incorporated herein by reference as if
fully set forth herein. Additionally, those documents shall in no
way be deemed to limit the Client's obligations under the terms of
this agreement. Lastly, the Law Firm agrees to waive any
additional fee for services rendered in connection with the second
indictment filed in this matter.

**Termination of representation.** In the event the Client terminates
the Law Firm's representation in this matter, the Law Firm will
retain from the monies provided $600.00 per hour for the legal
services rendered by Joseph Tacopina, Esq., Stephen Turano, Esq.,
and Chad Seigel, Esq., and $400.00 per hour for the legal services
rendered by associates.

**No guarantee.** The Law Firm agrees to provide conscientious,
competent and diligent services and at all times will seek to
achieve solutions which are just and reasonable for the client.
However, because of the uncertainty of legal proceedings, the
interpretation and changes in the law and many unknown factors, the
Law Firm cannot and does not warrant, predict or guarantee results
or the final outcome of any case.

**Signatures.** Upon signing this agreement, the Client affirms that
she has read this Agreement and that this Law Firm has answered all
of her questions and fully explained this Agreement to her complete
satisfaction. The client shall also be furnished with a signed copy
of this Agreement.

Dated:    New York, New York
          March 9, 2007

LAW OFFICES OF JOSEPH TACOPINA, P.C.

By: _____          _____
    Joseph Tacopina, Esq.                    Melanie McGuire

Da 71



JOSEPH E. KRAKORA, PUBLIC DEFENDER
POST-CONVICTION RELIEF UNIT
P.O. BOX 46010
31 CLINTON STREET, 5th FLOOR
NEWARK, NEW JERSEY 07101
(973) 648-7651

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION (MIDDLESEX COUNTY)
IND. NO. 05-10-164

|  |  |  |
|---|---|---|
| STATE OF NEW JERSEY,<br>*Plaintiff-Respondent* | : | <u>Criminal Action</u> |
|  | : |  |
| V. | : | Certification |
|  | : |  |
| MELANIE MCGUIRE,<br>*Defendant-Petitioner* | : |  |

RICHARD SCOTT, of full age, hereby certifies that:

1. I am a medical doctor who specializes in reproductive endocrinology. I am the clinical director and was the managing partner of Reproductive Medical Associates (RMA). I held these positions in 2004 when Melanie McGuire was employed as a nurse by RMA.

2. RMA primarily treats patients with infertility problems. RMA's main office is located in Morristown, New Jersey.

3. At the time that I was the managing partner, I was responsible for overseeing the administrative side of the practice.

4. In 2004, our patient records were kept on a computerized data base which the doctors and nurses could access from any location. They did not have to be physically present in the office in



order to do so.  It was not necessary for them to obtain permission from a supervisor to access these records.

5.  At no time did the attorneys who represented Ms. McGuire at trial speak to me regarding remote access to our computerized patient records.

6.  I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:  2/21/2013

RICHARD SCOTT

Da 73

JOSEPH E. KRAKORA, PUBLIC DEFENDER
POST-CONVICTION RELIEF UNIT
P.O. BOX 46010
31 CLINTON STREET, 5th FLOOR
NEWARK, NEW JERSEY 07101
(973) 648-7651

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION (MIDDLESEX COUNTY)
IND. NO. 05-10-164

|  |  |
|---|---|
| STATE OF NEW JERSEY, *Plaintiff-Respondent* | Criminal Action |
| V. | Certification |
| MELANIE MCGUIRE, *Defendant-Petitioner* |  |

ANN MCGUIRE, of full age, hereby certifies that:

1. Although we have the same surname, I am not related by blood or marriage to Melanie McGuire.

2. I am a nurse employed by Reproductive Medical Associates (RMA) in Morristown, New Jersey. I worked there in 2004, and knew Melanie McGuire as a fellow employee.

3. In 2004, RMA's patient records were kept on a computer data base. Due to the high demands of our practice, the work day did not end at the office. As a result, the clinical employees could access the patient records data base from any location. It was not necessary for them to obtain data permission from a supervisor to access these records. However, authorization was necessary for long term usage.

Da 74

4.  It was a standard process to use the patient records computerized data base as a communication tool, to keep in contact with patients between office appointments.  Melanie McGuire was responsible for coordination of patients' care for patients in the "Gestational Carrier Program."  Melanie often needed to keep in constant contact with these patients, sometimes via e-mail on a daily basis, and would utilize the database system for this purpose.

5.  At no time ~~did~~ do I recall Otm the attorneys who represented Ms. McGuire at trial speak to me regarding remote access to our computerized patient records.

6.  I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Dated: 2/28/13

ANN MCGUIRE

Da 75

JOSEPH E. KRAKORA, PUBLIC DEFENDER
POST-CONVICTION RELIEF UNIT
P.O. BOX 46010
31 CLINTON STREET, 5th FLOOR
NEWARK, NEW JERSEY 07101
(973) 648-7651


SUPERIOR COURT OF NEW JERSEY
LAW DIVISION (MIDDLESEX COUNTY)
IND. NO. 05-10-164


|  |  |  |
|---|---|---|
| STATE OF NEW JERSEY, | : | <u>Criminal Action</u> |
| *Plaintiff-Respondent* | : | |
| | : | Certification |
| V. | : | |
| | : | |
| MELANIE MCGUIRE, | : | |
| *Defendant-Petitioner* | : | |


Dr. David M. Benjamin, Ph.D., of full age, hereby certifies that:

    1. I am a Clinical Pharmacologist and Toxicologist with 40 years of practice. My *Curriculum Vitae* is attached.

    2. I was contacted by Lois De Julio, counsel for the defendant in this case, and asked to research and report on the use of Chloral Hydrate in the treatment of the symptoms of withdrawal due to gamma hydroxy-butyrate (GHB). I was also asked to report on the likelihood that any attempts to clean a blood-stained area would be completely successful.

    3. My report is attached.

    6. I certify that the foregoing statements made by me are true. I am aware that if any of the


Da 76

foregoing statements made by me are wilfully false, I am subject to punishment.

Dated: _June 4, 2003_          _____
                                    DAVID M. BENJAMIN

Da 77

# *David M. Benjamin, Ph.D.*

77 Florence Street
Suite 107N
Chestnut Hill, Mass. 02467-1918

Telephone (617) 969-1393
Facsimile (617) 969-4285
E-mail: medlaw@channel1.com
New Email: medlaw@doctorbenjamin.com

DAVID M. BENJAMIN, PH.D.
CLINICAL PHARMACOLOGIST & TOXICOLOGIST

June 4, 2013

Lois De Julio, Esq.
Assistant Deputy Public Defender
State of New Jersey
Office of the Public defender
Post-Conviction Relief Unit
P.O. Box 46010
31 Clinton St., 5th floor
Newark, NJ 07101

Re: State v Melanie McGuire

Dear Attorney De Julio:
You have asked me to research and report on the use of Chloral Hydrate in the treatment of the symptoms of withdrawal due to gamma hydroxy-butyrate (GHB).

## Qualifications

My complete CV is attached and covers my 40 years of practice as a clinical pharmacologist and toxicologist with applications of these skills to forensic toxicology.

I have been familiar with the pharmacology and toxicology of GHB for longer than 25 years. GHB was first thought of as a neurotransmitter in the central nervous system. However during the 1970s-1980s, GHB was used illicitly by bodybuilders for weight control and as a release of growth hormone. I was involved with the evaluation of one of the first cases involving GHB toxicity where a pregnant female bodybuilder using GHB passed out behind the wheel of her car while driving, resulting in the death of her and her in-utero baby. I was also involved in a case where a GHB user was in police custody, went into withdrawal, and did not receive any medical care and died.

In the 1990s, GHB also was used illicitly as a "Date Rape" drug. The drug was surreptitiously put into young women's drinks and after losing consciousness the women were sexually assaulted. This crime has now become known as drug facilitated sexual assault (DFSA). As DFSA became more prevalent, I was asked by leadership in the International Association of Forensic Nurses (IAFN) to lecture to the air sexual assault nurse examiners (SANE) on the physiology, pharmacology and toxicology of drugs used for DFSA. In 2002, I was asked to join the DFSA Ad Hoc Committee developed by the FBI and consisting of

1



members from Both the American Academy of Forensic Sciences (AAFS) And the Society of Forensic Toxicologists (SOFT) where I served for several years.

In 2006, I gave a paper entitled Gamma -Hydroxybutyrate- Withdrawal with Severe Rhabdomyolysis, Hyperkalemia and Cardiac Arrest at the annual meeting of the AA FS in San Antonio, Texas, February 2007. Most recently, I have been retained by the Commonwealth of Massachusetts to consult and testify in a DFSA case involving the surreptitious administration of 1, 4,-butanediol, a substance which is converted in the body to GHB, to four unsuspecting individuals.

I have also been familiar with the drug Chloral Hydrate for 40 years or more. Chloral Hydrate was the original "Mickey Finn" which was put into alcoholic drinks in order to render the drinker unconscious. This was probably the original "date rape" drug or intoxicating drug used to facilitate rapes robberies and assaults.

**Documents reviewed in this case:**
1. Statement of facts
2. Autopsy/toxicology report from the Virginia chief medical examiner
3. Toxicology report from the New Jersey State toxicology laboratory
4. Toxicology analysis from the New Jersey state police office of forensic sciences
5. Report of the New Jersey state police investigator, John Jenna way it, regarding the "Tiffany Bayne" prescription for Chloral Hydrate an interview of Pharmacist, Kim Li Yan
6. Trial testimony of Kim Le Yen
7. Trial testimony of Dr. David Baron, director of central laboratory, Virginia Department of forensic sciences
8. Trial testimony of Dr. George Jackson chief Toxicologists for the state of New Jersey
9. Excerpt of trial testimony of Cindy Ligosh, sister of Bill Maguire, regarding her concerns about Possible steroid abuse
10. Three articles regarding Chloral Hydrate used to treat GHB withdrawal:
    a. Gamma-hydroxybutyrate withdrawal and Chloral Hydrate
    b. Gamma hydroxybutyric acid Intoxication
    c. Clinical features and management of gamma -hydroxybutyrate withdrawal
11. Excerpt of trial testimony of Rupal Franks-Slotwinski regarding the search of the Maguire townhouse
12. Excerpt of trial testimony of Thomas Lesniak, New Jersey state police forensic scientist, regarding the search of the Maguire townhouse
13. Excerpt of trial testimony of detective Ray Pickel, Virginia Beach homicide squad, regarding the search of the Maguire townhouse.
14. My own extensive file on GHB.
15. A paper entitled letter to the editor-October 1, 2000, ?-Hydroxybutyrate withdrawal and Chloral Hydrate by BURTON Hutto, Amy Fairchild, M.D., and Robert Wright, M.D.

    Secondary publication: American Journal of Psychiatry 2000; 157:1706.

16. Disposition of Toxic Drugs and Chemicals in Man, 8th edition, Baselt, RC, 2008.

2



**Brief Summary Of the Significant Events In This Case:**

On May 5, 2004, the Virginia Beach police from Chesapeake Bay recovered a suitcase containing a portion of the victim's body. On may 11, a 2nd suitcase was recovered and on May 16 a 3rd suitcase containing portions of the victim's body were found. Autopsies determined the cause of death to be 2 gunshot wounds. Toxicology tests revealed a blood ethanol of 0.01%, essentially equivalent to half of a beer. No cocaine, benzoylecgonine, or opioids were detected and no testing was conducted for Chloral Hydrate.

The victim was subsequently identified on or about May 25, 2004 as Bill Maguire. The Virginia Beach police contacted Ms. McGuire, the victim's wife, who reported that she had not heard from her husband since April 29, 2004, when her husband told her he was "leaving for good." She did state that their marriage had been deteriorating for a long time.

Ms. McGuire told the police that her husband had a serious gambling problem and spent a lot of time in Atlantic City. She also stated that she had driven to Atlantic City to try to find him and was successful in locating his car in the parking lot of one of the casinos. At that time she used her key to move his car to another parking lot to inconvenience her estranged husband.

Around June 4, 2004 Mr. Maguire's car was found by the Atlantic City Police Department a search of the car indicated a vial of liquid in the glove compartment which was later analyze and determine to be Chloral Hydrate. A hypodermi c syringe was also found in the glove compartment.

Investigators led to determined that a prescription for Chloral Hydrate had been filled on April 28, 2004 at a Walgreens pharmacy near Ms. McGuire's home. The prescription has been made out to 8 Tiffany Bayne and was allegedly signed by Dr. Brad Miller, a man with whom Ms. McGuire was alleged to be having an affair. Apparently Ms. Bayne denied ever receiving the prescription, and Dr. Miller denied having written it.

The Maguire's townhouse apartment in Woodbridge was search 3 times by various police agencies on June 2, 2004, March 31, 2005, and February of 2006. The searches revealed nothing including no traces of blood following the use of luminal.

At trial, the state put forth with their theory that the Chloral Hydrate had been used by the decedent's wife to sedate him so she could shoot him without a fight. Because Ms. Maguire was a nurse and worked in Dr. Miller's office, the state further alleged that she was the only person who had sufficient knowledge of the pharmacology of GHB to use it to subdue her husband. However, it has subsequently been determined that Mr. Maguire had been in his 5th year of pharmacy school at Rutgers but dropped out due to legal problems. The victim's sister, Cindy Ligosh, told police, and testified in part at trial, that her brother, the decedent, Bill Maguire, had shown signs of what she believed might have been steroid abuse, such as gaining weight becoming stockier starting to bald and generally increasing in size. However, many of these same signs can occur subsequent to GHB use because GHB is known to release growth hormone which would definitely contribute to an increase in size of an individual.

At trial, toxicologist Dr. George Jackson testified that he wasn't unable to find any traces of Chloral Hydrate in biological fluids of the decedent. However, Dr. Jackson explained that the half-life of Chloral Hydrate was very short (4 minutes) and the fact that he had not been told to look for it in the original requests for analysis confounded his ability to detect it. Testimony by Dr. David Baron, an analytical



3

chemist from the laboratory in Virginia, confirmed that he could not state whether or not Chloral Hydrate had been used by the decedent or not.

**Pharmacology and Toxicology of Gamma Hydroxybutyrate (GHB)**
GHB is a naturally occurring substance which is converted in the body to gamma amino butyric acid (GABA). GHB has been used illicitly as a date rape drug for decades. However, in the early 2000s, GHB was approved by the FDA for nighttime treatment in patients with sleep disorders or sudden loss of muscle tone associated with cataplexy or narcolepsy. The brand name is Xylem, also known as sodium oxybate. Is marketed as a liquid solution containing 500 mg/ml, and is a C-III scheduled drug. The liquid formulation is intended for oral administration but could certainly be injected.

The fact that GHB is scheduled Under the Controlled Substances Act of 1970, indicates that it has a potential for addiction and dependence. Withdrawal symptoms are well-established in the literature and were reported in my paper (cited above). The typical signs and symptoms of GHB withdrawal are similar to those of ethanol withdrawal. Treatment for GHB withdrawal generally involves administration of Benzodiazepines like Valium (diazepam) or Ativan (lorazepam). However, some patients experiencing withdrawal from GHB do not respond to classical treatment with either lorazepam or haloperidol, as reported by Hutto, et al, and alternative treatment with Chloral Hydrate had to be used to suppress the patient's insomnia, irritability hallucinations, sweating, delirium, psychosis and lack of food intake. The patient was given 1500 mg of Chloral Hydrate and slept for almost 24 hours, during which 2 more doses of Chloral Hydrate, 1000 mg were administered when she appeared to be awakening. The next morning the patient was alert, fully oriented although somewhat amnesic but free of hallucinations. She slept well the next few nights while taking Chloral Hydrate and except for a mild recurrence of hallucinations which was managed with a dose of haloperidol, the patient did well and was discharged after a 10 day hospitalization. Due to the patient's rapid recovery, the office concluded that Chloral Hydrate may have some specific efficacy for GHB withdrawal that other classical drugs like benzodiazepines and haloperidol lack.

**Detecting Blood Stains that are not visible to the Naked Eye at Crime Scenes**
It is often quite common for crime scene analysts to look for signs of blood stains too small to see with the naked eye, or to look for signs that an attempt was made to clean or remove blood stains or "blood spatter" left at the scene of a crime where a victim or perpetrator was injured and bleed. The most common chemical used to identify even tiny spots of dried or residual blood is luminol (3-amino-phthalhydrazide). Luminol reacts with the heme (iron moiety) of the blood to form a chemiluminescent product which emits a faint blue glow which is best observed in a darkened environment.

While Luminol is not 100% specific for blood, it does not react with semen, saliva or urine, but does react with strong oxidizers like hypochlorite-containing bleach. This is very helpful in revealing efforts to clean blood stains with bleach and spraying that area will reveal cloth or sponge swipe marks, handprints, fingerprints, and blood spatter patterns. Luminol also works best on dried blood samples, so samples that were deposited on a surface on a prior occasion usually will be revealed. (see: Forensic Science Handbook, Vol. I, 2nd Edition, 2002, edited by Dr. Richard Saferstein, former Chief Forensic Chemist for the State of NJ).

Regarding the sensitivity of luminol testing for occult blood stains, in his recent highly-acclaimed Criminalistics textbook, (10th edition, 2010), Dr. Richard Saferstein points out that the luminol test is "extremely sensitive – capable of detecting bloodstains diluted to as little as 1 in 100,000." (page 249). Thus, it is highly unlikely that any attempts to clean a blood-stained area would be completely successful, and that, using proper technique in a dark environment, would demonstrate the presence of residual blood stains the size of a pin point.

4

$Da$ BI

I have given many lectures on forensics to hospital nurses, legal nurse consultants (AALNC), forensic nurses (IAFN) and nurse attorneys (TANA), and based on my extensive teaching experience in educating nurses, it is my opinion that although most of this information is well-known to crime scene investigators and forensic scientists, it is not known to medical doctors or clinical nurses, unless they have had special training in forensics.

**Conclusions**

Due to the short half-life of Chloral Hydrate (4 minutes), it is very difficult to detect in blood or urine of patients known to be taking the medication. Moreover, Chloral Hydrate is not a drug typically analyzed for in forensic toxicology lab in biological samples. If you want a sample analyzed for Chloral Hydrate, you have to specify it on the order to the toxicology laboratory, otherwise no one will analyze for it.

Chloral Hydrate is generally administered as a pill or an oral liquid, however the liquid can certainly be injected into the body with a standard syringe. Generally accepted, peer-reviewed papers in the literature have indicated that Chloral Hydrate may play a special role in the treatment of GHB withdrawal. Although other CNS depressants like Benzodiazepines or haloperidol have been used in the past, Chloral Hydrate may be particularly effective in treating GHB withdrawal. In addition to Hutto, Glasper also mentions Chloral Hydrate (European Addiction Research 2005; 11:152-154) and cites another article by Sivilotti, et el (Annals of Emergency Medicine 2001; 38:660-665), who also mentions Chloral Hydrate in the treatment of GHB withdrawal, as does McDonagh (Drug Alcohol Dependence 2004; 15:75 (1) 3).

I conclude with reasonable scientific certainty that the finding of the injectable Chloral Hydrate is consistent with the self-medication of GHB withdrawal. This conclusion is supported by the peer-reviewed, generally accepted literature and by the known central nervous system depressant activity of the drug. The literature is replete with instances of patients experiencing a severe GHB withdrawal including seizures, fast heart rates, lack of nutrition, and death. There are many reports of patients in GHB withdrawal who do not respond to administration of classical agents like Valium, Ativan, or haloperidol. Haloperidol is feared in the treatment of GHB withdrawal because it may lower seizure threshold. Therefore the use of a relatively innocuous drug like Chloral Hydrate, which appears to act in areas of the brain that differ from Benzodiazepines, and is effective in Benzodiazepines-resistant GHB withdrawal seizures has been proven lifesaving in numerous instances.

I was able to access the published literature on the use of Chloral Hydrate in GHB withdrawal with a simple literature search conducted on Pub Med and the National Library of Medicine. Certainly a fifth-year pharmacy student like Mr. McGuire could easily have access the same literature. I teach pharmacy students and graduate students at the Northeastern University school of pharmacy here in Boston, and I know such a literature search is well within their training.

Very truly yours,

David M Benjamin, Ph.D.
Clinical Pharmacologist and Toxicologist

5

**David M. Benjamin, Ph.D.**
**Clinical Pharmacologist & Toxicologist**
**77 Florence Street - Suite 107N**
**Chestnut Hill, MA 02467- 2121**
**Phone: 617-969-1393 - E-mail: medlaw@doctorbenjamin.com**

**Brief Biography**

## Academic

Boston University, B.A. in Biological Sciences, 1968
University of Vermont College of Medicine, M.S. & Ph.D. in Pharmacology, 1968-72
Kansas Univ. Medical Center, Fellowship, Clinical Pharmacology/Toxicology, 1972-3

## Work Experience in the Pharmaceutical Industry

Twelve years of experience in the Pharmaceutical Industry: Conducting Clinical Drug Studies, Evaluating Adverse Drug Reactions, Writing Labeling, and Filing INDs and NDAs with the FDA.

## Publications

Dr. Benjamin has more than 225 Presentations and Publications listed on his full CV, including a book chapter entitled "*Forensic Pharmacology*" in *Forensic Science Handbook Volume III*. This textbook was reviewed by the Journal of Forensic Sciences and described as follows: "This third volume follows what has become a tradition of in depth chapters written by recognized forensic experts . . . . Forensic science practitioners and attorneys who interact with them, in either the criminal or civil areas, will find this collection of learned treatises a required addition to their professional library."

## Teaching Experience

Program Committee, International Conference on Opioids (2012, 2013) and speaker, International Conference on Opioids, June 10-12, 2012, Boston, MA; Keynote Speaker, Convocation, Northeastern Univ. School of Pharmacy, May 1, 2008, Boston, MA. Adjunct Assistant Professor – Boston University School of Medicine, 2006; Adjunct Assistant Professor Tufts University School of Medicine, 2001-05; Guest Faculty 1995-01;2009-12 Harvard Medical School Risk Management Program, Boston, MA, Dec.1999 - 2007; 2009; 2012; Breathalyzer and Blood Alcohol, Field Sobriety Testing, Urine Drug Screening and Drug Recognition Testing, ABA/NHTSA Seminar for Judges, 4/30/99. Traffic Adjudication Seminar for Florida Judges, Dec. 1999 - 2006; Toxicology & Pharmacology in Impaired Driving Cases & Panel Discussant Sobriety & Substance Testing, 2005 Kentucky District Judges Traffic Law Enforcement Conference, April 4, 2005; Understanding Blood Alcohol Levels - Mass. Academy of Trial Attorneys - Operating Under the Influence Seminar Oct. 1994 - Mass. Continuing Legal Education - 2/13/96, 5/21/96, 7/27/98 & 3/20/06; Suffolk Law School Feb 04; GW University Law School (99-06;08;2011-12); Southern New England School of Law – Scientific Evidence, 2010-11; The Role of the Occupational Health Specialist in a Toxic Chemical Exposure Case - Harvard School of Public Health - 1999-2012; Mass. College of

Pharmacy & Allied Health Sciences, Adjunct Associate Professor of Regulatory Affairs & Health Policy - 1999 - 2000; Food and Drug Law and Public Policy Issues, Fordham Law School - April 1994-5; Scientific Evidence - Stetson University College of Law - 1990 & 1997-2003; ABQAURP - 1998 - 2002; American Academy of Forensic Sciences; American College of Legal Medicine; Risk Management for Physicians - Harvard Medical School - Jan. 1995; The Interface of Drug Product Liability and Medical Malpractice; Statistics, Science and Using the Medical Literature - ATLA's National College of Advocacy - Paralegal Program - June 1995; Understanding the Analysis of Blood and Urine Samples for Drug Abuse - Mass. Continuing Legal Education - 1994/95; Presenting Scientific Evidence in Court: Meeting the *Daubert* Standards for Reliability, Am. Acad. Forensic Sciences, 2/21/00; Chair, Teaching Forum, American College of Clinical Pharmacology -1999-2004, Chair, Education Committee, 2003-2004.

### Professional Organizations
Fellow, American College of Clinical Pharmacology, Board of Regents, 2000-2005; Education Committee, & Chair, Teaching Forum, 00-04; Fellow, American College of Legal Medicine; Fellow, American Academy of Forensic Sciences (Toxicology); Member: Society of Forensic Toxicologists, American Society for
Clinical Pharmacology & Therapeutics; Am. Acad. of Clinical Toxicology; & Fellow, American Society for

Healthcare Risk Management; Editorial Boards: J. Healthcare Risk Management (1998-2012), J of
Clinical Pharmacology (2000-05) & J of Opioid Management 2005-Present.



Da 84

3

# David M. Benjamin, Ph.D.
**Clinical Pharmacologist & Toxicologist**
**77 Florence Street - Suite 107N**
**Chestnut Hill, MA 02467- 2121**
**Phone: 617- 969-1393**
**E-mail: medlaw@doctorbenjamin.com**

## CURRICULUM VITAE

## EDUCATION
University of Kansas Medical Center, Departments of Medicine and Pharmacology, Post-Doctoral Fellowship in Clinical Pharmacology and Toxicology, 1972-1973.

University of Vermont College of Medicine, Department of Pharmacology, M.S., 1970; Ph.D., 1972.

Boston University, Department of Biological Sciences, Biological Sciences with emphasis in Physiology, B.A., 1968.

## CURRENT CONSULTING ACTIVITIES
Clinical Pharmacology, Clinical & Forensic Toxicology; Drug Interactions; Pharmacokinetics; Adverse Drug Reactions; Drug Safety, Substance Abuse; Federal Regulations governing: Clinical Trials, IND/NDA Filings; Product Labeling; Informed Consent, Human Rights; QC/QA; GMPs.

## EMPLOYMENT HISTORY IN THE PHARMACEUTICAL INDUSTRY (from most recent)
William H. Rorer, Inc. /Revlon Health Care (Rorer acquired Revlon in 1985), Ethical Products Division,
USV Laboratories & Armour Pharmaceutical Company, Director, Clinical Research - 1984-1986.

Astra Pharmaceutical Products, Inc.
Director, Clinical Research (Local Anesthetic Products & Pain Control) - 1982-3

Hoffmann-La Roche, Inc.
Director, Corporate Licensing Department - 1980-1982
Clinical Research Scientist (Medical Monitor) - 1974-1980

Pfizer Pharmaceuticals
Assistant Director, Scientific Affairs - 1973-1974

## ACADEMIC APPOINTMENTS AND ADVISORY AFFILIATIONS
Boston University School of Medicine           Northeastern University, Bouvé College of Health


Da 85

4

Adjunct Assistant Professor of Anatomy
Professor,
and Neurobiology – Graduate Program in
Forensic Toxicology, 2006.

Cornell University Medical College,
Experimental Therapeutics
Dept. of Pharmacology
2005
Assistant Adjunct Professor, 1976-1982
2012.
Clinical Pharmacology Section,
New York, NY
Pharmacy and AHS

Regulatory

Sciences, Adjunct Associate

2009-Present

Tufts University School of Medicine
Dept. Pharmacology &

Adjunct Assistant Professor, 2001-

Guest Faculty 1995-2005; 2010-

Massachusetts College of

Adjunct Associate Professor of

Affairs & Health Policy, 1999-2000

Massachusetts General Hospital
*Management*,
Division of Nuclear Medicine
Society for
Consultant in Drug Development - 1989-1998

1998-2012
Visiting Professor of Medicine and Pharmacology,
Univ. of Bonn School of Medicine
*Care*
October, 1981.

*Journal of Clinical Pharmacology*
Editorial Board, 2000-2005
the Law

Commonwealth of Massachusetts
Consultant/Peer Reviewer, 2004-05
Board of Registration in Medicine

Journal of Opiod Management
Editorial Advisory Board, 2005-Present
Editor, 1993-94
International Conference on Opioids
(Committee Member), June 2012; 2013

*Journal of Healthcare Risk*

Published by the American

Healthcare Risk Management
Editorial Review Board,

*Journal of Quality Health*

Editorial Board, 2000-2005

Harvard Medical School
Program in Psychiatry and

2003-Present

Opiod Management Society
Educational Advisory Board
2005-Present

*Drug Therapy*, Department


Da 86

## ACADEMIC APPOINTMENTS AND ADVISORY AFFILIATIONS (cont'd)

Guest Faculty: Harvard School of Public Health - Occupational Health Policy & Administration Course 1995-2012; Northeastern University School of Pharmacy (2005-Present); Stetson University College of Law (1990, 1997-2003), Fordham University School of Law (1994, 1995), Harvard Medical School Risk Management Program (1999-Present); George Washington University Law School (1999-2008;2010-11);Harvard Medical School Program in Psychiatry and the Law (2000-Present).

### Continuing Education Programs in Forensic Toxicology

The Effects of Alcohol and Drugs on Human Performance and Behavior, August 20-22, 1998,
Los Angeles, CA, American Academy of Forensic Sciences.

Breath Alcohol Testing for Forensic Purposes: Principles, Practice and Present Status, August 24, 1999, Los Angeles, CA, International Association of Forensic Sciences.

Current Topics: Drugs, Driving, and Human Performance Testing, February 20, 2000, Seattle, WA, Annual Meeting of the American Academy of Forensic Sciences,
AAFS Toxicology Section, Drugs and Driving Committee, Participant and Instructor.

Application of the Principles of Pharmacology and Pharmacokinetics to the Interpretation
of Drug Blood Levels, February 17, 2004, Las Vegas, NV, Annual Meeting of the American Academy of Forensic Sciences.  Workshop Chairman

Blood Alcohol Concentration Extrapolation, October 17, 2005, Nashville TN,
Annual Meeting of the Society of Forensic Toxicologists (SOFT).

Postmortem Toxicology Interpretation, October 18, 2005, Nashville TN,
Annual Meeting of the Society of Forensic Toxicologists (SOFT).

Postmortem Pharmacokinetics, Oct. 3, 2006 Austin, TX
Annual Meeting of the Society of Forensic Toxicologists (SOFT).

Addiction and Pain Management for Forensic Toxicologists -- Update on Drug Therapy, Clinical and Forensic Toxicology and the Emerging Role of Pharmacogenomics, Oct. 4, 2006, Annual Meeting of the Society of Forensic Toxicologists (SOFT).

New Antidepressants & Antiepileptics: Clinical Pharmacology, Gene Expression, and Neurobiology of Depression and Suicide and Forensic Toxicology, Oct. 4, 2006, Annual Meeting of the Society of Forensic Toxicologists (SOFT).


Da 87

6

Forensic Toxicology: Historical Perspective (Post-Mortem Toxicology, Urine Drug Testing, and Performance Testing. February 18, 2008, Annual Meeting of the American Academy of Forensic Sciences.

Post-Mortem Toxicology: Interpretation of Drug Concentrations in Hair. February 19, 2008, Annual Meeting of the American Academy of Forensic Sciences.

Il Ruolo della Scienza nell'Indagine e nel Processo (The Role of Science in Investigation and Trial), September 1, 2008, Parma, Italy. Presentation by Dr. Benjamin: Confounding Issues in Forensic Toxicology.

Chairman Workshop #22 – Pharmacology and Pharmacokinetics for Forensic Toxicologists, February 17, 2009, Annual Meeting of the American Academy of Forensic Sciences, Denver, CO.

New York State Division of Criminal Justice Services – Office of Forensic Services - Expert
Witness Testimony Workshop, Albany, NY.
Instructor - Contemporary Issues in Forensic Toxicology - September 15, 2009.

Interpretation of Postmortem Toxicology Values, Workshop: American Academy of Forensic Sciences, February 21, 2011, Chicago, IL.

Blood Alcohol Concentration (BAC) Evidence: Extrapolation, Interpretation, and Testimony in the Post-NSA Era. Workshop: American Academy of Forensic Sciences, February 22, 2011, Chicago, IL.

Using Pharmacokinetics to Analyze Forensic Cases (Workshop Chair), American Academy of Forensic Sciences, February 21, 2011, Atlanta, GA.

Benjamin, David M.: Workshop Chair – Contemporary Issues in Driving Under the Influence of Alcohol and DUI-Drugs, Society of Forensic Toxicologists, July 3, 2012, Boston MA.
Presentations: Impairment: Defining it, recognizing it, and testing for it.
                    How do Urine Drug Tests Correlate with Impairment?

Benjamin, David M.: Workshop Co-Chair – Toxic Catastrophes Throughout History, Society of Forensic Toxicologists, July 3, 2012, Boston MA.
Presentation: Chemical Weapons: The Role of the "First Responder"


**PROFESSIONAL SOCIETIES**
Society of the Sigma Xi, 1975-2001
American Pharmacists Association, Academy of Pharmaceutical Research and



Sciences 1974-2006
American Society for Clinical Pharmacology and Therapeutics, since 1970s
Member - Medical Education Committee, 1976-83, Program Committee, 1982-83
    Constitution and By-Laws Committee, 1984-85, Committee on Substance Abuse,
1987-1999
American College of Clinical Pharmacology Member/Fellow1972-Present; Board of
Regents, 2000-2005;
Chair, Teaching Forum, 1999-2004; Program & Education Committees 1999-04;
Program Committee 02-04
New York Academy of Sciences, 1976-2001
American Academy of Dermatology, 1978-79; 1983-84
American Federation for Clinical Research, 1970s-1998
Associates of Clinical Pharmacology, 1979-86; (President, 1981-82)
American Pain Society, 1982-84
American Association for the Advancement of Science, 1980-2001; 2006-7
American Society of Regional Anesthesia, 1983-2007
American Society of Anesthesiologists, 1983-2007
American Academy of Clinical Toxicology, since 1970s; member - Acute and Intensive
Care Section, 1990-Present
American College of Legal Medicine, 1991; Elected Fellow 1998
American Society of Law, Medicine and Ethics 1991-1996
Drug Information Association, 1987-1998
National Forensic Center, 1986-2001, Member, Advisory Board, 1991-93
Association of Trial Lawyers of America, Non-Attorney Member 1990-2007
Defense Research Institute, Non-Attorney Member 1990-Present
The Hastings Center, 1992-1995
American Health Lawyers Association (formerly NHLA), Non-Attorney Member, 1993-
1999
International Society of Occupational Medicine & Toxicology, 1994-2003
American Statistical Association, 1994-1998
Pittsburgh Institute of Legal Medicine, 1994-2001
American Academy of Forensic Sciences, (Forensic Toxicology) 1995; Fellow, 2001-
Present;
American Society for Healthcare Risk Management, 1996-Present; Fellow, June 2002
American Public Health Association, 1997-2001
Society of Forensic Toxicologists, 2005-Present

**DISPUTE RESOLUTION PROGRAMS**
NHLA/AAA Training Program in Arbitration - 1993
NHLA Training Program in Mediation - 1997
NHLA Alternative Dispute Resolution Service (Arbitration, 1993 & Mediation, 1997)
Negotiation and Conflict Resolution for Health Care - Harvard School of Public Health,
1997
Center for Medical Ethics and Mediation, San Diego, CA, Instructor, 1997, Board
Member, 1998.



8

## ACADEMIC HONORS
Keynote Speaker, Convocation, Northeastern School of Pharmacy, May 1, 2008, Boston, MA.
Awarded Second Prize in Independent Research Competition, Vermont Chapter of the Sigma Xi, 1970.
Participant: ASPET's Third Supplementary Training Program in Molecular Pharmacology- University of California Medical Center, SF, CA - July, 1971
Completed Massachusetts Institute of Technology's summer program in: Enzymes in Analysis and Diagnosis - Certificate of Completion - June, 1975
American Men and Women of Science, 14th Edition, 1979. Who's Who in the East, 23rd Edition, 1990.


## FOREIGN LANGUAGES
Conversational French, German and Italian.

## RESEARCH INTERESTS
Clinical Trial Methodology, Pharmacokinetics, Drug Interactions, Adverse Drug Reactions, Clinical Toxicology, Substance Abuse, Correlations Between Drug Blood Levels and Pharmacologic and Toxicologic Effects.

## BREATHALYZER TESTING  Breath Alcohol Testing for Forensic Purposes; Principles, Practice and Present Status, Completed: August 24, 1999, at UCLA, as part of the International Association of Forensic Sciences, LA, CA. (see expanded list)

## DISSERTATIONS
Ph.D. Thesis: A Study of Approaches to the Chemical Analysis of Aminoglycoside Antibiotics, September, 1972.

Master's Thesis: Studies of the Molecular Interaction Between Warfarin and Cholestyramine, May, 1970.

Da 90

## PRESENTATIONS AND PUBLICATIONS

Benjamin, David M., Robinson, Donald, S. and McCormack, John J.: Cholestyramine Binding of Warfarin in Man and In Vitro. Clinical Research 18:336, 1970.

Benjamin, David M., McCormack, John J. and Gump, Deiter W.:  Studies of Approaches to the Chemical Determination of Kanamycin in Body Fluids.  (Presented at the Eleventh Interscience Conference on Antimicrobial Agents and Chemotherapy, Atlantic City, NJ, October, 1971).

Shoeman, Donald W., Benjamin, David M. and Azarnoff, Daniel L.: Alteration of Human Serum Albumin in Uremia. (Presented: the New York Academy of Sciences' Conference on Drug Protein Binding, New York, New York, January, 1973).

Maxwell, D.R., Benjamin, D.M., Donahay, S., et al:  Randomized Double-Blind Study of 1, 25-dihydroxy-vitamin D-3. (Presented in part at the Clinical Dialysis and Transplant Forum of the Council of Dialysis and Transplantation, National Kidney Foundation, Washington, DC, November, 1977).

Benjamin, David M., Symposium Chairperson:  Clinical Pharmacology/Toxicology of Drug Abuse. (Presented at the Seventh Annual Meeting of the American College of Clinical Pharmacology, San Francisco, CA, April, 1978).

Benjamin, David M.:  Patterns of Drug Abuse. (Presented at the Seventh Annual Meeting of the American College of Clinical Pharmacology, San Francisco, CA, April, 1978).

Benjamin, David M.:  Problems of Polypharmacy. (Presented in part at "Use of Psychopharmacologic and Analgesic Agents in the Clinical and Psychosocial Care of the Dying Patient and the Bereaved", Columbia-Presbyterian Medical Center, New York, New York, May, 1978).

Benjamin, David M., Carbone, John J. and Coutinho, Claude B.:  Effects of Phenobarbital and SKF-525A on the Metabolism and Hypnotic Effect of Flunitrazepam in Mice. (Presented at the Annual Meeting of the Academy of Pharmaceutical Sciences, Hollywood, FL, November, 1978).

Diagnosis and Treatment of Drug Abuse, Invited Discussant, Rutgers Medical School, Piscataway NJ, May, 1978.

Benjamin, David M., Berl, T., Maxwell, D. et al:  Effects of Calcitriol on the Biochemical Abnormalities Associated With Chronic Dialysis:  A Multi-Center Double-Blind Controlled Study.



10

(Presented at the Annual Meeting of the American Society of Clinical Pharmacology and Therapeutics, Kansas City, MO, March, 1979).

Benjamin, David M. - Co-Chairperson - Experimental Protocol Design, (Presented at the Annual Meeting of the Associates of Clinical Pharmacology, Kansas City, MO, March, 1979).

Benjamin, David M.:  Analgesia, Pain and Analgesic Drug Interactions.
(Presented at the American Cancer Society Symposium:  Pain Control for the Cancer Patient:  A Multidisciplinary Approach, Nutley, NJ, April 23, 1980).

New Developments in Local Anesthetic Agents and Pain Control, Invited Presenter, Workshop on Regional Anesthesia, Sponsored by the American Society of Regional Anesthesia,
Cambridge, MA, October, 1982.

Yagiela, J.A. and Benjamin, D.M.:  Evaluation of Etidocaine For Topical Anesthesia.
 J. Dental Research, September, 1983.

Greenblatt, D.J., Benjamin, D.M., Willis, C.R., et al:  Two-Percent Lidocaine Solution: Systemic Plasma Levels Following Topical Oral Cavity Use, Or When Swallowed.
(Presented at the Annual Meeting of the American College of Clinical Pharmacology, October, 1984).

Benjamin, D.M., Gordon, G., Baran, D. et al:  Intranasal Calcitonin Lowers Alkaline Phosphatase In Pagetic Patients. (Presented at the International Conference on Calcium and Bone Metabolism, Nice, France, October, 1986).

Benjamin, David M., et al: Open-Label Study of Intal (cromolyn sodium) in Patients With Eosinophilia Myalgia Syndrome Due to L-tryptophan. Preliminary report: L-T/EMS Update, November, 1990, and
J. Pharmacy Practice 4:(2) VI-X, 1991.

Benjamin, David M.:  When Is A Drug Not A Drug?  The L-Tryptophan Tragedy: Lessons To Be Learned. (Presented at the Annual Meeting of the Drug Information Agency, Washington, DC, June 18, 1991).

Robinson, Donald S., Benjamin, David M. and McCormack, John J.:  Interaction of Warfarin and Nonsystemic Gastrointestinal Drugs, Clin. Pharmacol. Therap. 12:491-495.1971.

Benjamin, David, McCormack, John and Gump, Deiter:  The Use of Newer Amino Group Reagents For The Detection And Determination of Kanamycin, Anal. Chem. 45:1531-1534, 1973.

Maxwell, D.R., Benjamin, D.M., Donahay, S.L.:  Effects of Calcitriol in Dialysis Patients,



11

Clin. Pharmacol. Therap. 23:515-519, 1978.

Maxwell, D.R., Benjamin, D.M., Donahay, S.L., et al: Randomized Double-Blind Study of 1,25-dihydroxy-Vitamin D3 in Dialysis Patients, Proc. Clin. Dialy. Transpl. Forum. 7:166-169, 1977.

Benjamin, David M.: Problems of Polypharmacy, Arch. Thanatol. 7:11, 1978.

Reed, M., Stanley, J., Stengel, F., Shupack, J. and Benjamin, D.: Mal De Meleda Treated With 13-cis Retinoic Acid, Arch. Dermatol. 115:605-608, 1979.

Willis, C.R., Greenblatt, D.J., Benjamin, D.M., et al: Simultaneous Determination of Lidocaine and Its Deethylated Metabolites Using GLC with Nitrogen-Phosphorous Detection,
J. Chromatography, 307:200-205, 1984.

Greenblatt, D.J., Benjamin, D.M. et al: Lidocaine Plasma Concentrations Following Administration of Intraoral Lidocaine Solution, Arch. Otolaryngology, 111:298-300, 1985.

Benjamin, David M.: Drug Defects' Dilemmas: Drugs Don't Have Side Effects, People Do!,
Expert Witness Journal, Vol. 1, No. 7, pages 1-ff, July, 1989.

Benjamin, David M.: The Legal and Social Ramifications of Urine Drug Testing In The Workplace, Sixth Annual Meeting of the National Forensic Center, San Antonio, TX, December 10, 1989.

Benjamin, David M.: Drug Product Liability Litigation: Federal Law vs. Nature's Law, Presented at the Annual Meeting of the American College of Legal Medicine, Orlando, FL, March 16, 1990.

Hand, Robert P. and Benjamin, David M. (Eds.): What's Behind the L-tryptophan Ban? Medical Sciences Bulletin 12:(9) 1-2, May, 1990.

Benjamin, David M.: History and Pathogenesis of L-Tryptophan-Induced Eosinophilia Myalgia Syndrome (EMS) and Approaches to Treatment. Presented: National ATLA meeting, San Diego, CA, July, 1990.

Benjamin, David M.: L-Tryptophan: A Pharmaceutical Detective Story,
J. Pharmacy Practice 4:(2) VI-X, 1991.

Benjamin, David M.: When Is A Drug Not A Drug? The L-Tryptophan Tragedy: Lessons To Be Learned, Drug Information Journal 26:(2) 231-236, 1992.

Benjamin, David M.: Risk Management Strategies for Prescribing Drugs, Presented at the Annual Meeting of the American College of Legal Medicine, Las Vegas, Nevada,



12

March 11, 1993.

Benjamin, David M.: Elements of Causation in Toxic Tort Litigation: Science and Law Must Agree,
J. Legal Medicine 14:153-165, 1993.

Benjamin, David M.: Prescriber Liability: Minimize Your Risks, Drug Therapy 23: (8) 15-26, 1993.

Benjamin, David M.: Distinguishing Reliable Science From Junk Science in the Post-Daubert Era, J. Mass. Acad. of Trial Attorneys, October, 1993, p.40-44.

Benjamin, David M.: Symposium Coordinator: The Impact of Daubert v. Merrell Dow Pharmaceuticals on the Admissibility of Expert Testimony, 10th Annual Meeting of the National Forensic Center, Las Vegas, Nevada, December 4, 1993.

Benjamin, David M.: The Use and Misuse of the Scientific Method, Statistics, and Epidemiology in the Evaluation of the Toxic Tort Case, 10th Annual Meeting of the National Forensic Center, Las Vegas, Nevada, December 4, 1993.

Benjamin, David M.:  New Developments in Drug Therapy - Curses and Cures, Presented at the Annual Meeting of the American College of Legal Medicine, Anaheim, CA, March 11, 1994.

Benjamin, David M.: Communicating With Patients About Adverse Drug Reactions, Drug Therapy 24: (4) 36-38, 1994.

Benjamin, David M.: The Pharmacoepidemiology of Adverse Drug Reactions: The "First Year Effect" or Expansion of The Denominator. (Presented at the Annual Meeting of the Drug Information Association, Washington, DC, June 7, 1994.)

Benjamin, David M.: Recognizing & Preventing Adverse Drug Reactions, Drug Therapy 24: (6) 52-56, 1994.

Benjamin, David M.: Understanding Blood Alcohol Levels.  (Presented at the Massachusetts Academy of Trial Attorney's Seminar on "Preparing & Trying Your Drunk Driving Case Under the New OUI Amendments", Boston, MA, October 5, 1994.

Benjamin, David M.: Legal Update: New State and Federal Case Law Implications for Testifying as an Expert (Presented at the Spring Conference of the American Board of Vocational Experts,
Marco Island, FL, March, 1995).

Benjamin, David M.: Symposium Chairperson: Opportunities and Challenges in the Evaluation and Management of Chronic Pain (Presented: the Annual Meeting of the American College of Legal Medicine, Orlando, FL, March, 1995).



Da 94

13

Benjamin, David M.: Medical-Legal and Regulatory Implications of Analgesic Therapy (Presented at the Annual Meeting of the American College of Legal Medicine, Orlando, FL, March, 1995).

Benjamin, David M.: Case Studies in Pharmaceutical Risk Management, Medical Sciences Bulletin
17:(12) 7, August, 1995; 18:(3) 3, November, 1995.

Benjamin, David M. and Buckman, Robert W.: Minimizing the Risk of Adverse Drug Reactions, The Female Patient 21:47-61, April, 1996.

Benjamin, David M.: Putting the Inmates in Charge of the Asylum: Ethical Issues Involved in Government-Sponsored LSD Testing in Unwitting Subjects, (Presented at Annual Meeting of the American Academy of Forensic Sciences, Jurisprudence Section, February 20, 1997).

Benjamin, David M. and Bursztajn, Harold J.: Surreptitious LSD Administration: Ethical, Toxicologic and Psychiatric Impact on Toxic Tort Issues, (Presented at Annual Meeting of the American Academy of Forensic Sciences, Toxicology Section, February 20, 1997).

Benjamin, David M.: Vicarious Liability of Physicians and Hospitals in Drug Product Liability Litigation,
(Presented at the Annual Meeting of the American College of Legal Medicine, Ft. Lauderdale, FL,
March 7, 1997).

Benjamin, David M.: Onset of Severe Bromocriptine-Related Adverse Effects Correlates Well With Bromocriptine's Pharmacokinetic Profile, (Presented at the Annual meeting of the American Society for Clinical Pharmacology and Therapeutics, San Diego, CA, March 8, 1997).

Benjamin, David M. and Buckman, Robert W.:  Selecting New Drugs for the Hospital Formulary,
Medical Sciences Bulletin, 1997;20(2):9.

Benjamin, DM: Pharmacist/Pharmacy Negligence Litigation, Medical Science Bulletin, 1997;20(3):8.

Benjamin, David M., Mediation: A Better, Faster, Cheaper Way to Resolve Health Care Disputes,  Massachusetts Lawyers Weekly, May 12, 1997, p. B5.

Benjamin, David M.: Alpha Blockers and the Law, (Presented at Annual Meeting of the American Academy of Forensic Sciences, Toxicology Section, February 11, 1998).


Da 95

Benjamin, David M.:  The Death of J. Edgar Hoover - Pharmacological Afterthoughts (Presented at: American Academy of Forensic Sciences, Jurisprudence Section, February 13, 1998).

Benjamin, David M.: Session Moderator, Contributed Papers, Annual Meeting of the American
College of Legal Medicine, Las Vegas, Nevada, March 19, 1998.

Benjamin, David M.: The Use of Medical Negligence Data in the Development of Risk Management Programs, (Presented at Annual Meeting of the American College of Legal Medicine,
Las Vegas, Nevada, March 19, 1998).

Benjamin, David M.: Pharmaceutical Risk Management: Special Problems Encountered in the
Hospital Setting, J. Healthcare Risk Management, 1998;18:3 (winter) updated in spring edition.

Benjamin, David M.:  Alcohol from Cough Syrup, Medical Review Officer Update, February 1999.

Benjamin, David M.:  Exhumation of Saponified Remains Determining Manner of Death: Malinda McIntosh - Pharmacologic Analysis. (Presented at: American Academy of Forensic Sciences, Jurisprudence Section, February 18, 1999).

Benjamin, David M.: Combinations of Ethanol and Prescription Drugs While Driving: Factoring Out the Effects of Ethanol. (Presented at: American Academy of Forensic Sciences, Toxicology Section, February 19, 1999).

Benjamin, David M.: Symposium Chairperson: Mass Toxic Torts - Protecting the Public View While Advancing Medical Science: The Thin Red Line (Presented: the Annual Meeting of the American College of Legal Medicine, New Orleans, LA, March, 1999).

Benjamin, David M.: Pharmacological Overview of Mass Tort Litigation, (Presented: the Annual Meeting of the American College of Legal Medicine, New Orleans, LA, March, 1999).

Benjamin, David M.: Testing for Drugs in the Exhumed Body: Confounding Issues in Quality Control, Specificity and Reliability, International Association of Forensic Sciences, Aug. 26, 1999, LA, CA.

Benjamin, David M.: Redesigning Drug Approval - Redefining Drug Safety: The Felbamate-Bromfenac Paradigm, (Presented at the Annual Meeting of the American College of Clinical Pharmacology, Sept. 18, 1999, Rockville, MD).

Benjamin, David M.: Evaluating Claims for Medication Errors, (Presented at the Annual



15

Meeting of the American Society for Healthcare Risk Management, Oct. 5, 1999, Chicago, IL)

Benjamin, David M. and Starrs, James E.: Presenting Scientific Evidence in Court: Meeting the *Daubert* Standard for Reliability, (Presented at: the 52nd Annual Meeting of the American Academy of Forensic Sciences, Co-sponsored by the Toxicology and Jurisprudence Sections, Reno, Nevada, February 21, 2000).

Benjamin, David M.: Chair, Teaching Forum: Educational Issues in Clinical Pharmacology: Updating the Curriculum for the New Millennium, 29th Annual Meeting of the American College of Clinical Pharmacology, Chicago, IL, September 19, 2000.

Benjamin, David M.: Medication Mis-Adventures: Case Studies in Clinical Pharmacology, 29th Annual Meeting of the American College of Clinical Pharmacology, Chicago, IL, September 19, 2000.

Benjamin, David M.: Are Pharmacologists/Toxicologists Without Medical Degrees or MDs Best Qualified to Testify About Drugs?  (Presented at: American Academy of Forensic Sciences, Jurisprudence Section, Seattle, WA, February 23, 2001).

Benjamin, David M.: Common Defenses Asserted Against Driving Under the Influence of Drugs Claims.  (Presented at: American Academy of Forensic Sciences Toxicology Section, Drug & Driving Committee Workshop: Drugs, Driving and Human Performance Testing, Seattle, WA, February 20, 2001).

Benjamin, David M. and Starrs, James E.: Abuse of Experts or Experts of Abuse? (Presented at: American Academy of Forensic Sciences, Co-sponsored by the Toxicology and Jurisprudence Sections, Seattle, WA, February 20, 2001).

Benjamin, David M.: Drug Approvals, Drug Withdrawals: Deja Vu All Over Again, Pharmaceutical & Medical Devices Law Bulletin, Vol. 1, No. 6, June 2001.

Benjamin, David M.: Chair, Teaching Forum: Minimizing Medication Errors: Practical Pointers for Prescribers, 30th Annual Meeting of the American College of Clinical Pharmacology, Vienna, VA, September 24, 2001.

Benjamin, David M.: Reducing Medication Errors and Increasing Patient Safety: Case Studies in Clinical Pharmacology, 30th Annual Meeting of the American College of Clinical Pharmacology, Vienna, VA, September 24, 2001.

Benjamin, David M.: Applications and Limitations of Back Extrapolation in Expert Testimony, Massachusetts Lawyers Weekly, page B-5, August 20, 2001.

Benjamin, David M.: Reducing Medication Errors and Increasing Patient Safety, (Presented at the Annual Meeting of the American Society for Healthcare Risk Management, Oct. 31, 2001, Boston, MA).


Da 97

FILED, Clerk of the Appellate Division, July 20, 2018, A-002150-14    Case 3:18-cv-03841-MAS Document 8-16   Filed 09/14/18   Page 101 of 194 PageID: 1221

16

Benjamin, David M.: Reducing Medication Errors and Increasing Patient Safety Through Better Communication, Focus on Patient Safety, National Patient Safety Foundation, 2001;4:6,8.

Benjamin, David M.: Patient Safety and New Drugs: View of a Clinical Pharmacologist, The More Things Change, the More Things Stay the Same Journal of Quality Health Care, 2002; 1:17-21.

Benjamin, David M.: Driving Under the Influence of Medications: Are Physicians and Pharmacists Adequately Informing Their Patients of the Risks of Medication Use? News & Vies (newsletter of Toxicologie Section of the AAFS) May 2002.

Benjamin, David M.: Chair, Teaching Forum: Legal Medicine for Clinical Pharmacologists, 31st Annual Meeting of the American College of Clinical Pharmacology, San Francisco, CA, September 23, 2002.

Benjamin, David M.: Theories of Liability Against Pharmaceutical Manufacturers, Investigators, Their Staff, Hospitals, Medical Schools & IRBs 31st Annual Meeting of the American College of Clinical Pharmacology, San Francisco, CA, September 23, 2002.

Benjamin, David M.: Development of Drugs and Dissemination of Safety Information by Healthcare Professionals (Presented at: American Academy of Forensic Sciences, Toxicology Section, Chicago, IL, February 20, 2003).

Benjamin, David M.: Biological & Chemical Weapons: Perspectives in Clinical Pharmacology (Presented at: American Academy of Forensic Sciences, Toxicology Section, Chicago, IL, February 21, 2003).

Benjamin, David M.: Medical, Legal and Public Policy Issues Arising out of Biological & Chemical Weapons (Presented: the Annual Meeting of the American College of Legal Medicine, Phoenix, AZ, February 28, 2003).

Benjamin, David M. and Blum, Richard S.: "Off-Label" Prescribing of Drugs: Are You Legal or Liable? (Presented: the Annual Meeting of the American College of Legal Medicine, Phoenix, AZ, February 28, 2003).

Blum, Richard S. and Benjamin, David M.: The Dependence-Addiction Paradigm: Good vs. Bad -Treatment vs. Abuse (Presented: the Annual Meeting of the American College of Legal Medicine, Phoenix, AZ, February 28, 2003).

Benjamin, David M.: Minimizing Medication Errors: Practical Pointers for Prescribers, (Symposium Introduction) J Clin Pharmacol 2003;43:751-753.

Benjamin, David M. and Pendrak, Robert F.: Medication Errors:  An Analysis Comparing PHICO's Closed Claims Data and PHICO's Event Reporting Trending System (PERTS),



Da 98.

J Clin Pharmacol 2003;43:754-759.

Benjamin, David M.: Reducing Medication Errors and Increasing Patient Safety: Case Studies in Clinical Pharmacology, J Clin Pharmacol 2003;43:768-783.

Benjamin, David M.: Chair, Teaching Forum: Ethics in Medicine, 32nd Annual Meeting of the American College of Clinical Pharmacology, Tampa, FL, September 23, 2003.

Benjamin, David M.: The History of the Informed Consent Doctrine, 32nd Annual Meeting of the American College of Clinical Pharmacology, Tampa, FL, September 23, 2003.

Benjamin, David M. : Symposium Chair : Application of the Principles of Pharmacology and Pharmacokinetics to the Interpretation of Drug Blood Levels. (Presented at: American Academy of Forensic Sciences, Las Vegas, NV, February 17, 2004).

Benjamin, David M. : Use of the Covino Algorithm in Evaluating the Additive Toxicity of Lidocaine and Bupivacaine. (Presented at: American Academy of Forensic Sciences, Toxicology Section, Las Vegas, NV, February 18, 2004).

Benjamin, David M. : The Death of Ted Binion: Drug OD/Suicide or Murder by Poisoning – When the Average Means Too Much. (Presented at: American Academy of Forensic Sciences, Last Word Society, Las Vegas, NV, February 19, 2004).

Benjamin, David M. : Jurors' Right to Question Testifying Expert Rights Lawyers' Wrongs. (Presented at: American Academy of Forensic Sciences, Jurisprudence Section, Las Vegas, NV, February 20, 2004).

Benjamin, David M.: Avoiding Medication Error: Using Therapeutic Drug Monitoring to Optimize Pharmaceutical Care with Gentamicin. *Protecting Your Practice*, February 2004, Farmers' Insurance.

Benjamin, David M.:  Risk Management Strategies for Reducing Medication Errors. (Presented: the Annual Meeting of the American College of Legal Medicine, Las Vegas, NV, March 5, 2004).

O'Donnell, James T. and Benjamin, David M.: Systems Failure in Oncology Drug Administration: Intrathecal Vincristine Leads to Permanent Paralysis. (Presented: the Annual Meeting of the American College of Legal Medicine, Las Vegas, NV, March 5, 2004).

Benjamin, David M.: Reducing Medication errors by Re-Designing Your Medication Use Process. *Healthcare Perspectives*, April 2004, Farmers' Insurance.

Benjamin, David M.: Reconciling Medication, HCPro Audio-cast, January 28. 2005.



18

Benjamin, David M.: New Patient Safety Legislation and JCAHO Patient Safety Goals. (Presented: the Annual Meeting of the American College of Legal Medicine, San Diego, CA, March 4, 2005).

Benjamin, David M.: Drug Product Liability and Vicarious Liability. (Presented: the Annual Meeting of the American College of Legal Medicine, San Diego, CA, March 6, 2005).

Benjamin, David M. and O'Donnell, James T.: Prothrombotic Effects of COX-2 Inhibitors: Is it a Class Effect? (Presented: the Annual Meeting of the American College of Legal Medicine, San Diego, CA, March 4-6, 2005).

Benjamin, David M. : Drug Recalls: Pharmacoepidemiologic, Regulatory & Legal Implications. 34th Annual Meeting of the American College of Clinical Pharmacology, Rockville, MD, September 10, 2005.

Benjamin, David M. : Drug Recalls – Issues of Interest for the Insurance Industry. Annual meeting of the Casualty Actuarial Society, Boston, MA, September 13, 2005.

Benjamin, David M. : Risk Management Strategies to Reduce Exposure to Litigation, Presented at : Cardiovascular Disease : New Horizons in Prevention and Treatment, Sponsored by : Tufts University School of Medicine, Tufts Health Care Institute and Tufts-New England Medical Center, Massachusetts Medical Society Conference Center, Waltham, MA, September 28, 2005.

Benjamin, David M. and Powers, Robert H.: Clinical vs. Forensic Toxicology – A Comparison of Methods and Resources for Case Evaluation. (Presented at: American Academy of Forensic Sciences, Toxicology Section, Seattle, WA, February 22, 2006).

Benjamin, David M. : Using Subsequent Blood Ethanol Determinations to Invalidate the Results of Breathalyzer Testing. (Presented at: American Academy of Forensic Sciences, Jurisprudence Section, Seattle, WA, February 23, 2006).

Benjamin, David M.: Cocaine Controversies: "Free Base" vs. Salt – Is it Everything It's "Cracked" Up to Be? (Presented: the Annual Meeting of the American College of Legal Medicine, Las Vegas, NV, March 3, 2006).

Benjamin, David M.: Direct to Consumer Advertising of Prescription Drugs and Drug Product Liability. (Presented: the Annual Meeting of the American College of Legal Medicine, Las Vegas, NV, March 5, 2006).

Benjamin, David M.: Invited Panelist, Current Trends in Toxicology. Joint Meeting of the Federation of State Physician Health Programs and the Federation of State Medical Boards, Boston, MA, April 22, 2006.

Benjamin, David M.: A Comparison of the Pharmacokinetics and Pharmacodynamics of



19

Cocaine by Insufflation, Smoking and the Intravenous Routes. (Presented at the Society of Forensic Toxicologists, Oct. 6, 2006 Austin, TX)

Benjamin, David M.: Gamma-Hydroxybutyrate (GHB)-Withdrawal With Severe Rhabdomyolysis,
Hyperkalemia and Cardiac Arrest. (Presented at: American Academy of Forensic Sciences, Toxicology Section, San Antonio, TX, February 21, 2007).

Benjamin, David M.: Internet Pharmacy Litigation: US v. Brij Bansal. (Presented: the Annual Meeting of the American College of Legal Medicine, Orlando, FL March 2, 2007).

Benjamin, David M.: Prosecution of Physicians for Prescribing Opioids to Patients. Clin. Pharmacol. Therap. 2007;81:797-798.

Benjamin, David M.: OUI Decision (Com v Colturi) is Both Good News, Bad News for Prosecutors and Defense Attorneys. Massachusetts Lawyers Weekly, June 25, 2007, page 47.

Benjamin, David M.: Cardiotoxicity of Diphenhydramine, ToxTalk, 2007;31(4):12-14.

Benjamin, David M.: Sick Building Syndrome and Hazards of Mold Infestation. (Presented at: American Academy of Forensic Sciences, Combination Engineering/Jurisprudence Sections, Washington, DC, February 21, 2008; Abstract C29, p.152 in the proceedings.

Benjamin, David M.: The Salem Witch Trials – Sociopolitical Hysteria, Systematic Persecution of Women, or Ergot Poisoning? (Presented at: American Academy of Forensic Sciences, Last Word Society, Washington, DC, February 21, 2008; Abstract LW2, pp.436-7 in the proceedings).

Multi-Disciplinary Panel on Sick Building Syndrome and Toxic Mold Infestation (Invited Panelist, Combination Engineering/Jurisprudence Sections, Washington, DC, February 22, 2008).

Benjamin, David M.: Ruling (Com v Pierre) Proves Timing Everything in OUI Cases. Massachusetts Lawyers Weekly, December 29, 2008, page 39.

Benjamin, David M., Chairman Workshop #22 – Pharmacology and Pharmacokinetics for Forensic Toxicologists, February 17, 2009, Annual Meeting of the American Academy of Forensic Sciences, Denver, CO.

Benjamin, David M.: An Unusual Case of Ethanol/Methanol poisoning: Or Was It? The Million Dollar Question. February 18, 2009, Annual Meeting of the American Academy of Forensic Sciences, Denver, CO.



Benjamin, David M.:  The Role of the Forensic Expert in Criminal Cases Pursuant to the Sixth Amendment of the U.S. Constitution.  February 19, 2009,  Annual Meeting of the American Academy of Forensic Sciences, Denver, CO.

Benjamin, David M.:  Strange "Ambience" for a Good Night's Sleep – Ambien-Related Sleep-Driving and Other Somnambulistic Behavior.  Poster Paper presented: the Annual Meeting of the American College of Legal Medicine, Orlando, FL March 5-6, 2010).

Benjamin, DM.: Urine Drug Test Results and the Ability to Infer Impairment: Science and Ethics, ToxTalk, 34:(1)23-24, March 2010.

Rozovsky, F. and Benjamin, DM.: Medication Error Risk Reduction: Communication Lessons from Claims Data. (Presented at the Annual Meeting of the American Society for Healthcare Risk Management, Oct. 14, 2010, Tampa, FL).

Benjamin, David M., Nowaczyk, R. and Trocino, C.:  Reliability of the Drug Recognition Exam: Admissions by the Suspect Increase the Chances of Getting it Right. February 25, 2011, Annual Meeting of the American Academy of Forensic Sciences, Chicago, IL.

Benjamin, David M.: The CPCS debate: a forensic expert's perspective, Massachusetts Lawyers Weekly, 39(28):39, February 28, 2011.

Benjamin, David M.:  Workshop Chairman, Using Pharmacokinetics to Analyze Forensic Toxicology Cases. Feb. 20, 2012, Annual Meeting of the American Academy of Forensic Sciences, Atlanta, GA.

Benjamin, David M.  Overview of Pharmacology and Pharmacokinetics.  (Part of above workshop).

Benjamin, David M.:  Disingenuous Testimony in Forensic Toxicology Cases. Feb. 21, 2012, Part of  workshop on Flawed Forensics:  Recognizing and Challenging Misleading Forensic Evidence and Disingenuous Expert Testimony. Annual Meeting of the American Academy of Forensic Sciences, Atlanta, GA.

Benjamin, David M.: Drug Recognition Experts are not Qualified to Testify as Experts and Should Only Testify as Fact Witnesses.  Jurisprudence Section of the American Academy of Forensic Sciences, Feb. 23, 2012, Atlanta, GA.

Benjamin, David M.:  Disingenuous Testimony in Forensic Toxicology Cases. Review of:  State of North Carolina vs. Greg Taylor, Jurisprudence Section, Annual Meeting of the American Academy of Forensic Sciences, Feb. 24, 2012, Atlanta, GA.

Benjamin, David M.: A Review of the Pharmacology involved in: Commonwealth of Massachusetts vs. Carolyn Riley.  Pediatric Postmortem Toxicology symposium, Toxicology Section, Annual Meeting of the American Academy of Forensic Sciences,


Da 102

FILED, Clerk of the Appellate Division, July 09, 2018, A-002160-14    Case 3:18-cv-08341-MAS Document 216-1 Filed 09/14/18    Page 106 of 194 PageID: 1226

21

Feb. 24, 2012, Atlanta, GA.

Benjamin, David M. and Rozovsky, F.: Using Route Cause Analysis (RCA) to Demonstrate the Return on Investment (ROI) of Medication Error Risk Reduction. New England Regional Risk Management Healthcare Conference, Providence, RI, May 7, 2012.

Benjamin, David M.: Medical-Legal and Regulatory Aspects of Prescribing Opioids: Avoiding Problems with the Board of Registration in Medicine and the DEA. International Conference on Opioids (Committee Member), Harvard Medical School, Boston, MA, June 11, 2012.

Benjamin, David M.: Workshop Chair – Contemporary Issues in Driving Under the Influence of Alcohol and DUI-Drugs, Society of Forensic Toxicologists, July 3, 2012, Boston MA.
Presentations: Impairment: Defining it, recognizing it, and testing for it.
                How do Urine Drug Tests Correlate with Impairment?

Benjamin, David M.: Workshop Co-Chair – Toxic Catastrophes Throughout History, Society of Forensic Toxicologists, July 3, 2012, Boston MA.
Presentation: Chemical Weapons: The Role of the "First Responder"

Benjamin, David M.: Using Pharmacology to Screen your DWI-Drug Cases. Special Session: Driving Under the Influence (Toxicology Section) February 21, 2013, Annual Meeting of the American Academy of Forensic Sciences, Washington, DC.

Benjamin, David M.: How do Urine Drug Screens Correlate with Impairment? Combined Session of the NACDL and the AAFS, February 22, 2013, Annual Meeting of the National Association of Criminal Defense Lawyers, Washington, DC.

## LECTURES

Reporting of Side Effects and Drug Toxicity To FDA, Advanced Course for FDA Drug Investigators, College of Physicians and Surgeons, Columbia University, New York, New York, September 30, 1980.

The Regulation of New Drug Development and its Relationship to Drug Product Liability Litigation, Pre-Meeting Workshop, Annual Meeting of the National Forensic Center, Miami, FL, December 2, 1988.

The History and Pathogenesis of L-Tryptophan-Induced Eosinophilia Myalgia Syndrome (EMS) and Approaches to Treatment. Presented: National ATLA meeting San Diego, CA, July, 1990.

A History of Drug Product Liability Litigation & The L-Tryptophan Tragedy, November 19, 1990,


Da 103.

22

Selecting & Working With Experts, Feb. 24, 1997, Stetson University College of Law, St. Petersburg, FL.

The Adulteration of L-Tryptophan. Presented at the ATLA, L-Tryptophan/EMS Educational Update Meeting, Albuquerque, NM, December, 1990.

Good Manufacturing Practices (GMPs) and Their Application to the Synthesis and Administration of Radiopharmceuticals in Positron Emission Tomography (PET) Scanning, Massachusetts General Hospital, Dept. of Nuclear Medicine, Boston, MA, April, 1991.

Testifying As An Expert In Court: Legal And Ethical Guidelines, Presented at the Annual Meeting of the National Forensic Center, Orlando, FL, Dec. 8, 1991.

The Development and Testing of New Drugs and Biologicals With Special Reference to Pharmacokinetics, and The Pharmacoepidemiology of Adverse Drug Reactions. Biogen Inc., Cambridge MA, Feb. 23, 1994.

Understanding the Analysis of Blood & Urine Samples for Drug Abuse. Mass. CLE. 11/22/94 & 9/13/95.

The Clinical Pharmacology of Risk Management. Tufts University School of Medicine, Division of Clinical Pharmacology, Boston, Mass., February 24, 1994, February 22, 1995, May 1, 1997.

Food and Drug Law 4/21/94. Regulation of New Drug Development and Public Policy Issues 4/13/95 Fordham University School of Law, New York, New York.

Risk Management Issues: Am I Going To Be Sued?, Boston Joint School Geriatrics Symposium: Practical Issues in the Care of the Elderly, Harvard Medical School, Boston, MA, January 21, 1995.

The Role of the Occupational Health Professional in the Toxic Chemical Exposure Case, Harvard School of Public Health, Boston, MA, March 20, 1995, April 1, 1996, April 21, 1997, March 9, 1998.

The Pharmacology of Blood Alcohol. Liquor Liability Update '96, 2/13/96; Liquor Liability Update '98, 7/27/98; Liquor Liability Update, 2006; OUI: The Basics land More. 5/5/96 Mass. CLE.

Benjamin, David M. and Bush, Donna M.: Preparing for Cross-Examination: Developing Active Listening Skills. Annual meeting of the American Academy of Forensic Sciences, Nashville, TN, Feb. 20, 1996.

Preparing to Testify as an Expert - Session Moderator: Expert Negligence Revisited:


Da104

23

Mattco Forge v. Arthur Young & Co., & Developing "Active Listening" Skills, Annual Meeting of the American College of
Legal Medicine, Las Vegas, NV, March 8, 1996.

Wecht, Cyril and Benjamin, David M.: Evaluation and Commentary of the Strengths and Weaknesses of the Experts in the O. J. Simpson Trial. Annual Meeting of the American College of Legal Medicine, Las Vegas, NV, March 8, 1996.

Substance Abuse and Motor Vehicle Operation. State of Connecticut Department of Motor Vehicles' Medical Advisory Board, Wethersfield, CT, May 2, 1996.

Forensic Pharmacology. Brigham and Women's Hospital, Boston, MA, Aug. 14, 1996.

Risk Management Strategies for Minimizing Liability During Drug Development, ACI Conference on Drug and Medical Device Litigation, New York, NY, December 6, 1996.

The Use of Mediators With "Subject Matter Knowledge" in the Resolution of Health Care Disputes. The
Center for Medical Ethics land Mediation, San Diego, CA, March 9, 1997.

Case Studies in Pharmacist/Pharmacy Negligence, Brigham and Women's Hospital, Boston, MA, Dec. 10, 1997.

How to Stay Out of Hot Water! Reduce Your Medical Liability Exposure, PHYCOR IPA OFFICE MANAGEMENT SEMINAR, Dallas, Texas, February 26, 1998.

Reducing Medication Errors, Southwest Physicians Group, Dallas, Texas, February 27, 1998.
Pharmaceutical Risk Management, American Board of Quality Assurance and Utilization Review Physicians, Tampa, FL, February 28, 1998.

Managing Risk and Errors in Medicine, Panel Member, American Board of Quality Assurance and Utilization Review Physicians, Tampa, FL, February 28, 1998.

Preparing to Testify as an Expert in Occupational land Environmental Medicine, American Occupational Health Conference, Boston, MA, April 29, 1998.

New Developments in the Admission of Scientific Evidence in Court, Annual Meeting of the International Association of Accident Reconstruction Specialists, July 13, 1998, Boston, MA.

Risk Management, Medical Grand Rounds, Department of Internal Medicine, University of Florida Health Science Center, Jacksonville, Florida, October 28, 1998.

Risk Management Strategies for Preventing Medication Errors, Medical Grand Rounds, University of Florida College of Medicine, Shands Teaching Hospital, Gainesville,


Da 105

24

Florida, October 29, 1998.

Evolving Strategies for Minimizing the Risk of Medication Errors, American Board of Quality Assurance & Utilization Review Physicians, "The Future of Health Care, 2000 and Beyond", San Antonio, Texas, November 14, 1998.

Daubert v. Merrell Dow Pharmaceuticals and the Introduction of Scientific Evidence; Analyzing Forensic Cases Involving Ethanol; How the Expert Can Assist the Attorney in Understanding Scientific Evidence;
Medical Jurisprudence, Stetson College of Law, St. Petersburg, Florida, 3 semesters in each of 1997 & 1998.

Constitutional and Evidentiary Issues in Testifying as an Expert in a Drug Testing Case, Annual Meeting of the New England College of Occupational and Environmental Medicine, December 4, 1998, Boston, MA.

Risk Management Strategies for Reducing Medication Errors in Pharmacy Practice, Kaiser Healthcare, Department of Pharmacy, Kansas City, MO, February 12, 1999.

Minimizing Medication Errors in Your Practice, Department of Medicine, VA Medical Center,
Shreveport, LA, April 8, 1999.

Reducing the Risk of Medication Errors and Medical Negligence, Louisiana Association for Healthcare Quality, Shreveport, LA, April 9, 1999.

Medical, Legal & Risk Management Issues for the Judicious Use of Medications by Neurologists, 51st Annual Meeting of the American Academy of Neurology, Toronto, Ontario, Canada, April 22, 1999.

Technology and Blood Alcohol, Traffic Court Technology Seminar for Judges, Newport, RI, April 30, 1999.

Field Sobriety Testing, Urine Drug Screening, and Drug Recognition Testing, Traffic Court Technology Seminar for Judges, Newport, RI, April 30, 1999.

Update on *Daubert* and *Kumho* for Educators, Associated Education Experts, Westerville, Ohio, May 18, 1999.

Preparing and Filing a Medical Device Regulatory Submission, DIA/MCPHS, Boston, MA, August 5-6, 1999.

Update on *Daubert* and *Kumho* for Vocational/Rehabilitation Experts, and Preparing to Testify as a Vocational or Rehabilitation Expert Under *Daubert* and *Kumho*, California Association of Rehabilitation & Reemployment Professionals, San Diego, CA, October 16-17, 1999.  Co-Presenter: David Stein, Ph.D., ABVE.



Da 106

Medication Mis-Adventures: Perils of Prescribing Practices, American Board of Quality Assurance and Utilization Review Physicians, San Diego, CA, November 6, 1999.

Understanding Ethanol Pharmacology and Breathalyzer Testing, 1999-2006 Traffic Adjudication Seminar for Judges, Naples, FL , December 9, 1999. [Note: The Supreme Court of the State of Florida has a policy which required a copy of my presentation be posted on the Court's web site.]

Faculty, Harvard Medical School Risk Management Program Medical and Surgical Practitioners in Court, and the Mental Health Clinician in Court: A Survival Guide, December 1999-2004.

Update on *Daubert, Joiner* & *Kumho* With Regard to the Admission of Expert Testimony in Court,
George Washington University Law School, Washington, DC, January 19, 2000.

Product Liability Litigation as it Impacts Healthcare Professionals and Hospitals, American Board of Quality Assurance land Utilization Review Physicians, Clearwater, FL, April 1, 2000.

The Application of Clinical Pharmacology to Risk Management: Minimizing the Risk of Litigation, Grand Rounds, Rush-Presbyterian- St. Lukes Medical Center, Chicago, IL, May 30, 2000

Faculty, American Bar Association 2000 Annual Meeting - Assassination of J. Edgar Hoover?  A High-Tech Hearing - Presidential Showcase Status, New York, New York, July 8, 2000.

Risk Management Strategies for Reducing Medication Errors in the Hospital Setting, Wilcox Memorial Hospital, Kauai, HI, July 31, 2000 & Hawaii Association for Healthcare Risk Management, Honolulu, HI, August 1, 2000.

Medication Mis-Adventures: Perils of Prescribing Practices, American Board of Quality Assurance and Utilization Review Physicians, Chicago, IL, September 16, 2000.

Drug Product Liability Litigation and Vicarious Liability of Healthcare Professionals land Hospitals,  American Board of Quality Assurance and Utilization Review Physicians, Chicago, IL, September 16, 2000.

Evidence-Based Drug Selection: Raising Your Consciousness About Medication Errors, American Board of Quality Assurance land Utilization Review Physicians, Las Vegas, NV, November 18, 2000.

Minimizing Medication Mistakes, Harvard Medical School Risk Management Program, December 1, 2000, Boston, MA.


Da 107

FILED, Clerk of the Appellate Division, July 08, 2019, A-002160-14    Case 3:18-cv-08431-MAS  Document 2-16  Filed 09/14/18  Page 111 of 194 PageID: 1231

26

Recognizing & Responding to Trick Questions, Harvard Medical School Risk Management Program, December 2, 2000, Boston, MA.

Understanding Ethanol Pharmacology and Breathalyzer Testing, 2000 Traffic Adjudication Seminar for Judges, Palm Harbor, FL , December 7, 2000. [Note: The Supreme Court of the State of Florida has a policy which required a copy of my presentation be posted on the Court's web site.]

Medication Mis-Adventures: Perils of Prescribing, Woman's Hospital Medical Staff Leadership Retreat, New Orleans, LA, January 7, 2001.

Prescription for Malpractice: Legal Issues in the Prescriber-Patient Relationship, Faculty Panel Member, American Health Lawyers Association, New York, New York, January 25, 2001.

Responding to Subpoenas: "Know When to Hold 'Em land When to Fold 'Em", American Board of Quality Assurance land Utilization Review Physicians, Clearwater, FL, March 3, 2001.

*Daubert, Joiner & Kumho* and the Admissibility of Expert Testimony for Forensic Nurses, Annual South Central Region of the International Association of Forensic Nurses Conference, University of Alabama, Huntsville, 4/27/01

Drug Facilitated Rape: Which Drugs are Used and How do you Collect the Evidence, Annual South Central Region of the International Association of Forensic Nurses Conference, University of Alabama, Huntsville, April 28, 2001.

Faculty, American Bar Association 2001 Annual Meeting - The Boston Strangler Case and the Death of Mary Sullivan  Were Drugs Involved?  American Bar Association Meeting  A High-Tech Hearing - Presidential Showcase Status, Chicago, IL, August 4, 2001.

The Impact of Daubert, Joiner & Kumho on Testifying as a Forensic Toxicologist, Annual Meeting of the Society of Forensic Toxicologists, New Orleans, LA, October 1, 2001.

Drug Product Liability and Vicarious Liability of Hospitals and Healthcare Professionals, Suffolk Law School, Boston, MA, October 16, 2001.

Using the Principles of Clinical Pharmacology in Risk Management, Thomas Jefferson University, Department of Medicine, Division of Clinical Pharmacology, Philadelphia, PA, November 9, 2001.

Patient Safety and Prescriber Risk Management, American Board of Quality Assurance and Utilization Review Physicians, Philadelphia, PA, November 10, 2001.



Da 108

Benjamin, David M. and Langer, Carolyn S.: Liability Issues in Occupational Medicine, New England College of Occupational & Environmental Medicine, 2001-2013, Boston, MA.

Benjamin, David M. and Hochhaus, Gunther: Perils of Prescribing - Introduction and Case Studies, Joint Meeting of AGAH and the American College of Clinical Pharmacology, Garmisch-Partenkirchen, Germany, January 27, 2002.

Understanding Ethanol Toxicology & Breathalyzer Testing, New Hampshire Bar Association, February 15, 2002.

Integrated Drug Delivery: Quality Improvement and Patient Satisfaction, American Board of Quality Assurance land Utilization Review Physicians, Las Vegas, NV, April 12, 2002.

Overview of Medication Errors, Saint Elizabeth's Hospital, Boston, MA,  June 24, 2002.

Risk Management Strategies for Reducing Exposure to Litigation in the Pharmaceutical Industry, Pharmaceutical Risk Management Conference, Philadelphia, PA, December 2, 2002.

Clinical Pharmacology as a Risk Management Tool for Reducing Medication Errors. Keynote Address
Lovelace Medical Fondation, Albuquerque, NM, March 15, 2003

Implementing Strategies to Decrease Medication Errors (workshop)
Lovelace Medical Foundation, Albuquerque, NM, March 15, 2003

How to use Failure Mode Effect Analysis (FMEA) to identify areas of risk in your medication management system.  David M. Benjamin, John Santell and Glenn Krasker. National Audio Conference, November 19, 2003.  Sponsored by HCPro.

JCAHO National Patient Safety Goals : How to face changes coming in 2004.  Richard J. Croteau, MD, David M. Benjamin, Ph.D., and Grena G. Porto, RN, ARM, CPHRM. National Audio Conference, December 2, 2003.  Sponsored by the American Society for Healthcare Risk Management (ASHRM).

Using the Principles of Clinical Pharmacology to Reduce Medication Errors & Increase Patient Safety.
Medication Safety & Quality Committee, Tufts-New England Medical Center, January 15, 2004.

Understanding How the Alcotest 7110 Breathalyzer Works.  Understanding the New Law, Strategies for Trying an OUI Case, Suffolk Law School, February 6, 2004.


Da 109

Risk Management Strategies for Reducing Medication Errors. Grand Rounds for the Medical House Staff at Tufts-New England Medical Center. Boston, MA, May 29, 2004.

Liquor Liability in the Civil and Criminal Courts. Presented at the annual meeting of the American Association of Legal Nurse Consultants. Chicago, IL, April 2, 2004.

The Information-Technology Gap : The Greatest Obstacle to Quality Care. Grand Rounds, Thomas Jefferson University, Deptartment of Medicine, Division of Clinical Pharmacology. June 8, 2004

Reconciling Medication Across a Continuum of Care, HCPro Audio-Conference, January 28, 2005.

Drug Product Liability & Vicarious Liability of Healthcare Providers and Hospitals. Presented at the annual meeting of the American Association of Legal Nurse Consultants. San Diego, CA, April 1, 2005.

Forensic Foundations of Toxicology & Pharmacology in Impaired Driving Cases. 2005 District Judges Traffic Law Enforcement Conference. Cardiz, Kentucky, April 4, 2005.

The Technology of Sobriety & Substance Testing (Panel Discussant). 2005 District Judges Traffic Law Enforcement Conference. Cardiz, Kentucky, April 4, 2005.

Liquor Liability, Breathalyzer Testing, and Interpretation of Blood and Urine Drug Tests. Southern New England Chapter of the American Association of Legal Nurse Consultants. Canton, MA May 5, 2005.

Understanding Ethanol Pharmacology, Massachusetts Continuing Legal Education, March 20, 2006.

Forensic Toxicology for the Legal Nurse Consultant, Presented at the annual meeting of the American Association of Legal Nurse Consultants. Atlanta, GA, March 23, 2006.

How do Medications Fit in the National Concerns of Pain Management & Treatment, 28th Annual Edward E. Hollowell Health Law Forum: East Carolina University - Brody School of Medicine, Greenville, NC, September 13, 2006.

The Importance of Developing a Chronology in Determining the Proximate Cause of Impairment in Mixed DUI/DUID Cases. Society of Forensic Toxicologists (SOFT), in the SOFT/AAFS Drugs and Driving Committee special session. Austin, TX October 2006.

Fundamentals of Forensic Toxicology, The American Association of Nurse Attorneys, San Francisco, CA, October 26, 2006.

Medical, Legal and Public Policy Issues Arising out of the Use of Calming Agents. National Institute of Justice, Washington, DC, April 30, 2007.



Da 110.

Fundamentals of Forensic Toxicology.  CPCS Annual Training Conference, Worcester, MA, May 3, 2007.
Forensic Toxicology.  Massachusetts Continuing Legal Education,  October 4, 2007.

*Pro Bono*: Who Said Working for Nothing is not Rewarding?  The Voice, Vol. 7, Issue 32, August 13, 2008, Defense Research Institute, Chicago, IL.

Confounding Issues in Forensic Toxicology, Il Ruolo della Scienza nell'Indagine e nel Processo (The Role of Science in Investigation and Trial), September 1, 2008, Parma, Italy.

New York State Division of Criminal Justice Services – Office of Forensic Services - Expert
Witness Testimony Workshop, Albany, NY September 14-15, 2009.
Instructor - Developing Active Listening Skills - September 14.
Instructor - Contemporary Issues in Forensic Toxicology – September 15.

How the Pharmacist and Nurse Serve as a Safety Net to Reduce Medication Errors. Northeastern University.  February 27, 2012, Boston, MA.

Pharmacology, Forensics and Legal-Medicine, University of Vermont College of Medicine, Department of Pharmacology, Burlington, VT, May 17, 2012.

Forensic Toxicology for Legal Nurse Consultants, Northeast Regional Legal Nurse Consultant Conference, Northampton, MA, October 2, 2012.

Confounding Issues in Forensic Toxicology, University of Rhode Island, Forensic Sciences Lecture Series, October 19, 2012.

## **BOOK CHAPTERS**

The Effects of Drugs on Sexual Response, in The New Sex Therapy, 2nd Edition, Kaplan, H.S., Brunner/Mazel, 1978.

Forensic Pharmacology, in Forensic Science Handbook, Volume III,
Richard Saferstein, Ph.D., (Ed.), Prentice Hall, 1993.

Making the Expert a Part of the Litigations Team and Educating the Defense Witness About the Litigation Process (contributor), in Reengineering Healthcare Liability Litigation (Zaremski land Heckman, eds.), Michie, 1997.

PEARLS for Medication Error Reduction, David M. Benjamin, PhD, Chair, American Society for Healthcare Risk Management, October 2001.


Da 111

30

Benjamin, David M. and Santell, John P. : Medication Error Reduction – Voluntary and Regulatory Oversight, in The Handbook of Patient Safety and Compliance – A Practical Guide for Health Care Organizations, Fay A. Rozovsky and James R. Woods, Jr. (Eds), Jossey-Bass, March 2005.

Iyer, PW, O'Donnell, J., and Benjamin, D. Medication Errors, in Nursing Malpractice, Third Edition, Patricia Iyer and Barbara J. Levin (Eds), Lawyers and Judges Publishing Co., 2007.

Benjamin, David M. and O'Donnell, James T. Medication Errors, in Legal Medicine, Seventh Edition,      S. Sandy Sanbar (Ed), Mosby Elsevier, 2007.

O'Donnell, James T. and Benjamin, David M., Pharmacist Malpractice and Liability, in Legal Medicine, Seventh Edition, S. Sandy Sanbar (Ed), Mosby Elsevier, 2007.

Forensic Pharmacology, in Forensic Science Handbook, Volume III, Second Edition. Richard Saferstein, Ph.D., (Ed.), Prentice Hall, 2010.

Benjamin, David M. and O'Donnell, James T. Medication Errors, in Legal Medicine & Medical Ethics, Eighth Edition, E-Book, S. Sandy Sanbar (Ed), 2010.

O'Donnell, James T. and Benjamin, David M., Pharmacist Malpractice and Liability, in Legal Medicine, Eighth Edition, E-Book, S. Sandy Sanbar (Ed), Mosby Elsevier, 2010.

O'Donnell, James T, Iyer, Patricia and Benjamin, David M., Medication Errors, in Drug Injury: Liability, Analysis and Prevention. Third Edition, James T. O'Donnell (Ed), Lawyers and Judges Publishing Co., Inc., 2012.

O'Donnell, James T. and Benjamin, David M., Pharmacist Malpractice and Liability, in Drug Injury: Liability, Analysis and Prevention. Third Edition, James T. O'Donnell (Ed), Lawyers and Judges Publishing Co., Inc., 2012.


Da112

JOSEPH E. KRAKORA, PUBLIC DEFENDER
POST-CONVICTION RELIEF UNIT
P.O. BOX 46010
31 CLINTON STREET, 5th FLOOR
NEWARK, NEW JERSEY 07101
(973) 648-7651

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION (MIDDLESEX COUNTY)
IND. NO. 05-10-164

|  |  |  |
|---|---|---|
| STATE OF NEW JERSEY, *Plaintiff-Respondent* | : : : : | <u>Criminal Action</u> |
| v. | : : | Certification |
| MELANIE MCGUIRE, *Defendant-Petitioner* | : : | |

FRANCIS J. REILLY., of full age, hereby certifies that:

1. I am an investigator employed by the Office of the Public Defender, working in the Essex Trial Region in Newark. I was assigned to assist Assistant Deputy Public Defender Lois De Julio with the post-conviction relief proceeding for Melanie McGuire.

2. On June 17, 2013, I opened the Access Database labeled: "Hstex-IH-0400." This data base contains the Internet history extracted from the hard drive of the desktop computer (HP Pavilion, 520N, S/N: MX14902841) which was in the McGuire household.

3. Using the key word "Wife," I searched this database. The results of that search are summarized in the chart which is attached to this certification.



Da 113.

5. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Dated: _28 JUN 13_

FRANCIS J. REILLY

Da 114.

| Last Visited | Internet History |
|---|---|
| 4/25/2002 12:22:57 AM | http://www.cnn.com/2002/LAW/04/24/blake.wife.slain/index.html |
| 1/21/2004 7:43:44 AM | http://www.google.com/search?hl=en&lr=&ie=UTF-8&oe=UTF-8&q=poison+your+wife |
| 1/21/2004 7:43:44 AM | http://www.google.com/search?hl=en&lr=&ie=UTF-8&oe=UTF-8&q=poison+your+wife |
| 1/21/2004 7:44:51 AM | http://www.google.com/search?q=poison+your+wife&hl=en&lr=&ie=UTF-8&oe=UTF-8&start=10&sa=N |
| 1/21/2004 7:44:51 AM | http://www.google.com/search?q=poison+your+wife&hl=en&lr=&ie=UTF-8&oe=UTF-8&start=10&sa=N |
| 1/21/2004 7:46:14 AM | http://www.unfaithfulwife.net/header-unfaithful.gif (followed by 18 references from www.unfaithfulwife.net) |
| 1/21/2004 7:48:39 AM | http://www.google.com/search?q=poison+your+wife&hl=en&lr=&ie=UTF-8&oe=UTF-8&start=20&sa=N |
| 1/21/2004 7:50:28 AM | http://www.google.com/search?q=poison+your+wife&hl=en&lr=&ie=UTF-8&oe=UTF-8&start=20&sa=N |
| 1/21/2004 7:56:10 AM | http://www.google.com/search?hl=en&lr=&ie=UTF-8&oe=UTF-8&q=poison+your+wife (followed by 3 more google search references to poison your wife) |

These entries are followed by:

| Last Visited | Internet History |
|---|---|
| 1/21/2004 7:58:14 AM | http://www.poisonprevention.org/top.html (followed by 47 entries from www.poisonprevention.org) |
| 1/21/2004 7:58:19 AM | http://www.google.com/search?q=poison&hl=en&lr=&ie=UTF-8&oe=UTF-8&start=40&sa=N (followed by 10 entries from google searching poison) |
| 1/21/2004 7:59:01 AM | http://www.poison.org/images/800redmed.gif (followed by 87 entries from www.poison.org) |

Da 115



# State of New Jersey
## OFFICE OF THE PUBLIC DEFENDER
POST-CONVICTION RELIEF UNIT
P.O. BOX 46010
31 CLINTON STREET, 5TH FLOOR
NEWARK, NEW JERSEY 07101

TEL.: 973-648-7651; FAX 973-648-7098

CHRIS CHRISTIE
*Governor*

JOSEPH E. KRAKORA
*Public Defender*

RAYMOND BLACK
*Deputy Public Defender*
*PCR Unit*

## CERTIFICATION OF RECORDS

NAME OF SCHOOL: Rutgers, The State University of New Jerseyty

ADDRESS: New Brunswick, New Jersey

STUDENT'S NAME: William McGuire

STUDENT'S DATE OF BIRTH: 9/21/64       S.S.N. 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

DATE OF RECORD(S): 6/18/2013_____

     The copies of records for which this certification is made are true and complete reproductions of the original or microfilmed school records maintained by this institution. The original records were made in the regular course of academic business at or near the time of the matter recorded. This certification is given by the Senior Legal Assistant in lieu of his/her person appearance.

     I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Dated: _7/18/2013_____

Barbara A. McManus
BARBARA A. MC MANUS

{00156428.1 / MCMANUS}

FILED, Clerk of the Appellate Division, July 20, 2018, A-002150-14
Case 3:18-cv-08341-MAS Document 10-16 Filed 09/14/18 Page 120 of 194 PageID: 1240

# RUTGERS
THE STATE UNIVERSITY
OF NEW JERSEY

STUDENT NUMBER: 068001036

RECORD DATE: 06/18/13   PAGE: 1

WILLIAM T. MCGUIRE

THIS IS A RED SECURITY SHEET. IF COPIED, "VOID" WILL APPEAR

| TITLE | SCH | DEPT | CRS | SEC | CREDITS | PR | GRADE |
|---|---|---|---|---|---|---|---|
| TRANSFER COURSES | | | | | | | |
| TIDEWATER CMTY COLL-VA BEACH | | | | | | | |
| FALL 1988: | | | | | | | |
| GEN BIOLOGY I | | | | | | | |
| WEST CIV I | | | | | | | |
| PRECALC | | | | | | | |
| SPRING 1989 | | | | | | | |
| GEN BIOLOGY II | | | | | | | |
| COLLEGE COMP I | | | | | | | |
| WEST CIV II | | | | | | | |
| SUMMER 1989 | | | | | | | |
| COLLEGE CHEM 1 | | | | | | | |
| FALL 1989 | | | | | | | |
| COLLEGE CHEM 2 | | | | | | | |
| PRIN ECONOMICS | | | | | | | |
| COLLEGE COMP II | | | | | | | |
| GEN COLLEGE PHYSICS I | | | | | | | |
| SUMMER 1990 | | | | | | | |
| COLLEGE CHEM 1 | | | | | | | |
| PRIN ECONOMICS 1 | | | | | | | |
| FALL 1990 | | | | | | | |
| ORGANIC CHEM I | | | | | | | |
| ORGANIC CHEM I LAB | | | | | | | |
| SUR AMER LIT I | | | | | | | |
| CALCULUS I | | | | | | | |
| GEN COLLEGE PHYSICS II | | | | | | | |
| SPRING 1991 | | | | | | | |
| ORGANIC CHEM II | | | | | | | |
| ORGANIC CHEM II LAB | | | | | | | |
| SUR AMER LIT II | | | | | | | |

(TRANSFER CREDITS: 66.0)

| TITLE | SCH | DEPT | CRS | SEC | CREDITS | PR | GRADE |
|---|---|---|---|---|---|---|---|
| FALL 1991: COLLEGE OF PHARMACY | | | | | | | |
| MAJOR: PHARMACY | | | | | | | |
| CLASS: 95 | | | | | | | |
| INTRO BIOCHEM/SRV | | | | | | | |
| INTRO PHARMACEUTICS | | | | | | | |
| PHARM IN HEALTH CARE | | | | | | | |
| PHAR PRAC MANAGMT I | | | | | | | |
| DEGREE CREDITS: 78.0 | | | TERM AVG: 2.500 | | | | CUMULATIVE AVG: 2.500 |
| SPRING 1992 COLLEGE OF PHARMACY | | | | | | | |
| MAJOR: PHARMACY | | | | | | | |
| CLASS: 95 | | | | | | | |
| INTRO PHYSIOLOGY | | | | | | | |
| PHAR PRAC MANAGMT II | | | | | | | |
| DEGREE CREDITS: 84.0 | | | TERM AVG: 3.000 | | | | CUMULATIVE AVG: 2.607 |
| FALL 1992: COLLEGE OF PHARMACY | | | | | | | |
| MAJOR: PHARMACY | | | | | | | |
| CLASS: 95 | | | | | | | |
| MEDICAL ERRS | | | | | | | |
| PHARM CHEM | | | | | | | |
| PHARMACOKINDCS | | | | | | | |
| DEGREE CREDITS: 90.0 | | | TERM AVG: 3.000 | | | | CUMULATIVE AVG: 2.780 |
| SPRING 1993 COLLEGE OF PHARMACY | | | | | | | |
| MAJOR: PHARMACY | | | | | | | |
| PHARM MICROBIOLOGY | | | | | | | |
| PATHOPHYSIOLOGY | | | | | | | |

**CONTINUED ON NEXT PAGE**

This transcript is not official without the signature of the registrar.

Pursuant to the Family Education Rights and Privacy Act of 1974, Information Contained Herein Shall Not Be Released to a Third Party Without the Written Authorization of the Student.

RAISED SEAL NOT REQUIRED

University Registrar
Rutgers, the State University of New Jersey

Da 117

# RUTGERS

THE STATE UNIVERSITY
OF NEW JERSEY

**WILLIAM T. MCGUIRE**

STUDENT NUMBER: 068001036

RECORD DATE: 06/18/13    PAGE: 2    THIS IS A RED SECURITY SHEET. IF COPIED, "VOID" WILL APPEAR

| TITLE | SCH | DEPT | CRS | SEC | CREDITS | PR | GRADE |
|-------|-----|------|-----|-----|---------|-----|-------|

PHARMACOKINETICS.    30    721    302    01    3.0    B

**FALL 1993. COLLEGE OF PHARMACY**
MAJOR: PHARMACY
CLASS: 96
DEGREE CREDITS: 100.0    TERM AVG: 2.500    CUMULATIVE AVG: 2.676

PHARM CHEM    30    715    305    03    5.0    C
PHARMACOLOGY 1    30    718    407    01    4.0    C
PHARM THERAPEUTICS I    30    725    401    01    6.0    B

DEGREE CREDITS: 107.0    TERM AVG: 2.143    CUMULATIVE AVG: 2.585

**SPRING 1994. COLLEGE OF PHARMACY**
MAJOR: PHARMACY
CLASS: 96
DIET NUTR DISEASE PREV    30    717    402    01    3.0    B
PHARM THERAPEUTICS I    30    725    402    01    6.0    C
PHARMACEUTICAL LAW    30    725    407    01    3.0    B
HISTORY OF PHARMACY    30    725    424    01    3.0    A

DEGREE CREDITS: 114.0    TERM AVG: 1.414    CUMULATIVE AVG: 2.360

**FALL 1994. COLLEGE OF PHARMACY**
MAJOR: PHARMACY
CLASS: 96
MEDICINAL CHEM    30    715    409    01    3.0    F
PHARMACOLOGY I    30    718    407    01    4.0    D
DRUG DELIVERY I    30    721    408    01    4.0    D

DEGREE CREDITS: 122.0    TERM AVG: 1.000    CUMULATIVE AVG: 2.180

---

| TITLE | SCH | DEPT | CRS | SEC | CREDITS | PR | GRADE |
|-------|-----|------|-----|-----|---------|-----|-------|

**FALL 1996. COLLEGE OF PHARMACY**
MAJOR: PHARMACY
CLASS: 98
MEDICINAL CHEM    30    715    409    01    3.0    F
PHARMACOLOGY I    30    718    407    01    4.0    F
DRUG DELIVERY I    30    721    408    01    4.0    F

DEGREE CREDITS: 122.0    TERM AVG: 0.000    CUMULATIVE AVG: 1.841

**ACADEMIC DISMISSAL**

LAST TERM CREDIT HOURS:    11.0
TERM CREDITS IN GPA:    11.0
TERM POINTS IN GPA:    0.0
CUMULATIVE CREDITS IN GPA:    69.0
CUMULATIVE POINTS IN GPA:    127.0

*** END OF TRANSCRIPT ***

This transcript is not official unless the signature differs registration.

Pursuant to the Family Education Rights and Privacy Act of 1974 and legislation, I understand that
Shall not be released to a Third Party without the Written Authorization of the Student.

RAISED SEAL NOT REQUIRED

University Registrar

**Rutgers, the State University of New Jersey**

Da 118

# EXPLANATION OF GRADING SYSTEM

A. Standard (Exception: School of Law - Newark, School of Law - Camden, Livingston College, and Rutgers Business School Newark/New Brunswick (Grad)

| | | Grade Points | | | | Grade Points |
|---|---|---|---|---|---|---|
| A | - Distinguished | 4.00 | F | - | Failing | 0.00 |
| B+ | - Intermediate grade | 3.50 | Pass | - | (A thru C) | |
| B | - Good | 3.00 | NOCR | - | No credit (D & F) | |
| C+ | - Intermediate grade | 2.50 | IN | - | Incomplete | |
| C | - Satisfactory | 2.00 | PIN | - | Permanent incomplete | |
| D | - Poor | 1.00 | TNC | - | Temporary no credit | |

B. School of Law - Camden & Newark

| | | Grade Points | | | | Grade Points |
|---|---|---|---|---|---|---|
| A+ | - | 4.33 | C | - Satisfactory | | 2.00 |
| A | - Distinguished | 4.00 | C- | - Intermediate grade | | 1.67 |
| A- | - Intermediate grade | 3.67 | D+ | - Intermediate grade | | 1.33 (Camden only) |
| B+ | - Intermediate grade | 3.33 | D | - Poor | | 1.00 |
| B | - Good | 3.00 | F | - Failing | | 0.00 |
| B- | - Intermediate grade | 2.67 | PASS | - Credit awarded | | |
| C+ | - Intermediate grade | 2.33 | NOCR | - No credit | | 0.00 |
| | | | IN | - Incomplete | | |

C. School of Law - Camden (through Summer Session 2001)

| | | Grade Points | | | Grade Points |
|---|---|---|---|---|---|
| A+ | - | 4.50 | C+ | - Intermediate grade | 2.50 |
| A | - Distinguished | 4.00 | C | - Satisfactory | 2.00 |
| B+ | - Intermediate grade | 3.50 | D+ | - Intermediate grade | 1.50 |
| B | - Good | 3.00 | D | - Poor | 1.00 |
| | | | F | - Failing | 0.00 |

D. Rutgers Business School Newark/New Brunswick (Grad)

| | | Grade Points | | | Grade Points |
|---|---|---|---|---|---|
| A | - Distinguished | 4.00 | C+ | - Intermediate grade | 2.33 |
| A- | - Intermediate grade | 3.67 | C | - Satisfactory | 2.00 |
| B+ | - Intermediate grade | 3.33 | C- | - Intermediate grade | 1.67 |
| B | - Good | 3.00 | D | - Poor | 1.00 |
| B- | - Intermediate grade | 2.67 | F | - Failing | 0.00 |
| | | | INC | - Incomplete | |

E. Livingston College

| | | Grade Points | | | Grade Points |
|---|---|---|---|---|---|
| A | - Distinguished | 4.00 | D | - Poor | 1.00 |
| B+ | - Intermediate grade | 3.50 | NOCR | - Failed (no credit) | 0.00 |
| B | - Good | 3.00 | TNC | - Temporary no credit | 0.00 |
| C+ | - Intermediate grade | 2.50 | H | - Honors (A) | |
| O | - Satisfactory | 2.00 | CR | - Credit (B & C) | |
| | | | F | - Failing | 0.00 |

F. OTHER GRADE SYMBOLS

| | | | | | | |
|---|---|---|---|---|---|---|
| DF | Disciplinary failure | S | Satisfactory | W | Withdrew or dropped |
| IN | Incomplete | TZ | Grade not submitted | WF | Withdrew failing |
| NG | No grade given | X | Examination not taken | U | Unsatisfactory |
| WP | Withdrew passing | H | Honors grade | XF | Disciplinary Failure |

REGULATIONS GOVERNING USAGE of above grade symbols are determined by each college of the University. Complete explanations are found in appropriate college bulletins of the general catalog of Rutgers University.

CREDIT HOUR PREFIXES
- E - Credits do not count toward degree
- N - Noncredit course - Credits do not count toward degree
- G - Undergraduate course taken for graduate credit
- PN - Course undertaken on pass/no credit basis
- R - Repeated course
- J - Counts as degree credit but is not in the CUM GPA
- K - Does not count as degree credit but is in the CUM GPA
- M - Counts toward major

TERMS AND CUMULATIVE AVERAGES

$$\frac{\text{Total grade points}}{\text{Total credit hours}} = \text{Weighted average}$$

GRADE PREFIXES
- R - Re-examination permitted
- T - Term work incomplete

CREDIT HOURS
One credit is given for 800 minutes of class (lec. or rec.) or for three times this amount of laboratory time.

Issued By:

Newark
249 University Avenue
Newark, NJ 07102
973-353-5324

Camden
311 North 5th Street
Camden, NJ 08102
856-225-6053

New Brunswick
ASB, Room 200L
65 Davidson Rd.
Piscataway, NJ 08854-8098
848-445-3220


Da 119

JOSEPH E. KRAKORA, PUBLIC DEFENDER
POST-CONVICTION RELIEF UNIT
P.O. BOX 46010
31 CLINTON STREET, 5th FLOOR
NEWARK, NEW JERSEY 07101
(973) 648-7651

|  | | SUPERIOR COURT OF NEW JERSEY |
|---|---|---|
|  | | LAW DIVISION (MIDDLESEX COUNTY) |
|  | | IND. NO. 05-10-164 |

|  |  |  |
|---|---|---|
|  | : | <u>Criminal Action</u> |
| STATE OF NEW JERSEY, | : | |
| *Plaintiff-Respondent* | : | Certification |
|  | : | |
| V. | : | |
|  | : | |
| MELANIE MCGUIRE, | : | |
| *Defendant-Petitioner* | : | |

PETER R. DE FOREST, of full age, hereby certifies that:

1. I hold a doctorate in criminalistics. My *Curriculum Vitae* is attached.

2. I was contacted by Lois De Julio, counsel for the defendant in this matter, and asked to research and report on the possible significance of two lead wadcutter bullets recovered in this case. My report is attached.

6. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Dated: **23 - AUG - 2013**

_____
PETER R. DE FOREST

Da 120

Lois DeJulio, Esq., Re: Melanie McGuire/ Our Case #: g-08120215.

# Peter R. De Forest, D.Crim.

## Forensic Consultants
## Post Office Box 141
## Ardsley, NY 10502-0141

(914) 428- 8649
Fax: (914) 949- 8871

Criminalistics
Scene Reconstruction
Trace Evidence
Microscopy

August 20, 2013

Lois DeJulio, Esq.
Assistant Deputy Public Defender
Office of the Public Defender
31 Clifton Street, 5th Floor
Newark, New Jersey 07101

      Re:   State v. Melanie McGuire
              Firearms Identification
              Our Case #: g-08120215

Dear Atty. DeJulio,

Herewith is the report that you requested in the above-captioned matter.

---

# REPORT

## Introduction

      This report deals with the possible significance of two lead wadcutter bullets recovered in this case. No firearm was recovered with which to explore the

Da 121

Lois DeJulio, Esq., Re: Melanie McGuire/ Our Case #: g-08120215.

question of the specific source of these bullets definitively. Without a firearm the avenues of bullet type and general markings left on the bullets by the gun which fired them, become important in learning as much as possible from a difficult situation. The best that can be done in such a situation is to produce a list of candidate firearm types and manufacturers of models of firearms that "could have" fired the bullets in question and eliminate other firearms. This can be useful at the early investigative stages of a case. It has no value as scientific proof of an association.

**Background**

A number of years ago the FBI set up a computerized resource known as the Crime Laboratory Information system (CLIS). A significant part of this resource is a firearms database known as the GRC. This abbreviation stands for general rifling characteristics. The GRC database is valuable for use by firearms examiners to identify candidate firearms from the land and groove markings on fired bullets recovered in criminal investigations. The land and groove markings found on recovered bullets are the result of the bullet passing down a rifled gun barrel. The rifling consists of helical grooves cut into the bore of the barrel. The cutting to produce the grooves naturally results in raised areas between the grooves, which are known as lands. Rifling became common in the mid-19th-century. The helical grooves and the associated raised areas or lands between them"bite" into the softer bullet and impart an axial spin to it as it passes down a rifled barrel. The spin serves to stabilize the bullet in flight and results in better accuracy and increased useful range. The helical rifling in the barrel can be cut to have either a right-hand or left-hand twist. This will result in a right-hand or left-hand spin for the bullet. The direction of twist of the rifling in the barrel and the number of lands and grooves can be easily discerned from an examination of an undamaged or minimally damaged bullet which has been fired through that barrel.

The GRC database only represents the guns for which evidence was sent to the FBI to add into the database. It is not representative of manufacturing trends or available weapons in the marketplace. For this reason, accurate statistical calculations cannot be conducted using the GRC database. However, even with this limitation, it is the best source of information for making estimates of rarity or commonness of rifling characteristics seen on bullets and allowing a list of candidate firearms that could be the source of such bullets to be generated during an investigation. The information provided by the GRC that is relevant for this report includes the direction of twist of the rifling, the number of lands and grooves

Da 122

Lois DeJulio, Esq., Re: Melanie McGuire/ Our Case #: g-08120215.

and the measured widths of the land and groove impressions in thousands of an inch.

**Discussion**

An examination of the two lead bullets recovered in this case revealed them to have six lands and grooves with a right-hand twist. When a query of the CLIS GRC computer database is made, searching for Taurus Model 85s, three are located. These all have five lands and grooves with a right-hand twist. This is abbreviated 5R. In other words, no handguns designated as Taurus Model 85s with 6R rifling are in the database. There are 6R Taurus revolvers in the database, but none of these is listed as a Model 85. I have a Taurus Model 85 in my personal reference collection of firearms. It has 5R rifling. Taurus is a Brazilian company. They maintain a company website. A few years ago their website listed the Taurus model 85 as having 5R rifling. Curiously, more recently when I checked this website the listing for the Model 85 had been changed to 6R.

In connection with this case, at the request of the prosecution, a Mr. Robert Morrison, an executive with Taurus USA, prepared an affidavit in which he stated that the Taurus model 85 could be made with either 5R or 6R rifling and that no record was kept of which weapons had which rifling.

There are many manufacturers of 38 or .357 caliber guns with 6R class characteristics. Based upon the general rifling characteristics of the recovered bullets in the present case (*i.e.,* lead bullet, weight of 147grains, 6R, the reported land and groove dimensions, and a wad cutter design), there are many guns that could have been used to fire such bullets and produce the reported land and groove markings.

Although one cannot say categorically that the bullets in question were not fired in an autoloading handgun (*e.g.,* 380 APC, 9 mm Luger, 38 Super, 357 SIG) This is extremely unlikely. The flat anterior face of the cylindrical lead projectile would be expected to make chambering of the cartridge difficult with an autoloading handgun. In addition, I know of no commercially produced ammunition where lead wadcutters are used in these chamberings. Hand loading of wadcutter bullets in the listed autoloader cartridge cases, although possible, would make no sense. It is doubtful that anybody would produce such a load. So although there is large number of candidate autoloaders that would have 6R rifling in the specified range of land and groove widths, these will be eliminated from consideration in this discussion. This leaves a limited number of revolver calibers

Da 123

Lois DeJulio, Esq., Re: Melanie McGuire/ Our Case #: g-08120215.

(*e.g.*, 357 MAG, 38 S&W, 38 Special). However many manufacturers have made revolvers with six right rifling in the specified range of land and groove width measurements (Land: Min 0.083 & Max 0.085; Groove: Min 0.095 & Max 0.099; +/- 0.003). Based on the revolvers listed in the CLIS GRC file, and using the criteria discussed above, 24 different manufactures could have made a weapon that could have produced a bullet having rifling characteristics consistent with those observed on the evidence bullets in this case. Although a number of Taurus 38 special handguns fall in this range, no model 85s are cited.

**Summary and Conclusions**

From the two independent and complementary perspectives, as detailed above (i.e., the failure to find any evidence of Model 85 Taurus revolvers manufactured during the relevant time frame with six right rifling and the large number of other possible weapons that could have produced bullets with the same general rifling characteristics as the questioned bullets in this case), there is no evidence that it is likely that the fired bullets in this case came from a Taurus Model 85 manufactured during the relevant time frame. To state that the fired bullets in this case are "absolutely consistent" with having come from the gun in this case is very misleading. To be accurate, all that can be said is that, based on the information available to this point, the possibility of the two questioned bullets having been fired from the Taurus Model 85 cannot be eliminated. Given the number of other possibilities, this is not very significant as associative evidence.

---

I reserve the right to amend this report should more information or materials to review become available. My curriculum vita has been submitted separately.

If you should have any questions, please let me know.

Sincerely,

Peter R. De Forest, D.Crim.

Da 124

# CURRICULUM  VITAE

### Peter R.  De Forest

**Birthdate:** August 24, 1941

**Birthplace:** Los Angeles, California

**Family Status:**

| | |
|---|---|
| **Married:** | January 25, 1966 to Carol Etsuko Toriumi |
| **Daughter:** | Ellen Kimiko born December 1, 1973 |
| **Son:** | Robert Toriumi born April 10, 1976 |

**Education:**

Graduated from Ventura High School, Ventura, CA, June 1959
A.A. degree (chemistry), Ventura College, January 1962
B.S. (with honors) in criminalistics, University of California, Berkeley, June 1964
D.Crim. in criminalistics, University of California, Berkeley, June 1969

**Experience:**

Student Forensic Chemist, Ventura County Sheriff's Crime Laboratory, Ventura, CA, September 1960 to August 1962
Laboratory Aide, Paul L. Kirk and Associates, Berkeley, California, October 1962 to June 1964
Student, Field Study, Richmond (California) Police Department Crime Laboratory, September 1963 to March 1964
Research Assistant, USPH Toxicology Grant, University of California, Berkeley, 1963 to 1967 (summers)
Criminalist-Consultant, Paul L. Kirk and Associates, Berkeley, California, June 1964 to May 1969
Teaching Assistant, Criminalistics, University of California, Berkeley, September 1964 to June 1967
Teaching Fellow, Criminalistics, University of California, Berkeley, September 1967 to June 1968
Scientific Observer, Physical Evidence Study with Berkeley Police Department, (Professor Brian Parker, principal investigator), LEAA Grant NI-020-032, Summer 1969
Faculty Member, Department of Sciences, John Jay College of Criminal Justice, City University of New York, New York, NY
     Assistant Professor of Criminalistics, 9/1/69 – 12/31/73
     Associate Professor of Criminalistics, 1/1/74 – 12/31/79
     Professor of Criminalistics, 1/1/80 – 1/2/08 — Retired

**Doctoral Dissertation:**

"Individualization of Human Hair - Pyrolysis-Gas Chromatography", University of California at Berkeley, May 1969. Director, Dr. Paul L. Kirk, Professor of Criminalistics, Committee Members: Drs. James Cason and Chester O'Konski, Professors of Chemistry.



Da 125

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008     Page 2

## Honorary and Professional Society Memberships:

Member of the Upper Division and Graduate Scholastic Honor Students' Society of the University of California, Berkeley, January 1963 to June 1965

President of the Upper Division and Graduate Scholastic Honor Students' Society of the University of California, Berkeley, June 1964 to June 1965

Corresponding Member of the California Association of Criminalists, from October 1968

Associate Member of The Society of the Sigma Xi (1968-1971)

Fellow of the American Academy of Forensic Sciences

    Chair, Committee to Select Name for Criminalistics Section Award, AAFS, 1986.

    Member, Student Affiliate Chapter Committee of the (AAFS).

    Program Chair, Scientific Program, Criminalistics Section, 2005 AAFS Meeting, New Orleans

    Secretary, Criminalistics Section, American Academy of Forensic Sciences, 2005-2006.

    Chair, Criminalistics Section, American Academy of Forensic Sciences, 2006-2007.

Member of the New York Academy of Sciences

Member of the American Association for the Advancement of Science

Member of the American Society for Testing and Materials (ASTM) Committee E-30 on Forensic Sciences

Corresponding Secretary of the Criminalistics Subcommittee of the ASTM Committee E-30 on Forensic Sciences (1972-1974)

Awarded Honorary Life Membership, Northeastern Association of Forensic Scientists (NEAFS), 1989.

Chairman of the Education Committee NEAFS (1977-1979)

Member of the American Chemical Society

Member of the New York Microscopical Society (NYMS) and Board of Managers of NYMS / Recording Secretary (1986-89), Vice President (1989-90)

Member of the Canadian Society of Forensic Science

Member, Committee on Forensic Hair Comparison, (under auspices of the FBI Forensic Science Research and Training Center and The International Association of Microscopy) (1985-1986).

Charter Member New York Society of Forensic Sciences (NYSFS), Secretary NYSFS from 1986 to 1996.

Chairman, Council on Forensic Science Education, 1991-1992

Sustaining Life Member of the International Association for Identification (IAI), from 1994.

Academic Affiliate, American Society of Crime Laboratory Directors, from 1997.

Member, International Association of Chiefs of Police (IACP) from 2003.

## Honors and Advisory Committee Memberships:

Listed in American Men of Science, from 12th Edition

Listed in Who's Who in the East, from 15th Edition

Member, Criminal Justice Advisory Council, University of New Haven, September 1976 to 1979.

Member, New York State Crime Laboratory Advisory Committee, from October 1977

Member, Forensic Microscopy Workshop Steering Committee, Forensic Sciences Foundation, Rockville, MD, from June 1978

Member, Forensic Sciences Education Guidelines Committee, Forensic Sciences Foundation, Rockville, MD, September 1979

Commendation, Greenburgh (New York) Police Department, June 1978

Honorary Life Member Award, Northeastern Association of Forensic Scientists (NEAFS), October 20, 1989.

Member, Editorial Board, *Crime Laboratory Digest* (ceased publication in 1998)

Member, Editorial Board, *Journal of Forensic Sciences* (to end of term in 2003)

Chairman, Examination Committee, American Board of Criminalistics from 1990 to 2001

Chairman, Examination Committee, Crime Scene Certification Board, New York Division of the International Association for Identification from 1999 to 2003.



Da 126

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008    Page 3

Recipient of the Paul L. Kirk Award of the Criminalistics Section of the American Academy of Forensic Sciences, 1999.

Member, Scientific Working Group on Materials Analysis (SWGMAT) sponsored by the FBI.

Member, Technical Working Group on Education and Training in Forensic Science (TWG-ED) funded by the National Institute of Justice (NIJ) (2000-2003).

Member of *Committee on Scientific Assessment of Bullet Lead Elemental Composition Comparison* of the National Research Council, National Academy of Sciences from February 2003 to February 2004.

Commissioner, Forensic Education Program Accreditation Commission/ (FEPAC) sponsored by the American Academy of Forensic Sciences (AAFS) (Inception through end of term Feb. 2006).

Member, *Forensics Committee* of the International Association of Chiefs of Police (IACP) term ending Fall 2007.

Member Advisory Committee for New York City Police Department Laboratory 2004.

## Certificates and Licenses Held and Special Short Courses and Workshops Taken:

X-ray Analytical Instrumentation, 55th Norelco X-ray Analytical School, San Francisco, CA, September 12-16, 1966

Kodak Law Enforcement Photography Seminar, San Francisco, CA, February 17, 1967

Glass Capillary Gas Chromatography, Hewlett-Packard Company, Paramus, NJ, April 20-21, 1978

Bloodstain Workshop, Northeastern Association of Forensic Scientists (NEAFS), St. John's University, March 31, 1979

Advanced Microscopy/Soils, McCrone Research Institute, sponsored by LEAA/NILECJ, Chicago, IL, April 15-20, 1979

Certificate of Competency in General Criminalistics, California Association of Criminalists, 1989 (Certificate #99).

Certified Senior Crime Scene Analyst, International Association for Identification, 1990-2003.

Diplomate of the American Board of Criminalistics, 1992 (Certificate # 005).

Federal Firearms License # 6-13-119-01-3M-33535

State of New York, Dealer in Firearms (License #103794F)

State of New York, Gunsmith (License # 103795G)

## Teaching:

### Courses Taught at John Jay

#### Undergraduate

Forensic Science 108, Concepts of Forensic Science
Forensic Science 213, Survey of Criminalistics
Forensic Science 315-316 and 415-416 Forensic Science Laboratory
Forensic Science 401, Laboratory Internship
Chemistry 310, Scientific Arson Investigation

#### Graduate

Forensic Science 710-711, Advanced Criminalistics I and II
Forensic Science 723, Analytical Toxicology
Forensic Science 790, Crime Scene Reconstruction for the Laboratory Scientist (Fall Semesters 1982, 90, 92, 95, 98) and Spring 2001.
Forensic Science 791, Thesis Seminar
Forensic Science 792-793, Lab Research Tutorial I and II
Criminal Justice U715, Science and Justice, Ph.D. Seminar


da 127

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008     Page 4

**Off-Campus Teaching**

Presented three lectures "Forensic Microscopy" at Northeastern University, Boston, MA, February-March, 1976.

Lectured in "Crime Scene Investigation Seminar" sponsored by the Criminal Justice Center, John Jay College, New York, NY, June 1976.

Lectured and took part in panel discussion in "Arson - A Five Day Seminar," sponsored by The Criminal Justice Center and the Pinkerton Foundation, New York, NY, January 31-February 4, 1977.

Co-Taught and helped organize "Forensic Microscopy," sponsored by the Northeastern Association of Forensic Scientists, University of Connecticut, Storrs, CT, June 18-24, 1977.

Lectured and helped organize a serological evidence seminar for the Morris County Detectives Association in cooperation with the North Regional Laboratory, New Jersey State Police, November 21-23, 1977.

Lectured in "Arson Seminar," New Haven Fire Department, New Haven, CT, November, 1977.

Lectured and helped organize "Introduction to Forensic Microscopy," sponsored by the Northeastern Association of Forensic Scientists, University of Connecticut, Storrs, CT, August 20-25, 1978.

Lectured and helped organize "Basic Bloodstain Workshop," sponsored by the Northeastern Association of Forensic Scientists, University of New Haven, West Haven, CT, October 8-13, 1978.

Presented one day lectures in the "Scientific Investigation of Crime" seminar at the Southern Police Institute, University of Louisville, KY, December 7, 1978 and December 7, 1979.

Lectured in "Advanced Arson Seminar", Connecticut Police Academy, Meriden, CT, June 12-14, 1979.

Organized and lectured in a workshop entitled "Bloodstain Pattern Interpretation," sponsored by the Northeastern Association of Forensic Scientists, John Jay College, CUNY, New York, NY, January 25, 1985.

Lectured and helped organize "Polarized Light and Chemical Microscopy," sponsored by the Northeastern Association of Forensic Scientists, St. John's University, Queens, NY, April 8-11, 1985.

Lectured and helped organize, "Forensic Science -- A Workshop for High School Chemistry Teachers," Sacred Heart University, Bridgeport, CT, April 26, 1985.

Lectured in "Bloodstain Evidence Seminar," sponsored by the Connecticut State Police and the Municipal Police Training Council, Police Academy, Meriden, CT, May 28-31, 1985.

Lectured and helped organize, "Modern Forensic Science -- Theory and Practice," a series of lectures given at People's University, Beijing, China, August 6 - 20, 1985, sponsored by the Government of the Peoples Republic of China.

Presented a lecture entitled, "Bloodstain Pattern Interpretation and Crime Scene Reconstruction", for Office of the District Attorney, Erie County, Buffalo, NY, February 1, 1986.

Presented a lecture entitled, "Crime Scene Investigation and Documentation", lecture for students at Municipal Police Training Council (MPTC) Headquarters, Meriden, CT, February 26, 1986.

Organized and lectured in, "Bloodstain Pattern Interpretation", a course for the staff of the Forensic Science Laboratory, Suffolk County, Hauppauge, NY, May 16-17, 1986.

Presented plenary lecture, "The Crime Scene and the Criminalistics Laboratory", to investigators from police departments in New York State at the 4th Annual Statewide Special Programs Conference (MOPP, SWEEP, HALT) sponsored by DCJS, Albany, NY, June 6, 1986.

Presented lectures, "Bloodstain Patterns and Crime Scene Reconstruction", to two groups of crime scene personnel, Bureau of Criminal Identification (BCI), New York State Police, State Police Academy, State Campus, Albany, NY, October 20, November 3, 1986.

Presented a lecture, "The Role of Chemistry in the Forensic Individualization of Physical Evidence," undergraduate chemistry seminar, Pace University, Pleasantville, NY, March 11, 1987.

Presented a lecture, "Crime Scene Investigation and Documentation", for students at Municipal Police Training Council (MPTC) Headquarters, Meriden, CT, March 18, 1987.

Organized and lectured in a course entitled "Crime Scene Reconstruction," sponsored by the Florida Department of Law Enforcement, Tallahassee, FL, September 30 thru October 1, 1987.

Da 128

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008      Page 5

Lectured in "Scientific Sleuthing -- A Program for Teachers," a workshop for high school teachers sponsored by the New York Section of the American Chemical Society, New York, NY, November 14, 1987.

Presented Eighth Annual Sweeny Lecture, Department of Chemistry, Lehman College/ CUNY, December 4, 1987.

Presented a lecture entitled "Crime Scene Reconstruction," for the Crime Scene Unit, New York City Police Department, February 3, 1988.

Presented two lectures in "Forensic Evidence," a Course for Public Defenders, Mississippi Judicial College, Medical Center, Univ. of Mississippi, Jackson, MS, March 17, 1988.

Presented a lecture, "Forensic Chemistry," Department of Chemistry/Physics, Sacred Heart University, Fairfield, CT, April 5, 1988.

Speaker, Doctoral Colloquium Series, Ph.D. Program in Criminal Justice, City University of New York, May 9, 1988.

Presented lectures on Forensic Science, Hair and Fiber Evidence, to investigators and attorneys of the Public Defender's Office, Department of the Public Advocate, Trenton, NJ, May 18, 1988.

Speaker, Meeting of Forensic Science Educators, New York, May 21, 1988.

Presented three lectures entitled "Scientific Investigation of the Crime Scene," at Nassau Science Explorations, Hofstra University, May 24, 1988.

Presented lectures entitled "Crime Scene Reconstruction" and "Documentation," for the Crime Scene Unit, New York City Police Department, June 7, 1988.

Faculty Member, session on "New and Evolving Issues Involving Expert Witnesses," Judicial Seminar, Rochester, NY, July 13, 14, 20, 21, 1988, sponsored by Office of Court Administration, New York State Unified Court System.

Presented lecture entitled "Trace Evidence and Crime Scene Reconstruction," Fiftieth Summer Conference of the New England Association of Chemistry Teachers, Hotchkiss School, Lakeville, CT, August 17, 1988.

Lectured, "Crime Scene Reconstruction Workshop," Fourteenth Annual Meeting of the Northeastern Association of Forensic Scientists, Mystic, CT, October 20 - 21, 1988.

Presented lectures on crime scene reconstruction at the 99th Eastern Armed Robbery Conference hosted by the Maryland State Police, Timonium, MD, November 17, 1988.

Presented lecture on forensic science to the Western Connecticut Section of the American Chemical Society, Stamford, CT, January 17, 1989.

Presented lectures entitled "Crime Scene Reconstruction" and "Documentation," for the Crime Scene Unit, New York City Police Department, January 30, 1989.

Presented lecture entitled "Science at the Crime Scene," at the National Convention and Seminar of the National Association of Legal Investigators, Philadelphia, PA, July 14, 1989.

Presented a lecture entitled, "Crime Scene Reconstruction, Evidence Recognition, and Scene Documentation, for The Bergen County Prosecutor's Office, Police Academy, Mahwah, NJ, October 31, 1989.

Presented a lecture entitled "Crime Scene Reconstruction and Physical Evidence Interpretation," for the Public Defender's Office, Department of the Public Advocate, State of New Jersey, Trenton, NJ, November 13, 1989.

Lectured in "Forensic Hair Symposium," sponsored by the Northeastern Association of Forensic Scientists, New York, NY, November 17-18, 1989.

Presented a lecture entitled, "Forensic Science," for Department of Chemistry, Fordham University, Bronx, NY, November 28, 1989.

Presented a lecture entitled, "Forensic Chemistry," for Math-Science Cluster/ Bronx-Manhattan Conference/ Lehman High School, Bronx, NY, March 21, 1990.

Presented a lecture entitled, "Forensic Chemistry," Meeting of Connecticut Science Teachers, Sacred Heart University, Fairfield, CT, May 2, 1990.

Presented module entitled, "Trajectory Reconstructions, " in Crime Scene Reconstruction Workshop sponsored by the American Academy of Forensic Sciences, Anaheim, CA, February 19, 1991.

De Forest, P.R., "Forensic Sciences", presented at Career Days, New York Hall of Science, Flushing, NY, April 28, 1992.

Da 129

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008    Page 6

De Forest, P.R., "Forensic Science and Crime Scene Reconstruction", presented at Death Scene Investigation Seminar, Vermont State's Attorneys Conference, Vermont Technical College, Randolph, VT, June 4, 1992.

De Forest, P.R., "Crime Scene Reconstruction", presented at Training Seminar, Criminal Defense Division of Legal Aid Society, Fordham University, New York, NY, June 9, 1992.

De Forest, P.R., "Reconstruction: The Scene and the Courtroom", presented at 1992/93 Seminar Series, Effective Use of Experts in Civil Trials, Connecticut Trial Lawyers Association, Cromwell, CT, November 21, 1992.

De Forest, P.R., organized and lectured in, "Evidence Recognition and Crime Scene Reconstruction," for the Scientific Investigation Bureau, Nassau County Police Department, March 16, 23, 30, 1993.

De Forest, P.R., presented one day lecture, "Crime Scene Reconstruction," at Crime Scene Investigator's Course, conducted by The Detective Bureau, New York City Police Department, Fort Schyler, September 28, 1993.

De Forest, P.R., presented welcoming lecture, "A Historical Perspective of the Northeastern Association of Forensic Scientists," at the Twentieth Annual Meeting of Northeastern Association of Forensic Scientists, New York, NY, October 14, 1994.

De Forest, P.R., "Trajectory Reconstructions", in Crime Scene Workshop at the 21st Annual Meeting of the Northeastern Association of Forensic Scientists, Mystic, CT, October 25-28, 1995.

De Forest, P.R., lectured at the National Training Centre for Scientific Support to Investigations, Harperley Hall, Crook, England, UK, November, 1997.

De Forest, P.R., "Crime Scene Examination -- A Cognitive Approach", presented at the Third International Seminar on Advancing the Scientific Investigation of Crime, Durham, England, UK, July 11th-23rd, 1999.

De Forest, P.R., Advanced Crime Scene Reconstruction Workshop: "Glass Evidence" and "Bloodstain Pattern Evidence," Presented at the 25th Annual Meeting of NEAFS, Hyannis, MA, October 13-16, 1999.

De Forest, P.R., "Shooting Reconstructions and the Totality of the Physical Evidence", Reconstruction of Shooting Crime Scenes Workshop, presented at the 29th Annual Meeting of the Northeastern Association of Forensic Scientists, Pittsfield, MA, November 5-8, 2003.

De Forest, P.R., "Shooting Reconstructions and Trace Evidence", Reconstruction of Shooting Crime Scenes Workshop, presented at the 30th Annual Meeting of the Northeastern Association of Forensic Scientists, Mystic, CT, September 29, 2004.

De Forest, P.R., "Trace Evidence", presented in a Trace Evidence Workshop at the 104th Semi-Annual Seminar, California Association of Criminalists, Ventura, CA, October 26, 2004.

De Forest, P.R., "Shooting Reconstructions and Trace Evidence", Reconstruction of Shooting Crime Scenes Workshop, presented at the 31st Annual Meeting of the Northeastern Association of Forensic Scientists, Newport, RI, November, 2005.

De Forest, P.R., "Forensic Science (Criminalistics) is 'Rocket Science'," Keynote Address, Bay Path College, March 7, 2006

De Forest, P.R., "Police Involved Shootings -- Forensic Science Early," presented at the Mid-Year Meeting of the Forensics Committee of the IACP Tampa, FL, March 10th, 2006.

## College and University Appointments:

Coordinator for the Master of Science in Forensic Science Program, (from 1970)
Member of Doctoral Faculty, City University of New York, for Program in Criminal Justice
Member, Executive Committee for Ph.D. Program in Criminal Justice (from inception/ one interruption)
Past Member, Admissions Committee for Ph.D. Program in Criminal Justice
Past Member, Faculty Membership and Financial Aid Committees for CJ Ph.D.
Acting Graduate Dean, Spring 1989 Semester
Visiting Professor, Forensic Science Unit, Univ. Strathclyde, Glasgow, Scotland, October 7-18, 1991.
Visiting Professor, Forensic Science Unit, Univ. Strathclyde, Glasgow, Scotland, October 19-28, 1992.



Da 130

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008     Page 7

Visiting Professor, Forensic Science Unit, Univ. Strathclyde, Glasgow, Scotland, October 16-28, 1994.
Exchange Professor, National Crime Faculty, Police Staff College, Bramshill, Hampshire, England, UK, September to December, 1997.

## Publications:

### Books and Chapters

De Forest, P.R., "Foundations of Forensic Microscopy," Chapter 9 in *Forensic Science Handbook,* Saferstein, R., ed., Prentice-Hall, Englewood Cliffs, NJ, 1981, pp. 416-528.

De Forest, P.R., Gaensslen, R.E., Lee, H.C., *Forensic Science--An Introduction to Criminalistics,* McGraw-Hill, New York, 1983, 463 pages.

Lee, H.C. and De Forest, P.R., "Forensic Hair Examination," Chapter 37A in *Forensic Science,* Cyril Wecht, Ed., Matthew Bender, New York, 1984, pp. 37A-1 thru 37A-46.

De Forest, P.R., Petraco, N., and Kobilinsky, L., "Chemistry and the Challenge of Crime," Chapter 5 in *Chemistry and Crime -- from Sherlock Holmes to Today's Courtroom,* S.M. Gerber, ed., ACS Symposium Series, American Chemical Society, Washington, 1983, pp. 45-63.

De Forest, P.R., Tebbet, I.R., and Larsen, A.K., "Pyrolysis Gas Chromatography in Forensic Science," Chapter 6 in *Gas Chromatography in Forensic Science,* I Tebbett, ed., Ellis Horwood, London, 1992, pp. 165-185.

Petraco, N. and De Forest, P.R., "A Guide to the Analysis of Forensic Dust Specimens," Chapter 2 in *Forensic Science Handbook, Vol. III,* Saferstein, R., ed., Prentice-Hall, Englewood Cliffs, NJ, 1993, pp. 24-70.

Nelson, D.C. and De Forest, P.R., "Forensic Examination of Hairs for Cosmetic Treatment," Chapter 6 in *Forensic Examination of Hair,* J. Robertson, ed., Taylor and Francis, London, 1999, pp. 229-242.

De Forest, P.R., "What is Trace Evidence?," Chapter 1 in *Forensic Examination of Glass and Paint,* B. Caddy, ed., Taylor and Francis, London, 2001, pp. 1-25.

De Forest, P.R., "Crime Scene Investigation", in *Encyclopedia of Law Enforcement,* L. Sullivan, ed., Sage Publications, Thousand Oaks, CA, 2005, pp. 111-116.

### Articles in Refereed Journals

Ojena, S.M. and De Forest, P.R., "Precise Refractive Index Determinations by the Immersion Method, Using Phase Contrast Microscopy and the Mettler Hot Stage," *Journal of the Forensic Science Society, 12,* (1972), pp. 315-329.

Ojena, S.M. and De Forest, P.R., "A Study of Refractive Index Variations Within and Between Sealed-Beam Headlights Using a Precise Method," *Journal of Forensic Sciences, 17,* (1972), pp.409-425.

De Forest, P.R. and Berger, S.A., "The Forensic Chemist and Environmental Pollution," *The Criminologist, 7,* No. 26, Autumn, (1972), pp. 37-44.

De Forest, P.R., and Kirk, P.L., "Forensic Individualization of Hair," *The Criminologist, 8,* No, 27, Winter, (1973), pp. 35-45.

De Forest, P.R., "The Potential of Pyrolysis-Gas Chromatography for the Pattern Individualization of Macromolecular Materials," *Journal of Forensic Sciences, 19,* (1974), pp. 113-120.

De Forest, P.R., Morton, C.V., and Henderson, R.A., "Microscopic Morphology of Marijuana Ash," *Journal of Forensic Sciences, 19,* (1974), pp. 372-378.

Berger, S.A. and De Forest, P.R., "A Simple Self-Contained Delivery-Absorption Cell System for Microphotometric Titrations," *Mikrochimica Acta* (Wein), (1974), pp. 689-696.

Lee, H.C. and De Forest, P.R., "A Precipitin-Inhibition Test on Denatured Bloodstains for the Determination of Human Origin," *Journal of Forensic Sciences, 21,* (1976), pp. 804-810.

Peterson, J.L., and De Forest, P.R., "The Status of Forensic Science Degree Programs in the United States," *Journal of Forensic Sciences, 22,* (1977), pp. 17-33.

Da 131

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008      Page 8

Canfield, D.V. and De Forest, P.R., "The Use of the Gandolfi Camera as a Screening and Confirmation Tool in the Analysis of Explosive Residues," *Journal of Forensic Sciences*, 22, (1977), pp. 337-347.

Chao, J.M., Loscalzo, P.J., and De Forest, P.R., "Detection of Gasoline Vapor from Different Surfaces after Various Periods of Combustion and Collection Delay," *Arson Analysis Newsletter*, 1, No. 6, (1977), pp. 4-8.

Lee, H.C. and De Forest, P.R., "Identification of Blood by Anti-Human Hemoglobin Serum," *Police Science*, (Taiwan, ROC),9, No. 34, (1979), pp. 110-114.

Loscalzo, P.J., De Forest, P.R., and Chao, J.M., "A Study to Determine the Detectability of Gasoline Vapor from Simulated Arson Residues," *Journal of Forensic Sciences*, 25, (1980), pp. 162-167.

Petraco, N., De Forest,P.R., and Harris, H.A., "A New Approach to the Microscopical Examination and Comparison of Synthetic Fibers Encountered in Forensic Cases," *Journal of Forensic Sciences*, 25, 1980, pp. 571-582.

Sottolano, S.M. and De Forest, P.R., "An Improved Technique for the Preparation of Teichmann and Takayama Blood Crystals," *Microscope*, 28, 1980, pp. 41-46.

Resua, R., De Forest, P.R., and Harris, H.A., "The Evaluation and Selection of Uncorrelated Paired Solvent Systems for use in the Comparison of Textile Dyes by Thin Layer Chromatography", *Journal of Forensic Sciences*, 26, 1981, pp. 515-534.

Rothchild, R. and De Forest, P.R., "Simple Device for On-Column Cryofocusing in Capillary Column Gas Chromatography", *Journal of Chromatographic Communications*, 1, 1982, p. 321

De Forest, P.R. and Rothchild, R., "Construction of a Syringe Needle Guide and Septum Purge Adapter for GC", *Journal of Chromatographic Science*, 21, 1983, pp. 94-96.

Choudhry, M.Y., Kingston, C.R., Kobilinsky, L. and De Forest, P.R., "Individual Characteristics of Chemically Modified Human Hairs Revealed by Scanning Electron Microscopy", *Journal of Forensic Sciences*, Vol. 28, 1983, pp. 293-306.

Taylor, J.V., DiBennerdo, R., Linares, G.H., Goldman, A.D., and De Forest, P.R., "Metropolitan Forensic Anthropology Team (MFAT) Case Studies in Identification: Race and Sex Assessment by Discriminant Function Analysis of the Postcranial Skeleton, " *Journal of Forensic Sciences*, Vol. 29, 1984, pp. 1253-1259.

Pizzola, P.A., Roth, S., and De Forest, P.R., "Blood Droplet Dynamics - I.", *Journal of Forensic Sciences*, Vol. 31, 1986, pp. 36-49.

Pizzola, P.A., Roth, S., and De Forest, P.R., "Blood Droplet Dynamics - II.", *Journal of Forensic Sciences*, Vol. 31, 1986, pp. 50-64.

Zugibe, F.T., Taylor, J., Weg, N., DiBennerdo, R., Costello, J.T., and De Forest, P.R., "Metropolitan Forensic Anthropology Team (MFAT) - Case Studies in Identification: 3. Identification of John J. Sullivan, the Missing Journalist", *Journal of Forensic Sciences*, Vol. 31, 1986, pp. 221-231.

De Forest, P.R., Shankles, B., Sacher, R.L., and Petraco, N., "Meltmount 1.539 as a Mounting Medium for Hair," *The Microscope*, Vol. 35, No. 3, 1987, pp. 249-259.

De Forest, P.R., Ryan, S., and Petraco, N., "Meltmount Stick Mounting Medium," *The Microscope*, Vol. 35, No. 3, 1987, pp. 261-265.

Petraco, N., Fraas, C., Callery, F.X., and De Forest, P.R., "The Morphology and Forensic Significance of Human Hair Roots," *Journal of Forensic Sciences*, Vol. 33, No. 1, January 1988, pp. 68-76.

De Forest, P.R., Myers, C., and Rothchild, R., "Safety Hazards Posed by Ceramic-Top Hotplates," *Journal of Chemical Education*, Vol. 65, No. 8, August, 1988, pp. 722-723.

McNally, L, Shaler, R.C., Giusti, A., Baird, M., Balazs, I., De Forest, P.R., and Kobilinsky. L., "Evaluation of Deoxyribonucleic Acid (DNA) Isolated from Human Bloodstains Exposed to Ultraviolet Light, Heat, Humidity, and Soil," *Journal of Forensic Sciences*, Vol. 34, No. 5, September 1989, pp. 1059-1069.

McNally, L, Shaler, R.C., Giusti, A., Baird, M., Balazs, I., Kobilinsky. L., and De Forest, P.R., "The Effects of Environment and Substrata on Deoxyribonucleic Acid (DNA): The Use of Casework Samples from New York City," *Journal of Forensic Sciences*, Vol. 34, No. 5, September 1989, pp. 1070-1077.

Butler, D.J., De Forest, P.R., and Kobilinsky. L., "The Use of Isoelectric Focusing to Identify Rhinoceros Keratins," *Journal of Forensic Sciences*, Vol. 35, No. 2, March 1990, pp. 336-344.

Da 132

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008      Page 9

Petraco, N. and De Forest, P.R., "Trajectory Reconstructions I. -- Trace Evidence in Flight," *Journal of Forensic Sciences.*, Vol. *35*, No. 6, November 1990, pp. 1284-1296.

Bieschke, E.T.,Wallace, M.M., De Forest, P.R., Shaler, R.C., and Prinz, M., "Characterization of a Novel Dimorphism in the 5' Flanking Region of the Short Tandem Repeat Locus (STR) Locus, c-fes/fps (FES)," *Journal of Forensic Sciences*, Vol. *48*, No. 1, January 2003, pp. 80-82.

Gillis, T.D.,Kubic, T.A., and De Forest, P.R., "An Alternative Method to Screen for Pepper Spray Residue," *Journal of Forensic Sciences*, Vol. *48*, No. 1, January 2003, pp.111-115.

Swiatko, J., De Forest, P.R., and Zedeck, M., "Further Studies on Spot Test and Microcrystal Tests for the Identification of Cocaine," *Journal of Forensic Sciences*, Vol. *48*, No. 3, May 2003, pp. 581-585.

De Forest, P.R., Martir, K. and Pizzola, P., "Gunshot Residue Particle Velocity and Deceleration," *Journal of Forensic Sciences*, Vol. *49*, No. 6, November 2004, pp. 1237-1243.

Kolowski, J., Petraco, N., Wallace, M., De Forest, P.R., and Prinz, M., "A Comparison of Hair Examination Methodologies," *Journal of Forensic Sciences*, Vol. *49*, No. 6, November 2004, pp. 1253-1255.

Diaczuk, P.J. and De Forest, P.R., "Determination of Entry vs. Exit Bullet Holes in Garments Using Light Microscopy," *The Microscope*, Vol. *53*, No. 3, 2005,p.138,

### Published Abstracts, Lectures, Reviews, and Letters

Sheehan, F.X., Kingston, C.R., Petraco, N., and De Forest, P.R., "A Computerized Human Head Hair Database -- A Preliminary Report," *Proceedings of the Section on the Characterization of Human Hair, 10th Triennial Meeting of the International Association of Forensic Sciences*, Oxford, England, September 18-25, 1984.

De Forest, P.R., "Pattern Evidence", *Proceedings of the Chinese-American Police Conference*, Taipei, Taiwan, March 10-13, 1986.

De Forest, P.R., "Bloodstain Pattern Reconstruction", *Proceedings of the Chinese-American Police Conference*, Taipei, Taiwan, March 10-13, 1986.

De Forest, P.R., "Funding for Criminalistics," letter to the editor, *Chemical and Engineering News*, Oct. 13, 1986, p. 2.

De Forest, P.R. and Rothchild, R., "Fiber Analysis Using Heated Hydrogen Peroxide," letter to the editor, *Chemical and Engineering News*, August 3, 1987, p. 2.

De Forest, P.R., "Microchemical Crystal Tests," letter to the editor, *The Microscope*, Vol. *36*, No. 3 and 4, 1988, pp. 373-377.

De Forest, P.R. and Haag, L.C., "Trajectory Reconstructions at Crime Scenes Using Low-Power Lasers and Positioning Stages," *Proceedings of the International Symposium on the Forensic Aspects of Mass Disasters and Crime Scene Reconstruction -- FBI Academy, Quantico, June 1990*, USGPO, pp. 275-76.

De Forest, P.R., "Trace Evidence: A Holistic View and Approach," *Proceedings of the International Symposium on the Forensic Aspects of Trace Evidence -- FBI Academy, Quantico, June 1991*, USGPO, pp. 9-15.

De Forest, P.R., review of: Eckert, W.G. and James, S.H., *Interpretation of Bloodstain Evidence at Crime Scenes*, Elsevier, New York, 1989, *Journal of Forensic Sciences.*, Vol. *35*, No. 6, November 1990, pp. 1491-1495.

De Forest, P.R., review of: McDonald, P., *Tire Imprint Evidence*, Elsevier, New York, 1989, *Journal of Forensic Sciences.*, Vol. 37 No. 2, March 1992, pp. 663-667.

De Forest, P.R., "Certification of Criminalists", letter to the editor, *Journal of Forensic Sciences.*, Vol. *38*, No. 5, September 1993, p. 1017.

Nelson, D.C., Roberts, K.A., Pizzola, P.A., and De Forest, P.R., "Gunshot Residue Pattern Transfer Efficiency", abstract in *Proceedings of the American Academy of Forensic Sciences.*, Vol. *1*, February1995, p. 46.

Bynum, K., Roberts, K.A., Pizzola, P.A., and De Forest, P.R., "Trace Metal Detection", abstract in *Proceedings of the American Academy of Forensic Sciences.*, Vol. *1*, February1995, p. 47.

Da 133

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008    Page 10

Roberts, K.A., Martir, K., Pizzola, P.A., and De Forest, P.R., "Formation of Gunshot Residue", abstract in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 1, February1995, p. 47.

Boggiano, D., De Forest, P.R., and Sheehan, F.X., "CAD Programs: A Tool for Crime Scene Processing and Crime Scene Reconstruction", *Proceedings of the International Society for Optical Engineering (SPIE) – Forensic Evidence Analysis and Crime Scene Investigation,* Hicks, J., De Forest, P.R., and Baylor, V.M., eds., Vol 2941, November 20-21, 1996 pp. 52-55.

De Forest, P.R., "Ethics in the Practice of Criminalistics – Beyond the Proscriptive", abstract B10 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 3, February1997, p. 12.

Perlee, L.M., Shaler, R.C., and De Forest, P.R., "A View of the Broader Implications of the Introduction of DNA Technology in the Forensic Science Laboratory", abstract B22 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 3, February1997, p. 18.

Chisum, W.J., Pizzola, P.A., and De Forest, P.R., "Scientific Expertise and the Crime Scene", abstract B69 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 3, February1997, p. 37.

De Forest, P.R., "The Potential for Microscopic Physical Matches in Casework", abstract B70 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 3, February1997, p. 38.

Morton, C.V., Bynum, K., and De Forest, P.R., "Computer Animation and Crime Scene Reconstruction", , abstract B77 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 3, February1997, p. 41.

Buscaglia, J.A., Aitken, C.G.G., Brown, K., De Forest, P.R. , and Kubic, T.A., "The Discrimination of Window Glass Fragments by Energy Dispersive X-Ray Fluorescence Spectroscopy", abstract B80 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 3, February1997, p. 42.

Sargeant, M.A., De Forest, P.R., Pizzola, P.A., Meinken, T., and Krivosta, G.G., "Detection and Interpretation of Gunshot Residue on the Hands of Shooters", abstract B89 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 3, February1997, p. 47.

Pizzola, P.A. and De Forest, P.R., "A Recommended Protocol for Carrying out Gunshot Discharge Residue Testing on Garments", abstract B90 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 3, February1997, p. 47.

De Forest, P.R., "Re: 'Memories of Elliott Hensel, A Pragmatic Criminalist, ' Guest Editorial, JFI 47(4)", letter to the editor, *Journal of Forensic Identification,* Vol. 47, No. 6, 1997.

De Forest, P.R., "What is Trace Evidence – Concept, Scope, and Utilization", *Proceedings of the International Workshop on the Forensic Examination of Trace Evidence,* sponsored by the National Research Institute of Police Science, Tokyo, Japan, January 22-23, 1998, pp. 7-8.

De Forest, P.R., "Recapturing the Essence of Criminalistics", Founders Lecture, California Association of Criminalists, *Science and Justice,* Vol. 39, July-September, 1999, pp. 196-208.

De Forest, P.R., "Proactive Forensic Science", Editorial, *Science and Justice,* Vol. 38, January-March, 1998, pp. 1-2.

Fogarty, P.E., Mar, E.J., Rourke, L.C., Nelson, D.C., and De Forest, P.R., "Discrimination of Soils by Density Gradient: Single Grains vs. Aggregates", abstract B62 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 4, February1998, p. 41.

De Forest, P.R., Shem, R., Nelipa, P., and Robertson, J., "Science in Crime Scene Reconstructions", abstract B73 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 4, February1998, p. 46.

De Forest, P.R., Blake, E.T., Gibbons, M.M., and Linacre, A.M.T., "The Future of DNA Technology as a Trace Evidence Tool", abstract B101 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 4, February1998, p. 58.

De Forest, P.R., "Forensic Science Education and the Implications of the Introduction of DNA Technology into Forensic Science Laboratories", abstract B34 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 5, February1999, p. 36.

Wintonick, S.G., Antoci, P.R., and De Forest, P.R., "The Examination of Fiber Fracture Characteristics in Cotton Fibers Utilizing the Scanning Electron Microscope", abstract B58 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 5, February1999, p. 50.

Buscaglia, J., Koons, R.D., and De Forest, P.R., "Elemental Analysis of Black Polyethylene Trash Bags Using Total Reflection X-ray Fluorescence (TXRF) Spectrometry", abstract B68 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 5, February1999, p. 55.

Da 134

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008    Page 11

Duggar, A.S., De Forest, P.R., and Shaler, R.C., "Identification of Initial and Secondary Stains in Overlapping Bloodspatter Patterns", abstract B77 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 7, February2001, p. 62.

Quarino, L., Shaler, R.C., De Forest, P.R., and Kobilinsky, L., "The Measurement of Nociceptive Peptides for the Assessment of Acute and Chronic Pain in the Medicolegal Investigation of Violent Death.", abstract B100 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 7, February2001, p. 72.

De Forest, PR, "Private Consultants for the Prosecution - Are They Really Necessary?", abstract B39 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 10, February 2004, p. 42.

De Forest, PR, "It May Have Two Sides, but it is the Same Coin", abstract B73 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 10, February 2004, p.59.

De Forest, PR, "Future Crime Labs without Trace Evidence -- Dysfunctional Dystopias," abstract B118 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 10, February 2004, p.82.

Hietpas, J., Diaczuk, P., Speir, J., De Forest, PR, "Elucidating the Relative Dependence of Propellant Pattern-based Muzzle-to-Target Distance Determinations on Variables of Weapons and Ammunition," abstract B167, in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 10, February 2004, p.107.

De Forest, P.R., "The Important Role of Classical Analytical Techniques in Modern Problem Solving Approaches in Non-Routine Cases", abstract, in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 11, February 2005.

Domzalski, A. and De Forest, P.R., "The Effects of Environmental Exposure on Human Scalp Hair Root Morphology", abstract B100 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 12, February 2006, p. 88.

De Forest, P.R., "Experience with and the Rationale for a Doctoral Program in Forensic Science", abstract B155 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 12, February 2006, p.115.

De Forest, P.R. and Bernstine, E.G., "What Drives Criminalistics Examinations?", abstract B158 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 12, February 2006, p.117.

Bucht, R.E., Contreras, E., De Forest, P.R., and Pizzola, P.A., "Polarized Light Photography of Bloodstains on Dark Reflective Surfaces", abstract B171 in *Proceedings of the American Academy of Forensic Sciences.*, Vol. 12, February 2006, p.123.


## Papers and Other Presentations at Regional, National, and International Meetings:

De Forest, P.R. and Kirk, P.L., "Forensic Individualization of Hair," paper presented at the Fifth Meeting of the International Association of Forensic Sciences, Toronto, Ontario, Canada, June 6-11, 1969.

Ojena, S.M. and De Forest, P.R., "Precise Refractive Index Determinations by the Immersion Method, Using Phase Contrast Microscopy and the Mettler Hot Stage," presented at the Semiannual Seminar of the California Association of Criminalists, Burlingame, CA, October 22, 1971.

Ojena, S.M. and De Forest, P.R., "A Study of Refractive Index Variations Within and Between Sealed-Beam Headlamps Using a Precise Method," presented at the Twenty-fourth Annual Meeting of the American Academy of Forensic Sciences, Atlanta, GA, March 4, 1972.

Berger, S.A. and De Forest, P.R., "The Role of the Forensic Chemist and the Problems of Environmental Pollution," presented at Metrochem 72 - The New York and North Jersey Regional Meeting of the American Chemical Society, Fairleigh Dickenson University, Teaneck, NJ, May 13, 1972.

De Forest, P.R., Morton, C.V., and Henderson, R.A., "Microscopic Morphology of Marijuana Ash," presented at the Twenty-fifth Annual Meeting of the American Academy of Forensic Sciences, Las Vegas, NV, February 19-23, 1973.

De Forest, P.R., "The Potential of Pyrolysis-Gas Chromatography for the Pattern Individualization of Macromolecular Materials," presented at the Twenty-fifth Annual Meeting of the American Academy of Forensic Sciences, Las Vegas, NV, February 19-23, 1973.

Da 135

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008    Page 12

Lee,H.C. and De Forest, P.R., "Precipitin-Inhibition Test for the Determination of Species of Origin on Denatured Bloodstains," presented at the Twenty-eighth Annual Meeting of the American Academy of Forensic Sciences, Washington, D.C., February 17-20, 1976.

Low,I.A., De Forest, P.R., and Kingston, C.R., "Evaluation of Dispersion as a Useful Parameter for the Individualization of Headlamp Glass," presented at the Twenty-eighth Annual Meeting of the American Academy of Forensic Sciences, Washington, D.C., February 17-20, 1976.

De Forest, P.R., "Bachelor's Degree in Forensic Science," presented at the Twenty-eighth Annual Meeting of the American Academy of Forensic Sciences, Washington, D.C., February 17-20, 1976.

Canfield, D.V. and De Forest, P.R., "The Use of the Gandolfi Camera as a Screening and Confirmation Tool in the Analysis of Explosive Residues," presented at the Twenty-eighth Annual Meeting of the American Academy of Forensic Sciences, Washington, D.C., February 17-20, 1976.

Peterson, J.L., De Forest, P.R., "The Status of Forensic Science Degree Programs in the U.S.," presented at the Twenty-eighth Annual Meeting of the American Academy of Forensic Sciences, Washington, D.C., February 17-20, 1976.

De Forest, P.R., "Forensic Science - A Failure?," presented at the Twenty-ninth Conference of the Harvard Associates in Police Science, Mt. Snow, VT, June 14-17, 1976.

Chairman, Microscopy Session, Second Annual Meeting of the Northeastern Association of Forensic Scientists, New York, NY, October 23, 1976.

Lee,H.C. and De Forest, P.R., "The Use of Anti-Human Hemoglobin Serum for Bloodstain Identification," presented at the Twenty-ninth Annual Meeting of the American Academy of Forensic Sciences, San Diego, CA, February 15-19, 1977.

De Forest, P.R., Kingston, C.R., and Singer, D.L., "The Role of a Staff Criminalist in Law Enforcement Agencies without Crime Labs," presented at the Twenty-ninth Annual Meeting of the American Academy of Forensic Sciences, San Diego, CA, February 15-19, 1977.

Loscalzo, P.J., De Forest P.R., and Chao, J., "A Study to Determine the Limits of Detectability of Gasoline Vapor from Different Surfaces after Various Periods of Combustion and Collection Delay," presented at the First Joint Meeting of the Northeastern and Mid-Atlantic Associations of Forensic Scientists, Mount Laurel, NJ, April 15-16, 1977.

Sottolano, S.M., and De Forest, P.R., "An Improved Technique for the Preparation of Teichmann and Takayama Blood Crystals," presented at the First Joint Meeting of the Northeastern and Mid-Atlantic Associations of Forensic Scientists, Mount Laurel, NJ, April 15-16, 1977.

Sottolano, S.M. and De Forest, P.R., "An Improved Technique for the Preparation of Teichmann and Takayama Blood Crystals," (revised), presented at the Forty-ninth Semi-Annual Seminar of the California Association of Criminalists, Indian Wells, CA, May 12-14, 1977.

Lee, H.C., Gaensslen, R.E., and De Forest, P.R., "The Effect of Environmental Factors on Genetic Markers in Human Bloodstains," presented at Symposium on Forensic Chemistry, 1977 Annual Meeting of the American Chemical Society, Chicago, IL, August 28 - September 2, 1977.

De Forest, P.R., "The Generalist-Criminalist in an Age of Specialists," presented at the Fall Meeting of the Mid-Western Association of Forensic Scientists, Bloomington, Minnesota, October 5-8, 1977.

De Forest, P.R., "An Immunological Method for the Identification of Bloodstains," presented at the Third Annual Meeting of the Northeastern Association of Forensic Scientists, Mineola, NY, October 29, 1977.

Lee,H.C. and De Forest, P.R., "The Effect of Environmental Factors on Human Serum Proteins," presented at the Thirtieth Annual Meeting of the American Academy of Forensic Sciences, St. Louis, MO, February 20-25, 1978.

De Forest, P.R., Lee,H.C., and Crispino, V., "Considerations and Recommendations Regarding the Collection and Handling of Fresh Bloodstains," presented at the Eighth Triennial Meeting of the International Association of Forensic Sciences, Wichita, KS, May 22-26, 1978.

Lee, H.C., De Forest, P.R., and Lin, M.H., "Estimation of the Age of Bloodstains by the G/A Ratio," presented at the Eighth Triennial Meeting of the International Association of Forensic Sciences, Wichita, KS, May 22-26, 1978.

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008    Page 13

Crispino, V. and De Forest, P.R., "Comparison of Pigment Inhomogeneities in Polyethylene Film Bags as a means of Individualization," presented at the Eighth Triennial Meeting of the International Association of Forensic Sciences, Wichita, KS, May 22-26, 1978.

De Forest, P.R., "Forensic Microscopy," presented at the Meeting of the New York Microscopical Society, New York, NY, October 20, 1978.

De Forest, P.R., Lee, H.C., and Crispino, V., "The Collection and Handling of Fresh Bloodstains," presented at the Fourth Annual Meeting of the Northeastern Association of Forensic Scientists, Storrs, CT, October 28, 1978.

De Forest, P.R., "Glass Evidence," Part of a Moot Court Presentation Chaired by Jerome S. Drugonis a t the Fourth Annual Meeting of the Northeastern Association of Forensic Scientists, Storrs, CT, October 28, 1978.

Canfield, D.V., De Forest, P.R., and Lee, H.C., "Developing a Program in Forensic Science," presented at the Forensic Chemistry Symposium, Southeastern Regional Meeting of the American Chemical Society, Savannah, GA, November 9, 1978.

Lorimer, P., De Forest, P.R., Barry, J.E., and Rafla, F.K., "The Role of the Forensic Scientist in Equine Testing Programs," presented at the Thirty-first Annual Meeting of the American Academy of Forensic Sciences, Atlanta, GA, February 12-17, 1979.

Lee, H.C., Attard, A.E., and De Forest, P.R., "The Use of Dansyl Chloride in Latent Print Detection," presented at the Thirty-first Annual Meeting of the American Academy of Forensic Sciences, Atlanta, GA, February 12-17, 1979.

Petraco, N. and De Forest, P.R., "A New Microscopical Method for the Forensic Characterization of Synthetic Fibers," presented at the Thirty-first Annual Meeting of the American Academy of Forensic Sciences, Atlanta, GA, February 12-17, 1979,

De Forest, P.R., "Current Status of Education in Criminalistics," presented at the Thirty-first Annual Meeting of the American Academy of Forensic Sciences, Atlanta, GA, February 12-17, 1979.

Gaensslen, R.E., Lee, H.C., and De Forest, P.R.,"Fluorescein Derivatives in Presumptive Tests for Blood," presented at the Joint Meeting of the Mid-Atlantic Association of Forensic Scientists and the Northeastern Association of Forensic Scientists, Gettysburg, PA, April 27-28, 1979.

De Forest, P.R., "The Role of Microscopy in the Teaching of Forensic Science," presented at the New York Microscopical Society, Dialogues '79", New York, NY, June 1, 1979.

De Forest, P.R., "Reconstruction and Blood Pattern Interpretation," presented at the Thirty-second Annual Conference of the Harvard Associates in Police Science, Livingston, NJ, June 20, 1979.

Picciochi, R., Rothchild, R., and De Forest, P.R., "A Gas Chromatographic Approach to the Typing of Bloodstains," presented at the Eighteenth Eastern Analytical Symposium, New York, NY, November 2, 1979.

Lee, H.C., Gaensslen, R.E., and De Forest, P.R., "An Evaluation of Fluorescin as a Presumptive Test Reagent for Blood," presented at the Eighteenth Eastern Analytical Symposium, New York, NY, November 2, 1979.

Choudhry, M.Y., Kingston, C.R., and De Forest, P.R., "Individual Characteristics of Chemically Modified Human Hairs Revealed by SEM," presented at the 14th Mid-Atlantic Regional Meeting of the American Chemical Society, Valley Forge, PA, April 23, 1980.

Rothchild, R. and De Forest, P.R., "Gas Chromatography in Immunology," presented at the First Annual Minisymposium of the New York Chromatography Society and the Analytical Group of the New York Section of the American Chemical Society, CUNY Graduate Center, New York, NY, June 11, 1980.

De Forest, P.R., "Microscopic and Macroscopic Reconstructions in Forensic Science," presented as part of Forensic Microscopy Panel at INTER-MICRO 80, Chicago, IL, July 21-25, 1980.

Kingston, C.R., De Forest, P.R., Horan, J., and Berger, S.A., "Importance of the Academic Setting to the Success of Forensic Science Programs," presented a meeting of the Federation of Analytical Chemistry and Applied Spectroscopy, Philadelphia, PA, September 19, 1980.

De Forest, P.R. and Rothchild, R., "Approach to a Quantitative Gas Chromatographic Method for Simultaneous Determination of Several Antigens in Dried Bloodstains," presented at Metrochem 80 - The New York and New Jersey Regional Meeting of the American Chemical Society, South Fallsburg, NY, October 3, 1980.

Da 137 .

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008    Page 14

Rothchild, R., O'Connor, J., Rios, F., Fabrizio, R., and De Forest, P.R., "Tagged Antibody Determination of Antigens Using Pyrolysis-Gas Chromatography," presented at the 15th Mid-Atlantic Regional Meeting of the American Chemical Society, Washington, D.C., January, 9, 1981.

De Forest, P.R., Rothchild, R., O'Connor, J., Fabrizio,R., and Rios, F., "Simultaneous Determination of Several Antigens in Bloodstains," presented at the 33rd Annual Meeting of the American Academy of Forensic Sciences, Los Angeles, CA, February, 18, 1981.

De Forest, P.R., "Chemistry in Crime Reconstruction," presented at the 182nd National Meeting of the American Chemical Society, New York, NY, August 25, 1981.

Cadman, W.J. and De Forest, P.R., discussion leaders, "Where to From Here?" Session #7, Forensic Science Seminar, FBI Academy, Quantico, VA, March 29-31, 1982.

Chany, C., Crispino, V., and De Forest, P.R., "Improving the Resolution and Sensitivity of Dynamic Headspace Analysis of Arson Samples Using a Cryogenic Focuser and Small Bore Capillary Columns," presented at the Ninth Annual Meeting of the Northeastern Association of Forensic Scientists, Hasbrouck Heights, NJ, October 8, 1983.

De Forest, P.R., panelist, "Ethical Issues in Forensic Science," Joint Session of Criminalistics and Jurisprudence Sections, 36th Annual Meeting of the American Academy of Forensic Sciences, Anaheim, CA, February 21-25, 1984.

De Forest, P.R., "A Computerized Hair Database," presented at the annual meeting of the Committee on Forensic Hair Comparison, FBI Academy, Quantico, Virginia, May 29, -- June 1, 1984.

Sheehan, F.X., Kingston, C.R., Petraco, N., and De Forest, P.R., "A Computerized Head Hair Database -- A Preliminary Report," presented at the 10th Triennial Meeting of the International Association of Forensic Sciences, Oxford University, Oxford, England, September 18-25, 1984.

Pizzola, P.A., Roth, S.D., and De Forest, P.R., "Blood Spatter Dynamics," 10th Annual Meeting of the Northeastern Association of Forensic Scientists, Uniondale, NY, October 27, 1984.

Sheehan, F.X., Kingston, C.R., Petraco, N., and De Forest, P.R., "Computerized Hair and Fiber Databases," 10th Annual Meeting of the Northeastern Association of Forensic Scientists, Uniondale, NY, October 27, 1984.

De Forest, P.R., "The Defense Expert," part of panel discussion at the International Symposium on Forensic Hair Comparisons, FBI Academy, Quantico, Virginia, June 25-27, 1985.

Dillon, D.J. and De Forest, P.R., "America's Sherlock Holmes: Innovation and Prophesies in the Forensic Sciences", presented at the 38th Annual Meeting of the American Academy of Forensic Sciences, New Orleans, LA, February 10-15, 1986.

De Forest, P.R., "Pattern Evidence", presented at the Chinese-American Police Conference, Taipei, Taiwan, March 10-13, 1986.

De Forest, P.R., "Bloodstain Pattern Reconstruction", presented at the Chinese-American Police Conference, Taipei, Taiwan, March 10-13, 1986.

De Forest, P.R., "Dilemmas and Pitfalls for the Scientific Expert in Criminal Trials", presented at The 191st National Meeting of the American Chemical Society, New York, NY, April 13-18, 1986.

De Forest, P.R., "Crime Scene Reconstruction", presented at The New York Society of Forensic Sciences meeting, New York, NY, May 21, 1986.

De Forest, P.R., "Crime Scene Reconstruction", presented at the Annual Meeting of the Connecticut State Bar Association, Hartford, CT, May 28, 1986.

Zinnermon, W.D., Mieszerski, L., and De Forest, P.R., "Effects of Exposure on Hair Microscopy", presented at Inter/Micro 86, Chicago, IL, July 21-24, 1986.

De Forest, P.R., Shankles, B., Sacher, R.L., and Petraco, N., "Meltmounts for Hair", presented at Inter/Micro 86, Chicago, IL, July 21-24, 1986.

De Forest, P.R., "The Need for National Forensic Databases", presented at the 14th Annual Symposium on Crime Laboratory Development, FBI Academy, Quantico, VA, September 14-19, 1986.

Mieszerski, L., Zinnermon, W.D., and De Forest, P.R., "The Effects of Exposure on Hair", presented at the 25th Annual Eastern Analytical Symposium, New York, NY, October 20-24, 1986.

Jarman, M., Adamo, R.A., and De Forest, P.R., "An Examination of Some Presumptive Tests for Blood False Positives," 12th Annual Meeting of the Northeastern Association of Forensic Scientists, Peabody, MA, October 25, 1986.

De Forest, P.R. and Lee, H.C., "Forensic Science in China", Plenary Lecture, presented at the 12th Annual Meeting of the Northeastern Association of Forensic Scientists, Peabody, MA, October 25, 1986.

Pizzola, P.A., Sherwin, L., Perkins, J.C., and De Forest, P.R., "Bloodstain Pattern Interpretations -- Secondary Spatter," presented at the 11th Triennial Meeting of the International Association of Forensic Sciences, Vancouver, BC, Canada, August 2-7, 1987.

Petraco, N., Fraas, C., Callery, F.X., and De Forest, P.R., "The Morpholgy and Forensic Significance of Human Hair Roots," presented at the 11th Triennial Meeting of the International Association of Forensic Sciences, Vancouver, BC, Canada, August 2-7, 1987.

De Forest, P.R., Petraco, N. and Adamo, R.A., "Significance of Environmental Exposure in the Interpretation of Hair Evidence," presented at the 11th Triennial Meeting of the International Association of Forensic Sciences, Vancouver, BC, Canada, August 2-7, 1987.

Bombardi, P., Butler, D.J., Hira, B., Adamo, R.A., and De Forest, P.R., "Studies of Hair Deterioration -- Exterior Environments," presented at the 11th Triennial Meeting of the International Association of Forensic Sciences, Vancouver, BC, Canada, August 2-7, 1987.

Chille, E.A., Gordon, R.E., Adamo, R.A., and De Forest, P.R., "Studies of Hair Deterioration -- Interior Environments," presented at the 11th Triennial Meeting of the International Association of Forensic Sciences, Vancouver, BC, Canada, August 2-7, 1987.

Callery, F.X., Petraco, N., Fraas, and De Forest, P.R., "The Morphology and Forensic Significance of Human Hair Roots," presented at the 13th Annual Meeting of the Northeastern Association of Forensic Scientists, Princeton, NJ, October 24, 1987.

Chany, C. and De Forest, P.R., "Micro-FTIR Spectroscopic Examination of Fibers from Used and Laundered Garments," presented at the 13th Annual Meeting of the Northeastern Association of Forensic Scientists, Princeton, NJ, October 24, 1987.

Moore, P.A., Saferstein, R., and De Forest, P.R., "Discrimination of Polyester Fibers by Pyrolysis Gas Chromatography," presented at the 40th Annual Meeting of the American Academy of Forensic Sciences, Philadelphia, PA, February 15-20, 1988.

Chany, C. and De Forest, P.R., "Micro FTIR Spectroscopic Examination of Fibers From Used and Laundered Garments," presented at the 40th Annual Meeting of the American Academy of Forensic Sciences, Philadelphia, PA, February 15-20, 1988.

Chille, E.A., Gordon, R.E., and De Forest, P.R., "Insect Damage to Hairs and Its Evidential Significance," presented at the 40th Annual Meeting of the American Academy of Forensic Sciences, Philadelphia, PA, February 15-20, 1988.

Sherwin, L.K., Pizzola, P.A., Perkins, J.C., and De Forest, P.R., "A Critical Assessment of the Phenomenon of Secondary Bloodspatter," presented at the 40th Annual Meeting of the American Academy of Forensic Sciences, Philadelphia, PA, February 15-20, 1988.

Pizzola, P.A., Sherwin, L.K., Perkins, J.C., and De Forest, P.R., "A Critical Assessment of the Phenomenon of Gunshot Backspatter," presented at the 40th Annual Meeting of the American Academy of Forensic Sciences, Philadelphia, PA, February 15-20, 1988.

Buscaglia, J., Kubic, T.A., and De Forest, P.R., "Variation of the Refractive Indices Between and Across Window Panes, as Measured with an Automated Hotstage," presented at the 40th Annual Meeting of the American Academy of Forensic Sciences, Philadelphia, PA, February 15-20, 1988.

De Forest, P.R., Pizzola, P.A., and Locke, D.C., "Pyrolysis-Supercritical Fluid Chromatography as a Polymer Characterization Tool," 27th Eastern Analytical Symposium, New York, NY, October 2-7, 1988.

Kodet-Sherwin, L., Pizzola, P.A., Perkins, J.C., and De Forest, P.R., "Bloodstain Pattern Interpretation: Secondary Spatter," presented at the Fourteenth Annual Meeting of the Northeastern Association of Forensic Scientists, Mystic, CT, October 22, 1988.

Pizzola, P.A., Locke, D.C., De Forest, P.R., Ristenbatt, R.R., and Buscaglia, J.A., "Pyrolysis Supercritical Fluid Chromatographic Characterization of Polymers of Forensic Interest,"

presented at the Fourteenth Annual Meeting of the Northeastern Association of Forensic Scientists, Mystic, CT, October 22, 1988.

Butler, D., De Forest, P.R., Adamo, R., and Kobilinsky, L., " Isoelectric Focusing of Keratins Derived from Different Species," presented at the Fourteenth Annual Meeting of the Northeastern Association of Forensic Scientists, Mystic, CT, October 22, 1988.

Wihlborg, W. T., Reffner, J.A., and De Forest, P.R., Fourier Transform Infrared Micro-spectrophotometry and Soil Comparisons, presented at the 41st Annual Meeting of the American Academy of Forensic Sciences, Las Vegas, NV, February 13-18, 1989.

Butler, D.J., De Forest, P.R., and Kobilinsky, L., "Identification of Rhinoceros Keratins by Isoelectric Focusing," presented at the 41st Annual Meeting of the American Academy of Forensic Sciences, Las Vegas, NV, February 13-18, 1989.

De Forest, P.R., "Physical Evidence and the Crime Scene," Presented to the Criminal Justice Section of the Westchester County Bar Association, May 9, 1989.

Ristenbatt, R., Pizzola, P.A., Locke, D.C., and De Forest, P.R., "Characterization of Polymeric Trace Evidence -- Pyrolysis Supercritical Fluid Chromatography," presented at the Gordon Research Conference on Analytical Pyrolysis, New Hampton, NH, June 19-23, 1989.

De Forest, P.R., "The 'Preppie Murder': Science and the Scene Investigation," 28th Eastern Analytical Symposium, New York, NY, September 24-29, 1989.

Panelist, Plenary Session: "The Preppie Murder Trial," Fifteenth Annual Meeting of the Northeastern Association of Forensic Scientists, Albany, NY, October 21, 1989.

De Forest, P.R., "Chemical Instrumentation in Forensic Investigations," presented for Instrumentation Section of the New York Academy of Sciences, New York, NY, December 14, 1989.

De Forest, P.R., "Analytical Instrumentation in Forensic Investigations," Analytical Topical Group, New York Section, American Chemical Society, New York, NY, January 11, 1990.

Panelist, "Serial Murder," Mystery Writers of America, New York, April 28, 1990.

Roberts, K.A., Ristenbatt, R.R., Pizzola, P.A., Locke, D.C., and De Forest, P.R., "Pyrolysis-Supercritical Fluid Chromatography in the Analysis of Polymers of Forensic Interest," presented at the 9th International Conference on Fundamental Aspects, Analytical Techniques, Processes, and Applications of Pyrolysis (Pyrolysis 90), Noordwijkerhout, The Netherlands, June 11-15, 1990.

De Forest, P.R. and Haag, L.C., Trajectory Reconstructions at Crime Scenes Using Low Power Lasers and Positioning Stages, paper presented at the International Symposium on Forensic Aspects of Mass Disasters and Crime Scene Reconstruction, FBI Academy, Quantico, VA, June 23-29, 1990.

De Forest, P.R., "Forensic Science and Crime Scene Reconstruction," presented at the National Association of Criminal Defense Lawyers (NACDL) 1990 Annual Meeting, Toronto, Ontario, August 16, 1990.

Roberts, K.A., Xu, Y., and De Forest, P.R., "SFC and Pyrolysis-SFC in Forensic Science," paper presented at the 12th Triennial Meeting of the International Association of Forensic Sciences (IAFS), Adelaide, Australia, October 24-29, 1990.

Sheehan, F.X., Haag, L.C., Petraco, N., and De Forest, P.R., "Trajectory Reconstructions Utilizing Laser Techniques," paper presented at the 12th Triennial Meeting of the International Association of Forensic Sciences (IAFS), Adelaide, Australia, October 24-29, 1990.

Chairman, Hair and Fibres Session at the 12th Triennial Meeting of the International Association of Forensic Sciences (IAFS), Adelaide, Australia, October 27, 1990.

De Forest, P.R., "Trace Evidence -- A Holistic View and Approach", plenary lecture at the International Symposium on the Forensic Aspects of Trace Evidence, FBI Academy, Quantico, VA, June 24-28, 1991.

De Forest, P.R., "Forensic Evidence," at Third Annual Super Saturday of the Association of Criminal Defense Lawyers of New Jersey, East Brunswick, New Jersey, November 2, 1991.

De Forest, P.R., "Crime Scene Reconstruction," Presented to the Criminal Justice Section of the Westchester County Bar Association, February 11, 1992.

Ristenbatt, R.R., Cusumano, C.L., Gagliano, A., Gestring, B.J., and De Forest, P.R., "The Implications of Pattern Impressions in Bullets", presented at the 44th Annual Meeting of the American Academy of Forensic Sciences, New Orleans, LA, February 17-22, 1992.

Da 140

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008    Page 17

Roberts, K.A., Ristenbatt, R.R., Pizzola, P.A., and De Forest, P.R., "Supercritical Fluid Technology for the Characterization of Trace Evidence", presented at the 44th Annual Meeting of the American Academy of Forensic Sciences, New Orleans, LA, February 17-22, 1992.

Neighbor, G.W., Haag, L.C., and De Forest, P.R., "A Study of Fiber Damage Characteristic of Bullet Holes", presented at the 44th Annual Meeting of the American Academy of Forensic Sciences, New Orleans, LA, February 17-22, 1992.

Nelson, D.C., Kingston, C.R., Sheehan, F.X., and De Forest, P.R., "An Experimental Assessment of Coincidental Hair Matches", presented at the 44th Annual Meeting of the American Academy of Forensic Sciences, New Orleans, LA, February 17-22, 1992.

Panelist, "Futuristics," Mystery Writers of America, New York, April 29, 1992.

De Forest, P.R., "The Crime Scene and the Forensic Scientist", presented at the Victoria Police State Forensic Science Laboratory, Macleod, Victoria, August 14, 1992.

De Forest, P.R., "Bullet Impact and Rapid Shear Fractures of Synthetic Fibers", presented at the 11th Australian and New Zealand International Symposium on the Forensic Sciences, Hobart, Tasmania, August 17-21, 1992.

De Forest, P.R., "Scalp Hair and Muzzle to Target Determinations", presented at the 11th Australian and New Zealand International Symposium on the Forensic Sciences, Hobart, Tasmania, August 17-21, 1992.

Panelist, "Scene Examination Seminar", at the 11th Australian and New Zealand International Symposium on the Forensic Sciences, Hobart, Tasmania, August 17-21, 1992.

De Forest, P.R., "The Forensic Scientist and the Crime Scene", presented at the 11th Australian and New Zealand International Symposium on the Forensic Sciences, Hobart, Tasmania, August 17-21, 1992.

De Forest, P.R., "Certification of Criminalists in the United States", presented at the 11th Australian and New Zealand International Symposium on the Forensic Sciences, Hobart, Tasmania, August 17-21, 1992.

De Forest, P.R., "Regulation of Forensic Science Laboratories and Certification of Forensic Scientists", presented at Queensland Branch of the Australian and New Zealand Forensic Science Society, Brisbane, Queensland, August 24, 1992.

De Forest, P.R., "Trace Evidence", presented at the Queensland Police Service Laboratory, Brisbane, Queensland, August 24, 1992.

De Forest, P.R., "The Crime Scene and the Role of the Forensic Scientist", presented at the Queensland Police Service Laboratory, Brisbane, Queensland, August 24, 1992.

Nelson, D.C., Roberts, K.A., and De Forest, P.R., "The Effectiveness of Scalp Hair in Filtering Gunshot Residue", presented at the 45th Annual Meeting of the American Academy of Forensic Sciences, Boston, MA, February 15-20, 1993.

Roberts, K.A., Nelson, D.C., and De Forest, P.R., "Bubbles and the Formation of Fine Blood Droplet Stains", presented at the 45th Annual Meeting of the American Academy of Forensic Sciences, Boston, MA, February 15-20, 1993.

Ristenbatt, R.R., Shaler, R.C., and De Forest, P.R., "Accuracy of Angle of Incidence Determinations on Different Size Blood Droplet Stains", presented at the 45th Annual Meeting of the American Academy of Forensic Sciences, Boston, MA, February 15-20, 1993.

Kodett-Sherwin, L., De Forest, P.R., and Pizzola, P.A., "Blood Droplet Dynamics", presented at the 45th Annual Meeting of the American Academy of Forensic Sciences, Boston, MA, February 15-20, 1993.

De Forest, P.R., "The Role of the Forensic Scientist in Criminal Investigations with Emphasis on Reconstructions and Trace Evidence," National Meeting of Forensic Chemists, sponsored by National Research Institute of Police Science, Tokyo, Japan, October 19-20, 1993.

Co-chair, Drug Profiling Session at the International Symposium of Forensic Science, Tokyo 1993 -- International Workshop on Impurity Profiling Analysis of Illicit Drugs, Tokyo, Japan, October 21-22, 1993.

De Forest, P.R., "Certification of Forensic Science Laboratory Personnel in the United States", The First Forensic Experts Conference, Dubai, United Arab Emirates, January 8-10, 1994.

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008    Page 18

De Forest, P.R., "Interfacing DNA Technology with Other Approaches to the Scientific Analysis of Physical Evidence", The First Forensic Experts Conference, Dubai, United Arab Emirates, January 8-10, 1994.

Ristenbatt, R.R., Shaler, R.C., and De Forest, P.R., "An Elusive Cause of Death", presented at the 46th Annual Meeting of the American Academy of Forensic Sciences, San Antonio, TX, February 14-19, 1994.

Roberts, K.A., Nelson, D.C., Rourke, L.C., Pizzola, P.A., Martir, K., and De Forest, P.R., "The 'Paraffin Test' Revisited", presented at the 46th Annual Meeting of the American Academy of Forensic Sciences, San Antonio, TX, February 14-19, 1994.

Pizzola, P.A., Martir, K., Kodet-Sherwin, L., and De Forest, P.R., "Visualization of Gunshot Residue Patterns on Cloth by Photoluminescence", presented at the 46th Annual Meeting of the American Academy of Forensic Sciences, San Antonio, TX, February 14-19, 1994.

Gestring, B.J., Ristenbatt, Pizzola, P.A., and De Forest, P.R., "The Impact of the Stability and Retention of Nitrites in Gunshot Residue Pattern Interpretation", presented at the 46th Annual Meeting of the American Academy of Forensic Sciences, San Antonio, TX, February 14-19, 1994.

Roberts, K.A., Pizzola, P.A., Martir, K., DiMaio, V.J.M., and De Forest, P.R., "Factors Influencing Propellant Stippling Patterns in Shootings", presented at the 46th Annual Meeting of the American Academy of Forensic Sciences, San Antonio, TX, February 14-19, 1994.

De Forest, P.R., Dujanovich, M., Adamo, R.A., and Drummond, F., "The Importance of Tempered Glass Fracture Documentation in Shooting Reconstructions", presented at the 46th Annual Meeting of the American Academy of Forensic Sciences, San Antonio, TX, February 14-19, 1994.

Roberts, K.A., Martir, K., Pizzola, P.A., and De Forest, P.R., "Formation of Gunshot Residue", presented at the 47th Annual Meeting of the American Academy of Forensic Sciences, Seattle, WA, February 13-18, 1995.

Nelson, D.C., Roberts, K.A., Pizzola, P.A., and De Forest, P.R., "Gunshot Residue Pattern Transfer Efficiency", presented at the 47th Annual Meeting of the American Academy of Forensic Sciences, Seattle, WA, February 13-18, 1995.

Bynum, K.C., Roberts, K.A., Pizzola, P.A., and De Forest, P.R., "Trace Metal Detection", presented at the 47th Annual Meeting of the American Academy of Forensic Sciences, Seattle, WA, February 13-18, 1995.

De Forest, P.R., "Chemistry and the Crime Scene", presented at the Meeting of the Analytical Topical Group, New York Chapter, American Chemical Society, New York, NY, June 8, 1995.

De Forest, P.R., "Forensic Scientists at Fire Scenes", presented at An International Symposium on the Forensic Aspects of Arson Investigation, Hosted by the FBI Laboratory Division, George Mason University, Fairfax, VA, July 31 - August 4, 1995.

De Forest, P.R., "Integrated Approaches to Forensic Investigations", presented at the 210th Annual Meeting of the American Chemical Society, Chicago, IL, August 21-25, 1995.

Roberts, K.A., De Forest, P.R., Bynum, K.C., and Pizzola, P.A., "Trace Metal Detection Technique", presented at the 210th Annual Meeting of the American Chemical Society, Chicago, IL, August 21-25, 1995.

Nelson, D.C., De Forest, P.R., Roberts, K.A., and Pizzola, P.A., "Formation and Detection of Gunshot Residue", presented at the 210th Annual Meeting of the American Chemical Society, Chicago, IL, August 21-25, 1995.

Bynum, K. C., De Forest, P.R., Martir, K., and Pizzola, P.A., "Thin Layer Chromatographic Separation of Components of Propellant Particles Utilizing Fluorescent and Chemical Visualization Techniques", presented at the 21st Annual Meeting of the Northeastern Association of Forensic Scientists, Mystic, CT, October 25-28, 1995.

Bynum, K. C., De Forest, P.R., Roberts, K.A., and Pizzola, P.A., "Trace Metal Detection", presented at the 21st Annual Meeting of the Northeastern Association of Forensic Scientists, Mystic, CT, October 25-28, 1995.

Sargeant, M., De Forest, P.R., Bynum, K.C., Nelson, D.C., Roberts, K.A., Kasbarian, B., Rourke,L., and Pizzola, P.A., "Photoluminescent Detection of Propellant Particles", presented at the 21st

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008    Page 19

Annual Meeting of the Northeastern Association of Forensic Scientists, Mystic, CT, October 25-28, 1995.

Martir, K., De Forest, P.R., and Pizzola, P.A., "Gunshot Residue Dynamics", presented at the 21st Annual Meeting of the Northeastern Association of Forensic Scientists, Mystic, CT, October 25-28, 1995.

Rourke, L., Sargeant, M., De Forest, P.R., Bynum, K.C., Nelson, D.C., Roberts, K.A., Kasbarian, B., and Pizzola, P.A., "Sequential Photoluminescent Detection of Gunshot Residue", presented at the 21st Annual Meeting of the Northeastern Association of Forensic Scientists, Mystic, CT, October 25-28, 1995.

Roberts, K.A., Nelson, D.C., De Forest, P.R., Sargeant, M., and Pizzola, P.A., "Transfer Efficiency of 'Walker' Type Gunshot Residue Examinations", presented at the 21st Annual Meeting of the Northeastern Association of Forensic Scientists, Mystic, CT, October 25-28, 1995.

De Forest, P.R., "The Scientific Method at the Crime Scene", presented at the 21st Annual Meeting of the Northeastern Association of Forensic Scientists, Mystic, CT, October 25-28, 1995.

De Forest, P.R., "Optimization of the Integration of Science with Criminal Investigation" Plenary Lecture at the Joint Inaugural Session of The International Workshop on Forensic DNA Typing of Evidence Samples and the First Meeting of the Japanese Association of Science and Technology for Identification, Tokyo, Japan, December 12-13, 1995.

De Forest, P.R., "Science at the Crime Scene and Trace Evidence", *Trace Evidence at Crime Scenes*, The Second Forensic Experts Conference, Dubai, United Arab Emirates, January 6-8, 1996.

Alkhayat, A.Q. and De Forest, P.R., "Characterization of Gunshot Discharge Residue by FT-IR Microscopy", *Trace Evidence at Crime Scenes,*, The Second Forensic Experts Conference, Dubai, United Arab Emirates, January 6-8, 1996.

De Forest, P.R., panelist in the Joint Session of Criminalistics and Jurisprudence Sections, 48th Annual Meeting of the American Academy of Forensic Sciences, Nashville, TN, February 13-18, 1996.

De Forest, P.R., presented lectures on forensic science at the Cardozo Law School, New York, NY, March 13, 1996.

De Forest, P.R., "Forensic Microscopy in the Age of DNA Technology", New York Microscopical Society, New York, NY, May 23, 1996.

De Forest, P.R., "Trace Evidence -- The Future", closing keynote address presented at An International Symposium on the Forensic Aspects of Trace Evidence in Transition, Hosted by the FBI Laboratory Division, San Antonio, TX, June 21 - 25, 1996.

De Forest, P.R., "Trace Evidence in the Era of Ascendant DNA Technology", presented at Intermicro 96, Chicago, IL, July 20 - 25, 1996.

De Forest, P.R., "Bloodstain Patterns in Reconstructions", presented at the Tenth Annual Meeting of the New Jersey Division of the International Association for Identification, Cape May, NJ, October 20-23, 1996.

De Forest, P.R., "Communication Between Investigators and Scientists", presented at the Tenth Annual Meeting of the New Jersey Division of the International Association for Identification, Cape May, NJ, October 20-23, 1996.

De Forest, P.R., "Scene Reconstructions in Police Involved Shootings", presented at the Tenth Annual Meeting of the New Jersey Division of the International Association for Identification, Cape May, NJ, October 20-23, 1996.

Boggiano, D., De Forest, P.R., and Sheehan, F.X., "CAD Programs: A Tool for Crime Scene Processing and Crime Scene Reconstruction", presented at Forensic Evidence Analysis and Crime Scene Investigation, sponsored by the International Society for Optical Engineering (SPIE), Boston, MA, November 20-21, 1996.

De Forest, P.R., Moderator, Criminalistics Symposium, "Ethics in the Practice of Criminalistics — Beyond the Proscriptive", 49th Annual Meeting of the American Academy of Forensic Sciences, New York, NY, February 17-22, 1997.

Perlee, L.M., Shaler, R.C., and De Forest, P.R., "A View of the Broader Implications of the Introduction of DNA Technology in the Forensic Science Laboratory", presented at the 49th Annual Meeting of the American Academy of Forensic Sciences, New York, NY, February 17-22, 1997.

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008    Page 20

Chisum, W.J., Pizzola, P.A., and De Forest, P.R., "Scientific Expertise and the Crime Scene", presented at the 49th Annual Meeting of the American Academy of Forensic Sciences, New York, NY, February 17-22, 1997.

De Forest, P.R., "The Potential For Microscopic Physical Matches In Casework", presented at the 49th Annual Meeting of the American Academy of Forensic Sciences, New York, NY, February 17-22, 1997.

Bynum, K., Morton, C.V., and De Forest, P.R., "Computer Animation and Crime Scene Reconstruction", presented at the 49th Annual Meeting of the American Academy of Forensic Sciences, New York, NY, February 17-22, 1997.

Buscaglia, J.A., Aitken, C.G.G., Brown, K., De Forest, P.R. , and Kubic, T.A., "The Discrimination of Window Glass Fragments by Energy Dispersive X-Ray Fluorescence Spectroscopy", presented at the 49th Annual Meeting of the American Academy of Forensic Sciences, New York, NY, February 17-22, 1997.

Sargeant, M.A., De Forest, P.R., Pizzola, P.A., Meinken, T., and Krivosta, G.G., "Detection and Interpretation of Gunshot Residue on the Hands of Shooters", presented at the 49th Annual Meeting of the American Academy of Forensic Sciences, New York, NY, February 17-22, 1997.

Pizzola, P.A. and De Forest, P.R., "A Recommended Protocol for Carrying out Gunshot Discharge Residue Testing on Garments", presented at the 49th Annual Meeting of the American Academy of Forensic Sciences, New York, NY, February 17-22, 1997.

De Forest, P.R., presented lectures on forensic science at the Cardozo Law School, New York, NY, March 31, 1997.

De Forest, P.R., "Scientific Reconstruction in Police Involved Shootings", 82nd Annual Educational Conference of the International Association of Identification, Danvers MA, July 28-August 1, 1997.

De Forest, P.R., presented *Founder's Lecture*, "Recapturing the Essence of Criminalistics", 90th Semi-Annual Seminar of the California Association of Criminalists, Irvine, CA, October 8-11. 1997.

De Forest, P.R., panelist, "Is Something Wrong? Judge for Yourself – An Interactive Panel Discussion on the O.J. Simpson Case", B.A.J. Fisher, moderator, 90th Semi-Annual Seminar of the California Association of Criminalists, Irvine, CA, October 8-11. 1997.

De Forest, P.R., "What is Trace Evidence – Concept, Scope, and Utilization", International Workshop on the Forensic Examination of Trace Evidence, sponsored by the National Research Institute of Police Science, Tokyo, Japan, January 22-23, 1998.

Fogarty, P.E., Mar, E.J., Rourke, L.C., Nelson, D.C., and De Forest, P.R., "Discrimination of Soils by Density Gradient: Single Grains vs. Aggregates", presented at the 50th Annual Meeting of the American Academy of Forensic Sciences, San Francisco, CA, February 9-14, 1998.

De Forest, P.R., Shem, R., Nelipa, P., and Robertson, J., "Science in Crime Scene Reconstructions", presented at the 50th Annual Meeting of the American Academy of Forensic Sciences, San Francisco, CA, February 9-14, 1998.

De Forest, P.R., Blake, E.T., Gibbons, M.M., and Linacre, A.M.T., "The Future of DNA Technology as a Trace Evidence Tool", presented at the 50th Annual Meeting of the American Academy of Forensic Sciences, San Francisco, CA, February 9-14, 1998.

De Forest, P.R., "Crime Scene Reconstruction and Trace Evidence," presented at the National Association of Criminal Defense Lawyers (NACDL) 1998 Spring Meeting, Santa Monica, CA, April 22-25, 1998.

De Forest, P.R., "Lessons from the Sheppard and O.J. Simpson Cases", presented at the Annual Meeting of the California Division of the International Association for Identification, Rohnert Park, CA, May 4-8, 1998.

De Forest, P.R., "Teamwork and Lessons from the Dr. Sam Sheppard and the O.J. Simpson Cases", presented at the 83rd International Educational Conference of the International Association for Identification, Little Rock , AR, July 24, 1998

De Forest, P.R., "Criminalistics: The Unrealized Potential", Presented at the 24th Annual Meeting of NEAFS, Newport, RI, November 5-7, 1998.

De Forest, P.R., "Scientist and Investigator Teamwork at the Crime Scene", presented at the 19th National Conference of Scientific Support, Lancashire, UK, November 12th and 13th, 1998.

Da 144

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008     Page 21

Wintonick, S. Antoci, P., and De Forest, P.R., "Fracture of Cotton Fibers", presented at the 51st Annual Meeting of the American Academy of Forensic Sciences, Orlando, FL, February 15-20, 1999.

De Forest, P.R., "Forensic Science Education and the Implications of the Introduction of DNA Technology into Forensic Science Laboratories", presented at the 51st Annual Meeting of the American Academy of Forensic Sciences, Orlando, FL, February 15-20, 1999.

De Forest, P.R., panelist, "Forensic Science Education", presented at the 51st Annual Meeting of the American Academy of Forensic Sciences, Orlando, FL, February 15-20, 1999.

Buscaglia, J., Koons, R.D., and De Forest, P.R., "Elemental Analysis of Black Polyethylene Trash Bags Using Total Reflection X-ray Fluorescence (TXRF) Spectrometry", presented at the 51st Annual Meeting of the American Academy of Forensic Sciences, Orlando, FL, February 15-20, 1999.

De Forest, P.R., "Educating the Expert Forensic Scientist", presented at An International Symposium on Setting Quality Standards for the Forensic Science Community, Hosted by the FBI Laboratory Division, San Antonio, TX, May 3-7, 1999.

De Forest, P.R., "Science and Questioned Document Examination", presented at the 2nd International Symposium on the Forensic Examination of Questioned Documents, Hosted by the FBI Laboratory Division, Albany, NY, June 14-18, 1999.

De Forest, P. R. "Essential Attributes and the Making of a Good Criminalist", presented at the 15th Triennial Meeting of the International Association of Forensic Sciences, Los Angeles, CA, August 22 - 28, 1999.

De Forest, P.R., "Reflections on a Quarter Century of NEAFS and Criminalistics in the Northeast", Presented at the 25th Annual Meeting of NEAFS, Hyannis, MA, October 13-16, 1999.

De Forest, P.R., "Has DNA Made a Forensic Science Degree Irrelevant in Today's World", Presented a t the 25th Annual Meeting of NEAFS, Hyannis, MA, October 13-16, 1999.

De Forest, P.R., "Forensic Science at the Crossroads", Presented at the International Conference on Forensic Science – From the Crime Scene to the Courtroom, Dublin, Ireland, May 2-5, 2000.

De Forest, P.R., "Keeping the Science in Forensic Science – Drawing from the Past While Adapting to the Future", Presented at the 26th Annual Meeting of NEAFS, Saratoga Springs, NY, October 11-14, 2000.

De Forest, P.R., "Interpretation and Reconstruction – The Culmination of the Scientific Work on a Case", National Research Institute of Police Science, Tokyo, Japan, December 7, 2000.

Duggar, A.S., De Forest, P.R., and Shaler, R.C., "Identification of Initial and Secondary Stains in Overlapping Bloodspatter Patterns", presented at the 53rd Annual Meeting of the American Academy of Forensic Sciences, Seattle, WA, February 19-24, 2001.

Quarino, L., Shaler, R.C., De Forest, P.R., and Kobilinsky, L., "The Measurement of Nociceptive Peptides for the Assessment of Acute and Chronic Pain in the Medicolegal Investigation of Violent Death." presented at the 53rd Annual Meeting of the American Academy of Forensic Sciences, Seattle, WA, February 19-24, 2001.

Diaczuk, P.J. and De Forest, P.R., "Evidence Falling Through the Cracks", Presented at the 27th Annual Meeting of NEAFS, Mt. Snow, VT, October 3-6, 2001.

De Forest, P.R., "The Perils of Item Focus. Myopia in Forensic Investigations, Presented at the Third National Conference on Science and the Law – Emerging Trends: Scientific Evidence in the Courtroom, sponsored by the National Institute of Justice, Miami, FL, October 4-6, 2001.

De Forest, P.R., "Lessons to be Learned from Incidents Where the Evidence was Apparently not the Initial Focus of the Investigation," presented at The Sixth International Conference in Clinical Forensic Medicine of the World Police Medical Officers, Sydney, Australia, March 17 - 22, 2002

De Forest, P.R., "Education in Forensic Science," The Sixth International Conference in Clinical Forensic Medicine of the World Police Medical Officers, Sydney, Australia, March 17 - 22, 2002

De Forest, P.R., "Approaches to Complex Cases in Forensic Science," The University of Western Australia, Perth, March 24, 2002

De Forest, P.R., "The Forensic Scientist and Complex Case Solutions," The University of Western Australia, Perth, March 25, 2002

Da 145

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008     Page 22

De Forest, P.R., "High Profile Cases and Public Perceptions of Forensic Science," The University of Technology, Sydney, Sydney, Australia, March 27, 2002

De Forest, P.R., "Front End Assessment in Complex Cases," The University of Technology, Sydney, Sydney, Australia, March 27, 2002

De Forest, P.R., "Voodoo Science by Default", Presented at the Fourth National Conference on Science and the Law – Emerging Trends: Scientific Evidence in the Courtroom, sponsored by the National Institute of Justice, Miami, FL, October 3-5, 2002.

De Forest, PR, "Dr. McCrone's Life of Science - Its Significance and Impact in Criminalistics from an Academic Perspective" Presented at the 55th Annual Meeting of the American Academy of Forensic Sciences, Chicago, IL, February 17 –22, 2003

Diaczuk, P., De Forest, PR, "The Soap Box Bullet Recovery System-Or the Soap Solution", Presented at the 55th Annual Meeting of the American Academy of Forensic Sciences, Chicago, IL, February 17 –22, 2003

De Forest, PR, and Lentini, JJ, "Reducing the Prevalence of Pseudoscientific Interpretations in Complex Physical Evidence Casework" Presented at the 55th Annual Meeting of the American Academy of Forensic Sciences, Chicago, IL, February 17 –22, 2003

De Forest, P.R., "Scientific Assessment of the Totality of the Physical Evidence", Keynote Address presented at the 32nd Annual Meeting of the Midwestern Association of Forensic Scientists, Columbus, OH, October 20-24, 2003.

Hietpas, J., Diaczuk, P., Speir, J., De Forest, PR, "Elucidating the Relative Dependence of Propellant Pattern-based Muzzle-to-Target Distance Determinations on Variables of Weapons and Ammunition," Presented at the 56th Annual Meeting of the American Academy of Forensic Sciences, Dallas, TX, February 16 –21, 2004.

De Forest, PR, "Future Crime Labs without Trace Evidence -- Dysfunctional Dystopias," Presented at the 56th Annual Meeting of the American Academy of Forensic Sciences, Dallas, TX, February 16 –21, 2004

De Forest, PR, "Private Consultants for the Prosecution - Are They Really Necessary?", Presented at the 56th Annual Meeting of the American Academy of Forensic Sciences, Dallas, TX, February 16 –21, 2004

De Forest, PR, "It May Have Two Sides, but it is the Same Coin", Presented at the 56th Annual Meeting of the American Academy of Forensic Sciences, Dallas, TX, February 16 –21, 2004

De Forest, P.R., "The Essential Role of Crystal Tests and Microchemical Approaches in Forensic Science Curricula", presented at Intermicro 2004, Chicago, IL, July 12-15, 2004

De Forest, P.R., "Forensic Science Begins at the Scene," Keynote lecture presented at the Integrated Evidence Management Conference, Dublin, Ireland, October 5-8, 2004

De Forest, P.R., "The Unfortunate (Though Imaginary) Generalist/Specialist Dichotomy and the Challenges of Modern Criminalistics", presented at the 104th Semi-Annual Seminar, California Association of Criminalists, Ventura, CA, October 25-29, 2004.

De Forest, P.R., "Lessons from the Early History of the Ventura County Sheriff's Crime Lab and Criminalistics in California" presented at the 104th Semi-Annual Seminar, California Association of Criminalists, Ventura, CA, October 25-29, 2004.

De Forest, P.R., "Physical Evidence - Who Should Define the Questions to be Addressed?", presented at the meeting of the American Society of Crime Laboratory Directors (ASCLD), San Diego, CA, November 10, 2004.

De Forest, P.R., "The Important Role of Classical Analytical Techniques in Modern Problem Solving Approaches in Non-Routine Cases", presented at the 57th Annual Meeting of the American Academy of Forensic Sciences, New Orleans, LA, February 21-26, 2005.

De Forest, P.R., "Forensic Science Education Program Accreditation Commission: Accreditation Standards", keynote lecture presented at the 37th Middle Atlantic Regional Meeting of the American Chemical Society, Busch Campus, Rutgers Univ., Piscataway, NJ, May 25, 2005.

Diaczuk, P.J. and De Forest, P.R., "Determination of Entry vs. Exit Bullet Holes in Garments Using Light Microscopy," presented at Inter/Micro-2005, Chicago, IL, July 11-15, 2005.

Da 146

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008    Page 23

De Forest, P.R., "Role Definition and Teamwork in Crime Scene Reconstruction", presented at the 2005 Annual Training Conference, International Association of Bloodstain Pattern Analysts, Santa Barbara, CA, October 4-7, 2005.

De Forest, P.R., "The Evolution of Criminalistics: Fact vs. Fiction", presented at the 106th Semi-Annual Seminar, California Association of Criminalists, Los Angeles, CA, October 11-15, 2005.

De Forest, P.R., "Experience with and the Rationale for a Doctoral Program in Forensic Science", presented at the 58th Annual Meeting of the American Academy of Forensic Sciences, Seattle, WA, February 20-25, 2006.

De Forest, P.R. and Bernstine, E.G., "What Drives Criminalistics Examinations?", presented at the 58th Annual Meeting of the American Academy of Forensic Sciences, Seattle, WA, February 20-25, 2006.

Domzalski, A. and De Forest, P.R., "The Effects of Environmental Exposure on Human Scalp Hair Root Morphology", presented at the 58th Annual Meeting of the American Academy of Forensic Sciences, Seattle, WA, February 20-25, 2006.

Bucht, R.E., Contreras, E., De Forest, P.R., and Pizzola, P.A., "Polarized Light Photography of Bloodstains on Dark Reflective Surfaces", presented at the 58th Annual Meeting of the American Academy of Forensic Sciences, Seattle, WA, February 20-25, 2006.

## Consulting:

Consultant in criminalistics and physical evidence to police departments, prosecutor's offices, public defender's offices, and private attorneys on both civil and criminal cases in several states throughout the United States (expert testimony given in over 100 trials).

Scientist in Residence, Criminalistics, Metropolitan Forensic Anthropology Team (MFAT), Lehman College/CUNY (1980-1995).

Forensic Consultant, Forensic Science Laboratory, Connecticut State Police (1980-1989).

Program review and site visit, Forensic Science Program, University of Alabama, Birmingham, March 20 - 22, 1988.

Consultant to Robert Richter Productions, for the production of a **NOVA** Television Program on the Assassination of President John F. Kennedy, National Educational Television Network, 1987.

Consultant on forensic science and Kennedy assassination to St. Martin's Press, New York, NY, 1991.

Program review and site visit, MS in Forensic Science Program, University of Illinois, Chicago, April 29-30, 1999.

Member, three member international Peer Review Panel (PRP), Bloody Sunday Inquiry, (Oversight and interpretation of scientific evidence in the British Government's re-investigation of the shooting of marchers in Londonderry, Northern Ireland in January of 1972) since Nov. 1998.

Member External Review Committee, review of research grants on fingerprint development at the National Research Institute of Police Science, Tokyo, Japan, December 6, 2000.

Program review and site visit, MS in Forensic Science Program, California State University at Los Angeles, Los Angeles, October 22-25, 2001.

Program review and site visit, BS in Forensic Science Program, Eastern Kentucky University, Oct. 2003

Member, three member international Peer Review Panel (PRP), Omagh Bombing Investigation, (Oversight and interpretation of scientific evidence in the Police Service of Northern Ireland's (PSNI) investigation of a series of terrorist bombings) since November 2003.

## Consulting (Selected publicized cases with possible name recognition):

Consultation for Prosecutor's Office, Bergen County, New Jersey, in State v. Stephen Perry, the Murder of Deputy Rypka, 1979.

Consultation for Westchester County District Attorney in Peo. v. Jean Harris, 1980-81, ("*Scarsdale Diet Doctor" Case*).



Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008    Page 24

Consultation and Testimony for Rockland County DA's Office in Peo. v. Sheryl Sohn, et al., 1981.

Consultation for Atty. Leonard Weinglass in Peo. v. Kathy Boudin, 1982, (*Rockland County Brink's Armored Car Robbery and Homicide*).

Consultation and Testimony for Atty. William Kunstler in Peo. v. Larry Davis, 1986-88.

Consultation for New York County District Attorney, in Peo. v. Robert Chambers, 1987-88, ("*Preppie Murder*" Case).

Consultation and Testimony for Attys. Sagarin and Farver in State of CT. v. Richard Crafts, 1987-89, ("*Wood Chipper*" Case).

Consultation for New York County District Attorney, 1990, ("*Central Park Jogger*" Case).

Consultation and Grand Jury Testimony for Attorney General, State of New Jersey, in Teaneck Police Shooting, 1990.

Consultation and Testimony for Westchester County District Attorney in Peo. v. Carolyn Warmus, 1989, 1991-92, ("*Fatal Attraction*" Case).

Consultation for Atty. William Kunstler in Peo. v. El-Sayyid Nosair, 1991, (*Rabbi Meir Kahane Murder Case*).

Consultation and Grand Jury Testimony in New York County, for Attorney Allesi in Shooting of Jose "Kiko" Garcia, 1992, (*Washington Heights Police Shooting*).

Consultation and Testimony for Queens County District Attorney, in Peo. v. Patrick Bannon, Shooting of Police Officer Heidelberger, 1993.

Consultation and Testimony for New York County District Attorney, in Peo. v. David Degondea, the Shooting of Detective Luis Lopez, 1993-95.

Consultation and Grand Jury Testimony for New York County District Attorney, in Transit Police Shooting ("Friendly Fire"), 1994 - 95.

Consultation for Los Angeles County District Attorney, in Peo. v. O. J. Simpson, 1995.

Consultation for Mitchell, Silberberg & Knupp, in Fred Goldman, *et al.* v. O.J. Simpson, 1996.

Consultation for Haddon, Morgan, *et al.*, Denver, CO, in Colorado v. Kobe Bryant, 2004.


**Grants Received:**

"A Novel Labeled Antibody Approach for Simultaneously Determining Several Antigens", PSC-BHE Research Award Program of CUNY, 1979, ($8,000.00)

"A Labeled Antibody Approach for Simultaneously Determining Several Antigens in a Dried Bloodstain", National Institute of Justice, 1979, ($48,677), with Professor Rothchild.

"Field Sampling and Concentration of Volatile Accelerants from Arson Scenes, Factory Mutual Insurance, 1979, ($3,000), with Professor Charles Ryan.

"Individualization of Polymeric Trace Evidence -- Pyrolysis Supercritical Fluid Chromatography," National Institute of Justice, 1987, ($169,453.00).

"Identification of Wildlife Products by Pyrolysis Supercritical Fluid Chromatography", PSC-BHE Research Award Program of CUNY, 1988, ($6,286.00)

"Gunshot Residue Detection and Interpretation," National Institute of Justice, 1992, ($122,227.00).


**Miscellaneous:**

Invited Guest, Meeting of the Board of Directors, American Society of Crime Laboratory Directors, FBI Academy, Quantico, VA, June 15-19, 1986.


Da 148.

Curriculum Vitae / Peter R. De Forest / Undergoing Update 2008    Page 25

Invited Guest, Meeting of the American Society of Crime Laboratory Directors, FBI Academy, Quantico, VA, September 14-19, 1986.

Judge, City Wide Science Fair, New York, April 6, 1987.

Invited Keynote Speaker for the 11th Australian and New Zealand International Symposium on the Forensic Sciences, Hobart, Tasmania, August 17-21, 1992.

Invited Speaker for National Meeting of Forensic Chemists, sponsored by National Research Institute of Police Science, Tokyo, Japan, October 19-20, 1993.

Presented the Plenary Lecture entitled "Optimization of the Integration of Science with Criminal Investigation" at the Joint Inaugural Session of The International Workshop on Forensic DNA Typing of Evidence Samples and the First Meeting of the Japanese Association of Science and Technology for Identification, Tokyo, Japan, December 12-13, 1995.

Presented three lectures on Trace Evidence and Crime Scene Investigation at the Forensic Science Laboratory, Dublin, Ireland, December 3-4, 1997.

Presented lecture on Forensic Science and Crime Scene Investigation for the Garda Siochana, Dublin, Ireland, December 4, 1997.

Presented lectures on Forensic Science and Trace Evidence, Lausanne, Switzerland, December 9-11, 1997.

Da 149.

JOSEPH E. KRAKORA, PUBLIC DEFENDER
POST-CONVICTION RELIEF UNIT
P.O. BOX 46010
31 CLINTON STREET, 5th FLOOR
NEWARK, NEW JERSEY 07101
(973) 648-7651

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION (MIDDLESEX COUNTY)
IND. NO. 05-10-164

|  |  |  |
|---|---|---|
| STATE OF NEW JERSEY, | : | <u>Criminal Action</u> |
| *Plaintiff-Respondent* | : |  |
|  | : | Certification |
| V. | : |  |
|  | : |  |
| MELANIE MCGUIRE, | : |  |
| *Defendant-Petitioner* | : |  |
| ------------------------------------------- | : |  |
|  | : |  |

PAUL IBSEN, of full age, hereby certifies that:

    1.  I am an investigator employed by the Office of the Public Defender, working out of the Warren Trial Region in Belvidere. I was assigned to assist Assistant Deputy Public Defender Lois De Julio with the post-conviction relief proceeding for Melanie McGuire.

    2.  At Ms. De Julio's request, I attempted to locate Taurus Model 85 revolvers in the New Jersey/New York/Pennsylvania areas and determine whether they had barrels with five lands and grooves, or six lands and grooves.

    3.  I located and examined nine Taurus Model 85 revolvers, as specifically described

Da 150,

below.  They all had five lands and grooves.  I did not find any with six lands and grooves.

4.  On June 1, 2013, I attended the Philadelphia Armory Gun Show.  I found Taurus Model 85 serial # 1016485, offered for sale by "Shooters Surplus" of Philadelphia.

5.  On June 2, 2013, at the Allentown Rodeway Inn Gun Show, I located Taurus Model 85 serial #FY64882, being sold by "Haycock Hollow Arms."

6.  I attended the Plainfield Pennsylvania Volunteer Fire Department Gun Show on June 30, 2013.  I found Taurus Model 85 serial #GN91362 which was being sold by a private seller.  I also located Taurus Model 85 serial #GM84408, offered for sale by "Country Guns" of Thompson, Pennsylvania.

7.  At the Forks of the Delaware Arms Collector Show in Allentown, Pennsylvania on July 14, 2013, I found Taurus Model 85 serial #FY58544 being sold by a private seller.

8.  At the Split Rock Gun Show, held on August 25, 2013 at Lake Harmony, Pennsylvania, I located Taurus Model 85 serial #GN90963, offered for sale by "G and G Guns" of Feasterville, Pennsylvania; Taurus Model 85 serial #GM90754, being sold by "Bill's Gun Shop" of Piperville, Pennsylvania; and Taurus Model #85 serial #GM84659 offered by a private seller.

9.  On Sept 8, 2013, I attended a gun show in Allentown, Pennsylvania.  I saw Taurus Model 85 serial #GN89260, being sold by the "Gun Exchange" of Lenhartsville, Pennsylvania.

10.  I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Dated: 9-9-13

Paul Ibsen

A 6576-06T4

ORDER ON MOTION
-------------------

STATE OF NEW JERSEY
VS
MELANIE MCGUIRE

SUPERIOR COURT OF NEW JERSEY MM
APPELLATE DIVISION
DOCKET NO.   A -006576-06T4
MOTION NO.   M -005738-08
BEFORE PART: P
JUDGE(S):    COLEMAN
             GRAVES

MOTION FILED:     JUNE 04, 2009        BY: MELANIE  MCGUIRE
ANSWER(S) FILED:

RECEIVED
APPELLATE DIVISION

JUL 21 2009

SUBMITTED TO COURT:  JULY 06, 2009

SUP___ _R COURT
OF NEW JERSEY

O R D E R
---------

THIS MATTER HAVING BEEN DULY PRESENTED TO THE COURT, IT IS ON THIS

13th DAY OF _July_ , 2009, HEREBY ORDERED AS FOLLOWS:

|  | GRANTED | DENIED | OTHER |
|---|---------|--------|-------|
| MOTION BY APPELLANT<br>- FOR TEMPORARY REMAND<br>- TO SUPPLEMENT THE RECORD | ( ) | (X) | ( ) |

SUPPLEMENTAL:  Appellant's motion to supplement the record or

for a limited remand is denied.

FILED
APPELLATE DIVISION

JUL 2 1 2009

MID 05-10-164-S

FOR THE COURT:

_Rudy B. Coleman_
RUDY B. COLEMAN J.A.D.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

JUMTM

9 152

Melanie McGuire, Pro Se Defendant
#584496
Edna Mahan Correctional Facility
PO Box 4004 – South Hall
Clinton, New Jersey 08809-4004

| | | |
|---|---|---|
| STATE OF NEW JERSEY, | : | SUPERIOR COURT OF NEW JERSEY |
| Plaintiff, | : | LAW DIVISION - CRIMINAL |
| | : | MIDDLESEX COUNTY |
| | : | INDICTMENT NO.: 05-10-00164-S |
| Vs. | : | |
| | : | |
| | : | VERIFIED PETITION FOR |
| MELANIE MCGUIRE, | : | POST-CONVICTION RELIEF |
| Defendant | : | Pursuant to Court Rule 3:22 |

The Petitioner, Melanie McGuire, appearing Pro se, respectfully petitions the Court for Post Conviction Relief, pursuant to Rule 3:22 of the Rules Governing the Courts of the State of New Jersey and alleges:

    1. That the Petitioner was charged with: Murder (N.J.S.A. 2C:11-3; 2C:2-6); Possession of Weapon for Unlawful Purpose (N.J.S.A. 2C:39-4a; 2C:2-6); Desecrating Human Remains (N.J.S.A. 2C:22-1); 2C:2-6); and Perjury (N.J.S.A. 2C:28-1) on Middlesex County, Indictment number 05-10-00164-S, dated October 2005.

    2. That the Petitioner, Melanie McGuire was found guilty after a jury trial of Murder (N.J.S.A. 2C:11-3; 2C:2-6); Possession of Weapon for Unlawful Purpose (N.J.S.A. 2C:39-4a; 2C:2-6); Desecrating Human Remains (N.J.S.A. 2C:22-1); 2C:2-6); and Perjury (N.J.S.A. 2C:28-1) on April 23, 2007, after a jury trial.

    3. That the Petitioner was sentenced on the above mentioned charge on July 19, 2007 before the Honorable Frederick P. DeVesa, Judge of the Superior Court of New Jersey - Law Division, Middlesex County.

    4. That the Court imposed a term of life in prison subject to the mandatory 85% parole ineligibility stipulation required by N.E.R.A. on the murder conviction. The court imposed a

JOSEPH E. KRAKORA, PUBLIC DEFENDER
POST-CONVICTION RELIEF UNIT
P.O. BOX 46010
31 CLINTON STREET, 5th FLOOR
NEWARK, NEW JERSEY 07101
(973) 648-7651

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION (MIDDLESEX COUNTY)
IND. NO. 05-10-164

|  |  |  |
|---|---|---|
| STATE OF NEW JERSEY, *Plaintiff-Respondent* | : | Criminal Action |
|  | : | NOTICE OF MOTION FOR ADDITIONAL |
|  | : | DISCOVERY NECESSARY FOR POST- |
| V. | : | CONVICTION RELIEF |
|  | : |  |
| MELANIE MCGUIRE, *Defendant-Movant* | : |  |
|  | : |  |

TO:    DIVISION OF CRIMINAL JUSTICE
       HUGHES JUSTICE COMPLEX
       P.O. BOX 086
       25 MARKET STREET
       TRENTON, NEW JERSEY 08625-0086
       ATTN DANIEL BORNSTEIN, D.A.G.

Counselor:

PLEASE TAKE NOTICE that the undersigned attorney for defendant-petitioner Melanie

McGuire will move before the Honorable Bradley J. Ferencz, P.J.Cr., at a time and date to be set by

him, for an Order compelling the State to supply the following additional discovery necessary for

post-conviction relief:

Da 154

1) A copy of the hard disk from a Dell laptop computer recovered from William McGuire's car.

2) Samples from two garbage bags found with the victim's body and from two garbage bags taken from the McGuire apartment (Specimen Nos. 11-18, 11-22, 11-6, and 11-3).

In support of this motion, reliance will be placed upon the letter-brief and appendix submitted simultaneously herewith.

Respectfully submitted

JOSEPH E. KRAKORA, Public Defender
*Attorney for Defendant*

BY: _____
LOIS DE JULIO
Assistant Deputy Public Defender

## CERTIFICATION

On this day, I did cause to be mailed or delivered a copy of the attached documents to the Division of Criminal Justice, Hughes Justice Complex, 25 Market Street, P.O. Box 086, Trenton, New Jersey 08625-0086.

I hereby certify that the foregoing statement made by me is true. I am aware that if the foregoing statement made by me is wilfully false, I am subject to punishment.

Dated: 2/26/2013                              _____
FLORENCE SEPULVEDA, Secretary

Da155

FILED

MAY 21 2013

Bradley J. Ferencz, P.J.Cr.
Middlesex Vicinage

| | |
|---|---|
| STATE OF NEW JERSEY, | SUPERIOR COURT OF NEW JERSEY<br>CRIMINAL DIVISION<br>MIDDLESEX COUNTY<br>INDICTMENT NO.: 05-10-00164-S |
| vs. | Criminal Action |
| MELANIE McGUIRE,<br>Defendant. | **ORDER** |

**THIS MATTER** having been brought before this Court on March 1, 2013 by Lois DeJulio, Esq., representing the defendant Melanie McGuire, on a Motion to Compel Additional Discovery for Defendant's Post Conviction Relief Petition; and this Court having reviewed the moving papers and having heard the arguments of counsel; and for other good cause being shown;

**IT IS ON THIS 21st DAY OF MAY 2013,**

**ORDERED** that the defendant's Motion to Compel Discovery for her Post Conviction Relief Petition is hereby **DENIED**.

**IT IS FURTHER ORDERED** that a copy of this Order be served upon all parties of record within seven (7) days of the date hereof.

_____
THE HON. BRADLEY J. FERENCZ, P.J.Cr.

Da 156

**BY ORDER OF THE COURT**

State of New Jersey,

Plaintiff,

vs.

Melanie McGuire,

Defendant.

SUPERIOR COURT OF NEW JERSEY
COUNTY OF MIDDLESEX
LAW DIVISION
INDICTMENT NO.: 05-10-00164-S

Criminal Action

MEMORANDUM OF DECISION

The following is the Court's decision and Order with reference to Defendant's Motion to Compel Discovery for her Post Conviction Relief Petition.

FACTS

On April 28, 2004 William McGuire disappeared. The defendant Melanie McGuire, William's wife of five years and mother to his two children told police that on the night Bill disappeared, the couple had gotten into a heated argument over finances. Melanie claimed that Bill pushed her into a wall, slapped her and stuffed a dryer sheet into her mouth. Melanie said that she was able to escape to the bathroom with her young son and locked herself in as Bill packed his things and stormed out of their apartment vowing never to return. Melanie also told police Bill had likely gone to Atlantic City because he was a big gambler and was heavily comped at the casinos. Two days later Melanie filed for a restraining order against her husband and moved in with her parents.

Only a few days later on May 5th, 11th and 16th three matching green and black Kenneth Cole Reaction suitcases washed up on the shores of the Chesapeake Bay in Virginia. The suitcases contained the remains of a dismembered body. The first case contained a man's legs below the knee, the next his torso and thighs and finally his upper torso and head in the third. The body parts had been wrapped up in black plastic garbage bags and one case contained a blue hospital blanket and free weight. Police were able to determine that the victim had been shot at least three times before being cut to pieces, bagged and thrown off the Chesapeake Bay Bridge Tunnel. On May 21st the police in


Da 157

Virginia released a picture of what the victim would have looked like alive and an old friend of Bill McGuire's who was now living in the area made the identification. Fingerprints then confirmed that the victim was indeed Bill McGuire.

Suspicion quickly turned to Melanie as it was discovered that she was having an affair with a co-worker and had been planning to leave her husband and raise her family with her paramour. Officers interviewed Melanie who told them that her marriage was an unhappy one and that Bill had a habit of pissing people off and was becoming more and more erratic lately due to stress at work. When questioned on the subjects Melanie told police that she and her husband did not own a matching set of luggage or a handgun. Melanie later recanted her statement about the luggage and it was uncovered that she had purchased a handgun in Pennsylvania only two days before Bill's murder.

When police conducted a search for the victim's 2002 Nissan Maxima they learned it had been towed from the Flamingo Motel in Atlantic City. Upon viewing the surveillance tape of the parking lot, investigators discovered that the car was parked there on April 30, 2004 at 12:41 A.M. Immediately thereafter a car matching the description of Melanie's Nissan Pathfinder pulled into the parking lot and the driver of the Maxima got out and entered the passenger side of the Pathfinder. The Maxima then remained in the parking lot of the Flamingo Motel for eight days before being towed away.

In a conversation with a friend that was taped without her knowledge, Melanie admitted that she had gone to Atlantic City that night searching for Bill. She found his car in the parking lot of a casino and moved it to the Flamingo hotel to spite Bill.

When searched, investigators discovered a vial of the sedative chloral hydrate in the glove compartment of Bill's car. Investigators later uncovered that Melanie had filled a forged prescription for chloral hydrate a few days before Bill's disappearance. The prescription was made out to a patient of the fertility clinic where she worked, but the patient had never been prescribed that drug. Trace evidence found on the floor of the vehicle also found Bill McGuire's fibrous connective tissue, a part of the body that a forensic expert testified can only be shed when a person is cut up in the way Bill McGuire was.

As part of the ongoing investigation, eight computers were seized, including three desktop computers and a work laptop recovered from the trunk of Bill's car. State Police


Da 158

Computer Experts examined the browser histories of three of the desktop computers seized and found that on the McGuire's desktop several internet searches had been conducted between April 11 and April 26, 2004 for the following topics: "undetectable poisons," "state gun laws," "instant poisons," "gun laws in Pennsylvania," "toxic insulin levels," "fatal insulin doses," "fatal digoxin does," "instant undetectable poisons," "how to commit suicide," "how to commit murder," "how to purchase hunting rifles in NJ," "pesticide as poison," "insulin as poison," "morphine poisoning," "how to find chloroform," "insulin shock," "neuromuscular blocking agents," "sedatives," "tranquilizers," "barbiturates," "Nembutal," "pharmacy," "chloral hydrate," "choral and side effects," and "Walgreens." The State Police expert did examine the contents of the laptop found in the victim's car, but determined it contained only work related matters and did not conduct a further search of the internet history.

In October of 2005 Melanie was indicted for the murder of her husband. Defendant was tried before a jury and the Honorable Judge DeVesa in the months of March and April, 2007. At trial the State argued that it was Melanie who conducted the incriminating internet searches, but the expert testified that there was no real way for her to be sure who was at the computer. The defense presented a rebuttal expert who testified that the incriminating searches were made within minutes, sometimes seconds, of hits for websites that Bill McGuire was known to frequent, including his email and a gambling site he visited often. The defense used this inference to argue that it was Bill who was conducting those searches.

The State also presented evidence at trial linking the black plastic garbage bags that Bill's remains were found in to garbage bags that Melanie had used to pack Bill's clothing to give away to a friend. Two experts, Frank Ruiz and Thomas Lesniak testified for the State that based on the various tests they performed, they could conclude that the bags found with Bill's body matched the bags found in defendant's home. After seeing the expert's testimony broadcast on Court-TV, a woman named Sally Ginter contacted defense counsel and told them she disagreed with the expert testimony. Ms. Ginter was the CEO and owner of a consulting company and a retired chemist who had a specialty in polymers and plastics development but had no experience with the manufacturing of plastic garbage bags. The defense called Ms. Ginter as a last minute defense witness and


Da 159

she testified that from the tests performed by the two State experts, there was no way to conclusively determine that the two sets of garbage bags matched. Ms. Ginter criticized the expert's methodology and testified that a nuclear magnetic resonance test was necessary to determine if the bags were of the same batch. However, because of her late involvement in the case, Ms. Ginter was not afforded the time to conduct such a test with the samples.

On April 23, 2007 the jury returned a verdict convicting the defendant of first degree murder, possession of a weapon for an unlawful purpose, desecrating human remains and perjury. On July 19, 2007 Judge DeVesa sentenced the defendant to a term of life imprisonment subject to the No Early Release Act on the murder charge, a concurrent ten years for the desecration of human remains charge, and a consecutive term of five years with a two and half year period of parole ineligibility on the perjury charge. In a published opinion on March 16, 2011 the Appellate Division affirmed the defendant's convictions and sentence. State v. McGuire, 419 N.J. Super. 88 (App. Div.), certif. denied, 208 N.J. 335 (2011). On September 22, 2011 the New Jersey Supreme Court denied defendant's petition for certification. State v. McGuire. 208 N.J. 335 (2011).

Defendant now seeks to have the State compelled to turn over discovery relevant to her post conviction relief petition. Specifically the defendant is requesting samples from the plastic garbage bags that the victim was found in and the samples known to come from Melanie McGuire's home. The defendant wishes to have the bags re-tested by Ms. Ginter. Defendant alleges that if the new tests demonstrate that the bags came from different batches she can then demonstrate that the failure to perform the testing prejudiced her case and thus amounted to a prima facie case of ineffective assistance of counsel. Additionally the defendant is requesting the hard drive from the victim's laptop computer found in the trunk of his car. Defendant argues that defense counsel should have conducted an analysis of the victim's internet activity on that laptop and determined if there were any similarly incriminating searches found in the history of that computer. If there were similar searches conducted, defendant could have had a stronger argument that the suspicious searches on the desktop computer originated from Bill.

Da 160

# DISCUSSION

Under R. 3:22-10(a), a petitioner for post conviction relief is only entitled to an evidentiary hearing "upon the establishment of a prima facie case in support of post-conviction relief." To establish a prima facie case, a "Petitioner must demonstrate a reasonable likelihood that his or her claim, viewing the facts alleged in the light most favorable to the Petitioner, will ultimately succeed on the merits." R. 3:22-10(a); see also State v. Marshall, 148 N.J. 89, 158 (1997). "A court shall not grant an evidentiary hearing: "if the Petitioner's allegations are too vague, conclusory or speculative." R. 3:22-10(d)(2). Nor may the Court grant an evidentiary hearing "for the purpose of permitting a Petitioner to investigate whether additional claims for relief exist for which Petitioner has not demonstrated a reasonable likelihood of success." R. 3:22-10(d)(3). For this reason, on a petition for post conviction relief a convicted defendant has limited rights to discovery.

Our New Jersey Supreme Court has made clear that a post conviction relief petition "is not a device for investigating possible claims, but a means for vindicating actual claims." State v. Marshall, 148 N.J. 89, 270 (1997). Accordingly, "the filing of a petition for PCR is not a license to obtain unlimited information from the State, but a means through which a defendant may demonstrate to a reviewing court that he was convicted or sentenced in violation of his rights." State v. Herrerra, 211 N.J. 308, 328 (2012). Post conviction relief is therefore not a "fishing expedition" for the defendant go through the State's files to find a basis for collateral relief. Marshall at 270.

On the other hand, "in order to establish a prima facie claim, a petitioner must do more than make bald assertions that he was denied the effective assistance of counsel. He must allege facts sufficient to demonstrate counsel's alleged substandard performance." Defendant must also prove that he was prejudiced by counsel's failures and demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Hill v. Lockhart, 474 U.S. 52, 57 (1985).

While not directly authorizing discovery in post conviction relief petitions, the Supreme Court has held, "where a defendant presents a PCR court with good cause to order the State to supply the defendant with discovery that is relevant to the defendant's

case and not privileged, the court has the discretionary authority to grant relief."
Marshall at 270. Defendant submits that the discovery sought is relevant, non-privileged
and necessary to the establishment of defendant's claims of ineffective assistance of
counsel.

Defendant suggests that the failure of defense counsel to investigate the internet
search history of Bill McGuire's work laptop was ineffective assistance of counsel. She
argues that if the laptop computer contained searches for similarly incriminating phrases,
that would prove that it was more likely Bill McGuire who searched those terms on the
household desktop. Defendant states that she would not be able to conclusively prove
that she was prejudiced by counsel's failure to investigate the laptop unless she was able
to show that the laptop contained records of searches similar to the ones found on the
desktop. Without being able to examine the contents of the laptop, defendant is at a
disadvantage in pursuing her claim.

Defendant also argues that the black plastic bag samples are critical to her being
able to establish ineffective assistance of counsel as to counsel's failure to have the bags
re-tested by the defense expert witness. Again, the defendant may allege in her petition
that this was ineffective assistance, but without actual test results showing that the bags
were not of the same batch, defendant cannot prove that she was prejudiced by this
failure.

Defendant notes that she is not attempting to rummage through the State's files,
but has presented a request for two specific relevant items that may aid in defendant's
specific arguments that counsel was ineffective. And, defendant also correctly points out
that the laptop hard drive and garbage bags are physical evidence and thus not privileged
material to the State.

The State argues that the defense is conducting a prohibited fishing expedition to
"confirm mere speculation or hope that a basis for collateral relief may exist." Marshall
at 270. The State points out that trial counsel's failure to have the bags tested further or
perform analysis of the laptop computer may well have been reasonable trial strategy
because they did not know what they might find. For example, the new tests on the
plastic bags may confirm conclusively that they were from the same package. Or, the
laptop may show no incriminating searches, or perhaps even different evidence

$)$ a 162

incriminating the defendant. The State asserts that trial counsel made a reasonable strategic decision and PCR counsel is now attempting to undermine that judgment.

As for the garbage bags, the State goes into great detail about the testimony of the two expert witnesses as to how they painstakingly tested the bag samples in a myriad of ways. And, the State presents a summary of the defense expert's qualifications and how she was not experienced in the manufacture of plastic bags and thus her testimony was limited to plastics analysis. The defense used Ms. Ginter's testimony to attempt to undermine the validity of the State's witnesses and the State asserts that it was reasonable trial strategy to not have the bags further because the results could have further supported the State's theory. The State also argues that even if further testing showed that the bags were from different batches, it still would have little effect on the case because defendant's connection to the plastic bags in the suitcase was proven by other independent evidence, including nail polish chips, a blanket from defendant's workplace and defendant's DNA.

The Court has also heard oral argument on the issue where the parties raised new concerns for the Court. These included the defense's argument that it may have been ineffective assistance of counsel for the trial counsel to not have prepared a rebuttal witness on the garbage bags issue prior to Ms. Ginter's intervention in the middle of trial; and the State's argument that it was not ineffective assistance of counsel for trial counsel to not ask for samples of the bags because it would have tipped off the State that additional testing should be done.

After hearing all the arguments of counsel and giving much thought to the issue, the Court has decided that it will not compel the State to turn over the requested items. The Court recognizes that the Defense is not attempting to conduct a "fishing expedition" and has made distinct, specific requests for non-privileged physical evidence. However, the Court has examined the language of <u>Marshall</u> and determined that the defense does not have an "actual claim" to vindicate. <u>State v. Marshall</u>, 148 <u>N.J.</u> 89, 270 (1997). This is because, even if the Defense were to re-examine the evidence and determine that the bags were from different batches, or similar searches were made on the laptop, the defense can still not prove that trial counsel's failure to conduct these tests was ineffective assistance of counsel.

Da 163

Consider the fact that if trial counsel had the garbage bags tested originally, those tests may have demonstrated that the bags were of the same batch. Then, the defense would have no expert to rebut the findings of the State's two experts because they could not ethically then send an expert to swear to testimony they knew to be false, or at least disingenuous. Trial counsel made the reasonable strategic decision to not risk their own expert finding conclusive, indisputable evidence that the bags were the same. Instead, counsel choose to attack the credibility and conclusions of the State's expert in attempt to undermine their findings and find reasonable doubt in the State's case. And under Strickland, that reasonable decision would not amount to ineffective assistance of counsel. It in fact was a sound strategic position for counsel to take. Accordingly, if this issue were to come before the Court on post-conviction relief, even with expert findings that the bags were from different batches, the Court could not find that it was ineffective assistance of counsel for trial counsel to make the competent and good strategic decision not to have their expert re-test the bags.

The same holds true of the laptop hard drive. At the time of trial defense counsel recognized that there was a very good chance that the laptop would show that no incriminating internet searches. Instead foreclosing his argument, defense counsel legitimately chose to argue the inference that that laptop could have contained similar searches. And the absence of proof, along with the defense computer expert's testimony that the searches were conducted close in time to hits for Bill McGuire's favorite websites, was favorable testimony to the defense that supported their theory of the case. Therefore no matter what the defense finds as a result of new investigation of the requested items, it was still reasonable trial strategy at the time of trial and nothing the defense can offer from further investigation will buttress their ineffective assistance claim.

Accordingly the Court does not find "good cause" under State v. Marshall, to compel the State to provide post-conviction discovery and the defense's motion to compel discovery is **DENIED**. Attached please find an Order reflecting same.

Da 164

STATE OF NEW JERSEY,

vs.

MELANIE McGUIRE,

Defendant.

SUPERIOR COURT OF NEW JERSEY
CRIMINAL DIVISION
MIDDLESEX COUNTY
INDICTMENT NOs.: 05-10-00164-S

Criminal Action

ORDER

**FILED**

OCT - 2 2014

Bradley J Ferencz, P.J.Cr.
Middlesex Vicinage

**THIS MATTER** having been brought before this Court on September 25, 2014, by Lois De Julio, Esq., on behalf of Petitioner, Melanie McGuire, on a Petition for Post-Conviction Relief, and Deputy Attorney General Daniel Bornstein appearing on behalf of the State; and this Court having reviewed the moving papers and having heard the arguments of counsel; and for the reasons stated on the record and other good cause being shown:

**IT IS ON THIS 2nd DAY OF OCTOBER 2014,**

**ORDERED** that Petitioner's Petition for Post-Conviction Relief is **DENIED without an Evidentiary Hearing**;

**IT IS FURTHER ORDERED** that a copy of this Order be served upon all parties of record within seven (7) days of the date hereof.

THE HON. BRADLEY J. FERENCZ, P.J.Cr.

Da 165

FILED

OCT - 2 2014

Bradley J Ferencz, P.J.Cr.
Middlesex Vicinage

**BY ORDER OF THE COURT**

---

State of New Jersey,

      Plaintiff,

    vs.

Melanie McGuire,

      Defendant.

SUPERIOR COURT OF NEW JERSEY
COUNTY OF MIDDLESEX
LAW DIVISION
INDICTMENT NO.: 05-10-00164-S

**Criminal Action**

**OPINION**

---

    The following is the Court's decision and Order with reference to the Petitioner's Petition for Post-Conviction Relief.

## FACTS

    The following facts are taken from the parties' briefs as well as the published Appellate Opinion of State v. Melanie McGuire, 419 N.J. Super. 88 (App. Div. 2011).

    On April 28, 2004, William McGuire (Bill) disappeared. Only a few days later on May 5th, 11th, and 16th, three matching green and black Kenneth Cole Reaction suitcases washed up on the shores of the Chesapeake Bay in Virginia. The suitcases contained the remains of a dismembered body. The first suitcase contained a man's legs, dismembered below the knee; the next contained a man's lower torso and thighs; finally, a man's upper torso and head was in the third suitcase. A medical examiner in Virginia found two bullets in the torso, and separate entrance and exit wounds to the head and chest. The body parts had been drained of blood and wrapped up in black plastic garbage bags. One suitcase contained a blue hospital blanket and free weight. Police were able to determine that the victim had been shot at least three times before being cut to pieces, bagged, packaged, and thrown off the Chesapeake Bay Bridge Tunnel.

1

Da 166

On May 21, 2004, Virginia police released a picture of what the victim would have looked like alive. An old friend of Bill McGuire's, who was living in the area, made the identification. Fingerprints then confirmed that the victim was indeed Bill McGuire.

Suspicion quickly turned to Defendant, Melanie McGuire, Bill's wife and the mother of his two children. As to motive, the State presented evidence that at the time of Bill's disappearance, Melanie was involved in an intense, extramarital love affair with Dr. Bradley Miller, a partner in the medical practice where she worked. Miller was also married and had young children. According to Miller's testimony, the intimate relationship began in 2002. In time, he and Melanie spoke about getting married, buying a house, and having children, although they had no immediate plans to divorce their spouses. Melanie told Miller that Bill had once threatened to take their sons and disappear if she were ever to file for divorce. A nurse who worked alongside Melanie and was her friend also testified she had discussed the high costs of her own divorce with Melanie in the months preceding Bill's disappearance.

On June 2, 2004, Virginia Beach police interviewed Melanie, who told them that her marriage was an unhappy one. She told officers that Bill had assaulted her in the early morning hours of April 29, 2004, and she had hidden in a bathroom of the Woodbridge apartment with one of their sons. She stated that she heard Bill rummaging through the apartment before he left in the middle of the night, saying she would never see him again. Defendant also told the Virginia detective that Bill was in the habit of saying things that angered people, that he frequently gambled in Atlantic City, and that Bill was "highly comped." She suggested the police might find him or his car there. However, she did not tell the detective that she had already traveled to Atlantic City five weeks earlier and had parked Bill's car in a motel parking lot there.

When police conducted a search for Bill's 2002 Nissan Maxima, they learned it had been towed from the Flamingo Motel in Atlantic City. Upon viewing the surveillance tape of the parking lot, investigators discovered that the car was parked there on April 30, 2004 at 12:41 A.M. Immediately thereafter, a car matching the description of Melanie's Nissan Pathfinder pulled into the parking lot, and the driver of the Maxima got out and entered the passenger side of the Pathfinder. The Maxima then remained in the parking lot of the Flamingo Motel for eight days before being towed away. In a conversation with a friend

2


Da 167

that was taped without her knowledge, Melanie admitted that she had gone to Atlantic City that night searching for Bill. She stated that she found his car in the parking lot of a casino and moved it to the Flamingo hotel to spite him.

When Bill's vehicle was searched, investigators discovered a vial of the sedative chloral hydrate and a syringe in the glove compartment. Investigators later discovered that Melanie had filled a forged prescription for chloral hydrate a few days before Bill's disappearance. The prescription was made out to a patient of the fertility clinic where she worked, but this patient stated that she had never been prescribed that drug. Evidence from the Walgreens pharmacy where the prescription was filled showed that the prescription had been ordered by Dr. Miller on a prescription pad from the Morristown medical practice. Dr. Miller denied having written the prescription, and a handwriting expert testified that the writing was not his. However, the expert could neither identify the signature as one written by Melanie nor exclude her as the writer. The managing partner at the medical practice testified that he and other doctors in his practice were unlikely to prescribe chloral hydrate for their patients. He also testified that nurses were permitted to sign prescriptions, and that it was not unusual for Melanie to have signed Dr. Miller's name.

A sweep of the vehicle also revealed trace evidence found on the floor and matching Bill McGuire's fibrous connective tissue, a part of the body that a forensic expert testified could only be shed when a person is cut up in the way Bill McGuire was. Further investigation into the murder resulted in the accumulation of numerous items of evidence, including: reports of the medical examiners, grand jury testimony, witness interviews, voluntary statements from Melanie to the police, statements Melanie had made to friends and others, records from a gun shop in Pennsylvania, business records such as telephone and pharmacy records, surveillance tapes from business locations, expert evaluations of forensic evidence gathered from the suitcases and from Bill's car, DNA identification of trace evidence, handwriting and linguistics analysis, consensual taping of telephone conversations, and court-authorized wiretapping of the telephones of Melanie and her parents.

In addition, eight computers were seized, including three desktop computers and a work laptop recovered from the trunk of Bill's car. State Police Computer Experts examined the browser histories of three of the desktop computers seized and found that on

3



the McGuire's desktop, several internet searches had been conducted between April 11 and April 26, 2004 for the following topics: "undetectable poisons," "state gun laws," "instant poisons," "gun laws in Pennsylvania," "toxic insulin levels," "fatal insulin doses," "fatal digoxin dose," "instant undetectable poisons," "how to commit suicide," "how to commit murder," "how to purchase hunting rifles in NJ," "pesticide as poison," "insulin as poison," "morphine poisoning," "how to find chloroform," "insulin shock," "neuromuscular blocking agents," "sedatives," "tranquilizers," "barbiturates," "Nembutal," "pharmacy," "chloral hydrate," "choral and side effects," and "Walgreens." The State Police expert also examined the contents of the laptop found in the victim's car, but determined it contained only work related matters and did not conduct a further search of the internet history.

To establish the connection between the Woodbridge apartment and Bill's murder, the State emphasized expert examinations of evidence found in the suitcases thrown into the Chesapeake Bay and related circumstantial evidence. When first interviewed by the Virginia detective, Melanie had said she and Bill did not own matching luggage. The next day, having remembered a set of luggage they owned, she recanted and identified a picture of a suitcase shown by the detective as resembling their matching set. A ten-inch hair had been found in one of the suitcases and was identified by DNA analysis as possibly coming from Melanie.

Inside the suitcases, Bill's body had been wrapped in garbage bags sealed with adhesive tape. Those items were crucial evidence used by the prosecution at the trial. When moving out of the Woodbridge apartment at the end of May 2004, Melanie had gathered Bill's clothing for disposal in several industrial-type garbage bags. An acquaintance who was helping Melanie move her belongings kept the bags of Bill's clothing, which the police later recovered.

State experts compared the garbage bags taken from the Woodbridge apartment to the garbage bags found in the suitcases. Frank Ruiz was qualified by the trial court as an expert witness in plastic bag technology and manufacturing by virtue of his twenty-seven years of experience in the plastic bag industry and his degree in chemistry. Ruiz testified that the two sets of garbage bags were produced on the same production line and within hours of each other. State Police forensic scientist Lesniak also examined the garbage bags. He testified as a tool mark expert that the two sets of bags contained markings revealing

4

Da 169

that they were produced with the same tools and therefore on the same extrusion line. Using the testimony of these two expert witnesses, the State asserted that the garbage bags the killer used to wrap the body in early May 2004 came from the same source as those that Melanie used to pack Bill's clothes later in May.

From adhesive tape inside the suitcases, the State recovered a particle of red nail polish and some small hairs. Through microscopic examination, the State's expert described the hairs as being cut at both ends, like shaving stubble. One of the hairs was identified with Bill's DNA and one with Melanie's DNA. The State argued to the jury that these small cut hairs were evidence that Bill's body was cut and wrapped in a bathroom of the McGuire apartment, where such shaving stubble might have inadvertently found its way onto the adhesive tape used to wrap the body.

Also inside one of the suitcases, a blanket had been wrapped around the torso's head. The blanket was imprinted with the initials "HCSC," a company that supplied linens to about one hundred hospitals and doctors' offices in New Jersey. An account representative from HCSC recognized the blanket as one of the company's products, and further testified that the medical practice in Morristown where Melanie worked had been his client since 2001. In April 2004, the company was shipping approximately one hundred such blankets per week to that facility.

Based upon the evidence presented from the investigation up to that point in time, Melanie was arrested for the murder of Bill McGuire in June 2005 and released on bail.

## PROCEDURAL HISTORY

On October 11, 2005, a State Grand Jury returned Indictment 05-10-00164, charging Petitioner with First-Degree Murder, Second-Degree Possession of a Weapon (Firearm) for an Unlawful Purpose, Second-Degree Desecrating Human Remains, and Third-Degree Perjury.

On October 26, 2006, a State Grand Jury returned Indictment 06-10-00119, charging Petitioner with two counts of Third Degree Hindering Prosecution, Fourth-Degree Tampering With or Fabricating Physical Evidence, Fourth-Degree False Reports to Law Enforcement Authorities, and four counts of Third-Degree Possession of a Controlled Dangerous Substance.

5



Da 170

On January 24, 2007, the Honorable Frederick P. DeVesa, P.J.S.C., granted the State's motion to consolidate the two indictments for trial. Petitioner was tried by a jury before Judge DeVesa between March 5 and April 23, 2007. The Prosecution called sixty-four witnesses, and the defense called sixteen other witnesses. Many stipulations were read to the jury in order to obviate the need to call additional witnesses. Twenty-one of the witnesses who testified were qualified by the Court as experts in a variety of fields and specialties. Hundreds of exhibits were admitted in evidence and displayed to the jury.

On April 23, 2007, after twenty-three days of testimony and approximately three days of deliberation, the jury returned a verdict convicting the Petitioner of first degree murder, possession of a weapon for an unlawful purpose, desecrating human remains and perjury. A motion for a new trial was heard and denied on May 14, 2007. On July 19, 2007, Judge DeVesa sentenced the Petitioner to a term of life imprisonment subject to the No Early Release Act on the murder charge, concurrent to a term of ten years with five years of parole ineligibility for the desecration of human remains charge, and consecutive to a term of five years with a two and half year period of parole ineligibility on the perjury charge.

Petitioner filed a timely notice of appeal, raising the following issues:

I. JURY TAINT DEPRIVED MS. McGUIRE OF A FAIR TRIAL.

    A. THE JURORS WERE REPEATEDLY EXPOSED TO HIGHLY INFLAMMATORY MEDIA ACCOUNTS.

    B. THE TRIAL COURT DID NOT *VOIR DIRE* THE JURORS PROPERLY.

    C. THE TRIAL COURT FAILED TO INVESTIGATE EVIDENCE THAT JURORS MAY HAVE BEEN POSTING TO INTERNET MESSAGE BOARDS DURING DELIBERATIONS.

    D. THE TRIAL COURT APPLIED THE WRONG STANDARD AND BURDEN OF PROOF.

II. PROSECUTORIAL MISCONDUCT REQUIRES REVERSAL AND REMAND

    A. THE STATE'S RELIANCE ON THE ABSENCE OF EVIDENCE IT SUCCESSFULLY EXCLUDED FROM THE CASE REQUIRES REVERSAL (NOT RAISED BELOW).

    B. OTHER PROSECUTORIAL MISCONDUCT CONTRIBUTED TO A FUNDAMENTALLY UNFAIR TRIAL (PORTIONS NOT RAISED BELOW).



Da 171

III. THE TRIAL COURT COMMITTED NUMEROUS EVIDENTIARY ERRORS
REQUIRING REVERSAL.

    A. THE TRIAL COURT ERRED IN ADMITTING EXPERT TESTIMONY
REGARDING GARBAGE BAGS.

    B. THE TRIAL COURT ERRONEOUSLY EXCLUDED RELEVANT,
ADMISSIBLE, AND EXCULPATORY EVIDENCE SUPPORTING THE
DEFENSE.

    C. REVERSAL IS REQUIRED.

IV. MS. McGUIRE IS ENTITLED TO RESENTENCING.

    A. THE TRIAL COURT ERRED BY INVOKING POST-MURDER CONDUCT
TO AGGRAVATE THE MURDER CHARGE (NOT RAISED BELOW).

    B. THE COURT ERRONEOUSLY REFUSED TO CONSIDER A MITIGATING
FACTOR.

In a published opinion issued on March 16, 2011, the Appellate Division affirmed
the Petitioner's convictions and sentence. State v. McGuire, 419 N.J. Super. 88 (App.
Div.), certif. denied, 208 N.J. 335 (2011). On September 22, 2011, the New Jersey
Supreme Court denied Petitioner's petition for certification. State v. McGuire, 208 N.J.
335 (2011).

On October 17, 2011, Petitioner filed a *pro se* Petition for Post-Conviction Relief,
along with an application for representation by the Office of the Public Defender. PCR
counsel was assigned and on or about April 25, 2013, PCR counsel filed a Motion to
Compel the State to turn over Discovery relevant to her Post-Conviction Relief Petition.
Oral argument was heard on May 3, 2013, and the motion was denied. The instant Petition
for Post-Conviction Relief followed.

## PETITIONER'S ARGUMENTS

Petitioner argues that she was denied the effective assistance of counsel guaranteed
to her by the U.S. Constitution Amendments VI and XIV, and the N.J. Constitution Article
I, Paragraph 10 because (1) her counsel failed to consult and retain appropriate expert

Da 172

witnesses; and (2) her counsel failed to call witnesses and present evidence critical to the defense.

Specifically, with regard to Point 1, Petitioner argues that her trial counsel was ineffective for (a) failing to consult with an expert to determine if the gun she purchased matched the bullets recovered from the victim's body; (b) failing to consult and retain an expert witness to present an alternative explanation from that of the State for the presence of chloral hydrate in the victim's ear; (c) failing to call an expert witness to rebut the State's contention that Petitioner could have rid her apartment of all bloodstains resulting from the murder and dismemberment of the victim; (d) failing to authorize their computer expert to review the entire internet history of the Pavillion computer take from the McGuire apartment; and (e) failing to retain the appropriate experts in light of the conflict of interest inherent in the retainer agreement.

With regard to Point 2, Petitioner contends that her trial counsel was ineffective for (a) failing to call Dawn Zhu, a resident of an apartment neighboring Petitioner's, to testify to the argument she heard; (b) failing to call Ronald Chwala, Jr., the Maintenance Supervisor of the apartment complex where Petitioner lived, to testify to the lease requirement that walls be returned to white; (c) failing to present witnesses from Reproductive Medical Associates (RMA) to testify that the patient information computer data base could be accessed remotely; and (d) failing to present evidence of William McGuire's training in pharmacology.

Finally, Petitioner asserts that should this Court determine that none of the above points individually warrants an evidentiary hearing, defendant submits that the Court must consider their cumulative effect, pursuant to State v. Orecchio, 16 N.J. 125 (1954) and State v. Preciose, 129 N.J. 451 (1992).

## STATE'S ARGUMENTS

The State asserts that Petitioner's petition for post-conviction relief should be denied without an evidentiary hearing because Petitioner has failed to make out a *prima facie* case of ineffective assistance of counsel. The State preliminarily highlights the important fact that Petitioner was well-represented at trial by two respected and experienced criminal trial lawyers in the country. The State cites to media outlets such as

Da 173

*The New York Times*, *The Wall Street Journal*, *USA Today*, *Court TV*, *CNN* and *Fox News*, which have lauded both lead counsel Joseph Tacopina, Esq. as well as his noted co-counsel, Stephen Turano, Esq., for their "legal acumen and courtroom expertise to successfully defend many politicians, police officers, athletes, recording artists, and Fortune 500 executives, among others."

With that context in place, the State argues that Petitioner's trial attorneys were not constitutionally ineffective for failing to consult with or retain additional expert witnesses, nor were they constitutionally ineffective for failing to call additional fact witnesses. Lastly, the State contends that the Petitioner has failed to show any error, let alone cumulative error, on the part of her trial counsel.

## LEGAL STANDARD

New Jersey Court Rule 3:22-1 provides, "Any person convicted of a crime may, pursuant to this rule, file with the criminal division manager's office of the county in which the conviction took place, a petition for post-conviction relief captioned in the action in which the conviction was entered." A petition for post-conviction relief under R. 3:22 is "New Jersey's analogue to the federal writ of habeas corpus." State v. Preciose, 129 N.J. 451, 458 (1992). Post-conviction relief provides a means for defendants to challenge their convictions on grounds "which could not have been raised on direct appeal." State v. McQuaid, 147 N.J. 464, 482 (1997); State v. Cummings, 321 N.J. Super. 154, 164 (App. Div.), certif. denied, 162 N.J. 199 (1999); N.J.C.R. 3:22-4(a)(1). However, an application for post-conviction relief will only be granted if the applicant establishes, by a preponderance of credible evidence, one of the cognizable grounds for relief under R. 3:22. McQuaid, 147 N.J. at 482 (citing N.J.C.R. 3:22-2). To be eligible for post-conviction relief, a petitioner must prove a state or federal constitutional violation by a preponderance of the credible evidence. Preciose, 129 N.J. at 459.

A petitioner is not automatically entitled to an evidentiary hearing to address claims raised in a post-conviction relief application. State v. Marshall (III), 148 N.J. 89, 157 (1997). Instead, the petitioner must establish a *prima facie* case, or a reasonable likelihood of succeeding on the merits. Id. at 158. Thus, the post-conviction relief court should determine whether defendant would be entitled to post-conviction relief if the facts are

9

Da 174

viewed "in the light most favorable to him." Id. However, there is a "pragmatic dimension" to this determination: "If the court perceives that holding an evidentiary hearing will not aid the court's analysis of whether the defendant is entitled to post-conviction relief, or that the defendant's allegations are too vague, conclusory, or speculative to warrant an evidentiary hearing, then an evidentiary hearing will not be granted." Id.

The benchmark for judging any claim of ineffective assistance of counsel must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. Strickland v. Washington, 466 U.S. 668, 686 (1984). If counsel's performance is "so woefully inadequate" that it amounts to a "complete denial of counsel," prejudice is presumed and reversal of the conviction is warranted. United States v. Cronic, 466 U.S. 648 (1984). If, however, counsel's deficiency is not as great as to amount to a "complete denial of counsel," the Petitioner's claims must be examined in accordance with a two-prong test. To determine whether assistance was in fact reasonable and adequate and to establish a *prima facie* case of ineffective assistance of counsel, a petitioner must demonstrate a reasonable likelihood that his claim will meet the two factors set forth in Strickland v. Washington and United States v. Cronic, and adopted by the New Jersey Supreme Court in State v. Fritz, 105 N.J. 42, 51 (1987). See State v. Preciose, 129 N.J. 451, 463 (1992). Under the Strickland test, the petitioner must show that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; Preciose, 129 N.J. at 459.

As to the first prong of the test, the proper inquiry to be made is "whether counsel's assistance was reasonable considering all the circumstances." Strickland, 466 U.S. at 668. Prevailing norms of the practice of law should be used as a guide when making this inquiry. Id. The petitioner's petition "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Id. at 690. The court must then decide in light of the particular circumstances of the case, whether the acts or omissions identified by the petitioner "were outside the wide range of professionally competent assistance." Id. In rendering its decision, the court should apply the strong

Da 175

presumption that counsel has rendered adequate assistance. Id. "As a general rule, strategic miscalculations or trial mistakes are insufficient to warrant reversal except in those rare instances where they are of such magnitude as to thwart the fundamental guarantee of a fair trial." Id. To overcome this presumption, the petitioner must "identify the acts or omissions of counsel that are . . . outside the wide range of professionally competent assistance" in light of all the circumstances of the representation. Strickland, 466 U.S. at 690.

Trial strategy ordinarily cannot be considered ineffective assistance of counsel following an adverse verdict. State v. Gary, 229 N.J. Super. 102, 116 (App. Div. 1988). With specific regard to defense counsel's choice of witnesses to call, our Supreme Court has ruled that such choices may be purposeful decisions and "might be considered sound trial strategy" at the time they are made. State v. Arthur, 184 N.J. 307, 320 (2005). It is all too easy to second-guess counsel's decisions after they have proved to be unsuccessful. Strickland, 466 U.S. at 689. As the Arthur Court found,

> Determining which witnesses to call to the stand is one of the most difficult strategic decisions that any trial attorney must confront. A trial attorney must consider what testimony a witness can be expected to give, whether the witness's testimony will be subject to effective impeachment by prior inconsistent statements or other means, whether the witness is likely to contradict the testimony of other witnesses the attorney intends to present and thereby undermine their credibility, whether the trier of fact is likely to find the witness credible, and a variety of other tangible and intangible factors.

[Arthur, 184 N.J. at 320-21.]

Thus, in evaluating counsel's performance, courts must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective *at the time*." Id. (emphasis added).

As to the second prong, prejudice is not presumed and must be proven by the petitioner. State v. Fritz, 105 N.J. at 52. "A Petitioner alleging [ineffective assistance of counsel] must show that there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. (quoting Strickland, 466 U.S. at 694). Purely speculative deficiencies in representation are

11


Da 176

insufficient to support a claim of ineffective assistance of counsel. State v. Fritz, 105 N.J. at 64. Thus, in order to be entitled to an evidentiary hearing, a petitioner "must do more than make bald assertions that he was denied the effective assistance of counsel." State v. Cummings, 321 N.J. Super. 154, 170, cert. denied, 162 N.J. 199 (App. Div. 1999). Instead, the petitioner must allege facts sufficient to demonstrate counsel's alleged substandard performance. Id.

The Strickland standard is not easily met. A petitioner must specifically demonstrate that his or her "counsel's performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to conviction." State v. Fritz, 105 N.J. at 58. In reviewing a claim that counsel was ineffective, the performance of counsel must be evaluated from his or her perspective at the time of the alleged error, and "judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689; Kimmelman v. Morrison, 477 U.S. 365, 381 (1986). Thus, "a [reviewing] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.

Finally, the New Jersey Supreme Court has emphasized the significance of a petition for post-conviction relief and stressed that a hearing on such a petition is a substantive and "'meaningful procedure' to root out mistakes that cause an unjust result either in verdict or sentence." State v. Parker, 212 N.J. 269, 279 (2012)(quoting State v. Hess, 207 N.J. 123, 144-45 (2011)). Accordingly, our courts should uphold the presumption that favors the grant of oral argument on an initial petition for post-conviction relief. Id. at 282. To that end, the Appellate Division in State v. Mayron, 344 N.J. Super. 382, 384 (App. Div. 2001), listed various factors that courts should consider when determining whether to hear oral argument on a petition for post-conviction relief, or whether to dispense with it. Those factors include "the apparent merits and complexity of the issues . . ., whether argument of counsel [would] add to the written positions . . ., and in general, whether the goals and purposes of the post-conviction procedure are furthered by oral argument." Mayron, 344 N.J. Super. at 387. However, in weighing these factors, the Parker Court stressed adopting a general approach "with the view that oral argument should be granted." Parker, 212 N.J. at 282. In the event that a judge concludes that a petitioner's claims do not warrant oral argument, "the judge should provide a statement of

Da177

reasons that is tailored to the particular application, stating why the judge considers oral argument unnecessary." <u>Id.</u>

## DISCUSSION

Here, as a preliminary matter, Petitioner's application for post-conviction relief is not procedurally barred by <u>R.</u> 3:22-12. New Jersey Court Rule 3:22-12 provides that no petition for post-conviction relief, "...shall be filed pursuant to this rule more than 5 years after rendition of the judgment or sentence sought to be attacked unless it alleges acts showing that the delay beyond said time was due to defendant's excusable neglect." In this case, Petitioner was sentenced on July 19, 2007, and she filed her petition for post-conviction relief on or about October 17, 2011. Thus, Petitioner has satisfied the five-year time limit of <u>R.</u> 3:22-12.

## I.   Ineffective Assistance of Counsel – Failure to Consult and Retain Appropriate Expert Witnesses

Petitioner alleges in five separate sub-points that her trial counsel failed to consult and retain several appropriate expert witnesses, thus depriving her of constitutionally effective assistance of counsel.

**First**, Petitioner states that her counsel was ineffective for failing to consult with or present any evidence from its own expert witness to contradict the testimony of the State's witnesses that the gun Petitioner purchased in Pennsylvania was consistent with the bullets removed from the body of the deceased. During trial, the State called two ballistics experts who testified that the two bullets recovered from the victim's body were .38 Special caliber and had been fired from the same firearm, which had six lands and grooves that were inclined to the right. Petitioner claims that in preparation for the instant petition for post-conviction relief, she consulted Dr. Peter De Forest, an expert in the field of ballistics. Dr. De Forest, unlike the State's experts at trial, "entered the specific model number of the gun [she] purchased" into a search of the FBI's general rifling class characteristics, producing results for "three Taurus .38 Specials, Model 85B2," all of which "fired bullets with five, not six, lands and grooves." Petitioner maintains that if her trial attorneys had consulted with an expert such as Dr. De Forest, the expert might have established that the particular

13



Da 178

gun she purchased most likely had five lands and grooves, whereas the bullets recovered from the victim's body had six.

However, this argument is without merit. On direct appeal, Petitioner made this argument and attempted to supplement the record with information obtained from the website of the manufacturer of the gun she purchased, Taurus International Manufacturing, Inc. (TIMI). In response, the State provided the Affidavit of Robert Morrison, President and Chief Executive Officer of TIMI. Mr. Morrison had been the CEO of TIMI since 1997 and was familiar with the manufacturing process involved and employed by TIMI in the manufacturing of its Taurus handguns, including the Model 85 .38 Special.

Specifically, Mr. Morrison attested to the following relevant facts in his June 29, 2009 affidavit: (1) the handgun defendant purchased (Taurus Model 85 revolver, Serial Number XA53389) has a steel frame and a relatively short barrel; (2) because of its relatively short barrel, coupled with its moderate caliber and chamber pressures, the number for lands and grooves has very little effect on the accuracy of the gun; (3) parts and tools containing five and six lands and grooves are, and always have been, used *interchangeably* in the production of Model 85 handguns; (4) all Model 85 handguns have *either five or six* lands and grooves, but because the factory sometimes uses tools and parts that five lands and grooves, and sometimes uses tools and parts that have six lands and grooves, *there is no way of knowing whether the revolver at issue has five lands and grooves or six lands and grooves;* (5) all Taurus revolvers have right twists; (6) parts and tools containing *either* five or six lands and grooves conform to Taurus's manufacturing process, and *either* is considered fungible and equally appropriate for .38 Special revolvers; (7) because neither the tooling nor the barrels used in the Model 85 are serialized, it is not possible to determine the number of lands and grooves which were cut into the barrel of the revolver at issue (Model 85, Serial Number XA53389) *without examining the weapon itself;* (8) defendant's revolver could have had *either five or six lands and grooves* when it left the factory; (9) although the manufacturer's website indicates that the revolver at issue (Model 85, Serial Number XA53389) had five grooves, the "technical information listed on TIMI's website is subject to change and should not be relied on as accurate;" and (10) the TIMI website is "under constant revision," and data on the site contains erroneous information.

14

Da 179

In light of Mr. Morrison's affidavit as well as the undisputed fact that Taurus manufactured Model 85 .38 caliber revolvers with *both* five *and* six lands and grooves, Petitioner's reliance on Dr. De Forest's claims is unpersuasive. Without the availability of Petitioner's gun for inspection, which is the *only* way to accurately determine the number of lands and grooves it contained, expert testimony such as that of Dr. De Forest lends no credence to Petitioner's claim. Because such testimony would not establish that Petitioner's gun "most likely had five lands and grooves" as opposed to the six that were found on the bullets extracted from the victim's body, Petitioner's trial counsel cannot be deemed ineffective for failing to retain an expert witness to give general testimony regarding the number of lands and grooves in *other* Taurus Model 85 .38 Special handguns. Accordingly, Petitioner is unable to satisfy both prongs of <u>Strickland</u> and establish a claim of ineffective assistance of counsel on this basis.

**Second**, Petitioner claims that her counsel was ineffective for failing to consult and retain an expert witness to present an alternative explanation from that of the State for the presence of chloral hydrate in the victim's car. Petitioner asserts that in an interview with the police, the victim's sister, Cindy Ligosh, "[t]old police that she was concerned about her brother's health" because "he had been showing signs of what she believed might be steroid abuse," such as weight gain, balding, and an enlarged head. Petitioner argues that her trial attorneys should have consulted an expert such as Dr. David Benjamin, a forensic pharmacologist and toxicologist, who speculates that if the victim was using GHB (gamma hydroxyl-butryrate) for body building or other purposes, then he could also have been taking chloral hydrate to counteract the symptoms of GHB withdrawal.

However, this argument flies in the face of the evidence in the record. Specifically, there was no evidence presented from which a jury could infer that the victim was using steroids or GHB. Moreover, the victim's sister testified that she "had no knowledge of any drug use by William," that he "was not in too good of shape anymore," and although he had purchased a "weight set" the year before, she did not know if he ever "used it." Accordingly, there was nothing in Ms. Ligosh's statement indicating that she believed the victim was bodybuilding or showing signs of using steroids to do so. To the contrary, Ms. Ligosh indicated that her brother was out of shape and that he had gotten heavier and started balding over the years, all general information provided to the police in an effort to assist

15

Da 180

their investigation. Therefore, it is unlikely that an expert witness would have been permitted to testify to a wild speculation that has no support in the record. Moreover, assuming that an expert witness was permitted to testify to the fact that chloral hydrate can be used to counteract the symptoms of GHB withdrawal, such testimony would not constitute proof that the victim was in fact using steroids or GHB and suffering from withdrawals. It is highly improbable that such testimony would have resulted in a different verdict by the jury, and accordingly, Petitioner's trial counsel was not ineffective for strategically choosing not to retain or consult with such an expert. More importantly, it is highly unlikely that the Court would have admitted such speculative testimony—testimony that in fact was contrary to all the evidence presented at trial.

Third, Petitioner asserts that her counsel was ineffective for failing to call an expert witness to rebut the State's contention that she could have rid her apartment of all bloodstains resulting from the murder and dismemberment of the victim. During trial, the State addressed the fact that no bloodstains or other biological evidence was found in the McGuire apartment by eliciting testimony from forensic scientists "that blood and tissue can be cleaned up . . . that they do it in the laboratory every single day." Petitioner argues that her attorneys should have called an expert witness such as Dr. David Benjamin, who would have testified regarding the effectiveness of luminol in testing for bloodstains that are naked to the human eye.

However, during trial, Petitioner's counsel cross-examined the State's witnesses, forensic scientist Thomas Lesniak, in order to highlight the fact that scientists and forensic investigators have the technological capability to detect even trace quantities of DNA from blood or tissue that would otherwise be undetectable to the naked eye. Specifically, the following examination took place:

> COUNSEL: Mr. Lesniak, you prepared obviously many, many reports in this case, correct?
> MR. LESNIAK: Yes.
> COUNSEL: Hundreds of pages.
> MR. LESNIAK: Yes.
> COUNSEL: If I totaled them. More than that.
> MR. LESNIAK: Yes.
> COUNSEL: And you certainly did a thorough job as far as trying to recover as much valuable trace evidence as you could?
> MR. LESNIAK: That's my job.

16



Da 181

COUNSEL: Of course. And you did, correct?

MR. LESNIAK: Yes.

COUNSEL: You said something to this jury yesterday about, with today's technology you can detect DNA or trace evidence very easily, correct?

MR. LESNIAK: Very easily. It depends on how much material is there, very easily.

COUNSEL: Sure.

MR. LESNIAK: Let's say technology has improved over the years, yes.

COUNSEL: That's why you said you took all those precautions in your lab and put two sheets down of paper?

MR. LESNIAK: Yes.

COUNSEL: Because you could pick up DNA?

MR. LESNIAK: You can, yes.

COUNSEL: Blood which I know is part of DNA or other trace evidence easily and you want to make sure it's a sterile environment?

MR. LESNIAK: Sterile environment.

COUNSEL: *And you can pick up DNA or blood even if you can't see it, right, in your analysis?*

MR. LESNIAK: If I can see it. Usually if I'm looking--

COUNSEL: Let me withdraw that and rephrase the question. I understand I confused you with that. *You can pick up, you, the scientist, looking with forensic testing can pick up DNA or blood evidence that a lay person couldn't see?*

MR. LESNIAK: Correct.

COUNSEL: Okay. *That a lay person couldn't feel, right?*

MR. LESNIAK: Correct.

COUNSEL: That a lay person couldn't smell, for instance, yes?

MR. LESNIAK: Yes.

COUNSEL: Okay. And that's why you went to that Woodbridge apartment yourself four times, correct?

MR. LESNIAK: Yes.

COUNSEL: And you looked thoroughly as you described to this jury, yes?

MR. LESNIAK: Yes.

COUNSEL: And you came up with no evidence.

MR. LESNIAK: That's correct.

[Trial Tr. 109:8 to 111:11, Mar. 29, 2007, emphasis added.]

Petitioner's trial counsel engaged in this extensive cross-examination for the purpose of convincing the jury that the murder and dismemberment of William could not have occurred inside the McGuire apartment, since multiple searches, utilizing the most technologically advanced tools available to a forensic scientist, yielded no DNA evidence. Accordingly, calling an additional witness such as Dr. Benjamin for the purpose of

17

Da 182

testifying to one such tool by name, i.e., luminol, would have been unnecessary and perhaps even redundant. Moreover, Petitioner's trial counsel may have had strategic reasons for not introducing an expert on luminol at trial. For example, such evidence may have sparked additional investigation by the police utilizing luminol testing and resulting in the discovery of the very same bloodstains counsel argued did not exist. Accordingly, the decision not to call an expert on luminol was a sound trial strategy counsel carefully employed as the evidence needed was already before the jury, and therefore Petitioner is unable to prove that her counsel was ineffective pursuant to *State v. Arthur*, 184 N.J. 307 (2005).

**Fourth,** Petitioner argues that her counsel was ineffective for failing to authorize their computer expert to review the entire internet history of the Pavillion computer taken from the McGuire apartment. She contends that if her trial attorneys had authorized a search of the entire internet history, rather than a limited search confined to the six-day period reviewed by the State's expert, they would have discovered that on January 21, 2004, someone performed searches for "poison your wife" and "poison," and someone accessed websites with the following titles: "www.unfaithfulwife.net"; "www.poisonprevention.org"; and "www.poison.org".

However, this argument also fails to establish a *prima facie* case of ineffective assistance of counsel. First, the existence of those searches on the computer in no way proves that William McGuire conducted them, or that the Petitioner did not. As the State's computer experts testified, "one of the most difficult parts of computer forensics is trying to put someone at the keyboard," and that there is "no way of knowing whether someone else in the household jumped on the computer for a few minutes to do a search and then let the prior person return to what they were doing." (Trial Tr. 93:17 to 94:4, Apr. 11, 2007). Moreover, the searches Petitioner relies on were conducted months prior to the murder and therefore not necessarily related to the searches that were conducted closer in time to the victim's disappearance.

Lastly, and most significantly, Petitioner fails to appreciate that the decision to limit the search to the six-day timeframe prior to the murder was most likely a strategic one. At trial, Petitioner's counsel was able to challenge the State's contentions regarding the incriminating searches found on the computer by presenting an expert of their own. This

18



Da 183

defense witness testified that some of these incriminating searches were made within minutes of other searches, thus supporting defense counsel's argument that the searches were more likely to have been conducted by William McGuire. Authorizing a search of the *entire* internet history on the McGuire computer could have undercut this defense insofar as it could have revealed other incriminating evidence linking Petitioner to the crime. This was a risk trial counsel most likely did not wish to take, and accordingly the decision to limit the search constituted sound trial strategy pursuant to State v. Arthur. Petitioner is unable to show that her trial counsel's performance was ineffective.

**Finally,** Petitioner claims that her counsel was ineffective for failing to retain the appropriate experts in light of the conflict of interest inherent in the retainer agreement. Specifically, Petitioner alleges that the "inherent conflict of interest" arose from the supplemental retainer agreement she entered into with her counsel, whereby she agreed to pay a flat sum of $180,000 that would cover the cost of "all necessary legal work to properly represent the client," as well as all costs "associated with investigators, experts, paralegals, accommodations in New Jersey, service of subpoenas, and preparation of exhibits." Under the terms of the supplemental agreement, Petitioner contends, "the cost of retaining experts diminishes the size of the fee for the attorney," arguably creating a disincentive for her trial counsel to expend the funds on additional witnesses and investigation and producing an inherent conflict of interest.

Nevertheless, there is no legal authority that supports Petitioner's argument that a retainer agreement of this sort creates a conflict of interest and rises to the level of constitutional ineffective assistance of counsel. The case that Petitioner cites to, State v. Norman, 151 N.J. 5 (1997), involved a retainer agreement whereby the defendant's attorney fees were paid by his co-defendant. The Norman Court recognized that payment of attorney fees by a third party who could be implicated by the defendant's testimony "has the inherent risk of dividing an attorney's loyalty." Id. at 34-35 (quoting In re Abrams, 56 N.J. 271, 275 (1970)). Petitioner's case in entirely distinguishable. Moreover, Petitioner is unable to show that she suffered any prejudice from the retainer agreement. In the first instance, the supplemental agreement was signed on March 9, 2007, *after Petitioner's trial was already underway.* At this point, the State and Defense would have already completed their review of discovery and their pretrial investigation, and would have submitted their

19



Da 184

respective lists of witnesses. However, even assuming that the Defense would have pursued additional witnesses as Petitioner argues, she has not included any certification from her trial counsel indicating that they were concerned that hiring additional expert witnesses could reduce the pool of money from which they would be paid, or that they actually failed to retain additional experts because of insufficient funds. Accordingly, Petitioner's argument is too vague and speculative to warrant an evidentiary hearing. Moreover, should Petitioner have run out of funds, counsel could have petitioned the Office of the Public Defender for ancillary services. No defendant in the State of New Jersey goes without access to necessary witnesses or process, as evidenced by the fine work of the Office of the Public Defender on this appeal.

## II.    Ineffective Assistance of Counsel – Failure to Call Witnesses and Present Evidence Critical to the Defense

Petitioner alleges in four separate sub-points that her trial counsel failed to call witnesses and present evidence critical to the Defense, thus depriving her of constitutionally effective assistance of counsel.

First, Petitioner contends that her counsel was ineffective for failing to call Dawn Zhu, a resident of an apartment neighboring Petitioner's, to testify to the argument she heard. Petitioner argues that Ms. Zhu's testimony would have been crucial because it would have corroborated Petitioner's version of what occurred the night her marriage ended, that is, that she had gotten into a heated argument with the victim which caused him to leave the apartment and abandon her and her children. Petitioner claims that although Ms. Zhu "could not remember the exact date of the argument she overheard, she recalled that it took place in the early morning hours, and that it occurred before June 2004, which would put it within the correct time-frame."

However, there is no reason to believe that putting Ms. Zhu on the stand would have helped Petitioner's defense in any way. In her statement to the Woodbridge Police, Ms. Zhu said that she was awakened in the early morning hours because she heard a loud argument. Ms. Zhu could not recall the exact date when she heard this argument, nor could she identify precisely where it was coming from, but it sounded as though it was coming from an upstairs apartment. Ms. Zhu heard the voice of a woman, but she could not identify

20



the second voice as being positively male or female because it was very low. Moreover, Ms. Zhu stated that because she did not speak fluent English, she could not understand everything that was said. She also indicated that she did not know the McGuires, nor did she recall hearing any arguments subsequent or prior to this one.

In light of the weak testimony Ms. Zhu would have provided, Petitioner's counsel did not call her as a defense witness. Instead, defense counsel cleverly elicited parts of Ms. Zhu's statement that inured to the defense through the testimony of Sergeant Dalrymple. Specifically, defense counsel highlighted for the jury, through Sgt. Darlymple, the fact that Ms. Zhu heard an argument coming from the McGuire apartment, and urged the jurors to draw an inference that this corroborated the Petitioner's version of what occurred. Defense counsel's strategy in not calling Ms. Zhu, who would then be subject to rigorous cross-examination, but rather eliciting the helpful aspects of her statement, was reasonable under the circumstances. Indeed, Ms. Zhu's testimony may have led a jury to believe that Petitioner had fought with the victim and that the argument precipitated the murder. Therefore, Petitioner is unable to prove that her trial counsel's performance fell below a reasonable and competent standard of practice, or that the outcome in her case would have been any different had Ms. Zhu been called to testify. Accordingly, Petitioner fails to establish a *prima facie* claim of ineffective assistance of counsel.

**Second,** Petitioner argues that her counsel was ineffective for failing to call Ronald Chwala, Jr., the Maintenance Supervisor of the apartment complex where Petitioner lived, to testify to the lease requirement that walls must be returned to a white or eggshell color before a tenant vacates an apartment. During trial, the State asserted that William McGuire was murdered and dismembered inside the couple's Woodbridge apartment, and that the apartment's spotless condition was the result of Petitioner's meticulous efforts to conceal the evidence of her crimes. Petitioner submits that the testimony of Mr. Chwala, together with the written lease agreement, could have neutralized this inference and rebutted the State's contention that Petitioner repainted the walls for the purpose of "cleaning up."

However, it is clear that the decision not to call Mr. Chwala was a deliberate one since his testimony would have done nothing to bolster the Petitioner's defense. Most leases contain provisions requiring tenants to return walls to a neutral color in order for the landlord to re-lease the premises. Most, if not all, of the jurors would already have been

Da 186

aware of this commonly known fact. What was significant in Petitioner's case was not that the walls had been re-painted, but the fact that the entire Woodbridge apartment had been bleached, scrubbed and painstakingly cleaned to eliminate all traces of DNA evidence. As most lease agreements require tenants to leave the premises in "broom clean" condition, this fact would certainly have been raised by the State on cross-examination of Mr. Chwala to highlight the excessiveness of Petitioner's "cleaning." Therefore, defense counsel's decision not to call Mr. Chwala as a witness was a sound strategy in light of the fact that his testimony would have done very little, if anything, to help the Defense, and would, in fact, have opened the door to potentially more incriminating testimony. Accordingly, Petitioner is unable to show that her counsel's reasonable strategy rose to the level of ineffective assistance or that the outcome of her case would have been different had Mr. Chwala been called to testify.

**Third,** Petitioner claims that her counsel was ineffective for failing to present witnesses from Reproductive Medial Associates (RMA) to testify to the fact that the patient information was kept on a computer database that doctors and nurses could access remotely. Petitioner maintains that had this information been presented to the jury, it would have "undermined the State's argument that only [she] had access to the patient information necessary to produce this prescription, and showed that it could have been written by Bill McGuire."

However, the Petitioner's logic is flawed in several respects. First, eliciting such testimony from the RMA witnesses would not have proven that Bill McGuire accessed the information, since it was password-protected and accessible only by the doctors and nurses who worked for RMA. Instead, this testimony would have confirmed that Petitioner had additional ways of obtaining the patient's information, outside of the fertility clinic's offices. However, even assuming that Bill McGuire had somehow gained access to the remote database, this evidence still would not account for the fact that Petitioner was the one with access to the RMA prescription forms, and that nurses at RMA routinely filled such forms out. In addition, this testimony would also not account for the plethora of evidence presented showing that Petitioner was the one who filled the prescription. Of particular note is the fact that (1) Petitioner was a fertility nurse at RMA with access to the RMA prescription pads; (2) the prescription for chloral hydrate was signed by Dr. Bradley

22

Da 187

Miller, the Petitioner's paramour, and filled in the name of one of Dr. Miller's fertility patients; (3) the forged prescription was filled at a Walgreens pharmacy on the same day the victim disappeared; (4) the Walgreens pharmacy was located approximately eight minutes away from the daycare facility where Petitioner routinely brought her sons; (5) records indicate that the prescription was filled approximately twelve minutes after Petitioner dropped her sons off at daycare. State v. McGuire, 419 N.J. Super. at 113-14.

Given the overwhelming evidence proving that it was Petitioner who forged and filled the prescription for chloral hydrate, it is unreasonable to believe that presenting testimony from the RMA witnesses to a jury would have persuaded them otherwise. Accordingly, Petitioner is unable to show that her counsel's strategic decision not to call RMA witnesses constituted ineffective assistance of counsel, or that the outcome in the case would have been different had these witnesses been called.

Finally, Petitioner asserts that her counsel was ineffective for failing to present evidence of William McGuire's training in pharmacology. Petitioner maintains that had her trial counsel properly investigated, they would have discovered that Bill McGuire attended the Rutgers University School of Pharmacy from 1991 to 1994, which would have given him the "pharmacological knowledge to prescribe chloral hydrate for symptoms of GHB withdrawal" as well as "the technical expertise to write the prescription." Petitioner contends that had this information been presented to the jury, it would have undermined the State's argument that only she would have known the sedative properties of chloral hydrate or had the ability to forge such a prescription.

However, it is unlikely that presentation of this evidence would have refuted the State's proofs that Petitioner was the one who filled the forged prescription for chloral hydrate. Moreover, it is unreasonable to think that the jury would have been persuaded by the evidence, given the fact that nothing in the record suggests that Bill McGuire was using GHB or suffering from GHB withdrawal. Regardless of any "pharmacological knowledge" Bill McGuire may have obtained ten years prior to his murder, the record is replete with evidence that Petitioner had not only the training to prepare and fill the prescription, but also the motive and the access to do so. Moreover, any "pharmacological knowledge" on the part of Bill McGuire does not explain the internet searches discovered on the McGuire computer, which included search results for not only "chloral hydrate,"

23


Da 188

but also "undetectable poisons," "how to purchase hunting rifles in NJ," "gun laws in Pennsylvania," and "how to commit murder."

Based on the overwhelming evidence implicating Petitioner, there was no reason for defense counsel to present evidence of Bill McGuire's pharmacological knowledge to the jury. Not only is Petitioner unable to show that her defense counsel was ineffective, but she also fails to prove that the outcome of her trial would have been different had this evidence been presented to the jury. Accordingly, Petitioner is unable to establish a *prima facie* claim of ineffective assistance of counsel.

### III. Ineffective Assistance of Counsel – Cumulative Errors Warrant Evidentiary Hearing

In her final point, Petitioner argues that should this Court determine that none of the previously raised points individually warrant an evidentiary hearing, the Court must consider their cumulative effect on the outcome of Petitioner's case. As this Court has not found any errors in counsel's legal representation of Petitioner, this point requires no added discussion. Petitioner is unable to meet both prongs of the Strickland test and Petitioner fails to establish a *prima facie* case of ineffective assistance of counsel.

### CONCLUSION

Petitioner has failed to provide evidence of a *prima facie* case of ineffective assistance of counsel under Strickland/Fritz. She has failed to demonstrate under the Strickland test that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Accordingly, Petitioner's petition for post-conviction relief is denied without an evidentiary hearing.

_____
THE HONORABLE BRADLEY J. FERENCZ, P.J.Cr.

24

Da 189

**New Jersey Judiciary**
**Superior Court - Appellate Division**
# Notice of Appeal

| Type or clearly print all information. Attach additional sheets if necessary. | ATTORNEY / LAW FIRM / PRO SE LITIGANT |
|---|---|

| TITLE IN FULL (AS CAPTIONED BELOW) | NAME |
|---|---|
| **STATE OF NEW JERSEY** V. **MELANIE MCGUIRE** | **HELEN C GODBY, Esq.** |

NAME
**HELEN C GODBY, Esq.**

STREET ADDRESS
**31 CLINTON ST. P.O. BOX 46003**

| CITY | STATE | ZIP | PHONE NUMBER |
|---|---|---|---|
| **NEWARK** | **NJ** | **07101** | **973-877-1200** |

EMAIL ADDRESS
**EDWARD.GERMADNIG@OPD.STATE.NJ.US**
**intake.appellate@opd.state.nj.us**

## ON APPEAL FROM

| TRIAL COURT JUDGE | TRIAL COURT OR STATE AGENCY | TRIAL COURT OR AGENCY NUMBER |
|---|---|---|
| **BRADLEY J. FERENCZ, JSC** | **MIDDLESEX** | **05-10-0164-S** |

Notice is hereby given that **MELANIE MCGUIRE** appeals to the Appellate Division from a ☐ Judgment or ■ Order entered on **10/02/2014** in the ☐ Civil ■ Criminal or ☐ Family Part of the Superior Court or from a ☐ State Agency decision entered on _____

If not appealing the entire judgment, order or agency decision, specify what parts or paragraphs are being appealed.

For criminal, quasi-criminal and juvenile actions only:

Give a concise statement of the offense and the judgment including date entered and any sentence or disposition imposed:

**ON OCTOBER 2, 2014 DEFENDANT'S PETITION FOR POST CONVICTION RELIEF WAS DENIED.**

This appeal is from a ☐ conviction ☐ post judgment motion ■ post-conviction relief.
If post-conviction relief, is it the ■ 1st ☐ 2nd ☐ other _____
                                                                    specify

Is defendant incarcerated? ■ Yes ☐ No

Was bail granted or the sentence or disposition stayed? ☐ Yes ■ No

If in custody, name the place of confinement:
**EDNA MAHAN CORRECTIONAL FACILITY FOR WOMEN**
Defendant was represented below by:

■ Public Defender   ☐ self   ☐ private counsel _____
                                                              specify

(*) truncated due to space limit. Please find full information in the additional pages of the form.

Da 190

Notice of appeal and attached case information statement have been served where applicable on the following:

| | Name | Date of Service |
|---|---|---|
| Trial Court Judge | **BRADLEY J. FERENCZ, JSC** | **12/30/2014** |
| Trial Court Division Manager | **MIDDLESEX** | **12/30/2014** |
| Tax Court Administrator | | |
| State Agency | | |
| Attorney General or Attorney for other Governmental body pursuant to *R.* 2:5-1(a), (e) or (h) | | |

Other parties in this action:

| Name and Designation | Attorney Name, Address and Telephone No. | Date of Service |
|---|---|---|
| **STATE OF NEW JERSEY** | **TERESA ANGELA BLAIR, Esq.** **ATTORNEY GENERAL CRIMINAL JUSTICE** **25 MARKET STREET** **PO BOX 085** **TRENTON NJ 08625** **609-984-6500** **dcj-efile@njdcj.org** | **12/30/2014** |

Attached transcript request form has been served where applicable on the following:

| | Name | Date of Service |
|---|---|---|
| Trial Court Transcript Office | **MIDDLESEX** | **12/30/2014** |
| Clerk of the Tax Court | | |
| State Agency | | |

Exempt from submitting the transcript request form due to the following:

☐ No verbatim record.

☐ Transcript in possession of attorney or pro se litigant (four copies of the transcript must be submitted along with an electronic copy).

List the date(s) of the trial or hearing:

☐ Motion for abbreviation of transcript filed with the court or agency below.  Attach copy.

☐ Motion for free transcript filed with the court below.  Attach copy.

---

I certify that the foregoing statements are true to the best of my knowledge, information and belief.  I also certify that, unless exempt, the filing fee required by *N.J.S.A.* 22A:2 has been paid.

| __12/30/2014__ | s/ HELEN C GODBY, Esq. |
|---|---|
| Date | Signature of Attorney or Pro Se Litigant |

BAR ID #    **018191981**    EMAIL ADDRESS    **intake.appellate@opd.state.nj.us**

---

Da 191