FILED, Case 3:18-cv-02431-MAS Document 9-50 Filed 09/14/18 Page 1 of 163 PageID: 3129
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1

```
 1                              SUPERIOR COURT OF NEW JERSEY
                                LAW DIVISION-MIDDLESEX COUNTY
 2                              INDICTMENT NO. 05-10-00164-S
                                              06-10-00116-S
 3                              APPELLATE NO. 6576-06-T4

 4
     STATE OF NEW JERSEY,        *
 5                               *    STENOGRAPHIC TRANSCRIPTION
          VS.                    *              OF
 6                               *
     MELANIE MC GUIRE,           *       TRIAL PROCEEDINGS
 7              Defendant.       *

 8

 9                         Place:  Middlesex County Courthouse
                                   New Brunswick, N J  08903
10
                           Date:   March 6, 2007
11

12   TRANSCRIPT ORDERED BY:   Helen Godby, Esq.,
                              Assistant Deputy Public Defender?
13                            Appellate Section

     BEFORE:
14                     HONORABLE FREDERICK P. DE VESA, J.S.C.

15   APPEARANCES:

16   PATRICIA PREZIOSO, ESQ.,
     CHRISTOPHER ROMANYSHYN, ESQ.,
17   DEPUTY ATTORNEYS GENERAL
     FOR THE STATE
18
     JOSEPH TACOPINA, ESQ.,
19   STEPHEN TURANO, ESQ.,
     ATTORNEYS FOR DEFENDANT
20

21
                                   Susan J. Marcinczyk, CSR
22                                 Official Court Reporter
                                   Middlesex County Courthouse
23                                 New Brunswick, N.J.

24

25
```

FILED, Case 3:18-cv-02141-MAS Document 1-50 Filed 09/14/18 Page 2 of 163 PageID: 3130
FILED, Clerk of the Appellate Division, July 18, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

2

INDEX

| WITNESS | | PAGE |
|---|---|---|
| ELIZABETH DUTTON | | |
| Direct Examination by MR. ROMANYSHYN | | 3 |
| Cross Examination by MR. TACOPINA | | 33 |
| Redirect Examination by MS. PREZIOSO | | 49 |
| JOSEPH RAY PICKELL | | |
| Direct Examination by MS. PREZIOSO | | 54 |
| Cross Examination by MR. TACOPINA | | 104 |
| Redirect Examination by MS PREZIOSO | | 139 |
| Recross Examination by MR. TACOPINA | | 142 |
| JOHN COSCIA | | |
| Direct Examination by MS. PREZIOSO | | 143 |
| Cross Examination by MR. TACOPINA | | 152 |
| Redirect Examination by MS. PREZIOSO | | 157 |

EXHIBITS

| | | |
|---|---|---|
| S-25A EVD. | BULLET | 20 |
| S-25B EVD. | BULLET | 21 |
| S-180, S-182, S-184, | | |
| S-186, S-187 EVD. | PHOTOS | 30 |
| S-6 EVD. | SUITCASE | 33 |
| S-2 EVD. | TOWELS | 51 |
| S-227 EVD. | TAPE | 90 |
| S-223A EVD. | VIAL | 97 |
| S-223B EVD. | SYRINGE | 97 |
| S-1005 EVD. | CD/PHOTOS | 98 |
| S-221 EVD. | BROWN BAG | 98 |
| S-229 EVD. | EZ-PASS | 99 |
| S-257 | BLACKBERRY | 100 |
| S-231 EVD. | FEDERAL FORM | 146 |
| S-233 EVD. | STATE FORM | 150 |
| S-235 EVD. | REGISTER RECEIPT | 151 |
| S-232 EVD. | WRITTEN RECEIPT | 151 |



FILED, Case 8:18-cv-02421-MAS Document 10-14 Filed 09/14/18 Page 3 of 163 PageID: 3131
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

```
 1              ( Court resumes)
 2              THE COURT:  Counsel, are we ready to bring the
 3    jury in?
 4              MR. TACOPINA:  Yes, your Honor.
 5              ( Whereupon the jury returns to the courtroom and
 6    court resumes )
 7              THE COURT:  All right, good morning, ladies and
 8    gentlemen, please be seated.
 9              Mr. Romanyshyn, are we ready to continue with the
10    testimony of Ms. Dutton?
11              MR. ROMANYSHYN: Yes, your Honor, the State is
12    prepared to continue at this time.
13              THE COURT:  Good morning.  You have been
14    previously sworn and you remain under oath.
15              THE WITNESS:  Yes, sir.
16              THE COURT:  Go ahead, Mr. Romanyshyn.
17    E L I Z A B E T H   D U T T O N, previously sworn, resumes
18    the witness stand.
19    DIRECT EXAMINATION BY MR. ROMANYSHYN:
20         Q    Good morning, Ms. Dutton.
21    A    Good morning.
22         Q    When we left off with your testimony yesterday you
23    had just described for the jury the recovery of the second
24    suitcase on Fisherman's Island, do you recall that, ma'am?
25    A    Yes, I do.
```

FILED, Case 3:18-cv-02421-MAS Document 1-4 Filed 09/14/18 Page 4 of 163 PageID: 3132
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1        Q      From the time you recovered the suitcase on

2    Fisherman's Island, what did you do next?

3    A      After the suitcase was, are you referring to after

4    we've transported it back to the medical examiner's office.

5        Q      Yes, ma'am?

6    A      Okay, the suitcase was placed in a black body bag on

7    Fisherman's Island placed in a metal tub, placed into my

8    vehicle and driven to the medical examiner's office in

9    Norfolk, Virginia.

10       Q      And what happened once you arrived at the medical

11   examiner's office?

12   A      More photographs were taken of the suitcase.  Doctor

13   Turner Gray was there and as I was photographing the

14   suitcase he opened the top flap of the suitcase folding it

15   over revealing black plastic trash bags inside the suitcase.

16       Q      And what was the condition of those trash bags?

17   A      The trash bags seemed fairly intact.  They didn't have

18   any holes or rips or tears in it.  It did have a thick

19   yellowish white kind of film, oily film all over the trash

20   bags.

21       Q      And at this point can you tell what size the trash

22   bags are?

23   A      At the time before we had removed them out, no, we just

24   knew there was a number of them.  After the removal of the

25   trash bags it was determined that there were five trash



FILED, Clerk of the Appellate Division, July 18, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    bags.   Three large trash bags and two smaller trash bags.

2    The large trash bags were consistent of the industrial size

3    trash bags where you have to gather it up at the top and use

4    a twist tie to close it.

5              The two smaller ones I would characterize as

6    kitchen-size trash bags that had yellow draw strings to draw

7    up to close.

8         Q    Did it smell?

9    A    Yes, it smelled, it smelled.

10        Q    What did it smell like?

11   A    It smelled like decomposing flesh, rotten fish and the

12   actual sea or bay water.

13        Q    On the outside of these bags did you observe any

14   blood?

15   A    No, I did not.

16        Q    On the interior of the suitcase at the M.E.'s

17   office did you observe any blood?

18   A    No, I did not.

19        Q    You've indicated that the suitcase was opened at

20   the medical examiner's office?

21   A    Yes, it was.

22        Q    And what was done next?

23   A    Under my direction Doctor Gray attempted look for an

24   opening in the trash bags to reveal what was in the bags.

25   He felt around in the trash bag and was able to find an

FILED, Case 3:18-cv-02411-MAS Document 150-14 Filed 09/14/18 Page 6 of 163 PageID: 3134
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    opening.  As he separated the bags it was determined he was

2    actually separating two different trash bags that were

3    meeting.  So, he separated the bags revealing the torso of a

4    white male.

5         Q    What position was that torso in?

6    A    The torso was lying on his back in the suitcase.  He

7    had his right arm brought up over his shoulder in this

8    manner.  The left arm was across his chest and under his

9    chest across his belly with these three fingers curled under

10   and his fingers pointing like this.

11        Q    Was the head attached?

12   A    Yes, the head was attached.  It was a torso from the

13   head to the waist down, it was severed at the waist.

14        Q    How did the head appear?

15   A    The head in the suitcase was turned to the left with

16   the right ear being visible.  There was a blanket that was

17   underneath the torso that was drawn up around his head, not

18   covering his face, but brought up on the back of his head

19   around his forehead and towards his ears.

20        Q    Is that the blanket that you told us about

21   yesterday?

22   A    Yes, it was.

23        Q    Can you describe the condition of the torso?

24   A    The torso was severed from the waist down.  It had some

25   stages of decomposition and there was different degrees of

FILED, Clerk of the Appellate Division, July 18, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, **079925**





1    discoloration within the skin.

2        Q    Was that discoloration uniform?

3    A    No, it was in various blotches.  There were some red

4    spots, there were some green spots, some very pale white

5    spots, some skin slippage from the decomposition.

6        Q    Were there body organs visible?

7    A    Yes, there were body organs visible on the waistline

8    near the cut line that was made.

9        Q    What was the condition of the interior of the

10   garbage bags?

11   A    The two larger bags, when we spread them apart we

12   realized they were the two smaller bags I had referred to

13   earlier were inside the larger bags, so it was consistent

14   with the smaller kitchen-size trash bag being placed over

15   the head, pulled down towards the waist area and then a

16   larger bag over that.  The other smaller trash bag was

17   consistent with coming up on the waist part of the torso

18   drawn up towards the chest area with a larger bag over that

19   with the two larger bags meeting in the middle.

20       Q    Was the torso removed from the suitcase?

21   A    Yes, it was.  The torso was slid out of the bags and

22   the suitcase.  The bags remained inside the suitcase to

23   preserve any possible trace evidence that was on the bags or

24   in the suitcase.

25       Q    Once the torso had been removed from the bags,

FILED, Case 3:18-cv-0241-MAS Document 50-14 Filed 09/14/18 Page 8 of 163 PageID: 3136
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    what was done next?

2    A    We closed the suitcase back up.  The suitcase was

3    placed back in a bio-hazard bag, back in the original tub

4    that I had transported it in, placed back in my vehicle and

5    I responded to my lab at my office to process it.

6         Q    Now, which items did you take back to the lab with

7    you?

8    A    Took back the suitcase, the blanket, everything that

9    was contained in the original suitcase minus the torso.

10        Q    And once you returned to the lab with these items

11   what was the next step?

12   A    More photographs were taken of the items back in my

13   lab.  The items of evidence were taken out of the suitcase

14   and each item, including the suitcase, was examined for any

15   possible physical evidence.

16        Q    Please describe for the jury what you did with the

17   suitcase?

18   A    I did visually examine the suitcase, I did not observe

19   any blood.  I examined the suitcase with an instrument that

20   we called the Lumi Light for any trace evidence.  A Lumi

21   Light is a hand-held alternate light source.  It fluoresces

22   any not readily, easily visible evidence such as hair and

23   fibers, any latent fingerprints that have been treated with

24   a fluorescent powder or a fluorscent dye.

25        Q    What were the results of that examination?



FILED, Case 2018-cv-0241-MAS Document 150 Filed 09/14/18 Page 9 of 163 PageID: 3137
FILED, Clerk of the Appellate Division, July 18, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, **079925**



1    A    That yielded negative results.

2         Q    Did you also process the trash bags?

3    A    Yes, I processed the trash bags.  All five trash bags

4    were removed from the suitcase.  They were placed in a

5    drying chamber that we have in an attempt to try to dry them

6    out as much as possible.

7         Then they were placed in a cyanoacrylate fuming

8    chamber which is just a fancy word for super glue chamber.

9         Q    Can you please explain to the jury how that

10   process is done, that fuming process?

11   A    Our super glue chamber is six feet tall, four feet

12   wide, a vacuum-sealed chamber that as you open the door I

13   would hang up the bags just on a regular coat hanger with

14   clips, I insert them into our chamber.  The bottom of the

15   chamber there's a heating element where on a small tin I

16   take simple liquid super glue and place it into the tin.  It

17   slides into the machine.  The tin is heated.  When the super

18   glue is heated it causes these fumes to rise up and the

19   fumes will actually adhere to the oils and the fatty tissues

20   that are left within the fingerprint residue and ridge

21   detail almost making like a cast of the fingerprint and

22   making them visible.

23        Q    And what were the results of that process with

24   respect to the bags?

25   A    Once the actual cyanoacrylate or super glue was done



FILED, Case 3:18-cv-02431-MAS Document 62-50-14 Filed 09/14/18 Page 10 of 163 PageID: 3138
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    the bags were taken out and a visual exam was done of the

2    bags to look at any latent fingerprints.  None was readily

3    visible.

4           The next step I took was to spray it with another

5    chemical called MBD.  This is a fluorescent dye that

6    actually also reacts to the cyanoacrylate or super glue and

7    when you look at it under the Lumi Light that I just talked

8    about it will fluoresce and make clear any of the ridge

9    details.

10          After that whole process of all the bags it did

11   yield negative results.

12   Q    And what did you do with the bags after that?

13   A    The bags were then packaged and placed down in property

14   and evidence.

15   Q    And the blankets that you described earlier, what

16   did you do with that item?

17   A    The blanket that I had looked at, there seemed to be

18   some sort of red staining on there.  I did not see any

19   noticeable trace evidence, so that was packaged up, placed

20   on a property and evidence and to be sent to the lab for

21   further analysis.

22   Q    And what was the condition of the blanket?

23   A    I'm sorry?

24   Q    Was it wet?

25   A    The blanket at the time I got it was wet.  It was

FILED, Clerk of the Appellate Division, July 09, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    placed in our drying cabinet to dry out and prior to being

2    packaged.

3         Q    And how did you package it?

4    A    I packaged it in what we would call butcher block paper

5    which the blanket, once it's dried it's laid flat, there's

6    two pieces of paper that are put between the blanket, it's

7    folded up and then placed into another paper bag.

8         Q    Is there a particular reason that the blanket was

9    packaged in that manner?

10   A    It's to preserve any trace evidence, it also, if you

11   put two pieces of paper together and as you fold it up you

12   won't have any possibility of cross contamination of any

13   stains that may be on there that the lab can analyze.

14        Q    Did there come a point in time when you returned

15   to the medical examiner's office for the autopsy portion of

16   the torso?

17   A    Yes, I did.  The very next day I responded back to the

18   medical examiner's office for the autopsy.

19        Q    And did you take photographs at that time?

20   A    Yes, upon arrival I took photographs prior to Doctor

21   Gunther who was our forensic pathologist who was going to

22   perform the autopsy.

23        Q    While you were present at the autopsy did you

24   collect any further evidence?

25   A    Yes, I did.  I recovered two bullets, actually Doctor

FILED, Clerk of the Appellate Division, July 09, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    Gunther recovered two bullets that was eventually turned

2    over to me.

3         Q    They were turned over to you?

4    A    They were turned over to me, correct.

5         Q    You were present when they were recovered?

6    A    Correct, during the autopsy Doctor Gun--

7         Q    Let me stop you for one second.  Let's Confine

8    ourselves for a moment to the first bullet that was given to

9    you, do you recall that?

10   A    Yes.

11        Q    Can you describe for the jury the condition of

12   that bullet?

13   A    Sure, the first bullet that Doctor Gunther had

14   recovered was in the chest cavity area of the torso.  It was

15   a small lead projectile, smaller than an inch, an inch in

16   length.  It didn't appear to have, it appeared to be a

17   fairly clean bullet.  It was packaged and sealed and turned

18   over to me at the medical examiner's office.

19        Q    Did you seal it?

20   A    No, I did not.  The medical examiner sealed it in a

21   heat-sealed plastic container.

22        Q    And she did that in your presence, is that

23   correct?

24   A    Yes, she did.

25        Q    You indicated earlier you received a second

Case 3:18-cv-02421-MAS Document 62-50-14 Filed 09/14/18   Page 13 of 163 PageID: 3141

Dutton-Direct                                    13

1    bullet, is that correct?

2    A    Yes, I did.

3        Q    Please describe for the jury that bullet?

4    A    The second bullet was found loose on the gurney but

5    kind of close to the waist area or the cut line of the

6    torso.  When the torso was on the gurney alot of the insides

7    had come out and the bullet was, I believe, under that.

8    Doctor Gunther recovered it and returned it over to me.

9    There was a lot of fibers around this bullet with a piece of

10   material that was attached to the fiber that was around the

11   bullet.

12       Q    Can you describe the fiber, please?

13   A    The fiber, it was a massive kind of greenish-brown

14   fibers, it was fiber strands that were encasing the bullet

15   along with a very small piece of fabric, about two to three

16   centimeters more of a greenish color itself.

17       Q    And how did you receive those items?

18   A    Again, Doctor Gunther had placed it in a heat-sealed

19   envelope, it was turned over to me and I brought it back to

20   my lab.

21       Q    That was all done in your presence?

22   A    Yes, it was.

23       Q    Did you collect any other evidence while you were

24   at the autopsy?

25   A    Yes, during the torso autopsy I collected a DNA card

FILED, Case 3:18-cv-02411-MAS-DEC Document 62-50 Filed 09/14/18 Page 14 of 163 PageID: 3142
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    from the torso that was sent off to the lab for analysis to

2    compare the body parts to make sure they all matched up.

3         Q    Did you ultimately receive a result from that?

4    A    Yes, we did.

5         Q    And what was that result?

6    A    That the torso, legs, and eventually when we found the

7    other suitcase, that the torso and the legs matched up as

8    coming from the same person.

9         Q    When you returned to your laboratory what was the

10   next step you took with the first bullet?

11   A    The first bullet I did nothing with, it was already

12   sealed up with the initials of the medical examiner.  It did

13   not appear to me that it had any sort of trace evidence,

14   hair, fiber on it, so I pretty much left it alone and sent

15   it to the lab for our firearms section for them to do their

16   analysis.  When a bullet goes to the firearm section they

17   will be able to determine the lands and grooves, the twists

18   of the bullet and the possible make and model of the weapon

19   that it had come from.

20        Q    Did you conduct any further analysis on the second

21   bullet?

22   A    The second bullet was photographed by me in the lab and

23   the fibrous material or the fibers that were around the

24   bullet along with the piece of material that was on the

25   fiber was all separated from the bullet and packaged

FILED, Case 3:18-cv-02340-MAS-DEA Document 62-50 Filed 09/14/18   Page 15 of 163 PageID: 3143
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   separately.

2       Q    Were you able to do any analysis on the fiber?

3   A    The fibers were going to be sent to the lab so the lab

4   could do an analysis.  The reason that I separated the fiber

5   from the bullet is because they are two different

6   disciplines in the State Lab.  The bullet will go to the

7   firearms section.  All the material, fiber and fabric will

8   go to the trace section and then they will conduct their

9   analysis.

10       Q    You indicated that while you were present at the

11  autopsy you took some photographs, is that correct?

12  A    Yes.

13            MR. ROMANYSHYN:  If I could approach.  The record

14  could reflect I am handing the witness State's exhibits

15  32, 162, 163, 164, 165 and 166.

16       Q    Supervisor Dutton, I ask you to take those

17  photographs, if you would just kindly look at them to

18  yourself and tell us whether or not you recognize those

19  items?

20  A    Yes, these are the photographs that I took at the

21  medical examiner's office.

22       Q    Let me show you State's 32.  Again, please keep it

23  to yourself.  What is that a picture of?

24  A    This is an overview shot or overview photograph of the

25  suitcase that was recovered on Fisherman's Island brought

Dutton-Direct                                                16

1    back to the medical examiner's office.  The lid of the

2    suitcase is open, the black plastic trash bags have been

3    pushed aside revealing the position of the torso that is

4    from the head to the waist.

5         Q    Let me show you items 162 through 166 and what are

6    those pictures, ma'am?

7    A    These pictures are of the x-ray film that was on the

8    light box when I arrived in the autopsy bay prior to the

9    autopsy.

10        Q    I'm sorry, Ma'am, I have another set for you.

11   These would be State's 176, 182, 186, 180, 167, 173, 170,

12   174, and 168.

13             I ask you if you would take a look at those

14   please?

15   A    These are also photographs that I have taken for,

16   section of them are for the actual bullet I described that

17   had the fiber around it, those were photographs I had taken

18   in the lab.  There are other photographs documenting the

19   close-up detail of the suitcase and another suitcase that

20   was at the M.E.'s office.

21        Q    I'd like to go through a few of these with you.  I

22   am just going to hand you this pointer if you would.

23             MR. ROMANYSHYN:  Judge, I am placing on the

24   presenter at this time, if I may publish to the jury.

25             THE COURT:  Has counsel seen them?



FILED, Case 3:18-cv-02341-MAS-Document 6-51 Filed 09/14/18 Page 17 of 163 PageID: 3145
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1          MR. ROMANYSHYN:  Judge, can these items be

2    received as well?

3          MR. TACOPINA:  No objection to any of them.

4          THE COURT:  Okay.

5     Q    Placing on the presenter State's 167. The picture

6    is much clearer.

7          If you can, please describe for the jurors this

8    area of the photo here, what does that depict?

9    A    This is bullet number two that was recovered on the

10   gurney during the autopsy.  This is the bullet as soon as

11   Doctor Gunther had removed it from the gurney and placed it

12   on one of her surgical towels.  As you can see it does have

13   a fiber encased around the bullet.

14         MR. ROMANYSHYN:  May I display that to the jury?

15   It's a little difficult to see on the presenter, folks.

16         MR. TACOPINA:  I'm sorry, I can't hear what he's

17   saying.

18         MR. ROMANYSHYN: I said it's a little difficult to

19   see on the presenter.  That's the reason I am holding it

20   up.

21    Q    State's 170.  Ms. Dutton, what does that photo

22   depict?

23   A    This is a photograph that I took back in the lab and

24   this is the bullet, this is after the fibers that we just

25   originally looked at that were around the bullet, it has now

FILED, Case 3:18-cv-02341-MAS-LHG Document 62-14 Filed 09/14/18 Page 18 of 163 PageID: 3146
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    been removed.  This is the lead projectile that is the

2    bullet.  This would be the end of the bullet.  This is the

3    head of the bullet here, and again once I revealed, once I

4    took off the fiber from the bullet another piece of fabric

5    and fiber was also on the head of the bullet almost wrapped

6    around it, you can see this right here is all another piece

7    of fabric.  That was photographed and removed from the

8    bullet and packaged separately.

9         Q    State's 173, is that the fibrous material you were

10   just referring to?

11   A    Yes, this is the fiber material.  The first photo that

12   you looked at it looks a little different.  This is when the

13   fibers have actually dried, it is dried out, it has been

14   removed from the bullet and you can see the kind of

15   greenish-brown fibers here, and then right here on the edge

16   is this small little piece of fabric that is attached to the

17   fibers.

18        Q    State's 168, does this photo depict a better view

19   of the small piece of material that you just described for

20   the jury?

21   A    Yes.

22        Q    Could you indicate please with the laser pointer

23   on there where that piece of material is?

24   A    This is the same fiber that was removed from the bullet

25   and again this would be the fiber, the bullet was taken out




FILED, Clerk of the Appellate Division, July 05 2018, A-002150-14 Filed 09/14/18 Page 19 of 163 PageID: 3147
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    of this end and right here is the piece of material that I

2    would be referring to.  It's kind of entwined, just attached

3    to it, it was easily removed.

4         Q    I am just going to need to get a piece of

5    evidence.

6              MR. ROMANYSHYN:  At this point, your Honor, I

7    would like to show some physical exhibits to Ms. Dutton.

8    They remain evidence packaged so we are obtaining some

9    gloves for her now and I am going to ask her to unseal them

10   in the presence of the jury.

11        Q    Ms. Dutton, these have been marked for

12   identification as State's 25A and B.  I am going to hand you

13   this envelope and this pair of sissors and I am going to ask

14   that you unseal that envelope, please.

15        Do you recognize those items, ma'am?

16   A    Yes, these are the items that I had collected from the

17   medical examiner's office.  This is my red evidence tag I

18   placed on my evidence.  This is listed as item number one

19   and item number two which would depict the two bullets that

20   were recovered from the autopsy.

21        Q    Are those envelopes sealed, Ma'am?

22   A    Yes, they are.

23        Q    Would you unseal the first envelope, please,

24   Ma'am.

25        Do you recognize the item?

FILED, Clerk of the Appellate Division, July 26, 2018, A-002150-14

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1     A      Yes, I do.

2           Q      And what is it?

3     A      This is the bullet that was recovered from the chest

4     cavity of the torso during the autopsy.

5           MR. ROMANYSHYN:  Judge, at this point time I ask

6     that bullet be received in evidence.

7           MR. TACOPINA:  No objection.

8           THE COURT:  Is that S 25A.

9           MR. ROMANYSHYN:  S 25A, sir.

10          THE COURT:  S-25A will be admitted into evidence

11    without objection.

12               ( Exhibit marked in evidence )

13          Q      I don't know how effective this is going to be but

14    I am going to try to put it up on the presenter.

15               Directing your attention to the small object just

16    above the white card, is that the bullet, Ma'am?

17    A      This is the bullet, yes.

18          Q      Would you kindly unseal the second envelope,

19    please.

20               Do you recognize that item, ma'am?

21    A      Yes, this is the second bullet that was recovered

22    during the autopsy of the torso.

23          MR. ROMANYSHYN:  Judge, I'd ask 25B, the second

24    bullet, be received into evidence.

25          MR. TACOPINA:  No objection.

FILED, Clerk of the Appellate Division, July 05, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

Case 3:18-cv-02451-MAS   Document 62-51   Filed 09/14/18   Page 21 of 163 PageID: 3149

Dutton-Direct                                        21

1            THE COURT:   S-25B will be admitted into evidence

2    without objection.

3            ( Exhibit marked into evidence )

4        Q    Will you please indicate where the bullet is?

5    A    Right here is the bullet that was recovered loose on

6    the gurney.

7        Q    Let me show you another item, this has been marked

8    State's 26, 27 and 28 for identification.  You can open the

9    envelope, please.

10            Do you recognize that item, Ma'am, you can unseal

11   it, you can unseal that inner envelope?

12   A    Yes, these are, again, my red evidence tags as I marked

13   my items when I had them back in the lab, these are the

14   items that I had removed from that second bullet where we

15   talked about the fiber and the material.

16       Q    If you can, can you unseal them, please?

17       Do you recognize the item?

18   A    Yes.

19       Q    And what is it?

20   A    This is the fiber from the bullet.

21       Q    You can replace that in the envelope.

22       Do you recognize that item?

23   A    There's nothing in this.  I am not sure if the lab has

24   used all the, I don't know what analysis the lab has used.

25   At times if you don't have a large sample the items that are

Dutton-Direct                                                         22

1    turned into the lab they can use them all during their

2    analysis and, therefore, which is why this glassine envelope

3    is empty.

4        Q    Would you open the third item, please?

5        Do you recognize that item?

6    A    Yes.

7        Q    Can you tell the jury what that item is, please?

8    A    This is the actual fibers that were wrapped around the

9    bullet and encompassed in the bullet.

10        And I made an error in this, because, the fiber is

11   tucked up in the corner and, I apologize, I did not see it.

12   But the little square piece of fiber that I pointed out

13   earlier, that was on the outside of the fibers.  It is, it's

14   right up there behind the flap.

15        Q    If you could replace those in the envelopes,

16   Ma'am.

17        Now, if I may direct your attention to May 16th of

18   2004?

19   A    May I remove the gloves?

20        Q    You can take the gloves off.

21   A    Thank you.

22        Q    Directing your attention to May 16th, 2004, were

23   you working on that day?

24   A    No, that was a Sunday, and that was my day off.

25        Q    Did there come a time during that day when you

Dutton-Direct                                                23

1    became involved in a case involving yet another suitcase

2    with body parts contained in it?

3    A    Yes, I received a call at my house saying they have

4    located yet another suitcase with, at this point, everybody

5    pretty much knew, body parts in there.

6        Q    And when you received this phone call what did you

7    do?

8    A    I responded from my house, I went out to the Lynnhaven

9    City Marina which is off Vista Circle in the City of

10   Virginia Beach and met Detective Zebley is there and Doctor

11   Gray.

12       Q    After meeting Detective Zebley and Doctor Gray,

13   what did you do?

14   A    I was directed by a marine patrol officer to the dock,

15   to the dock area.  Walking down the docks it was brought to

16   my attention a object that was covered with a yellow blanket

17   that the police officers normally carry, it's one of those

18   safety blankets.

19       Q    Did you removed the blanket?

20   A    Yes, the suitcase was underneath the blanket.  Upon my

21   arrival at the dock I removed the yellow blanket that was

22   covering the suitcase and immediately recognized a small, it

23   was about a twenty-six inch Kenneth Cole green and black

24   suitcase that was consistent with the other two suitcases

25   that I had come in contact with.

FILED, Clerk of the Appellate Division, July 26, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

Case 3:18-cv-02341-MAS Document 62-50 Filed 09/14/18 Page 24 of 163 PageID: 3152

1      Q     And what was the condition of the suitcase at the

2   time you first observed it?

3   A     The suitcase was laying flat on its back side so the

4   opening and the lid was upward.  It had some significant

5   water weight to it, not as much sand and the previous one.

6   There has been two ropes that I believe the marine patrol

7   attached to the top handle and the side handle of the

8   suitcase.  Again, it was in relatively good condition.  No

9   rips, no tears, no dents within the actual suitcase itself.

10      Q     Did you observe any blood on the exterior of the

11   suitcase?

12   A     No, I did not.

13      Q     Did it have a smell?

14   A     Yes, this was probably the most potent of all suitcases

15   and the smells, by the time you hit the dock you knew

16   exactly what you had.  Again, it was a strong odor of

17   decomposing flesh, rotten fish and that nasty bay water.

18      Q     Did you open the suitcase at the scene?

19   A     No, we did not open the suitcase at the scene.

20      Q     What did you do with it?

21   A     After I finished photographing it Doctor Gray met me on

22   the dock.  Again, she provided a white body bag, we placed

23   the suitcase in a white body bag, placed it back into tin

24   tub and loaded it into Doctor Gray's vehicle at this point

25   in which we transferred it to the medical examiner's

FILED, Case 3:18-cv-02404-MAS Document 62-150-14 Filed 09/14/18 Page 25 of 163 PageID: 3153
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   office.  I followed behind Doctor Gray to the medical

2   examiner's office.

3        Q    Upon your arrival at the medical examiner's office

4   what steps were taken at that point?

5   A    Again, the suitcase was removed from Doctor Gray's

6   vehicle, placed into the autopsy bay on a gurney and the

7   body bag was opened revealing the suitcase.

8        Q    Was the suitcase opened at that time?

9   A    The suitcase was closed at that time.  I took overall

10  photos and again under my direction Doctor Gray opened the

11  suitcase revealing more black trash bags.

12       Q    What was the condition of those trash bags?

13  A    Again, they seemed in fairly good condition.  They

14  didn't have any rips or tears or punctures or stretches.

15  They had that consistent slimy, oily film that was covering

16  the trash bags, and there was, obviously, another body part

17  within the trash bags.

18       Q    Could you tell at this point how many trash bags

19  were contained within that suitcase?

20  A    No, we couldn't, not at that point.

21       Q    Were those trash bags opened at the medical

22  examiner's office?

23  A    When attempting to, Doctor Gray attempted, again, to

24  find the natural opening of the trash bag but, we found it

25  extremely difficult with this one.  As he was feeling



FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-17
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    around, concern for the possibility of destroying trace

2    evidence, we discussed for the first time actually removing

3    the trash bags from the suitcase with the body part in it to

4    try to get it away from that confined area.

5            So, the trash bag with the body part was lifted up

6    and placed on another gurney.  It wasn't until then that we

7    found that the opening of the trash bag was beneath the body

8    part.  We found the opening.  We opened up the trash bag and

9    inside of it was another trash bag, one of the smaller ones.

10   Again, I believe it had the yellow draw string.  We parted

11   that and that is where we discovered the mid section of a

12   white male.  It had been severed at the waist and severed

13   both above the left and the right knee.

14       Q    What was the condition of that mid section that

15   you observed?

16   A    The condition of that mid section I think was worse

17   than the other two parts.  I think they had a little bit

18   more decomposition of the body.  The skin had a greenish

19   tint to it and it had much more skin slippage, especially

20   around the wounds and where it had been severed.

21       Q    How many total cuts were there?

22   A    There were three cuts, one through the waist and then

23   again right above where the right knee would be and then the

24   left leg, above the knee.

25       Q    And was there any exposed tissue at the cut sites?

FILED, Case 3:18-cv-02341-MAS Document-2-50-1 Filed 09/14/18 Page 27 of 163 PageID: 3155
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    Yes, at each cut site there was exposed tissue and

2    bone.

3         Q    What was done with the mid section portion of the

4    body at this point?

5    A    The mid section portion of the body was left at the

6    medical examiners office.  The bags were then placed back in

7    to the suitcase, the suitcase was closed and placed into a

8    bio-hazard bag, placed back into that tub, placed back into

9    my vehicle and I responded back to my lab to finish the

10   processing.

11        Q    Did the body part have any clothing on it?

12   A    Yes, the body part had Fruit of the Looms, men's briefs

13   on.

14        Q    Did you observe any blood on those briefs?

15   A    I saw small hints of red stains.  I wasn't sure what it

16   was, but there were small hints of red stains.  There was a

17   lot of dirt, black soot on there, not soot but black and

18   brown discoloration on the underwear.

19        Q    Did you find any blood on the interior of the

20   garbage bags?

21   A    No, I did not.

22        Q    Did you take the briefs back to the lab with you?

23   A    Yes, I did.

24        Q    On that day?

25   A    No, the next day.  The briefs and the mid section

1    stayed at the M.E.'s office.  I went back with the suitcase

2    and the items of evidence that were inside the suitcase.

3    The next day I responded to the medical examiner's office

4    for the autopsy of the mid section and it was at that point

5    that I collected the briefs.

6         Q    Did you examine the suitcase after you returned to

7    your lab?

8    A    Yes, I did.  I used the same process that I did with

9    the first suitcase, the visual examination of the suitcase

10   and then examined the suitcase with the Lumi Light looking

11   for trace evidence yielding negative results.

12        Q    Did you find any blood in the suitcase?

13   A    No, I did not.

14        Q    Did you recover any other items of evidence from

15   the suitcase?

16   A    In that suitcase there were the two black trash bags,

17   one through, again, the larger one that has to be gathered

18   up at the top with a twist tie for a closure and a smaller

19   trash bag that I do believe had the same yellow draw

20   strings.  They were processed in the same manner that I had

21   processed the black bags in the second suitcase with the

22   super glue, the MBD and analyzing it under the Lumi Light.

23   Again that yielded negative results.

24        Q    Did you recover any other items of evidence from

25   the suitcase?



FILED, Case 3:18-cv-02421-MAS Document 62-51 Filed 09/14/18 Page 29 of 163 PageID: 3157
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    Yes, in the interior of the, this suitcase there was a

2    flap that we revealed, a mesh pocket.  Inside that pocket

3    was a ziplock bag that contained like a reordering form for

4    tags or something for the suitcase.  That was processed for

5    fingerprints using the super glue technique and MBD also

6    yielding negative results.

7         Q    Were there any other items of evidence recovered

8    from inside the suitcase?

9    A    Inside the suitcase, no.  In the exterior pocket there

10   was a small Marshall's tag, price tag in it, that was also

11   processed for latent fingerprints using another chemical

12   called ninhydrin.

13        Q    What is ninhydrin?

14   A    Ninhydrin is a spray chemical you use to develop

15   fingerprints on surfaces such as paper, checks, money,

16   surfaces like that.  It reacts with, with the amino acids

17   that are left within the fingerprints, and what it pretty

18   much does when you spray it on an item the ninhydrin will

19   actually dye the amino acids that are in the ridge detail,

20   almost the color of purple, and it will reveal and make the

21   fingerprints visible.

22        Q    And did you receive results from that examination?

23   A    That was negative results.

24        Q    Let me show you what's been marked for

25   identification as State's Exhibit 187, 184, 186, 182 and

FILED, Case 3:18-cv-02341-MAS Document 62-51 Filed 09/14/18 Page 30 of 163 PageID: 3158
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    180.  If you could please review those for me and tell me

2    whether or not you recognize those items?

3    A    Yes, these are my photographs I took of the suitcase on

4    the dock once we responded to the medical examiner's office

5    in Norfolk and of, close-ups of the suitcase itself.

6        Q    Do those photos fairly and accurately represent

7    the condition of the items depicted?

8    A    Yes, they do.

9        Q    On the day that you took them?

10   A    Yes, they do.

11           MR. ROMANYSHYN:  Judge, I ask the items be

12   received.

13           MR. TACOPINA:  No objection.

14           ( Exhibits marked into evidence )

15       Q    I am putting up on the presenter S-176, is that

16   the suitcase you recovered on May 16, 2004?

17   A    Yes, it is.  This is the dock area I was directed to.

18   Over here is the yellow safety blanket our police officers

19   carry in their vehicle.  This was the blanket that was

20   placed over the suitcase.  This is where I had removed it

21   from.  This is the back part of the suitcase lying on the

22   dock.  This is what I referred to earlier as the top part of

23   the suitcase where the top handle is adjacent to the

24   retractable handle.  This is the top part of the lid that

25   when unzipped will fold over.  These ropes were the ropes I

Dutton-Direct                                          31

1    was originally referring to that go to that, ran through the

2    handle, our marine officers had placed on the suitcase

3    during the recovery stage and bringing it up on the dock.

4           Q    Directing your attention to the center of the bag

5    where there appears to be a plate where your laser pointer

6    was.  Do you know what that is?

7    A    That's the logo for the Kenneth Cole Reaction.  That's

8    the big R they have as their logo with the small print

9    Kenneth Cole underneath it.

10          Q    State's 180, are you familiar with that, ma'am?

11   A    Yes, I am.

12          Q    What does that depict?

13   A    This is the side view, shows the close-up view of a

14   lock that's on two of the super pulls.  This is the bottom

15   of the suitcase and again this is the top portion, this is

16   that top handle and this is the retractable handle.  This

17   portion of the suitcase is the expandable part of the suit

18   case, when you travel and you pack too much on your way home

19   you can zip it and give yourself another inch or two.  This

20   is that part of the suitcase.  This is the lip of the

21   suitcase and then here is the zipper part that you would

22   unzip to reveal the interior of the suitcase and flip it

23   over.

24          Q    Was the suitcase, in fact, locked?

25   A    The suitcase was not locked.

FILED, Case 3:18-cv-0241-MAS-DEA Document 62-14 Filed 09/14/18 Page 32 of 163 PageID: 3160
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1        Q     State's 182, and what does that depict, ma'am?

2    A     This is the suitcase, it's a little dark but we are

3    back at the M.E.'s office in Norfolk, we unzipped the white

4    body bag.  The suitcase has been opened and the lid is

5    flipped over.  This is the interior of the suitcase

6    revealing the black plastic bag with a body part inside.

7        Q     State's 184, what does in a picture depict, ma'am?

8    A     Again, this is what I was referring to when we had to

9    remove the entire bag with the body part in it.  We've got

10   two people, I believe this is Doctor Gray and an assistant

11   actually lifting the body part up.  It's still encased in

12   the plastic bag.  He simply lifted it up, moved it back on

13   the gurney to look for the opening to remove the body part.

14       Q     State's 187, what does that photo depict, ma'am?

15   A     This is the item of evidence, these are the Fruit of

16   the Loom briefs I recovered during the autopsy phase of the

17   mid section.

18             In this area right here is where I saw some red

19   stains that I originally referred to and you can see the

20   condition of the underwear with the discoloration in various

21   areas.

22             MR. ROMANYSHYN:  Judge, I just need to retrieve

23   some exhibits.

24       Q     Ms. Dutton, do you recognize that item, Ma'am?

25   A     Yes, this is the suitcase that I recovered off of the

FILED, Case 3:18-cv-02441-MAS Document 62-50-14 Filed 09/14/18 Page 33 of 163 PageID: 3161
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    dock and it still has my red evidence tag for my

2    identification purpose but, yes, it is the suitcase that we

3    just shown photos of.

4         Q    Is it in a similar condition as it was at the time

5    you recovered it?

6    A    It is.  It's a little dryer but, yes, it's in the same

7    condition as when I had it.

8              MR. ROMANYSHYN:  Judge, that has been marked as, I

9    believe, State's number six, and I would ask that that be

10   received into evidence at this time.

11             MR. TACOPINA:  No objection.

12             THE COURT:  Any objection, counsel?

13             MR. TACOPINA:  No.

14             THE COURT:  S-6 will be admitted in to evidence.

15             ( Exhibit marked into evidence )

16             MR. ROMANYSHYN:  Your Honor, the State has no

17   further questions of Supervisor Dutton at this time.

18             THE COURT:  Mr. Tacopina.

19             MR. TACOPINA:  Yes, just one second, please.

20   CROSS EXAMINATION BY MR. TACOPINA:

21        Q    Good morning, Ms. Dutton.

22   A    Good morning, sir.

23        Q    Is it Miss or officer?

24   A    Miss, that's fine.

25        Q    Miss Dutton, you referenced yesterday some notes

FILED, Case 3:18-cv-02341-MAS-DEA Document 62-50-14 Filed 09/14/18 Page 34 of 163 PageID: 3162
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   that you said you used to refresh your recollection, is that

2   the typed out reports?

3   A    Yes, sir, that's our crime scene search report also

4   known as a PD162.

5        Q    And you have your PD162 with you?

6   A    Yes, sir, I do.

7        Q    You testified that in that last suitcase you

8   recovered, with the underwear, you recall that?

9   A    Yes, sir.

10       Q    That inside you recovered a ziplock bag inside

11  the, inside the suitcase?

12  A    Yes, sir.

13       Q    And also a tag from the department store?

14  A    Yes, sir.

15       Q    That was in the bag with the underwear?

16  A    The underwear was on the mid section.  The plastic bag,

17  the ziplock bag and the Marshall tags were in various

18  pockets that were in and around the suitcase.

19       Q    This in that same suitcase?

20  A    Yes, sir.

21       Q    Are you sure about that?

22  A    Sure about?

23       Q    Those tags, that ziplock bag being in the suitcase

24  with the underwear?

25  A    Yes.



FILED, Clerk of the Appellate Division, July 2018, A-002150-14   Filed 09/14/18   Page 35 of 163 PageID: 3163
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925



1      Q    Why don't you take a look at your notes which

2  is --

3           MR. TACOPINA:  Your Honor, for identification

4  purposes, State exhibit 357.

5      Q    Ms. Dutton, it is your crime scene search report

6  dated 5/19/2004, do you see that?

7  A    I have 5/16 and 5/17/2004.

8           MR. TACOPINA:  One second, please, your Honor.

9           MR. ROMANYSHYN:  It's not a marked copy.

10          MR. TACOPINA:  Your Honor, I am going to approach

11  and show Ms. Dutton what's been identified as exhibit 357

12  with the Court's permission.

13          THE COURT:  Okay.

14     Q    What's the date on that report, Ms. Dutton?

15  A    I have 5/17/2004.

16     Q    And is that the report you created in regards to

17  that suitcase, this with the white briefs?

18  A    This is the report I created referencing the mid

19  autopsy and the mid section not in reference to the

20  suitcase.

21     Q    Did you describe what you recovered from that

22  suitcase in your report?

23  A    Not in this report, because this is just for the

24  autopsy and items that I collected during the autopsy and

25  the mid section.  There's another report that is generated

1    that documents the items that were collected in the

2    suitcase.

3         Q     Which report is that?

4    A    That's the report that's dated 5/16, the control number

5    is 20040518-2157.

6         Q     I'll scoot up there, if you don't mind?

7    A    Absolutely.

8         Q     In is the --

9    A    Absolutely.  This is the crime scene report which is

10   separate from the autopsy report.

11        Q     Okay, and in the autopsy report you note that you

12   recovered from that suitcase, in the item description that's

13   the report we were looking at before, the 5/17 report, white

14   briefs, from item number one and DNA blood card, correct.

15   A    Not from the suitcase, but from the mid section of

16   the, during the autopsy of the mid section what I collected

17   off of the mid section were white briefs, the white briefs

18   and a DNA blood card.

19        THE COURT:  Excuse me, Mr. Tacopina, I have been

20   advised the jury needs a recess at this point.  This is a

21   good time to take the morning recess, and we'll continue in

22   about fifteen minutes.

23        MR. TACOPINA: Okay, your Honor.

24        THE COURT:  We'll resume, ladies and gentlemen, at

25   10:45.

FILED, Case 3:18-cv-02341-MAS Document 62-50-1 Filed 09/14/18 Page 37 of 163 PageID: 3165
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1          ( Jury excused )

2          THE COURT:  All right, counsel, we'll resume at

3     10:45.

4          ( Recess )

5          ( Whereupon the jury returns to the courtroom and

6     court resumes )

7          THE COURT:  Okay, Mr. Tacopina.

8     Q    Officer Dutton, I am going to hand you State's

9     Exhibits 354, 355, 356, 357, and 358 for you to take a look

10    at so we are talking about the same documents.  Take a look

11    at them.

12         Okay, Miss Dutton, what I have handed you are

13    various Virginia Beach crime scene search reports, correct?

14    A    Correct.

15    Q    And what I will do, instead of referring to dates

16    on the reports I'll just go by that exhibit number make it a

17    little easier, okay?

18    A    Okay.

19    Q    Starting with 354, you talked about a variety of

20    tests that you conducted and that you were involved in the

21    forensic analysis of the items in the various suitcases,

22    correct?

23    A    Correct.

24    Q    And you took steps to attempt to preserve trace

25    evidence?



FILED, Clerk of the Appellate Division, July 26, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    That is correct.

2         Q    And in some instances you used, I guess, a scope

3    to examine the trace evidence?

4    A    That is correct.

5         Q    In some instances you put the bags in a fuming

6    chamber?

7    A    That is correct, yes.

8         Q    Some instances you sprayed the items with MBD?

9    A    It is MBD.

10        Q    MBD, which I also sort of like a fluorescent dye?

11   A    Correct, it will enhance the super glue fumes.

12        Q    Then you observe those items under a Lumi Light?

13   A    Lumi Light.

14        Q    You did a variety of those tests on whatever items

15   you recovered from those suitcases, correct?

16   A    Correct.

17        Q    Referring you to the second page of State's

18   Exhibit 354, that basically is the forensic analysis that

19   was done on the recovery from May 11th, 2004, correct?

20   A    Yes.

21        Q    And you tested the suitcase, the Kenneth Cole

22   suitcase under the Lumi Light, correct?

23   A    Yes.

24        Q    And that provided negative results?

25   A    That is correct.



FILED, Case 3:18-cv-02441-MAS-Document 62-51 Filed 09/14/18 Page 39 of 163 PageID: 3167
FILED, Clerk of the Appellate Division, July 08, 2019, A-002150-14

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1      Q      You tested that hospital blanket, did you not?

2    A    No, sir, I did not do any tests on the hospital

3    blanket.  I visually observed it, packaged it in paper and

4    was going to submit it to the lab for them to do their

5    analysis on.

6      Q      You made a determination there was no valuable

7    trace evidence on that?

8    A    I could not readily see anything that I needed to

9    collect.  I knew the lab had other capabilities and not to

10   tamper or alter that piece of evidence in any way or destroy

11   what the lab would be able to do which capabilities I did

12   not have.  So, in an attempt to try to preserve that I did

13   nothing with that blanket.

14     Q      Okay, the small plastic bag was air dried and then

15   I guess processed for fingerprints as well, the garbage bag?

16   A    Yes, all the plastic bags were dried and processed for

17   fingerprints.

18     Q      Just referring to the ones that were recovered on

19   May 11th, 2004, State's Exhibit 354 items, if you will,

20   there were negative results for any fingerprint testing on

21   those bags?

22   A    That is correct.

23     Q      Now, you also in that suitcase recovered that

24   little weight that you showed us yesterday, correct?

25   A    Yes, sir.

1      Q      You processed that as well for fingerprints and

2  that came up negative?

3  A      That is correct.

4      Q      Now, that suitcase was the one also with the duct

5  tape, is that right, that you recovered?

6  A      Yes, the thirty inch suitcase had a piece of duct tape

7  in it.

8      Q      And you processed that for fingerprints?

9  A      Yes, I did.

10     Q      Negative results?

11 A      Negative results.

12     Q      And that little black address label that you

13 talked about that was recovered in the May 11th suitcase,

14 that was also processed for fingerprints with negative

15 results?

16 A      A blank address label?

17     Q      Yes.

18 A      Yes, sir, and that was negative results.

19     Q      Turning your attention to State's Exhibit 355, if

20 you will.  This is your crime scene search report regarding

21 those bullets and the fibers you discussed this morning?

22 A      Items that were recovered during the autopsy of the

23 torso.

24     Q      Right, there were two bullets recovered, correct?

25 A      Yes, sir.

FILED, Case 3:18-cv-02341-MAS Document 62-50 Filed 09/14/18 Page 41 of 163 PageID: 3169
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1        Q    One of them had that fiber on it?

2    A    Yes, sir.

3        Q    And one had nothing on it?

4    A    Correct.

5        Q    So, one bullet had none of those little particles

6    or any fabric or anything?

7    A    That I could determine.

8        Q    And the other one had fiber and some fabric?

9    A    That is correct.

10        Q    Turning your attention to State's exhibit 356 just

11    for point of reference, that was the last suitcase, the 5/17

12    recovery report, correct?

13    A    Correct.

14        Q    And, additionally, forensic testing or analysis

15    was done on the items recovered in those bags to determine

16    if there was any trace evidence?

17    A    Correct.

18        Q    And the suitcase, in and of itself, was put under

19    the Lumi Light?

20    A    Yes.

21        Q    And there were no results, there were negative

22    results?

23    A    Negative results, yes, sir.

24        Q    And the smaller and larger plastic bags or group

25    of garbage bags, if you will, were also tested for



FILED, Clerk of the Appellate Division, July 30, 2018, A-002150-14

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

```
 1    fingerprints with negative results?

 2    A    That is correct.

 3         Q    And that little ziplock bag that you discussed was

 4    tested for fingerprints with negative results?

 5    A    That is correct.

 6         Q    And in a Marshall's Department Store sales tag

 7    that you recovered was tested for fingerprints with negative

 8    results?

 9    A    Correct.

10         Q    And finally, well, not finally, almost finally,

11    357, State's Exhibit 357 is the report you generated based

12    on your, well based on additional information and the items

13    recovered from the autopsy on the 5/17, 5/17 recovery?

14    A    Yes, that's correct.

15         Q    And the briefs, the underwear, Fruit of the Loom,

16    they were put under the Lumi Light?

17    A    They were placed under the Krimesite Imager, which is

18    another alternate light source similar to the Lumi Light

19    that detects, possibly fluoresces any trace evidence that is

20    correct.

21         Q    And you found no trace evidence?

22    A    There were three strands of hairs that were collected

23    from inside the underwear.

24         Q    Did you determine whose hair that was?

25    A    I collected them, packaged it separately and sent it
```

Case 3:18-cv-02341-MAS Document 62-50-14 Filed 09/14/18 Page 43 of 163 PageID: 3171

1    off to the lab for their analysis.

2         Q    Other than those three strands of hair that you

3    sent off to the lab, by the way, that was the Virginia Beach

4    lab?

5    A    Correct.

6         Q    Other than those three strands of hair, any other

7    trace evidence that you thought was valuable?

8    A    I located no other trace evidence besides the three

9    strands of hair and did no other analysis on the underwear.

10        Q    And finally, State's Exhibit 358 is the crime

11   scene search report that was generated from the May 5th

12   recovery, correct?

13   A    That is correct, Technician Stockman generated this

14   report.

15        Q    Right.  Now, Technician Stockman is someone who

16   works under you?

17   A    He was an employee of mine.  He is no longer in my

18   unit.  He has left for another position.

19        Q    Are you familiar with the work he did in regards

20   to this forensic analysis on the 5/5?

21   A    Yes, I am.

22        Q    I should say the 5/5 recovery?

23   A    5/5.

24        Q    Inside that suitcase, let's start with the

25   suitcase.  The suitcase itself was tested for any valuable

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1     trace evidence with negative results?

2     A     That is correct.

3           Q     The plastic bags, the garbage bags were tested for

4     fingerprints with negative results?

5     A     That is correct.

6           Q     The blue piece of tape, that's the suitcase you

7     talked about that blue piece of tape, correct?

8     A     Yes, sir.

9           Q     That blue piece of tape was also tested because

10    that had adhesive on it inside?

11    A     Correct.

12          Q     That's something more likely to pick up a

13    fingerprint than something without adhesive, correct?

14    A     It's possible.  We usually have good results.  We do

15    have an sticky side tape, we are able to process the

16    adhesive side of tape as well as the flat, matted side of

17    the tape.

18          Q     And you employed that technique, you used that

19    chemical on this tape?

20    A     Steve Stockman, yes, he did.

21          Q     And the results were negative?

22    A     The results were negative, yes, sir.

23          Q     That half tag on the outside of the suitcase was

24    also processed for forensic analysis?

25    A     Yes, it was.

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

```
1          Q     Negative results?

2    A     That is correct.

3          Q     The small ziplock bag inside the compartment in

4    the suitcase was tested for forensic analysis?

5    A     Yes, it was.

6          Q     Under the forensic light?

7    A     The small ziplock bag, yes, it was processed with

8    cyanoacrylate MBD and reviewed under the forensic light.

9          Q     And there were negative results?

10   A     Yes, sir.

11         Q     The lock, small lock on the outside was also

12   tested.  What is black powder?

13   A     Black powder is the fingerprint technique we use in

14   developing latent fingerprints.  Your fingerprints are

15   mostly made up of water, moisture, actually ninety-eight

16   percent.  So, the black powder actually adheres to the

17   moisture in your fingerprints.  We refer to it as black

18   powder processing.

19         Q     And did you use the black powder processing on

20   that small lock?

21   A     Technician Stockman did.

22         Q     And there were negative results on that?

23   A     That is correct.

24         Q     And that Marshall's price tag in that suitcase,

25   that was also tested?
```

Dutton-Cross                                              46

1     A     Yes, it was.

2           Q     What was that tested for?

3     A     That was tested for fingerprints also using the

4     ninhydrin spray I originally discussed, the chemical spray

5     on paper that will actually dye the amino acids in the ridge

6     details, if you remember that, a color purple, that was also

7     negative results.

8           Q     Okay, and you noticed on that, Technician Stockman

9     noticed on that suitcase that there were no visible stains

10    or dents or anything in the suitcase, correct?

11    A     That is correct.

12          Q     Now, I asked you about the garbage bags and the

13    testing that you did on the garbage bags in these various

14    suitcases.  Fair to state they were different garbage bags

15    in different suitcases, in other words different types of

16    garbage bags?

17    A     Different size garbage bags.

18          Q     Different size, correct?

19    A     Correct.

20          Q     Some had a yellow pull strings and some didn't?

21    A     That is correct.

22          Q     So, there are different types as well, right?

23    A     I am not that familiar with the different types of

24    garbage bags.  I can testify they were a different size.

25    There were large garbage bags in the same size, similar,



FILED, Case 3:18-cv-02441-MAS Document 62-50-14 Filed 09/14/18 Page 47 of 163 PageID: 3175
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    appeared to be the same size, and smaller ones, yes, that

2    did have the yellow draw strings.

3         Q    Where others didn't necessarily have that?

4    A    That is correct.

5         Q    Now, how much, for instance, did that last

6    suitcase, do you know how much it weighed when you recovered

7    it?

8    A    The heaviest of the suitcases was the second suitcase

9    with the torso in it.  Between the water weight and the sand

10   and the weight of the torso that one was approximately

11   seventy to eighty pounds.

12        This last one, you know, again, had some

13   significant weight to it, anywhere between sixty to seventy

14   pounds.

15        Q    Do you know, Ms. Dutton, how high the top of the

16   Chesapeake Bay Bridge is from that body of water?

17   A    No, I do not.

18        Q    Just one more thing, you described yesterday, I

19   believe it was, recovering a strand of hair.  I am not

20   talking about the ones recovered inside the underwear, but a

21   different strand of hair, correct?

22   A    Can I refer to my notes?

23        Q    Please.

24   A    Yes, sir.

25        Q    Can you just tell me what note you are referring

Dutton-Cross                                              48

1    to?

2    A     I'm sorry, State's Exhibit 354.

3          Q     Okay, great.

4    A     The second suitcase.

5          Q     Okay.

6    A     On one of the larger plastic bags that were inside the

7    suitcase I observed a strand of hair on the edge of it.  It

8    had no tape or anything attached to it.  It was just a

9    strand of hair I had recovered from the bag packaged

10   separately and sent to the lab for analysis.

11         Q     Just to be clear, there was no tape or anything

12   attached to that strand of hair?

13   A     No, there was no tape attached to it.

14         Q     So, it was loose inside the suitcase, correct?

15   A     It was attached to the plastic bag when I observed it

16   and collected it.

17         Q     But it was on top of the plastic bag not inside

18   the plastic bag?

19   A     That is correct.

20         Q     And did you recover from all three of these

21   suitcases any other hair aside from the underwear hairs that

22   you discussed earlier?  Take your time, if you need to look

23   through your notes for a second.

24   A     Including the hair we just discussed and the hair

25   discussed in Detective Stockman's report, no other hair was

 1    collected.

 2         Q    So, to be clear, you reviewed all three suitcases

 3    for forensic analysis?

 4    A    That is correct.

 5         Q    And you are familiar with the findings of the

 6    forensic analysis of all three suitcases and the items

 7    contained therein?

 8    A    Yes, sir.

 9         Q    And in total there were the hairs recovered inside

10    the underwear that you discussed, right?

11    A    Correct.

12         Q    And one other strand of hair, which is the hair

13    you just described to this jury?

14    A    On the outside of the large plastic bag in suitcase

15    two, yes.

16         Q    On the outside of the large plastic bag of

17    suitcase two that was not attached to any tape?

18    A    Correct.

19              MR. TACOPINA:  Thank you, Ms. Dutton, I have no

20    further questions.

21              THE WITNESS:  Thank you.

22              MR. ROMANYSHYN:  Brief redirect, your Honor.

23    REDIRECT EXAMINATION BY MR. ROMANYSHYN:

24         Q    Supervisor Dutton, just to clarify a few things

25    Mr. Tacopina asked you about.

FILED, Clerk of the Appellate Division, July 09, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1          With respect to the blue tape you testified to

2     yesterday?

3     A     Yes.

4          Q     Was there more than one piece of blue tape?

5     A     There was a piece of blue painter's tape that was

6     recovered in suitcase number one.  There was a blue piece of

7     painter's tape that was recovered in suitcase number two.

8          Q     Is that all?

9     A     That's all.

10         Q     And ultimately were all the pieces of tape sent to

11    New Jersey together with the rest of the evidence?

12    A     Yes, it was.

13         Q     Let me return for a few moments to some of the

14    testimony that you gave yesterday.

15              You testified about the items that were recovered

16    from suitcase number one, do you recall that?

17    A     Yes, I do.

18         Q     Let me show you what's been marked State's Exhibit

19    4, do you recognize that item, Ma'am?

20    A     Yes, I do.

21         Q     And what is that item?

22    A     These are blue paper towels that were located in one of

23    the larger bags, larger trash bags.

24         Q     And that's within the first suitcase, is that

25    correct?

1    A    That is correct.

2         MR. ROMANYSHYN:  As I note, Judge, I misspoke.

3    That is State's Exhibit 2.  I would ask that be received in

4    to evidence at this time.

5         MR. TACOPINA:  Without objection, your Honor.

6         THE COURT:  All right, S-2 will be admitted into

7    evidence without objection.

8         ( Exhibit marked into evidence )

9         Q    Miss Dutton, you indicated this is the blue towel

10   you recovered from suitcase number one?

11   A    That Is the blue towel I observed Detective Stockman

12   handling in reference to suitcase number one.

13        MR. ROMANYSHYN:  If I may display to the jury,

14   Judge.

15        Q    Let me show you what's been marked State's Exhibit

16   3, do you recognize that item?

17   A    This is an item of evidence that Technician Stockman

18   recovered out of suitcase number one.

19        Q    And did you know what's contained in that envelope

20   based on the markings that you placed on the side of it?

21   A    He refers to this as item number three which

22   corresponds on the crime scene search report State Exhibit

23   358 as tags.

24        Q    Is there a specific description of the type of

25   tags?

FILED, Case 3:18-cv-00241-MAS Document 16-51 Filed 09/14/18   Page 52 of 163 PageID: 3180
FILED, Clerk of the Supreme Court, 22 Aug 2017, **079925**

Dutton-Redirect                                          52

1    A    Technician Stockman indicates in his report, item

2    number three is Marshall price tag, unused name tag, half of

3    a Reaction tag from outside of the bag on the handle.

4        Q    That's from suitcase number one, is that correct?

5    A    That's correct.

6        Q    I am going to show you an item that's marked

7    State's 8, do you recognize that item?

8    A    Yes, I do.  This is from, this is an item that I have

9    collected.

10        Q    And what is that item, can you identify it?

11   A    This is the plastic ziplock bag that was found on the

12   interior mesh pocket of suitcase number three, the one that

13   had the mid section in it.

14        Q    State's 9, are you familiar with that item?

15   A    Yes, this is another item that I collected from

16   suitcase number three that had the pelvis area in it, it is

17   a Marshall's sales tag.

18        Q    Ms. Dutton, did you retain the sissors?

19   A    No, they were taken away from me.

20        Q    I'll get you sissors.

21        Ms. Dutton, I give you these sissors, if you don't

22   mind unsealing these envelopes, just verify, you don't have

23   to take them out, just verify the contents are what you, in

24   fact, just testified to them to be?

25   A    Yes, these are the items that I just identified are



FILED, Clerk of the Appellate Division, July 08, 2018, A-002150-14
Case 3:18-cv-02341-MAS Document 62-51 Filed 09/14/18 Page 53 of 163 PageID: 3181
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    actually in these sealed envelopes.

2              MR. ROMANYSHYN:  Judge, the State has no further

3    questions of Supervisor Dutton at this time.

4              MR. TACOPINA:  Either do we.  Thank you.

5              THE COURT:  Ms. Dutton, thank you very much, you

6    are excused.

7              THE WITNESS:  Thank you, your Honor.

8              Ladies and gentlemen, we'll just take a five

9    minute break for preparation of the next presentation.

10             ( Jury excused )

11             THE COURT:  The Court will recess for five

12   minutes.

13             ( Recess )

14             ( Court resumes )

15             THE COURT:  Ms. Prezioso, are we ready to

16   continue?

17             MS. PREZIOSO:  Yes, your Honor.

18             THE COURT:  Can we get the jury in, please.

19             ( Whereupon the jury returns to the courtroom and

20   court resumes )

21             THE COURT:  All right, please be seated, ladies

22   and gentlemen.

23             Ms. Prezioso, would you call your next witness.

24             MS. PREZIOSO:  Yes, Judge, the State calls

25   Detective Ray Pickell.

FILED, Case 3:18-cv-02341-MAS, Document 62-50 Filed 09/14/18 Page 54 of 163 PageID: 3182
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    J O S E P H   R A Y   P I C K E L L, sworn.

2    DIRECT EXAMINATION BY MS. PREZIOSO:

3         Q    Good morning, detective, can we please state the

4    name you go by?

5    A    I go by Ray Pickell.

6         Q    Sir, by whom are you employed?

7    A    I am employed by the Virginia Beach Police Department.

8         Q    And what is your position or title there?

9    A    I am a homicide investigator for the department.

10        Q    Do they call you investigator or detective?

11   A    They call me, it's homicide detective, yes.

12        Q    And, sir, can you share a little bit about your

13   background with the jurors?

14   A    Sure.

15        I was hired by the police department in 1987.  I

16   worked uniform patrol for approximately five years.  From

17   uniform patrol I took a lateral position as a general

18   assignment detective, investigated larcenies, burglaries.

19        From there I transferred to sexual crimes and then

20   to robbery, and then in '99 I transferred into homicide.

21        Q    And you have been in the homicide unit for, since

22   1999 then?

23   A    Approximately eight years, yes.

24        Q    Approximately eight years, and prior to joining

25   the Virginia Beach Police Department did you have any other

1    law enforcement or military training?

2    A    Well, I was a paratrooper in the United States Army

3    attached to the 82nd Airborne Division, yes.

4        Q    What years that, sir?

5    A    '82 to '85.

6        Q    Now, I'd like to call your attention specifically

7    to May 19, 2004.  Did there come a time when you were

8    assigned to a case involving body parts in suitcases?

9    A    On May 29, 2004 I was advised by my supervisor at the

10   time, who was Sergeant J.T. Orr (phonetics), he informed me

11   that this case was going to be reassigned to me.  I was

12   aware at that point, obviously, of all three suitcases being

13   found, but prior to that, prior to being reassigned the case

14   I had responded out to the second suitcase that floated up

15   on Fisherman's Island.

16        Myself and my partner at the time, Brian Sebold

17   (phonetics) had responded out to Fisherman's Island and on

18   the beach we saw a large suitcase, it was on the beach, it

19   was upside down, and there was an odor of decomposition in

20   the area.

21        Q    Now, Detective Pickell, when you talk about

22   responding to the second suitcase that was when you were

23   assigned as the Virginia Beach lead detective, correct?

24   A    Exactly, that was on May 11th.

25        Q    Now, prior to May 19th who was running the case

FILED, Case 3:18-cv-02421-MAS Document A-002-15-1 Filed 09/14/18 Page 56 of 163 PageID: 3184
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    for the Virginia Beach Police Department?

2    A    The homicide detective was Doug Zebley.

3        Q    And incidentally, sir, the homicide detectives

4    within the Virginia Beach Police Department, do they all

5    work in one unit?

6    A    We do.

7        Q    So, it's a centralized homicide unit covering the

8    entire city of Virginia Beach, sir?

9    A    Correct.

10       Q    And on the 2nd when you responded with Detective

11   Sebold was Detective Zebley, did he eventually join you?

12   A    He did, he eventually, because he had not arrived at

13   work yet that day so I was at work and myself and Detective

14   Sebold responded until Zebley arrived.

15       Q    Now, when you first saw the suitcase, the  second

16   suitcase on May 11th on Fisherman's Island you described

17   that it was face down, was there anything outside of that

18   suitcase?

19   A    There was a brown plastic bag on the outside.

20       Q    And, sir, did you learn whether that brown bag had

21   anything to do with that second suitcase or not?

22   A    It didn't have anything to do with the suitcase.  That

23   was actually left there by the research worker that found

24   the bag.  I think she had been picking up trash along the

25   way and she left it near the suitcase.



FILED, Clerk of the Appellate Division, July 09, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1     Q    And that was when she, your understanding when she

2     notified her supervisors and got police to respond?

3     A    Correct.

4     Q    Now, with the second suitcase, sir, did you have

5     an opportunity to go to the medical examiner's office and

6     see that suitcase after it was open?

7     A    Yes, I did.

8     Q    And inside the suitcase, sir, can you describe to

9     the jurors what you saw?

10    A    When the suitcase was opened there was black plastic

11    garbage bags covering the, what later to be, obviously when

12    they opened it up, what later to be the torso, head and arms

13    of a white male.

14    Q    And, again, the torso, head and arms, that was one

15    continuous piece, sir?

16    A    Yes.

17    Q    Now, on top of the body was there any other items

18    other than the garbage bags?

19    A    There was a blanket that partially covered the head and

20    it was bunched up a little bit around his chin.

21    Q    And did you later find out what type of blanket

22    that was, sir?

23    A    The blanket came from a company that had the initials,

24    H C S C, turned out to be a medical linen company that

25    supplied blankets and linens to hospitals and doctor's

FILED, Case 3:18-cv-03241-MAS Document 62-14 Filed 09/14/18 Page 58 of 163 PageID: 3186
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    offices.

2        Q    And, sir, were you present when the ballistic

3    evidence was recovered?

4    A    No.

5        Q    Did you observe, prior, when you first saw the

6    torso in the suitcase, did you observe any wounds to the

7    torso?

8    A    Yes, I saw what appeared to be a bullet wound in the

9    forehead.

10        Q    And were you able to discern anything else?

11   A    No.

12        Q    Can you describe the general condition of the

13   torso to the jury?

14   A    The torso and the head, it was in a state of

15   decomposition.  The skin was slipping, which would be

16   normal.  There was a strong odor of rotting flesh.  Some of

17   the hair had slipped off, too.  There was not much, in fact,

18   I don't remember seeing a lot of blood on the body itself.

19   Now, there was decomposition, but there was no blood,

20   really.  The insides were coming out onto the gurney.  There

21   was no excessive amount of blood by any means.

22        Q    Did you observe any blood, sir, you just said

23   there was no excessive amount, did you see any?

24   A    Well, the only blood that I would be talking about

25   would be mixed in with maybe his insides, but there was no



FILED, Case 3:18-cv-02431-MAS-DEA Document 2-50 Filed 09/14/18 Page 59 of 163 PageID: 3187
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   blood that was pooling or spilling out onto the gurney.

2          Q    Now, sir, that was the second suitcase.  Did you

3   respond to the third suitcase?

4   A    No, I did not.

5          Q    And did you respond to the first suitcase?

6   A    No, I did not.

7          Q    But on May 19, 2004 when you were assigned to the

8   case had all three suitcases then been recovered?

9   A    Yes.

10         Q    Now, sir, at the time you were assigned was the

11  person whose body parts were in the suitcase identified yet?

12  A    No.

13         Q    And as the detective assigned, what did you do?

14  A    Once the case was reassigned to me I immediately

15  responded to our sketch artist that works for the police

16  department.  I told her that I would like for her to do a

17  sketch for me that I could put out to the media in order to

18  hopefully develop some phone calls to identify who our

19  victim was.  I had to provide her several photographs of the

20  victim and I dropped those at her office that same day.

21         She provided me a sketch of the victim on, it

22  would have been May 21st.  May 21st she provided me a sketch

23  of the victim and we released that to the media in Virginia

24  Beach.

25         Later that evening we had received a phone call

FILED, Clerk of the Appellate Division, July 09, 2018, A-002150-14

Case 3:18-cv-02341-MAS Document 6-51  Filed 09/14/18  Page 60 of 163 PageID: 3188

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    from a crime solver's caller who did identify himself and

2    leave a number so that if the investigator needed to contact

3    him we could do so, but the caller had advised that the

4    sketch appeared to be a good friend of his that had been

5    missing from New Jersey and that he provided a name of the

6    victim also, which was William McGuire.

7           At that time, with that information I contacted

8    Woodbridge, New Jersey Police Department.  I provided the

9    little bit of information that I did have at the time to a

10   Sergeant Joseph Joraskie with Woodbridge P.D. and I

11   explained a little bit about the case that we were

12   investigating and I asked him if he could do some intel work

13   on the name William McGuire.

14          In the meantime he further asked me, see what we

15   can find out at our end, and I ended up calling the crime

16   solver's caller back, which is a man named John Rice.  John

17   Rice lives in Chesapeake Virginia, in Virginia.  I spoke to

18   he and his wife on the phone briefly.  They informed me of

19   his name again, that he was from Woodbridge, New Jersey,

20   that his wife was Melanie McGuire, they had two small

21   children.  He knew the victim because they were close

22   friends in the Navy.  At one time they were both stationed

23   in Norfolk, Virginia at the naval base, and that was in the

24   '80's.

25          He also said that --

FILED, Case 3:18-cv-02415-MAS, Document 162-14 Filed 09/14/18 Page 61 of 163 PageID: 3189
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1          MR. TACOPINA:  Objection, your Honor, to any

2    further hearsay.

3          THE COURT:  The objection is sustained.

4          Ms. Prezioso, please elicit testimony in the

5    direct and personal knowledge of the witness.

6          MS. PREZIOSO:  Yes, your Honor.

7     Q    Detective, after speaking to John Rice, John and

8    Susan Rice, what did you do next?

9    A    With the information that I learned we were able to run

10   our own intel and we were able to determine that William

11   McGuire, while he was stationed in Norfolk, Virginia, that

12   he had been charged with a charge back in the '80's where he

13   was fingerprinted in our City.  We were able to get those

14   fingerprints, and I had a fingerprint expert compare those

15   fingerprints with the victim's fingerprints.  They were

16   confirmed to be a match.

17          I ended up sending the confirmation that it was

18   William McGuire to Woodbridge Police Department and I had

19   asked Sergeant Joraskie from Woodbridge Police Department

20   not to make the death notification, that I had every

21   intention of pretty much getting in my car the next day and

22   driving up here to contact the wife and present her the news

23   of the death of her husband.

24   Q    Now, in the meantime while this was going on, sir,

25   were you also continuing your investigation with the items



FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    that were recovered in the suitcase and general information

2    about the case?

3    A    We were.  It was a lot of background information, it

4    was running computer checks over the internet on the blanket

5    that we had recovered.  I was trying to gather up as much

6    information as I possibly could before traveling to New

7    Jersey.  It took longer than what I suspected, and on May

8    26th Sergeant Joraskie with Woodbridge said that --

9              MR. TACOPINA:  Objection, your Honor.

10             THE COURT:  The objection is sustained.

11        Q    Yes, sir, you have to just testify to, if you met

12   with him and then did something, that would be fine.

13             Could I just ask, sir, did you request any

14   specific reports from Sergeant Joraskie regarding Mr.

15   McGuire?

16   A    When I did speak to Sergeant Joraskie I learned that

17   there was a --

18             MR. TACOPINA:  Objection, your Honor.

19             THE COURT:  The objection is sustained.

20   A    I had discovered that a restraining order had been

21   filed by Melanie McGuire on April 30th, 2004.  The

22   restraining order was against William McGuire.  She was the

23   complainant.

24        Q    Now, Mr. Rice had told you, sir, that his friend

25   was missing?



FILED, Case 3:18-cv-02415-MAS Document 62-14 Filed 09/14/18 Page 63 of 163 PageID: 3191
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A     Yes.

2            MR. TACOPINA:  Objection.

3            THE COURT:  The objection is sustained, Ms.

4    Prezioso.  Please refrain from eliciting hearsay from this

5    witness.

6        Q    Were there any other reports available to you from

7    New Jersey to review at that time, simple yes or no, sir?

8    A     Not that I recall right now.

9        Q    Okay, did there come a time when you arranged for

10   a death notification to be done by New Jersey law

11   enforcement?

12   A     On May 26, 2004 the Barnegat Department had responded

13   to where, my understanding where Mrs. McGuire was living at

14   the time with her parents.  The Barnegat Police Department

15   had made the death notification.

16       Q    And, sir, after the death notification was made

17   did there come a time when you did, in fact, come to New

18   Jersey?

19   A     On June 1st, 2004, myself and another detective, Thomas

20   Shattuck responded from Virginia Beach to Woodbridge, New

21   Jersey.

22           When we arrived at Woodbridge --

23           MR. TACOPINA:  Judge, the narrative is what I am

24   going to object to.  It's a yes or no question.

25           THE COURT:  Detective, please just answer the

FILED, Case 3:18-cv-02431-MAS Document 62-50-14 Filed 09/14/18 Page 64 of 163 PageID: 3192
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    questions that are being asked without volunteering any

2    additional information or without getting into hearsay.

3            Go ahead, Ms. Prezioso.

4            MS. PREZIOSO:   Thank you.

5        Q    What was your first stop in New Jersey, sir?

6    A    We stopped at Woodbridge Police Department.

7        Q    And without saying what anybody said, who did you

8    meet with there, sir?

9    A    Detective Joraskie.

10       Q    And after Woodbridge where was your next stop in

11   New Jersey relating to this case?

12   A    We then travelled to Teaneck, New Jersey.

13       Q    And again without stating what was said, who did

14   you meet with in Teaneck?

15   A    Cindy Ligosh, the victim's sister.

16       Q    And did you have, did you interview Miss Ligosh?

17   A    Yes.

18       Q    After meeting with Miss Ligosh where was your next

19   stop?

20   A    The next stop, we drove by the apartment where Mr. and

21   Mrs. McGuire was living at the time of her husband's

22   disappearance.

23       Q    The apartment in Woodbridge, sir?

24   A    Yes.

25       Q    At 2902 Plaza Drive, specifically?



FILED, Case 3:18-cv-02341-MAS-LHG Document 62-50 14 Filed 09/14/18 Page 65 of 163 PageID: 3193
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    Correct.

2         Q    Okay, after driving to the apartment, did you do

3    anything else on June 1st?

4    A    No, that was a long day and we ended it.

5         Q    And June 1st, was that the same day you drove up?

6    A    Yes.

7         Q    On June 2nd who did you meet with regarding this

8    case first, what was your first stop?

9    A    We conducted an interview with a friend of William

10   McGuire that lives in Woodbridge, Jay, I think it's spelled

11   T r a n d a v a.

12        Q    Tandava?

13   A    Tandava, yeah.

14        Q    Where did you interview Mr. Tandava?

15   A    At the apartment complex where he resides.

16        Q    Did you learn what Mr. Tandava's relationship to

17   the victim was?

18   A    That they were good friends and co-workers.

19        Q    And did you receive any items of evidentiary value

20   from Mr. Tandava?

21   A    He had turned over two notes that were written to him

22   by Melanie McGuire.

23        Q    And those two notes, sir, without going into the

24   specifics of what they were, can you just give the jury a

25   sense of what they pertained to?

FILED, Case 3:18-cv-02341-MAS-DEA Document 62-51 Filed 09/14/18 Page 66 of 163 PageID: 3194
FILED, Clerk of the Appellate Division, July 03, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    They pertained to that her husband had left, she was

2    worried about some finances and was also telling him that

3    she didn't need his help or any friends help moving at this

4    point, cause --

5         Q    And they were two separate letters, correct, sir?

6    A    Yes.

7              MS. PREZIOSO:  Your Honor, the State is handing

8    Detective Pickell four pages of documentation all labeled

9    State's Exhibit 219C.

10        Q    Detective, now, those are Xerox copies I just

11   handed you, correct?

12   A    Yes, ma'am.

13        Q    I would like you to take a look at those four

14   pages.  Do you recognize them?

15   A    Yes.

16        Q    And what do you recognize them to be, sir?

17   A    A copy of the notes that were given to me by Jay

18   Tandavid.

19        Q    Tandava?

20   A    Tandava.

21        Q    And do those four pages fairly and accurately

22   reflect what the original notes looked like, are they exact

23   duplicates?

24   A    Yes.

25        Q    Thank you.  I'll take those, sir.

FILED, Case 3:18-cv-02411-MAS Document 6 Filed 09/14/18   Page 67 of 163 PageID: 3195
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

Pickell-Direct                                67



1          Now, sir, after you met with Mr. Tandava, who was

2     the next person or place that you visited regarding your

3     investigation into the McGuire case?

4     A    We then spoke to Tom Terry, who works for N.J.I.T. and

5     who is also the victim's supervisor, and that was in Newark.

6          Q    Newark?

7     A    Yes.

8          Q    I apologize, your accent is a little different

9     from mine.

10    A    Sorry.

11         Q    So, at N.J.I.T. you met with the victim's boss,

12    Tom Terry, and from there where did you go next, or what did

13    you even do next?

14    A    Before we even left Newark, New Jersey, I placed a

15    phone call to Melanie McGuire, identified myself and asked

16    her if I could come to wherever she was at and speak to her

17    about her husband, and that was the first time that I had

18    actually spoken to her.  She said that she had to call me

19    back, and approximately thirty minutes later maybe I

20    received a phone call, but I do believe it was from her

21    divorce attorney, Risa Kleiner.  I explained to the attorney

22    that it was very important that I speak to Melanie because

23    this is her husband, still, and she said that if I could --

24         Q    I'm sorry, sir.  Was there a meeting that was

25    arranged?

FILED, Case 3:18-cv-0234 bl MAS Document 00 50 14 Filed 09/14/18   Page 68 of 163 PageID: 3196
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    There was a meeting at an attorney's office in

2    Woodbridge, Wilentz attorney's office.

3         Q    Wilentz, Goldman & Spitzer, sir?

4    A    Yes.

5         Q    And did you and Detective Shattuck respond to the

6    Wilentz firm?

7    A    We did.

8         Q    And I'm sorry, sir, besides you and Detective

9    Shattuck was there any law enforcement personnel from New

10   Jersey there at the time, too?

11   A    Yes, Sergeant Joraskie from Woodbridge P.D.

12        Q    And can you describe to the jurors what took place

13   after you arrived at the Wilentz firm?

14   A    Sure.  We arrived at the attorney's office

15   approximately five o'clock and we were delayed a

16   considerable amount of time, at least forty-five minutes and

17   we were told by --

18             MR. TACOPINA:  Objection.

19             THE COURT:  The objection is sustained.

20        Q    Sir, did there come a time when you met with

21   Melanie McGuire?

22   A    Yes.

23        Q    And, sir, I'd ask you to look around the courtroom

24   and see if you see Melanie McGuire here today?

25   A    She's sitting right of counsel.

Pickell-Direct                                              69

1          MS. PREZIOSO:  Indicating the defendant, your

2    Honor.

3          THE COURT:  So noted.

4     Q    Now, when you met with Mrs. McGuire, was Miss

5    Kleiner, she was present?

6     A    Yes, two attorneys were present.

7     Q    Do you remember the name of the other one, sir?

8     A    John Hogan.

9     Q    And can you please describe to the jurors what

10   took place, what information you gained from the defendant?

11    A    Sure.  The interview took place in their law office.

12   We were in a small conference room -- a medium-sized

13   conference room.  There was a large table with several

14   chairs around the table.  I was sitting at more of the head

15   of the table.  Detective Shattuck was sitting to my right.

16   Sergeant Joraskie was sitting to my left.  Attorney John

17   Hogan was sitting next to him, then the divorce attorney,

18   Kleiner, and then Melanie.

19          Of course, introduced ourselves and asked her how

20   long she and the victim had been married.  She stated that

21   they had been married for five years but they had known each

22   other for ten.  She said that it wasn't a very happy

23   marriage, that, we then asked her about the vehicle that her

24   husband drove, and said he drove a 2002 Nissan Maxima that

25   had Pennsylvania tags on it.  We asked why does it have

FILED, Case 3:18-cv-02341-MAS-Document 62-50 Filed 09/14/18 Page 70 of 163 PageID: 3198
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    Pennsylvania tags, she said because her husband was trying

2    to avoid higher insurance premiums.

3          At one point in the interview she asked if we had

4    recovered her husband's vehicle, and I advised her that we

5    had not recovered the vehicle.  She said that more than

6    likely you are going to find it in Atlantic City because he

7    was heavily comped by a couple of the casinos there.  We

8    then asked her to tell us what happened prior to her last

9    seeing him.

10          She said that on April 28, 2004 she and her

11    husband had closed on their new house.  This house was

12    approximately a half a million dollar home.  They had closed

13    on this house between five p.m. and six p.m. and they went

14    home, they ended up both falling asleep on the couch

15    downstairs, but then they awoke at about 1:30, two o'clock

16    in the morning, just past midnight, and immediately almost

17    started arguing.  She had asked him, are you happy with the

18    house you finally wanted and he was saying that he wasn't

19    happy with the house, he wanted a bigger house.  This led

20    into more arguing and he was accusing her of not being a

21    very attentive mother.

22          At this point in the argument which she claims

23    that he put dryer sheet in her mouth and then she fled into

24    the bathroom of the residence.  She heard him rummaging

25    around the apartment, he was saying that she could have the

Case 3:18-cv-02341-MAS Document 62-14 Filed 09/14/18 Page 71 of 163 PageID: 3199



1    house, that she would never see him again, and that she's

2    the reason why the children don't have a father anymore.

3    She said that at this point he left the residence.

4         We asked her if her husband wore frequently any

5    jewelry, and she said her husband frequently wore his

6    wedding ring which was a braided platinum ring and that he

7    wore a Tag watch.  We asked if she had seen that, if she

8    knew he left with that or not, and she said she didn't

9    know.

10        She said later that morning she had called into

11   work and said that she wasn't going to go to work, that she

12   was going, and she said instead of going to work she went to

13   New Brunswick and attempted to file for a restraining order

14   but the line was too busy or it was backed up and she

15   decided that she wasn't going to wait, she would just leave

16   and pick up her children from day care and take them to her

17   parent's house in Barnegat.

18        The next day, on April 30th, she said she went to

19   the courthouse in New Brunswick and she did obtain this

20   restraining order.

21        She mentioned that her husband had a knack for

22   pissing people off, that in the last three or four months

23   his behavior became erratic, and he had a big mouth, and he

24   would often make people angry.  She said that he had a best

25   friend living in Chesapeake, Virginia, in Virginia named



FILED, Clerk of the Appellate Division, July 20, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, **079925**

Case 3:18-cv-02431-MAS-DEA Document 62-15   Filed 09/14/18   Page 72 of 163 PageID: 3200

Pickell-Direct                              72

1    John Rice and he was married to Susan Rice.

2           I asked her when was the last time that she had

3    seen the Rice family and she said that it was in 2003, they

4    had all met at Atlantic City and that was the last time that

5    they had or she had seen the Rice family.

6           I then asked her if she had any luggage and she

7    stated that they didn't travel very much that they had a

8    couple of mixed pieces of luggage.

9      Q    Sir, she said they didn't have a matching set?

10    A    Exactly, she said they didn't have a matching set, they

11   had mixed luggage.

12          MR. TACOPINA:  Your Honor, I object to that

13   question.  That's not initially what this detective said.

14   He said they had mixed pieces of luggage.  Ms. Prezioso

15   then, in a leading fashion, told this witness what she

16   wanted the answer to be.  I object to that and ask it be

17   stricken.

18          THE COURT:  Okay, I am going to ask you, Ms.

19   Prezioso, please refrain from asking leading questions, and

20   why don't you just rephrase the question so we get the

21   answer from the detective.

22     Q    What else did she tell you about her husband,

23   detective?

24    A    She said her husband had lost twenty-five to thirty

25   thousand dollars gambling four years ago during a two week

1    period and that he had lost, also, I think twenty, thirty

2    thousand dollars on day trading.

3         Q    And what else did she tell you about her husband,

4    anything else about the car?

5    A    I had asked her about the EZ-Pass, if she and her

6    husband had an EZ-Pass in their vehicles.  She said they

7    both did, however, he didn't like to use his because it was

8    almost as big brother was watching him, the government, so

9    he didn't like to use his.

10        She also told me that she had spoke to his

11   supervisor, Tom Terry, and Tom Terry told her that --

12        MR. TACOPINA:  Objection.

13        THE COURT:  I'll permit it.

14        MR. TACOPINA:  I'll withdraw that.

15        THE COURT:  I'll permit it as a statement of Mrs.

16   McGuire but not for the truth of what Mr. Terry may have

17   said.

18        Q    That means you can answer, sir?

19   A    According to the information she received from Tom

20   Terry is that her husband was having difficulties in work

21   and that if there were any cutbacks he was going to be the

22   first one to get fired.

23        She obtained phone numbers for me through Tom

24   Terry, he had a personal phone but then he also had a Nextel

25   phone and a Blackberry phone from the company, she provided



1    me those numbers.  She told me that she had moved out of the

2    apartment, took all the contents out of the apartment, that

3    she received help moving from friends and family and she had

4    stored the property at a storage unit.

5           At this point in the interview I did ask her,

6    could we have permission to search the facility.  The

7    attorney certainly agreed to it and it was the next day that

8    we did do that.

9           Q    And were there any communications between her and

10   her husband since the fight?

11   A    She said that she had not stayed at the apartment,

12   slept there, anyway, since the 29th, but she was in and out

13   of the apartment.  She said that at one point on May 2nd or

14   when she did go to the apartment she noticed that her

15   husband had left, not left, but had placed a call to the

16   residence because she saw the number on her caller I.D. on

17   May 2nd, at, I think, approximately 0110 in the morning but

18   there was no message left, it was just a number to this

19   phone.

20          Q    Just to be clear, she was saying her caller I.D.

21   had registered one of her husband's cell phone numbers about

22   1:10 in the morning on the 30th?

23   A    No, I believe that was on May 2nd.

24          Q    May 2nd, I apologize, sir.  On May 2nd there was

25   something on her caller I.D.?

FILED, Clerk of the Appellate Division, July 26, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, **079925**

1   A     It was just her husband's cell phone number.

2         Q     Was there any message, did you ask her if there

3   was any message?

4   A     I did.  There was no message.

5         Q     Now, sir, can you describe, we'll go back to the

6   statement in a minute, but can you describe for the jury,

7   what was Mrs. McGuire's, what was the defendant's demeanor

8   during this interview?

9   A     During the interview she was nervous, visibly shaking.

10  At times it appeared that maybe she was crying, however, I

11  did not see a tear come out of her eye, and I obviously am

12  watching for that.  She made the facial impression,

13  expressions she may be crying, but I did not see any tears

14  at all.

15        Q     And, sir, you said she was visibly shaking?

16  A     Yes.

17        Q     Did she ask you any questions?

18  A     She just asked me if we recovered her husband's

19  vehicle, of course I informed her that we had not.

20        Q     And besides what she said about you should look in

21  Atlantic City, he was heavily comped there, besides that was

22  any other information provided about the location of her

23  husband's vehicle?

24  A     No, other than that he was heavily comped and that's a

25  good place where his vehicle would be.



FILED, Case 3:18-cv-02421-MAS Document 62-51 Filed 09/14/18 Page 76 of 163 PageID: 3204
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1        Q    Was anything else discussed during the interview

2   that you remember?

3   A    It was a very short interview, obviously much shorter

4   than what I suspected was going to be.

5        Q    Okay.  Can you approximate for the jury about how

6   long this interview lasted?

7   A    Estimation, maybe fifteen, twenty minutes.

8        Q    And did you make any requests of Mrs. McGuire

9   then?

10  A    I had asked her if we could search her storage unit.

11       Q    And what was the response?

12  A    It was yes, yes.

13       Q    And did you, in fact, search her storage unit?

14  A    I did, but not until the next morning.

15       Q    And can you describe -- well, first where is her

16  storage unit located, do you recall?

17  A    It's Arthurs Self Storage in Edison, New Jersey.

18       Q    And what, besides you, who else responded to

19  Arthurs Self Storage?

20  A    Myself and Detective Thomas Shattuck.

21       Q    And was Detective Joraskie there?

22  A    No, he was not -- he was not there.  I'm sorry.

23       Q    Go ahead.

24  A    He was not there, no.

25       Q    So, at Arthurs Self Storage who else was there

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    besides you and Detective Shattuck?

2    A    Melanie McGuire and her attorney at the time, John

3    Hogan.

4         Q    So, the defendant and Mr. Hogan were there?

5    A    Yes.  The divorce attorney was not there.

6         Q    And did there come a time when Miss McGuire opened

7    up the storage facility for you?

8    A    Yes.

9         Q    Now, sir, can you describe what was contained in

10   the storage facility?

11   A    Well, it was stacked, I mean it was stuffed with

12   furnishings from the house, furniture, and I say this

13   because Detective Shattuck actually had to crawl up and over

14   to get to containers that, to a container that Mrs. McGuire

15   said her husband's belongings were in.  This container was

16   finally located, and while Detective Shattuck was looking

17   through the contents I was also making small talk to Mr.

18   Hogan and Mrs. McGuire, but I was watching what was being

19   taken out of the plastic container.

20        This plastic container was only three feet by two

21   feet by two feet, and it only contained paperwork, some

22   pictures.  I had asked her, where was the rest, where was

23   her husband's clothing, his property, and she said that she

24   had given away all of his clothes and the only property that

25   was left was in that container.

FILED, Clerk of the Appellate Division, July 05, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, **079925**

Case 3:18-cv-02341-MAS-DEA Document 62-51 Filed 09/14/18 Page 78 of 163 PageID: 3206

Pickell-Direct                                    78

```
 1         While Detective Shattuck was still looking through
 2    the container she had made a statement to me that she
 3    started thinking about the interview from the day before
 4    about the luggage and she finally realized that she did own
 5    a matching set of luggage, that it was a green color, it was
 6    a name brand product because her husband always bought
 7    name-brand merchandise.  I asked her if she would be okay
 8    looking at a picture of a piece of luggage and she and the
 9    attorney agreed that she would look at it but he wanted to
10    see the picture first.  So, later on we did do that outside
11    but.
12         Q    And sir, I'm sorry, what picture did you show her,
13    a picture of what?
14    A    I showed her a picture of the first suitcase, it was in
15    the best, it was in good shape so there was nothing vile
16    about it, it was in good shape, so that's what I showed her
17    later.
18         Q    And after you showed her the picture what
19    happened?
20    A    She said that it looked like the luggage they owned but
21    she wasn't one thousand percent sure, but she did say it
22    looked like the luggage they owned.
23         Q    Now, sir, can you describe the search that you and
24    Detective Shattuck did of this storage area, can you
25    describe it, and what I am trying to get at, sir, did you
```

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    empty everything out and inventory everything in there or

2    did you direct your attention at something specific?

3    A    No, our main focus for the search was to look at her

4    husband's property, look for weapons, whether it be handgun,

5    rifle, we were looking for anything that would be included

6    in firearms, bullets, things of that nature.  Did not find

7    anything.  We didn't find any cases for a gun, so we ended

8    the search at that -- well, before we ended the search I had

9    excused myself and went to the clerk's office.  When I came

10   back, Detective Shattuck was still searching.  Melanie

11   McGuire and the attorney was still at the storage unit.

12   Detective Shattuck had finished searching the plastic

13   container; and I asked Melanie where was all of her

14   husband's clothing, and she said that she had given the

15   clothing away, and the mattress and box springs when her

16   friends and family helped her move they put that out to a

17   dumpster.

18         She have also said she threw away a couple area

19   rugs, and we ended the search for that storage unit and we

20   were actually walking out to exit the building when I asked

21   if this, did she have any other storage building and she

22   stated she did, and she then, we then followed her to a

23   smaller storage unit and she opened the door, Detective

24   Shattuck was standing at the door, I was talking to Mr.

25   Hogan, making small talk with him.  I saw Detective Shattuck




FILED, Case 3:18-cv-02431-MAS Document 62-14 Filed 09/14/18 Page 80 of 163 PageID: 3208
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    walk in, this was a much smaller storage unit, and I saw him

2    come out with a wallet, it was a dark-colored wallet.  I saw

3    him open it up, he removed a card, Shattuck and Mrs. McGuire

4    had a conversation but I did not hear it, I was actually

5    talking to the attorney, and then I saw Detective Shattuck

6    fold up the wallet and put it back in, he continued

7    searching and we found at the time, nothing of any gun

8    boxes, weapon or bullets of any sort.

9         Q    Sir, when you first arrived there was it

10   identified to you that there were two storage units?

11   A    No. It was my understanding when I arrived there it was

12   just one.

13        MS. PREZIOSO:  There is a sissor, Chris.

14        Q    I am handing the witness State's Exhibit number

15   226, and, sir, I am going to ask you to open it and take it

16   out but hold it down and just take a look at that and then

17   replace it into the envelope.

18        Sir, do you recognize what's in that envelope marked

19   State's exhibit 226?

20   A    It certainly looks like the wallet that Detective

21   Shattuck had in his hand.

22        Q    That was replaced into the storage facility,

23   correct?

24   A    It was.

25        Q    And if you would just place that back in the

FILED, Case 3:18-cv-01234-MAS-DEA Document 62-14 Filed 09/14/18 Page 81 of 163 PageID: 3209
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    envelope, sir, and I'll take that from you.

2              Now, Detective Pickell, again in regard to both

3    the search of the first storage unit and the second storage

4    unit, did you and Detective Shattuck go through every item

5    in those storage units?

6    A    Not every item, no, no.

7         Q    Now, you did a general take-a-look-and-see what's

8    there, correct?

9    A    Correct.

10        Q    Now, in the first storage unit you mention that

11   all of Mr. McGuire's belongings were contained in a plastic

12   container?

13   A    Yes.

14        Q    And do you recall the color of the container, sir?

15   A    It was blue.

16        Q    I am handing the witness what's been marked

17   State's Exhibit 208, do you recognize that, sir?

18   A    I do, yes.

19        Q    What does that photo depict?

20   A    This is the blue plastic container that contained all

21   of William McGuire's property.

22        Q    And does it look similar to the container and its

23   contents that you saw when you looked at the storage

24   facility on June 2nd?

25   A    Yes.

Pickell-Direct                                         82

1        Q    Thank you, sir, I'll take that back.

2             Now, sir, were there other plastic containers that

3   were inside the storage units that you saw on June 2nd?

4   A    There were.

5        Q    Did you see any clear plastic containers?

6   A    No, we did open a few of the other blue ones, because

7   she wasn't positive which container contained all of her

8   husband's properties in, so we had to pull some other blue

9   containers down and we pulled the lid and she said, no, that

10  was nicknacks and so it took a little while, we looked

11  through a few, or a few at least until we found the right

12  containers.

13       Q    Sir, I am handing you what's been marked State's

14  Exhibit 201.  Again, I am going to ask you to keep it down,

15  sir, and tell me do you recognize what's depicted in State's

16  Exhibit 201 which is a photograph, do you recognize that?

17  A    No.

18       Q    No?

19  A    No, I don't.

20       Q    I was saying no, sir, because you can't shake your

21  head because the Court Reporter has to get that.  You have

22  never seen what's depicted in that photograph before?

23  A    No.

24       Q    You didn't see it on June 2nd, 2004 when you

25  searched the defendant's storage facility?

FILED, Clerk of the Appellate Division, July 26, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   A    No.

2       Q    Sir, at that point was there anything else notable

3   to you in the investigation about the searches of the

4   storage facilities?

5   A    No.

6            MS. PREZIOSO:  Your Honor there's a lot more

7   material to cover.  Do you want me to continue on to 12:30

8   or do you want me to take the break now?

9            THE COURT:  Why don't we keep going for a few

10  minutes.

11      Q    Sir, prior to coming to New Jersey did you obtain

12  any telephone records or other records pertaining to either

13  the victim or the defendant, prior to coming to New Jersey?

14  A    Phone records, no, no.

15      Q    Now, after searching the storage facility can you

16  describe to the jury what the next stop was while you were

17  up here in New Jersey?

18  A    After the search and then showing Melanie the

19  photograph of the suitcase we then discovered that during an

20  off-line search -- would you like me to describe?

21      Q    Can you tell the jury what an off-line search is?

22  A    The best I can describe it is, my police department

23  requesting, Delaware, New Jersey, Maryland to check your

24  data to see if anybody has come into contact as far as law

25  enforcement with a 2002 Nissan Maxima bearing Pennsylvania



FILED, Clerk of the Appellate Division, July 24, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    tags that was on the car.

2          So, we had, my police department receives a hit

3    that Atlantic City Police Department had had some kind of

4    contact with that car.

5          Now, that contact, actually turned out, it wasn't

6    the police department that had come across the car, it was

7    my understanding that Mr. McGuire's 2002 Nissan Maxima was

8    placed in a place, in a hotel that he didn't have a sticker

9    for, so it was towed, and in the State of Virginia, I am

10   sure it's the same way in New Jersey, that if your car is

11   towed the tow truck driver has to call in the vehicle make,

12   model, license plate number, VIN, so that if you are looking

13   for your vehicle you know how to find it.  So, they have

14   record of it.  That's what I discovered, is that the, Mr.

15   McGuire's vehicle had been towed from the Flamingo Motel

16   located at 3101 Pacific Avenue, Atlantic City.

17       Q    And did there come a time when you responded to

18   Atlantic City?

19   A    I did.  It was after searching the storage unit we

20   eventually did respond that same day to Atlantic City.  We

21   arrived late and we went to the Flamingo Hotel.  We were

22   able to determine there were surveillance cameras that have

23   been pointing in the direction of where Mr. McGuire's car

24   was parked at.

25       Q    Well, Detective, can you back it up for a minute.

1          How did you discern where Mr. McGuire's car had

2    been parked?

3    A    Prior to seeing the cameras I had contacted the owner

4    of the tow company.

5          Q    And without saying what they said, sir, did you

6    speak to the owner?

7    A    I did speak to the owner.

8          Q    Did you speak to any other members of the tow

9    company?

10   A    I spoke to the tow truck driver that towed the vehicle.

11         Q    And after speaking to the tow truck driver is that

12   when you went over to the Flamingo Motel?

13   A    Well, I was already there.

14         Q    Okay?

15   A    The toy truck driver came to me.

16         Q    Thank you for clarifying?

17   A    In fact, I followed him to the site of the building

18   where he pointed out to me that this is where I towed the

19   2002 Nissan Maxima, it was in the very last parking space on

20   the south side of the building and there was a camera

21   attached to the ceiling of the motel, so that's how I knew,

22   at least there was a camera, anyways.

23         I went to the management, management wasn't

24   working but an employee was working at the time at the motel

25   and I asked if we could look at the surveillance video.  He



1    wasn't sure how to work it, so we ended up not being able to

2    view the surveillance that night and we actually viewed it

3    the next day.

4          Q     That would be June 3rd?

5    A     Yes.

6          Q     Okay.

7    A     Yes.

8          Q     And when you viewed the --

9    A     No, actually that would be June 4th.

10         Q     June 4th, I apologize?

11         So, on June 4th, can you describe for the jury

12   how it was that you were able to locate it on the tape?

13   A     The management was there that morning of June 4th.

14   This surveillance equipment is, I'm not real familiar with

15   surveillance equipment, but there's cameras in certain areas

16   of the hotel, that the information is downloaded into a hard

17   drive.  I had contacted the Atlantic City forensic unit to

18   respond and help me with downloading the image of the

19   vehicle, of Mr. McGuire's vehicle onto a disk so that I

20   could have it in my possession and as evidence.

21         The technicians couldn't do it.  They couldn't

22   download the image from that hard drive.  I asked management

23   if he could contact the company that installed it for them

24   and a technician later that day did travel from Newark to

25   Atlantic City, tried for hours, hours to download the image

Pickell-Direct                                        87

1    from the hard drive onto a disk for evidence.  The

2    technician told me he, the technician, could not do it.  I

3    learned that if I disconnected the hard drive I was going to

4    lose the whole image.  That was a chance I was going to,

5    that could happen.

6              So, I was stuck between a rock and a hard spot.  I

7    either had to leave the hard drive there or I had to, or

8    attempt to disconnect it and just lose everything.

9              I elected not to disconnect it.  However, we were

10   able to down load onto a V C R the first you few minutes of

11   the vehicle being pulled into the parking space.  The

12   vehicle was there for eight days and it was just impossible

13   to download minute by minute by minute for eight days

14   straight onto a V H S tapes.

15             So, the next best thing is we downloaded the first

16   few minutes of the vehicle pulling in.

17        Q    And the recording time, when you got the first few

18   minutes, was it in real time, did it take as long to record

19   as it was that you were watching the screen?

20   A    Yes.

21        Q    So, at the time if you were to try to record eight

22   days it literally would have taken you eight days to make

23   the recording?

24   A    Yes.

25             MS. PREZIOSO:  Do you want to take the break now,

FILED, Clerk of the Appellate Division, July 20, 2018, A-002150-14, Filed 09/14/18   Page 88 of 163 PageID: 3216
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    sir?

2            THE COURT:  It seems like it's a logical place to

3    take the break, Ms. Prezioso.

4            Detective, we are going to break for lunch.  We'll

5    excuse the jury and you can be excused for lunch.

6            ( Jury excused )

7            THE COURT:  All right, ladies and gentlemen, we

8    are going to recess for lunch and we will resume at

9    approximately 1:30.

10            ( Recess )

11            ( Court resumes )

12            THE COURT:  Remain seated everyone.  The jury will

13    be out in a moment.

14            ( Whereupon the jury returns to the courtroom and

15    court resumes )

16            THE COURT:  All right, everyone please be seated.

17            Ms. Prezioso, can we continue with Detective

18    Pickell's testimony?

19       Q    Good afternoon.

20            Again, detective, we were speaking about the, we

21    were speaking about the tape at the Flamingo Hotel?

22    A    Yes.

23       Q    I apologize.  You said that you, you were saying

24    that you had difficulties getting the tape?

25    A    Exactly, we had difficulties in downloading the image

FILED, Case 3:18-cv-0241-MAS-Document-62-50-14 Filed 09/14/18 Page 89 of 163 PageID: 3217
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    from the point that it was parked there which was on April

2    30th, 2004 right at 0041 hours.  So, that's what time it was

3    parked at the Flamingo.  It was towed on May 8, 2004 at 1905

4    hours.  So we did, we had a problem downloading that whole

5    entire time and I was only able to get the first few minutes

6    on V H S.

7         Q    And besides getting the first few minutes on V H S

8    did you make other efforts to secure that tape?

9    A    We did.  I told you I didn't want to take the chance to

10   disconnect it and just lose it all, so I left it there.  I

11   had contacted Sergeant Joe Joraskie and asked that he make

12   arrangements on getting a technician to continue working on

13   it or if need be I guess it would have had to have been

14   disconnected and we just take the chance of losing it.

15        Q    And to your knowledge beyond that first few

16   minutes of tape was any other tape ever secured?

17   A    No, not to my knowledge.

18        Q    Now, I'm handing you what's been marked State's

19   Exhibit 227 in evidence and, sir, when did you last see what

20   I just handed you?

21   A    During lunch break.

22        Q    And did you open the seal in the ante-room?

23   A    I did.

24        Q    And do you recognize the contents?

25   A    Yes, it's the V H S tape that I had Atlantic City P.D.

1    put the first few minutes on.

2          Q    It's the first few minutes of what, sir?

3    A    It's the first few minutes of the vehicle pulling in

4    and then a little while later, I say the first few minutes,

5    it could be like two or three.

6          Q    And did you, how do you know that that, in fact,

7    is the same tape?

8    A    My initials are on it.

9          Q    And did you, by any chance, look at that tape

10   today?

11   A    Yes.

12         Q    And does it fairly and accurately depict what you

13   saw when you met with management in Atlantic City in June of

14   2004 as you've described to the jurors?

15   A    Yes.

16         MS. PREZIOSO:  Your Honor, at this time we would

17   offer it into evidence but we are not seeking to publish it

18   at this time.

19         THE COURT:  Counsel, any objection?

20         MR. TACOPINA:  No objection.

21         THE COURT:  Then it will be admitted into evidence

22   without objection.

23         ( Exhibit marked into evidence )

24         Q    Now, I believe we had skipped a part, detective.

25   We were speaking about your interview with the defendant,

FILED, Case 3:18-cv-02431-MAS-Document 62-10 Filed 09/14/18 Page 91 of 163 PageID: 3219
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    then we went to Atlantic City.

2           I'd like to go back, when you were finished with

3    your interview with the defendant, what did you do next?

4    A    Are you referring to the interview on June 2nd of 2004?

5           Q    Yes, sir.

6    A    After the interview was completed with Mrs. McGuire and

7    her attorneys, the apartment they were living in at the time

8    is, you could see it from the law office.  So, after the

9    interview I had Woodbridge Police Department's forensic

10   personnel conduct a search, along with me, in the apartment

11   that they used to reside in prior to him missing.

12          The apartment was clean.  There was no furniture

13   in it.  Mrs. McGuire had moved out, so it was under the

14   control of the management now.

15          The forensic unit used luminal to search for any

16   blood evidence, sparingly they used it.  I was disappointed

17   in the amount that they used.  We did receive a couple, I

18   think false positives, but it was, the luminal was used

19   sparingly.

20          Q    Were you told why that was, sir?

21   A    I was told because --

22          MR. TACOPINA:  Objection, objection.

23          MS. PREZIOSO:  Your Honor, it's not being offered

24   for the truth.

25          THE COURT:  I am going to sustain the objection,

FILED, Case 3:18-cv-02441-MAS Document 62-14 Filed 09/14/18 Page 92 of 163 PageID: 3220
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    it's still hearsay.

2         Q    Detective, the apartment that you processed was

3    back at 2902 Plaza Drive, correct?

4    A    Yes.

5         Q    And could you describe the areas that were

6    luminaled the heaviest?

7    A    The bathrooms and there was a spot in the basement

8    where a sump pump is, and that's it.

9         Q    Now, in your experience as a detective are there

10   other things that luminal reacts with that you have

11   experienced in your work?

12   A    Yes.

13        Q    And what are some of those items?

14   A    Bleach, bleach will luminesce.  Other cleaning products

15   will, yeah.

16        Q    And yet nothing luminesced significantly in the

17   bathrooms?

18   A    I understand -- well, I did see, there was a

19   luminescence in the bathroom but it could have been a

20   cleaning product because it turned out to be a false

21   positive.

22        Q    Now, moving on from the apartment, where did you

23   go next in your investigation, whether it was the same day

24   or the next day?

25   A    Well, actually after the search of the apartment, that



FILED, Case 3:18-cv-02341-MAS-Document 62-50 Filed 09/14/18 Page 93 of 163 PageID: 3221
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    night ended.  It was a late night, so it ended the next

2    morning would have been when I met Mrs. McGuire and her

3    attorney at the storage unit.

4         Q    And, okay, we talked about that already?

5    A    Yes.

6         Q    Just going back briefly again to the apartment,

7    can you describe the apartment, and what I am asking you,

8    sir, was it lived in and furnished at the time or something

9    else?

10   A    No, it was vacant.  There was no furniture.  In at

11   least one room there was an odor of paint, or fresh paint,

12   hardwood floors.  The bathrooms were very clean.  Obviously,

13   it appeared whoever moved out cleaned it and it was getting

14   ready to be rented again.

15        Q    Now, we spoke about the search of the storage area

16   and then what did you do next after the storage area?

17   A    From the storage area then that's when I had responded

18   to Atlantic City and, Atlantic City, and that's where the

19   vehicle was towed from the Flamingo Motel.

20        Q    And that's when you got the tape?

21   A    Exactly.

22        Q    Now, did you locate the car itself, did you locate

23   William's Maxima?

24   A    Yes, it was in a tow yard.  I had it towed to the

25   Atlantic City forensic office.

FILED, Clerk of the Appellate Division, July 03, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1          Q     And at the Atlantic City forensic office what

2     happened?

3     A     It was put in a bay and then it was processed, but

4     before they would process it I had to either obtain a search

5     warrant or I had to get permission from Mrs. McGuire.

6                I had Detective Shattuck contact Mrs. McGuire and

7     she didn't give us a yes or no at the time.  She said she

8     had to make a phone call, and then she called us back and

9     said, yes, she would give us permission, and we asked her to

10    meet us at an exit off of the Garden State Parkway, I

11    believe it is, and we met her at an exit, she signed a

12    consent form and had to travel back to Atlantic City,

13    present that to the forensic technicians for Atlantic City

14    before they would even start to process.

15         Q     And did they, in fact, process the car?

16    A     Yes.

17         Q     And can you describe to the jurors what the

18    processing included, like what did they do first?

19    A     First thing they did was take pictures of the car

20    inside and outside.  After pictures then they did the sweep,

21    it's called vacuuming the rugs, the carpet, for any trace

22    evidence.

23               After the sweepings they then processed what they

24    could for fingerprints; and the last thing was, we, myself

25    and Detective Shattuck searched the vehicle.  During the

FILED, Case 3:18-cv-02341-MAS-Document 6-51 Filed 09/14/18 Page 95 of 163 PageID: 3223
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    search in the glove box we found a pinkish-clear liquid in a

2    small glass vial, I believe it had a black cap.  It was

3    hidden under some paperwork in the glove box.  Also, there

4    was a syringe in the glove box.

5            On the seat, on the front passenger seat was two

6    brochures one was from Atlantic City and one was a brochure

7    from Virginia.  In the center console was Mr. McGuire's

8    EZ-Pass.  Inside the trunk of the car there was a computer

9    bag with a computer, a baby stroller and miscellaneous

10   objects.

11           In the back seat, though, of the car was two baby

12   seats leaving not much room for anything.  I believe that

13   was it.

14       Q    Now, did you witness when the sweepings were done?

15   A    I was there when they were, yes, vacuumed.

16       Q    I'm sorry?

17   A    When they were sweeping, yes, I was.

18       Q    When you say sweeping, were they using a broom or

19   something else?

20   A    No, it's a vacuum.

21       Q    What areas did they vacuum that you observed, that

22   you remember?

23   A    The front, the driver's carpet on the floor and the

24   passenger carpet on the floor.

25       Q    Sir, I'm handing you a D V D labeled State's

FILED, Clerk of the Appellate Division, July 31, 2018, A-002150-14

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    Exhibit 1005, do you recognize that?

2    A    Yes.

3         Q    And what do you recognize that to be?

4    A    It's photos of the Maxima that Atlantic City took

5    pictures of the car.

6         Q    So, you viewed that C D and you saw what it

7    contains?

8    A    Yes.

9         Q    And it contains photos of the Maxima that you

10   described to the jury?

11   A    Yes.

12        Q    And when did you view that C D, sir, last?

13   A    This morning, I believe, this morning.

14        Q    And how do you know it's the same C D or D V D,

15   sir?

16   A    My initials are on it.

17        Q    And the pictures that are contained therein do

18   they fairly and accurately reflect what William McGuire's

19   Nissan Maxima looked like in June of 2004 when you observed

20   the search by the Atlantic City forensic unit?

21   A    Yes.

22        Q    Thank you.

23             Sir, I am handing you what's been premarked

24   State's Exhibit 223A and B.  I am going to ask you to take a

25   look at that, sir, and do you recognize the items in that

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    envelope, sir?

2    A    I do.

3         Q    What do you recognize them to be?

4    A    The one item is the clear pinkish liquid that was found

5    in the glass vial that was in the glove box and the other

6    piece of evidence is the syringe that was in the glove box.

7         Q    And do those items, do they look consistent, do

8    they look the same as they did when you last saw them?

9    A    Yes.

10        Q    And you last saw them when Atlantic City forensic

11   unit searched the Maxima as you have described to this jury?

12   A    Well, we searched, Detective Shattuck and I, yes.

13        Q    In the presence of the Atlantic City forensic

14   unit, sir?

15   A    Yes.

16        Q    And, sir, were both items recovered from the glove

17   box?

18   A    Yes.

19             MS. PREZIOSO:  Your Honor, the State would offer

20   223A and B into evidence.

21             MR. TACOPINA:  No objection.

22             THE COURT:  S-223A and B will be admitted into

23   evidence without objection.

24             ( Exhibit marked into evidence )

25             MS. PREZIOSO:  Further, I don't think I offered

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    State's 1005, the pictures of the Maxima.

2            THE COURT:  Okay.

3            MR. TACOPINA:  No objection.

4            THE COURT:  S-1005 will also be admitted without

5    objection.

6            ( Exhibit marked into evidence )

7        Q    Detective Pickell, I am handing you what's been

8    marked State's 221 for identification, can you open that,

9    sir, do you recognize the contents?

10   A    Yes.

11       Q    And when did you last see those contents, sir?

12   A    In Atlantic City, the day we processed the, Mr.

13   McGuire's vehicle.

14       Q    And are they in substantially the same condition

15   today as they were when you recovered them from William

16   McGuire's Maxima in June of 2004 as you have described?

17   A    Yes.

18           MS. PREZIOSO:  Your Honor, the State would offer

19   this exhibit as well.  Let me show defense counsel.

20           MR. TACOPINA:  No objection.

21           ( Exhibit marked S-221 in evidence )

22       Q    Sir, I am handing you what's been marked State's

23   Exhibit 229 for identification, do you recognize that, sir?

24   A    Not yet.

25           Yes.

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1        Q     What do you recognize it to be?

2     A     An EZ-Pass.

3        Q     And do you know, sir, can you tell by the markings

4     whether or not that's the same one that was recovered from

5     William's Maxima?

6     A     Yes, well, with the fingerprint powder on it, too, yes.

7        Q     Is it in substantially the same condition today as

8     it was the last time you saw it?

9     A     Yes.

10           MS. PREZIOSO:  Thank you, Judge, we would offer

11    this exhibit as well.

12           MR. TACOPINA:  No objection.

13           THE COURT:  Okay, that's S-229?

14           MS. PREZIOSO:  Yes.

15           THE COURT:  S-229 will be admitted into evidence.

16           ( Exhibit marked into evidence )

17        Q     I am handing Detective Pickell State's Exhibit

18    257, and detective you opened that exhibit earlier today,

19    correct?

20    A     Yes.

21        Q     And you examined the markings?

22    A     Yes.

23        Q     And what's contained in that exhibit, sir?

24    A     It's a Blackberry device.

25        Q     And what did you recover that Blackberry from?

FILED, Clerk of the Appellate Division, July 06, 2018, A-002510-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, **079925**

1    A    This was in the trunk of the car.

2         Q    The trunk of William's Maxima, sir?

3    A    Yes.

4         Q    Does it appear in substantially the same condition

5    as it was when you recovered it in June of 2004 from

6    William's Maxima?

7    A    Yes.

8              MS. PREZIOSO:  The State would offer that exhibit

9    as well, sir.

10             MR. TACOPINA:  No objection.

11             THE COURT:  All right, the Blackberry device will

12   be admitted without objection.

13             ( Exhibit marked into evidence )

14        Q    Detective, the vacuumings from the car, were they

15   retained by Virginia or Atlantic City Police Department?

16   A    Atlantic City.

17        Q    So, you did not take the vacuumings back with you,

18   correct?

19   A    Correct.

20        Q    Now, I'd like to move on from Atlantic City, did

21   you do anymore interviews?

22   A    Not on that date.

23             The following date myself and Detective Shattuck

24   responded to Brooklyn, New York and we had an interview with

25   Mrs. McGuire's friend, Selene Trivizas, T r i v i z a s, I

FILED, Clerk of the Appellate Division, July 06, 2018, A-002130-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    believe it's spelled.

2         Q    Trivizas, sir?

3    A    Trivizas.

4         Q    Without saying what she said, did an interview

5    actually take place?

6    A    Yes.

7         Q    After speaking with Ms. Trivizas did you speak

8    with anybody else following that?

9    A    I did, also while I was at Selene and Alexander's house

10   I did look at some weights that were there and determined

11   that wasn't the weight that I was, the weights that I was

12   looking for.

13        After I left that location I drove to a subject's

14   named Justin Marrero in Brooklyn, New York.  While I was at

15   Mr. Marrero's residence I observed another set of weights

16   but this was a weight set, actually, but while I was looking

17   at the weight set I then observed about seven to ten black

18   trash bags that were lined up against the wall that

19   contained clothing, and we then left from that location.

20        Q    Now, I would ask you just to answer yes or no,

21   sir.  Did you learn where the clothing and the trash bags

22   had come from while you were with Mr. Marrero?

23   A    Yes.

24        Q    Now, did there come a time after that interview

25   where you did anything relating to what you saw in Mr.

FILED, Clerk of the Appellate Division, July 05, 2018, A-002550-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    Marrero's apartment?

2    A    We were traveling at that time, after we finished that

3    interview from Brooklyn, we were traveling back to Virginia

4    and we were actually discussing the case when it dawned on

5    me, suddenly, that I needed to get a New York detective back

6    to the Marrero's residence and collect those black trash

7    bags.

8         Q    And did you, in fact, make those arrangements,

9    sir?

10   A    Yes.

11        Q    And to your knowledge were those trash bags from

12   Justin Marrero collected?

13   A    Yes.

14        Q    Following those interviews that took place in New

15   York, what did you do?

16   A    On June 10th, 2004, I had placed a phone call to

17   William McGuire's boss, Tom Terry, and --

18        Q    Did you request anything specific from Tom Terry?

19   A    I did.

20        Q    What did you request?

21   A    I asked him if he could obtain a cell site location for

22   me for the last phone number dialed by William McGuire's

23   Nextel phone, which is the work phone.

24        Q    And what day and time was that call placed?

25   A    The last one was on April 30th at about 1741 hours,



FILED, Clerk of the Appellate Division, July 02, 2018, A-002530-14 Filed 09/14/18    Page 103 of 163 PageID: 3231
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    5:41 p.m.

2         Q    And have you reviewed the phone records, sir?

3    A    I have seen them.

4         Q    Do you recall who that call was placed to?

5    A    I believe it was placed to Mr. John Rice, his friend.

6         Q    I apologize, did there come a time when you got a

7    response from, don't say what the response was, did there

8    come a time when you got a response from Mr. Terry?

9    A    Yes.

10        Q    Now, sir, sometime after your trip to New Jersey

11   what happened with the case as far as, in relation,

12   specifically, to the Virginia Beach Police Department, and,

13   sir, I am going to caution you, please don't say any

14   conclusions, please just say what happened to the case?

15   A    I continued making phone calls the best I could and

16   trying to work this case from Virginia.  It was difficult

17   and it was eventually turned over to New Jersey authorities.

18        Q    And do you know at what point it was, obviously,

19   turned over to New Jersey?

20   A    I believe it was in October of 2004.

21        Q    And at that point in October of 2004 the

22   investigation officially came up north, correct, sir?

23   A    It did.

24        MS. PREZIOSO:  Judge, I have no further questions

25   at this time.

FILED, Clerk of the Appellate Division, July 18, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1            THE COURT:  Mr. Tacopina.

2            MR. TACOPINA:  Yes, your Honor.

3   CROSS EXAMINATION BY MR. TACOPINA:

4        Q    Good afternoon, Detective Pickell.

5   A    Good afternoon.

6        Q    Sir, we never have spoken or met before, correct?

7   A    No, we have not.

8        Q    If you can't hear me ask me to speak up.  I seem

9   to be losing my voice which I assume is good news to many

10  but not very helpful today.

11           I will start out by handing you State's Exhibit

12  853, and I want you to tell me if you recognize it, okay?

13           MR. TACOPINA:  Your Honor, can I approach?

14           THE COURT:  Sure.

15           MS. PREZIOSO:  853, Joe?

16           MR. TACOPINA:  853.

17       Q    Detective, is that a copy of your report in this

18  case?

19  A    Yes, sir.

20       Q    Now, I notice that's one typewritten report,

21  correct?

22  A    Say that again?

23       Q    That is one typewritten report?

24  A    Yes.

25       Q    Was that created on one day?

FILED, Clerk of the Appellate Division, July 03, 2018, A-002530-14

Case 3:18-cv-03410-MAS Document 25-1 Filed 09/14/18 Page 105 of 163 PageID: 3233

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    No.

2         Q    It was added on to over time?

3    A    Yes.

4         Q    Did you take any handwritten notes during your

5    investigation?

6    A    Yes.

7         Q    Yes?

8    A    Yes.

9         Q    Did you maintain those?

10   A    Until they were dictated into my case.

11        Q    Once they were dictated, what did you do to those

12   handwritten notes?

13   A    Destroyed.

14        Q    Now, is that exhibit that you are looking at, 853,

15   a complete copy of your report?

16   A    It is.

17        Q    There seems to be missing a page two, there's no

18   page two in that, it says one of fifty-three, then it goes

19   to three of five three, is that just a typo or is there a

20   page two floating around out there?

21   A    Actually there's probably a page one and that is, it's

22   nothing that I dictate on it, it's a cover sheet, so.  It

23   has numerous things where you check off what is contained in

24   the file, so that's what's missing.

25        Q    Okay, but you will agree your report goes from

FILED, Clerk of the Appellate Division, July 30, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    page one to page three, so the cover sheet would normally be

2    the first page, right?

3    A    No, page one is missing, is that what you are asking

4    me?  That is the cover sheet.

5         Q    Can I see your exhibit right there?

6    A    Yeah.  I think that is page two, that is page three.

7         Q    I'll go back.

8              The page on top, the first page of that report,

9    does it have any numerical indicator on it, in other words,

10   page one, page two, page anything?

11   A    No, unless it was cut off somehow right here but, no,

12   it doesn't.

13        Q    So we are complete, that first page flows into

14   what's marked as page three?

15   A    Yes.

16        Q    In your investigation you learned that there were

17   two bullets recovered in the various suitcases, correct?

18   A    Yes.

19        Q    And one had some matted fiber on it, correct?

20   A    Yes.

21        Q    And the other bullet had nothing on it, correct?

22   A    To my knowledge, yes.

23        Q    You told this jury about a conversation or various

24   conversations you had with Mrs. McGuire and in one of those

25   conversations, as a matter of fact it was the second day

1   when you went to the storage facility, do you recall that?

2   A    Yes.

3        Q    Mrs. McGuire, on her own said to you, by the way,

4   we did have a matching set of luggage, correct?

5   A    Yes.

6        Q    It's not like you went up to her and said, Mrs.

7   McGuire can we talk about the luggage, are you sure you

8   don't have a matching set.  You didn't initiate in a

9   secondary conversation about the luggage, did you?

10  A    No.

11       Q    So, she came out and told you that she actually

12  did recall purchasing a set, correct?

13  A    Yes, or that they owned a matching set.

14       Q    And at that point you showed her the pictures of

15  the luggage that was recovered?

16  A    One picture.

17       Q    And she seemed pretty certain that that was the

18  set, correct?

19  A    Yes.

20       Q    And on those three pieces of luggage recovered

21  there were no identifying features on that suitcase or any

22  of the suitcases that indicated who the owner was, correct?

23  A    Just on the suitcases alone, no.

24       Q    And there was nothing inside the suitcases that

25  said, if lost please return to the McGuire residence, right

FILED, Clerk of the Appellate Division, July 26, 2018, A-002510-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    Well, there was body parts.

2         Q    I understand that.  I am talking about the

3    suitcase itself.  There was nothing on the suitcases that

4    indicated who the owners of those suitcases were?

5    A    No.

6         Q    So, but for the fact that she told you that those

7    were her suitcases or their suitcases you had no evidence of

8    that at the time, correct?

9    A    Correct.

10        Q    Now, you were just most recently asked about this

11   meeting on the Garden State Parkway or the Jersey Turnpike

12   to sign a consent form with Mrs. McGuire?

13   A    Yes.

14        Q    You asked her if you could search her husband's

15   car, correct?

16   A    Yes.

17        Q    And she said she was going to call her attorney

18   and then called you right back, correct?

19   A    I didn't say attorney.  I said she said she would call

20   us back, yeah.

21        Q    And she did do that?

22   A    She, yeah.

23        Q    She consented to you searching that car?

24   A    Yes.

25        Q    And you met her on the Parkway somewhere?

FILED, Clerk of the Appellate Division, July 30, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    Yes.

2         Q    And she signed the consent forms, correct?

3    A    Yes.

4         Q    She also gave you a set of keys for the car,

5    correct?

6    A    I don't recall that.  I remember giving her a key.

7         Q    You gave her a key for the car?

8    A    No, not for the car, for the new house they had

9    purchased, yeah, I was giving her that key back.

10        Q    How did you get into the car?

11   A    No, I'm saying she could have, I don't recall her

12   giving me the key, but that could be the fact, yes.

13        Q    And, as a matter of fact, every time you asked her

14   in your brief interaction with Mrs. McGuire, every time you

15   asked her to search something, she consented, correct?

16   A    After advice from her attorney, I guess so, yes.

17        Q    Well, you don't know what her attorney told her,

18   did you?

19   A    I am assuming because you told me.

20        Q    Don't assume anything.  My question was this,

21   let's do this one more time, any time you asked her for

22   consent to search something she said to you, yes, correct?

23   A    Yes.

24        Q    And you recovered from that car that she agreed to

25   allow you to search, a laptop computer also, right?

FILED, Clerk of the Appellate Division, July 26, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

Case 3:18-cv-03481-MAS Document 3-51 Filed 09/14/18 Page 110 of 163 PageID: 3238

1   A    She allowed, I'm sorry, she allowed us to take it.

2        Q    The consent that she gave to you to search that

3   car, that Nissan Maxima, did you recover a laptop computer

4   from that car?

5   A    Yes.

6        Q    That was William McGuire's laptop?

7   A    Yes.

8        Q    What did you do with it?

9   A    It was Transported back to Virginia Beach.

10       Q    Who did you give It to in Virginia Beach?

11  A    It stayed in property and evidence.

12       Q    Did anyone ever access it to see if there was any

13  relevant evidence on that computer?

14  A    No, I don't believe so.

15       Q    No, well, how about we've heard a little bit in

16  this case about internet history.  Did you or anyone that

17  you know under your direction get the internet history of

18  that laptop in William McGuire's car?

19  A    I don't think my department, no.

20       Q    Do you know if anyone ever did that?

21  A    No, sir, I don't.

22       Q    You would agree that perhaps in that computer

23  could be some leads that you might want to follow, right,

24  detective?

25  A    It's possible.

FILED, Clerk of the Appellate Division, July 30, 2018, A-002530-14
Case 3:18-cv-08341-MAS Document 1-51 Filed 09/14/18 Page 111 of 163 PageID: 3239
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1        Q      Now, in the apartment, let's go now to Woodbridge

2    to that apartment that you went in and talked about this

3    luminal process, correct?

4    A     Yes.

5        Q      There was luminal applied in the bathroom?

6    A     Yes.

7        Q      Upstairs?

8    A     Yes.

9        Q      Downstairs?

10   A     Yes.

11       Q      And in the shower or tub?

12   A     Yes.

13       Q      On the floors?

14   A     Parts of the floors in the bathroom, um-hum.

15       Q      And the end result of that is that there was no

16   evidence, no indication that there was any blood there?

17   A     Correct.

18       Q      As a matter of fact, you even went so far, I don't

19   know if Ms. Prezioso asked you this on direct, if she did,

20   forgive me, you even went so far to ask the superintendent

21   to cut through the wall and pull out a piece of the drain

22   underneath the tub, correct?

23   A     Yes.

24       Q      Because your investigative mind told you that if

25   there were blood evidence or perhaps tissue that was flushed

Pickell-Cross                                              112

1   down the drain in a bathtub the pipe might be a good place

2   to look for trace evidence of that?

3   A     Sure, yes.

4       Q     That's what you are trained to do as a homicide

5   detective, yes?

6   A     Look for evidence, yes.

7       Q     And you did that, that's why you had them remove a

8   drain, right?

9   A     Yes.

10      Q     And that drain pipe came back with negative

11  results for blood or tissue?

12  A     There was some kind of false positive with that, yes.

13      Q     False positive to the juries understanding means,

14  not, not an accurate result of blood, right?

15  A     Correct.

16      Q     Or tissue?

17  A     Correct.

18      Q     Now, I want to ask you about this car in the

19  Flamingo Hotel and your investigation pursuant to finding

20  that vehicle over there.

21          You said on direct that the car remained at the

22  Flamingo Hotel from up until May 8th, correct?

23  A     Yes.

24      Q     From what date up until May 8th did the car remain

25  at the Flamingo Hotel?

FILED, Clerk of the Appellate Division, July 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    It was parked there on April 30th until May 8th when it

2    was towed.

3         Q    Let me ask you this, how do you know it remained

4    there without being moved between April 30th and May 8th?

5    A    I fast forwarded it.

6         Q    You watched that entire tape?

7    A    Fast forward, and it didn't appear it had moved.

8         Q    When you say it didn't appear, I want to make sure

9    we understand each other.

10   A    It was in the same spot when it was parked and when I

11   stopped it at the end before it was towed, it was there.

12        Q    So, your testimony is you watched the beginning of

13   that tape, correct, when it was parked?

14   A    Um-hum.

15        Q    Did you watch what happened the next eight days,

16   seven days?

17   A    Fast forwarding, yes.

18        Q    I know you were fast forwarding, I know that's how

19   you get to the end, but did you observe the video as it was

20   fast forward?

21   A    Yes.

22        Q    And you were able to watch the entire seven days?

23   A    Yes.

24        Q    And you did nothing to preserve that evidence, did

25   you?

FILED, Clerk of the Appellate Division, July 30, 2018, A-002530-14
Case 3:18-cv-03461-MAS Document 25-1 Filed 09/14/18 Page 114 of 163 PageID: 3242
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    I, in fact, I did.  I had it downloaded for the first

2    few minutes.

3         Q    I understand the first few minutes but the next

4    seven days is gone?

5    A    It is.

6         Q    And it's your testimony that at the end of that

7    tape, let me ask you this -- withdrawn.

8              It's your testimony at the end of that tape on May

9    8th that car was parked in the same spot it was parked on

10   April 30th?

11   A    Yes.

12        Q    Where is that in your report?

13   A    It is not in the report.

14        Q    It's not in your report, is it?

15   A    No.

16        Q    That's an important fact, right, detective?  For

17   instance, if the car were moved five or six times and  some

18   interloper came and moved that car that would be a

19   significant piece of your investigation, wouldn't it be?

20   A    Yes.

21        Q    So, it's your testimony that you watched the end

22   of this tape on May 8th and you saw that the car was in the

23   same spot that it was on April 30th?

24   A    Yes.

25        Q    You did not put that fact in your report though,

FILED, Clerk of the Appellate Division, July 06, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    correct?

2    A     Correct.

3         Q     And you didn't download that little eight second

4    snippet on videotape either?

5    A     I was lucky to get the first few minutes.

6         Q     Lucky as you were, you could have got lucky

7    general, right, did you try?

8    A     It's a little different working with other departments.

9    I did the best that I can.  I got the first few minutes, I

10   fast forward the tape watching, and I saw when the tow truck

11   towed the vehicle on the 8th.

12        Q     What do you mean by that it's a little different

13   working with other departments, were they not up to snuff or

14   something?

15   A     Well, I don't know if they have the proper equipment

16   and I don't know if they have that much time to put in, you

17   know, it's a possibility that --

18        Q     You didn't know if they had that much time, this

19   is a homicide investigation, detective, correct?

20   A     Yes.

21        Q     It was your testimony to this jury just now that

22   you didn't know if they really had that much time to

23   download that last eight seconds before that car was towed?

24   A     Probably the wrong choice of words on my part.

25        Q     I would think, right?

Case 3:18-ap-03411-MAS Document 251-1 Filed 09/14/18 Page 116 of 163 PageID: 3244

Pickell-Cross                                    116

1   A     I was able to get them to do the first few minutes.

2         Q     Did you ask them to do the last few minutes?

3   A     I don't think I did, no.

4         Q     So, it wasn't really this department's fault.  You

5   didn't ask, did you?

6   A     Not that I recall, no.

7         Q     Do you know, did you speak to the tow truck

8   operator that towed that car away?

9   A     Yes.

10        Q     Did you find out what spot he said he towed that

11  car from?

12  A     Yes.

13        Q     Do you know it's a different spot than the spot it

14  was in on April 30th?

15  A     No.

16        Q     You didn't know that?

17  A     No.

18        Q     But, again, you are going on your recollection

19  here on this one, right, detective, because there's nothing

20  in your report from how many years ago, two years ago?

21  A     Almost three.

22        Q     This is all to say to this jury, all on your

23  recollection?

24  A     Yes.

25        Q     Because it's not memorialized either in that

FILED, Clerk of the Appellate Division, July 30, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    snippet of eight more seconds you could have put on the

2    videotape or it's not memorialized in your report?

3    A    Correct.

4         Q    You fast forwarded and watched the rest of that

5    videotape in high speed?

6    A    Whatever speed to fast forward in, yes.

7         Q    Did you not see anyone come back into that car at

8    all for seven days?

9    A    Well, I don't know how quickly the tape, you know,

10   advances.  Sure, there could have been somebody that came

11   back to the car, but I didn't see it.  I saw when it was

12   parked and when it was towed.  I saw some in between but

13   it's so fast I'm just saying it didn't appear to me that the

14   car had been moved.

15        Q    It didn't appear to you.  That's a little

16   different than you fast forwarded, watched the entire

17   footage to see if someone came into that car, isn't it?

18   A    I don't think I said entire footage.  I said I fast

19   forwarded.  I don't think that's the entire footage.  I'd

20   have to watch it second by second to watch the entire

21   footage.

22        Q    There's nothing in your report to indicate how

23   much time you spent watching this fast forward footage, is

24   there?

25   A    No.

FILED, Clerk of the Appellate Division, July 25, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1     Q    At the time you were watching this fast forward

2   footage you certainly didn't see anyone come to that

3   vehicle, did you?

4   A    No, I didn't.

5     Q    You recovered from the car an EZ-Pass you said?

6   A    Yes.

7     Q    The Nissan Maxima, you understand we are talking

8   about that car?

9   A    Yes.

10    Q    Did you, did you pull the EZ-Pass records of that

11  particular EZ-Pass?

12  A    I believe we pulled the records to that, yes.

13    Q    And did you compare or do an analysis of those

14  EZ-Pass records to determine frequency of use and whatnot?

15  A    No, I don't think I did.

16    Q    Were you able to determine in your investigation

17  if there were times where William McGuire was in Atlantic

18  City prior to April of 2004 but his EZ-Pass records did not

19  indicate he had used any EZ-Pass to get to Atlantic City,

20  did you find that out in your investigation at all?

21  A    I don't recall that, no.

22    Q    Let's talk about the weights, the weight set you

23  were looking for, okay?

24  A    Yes.

25    Q    You were looking for a matching weight to one of



FILED, Clerk of the Appellate Division, July 10, 2018, A-002510-14 <span>Case 3:18-ap-00411-MAS Document 25-1 Filed 09/14/18 Page 119 of 163 PageID: 3247</span>
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

```
 1    the weights that were found in that, in one of the

 2    suitcases, correct?

 3    A    Yes.

 4         Q    And that was a Weider, W e i d e r, a Weider

 5    weight?

 6    A    Weider weight, yes.

 7         Q    You told this jury you looked in Justin Marrero's

 8    place, correct?

 9    A    His residence, yes.

10         Q    And you saw some weights there?

11    A    Yes.

12         Q    But they were not Weider weights, right?

13    A    Correct.

14         Q    So, they didn't match?

15    A    Correct.

16         Q    And you looked in Alex Marrero's residence you saw

17    some dumbbells over there?

18    A    In the backyard, yes.

19         Q    They didn't match up either?

20    A    No.

21         Q    You didn't find any matching set of Weider

22    weights?

23    A    No.

24         Q    You said, who was the person who made the initial

25    identification you spoke with, a friend of Mr. McGuire's?
```



FILED, Clerk of the Appellate Division, July 18, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

Case 3:18-cv-08341-MAS Document 251 Filed 09/14/18 Page 120 of 163 PageID: 3248

Pickell-Cross                                    120

1    A    John Rice.

2         Q    John Rice, and his initial reaction when you

3    showed him the photograph and talked to him about this was

4    that Mr. McGuire probably went to Atlantic City?

5    A    I'm sorry, say that again?

6         Q    His initial reaction when you asked Mr. Rice about

7    Mr. McGuire and his whereabouts, he told you that he

8    probably went to Atlantic City, correct?

9    A    He did mention Atlantic City, that he liked it there,

10   yeah, he liked going there.

11        Q    You during the course of your investigation, sir,

12   you took at least one trip from Virginia Beach up to

13   Woodbridge, correct?

14   A    Yes.

15        Q    About six hours?

16   A    Roughly, yes.

17        Q    Roughly.

18        In the course of your investigation you

19   interviewed many witnesses, correct?

20   A    Yes.

21        Q    And you asked questions of those witnesses, some

22   of which had perhaps more of a purpose than others, right?

23   A    Yes.

24        Q    You asked friends of Mr. McGuire whether or not

25   Bill had any gambling debts, correct?

FILED, Clerk of the Appellate Division, July 02, 2018, A-002550-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    Who did I ask that too, I'm sorry?

2         Q    Do you recall a Jay Tandava?

3    A    Yes.

4         Q    Did you ask Jay Tandava, did you ask, not what he

5    said to you, but did you ask if Mr. Bill McGuire had any

6    gambling debts?

7    A    I believe I may have.

8         Q    Is that something you asked some of Mr. McGuire's

9    friends regarding gambling debts?

10   A    I may have, yes.

11        Q    And the reason you may have is because during your

12   investigation you came to learn that Mr. McGuire was a bit

13   of a gambler?

14   A    In, yeah, from Mrs. McGuire, yes.

15        Q    From Mrs. McGuire, John Rice, his best friend?

16   A    No, I think initially from her.

17        Q    Initially from her, but you did your own

18   investigation as a police officer, right?

19   A    Yes.

20        Q    Now, did you ever follow-up, did you ever pull

21   casino records to determine Mr. McGuire's gambling pattern?

22   A    I did not, no.

23        Q    Did someone working under your employ?

24   A    I don't know if somebody did, but I did not.

25        Q    Well, was any follow-up done to determine whether

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, **079925**

1   Mr. McGuire, Mr., Bill McGuire, had excessive gambling

2   debts, was any follow-up investigation done on your part?

3   A    Not by my part, no.

4       Q    One of the individuals you interviewed was Mr.

5   McGuire's ex-wife, Marci Paulk, right?

6   A    Yes.

7       Q    And did she speak to you and answer all your

8   questions?

9   A    Yes.

10      Q    During the course of your investigation,

11  detective, by the way, you asked Mrs. McGuire, one of Mrs.

12  McGuire's divorce attorneys for her computer, correct?

13  A    Yes.

14          THE COURT:  Excuse me, Mr. Tacopina, you mean the

15  lawyer's computer, Mrs. McGuire's computer?

16          MR. TACOPINA:  I'll clarify that, your Honor.

17      Q    You didn't ask for the lawyer's computer, did you?

18  A    No.

19          MR. TACOPINA:  I bite my tongue, and I'll move on.

20      Q    You asked for Mrs. McGuire's computer, correct?

21  A    Yes.

22      Q    And the lawyer told you she had received it from

23  Mrs. McGuire, correct?

24  A    Yes.

25      Q    So, you didn't do that by way of subpoena, you

FILED, Clerk of the Appellate Division, July 2018 At 002530-14 Filed 09/14/18   Page 123 of 163 PageID: 3251
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    didn't compel her to give you that computer, right?

2    A    No.

3         Q    You asked for it, and Mrs. McGuire gave it to her

4    attorney to give to you?

5    A    Yes.

6         Q    You never did pick that up though, correct?

7    A    No, I didn't.

8         Q    And when I say computer, we are talking about the

9    computer that was in the home, correct?

10   A    Yes.

11        Q    Another person you wanted to speak to in the

12   course of your investigation, this homicide, was a fellow

13   named Brad Miller, right?

14   A    Yes.

15        Q    Doctor Brad Miller, he's someone you wanted to

16   interview in person as opposed to on the phone, right?

17   A    Yes.

18        Q    And you eventually did that?

19   A    No.

20        Q    Did you speak to him on the phone?

21   A    Briefly.

22        Q    Did he agree to meet with you?

23   A    I don't think I ever asked him to meet with me.

24        Q    Did you learn whether or not Mr. Miller had

25   purchased a reciprocating saw, on May 2nd of 2004?

FILED, Clerk of the Appellate Division, July 26, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   A    I didn't ask him that, I don't know that.

2        Q    You didn't ask him that?

3   A    Correct.

4        Q    Now, would that be something you would have been

5   interested in knowing on May 2nd, 2004, if Mr. Miller

6   purchased a reciprocating saw?

7   A    Sure, yes.

8        Q    Based on this homicide investigation, correct?

9   A    Yes.

10       Q    Did you know Mr. Miller, Doctor Miller was

11  involved in an extramarital affair with Melanie McGuire at

12  the time?

13  A    I didn't know at that time.

14       Q    Now, getting back, detective, to the interview of

15  Mrs. McGuire.  I just want to go through a few of the things

16  you told this jury earlier today?

17  A    Sure.

18       Q    You mentioned the attorneys name was Risa Kleiner,

19  correct, the divorce attorney?

20  A    Yes.

21       Q    And Risa Kleiner called you have back within

22  thirty minutes of you calling Melanie McGuire to make the

23  request?

24  A    I believe so, yes.

25       Q    And they agreed to have Mrs. McGuire sit down and

FILED, Clerk of the Appellate Division, July 02, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    answer your questions, right?

2    A    Yes.

3         Q    And Mrs. McGuire told you during that -- by the,

4    way were any parameters set on that interview?  Did they

5    tell you can't ask her certain questions, the attorneys?

6    A    No, but they made it clear they didn't want the

7    interview to be very long because she was very upset.

8         Q    Obviously, because it was June 2nd of 2004,

9    correct?

10   A    Yes.

11        Q    And when was the notification made to Mrs. McGuire

12   about her husband?

13   A    May 26th.

14        Q    And when you sat down with her it was Ms. McGuire

15   who told you that the car had Pennsylvania plates on it,

16   correct?

17   A    We asked about, yeah, we are asking her questions, yes,

18   she provided that.

19        Q    Did you know at that time on June 2nd that the car

20   had Pennsylvania plates on it?

21   A    I don't know if I did or not, I really do not.

22        Q    And, by the way, she told you, she told you that

23   Mr. McGuire had a platinum ring, platinum braided wedding

24   ring?

25   A    Yes.

FILED, Clerk of the Appellate Division, July 06, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1        Q    You recall her saying platinum, specifically?

2    A    Yes.

3        Q    As opposed to fourteen carat gold, right?

4    A    Yes.

5        Q    And you not only spoke to her on June 2nd but you

6    got to speak to her two more times after that, correct?

7    A    On June 3rd and then on June 4th, yes.

8        Q    So, you did three interviews with Mrs. McGuire,

9    correct?

10    A    Interviews, I spoke to her.

11        Q    That's what you call in your report, an interview,

12    right?

13    A    Yes.

14        Q    And you were not once ever told you can't ask any,

15    a certain question, were you?

16    A    No.

17        Q    And you asked whatever questions you thought were

18    relevant or that you wanted answers to, correct?

19    A    Yes.

20        Q    Now, you asked, when you were in the storage

21    facility, you asked Mrs. McGuire where her husband's clothes

22    were, right?

23    A    Yes.

24        Q    And let me just make sure we have the dates square

25    here.  This is June 2nd of 2004, right, or June 3rd now?

FILED, Clerk of the Appellate Division, July 09, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, **079925**

1   A    June 3rd, yes.

2        Q    She's already learned her husband is dead, right?

3   A    Yes.

4        Q    And you know from your investigation that she had

5   moved out and vacated the apartment they shared, correct?

6   A    Yes.

7        Q    So, you found it somewhat unusual that she had

8   given away his clothes, is that your testimony?

9   A    I find it unusual, yes.

10       Q    That's why you gave that little chuckle before

11  when you said it?

12  A    I don't know --

13           MS. PREZIOSO:  Objection.

14  A    If I chuckled --

15           THE COURT:  Objection sustained.

16       Q    You don't know what their marriage was like, do

17  you?

18  A    Just by going by what she said, yeah, that it was

19  unhappy.

20       Q    And you spoke to other people who sort of painted

21  that same picture, didn't you?

22  A    Yes.

23           MS. PREZIOSO:  Objection.

24           THE COURT:  Overruled.

25       Q    And that first interview on June 2nd, when did

FILED, Clerk of the Appellate Division, July 20, 2018, A-002730-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    Mrs. McGuire start becoming expressive in the face as you

2    just described?

3    A    The --

4         Q    How far into?

5    A    The first interview you mean?

6         Q    Yes.

7    A    I would say soon as she came into the room.

8         Q    And this is the first time you have ever seen

9    Melanie McGuire in your life, right?

10   A    Yes.

11        Q    First time you ever met her?

12   A    Yes.

13        Q    First time you ever spoke to her?

14   A    Other than the initial phone call.

15        Q    Withdrawn, you are right.  First time you ever

16   spoke to her in person?

17   A    Yes.

18        Q    And certainly you don't know how she expresses

19   herself, do you?

20   A    No.

21        Q    You don't know what her facial expressions are

22   like going into that meeting, do you?

23   A    No.

24        Q    So, you made some summary conclusion that she

25   appeared to be crying but there were no tears?

1   A       Correct.

2       Q       You never met this woman before and the minute she

3   came into that room you drew that conclusion?

4   A    No, I watched her during that fifteen, twenty minute

5   interview.  I observed her.  I watched her actions, yes.

6       Q       And, and you watched her actions and because she

7   frowned downward you determined that's consistent with

8   crying, correct?

9   A    Well, her voice was low, it was cracking at times and

10  she would bring her hands up to her face, but I watched her

11  eyes and never a tear came out.

12      Q       And that was something very unusual to you,

13  correct?

14  A    I find it unusual, yes.

15      Q       And based on that -- oh, by the way, when she was

16  all crying, did she take a break and ask for some water and

17  ask for a break?

18  A    I don't remember that.  It was a short interview.  I

19  don't remember us taking a break.

20      Q       It was a short interview, detective, because you

21  had asked her all the questions you had at that particular

22  time, correct?

23  A    No.

24      Q       The lawyer cut it short?

25  A    The lawyers really did not want the interview to be

FILED, Clerk of the Appellate Division, July 30, 2018, A-002510-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    long because she, in fact, they said she wasn't even going

2    to consider doing an interview because she was too upset.

3        Q    She did the interview, correct?

4    A    Yes.

5        Q    She did?

6    A    Yes.

7        Q    And then another one after that, the next day?

8    A    Yes.

9        Q    And then another one the next day?

10   A    Yes.

11       Q    Where does it say the attorneys cut the interview

12   short, did you put that in your report?

13   A    No.

14       MR. TACOPINA:  Your Honor, can I have State

15   Exhibit 201, I'm sorry, just 201.

16       Q    I am going to show you what's shown earlier,

17   State's Exhibit 201.  Just take a look at it.  Before you is

18   State's Exhibit 201, and Ms. Prezioso showed you that

19   earlier, correct?

20   A    Yes.

21       Q    And that's a picture of a plastic container?

22   A    Yes.

23       Q    And you said you didn't recognize that, correct?

24   A    Correct.

25       Q    You did not go into the second storage area, that



FILED, Clerk of the Appellate Division, July 06, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

Case 3:18-cv-03461-MAS Document 6-1 Filed 09/14/18 Page 131 of 163 PageID: 3259

1    was your partner who went in, correct?

2    A    Correct, yes.

3        Q    So, why would you recognize something that was in

4    an area you may never have gone into?

5    A    I said I didn't recognize it.

6        Q    But you would agree you never went into that

7    second storage area to determine what was in there, correct?

8    A    Correct, I didn't recognize this.

9        Q    If there was something in the second storage area

10   it would have no recall value to you today because you

11   didn't go in there, correct?

12   A    Correct.

13           MR. TACOPINA:  I'm done with that, by the way.

14       Q    In front of you with the attorney, do you recall

15   telling the attorney -- the attorney telling Mrs. McGuire

16   don't answer the questions that were asked of you?

17   A    I'm sorry?

18       Q    Did the attorney instruct Mrs. McGuire in front of

19   you to only answer the questions asked and not volunteer

20   information?

21   A    No, I don't recall that.

22       Q    You don't recall that.

23           Just a few more things, Detective Pickell.  I want

24   to ask you a few things regarding your investigation.

25           When you went to this, when was the first time you

FILED, Clerk of the Appellate Division, July 06, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, **079925**

1    went to the Woodbridge apartment that William and Melanie

2    McGuire lived in?

3    A    We drove by the first night that we arrived but we did

4    not go in, of course.

5         Q    What night was that?

6    A    June 1st.

7         Q    June 1st?

8    A    Yeah.

9         Q    You drove by it, but didn't go in?

10   A    Yes, I wasn't familiar with the area and Detective

11   Shattuck wanted to show me the apartment, where it was

12   located.

13        Q    Anyway, so you went back the next day, June 2nd,

14   correct?

15   A    For the actual search, yes.

16        Q    Now, after or before the actual search did you

17   canvass the area for other neighbors of Bill McGuire's?

18   A    We knocked on some doors.  I don't think it was a

19   complete thorough canvas, though.

20        Q    It wasn't a complete thorough canvass where you

21   asked every neighbor if they had heard like a gunshot?

22   A    Exactly, no, it wasn't.

23        Q    No, it wasn't; and how many doors did you knock

24   on?

25   A    Two, three, four.



FILED, Clerk of the Appellate Division, July 26, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1        Q     How many people did you speak to?

2    A    I don't even think anyone was home that I recall.

3        Q     What time did you go?

4    A    It was the morning hours, I want to say in the morning

5    hours.

6        Q     The wee morning hours or like sunshine morning

7    hours?

8    A    Sunshine morning hours.

9        Q     And you didn't find one person in the few doors

10   that you knocked on, a neighbor or --

11   A    Not initially, I don't think we did, no.

12       Q     Did you go back the next day and do a canvass of

13   neighbors to see maybe they heard a gunshot or a buzz, buzz

14   saw or something like that?

15   A    No, I did not.

16       Q     You agree if perhaps a neighbor heard a gunshot

17   that would be an important piece of information for your

18   investigation?

19   A    Yes, if a neighbor did, yes.

20       Q     And the cell phone records of William McGuire, did

21   you eventually subpoena those?

22   A    I did subpoena some cell phone records, yes.

23       Q     I mean July of 2004, correct, does that sound --

24   A    That does sound, yes.

25       Q     Any particular reason why you waited a little over

FILED, Clerk of the Appellate Division, July 06, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   a month to subpoena those records?

2   A    Actually, I think the reason why is because I was

3   thinking Woodbridge actually subpoenaed them and they never

4   received them so then I subpoenaed for them again, I think,

5   I believe that's the reason.

6        Q    You would agree, obviously phone records are an

7   investigative tool that could be valuable, correct?

8   A    Absolutely.

9        Q    How about a contact list, you would agree that's

10  an investigative tool that could be valuable, right?

11  A    A contact list?

12       Q    Sure, a contact list contained within a cell

13  phone?

14  A    Oh, yes.

15       Q    Did you, you took charge of William McGuire's

16  Blackberry device that you showed this jury, right?

17  A    Yes.

18       Q    Did you go through his list of contacts there?

19  A    No, I didn't.

20       Q    Any of them?

21  A    No.

22       Q    One of the brochures you showed this jury earlier

23  that was recovered on the front seat of William McGuire's

24  car was a brochure for the Atlantic City Eco-lodge, right?

25  A    Yes.

FILED, Clerk of the Appellate Division, July 06, 2018, A-002530-14

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1      Q    What did the Atlantic City Eco-lodge tell you

2  regarding William McGuire?

3  A    I didn't go to that location.

4      Q    So, you found a brochure for an Atlantic City

5  Eco-lodge and you did not go there to determine whether

6  William McGuire ever stayed there or not?

7  A    I did not, no.

8      Q    Someone working under you do that?

9  A    I don't know if they went later on, I don't know.

10     Q    But you were the lead of this Virginia Beach

11 investigation, correct?

12 A    The lead?

13     Q    Detective?

14 A    The lead until.

15     Q    It went up to Jersey?

16 A    Yes.

17     Q    Did you get replaced or something before it went

18 up to New Jersey?

19 A    No.

20     Q    The lead until it went up to New Jersey, correct?

21 A    Yes.

22     Q    And it went up to New Jersey, what was the date?

23 A    In October, I believe.

24     Q    October, that's like, 10/04 tenth month of 2004?

25 A    Yes, tenth month.

FILED, Clerk of the Appellate Division, July 02, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1        Q      So, up until that point no one went to the

2   Eco-lodge to determine if there were any stays there by

3   William McGuire?

4   A      Not to my knowledge, no.

5        Q      You took some business cards from William

6   McGuire's wallet, correct?

7   A      Business cards from his wallet?

8        Q      Did you take charge of any business cards from

9   William McGuire's wallet when you went to that storage

10  facility?

11  A      Not to my knowledge.

12       Q      Did your partner, to your knowledge, take

13  possession of any business cards belonging to William

14  McGuire?

15  A      No.

16       Q      Did you find any business cards in the car of

17  William McGuire?

18  A      I think there was some in the car, yes.

19       Q      Did you follow-up on those individuals to

20  determine if they had any information pertinent to the

21  investigation?

22  A      No, they were left to Atlantic City and vouchered all

23  up as one, so, no, I didn't.

24       Q      How about credit card records, did you pull

25  William McGuire's credit card records for the last month of

FILED, Clerk of the Appellate Division, July 09, 2018, A-002530-14

Case 3:18-cv-03841-MAS Document 8-51 Filed 09/14/18 Page 137 of 163 PageID: 3265

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1     his life?

2     A     No.

3          Q     Detective, that is all for now, thank you -- one

4     last thing and then we are done.

5               Turn to page five of your report, would you

6     please, in that first paragraph I want to ask you a

7     question.  That first paragraph was created on June 4th of

8     2004 or at least there are notes that were taken

9     contemporaneous with your work on June 4th, 2004, the search

10    of the car?

11    A     The search of the car occurred on that date.

12         Q     And aside from searching the car you observed the

13    car, right?

14    A     We were in the bay, yes.

15         Q     And you took pictures of the car?

16    A     Atlantic City did, yes.

17         Q     And one thing -- withdrawn, at this point you had

18    observed those three suitcases that were recovered in the

19    Chesapeake Bay, you, yourself?

20    A     I had seen them, yes.

21         Q     One thing you were certain about when you looked

22    at that car was that those three suitcases could not fit in

23    that Nissan Maxima, correct?

24    A     Repeat that.

25         Q     Sure, one thing you were certain about, one thing

FILED, Clerk of the Appellate Division, July 08, 2019, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    you were certain about when you looked at that car is that

2    those three suitcases recovered in the Chesapeake Bay could

3    not have fit inside that Nissan maximum, correct?

4    A    I wouldn't say definitely not.  Surely one suitcase I

5    guess could have been put in the trunk, maybe a small one in

6    the back seat, but, I don't think all three of them would

7    have fit in the trunk of that car, no, I don't.

8         Q    Well, as a matter of fact, you said the trunk did

9    not have enough room to contain the three suitcases, right?

10   A    The trunk did not.

11        Q    And you told this jury earlier there was no

12   additional room in that car for anything because there were

13   kids seats in the back and everything, right?

14   A    Right.

15        Q    Is that correct?

16   A    Right.

17             MR. TACOPINA:  Thank you, detective, no further

18   questions.

19             THE COURT:  Any follow-up?

20             Mrs. Prezioso, I am going to want to take the

21   afternoon recess for the jury and then we'll take your

22   follow-up.

23             MS. PREZIOSO:  It will be brief, your Honor, real

24   brief.

25             THE COURT:  I think maybe we should take a break,

FILED, Clerk of the Appellate Division, July 06, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    then there may be follow-up to that and the jury has been

2    sitting.

3              Let's take a fifteen minute recess.

4              ( Jury excused )

5              THE COURT:  We'll resume at 3:10.

6              ( Recess )

7              ( Whereupon the jury returns to the courtroom and

8    court resumes )

9              THE COURT:  Continue, Ms. Prezioso.

10             MS. PREZIOSO:  Thank you, your Honor.

11   REDIRECT EXAMINATION BY MS PREZIOSO:

12        Q    Detective, during Mr. Tacopina's cross examination

13   you repeatedly specified are you talking about the first

14   interview.  Do you consider that there were other interviews

15   of Mrs. McGuire, just for clarification for the jury so they

16   understand you, sir?

17   A    Maybe contacts, the contacts that I had with her.

18        Q    But outside of what you described, the interview

19   that happened at the Wilentz firm, was there another time

20   that you sat down and had a discussion with Mrs. McGuire?

21   A    No.

22        Q    So, what you are referring to as the other

23   interviews, what are they, sir?

24   A    Just contacts with her, yeah.

25        Q    And you discussed, I believe your second contact

FILED, Clerk of the Appellate Division, July 2018, A-002530-14

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1  was at the storage facility?

2  A    Yes.

3      Q    So, when you were referring to other interviews,

4  you were talking about the discussion you had at the storage

5  facility?

6  A    Yes.

7      Q    And the third interview, sir, you were talking

8  about the contacts regarding the consent to search the car?

9  A    Yes.

10     Q    But there was no other time, other than at the

11 Wilentz firm when you sat down and spoke to her?

12 A    Correct.

13     Q    Now, sir, Mr. Tacopina also asked you about a

14 platinum ring.  Is that noted in your report, sir, about the

15 platinum braided ring?

16 A    It is.

17     Q    It is in your report, correct?

18 A    It is.

19     Q    And, sir, Mr. Tacopina also asked you about

20 removing a piece of pipe from the apartment at 2209 Plaza

21 Drive, 2209, the apartment on Plaza Drive.  I may have the

22 number incorrect.  You removed a pipe, correct?

23 A    The on-site maintenance man did, yes.

24     Q    Now, how many bathrooms were there in the upstairs

25 that had bathing facilities, I am referring to full

FILED, Clerk of the Appellate Division, July 20, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    bathrooms, how many full bathrooms were in that apartment?

2    A    Two.

3         Q    Well, is that a question, sir, or an answer?

4    A    I guess, there was a bathroom in the master bedroom and

5    there was a bathroom down the hallway, so.

6         Q    And in the master bathroom what was the bathing

7    facility in there?

8    A    A shower.

9         Q    It was a shower stall?

10   A    Yes.

11        Q    And in the other bathroom what was the bathing

12   facility?

13   A    A bath tub and shower.

14        Q    And which bathroom was the pipe removed from?

15   A    The bathtub.

16        Q    The one in the hallway, correct?

17   A    Correct.

18        Q    Not the one in the master bathroom, right?

19   A    Correct.

20        Q    Now, you were also asked about several computers

21   and Blackberrys, correct?

22   A    Yes.

23        Q    Now, detective, when the case moved up to New

24   Jersey were all of those computers and Blackberrys turned

25   over to the New Jersey authorities?



Case 3:18-cv-08341-MAS Document 8-1 Filed 09/14/18 Page 142 of 163 PageID: 3270

```
 1    A    Yes.
 2         Q    And as a matter of fact, sir, was every piece of
 3    evidence that you collected turned over to the New Jersey
 4    authorities?
 5    A    Yes.
 6         Q    And whether or not further testing was done, I
 7    don't know whether you know, sir, correct?
 8    A    Correct.
 9         Q    But New Jersey got everything eventually, right?
10    A    Yes.
11              MS. PREZIOSO:  Nothing further, Judge.
12              MR. TACOPINA:  One or two, Judge, real quick.
13    RECROSS EXAMINATION BY MR. TACOPINA:
14         Q    Detective, Ms. Prezioso was asking you about these
15    other contacts with Mrs. McGuire.
16              In your report you called them a first, a second
17    and a third interview, correct?
18    A    Correct.
19         Q    Whether it was at a law office or a storage
20    facility, they were periods of time where you asked
21    questions and she gave answers, correct?
22    A    Correct.
23         Q    And, by the way, you never asked for another
24    sit-down interview in the lawyer's office or anything, did
25    you?
```

FILED, Clerk of the Appellate Division, July 08, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    I did not, no.

2         Q    And lastly, the question about the platinum ring,

3    make no mistake about it, Mrs. McGuire told you the ring was

4    platinum, not gold, right?

5    A    Braided platinum ring.

6         Q    Braided platinum, thank you.

7              MR. TACOPINA:  No further questions.

8              MS. PREZIOSO:  Nothing further.

9              THE COURT:  I want you to know, Ms. Prezioso's six

10   questions turned into twenty, and your one or two turned

11   into five.

12             MR. TACOPINA:  It was one A, two B.

13             THE COURT:  Thank you, detective, you are excused.

14             Ms. Prezioso, next witness, please.

15             MS. PREZIOSO:  Yes, Judge, the State would like to

16   call Mr. John Coscia.

17   J O H N   C O S C I A, sworn.

18             MS. PREZIOSO:  May I inquire, sir?

19   DIRECT EXAMINATION BY MS. PREZIOSO:

20        Q    Good afternoon, Mr. Coscia.

21   A    Good afternoon.

22        Q    Sir, what do you do for a living currently?

23   A    I have a small gun shop and tackle shop.

24        Q    And where is that store located, sir?

25   A    Easton, Pennsylvania, in Palmer Township.

FILED, Clerk of the Appellate Division, July 26, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, **079925**

1       Q    And are you the owner of the shop, Mr. Coscia?

2    A    Yes.

3       Q    Now, prior to owning the gun shop did you do

4    something else?

5    A    I worked as a medical lab technician for about thirty

6    years at Eastern Hospital in a private lab.

7       Q    And you are retired from that position, correct?

8    A    Yes.

9       Q    And this gun shop that you have been running in

10   Palmer Township, Pennsylvania, how long have you been doing

11   that, sir?

12   A    Part time and full time about twenty-eight years.

13      Q    Sir, I'd like to call your attention now to April

14   26, 2004, do you recall that day?

15   A    Yes.

16      Q    Do you remember, did there come a time when a

17   woman came into your store that day?

18   A    Yes.

19      Q    And can you tell the jury, do you remember what

20   that woman's name is, sir?

21   A    Melanie McGuire.

22      Q    And when Melanie McGuire came into your store did

23   she purchase anything, sir?

24   A    She purchased a handgun.

25      Q    Do you recall what kind?



Coscia-Direct                                          145

1      A      A Taurus Model 85, .38 Special.

2             Q      And did she purchase anything else besides the

3      gun, sir?

4      A      A box of bullets.

5             Q      And do you recall what type of bullets?

6      A      The maker was Ultramax, it was either wad cutter or

7      round nose.

8             Q      And how do you know that, sir?

9      A      That was the only ammo I was handling at the time with

10     .38 Specials.

11            Q      And in order for someone to purchase a gun do they

12     have to fill out paperwork?

13     A      They must fill out a Federal form and a Pennsylvania

14     form for handguns.

15            Q      Sir, I am going to hand you what's been marked

16     State's Exhibit 231.  One moment, sir.

17            MS. PREZIOSO:  Mr. Tacopina.

18            Q      Mr. Coscia, do you recognize this form?

19     A      Yes.

20            Q      And can you explain to the jury what this form is?

21     A      This is the Federal form that you have to fill out to

22     purchase a handgun or a long gun.

23            Q  .  And who fills the out the form, sir, would it be

24     you or the person buying the gun?

25     A      The person buying the gun, and I fill out part of it,

FILED, Clerk of the Appellate Division, July 09, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    too.

2         Q    And, sir, does this form in front of you, do you

3    recognize this specific filled-out form?

4    A    Yes.

5         Q    And which form is that, sir?

6    A    That's the Federal form.

7         Q    Filled out by whom?

8    A    The purchaser and me.

9         Q    And who is the purchaser that filled out this

10   particular form?

11   A    Melanie McGuire.

12        Q    And did Melanie McGuire fill this form out in

13   front of you?

14   A    Yes.

15        Q    And does what's in front of you, is that an exact

16   copy, is that a piece of the form that Melanie McGuire

17   filled out to purchase a gun in your shop?

18   A    This is the original copy.

19        MS. PREZIOSO:  Your Honor, the State would offer

20   this form into evidence as State's Exhibit 231.

21        MR. TACOPINA:  No objection.

22        THE COURT:  All right, S-231 will be admitted in

23   to evidence without objection.

24        ( Exhibit marked into evidence )

25        Q    Sir, I'm handing you what's been marked State's

FILED, Clerk of the Appellate Division, July 06, 2018, A-002530-14    Filed 09/14/18    Page 147 of 163 PageID: 3275
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    Exhibit 233.  Do you recognize that?

2    A    Not this one, no.  That one I do.

3         Q    What's different about the one with the red

4    sticker, sir?

5    A    I don't know if that came from the State or where.

6         Q    Because of what's on the bottom, the

7    certification?

8    A    This is on the other part of the, yeah, this is a copy.

9         Q    Okay, and what's it a copy of, sir, do you

10   recognize that, is that a form that's used in your shop?

11   A    I am trying to see -- yes, it is.  That's the State

12   form.  This one.

13        Q    And both of these forms that are before you, 233,

14   one is a copy of the other, correct?

15   A    Yes, but this isn't the original.  This is a copy.

16        Q    Is it an exact copy, sir?

17   A    Yes.

18        Q    And what is it an exact copy of?

19   A    Purchaser buying a handgun and me filling out the

20   bottom.

21        Q    And is that a form that's used in your gun shop to

22   purchase a gun?

23   A    That's required by Pennsylvania when you purchase a

24   handgun they run a NIX check on them.

25        Q    What is a NIX check?

FILED, Clerk of the Appellate Division, July 26, 2018, A-002550-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925
Case 3:18-cv-03415-MAS Document 9-51 Filed 09/14/18 Page 148 of 163 PageID: 3276

1    A    It's an instant check the State runs to see if the

2    person buying the handgun is eligible to take it with them.

3         Q    And what do they have to show in order to do that,

4    sir?

5    A    Photo driver's license, Pennsylvania.

6         Q    And is that to show proof of residency, sir?

7    A    Yes.

8         Q    Is proof of residency required to purchase a

9    handgun in Pennsylvania?

10   A    Yes.

11        Q    And who filled out that particular form that's in

12   front of you?

13   A    The purchaser fills out the top part and I fill out the

14   bottom part.

15        Q    And which particular purchaser filled that form

16   out, sir, who filled it out?

17   A    Melanie McGuire.

18        Q    And did she fill it out in front of you, sir?

19   A    Yes.

20        Q    And on this form does it indicate the occupation

21   of the purchaser?

22   A    Yes.

23        Q    And what's the occupation?

24   A    Registered nurse.

25        Q    And do you remember when Melanie McGuire came in

FILED, Clerk of the Appellate Division, July 06, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925



1    to your store, do you remember her?

2    A    Yes.

3         Q    And why do you remember her, sir?

4    A    Well, not many women come into the shop purchasing a

5    handgun, and when she came in, well, she was well-dressed, I

6    noticed that, and then when I saw she was a registered nurse

7    all the years that I worked in the hospital she was the

8    first female nurse that bought a handgun that I remember.

9         Q    And, sir, I ask you to look around the courtroom

10   and tell me if you see the person who bought the handgun

11   from you on the 26th, and if you don't see her that's okay,

12   too, just take a look around and tell me if you do?

13   A    No.

14        Q    Now, the person that bought the gun from you that

15   day, who filled out those forms, did she fill them out in

16   front of you?

17   A    Yes.

18        Q    And this is an exact duplicate of the State form

19   that she filled out?

20   A    Yes.

21        MS. PREZIOSO: Your Honor, at this time the State

22   would offer State's 233 into evidence.

23        THE COURT:  Counsel.

24        MR. TACOPINA:  No objection, your Honor.

25        THE COURT:  Okay, S-233 will be admitted into

FILED, Clerk of the Appellate Division, July 08, 2019, A-002510-17
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    evidence.

2              ( Exhibit marked into evidence )

3        Q    Sir, I am handing you what's been marked with a

4    red sticker as State's Exhibit 235.  Can you take that, sir?

5              Now, what is that piece of paper that I have

6    handed you?

7    A    Receipt from my cash register.

8        Q    Now, you saw that earlier today, right?

9    A    Yes.

10       Q    And you took a look at it before you came into the

11   court to testify?

12   A    Yes.

13       Q    And do you see on that tape anything that has to

14   do with the purchase that Melanie McGuire made on April 26,

15   2004?

16   A    The handgun purchase and the 9.95 for the ammo.

17       Q    And, sir, besides those bullets were you selling

18   anything else in your store for $9.95?

19   A    No.

20       Q    And the sale that has to do with Mrs. McGuire, did

21   you put a mark next to it earlier today?

22   A    Yes.

23       Q    And is that your mark that's on it?

24   A    Yes.

25       Q    And is this an exact, is that the original?

FILED, Clerk of the Appellate Division, July 09, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   A     That's the original tape.

2           MS. PREZIOSO:  Your Honor, the State would offer

3   Exhibit 235 into evidence.

4           MR. TACOPINA:  No objection.

5           THE COURT:  235 will be admitted without

6   objection.

7           ( Exhibit marked into evidence )

8     Q     Last one, sir.  I am showing you what's been

9   marked State's Exhibit 232 with the red sticker, do you

10  recognize that?

11  A     That's my receipt that I write out when someone

12  purchases a handgun.

13    Q     The receipt you write out.  That has only the

14  handgun on it, correct, sir?

15  A     The handgun, the sales tax, and the five dollars that

16  the state charges for the check.

17    Q     Thank you, and is that the original copy?

18  A     Yes.

19          MS. PREZIOSO:  Your Honor, the State would offer

20  232 into evidence.

21          MR. TACOPINA:  No objection.

22          THE COURT:  All right, 232 admitted without

23  objection.

24          ( Exhibit marked into evidence )

25          MS. PREZIOSO:  One moment, Judge.

FILED, Clerk of the Appellate Division, July 06, 2018, A-002530-14
Case 3:18-cv-08341-MAS Document 1251-1 Filed 09/14/18 Page 152 of 163 PageID: 3280
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1        Q    And, Mr. Coscia, do you recall any conversations

2    that you had with Melanie McGuire on April 26, 2004?

3    A    Well, whenever someone purchase a handgun I usually go

4    over, you know, the safety features and how to use it and

5    that type of thing.

6        Q    And do you specifically recall whether you did

7    that with Melanie McGuire or not, sir?

8    A    I do it with all purchasers.

9        Q    And when Mrs. McGuire came into your shop did she

10   know what type of gun she wanted to purchase or did she

11   browse?

12   A    I don't remember.

13       MS. PREZIOSO:  Okay, I have no further questions

14   at this time, sir.

15       THE COURT:  Mr. Tacopina.

16   CROSS EXAMINATION BY MR. TACOPINA:

17       Q    Good afternoon, Mr. Coscia.

18   A    Good afternoon.

19       Q    Just a couple questions about your store and the

20   procedures.

21       You don't take credit cards, correct, at your

22   store?

23   A    No, only on small items.

24       Q    So, you demand payment in cash or check?

25   A    Or check.

FILED, Clerk of the Appellate Division, July 06, 2018, A-002130-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

Case 3:18-cv-03420-MAS Document 3-1 Filed 09/14/18 Page 153 of 163 PageID: 3281

Coscia-Cross                                                    153

1       Q     Now, can you explain to the jury the process that

2  you have to go through when someone buys a gun from you, it

3  takes time to process all the paperwork, correct?

4  A     Yes.

5       Q     Because you have to get their information after

6  they fill out these forms, right?

7  A     Yes.

8       Q     And then you have to put that into some system,

9  statewide system?

10  A     No, I access the State Police computer.

11       Q     That's what I meant, you access the State Police

12  computer then and there, right?

13  A     Yes.

14       Q     And you do that with every customer, correct?

15  A     Yes.

16       Q     And once you access the State Police computer that

17  means you are giving the information of that particular gun

18  purchaser, or potential gun purchaser to the State Police,

19  correct?

20  A     All I do is give them the driver's license number and

21  they come back with last name, social security and date of

22  birth.

23       Q     And did they come back with Melanie McGuire's

24  name?

25  A     Yes.

FILED, Clerk of the Appellate Division, July 08, 2016, A-002510-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1      Q    So the State Police told you?

2   A    The computer.

3      Q    The State Police computer gave you Melanie

4   McGuire's last name, first name and social, date of birth?

5   A    Yes.  I think in her case because she doesn't have a

6   zero in front of the approval number I probably got the

7   operator.  Seventy percent of the time I talk to the

8   computer and then if something flags or something I will get

9   an operator and I talk to an actual person and then they do

10  a further check.

11     Q    So, in this instance you actually spoke to someone

12  from the State Police?

13  A    Yes.

14     Q    And they told you it's Melanie McGuire, here's her

15  social security number?

16  A    No, the computer does that.

17     Q    Okay, so you gave the person on the phone that

18  information?

19  A    Sometimes they ask me to verify it and sometimes they

20  don't.

21     Q    But you recall this time or you believe this time,

22  I should say, because of the approval code the way it's --

23  A    No, the computer will give me an approval number.

24  That's done.  If they did a further check the person that I

25  am talkin' to will give me the approval number, and when

FILED, Clerk of the Appellate Division, July 18, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    they give me the approval number there's no zero in the

2    front of the number.

3        Q    Okay, so, that means that you were actually

4    speaking to someone at the State police in regards to

5    Melanie McGuire?

6    A    Yes.

7        Q    And was Melanie there when you were doing all

8    this?

9    A    Oh, yes.

10        Q    So, she's hearing you speak to someone from the

11    State Police, right?

12    A    Beg your pardon?

13        Q    She's listening to you speak to someone from the

14    State Police?

15    A    Yes.

16        Q    And she knows you are telling them, I have Melanie

17    McGuire here in front of me, right?

18    A    No, they tell me that.

19        Q    Okay, so the State Police is telling you that in

20    front of Melanie McGuire?

21    A    Yes.

22        Q    And then you said there's a Federal form, also?

23    A    Yes.

24        Q    Where does that eventually make its way to?

25    A    Where's that what?

FILED, Clerk of the Appellate Division, July 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1        Q     Where does that go, where Is the Federal form?

2    A    I keep that, that's permanent, that stays with me.

3        Q     And that's a Federal requirement that you keep

4    those records?

5    A    Yes.

6        Q     And Mr. Coscia, the Taurus model purchased by

7    Melanie, that's a very common gun, correct?

8    A    Yes.

9        Q     And you told this jury you don't really recall any

10   specifics of the conversations you had with Melanie from

11   almost three years ago, correct?

12   A    No.

13       Q     Let me do one thing because you remember Melanie

14   McGuire was in front of you, correct?

15   A    Yes.

16       Q     When she came in she didn't have dark sunglasses

17   on or a hat or anything, did she?

18   A    I just noticed that she was well-dressed and I didn't

19   want to stare at her.

20       Q     That's all right, you could.

21            Well, let me do this Mr. Coscia, if you don't

22   mind, with the Court's permission I will ask Mrs. McGuire to

23   stand up.

24            THE COURT:  Sure.

25       Q     Mr. Coscia, just see, does this refresh your

FILED, Clerk of the Appellate Division, July 20, 2018, A-002130-14 Filed 09/14/18   Page 157 of 163 PageID: 3285
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925



1    recollection, does this look like Melanie McGuire?

2    A    Resembles her.

3         Q    Okay, and the person that came in that you didn't

4    want to stare at that day, Mr. Coscia, gave you her name and

5    showed you identification, correct?

6    A    The first thing I asked, I need your Pennsylvania

7    driver's license.

8         Q    And she gave you a Pennsylvania driver's license

9    with her name?

10   A    Yes.

11        Q    And that matched up to the State Police's records

12   clearly or you wouldn't have been able to give her that gun,

13   right?

14   A    Yes.

15             MR. TACOPINA:   Thank you, no further questions.

16   REDIRECT EXAMINATION BY MS. PREZIOSO:

17        Q    Mr. Coscia, you just told Mr. Tacopina that you

18   checked Mrs. McGuire's Pennsylvania driver's license?

19   A    I checked the driver's license.   I look at the photo

20   and I check expiration date.

21        Q    And you checked and saw that the address that came

22   up on the computer matched the form, right?

23   A    No, they don't give me the address.   They just give me

24   the last name, date of birth and social security number.

25        Q    But, sir, you are permitted under the regulations

```
 1    that allow you to sell guns --

 2             MR. TACOPINA:  Your Honor, objection to the

 3    leading.

 4             THE COURT:  Please don't lead.

 5        Q    Sir, how do you know she was a resident of

 6    Pennsylvania, you said that was a requirement, right?

 7    A    Yes.

 8        Q    And what told you, sir, that she was a resident of

 9    Pennsylvania?

10    A    Pennsylvania driver's license and then the State, when

11    I give them the number they must accept it that she's a

12    resident.

13             MS. PREZIOSO:  Thank you.

14             MR. TACOPINA:  No further questions.

15             THE COURT:  All right, Mr. Coscia, thank you very

16    much.  You are excused.

17             MS. PREZIOSO:  Judge, can we come up?

18             THE COURT:  Sure.

19             ( Discussion at sidebar held off the record )

20             THE COURT:  All right, members of the jury, there

21    wouldn't be enough time for us to complete the testimony of

22    the next witness, so we are going to break now for the day

23    and we'll resume tomorrow at nine a.m.

24             Again, I am going to remind you, please don't

25    discuss the case among yourselves or with anyone else.  Have
```

FILED, Clerk of the Appellate Division, July 06, 2018, A-002530-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

Case 3:18-cv-03412-MAS Document 25-1 Filed 09/14/18 Page 159 of 163 PageID: 3287

159

1    a nice evening and report to the jury assembly room at nine

2    a.m. tomorrow.

3           ( Jury excused )

4           THE COURT:  All right, everyone please be seated.

5           For the members of the media that are in

6    attendance, my clerk or one of the officers has mentioned to

7    me that some of you may have had questions of the Court and

8    I indicated that I could only take the questions in the

9    presence of counsel.

10          So, if anybody has a question that you wanted to

11   raise regarding access to information that I can begin to

12   address with counsel I would be willing to address it at

13   this time, if possible.  Anybody?

14          A SPECTATOR: It's just I think we think perhaps

15   it might be a good thing if we could shoot the day's State's

16   Exhibits at the end of the day.

17          THE COURT:  I will discuss that with counsel, but

18   as you may recall when the attorneys were not present, that

19   question was raised and, you know, while the Court does

20   everything in its power to accommodate the press and to make

21   information available to you, I am not sure that we can

22   really create displays for you.  I mean, you have a right to

23   photograph exhibits as they are being introduced and they

24   are being displayed on the screens, if you will, but it

25   really is not very, you know, appropriate for the Court to

FILED, Clerk of the Appellate Division, July 06 2018, 02:30-14 Filed 09/14/18    Page 160 of 163  PageID: 3288
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

160

1    actually be doing set-ups and displays.

2            I will talk it over with counsel and I will see

3    what we can accomplish, but you have to remember, ladies and

4    gentlemen, and you got to bear with me, the priority here is

5    that we have a fair and efficient trial and we can't stop

6    the trial or create displays simply so that you can get

7    better shots of different exhibits.

8            But, I will consult with counsel on that.

9    Tomorrow morning I will give you our answer on that.

10           MS. WONG:  Grace Wong, Court T.V.  I also would

11   like to request the Court's file and update copies of

12   documents in evidence.

13           THE COURT:  The Court file is being actively used

14   by the Court, and I made mention of this yesterday.  The

15   Court cannot permit the file to be taken away and inspected

16   and copied.  As you can well understand, there are many,

17   many documents in the file, some of which are not public

18   records and some of which are.  They are all, right now, in

19   the possession of this Court.  They are not in our criminal

20   records room.

21           Obviously, at the end of the trial the official

22   court file will be sent downstairs to our criminal records

23   room and a request to inspect the file can be made.  There's

24   a place in the criminal records room where one can inspect

25   the file and then actually ask to have photocopies made of

documents that are part of the official court file. Right now we don't even know what's part of the official court file because the trial isn't over, and secondly, I have the only file and I can't just permit it to be taken away so that people can gain access to it.

I did give out some requests yesterday and some request forms, and the first step has to be for someone to make a specific request and then I have to be able to consult with the Trial Court Administrator and our record room and make an assessment as to the best way to accommodate you; but I clearly cannot accommodate that kind of a request at this point while the trial is going on. It would be very disruptive to the trial because it would require that the court file be examined and then purged of any court work product or any attorney work product that's been submitted to the Court in the context of motions and things like that. It would be an extraordinarily complex and time-consuming task.

Once the trial is over the court file must be separated into the official court file and any work product and then the official court file will be available at our criminal records room as it routinely is.

So, if you have a more specific request I would be happy to entertain it, but I can't just, I can tell you now that I can't grant the request to inspect a court file

1    because it is evolving as we speak and it's in active use.

2         If you notice on the guidelines that were given

3    out yesterday it does point out that when a court file is

4    being actively used it cannot just be routinely inspected

5    when it's actually in the possession of the trial court.

6         Anything else?

7         All right, ladies and gentlemen, I am going to

8    consult with counsel then on this issue of the exhibits and

9    I will try to get you a better answer on this; and again,

10   even, even at the point where we are able to accommodate you

11   we need to get a specific written request.  That's what the

12   Supreme Court Rules require.  There has to be this issue of

13   who is going to deal with the cost of it, and we have to

14   establish a procedure.

15        This Court is not in the position to interrupt the

16   Court proceedings while people make photocopies of exhibits

17   and examine exhibits.  The trial has really got to take

18   priority and I will have to make arrangements for you to be

19   somewhere else making these photocopies or getting a look at

20   various exhibits other than what's displayed in court that

21   you are able to see just like everyone else in observing

22   these proceedings.

23        Anything further?  You had another request?

24        Thank you very much.  We'll resume at nine a.m.

25   tomorrow morning.

1        ( Recess )

2

3                C E R T I F I C A T I O N

4

5        I, SUSAN J. MARCINCZYK, C.S.R., License Number

6   #XI00867, an Official Court Reporter in and for the State

7   of New Jersey, do hereby certify the foregoing to be

8   prepared in full compliance with the current Transcript

9   Format for Judicial Proceedings and is a true and accurate

10  non-compressed transcript of my stenographic notes taken in

11  the above matter to the best of my knowledge and ability.

12

13

14              Susan J. Marcinczyk, C.S.R.

15              Official Court Reporter

16              Middlesex County Courthouse

17              New Brunswick, New Jersey

18

19

20  Date: 3-1-08

21

22

23

24

25