1

1                            SUPERIOR COURT OF NEW JERSEY
                           LAW DIVISION-MIDDLESEX COUNTY

2                           INDICTMENT NO. 05-10-00164-S
                                   06-10-00116-S

3                           APPELLATE NO. 6576-06-T4

4

5  STATE OF NEW JERSEY,        *
                           *  STENOGRAPHIC TRANSCRIPTION

         VS.              *         OF

6                           *

  MELANIE MC GUIRE,          *    TRIAL PROCEEDINGS

7            Defendant.    *

8

9                      Place:  Middlesex County Courthouse
                              New Brunswick, N J  08903

10

                      Date:   March 7, 2007

11

12  TRANSCRIPT ORDERED BY:  Helen C. Godby, Esq.,
                                 Assistant Deputy Public Defender

13                         Appellate Section

  BEFORE:

14             HONORABLE FREDERICK P. DE VESA, J.S.C.

15  APPEARANCES:

16  PATRICIA PREZIOSO, ESQ.,
  CHRISTOPHER ROMANYSHYN; ESQ.,

17  DEPUTY ATTORNEYS GENERAL
  FOR THE STATE

18

  JOSEPH TACOPINA, ESQ.,

19  STEPHEN TURANO, ESQ.,
  ATTORNEYS FOR DEFENDANT

20

21

                                 Susan J. Marcinczyk, CSR

22                             Official Court Reporter
                               Middlesex County Courthouse

23                             New Brunswick, N.J.

24

25

FILED, Court of the Appellate Division, July 18, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

2

```
1                           INDEX
2
        WITNESS                              PAGE
3       WENDY GUNTHER
        Direct Examination by MS. PREZIOSO    30
4       Cross Examination by MR. TACOPINA     77
        Redirect Examination by MS. PREZIOSO  85
5       Recross Examination by MR. TACOPINA   88
        JOHN G. WARD
6       Direct Examination by MR. ROMANYSHYN  90
        Cross Examination by MR. TURANO      100
7       TIMOTHY A. LACEK
        Direct Examination by MR. ROMANYSHYN 102
8       Cross Examination by MR. TURANO      109
        Redirect Examination by MR. ROMANYSHYN 112
9       PETER R. BURNEJKO
        Direct Examination by MR. ROMANYSHYN 113
10      Cross Examination by MR. TURANO      123
        Redirect Examination by MR. ROMANYSHYN 126
11      JOSEPH JORASKIE
        Direct Examination by MS. PREZIOSO   132
12      Cross Examination by MR. TURANO      154
        Redirect Examination by MS. PREZIOSO 174
13      Recross Examination by MR. TURANO    175
        JAMES RYAN
14      Direct Examination by MR. ROMANYSHYN 176
        Cross Examination by MR. TACOPINA    184
15
16
17
18
19
20
21
22
23
24
25
```

1      ( Court resumes )

2          THE COURT:  Mr. Turano, I just wanted to begin, I

3      wanted to address the members of the press.

4          The Attorney General indicated they needed some

5      time to have further discussions and preparation and they

6      know what I am about to address.

7          Ladies and gentlemen who are here from various

8      media organizations, as you know we have had several

9      requests for various documents and exhibits that are part of

10     this trial, and I have been indicating that as a first step

11     I need a written request pursuant to Supreme Court rules and

12     guidelines so that I can address the request officially, and

13     I do have the first written request from Court T.V., so, I

14     do believe that you are entitled to an answer at this point

15     in time, and I want to spend a little bit of time explaining

16     to you as a general proposition what we can do and what we

17     can't do.

18         First of all, it is clear that both in Federal,

19     under Federal and State Constitutions it has been held that

20     there is a constitutionally protected right of access to

21     criminal trials that is implicit both in the guarantees

22     under the First Amendment and under the New Jersey

23     Constitution.

24         The leading cases that the Court has sought for

25     guidance are the United States of America versus Martin and

FILED, Case 3:18-cv-02411-MAS Document 9-14 Filed 09/14/18 Page 4 of 190 PageID: 3295
FILED, Clerk of the Supreme Court, 22 Aug 2017, **079925**

4

1    the Philadelphia Newspapers Inc., and then that case was

2    cited with approval by our Supreme Court, that is a Third

3    Circuit case which is the Circuit that, of course, New

4    Jersey is part of, and then our Supreme Court in the matter

5    of the application of V V Publishing Corporation also cited

6    the Martin case and held that the same principle of public

7    access that are found under the First Amendment of the U.S.

8    Constitution are protected under the New Jersey Constitution

9    as well.

10        And I think, just so the record is clear, In the

11    Matter of the Application of V V Publishing, I think our

12    Supreme Court said it best when it quoted another case and

13    it basically stated, public scrutiny of a criminal trial

14    enhances the quality and the safeguards, the integrity of

15    the fact-finding process with benefits to both the defendant

16    and to society as a whole, public access to a criminal trial

17    fosters an appearance of fairness thereby heightening public

18    respect for the judicial process, and in the broadest terms

19    public access to criminal trials permits the public to

20    participate and serve as a check upon the judicial process,

21    an essential component in our structure of self government.

22        The institutional value of an open criminal trial

23    is recognized in both logic and experience and ultimately

24    our Supreme Court has adopted guidelines to promote access

25    to the public and to the press of information coming from

FILED, Case 2:12-cv-02419-MAS Document 92-14 Filed 09/14/18 Page 5 of 190 PageID: 3296
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

5

1    our criminal trials, and it has been said that that right of

2    access can only be overcome when there is an overriding

3    State interest articulated in findings by the Court that

4    would impose limitations on the right of access.

5          Now, you know that I have consulted with counsel

6    in this matter and I very carefully considered these various

7    requests and I have reviewed the Supreme Court guidelines

8    and I have found that providing broad access to the

9    information requested would not in anyway deprive the

10   defendant of a fair trial.  I have not been provided with

11   any type of information that would cause the Court to

12   conclude that the defendant would be deprived of a fair

13   trial by providing the kind of access that has been

14   requested, and I also do not find that providing access of

15   information that is flowing from this trial would in any way

16   deprive any future defendant or deprive anyone of a fair or

17   impartial trial in any future proceeding, if there should be

18   one.

19         So, as a matter of law I do not find that there is

20   any basis for this Court to impose per se restrictions on

21   the access to the media and to the public on information

22   flowing from these proceedings.

23         Now, having said that, there are obvious

24   logistical and administrative barriers that would have to be

25   overcome in order to provide the kind of access that is



 1   being requested here.

 2          As I think you have all seen or heard there are,

 3   at the present time, anticipated to be approximately one

 4   thousand exhibits that might be somehow discussed during the

 5   course of this trial.  There could be, well, on the work

 6   product witness list that the attorneys provide to the Court

 7   just so that the Court can select a jury and estimate the

 8   time, there are over four hundred names listed.

 9          Now, obviously, as an example, that witness list

10   is not an official court record and it doesn't even contain

11   an accurate rendition of who will be a witness in this

12   case.  It is, in effect, attorney work product.  They've

13   studied the case, they've studied all of the information and

14   they've made an assessment that these are the possible

15   witnesses in the case.

16          So, in this particular request that I have now

17   received from Court T.V. there's a request for a witness

18   list.  Well, there is no witness list that is accurate and

19   that is a part of the Court record at this point in time, so

20   this is clearly something that the Court is not in a

21   position to provide.

22          However, I have said to some members of the media

23   that at the end of a day there will be a list of witnesses

24   who have testified and all one needs to do is discuss with

25   the Clerk the names of those people, if there are problems

FILED, Case 3:18-cv-02441-MAS Document 9-1:52 Filed 09/14/18 Page 7 of 190 PageID: 3298
FILED, Clerk of the Supreme Court, 22 Aug 2017, **079925**

1    with their spellings or whatever, but that is an example of

2    a situation where the Court takes the position that there is

3    simply no limitation on access to the press of any part of

4    the official court record, if you will, but, if you can, I

5    am sure all appreciate, that there are many things, like my

6    notes and my law clerks notes and attorney work product that

7    are not part of the Court record but that still may be in

8    the possession of those of us who are involved with this

9    trial.

10          So, sometimes the request cannot be complied with,

11   and in a moment I am going to ask you for some guidance or

12   some help as to how we can best do this.

13          I would like to go over for a moment with you the

14   request for in-court t.v. so that I can at least give you an

15   Idea of some of the practical difficulties, some of the

16   things that we can easily comply with and some of the things

17   that are not so easily complied with.

18          So, for example, we have a copy of the indictment.

19   Obviously, the indictment is a matter of public record and

20   it can easily be copied and provided to the press.

21          On the other hand, we have a copy of the witness

22   list, and again I say to you there is no witness list in the

23   true sense of the word, there is simply attorney work

24   product that is submitted to the Court with possible

25   witnesses that I am required to discuss with the jury during

8

1    jury selection just to see if they know anybody that might

2    be mentioned; but it would be inappropriate for me to turn

3    that over now as a part of the official court record because

4    it simply is not.

5         Another request is for the criminalist reports of

6    Elizabeth Dutton.  Those of you who cover Court T.V. realize

7    a lot of time police officers will be questioned about

8    confidential investigative reports that they have written

9    because of alleged inaccuracies or dates and times and

10   things like that and those reports are never admitted into

11   evidence and they are never made part of the official court

12   file, and our Supreme Court guidelines make it very clear

13   that investigative reports of law enforcement agencies are

14   not part of the official record.

15        So, there's an example of something that might

16   exist.  It might be mentioned, but it's not part of the

17   Court file, and absent some consent by the Prosecutor or a

18   police department, the Court is simply not in official

19   possession of those items.  They are not necessarily even

20   turned over to the Court.

21        You will hear, at some point I am sure, a witness

22   coming in and saying, well, my notes were kept, I don't have

23   those notes, they are not part of the court file.  They may

24   be mentioned, but they are not part of the court file.

25        Similarly, the report, I have a request here for

FILED, Case 2:18-cv-02411-MAS Document 9-14 Filed 09/14/18 Page 9 of 190 PageID: 3300
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

9

1    the report of Detective Ray Pickell, marked as an exhibit

2    for discussion purposes but never introduced into evidence

3    and never turned over to the Court.

4            So, those kinds of things are not part of a court

5    file that can be turned over.

6            Now, on the other hand, we have an exhibit

7    involving the gun purchase from Pennsylvania.  We have three

8    separate exhibits.  They have been admitted into evidence.

9    The Court does have them in its possession as part of the

10   Court file and they can be turned over.

11           Bail information, here, again, that's something

12   that in some parts is available.  How one, what one means

13   when we talk about bail information is an entirely different

14   story, and I would ask you that when you make these requests

15   to the Court you try to understand that you have to make the

16   request narrow and concise so we can comply with it.  Bail

17   information is a very good example.

18           We have a records that says how much bail has been

19   set in this matter, but there was also a transcript of court

20   proceedings, I think on two or three different days, where

21   there was a full argument in court with all the factors that

22   the Court had to consider during the bail hearing.  I think

23   some of you were present during the bail hearing.  I don't

24   have a transcript of that bail hearing and, obviously, it's

25   not part of the court file, but a transcript is available.

1          Again, I don't mean to put any of you through

2     hoops, but you must understand that certain categories of

3     information may not be available in the court file or they

4     may be requested elsewhere and this issue of the bail

5     hearing transcript is a good example of that.

6          So, I suspect that when somebody is asking me for

7     bail information they are not simply asking how much the

8     bail was and when it was set, but that is part of the court

9     file and it can be easily provided, but any further details

10    are found in the bail hearing transcript and, again, that

11    has to be separately requested from the Trial Court

12    Administrator who is responsible for the oversight of our

13    Court Reporters.

14          So, that's where we stand.

15          Now, I have a question that I would throw out to

16    you, I guess I would throw it out first to Court T.V.,

17    having said what I have just said it is clear that this

18    Court will be required, without disruption to the criminal

19    trial, which again requires this Court to exercise

20    discretion, everything I have just said about your right of

21    access all presupposes that you can be granted access

22    without distraction to the criminal trial.  If I am to

23    receive on a daily basis a dozen or so requests from

24    different organizations for different exhibits and pieces of

25    evidence and different exhibits, and different pieces of

1   evidence and different photographs obviously we could never

2   comply on a piecemeal basis without having some level of

3   disruption to the criminal trial.

4          My suggestion would be, just as you have agreed

5   upon pooling the coverage and photographs, you might want to

6   consult with one another and agree upon some level of

7   sharing this information.

8          Let me give you an example.

9          I am told that some of you are interested in

10  having the audio tapes of the electronically recorded

11  conversations when they are admitted into evidence.

12         The Court feels as a matter of law that it must

13  grant that request.

14         Now, I am told that the audio tapes at this point

15  are found in approximately five or six disks.  Obviously, if

16  there are fifteen or twenty organizations here and I were to

17  get requests to reproduce five or six C.D.'s every couple of

18  days or every couple of hours it would be very burdensome on

19  the Court.

20         It would be much more sensible if the media, well,

21  I won't say more sensible, but easier on the Court, if you

22  will, if the media got together and agreed that I could turn

23  over or the Court can turn over five C.D.'s which would

24  represent all of the audio tapes of the recorded

25  conversations once they are, once we know which ones are

1    going to be offered in court; and then the media can figure

2    out how to share that information and reproduce that

3    information.

4           That's just one example.

5           We have requests for photographs.  Obviously, the

6    photographs that are submitted to Court are original pieces

7    of evidence that cannot be tampered with and cannot be

8    altered in anyway.  The Attorney General, I believe, has

9    digital copies of those photographs.  The Court may be in a

10   position to make paper copies of those photographs.  I am

11   consulting with the Attorney General right now about whether

12   or not the Attorney General would be willing, under Court

13   order, to assist the Court by providing digital copies of

14   photographs that are admitted into evidence; but here again,

15   we can probably use your collaboration and help with that.

16          These photographs, as I understand them and as you

17   have seen in the last couple of days, involve almost on an

18   ongoing basis photos being admitted into evidence that I

19   have never seen before with the exception of those few that

20   have been the subject of motions.  As they come in, I have

21   no idea how many will come in on a given day.  If we were to

22   try to do this without some organization, again, it would be

23   somewhat disruptive.

24          My sense is that maybe at the end of a day or at

25   the end of a week, you know, a lead organization can make a

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    request and we can figure out how to best accomplish it.

2            Now, again, you understand that the Court is not

3    saying that one cannot take pictures of what's on the screen

4    or, you know, take notes about that, and I know that's

5    already been done.  I am saying if you actually want the

6    Court to reduce things for you, we are not in a position

7    while we have an active court file being compiled as we

8    speak to continually stop and then make photographs or make

9    photocopies and then get another request and stop again.

10   So, we need some help.

11           So, that's the bottom line on access to exhibits

12   and transcripts.

13           As a matter of law, I make a finding that members

14   of the media are entitled to anything that is ultimately

15   introduced into this court proceeding and the Court will

16   make every effort to expeditiously turn that over to those

17   of you who request it.  Our finance department is trying to

18   figure out a way of, you know, efficient billing for this

19   as, you know, reviewing our guidelines, there are certain

20   costs you must bear.  We will try to minimize them and we

21   are working on that right now.

22           As a matter, there's a request from Court T.V. to

23   go live at some point in time.  I have consulted with

24   counsel.  Here, again, there is no finding that the Court

25   can make that would prevent live coverage.  I am satisfied

1    that the public right to monitor these proceedings overrides

2    any concern that there might be.  There's been no showing of

3    any possible deprivation of a fair trial because of a matter

4    being broadcast live.

5           Obviously, the Court has already granted, pursuant

6    to our Supreme Court guidelines, the right to cover these

7    proceedings electronically and broadcasting them thereafter

8    live is not, in my view, provide any further risk of denying

9    the defendant or the State of a fair trial.

10           So, that request is also granted.

11           Now, do any of you have any questions or any

12    suggestions as to how we might address this overriding issue

13    of how the Court can logistically comply with what may be a

14    number of ongoing requests for a large volume of items

15    without disrupting these proceedings which, of course, is a

16    primary concern to the Court.  Anybody have any questions or

17    suggestions?

18           Can I ask you to state your name for the record

19    because our Reporter has to take this down.

20           MS. FINLEY:  Liza Finley, 48 Hours.

21           I think what we are requesting to do is the same

22    as covering the trial would have Court T.V. at the end of

23    the day perhaps even right here, even something that would

24    not be cumbersome, just come in here with a camera and just

25    shoot the exhibits of the day and --

FILED, Case 3:18-cv-0241-MAS Document 62-50-14 Filed 09/14/18 Page 15 of 190 PageID: 3306
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    THE COURT:  You see, as I've explained earlier, I

2  have some concerns about that process because you may

3  remember, I am sure you remember because you are

4  experienced, years ago there were times when Prosecutor's

5  would have press conferences and they would lay out all of

6  the evidence in the case on a table and then there would be

7  pictures of that, and that process has not only be

8  criticized but prohibited by our Supreme Court.

9    The Court cannot be part of making a display of

10 evidence.  The Court has an obligation to provide you with

11 access to court material but it really can't set up, you

12 know, displays for your review because it can be argued at

13 some point or some people may feel that that kind of a

14 display is prejudicial, it's not completely fair or

15 impartial, it doesn't cover all off the evidence, if you

16 will, and the Court can't be subjected to that kind of

17 possible assertion or, you know, perception.  It just simply

18 puts the Court in a position where we are doing more than

19 providing you with access or, in effect, you know, laying

20 out props, so to speak, or creating displays, and I

21 appreciate your, you know, I know you are trying to help out

22 here and I really appreciate that, but I have said to you

23 before, I don't think that we can go in that direction

24 because of those concerns.

25    Now, pooling, obviously we can do, and if I could

FILED, Clerk of the Appellate Division, July 09, 2018, A-002150-14 Filed 09/14/18 Page 16 of 190 PageID: 3307
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1  get some type of a request on a regular basis with the

2  agreement of all the organizations perhaps consistent with

3  what we've already done; in other words, we already have the

4  Star Ledger and the Home News agreeing to disseminate

5  photographs, we already have Court T.V. agreeing to pool the

6  electronic coverage.  If those same organizations can be

7  responsible for somehow dividing up these other, dividing up

8  these other types of exhibits it would be helpful to the

9  Court.

10        I am told, by the way, today is the last day this

11  week that we will be having jury proceedings.  Tomorrow the

12  Court will be addressing other matters and so probably some

13  of these issues are not really going to come out that

14  critical until next Monday.  So, there is a day or two that

15  you can begin to kind of collaborate with one another and

16  give us an opportunity to address your request.

17        But in any event, that's something that, you know,

18  in terms of setting up a display at the end of the day, I

19  really think that would not be appropriate.  So, I am sorry

20  that we can't do that.

21        If you can just kind of picture it, I mean,

22  imagine if the Court were to take a bunch of suitcases, gun

23  permits and things like that and put them on a table and let

24  you photograph that, I think that really would not be

25  something that the Court should be doing.

1          Anybody else have any other suggestions other than

2     the pooling?

3          All right, well, it would be extremely helpful to

4     the Court if you could agree among yourselves to, with some

5     kind of pooling.  I will continue to work on this and get

6     back to you with respect to the, what our finance department

7     feels is the appropriate way of dealing with the billing.

8     My sense is right now we will simply keep track of what we

9     give to people and then charge you the regular rates.

10          Yes, your name, please?

11          MS. MERKSAMER:  Marni Merksamer with ABC News.

12          I just want a clarification.  I am confused.  Are

13    we only going to be able to shoot things the Court provides

14    us such as photographs, audio recordings, video, as far as

15    physical evidence is concerned we wouldn't be able to shoot

16    that at all because of what you are stating how it can be

17    shot.

18          THE COURT:  Not true, not true, you can shoot it

19    when it's being displayed in court, but I can't create a

20    display for you to shoot later.

21          MS. MERKSAMER:  Okay.

22          THE COURT:  Some of these exhibits have already

23    been shot or photographed, if you will, anything that

24    happens in this court you know is part of the open court

25    proceedings but the requests that we are talking about goes

18

1    a little further and asks us to reproduce a display and

2    that's something that I can't do.

3          Yes, sir.

4          MR. GLATT:  John Glatt.

5          THE COURT:  Mr. Glatt, how are you?

6          MR. GLATT: I'm good.  Listen, I want to clarify, I

7    have been shut out of the photo pool on the understanding of

8    I am not a daily paper, I don't want to get shut out of this

9    other pool when it's formed.

10         THE COURT:  You have to put your request, but the

11   reason than you have been, as you put it, shut out so far,

12   my understanding is you are an author who is writing a book

13   and you are not really part of the news, if you will, and as

14   you can appreciate there are many people that get involved

15   in commercial enterprises surrounding court events, and I am

16   required under our Supreme Court guidelines to provide

17   access to bona fide media outlets for news reproduction and

18   not to provide access to individuals who are involved with

19   commercial enterprises that simply are, you know, doing

20   research and things of that sort.

21         MR. GLATT:  But I have official accreditation from

22   New Jersey Press.

23         THE COURT:  I don't mean to debate that with you

24   now.  I am just trying to give you an explanation.  If you

25   wish to make further inquiry, if you wish to contest the

FILED, Clerk of the Appellate Division, July 26, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

19

```
1    Court's determination or the Supreme Court guidelines then

2    you could do that, but I have to follow the Supreme Court

3    guidelines and the Supreme Court guidelines are very clear

4    that what we are doing now is designed to accommodate the

5    press for purposes of news and not to accommodate

6    individuals who are interested in making movies or writing

7    books.

8              I want to assure you, you haven't been singled

9    out.  There have been others who have made similar requests

10   and they've gotten the same answer.

11             Again, if you are not happy with that answer then

12   you need to request some kind of an official review of it,

13   I'm sorry.

14             MR. GLATT:  Thank you.

15             THE COURT:  Yes.

16             MS. FINLEY:  Liza Finley, 48 Hours.

17             One more question regarding the exhibits.  Once

18   the trial is completed do you think there will be

19   opportunity to request some of the physical, that we can't

20   get electronically, some of the physical evidence such as

21   the suitcase?

22             THE COURT:  Well, under New Jersey Court Rules

23   once the trial is completed the exhibits are turned back

24   over to the parties that have offered them.  The Court does

25   not retain possession of exhibits.
```

1    As you could imagine with thousands and thousands

2    of trials the feeling has been that those people that have a

3    great stake in the preservation of those exhibits and who

4    have the capacity to store them for future proceedings are

5    in the best position to do so.

6    So, there may be, subject to the positions of the

7    attorneys, there may be this brief window of opportunity at

8    the end of a trial, you know, very short window of

9    opportunity where the exhibits will still be here before

10   they are turned over to the proponents; but as a general

11   proposition once the trial is over the official court file

12   will be completed, if you will, and that may have copies of

13   certain documents and things of that sort, but the actual

14   original exhibits that have been marked into evidence will

15   be turned back over to the people that have proposed them.

16   MR. SERRANO: Ken Serrano, Home News Tribune.

17   Have you made a determination of the transcript of

18   the audio tapes?

19   THE COURT:  Yes, the Court has made a

20   determination, again, based on the prevailing case law, that

21   the transcripts will be provided to the press at the same

22   time as the audio tapes.  The case law is pretty clear that

23   the transcripts should be provided.

24   Now, here again, we are talking about a large

25   volume of material, and I am going to need some help from

```
 1    the press in terms of how we can reproduce that.  We may
 2    need some help from the Attorney General.
 3              Anything further?
 4              We need to get the jury out, ladies and gentlemen.
 5    How are we doing?
 6              MS. PREZIOSO:  Your Honor, before we bring the
 7    jury in the State has an application.
 8              Judge, prior to trial beginning there was a
 9    hearing held regarding the photos, specifically the photos
10    of William's remains, and during that one of the photos that
11    your Honor withheld judgment on is State's Exhibit 32.
12              THE COURT:  I am familiar with it.
13              MS. PREZIOSO:  Judge, at this time the State will
14    be offering Doctor Wendy Gunther today.  She's the medical
15    examiner from Virginia that did the examination of William's
16    remains.
17              In preparing her for her testimony there were
18    several concepts that were discussed and information that
19    was gone over and the picture is illustrative of several
20    things.  The picture shows the ragged cut of William's
21    torso.  It shows the body positioning and how he was folded
22    up.  It clearly shows livor mortise, the blanching patterns
23    on his skin the relative position of the blanket covering
24    William's face, the wrinkley fingers are indicative of
25    washer woman, what's described as washer woman syndrome,
```

FILED, Case 3:18-cv-02341-MAS Document 02-50-14 Filed 09/14/18 Page 22 of 190 PageID: 3313
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    when moisture gets into the finger tips, and the photo would

2    help her if she were able to put it up and explain to the

3    jury these concepts, it would help them see what, indeed,

4    she was talking about.

5          I would just like to respectfully remind the

6    Court, your Honor, during the defense opening they raised

7    several issues as to freshness of the body and of that

8    nature, so these are areas that the State really does want

9    to explore and make sure that the jury understands.

10         As Doctor Gunther is not a local medical examiner,

11   the State did fly her in for this purpose, and were this to

12   be decided later in the trial it would require us to fly her

13   back with the explanation the photo really does provide a

14   visual guide to the jury and I think will make it easier for

15   the jury to understand.

16         Again, Judge, although this is a picture of a

17   torso, of the pictures that we had it was the State's

18   feeling that this was the least gruesome and externally we

19   are not offering it for anything other than what it is a

20   picture of, and the State would request at this time your

21   Honor render a decision and permit the State to introduce,

22   subject, of course, to proper authentication, that the

23   picture comes in.

24         THE COURT:  Well, what is the probative value of

25   the photo that cannot be addressed in a less inflammatory or

FILED, Case 3:18-cv-02341-MAS Document 62-50 Filed 09/14/18 Page 23 of 190 PageID: 3314
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   unpleasant manner?  Tell me specifically.  I understand that

2   this is a case involving murder and desecration of human

3   remains, but tell me why a photograph, as opposed to

4   testimony and a diagram, let's say, or other visual aides by

5   a medical examiner would not be sufficient to demonstrate to

6   the jury what the, you know, the facts in issue tend to be?

7           MS. PREZIOSO:  Well, Judge, of course Doctor

8   Gunther can use language to explain all of this to the jury;

9   however just like the discussion we've been having this

10  morning about the significance of seeing exhibits, a

11  photograph, we live in a visual society and a photograph is

12  always, not always, but, it illustrates concepts that words

13  certainly don't deliver and that is exactly what we would be

14  talking about here.

15          I would guess that most of the jury hasn't dealt

16  with anything of this sort before in their lives, and

17  hearing terms about decomposition and blanch patterns and

18  marbling and washer woman's syndrome and whatnot, those are

19  concepts that, of course, can be described in words, but

20  just as with any media, a photograph helps to make those

21  words truly be understandable.

22          THE COURT:  But what is it about those words that

23  are so hard to understand or that are so hotly contested

24  that it's necessary to display a gruesome photograph to this

25  jury and to the public, I might add?

24

1      I understand that the picture is worth more than

2  the words, so to speak, but that's not the test.  The test

3  is what is it that the State is required to prove that

4  cannot be proven by the words and by some less inflammatory

5  or unpleasant manner?  That's the test.  Tell me what it is

6  that you are required to prove that has to be proven by this

7  photograph?

8      MS. PREZIOSO:  Your Honor, I would respectfully

9  disagree as to the test.  I think with most evidence we

10  could prove things basically through words but that's not

11  the most persuasive form of media to get it to the jury.  I

12  understand where the Court --

13      THE COURT:  The test is the Court's requirement to

14  weigh the probative value against the prejudicial impact.

15  That's the test.  I know you don't disagree that that's the

16  test, okay.  So, what I am asking you is tell me why the

17  probative value of the photo is so great that it's not

18  outweighed by the prejudicial impact.  So far the only thing

19  that the State has said to me both before and today is

20  simply that it would prefer to use the photograph because

21  the photograph is more illustrative, you know, the torso, if

22  you will, than a simple, verbal explanation, and I agree

23  with you, it is, but that is not what the Court is required

24  to do.  The Court is required to balance whether or not you

25  need that full illustration because of the obvious

FILED, Clerk of the Appellate Division, July 26, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    prejudicial impact and the unpleasantness of it.

2            MS. PREZIOSO:  Your Honor, may I suggest this, can

3    we go on with Doctor Gunther's testimony and let's see how

4    it goes and then I may reapply for the photo.

5            THE COURT:  Let me hear from the defense first.

6    Maybe they won't disagree with you.

7            MR. TACOPINA:  Oh, but, your Honor, that's an

8    unlikely scenario here.  I agree with your Solomonic ruling

9    so far.

10            THE COURT:  I haven't ruled yet.

11            MR. TACOPINA:  You did before, and I want to go

12    back to before the hearing.  There was nothing new

13    articulated today than was articulated at that hearing, and

14    I thought we had that hearing before we started this jury

15    trial.  So, we didn't do this at ten minutes after ten, but

16    my point is just this.  I think the case law is precisely

17    clear, Johnson and Locket, and when there's an issue of

18    prejudicial impact, substantially outweighing its probative

19    value like we have here, I just think the Court should not

20    be letting it in.  We discussed it.  We argued it.  Our

21    papers are on point in that regard.  We are not contesting

22    the facts for which the photographs are offered.  There are

23    so many less prejudicial ways to present this sort of

24    evidence.

25            In the Locket case the Court stated that

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    presentation of evidence that, quote, could not help to

2    focus the juries attention on the gruesome details of the

3    condition of the victim's body rather than defendant's

4    guilt, which precisely fits into why Ms. Prezioso wants this

5    in.  She said herself, we live in a visual society.  That's

6    great, but that's not the test here, and this can go on.

7    She has the clarity to describe the things.  The reasons the

8    State wants this in today to show the rugged cut, the

9    position of the body, the fact there's washer woman syndrome

10   on the water-logged hands and the freshness, none of this is

11   in dispute. If we open doors, certainly we proceed at our

12   own risk.

13           This was the suitcase, you will recall, that was

14   recovered two weeks later on 5/11.  This Is the only

15   suitcase we think there's any issue regarding relevancy of

16   freshness and decomposition is the first suit case, the one

17   on 5/5, because these other suitcases were in water and sand

18   for so much longer, in this instance another week.  So, they

19   also are not facts in dispute.

20           You will hear by our cross examination they are

21   not facts in dispute, and these pictures, your Honor, you

22   have seen them, I think would do so much to inflame the

23   passions of this jury, it would be so emotional, invoke such

24   visual reaction, I just don't think this jury is going to be

25   able to evaluate them in a passionate manner.  That's the

FILED, Clerk of the Appellate Division, July 30, 2018, A-002150-14 Case 3:18-cv-02431-MAS Document 62-150-14 Filed 09/14/18 Page 27 of 190 PageID: 3318
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   standard, and by the way, there was nothing argued today

2   that was argued two weeks ago.

3           That's our position.  We would oppose it and ask

4   the Court to adhere to it's ruling.

5           THE COURT:  Ms. Prezioso, again, I am satisfied

6   here that at least at this point there is nothing that the

7   State is required to prove through the use of this

8   particular photograph that would be so valuable that it

9   would outweigh the obvious prejudicial impact.  The

10  photograph is rather unpleasant and gruesome, and from

11  everything that I have heard nothing that the State would be

12  trying to prove that could be illustrated by the photograph

13  is really being tested.

14          Now, as I said before, the doctor can authenticate

15  the photograph, and if it turns out through cross

16  examination or even through part of the defense case that

17  there is some critical point that can only be proven through

18  the photograph, then that tips the balance; but at this

19  point I am satisfied that the photograph does not have such

20  great probative value that it is outweighed by the

21  prejudicial impact and, therefore, I do think that because

22  the photograph does have a tendency to inflame, could have a

23  tendency to inflame or have a prejudicial impact upon the

24  jury because of its graphic nature and its unpleasantness, I

25  will not allow it to be published or admitted into evidence

1    at this time, but I will reserve my decision subject to any

2    cross examination and subject to any defense case that may

3    come later.

4              MS. PREZIOSO:  Judge, that's fine.

5              The State, just so the record is complete, would

6    like to direct the Court again, as we did before, to State

7    v. Savage which was also a desecration case involving body

8    parts in a suitcase and certainly it is within the Court's

9    discretion, but that's fine.

10             Your Honor, just so you know, there are other

11   photos as well that we are just going to be authenticating

12   today on C.D.S.  Nothing will be shown, and they will be

13   held should issues relevant to those photos come in so we

14   won't have to bring Doctor Gunther back.

15             THE COURT:  Mr. Turano.

16             MR. TURANO:  Just for clarification, was that

17   State's Exhibit 32 we were discussing?

18             MS. PREZIOSO:  Yes.

19             MR. TURANO: Thank you, sorry.

20             THE COURT:  Can we bring the jury out?

21             MR. TACOPINA:  While we do that, I ask the State,

22   not through any fault of their own, to make sure when the

23   photos are displayed the witness knows not to do what the

24   first witness did, which was flip them up and turn them

25   around.

FILED, Case 3:18-cv-02431-MAS-DEC Document 62-14 Filed 09/14/18 Page 29 of 190 PageID: 3320
FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1          MS. PREZIOSO: Judge, I want to make sure the

2     witness knows that picture isn't coming in.  She knew we

3     were going to be arguing it this morning.

4          THE COURT:  Are we ready to proceed?

5          MS. PREZIOSO:  Yes, Judge.

6          THE COURT:  Ready to proceed?

7          MR. TACOPINA:  Yes.

8          THE COURT:  Okay.

9          ( Whereupon the jury returns to the courtroom and

10    court resumes )

11         THE COURT:  Good morning, ladies and gentlemen,

12    please be seated.

13         First let me apologize to you for the delay

14    getting you out here.  The Court had to go over some matters

15    with counsel.  It took a little longer than I expected, but

16    we are ready to begin now and, Ms. Prezioso, I am going to

17    ask you to call your next witness.

18         MS. PREZIOSO: The State calls Doctor Wendy

19    Gunther.

20         THE COURT:  Doctor Gunther, please stand and

21    follow along with the clerk as she administers the oath.

22    W E N D Y   G U N T H E R, sworn.

23         MS. PREZIOSO:  May I continue?

24         THE COURT:  Go ahead, Ms. Prezioso.

25

FILED, Case 3:18-cv-02411-MAS Document 62-150-14 Filed 09/14/18 Page 30 of 190 PageID: 3321
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    DIRECT EXAMINATION BY MS. PREZIOSO:

2         Q    Good morning, Doctor Gunther.

3    A    Good morning.

4         Q    Doctor Gunther, by whom are you employed?

5    A    I'm Assistant Chief Medical Examiner in the

6    Commonwealth of Virginia, Tidewater District.

7         Q    Please give the jury the benefit of your

8    experience and educational background?

9    A    I am a medical doctor.  I did go to medical school, it

10   seems like a long time ago.  I now only treat dead people.

11   I am not only a physician, but I have had special training

12   in pathology and in subspecialties of forensic pathology

13   pediatric pathology, anatomic and clinical pathology.

14        I am Board certified in all those, anatomical,

15   pediatric and clinical pathology.  I have done coming up on

16   three thousand autopsies.

17        Q    Doctor Gunther, prior to working in the

18   Commonwealth of Virginia what other officers have you worked

19   at as a forensic pathologist?

20   A    Before Virginia I worked for not quite two years in

21   Washington, D.C. as a forensic pathologist.  Before that I

22   got my first forensic job, Memphis.  I was there not quite

23   five years.  Before that I trained in Manhattan and Brooklyn

24   as a fellow in the Office of the Chief Medical Examiner of

25   the City of New York.

1    Q    Doctor Gunther, have you ever been called to

2  testify as an expert in forensic pathology before the courts

3  in this country?

4  A    Yes.

5    Q    And can you approximate for the jury about how

6  many times you have testified?

7  A    You know, I really don't know.  I have lost track.  I

8  know it's more than thirty, but I don't know how many more.

9    Q    Have you ever been denied by any court of this

10  country being deemed an expert in forensic pathology?

11  A    No.

12    Q    Have you ever testified before the courts, any

13  courts within the State of New Jersey as an expert in

14  forensic pathology?

15  A    Yes, my very first testimony when I was not even all

16  the way through my fellowship in forensic pathology, I

17  testified in the juvenile and domestic court, if that's the

18  right word for it, that was my very first testimony.

19    Q    And could you roughly approximate what year that

20  was, Doctor Gunther?

21  A    Well, if I was in Fellowship must have been 1994, 1995

22  probably.

23    Q    And you have worked continuously as a forensic

24  pathologist since?

25  A    I have.

FILED, Clerk of the Appellate Division, July 09, 2018, A-002150-14 Filed 09/14/18   Page 32 of 190 PageID: 3323
FILED, Clerk of the Supreme Court,  22 Aug 2017,  079925

1      Q    Can you describe for the jury what is forensic
2  pathology?
3  A    Well, pathology is the branch of medicine that studies
4  what goes on in your body when you are sick.  It doesn't so
5  much seek to cure you, but to give your doctor what he or
6  she needs to cure you.  If your doctor takes a Pap smear we
7  read it.  If your surgeon takes out a tumor, operates, we
8  look and see if it's cancer and tell your doctor what to
9  do.  We don't cure you, yourself, but study the course of
10  disease.
11            Forensic pathologists study the course of trauma.
12  We look at what happens in your body when you are injured,
13  whether it's an injury that kills you instantly or takes
14  time; what happens to you after death; whether that injury
15  comes from a act of God like an tornado or heatwave or
16  whether it's inflicted by yourself or an injury inflicted by
17  yourself or another.
18            MS. PREZIOSO:  Your Honor, before continuing the
19  State would request the Court deem Doctor Gunther an expert
20  in forensic pathology.
21            THE COURT:  Counsel, do you have any questions of
22  Doctor Gunther?
23            MR. TACOPINA:  No, your Honor.  No objection, by
24  the way, no objection.
25            THE COURT:  All right, the Court is satisfied by

FILED, Clerk of the Appellate Division, July 30, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, **079925**



1    virtue of her training and experience of there being no

2    objection that Doctor Gunther is qualified to testify as an

3    expert in these proceedings in the field of forensic

4    pathology, and before we go any further, then, Ms. Prezioso,

5    I just want to address the jury.

6         Members of the jury, ordinarily witnesses are only

7    allowed to teach about matters within their personal

8    knowledge or observation and they are not allowed to testify

9    with respect to opinions that they may have about certain

10   matters that are of interest in the case.

11        However, under our law we have an exception to

12   this rule and this exception is that the Court may qualify

13   an expert witness who has some special training or

14   experience beyond that of an ordinary juror, and that

15   witness may give an opinion that will assist the jury in its

16   fact finding duties.

17        In this case, and there will be other cases, the

18   Court has determined that Doctor Gunther is an expert in the

19   field of forensic pathology and that she will be, therefore,

20   authorized to state her opinions as to certain issues in

21   this matter which may assist you in your fact-finding

22   duties.

23        I want you to understand that the mere fact that

24   the Court determines that someone is an expert witness does

25   not mean that you are bound by their opinion.  You must, as



FILED, Clerk of the Appellate Division, July 26, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925
Case 3:18-cv-02341-MAS-DEA Document 62-50 Filed 09/14/18 Page 34 of 190 PageID: 3325

1    in the case of all witnesses, evaluate the credibility of

2    the witness.  You have a right to consider the witnesses

3    qualifications and the basis for the witnesses opinion and

4    you have a right to consider all the factors that I have

5    already discussed with you preliminarily in weighing the

6    credibility of a witness.

7             So, Doctor Gunther is qualified as an expert in

8    these proceedings and, therefore, will be authorized to

9    render certain opinions, but, again, just like any other

10   witness, it is up to you to decide how much weight you want

11   to give to her testimony.  You have a right to accept it,

12   only accept a part of it if you only think a part of it is

13   credible or reliable or you can reject it completely if you

14   choose to do so, but in any event, that is the law on the

15   use of expert witnesses in court.

16            Ms. Prezioso, please continue.

17            MS. PREZIOSO:  Thank you.

18       Q    Doctor Gunther, can you explain what an autopsy is

19   to the jurors?

20   A    An autopsy is like a big surgical procedure when you

21   open up the body and take everything out; but before I start

22   an autopsy I put my hands in my pockets and I walk around

23   the dead body looking at it.  Do I see obvious injury?  Do I

24   think it's the right person?  Do they look like they are the

25   right age?  Do I see trace evidence?  Do I see, you know,



FILED, Case 3:18-cv-0341-MAS-Document-02-150-14 Filed 09/14/18 Page 35 of 190 PageID: 3326
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    clothes?  Do the clothes look normal?  Do I see signs of

2    what happened after death?  Did this person die in the

3    hospital where the doctor is working on them?  Those are the

4    things you have to look at first before you ever start

5    approaching opening the body.

6           I take lots of photographs.  I have my assistants

7    help me photograph the body.  We undress it.  We take the

8    things out the doctors have put in, if there are any.  We

9    collect trace evidence if we find any.  When we've done that

10   that can take hours, sometimes then we open up the body, we

11   have like a big surgery, we take out everything, we follow

12   gunshot paths, we collect bullets if we find them.  We

13   collect fluids and other things to be taken to the lab

14   tested for blood.  We open up the head and take out the

15   brain.  If we have to take, we take out the spinal cord.  We

16   look for everything that helps us understand.  We take

17   things out, we don't stop, I take every organ dissecting it,

18   weighing it, take small pieces of it, put it in a safe jar,

19   taking portions important, take microscopic slides.  I take

20   some to my histologist, so I can read slides on the

21   microscope.  Do I see obvious signs that can explain this

22   person's death.

23          Even though I release the body after I do the big

24   surgery on it and the body can be respectfully buried, I

25   don't consider the autopsy complete because I haven't looked

FILED, Clerk of the Appellate Division, July 26, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    at the slides yet. I haven't got the reports back from

2    toxicology telling me if there are drugs. I haven't gotten

3    ancillary reports I may need.

4              When I have everything back I can think about the

5    case, put it together and write it up, then I figure I can

6    do an autopsy and I testify to it in court.

7        Q    And the purpose of the autopsy, what information

8    are you looking for to determine what?

9    A    Basically trying to figure out the cause and manner of

10   death. Everything else is secondary to that.

11       Q    Doctor Gunther, I would like to call your

12   attention now to May 5th, 2004, did there come a time when

13   you worked on a case associated with remains being recovered

14   in a suitcase?

15   A    Yes.

16       Q    Can you describe that to the jury what happened on

17   May 5th and what your involvement was?

18   A    May I make reference to the notes?

19             THE COURT: Sure.

20       Q    Doctor Gunther, what I am going to ask you to

21   do --

22             MR. TACOPINA: Hold on, excuse me, can we just have

23   them identified with our notes so we can look along here.

24             MS. PREZIOSO: Judge, I am going to give Doctor

25   Gunther the State's copy of her autopsy report which is

FILED, Clerk of the Appellate Division, July 09, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1  State's Exhibit 218?

2  A    On the 5th of May we got in a suit case that contained

3  a pair of legs from the knees down.  This was very unusual.

4  I have never before received a suitcase with a pair of legs

5  from the knees down.

6           We looked at the knees, knees and legs.  You can't

7  tell the sex of a person from legs from the knees down, but

8  you can make a guess and they looked male to us based on

9  strong musculature and dark hair.  We could tell they were

10 right and left and they looked like they had been sawed

11 off.  They also looked fresh.

12      Q    Now, Doctor, you just used the term fresh, can you

13 explain to the jury what do you mean by that, what's fresh?

14 A    I mean fresh, you know, I've looked at a lot of dead

15 bodies, not just the nearly three thousand I've autopsied

16 but bodies I didn't have to autopsy, bodies my colleagues

17 were working on.  At the same time I have seen thousands and

18 thousands of dead people.  Most of the dead people I see

19 died the day before.  They were in their house or they were

20 in the hospital and they get put in the cooler overnight and

21 they come to us in the morning and the cooler is kept at

22 forty degrees because at thirty-two degrees they freeze and

23 warmer than that they don't keep optimally.  So, the cooler

24 is like a refrigerator except it has a special control to

25 make sure it's always at forty.  Those people look fresh.

FILED, Clerk of the Appellate Division, July 09, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1          When a person is not found right away when they

2     die in their house alone, whether they die of natural

3     disease and just no one knows they've died or whether they

4     are murdered and the murderer leaves, they start to go bad.

5     So, I have looked at a lot of people who have just begun to

6     decompse, which is go bad, and a lot of people who had

7     decomposed a lot and quite a number of people who have

8     decomposed a lot of the way and are partly skeletons.

9          These legs looked fresh to me like the legs of

10    people who come from the hospital the day before.

11         Q    Now, Doctor, you mentioned decomposition.  We'll

12    come back to fresh, but can you explain to the jury what is

13    the process of decomposition?

14    A    Decomposition is when the bacteria that normally lives

15    in your body and on your body break your body down because

16    you are dead.  They don't break you down while you are alive

17    because you have an immune system that fights them, but as

18    soon as you die the bacteria find themself not opposed by

19    any white cells and they start breaking you down.

20         Where is the most bacteria in your body?  Inside

21    your colon, which is full of feces which is mostly bacteria.

22    That's the first thing that happens in decomposition.  After

23    that they spread through the blood and tissues all over your

24    body and it goes bad.  It's a lot like hamburger, if you

25    have ever gotten some hamburger from the grocery store and

FILED, Clerk of the Appellate Division, July 05, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1  left it in your trunk in the summer, it went bad.  If you

2  put it in the fridge it stays a lot longer before it goes

3  bad.  It's a very similar process.

4       Q    Now, is the speed of decomposition the same for

5  everyone or is it dependent on other factors?

6  A    It's absolutely dependent on other factors, and the

7  only really important factor is temperature.  In our classic

8  forensic text, Spitz and Fisher, there are photographs of a

9  mother and father killed by a psychotic son.  They were both

10  killed on the same day and the cops found the bodies the

11  next day.  One was killed in the basement, which was cold,

12  and one was killed in the attic, which is hot.  The one in

13  the basement looked fresh and the one in the attic was badly

14  decomposed.

15       I have autopsied a body of a man who was shot and

16  dumped at the edge of a cotton field in Harden County, which

17  is a very hot county in Tennessee in August, and he was

18  skeletonized part way by the next day.  Most of that was due

19  to bacteria and also insects.

20       But, when I used to work in Wisconsin, if a person

21  goes through a hole in the ice in October and doesn't come

22  out until spring, they haven't begun to decompose yet.

23       It's just like hamburger.  I said you took some

24  hamburger from the store and put it in the freezer is it

25  good six months later, probably.  In your fridge,




Case 3:18-cv-02452-MAS Document 62-14 Filed 09/14/18 Page 40 of 190 PageID: 3331

1  good six months later, maybe not.  A week, maybe.  If you

2  put it on the kitchen counter is it good, probably not.  If

3  you left it on the top of your car, is it still good in the

4  hot sun, no.  It's totally temperature dependent.

5          With that there are continually factors that a

6  big, fat person decomposes faster because they are rounder.

7  A person in a dry place can mumify.  The Egyptian mummies,

8  they are very careful to remove everything that has feces

9  and germs and they put myrrh and other things in them that

10  keep them sterile to fight bacteria.  Once they are dried

11  out they tend to go without decomposing for thousands and

12  thousands of years.  If you don't dry out the germs of your

13  body the insects will turn you to a skeleton, and it's

14  completely dependent on temperature.

15      Q    So, going back to the phrase, fresh, Doctor

16  Gunther, you mentioned the day before, but could a body be

17  two, three, four days old and be kept at a temperature where

18  the body parts would still appear fresh?

19  A    Yes, because I've sometimes had to autopsy someone

20  Monday that died Friday from the hospital, they were in the

21  cooler and they still looked fresh.

22      Q    Is that similar to say if you grocery shop once a

23  week and maybe buy chicken on Saturday and cook it on

24  Thursday, would that still be considered fresh?

25  A    I would hope so, although with chicken, if you put it

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    in your fridge you may notice after four or five days it

2    begins to smell funny, the.  Smell is actually bacteria

3    by-products and that's your nose detecting you are beginning

4    to undergo very early decomposition.  That's the point you

5    say, I don't know if this chicken is good any more.

6         Q    Now, the legs looked fresh.  Could you also

7    describe how much blood was left in the legs?

8    A    There wasn't any blood at all at the cuts.  There was

9    more than one cut.  There were cuts across the knees where

10   the legs have been divided, but there's also a cut in one

11   leg on the side where there looks like a cut mark or a saw

12   mark into the leg like somebody started to cut it and

13   stopped.  It's not bleeding.  There's no blood on the

14   exposed bone across the tops of the knees.  There's no

15   bleeding in there and there's no blood I can see with the

16   naked eye inside the black plastic bag inside the suitcase.

17   The legs have no smell.

18        Now, when I was trying to get blood I opened up

19   all the way and I traced the popliteal artery and vein, I

20   traced two large blood vessels that run down next to the

21   bone in the very center of your leg that carry blood down to

22   your foot.  I was able to get a little bit of blood out,

23   enough for DNA cards so we can see whose legs they were, but

24   there was no blood leaking out of the middle.

25        Q    Now, Doctor Gunther, you examined the bags as well

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14 Filed 09/14/18  Page 42 of 190 PageID: 3333
FILED, Clerk of the Supreme Court,  22 Aug 2017,  079925

1    that the legs were found in?

2    A    What I did with the bags, I was very careful not to

3    touch them, because I do not do everything in the autopsy

4    suite.  I take care of the body.  The body is my job.  I

5    don't do fingerprints.  My only association with DNA is to

6    collect samples for the experts on DNA to do DNA.  It's not

7    like television.

8            So, what I did with the bags is I only handled

9    them with gloves on so I wouldn't transfer my own DNA and my

10   own prints to them, and I photographed them carefully and I

11   removed the pieces from them and removed them carefully and

12   put them somewhere safe so they could be turned over to the

13   responsible authorities.

14           When I was taking the legs out of the side and I

15   looked inside with my eyeball, I didn't see blood.  I have

16   seen a lot of blood and I didn't see blood.

17   Q    Doctor Gunther, could you tell by visual

18   examination whether body parts were refigerated or not?

19   A    No, I can't tell that.

20   Q    So, if the legs of this person had been removed

21   and the person that put them in the plastic bags let the

22   legs drain out and then wrapped the legs and put them in a

23   refrigerator, then it could have been certainly two, three,

24   four days before you found that?

25   A    Sure.

FILED, Clerk of the Appellate Division, July 05, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1      Q    Now, where was the cut at the knee, Doctor

2    Gunther?

3    A    I am making reference to autopsy report, State's

4    Exhibit 218 here because I don't remember exactly where they

5    were cut at the knee.  Truncated lower legs belonged to

6    white adult likely male.  The right leg has been divided

7    through the knee joint exposing the tibial plateau.  The

8    tibia is the biggest bone in your leg.  It comes up to the

9    top and it spread out and they call that a plateau.  It's

10   right through the knee, the kneecap is divided, you can see

11   right inside the knee where doctors would operate, you could

12   see the cartilage.  That's the right leg.

13        The left one has been divided in two places.  It's

14   through the bottom of your femur which is your thigh bone

15   and also the top of the tibia.  It's cut unevenly.  It's

16   really sawed right through the bone.  I called it a saw

17   mark.  It looked like a saw mark to me, and there's, again,

18   the cut on one of the legs looked like somebody had started

19   and stopped.

20        Q    Now, when you say a cut through the cartilage,

21   Doctor Gunther, did it also cut through any specific type of

22   tissue that would have been exposed?

23   A    Well, you are cutting right through a person's legs,

24   you are going to cut through arteries, veins, connective

25   tissue.  Bones are one of the kinds of connective tissue,

FILED, Clerk of the Appellate Division, July 10, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    ligaments are another kind of connective tissue and muscle.

2            That's another thing, muscle looked fresh, the way

3    steak looks fresh when you keep it in the fridge.

4        Q    Doctor, can you go back to connective tissue, I

5    didn't hear you.

6    A    Bone is connective tissues, tendons, the ones in the

7    back of my hands are connective tissue, ligaments are

8    connective tissue, anything that connects one piece of your

9    body to the another.

10        Q    Now, when doing an autopsy and calculating time of

11   death, is that a precise, can you do that precisely without

12   knowing where the body was?

13   A    It is not precise at all.  All the calculations for

14   time of death are based on assuming the temperature is

15   around seventy degrees, and we know that you go bad much

16   faster if you are somewhere warm and much slower if you are

17   somewhere cold.  Even if a person says to me, even if an

18   officer says to me, Doc, this body was in an apartment with

19   the heat set to sixty-eight, I have to know was that person

20   lying under a sunbeam under a window and I still can't

21   calculate an exact time of death.  I mostly don't give times

22   of death anymore.  I feel they are unreliable.  I mostly say

23   the time the person was last seen alive and the time they

24   were found dead.  Other than that I can't really be more

25   precise than days, and in this case in particular I can't be

Gunther-Direct                                              45

1    precise at all.

2         Q    Doctor Gunther, going back to decomposition, can

3    you explain to the jury blanching patterns and how long,

4    what's the range for how long that would take to appear?

5    A    When you die your heart stops pumping.  Suppose you die

6    in bed, you are lying face up.  The blood that's not being

7    pumped gradually settles to your back.  Why?  Gravity.

8         So, when I first look at a dead person generally

9    their face is pale and their chest is pale if they died

10   lying face up, and their sides are very dark red, redder

11   towards their back.  That's just settled blood.  We have a

12   name for it, we call the livor mortis, l i v o r, which is

13   different from the liver in your body.  Some people

14   pronounce it livor, so we know you are not talking about

15   about the liver in your body.

16        This settling of the blood dependent upon gravity

17   can be easily interfered with.  For instance, if you are a

18   heavy person lying on the sheet, the sheet and bed push up

19   on your back so you have a big blanched area, that's the

20   white spot where the blood couldn't settle because the sheet

21   and folds are up, and I will see the folds of the sheet on

22   your back, livor mortis.  If you die in your clothes, I'll

23   see the clothes, buttons, elastic bands marked in the

24   settled blood.  At seventy degrees, around, it's supposed to

25   start settling right away.  It's supposed to take a day to

FILED, Clerk of the Appellate Division, July 05, 2018, A-002150-14
Case 3:18-cv-02431-MAS-DEA Document 62-50 Filed 09/14/18 Page 46 of 190 PageID: 3337
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    reach maximal, sort of like rigor mortis, it's sort of

2    eventual change to the point where it becomes permanent.

3            If you die phase up and I take your body into the

4    autopsy suite and for some reason I have to turn you face

5    down and leave you there for a couple hours your livor

6    mortis will gradually start shifting to your face and belly

7    because it's gravity, right.

8            When you have been dead somewhere warm enough for

9    you to begin to decompose, all your little blood vessels in

10   your skin break down, your capillaries, they break down and

11   the blood starts leaving have the capillaries through all

12   the little break down points and it gets stuck in the skin.

13           At that point, if I turn you it will no longer

14   move.  That's called fixed livor mortis, but, again, all of

15   this is temperature dependent.  It can happen in a few hours

16   in a person at a very hot place like the guy at the edge of

17   the cotton field.  It can take months in a person who is in

18   a very, very cold place, like underneath a Great Lake in

19   winter.

20           Q    Doctor Gunther, also explain the term, rigor

21   mortis?

22   A    Rigor mortis is a fascinating phenomena noted by humans

23   beings for thousands of years before we began studying it

24   scientifically.  When you first die your body is lax and

25   relaxed, and then you gradually start to stiffen up.  You

FILED, Clerk of the Appellate Division, July 23, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

Case 3:18-cv-02413-MAS Document 62-13 Filed 09/14/18 Page 47 of 190 PageID: 3338

1    stiffen up in the position in which you die.

2            So, I am sitting in this chair with my leg

3    crossed.  If I were to die in this chair like this no one

4    disturbed me and I went into rigor mortis my leg would be

5    crossed like this, my other knee would be bent and if you

6    laid me on my back my right leg would be up making a corner

7    and my other leg would be crossed to crossing.

8            I see people all the time whose hands appear to be

9    lifted up in front of them.  We know nobody is going to lie

10   with their hands like that.  I know they have died face down

11   with their hands underneath them.  They went into rigor

12   mortis and got stiff.

13           We understand the scientific concept which it has

14   to do with a break down of molecule called ATP.  First you

15   are limp.  Twenty-four hours later, depending on

16   temperature, you are stiff.  Twelve to twenty-four hours

17   later it passes over again, you will gradually you will get

18   released again and that's beginning of when you start going

19   bad.

20   Q    Doctor Gunther, if we could move on now to May

21   11th, 2004, and by the way, Doctor Gunther, I am handing you

22   State's Exhibit 1006.

23           For the record, those are the doctor's copy of her

24   autopsy photos which was in her file that we marked so we

25   would know what you were referring to if you should need

Case 3:18-cv-02431-MAS-DEA Document 62-14 Filed 09/14/18 Page 48 of 190 PageID: 3339
FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

Gunther-Direct                                    48

1      them.  I just wanted to give them back to you.

2             If we could go back to May 11th of 2004, did

3      anything occur that day regarding the suitcase

4      investigation?

5      A     Yes, that's when we heard that the second suitcase had

6      been found.  Actually, from the 5th when we got the suitcase

7      with the legs in it we were anxiously waiting for the rest

8      of the body, and on the 11th we heard they had found the

9      second suitcase but that it had been exposed to the sun on a

10     beach for a period of days, and when we got the suitcase in

11     and we unwrapped it, we got the sand off it, we found inside

12     the upper part of a man's body from below his belly button,

13     chest, arms, hands and head beginning, not beginning,

14     decomposing fairly badly.

15            Q     And did you perform an autopsy on that piece?

16     A     We did.

17            Q     And, doctor, before going into that, did you

18     observe the body inside the suitcase, the torso?

19     A     We did.  We took lots of pictures.

20            MS. PREZIOSO:  Your Honor, I am handing the

21     witness State's Exhibit 32.

22            Q     Doctor Gunther, I am going to ask you to make sure

23     that neither the jury nor the audience sees the content of

24     the picture.  If you would just hold it down this way.

25            Doctor, if you could describe what that's a

FILED, Clerk of the Appellate Division, July 05, 2018, A-002-15 Case 3:18-cv-02341-MAS Document 62-14 Filed 09/14/18 Page 49 of 190 PageID: 3340
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    photograph of?

2    A    I don't remember if this was a photograph I took or a

3    photograph taken by my assistant.  I think I took this

4    picture.

5          This is a picture of the open suitcase with the

6    black plastic trash bag unfolded and the torso and upper

7    arms of the decedent exposed with his arms folded around it.

8    Q    Does that photograph fairly and accurately depict

9    what the suitcase looked like after the trash bags were

10   lifted and the torso was exposed?

11   A    It fairly and accurately depicts the dead person and

12   the trash bags.  You can't really see the suitcase itself.

13         MS. PREZIOSO:  I'll take that, please.

14         Mr. Tacopina, are we okay with authentication.

15         MR. TACOPINA:  Sure.

16   Q    Doctor Gunther, could you describe where the

17   blanket was on the body?

18   A    There was a blanket over his face.

19   Q    Now, can you describe the condition of the torso

20   and your examination to the jurors?

21   A    Most definitely decomposing.  Decomposition isn't

22   always the same all over the body because whatever area is

23   more exposed to germs goes bad quicker, whatever area is

24   warmer goes bad quicker.

25         So, the lower half of his body had been cut off.

FILED, Case 3:18-cv-02431-MAS Document 62-14 Filed 09/14/18 Page 50 of 190 PageID: 3341
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    There was a ragged edge with the skin higher, cut higher and

2    then some muscle, and then his guts sticking out.  As a

3    result his whole abdominal cavity, which was exposed to

4    germs and could easily get warm because there's nothing like

5    skin defending it from the outside, was really badly

6    decomposed, to the point later in the autopsy I was looking

7    for the pancreas and I wasn't even sure I recognized it.

8            On the other hand his chest wasn't in that bad of

9    shape.  Parts of his body, parts of his skin that may have

10   been colder weren't in that bad of shape.  His face was

11   still a recognizable face.

12           When I looked at his brain during the autopsy his

13   brain sort of liquified and fell apart as I was examining

14   it.  So, there were parts badly decomposed and they were

15   probably the parts that were warmer.  They were probably the

16   parts that were warmer.

17      Q    Doctor, you mentioned, you used the term ragged

18   edge to describe the cut.  Can you talk to the jurors a

19   little bit more about that, a description of the cut

20   through, through the decedent's torso?

21   A    I make clean cuts all the time because I open bodies

22   with scalpels.  I know what a clean scalpel cut looks like.

23   A scalpel is basically a razor blade on a handle, leaves a

24   very straight cut.

25           I cook, I know what a normal cooking knife looks

FILED, Case 3:18-cv-0241-MAS-Document-62-50-1 Filed 09/14/18   Page 51 of 190 PageID: 3342
FILED, Clerk of the Supreme Court,  22 Aug 2017,  079925

1    like when you cut food.  This was a really ragged edge and

2    it's hard for me to say whether it was a saw or a tear

3    because the edge had begun to decompose.  So, some of the

4    raggedness was due to the way it was cut and some was

5    probably due to the fact while it was going bad little

6    pieces were crumbling off it.

7        Q    Now, Doctor Gunther, are you aware of where this

8    suitcase was recovered from, the second one?

9    A    I am aware that it was found on the beach of a research

10   Island and that's as much as I know.

11       Q    Do bodies decompose at different rates out on the

12   beach in Virginia in May as opposed to in the waters of the

13   Chesapeake Bay?

14   A    Yes, because the water is still kind of cold in May, at

15   least it's not hot; where if you've ever laid on the beach

16   in the afternoon you know how hot it can get and

17   decomposition is totally temperature-related, so it's going

18   to be hot on the beach, there's not going to be any cool

19   water conducting the heat away from the suitcase.  I am sure

20   most of his decomposition went on while he was on the beach.

21       Q    And as part of the information that's given to you

22   to rely on as medical examiner you are informed of

23   approximately how long they would have thought it was on the

24   beach?

25   A    Yes.

FILED, Case 3:18-cv-02431-MAS Document 60-14 Filed 09/14/18 Page 52 of 190 PageID: 3343
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925



1    Q    And do you recall in this case how long they

2    thought it was on the beach?

3    A    I think it was at least a day and a half because it was

4    one of the interns working at the research station who paid

5    any attention to the suitcase.  The scientists paid it no

6    attention whatsoever.  I remember being told she passed on

7    her morning walk at least once and did nothing about it, and

8    then passing it again decided to find out what was in it.

9    So, I know it was at least a day and a half.  It may have

10   been longer, I don't recall.

11       Q    And Doctor Gunther the green coloring of the skin,

12   is that part of decomposition as well?

13   A    Yes, it Is.

14       Q    And what causes that?

15   A    When your blood starts to break down in your skin first

16   you get livor mortis that doesn't move, it's still red on

17   his body.  You can still see some area where the livor

18   mortis is kind of read.  Then it begins to undergo a lot of

19   decompositional processes all from bacteria.  One of the

20   things the bacteria do, they basically chew up the blood and

21   they leave behind a by-product that's green.  It's sort of

22   the same green as a bruise, not a bright green, sort of

23   gray-green, and they can do that in a generalized area, or

24   patches or in a process called marbling which is very

25   interesting.  They take large veins and they eat the blood

Gunther-Direct                                        53

1    and you see a pattern of the veins through the skin.  That's

2    just another way bodies decompose.

3        Q    Doctor Gunther, if a body has less blood in it

4    than a normal body would, say it was cut up and allowed to

5    drain would that affect the rate of decomposition?

6    A    That's very hard for me to say because I have never

7    done or heard of an experiment where somebody took two

8    bodies, drained all the blood out of one and didn't drain

9    the blood out of another and saw the body decomposed faster.

10        The only thing I can say, blood is warm.  If it

11   kept the heat in It would probably decompose faster, but I

12   really can't be sure.

13       Q    Now, did you do an autopsy on the torso?

14   A    I did.

15       Q    And can you describe what you found upon your

16   examination?

17   A    Sure, I saw the body of a white man who had begun to

18   decompose.  I made a rough guess as to his age, I thought he

19   have was in his thirties to forties but I couldn't get

20   closer than that.  I was able to determine the color of his

21   eyes.  He looked healthy.  Didn't look overweight, didn't

22   look thin, he looked muscular.  Some of the skin of his back

23   and the right sides of his face weren't as far gone as his

24   belly and the left side of his face.  Typical patchy

25   decomposition.

FILED, Case 3:18-cv-02341-MAS-Document 62-50-1 Filed 09/14/18 Page 54 of 190 PageID: 3345
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1              His scalp hair, which was brown and fairly long,

2    was beginning to slide off in pieces.  That's called

3    desquamation, but he wasn't bald.  This is another thing

4    that happens as you go bad, actually your whole scalp or

5    pieces of it will slide off carrying the hair with it.

6    That's why when skeletons are found they generally have no

7    hair.  His scalp was sliding off, but I didn't think he was

8    bald.  Hair, half inch long on the sideburns to three or

9    four inches long on the top of his head.  Longer than mine.

10             I felt his face and his nose with my hands and I

11   didn't feel any fractures, nobody had broken his nose,

12   didn't look like he was punched or hit or anything.

13             He had brown eyes.  Of course his corneas had

14   clouded after death.  The whites of his eyes were very pale.

15   There weren't any petechiae, little blood blisters you get

16   when you are strangled, there were no signs he was

17   strangled.  Natural teeth in the mouth.  When I am looking

18   at a dead body, looking at the mouth from the front, I can

19   usually only see the front teeth.  I can't see all the way

20   back, but our x-rays showed lots of fillings.  The teeth I

21   could see from the front, I could see from the smile, looked

22   like pretty good teeth.

23             He had a little bit of stubble across his upper

24   chin, but no beard.  His neck looked like it hadn't been

25   injured.  His chest didn't look like he had emphysema,

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    looked fairly normal, muscular.  I usually say whether the

2    person has a fat belly, a distended belly, which means they

3    are sick and their belly is swollen, a flat belly.  I

4    couldn't really say because his belly was cut in half, so I

5    say it didn't show any evidence of fat accumulation.  What

6    can you say about a belly that's cut in half, he doesn't

7    look fat.

8              I didn't see any visual surgical scars or any

9    tattoos that would help me identify him.  His back was

10   unremarkable except for an exit gunshot wound and his chest

11   also showed an entrance gunshot wound, and I saw entrance

12   and exit gunshot wounds on his head.

13             Now, when I first x-rayed his body, what I do

14   while my hands are in my pockets before I start messing with

15   the body, I saw two bullets on the x-ray.  One of the

16   bullets looked to be about here, I am indicating my left

17   upper quadrant below the chest in the upper belly, and the

18   other one appeared to be somewhere down where the guts were

19   hanging out.  Neither of these bullets traced to a gunshot

20   wound path that killed him.  Both of the bullets that killed

21   him seemed to have entered the body and exited the body.

22             Whenever you have a body that's decomposed all

23   your findings are slightly less certain, because as things

24   go bad, it gets harder and harder to tell what's going on.

25             For instance, the gunshot wound to his head, this

FILED, Case 3:18-cv-02431-MAS Document 62-150-14 Filed 09/14/18 Page 56 of 190 PageID: 3347
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    is obviously a fatal gunshot wound.  I have no uncertainty

2    about that.  It enters in his left side of his forehead, if

3    you feel the top of your head if you move your hand down

4    about two and a half inches, and just a half inch left to

5    the midline, that's just where it was.  It goes through his

6    skull, right through the frontal lobe there, goes through

7    his parietal bone on the opposite side and through his

8    brain.

9            Now, when I first took the top of his skull off,

10   you know, we take the saw and saw a big circle so I can take

11   the top of his skull off.  I see the brain was coated with

12   old blood, it was still dark red.  The moment we tried to

13   pull on the brain it was so far gone that it kind of

14   liquified into a heap.  We had a pan there waiting to catch

15   it, so we were able to weigh it.  I took my knife and made

16   cuts through it and I could see the bloody decomposed rot

17   where the bullet must have passed through, and it goes in a

18   straight line from where the bullet goes in and goes out.

19           So, I say with complete confidence this is a

20   fatal gunshot wound of the head that went in through his

21   forehead, out through the side of his head and went through

22   his brain.  If you asked me what examination his brain went

23   through, I don't know, he's starting to rot, going bad.

24           On his chest we have another fatal gunshot wound.

25   This is in the left upper quadrant of the abdomen.  I have

FILED, Case 3:18-cv-02341-MAS Document 02-50-14 Filed 09/14/18 Page 57 of 190 PageID: 3348
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925




1   to have you realize when you are touching the bottom of your

2   ribs you think of that as the bottom of your chest, but your

3   fingers are actually lying over organs in your abdomen.

4        If you touch your ribs on the right side at the

5   edge of your ribs, they are lying over the entire, on the

6   other side they are lying on the end of your transverse

7   colon and over the back of your spleen.  Your lungs are

8   actually higher up than the edge of your lower ribs.

9        I have a bullet goes in here just below the edge

10  of his ribs.  Three and three fourths inches left of the

11  midline.  It's going from his front to his back, upwards and

12  just a little tiny bit leftward.  This bullet goes through

13  his abdominal wall, seems to miss the transverse colon and

14  the adjacent stomach.

15       The reason I say seems to, I am not sure where all

16  of his transverse colon is.  His lower half is rotted so

17  much there are things I can't even identify.  I am not

18  exactly sure where his transverse colon is.  I clearly

19  identified part of It.  The rest of it I am just scratching

20  my head.  There's a lot of mush in there.  I am just not

21  sure.

22       I think this bullet misses his colon and misses

23  his stomach and it goes through the diaphragm which is the

24  dividing muscle between your belly and your actual chest

25  where your lungs and heart are.

FILED, Case 3:18-cv-02341-MAS-DEA Document 2-14 Filed 09/14/18 Page 58 of 190 PageID: 3349
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1          The next thing it's going to go through, it goes

2     right past the rib without touching and it goes right

3     through his lung.  It starts at the bottom of his lung, goes

4     through the bottom, goes through the middle, goes through

5     the upper part of it and it leaves his back after shattering

6     his fifth rib.  The fifth rib is very high up.  You know

7     it's going in below the front edge of his ribs and it's

8     going out through the fifth rib and there's a slit-like hole

9     in his back surrounded by a green discoloration in his skin

10    which is consistent with blood that has started to go bad.

11         That bullet caused him to bleed more than a

12    thousand cc's of blood into his chest cavity.  Compressed

13    his left lung.  That was also a fatal wound.

14         So, I have two bullets, both of which contributed

15    to death, either of which would have caused death alone.

16    One through his abdomen and his lung, one through his brain,

17    so now I know why he died.  Someone shot him, twice.

18         But I also have two more bullets that I saw on

19    x-ray.  One of these bullets seems to be underneath his

20    guts, which are hanging out of the bottom of his Transected

21    abdomen.  This bullet is very odd, but it is completely

22    coated in a mass of fibers.  I said in my autopsy report it

23    reminded me of a bezoar, which is a stone animals, but

24    occasionally humans, swallow, stays in their stomach for

25    years and years and gets layers of natural material laid

FILED, Case 3:18-cv-0241-MAS-Document-02-150-14 Filed 09/14/18 Page 59 of 190 PageID: 3350
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    over it.

2           Of course you are not going to swallow a bullet

3    and have stuff lying over it.  It just reminded me of that

4    because it was so peculiar.

5           I have also recovered from homicide bodies bullets

6    that have gone through couches.  Remember one in particular

7    in Memphis that had not only the couch upholstery but a

8    piece of the foam from the couch that was carried all the

9    way through the body.  When I was describing this bullet at

10   autopsy I said it's covered with matted fibers and reminded

11   of a bezoar, and I don't know if they are natural, I can't

12   rule out upholstery by looking, so I turned that bullet over

13   to other people who can do special trace evidence studies

14   with a microscope and tell me is that covered with stuff

15   from his body or is it covered with upholstery or cloth from

16   something else.  Either way, the only reasonable reason for

17   it to be in his guts is that it was shot into him, but I

18   don't have a hole.  Now, I have a big ragged edge where the

19   skin is shorter and the muscle sticks out further and the

20   whole thing is going bad, so maybe the hole where it went in

21   got shot away.

22          The final bullet is the most frustrating and

23   puzzling of all.  When I was looking at the gunshot wound

24   through his lung I had to take eleven hundred cc's of blood

25   out of his left pleural cavity, some of which I sent on for

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    toxicology, most of which I examined and discarded, and I

2    cleaned out his left pleural cavity.  The pleural cavity is

3    the place inside your body where the ribs go to the spine

4    and the back, talking deep inside your body, and I looked

5    around this whole cavity where I had just taken out all this

6    blood and taken out his lung and I can see the exit hole of

7    the bullet that went through his lung and it was clean.

8            So then I cut a long hole in his diaphragm which

9    is a separating muscle between the lungs and the belly.  I

10   cut his esophagus and I started to try to get his spleen out

11   of his belly with care.  I put in my autopsy report with

12   care, as your spleen goes bad it's very easy to rip it.  As

13           I was trying to get his spleen out a bullet

14   appeared in his left pleural cavity.  That bullet had to

15   fall into his left pleural cavity from one of two places.

16   It either fell from his abdomen or it fell out of his

17   esophagus.  If it fell out of his esophagus that was short,

18   then it was in his stomach.  If it fell out of his abdomen

19   it could have come through his colon.  Either way in his

20   condition of dismemberment and decomposition I don't have a

21   path for this bullet.  All I know it was deep inside his

22   body somewhere, and it's very frustrating to me as a medical

23   examiner not to provide you with a bullet path, but here I

24   have a bullet that I saw on x-ray that was somewhere deep

25   inside him that fell into the place where his lung was as I

1    was working on him.

2         Q    Now, Doctor Gunther, can you describe for the jury

3    when this second bullet that you found, were you, where were

4    you in William's body, were you deep inside the body, well

5    above where he was cut from the disarticulation?

6    A    Yes, I was well above where he was cut.  I was actually

7    above the diaphragm, above the spleen, above the kidney,

8    above the transverse colon which was so decomposed I can't

9    identify it, above the pancreas and the bullet falls to the

10   place where the lung was.  I lifted up his diaphragm and

11   took a picture there is a little puddle of blood that had

12   re-collected because that was one of those things happens

13   sometimes in forensic, they don't tell you in the books,

14   sometimes you find a bullet.  I don't know where it came

15   from.

16         MS. PREZIOSO:  Judge, I am handing Doctor Gunther

17   State's Exhibit 1009.

18         Q    Doctor Gunther, earlier today you looked at,

19   before the jury came in you looked at a photograph of where

20   you recovered this bullet from, correct?

21   A    Right.

22         Q    And is that photograph fairly and accurately

23   depicted on the computer disk that you initialled?

24   A    Yes.

25         Q    Now, Doctor Gunther, when you lifted this torso, I

FILED, Clerk of the Appellate Division, July 20, 2018, A-002150-14 Filed 09/14/18   Page 62 of 190 PageID: 3353
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    don't mean you lifted, Ma'am, when the torso was removed

2    from the garbage bags and the suitcase and put onto the

3    gurney you were working on, what happened to the innards of

4    the deceased?

5    A    They spilled all over the place.

6        Q    And, Doctor Gunther, does that affect your ability

7    to see a bullet path?

8    A    I can find a bullet path in a fresh body no matter how

9    I move the body because there's a blood trail.  When you

10   decompose to the point you can't recognize certain organs

11   you can't recognize a blood trail.  Certainly I have seen

12   bullets move around in bodies when I move the body,

13   particularly if the bullet is loose in blood, you can see it

14   on the x-ray up here and you find it down here and it was

15   floating in the blood.  As you drain the blood out it moved

16   down.

17       I have also seen a bullet in an intestine move

18   from one side of the abdomen to the other from the x-ray to

19   the time we found it because the intestines can flop around

20   a little bit.  Bullets can move a limited extent in the

21   extent body just from postmortem manipulation, but the blood

22   trail, if it's identifiable, does not move.

23       Q    Doctor Gunther, can you explain to the jury what a

24   short return is?

25   A    A short return happens sometimes when a bullet

FILED, Case 3:18-cv-0241-MAS-DC Document 62-14 Filed 09/14/18 Page 63 of 190 PageID: 3354
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    partially exits the body, gets part of the way out and then

2    falls back in.  Short returns are unusual.

3           I have seen, I can think of three off the top of

4    my head.  I have probably seen ten or fifteen of them in

5    twelve or thirteen years of practice.  But sometimes a

6    bullet will not stay in the body and it will not exit the

7    body.  It gets most of the way out and then falls back in.

8           Q    And in this case is it possible that the back,

9    what you see, what you described as an exit wound, could

10   that be a short return?

11   A    It's possible.

12          Q    And short returns, they usually happen if the

13   bullet hits, goes through a body and hits a hard surface,

14   correct, ma'am?

15   A    Some of the short returns I have seen, there haven't

16   been many, have been where a bullet hit a bone and then hit

17   the skin and turned around and came back in.  But actually

18   after bone the thing that is most likely to stop a bullet is

19   the skin itself because the skin is elastic and if the

20   bullet is slowed down by the bone and hits the skin, the

21   skin will bow out and bring it back.  So, bone, skin,

22   sometimes a bullet punches through, sometimes it stays

23   inside.

24          Once in a great while, although it's rare, goes

25   part of the way and comes back in in a short return,

FILED, Case 3:18-cv-02341-MAS, Document 62-50-14, Filed 09/14/18    Page 64 of 190 PageID: 3355
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    probably the skin does most of that, although the bone slows

2    the bullet down.

3        Q    And the two bullets that you recovered, they were

4    given to your staff, also?

5    A    Yes.

6        Q    And that would be Beth Dutton?

7    A    I believe so.

8        Q    Now, I'd like to move on -- well, before I do, let

9    me ask you, to a reasonable degree of scientific certainty

10   do you know the cause of death of the deceased?

11   A    Oh, yeah, I know the cause of death through the

12   deceased.  He was shot through the head and through the

13   chest.  That's not difficult.

14       Q    It was gunshot wounds?

15   A    Gunshot wounds through the head and chest.  That's the

16   only part of this case that's easy.

17       Q    I would like to refer you to May 16th.  Do you

18   recall that something happened on May 16th regarding this

19   investigation?

20   A    I do, but may I clarify a previous answer.

21       Beth Dutton is not a member of my staff.  Beth

22   Dutton is one of the police officers or forensic technicians

23   who picked up evidence from us.

24       Q    I apologize.  She's with the Virginia Beach Police

25   Department, correct?

Gunther-Direct                                             65

1    A    Right.

2         On the 16th we finally got the remaining piece.

3    Now, you have had two pieces of a body show up in suitcases,

4    you know there's another piece of a body, so you are not

5    particularly surprised when it shows up in the final

6    suitcase.  May I say this was a matching set of suitcases.

7    There was a small one, a medium one and a large one.

8         We had the small one with the legs and the large

9    one with the upper body down to below the belly button.  Now

10   we have the medium suitcase with the belly from below the

11   belly button to the legs above the knees; and this was also

12   badly decomposed, although not quite as bad as the upper

13   body, probably because there were next to no guts left, so

14   there was very little bacteria to accelerate decomposition.

15   Q    And you mentioned connective tissue in relation to

16   the thighs, was it, with relation to the knees, was there

17   similarly connected tissue exposed here?

18   A    Of course.

19   Q    And is there any sort of examination, internal

20   examination that you did with this portion?

21   A    Yes, we did.  We had already sent some of the blood

22   from his chest off for the lab to tell us if it had some

23   drugs in it.  We found that his bladder had not been sawed

24   in half and that the bladder was still intact and still had

25   urine in it, so we sent urine off to be tested.



FILED, Clerk of the Appellate Division, July 08, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1         Other than that, we basically identified normal

2    testes in the scrotum, normal bladder, end of the rectum

3    where it goes out and the sawed surfaces, and I actually

4    took off part of the sawed surfaces with our own autopsy

5    saw, dried them out and kept them in hopes that somebody

6    would be able to examine them someday who knew more about

7    bones.

8         Q    Doctor Gunther, can you explain a little more

9    about that to the jury, what portion did you take out?

10   A    I took, I don't know that it's in the autopsy report, I

11   don't remember exactly what portions I took out, I know I

12   took at least part of the vertebral column, that's the spine

13   where it was cut off short, and had been sawed in half,

14   because the first job I ever got was in Memphis, spent

15   almost five years there as a forensic pathologist, and I

16   worked there with two forensic anthropologists who taught me

17   a little bit about their field and they were experts that I

18   admired in the field of examining bones after death.  So, I

19   knew that people who have that area of expertise, which

20   overlaps mine, I am not a forensic anthropologist can tell

21   me more from the bones than I can tell by looking at them.

22        I know I at least sawed off some of the spine.  I

23   don't remember exactly what else I took.  It's in my notes

24   somewhere.

25        Q    What's the purpose for taking these bone pieces?

FILED, Clerk of the Appellate Division, July 16, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    You are going to have an expert examine them and try to

2    tell you is, what kind of injury is there to them.  These

3    people can tell you if there was a knife used or a saw.  If

4    it was a knife was it a serrated knife like you use when you

5    are cutting bread or was it a smooth-edged knife, a

6    two-edged knife or single-edged knife.  This is something

7    they can do.

8         They can also look at bones and try to guesstimate

9    the age and height of the person.  Matter of fact, a person

10   in our office with forensic anthropology training who is not

11   yet fully certified who looked at the age, which was all we

12   had, who guessed we had a five, between five-nine and

13   six-two, between thirty-seven and thirty-nine, granted

14   that's an age range.  They can tell you about the height,

15   age, gender of the person and the tools that were used on

16   the bones.

17   Q    Now, Doctor Gunther, the cutting of this body,

18   can you tell whether it was cut off before death or after

19   death?

20   A    It is extremely likely it was after death.  The only

21   reason I am only saying extremely likely is the

22   decomposition, but I know what people look like when they

23   have been stabbed, they bleed into their stab wounds.  You

24   see, you folks have normal blood pressure.  I assume you are

25   all healthy, you have one twenty over eighty, that means

FILED, Clerk of the Appellate Division, July 10, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    when your heart is beating its hardest it's at one twenty,

2    relaxed it's at eighty millimeters or Mercury that means

3    it's always pushing the blood in your body at one twenty

4    over eighty.  If you get a cut, some of that blood gets

5    pushed into the tissue around the cut at one twenty over

6    eighty.

7         So you get spreading blood in the skin around the

8    cut or around a bruise.  That's how you get a bruise.  You

9    can't bruise a dead body.  Their blood pressure is zero.  If

10   you knock a dead body off a gurney which hasn't happened to

11   me in many years and you pick the dead body back up it's not

12   bruised because it has no blood pressure to push the blood

13   in it against pressure into the skin.  The same way if the

14   dead body should happen to break a small bone when it falls

15   off the table onto the ground and you open up and you look

16   at that rib, there's no blood around the break because they

17   don't have a beating heart, they don't have any blood

18   pressure, the exit wound in William's McGuire's break has a

19   big halo of blood around it in the tissue and that makes me

20   feel that he was alive when that bullet went through him.

21        But the places where his body are cut have no

22   blood in them, none that I can distinguish whatsoever, and

23   so I am fairly confident he was cut up long after he was

24   dead.

25        THE COURT:  Ms. Prezioso, maybe this would be a

FILED, Case 3:18-cv-03241-MAS Document 62-50-14 Filed 09/14/18 Page 69 of 190 PageID: 3360
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    good time to take a break.  Now we've been sitting for about

2    an hour.

3              MS. PREZIOSO:  Sure, Judge.

4              THE COURT:  All right, ladies and gentlemen, we'll

5    take the morning recess at this point and we'll resume at

6    about 11:30.

7              ( Jury excused )

8              THE COURT:  All right, ladies and gentlemen, court

9    will recess until 11:30.

10             ( Recess )

11             ( Court resumes )

12             THE COURT:  All right, counsel can we get the jury

13   out?  Hearing no objection we'll get the jury out.

14             MR. TACOPINA:  If I objected would you sustain it?

15             THE COURT:  But I would know it.

16             ( Whereupon the jury returns to the courtroom and

17   court resumes )

18             THE COURT:  All right, members of the jury, we are

19   ready to continue with Doctor Gunther's testimony.

20             MS. PREZIOSO: May I proceed?

21             THE COURT:  Yes.

22        Q    Doctor Gunther, I am showing you what's been

23   marked --

24             MR. ROMANYSHYN:  State's 1007A.

25        Q    State's 1007A, do you recognize what this is a

FILED, Clerk of the Appellate Division, July 09, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    chart of?

2    A    Yes.

3         Q    And would this chart assist you in explaining to

4    the jurors where the cut marks, where William McGuire's body

5    was cut up?

6    A    Yes.

7              MS. PREZIOSO:  Your Honor, the State offers this

8    into evidence.

9              THE COURT:  Any objection, counsel?

10             MR. TACOPINA:  No, your Honor.

11             THE COURT:  All right, the chart will be admitted

12   into evidence.

13             I'm sorry, I didn't get the number?

14             MR. ROMANYSHYN:  1007A, your Honor.

15             THE COURT:  1007A will be admitted in to evidence.

16             MS. PREZIOSO:  And with the Court's permission,

17   your Honor, I would ask the witness be permitted to approach

18   the chart.

19             THE COURT: Sure.  We do have a laser pointer,

20   though, don't we?

21             MS. PREZIOSO:  Your Honor, I am going to ask

22   Doctor Gunther to MARK on the chart where the body was cut.

23             THE WITNESS:  Your Honor, may I make reference to

24   my autopsy pictures?

25             THE COURT:  Sure.

FILED, Case 3:18-cv-02411-MAS-DQ Document 62-14 Filed 09/14/18 Page 71 of 190 PageID: 3362
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1      Q    Doctor Gunther, if you would, you described the

2   first suitcase as containing roughly from the knees down.

3   Could you mark on the chart for the jury with the black pen

4   where the cut marks were?

5   A    Yes.  It's a little longer on the right side of the

6   femur going right through the knee itself and starting lower

7   and rising a little higher here.  Uneven on the backs.  They

8   don't match perfectly.  It's because some pieces were

9   missing.  Probably just below the belly button here on the

10  torso.  The belly button is the upper piece.  This piece is

11  ragged.  I think some pieces are missing.  I don't know if

12  they were missing because they were chewed up in the cutting

13  process or because they decomposed.  A little higher back

14  here.

15      Q    Thank you, Doctor Gunther.

16          Now, what I would like to talk to you about next,

17  well, even before I do that, Doctor Gunther, I'd like to

18  show you what's been marked State's Exhibit 30 for

19  identification.

20          Doctor Gunther do you recognize that photograph?

21  A    I do.

22      Q    What do you recognize it to be?

23  A    This is the legs from --

24      Q    Again, I'm sorry to interrupt.  I ask you make

25  sure the jury not see the photo.

FILED, Case 3:18-cv-02341-MAS Document 02-150-14 Filed 09/14/18 Page 72 of 190 PageID: 3363
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    This is the legs from the knees down inside the

2    suitcase, still wrapped in the black plastic garbage bag

3    with only the very cut ends of the legs partially showing

4    and with our autopsy number on it on a label.

5         Q    And does that photograph fairly and accurately

6    depict what the legs looked like inside the suitcases with

7    the garbage bags partially covering them?

8    A    It does.

9         MS. PREZIOSO:  Your Honor, the State would offer

10   the exhibit into evidence, but we are not going to publish

11   it at this time.

12       MR. TACOPINA:  Your Honor, there's no objection

13   except for the fact I think the witness said from the knees

14   down and if that's the case I think that's the wrong photo.

15       MS. PREZIOSO:  No, your Honor it's not the wrong

16   photo.

17       MR. TACOPINA: Your Honor, based on our previous

18   conversations I think it's cumulative, and we probably would

19   object, just from the knees down.

20       MS. PREZIOSO:  Your Honor, we'll recheck the

21   photo.

22       Your Honor, in the meantime.

23       Q    Doctor Gunther, I'd like to talk to you now about

24   toxicology.  Did you request a toxicology be done as part of

25   this examination?

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925
Case 3:18-cv-02431-MAS Document 62-14 Filed 09/14/18 Page 73 of 190 PageID: 3364

1    A    Yes, on blood I got from the left chest cavity next to

2    the lung and on the urine from the pelvis.

3        Q    Can you describe why you do toxicology, why you

4    have it done?

5    A    Well, some deaths you can only explain by toxicology.

6    You know, if you get a person who has died alone in a house

7    with a suicide note and some empty pill bottles you are

8    pretty sure they died from taking the pills, you have to

9    find out, because every now and then somebody will die from

10   a heart attack before they take the pills.

11       Same if a person dies in a heroin overdose, you

12   have to find the heroin to call it an heroin overdose.  We

13   always send toxicology routinely on everyone you autopsy.

14   You never know what drugs they might have in their system

15   and the commonest drug is the one that most affects behavior

16   and that's alcohol.

17       We can't look for everything, though we ask the

18   lab to look for heroin and it's cousins, OxyContin and those

19   types of things, cocaine and alcohol.

20       Q    Now, Doctor Gunther, is there such a test that

21   tells you everything that's in somebody's blood?

22   A    No. No, there's no test that tells you everything

23   that's in a person's blood.  If you want to know if a drug

24   is there you have to ask for it.  If you say this person was

25   taking Prozac, I want to know if they were on Prozac --

FILED, Clerk of the Appellate Division, July 09, 2018, A-002150-14
Case 3:18-cv-02341-MAS Document 62-50-14 Filed 09/14/18 Page 74 of 190 PageID: 3365
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1           MR. TACOPINA:  I object at this point.  This

2    witness is not a toxicologist from my understanding.  It's

3    not the appropriate forum for this, so I'll object.

4           THE COURT:  Sustained.

5      Q    Doctor Gunther, the toxicology reports that come

6    back, are they routinely relied on by you?

7    A    Yeah.

8      Q    And as part of your job as medical examiner and

9    forensic pathologist do you have a basic understanding of

10   forensic toxicology as well?

11   A    A basic understanding, yeah.

12     Q    And the screen that was done in this case, was

13   that something that you considered and relied upon in making

14   your conclusions as to cause of death of William McGuire?

15   A    Yes.

16     Q    What were the toxicology, what was the request,

17   what did you request be tested for here?

18   A    I asked for the usual which is cocaine, heroin and

19   other opiates and alcohol.

20     Q    And what were the results?

21   A    There were no opiates, no heroin, no OxyContin, no

22   cocaine and none of its broken down by-product

23   benzoylecgonine, and there was only a trace of alcohol but

24   that trace is not reliable because the body is decomposing.

25   Sometimes in decomposing people they actually have some

FILED, Case 3:18-cv-02341-MAS-DEA Document 62-50-14 Filed 09/14/18 Page 75 of 190 PageID: 3366
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    germs in them which make alcohol.  So, when you have a lot

2    of alcohol in a decomposed person they were probably

3    drinking.  When you have only a trace you don't know if it

4    was real, if it came from bacteria.

5        Q    Now, Doctor Gunther I want to ask you, if a person

6    is alive and has ingested a drug, say a sedative that makes

7    the person go into a deep sleep, what's the body process

8    that's going on, if any, relative to that drug?

9    A    Well, the drug is effecting the person's brain or they

10   wouldn't be in a deep sleep and probably affecting other

11   organs like his lungs and heart as well.  While they sleep

12   the liver and kidneys are metabolizing the drugs getting rid

13   of it.  Just like when a person gets so drunk they fall

14   asleep, while they sleep their body ultimately gets rid of

15   the alcohol.  When they wake up they are not drunk, they

16   have a hangover.  The next day they are not drunk and have

17   no hangover, that is because their body has completely

18   gotten rid of the alcohol, which is a drug like any other

19   drug.

20       Q    And as a forensic pathologist have there been

21   times in your career when you have asked for certain drugs

22   to be looked at that were outside of the normal screen?

23   A    Yes.

24       Q    And are all drugs equally traceable in remains?

25   A    No.

FILED, Clerk of the Appellate Division, July 09, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1       Q       And can you explain that to the jury?

2    A      Drugs that a person's body makes are very hard to

3    trace, like insulin or steroids.  Some drugs you can trace

4    in a live person are very hard to trace in a dead person,

5    particularly drugs that fall in the general class of

6    proteins, because proteins break up when a person dies, if

7    their blood clots and unclots.  Drugs which are complex

8    organic molecules, like LSD which is lysergic acid

9    diethylamide, are hard to find.  Some drugs like cocaine are

10   easy.

11      Q       So, not all drugs are equally discernible then?

12   A      Not all drugs leave the body at the same rate time.

13      Q       Are you familiar with the drug Chloral Hydrate?

14   A      Generally familiar, not specifically, I have never had

15   a case of it, that is, I have never known of a case of it.

16   I never asked for it.  It may have been present at times and

17   I didn't know it was there.

18      Q       But you are familiar with alcohol you said, Doctor

19   Gunther?

20   A      I am very familiar with alcohol.

21      Q       Can I ask if a person had had alcohol combined

22   with some sedative, say more than twenty-four hours before

23   the person died and perhaps was in a deep sleep, would you

24   expect to still find alcohol in the remains?

25   A      No.

FILED, Case 3:18-cv-0241-MAS, Document 62-50-1 Filed 09/14/18  Page 77 of 190 PageID: 3368
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1          MS. PREZIOSO: No further questions, Judge.

2          THE COURT:  Mr. Tacopina.

3     CROSS EXAMINATION BY MR. TACOPINA:

4          Q     Good morning, Doctor Gunther.

5     A     Good morning.

6          Q     Doctor Gunther, you talked about in your direct

7     testimony a test that you did when you found that final

8     bullet that you, as you described it, I think you said you

9     took blood out of the left pleural cavity?

10    A     Yeah.

11         Q     You took eleven hundred cc's of blood?

12    A     Yeah.

13         Q     And that's just over a liter of blood, correct?

14    A     That's right.

15         Q     That's a lot of blood?

16    A     You imagine a liter Coke bottle full of blood, that's a

17    lot of blood.

18         Q     So, you were then asked about blood being allowed

19    to drain, I think you were posed the hypothetical question

20    but once the body is no longer living, the spigot sort of

21    shuts off, right, I mean the blood, when a blood vessel cut

22    the blood will spew out of that blood vessel but it won't

23    replenish itself once the heart is not beating anymore, is

24    that correct?

25    A     Absolutely.  When you have a dead person and you make a

FILED, Clerk of the Appellate Division, July 26, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    cut with a scalpel in the skin, the cut is white and yellow,

2    white for the skin, yellow for the fat.  It doesn't bleed.

3    If you cut across a big vein in their neck the blood comes

4    out of the vein until it's all come out and then it stops.

5    It can be a considerable quantity when the body was cut in

6    half and they went across the two biggest blood vessels in

7    the body, the aorta and vena cava, a fair amount of blood

8    would have come out, but once it's done the spigot is off

9    and it stops.

10       Q    Now, I want to talk to you about your examination

11   of the first suitcase, the one from 5/5/04, May 5th, '04,

12   okay?

13   A    Okay.

14       Q    In describing that you used the words, the legs

15   were fresh looking, correct?

16   A    Right.

17       Q    And what you said was, it was like the people that

18   had come from the hospital the day before, correct?

19   A    Right.

20       Q    Meaning that the people who had come from the

21   hospital the day before are the people that you are saying

22   died the day before, correct?

23   A    Right.

24       Q    So, the legs you received on 5/5/2004 looked like

25   legs that had come from a person who had died the day

FILED, Clerk of the Appellate Division, July 19, 2018, A-002130-14 Filed 09/14/18 Page 79 of 190 PageID: 3370
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    before?

2    A    They looked like legs of a person who had died in the

3    hospital the day before, because hospitals take the dead

4    bodies and put them in a cooler.  If the person had died in

5    a hot car the day before they would look nowhere near that

6    fresh, and if the person died Friday in the hospital and

7    autopsy on Monday they also would have looked fresh.  I

8    can't say it looked like the person who died the day

9    before.  They look similar to legs of people who died in the

10   hospital and were put in the cooler the day before or the

11   day before that.

12        Q    They were fresh looking?

13   A    They were fresh looking.

14        Q    Certainly they wouldn't like look legs from a

15   person who was killed six or seven days before that and left

16   in normal temperature above forty degrees?

17   A    Definitely.

18        Q    Definitely not, right?

19   A    Definitely not.

20        Q    You mentioned the term connective tissue, Doctor

21   Gunther?

22   A    Yeah.

23        Q    And connective tissue is anything that connects

24   with one piece of the body to another, correct?

25   A    Yeah.

FILED, Case 3:18-cv-02341-MAS-Document 06-53-14 Filed 09/14/18 Page 80 of 190 PageID: 3371
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1          Q      And connective tissue could come from a living

2   person or a dead person, right?

3   A      Right.

4          Q      Connective tissue is not only exclusively coming

5   from a dead person, correct?

6   A      Right.

7          Q      When you say right, you mean you agree with me?

8   A      I agree with you.

9          Q      Just a couple more things.

10         This male that you observed, did you ever make a

11  height assessment of this individual?

12  A      We made a general height assessment when we put all

13  three of the pieces back together.  We had nineteen inches

14  for the legs, thirty-two inches for the torso, and

15  twenty-five inches for the mid section which we called from

16  lumbar vertebrae to knee.  Now, let me put that together.

17  Twenty-five and thirty-two is fifty-seven and nineteen is,

18  help me here.

19         Q      We are getting help here.

20  A      Seventy-six.  Those are approximate measurements

21  because he flops when you put him down because he's, the

22  legs are an accurate measure, they are fresh.  The upper

23  parts you can subtract or add a couple inches.

24         Q      Somewhere between five-ten and six-one?

25  A      That sounds reasonable to me.  Could be a little

FILED, Case 3:18-cv-02431-MAS Document 02-150-14 Filed 09/14/18 Page 81 of 190 PageID: 3372
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    taller.  Could be a little shorter.

2         Q    Now, I want to talk to you about some of the

3    gunshot wounds that you observed, okay.  Let's talk about

4    the one to the head.  What you observed was an entry wound?

5    A    Yeah.

6         Q    And an exit wound?

7    A    Yeah.

8         Q    And an exit wound means the bullet left the head?

9    A    Right.

10        Q    And went somewhere else?

11   A    Right.

12        Q    Like into a wall or someplace, correct?

13   A    Right.

14        Q    It didn't just dissipate?

15   A    I autopsy bodies all the time with entrance-exit wounds

16   and the cops tell me where they find the bullet, sometimes

17   in the wall, sometimes in the floor, sometimes in a dish,

18   sometimes in a pillow.  I don't pay attention where the

19   bullet goes when it leaves the body.  The bullet -- my

20   concern is the body.  The bullet left little tiny pieces of

21   lead in the scalp, trace of some blood, but where it went I

22   don't know.

23        Q    Did the cops in this case tell you where it went?

24   A    No.

25        Q    And that bullet, according to your report, was

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   never recovered as far as you know?

2   A    Right.

3        Q    Now, going to the gunshot wound of the torso.

4             Now, the gunshot wound of the torso I think you

5   thought was possibly a distance shot, right?

6   A    Yeah.

7        Q    Meaning not close range, not against the body?

8   A    I couldn't tell if it was a distance shot for sure

9   because I don't have the clothes, that is I don't know if he

10  was wearing clothes when he was shot.  If you shoot a person

11  close up and they are naked you will see some spray from the

12  gun on the skin, it's calling fouling and stippling.  It

13  stops showing at three feet.  If the person is wearing

14  clothes, it's all in the clothes and not on the skin.  So, I

15  said probably distant shot.  To us distant means more than

16  three feet, which may not mean distant to you.  It looks

17  like a shot that would be more than three feet away but

18  without the clothes I can never be sure.

19       Q    By the way, that also, that torso shot, if you

20  will, the entry shot also had an exit wound as well,

21  correct?

22  A    Right.

23       Q    Meaning that that bullet from the torso entered in

24  the front and exited in the back?

25  A    That's right.

FILED, Clerk of the Appellate Division, July 16, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1       Q       And went somewhere else, like the bullet from the

2   head, correct?

3   A       That's right.

4       Q       And to your knowledge that bullet was never

5   recovered?

6   A       No one ever told me if it was recovered but I

7   frequently don't find out if they find out later..

8       Q       You then said we also have two more bullets,

9   correct?

10  A       Right.

11      Q       And those were the bullets that were, in fact,

12  recovered with the body?

13  A       Yeah.

14      Q       Now, those are separate bullets, those bullets, in

15  other words, did not create the entry and exit wounds in the

16  head and torso, correct?

17  A       It definitely did not create the entry and exit wounds

18  in the head.  I can't be absolutely sure the bullet I

19  recovered from deep inside the chest did not create, did not

20  exit, was not the same one that went through the lung.  It

21  seems likely to me the bullet that went in the abdomen

22  through the lung and out the exit was never recovered, but

23  it's possible that it fell back inside and was the bullet I

24  found inside during autopsy, but I don't know, I don't have

25  a blood trail.

FILED, Case 3:18-cv-02421-MAS-Document 62-50-1 Filed 09/14/18 Page 84 of 190 PageID: 3375
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1      Q      But for certain the one in the head was not in

2    that, in any of those suitcases, correct?

3    A      Absolutely, the one in the head entered and it exited

4    leaving little pieces of lead wipe at the exit.

5      Q      Certainly the one at the torso, the one that

6    entered, what happened with the bullet, it entered and

7    exited as well?

8    A      It created an entrance and created an exit.  The likely

9    thing it exited, but it could have been a short return

10   bullet that fell back inside.

11     Q      The likeliest thing is it existed, correct?

12   A      In my opinion the likeliest thing is it exited.

13     Q      And, again, to your knowledge where those bullets

14   went, if they left any trace evidence in a wall or anywhere

15   else, is something you don't know, correct?

16   A      To know that I would have to be present when the person

17   was killed.  I was not present when this person was killed.

18     Q      Yes, but, yes, you also told the jury sometimes

19   the police tell you where the other bullets are recovered.

20   They didn't tell you in this case?

21   A      That is correct.  I have not been told anything about

22   the bullets that left the body.

23     Q      And one last thing about the bullets, out of the

24   two bullets that you did recover, one of them had that fiber

25   on it, correct?

FILED, Clerk of the Appellate Division, July 30, 2018, A-002150-14

Case 3:18-cv-02341-MAS Document 62-13    Filed 09/14/18    Page 85 of 190 PageID: 3376

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    Right.

2         Q    The other one did not, correct?

3    A    I described the other bullet as looking pristine.

4         Q    Pristine, meaning without any fiber or any fabric

5    on it?

6    A    Without any fiber or fabric and not terribly banged up

7    as it passed through the body.  All bullets get banged up a

8    little bit.  They have dents and so forth.  This one in the

9    photograph has little distinction and dent in it.  It passed

10   through something but it doesn't have any coating of fibrous

11   and isn't squished, when bullets are squished when they hit

12   the pelvic bone.

13             MR. TACOPINA:  Thank you, Doctor.

14             THE COURT:  Ms. Prezioso.

15             MS. PREZIOSO:  I do have redirect if I can just

16   have one moment.

17   REDIRECT EXAMINATION BY MS. PREZIOSO:

18        Q    Doctor Gunther, I would like to show you what's

19   been previously marked State's Exhibit 164 for

20   identification.  Do you recognize that?

21   A    I do.

22        Q    And what do you recognize that to be?

23   A    This is a picture I took of the x-ray of, from the

24   bottom of his neck to the edge of where he was cut off, and

25   this x-ray shows a broken rib in the back where a bullet

FILED, Clerk of the Appellate Division, July 26, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    smashed through the fifth rib, and it also shows a bullet

2    sitting in the left upper quadrant of the abdomen.

3        Q    Is that consistent with approximately where you

4    found that bullet?

5    A    It is.

6        Q    It is, correct, Doctor Gunther?

7    A    It is.

8        Q    When Mr. Tacopina asked you, you said it was most

9    likely the bullet exited but it was possible the bullet was

10   a short return from the chest injury?

11   A    Yes, that bullet came from deep in his body.  Where it

12   came from I don't know.  I have one of two possibilities.

13   Either it's a short return which means --

14       Q    Doctor, I'm sorry, Doctor Gunther, I don't mean to

15   interrupt.

16       MR. TACOPINA:  But you did and I object to her

17   interrupting the witnesses answer.

18       THE COURT:  All right, well, I think we ought to

19   let the witness finish the answer.

20       Q    I'm sorry, Doctor Gunther, go ahead?

21   A    Either it's a short return, which means it went through

22   his lung, started to exit and fell back in; or it's another

23   gunshot that went through the area that the saw later chewed

24   up, through his transverse colon, I can't tell what's going

25   on because it's decomposed, and stopped just underneath his

FILED, Clerk of the Appellate Division, July 19, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925
Case 3:18-cv-02431-MAS Document 6-53 Filed 09/14/18 Page 87 of 190 PageID: 3378

1    diaphragm.  When I was tearing his diaphragm open it feel

2    into the place by his lung.

3         Q    Either way, the greatest likelihood it comes from

4    a bullet that was shot at his body and entered his body?

5    A    Whether it's a short return or a third gunshot wound to

6    his abdomen, I don't know.

7         Q    And, Doctor Gunther, earlier today, before the

8    jury came in, you looked at both of these exhibits, I am

9    going to hand you now, we already talked about 09, a CD

10   marked State's 1008 which contains three photos on it and

11   the three photos that it contains --

12        MS. PREZIOSO:  Your Honor, may I approach just for

13   a moment?

14        THE COURT:  Um-hum.

15        (Following discussion was held at sidebar)

16        MS. PREZIOSO:  Judge, I didn't want to put a

17   description on the record because it might be offensive to

18   the jury.  It's three photos that have the body parts of all

19   three suitcases laid together.  It shows the relative

20   decomposition.  It's something I just wanted Doctor Gunther

21   to authenticate.  The other CD only had one photo on it.  By

22   my saying three photos she'll be able to answer it fairly

23   and accurately depicts what it looks like.  I just did not

24   want to put this on the record in open court.

25        MR. TACOPINA:  No problem with the authentication

FILED, Case 3:18-cv-0341-MAS Document 02-150-14 Filed 09/14/18 Page 88 of 190 PageID: 3379
FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    of this.

2              THE COURT:  Okay.

3              (Discussion at sidebar concluded)

4              THE COURT:  Go ahead, Ms. Prezioso.

5         Q    And, Doctor Gunther, the CD with the three photos

6    on it that you looked at this morning, did they fairly and

7    accurately reflect, reflect William McGuire's body at the

8    conclusion of all of your examination -- and I am going to

9    ask you, Doctor Gunther, I apologize, please don't be

10   descriptive, if you can just say yes or no?

11   A    Yes, two photos.

12             Q    Two photos?

13   A    Two photos.

14             Q    Thank you for correcting me.

15             And lastly, Doctor Gunther, the body parts that

16   you recovered cut the way you described to this jury and

17   what you observed inside the suitcases and inside the bags,

18   was that consistent with the body being cut where you

19   described, the person who cut it letting the blood drain out

20   as well as could be expected and then putting the body into

21   the suitcase?

22   A    Yes.

23             MS. PREZIOSO:  Nothing further, Judge.

24   RECROSS EXAMINATION BY MR. TACOPINA:

25        Q    Doctor Gunther, as well as can be expected, what

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    does that mean exactly?

2    A    That means to me that if a person cuts a body in half

3    the blood is going to drain out of the aorta and vena cava

4    by gravity.  With the spigot off, it's just going to drain

5    out as well as you can expect blood to move when nothing is

6    pumping it.

7         Q    With the spigot off.  The heart stops, it's like a

8    hose, you turn the spigot off, whatever is in that strand of

9    hose before you shut it off will come out of the hose but

10   nothing else will replenish it, correct?

11   A    Right.

12        Q    And as you said, you found a little over a liter

13   of blood in one of the cavities, correct?

14   A    Yes, but whenever I autopsy homicide victims who have

15   been shot through the chest a lot of blood collects in the

16   chest and that blood has no way to leave the chest except

17   through the gunshot wounds, which are not effective leaks --

18        Q    Unless, of course -- I'm sorry.

19   A    I am very familiar with finding people who are almost

20   bloodless because they've bled out of other areas who have a

21   large collection of blood in their chest.  It's not

22   impossible for a person to be shot, have a big puddle of

23   blood that can't get out and wherever you cut across some

24   other artery that drains like a hose after the spigot is

25   off.

FILED, Clerk of the Appellate Division, July 06, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925
Case 3:18-cv-02419-MAS Document 62-53 Filed 09/14/18 Page 90 of 190 PageID: 3381

1        Q    Right, and certainly if someone wanted to drain

2   all the blood out of a body and had a purpose in trying to

3   get all the blood out of a body, leaving over a liter in

4   that pleural cavity it would not be very effective, correct?

5   A    As far as that's within my expertise, it's sort of a

6   little bit out of my area of expertise, I suppose so.

7        Q    Okay, great.  Thanks.  Thank you.

8             MS. PREZIOSO:  We're good, Judge.

9             THE COURT:  Doctor Gunther, thank you very much.

10  You are excused.

11            THE WITNESS:  Thank you, your Honor.

12            THE COURT:  Do we have time for another witness?

13            MS. PREZIOSO:  I am not sure, Judge.

14            THE COURT:  Do you want to check.

15            MR. ROMANYSHYN: It's a relatively short witness,

16  Judge.  We may run a little bit long on the direct, I don't

17  know what the cross, if any, will be, it will be John Ward.

18            THE COURT:  Why don't we give it a try.

19            MR. ROMANYSHYN:  State calls John Ward.

20  J O H N    G.    W A R D, sworn.

21  DIRECT EXAMINATION BY MR. ROMANYSHYN:

22        Q    Mr. Ward, good morning, sir.

23  A     Good morning.

24        Q    Are you employed, sir?

25  A     Yes, sir, I am.

FILED, Clerk of the Appellate Division, July 30, 2018, A-002150-14 Case 3:18-cv-02431-MAS Document 62-50 Filed 09/14/18 Page 91 of 190 PageID: 3382
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1      Q      By whom are you employed?

2    A    Currently employed by the Commonwealth of Virginia,

3    Department of Forensic Science.

4      Q      And what do you do with the Department of Forensic

5    Science?

6    A    I am classified as a forensic scientist, supervisor of

7    the firearms section.

8      Q      Do you have an area of specialty?

9    A    My area of specialty is the forensic science,

10   discipline of firearms and tool mark examination.

11     Q      Would you kindly give the jury the benefit of your

12   training?

13   A    I first entered the discipline of firearms and tool

14   mark examination while a member of the United States Army

15   Criminal Investigation Command.  Part of my career

16   development was a responsibility of going into the

17   laboratory.  I attended and successfully completed a

18   two-year course of instruction in this discipline, certified

19   by the Department of the Army and served from '71 to '72 in

20   Vietnam in our laboratory there.  Came back to the United

21   States, became the second chief of the Army Crime Laboratory

22   responsible for all the evidence to be processed.  The crime

23   laboratories are responsible for processing and assessing

24   all evidence of DOD origin, including Coast Guard.  We are

25   also responsible for training other students in the

FILED, Case 3:18-cv-00241-MAS-LHG Document 62-14 Filed 09/14/18 Page 92 of 190 PageID: 3383
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    discipline so when our personnel retire we can replace them,

2    and we had a minor mission with the USAD training foreign

3    nationals in the forensic science discipline of firearms and

4    tool mark examination.

5            I retired from the military in '76, went to the

6    State of Wisconsin, worked for the Department of Justice up

7    there in the crime laboratory near Milwaukee, and in 1981 I

8    had the opportunity to go to Virginia and I have been with

9    that department ever since.

10           I am past president of the Association of Firearms

11   and Tool Mark Examiners which is the only international

12   association representing my discipline, and I am currently

13   the chairman of a training committee responsible for the

14   training manual, the technical procedure manual and

15   glossary.

16           The technical procedure manual is a manual

17   designed to assist laboratories who are starting up or have

18   a firearm section identifying techniques and procedures for

19   evaluating evidence.

20      Q    Sir, in your experience approximately how many

21   ballistic examinations have you conducted?

22      A    I honestly have --

23      Q    Can you give me an estimate?

24      A    I have worked, for the past twenty-five years I have

25   worked over two hundred cases a month -- a year, I mean, two

FILED, Case 3:18-cv-02441-MAS Document 62-50-14 Filed 09/14/18 Page 93 of 190 PageID: 3384
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    hundred cases a year.  So, I don't have any idea of how

2    many, it's just --

3         Q    Have you ever testified in court before?

4    A    Yes, I have.

5         Q    You have testified as an expert witness, correct?

6    A    Yes.

7         Q    Approximately how many cases have you testified in

8    court?

9    A    Over five hundred fifty times overall, that's military,

10   Federal, State courts in Wisconsin, and in the Commonwealth

11   of Virginia I have testified a total of those five fifty,

12   four hundred eighty times.

13        MR. ROMANYSHYN:  Your Honor, at this time based on

14   his training and qualifications the State would move Mr.

15   Ward be recognized by the Court as an expert in ballistics.

16        MR. TACOPINA: No objection.

17        THE COURT:  All right, the Court is satisfied that

18   Mr. Ward, by virtue of his training and experience and there

19   being no objection at this time, is qualified to testify as

20   an expert in these proceedings in the field of ballistics.

21        Ladies and gentlemen, I will remind you of my

22   earlier instructions regarding expert testimony again.  Mr.

23   Ward is determined by the Court to be qualified as an expert

24   in those these proceedings.

25        Mr. Romanyshyn, why don't you continue.

FILED, Case 3:18-cv-02341-MAS-Document 62-13-Filed 09/14/18   Page 94 of 190 PageID: 3385
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1            MR. ROMANYSHYN:   Thank you.

2       Q    Mr. Ward, did there come a time when you became

3    involved in ballistic examination of some bullets that were

4    recovered from body parts in suitcases in the Commonwealth

5    of Virginia?

6    A    Yes, I was.

7       Q    Can you explain for the jury how you became

8    involved in that matter?

9    A    The case was originally being worked by Virginia Beach

10   P.D., Police Department and they submitted two bullets for

11   examination.  I believe they were submitted in May of 2004.

12   I received them in June of 2004 and Issued a report on about

13   the 25th of June, 2004.

14      Q    When you had received these bullets for

15   examination, sir, what is the first step in the process of

16   making your examination?

17   A    They are submitted in packages.  We make all the notes

18   on those things.  The bullets then are processed and cleaned

19   from any hazardous material that may be on them and then I

20   examine them to attempt to identify.  When you have bullets

21   what you attempt to do is identify the caliber of the

22   bullet, the type of firearm from which it may have been

23   fired, those type of things that can be done with just two

24   bullets.

25            In this case here there were two bullets that were

1    identified as wad cutter, they are normally loaded in like

2    .38 Special cartridges.  Originally, a wad computer was

3    designed primarily for target shooters.  It's a lead bullet

4    weighs about a hundred forty-eight grains, the nose is flat,

5    it doesn't have an o-jive on it like many bullets have, and

6    when it penetrates the target paper for target shooters it

7    makes a nice, nice hole that can be evaluated to determine

8    if there's more than one hole, because target people are

9    very particular about not missing the target.  They'll say

10   there is two holes, they can measure and determine.  So,

11   it's primarily designed for that purpose and they are fired

12   primarily in revolvers.  There are some Derringer's that

13   will fire them.

14          So, in this case here I evaluated these bullets

15   and determined they were .38 Special and they were fired

16   from a firearm having six lands and grooves which were

17   inclined to the right.  That means that when the

18   manufacturer produces the firearm they have certain

19   specifications that they have for that firearm.  Say it's a

20   .38 Special and consequently they take a piece of stock

21   steel, drill it out for the bore and that becomes the

22   caliber.  On the .38 Special or .357 that's about .357

23   inches in diameter.  That hole is polished, as in all

24   firearms they run some kind of tool through the barrel that

25   causes lands and grooves to appear.  It makes an impression.

FILED, Case 3:18-cv-0241-MAS Document 62-14 Filed 09/14/18 Page 96 of 190 PageID: 3387
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925




1        Anyway, as that tool is drawn through it's turned

2   to the right or turned to the left, some are right some are

3   left.  Those are manufacturer's specifications.  We measure,

4   in this case I was able to measure the lands and grooves,

5   determined the number of them and then we have a computer

6   program called a general rifling class characteristics file

7   that will identify for us possible manufacturers of firearms

8   that make barrels consistent with what we found in this

9   bullet.

10       I was able to identify a number of firearms and I

11  issued a report indicating that firearms with a rifling

12  class characteristics consistent with those noted on the

13  three bullets submitted --

14       Q    Sir, may I back you up for just a moment.

15       You indicated that you measured things that you

16  referred to as lands and grooves.  Can you please explain to

17  the jury what are lands and grooves?

18  A    The lands would be, we term land impressions and groove

19  impressions.  When you run the bullets through you cause a

20  groove, but on the bullet we call it a land impression.  So,

21  you have land impressions and groove impressions, like on a

22  .357 you can have different sizes as long as it reached the

23  number of lands and grooves, the total.  So, by measuring

24  those we can tell you what the caliber is.  If we didn't

25  have, you know, out of round, you couldn't measure that.

FILED, Clerk of the Appellate Division, July 09, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

Case 3:18-cv-0341-MAS-Document-62-52- Filed 09/14/18  Page 97 of 190 PageID: 3388

Ward-Direct                                    97

1    These bullets were not out of round, and you could also

2    determine what the manufacturer might be.

3         Q    And you also utilized the term class

4    characteristics, you explain for the jury what a class

5    characteristic is?

6    A    It would be, like the number of lands and grooves, the

7    direction of twist and the size of those lands and grooves

8    are class characteristics of a manufacturer.

9         Q    And with respect to these bullets that you

10   examined, how many lands and grooves were there?

11   A    Six.

12        Q    What direction was the twist?

13   A    Inclined to the right.

14        Q    And did you utilize that information to attempt to

15   determine who may have manufactured the weapon that fired

16   those bullets?

17   A    Yes.

18        Q    And what procedures did you use to do that?

19   A    Really get into the computer program and plug in the

20   data that you have observed from your examination.  It then

21   identifies, sometimes you don't get any, sometimes you get

22   maybe one, other times you might get a number.  In this case

23   here I think I was able to identify six.

24        Q    So, would it be fair to say that manufacturers

25   keep some sort of record of their manufacturing process?

FILED, Clerk of the Appellate Division, July 09, 2018, A-002150-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    Well, certainly they do, but this computer program was

2    put together by the Bureau of the F.B.I. and it was the

3    result of major test firing of bullets from various weapons.

4         Q    You indicated you were able to determine class

5    characteristics and come up with a list of manufacturers

6    that may have manufactured the weapon that fired these

7    bullets is that correct?

8    A    That's correct.

9         Q    Can you tell the jury who some of those

10   manufacturers were?

11   A    I will try to remember them all.  Astra, an outfit

12   called FIE, Hopkins and Allen, High Hunter, Ira Johnson, and

13   Taurus.

14        Now, the list, when I issue these and I give these

15   to police officers they are only an investigative tool.

16   These are firearms that I was able to identify.  Are there

17   others, there very well may be, and so if during the course

18   of an investigation an officer would find a firearm from

19   someone that they had a suspect on but it wasn't on that

20   list they shouldn't disregard that.  They should send that

21   firearm to the firearm's section and I would eliminate or

22   identify it as a possibility.

23        So, it's a very good investigative tool that we

24   are able to give the departments that we support.

25        Q    And the caliber of these bullets was .38 caliber

1    as a result of your examples, do I recall correctly?

2    A    It's .38 class, .38, .357 class bullet.

3         Q    Sir, let me show you items that have been

4    previously marked as State's Exhibits 25A and 25B.

5              MR. ROMANYSHYN: Your Honor, I believe those are

6    actually in evidence already.

7         Q    Do you recognize those items, sir?

8    A    Yes, our laboratory identifying characteristics are on

9    both envelopes.  You will notice this is the envelope that

10   the bullet came to me in.  After cleaning it and preparing

11   it for examination I placed it in a small envelope and

12   attached it.  Both of those are the, my item six on my

13   report and this would be item seven on the report.

14        Q    In examining these two bullets, in examining these

15   two bullets were there any characteristics that would lead

16   you to believe they were fired from different weapons?

17   A    In fact, that's why I wrote the report that these two

18   bullets were fired from a firearm having six lands and

19   grooves and incline to the right.  You look for individual

20   characteristics.  There was nothing to indicate there was

21   more than one firearm used, so I wrote the report reflecting

22   that those two bullets were fired from a firearm having a

23   rifle from six lands and grooves inclined to the right.

24        Q    You indicated these are wad cutter bullets?

25   A    They are.

FILED, Case 3:18-av-00846-1-MAS July Document 2-58-14 Filed 09/14/18 Page 100 of 190 PageID: 3391
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1        Q     They have a flat head?

2   A    That's correct.

3        Q     Are they still capable of killing someone?

4   A    Certainly, they would be.

5              MR. ROMANYSHYN:  Thank you, sir.

6              The State has no further questions of Mr. Ward at

7   in time.  Thank you, sir.

8              THE COURT:  Mr. Turano.

9   CROSS EXAMINATION BY MR. TURANO:

10       Q     Good morning, Mr. Ward.

11  A    Good morning, sir.

12       Q     Actually, good afternoon.

13             Your experience in wad cutter is not a

14  particularly unusual type of bullet?

15  A    It's not unusual at all, no, sir.

16       Q     And when you were asked about rifling

17  characteristics, essentially we are talking about six lands

18  and grooves, correct?

19  A    Correct.

20       Q     And a right twist?

21  A    That's correct.

22       Q     And you mentioned that in the report you had

23  prepared?

24  A    Yes, sir.

25       Q     And in your report you mention the six names you

FILED, Clerk of the Appellate Division, July 30, 2018, A-002580-14
Case 3:18-cv-03411-MAS Document 2-8 Filed 09/14/18 Page 101 of 190 PageID: 3392
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    had just read off or you just mentioned a moment ago,

2    correct?

3    A    I, yes, sir.

4        Q    But you also included that certainly those are not

5    the only types of manufacturers that would produce barrels

6    that are consistent with the characteristics that you found,

7    correct?

8    A    I don't have the report here, but it says these are the

9    ones, but it's not limited to this list because we cannot

10   say beyond a doubt there's not another firearm out there.

11   There is no way to do that.

12       Q    In fact, you indicated there were most likely

13   others?

14   A    There very well could be, sir.

15       Q    And sitting here today you didn't know how many

16   other manufacturers would have produced the same types of

17   characteristics?

18   A    No, sir.

19           MR. TURANO:  Nothing further, thank you.

20           MR. ROMANYSHYN:  No redirect, your Honor.

21           THE COURT:  All right, Mr. Ward, thank you.  You

22   are excused.

23           THE WITNESS:  Thank you for having me, your Honor.

24   I appreciate it.

25           THE COURT:  All right, members of the jury, we are

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

Case 3:18-cv-03415-MAS Document 2-2 Filed 09/14/18 Page 102 of 190 PageID: 3393

Lacek-Direct                                                        102

```
 1    going to break for lunch at this time.  I will ask you to

 2    report back to the general jury assembly room at 1:30 and

 3    we'll continue with our next witness.

 4              ( Jury excused )

 5              THE COURT:  All right, counsel anything before we

 6    break for lunch?

 7              MR. TACOPINA:  No, your Honor.

 8              MR. TURANO:  No, your Honor.

 9              THE COURT:  All right, the Court will recess until

10    1:30.

11              ( Recess )

12              ( Whereupon the jury returns to the courtroom and

13    court resumes )

14              THE COURT:  Is the State ready to call its next

15    witness?

16              MR. ROMANYSHYN:  State calls Tim Lacek.

17    T I M O T H Y  A.   L A C E K,  sworn.

18    DIRECT EXAMINATION BY MR. ROMANYSHYN:

19              Q    Mr. Lacek, good afternoon, sir.

20    A    Good afternoon.

21              Q    Are you employed?

22    A    Yes, I am.

23              Q    By whom are you employed?

24    A    Hospital Central Services based out of Allentown,

25    Pennsylvania.
```

FILED, Case 3:18-cv-08341-MAS July 2017 at 02:52 PM Document 58-14 Filed 09/14/18 Page 103 of 190 PageID: 3394
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1        Q      How long have you been with Hospital Central

2   Services?

3   A      Since 1987.

4        Q      Is Hospital Central Services also referred to as

5   HCSC?

6   A      HCSC is known as Hospital Central Service Cooperative

7   is a health care co-op based out of Allentown, strictly

8   health care, we do health care facilities.  We don't do

9   hotels or restaurants or anything like that.  I work for the

10  laundry division.

11       Q      When you say health care facilities, that would

12  include hospitals, doctor's offices?

13  A      Acute care hospitals make up a majority of our

14  business, but we do have some rehab facilities as well, some

15  doctor's offices.

16       Q      And what capacity are you employed with HCSC?

17  A      Currently I am an account representative.

18       Q      As an account representative do you have an

19  assigned group of clients?

20  A      The group that I have is assigned for the most part.

21  For the most part I am on site at a large group of hospitals

22  and then I do have some other accounts that go along with

23  that.

24       Q      And where are those hospitals located?

25  A      Morristown, New Jersey; Summit, New Jersey, as well as

FILED, Clerk of the Appellate Division, July 08, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    Montclair is the majority of my business and or majority of

2    where I spend my time, but I do also have several other

3    accounts in the Morristown area.

4         Q    On your list of assigned clients is one of them

5    R.M.A. of Morristown?

6    A    Yes.

7         Q    That's Reproductive Medical Associates in

8    Morristown?

9    A    Correct.

10        Q    How long have you been assigned to R.M.A. as the

11   account representative?

12   A    Approximately, I'd say back to September of 2003.

13        Q    And, sir, if you know, how long has HCSC supplied

14   R.M.A.?

15   A    R.M.A. has been under contract with us since 2001.

16        Q    Describe to the jury the types of medical supplies

17   you provide to R.M.A.?

18   A    The division again is linen and laundry service.  You

19   can take a look, it would be the sheeting, the blankets, the

20   gowning that they'll use.  R.M.A. does also have some

21   surgical towels and scrub apparel.

22        Q    Is HCSC a nationwide company?

23   A    We are a regional operator, very large regional

24   operator.  Again, we are based out of Allentown, but our

25   service region is basically Pennsylvania and the contiguous

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14

Case 3:18-cv-03461-MAS Document 028-1 Filed 09/14/18 Page 105 of 190 PageID: 3396

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    states, Pennsylvania, New York, New Jersey, Maryland and

2    District of Columbia.

3         Q    And were you the account representative in 2004?

4    A    Yes, I was.

5         Q    Let me show you, sir, an item that has been

6    premarked as State's exhibit 955.  Have you seen those

7    documents before, sir?

8    A    Yes.

9         Q    And what do you recognize them to be?

10   A    It's our billing and shipping documents back to each

11   account.

12        Q    Can you tell from what time period those billing

13   records are?

14   A    June of 2003 through June of 2004.

15        Q    And who is the client for those medical bills?

16   A    Reproductive Medical Associates of New Jersey.

17        Q    And did you have an opportunity to examine those

18   records previously, I realize they are quite voluminous?

19   A    Yes, I did.  I just had the opportunity just a few

20   moments ago.

21        Q    And did you have the opportunity to examine the

22   specific, opportunity to examine the specific billing

23   records for April of 2004?

24   A    Yes.

25        Q    What types of supplies were you shipping to R.M.A.

FILED, Clerk of the Appellate Division, July 30, 2018, A-002580-14

Case 3:18-cv-03415-MAS Document 25-1 Filed 09/14/18 Page 106 of 190 PageID: 3397

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    in April of 2004?

2    A    Same items I mentioned before, blankets, towels,

3    sheets, scrub apparel, some lab coats.

4        Q    When you say blankets, what types of blankets did

5    you supply R.M.A. with?

6    A    One blanket in particular, our item number is 205, our

7    bath blanket.

8        Q    And do you recall or can you tell from your review

9    of those records approximately how many of those blankets

10   you shipped to R.M.A. in April of 2004?

11   A    Roughly one hundred per week.

12       Q    That's each week of the month?

13   A    Each week.  Again, it's rough numbers.  Some weeks will

14   be higher.  It's on average.  Some weeks a little bit lower.

15       Q    Do your products bear markings, sir?

16   A    A lot of our, a lot of our products do bear property

17   mark.  Our sheeting will have a continuous institutional

18   marking basically an ink mark that runs down with Hospital

19   Central Services Cooperative on it.  Other items that were

20   not able to, they will be tagged.  Our blankets are tagged,

21   some of our scrub apparel, instead of being a continuous

22   marking will actually have a heat transfer, a stamp on the

23   scrub apparel, It's designated as our property.

24       Q    And can you describe, you just mentioned a marking

25   on scrub apparel?

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14   Filed 09/14/18   Page 107 of 190 PageID: 3398
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    Sure.

2         Q    Can you describe how that marking appears for our

3    jury?

4    A    It will say "Property of HCSC" and underneath it it

5    will say never sold.

6         Q    Is there a reason it says never sold?

7    A    We don't sell the product.  It's never for sale.  When

8    you see it on the streets and someone was walking with it,

9    it was taken from a facility.

10        Q    How would your blankets be marked, sir, if at all?

11   A    The blankets are marked with a tag.  There's two types.

12   We have many different blankets.  Two styles of tags.  The

13   tag on our bath blanket, it's a less expensive product so we

14   don't put a lot of investment into the tag, but my companies

15   philosophy is if we are able to put it out to our customers

16   we want to be able to have a notification it is from HCSC,

17   so there is a tag on it.  It does not last very long through

18   the process, but there is a tag on it.

19        Q    Could you describe for the jury, please, what one

20   of those bath blankets appears like?

21   A    Well, it's a hundred percent cotton blanket.  What

22   happens, again, with the process it comes out of a bale from

23   overseas, it's actually tan, it's tan when it starts the

24   process, and through the course of time it will actually

25   bleach white.

1          Another blanket we have is actually our thermal

2    blanket that is a white product to begin with, but the bath

3    blanket we serve R.M.A. actually starts as tan, on the brown

4    side, and does bleach white.

5          Q    And does your tag on the blanket bear specific

6    markings?

7    A    Yes.

8          Q    Could you describe those markings for the jury,

9    please?

10   A    The tag on the bath blanket, actually it's a printed

11   tag.  It does have our logo which is four arrows pointing

12   in, four arrows pointing out, and then HCSC, and I believe

13   at the top it does say property of, if I'm not mistaken.

14          MR. ROMANYSHYN:  Judge, at this time I would just

15   like to retrieve a piece of evidence.

16          THE WITNESS:  No problem.

17          MR. ROMANYSHYN:  Judge, I'd like to show Mr. Lacek

18   at this time an exhibit premarked as State's 17A.  They had

19   no objection.  Please correct me if that's an incorrect

20   representation.

21          MR. TURANO:  No objection, your Honor.

22          Q    Mr. Lacek, directing your attention to the bottom

23   center portion of the blanket.  Do you recognize that, sir?

24   A    Yes, that's an HCSC blanket.

25          Q    How did you recognize it's an HCSC blanket?

FILED, Clerk of the Appellate Division, July 08, 2018, A-002580-14

Case 3:18-cv-08841-MAS Document 9-5 Filed 09/14/18 Page 109 of 190 PageID: 3400

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   A      Obviously by the tag that has property of HCSC and our

2   logo.

3        Q    Can you describe the tag, when you say logo, can

4   you describe the logo?

5   A     Again, I mentioned before, four arrows pointing in,

6   four arrows pointing out.

7        Q    Sir, from the appearance of the tag is there

8   anything else you can conclude about that blanket?

9   A     When I had the opportunity to look at the blanket, as I

10  mentioned before the blanket starts the process out of the

11  bale as being tan.  This blanket is tan, and through the

12  course of time it will bleach white.

13       Q    And, sir, you've had an opportunity to examine

14  that blanket before?

15  A     Yes.

16       Q    When was the last time you examined that blanket?

17  A     Just a few moments ago, within the last hour.

18            MR. ROMANYSHYN: Thank you, sir.  I don't have any

19  further questions at this time.

20            THE COURT:  Mr. Turano.

21  CROSS EXAMINATION BY MR. TURANO:

22       Q    Mr. Lacek, you just mentioned a moment ago that

23  the HCSC blankets are a hundred percent cotton?

24  A     Right.

25       Q    And one of the other distinguishing marks you said

FILED, Clerk of the Appellate Division, July 20, 2018, A-002580-14

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    these logos, these four arrows, you just spoke about?

2    A    Yes.

3        Q    You just mentioned you are a very large regional

4    operator?

5    A    Operator, um-hum.

6        Q    And, again, could you just, the areas that you

7    said that your distribution included, were they --

8    A    We service about four hundred seventy clients, majority

9    of the volume by pounds coming from hospitals, but the

10   geographical region is Pennsylvania, New York, New Jersey,

11   Maryland and District of Columbia.

12       Q    That would be certainly hospitals, doctor's

13   offices, health care providers in general?

14   A    Correct.

15       Q    And it would be those types of establishments

16   throughout the states you just mentioned, correct?

17   A    Correct.

18       Q    Fair to say, New Jersey, you would distribute to

19   hospitals and health care providers throughout New Jersey?

20   A    If they are under contract with us, yes.

21       Q    If they are under contract, sure.

22            Now, you also mentioned that one of your, your

23   particular accounts was Morristown Memorial Hospital?

24   A    Correct.

25       Q    And certainly R.M.A., I'm sorry, the HCSC has

FILED, Clerk of the Appellate Division, July 30, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    R.M.A. as an account, for example?

2    A    Correct.

3        Q    It has other health care providers as an account

4    you may not be aware of, correct?

5    A    That is fair to say, yes.

6        Q    How about St. Barnabas Medical System, is that a

7    client?

8    A    That is a customer of HCSC.

9        Q    Now, in that particular hospital or facility would

10   be located in New Jersey, correct?

11   A    Correct.

12       Q    Now, these blankets that you talked about are

13   provided to these clients of your's, whether it be a

14   hospital, hospital would be one of the bigger, obviously,

15   clients, correct?

16   A    Correct.

17       Q    And they would order, many, many towels, or

18   blankets?

19   A    Yes.

20       Q    And likewise, for instance, a doctor's office or

21   facility would order numerous blankets, correct, depending

22   on the size of the practice?

23   A    Proportionately, correct.

24       Q    One of the services you provide at HCSC is kind of

25   like a laundry cleaning service?

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

```
1    A      Correct.

2           Q      So, there's a constant train of blankets, correct?

3    A      It's a pulled inventory.

4           Q      The actual blankets you provide to various

5    providers are not tagged or specified in anyway, they are

6    not certainly tracked, correct?

7    A      To and from a location?

8           Q      Yes.

9    A      No, it's a pulled inventory.

10          MR. TURANO:  I have nothing further, thank you.

11   REDIRECT EXAMINATION BY MR. ROMANYSHYN:

12          Q      Mr. Lacek, based on your examination of State's

13   17A your company supplied R.M.A. with these blankets in

14   April of 2004?

15   A      Yes.

16          Q      And prior to April of 2004 had you supplied R.M.A.

17   with these particular types of blankets?

18   A      Prior to April of 2004, yes.

19          Q      And, sir, how many clients do you have in the

20   State of New Jersey?

21   A      Roughly one hundred, it's over a hundred, say a hundred

22   one.

23          MR. ROMANYSHYN:  Thank you.

24          THE COURT:  Anything further?

25          MR. TURANO:  Nothing, your Honor.
```

FILED, Clerk of the Appellate Division, July 09, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1             THE COURT:  Thank you, sir, you are excused.

2             Next witness.

3             MR. ROMANYSHYN:  Your Honor, State calls Peter

4    Burnejko.

5    P E T E R   R.   B U R N E J K O, sworn.

6    DIRECT EXAMINATION BY MR. ROMANYSHYN:

7        Q    Mr. Burnejko, good afternoon, sir.

8    A    Good afternoon.

9        Q    Are you employed?

10   A    Yes.

11       Q    By whom are you employed?

12   A    The Roselle Tire Company in Roselle, New Jersey.

13       Q    How long have you been in that line of work?

14   A    It will be twenty-one years in October.

15       Q    Sir, did you ever have the occasion to meet

16   William McGuire?

17   A    Yes, at an open house.

18       Q    I'm sorry, you said an open house?

19   A    Yes.

20       Q    Would that be for the sale of a home?

21   A    Yes.

22       Q    And whose open house was it?

23   A    It was our open house at 20 Halls Mill road.

24       Q    Where is that located, sir?

25   A    In Asbury, Warren County, Asbury, New Jersey.

FILED, Clerk of the Appellate Division, July 08, 2016, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

Case 3:18-cv-03341-MAS Document 8-58 Filed 09/14/18 Page 114 of 190 PageID: 3405

Burnejko-Direct                                          114

1          Q     And the defendant came to your open house, is that
2    correct?
3    A     Correct.
4          Q     And do you recall when that was, sir?
5    A     I can't pinpoint whether it was November, before
6    Thanksgiving or a little bit after.
7          Q     And what year was that, sir?
8    A     2003.
9          Q     And you had occasion to meet him at that time?
10   A     Yes.
11         Q     And did he come to the open house alone?
12   A     No, he came with the defendant.
13         Q     Was there anyone else with him?
14   A     An older gentleman, mustache and, I believe it could be
15   one of his relatives.
16         Q     And when they came to the open house did you have
17   occasion to speak with Mr. McGuire?
18   A     Yes, small talk.  Basically, you know, how big the home
19   was, how big the rooms were, and he had come upstairs and
20   said they were nice size rooms.  Basic small talk.  Nothing
21   other than that.
22         Q     What did the defendant do during the open house?
23   A     I believe --
24         MR. TACOPINA:  Your Honor, I am confused, because
25   I don't think he's mentioned Mrs. McGuire there unless I

FILED, Case 3:18-av-03411-MAS Document 2-58 Filed 09/14/18 Page 115 of 190 PageID: 3406
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    misheard Mr. Burnejko.  Can I just get clarification?  I am

2    not sure he's saying the defendant and William McGuire and

3    switching them.

4              THE COURT:  Mr. Romanyshyn, do you want to clarify

5    the question.

6              MR. ROMANYSHYN:  I'll back it up.

7         Q    Mr. Burnejko, do you know Melanie McGuire?

8    A    No.

9         Q    Let's back up just a moment.

10             Mr. McGuire came to your open house, is that

11   correct?

12   A    Yes, he did.

13        Q    Did he come by himself?

14   A    No.

15        Q    Who was with him?

16   A    Mrs. McGuire and a gentleman, probably related.

17        Q    Do you see Mrs. McGuire in the courtroom today?

18   A    Yes.

19        Q    And could you indicate for the record where you

20   see Mrs. McGuire?

21   A    Sitting with the defense.

22             MR. ROMANYSHYN: The record indicating at the

23   table, your Honor.

24             THE COURT:  So noted.

25        Q    Approximately how long did the McGuire's remain at

FILED, Clerk of the Appellate Division, July 08, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   your open house?

2   A    At that time between, approximately fifteen to twenty

3   minutes.

4        Q    And what did they do while they were there?

5   A    Well, Bill was asking me questions about the home and

6   Melanie stayed with the realtor downstairs and I heard, I

7   guess conversing downstairs which, of course, you can't

8   really make out, but Melanie stayed downstairs.

9        Q    Did you have occasion to speak to her at all?

10  A    Really just hello, you know, at the introduction and

11  then beyond that probably thank you for coming and that was

12  it.

13       Q    Did she ask you any questions?

14  A    I don't remember.

15       Q    Did Mr. McGuire ask you questions?

16  A    Yes.

17       Q    And was an offer made on your house?

18  A    No, not at that time.

19       Q    Was there a realtor involved in the sale of your

20  home?

21  A    Yes, well, at this time we were under contract with a

22  realtor.

23       Q    Did you have occasion after they left your open

24  house to speak with William McGuire again?

25  A    Yes, but that had come after our contract had closed

FILED, Clerk of the Appellate Division, July 16, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    and during that time I decided to put the home up for sale

2    by owner.

3          Q    Do you recall approximately when that was, sir?

4    A    Yes, around the second week in January of 2004.

5          Q    And do you recall when you next had contact with

6    William McGuire?

7    A    Well, about a week after that I put up signs where the

8    home was and on the road leading into the development where

9    we lived.  I had gotten a phone call about a week after

10   putting up the signs.

11         Q    Did you receive this phone call?

12   A    My wife did and then she had called me and said Mr.

13   William McGuire --

14              MR. TURANO:  Objection, your Honor, as to hearsay.

15              THE COURT:  Sustained.

16         Q    Did there come a time when you learned that

17   William McGuire had attempted to contact you?

18   A    Yes.

19         Q    And in response to that knowledge what did you do,

20   sir?

21   A    I called him, and I left a message.

22         Q    Did he call you back?

23   A    Yes.

24         Q    And do you recall the time frame between your

25   leaving the message and his calling you back?

FILED, Clerk of the Appellate Division, July 27, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

Case 3:18-cv-08461-MAS Document 052 Filed 09/14/18    Page 118 of 190 PageID: 3409

Burnejko-Direct                                        118

1      A      About an hour or two.

2             Q      And without saying directly what was said, sir,

3      what was the result of your conversation with him, did you

4      speak to him at that time when he called you back?

5      A      Yes.

6             Q      Without saying what was said, what was the result

7      of your conversation?

8      A      Well, he wanted to come and negotiate a price.

9             MR. TURANO: Again, your Honor, objection as to

10     hearsay, to the hearsay testimony.

11            THE COURT:  The objection is overruled.  It's not

12     being offered for the truth of the content.

13            Q      Sir, that means you can answer the question.

14     A      Thank you.

15            We then had a conversation which we would have a

16     meeting to negotiate a price for the sale of the home.

17            Q      Did that meeting ultimately take place?

18     A      Yes.

19            Q      And do you recall when that was?

20     A      Approximately two or three days after the phone call.

21            Q      And where did that meeting take place, sir?

22     A      Right in our dining room in the home.

23            Q      And who attended that meeting?

24     A      Mr. McGuire.

25            Q      Were you there, sir?

FILED, Clerk of the Appellate Division, July 18, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

```
 1   A    Yes.

 2        Q    Was your wife there?

 3   A    Yes.

 4        Q    Was Mrs. McGuire there?

 5   A    No, she wasn't.

 6        Q    Did Mr. McGuire come to the meeting entirely by

 7   himself?

 8   A    Yes, he did.

 9        Q    And as a result of this meeting was any agreement

10   reached?

11   A    We had a contract form that I had purchased and we

12   discussed the price being five hundred fifteen thousand

13   dollars at the time, and he was to leave a deposit of a

14   thousand dollars on the home.

15        Q    So, a contract was signed at that time?

16   A    Yes.

17        Q    And after that meeting, sir, did you have occasion

18   to have contact with Mr. McGuire again?

19   A    Yes, on a professional basis.

20        Q    Can you describe what your contacts with him were?

21   A    Well, he would call and then if I didn't receive the

22   call I would return the call to his voice mail and answer

23   his questions about letting a gentleman come in to appraise

24   the home, you know, before the closing, or different things

25   about the home, utilities, just everything that goes into
```

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    purchasing a home.

2         Q    Were there times that you placed calls to him

3    during that time frame?

4    A    To give him answers and just basically to reconfirm

5    things that we've talked about, about the home.

6         Q    How would you characterize your dealings with Mr.

7    McGuire during this process?

8    A    During our process, very respectful, professional.

9         Q    Directing your attention to April 28th of the year

10   2004, sir, do you recall that day?

11   A    Yes, I do.

12        Q    And why do you recall that day?

13   A    That was the closing day.

14        Q    Did you attend the closing, sir?

15   A    No, I did not.

16        Q    Who attended the closing on your behalf?

17   A    My lawyer did.

18        Q    Despite the fact that you didn't attend the

19   closing, did you have occasion to contact Mr. McGuire on

20   that day?

21   A    I tried to call Mr. McGuire after the closing, that was

22   approximately 6:30 p.m. to congratulate them and just to say

23   thank you.  I spoke to Melanie at the time, and at that time

24   in saying congratulations, I hope you will be happy at your

25   new home, I didn't hear anything, there was silence on the

FILED, Clerk of the Appellate Division, July 26, 2018, A-002730-14

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   other end.

2        Q    She didn't respond to your congratulations?

3   A    No.

4        Q    How did you leave that contact?

5   A    I just matter of factually said, I'll catch up with

6   Bill a little later.

7        Q    Did you attempt to contact Mr. McGuire after that?

8   A    Yes, I did.

9        Q    On how many occasions?

10  A    About four times.  On the day of our closing for our

11  home, we had to move everything out and we had a use and

12  occupancy agreement in the contract that would allow us to

13  stay a couple more days past the closing of our original

14  home, and at that point I called in the morning just to let

15  them know logistically that we were making our move and our

16  moving trucks are here now and I am trying to get out by the

17  prescribed time of five p.m. which was the designated time

18  for us to vacate our home.

19       Q    Do you recall the designated time on what day,

20  sir?

21  A    It's approximately two days, not more than three days

22  after the 28th, after that closing.

23       Q    Did Mr. McGuire ever return your calls?

24  A    No, no, he did not.

25       Q    Had Mr. McGuire ever not returned your calls

FILED, Clerk of the Appellate Division, July 26, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    previously?

2    A    No, he always pretty much made it a point within an

3    hour or two or the next day or so to return a phone call.

4         Q    During the course of this process, sir, closing on

5    your home, how many times did you have occasion to leave

6    messages for Mr. McGuire?

7    A    Prior to the closing or after the closing?

8         Q    All total?

9    A    Two or three times a week and then on the day of, we

10   leaving our home, about four times that day.

11        Q    And, sir, how would you characterize his responses

12   to your leaving messages?

13            MR. TACOPINA:  Objection, your Honor, characterize

14   his responses.

15            THE COURT:  Objection sustained.  The question is

16   vague.

17        Q    Did he return your calls when you left him

18   messages?

19   A    Yes.

20        Q    And did he return them promptly, what you would

21   consider to be promptly?

22   A    I would consider with the busy schedules, and so, yeah,

23   promptly.

24            MS. PREZIOSO:  I'm sorry, excuse me, your Honor.

25            MR. ROMANYSHYN:  Can I have a moment?

FILED, Clerk of the Appellate Division, July 30, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1       Q    Sir, let's go back to the time frame before the

2  closing when you would leave messages for Mr. McGuire, did

3  he return them?

4  A    Yes, he did.

5       Q    And did he return them in a manner that you would

6  consider to be prompt?

7            MR. TURANO: Your Honor, objection, asked and

8  answered, the same question three times now.

9            THE COURT:  Objection sustained.

10      Q    Sir, after the closing on April 28th of 2004, did

11  you ever receive a return call from Bill McGuire again?

12  A    No, I did not.

13            MR. ROMANYSHYN:  Judge, I don't have any further

14  questions at this time.

15            THE COURT:  Mr. Turano.

16  CROSS EXAMINATION BY MR. TURANO:

17      Q    Sir, a few moments ago you characterized promptly

18  as sometimes within a few hours and sometimes within a few

19  days, correct?

20  A    I said, yeah, depending on the question, if the

21  question warranted.

22      Q    If the question was how promptly did Mr. McGuire

23  get back to you and you said generally sometimes a few

24  hours, sometimes a few days?

25  A    Sure, yes.

1      Q    You also said given our busy schedule that was
2   essentially promptly, correct?
3   A    Yes.
4      Q    You also indicated you placed a call to Mr.
5   McGuire after the closing because you had not attended the
6   closing?
7   A    Yes.
8      Q    Do you recall specifically the date, I'm sorry,
9   the time of that call?
10  A    Approximately an hour or two after the closing,
11  approximately 6:30 in that range, in the evening.
12     Q    Now, but it's your recollection it was soon after
13  the closing, whatever the closing was?
14  A    Absolutely.
15     Q    And it would have been in response to your
16  attorney obviously letting you know that everything went
17  through, correct?
18  A    Absolutely.
19     Q    And this was certainly a, I guess not unlike many
20  home closings, a closing that had some issues, correct?
21  A    Yes.
22     Q    Financing issues, right?  You have to respond
23  affirmatively, yes or no, just so the Court Reporter can
24  take it down.
25  A    Sure, he had, I guess, made a commitment for five

FILED, Clerk of the Appellate Division, July 08, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    hundred fifteen thousand.  He called me about two weeks

2    before the closing and said he could not afford to pay five

3    hundred fifteen thousand, and I called my lawyer, Mr. Bundy,

4    and Gary suggested a promissory note for seventy-five

5    hundred dollars because he couldn't pay the full amount, and

6    I said, that's fine.

7         Q    But also in terms of during the course of your

8    negotiations with Mr. McGuire, not only was the price an

9    issue, specifically getting the appropriate funding and

10   financing was an issue or at least that's what was explained

11   to you, correct?

12   A    That's what he said close to the closing.

13        Q    Right, within several weeks of the closing?

14   A    Not several weeks, maybe two weeks or so.

15        Q    Now, fair to say, sir, that the sum total of your

16   interaction with Mrs. McGuire was extremely limited,

17   correct?

18   A    That's correct.

19        Q    You talked about an open house that you were

20   present at back in, I guess it was November of 2003?

21   A    Correct.

22        Q    And most of the time that you spoke with anyone at

23   that particular open house at least with respect to the

24   McGuire's, was with Bill, correct?

25   A    Correct.

FILED, Clerk of the Appellate Division, July 03, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

Case 3:18-cv-03412-MAS Document 25-12 Filed 09/14/18 Page 126 of 190 PageID: 3417

1          Q    And I believe you said you didn't even remember

2     having any conversation with Mrs. McGuire at the time of the

3     open house other than maybe hello and good-bye?

4     A    An introduction and then a good-bye, yeah.

5          Q    Again, all of your dealings with respect to the

6     negotiations that you talked about all went through Mr.

7     McGuire, correct?

8     A    Yes, correct.

9               MR. TURANO:  I have nothing further.

10    REDIRECT EXAMINATION BY MR. ROMANYSHYN:

11         Q    Mr. Burnejko, can you describe the home, please?

12    A    The --

13         Q    The one you sold to the McGuire's?

14              MR. TURANO:  Judge, I just object.  It's beyond

15    the scope.

16              THE COURT:  Sustained.

17         Q    You indicated in response to questions that the

18    final purchase price of the house was less than five hundred

19    fifteen thousand dollars, is that correct?

20    A    Correct.

21         Q    And you are aware of what the house appraised for?

22    A    It appraised for, I believe, 500,000.

23         Q    And based on the use and occupancy agreement that

24    you described earlier --

25    A    Yes.

FILED, Clerk of the Appellate Division, July 30, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1      Q    -- did you have any unfinished business with Mr.

2   McGuire after the closing.

3           MR. TURANO:  Also, again, beyond the scope of the

4   cross.

5           THE COURT:  What's the relevance, Mr. Romanyshyn?

6           MR. ROMANYSHYN:  The reason for the follow-up

7   call, your Honor, that he explained earlier on.

8           MR. TURANO:  He explained it.

9           THE COURT:  I am going to sustain the objection.

10           MR. ROMANYSHYN:  No further questions, Judge.

11           THE COURT:  Anything further?

12           MR. TURANO:  No, your Honor.

13           THE COURT:  All right, Mr. Burnejko, thank you

14   very much.  You are excused.

15           THE WITNESS:  Thank you, sir.

16           THE COURT:  Next witness, State.

17           MS. PREZIOSO:  Can we approach?

18           (Following discussion was held at sidebar)

19           MS. PREZIOSO:  Judge, the next witness we have is

20   Detective Joraskie, he's retired, that was the one with the

21   notes that you had this morning.

22           Here's the other issue, we might have to recall

23   Mr. Burnejko.  There is information about where the house is

24   located, things like that, we can put -- he objected,

25   there's more information that we wanted to get.

FILED, Clerk of the Appellate Division, July 09, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1          MR. TACOPINA:  Why didn't you do it on direct?

2          MR. TURANO:  He's here, you had him on direct.

3          MR. TACOPINA: I don't understand, it's stipulated.

4          MS. PREZIOSO:  You will stipulate the address of

5    the house?

6          MR. TACOPINA:  Sure.

7          Your Honor, with this witness we have those

8    documents we have been looking last night, they were hard to

9    read.  We worked them through at lunch.  The only thing I

10   noted from these new documents is a large part of, there's

11   not many documents from this witness, only about six in

12   total.  One is a report of someone interviewing him and then

13   one is his notes.  I don't think the State is going to do

14   this.  Being we are up here I might as well front it, I

15   object to him testifying about the same interview that

16   Detective Pickell testified to yesterday.  It's cumulative.

17   There were two things did he, Pickell did, he was at the

18   client meeting at the Wilentz firm on 6/2.  I object to him

19   being able to testify what she said there.  We got that from

20   Pickell already, and the Woodbridge apartment search as

21   well, I object to him being able to testify to that.  It's

22   cumulative and any, the other concern, aside from being

23   cumulative, if he has a different recollection to Mrs.

24   McGuire's statements it's going to give the impression it's

25   her inconsistencies as opposed to internal inconsistencies

FILED, Clerk of the Appellate Division, July 20, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   with the cops.

2           I know he did other things.  Maybe that's why the

3   State is offering him, but I object.  He'll testify to the

4   cumulative nature of the interview that was already

5   testified to at length by Detective Pickell.

6           MS. PREZIOSO:  Judge, it's the State's position

7   it's not cumulative.  Detective Joraskie's memory, he's a

8   different person, his memory is slightly different from

9   Detective Pickell's and any internal inconsistency Mr.

10  Tacopina is free to argue about.  It doesn't mean the State

11  is precluded from introducing the full picture of both the

12  statement and the search of the house.

13          MR. TACOPINA:  So, they get to do it twice.  Five

14  people, they call five people to say what she said.

15          THE COURT:  Well, we are not talking five people,

16  we are talking two, and I don't think that two is so overly

17  duplicative or repetitious.  If it gets to be that way I can

18  always address it on specific areas, but I am not going to

19  preclude the State from not allowing him to testify at all

20  about the search or the interview.

21          MR. TURANO:  Judge, I don't disagree with that,

22  but in terms of whatever inconsistencies they intend to

23  create through the two witnesses, the State never made an

24  effort to try to suggest or try to show Mr. Pickell's

25  recollection needed refreshing, that he was inaccurate or

FILED, Clerk of the Appellate Division, July 02, 2018, A-002580-14

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    that he wasn't remembering anything, they failed to show him

2    anything.

3              THE COURT:  Who says that's what they want to do

4    now.

5              MR. TURANO: That's what the argument is, our

6    objection is to have the same witness talk about what he

7    remembers about the statement.

8              THE COURT:  There's no prohibition about two

9    officers who are present during an interview being allow to

10   testify.  It happens all the time.

11             MR. TACOPINA:  To the interview.

12             MR. TURANO: Then we would ask different questions

13   of detective.

14             THE COURT:  I can't determine what questions you

15   want to ask but, clearly -- God bless you -- clearly the

16   mere fact that two witnesses testify about the same event is

17   not, by itself, unnecessarily duplicative or repetitious.

18             Now, it may be that in certain areas or if it

19   became five witnesses, that could be, but, there's simply no

20   basis for me to tell the State they can't call a second

21   witness to talk about one interview or one search.

22             MR. TACOPINA:  Just when they are done with the

23   direct can we take the afternoon break?  I am sure the

24   direct is not that long.

25             MS. PREZIOSO:  We may want it before then, but

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925



1    we'll see.

2              THE COURT:  I hope we don't want it before then

3    because it would seem to me, and I am going to say this

4    again, that last witness was talking about a lot of things

5    that were hardly relevant to those few things that obviously

6    were relevant, and I am going to ask the State to refrain

7    from just, you know, going on and on with witnesses or we

8    are going to have to really start moving along.  There

9    haven't been any objections because I assume the defense

10   does not want to create the impression that they are hiding

11   anything but, again, I will say to the State the Court has

12   an obligation to prevent undue consumption of time and to

13   prevent discussions that intend to either confuse or tire

14   the jury.

15             The more direct examination that the Court allows

16   that is not all that relevant, then the Court has to allow

17   cross examination that's not all That relevant, and when we

18   start getting into collateral issues -- so we have an

19   objection here to the detective's testimony, I am going to

20   allow it with the understanding that we are just not going

21   to rehash every single aspect of all the issues that were

22   previously discussed.  There may be some key issues and

23   there may be some things that are in dispute, and I

24   understand that, and that's what I expect is going to be

25   covered.  Thank you.

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1              THE COURT:  Okay, Ms. Prezioso, ready to call your

2    next witness?

3              MS. PREZIOSO:  Yes, your Honor, the State calls

4    Joseph Joraskie.

5    J O S E P H    J O R A S K I E, sworn.

6    DIRECT EXAMINATION BY MS. PREZIOSO:

7         Q     Good afternoon, sir.

8    A    Hello.

9         Q     I'd like to call your attention to May of 2004, in

10   May of 2004, sir, where were you working?

11   A    Woodbridge Township Police Department.

12        Q     And what was your position there?

13   A    Detective Sergeant.

14        Q     And currently, today, are you still employed

15   there?

16   A    No.

17        Q     What's your status?

18   A    I retired from there.

19        Q     Congratulations, sir.  When did you retire?

20   A    August 1st of this year, I'm sorry of last year, '06.

21        Q     Now, going back to when you were working as a

22   detective, what unit were you a part of?

23   A    Criminal investigation section.

24        Q     And within the Woodbridge Police Department are

25   all the detectives centrally located?

FILED, Clerk of the Appellate Division, July 26, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925
Case 3:18-cv-03412-MAS Document 10-58 Filed 09/14/18 Page 133 of 190 PageID: 3424

1    A    We have the criminal investigation section.  We also

2    have detectives in the identification bureau and other

3    detectives in the juvenile division, but they all somewhat

4    come under criminal investigation.

5         Q    And specifically now going back to May of 2004,

6    did there come a time when a law enforcement officer from

7    the State of Virginia contacted you about remains being

8    found in suitcases?

9    A    That's correct.

10        Q    And who was the detective that contacted you, sir?

11   A    Ray Pickell.

12        Q    And at the time that Detective Pickell contacted

13   you, had the remains been identified?

14   A    Not, not a hundred percent.

15        Q    Can you please describe to the jury what the

16   status of those remains are from your understanding after

17   you spoke with Detective Pickell?

18   A    He explained that the three separate suitcases --

19             MR. TACOPINA:  Objection, your Honor.

20             THE COURT: The objection is sustained.

21        Q    Detective, I ask you not to say what anybody else

22   said.

23             At the time he contacted you had, did Detective

24   Pickell have an idea of who the remains were?

25   A    Yes.

FILED, Case 3:18-ap-0341-D-MAS July Document at 025180-14 Filed 09/14/18 Page 134 of 190 PageID: 3425
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1      Q     And what was he calling you for?

2  A     To check on any information I may have in relation to a

3  William McGuire.

4      Q     So, what did you do in response to that request?

5  A     We have an in-house computer system.  I ran that name

6  through our system, being he was a resident of Woodbridge.

7  At that time I learned that there was a temporary

8  restraining order issued against William but had not yet

9  been served to him.  From what I learned it was necessary

10  for me to check if he was reported missing.  He was not

11  reported missing at that time.

12      Q     And do you recall approximately -- withdrawn.

13          Did you respond back to Detective Pickell with

14  that information?

15  A     Yes, I did.

16      Q     And what was your next action that you took in

17  regards to this case that Detective Pickell was calling you

18  about?

19  A     I went to the residence of 2902 Plaza Drive to see if I

20  could either locate Mr. McGuire or his wife.

21      Q     And did you?

22  A     No.

23      Q     Did you leave anything behind, sir?

24  A     On my second visit to the home I left my business card

25  in the front door of 2902 Plaza.

FILED, Clerk of the Appellate Division, July 02, 2018, A-002580-14

Case 3:18-cv-03841-MAS Document 6-58 Filed 09/14/18 Page 135 of 190 PageID: 3426

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1      Q     And did you receive any calls back in response to

2   leaving your business card?

3   A     Yes.  I, upon my next visit back to my office the

4   following day there was a voice mail on my machine in my

5   office from Melanie McGuire.

6      Q     And could you please, you can describe this, sir,

7   can you please describe what the message said to the jury?

8   A     That she located my business card at her residence and

9   that she could only assume I was in contact with her in

10   reference to the temporary restraining order that she had

11   obtained against William.  She provided me with a call-back

12   telephone number which did not work.

13      Q     And what happened next regarding this case?

14   A     Upon the temporary restraining order was a parental

15   address in Barnegat, New Jersey.  Being as I had no way to

16   get her at the phone number she provided I had Barnegat

17   Police respond to the parents address and ask them to have

18   Melanie call me.

19      Q     When you said according to the temporary

20   restraining order, how did you get the temporary restraining

21   order, sir?

22   A     Since Mr. McGuire lived in the jurisdiction of

23   Woodbridge Township it gets sent to our police department to

24   serve upon him.

25      Q     And in response to that did you, what was your

Case 3:18-cv-08341-MAS Document 9-58 Filed 09/14/18 Page 136 of 190 PageID: 3427

1    next contact?

2    A    After notifying Barnegat to make the notification I did

3    receive a call from Melanie McGuire.

4         Q    And did you speak with her, sir?

5    A    Yes.

6         Q    And what was the substance of the conversation,

7    can you describe that to the jury, please?

8    A    She repeated that she was calling, she assumed I had

9    reached out to her, she said in reference to the temporary

10   restraining order that she obtained against her husband.

11   She said, I can't think of any other reason that you would

12   be calling me.  I told her at that time that the restraining

13   order was now about three weeks old and we didn't like them

14   to go that long, did she have any idea where I could locate

15   her husband.

16        She told me she didn't know where he was but

17   suggested I look in either Atlantic City, New Jersey or

18   Virginia Beach.  I inquired as to why she suggested those

19   two locations and she said because he loved to gamble and he

20   always wanted to live in Virginia.

21        She then went on to tell me that if I was

22   successful in locating William to please let her know

23   because she had obtained a divorce attorney and wanted to

24   file him with divorce papers.

25        Q    And you had mentioned, sir, there had been no

FILED, Clerk of the Appellate Division, July 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    missing person's report filed?

2    A    No.

3        Q    Now, what happened, what was your next contact

4    with the investigation, what did you do next?

5    A    I received subsequent calls from Detective Pickell out

6    of Virginia Beach.  I updated him on the phone call from the

7    defendant to me and we discussed our next progress in the

8    case.  At this point it was Detective Pickell's case, so I

9    was doing what he requested of me.

10       Q    And did there come a time -- let me back up for a

11   minute.

12            Detective, you just referred to someone as

13   defendant, and we'll get to it in your testimony, but did

14   there come a time when you met the person you refer to as

15   Melanie McGuire in person?

16   A    Yes.

17       Q    Sir, I'd ask you to look around this courtroom and

18   tell me if you see that person here today?

19   A    Seated in the black jacket, white shirt at the defense

20   table.

21            MR. TACOPINA:  We'll stipulate that he knows

22   Melanie McGuire.

23            THE COURT:  Okay.

24       Q    Now, after you spoke to Detective Pickell about

25   the conversation that you had with the defendant on the

FILED, Clerk of the Appellate Division, July 02, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    phone, what happened next?

2    A    We agreed to have the person that had called Virginia

3    with the possible identification come to his office to make

4    a more detailed attempt to identify Mr. McGuire.

5         Q    And would that have been a person that knew

6    William McGuire was attempting to do that?

7    A    Yes, yes.

8         Q    And without going any further that's a person in

9    Virginia?

10   A    Correct.

11        Q    Did there, did that meeting ever take place, only

12   if you know, sir?

13   A    Yes, it did.

14        Q    And after that meeting took place did you receive

15   a subsequent phone call from Detective Pickell?

16   A    Correct.

17        Q    And was he making a specific request of you?

18   A    At this point he was looking for fingerprints of Mr.

19   McGuire for an absolute confirmation.

20        Q    And did you have any, sir?

21   A    No, I did not.

22        Q    Was Detective Pickell able to locate some?

23   A    Yes.

24        Q    And sometime after that were you notified as to

25   the absolute identification of the deceased that was

1    recovered in the three suitcases?

2    A    Yes, I was.

3         Q    Now, sir, after that, after the confirmation of

4    William McGuire's identification what was the next action or

5    involvement that you had with the investigation?

6    A    To call Barnegat Police Department and ask them to

7    respond to the parent's home in Barnegat to make a death

8    notification.

9         Q    Can you explain to the jurors, please, detective,

10   what is a death notification?

11   A    In New Jersey under Attorney General Guidelines, if a

12   family member is to be advised of the death of someone in

13   their family it cannot be done by telephone, it must be done

14   in person by, preferably, two police officers, that is done

15   because it's unknown how the person receiving the news is

16   going to react medically, not like to, we need to be there

17   for that purpose to advise them.  Also, to assist them at

18   that point with any questions they may have.

19              I could not do that over the phone for that

20   reason, so I had Barnegat Police do that for me.

21        Q    And did you receive confirmation from Barnegat

22   that the notification had taken place?

23   A    Correct.

24        Q    Moving ahead, what was your next action or contact

25   involving this investigation?

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    Detective Pickell and I arranged for him and his

2    partner to respond to New Jersey to begin the investigation

3    up here.

4         Q    And when did Detective Pickell and his partner

5    come up to New Jersey?

6    A    That would be the first of June of '04.

7         Q    And can you describe, did you meet with him on

8    June 1st?

9    A    Yes.

10        Q    And did you, together with Detective Pickell and

11   Detective Pickell's partner, did you do anything that day on

12   June 1st, together?

13   A    Well, obviously at that point we continued discussing

14   the next steps that we wished to take in the investigation

15   which --

16        Q    I am going to ask you not to repeat what anybody

17   else said.  What did you do?

18   A    At that time we responded to the area of 2902 Plaza

19   Drive for the Virginia detectives to get a visual bearing of

20   what the home looked like.  We met with the superintendent

21   of the complex at that time.  He advised us that the

22   apartment was empty.

23             MR. TACOPINA: Objection.

24             THE COURT:  Sir, again, please refrain from

25   repeating hearsay.

FILED, Clerk of the Appellate Division, July 26, 2018, A-002580-14
Case 3:18-cv-03461-MAS Document 258 Filed 09/14/18 Page 141 of 190 PageID: 3432
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

```
 1                  THE WITNESS:  Okay.

 2                  THE COURT:  Just try to answer the question to the

 3      best of your ability.

 4                  Go ahead, Ms. Prezioso.

 5          Q     Detective, did you go with Detective Pickell to

 6      certain interviews in New Jersey?

 7      A     Yes.

 8          Q     And I want to call your attention specifically to

 9      June 2nd, 2004.  Did there come a time when you went to the

10      Wilentz firm, sir?

11      A     Yes.

12          Q     And can you describe to the jury who was there

13      with you?

14      A     Detective Pickell, Detective, I believe it's Shattuck

15      is the pronunciation, the Virginia Beach partner of

16      Pickell.  An attorney named John Hogan and an attorney named

17      Risa Kleiner.

18          Q     Now Risa Kleiner and John Hogan are members of

19      which firm?

20      A     Wilentz.

21          Q     Can you describe to the jury what took place at

22      the Wilentz firm?

23      A     We had an appointment to interview Mrs. McGuire at

24      that, on that day.

25                  Upon our arrival we were placed in a waiting area,
```

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14    Case 3:18-cv-03415-MAS Document 9-58    Filed 09/14/18    Page 142 of 190 PageID: 3433
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    met with a private detective that is employed by Wilentz met

2    with us.  We learned it was going to be a little bit of a

3    delay because Mrs. McGuire, at that point --

4              MR. TACOPINA:  Objection, your Honor.

5              THE COURT:  Sustained.

6         Q    You were told there was going to be a delay, sir?

7    A    Yes.

8         Q    Did the interview eventually happen?

9    A    Yes, it did.

10        Q    And can you describe the interview to the jury,

11   please?

12   A    Mrs. McGuire entered the interview room.  The attorneys

13   were with her and Detective Pickell began the questioning.

14   Detective Shattuck also asked some questions at different

15   points.  I asked questions directly of Mrs. McGuire.

16        Q    And would you describe to the jury, please, what

17   the defendant told you that day.

18   A    As far as my questions or in totality?

19        Q    Totality, what you heard, sir.

20   A    That she repeated the information that there was a

21   fight the evening of the closing of their home that they had

22   just purchased that day, which I believe was April 29th of

23   '04.  After the closing of the house they went back to their

24   condominium, apartment, whatever it was referred to on Plaza

25   Drive and subsequently an argument developed where Bill and

FILED, Clerk of the Appellate Division, July 05, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925



1    her argued about the home they just bought.  She states that

2    Bill took a dryer vent-type of cloth, things you put in the

3    dryer, and he pushed it into her mouth.  She locked herself

4    in a bathroom, I believe she said on the first floor of the

5    home and she could hear Bill showering in a different

6    bathroom.

7              Subsequently, he told her she would have to advise

8    the kids they would never see their father again because of

9    her, and he left.

10        Q    Go ahead, what else did she tell you, sir?

11        A    She was asked by myself if there were any guns in the

12   house, she said no.  I asked if there was, a second

13   follow-up question, I said is there registered-type of guns,

14   more so hunting weapons as opposed to small guns, and she

15   said no to that as well.

16             She was questioned about the Pennsylvania plates

17   being on her husband's vehicle because they lived in New

18   Jersey.  She said that was for insurance purposes, her

19   husband had a problem with points, she said.  Asked about if

20   she had a three piece matching set of suitcases, she said

21   no.  She said they had some mismatched pieces but nothing as

22   far as a matching set.

23        Q    Was there anything else you remember, sir?

24        A    There's other things I am just not recalling at this

25   moment but we talked for some time.



FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1      Q     Is there anything that would refresh your

2   recollection, sir?

3   A     My supplemental investigation report probably would.

4      Q     One moment, please.

5           MR. TURANO:  Can I see it?

6           MS. PREZIOSO:  I am going to get the exhibit.

7           One moment, Judge.

8           Judge, can I supply the exhibit number in a

9   moment?  I have the bate stamp number I've given to defense.

10          THE COURT:  Why don't we take the afternoon recess

11  then and we can get the exhibit number at that time.

12          Ladies and gentlemen, we'll take the afternoon

13  recess and we'll resume at three p.m.

14          ( Jury excused )

15          THE COURT:  Ladies and gentlemen, we'll recess

16  until three p.m.

17          ( Recess )

18          ( Court resumes )

19          THE COURT:  Ready to continue?

20          MS. PREZIOSO:  Yes, sir.

21          THE COURT:  Bring the jury in.

22          ( Whereupon the jury returns to the courtroom and

23  court resumes )

24          THE COURT:  All right, please be seated.

25          Ms. Prezioso, will you continue.

FILED, Clerk of the Appellate Division, July 30, 2018, A-002580-14

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1              MS. PREZIOSO: Yes, Judge the State is handing the

2     witness State's Exhibit 619, a copy of Detective Joraskie's

3     report.

4        Q    Sir, I'd ask you to read through that and when

5     your recollection is refreshed look up.

6     A    Okay.

7        Q    Do you recall anything else about what the

8     defendant told you during the conversation you had with her

9     at the Wilentz firm?

10    A    Yes, in reference to Bill's personal, his habits and

11    whatnot, she stated that he was able to piss people off

12    easily, said he was a jerk, basically that at work he was

13    unliked, that his boss was looking to fire him and, in

14    general, that he wasn't a friendly person or a happy

15    person.

16             The general message she conveyed to me at that --

17             MR. TURANO:  Objection.

18             MR. TACOPINA:  Objection.

19             THE COURT:  I'll sustain the objection.

20       Q    Anything else, sir?

21             MR. TURANO:  Objection, your Honor, to the

22    question, anything else.  It's vague.  I don't know what the

23    District Attorney is referring to.

24             THE COURT:  The question is vague.

25             Please refrain the question.

FILED, Clerk of the Appellate Division, July 2018, A-002580-14

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1        Q     Had she said that her husband had been in contact

2   with her since he left?

3   A     She told me that there was --

4             MR. TURANO: Objection, your Honor.

5             THE COURT:  Excuse me just a minute, sir.

6             MR. TURANO:  Your Honor, just objecting to the

7   leading nature of the questions.

8             THE COURT:  Please refrain from leading the

9   witness.

10       Q     Did she tell you anything else about her husband,

11  sir?

12  A     She did state that there was a, on her answering

13  machine at her house at 2902 Plaza there was a missed call

14  from his cell phone to the house.

15       Q     Now, Detective Joraskie, how long would you say

16  you were speaking to the defendant that day at the Wilentz

17  firm?

18  A     I would say at least a half an hour.

19       Q     And did you have an opportunity to observe her at

20  that time?

21  A     The entire time.

22       Q     Can you describe her demeanor during the course of

23  the interview to the jury?

24  A     She seemed upset and angry, specifically when I would

25  ask questions of her, she seemed to be angry with me for

Joraskie-Direct                                    147

1    asking those questions.  She seemed upset but not

2    emotionally upset.  More of a, didn't want to be in this

3    situation.

4       Q   Now, when you say she was especially angry at you

5    when you asked her certain questions, which questions were

6    you asking her that seemed to evoke a response?

7    A   I asked her to repeat the fight that they had the

8    evening of his departure and at first her divorce attorney

9    said no, then her divorce attorney said okay, and the

10   defendant repeated her version of the fight for me.  I saw a

11   difference in what she had told me on the phone in that she

12   no longer stated that he had pushed her against the wall and

13   struck her in the face.  She left that physical part of it

14   out.

15      Q   And when you say she seemed angry, can you

16   describe what gave you the impression she was angry?

17             MR. TACOPINA:  Judge, objection, asked and

18   answered, same question.

19             THE COURT:  Objection sustained.

20      Q   Detective, did you obtain any records after that

21   interview, did you obtain any records pertaining to either

22   the defendant or Mr. McGuire?

23   A   Yes, I obtained what is called communication data

24   warrants for Mr. McGuire's EZ-Pass and for his Nextel cell

25   phone.

FILED, Clerk of the Appellate Division, July 30, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1     Q    And were you able to determine from a review of

2   the Nextel or of that, whatever type of phone it was, it was

3   a Nextel, sir?

4   A    I believe it was a Nextel.

5     Q    When was the last time a call was placed to that

6   phone?

7   A    Without seeing the records I would not be able to state

8   that.

9     Q    All right, we'll move on.

10        On June 5th of 2004 after the Virginia people were

11  back in Virginia did you do anything regarding this

12  investigation?

13  A    Yes, I did.

14    Q    And what did you do?

15  A    I responded to Brooklyn, New York and met with a

16  Detective Donald of that precinct, I think it was the 86th

17  Precinct, I am not positive in that.  My reason for going

18  there was to pick up black garbage-type bags, plastic bags

19  that he had in his possession.

20    Q    And did you eventually give those bags to someone?

21  A    To the Attorney Generals Office, Division of Criminal

22  Justice investigators.

23    Q    Do you remember which investigator you gave them

24  to?

25  A    No, I don't.

Case 3:18-cv-03414-MAS Document 2-52 Filed 09/14/18 Page 149 of 190 PageID: 3440

1      Q    Now, I'd like to go back.  After you went to the

2  Wilentz firm and you spoke to the defendant did you have an

3  occasion to respond to 2902 Plaza Drive?

4  A    Yes, we did.

5      Q    And at that time the Virginia detectives were

6  still here, correct?

7  A    Correct.

8      Q    I had skipped over that with my last question, and

9  I apologize.

10         Going back to that, do you recall what day you

11  went to the apartment?

12  A    It was the evening after the interview with, at the

13  Wilentz firm, so it would be the 2nd, 2nd of June.

14      Q    The interview was on the 2nd.  Do you want to

15  refresh your recollection, sir, and take a look at what day?

16  A    Sure.

17      Yes, June 2nd.

18      Q    And on June 2nd what, who was at the apartment

19  with you?

20  A    The two Virginia detectives, myself, and from my

21  identification bureau I had Sergeant Richard Bodner,

22  Detective Mark Saldutti and Detective Chris Kapinos.

23      Q    And what were you at the apartment to do?

24  A    To conduct a test of the interior of the structure for

25  blood using a chemical known as luminal.

FILED, Clerk of the Appellate Division, July 03, 2018, A-002580-14 Filed 09/14/18   Page 150 of 190 PageID: 3441
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1      Q    And did that, in fact, occur?

2   A    Yes.

3      Q    And were you, where were you when the luminal

4   testing was going on?

5   A    When the actual test was performed I was at the front

6   door outside on the porch area.

7      Q    And what's the reason for being outside, sir?

8   A    There's an unknown feeling in the police and science

9   world about luminal, it's alleged to cause cancer.  The

10  officers that were inside had protective gear on.  I did

11  not, so I stayed out.

12     Q    Before the luminal test was performed, did you

13  have the opportunity to walk through and look at the

14  apartment?

15  A    Yes.

16     Q    Can you describe for the jury what was the

17  condition of the apartment?

18  A    It was completely vacant.  Immaculately cleaned.  It

19  had hardwood floors on the main living area.  They were

20  extremely clean and shiny.  The walls were all freshly

21  painted white.  There was no furniture in the house at all.

22  There was carpeting in the basement.  Most of the house was

23  hardwood floors, very clean.

24     Q    And I want to direct your attention to the second

25  floor.  Did you have occasion to go into the bathrooms on

FILED, Clerk of the Appellate Division, July 26, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    the second floor?

2    A    Yes.

3         Q    And same question, sir, can you describe the

4    condition of the bathrooms to the jury, please?

5    A    Spotlessly clean.  Everything in this house was clean.

6         Q    I'd like to move forward now, after June 5th.  We

7    talked about on June 5th you had a meeting with Detective

8    Donald in New York City and you picked up some bags from

9    him.  What was your next involvement with the investigation?

10   A    Conducted some more interviews of the adjoining

11   neighbors, excuse me, around 2902 Plaza Drive.

12        Q    And did you learn anything from those interviews,

13   anything significant, sir?

14   A    No.

15        Q    Without repeating what anybody said, did you learn

16   anything significant?

17   A    No.

18        Q    Incidentally, can you describe the complex where

19   2902 Plaza Drive is?

20   A    The majority of the residences there are single-floor

21   apartment style with three in total, but each person owns

22   one floor.  Some of the end caps such as the McGuire

23   residence are all three floors.  They are more like a

24   townhouse.  Not a lot of children in the complex.  It's more

25   working couples that leave for the day.

FILED, Case 3:18-cv-00413-MAS Document 2-18 Filed 09/14/18 Page 152 of 190 PageID: 3443
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1        Q    And are these rental apartments or condos or a

2    combination, if you know, sir?

3    A    The area where the McGuire's lived was rental.

4        Q    Now, after conducting the canvasses, the canvass

5    when you went to interview the neighbors, after that what

6    was your next step in the investigation?

7    A    I reached out to the New Jersey State Police and

8    requested the Casino Control Commission to check for any

9    activity of Mr. McGuire at the casinos in Atlantic City.

10       Q    And did you get a response back from New Jersey

11   State Police on that?

12   A    Yes, I did.

13       Q    And did you learn anything about Mr. McGuire's

14   gambling?

15   A    They didn't have much of anything related to activity

16   as far as from any kind of comp cards or those V.I.P. cards,

17   they didn't have anything of that nature.  As I recall the

18   last comp room that had been provided to him was in October

19   of '03.

20       Q    So, he did gamble, and he did have a comp account,

21   for lack of a better word, with certain casinos?

22   A    Yes.

23       Q    Did you learn whether or not he was in debt?

24   A    I didn't learn of any debt, no.

25       Q    Now, after checking with Atlantic City on the

FILED, Clerk of the Appellate Division, July 30, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    gambling, did you do anything further between the time

2    period of say June of '04 and in the fall of '04, anything

3    between that?

4    A     As far as investigation, no.

5          Q     And, again, the investigation was still in

6    Virginia at that time, sir?

7    A     With Detective Pickell, yes.

8          Q     Now, during that intervening time did you have any

9    significant contacts with either the defendant or anyone in

10   her family or anyone related to the victim?

11   A     None with the defendant.  The victim's sister called me

12   repeatedly at least twice a week.

13         Q     And what's that sister's name sir?

14   A     Cindy Ligosh.

15         Q     Now, what happened in the fall of '04 with the

16   investigation?

17   A     I was notified that Division of Criminal Justice of the

18   Attorney Generals Office was going to begin the

19   investigation and I was requested to come to that facility

20   in Trenton to be part of the beginning of the investigation

21   again.

22         Q     And the first meeting took place in Trenton you

23   said, sir?

24   A     In Trenton.

25         Q     And what, following that meeting what was the next

FILED, Clerk of the Appellate Division, July 30, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, **079925**

1    major activity in the investigation?

2    A    A wire was placed on phones owned by the defendant.

3         Q    And were you involved in any of the investigation

4    surrounding the beginning of the wire, sir?

5    A    I placed some calls to friends of the defendant in an

6    effort to set up interviews with them.

7         Q    And is there a phrase that police have for what

8    you did, sir?

9    A    The reason it was done was to initiate or in the

10   attempt to initiate calls from those people back to the

11   defendant as far as --

12        Q    If you know, sir, did your activity in calling

13   people and setting up interviews, did it stimulate the wire,

14   sir?

15   A    Yes, it did.

16        MS. PREZIOSO:  No further questions, Judge.

17   CROSS EXAMINATION BY MR. TURANO:

18        Q    Not only intended to start, sir, incriminating

19   comments, it's also to start incriminating statements,

20   right?

21   A    Okay, I'm agreeing with you.

22        Q    Sir, you've been retired a number of months.  How

23   long were you with the Woodbridge Police Department?

24   A    Twenty-five years.

25        Q    And, obviously, you prepared, you prepared a

FILED, Clerk of the Appellate Division, July 02, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    statement in this case, correct, or a report, rather?

2    A    A report.

3         Q    Of your investigation, right?

4    A    I wouldn't really call it an investigation.  I call it

5    an assist for Virginia Beach, assist to their investigation.

6         Q    And it was actually marked, I think it was

7    referred to as State's Exhibit 619, the document in front of

8    you, right?

9    A    Yes.

10        Q    Bottom line, officer, is that this is, obviously

11   you prepare reports or statements or whatever you want to

12   call it, because it's something that you are intending to

13   rely on at a later date?

14   A    Correct.

15        Q    Obviously, your recollection two or three years

16   removed isn't going to be that strong as it is at the time,

17   correct?

18   A    Correct.

19        Q    And, obviously, in your experience you are trained

20   to prepare reports and you understand the importance of

21   report writing, correct?

22   A    Yes, sir.

23        Q    Now, you testified previously, or a few moments

24   ago, you were asked a question with respect to or I think

25   what you said is that you asked a question of Mrs. McGuire

FILED, Clerk of the Appellate Division, July 02, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    whether she had any guns, do you recall that?

2    A    Yes, sir.

3         Q    And that, I assume, was a question you asked

4    because you viewed it as an important question, correct?

5    A    Correct.

6         Q    And the response would, likewise, be an important

7    response?

8    A    Yes, sir.

9         Q    And, sir, certainly the response that you gave

10   here in court is not anywhere contained in your report,

11   correct?

12   A    That's correct.

13        Q    So, you didn't think that that particular response

14   was important enough to, important enough to ask, but you

15   didn't think it was important enough to put in your report?

16   A    I disagree it wasn't important enough.  I, obviously,

17   should have.  I believe at the time I was probably feeling

18   that Detective Pickell was going to do that.

19        Q    Well, sir, have you had an opportunity to review

20   Detectives Pickell's report in connection with your

21   testimony here?

22   A    Not recently.

23        Q    You would suspect Mr. Pickell, if it was something

24   articulated or discussed, you would expect he would have

25   that in a report, correct?

FILED, Clerk of the Appellate Division, July 08, 2019, A-002580-14
Case 3:18-cv-08341-MAS Document 2-58 Filed 09/14/18 Page 157 of 190 PageID: 3448
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    Correct.

2         Q    And you would expect him to testify about that if

3    that was something that was discussed on the 2nd, June 2nd

4    of '04?

5    A    Yes, sir.

6         Q    And, again, you would expect it to be in your

7    report?

8    A    Yes.

9         Q    Now, how were you able to, let me back up a

10   second.

11              Your first contact with Detective Pickell from

12   Virginia Beach was to essentially help him or help Virginia

13   Beach get some intel on William McGuire, does that sound

14   right?

15   A    His contact to me was first and it was to see if I had

16   any information on William McGuire, yes, sir.

17        Q    And the information you had certainly was there

18   was an outstanding TRO?

19   A    Yes.

20        Q    Anything else on Mr. McGuire, anything else come

21   back?

22   A    The only other thing that came back, sir, was about a

23   year prior a theft from his motor vehicle, what we call an

24   incident report.  That was the only other paperwork we had.

25        Q    How were you able to get a fingerprint?

FILED, Clerk of the Appellate Division, July 20, 2018, A-002580-14
Case 3:18-ap-03411-MAS Document 258-1 Filed 09/14/18 Page 158 of 190 PageID: 3449
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    I never got the fingerprint.

2         Q    Do you know if anyone did?

3    A    Virginia Beach did.

4         Q    Now, again, when I say about the fingerprint, I am

5    not referring about the fingerprint from Mr. McGuire's

6    remains, I am talking about you matched it up to a

7    fingerprint in a computer, correct?

8    A    Yes.

9         Q    And there was nothing you saw in the course of

10   getting intel that would have indicated why there was a

11   fingerprint in the computer system?

12   A    As I stated, my records check in Woodbridge was with

13   in-house checking not within State or Federal agencies.

14        Q    Now, you participated in, I think you said, a

15   thirty-minute conversation, in fact, can I invite you just

16   to look at your report, you testified it was a thirty

17   minute, thirty-minute conversation at the Wilentz firm,

18   correct?

19   A    I would say approximately thirty minutes.

20        Q    And during that thirty-minute conversation you

21   certainly participated in asking questions, correct?

22   A    Yes, sir.

23        Q    And you say that you sensed some degree of

24   hostility towards some of the questions you were asking,

25   correct?

FILED, Clerk of the Appellate Division, July 26, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    Questions I was asking as well as the overall being

2    there.

3         Q    Specifically, you testified on direct that the

4    hostility seems to be directed at some of the questions you

5    had asked?

6    A    Certainly.

7         Q    You had a conversation, you had, I guess, a number

8    of conversations or at least one conversation prior to June

9    2nd, correct, with Mrs. McGuire?

10   A    Over the phone, yes.

11        Q    And during the course of your conversations is it

12   fair to say that you made some characterizations about what

13   you believed to be -- let me backup.

14             I am talking about on the 2nd, you made some

15   characterizations about, for instance, the offices that the

16   Wilentz firm had, correct?

17   A    I'm not sure.

18        Q    Specifically, you made some references to Mrs.

19   McGuire about paying a great deal of money for the Wilentz

20   law firm.  Do you recall having conversations making those

21   statements?

22   A    Not at all, sir.

23        Q    Now, what about making comments with respect to

24   the degree of abuse that she alleged, basically minimizing

25   the fact she was slapped or pushed up against the wall, did

FILED, Case 3:18-Ap-0341-MAS Document 58-14 July Document at 01:25 PM Filed 09/14/18 Page 160 of 190 PageID: 3451
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    you make any comments about that?

2    A    Absolutely not.  In fact, she failed to mention being

3    slapped in that interview.

4         Q    Now, again, Detective Pickell was the lead

5    investigator, right?

6    A    Correct.

7         Q    And you were aware that Detective Pickell

8    testified, you are aware he testified yesterday, correct?

9    A    You are asking did I hear him testify?

10        Q    Were you aware that he did testify?

11   A    Yes.

12        Q    You were told that, right?

13   A    Yes.

14        Q    So, obviously, his recollection of interviews and

15   events would be certainly viable, would be correct

16   recollections, would you agree with that?

17   A    I would hope so.

18        Q    Certainly he had an interest in gathering

19   information and certainly taking down what Mrs. McGuire said

20   in those interviews, correct?

21   A    I would hope.

22        Q    And were you present during any of the interviews

23   that Mr. Pickell had or Detective Pickell had and other

24   members of law enforcement from Virginia Beach had on the

25   day when they executed, not executed, when they went in and

FILED, Case 3:18-cv-09341-MAS Document 9258-14 Filed 09/14/18 Page 161 of 190 PageID: 3452
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    searched the storage facility, were you aware of any

2    conversations that took place there?

3    A    I am aware of conversations, but I was not present.

4         Q    That's the question, you weren't present?

5    A    No.

6         Q    Now, you understand, obviously, that Mrs. McGuire

7    volunteered, consented to speaking to you on the 2nd,

8    correct, June 2nd, '04?

9    A    Yes.

10        Q    Certainly there were no parameters placed on the

11   conversations, correct?

12   A    Placed by who, sir?

13        Q    You weren't told what you could ask or what you

14   couldn't ask beforehand, right?

15   A    No.

16        Q    She answered your questions?

17   A    Yes.

18        Q    She answered Detective Pickell's questions?

19   A    Um-hum.

20        Q    Likewise, she answered your questions during your

21   phone conversation you had prior to June 2nd, correct?

22   A    Correct.

23        Q    Likewise, you have no reason to believe she didn't

24   answer any of the questions that Detective Pickell put forth

25   to her during the subsequent meetings he had with her?

FILED, Clerk of the Appellate Division, July 09, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    I have no knowledge.

2         THE COURT:  Mr. Turano, you know that this

3    detective couldn't possibly answer that question.

4         MR. TURANO: I'll move on.

5    Q    Now, originally Detective Pickell came up with

6    someone else from Virginia Beach on June 1st, correct?

7    A    Yes.

8    Q    And one of the things you did is you took them to

9    the apartment on Plaza Drive, correct?

10   A    Yes.

11   Q    And you drove around the area just to kind of show

12   them the scenery and where the apartment was?

13   A    Yes.

14   Q    Now, on that date, though, you did not conduct a

15   canvass of the area, did you?

16   A    No.

17   Q    And obviously, given your experience in law

18   enforcement you would expect that that would be a

19   significant thing to do, right, conduct a canvass?

20   A    I believe that at that point the decision was made to

21   hold off until we had a chance to interview Mrs. McGuire and

22   her attorney the following day.

23   Q    And that was on the 2nd, right?

24   A    Yes.

25   Q    And you testified that at some point in time,

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    though, you did make some inquiries around the apartment

2    complex, correct?

3    A     Yes.

4          Q     And when did that occur?

5    A     Throughout the following several days.

6          Q     And I believe the question was, did anything

7    significant result from those inquires and responses, no?

8    A     Correct.

9          Q     Now, obviously, you asked questions about whether

10   if anyone heard any gunshots, correct?

11   A     Correct.

12         Q     You asked questions whether anyone heard any, any

13   other noises, correct?

14   A     What do you mean by other noises, sir?

15         Q     Any commotions or power tools or anything like

16   that, correct?

17   A     I never specifically asked anybody about power tools.

18   In general the questions were, did you hear any

19   disturbances?

20         Q     But, clearly, if there were any gunshots, you

21   asked that question, right?

22   A     Right.

23         Q     And you asked, obviously, if anyone saw any

24   suspicious activity, if they saw something?

25   A     Sure.

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1        Q     People coming and going, right?

2    A    Correct.

3        Q     And the answers were no, right?

4    A    As far as what they felt suspicious, they said no.

5        Q     Obviously they would -- I'll move on.

6             Now, you briefly described the configuration of

7    this apartment complex.  I just want to touch on that a

8    little bit.

9             The particular unit that the McGuire's shared had

10   a number of other units within that structure, correct?

11   A    Their unit was, I guess the best way to explain it

12   would be an end cap, meaning there's multiple glass doors

13   that end up to six apartments, three on the left, three on

14   the right, all one floor apartments.  Then at the end of

15   that structure are two end caps which are all three floors

16   more like a townhouse.

17       Q     One end cap would be one residence which is where

18   the McGuire's live.  The other side of that structure would

19   have another end cap where another family would live?

20   A    Correct.

21       Q     Did you speak to anyone in that other end cap

22   unit?

23   A    Yes.

24       Q     Those are the people who said they had no

25   information, heard nothing suspicious, saw nothing

FILED, Clerk of the Appellate Division, July 02 2018, 02:50-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    suspicious, right?

2    A    Yes.

3         Q    And you said the interior of the two end caps were

4    multiple units, I think you said six?

5    A    No, the two ends caps actually have an adjoining wall,

6    the other apartments are behind them.

7         Q    And how many units would be behind the end caps?

8    A    Well, the first set of glass doors would gain you

9    entrance to six apartments on each side.

10        Q    So, you are talking about, I want to get this

11   straight, you are talking about twelve smaller apartments in

12   this particular unit or six smaller apartments in this unit?

13   A    Six smaller -- technically right behind the McGuire

14   residence would be three smaller apartments, directly behind

15   their back wall is what I am saying, but on the other side

16   of that common way would be another three, so we are talking

17   six.

18        Q    We are talking six units, three of which share a

19   common wall with the McGuire residence, correct?

20   A    Yes.

21        Q    And then you have three other units and then the

22   end cap unit, that's a total of six, seven, eight families

23   located within that one building, right, correct, do you

24   agree with that?

25   A    More, but as far as in proximity of the area of the end

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    cap, eight, yes.

2         Q    And that's not the extent of this complex?

3    A    Oh, no.

4         Q    This complex is comprised of numerous units

5    similar to that, correct?

6    A    About thirty different buildings.

7         Q    So, you have thirty different buildings with

8    varying numbers of apartment in those units, correct?

9    A    Correct.

10        Q    So, within, and those particular, when I say

11   complexes, I'm talking, again, about that structure that's

12   going to house a number of those apartment, you are talking

13   about them in pretty close proximity to one another,

14   correct?

15   A    Separated only by parking areas.

16        Q    Little parking sections, and again you said they

17   are along the lines of thirty of those in this particular

18   complex?

19   A    Correct.

20        Q    So, not that you have a neighbor to your right,

21   neighbor to your left, that's it, you have many, many areas,

22   many people in a small vicinity, is that correct?

23   A    The only exception I would say, sir, is that the

24   McGuire unit was the end of an end building facing into a

25   parking lot of a commercial building.  It didn't face any

FILED, Clerk of the Appellate Division, July 30, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   other apartments.

2        Q    But certainly to the other side there were a great

3   many apartments surrounding it, right?

4   A    Surrounding on the backs and sides, yes.

5        Q    And again we talked about the common wall.

6        Now, certainly, the first time that you met Mrs.

7   McGuire it was on June 2nd, correct?

8   A    In person meeting, yes.

9        Q    In person was June 2nd, 2004, correct?

10  A    Yes.

11       Q    And you described, you were asked questions about

12  her demeanor on that occasion, right?

13  A    Correct.

14       Q    And you indicated that Mrs. McGuire seemed upset?

15  A    Yes.

16       Q    And, obviously, we are talking about within

17  several weeks of being notified, correct, of her husband

18  death?

19  A    Yes.

20       Q    And you said she was angry, right?

21  A    Yes, I did.

22       Q    So, it's true to say she showed emotion?

23  A    If you asked me my opinion, it wasn't --

24       Q    I'm asking if you say being upset and angry is an

25  emotion?

FILED, Case 3:18-ap-03411-MAS Document 058 Filed 09/14/18 Page 168 of 190 PageID: 3459
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   A    Being upset is an emotion.

2        Q    Likewise being angry is an emotion, correct?

3   A    Yes.

4        Q    And one of the things I know you didn't say she

5   was making any faces or anything along those lines, correct?

6   A    Making faces?

7        Q    I'll move on.

8             Now, you testified that you were present when, as

9   far as you know, the first time any law enforcement went

10  into the Woodbridge apartment, correct?

11  A    Yes, sir.

12       Q    And that would have been approximately June 3rd of

13  '04 or June 1st of '04?

14  A    June 2nd.

15       Q    June 2nd, so it was the same.  I'm sorry, it was

16  the day before the interview with Mrs. McGuire, right?

17  A    I believe the interview was the 2nd, if I am not

18  mistaken.

19       Q    Your recollection is it might have been the same

20  day?

21  A    Yes.

22       Q    And you are certainly aware, sir, that at that

23  point in time Mrs. McGuire had vacated the apartment,

24  correct?

25  A    Yes, sir.

1      Q     So, you, yourself don't know what transpired

2    between, obviously, Mrs. McGuire vacating the apartment and

3    the time you actually entered on June 1st, 2nd or 3rd,

4    whatever the date is, correct?

5    A    That would be incorrect.

6      Q     That would be incorrect?

7    A    Yes, sir.

8      Q     By that I mean, sir if you yourself don't know,

9    you indicated that obviously you believed the apartment

10   looked to be very clean, right?

11   A    Very clean.

12     Q     It was being prepared, are you aware of whether it

13   was being prepared for new tenants?

14   A    I have information that it was not, I don't know where

15   I am allowed to go with that.  I do have information that it

16   was not prepared yet.

17     Q     That it was not prepared for other tenants?

18   A    It wasn't touched by anyone yet from the complex, sir.

19     Q     It had not been touched by anyone from the

20   complex?

21   A    That's correct.

22     Q     Now, you were asked questions about some of the

23   things that you did in speaking or assisting with the

24   initial investigation, do you recall some of those questions

25   a moment ago by Ms. Prezioso?

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    Yes.

2        Q    You said you pulled some records, EZ-Pass records

3    and some cell phone records, do you recall that?

4    A    When you say pull them, I obtained communication data

5    warrants and they were sent to respective agencies which

6    then responded.

7        Q    You are right.  You are correct.  I stand

8    corrected.

9            Did you actually review those documents?

10   A    Yes, sir.

11       Q    And you were asked whether you made any inquires

12   regarding casino records, correct?

13   A    Yes, sir.

14       Q    And when you referred to reaching out to the State

15   Police you were referring to reaching out to retain casino

16   records?

17   A    I am not sure what you mean when you say casino

18   records.  I was looking for any activity in Bill's name in

19   any of the casinos in Atlantic City.

20       Q    And it's your testimony here that you didn't see

21   any activities in Bill's name at any of the casinos in

22   Atlantic City?

23   A    I didn't see any records.  I spoke to officers via

24   phone from the State Police who told me they did not find

25   any current activity.

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1          Q     Sir, you are not aware that there were play

2    records in certainly 2003, early 2004 showing activity in

3    the range of a hundred thousand dollars?

4    A     No, I am not aware of that.

5          Q     And are you aware whether there were any loss fees

6    to casinos during that time period, whether or not there

7    were any losses or gains I should say?

8    A     I don't know.

9          Q     Are you aware whether Mr. McGuire made any

10   payments to the casinos during that time period?

11              MS. PREZIOSO:  Your Honor, I am going to object.

12   The witness said there was nothing current.  I think it

13   depends on the definition of current.  Obviously, this is

14   not the witness that is going to be putting before the jury

15   the gambling records.  The State is well aware of it.

16              THE COURT:  Well, Mr. Turano, the witness has

17   already indicated that he was not aware of any such records,

18   so I don't see any point in asking him the same question

19   five different ways.

20         Q     Sir, you also asked questions if you were aware if

21   there were any debts, correct?

22   A     Yes.

23         Q     But the fact of the matter is you didn't do

24   anything to ascertain whether there were any debts, did you?

25   A     I'm not sure what you want me to -- what is it you want

FILED, Clerk of the Appellate Division, July 06, 2018, A-002180-14
Case 3:18-cv-03341-MAS Document 25-8 Filed 09/14/18 Page 172 of 190 PageID: 3463
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    me to do to ascertain the debt?

2        Q    I would like to find out what you did to ascertain

3    whether in were any debts?

4    A    The only thing I learned was he borrowed ten thousand

5    dollars from his partner for the purchase of the house.   I

6    don't know if you want to call that a debt.   That's what I

7    learned.

8        Q    You certainly didn't make any inquires, again,

9    you, yourself, did not personally look at any casino

10   records, correct?

11   A    No, sir.

12       Q    And you, yourself, did not subpoena or request any

13   casino records, correct?

14   A    No.

15       Q    Early on in your contact with Mrs. McGuire you did

16   learn that a temporary restraining order had been filed,

17   correct?

18   A    Yes, sir.

19       Q    In fact, you learned that through court records,

20   correct?

21   A    Woodbridge Township court records, yes, sir.

22       Q    That was one of the first things Detective Pickell

23   asked you to do?

24   A    He didn't specify restraining order, he asked me to

25   find out what I could about William McGuire.

FILED, Clerk of the Appellate Division, July 02, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925
Case 3:18-cv-03841-MAS Document 2-58 Filed 09/14/18 Page 173 of 190 PageID: 3464

1      Q    That was one of the things you were able to

2   ascertain and report back?

3   A    Yes, sir.

4      Q    Now, if I could just go back a second, when you

5   went into the 2902 Plaza Drive, initially you reported

6   obviously not detecting any odors or any smells of bleach,

7   correct?

8   A    No.

9          MR. TURANO:  One second, your Honor.

10      Q    Sir, aside from placing the call to the State

11   Police and having whatever conversations you had with regard

12   to their knowledge of casino records and making some

13   inquiries of neighbors several days in June of 2006, did

14   you, yourself, do anything else in connection with the

15   actual investigation?

16   A    I was with Pickell and his partner at N.J.I.T. in

17   Newark for the interviews of the co-workers and the boss.

18   When I say boss, I mean Mr. McGuire's boss.

19      Q    At what time, point in time did you stop your

20   contact with the Virginia Police, Virginia Beach Police?

21   A    From my department that responded to Atlantic City due

22   to the vehicle being located, they returned to Virginia and

23   that pretty much was the end of my assisting them in the

24   investigation.

25          .he \Joraskie-Redirect\

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1            MR. TURANO: I have nothing further.

2            MS. PREZIOSO: May I, your Honor?

3   REDIRECT EXAMINATION BY MS. PREZIOSO:

4        Q    Detective, were you ever in charge of this

5   investigation?

6   A    No.

7        Q    So, at first you were assisting Detective Pickell,

8   correct?

9   A    Correct.

10        Q    And then it was transferred to the New Jersey

11   State Police Major Crime Unit and the New Jersey Division of

12   Criminal Justice, correct?

13   A    That's correct.

14        Q    And you worked with them in an assisting capacity

15   for a limited purpose, right?

16   A    Correct.

17        Q    Now, the information that you got you passed on to

18   the other law enforcement agencies that you were working

19   with?

20   A    Certainly.

21        Q    And, incidentally, sir, have you kept somewhat in

22   touch with the investigation bringing it to trial now?

23            MR. TACOPINA:  Judge, I object to the relevance

24   of that.

25            THE COURT:  Yes, I, at the very least I think the

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, **079925**

1    question is really vague, Ms. Prezioso, so why don't you

2    rephrase it if you have a relevant question.

3         Q    Well, detective, have you ever heard that Bill

4    McGuire gambled in the range of a hundred thousand dollars

5    before Mr. Turano said it, have you ever heard that?

6              MR. TURANO: I object.

7              THE COURT:  What's the objection?

8              MR. TURANO:  I asked those questions and Ms.

9    Prezioso issued an objection, now she's going to ask the

10   same.

11             MS. PREZIOSO:  The witness said no.  I didn't get

12   a chance to object, so I wanted to clarify it.

13             THE COURT:  I will allow it.

14        Q    Did you ever hear that, detective?

15   A    No.

16             MS. PREZIOSO:  Nothing further.

17             THE COURT:  Anything further?

18   RECROSS EXAMINATION BY MR. TURANO:

19        Q    Officer, you, yourself, didn't look at any casino

20   records, correct?

21   A    No.

22             THE COURT:  All right, detective, thank you very

23   much.  You are excused.

24             Call your next witness.

25             MR. ROMANYSHYN:  State calls James Ryan, your

FILED, Case 3:18-cv-02341-MAS Document 258-14 Filed 09/14/18 Page 176 of 190 PageID: 3467
FILED, Clerk of the Appellate Division, July 26, 2016, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    Honor.

2    J A M E S    R Y A N, sworn.

3    DIRECT EXAMINATION BY MR. ROMANYSHYN:

4         Q    Good afternoon, sir, are you employed?

5    A    Good afternoon, sir.

6         Q    Are you employed?

7    A    Yes, sir.

8         Q    And by whom are you employed?

9    A    The State of New Jersey Division of State Police, have

10   been so for approximately a little over twenty-one years.

11        Q    In what capacity are you employed by the State

12   Police?

13   A    Presently I'm assigned to what's called the ballistics

14   unit.  I have been for a little over ten years.

15        Q    And did you have prior assignments within the New

16   Jersey State Police?

17   A    Yes, sir.

18        Q    And what were those, sir?

19   A    General road-duty trooper.

20        Q    Sir, would you kindly give the jury the benefit of

21   any training that you've had in the area of ballistics?

22        MR. TACOPINA:  Your Honor, if this will speed it

23   along, we'll stipulate to his expertise.  We have no

24   objection to him being qualified as an expert.

25        MR. ROMANYSHYN:  Judge, I'll keep it brief.  I

FILED, Clerk of the Appellate Division, July 06 2018, 10:02:50-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925
Case 3:18-cv-08341-MAS Document 258-1 Filed 09/14/18 Page 177 of 190 PageID: 3468

1    think the jury should have the benefit of some of his

2    specific training.  We'll keep it short.

3         THE COURT:  Yeah, I agree Mr. Tacopina.  I

4    appreciate your willingness to expedite, if you will, but I

5    need to hear also a little bit about the witnesses

6    background.

7         Go ahead.

8    A    In our unit we work a little over two years alongside a

9    qualified firearms tool mark examiner.  In the course of

10   that period I attended numerous certified firearm's factory

11   courses given by the factories, Remmington, Heckler and

12   Coke, Smith and Wesson, Glock, just to name a few.  We

13   actually tour firearms manufacturing plants and observe

14   firearms being made initially from a block of steel, in its

15   finished product going out for shipment.  Through that

16   course I have test fired thousand of firearms to determine

17   their operability.  I microscopically examined thousands of

18   discharged bullets and shells.  I have attended numerous

19   advance courses given by the F.B.I. and the Bureau of

20   Alcohol, Tobacco Firearms and Explosives, those being

21   gunpowder and gunshot residue.  Bullet scene and bullet

22   trajectory industry courses given by bow the F.B.I. and the

23   Henry Lee Institute of Forensic Science.  Advanced certainly

24   serial number restoration course.

25        I'm a member of FTE, the Association of Firearms

FILED, Clerk of the Appellate Division, July 20, 2018, A-002180-14 Case 3:18-cv-03413-MAS Document 9-58 Filed 09/14/18 Page 178 of 190 PageID: 3469
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1   Tool Mark Examiners, this is a world-wide association.  I

2   lectured at The Sea Girt Academy and central laboratory in

3   Hamilton, New Jersey in regard to firearm's tool mark

4   examinations.

5          I have previously testified in both Superior

6   Courts in New Jersey and Federal Courts as an expert in

7   firearm's tool mark identification.

8      Q    Approximately how many types have you testified in

9   court before as an expert, sir?

10  A    Thirty-five to forty types.

11     Q    Have you ever been denied qualification as an

12  expert?

13  A    No, sir.

14         MR. ROMANYSHYN:  Based upon Mr. Ryan's training

15  and experience I ask this Court accept him as an expert in

16  the area of ballistics.

17         THE COURT:  Based on Detective Ryan's testimony, I

18  am satisfied by virtue of his training and experience, again

19  there being no objection, that he is qualified to testify as

20  an expert in this proceeding in the field of ballistics; and

21  again, ladies and gentlemen, you are reminded about my

22  earlier instructions with regard go expert testimony.

23         Mr. Romanyshyn, please continue.

24     Q    Sir, did there come a time when you were asked to

25  examine some bullets in this particular case?

FILED, Clerk of the Appellate Division, July 02, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A     Yes, sir.

2         Q     Can you please describe for the jury how that

3    came about?

4    A     Evidence is brought into our lab Friday, it's received

5    at our front counter.  The submitting agency has a request

6    form with what items he is submitting to the laboratory;

7    along with our information such as the name of the agency,

8    the time of crime, victim suspect, the agencies case

9    number.

10        When this comes into our laboratory system it's

11   assigned a laboratory number.  The laboratory number, it's

12   an internal number.

13        The evidence is actually opened at the counter,

14   it's compared to what's being on the request.  At that

15   particular time it's marked, given a number, an item

16   number.  Depending on what type of evidence it is, it would

17   be resealed.  The submitting agency is given a receipt.  A

18   copy of the receipt goes with the evidence and the evidence

19   is placed in what's called a temporary evidence storage

20   facility that's within our particular unit.

21        At such a time during the course of the year when

22   the case comes up for rotation to be done, the firearm's

23   examiner will retrieve the case information, he'll retrieve

24   the evidence, assign it to himself, via a computer data base

25   which is referred to as LIMS, L I M S.  It's scanned over to

FILED, Clerk of the Appellate Division, July 09, 2018, A-002580-14    Filed 09/14/18   Page 180 of 190 PageID: 3471
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

 1    him.  He'll do an examination.  The examination is usually

 2    peer reviewed by another examiner within our unit.

 3              The evidence is then, once it's completed, it's

 4    repackaged and sealed and placed in another evidence

 5    facility, a completed facility pending the submitting agency

 6    to come and retrieve it.

 7        Q    Sir, I am going to show you items marked State's

 8    25A and B.  I will ask you to take a look at those items and

 9    tell me whether or not you recognize them.

10    A    I am going to have to remove these from here, if that

11    would be okay.

12        Q    If that's necessary, sir?

13    A    Yes, sir.

14        Q    Do you recognize those items, sir?

15    A    Yes, sir, I do.

16        Q    Based on your observations of them can you tell

17    the jury what they are?

18    A    Yes, these are two discharge bullets that I examined in

19    our laboratory.  They were assigned laboratory number

20    N-0112004001890 and they are marked with that number and

21    they are also marked with the item number that it was

22    submitted on the evidence sheet.  Those being number

23    thirteen and number twelve; and what they are, they are

24    referred to as a .38 caliber class discharged lead wad

25    cutter bullet.

FILED, Clerk of the Appellate Division, July 09, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1       Q    Sir, did there come a point in time when you

2  compared those two bullets to one another?

3  A    Yes, sir.

4       Q    And based on that comparison were you able to draw

5  any conclusions about those bullets?

6  A    Yes, sir.

7       Q    What were those conclusions, sir?

8  A    It was my opinion that these two bullets were

9  discharged from the same firearm, in other words they were

10  shot from the same firearm.

11      Q    And what, specifically, was that determination

12  based on?

13  A    The bullets of the general characteristics, they have

14  six lands and six grooves with a right hand twist, but also

15  the fine stria as the bullets had gone through the barrel of

16  the firearm were transferred onto the lead portions of the

17  bullet and the fine stria has enough agreement between the

18  two bullets for me to conclude that they were discharged

19  from the same firearm.

20      Q    Sir, did you make any other comparisons involving

21  these bullets?

22  A    Yes, sir, I did.

23      Q    And what were those comparisons?

24  A    I physically compared these two discharged bullets

25  against some submitted bullets that were not discharged.  In

FILED, Clerk of the Appellate Division, July 30, 2018, A-002180-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    other words, they were manufactured bullets that had not

2    been loaded or fired from a firearm.

3         Q    And what, if any, conclusions were you able to

4    draw from those comparisons?

5    A    The two bullets that were submitted to us, number

6    twelve and thirteen, these two here, were consistent with

7    the submitted bullets which were, twenty of them, I believe,

8    they were consistent in the caliber, being a .38 caliber.

9    They were consistent with the design of this particular

10   bullet, the wad cutter-style bullet, and also with the

11   hollow base and the three grease rings which are alongside

12   the bullet, they were all consistent with that.

13        Q    And to your knowledge, sir, did those other

14   bullets that you compared to these two bullets have anything

15   to do with this case?

16   A    I don't know if it was evidence or not, sir.

17        Q    Yes.

18   A    Yes, obviously it was evidence, I don't know the --

19        Q    Based on your examination of the bullets were you

20   able to develop any conclusion as to a list of manufacturers

21   that the markings would be consistent with from the fired

22   bullets?

23   A    I'm sorry can, you repeat that.

24        Q    When you compared the bullets and you determined

25   there were six lands and grooves, correct?

FILED, Clerk of the Appellate Division, July 06, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    A    Correct.

2         Q    And that there was a right-hand twist?

3    A    That's correct.

4         Q    Is there a manner by which you attempt to

5    ascertain what type of a weapon fired those bullets?

6    A    We can, we can measure the lands and grooves of the

7    bullet, the high spots, the low spots on the bullets, we

8    refer to them as lands and grooves.  We can actually measure

9    the width of these and we can put that into what's called a

10   general rifling characteristic database which is run by the

11   F.B.I., and the F.B.I. have a list of firearms that meet

12   these same dimensions that are put in also with the same

13   number of lands and grooves and direction of twist, and they

14   can give you a printout of the known firearms that they have

15   seen that use those particular dimensions.

16        Q    And do you recall, sir, who some of those

17   manufacturers were?

18   A    There were numerous manufacturers involved with that.

19   Astra being one.  Taurus being one.  If I could refresh

20   myself from any notes, I can name other ones.

21        Q    I don't think that will be necessary, sir.

22             Do you recall, when I asked you the question about

23   the other bullets that you compared these two bullets to,

24   the twenty other bullets you just testified about?

25   A    Yes.

FILED, Clerk of the Appellate Division, July 20, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1      Q    Do you recall from whom you received those

2   bullets?

3      A    I believe it was the Division of Criminal Justice.  I'm

4   not quite sure.

5      Q    Is there anything that would refresh your

6   recollection as to who you received them from?

7      A    Yes, that would be the evidence submittal form.

8      Q    And do you have a copy of that evidence submittal

9   form?

10      A    Yes, I do.

11      Q    Please take a look at it and see if that refreshes

12   your recollection.

13          MR. TACOPINA:  Can I get an exhibit number on

14   that?

15      Q    Sir, does that refresh your recollection as to

16   from where you received those bullets?

17      A    Yes, sir.

18      Q    And where did you receive them, sir?

19      A    From a Detective Sergeant Dalrymple from the New Jersey

20   State Police.

21          MR. ROMANYSHYN:  Thank you, sir.

22          No further questions at this time, Judge.

23   CROSS EXAMINATION BY MR. TACOPINA:

24      Q    Detective, you only received two discharged

25   bullets in this case, correct?

FILED, Clerk of the Appellate Division, July 09, 2018, A-002580-14

Case 3:18-cv-03415-MAS Document 9-52 Filed 09/14/18 Page 185 of 190 PageID: 3476

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

```
1   A    That's correct, sir.

2        Q    So, the other ones you received were unfired or

3   new?

4   A    That is correct.

5        Q    And just for comparison purposes, correct?

6   A    Just for a physical comparison.

7        Q    And did you know who purchased those other

8   bullets?

9   A    Who actually, physically purchased them, I don't know,

10  sir.

11       Q    Was it a law enforcement agency to your knowledge?

12  A    That's my understanding.

13       Q    Done for the purpose of your comparison?

14  A    That's correct.

15       Q    So, the other twenty bullets you received were not

16  recovered as evidence in this case is your understanding?

17  A    Not to my knowledge, sir.

18       Q    So, the only bullets that were relevant to this

19  investigation were the two that you just told the jury

20  about, correct?

21  A    Items number twelve and thirteen.

22       Q    Twelve and thirteen, right.  So, to your

23  knowledge, the only bullets recovered in this case were two

24  bullets, yes?

25  A    Two discharged bullets.
```

FILED, Clerk of the Appellate Division, July 09, 2018, A-002580-14 Filed 09/14/18   Page 186 of 190 PageID: 3477
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

```
 1        Q     Two discharged bullets, yes?

 2   A    Yes.

 3        Q     Not four?

 4   A    What?

 5        Q     Not four?

 6   A    No, sir.

 7             MR. TACOPINA:  Thank you, no further questions.

 8             THE COURT:  Anything further?

 9             MR. ROMANYSHYN:  No, sir.

10             THE COURT:  Detective, thank you very much.  You

11   are excused.

12             THE WITNESS:  Thank you, your Honor.

13             THE COURT:  All right, members of the jury, that

14   concludes the testimony for today, and as I told you earlier

15   tomorrow there are some other proceedings that the Court has

16   to deal with so there will not be any proceedings related to

17   this trial tomorrow.

18             So, we are going to break for a longer weekend,

19   and I am going to ask that you report back to the jury

20   assembly room on Monday morning at nine a.m.

21             It's very important that you remember not to speak

22   to anyone about the case.  Please avoid any type of media

23   coverage about the case.  When you come back here on Monday

24   morning I am probably going to ask you to confirm whether or

25   not you have been exposed to any information about the case
```

FILED, Clerk of the Appellate Division, July 20, 2018, A-002580-14
Case 3:18-cv-08341-MAS   Document 8-2   Filed 09/14/18   Page 187 of 190 PageID: 3478
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

1    over the long weekend.

2            So, drive carefully, I think it's still snowing a

3    little bit, and leave your notes on your chair and have a

4    nice weekend and we'll see you on Monday morning.

5            ( Jury excused )

6            THE COURT:  All right, counsel, with respect to

7    tomorrow, as you may recall the Court had set aside tomorrow

8    to address any oral arguments or questions regarding access

9    by the media of exhibits or transcripts or tapes and it's my

10   understanding that all of those issues have been resolved by

11   order of the Court this morning and that no one wishes to

12   have any further arguments on those points.  Is that

13   correct?

14           MS. PREZIOSO:  That's correct, Judge.

15           MR. TACOPINA:  Yes, your Honor, yes.

16           THE COURT:  Are there any other issues that the

17   Court needs to address with counsel for tomorrow's session,

18   Ms. Prezioso?

19           MS. PREZIOSO:  Your Honor, the only thing that

20   comes to mind, which I know we had discussed it off the

21   record, was just about Doctor Hua, and I was told we can

22   bring him in at this point.  I just wanted to make sure that

23   that was in the record and we are proceeding correctly.

24           THE COURT:  When did you expect to call Doctor

25   Hua?

FILED, Clerk of the Appellate Division, July 08, 2018, A-002580-14

FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

```
 1              MS. PREZIOSO:  Judge, the staff has been working

 2   on the logistics with several witnesses today, and I don't

 3   know exactly what the line-up is, but I would expect he

 4   would be coming probably towards the end of next week.

 5              MR. TACOPINA:  No problem, we'll be ready.

 6              THE COURT:  Okay, Mr. Tacopina has reported that

 7   defense is prepared to address his testimony, so there will

 8   be no objection, obviously, to having him called as a

 9   witness.

10              MS. PREZIOSO:  And, your Honor, has Mr. Tacopina

11   received a report from Doctor Baden?

12              MR. TACOPINA:  She's asking you.

13              THE COURT:  You are asking me?

14              MS. PREZIOSO:  I'm asking just because if the

15   report is received or will be available in short order I

16   would see about delaying Doctor Hua until we can have a

17   copy.

18              THE COURT:  Mr. Tacopina, I think, Tacopina, I'm

19   sorry, the question was more directed towards you.  Do you

20   have any expert report at this point that you are prepared

21   to turn over to the State?

22              MR. TACOPINA:  We don't even have one at this

23   point to turn over, but not yet, your Honor.

24              THE COURT:  All right, anything further counsel?

25              MS. PREZIOSO:  No, Judge.
```

FILED, Clerk of the Appellate Division, July 20, 2018, A-002580-14
FILED, Clerk of the Supreme Court, 22 Aug 2017, 079925

Case 3:18-cv-03411-MAS Document 8-14 Filed 09/14/18 Page 189 of 190 PageID: 3480

189

1    THE COURT:  I am going to ask counsel to remain in

2    the courtroom for a moment so that you can go over with the

3    clerk of the Court the evidence items that have been

4    previously admitted into evidence so that she can be

5    prepared at some point in the future to respond to ask for

6    copies.

7    MR. TACOPINA:  Your Honor, did you get the list

8    for Monday?

9    THE COURT:  My understanding from Ms. Prezioso was

10   that it wasn't ready, and based upon what she just reported

11   to the Court, is that correct?

12   MS. PREZIOSO:  Yes, Judge, I understand you need

13   it before noon tomorrow, and I expect you will have it first

14   thing in the morning.

15   THE COURT:  And you will provide a copy to the

16   defense.

17   MS. PREZIOSO:  Absolutely.

18   THE COURT:  All right, thank you very much.

19   Ladies and gentlemen in the audience, there will

20   be no proceedings regarding this matter tomorrow.  As I

21   indicated we had set aside tomorrow for any hearings or oral

22   arguments on the issue of access by the media to exhibits

23   and things of that sort and we resolved all of those issues

24   without oral argument this morning.

25   So, the trial in this matter will continue on

```
1    Monday at nine a.m.  Thank you very much.

2              ( Recess )

3

4              C E R T I F I C A T I O N

5

6         I, SUSAN J. MARCINCZYK, C.S.R., License Number

7    #XI00867, an Official Court Reporter in and for the State

8    of New Jersey, do hereby certify the foregoing to be

9    prepared in full compliance with the current Transcript

10   Format for Judicial Proceedings and is a true and accurate

11   non-compressed transcript of my stenographic notes taken in

12   the above matter to the best of my knowledge and ability.

13

14   _____

15              Susan J. Marcinczyk, C.S.R.

16              Official Court Reporter

17              Middlesex County Courthouse

18              New Brunswick, New Jersey

19

20

21   Date:  3-1-08

22

23

24

25
```