1       SUPERIOR COURT OF NEW JERSEY
        LAW DIVISION – MIDDLESEX COUNTY
2       INDICTMENT NOS. 05-10-00164-S
                        06-10-00119-S
3       APP. DIV. DOCKET NO.006576-06-T4

4  THE STATE OF NEW JERSEY

5          vs.                    Transcript of
                          Jurors' Interviews in Chambers
6  MELANIE McGUIRE,                P.M. Session

7          Defendant.

8
                    Place:  Middlesex County Courthouse
9                           56 Paterson Street
                            New Brunswick, New Jersey
10
                    Date:  April 20, 2007
11
12  B E F O R E:

        HONORABLE FREDERICK P. DeVESA, J.S.C., and a Jury
13
   TRANSCRIPT ORDERED BY:  Helen C. Godby, Esq.
14                          Office of the Public Defender

15  A P P E A R A N C E S:

16      PATRICIA PREZIOSO, ESQ.
        CHRISTOPHER S. ROMANYSHYN, ESQ.
17      Assistant Attorney Generals
        Attorneys for the State
18
        JOSEPH TACOPINA, ESQ.
19      (Firm of Tacopina & Seigel, Esqs.)
        STEPHEN TURANO, ESQ.
20      (Firm of Stephen Turano, Esq.)
        Attorneys for the Defendant
21
                            Linda Urbaniak
22                          Certified Court Reporter
                            Official Court Reporter
23                          Middlesex County Courthouse
                            56 Paterson Street
24                          New Brunswick, New Jersey

25

FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

I N D E X

| JUROR | PAGE |
|---|---|
| Luann Bachetti (via telephone) | 3 |
| Donald Adams | 26 |
| Patricia Ciaccio | 40 |
| Linda Krzyzanowski | 52 |
| Patricia O'Donnell | 64 |
| Laura Krepps | 71 |
| Teresa Victoriano | 79 |
| Franklin Wright | 83 |
| Victoria Kim | 88 |
| Sandra Eid | 94 |
| Antowon Hinton-Graham | 99 |
| Basil Thomas | 104 |
| Celia Ahern | 108 |

---

Luann Bachetti      3

    (The following took place in Judge DeVesa's chambers with all four trial counsel present.)

    (Juror Luann Bachetti is speaking via telephone.)

    THE COURT:  Hello, Miss Bachetti.

    MS. BACHETTI:  Yes.

    THE COURT:  Hi.  This is Judge DeVesa.  How you doing?

    MS. BACHETTI:  Oh.  Good.  How are you?

    THE COURT:  Okay.  I have with me the attorneys on the McGuire case, all four of them, and I have our court reporter here.  We need to speak to you on the record.  Okay?

    MS. BACHETTI:  That's fine.

    THE COURT:  All right.  The reason I'm calling is that yesterday in the jury room we learned that there was this note to the jurors apparently from you and wanted to talk to you about that.  Okay?

    MS. BACHETTI:  Oh.  My goodness.  Okay.

    THE COURT:  First of all, can you tell me how the note got there.

    MS. BACHETTI:  Oh.  My god.  It's so terrible.  I didn't realize it would be an issue.

    Laura, I don't remember what number she was, she only lives a couple blocks from me, I left it on her car.

Luann Bachetti

```
 1          THE COURT:  All right.  So that's Laura
 2    Krepps, juror number five?
 3          MS. BACHETTI:  Yes.
 4          THE COURT:  So you left it on her car?
 5          MS. BACHETTI:  Right.
 6          THE COURT:  Okay.  I'm -- Miss Bachetti,
 7    don't be uncomfortable.  I'm repeating some of this
 8    because our reporter has to take it down.  Whenever
 9    there's any communication between jurors or with jurors
10    from someone who is not on the jury the Court is
11    required to make an inquiry just to find out what
12    occurred, so this is kind of a routine thing, and don't
13    worry about it --
14          MS. BACHETTI:  Okay.
15          THE COURT:  -- but I am required to do that.
16          MS. BACHETTI:  That's fine.
17          THE COURT:  As you know, we already did that
18    a couple times.
19          MS. BACHETTI:  Yes.
20          THE COURT:  So -- okay.  So again this note
21    was found and the note reflects that you have been, you
22    know, kind of catching up on the case, if you will, by
23    reading -- reading about it on the internet I guess.
24          MS. BACHETTI:  Right.
25          THE COURT:  Is that true?
```

Luann Bachetti                                                    5

```
 1          MS. BACHETTI:  Yes.
 2          THE COURT:  There's a couple -- how long have
 3    you been doing this?
 4          MS. BACHETTI:  Oh.  Not -- that happened on
 5    Tuesday.
 6          THE COURT:  You mean before --
 7          MS. BACHETTI:  When I was excused.
 8          THE COURT.  The day you were excused?
 9          MS. BACHETTI:  The day after.
10          THE COURT.  The day after?
11          MS. BACHETTI:  Right.
12          THE COURT:  And what have you -- what have
13    you heard so far?
14          MS. BACHETTI:  Oh.  My goodness.  You know
15    what?  You could go in any direction, you hear that --
16    that she's guilty or she's not guilty or there's a
17    verdict coming in five minutes.  These are bloggers, so
18    you don't know anything.  I'm sure you're familiar with
19    it.
20          THE COURT:  So you've been -- you know,
21    I mean I guess you've been reviewing a lot of
22    information.  Is that the bottom line?
23          MS. BACHETTI:  Sure.  I mean I can't believe
24    I'm not there now and seeing what's actually going to
25    happen, so I'm watching it on TV and reading the blogs.
```

Luann Bachetti

```
 1        THE COURT:  Have you been watching Court TV?
 2  Is that what you're primarily looking at?
 3        MS. BACHETTI:  Right.
 4        THE COURT:  And the Court TV blogs, that's
 5  what you've been checking?
 6        MS. BACHETTI:  That's right.  Right.
 7        THE COURT:  I do have one -- there's one part
 8  of this note that you wrote that I don't quite
 9  understand.  It said Linda, I'm the one with the hard
10  eyes and I intrigue the bloggers.  What does that mean?
11        MS. BACHETTI:  Because the woman said that --
12  one of the women who's blogging says there's a juror
13  with very hard eyes and it happens to be the juror who
14  was excused, so I knew it was me.
15        THE COURT:  Oh.  Well -- and who is Linda?
16        MS. BACHETTI:  Oh.  Linda's a juror.  Oh.
17  I see.
18        THE COURT:  Well, why would you be telling
19  her that?
20        MS. BACHETTI:  Because at some point someone
21  had said there was a blog that said there was a
22  tough-looking juror, and I don't know who said it or
23  how they knew it, but we were guessing which one it was
24  and it was me.
25        THE COURT:  So you had this discussion with
```

Luann Bachetti                                                    7

```
 1  the jurors?
 2        MS. BACHETTI:  At one point -- not -- not --
 3  obviously not after I had gone on the blog.  At one
 4  point during sitting in the jury room somebody said
 5  there was a juror with hard eyes and we guessed who it
 6  might be.  Everybody said it was probably me and, oh,
 7  it was.
 8        THE COURT:  Have you -- have you -- as a
 9  result of this note or before you wrote the note and
10  after you were excused, did you discuss what you've
11  read on the internet or what you've learned on
12  television?  Have you discussed this with any of the
13  other jurors?
14        MS. BACHETTI:  Oh.  No.  Absolutely not.
15  I've had no -- honestly, that note was written as a --
16  you know, I'm praying for you guys to do the right
17  thing and I wish I was there with you.  How ironic is
18  that?  But by no means would I ever tell them anything
19  I read.  I totally understand.
20        THE COURT:  Have there been any discussions
21  other than this mention of, you know, a juror with hard
22  eyes?  Have there been any other discussions about what
23  was on the internet or on television in your presence?
24        MS. BACHETTI:  Honestly, I can tell you that
25  I believe no one looked at any of that as what was
```

FILED, Case 3:18-cv-09341-MAS Document 2-14 Filed 09/14/18 Page 5 of 61 PageID: 6208
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SCR-10

Luann Bachetti

```
 1    going on.  No.  This is very serious.  I don't believe
 2    there's one person in there who is looking at the
 3    blogs.
 4              THE COURT:  Okay.  Have you?
 5              MS. BACHETTI:  Terrible that I wrote this
 6    note.  I honestly did it as, you know, a -- with the
 7    right intentions.  I didn't think it was --
 8              THE COURT:  Well, you heard me mention many
 9    times that jurors shouldn't be speaking about the case
10    among themselves or with anybody outside and, you know,
11    I have been trying to confirm that all the time, that's
12    what the law requires, so we do have to follow up on
13    this note.
14              MS. BACHETTI:  No.  I understand.  I
15    understand.
16              THE COURT:  Is there -- is there anything
17    else -- have there been any other discussions of this
18    sort with any of the other jurors or any type of
19    mention of what's been on the internet or what's been
20    on television or any comments --
21              MS. BACHETTI:  No.  No.
22              THE COURT:  -- from jurors about what they
23    may have learned from the outside?
24              MS. BACHETTI:  Let me think.
25              THE COURT:  This is really important.
```

Luann Bachetti                                                                9

```
 1              MS. BACHETTI:  No.  I totally understand what
 2    you're saying.  No.  I would have to say no.
 3              THE COURT:  All right.  I'm going to -- Miss
 4    Bachetti, I'm going to ask if any of the attorneys have
 5    any questions at this point in time, so just hold on
 6    one second and one or more of them may have some
 7    questions.
 8              Counsel, does anybody have a question of Miss
 9    Bachetti at this point?
10              MR. TACOPINA:  I have a few, your Honor.
11              THE COURT:  All right.  This is Mr. Tacopina.
12    Miss Bachetti, he says he has a couple questions.
13              MS. BACHETTI:  Hi.
14              MR. TACOPINA:  Hi.  How are you?
15              MS. BACHETTI:  I'm okay.  How are you?
16              MR. TACOPINA:  Okay.  Miss Bachetti, just
17    based on your answers I do have a few questions.
18              What day did you put the card on on whose car
19    you put it on, Laura's?
20              MS. BACHETTI:  It had to be Wednesday
21    morning.
22              MR. TACOPINA:  Wednesday morning.  Okay.  So
23    Wednesday morning you put it on, so that means, as far
24    as you know, she -- she had the card on Wednesday and
25    brought it with her on Wednesday probably?
```

Bachetti

```
 1          MS. BACHETTI:  No.
 2          MR. TACOPINA:  Did she speak to you -- did
 3  she tell you she got the note or anything like that?
 4          MS. BACHETTI:  I had a phone call that said,
 5  you know, thanks for your support and we'll be in touch
 6  when it's over.
 7          MR. TACOPINA:  Who -- who called you, Miss --
 8          MS. BACHETTI:  Laura did.
 9          MR. TACOPINA:  Laura called you to say thanks
10  for your support?
11          MS. BACHETTI:  Right.
12          MR. TACOPINA:  Was it a voice message or did
13  you actually speak with her?
14          MS. BACHETTI:  No.  She called.  I spoke with
15  her, but I was at work and she was a juror, and that
16  was it.
17          MR. TACOPINA:  Oh.  She called you from the
18  court?
19          MS. BACHETTI:  That doesn't mean that.
20  That's an assumption on my part.
21          MR. TACOPINA:  Miss Bachetti, did she tell
22  you she shared that note with everyone and what their
23  responses were?
24          MS. BACHETTI:  She didn't.  She said it was
25  very sweet of you.  Whether that was her opinion, their
```

Luann Bachetti                                          11

```
 1  opinion, I honestly don't know.
 2          MR. TACOPINA:  Okay.  You said in the note
 3  and you said just now that you were praying for you
 4  guys to do the right thing.  Did you --
 5          MS. BACHETTI:  Okay.  Go ahead.
 6          MR. TACOPINA:  Well, what did you mean by
 7  that?  Let's start with that.
 8          MS. BACHETTI:  I'm just a very religious
 9  person.  I prayed for help in making the right
10  decision.  I don't know what the right decision is in
11  this case.  I just prayed that they would have
12  guidance.  I wasn't trying to get a message to her.
13          MR. TACOPINA:  Okay.  Because exactly what
14  you said, you didn't put in this letter what you
15  believed the right thing was, so I'm just wondering.
16          MS. BACHETTI:  No.  We have never discussed
17  that as a group.  No.  This was just I'm praying for
18  guidance for the right decision.
19          MR. TACOPINA:  Okay.  So that's my next
20  question.  You said you never discussed what the right
21  thing would be like informally?
22          MS. BACHETTI:  No.  No.  No.
23          MR. TACOPINA:  And when the judge asked you
24  about Linda, clearly there was some discussions about
25  the blogs during some point in the trial prior to you
```

Luann Bachetti

```
 1  being excused because that's what you reference back,
 2  right?
 3          MS. BACHETTI:  Right.  Somebody had known
 4  that there was a hard-eyed juror.  I don't remember how
 5  that came in.  It just, you know -- I can't tell you.
 6  I honestly don't believe anyone read that.
 7          MR. TACOPINA:  Well -- okay.  But someone
 8  read it and told a juror about it and the juror shared
 9  it with all of you?
10          MS. BACHETTI:  Yeah.  In some way.  I
11  remember there being a discussion.
12          I'm sorry.  The other phone's ringing.
13          MR. TACOPINA:  Okay.
14          MS. BACHETTI:  There was a discussion with
15  one of the jurors had a hard look to her, who do you
16  think they mean, and, lucky me, it was me.
17          MR. TACOPINA:  First of all, I disagree with
18  that if that means anything.
19          MS. BACHETTI:  Well, thank you.
20          It's funny, how you hear everything
21  unfortunately.
22          MR. TACOPINA:  But who -- who was the juror
23  who said that someone said one of us?
24          MS. BACHETTI:  That's where I can't really
25  answer you because, you know, a bunch of conversations
```

Luann Bachetti                                                    13

```
 1  going on at once and then we just heard it, oh, who do
 2  you think has that look, so I don't know where it even
 3  originated.
 4          MR. TACOPINA:  So there was a discussion
 5  though, at least one discussion, in the jury room about
 6  what people were saying about you all on the blogs?
 7          MS. BACHETTI:  Yeah.  But a discussion or
 8  just this one comment, I did not know.  I was amazed,
 9  quite honestly, when I went on the blog to see how much
10  there was.  This was the only comment I ever heard and
11  it wasn't like an ongoing discussion where I don't
12  think anybody was familiar with the many different
13  things said about them.
14          MR. TACOPINA:  Okay.  But my question is,
15  Miss Bachetti, if you can, someone is -- according to
16  what you said, someone from the jury relayed something
17  to all of you or some of you, at least you, about what
18  someone told them was on the blogs, you don't remember
19  which juror that was?
20          MS. BACHETTI:  Right.
21          MR. TACOPINA:  Anything else from the blogs
22  that was discussed at all?
23          MS. BACHETTI:  Honestly, no.
24          MR. TACOPINA:  And why was it Linda you told
25  that to?
```

Luann Bachetti

```
 1            MS. BACHETTI:  Linda said to me I think it's
 2  you.  Nobody wants to see -- Linda is honest, but I
 3  think you have the eyes, so I was just answering back.
 4            You're right.  I feel terrible that I even
 5  wrote this note.
 6            MR. TACOPINA:  Okay.
 7            THE COURT:  Counsel, any other questions of
 8  Miss Bachetti?
 9            MS. PREZIOSO:  Yes.
10            Hi, Miss Bachetti.  Patty Prizioso here.
11            MS. BACHETTI:  Hi.
12            MS. PREZIOSO:  What time did you leave the
13  note on Laura's car?
14            MS. BACHETTI:  It must have been before eight
15  when I was taking my children to school.
16            MS. PREZIOSO:  It was before eight o'clock?
17            MS. BACHETTI:  I would think so.  Yeah.
18            MS. PREZIOSO:  Do you know how much before
19  eight o'clock?
20            MS. BACHETTI:  About five of.  That's what
21  time I leave.
22            MS. PREZIOSO:  Okay.  And Mr. Tacopina just
23  asked you questions about reading the blog or whether
24  somebody commented on the comment from the blog.
25  I just want to know, crystal clear, do you have
```

Luann Bachetti                                                    15

```
 1  information that any of the jurors was reading the
 2  blog?
 3            MS. BACHETTI:  Honestly, no, not at all.
 4            MS. PREZIOSO:  And beyond the comments that
 5  someone had heard that one of the jurors has hard eyes,
 6  beyond that one comment, was anything else related to
 7  the jury that you know of about what was contained in
 8  the blogs?
 9            MS. BACHETTI:  No.
10            MS. PREZIOSO:  Thank you.
11            THE COURT:  All right.  Counsel, anything
12  else?
13            MS. PREZIOSO:  No, your Honor.
14            MR. TACOPINA:  No, your Honor.
15            THE COURT:  All right.  Miss Bachetti, we
16  don't have any more questions at this time.
17            I'm going to please again ask you please do
18  not discuss this case with any of the other jurors.  If
19  they call you just indicate that, you know, since
20  you've been excused you really can't speak to them at
21  this time until the case is over.  And I don't know
22  whether the press will be reaching out for you or other
23  jurors, you know, they may do so in this case, as you
24  can see, there's a lot of interest, but I would really
25  strongly urge that you not discuss this with anybody
```

Luann Bachetti                                                16

1   else because every time there's a discussion I will
2   have to make inquiry about it and it will just cause
3   additional difficulties.  So I would really ask you
4   just not to discuss this with anybody at all.
5         MS. BACHETTI:  I understand.
6         THE COURT:  Okay?  All right.  Thank you very
7   much.
8         MS. BACHETTI:  Okay.
9         THE COURT:  Do you have any questions?
10        MS. BACHETTI:  I have one question just in
11  general.
12        THE COURT:  Yeah.
13        MS. BACHETTI:  I read in the paper things
14  like the woman -- the mother of three from Milltown has
15  been excused.  We're not as anonymous as we think we
16  are, are we?
17        THE COURT:  No, you're not anonymous at all.
18  Your names are part of public records, your
19  addresses -- your addresses are not and your phone
20  numbers are not, but when you are selected you come
21  from a public list of people who have driver's licenses
22  and voter registration and we in the courts are not
23  authorized by law to keep that information
24  confidential, these are public records, so that the
25  people involved in the case have a right to -- you

Luann Bachetti                                                17

1   know, to know your name, but no one is given your
2   address or your phone number.  Now, whether they could
3   find it out or not by making inquiry, obviously, you
4   know, you're not hiding, so it is possible, but it
5   won't come from the Court.
6         MS. BACHETTI:  Okay.
7         THE COURT:  But again if anybody should
8   contact you which is possible in a case like this
9   because they do like to interview jurors, I would
10  really urge that you not speak to them because, you
11  know, if you're misquoted or you're quoted in a way
12  that suggests that there were some problems, then --
13  you know, then we have to go back and interview
14  everybody all over again.
15        MS. BACHETTI:  Oh.  I understand what you're
16  saying.
17        THE COURT:  Okay.
18        MS. BACHETTI:  Okay.  Again I am sorry.
19        THE COURT:  All right.  Thank you very much.
20        MS. BACHETTI:  Take care.
21     (Judge DeVesa and Ms. Bachetti hung up the
22  telephones.)
23        THE COURT:  Well, it's obvious that we have
24  to interview all the jurors.  Does anyone disagree with
25  that?

FILED, Case 3:18-cv-02431-MAS Document 2-9 Filed 09/14/18 Page 10 of 61 PageID: 6213
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

```
 1                 MR. TACOPINA:  No.
 2                 MR. TURANO:  No.
 3                 THE COURT:  So I think I'm going to go out
 4    there now and tell all of these people that again
 5    because of the media coverage in this case I have
 6    consulted with counsel and we're going to interview the
 7    jurors because my recollection is that the jury had
 8    indicated that they wanted to leave at 3:30 today
 9    because somebody has an appointment and they're going
10    to come back Monday.  That's what they had said.
11                 THE CLERK:  That was yesterday.  Today they
12    didn't give a time yet.
13                 THE COURT:  Yesterday they did.
14                 THE CLERK:  They left at 3:30 yesterday.
15                 THE COURT:  Oh.
16                 THE CLERK:  Today they haven't given a time.
17                 THE COURT:  But they did indicate they wanted
18    to come back Monday.
19                 THE CLERK:  No.  We just told them that if
20    they didn't finish Monday would be the date to come
21    back.
22                 THE COURT:  In any event, by the time we
23    interview them it will be quarter to four, so I
24    don't -- I'd rather not have them speculating out there
25    on Court TV as to what we're doing in here.  I think
```

```
 1    I'm better off just indicating that as a result of, you
 2    know, the extensive media coverage I'm going to
 3    interview them again.  Anybody have a better idea?
 4                 MR. TACOPINA:  No, your Honor.
 5                 MR. TURANO:  No.  No.
 6                 MR. TACOPINA:  We're okay.  You're right.
 7    I agree.
 8                 THE COURT:  And -- well, all right.  What
 9    about this issue of the State's application for a gag
10    order?  Is there going to be an application?  Do you
11    want to research it further?  How do you want to handle
12    it?
13                 MS. PREZIOSO:  Judge, I want to research it.
14    I have people trying to get the clip right now and
15    I want to read the relevant case law.
16                 THE COURT:  All right.  I'm going to ask just
17    as a courtesy at this point that none of you discuss
18    this matter any further with any members of the media.
19    I'm not going to tell Court TV what to do and what not
20    to do without some stronger legal authority because
21    I don't know if I have the authority, but I am going to
22    urge counsel not to have any discussions with the media
23    and I'm going to urge counsel to provide that
24    information to the defendant as well at least until --
25    until we resolve whether there are grounds for this
```

FILED, Clerk of the Appellate Division, July 18, 2019, A-000160-14
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

Gag order

```
 1   Court to issue a gag order.
 2            MR. TACOPINA:  Your Honor, that's absolutely
 3   no problem.  We will not be speaking to anyone on Court
 4   TV.
 5            As I said earlier, we're on the record now,
 6   the only thing we did, obviously it was our
 7   understanding there was no gag order, the only thing
 8   Mr. Turano and I did were short interviews with Court
 9   TV, but said nothing that would argue to that jury in
10   summations, and, quite frankly, I thought I was less
11   vigorous because I also highly complimented the
12   prosecutor and their presentation of the case and so on
13   and so forth.
14            But, anyway, I absolutely agree.  There will
15   be no other issues.
16            As far as Miss McGuire is concerned, I was
17   there for that sort of conversation, it was hi, nice to
18   meet you, you know, this must be tough, yeah, it's
19   really tough, and then Miss Catorus went on and said
20   about how cheerful she is, and yet she was pretty
21   depressed.  I heard Miss Catorus on the TV this
22   morning.  But, in any event, I'll speak to her, make
23   sure other than pleasantries nothing is exchanged and
24   certainly will not -- you know, we will refrain from
25   speaking to anyone in the media, print or television
```

Gag order                                                          21

```
 1   regarding things that we've even told the jury, but,
 2   just to make it easier, that will be our tact and move
 3   forward.
 4            Judge, last thing, and part of our initial
 5   willingness to go to this Court TV and interviews, and
 6   again I did three totally, you know, a few minutes
 7   each, Mr. Turano had one or two, same thing, was --
 8   they were telling us that various prosecution witnesses
 9   were going on.  Mr. Thomas went on again, Mr. Ruiz,
10   there was another friend of the McGuire family.  I'm
11   not saying that's improper.  I certainly agree
12   wholeheartedly the prosecutors didn't condone or
13   something like that.  Maybe if we could ask them to
14   reach out to their witnesses and refrain because there
15   were some sort of unanswered questions being thrown out
16   there, maybe that would help as well.
17            THE COURT:  Well, I don't know how practical
18   that is.
19            MR. TACOPINA:  Yeah.
20            THE COURT:  There's 60 something witnesses.
21            MR. TACOPINA:  Perhaps it's not.  You're
22   right.  You're right.
23            THE COURT:  I don't know if that's possible.
24   But I will say this to you, in your research you'll
25   find that, you know, one of the areas of flexibility
```

Gag order                                           22

1   about defense making extra judicial statements, the
2   Court has to consider whether some of those are
3   necessary to balance the press, and obviously in this
4   case there have been press releases by the Attorney
5   General, there were hearings in court where a lot of,
6   you know, incriminating things were said about the
7   defendant, and then we do have apparently -- I know
8   Mr. Ruiz was on television, and I'm not sure I heard
9   Miss Thomas was on television, but, you know, this is
10  a problem on both ends, so if there is a way for the
11  State to get some of these witnesses not to speak to
12  the press it would probably be better, at least during
13  deliberations, you know.  Once this case is over one
14  way or the other there's not going to be any control
15  over it.  This is going to mushroom to a point where
16  everybody is going to be interviewed.  But, anyway, if
17  we could minimize it we're better off until
18  deliberations are over.
19        Okay.  I will come out there in a moment.
20  I may -- I may have to sentence somebody right now,
21  somebody has flown in from Italy to be sentenced, and
22  I thought I would have 15 minutes or a half hour to
23  sentence him.
24        (The hearing resumed in the courtroom and is out
25  of the presence of the jury.)

Scheduling                                          23

1         THE COURT:  All right.  Good afternoon,
2   counsel.
3         We're on the record again in the matter of
4   State v. Melanie McGuire.
5         I just wanted to state that as a result of
6   extensive media coverage that has been brought to the
7   Court's attention and a great number of internet
8   communications, some of which have, of course,
9   addressed opinions as to guilt or innocence of the
10  defendant, and because we're approaching another
11  weekend, the Court finds it necessary to again
12  interview the jurors in this matter on an individual
13  basis in chambers in order to insure that there has
14  been no improper information conveyed to any of the
15  jurors and to also remind them of the need to avoid any
16  such information over the weekend.  Given the hour I'm
17  confident that it's going to take approximately two
18  hours, that's what it took the last time, so I don't
19  believe that there will be any further court session
20  today unless there is any need to go back on the record
21  after discussing this matter with the individual
22  jurors.  So for those of you are here as observers the
23  Court will begin to with counsel interview each of the
24  jurors as I have done once before pursuant to our law
25  and I do not believe that we would be finished in time

FILED, Case 3:18-cv-02411-MAS Document 002 Filed 09/14/18 Page 13 of 61 PageID: 6216
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

Scheduling                                                    24

```
 1   for there to be any other court action, if you will,
 2   so I tell you that now so that you're not just waiting
 3   here wondering what's going on, and that that will be
 4   the schedule for today.
 5          I'm sorry if that has inconvenienced any of
 6   you, but as a result of these developments and reports
 7   that I've received it's necessary for me to do this.
 8          Counsel, does anyone have an objection to the
 9   Court adopting this approach?
10          MR. TACOPINA:  No, your Honor.
11          MS. PREZIOSO:  Your Honor, I would just ask
12   that as with all scheduling that it be left to the jury
13   and leave open the possibility if they did want to
14   deliberate later that they be permitted to do that.
15          MR. TACOPINA:  Sure.
16          THE COURT:  Okay.  I always do that anyway,
17   but I'm anticipating given the hour they won't want to,
18   but obviously if the jury wishes to remain here I will
19   make accommodations for them.
20          MS. PREZIOSO:  Thank you, sir.
21          THE COURT:  All right.  Anything further,
22   counsel?
23          MR. TACOPINA:  No, Judge.
24          THE COURT:  All right.  If you give me
25   a minute we'll arrange for the order of the interviews
```

Scheduling                                                    25

```
 1   and then we'll bring you in chambers.
 2          Thank you very much.
 3       (A recess was taken.)
 4       (The hearing resumed in Judge DeVesa's chambers.)
 5          THE COURT:  All right.  We're going to go in
 6   order.  I'm going to leave the alternates out unless
 7   there's a need.
 8          MS. PREZIOSO:  Great.
 9          THE COURT:  If you get 12 people say they
10   didn't talk about anything in there then, you know, I'm
11   inclined not to talk to the alternates because they
12   won't be deliberating, but if it turns out there's any
13   question or anything that needs further inquiry then
14   we'll -- we'll interview them all.
15          MS. PREZIOSO:  Okay.
16          MR. TACOPINA:  You have 12 people say that,
17   your Honor, we got a problem, so --
18          THE COURT:  Huh?
19          MR. TACOPINA:  You got 12 people say that, we
20   got a problem.
21          THE COURT:  Say what?
22          MR. TACOPINA:  That they didn't talk about
23   anything.
24          THE COURT:  Well, anything about the case.
25   They are allowed to speak.
```

FILED, Case 3:18-cv-02431-MAS Document 2-15Jul18 Filed 09/14/18 Page 14 of 61 PageID: 6217
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SPA-13

Donald Adams

```
 1          MR. TACOPINA:  Well, they're not allowed to
 2  have people tell them what was on a blog, your Honor,
 3  so --
 4          THE COURT:  Well, I don't know about that
 5  either.  Depends on what they tell them.
 6          THE CLERK:  Number one.
 7     (Juror Donald Adams entered chambers.)
 8          THE COURT:  Hi, Mr. Adams.  How are you?
 9          MR. ADAMS:  All right.
10          THE COURT:  We're back again on our personal
11  interviews mode.
12          MR. ADAMS:  Fire away.
13          THE COURT:  You've been here before --
14          MR. ADAMS:  Yeah.
15          THE COURT:  -- so you know the drill.
16          MR. ADAMS:  I'm an old hat at this.
17          THE COURT:  This time the reason that we're
18  interviewing members of the jury is that when our clerk
19  gathered up the evidence on -- today's Friday? --
20  I guess it was last night, last night, she found this
21  note to jurors which obviously, you know, concerned her
22  because no one should be writing a note to the jurors.
23          MR. ADAMS:  Note to jurors?
24          THE COURT:  Yes.
25          MR. ADAMS:  Okay.
```

Donald Adams                                              27

```
 1          THE COURT:  And I don't -- maybe you haven't
 2  seen it, but, in any event --
 3          MR. ADAMS:  Oh.  That.  That's from Luann.
 4  That was a card.
 5          THE COURT:  Yes.
 6          MR. ADAMS:  She left it on the -- on Laura's
 7  windshield.
 8          THE COURT:  Yes.
 9          MR. ADAMS:  Yes.  She told us about it, that
10  it was nice of her.
11          THE COURT:  Uh-huh.  So, anyway, you know, as
12  I explained here earlier, whenever there's any
13  communication to the jury from someone not on the jury
14  I have to conduct these interviews.  And she has been
15  excused --
16          MR. ADAMS:  Okay.
17          THE COURT:  -- so she's not on the jury any
18  more.
19          MR. ADAMS:  Didn't even think about that.
20  Yeah.
21          THE COURT:  Well, it's kind of an unusual
22  situation, but, in any event, what can you tell me
23  about the note?
24          MR. ADAMS:  All -- all I know about it is
25  that when Laura came in, whatever morning that was, you
```

FILED, Case 3:18-cv-02441-MAS Document 1-8 Filed 09/14/18 Page 15 of 61 PageID: 6218
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

```
 1  know, she says I found this note on my windshield of my
 2  car turned upside down.  First thing came to my head
 3  was well, okay, we got a note on there says to the
 4  jurors, I wouldn't even touch the damn thing.  Excuse
 5  me.  You know, I would have had gloves on or something.
 6  You just don't know.  And then, you know, we opened it
 7  up and everybody looked at it and, you know, all the
 8  other jurors looked at it, said that was really nice of
 9  her, glad that she got out of this, but, you know,
10  didn't make too much of it though.  But, you know, that
11  was -- I didn't even think about that to tell you the
12  truth, you know.
13          THE COURT:  Well, there's one part of the
14  note that makes reference to her reading a blog and
15  determining that she is the juror with the hard eyes
16  and it -- you know, when you read it suggests that
17  at least to the person that she was writing to or
18  mentioning that to that there had already been some
19  discussion about a blog saying one of the jurors had
20  hard eyes.
21          MR. ADAMS:  Yeah.  I do remember.
22          THE COURT:  Do you remember anything about
23  that?
24          MR. ADAMS:  I remember -- I can't honestly
25  say who or what, but I just remember somebody saying
```

```
 1  that -- you know, that it was somebody had mentioned
 2  it, about being a blog or whatever, not that a juror
 3  got into it, but somebody mentioned it to a juror,
 4  I don't know which one it is, and I -- I really can't
 5  remember who it was, but --
 6          THE COURT:  Was anything else said at that
 7  time, any kind of comment beyond that, that you can
 8  remember?
 9          MR. ADAMS:  Not -- no, not -- not pertaining
10  to the case.  I really think -- I think it was more of
11  some of the jurors are interested into like how the
12  media is looking at the jurors, you know, that type of
13  thing.  I don't think it had anything to do with
14  influence of anybody.  Honestly, I don't -- I -- the
15  sense -- I can't speak for anybody else --
16          THE COURT:  Right.
17          MR. ADAMS:  -- on the jury, but the sense
18  I get from everybody is they're being pretty honest
19  about not getting information from the outside.  I
20  think some people have been trying to give maybe -- or
21  give information on things that aren't -- or they
22  didn't feel it's relative to the case, if that makes
23  sense.
24          THE COURT:  Well, I mean, if you can
25  remember, have there been any discussions about
```

FILED, Case 3:18-cv-02413-MAS Document 102-10 Filed 09/14/18 Page 16 of 61 PageID: 6219
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

1  information that has been posted on the internet or by
2  the media about the case?
3           MR. ADAMS:  No, not -- not that.  Like I
4  said, the only thing that I know of is when somebody
5  mentioned, and I don't know who, about this hard eyes
6  thing, and, you know, I think it was natural for
7  everybody to wonder, wonder who the heck that is, you
8  know, but as far as to the case itself, I don't
9  remember any information, you know.
10          THE COURT:  Okay.  Have -- now let's look --
11 address you as an individual.  Have you heard or read
12 or have been told about anything about this case other
13 than what you have heard in the courtroom?
14          MR. ADAMS:  No.
15          THE COURT:  Okay.  Have you had any
16 discussions with anybody that would have caused you to
17 form an opinion already or, you know, would make it
18 difficult for you to continue to be a fair and
19 impartial juror?
20          MR. ADAMS:  No.
21          THE COURT:  Do you -- have you witnessed
22 anything in the jury room that would raise any
23 questions in your mind -- I mean you are the foreperson
24 of the jury, anything in the jury room that would raise
25 any questions in your mind about any other juror acting

1  improperly or saying anything improper?
2           MR. ADAMS:  Not improper.  I think -- how
3  should I put this?  Some emotions have been running
4  higher I think just because some people don't really
5  know how to express themselves in a professional
6  manner.
7           THE COURT:  Well, look, I don't want to
8  intrude into the confidentiality of deliberations.
9  Okay?  What I'm talking about is whether anybody has
10 mentioned anything outside, you know, the evidence in
11 the case.  I mean you guys are free to express your
12 opinions and argue about the evidence and your opinions
13 are -- that's what's expected of you.  Okay?  What I'm
14 talking about is anybody, you know -- you know, said to
15 you well, you know, on ABC they already said this, that
16 or the other thing or on Court TV.
17          MR. ADAMS:  No.
18          THE COURT:  When I talk about juror
19 misconduct I mean trying to influence other jurors by
20 raising information that's not part of this trial --
21          MR. ADAMS:  Right.
22          THE COURT:  -- that they heard from an
23 outside source --
24          MR. ADAMS:  No.  There's --
25          THE COURT:  -- or somebody told them or

FILED, Case 3:18-cv-02441-MAS Document 02-84 Filed 09/14/18 Page 17 of 61 PageID: 6220
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

Donald Adams                                                    32

1  something like that.
2       MR. ADAMS:  I -- unless I was in the bathroom
3  and which, you know, that doesn't happen that often,
4  lot more women in there, no, there hasn't -- I haven't
5  heard anybody say anything to that effect of, you know,
6  I heard this or I heard that.  You know, I really think
7  that some are just worried about how they're viewed and
8  worried about what information's going out to the
9  public about -- about the jurors themselves and -- and
10  that's --
11       THE COURT:  Maybe I'll address that with
12  everybody as a group.  But, you know, I have explained
13  earlier that -- and, if you remember, during jury
14  selection we did talk about the fact that there would
15  be people observing this case and there would be some
16  media coverage and that obviously is not the kind of
17  thing that should influence anybody and, you know,
18  after the case is concluded I will be giving the jury
19  some further instructions about what they might expect
20  in terms of whether any members of the press are going
21  to try to contact them or not, but maybe I'll address
22  that a little bit when we go back outside.  But do you
23  believe that there's anyone that has become so
24  influenced by this media coverage that they would not
25  be able to follow the law as I've explained it?

Donald Adams                                                    33

1       MR. ADAMS:  No.  Actually I think that
2  they're taking this very, very seriously and it's the
3  point where they -- I think some -- I get a sense from
4  some of the other jurors that they really want to go
5  over every letter of the law.  I think that's why they
6  want you to explain things over.  Some of us can grasp
7  these concepts quite easily and others are having
8  problems with it.  But I think they take it very
9  seriously and, you know, it's -- it's, you know --
10       THE COURT:  Okay.
11       MR. ADAMS:  -- they just -- they don't want
12  to make a mistake and nobody wants to be railroaded
13  into making a decision and that's why it's taking as
14  much time as it is.
15       THE COURT:  As the foreperson I can assure
16  you if anybody has any questions on the law or
17  questions about the case people should feel free to
18  ask.  I go over these inquiries with counsel and we do
19  our best to get back to you as quickly as possible --
20       MR. ADAMS:  Right.
21       THE COURT:  -- with the best answers.  Some
22  of these issues are complicated, as you can tell, but
23  we get -- we try to get back to you as clearly as we
24  can in short order.
25       MR. ADAMS:  All right.

Donald Adams                                    34

```
 1          THE COURT:  Counsel, do any of you have any
 2  questions of Mr. Adams?
 3          MR. TACOPINA:  No, your Honor.
 4          MS. PREZIOSO:  No, Judge.
 5          MR. ADAMS:  Okay.
 6          THE COURT:  Mr. Adams, again please don't
 7  discuss this conversation with any of the others.
 8          MR. ADAMS:  I remember the drill.
 9          THE COURT:  Okay.
10     (Mr. Adams left chambers.)
11          MR. TURANO:  Judge, I'm sorry if I missed
12  this, they were told not to stop -- they were told to
13  stop deliberating obviously, right?
14          THE COURT:  Well, they're not together any
15  more.  Yes.
16          MR. TURANO:  Well, one at a time is leaving,
17  right?
18          THE COURT:  No.  Six are up here and six are
19  downstairs.  And, you know, I repeatedly told them that
20  they must be altogether as a jury of 12.
21          MR. TURANO:  One at a time.
22          THE COURT:  No.  The room's too small even.
23          THE CLERK:  Ready for two?
24          MR. TACOPINA:  No.
25          THE COURT:  Just a minute.
```

Suggestions                                     35

```
 1          MR. TACOPINA:  I don't want to ask these
 2  questions, look like we're concerned one way or
 3  another, but this whole thing about when Linda comes in
 4  here who is juror number three I think we got to be a
 5  little more focused why it was directed to her, what
 6  did she say.  That's one thing.
 7          THE COURT:  Yeah.
 8          MR. TACOPINA:  The other thing is this thing
 9  about wisdom to do the right thing or do what is right,
10  could you just ask them if they've discussed prior to
11  this.
12          THE COURT:  But, see, here's the problem with
13  that.  You know, I believe that the Court has a
14  responsibility to inquire into possible jury
15  misconduct, but I don't believe that it's appropriate
16  for me to start asking people about their
17  deliberations.
18          MR. TACOPINA:  No.  No.
19          THE COURT:  Well, but, you see, when you
20  start asking people what do you mean by doing the right
21  thing there is absolutely nothing wrong with any of
22  these jurors now having formed an opinion as to the
23  guilt or innocence of Melanie McGuire.
24          MR. TACOPINA:  Right.
25          THE COURT:  I don't want to really get into
```

FILED, Case 3:18-cv-02431-MAS Document 102-18 Filed 09/14/18 Page 19 of 61 PageID: 6222
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

1  that with them unless, you know, I'm -- look, if
2  there's better ways to word these questions I invite
3  you to do so, but I cut him off because he
4  misunderstood -- I thought that he began to
5  misunderstand and thought that I was asking him about
6  the deliberations and how they're going and I don't
7  think that's appropriate and I don't think that people
8  should be asked what something means because then that
9  suggests like, you know, they might express their
10 opinion --
11        MR. TACOPINA:  Yeah.
12        THE COURT:  -- but I can ask them whether
13 they've had discussions, you know, about these things
14 before or, you know, about the letter or whatever, but,
15 you know, and if you got better questions I'll ask
16 them, too.
17        MR. TACOPINA:  Yeah.  I wouldn't expect you
18 to ask them what they think the right thing is in front
19 of us, but what I would ask based upon what she wrote
20 in the letter, one line she said I hope you have the
21 wisdom to do what is right, did you have discussions
22 prior to deliberation with Miss Bachetti or anyone else
23 about what anyone thought was right, was the right
24 thing, prior to deliberations, I'm not asking them what
25 they're thinking now, prior to deliberations, because

1  again that was my concern, reading this jumped out at
2  me, I hope you have the wisdom to do what is right,
3  praying to do the right thing.  That indicates to me,
4  without Miss Bachetti indicating what the right thing
5  is in this letter, that perhaps they had some
6  discussions about the comment they need to do what is
7  right.  That's all I'm asking.  Maybe if you could word
8  it in a way that predates deliberations.
9         THE COURT:  I'll try.  I'll try, but --
10        MS. PREZIOSO:  Could I suggest --
11        THE COURT:  Miss Prezioso?
12        MS. PREZIOSO:  Yes, sir.  I'm sorry.
13 I didn't mean to interrupt you.
14        THE COURT:  That's all right.  I was almost
15 done.
16        MS. PREZIOSO:  Could I suggest maybe the
17 jurors just be asked if Miss Bachetti prior to her
18 being discharged expressed an opinion as to the
19 defendant's guilt or innocence?  Is that what --
20 because that's what you're trying to get at, right?
21        MR. TACOPINA:  Not just her opinion.
22        MR. TURANO:  How about prior to her being
23 discharged did anyone express their opinion?
24        MR. TACOPINA:  About what's right.
25        MR. TURANO:  Prior to her being dismissed.

FILED, Case on the Appellate Division, July 2015, A-0215-14 T3, RB
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

```
 1        MR. TACOPINA:  Yeah.
 2        MS. PREZIOSO:  But I do think the judge is
 3  right.
 4        THE COURT:  I, frankly, think those kind of
 5  questions will cause an intrusion into their
 6  deliberations.  I got to tell --
 7        MR. TACOPINA:  Prior to deliberation.  Prior
 8  to deliberation.
 9        THE COURT:  Yeah.  But, see, with that kind
10  of a question, did anyone express an opinion or, you
11  know, was anything said that could suggest an opinion,
12  I mean I'm not so sure there's anything wrong with any
13  of that.
14        MR. TACOPINA:  Well, if they discussed
15  whether they thought there was evidence pointed towards
16  guilt or innocence prior to their deliberations I think
17  there's a lot wrong with that.
18        THE COURT:  It depends on how they discussed
19  it.  I mean if they formed -- if they have formed a
20  conclusion, you know, if they began deliberations in
21  effect and formed a conclusion before all the evidence
22  was in, yes, that's inappropriate, but I'm not so sure
23  somebody's supposed to sit there for six weeks and not
24  have, you know, any opinion at all or, you know, start
25  off with any opinion.  I mean --
```

```
 1        MR. TACOPINA:  Well, I agree with you, but
 2  it's not whether they have their own opinions, it's
 3  whether they discussed it with others, and how do we
 4  know without asking that question, your Honor?  I don't
 5  think we can know if they violated their oaths without
 6  asking that question.  Again we're in a very leading
 7  fashion prior to deliberations with Miss Bachetti
 8  because she was never part of deliberations obviously.
 9  Was there any discussion, not what the right thing was,
10  but as to what you all thought was right as far as
11  the -- the verdict in this case, was there any
12  discussion about that, I'm concerned about this and
13  that is I don't know how else to get to it.
14        I appreciate your concerns, your Honor.  I'll
15  defer however you want to word it, but I think we do
16  have to -- this is part of this letter that this jury
17  read, so, you know, leaving unsaid I'm praying for all
18  of you today that you will have the wisdom to do what
19  is right, I mean do they understand what that meant?
20  Do they understand what that meant?
21        THE COURT:  Well, that may be a more
22  appropriate answer (sic).
23        MR. TACOPINA:  Fine.  Question.
24        THE COURT:  Yes.  Question.  That would
25  suggest -- I mean the real question is now that she's
```

Patricia Ciaccio 40

```
 1   no longer a juror -- right? -- is she communicating
 2   with these people and suggesting a particular course of
 3   action to them.
 4            MS. PREZIOSO:  Right.
 5            THE COURT:  That's what --
 6            MR. TURANO:  Right.
 7            THE COURT:  -- what we really need to get at.
 8            Let's try it with number two.
 9            MS. PREZIOSO:  Your Honor, can I also make
10   the suggestion that perhaps you tell them before you
11   get into -- allow them to answer any question that
12   you're not seeking information about the deliberative
13   process and that should remain confidential.
14            THE COURT:  Good idea.
15            MS. PREZIOSO:  Okay.
16        (Juror Patricia Ciaccio entered chambers.)
17            MS. CIACCIO:  Hello.
18            THE COURT:  Hi, Patricia.  How are you?
19            MS. CIACCIO:  Good.  How are you?
20            THE COURT:  Okay.  As you know, from time to
21   time if there are any questions that the Court has
22   about communications to jurors and things like that I'm
23   required to talk to jurors individually, so we're here
24   again on that issue.
25            Now, of course, deliberations have begun, so
```

Patricia Ciaccio 41

```
 1   I want to make it clear that I don't want to talk about
 2   your deliberations any more than with respect to the
 3   questions that I ask, so, you know, don't -- don't read
 4   anything into what I'm asking and volunteer any
 5   information because your deliberations should remain
 6   confidential other than what I specifically ask about.
 7   Okay?
 8            MS. CIACCIO:  Uh-huh.
 9            THE COURT:  The -- it came to my attention
10   that one of the jurors who was excused left a note to
11   the rest of the jury.  This is the note.  I don't know
12   if you've seen it before.  You could --
13            MS. CIACCIO:  Oh.  Yeah.
14            THE COURT:  I don't want you to read it if
15   you haven't seen it before, but have you read that
16   before?
17            MS. CIACCIO:  I didn't personally read it.
18   It was read to us.
19            THE COURT:  Okay.  Can you tell me what you
20   know about the note or what you remember.
21            MS. CIACCIO:  The person that left the note
22   said good luck I guess or, you know, that's -- that's
23   basically what I really took from this, you know.
24            THE COURT:  Was it read to the whole jury?
25   Is that how you heard it?
```

FILED, Case 2:18-cv-02431-MAS Document 1-2 Filed 09/14/18 Page 22 of 61 PageID: 6225
FILED, Clerk of the Appellate Division, July 18, 2018, A-004280-14, SEALED
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

```
 1          MS. CIACCIO:  Well, I don't know -- I don't
 2   remember how many people were actually standing there
 3   when the note was read.
 4          THE COURT:  Where was it?  Was it in the jury
 5   room or downstairs or --
 6          MS. CIACCIO:  Downstairs.  That's where it
 7   was read, where I heard it.  I don't know what happened
 8   to it afterwards, you know.
 9          THE COURT:  But you heard it downstairs --
10          MS. CIACCIO:  Uh-huh.
11          THE COURT:  -- when you were gathered
12   together?
13          MS. CIACCIO:  Uh-huh.
14          THE COURT:  Do you know how many people were
15   there at the time?
16          MS. CIACCIO:  Maybe five people.  I'm not
17   sure.  I didn't really take note.
18          THE COURT:  So again, I know this is hard,
19   but I have to go through this, can you tell me to the
20   best of your recollection what you heard about the
21   note.
22          MS. CIACCIO:  Where -- where you mean from
23   start -- where it was found?
24          THE COURT:  Well, whatever was mentioned
25   about it.
```

```
 1          MS. CIACCIO:  That it was found on one of the
 2   juror's windshields when she came out of the house in
 3   the morning and she was afraid to read it, but she read
 4   it.  She opened it, she read it, and basically saying,
 5   you know, like I said, something like good luck or
 6   whatnot.  That's -- you know, I really didn't make much
 7   of it.
 8          THE COURT:  Was there anything that was
 9   reported about the letter that would have suggested to
10   you that the writer of the letter had an opinion as to
11   what you guys should do?
12          MS. CIACCIO:  No.  Or I didn't take it that
13   way.
14          THE COURT:  The -- the letter seems to
15   suggest that there may have been an earlier comment
16   about someone learning of a blog that mentioned a juror
17   with hard eyes or something like that.  Does that ring
18   a bell with you?
19          MS. CIACCIO:  Yeah.  It does.  Yeah.  Yeah.
20   Yeah.
21          THE COURT:  What do you remember about that?
22          MS. CIACCIO:  Yeah.  That the person who
23   wrote this said that she found out that she had the
24   hard eyes.  That's -- yeah.  I forgot about that.
25          THE COURT:  But -- but that means that there
```

FILED, Case 8:18-cv-02421-MAS-July 18-2018 NY-Document 8-14 Filed 09/14/18   Page 23 of 61 PageID: 6226
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

1  had to be a discussion earlier about somebody having
2  the hard eyes.  Like what would that mean to you?
3  If --
4           MS. CIACCIO:  Yeah.
5           THE COURT:  -- someone writes it and says I'm
6  the one with the hard eyes what does that mean?
7           MS. CIACCIO:  Yeah.  Somebody mentioned that.
8  Right.  Somebody mentioned that somebody told -- I
9  don't even remember who it was.  Somebody told somebody
10 that somebody was writing a blog and that one of the
11 jurors had hard eyes.
12          THE COURT:  Okay.
13          MS. CIACCIO:  I --
14          THE COURT:  Do you recall any other
15 discussions about people reporting information that
16 comes from the internet or from television or from
17 newspapers or anything like that?
18          MS. CIACCIO:  Somebody mentioned that --
19 something about our ages or where we lived, something
20 somebody -- that -- you know, I don't get too involved
21 in a lot of these, you know -- I sit there and I wait
22 to be called a lot of times.
23          THE COURT:  Have you heard anything from
24 anyone about the facts of the case or the merits of the
25 case that have been reported from outside the

1  courtroom?
2           MS. CIACCIO:  No.
3           THE COURT:  Have you overheard any
4  discussions in the jury room where someone has been
5  reporting information from outside the courtroom about
6  the merits of the case or any information about the
7  case or anything like that?
8           MS. CIACCIO:  No.
9           THE COURT:  Have you been exposed to any
10 information that would prevent you from following the
11 law and being an impartial juror as I've explained it?
12          MS. CIACCIO:  No.
13          THE COURT:  Are you aware of anybody else
14 that you feel has reported information or been exposed
15 to information outside the courtroom?
16          MS. CIACCIO:  Not to my knowledge, no.
17          THE COURT:  Let's see.  And you -- you don't
18 believe that it was mentioned that the author of the
19 note was trying to communicate any opinion to you about
20 how you guys should vote on this case or anything like
21 that?
22          MS. CIACCIO:  No, I didn't take it that way.
23          THE COURT:  Counsel, do you have any
24 questions of Miss Ciaccio?
25          MR. TACOPINA:  Miss Ciaccio, who all read the

Patricia Ciaccio                                    46

```
 1   note?
 2           MS. CIACCIO:  The person who actually
 3   received it.
 4           MR. TACOPINA:  Laura?
 5           MS. CIACCIO:  Laura.
 6           MS. PREZIOSO:  I have one question.  Does
 7   that note -- has it had any effect whatsoever on your
 8   deliberations?
 9           MS. CIACCIO:  No.
10           MS. PREZIOSO:  Thank you.
11           MS. CIACCIO:  My face is so red.
12           THE COURT:  It's warm in here.
13           MS. CIACCIO:  I know.
14           THE COURT:  Sorry.
15           MS. CIACCIO:  That's okay.
16           THE COURT:  We don't usually have this much
17   hot air in here with me starting and doing all the
18   talking, you know.
19           But, in any event, please don't discuss
20   this --
21           MS. CIACCIO:  No, I won't.
22           THE COURT:  -- with anybody else and, you
23   know, we'll try to get going as soon as I go through
24   the rest of the jurors.
25           Thank you very much.
```

Patricia Ciaccio                                    47

```
 1           MS. CIACCIO:  You're welcome.
 2           MS. PREZIOSO:  Thank you.
 3           MS. CIACCIO:  Thank you.
 4           MR. TACOPINA:  Thank you.
 5       (Ms. Ciaccio left chambers.)
 6           THE CLERK:  Ready for the next one?
 7           MR. TACOPINA:  No.
 8           THE COURT:  What?
 9           MR. TACOPINA:  I just want to make a request.
10           THE COURT:  Okay.
11           MR. TACOPINA:  What I'd like to do is just
12   read this part of the note and say in the note it said
13   I'm praying for all of you today that you will have the
14   wisdom to do what is right, did you attach any
15   significance to that.  The way you're asking it
16   I appreciate, I don't want to get into what they're
17   doing now, I think the preface what Patty suggested,
18   not saying where they're at or anything like that, I'm
19   really uncomfortable with this thing about heralding to
20   the jurors they have the wisdom to do what is right, is
21   it just a vague statement or because I don't think it's
22   clear that should be relaying to them what she thinks
23   they should do.  My problem is did they have
24   discussions before deliberations with this particular
25   juror about her opinion.  Why can't you just read the
```

```
 1   question?
 2           THE COURT:  Because I'm not satisfied that
 3   all of these 12 jurors have any idea what this letter
 4   says in its entirety and I don't really want to read it
 5   to them.  You've just heard someone say she thinks five
 6   people were present, obviously could be more or less,
 7   but it doesn't seem like it was very carefully
 8   discussed, and when I spoke to her she clearly doesn't
 9   have a real strong recollection of it and if the evil
10   that we're trying to address here is the potential of
11   being influenced by this letter or to uncover whether
12   or not there were prior discussions, then reading the
13   letter only makes it worse.
14           MR. TACOPINA:  Well, she said she heard the
15   letter.  I agree if a juror --
16           THE COURT:  She didn't say she remembered
17   every word of it or that she -- you know, she remembers
18   it being a letter that involved, you know, thank you,
19   you know, and I'm not very comfortable reading the
20   whole letter to them.
21           MR. TACOPINA:  I'm not asking you read the
22   whole letter, but the one line that says you'll have
23   the wisdom to do what is right.  Miss Juror, did you
24   discuss with Miss Bachetti, whatever her name is, prior
25   to her being excused what either you or she thought was
```

```
 1   right.  I think if we don't do that I think we're
 2   potentially letting an issue escape us, and I'm not
 3   talking about jurors who haven't seen the letter, but
 4   if this was read to them, this is a grave concern, that
 5   you'll have the wisdom to do what is right, did you
 6   discuss with Miss Bachetti -- I'm sorry, I'm butchering
 7   her name -- either you or she thought it was right
 8   prior to deliberation.
 9           THE COURT:  What's the State's position?
10           MS. PREZIOSO:  Judge, I -- I -- I think if
11   the juror is asked if the letter had any effect on
12   their deliberations that means they weren't influenced.
13   I -- I think that that's probably fine.  I understand
14   what Mr. Tacopina is saying.  I guess what I'm not
15   understanding is are you concerned with discussions
16   prior to deliberations rather than the effect that the
17   letter has had since?
18           MR. TACOPINA:  Both.  But, yes, Patty, in
19   particular prior.  Not that each juror may have in
20   their own mind formed an opinion and now we're
21   deliberating, nothing we could do about that.  Like the
22   judge said, I agree that's nothing necessarily
23   improper, but to be discussing with two jurors what
24   they thought was right prior to deliberations I think
25   is juror misconduct and that's what I want to uncover
```

FILED, Conroe the Appellate Division, July 18 2018 9:02:184-14, 9:02189
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

Suggestions                                50

```
 1  if there was, and certainly I think that's the first
 2  level of inquiry, and if there was no discussion about
 3  it then the general question about whether this would
 4  affect their deliberations is appropriate and it covers
 5  everything I think.
 6       MS. PREZIOSO:  And you don't think the judge
 7  asking whether the juror interpreted the writer as
 8  having a specific opinion covers it?
 9       MR. TACOPINA:  No because I don't think she's
10  expressing her opinion here.  My concern is the fact
11  she's alluding to doing what is right.  Not expressing
12  that opinion makes me believe that she had a discussion
13  with someone -- and I could be wrong, by the way, makes
14  me believe she had a discussion with someone about what
15  she thought was right before she left.
16       MS. PREZIOSO:  Well, I think doing what's
17  right -- your Honor, forgive me, I don't mean to
18  address Mr. Tacopina instead of you, but for me I --
19  I would interpret doing what's right as reading the
20  evidence, following the law and making a decision, and
21  I don't think that the term of and by itself I'm
22  praying for you that you do what's right is indicative
23  of that.  But, again, your Honor, I defer to the Court.
24       I -- I'm not in disagreement with what
25  Mr. Tacopina is suggesting.  Perhaps I just think that
```

Suggestions                                51

```
 1  the Court's questions are covering it, but I defer to
 2  the Court.
 3       THE COURT:  Yeah.  I'm inclined to think my
 4  questions are covering it, Mr. Tacopina.  I'll try to
 5  work around it, but I really do not want to ask
 6  questions that will try to elicit from this jury what
 7  they're thinking and any question involving the
 8  interpretation of what's right, you know, invites
 9  someone to talk about what they think is right.  I hear
10  what you're saying, but, you know, I'm just going to
11  have to do this as best I can.
12       If you want to ask particular questions I'm
13  allowing you to do that as long as, you know, you're
14  not going to get into their deliberations.
15       MR. TACOPINA:  Okay.  So, Judge, I don't want
16  to ask that question, you say don't ask that, but my
17  simple question would be, you know, in this letter if
18  they've read it or heard it, where Miss Bachetti says
19  you hopefully will have the wisdom to do right, did you
20  have a prior discussion before deliberations again with
21  Miss Bachetti what is right, don't tell us what you
22  think, I don't think that covers it.
23       THE COURT:  Well, if they say yes you're
24  going to want to have the discussion, right?
25       MR. TACOPINA:  If they say yes there's a
```

Linda Krzyzanowski                                    52

1   violation, two jurors decided --
2           THE COURT:  I don't know there's a violation.
3           MR. TACOPINA:  I don't know how we know
4   unless we ask.
5           THE COURT:  Well, then I don't know how you
6   get into all this without intruding into deliberations.
7   That's the problem.
8           MR. TACOPINA:  Prior to deliberations.
9           MS. PREZIOSO:  May I make another suggestion?
10          The judge ask did you feel that the writer of
11  the letter was indicating a direction to go, whether
12  guilty or innocent.
13          MR. TACOPINA:  Judge asked that already.
14          MS. PREZIOSO:  Then follow it up with prior
15  to deliberations were there any discussions where she
16  expressed her opinion to you.  Would that cover it?
17          MR. TACOPINA:  I think so.
18          THE COURT:  I'll do the best I can.  We got
19  to get rolling here.
20      (Juror Linda Krzyzanowski entered chambers.)
21          THE COURT:  Hello, Linda.
22          MS. KRZYZANOWSKI:  Hi.
23          THE COURT:  How are you?
24          We're back again interviewing jurors --
25          MS. KRZYZANOWSKI:  Yes.

Linda Krzyzanowski                                    53

1           THE COURT:  -- as you can tell.  And, as I
2   explained to you the first time we did it, it's kind of
3   a routine thing that when the Court has any concern or
4   reason to believe that there's been some communication
5   from outside the jury to the jury about the case,
6   whether it be because of media coverage or otherwise,
7   the law requires that I interview the jurors.  It's
8   just kind of a routine part of our safeguards, if you
9   will, so I don't want you to feel uncomfortable.
10          The reason I'm talking to you all now is that
11  the Court learned that one of the jurors who was
12  excused sent a note in to the jury --
13          MS. KRZYZANOWSKI:  Yes.
14          THE COURT:  -- and so, you know, since she is
15  no longer on the jury, she is someone from outside who
16  is communicating with you guys, and so I have to talk
17  to you a little about what happened and what you make
18  of it.
19          So can you tell me, first of all, what you
20  remember hearing about the note.
21          MS. KRZYZANOWSKI:  Hearing about the note?
22          THE COURT:  Or seeing the note if you saw it.
23  I don't know.  What do you know about the note?
24          MS. KRZYZANOWSKI:  I read the note.
25          THE COURT:  Okay.  You actually read it

FILED, Case 3:18-cv-02431-MAS Document 002110414130 Filed 09/14/18 Page 28 of 61 PageID: 6231
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

1  yourself?
2         MS. KRZYZANOWSKI:  Yes.
3         THE COURT:  Did you read it to yourself or
4  did you read it out loud?
5         MS. KRZYZANOWSKI:  When the -- who received
6  it?  When the person that received it came in she
7  explained that she was nervous because she had an
8  envelope on her car and when she saw it she said it
9  said to the jurors, she didn't want to touch it, she
10 didn't know what it was, she was nervous.  She said
11 I really didn't read it.  That's because she was late.
12 She's always late.  So when she got here she just
13 looked to see who it was from and she felt better,
14 whatever, and I think she just handed it to me and
15 I just read it.  Everybody wasn't there yet.
16        THE COURT:  Before I ask you any questions,
17 I forgot to say to you since your deliberations have
18 begun I don't want you to volunteer more information
19 than I ask you about because I don't really want to
20 intrude into the confidentiality of your deliberations.
21 Okay?  There's certain things I have to ask about which
22 I need you to try to remember and tell me about, but,
23 you know, try not to get beyond what I'm asking you and
24 go into your current deliberations.  Okay?
25        MS. KRZYZANOWSKI:  Right.

1         THE COURT:  Now, in terms of the letter,
2  again where were you when you first were shown the
3  letter?
4         MS. KRZYZANOWSKI:  Downstairs in the lobby.
5         THE COURT:  How many -- you remember how many
6  jurors were there?
7         MS. KRZYZANOWSKI:  About six I would say.
8         THE COURT:  Now, did they ultimately come to
9  learn about the letter, too?
10        MS. KRZYZANOWSKI:  Yes.  I think so.  I think
11 somebody read it in the jury room.
12        THE COURT:  Okay.  So your recollection is
13 that it was read to the jury in the jury room when all
14 the jurors were present?
15        MS. KRZYZANOWSKI:  I'm not sure if they read
16 it out loud.
17        THE COURT:  But you think they all kind of
18 were aware of it?
19        MS. KRZYZANOWSKI:  Yes.
20        THE COURT:  Now, tell me what you remember
21 now since you read the letter.  What do you remember
22 about it?
23        MS. KRZYZANOWSKI:  That she said that she's
24 sorry she couldn't be there, her -- her thoughts and
25 prayers were with us and she knows -- well, you know,

FILED, Case 2:18-cv-02421-MAS July 1820180ARdo2180 14 Filed 09/14/18 Page 29 of 61 PageID: 6232
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

1   make the right decision I believe, something to that
2   effect, and in a way she -- she was relieved because of
3   the stress that it's putting on us, and she said I'm
4   sure Deb and Rafik are, and then she writes -- she
5   wrote something to me also.  I did tell them something
6   that I did hear from outside, but I -- it was about us,
7   something somebody told me they said about us, and it
8   was about somebody that had hard eyes.
9           THE COURT:  Who told you?
10        (Mr. Tacopina's cell phone is ringing.)
11          MR. TACOPINA:  Gees.  I'm sorry, your Honor.
12          THE COURT:  Nice music, but we don't really
13   need music now.
14          MR. TACOPINA:  Sorry about that.
15          MS. KRZYZANOWSKI:  I think it was my sister.
16          THE COURT:  She mentioned to you something
17   about hard eyes?
18          MS. KRZYZANOWSKI:  Yes.  Because many people
19   been telling us they're writing stuff, they're putting
20   our hometown, our ages -- right? -- our names.
21          THE COURT:  I don't know that.  I mean I
22   don't see all the -- you know, I obviously can't keep
23   track of all the newspapers and things like that.
24          MS. KRZYZANOWSKI:  Right.  Right.  I'm not
25   saying I saw it.

1           THE COURT:  I mean your names are public
2   records and your hometown is a public record.  Before
3   you're selected you come off a list of driver's
4   licenses and voter registration and it's a public
5   record.  Your addresses, your phone numbers, your ages
6   are not given out to anybody.  So now that's not to
7   say, you know, none of us here have a great deal of
8   privacy any more because of the way records are kept.
9   But I can assure you that as far as the court records
10   are concerned just your names and your home towns are
11   listed in the juror records and anyone has a right to
12   look at juror records and get a name or a hometown.
13          But, in any event, so -- so your sister
14   tells --
15          MS. KRZYZANOWSKI:  Right.  And we talk about
16   what we hear about us.  Are we not allowed to?
17          THE COURT:  Well, you're not allowed to talk
18   about the case.  But what do you hear about us?
19          MS. KRZYZANOWSKI:  Actually Deb -- Deb.
20   Yeah.  Deb came in and -- actually somebody called, one
21   of the newspapers called her after she was excused.
22          THE COURT:  Yeah.  That wouldn't surprise me.
23          MS. KRZYZANOWSKI:  Somebody else came in and
24   said one of the papers had our name, our occupation,
25   our age and our hometown, and we do talk about that

FILED, Case 3:18-cv-02431-MAS Document 02180-14 Filed 09/14/18 Page 30 of 61 PageID: 6233
FILED, Clerk of the Appellate Division July 18, 2018, A-002180-14 SEALED
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

Linda Krzyzanowski                                    58

```
 1  stuff.  And I also mentioned that someone told me about
 2  the hard eyes and so she did write in that that it was
 3  her.  I guess she found out it was her.  She said,
 4  by the way, Linda, it was me who has the hard eyes.
 5          THE COURT:  Have you ever talked about the
 6  merits of the case or the facts of the case or has
 7  anyone reported anything like that to you?
 8          MS. KRZYZANOWSKI:  Absolutely not.  Nothing
 9  about the case, no.  Outside the deliberation room?
10          THE COURT:  Yeah.
11          MS. KRZYZANOWSKI:  No.
12          THE COURT:  Has this --
13          MS. KRZYZANOWSKI:  I expressed my concerns
14  like to my husband.  I was very upset yesterday.  We
15  had a very stressful day yesterday and I'm a stressful
16  person.
17          THE COURT:  Again I don't want to talk about
18  your deliberations.
19          MS. KRZYZANOWSKI:  Right.
20          THE COURT:  I mean --
21          MS. KRZYZANOWSKI:  The effects, as far as the
22  evidence goes, the case itself, absolutely, I haven't
23  talked to anybody about anything.
24          THE COURT:  Has anybody tried to contact you
25  about the case other than Miss Bachetti?  I mean has
```

Linda Krzyzanowski                                    59

```
 1  anybody communicated with you, any reporters tried to
 2  reach you or anything like that?
 3          MS. KRZYZANOWSKI:  No, not at all.  Actually
 4  I actually bumped into Melanie yesterday, too,
 5  physically.  You know what I mean?  It was like --
 6  I guess I should tell you that.  Going into the coffee
 7  shop, I was turning around talking, going in, she was
 8  talking, and we kind of just, you know --
 9          THE COURT:  Well, that happens.
10          MS. KRZYZANOWSKI:  Right.  But just to be
11  clear on everything.
12          THE COURT:  This Deborah, when did she -- she
13  was, you know, determined to be an alternate, right?
14          MS. KRZYZANOWSKI:  She is an alternate.  You
15  excused her, then I believe you told her she could come
16  back the next day.
17          THE COURT:  No.  That's Jennifer Malone.
18          MS. KRZYZANOWSKI:  See, I got them mixed --
19  I'm sorry.
20          THE COURT:  Jennifer Malone was going to be
21  excused because of her vacation --
22          MS. KRZYZANOWSKI:  Yes.
23          THE COURT:  -- plans.
24          MS. KRZYZANOWSKI:  I'm sorry.  It was her,
25  not Deborah, that got the phone call.
```

Linda Krzyzanowski                    60

1        THE COURT:  So what did she say?
2        MS. KRZYZANOWSKI:  Deborah?  I mean I --
3        THE COURT:  No.  Jennifer Malone.
4        MS. KRZYZANOWSKI:  I'm sorry.  I get them
5   confused.  She said she went home yesterday after you
6   excused her and someone from the paper called her
7   house.  She thought it was her husband.  She didn't
8   look at the Caller ID.  She just talked to her husband.
9   She picked it up.  Jennifer.  She said yes.  They said
10  it was the paper.  He said would you like to talk about
11  the case.  And she said no.  And they said you're
12  excused.  And she said well, she wouldn't do it.  She
13  said the conversation lasted two minutes I believe and
14  that was it.
15       THE COURT:  And it was unfortunate we had
16  agreed to excuse her, but then she said she wanted to
17  be excused the next day because she wanted to come and
18  listen to the closing arguments, so she was not yet
19  excused, but I could see if -- if a reporter thought
20  she was excused, so --
21       MS. KRZYZANOWSKI:  There's no other comments,
22  to like we just hear that I guess people tell us, what
23  the jury's (sic) saying about us.  Like the first day
24  somebody said they were saying that there was a comment
25  made about even a caveman can do it or something.

Linda Krzyzanowski                    61

1   That's what -- I'm just telling you.  I'm just telling
2   you like we're not believing everything, but we do talk
3   about what we hear about that.  But as far as the
4   evidence --
5        MR. TACOPINA:  I'm sorry.  Is it my turn?
6        THE COURT:  Yeah.
7        MR. TACOPINA:  What do you mean?  Even
8   a caveman could do what?
9        MS. KRZYZANOWSKI:  They said they were
10  talking about the jury and they referred us to like
11  cavemen.
12       MR. TACOPINA:  Do you know what context?
13       MS. KRZYZANOWSKI:  We don't know.  That was
14  one of the first things we started talking about.  Like
15  somebody said they nicknamed the jurors.  You know what
16  I mean?  And that just came up.  And so like that was
17  just one of the things that came up, the hard eyes.
18  There were a couple other ones, but --
19       THE COURT:  Well, let me ask you this.  Have
20  you -- you got to really, you know, think about this,
21  but have you -- has anybody mentioned anything to you
22  or has anything been brought to your attention that
23  would in any way have an influence as to how you would
24  decide this case?
25       MS. KRZYZANOWSKI:  No.

FILED, Case 8:18-cv-02411-MAS Document 102-14 Filed 09/14/18 Page 32 of 61 PageID: 6235
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

Linda Krzyzanowski                                                62

```
 1          THE COURT:  Are you satisfied that you can
 2  continue to deliberate and decide the case based only
 3  on the evidence that's been presented in the courtroom?
 4          MS. KRZYZANOWSKI:  Yes.
 5          THE COURT:  Any questions, counsel?
 6          MS. PREZIOSO:  No.
 7          MR. TACOPINA:  Could I ask like one thing,
 8  your Honor?
 9          THE COURT:  Sure.
10          MR. TACOPINA:  With -- with Miss Malone,
11  Malone or Malone, I'm not --
12          THE COURT:  Malone.
13          MS. KRZYZANOWSKI:  Jen.
14          MR. TACOPINA:  Yeah.  Jen.  What she told you
15  about that with the paper calling her, did she come
16  back the next day to the jury room like to deliberate?
17          MR. TACOPINA:  Not to deliberate.  I mean she
18  was back, but --
19          MS. KRZYZANOWSKI:  She came back because I
20  think you told her she could come back and listen the
21  next day and she came back.
22          MR. TACOPINA:  The person contacted her the
23  night before I guess?
24          MS. KRZYZANOWSKI:  As soon as she got here,
25  I guess they were in the courtroom, you did mention,
```

Linda Krzyzanowski                                                63

```
 1  I don't think you said it in front of us, that she was
 2  excused.
 3          THE COURT:  No.  What happened was we were in
 4  court and we had made a determination because of the
 5  weather conditions that one person was going to be
 6  excused and Miss Malone because of her vacation
 7  asked -- had asked to be excused, so we had made a
 8  determination that that would happen, but Miss Malone
 9  wasn't excused until the next day because she wanted to
10  hear the -- she wasn't going on vacation until after
11  the closing arguments, so she wanted to come back in --
12          MS. KRZYZANOWSKI:  Right.
13          THE COURT:  -- but I guess one of the
14  reporters thought she had been excused I guess.
15          MS. KRZYZANOWSKI:  Right.
16          THE COURT:  But, in any event, she told you
17  she didn't speak --
18          MS. KRZYZANOWSKI:  She said the conversation
19  lasted less than two minutes she said --
20          THE COURT:  Okay.
21          MS. KRZYZANOWSKI:  -- that she didn't want to
22  talk about it, she couldn't talk about it.  He tried to
23  tell her she could talk about it, she was excused.  And
24  she was like oh, well, I'm not going to.  That's how
25  she said it.
```

Patricia O'Donnell                                                      64

```
 1          THE COURT:  All right.  Anything else?
 2          MR. TACOPINA:  No, your Honor.
 3          THE COURT:  All right.  Linda, thank you very
 4   much.
 5          MS. KRZYZANOWSKI:  All right.
 6          THE COURT:  Please don't talk to anybody
 7   about this conversation and if any reporters call you
 8   don't talk to them.
 9          MS. KRZYZANOWSKI:  I won't.
10          THE COURT:  Okay?  Thanks.
11       (Ms. Krzyzanowski left chambers.)
12          THE COURT:  Want to take a 10-minute break?
13          MR. TACOPINA:  Yeah.
14          MS. PREZIOSO:  Ten minutes, Judge?
15       (A recess was taken.)
16       (Juror Patricia O'Donnell entered chambers.)
17          MS. O'DONNELL:  Hello.
18          THE COURT:  Patricia, our happiest juror.
19   Glad to see you're still happy.
20          MS. O'DONNELL:  Yeah.
21          THE COURT:  As I've explained before, every
22   now and then, if there's any concern by the Court that
23   there's been any kind of media coverage that may have
24   been communicated to the jury or any type of outside
25   communication it's routine procedure that I interview
```

Patricia O'Donnell                                                      65

```
 1   the jurors, so we're back here again.  I want you to
 2   understand though that now that deliberations have
 3   begun I really don't want to intrude into the
 4   confidentiality of your deliberations.  If I ask you
 5   anything that seems to be in that direction just answer
 6   me very precisely, but don't volunteer any information
 7   about the deliberations.  Okay?
 8          MS. O'DONNELL:  Okay.
 9          THE COURT:  It has come to my attention that
10   one of the jurors who were excused had left a note for
11   the jury and I wanted to ask you what you know about it
12   or what you remember about it.
13          MS. O'DONNELL:  About the note?
14          THE COURT:  Yeah.
15          MS. O'DONNELL:  She was wishing us good luck,
16   sorry she wasn't there.
17          THE COURT:  When did you first learn of the
18   note?
19          MS. O'DONNELL:  Today's Friday?
20          THE COURT:  Yeah.  I think.
21          MS. O'DONNELL:  Yeah.  Me, too.
22          Wednesday or -- yeah.  I think Wednesday.
23          THE COURT:  You remember where it was that
24   you learned of the note?
25          MS. O'DONNELL:  Here.  Downstairs.
```

Patricia O'Donnell                                      66

```
 1          THE COURT:  Was it downstairs or upstairs?
 2          MS. O'DONNELL:  Downstairs they said they had
 3   the note.  She read it to everybody upstairs.
 4          THE COURT:  And do you remember who read it?
 5          MS. O'DONNELL:  Uh-huh.
 6          THE COURT:  Who was it?
 7          MS. O'DONNELL:  Juror number five.
 8          THE COURT:  Laura?
 9          MS. O'DONNELL:  Uh-huh.
10          THE COURT:  Did she read the whole note?
11          MS. O'DONNELL:  I think so.  Yeah.
12          THE COURT:  What do you remember that she --
13   you know, that the note said?
14          MS. O'DONNELL:  Just that she was wishing us
15   luck, it was an awesome responsibility, she was praying
16   for all of us.
17          THE COURT:  Do you remember anything about
18   this issue of the juror with hard eyes?
19          MS. O'DONNELL:  Oh.  Well -- yeah.  That's
20   her.
21          THE COURT:  Tell me -- what does that mean to
22   you?  I mean what you know, what's this issue of a
23   juror with hard eyes?
24          MS. O'DONNELL:  That she was just looking
25   intently at everything.  That's really it.
```

Patricia O'Donnell                                      67

```
 1          THE COURT:  But how would you -- like if
 2   somebody says to you I'm the juror with hard eyes --
 3          MS. O'DONNELL:  Uh-huh.
 4          THE COURT:  -- you know, what kind of a
 5   connection does that give?  Where does that come from?
 6          MS. O'DONNELL:  There was I think some talk
 7   about the jurors outside and somebody said somebody has
 8   hard eyes and she confirmed that it was her.
 9          THE COURT:  So you remember it being reported
10   that somebody outside was making reference to the
11   jurors?
12          MS. O'DONNELL:  Yeah.
13          THE COURT:  When did that happen?  If you
14   remember.
15          MS. O'DONNELL:  I have no idea.  It's been
16   a long few weeks.  I don't remember when exactly.
17          THE COURT:  Have you overheard any other
18   discussions about information from outside the --
19          MS. O'DONNELL:  About us specifically?
20          THE COURT:  Well, about the case or you.
21          MS. O'DONNELL:  Not about the case.  Just
22   about different things that they've said about the
23   jurors.  Just somebody looked like they were sleeping.
24   We heard that all of our home towns and ages were
25   listed in the paper the other day.  Really just basic
```

FILED, Case 2:18-cv-02241-MAS Document 1-81 Filed 09/14/18 Page 35 of 61 PageID: 6238
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

1  things about what they're saying about us, like that.
2          THE COURT:  I'll explain this to all of the
3  jurors, but I don't know about this issue about the
4  ages.  I mean your names and your home towns, whatever
5  occupations that you reported come from this juror list
6  that comes from voter registration and driver's
7  licenses and those are deemed to be public records.
8  People can get them.  The Court does not give out any
9  information about anyone's specific address or age or
10 anything like that.
11         MS. O'DONNELL:  No one's going to show up at
12 my house.
13         THE COURT:  I guess unless you're real good
14 at hiding somebody can find out, all of us, where we
15 live, but we don't give that information out and
16 reporters are not permitted to try to contact you
17 during deliberations or while the case is going on.
18 They may try to contact you after the case and I will
19 give you further instructions about how you may respond
20 to that, you know, at the appropriate time, but you
21 could rest assured it's not anything you have to worry
22 about.
23         Now, but -- but aside from this issue of
24 somebody reporting to you or mentioning to you that the
25 jurors are being talked about, was there any other

1  discussion about the case or the evidence or anything
2  like that?
3          MS. O'DONNELL:  No.
4          THE COURT:  When this -- this letter from
5  Miss Bachetti was read, there's a part of it that talks
6  about hoping that you do the right thing.  What -- did
7  that mean anything to you or did that relate back to
8  any prior conversations or anything like that?
9          MS. O'DONNELL:  No.
10         THE COURT:  I think there's a spot that says
11 I'm praying for all of you today that you will have the
12 wisdom to do what is right.  That's the exact quote.
13 Did that -- does that relate to any conversations that
14 you had with her before or her suggesting to you how
15 you should vote on the case or anything like that?
16         MS. O'DONNELL:  No.
17         THE COURT:  Has -- have there been any other
18 discussions that would in any way make it difficult for
19 you to follow the law and try to reach a verdict simply
20 on the evidence that's been produced in court?
21         MS. O'DONNELL:  No.
22         THE COURT:  Have you been -- I mean have you
23 been exposed to any information that would possibly
24 influence you in a way that, you know, is contrary to
25 what I've explained your duties are?

FILED, Case 2:18-cv-02411-MAS Document 02180-14 Filed 09/14/18 Page 36 of 61 PageID: 6239
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

Patricia O'Donnell                                        70

```
 1          MS. O'DONNELL:  No.
 2          THE COURT:  Counsel, any questions --
 3          MR. TACOPINA:  No.
 4          THE COURT:  -- of Miss O'Donnell?
 5          MS. PREZIOSO:  No.
 6          MS. O'DONNELL:  No.
 7          MS. PREZIOSO:  Thank you.
 8          THE COURT:  Okay.  Thank you very much.
 9          MS. O'DONNELL:  You sure?
10          THE COURT:  Please -- please -- I guess I got
11  to mention this to you.  Please don't talk to anybody
12  about the case and even this issue.  I know it's not
13  exactly about the case, but jurors should not be
14  talking about what other people might be saying.
15          MS. O'DONNELL:  Saying about us?
16          THE COURT:  You know, it really isn't
17  productive.  Do you think -- I guess I should ask.  Do
18  you think that -- first of all, are you concerned about
19  what other people might be saying about you or would
20  that tend to influence your verdict in any way?
21          MS. O'DONNELL:  No.  I am concerned, kind of
22  upset, having a Court TV nickname like everybody has,
23  but other than that --
24          THE COURT:  How do you know?  You might.
25          MS. O'DONNELL:  I don't know, but I'm taping
```

Laura Krepps                                              71

```
 1  every day, but I don't know.
 2          THE COURT:  You'll be able to look it up some
 3  time from now, but who knows.  You might.
 4          All right.  Well, thank you very much,
 5  Mrs. O'Donnell.
 6          MS. O'DONNELL:  Thank you.  Have a good
 7  weekend.
 8          MS. PREZIOSO:  Thank you.
 9          MR. TACOPINA:  Good-bye.
10      (Ms. O'Donnell left chambers.)
11          THE CLERK:  Next?
12          THE COURT:  Yep.
13      (Juror Laura Krepps entered chambers.)
14          MS. KREPPS:  Hello.
15          MR. TACOPINA:  Hi.
16          MS. KREPPS:  Hi.
17          THE COURT:  Hi.  Laura, how you doing?
18          MS. KREPPS:  Very good.  Thank you.
19          THE COURT:  As you know from the last time we
20  talked to all the jurors, whenever I give any kind of
21  indication that there has been any type of media
22  coverage or communication --
23          MS. KREPPS:  Oh.  Okay.
24          THE COURT:  -- with jurors it's a routine
25  part of procedure that we have to speak to all the
```

FILED, Case 3:18-cv-02431-MAS Document 02-184 Filed 09/14/18 Page 37 of 61 PageID: 6240
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

```
 1   jurors.
 2              MS. KREPPS:  Oh.
 3              THE COURT:  Since you've begun deliberations
 4   I really don't want to talk to you about your
 5   deliberations, so don't, you know, volunteer any
 6   information like that.  What I do want to discuss with
 7   you is this letter, you know, that was sent to the
 8   jurors or brought to the jurors from Luann Bachetti.
 9              MS. KREPPS:  Oh.  The card that she wrote.
10   Okay.
11              THE COURT:  Is it a card or -- can you tell
12   me, you know, what you know about it.
13              MS. KREPPS:  Yeah.  It was actually left on
14   my car --
15              THE COURT:  Okay.
16              MS. KREPPS:  -- in the morning because she
17   lives in Milltown by me and it actually threw me for
18   a loop because, you know, walking out in the morning
19   I see a card on my windshield.  You know, my first
20   things is, you know, just being exausted after the
21   trial I went to bed early, so I'm saying okay, who is
22   trying to get hold of me who won't come to the house,
23   that sort of thing.  When I picked it up, turned it
24   over, the card said to all the jurors and, you know,
25   your heart kind of stops at that point, and I was like
```

```
 1   oh, okay, you know, and I got in my car and I looked
 2   around and, you know, from sitting through, you know,
 3   testimony and forensic, after this I took my sleeve of
 4   my sweater, you know, and I was like okay, secondary
 5   note, and I pulled the card out like forensic evidence,
 6   so I'm, you know, very careful and like I opened it up
 7   and I'm looking at the handwriting, I'm going okay and,
 8   you know, it -- I didn't get into like the wording of
 9   it, but it was so long, it didn't say who it was from,
10   and I'm flipping it over and I went oh, Luann.  I went
11   okay, okay, like she lives two blocks from me.  And if
12   you guys know, like Milltown lost power the day of that
13   storm, so, you know, I got dressed in the dark and, you
14   know, whatever, and I knew she wasn't going to come, so
15   that's why I think she brought it to my house because
16   I was close to her, she lives like two blocks from me.
17   So I didn't read it in the car, in the car like before
18   I got here, but I shared my story, they thought it was
19   funny as anything, and we all read it like together.
20   So they were like oh, my God, are you okay.  I'm like
21   yeah, I'm just a little shaken up.
22              THE COURT:  Did she talk to you ahead of time
23   about sending you the letter?
24              MS. KREPPS:  No.  I had no idea she was even
25   going to reach out or like send the card.  I know that
```

Case 3:12-cv-02411-MAS  Document 9-8  Filed 09/14/18  Page 38 of 61 PageID: 6241

Laura Krepps                              74

1  she has like some people's like phone numbers, that
2  sort of thing, but, no, she didn't say like, you know,
3  she was going to leave the card or anything.
4          THE COURT:  There's a part of the letter
5  that -- that says I'm praying for all of you today,
6  that you'll have the wisdom to do what is right.
7          MS. KREPPS:  Oh.
8          THE COURT:  Has she communicated to you or
9  anyone else anything about how you should vote or what
10  kind of a verdict you should reach or anything like
11  that?
12          MS. KREPPS:  No.  No.  She just said, you
13  know, pretty much for herself, you know, that she'd
14  been praying really hard about it, you know, to just
15  have the strength to do what's right and make those
16  decisions.  You know, as you see in her card, she said
17  that -- you know, she's like I guess I prayed, you
18  know, and he sent me, you know, wind and rain and that
19  was, you know, her sign or whatever, but she never said
20  like, you know, this is what I think, so just let you
21  guys know this is -- if I would have been here this is
22  what I would have said.  It was never anything like
23  that, so I think it was just her good nature of wishing
24  us like the best on something that's so difficult like
25  this, so --

Laura Krepps                              75

1          THE COURT:  There's one part where she does
2  indicate that she's the juror with the hard eyes and
3  that she intrigues the bloggers, so obviously there had
4  been some discussion about that.  What do you remember
5  about that?
6          MS. KREPPS:  I know that, you know -- you
7  know, you're -- I think just the general curiosity is
8  not what are they saying about the facts of the case,
9  like that sort of thing, but what are they kind of
10  saying about us because you hear Court TV gives jurors
11  nicknames and that sort of thing, so there's been
12  mention of -- you know, I don't remember how it came to
13  us, but, you know, one of the people, like the news in
14  the courtroom, just said that, you know, somebody --
15  one of the jurors has hard eyes, you know, so we were
16  discussing like who do you think it is.  You know,
17  well, I was -- fur on my brows I was thinking, so it
18  was that discussion of it, so --
19          THE COURT:  Do you think that -- this letter
20  or any of these discussions or concerns that people
21  have about the jurors, do you think that has influenced
22  you in any way or that would make it difficult for you
23  to decide this case based on the evidence and the law?
24          MS. KREPPS:  No.  No.  It's -- I think it's
25  just the natural curiosity of, you know, what they're

FILED, Case 8:18-cv-02441-MAS Document 02-1 Filed 09/14/18 Page 39 of 61 PageID: 6242
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

1 kind of saying about us in particular, not, you know,
2 about, you know, the facts or, you know, that sort of
3 thing, but what are they saying about us.  But that's
4 not going to change, you know, the way I feel or how
5 I'm going to apply the law in my decision, so --
6 　　　　THE COURT:  Okay.  Counsel, any questions of
7 Laura?
8 　　　　MR. TACOPINA:  Yeah.  Laura, I just wanted --
9 how do you guys know Court TV's giving you nicknames?
10 　　　　MS. KREPPS:  I can't remember exactly like
11 who had said it, but, you know, people that do watch
12 Court TV -- like I don't really watch Court TV, me
13 personally, but I remember somebody saying like yeah,
14 you know, it's known that, you know, when they do cover
15 trials that jurors get nicknames, like that sort of
16 thing, so --
17 　　　　MR. TACOPINA:  One of the jurors said that to
18 you?
19 　　　　MS. KREPPS:  Yeah.  I think it was just up in
20 conversation like that sort of thing.
21 　　　　MR. TACOPINA:  Was that the same juror who
22 told you about the nicknames in this case?
23 　　　　MS. KREPPS:  I can't say that it is or it
24 isn't because I know it's not -- I can't say like, you
25 know, I think it's Bachetti, like the same person

1 always kind of saying hey, Court TV said this or they
2 nicknamed the jurors, like that sort of thing.
3 　　　　MR. TACOPINA:  The same person.
4 　　　　MS. KREPPS:  I don't think it's the same
5 person.
6 　　　　MR. TACOPINA:  Oh.  You don't?
7 　　　　MS. KREPPS:  No because I can't say it's
8 always this person saying Court TV this or that sort of
9 thing, but I just remember it just being like an
10 overall discussion, but I honestly don't know where it
11 kind of stems from or that sort of thing, so --
12 　　　　MR. TACOPINA:  Okay.
13 　　　　MS. PREZIOSO:  May I, your Honor?
14 　　　　THE COURT:  Sure.
15 　　　　MS. PREZIOSO:  Just to be clear, your
16 discussions have all been about the jurors and how the
17 media is handling the jurors, correct?
18 　　　　MS. KREPPS:  Yeah.
19 　　　　MS. PREZIOSO:  So it's been nothing about
20 she's innocent or she's guilty or anything like that?
21 　　　　MS. KREPPS:  No.  No.  There's never been
22 anything like facts or hearsay or what, you know, the
23 media's opinions are, like that sort of thing.
24 　　　　MS. PREZIOSO:  Sure.
25 　　　　MS. KREPPS:  It's just pretty much wanting to

FILED, Case 3:18-cv-02241-MAS Document 2-80 Filed 09/14/18 Page 40 of 61 PageID: 6243
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

1 know like, you know, they're talking about, what are
2 they saying about us.
3      MR. TACOPINA:  What are they saying about you
4 guys?
5      MS. KREPPS:  Did they give us like Tweedledee
6 and Tweedledum or nicknames, stuff like that.
7      MS. PREZIOSO:  Has anything about how the
8 media is treating the jurors -- has that had any impact
9 on the deliberations?
10      MS. KREPPS:  No.  No.  Yeah.  There's no --
11 no -- like we're in there, we're really like --
12      MS. PREZIOSO:  I didn't mean to ask --
13      MS. KREPPS:  No.  I totally understand.
14 Yeah.  No.  No.
15      THE COURT:  All right.  Anything else,
16 counsel?
17      MR. TACOPINA:  No.  Thanks.
18      MS. KREPPS:  All right.
19      THE COURT:  Laura --
20      MS. KREPPS:  All right.
21      THE COURT:  -- please don't talk to any of
22 the other jurors about this and don't talk to anybody
23 else about it.
24      MS. KREPPS:  Sure.  Sure.  Thanks
25      (Laura Krepps left chambers.)

1      MS. PREZIOSO:  Judge, may I take a tissue?
2      THE COURT:  Yeah.  Sure.
3      MR. TURANO:  It's like someone's watching TV.
4      MS. PREZIOSO:  I didn't take it like that.
5 She said prior trials.
6      MR. TACOPINA:  She said nicknames in this
7 case.
8      MR. ROMANYSHYN:  I don't know whether anybody
9 said specifically names were given in this case.
10      (Juror Teresa Victoriano entered chambers.)
11      THE COURT:  Hi, Teresa.
12      MS. VICTORIANO:  Hello, sir.
13      THE COURT:  As you know, the Court will from
14 time to time interview jurors to see if there's any
15 problem with media coverage or anything like that.  So
16 I have learned that one of the jurors -- one of the
17 jurors was excused sent a note into the jury, so I need
18 to talk to you about it.  I've talked to all the jurors
19 about it.
20      Do you know anything about this note that was
21 sent into the jury from one of the excused jurors?
22      MS. VICTORIANO:  A note from one of the
23 jurors -- jurors that were excused?
24      THE COURT:  Yes.
25      MS. VICTORIANO:  It was just a card, sir --

Teresa Victoriano                                              80

```
 1          THE COURT:  Card.
 2          MS. VICTORIANO:  -- that was sent out just
 3  basically thanking that the jury -- you know, the whole
 4  jury, that there were -- we were all -- we got along
 5  well and that it was unfortunate that she could not,
 6  you know, complete her -- you know, her time, you know,
 7  because of the problem.
 8          THE COURT:  Okay.  When did this come to your
 9  attention?  I mean when did you learn about the note?
10          MS. VICTORIANO:  I think that was the time --
11  I know it was this week.  Could be -- could be Tuesday.
12          THE COURT:  Do you remember how it was
13  brought to your attention?
14          MS. VICTORIANO:  Well, one of our jurors
15  actually just, you know, sent -- you know, just
16  happened to have it and she said that it was left on
17  her -- on her car.
18          THE COURT:  Was it read to everybody?
19          MS. VICTORIANO:  Yeah.  We read that.  Yeah.
20          THE COURT:  Do you remember anything in
21  particular about what it said?
22          MS. VICTORIANO:  I would -- I heard -- I'm
23  sorry.  I read the card.  Everybody, you know, knew
24  about it, and I actually read it, yes.  She was just
25  thanking everyone and she was actually -- there was
```

Teresa Victoriano                                              81

```
 1  just mention that she had -- she just said that she --
 2  you know, she just had to do some researches about the
 3  case, but she did not particularly mention anything
 4  about -- you know, anything about our case or anyone
 5  but us, you know, nothing.  It was just general, you
 6  know.
 7          THE COURT:  She did mention that she was the
 8  juror with the hard eyes?  You remember reading that?
 9          MS. VICTORIANO:  Yes.
10          THE COURT:  What does that mean?  If you
11  know.
12          MS. VICTORIANO:  I don't know, sir, but from
13  the -- I -- I -- I think it's from the card she said
14  don't worry about the juror that has hard eyes or
15  something.  She said it was me, something like that.
16          THE COURT:  Okay.  But what did that refer
17  to?
18          MS. VICTORIANO:  I -- I have no idea, sir.
19          THE COURT:  Was there some talk among the
20  jurors about some juror having hard eyes or something
21  like that?
22          MS. VICTORIANO:  No, sir.  It probably -- she
23  probably picked it up from -- from the newspaper or
24  from media.
25          THE COURT:  Okay.  During the course of this
```

FILED, Case 2:18-cv-02431-MAS Document 102-4 Filed 09/14/18 Page 42 of 61 PageID: 6245
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

```
 1   trial and now have there been any discussions by the
 2   jurors about what's out there in the newspapers or
 3   what's out there on the internet or anything like that?
 4          MS. VICTORIANO:  Not from my side, sir.  I
 5   mean I don't know anything about it.
 6          THE COURT:  Well, have you overheard other
 7   jurors mentioning anything about the case that was on
 8   the internet or, you know, in the newspapers or
 9   television or anything?
10          MS. VICTORIANO:  Some of the -- I just
11   overheard one of them say that, you know, some were in
12   the paper, no names, just our numbers, and basically
13   they just mentioned where we came from and our ages.
14   That's all.  But --
15          THE COURT:  Have you -- this is an important
16   question.  Have you heard anything about the case,
17   either on television, you know, on the internet, read
18   anything on the internet, newspaper or from any other
19   juror about information not coming from the courtroom
20   that would in any way influence your judgment or
21   deliberations about this case?
22          MS. VICTORIANO:  No, sir.
23          THE COURT:  Can you -- will you be able to
24   follow the law and decide this case based only on the
25   evidence that's been presented in the courtroom?
```

```
 1          MS. VICTORIANO:  Yes, sir.
 2          THE COURT:  Mr. Tacopina, you look like you
 3   have a question.
 4          MR. TACOPINA:  No.  No.  No.  I don't, for
 5   once.
 6          THE COURT:  Sorry.  Anybody else have a
 7   question?
 8          MS. PREZIOSO:  No.  No.  Thank you very much.
 9          THE COURT:  All right.  Miss Victoriano,
10   again please don't discuss this conversation with
11   anybody.  We try not to have the jurors talking about
12   stuff other than the merits of the case.  Okay?
13          All right.  Thank you very much.
14          MS. VICTORIANO:  Yes, sir.
15          THE COURT:  Thank you very much.
16   (Ms. Teresa Victoriano left chambers.)
17          THE COURT:  Okay.
18   (Juror Franklin Wright entered chambers.)
19          THE CLERK:  Juror number eight.
20          THE COURT:  Hi, Mr. Wright.  How are you?
21          MR. WRIGHT:  Okay.  How are you?
22          THE COURT:  How you doing today?
23          I'm back on the interview of jurors at the
24   moment here.  Every now and then, as you know, when
25   there's a lot of media coverage in the case, I've
```

FILED, Case 2:18-cv-02411-MAS Document 02-11 Filed 09/14/18 Page 43 of 61 PageID: 6246
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

1  explained this before, the Court will interview the
2  jurors to see how things are going or to make inquiry
3  about any specific questions.
4            In this case I learned that one of the
5  excused jurors had written a note or a card to the rest
6  of the jurors --
7            MR. WRIGHT:  Uh-huh.
8            THE COURT:  -- and although she was a juror
9  at one time obviously now she's not a juror any more,
10  so she has written a note and so I got to make some
11  inquiry about it.  So, first of all, can you tell me
12  what you know or remember about this card or this note.
13            MR. WRIGHT:  I know it was put on one of the
14  juror's cars.  It said to the jurors.  I think she said
15  she was praying to God to give her the strength to get
16  through this and the next day it rained and her
17  basement flooded, so that was -- that was -- that was
18  God's answer I guess for her not to be on the jury.
19  That's -- wishing us well.  And that was basically it.
20  That's all I took from it.
21            THE COURT:  This -- there was a part -- two
22  parts in the note that I want to talk about.  The first
23  part is this saying to you, all of you, that she hopes
24  you will have the wisdom to do what is right.  Now, has
25  she previously suggested to any members of the jury how

1  they should vote or what their verdict should be or
2  anything like that?
3            MR. WRIGHT:  No.  No.
4            THE COURT:  I mean did you take that to be an
5  expression of her opinion to you as to what you should
6  do?
7            MR. WRIGHT:  No.  No.  Not really.
8            THE COURT:  What did you make of that
9  particular --
10            MR. WRIGHT:  I mean, you know, I hope we have
11  the wisdom to do what's right meaning we've heard the
12  case, we have to apply the law and the law is what it
13  is.  We have to apply what the law says about it and
14  whatever verdict comes is what's -- what's -- that's
15  what's doing right.  That's it.
16            THE COURT:  Second thing.  She made some
17  mention about her being the one with the hard eyes and
18  that she intrigues the bloggers.  So, you know, she's
19  talking apparently.  I know that she had said in the
20  letter that she had now gone out to do some research
21  because she wasn't on the jury any more, but this seems
22  to refer to earlier discussions about some juror with
23  hard eyes.  What do you remember about that, if
24  anything?
25            MR. WRIGHT:  Really nothing, tell you the

Franklin Wright                                        86

```
 1   truth.  I mean by hard eyes I think it was -- I don't
 2   know that may have came through saying the juror with
 3   hard eyes, but there's so many conversations going on,
 4   it's -- I just wouldn't -- to me, to know that I'm
 5   pretty focused, and if something like that, it just
 6   went over my head.  It's not something I entertained to
 7   tell you you the truth.
 8           THE COURT:  Have there been discussion about
 9   what's going out on the television or on the internet
10   or in the newspapers about the case?
11           MR. WRIGHT:  In the jury room?
12           THE COURT:  Yeah.
13           MR. WRIGHT:  Not -- not something that
14   would -- that would -- not really, no, not -- not
15   something that would -- would cause anybody to change
16   in a new direction or something like that.
17           THE COURT:  I don't want to get into your
18   deliberations.  Okay?
19           MR. WRIGHT:  Yeah.  Yeah.
20           THE COURT:  Those remain confidential.  But
21   before the deliberations begun or, you know, at any
22   time outside the deliberations I mean have there been
23   specific discussions among jurors about, you know, what
24   the internet is reporting or what the TV is reporting
25   or the newspapers are reporting?
```

Franklin Wright                                        87

```
 1           MR. WRIGHT:  Has there been discussion?
 2           THE COURT:  Yeah.
 3           MR. WRIGHT:  Meaning --
 4           THE COURT:  About what they're saying out
 5   there about the case or the facts of the case or about
 6   the jurors, I mean anything like that?
 7           MR. WRIGHT:  There was a couple -- yeah,
 8   couple things that were said.  To what -- what they
 9   were I really didn't -- couldn't -- couldn't tell you
10   what they were, but there were some -- this -- some
11   discussion about it.
12           THE COURT:  Anything about the facts of the
13   case or the merits of the case?
14           MR. WRIGHT:  No.  No.  Nothing like that.
15           THE COURT:  Anything that would tend to
16   influence you in the way you would decide the case?
17           MR. WRIGHT:  No.
18           THE COURT:  I mean have you been exposed to
19   any information that would in any way, you know, cause
20   you to be influenced, you know, so you couldn't decide
21   the case based on the evidence?
22           MR. WRIGHT:  No.  No, not me.  No.
23           THE COURT:  Counsel, anything further?
24           MR. TACOPINA:  No.
25           MS. PREZIOSO:  No.
```

FILED, Case 2:18-cv-02411-MAS Document 102-14 Filed 09/14/18 Page 45 of 61 PageID: 6248
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

Victoria Kim                                              88

```
 1          THE COURT:  Okay.  Mr. Wright, please just --
 2  you know, don't discuss this with anybody.
 3          MR. WRIGHT:  I know.  I won't.  I won't.
 4          THE COURT:  Thanks a lot.
 5          MR. WRIGHT:  Okay.
 6      (Mr. Wright left chambers.)
 7          THE COURT:  Can we get Victoria Kim in.
 8      (Juror Victoria Kim entered chambers.)
 9          THE COURT:  Hello, Victoria.  How are you?
10          That's the better seat.
11          How you doing?
12          I wanted to talk to you a little bit.  As you
13  know, from time to time the Court will speak to the
14  jurors if there's been any kind of media coverage that
15  might have gotten into the jury or any type of
16  communication from an outside source, and in this
17  particular case I've learned that one of the jurors
18  that was excused has written a note or a card to the
19  jury and I just wanted to talk to you guys about it
20  just to make sure I understood it and see how you felt
21  about it.  Can you tell me what you remember about
22  that.
23          MS. KIM:  That she was just wishing us all
24  well and that she missed us, and that was really about
25  all that I remember.
```

Victoria Kim                                              89

```
 1          THE COURT:  How do you -- do you remember
 2  when you first learned about the card or where you were
 3  told about the card?
 4          MS. KIM:  In the jury room.
 5          THE COURT:  In the jury room?
 6          MS. KIM:  Yeah.  Laura came in and said she
 7  found it on her car and she didn't know who it was and
 8  she tried to, you know, put so she didn't have
 9  fingerprints or anything on it, so and then she opened
10  it and it was from Luanne.
11          THE COURT:  Now, did she read it to
12  everybody?
13          MS. KIM:  Yes.
14          THE COURT:  So you heard what it said, right?
15          MS. KIM:  Yes.
16          THE COURT:  There's a couple things it said
17  that I do want to go over with you and the first one
18  is -- and, by the way, I don't want to get into
19  deliberations.  All right?  Those are confidential.  So
20  I'm not asking you to talk about the deliberations, but
21  I do want to talk about this note.  The note said
22  something to the effect that she was praying to all of
23  you to have the wisdom to do the right thing.  Had she
24  expressed to you what she meant by that previously or
25  did -- was she -- did you take this to mean that she
```

Victoria Kim                                              90

1   was rendering an opinion to you as to how you should
2   decide this case?
3              MS. KIM:  No.
4              THE COURT:  What did you think she meant by
5   that?
6              MS. KIM:  Just that we had to do what we felt
7   was right.
8              THE COURT:  But you don't know what she
9   thought you should do?
10             MS. KIM:  No.  I really didn't talk to her
11  much.
12             THE COURT:  Okay.  Now, the other thing she
13  said was that somehow she had learned now from
14  researching the case on I guess the internet that she
15  was the juror with the hard eyes.  What do you make of
16  that?
17             MS. KIM:  I didn't hear that one.  I didn't
18  hear that one.
19             THE COURT:  Okay.  Does that mean anything to
20  you, that she's the juror with the hard eyes?
21             MS. KIM:  I think if anybody had hard eyes it
22  was me.  No.
23             THE COURT:  But have you heard?  Was there
24  any discussion before that you're aware of?
25             MS. KIM:  That's the first time I heard that.

Victoria Kim                                              91

1              THE COURT:  Has there been any discussion
2   among the jurors aside from this communication about
3   the internet or about TV or about the newspapers and
4   what they were saying about the case?
5              MS. KIM:  Well, we were all kind of wondering
6   how all our ages and where we lived and everything got
7   into the newspapers.
8              THE COURT:  How -- now, how -- first of
9   all --
10             MS. KIM:  Well, my husband came out
11  laughing --
12             THE COURT:  I'm not even sure that's really
13  happened, but -- I really am not.  But how did it get
14  to be reported to you that it happened?
15             MS. KIM:  Well, my husband came out laughing
16  to me you're in the paper.  I said what.  And he said
17  yeah, and he said you're blah, blah, blah.  And I said
18  well, I'm not juror number whatever.  So they had me
19  wrong anyway.
20             THE COURT:  Okay.
21             MS. KIM:  And that's all he told me.  So and
22  then somebody came in the next day.  We all -- because
23  it wasn't just me that heard it.
24             THE COURT:  So -- so -- so -- so did your
25  husband tell you anything else about what the paper

FILED, Clerk of the Appellate Division, July 18, 2018, A-002180-14, SEALED
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

```
 1   said?
 2            MS. KIM:  No.  I couldn't be bothered.
 3   I couldn't be bothered.
 4            THE COURT:  These discussions, you know,
 5   among the jurors or about the fact that jurors'
 6   information, if you want to call it that, may have been
 7   in the paper, was there anything more specific than
 8   that, anything that got into the merits of the case?
 9            MS. KIM:  No.
10            THE COURT:  Would -- would the fact that you
11   heard this information -- is that going to influence
12   you in any way in terms of how you decide this case?
13            MS. KIM:  No.
14            THE COURT:  Are you satisfied that, you know,
15   even though this note has been talked about or, you
16   know, the fact that jurors' information has been in the
17   paper, are you satisfied that that's not going to
18   influence you in any way?
19            MS. KIM:  No, I don't think so.
20            THE COURT:  Okay.  Well, first of all,
21   counsel, do you have any questions?
22            MR. TACOPINA:  No.
23            MS. PREZIOSO:  No, Judge.
24            THE COURT:  I do want to say to you just so
25   it's clear, first of all, the Court -- your names and
```

```
 1   the town that you're from are part of the official
 2   public records of the county, from voter registration
 3   and from driver's license, and people can get that
 4   information.  Your addresses and your phone numbers are
 5   not.  Unless you have, you know, a published phone
 6   number, so -- and your ages are not, so I mean I
 7   don't -- I haven't seen any newspaper articles with,
 8   you know, names or where you're from or addresses, but
 9   it would not be impossible for somebody to get your
10   names and the towns that you're from because that is
11   a public record --
12            MS. KIM:  All right.
13            THE COURT:  -- and that's always been a
14   public record, all of these lists that the government
15   maintains about, you know, voters and driver's --
16   driving records are public records, but we don't give
17   that information out, so you shouldn't be worried.  We
18   don't give home addresses out or home phone numbers.
19   Now, from time to time people have unlisted numbers and
20   there are other ways that, you know, reporters can find
21   out, and I've asked everybody if somebody contacts you
22   about this case you got to let me know, but I
23   wouldn't -- you shouldn't worry about it.  There's
24   really nothing to worry about.
25            All right.  Well, thank you very much.
```

FILED, Case 3:18-cv-02421-MAS Document 10-14 Filed 09/14/18 Page 48 of 61 PageID: 6251
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

1       Please don't discuss this conversation with
2  the other jurors and make sure your husband doesn't
3  tell you anything about the case.
4       MS. KIM:  No, he won't.
5       Thank you.
6       MS. PREZIOSO:  Thank you very much.
7       MS. KIM:  Thank you.
8  (Ms. Kim left chambers.)
9  (Juror Sandra Eid entered chambers.)
10       MS. EID:  Hello.  Hello.
11       THE COURT:  Hello, Sandra.  How you doing?
12       MS. EID:  Good.  How are you?
13       THE COURT:  Have a seat.
14       I just wanted to get together and speak to
15  you a little bit.  Whenever there's any possibility
16  that there's been media coverage about the case that
17  may have been communicated to a juror or any
18  communication from a non-juror to the jury I have to
19  talk to jurors about it and in this case I've come to
20  learn that one of the excused jurors sent you guys
21  a card, and so technically she's not a juror any more,
22  you know, and, therefore, when she sends you a card we
23  have to talk about it, see what that means to you.
24       First of all, what do you know about this
25  card or what do you remember about this card?

1       MS. EID:  Okay.  I remember Laura came in
2  that morning and said that there was something on her
3  car and she was nervous about it, like she was scared
4  because she's like what is this on my car, and then she
5  turned it over and it said to the jurors, and she's
6  really scared about picking it up and everything, that
7  she was really careful she said, so she thought, you
8  know, may be a possibility there was something crazy in
9  it, but then when she opened it she saw all this
10  writing and she was still crazy because she's like
11  I don't see a name, I don't see a name.  So she was
12  looking for a name and then finally she turned it over
13  and it was from Luann, so she calmed down.  And it was
14  just basically saying that she had prayed for us that
15  we would make the right decision and -- and that was it
16  really, you know, that she had prayed for us and just
17  God be with you and -- something to that effect.
18       THE COURT:  Okay.  Had she ever communicated
19  to you or said to you or tried to suggest to you what
20  the right decision would be?
21       MS. EID:  No.  No.
22       THE COURT:  So you -- you took it to mean she
23  was just talking generally about making the right
24  decision?
25       MS. EID:  Yeah.

Sandra Eid 96

1      THE COURT:  Now, there's one part in the
2  letter that she talks about the fact that she has
3  learned from watching TV and researching the internet
4  that she was the juror with the hard eyes.  Do you
5  remember that?
6      MS. EID:  Yes, I do.  I do remember that.
7  When the letter was received people were talking about
8  it, like the group was talking about it, because we --
9  they opened it up and everybody was looking at it
10  together, you know --
11      THE COURT:  Right.
12      MS. EID:  -- but that wasn't like a big
13  thing, to me at least, you know.
14      THE COURT:  Well, do you know what she was
15  referring to when she said that she learned that she
16  was the juror with the hard eyes?
17      MS. EID:  That she had hard eyes.  I mean
18  I don't know.
19      THE COURT:  Well, I mean had there been a
20  discussion about a juror with hard eyes before that was
21  on the internet or on television or anything like that
22  that you were a part of?
23      MS. EID:  I didn't know anything about the
24  hard eyes thing until this letter came out, so --
25      THE COURT:  Have you been involved or have

Sandra Eid 97

1  you heard any other discussions among the jurors about
2  how they were being characterized on the internet or
3  anything about the case on the internet or on TV or in
4  the newspapers?
5      MS. EID:  Internet or TV or newspapers?  I'm
6  trying to remember if anybody ever said anything about
7  that.  I think somebody might have said at one point,
8  and I can't remember who it was, something about that
9  there's a blogger, there's a court blogger or something
10  like that in the -- that sits in the benches and
11  depicts who everyone is, who the jurors are or
12  something, something like that.  But I didn't know
13  anything about the hard eyes until that letter came out
14  and that supposedly it was Luann because she said it in
15  the letter.
16      THE COURT:  Right.  Do you remember who it
17  was that made this comment about the blogger?
18      MS. EID:  Who made the comment about the
19  blogger?  That's hard to say.  It was just like general
20  conversation.  It wasn't --
21      THE COURT:  You don't remember specifically
22  who might have said it?
23      MS. EID:  No.
24      THE COURT:  Counsel, do you have any
25  questions of Sandra?

FILED, Case 3:18-cv-02431-MAS Document 00921804-14 Filed 09/14/18 Page 50 of 61 PageID: 6253
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

```
 1        MR. TACOPINA:  No.
 2        MS. PREZIOSO:  I do.
 3        The discussions about the blogger --
 4        MS. EID:  Sure.
 5        MS. PREZIOSO:  -- did any of it involve facts
 6   about the case or whether the defendant was innocent or
 7   guilty or not guilty or anything like that?
 8        MS. EID:  No.  Absolutely not.
 9        MS. PREZIOSO:  Was it all about how the media
10   was regarding the jury?
11        MS. EID:  Yes.
12        MS. PREZIOSO:  And beyond how the media is
13   regarding the jury was there anything else discussed
14   about the facts of the case or opinions on the case or
15   media on the case or anything that would involve
16   bringing in information from outside of this courtroom?
17        MS. EID:  No.  Absolutely not.
18        MS. PREZIOSO:  Thank you.
19        MS. EID:  That's it?
20        MS. PREZIOSO:  Thank you.
21        THE COURT:  Okay.  All right.  Sandra, I'm
22   going to ask you not to discuss our conversation here
23   with anybody because I really -- you know, people
24   remember things differently, so I want everybody to
25   tell me what they remember without influence from
```

```
 1   others.
 2        MS. EID:  Sure.  Sure.
 3        THE COURT:  Okay.  Again make sure no one
 4   from outside the jury talks to you about the case and
 5   if that should ever occur you have to report that to
 6   me.
 7        MS. EID:  Right.
 8        THE COURT:  Okay?
 9        MS. EID:  Uh-huh.
10        THE COURT:  Thank you.
11        MS. PREZIOSO:  Thank you.
12        MS. EID:  Thank you.
13        MS. PREZIOSO:  Thank you.
14     (Ms. Eid left chambers.)
15     (Juror Antowon Hinton-Graham entered chambers.)
16        MS. PREZIOSO:  Hello.
17        MR. ROMANYSHYN:  Hi.
18        MS. PREZIOSO:  How are you?
19        THE COURT:  Hi.  Antowon, have a seat.
20        As I explained to you the last time we spoke,
21   every now and then when, you know, there's a
22   possibility of some outside communication to the jury
23   the Court has to inquire about it just to make sure,
24   you know, it's nothing inappropriate or doesn't have
25   the potential to influence anybody.
```

FILED, Case 8:18-cv-02411-MAS Document 9-1 Filed 09/14/18 Page 51 of 61 PageID: 6254
FILED, Court of the Supreme Court, 29 Aug 2017, 079925, SEALED

1       I learned today that one of the excused
2  jurors had sent a note in to the jury.  So it's
3  something because she is no longer a juror and she
4  sends a note in I got to talk to you guys about it, so
5  that's what this is all about.  And I guess the first
6  thing I'd like to do then is ask you, do you know
7  anything about this note or were you made aware of the
8  note?
9           MS. HINTON-GRAHAM:  Yes, I was.
10          THE COURT:  And what -- what do you remember
11 about the note and how were you made aware of it?
12          MS. HINTON-GRAHAM:  What I remember, a note
13 was put on one of the other juror's car.  It was a
14 card, and I don't think there was anything in detail,
15 it was just that she was sorry that she wasn't there to
16 see us through with the whole incident of everything.
17 And I didn't read the card, but just from memory it
18 was, you know, she was on the blog I guess and there
19 were a lot of things there, but she was tempted to say
20 something, but she chose not to, and she'll just have
21 us all in her prayer.
22          THE COURT:  Okay.  She did mention in the --
23 two things that I wanted to go over a little bit with
24 you.  One was this issue of the blog where she said
25 something to the effect that she was the one with the

1  hard eyes.  Apparently when she looked at the
2  information that the bloggers were, you know, writing,
3  she came to conclude that she was the one with the hard
4  eyes.  What does that refer to?
5           MS. HINTON-GRAHAM:  I don't know who it was,
6  but I guess someone told them that they referred to
7  a juror as a hard-eyed person.
8           THE COURT:  You don't remember who mentioned
9  that or --
10          MS. HINTON-GRAHAM:  I'm not sure.  I'm not
11 positive to which juror.
12          THE COURT:  Do you have any idea?
13          MS. HINTON-GRAHAM:  It was a friend that told
14 the juror, but I don't recall which one actually.
15          THE COURT:  Okay.  Was there -- has there
16 been any -- by the way, I don't want to talk about your
17 deliberations.  Huh?
18          MS. HINTON-GRAHAM:  From memory -- I want to
19 say that possibly -- I don't know her number -- Linda.
20 I'm not sure.
21          THE COURT:  That would be juror number three.
22          MS. HINTON-GRAHAM:  I don't know if it was
23 that one.  I could be mistaken though.  I just heard
24 the comment, but I'm not sure to exactly who.
25          THE COURT:  Okay.  Would you -- again I don't

FILED, Case 3:18-cv-02431-MAS Document 02180-14 Filed 09/14/18 Page 52 of 61 PageID: 6255
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

```
 1  want to go into the deliberations.  Okay.  Those really
 2  should remain confidential.  But prior to the
 3  deliberations has there been any discussion among the
 4  jurors about anything else that was reported on the
 5  internet or reported on television or in the
 6  newspapers?
 7          MS. HINTON-GRAHAM:  The name -- well, not
 8  names, no one's names, but the I guess reporting of our
 9  numbers --
10          THE COURT:  Your numbers?
11          MS. HINTON-GRAHAM:  -- our numbers, where we
12  live and our ages.  That was it.
13          THE COURT:  Have you heard anything while you
14  were on this jury about information that has come out
15  outside the courtroom that would in any way influence
16  you or make it difficult for you to continue to follow
17  the law and be a fair juror?
18          MS. HINTON-GRAHAM:  No.
19          THE COURT:  Counsel, do you have any other
20  questions of Miss Hinton-Graham?
21          MS. PREZIOSO:  No.  Thank you.
22          THE COURT:  I will tell you, I'll go over it
23  a little more in detail when all the jurors are
24  present, but I know that from my discussions that there
25  is some concern about this issue of your identities.
```

```
 1  You should know that your names and your towns are
 2  matters of public record, they're pulled together from
 3  the voting records and the driving records, and
 4  consequently whether you're on a jury or not someone
 5  could find out your name and the town you're from.
 6  Your addresses and your phone numbers, assuming they're
 7  unlisted, are not records that are ever accessible, so
 8  I don't really know what was in the paper.  Okay?  But
 9  I can tell you that, you know, the Court does not
10  disclose and no one else to the best of my knowledge
11  can disclosure addresses or your phone numbers, so
12  much, if anything, was in the paper they would be able
13  to put down juror number four from South River or
14  something like that, you know, but it would not
15  disclose, you know, your actual address, so you really
16  shouldn't worry about that --
17          MS. HINTON-GRAHAM:  All right.
18          THE COURT:  -- but I'll discuss this a little
19  further with the jurors.
20          MS. HINTON-GRAHAM:  Okay.
21          THE COURT:  In the meantime I'm going to ask
22  you please don't talk to any of the other jurors about
23  this discussion because I'd like to hear from each one
24  individually without being kind of commingled, if you
25  will, and clearly if there is any discussion, if
```

FILED, Case 8:18-cv-02411-MAS Document 102-8 Filed 09/14/18 Page 53 of 61 PageID: 6256
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

1  anybody reports anything to you that's in the
2  newspapers or on television, you really need to let the
3  Court know so I can make further inquiry.  Okay?
4           MS. HINTON-GRAHAM:  Okay.
5           THE COURT:  Thank you very much.
6           MS. PREZIOSO:  Thank you.
7           MS. HINTON-GRAHAM:  Thank you.
8        (Ms. Hinton-Graham left chambers.)
9        (Juror Basil Thomas entered chambers.)
10          MS. PREZIOSO:  Hello.
11          MR. THOMAS:  Why am I always the last one?
12          THE COURT:  How are you, Mr. Thomas?
13          MR. THOMAS:  I'm doing good.
14          THE COURT:  I'm talking to the jurors today
15  because one of the excused jurors sent a card into the
16  jury and since she was already excused prior to the
17  time she sent the card in that means that someone from
18  outside the jury had a communication to the jury and,
19  therefore, I have to make inquiry about it.
20          MR. THOMAS:  Okay.
21          THE COURT:  So I'd like to know from you what
22  you know about this card, when you learned about it and
23  what you remember about it.
24          MR. THOMAS:  I think it was Monday morning or
25  Tuesday morning, I forgot which day it was, and when we

1  got upstairs Laura said she -- she was coming out of
2  her house and she walked downstairs and there was
3  something on her windshield, like she was very scared,
4  she didn't know what it was, and she picked it up and
5  she looked at the back and then she got relieved, and
6  she said I have a surprise for you guys, so when we got
7  upstairs she opened it up and she read the note from
8  Luann --
9           THE COURT:  Okay.
10          MR. THOMAS:  -- and in the note she said
11  I miss you guys, I prayed for you guys last night and
12  wish you all the best, and that was the gist of it.
13  She said I know it's going to be hard on you guys,
14  I wish I was there for you, I prayed for you last
15  night, and that was the extent of the letter.
16          THE COURT:  One of the things she said was,
17  you know, she -- she was praying that you would do the
18  right thing.
19          MR. THOMAS:  Correct.
20          THE COURT:  I guess one of the questions I
21  have is had she expressed to you or suggested to you
22  how you should decide this case or what the right thing
23  was?
24          MR. THOMAS:  No, sir.  No.
25          THE COURT:  So it's just a general do the

FILED, Case 3:18-cv-02411-MAS Document 10-14 Filed 09/14/18 Page 54 of 61 PageID: 6257
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED
FILED, Count or the Appellate Division July 18, 2018 AD-021180-14

```
 1  right thing?
 2          MR. THOMAS:  Right.  Correct.
 3          THE COURT:  Second thing is she did make
 4  mention of the fact that she now because she was
 5  excused -- which is okay, she was researching the
 6  internet and, you know, looking at television and she
 7  had learned that she was the juror with the hard eyes
 8  and I wanted to know what she meant by that because --
 9          MR. THOMAS:  I have no idea what she meant by
10  that.
11          THE COURT:  No?
12          MR. THOMAS:  No.
13          THE COURT:  Do you remember any discussions
14  among the jurors about somebody being characterized as
15  having hard eyes?
16          MR. THOMAS:  It might have been mentioned and
17  nobody didn't know who they were talking about, could
18  have been myself, so I -- I don't remember the contents
19  and what it was used.
20          THE COURT:  Do you know who might have
21  mentioned it?
22          MR. THOMAS:  No, I don't remember.  It wasn't
23  Laura really because I think at that time she wasn't
24  there, so I don't remember who actually mentioned that.
25          THE COURT:  Has there been anything else
```

```
 1  mentioned in the jury room about what's being printed
 2  out there on the internet or what's being in the
 3  newspapers or on television, you know, about the jurors
 4  or about the case?
 5          MR. THOMAS:  No.  Only Jennifer, she went to
 6  Canada.
 7          THE COURT:  Uh-huh.
 8          MR. THOMAS:  When she came back the last day
 9  which was Tuesday before she went back to Canada she
10  said somebody called her house and she didn't speak to
11  that person, somebody from -- I don't remember -- the
12  Asbury News or somebody called her because I don't know
13  how she knew that she wasn't going to be on the
14  deliberating jury, and they called her house and she
15  said she was very scared because she didn't know how
16  they got her number.  First she thought it was her
17  husband.
18          THE COURT:  Did she mention whether she had
19  a published number or not?
20          MR. THOMAS:  I don't remember, but she said
21  she was very scared, didn't know how that person got
22  her home number, but she never spoke to that person.
23  Her husband walked through the door and the dogs were
24  barking and she just hung up the phone and that was the
25  extent of that.
```

FILED, Case 3:18-cv-02421-MAS Document 02180-14 Filed 09/14/18 Page 55 of 61 PageID: 6258
FILED, Clerk of the Appellate Division, July 18, 2018, A-002180-14, SEALED
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

1          THE COURT:  Okay.  Counsel, any questions of
2   Mr. Thomas?
3          Okay.  Thank you again.  And please don't
4   discuss this with the other jurors because I want to
5   hear from each one individually without, you know, any
6   kind of comingling of memories or anything like that.
7          MR. THOMAS:  You only have one more to go,
8   so --
9          MS. PREZIOSO:  Thank you.
10          THE COURT:  Thank you very much, Mr. Thomas.
11          MR. THOMAS:  No problem.
12      (Mr. Thomas left chambers.)
13          MR. TACOPINA:  What is this, number 15?
14          THE COURT:  Yeah.  This is 15.
15      (Juror Celia Ahern entered chambers.)
16          THE COURT:  Hi, Miss Ahern.  How you doing?
17          MS. AHERN:  Good.
18          THE COURT:  I've been interviewing the jurors
19   because I learned today that one of the excused jurors
20   sent in a note to the jury and so when someone from
21   outside the jury sends in a note I have to talk to the
22   jurors about it and, you know, see if there's anything
23   that I need to address.
24          Do you know anything about this note?  I mean
25   have you heard about this note --

1          MS. AHERN:  No.
2          THE COURT:  -- from Luann Bachetti?
3          MS. AHERN:  Oh.  A card.
4          THE COURT:  A card.  I'm sorry.
5          MS. AHERN:  Yes.  She put a card on Lori's
6   thing and I read it, I read the note, and something
7   like I wish I could be there with you or something to
8   that effect.  I don't -- I don't remember it word for
9   word though.
10          THE COURT:  When did you learn about it?
11          MS. AHERN:  The day that Lori got it,
12   whatever day that was.  Oh.  It was probably Monday.
13          THE COURT:  Where were you when you read it?
14          MS. AHERN:  Downstairs in the jury assembly
15   room.
16          THE COURT:  Okay.
17          MS. AHERN:  She passed it around.  We read
18   it.
19          THE COURT:  All righty.  There's a couple
20   spots in here that I do want to talk about a little bit
21   if you have a recollection of them.  There's one spot
22   where she says that I hope you will have the wisdom to
23   do what is right.  Has she ever communicated to you
24   what you should do or how you should -- you know, what
25   kind of verdict you should reach or anything like that?

FILED, Case 2:18-cv-02411-MAS Document 02180-14 Filed 09/14/18 Page 56 of 61 PageID: 6259
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

1          MS. AHERN:  No.  In fact I didn't even recall
2     that.  I thought -- you know, no, absolutely not.  No.
3          THE COURT:  Okay.  And the other part of the
4     card talks about she was -- now she was excused she was
5     watching television and reading blogs on the internet
6     and she had learned that she was the one with the hard
7     eyes as though she -- you know, apparently someone on
8     the internet had called her somebody with hard eyes.
9          MS. AHERN:  That's right.
10          THE COURT:  What did that refer to?  I mean
11     what --
12          MS. AHERN:  I don't know who mentioned it,
13     but somebody said that Luann said oh, I'm the one with
14     the hard eyes, but I didn't know the background for I'm
15     the one with the hard eyes.
16          THE COURT:  Have you heard any discussions
17     before that that people were talking about a juror with
18     the hard eyes or --
19          MS. AHERN:  No.  I didn't know anything about
20     that.
21          THE COURT:  Okay.  Have you overheard any
22     discussions among the jurors about names that they
23     might have been referred by or, you know, anything on
24     the internet or television, newspaper about the case?
25          MS. AHERN:  Somebody in the jury said that

1     somebody said some newspaper had everybody's -- not
2     their name, their address -- not their address, the
3     town, the town where they lived, and how old they were,
4     but I didn't -- that was mentioned once, but I --
5          THE COURT:  You don't remember who mentioned
6     it by any chance?
7          MS. AHERN:  No, I don't.  I don't know who
8     mentioned it, but I don't know what that meant or how
9     that came about.
10          THE COURT:  Okay.
11          MS. AHERN:  I mean I don't think anyone told
12     anybody.
13          THE COURT:  Have you heard anything about
14     this case or about the jury that would in any way
15     influence your deliberations or make it difficult for
16     you to be a fair and impartial juror?
17          MS. AHERN:  No, I have not.
18          THE COURT:  You're still satisfied you can
19     decide this case based only on the evidence?
20          MS. AHERN:  Yes, I can.  Yes.
21          THE COURT:  All right.  Counsel, any
22     questions of Miss Ahern?
23          MR. TACOPINA:  No.  Thanks.
24          THE COURT:  Okay.  Thank you very much.
25          Please don't discuss this with the other

Celia Ahern                                              112

```
 1  jurors --
 2          MS. AHERN:  No, I will not.
 3          THE COURT:  -- because I'd like you all to
 4  have your own individual memories.
 5          MS. AHERN:  No, I will not.
 6          THE COURT:  Thank you.
 7      (Ms. Ahern left chambers.)
 8          THE COURT:  Denise, we can bring the jury out
 9  into the courtroom in a moment.
10          Counsel, what I'm going to do is excuse this
11  jury.  Now, I know you want me to ask them if they want
12  to continue to deliberate, but at this point I think
13  it's hopeless and -- why are you looking at me like
14  that?
15          MS. PREZIOSO:  What do you mean you think
16  it's hopeless, Judge?
17          THE COURT:  They're never going to be able to
18  continue to deliberate and reach a verdict tonight.
19          MS. PREZIOSO:  Oh.
20          MR. TACOPINA:  Yeah.  Tonight.
21          MS. PREZIOSO:  Oh.  You almost gave me a
22  heart attack, Judge.
23          THE COURT:  I wouldn't --
24          MR. TACOPINA:  He'll grant my application
25  later.  Don't worry.
```

Scheduling                                              113

```
 1          THE COURT:  Well, that's what I was going to
 2  suggest, but that's another reason I was going to
 3  excuse the jury.  You folks can absorb this information
 4  and contemplate what you want to do about it and if
 5  there is any application you could make it at 8:30 on
 6  Monday morning and this way I'll excuse the jury now.
 7  I'll instruct them as to not to discuss the case with
 8  anybody, give them some further instructions, and then
 9  I will need a little bit of, you know, advance notice
10  if I'm going to get any paperwork on this so I could
11  decide it first thing Monday morning without a heck of
12  a lot more delay because again the longer this goes on
13  the more likelihood of mischief as you could see, so --
14  and I don't think it's fair to any of you to ask you to
15  do this now without, you know, really -- you got notes,
16  you can think about this, take a look at the case law
17  and have a better reasoned kind of, you know, debate
18  about this on Monday if you're even going to have
19  a debate.
20          THE CLERK:  They're bringing them up now.
21          We still have C-7.
22          THE COURT:  Oh.  Yes.  Has everybody seen
23  C-7?
24          MR. TACOPINA:  Yes.
25          THE COURT:  Let me see C-7.
```

FILED, Case 3:18-cv-02431-MAS Document 02180 14 Filed 09/14/18 Page 58 of 61 PageID: 6261
FILED, Clerk of the Appellate Division, July 10, 2018, A-002180-14
Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

Jury question                                                    114

```
 1          THE CLERK:  Do you want them to at least
 2   start deliberating and give them this today?
 3          THE COURT:  No, I don't want them to start
 4   deliberating.  I think they're shot.
 5          The assignment judge is out there, wants to
 6   talk to me about something.  Is there any more
 7   circumstances -- see, this is your bum information that
 8   you -- I don't have to say bum.
 9          About the circumstantial information --
10   evidence, I think -- I don't know if you folks want to
11   stay here or whether you want to respond to this
12   Monday.  I'm going to excuse the jury.  I don't think
13   I can give them meaningful answers at this time without
14   hearing from you and I can't -- I don't see the point
15   of holding them any longer.
16          MR. TACOPINA:  I'd like you to give some info
17   on that, Judge.  We have some draft, some responses.
18          THE COURT:  If you want to wait I have to see
19   the assignment judge.  I'll come out, I'll excuse the
20   jury and you can either put what you want to put on the
21   record now or you can hold off until Monday.
22          MR. TACOPINA:  Let's do it Monday at 8:30,
23   your Honor, and in regards to any -- well, we'll hold
24   off until Monday, 8:30.  My concern was putting
25   anything about this on the record will be broadcast
```

Jury question                                                    115

```
 1   on TV.
 2          THE COURT:  I'm not going to ask you to put
 3   any applications on the record.  I'm just going to give
 4   them further instructions and then excuse them --
 5          MR. TACOPINA:  Okay.
 6          THE COURT:  -- and then I'll be right out.
 7          Thank you.
 8          MR. TACOPINA:  Yes.
 9       (The hearing resumed in the courtroom.)
10          THE OFFICER:  Jurors entering.
11          THE COURT:  Small elevator.
12       (The hearing resumed in the presence of the jury.)
13          THE COURT:  All right.  Everyone, please be
14   seated.
15          All right.  Members of the jury, first of
16   all, I want to thank you very much for your patience.
17   As I've explained to you individually, there are times
18   when because of certain developments the Court is
19   required to speak to each of you individually and that
20   process has been completed.
21          Given the hour there's no point in asking you
22   to deliberate any further this evening.  You have a
23   couple of questions, so I'm going to go over them with
24   counsel and we will reconvene at nine o'clock on Monday
25   morning.
```

FILED, Case 2:18-cv-02431-MAS Document 1-8 Filed 09/14/18 Page 59 of 61 PageID: 6262
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

```
 1              Now, some of you have expressed some
 2    awareness or concern that your names or identities or
 3    your home towns have been printed in the newspapers.
 4    As I've indicated to you, juror names and home towns
 5    are matters of public record.  The Court does not
 6    disclose anyone's address or home phone number, but
 7    from driving records and voter registration records
 8    your names and towns and residence are public records
 9    and have already been disclosed as part of the public
10    records access; however, you should understand that
11    no one is permitted to in any way contact you during
12    the course of this trial about the performance of your
13    duties and so if that should in any way happen you must
14    report that to me.
15              The other thing I want to say to you as
16    a group is that you've all been instructed by the Court
17    previously not to become exposed to any outside
18    information about the case, and I know that you've all
19    religiously followed that request from the Court, but
20    it does seem to me that there was perhaps some
21    misunderstanding or at least some feeling that if
22    someone tells you information about the fact that
23    jurors are being discussed or that the -- the jury
24    activities are being discussed, and that is an
25    exception to what I explained, you should understand
```

```
 1    that if there is any information about jurors in the
 2    case that this is also information about the case, so
 3    to speak.  When you were first selected I mentioned to
 4    all of you that there would be some interest in this
 5    case and that there would be observers observing these
 6    proceedings and you all promised me that you would not
 7    in any way be influenced by that fact, so in order that
 8    you can fulfill that promise and only decide this case
 9    based on the evidence I also want you to tell your
10    family and friends and loved ones not to mention it to
11    you even if there's an article about how many jurors
12    are still left and who has been excused or anything of
13    that sort.  Again I understand that none of you have
14    intentionally in any way tried to circumvent the
15    Court's rulings, but I think it's very important that
16    you not be exposed to anything about this case or about
17    you that might be on the internet or on television or
18    in the newspapers, so please try to stay away from any
19    such information.
20              I have your questions about circumstantial
21    evidence and awareness and I'm going to go over those
22    questions with counsel and first thing Monday morning
23    when you come up I will give you more instructions
24    about this issue of circumstantial evidence and
25    awareness and then you can continue your deliberations.
```

FILED, Case 2018-ap-0241-MAS Document 9-84 Filed 09/14/18 Page 60 of 61 PageID: 6263
FILED, Clerk of the Supreme Court, 29 Aug 2017, 079925, SEALED

Scheduling                                                    118

```
1              So I'm told the weather outside is beautiful
2    and I hope you have a nice weekend and we'll see you on
3    Monday morning.
4              Thank you very much.
5         (The following is out of the presence of the
6    jury.)
7              THE COURT:  All right.  Please be seated,
8    everyone.
9              Counsel, just so that there's no further
10   delay in the proceedings, I'm going to ask that you all
11   report to the court at 8:30 on Monday to, first of all,
12   address with the Court the appropriate response to
13   these questions.
14             You all have a copy of these questions,
15   right?
16             MR. TACOPINA:  Yes, your Honor.
17             THE COURT:  And if you want to raise any
18   other issues relating to today's proceedings at that
19   time we'll do that as well.  Okay?  But I'd like us to
20   start at 8:30 so when the jury gets here shortly after
21   nine we can continue.  Okay?
22             MR. TACOPINA:  Sure.
23             THE COURT:  Any questions?
24             MR. TACOPINA:  No, your Honor.
25             THE COURT:  All right.  Have a good weekend.
```

```
                                                          119
1         Thank you very much.
2                          *  *  *
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    C E R T I F I C A T I O N
 2
 3
 4     I, Linda Urbaniak, Certified Court Reporter, License
 5     Number XI00678, an Official Court Reporter in and for
 6     the State of New Jersey, do hereby certify the
 7     foregoing to be prepared in full compliance with the
 8     current Transcript Format for Judicial Proceedings and
 9     is a true and accurate compressed transcript of my
10     stenographic notes taken in the above matter to the
11     best of my knowledge and ability.
12
13
14
15                         Linda Urbaniak
16                    Linda Urbaniak
17                    Certified Court Reporter
18                    Official Court Reporter
19                    Middlesex County Courthouse
20                    56 Paterson Street
21                    New Brunswick, New Jersey
22
23
24
25     Date:  October 26, 2007
```