**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MELANIE MCGUIRE, | : | |
| | : | Civil Action No. 18-3411 (MAS) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| THE ATTORNEY GENERAL OF | : | |
| THE STATE OF NEW JERSEY, et al., | : | |
| | : | |
| Respondents. | : | |

**SHIPP, District Judge**

Petitioner, Melanie McGuire ("Petitioner"), filed an Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Am. Pet., ECF No. 3.) Respondents, the Attorney General of the State of New Jersey and Sarah Davis, filed an Answer. (Answer, ECF No. 7.) For the reasons stated herein, the Amended Petition is DENIED and a certificate of appealability shall not issue.

## I.      BACKGROUND

### A.      The Underlying State Court Proceeding

The New Jersey Superior Court, Appellate Division, in its opinion on Petitioner's direct appeal, succinctly set forth the facts underlying Petitioner's conviction as follows:

> Defendant and William "Bill" McGuire were married in 1999. They lived with their two boys in an apartment in Woodbridge. Bill worked as a computer program analyst for a college in Newark. Defendant worked as a nurse for a medical practice in Morristown. On April 28, 2004, they closed on the purchase of the first home they would own. They then returned to their Woodbridge apartment, and Bill called the gas company at 5:37 p.m. to transfer their account to the new house. At 5:44 p.m. and 5:59 p.m., he called

two good friends to tell them happily he had completed the purchase of his new house.

Later that evening, Bill did not return a call from the seller of the house, as he had done promptly on prior occasions. There is no evidence that Bill ever spoke to anyone again after 6:10 p.m. on April 28, 2004, other than perhaps defendant. Bill's silence was unusual because he was normally very active on his telephones and Blackberry, both socially and for work.

On three dates from May 5 to May 16, 2004, Bill's body was found in the waters near the Chesapeake Bay Bridge-Tunnel in Virginia. The body had been cut into three sections, drained of blood, wrapped in garbage bags, and packed into three matching suitcases. The medical examiner in Virginia found two bullets in the torso, and separate entrance and exit bullet wounds to the head and the chest. Also found in one of the suitcases was a blanket with markings from a hospital supply company.

Four weeks after Bill disappeared, the police notified defendant that her husband's body had been found and identified. In October 2004, New Jersey authorities took over jurisdiction of the murder investigation from Virginia. In June 2005, defendant was arrested and charged with Bill's murder.

(App. Div. Direct Appeal Op. 2–3, ECF No. 9-8.)

In October 2005, a New Jersey grand jury indicted Petitioner on the following charges: first-degree murder, in violation of N.J. Stat. Ann. § 2C:11-3; second-degree possession of a weapon for an unlawful purpose, in violation of N.J. Stat. Ann. § 2C:39-4a; second-degree desecration of human remains, in violation of N.J. Stat. Ann. § 2C:22-1; and third-degree perjury, in violation of N.J. Stat. Ann. § 2C:28-1. (*Id.* at 4.) In October 2006, a second indictment was issued which charged Petitioner with two counts of third-degree hindering prosecution, in violation of N.J. Stat. Ann. §§ 2C:29-3(b)(4), 2C:2-6; fourth-degree tampering with or fabricating physical evidence, in violation of N.J. Stat. Ann. § 2C:28-6(2); fourth-degree making of a false report to law enforcement, in violation of N.J. Stat. Ann. § 2C:28-4a; and four counts of third-degree possession of a controlled dangerous substance, in violation of N.J. Stat. Ann. § 2C:35-10a(1).

(Indictment *6–13, ECF No. 9-2.)[1]  The two indictments were consolidated for trial purposes. (App. Div. Direct Appeal Op. 4.)

The case proceeded to a jury trial where the prosecution called 64 witnesses, Petitioner called 16 witnesses, and the Court qualified a total of 21 expert witnesses.  (*Id.*)  After 23 days of trial and three days of deliberation, the jury entered a guilty verdict on all four charges of the first indictment and acquitted Petitioner of all the charges in the second indictment.  (*Id.* at 4–5.)  The court sentenced Petitioner to life in prison on the murder charge, which was merged with the weapons offense for sentencing purposes, subject to the provisions of New Jersey's No Early Release Act, N.J. Stat. Ann. § 2C:43-7.2.  (*Id.* at 5.)  The court also sentenced Petitioner to a concurrent ten-year prison term on the desecration of human remains charge and a consecutive five-year prison term on the perjury charge.  (*Id.*)

The Appellate Division affirmed Petitioner's convictions in a detailed 89-page decision. (*See generally id.*)  Petitioner thereafter filed a petition for certification to the New Jersey Supreme Court, which was denied.  (N.J. Sup. Ct. Order, Sept. 22, 2011, ECF No. 9-12.)

Following her direct appeal, Petitioner filed a petition for post-conviction relief ("PCR") in the Superior Court.  (PCR Pet., ECF No. 9-13.)  The PCR petition alleged that Petitioner received ineffective assistance of counsel in violation of the Sixth Amendment.  (*See id.* ¶ 10(a).) In a written decision issued following oral argument on the PCR petition, the Superior Court denied relief.  (Law Div. Op. 24, ECF No. 9-14.)  The Appellate Division affirmed that decision, (App. Div. PCR Op., Aug. 7, 2017, ECF No. 9-18), and the New Jersey Supreme Court denied certification, (N.J. Sup. Ct. PCR Order, Jan. 29, 2018, ECF No. 9-22).

---

[1] Page numbers proceeded by an asterisk refer to the page number on the ECF header.

### B.   Petition for Writ of Habeas Corpus

Petitioner filed the instant action on March 9, 2018. (Pet. 2, ECF No. 1.) She later filed an Amended Petition on April 30, 2018. (Am. Pet. *1.) The Amended Petition raises five grounds for relief. (*Id.* at *14–22.) In Ground One, Petitioner claims that jury taint deprived her of a fair trial. (*Id.* at *14.) In Ground Two, Petitioner asserts various incidents of prosecutorial misconduct. (*Id.* at *15.) In Ground Three, Petitioner challenges three evidentiary rulings made by the trial court. (*Id.* at *17.) In Ground Four, Petitioner raises several ineffective assistance of counsel claims related to her counsel's apparent failure to properly investigate certain issues. (*Id.* at *18– 19.) And, in Ground Five, Petitioner asserts that her right to effective assistance of counsel was violated as a result of the retainer agreement with her attorney, "in which counsel agreed to pay for any expert witnesses[.]" (*Id.* at *20.) Petitioner argues that this provision created a conflict between her and her counsel because he "had a financial interest in saving money" by not hiring expert witnesses. (*Id.*)

Respondents filed an answer in which they argue that Petitioner has failed to state a claim for habeas relief. (Answer 7–8.) Petitioner thereafter filed a reply. (Reply, ECF No. 8.) The matter is now fully briefed and ripe for disposition.

## II.   STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that [s]he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When a claim has been adjudicated on the merits in state court proceedings, a writ of habeas corpus shall not issue unless the adjudication of the claim,

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Parker v. Matthews*, 567 U.S. 37, 40 (2012) (citing § 2254(d));

*Conover v. Main*, 601 F. App'x 112, 114 (3d Cir. 2015) (citing § 2254(d)).   With respect to

§ 2254(d)(1), "clearly established Federal law . . . includes only the holdings, as opposed to the

dicta, of [the Supreme Court's] decisions[,]" as of the time of the relevant state-court decision.

*White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks omitted) (quoting *Howes v.

Fields*, 565 U.S. 499, 505 (2012)).  As for § 2254(d)(2), a state court decision is based on an

unreasonable determination of the facts only if the state court's factual findings are objectively

unreasonable in light of the evidence presented in the state-court proceeding.   *Miller–El v.

Cockrell*, 537 U.S. 322, 340 (2003).   Furthermore, federal courts must follow a highly deferential

standard when evaluating, and thus give the benefit of the doubt to, state court decisions.  *See

Felkner v. Jackson*, 562 U.S. 594, 598 (2011); *Eley v. Erickson*, 712 F.3d 837, 845 (3d Cir. 2013).

## III.   DISCUSSION

### A.   Ground One – Jury Taint

In Ground One, Petitioner claims that "jury taint" deprived her of her right to a fair trial.

(Am. Pet. *14.)  Specifically, Petitioner contends that

> (1) the jurors were repeatedly exposed to highly inflammatory media accounts; (2) the trial court did not voir dire the jurors properly; (3) the trial court failed to investigate evidence that jurors may have been posting to internet message boards during their deliberations; and (4) the trial court applied the wrong standard and burden of proof to the allegations of jury taint.

(*Id.* at *14.) Petitioner's claims appear to relate to two separate incidents involving jurors that occurred at trial.

### i. Media Accounts of Trial and Voir Dire

Petitioner's first two subclaims appear to relate to correspondence sent to the jury by an excused juror. Shortly before the conclusion of trial, a juror ("Juror 14") was excused due to the flooding of her home. (App. Div. Direct Appeal Op. 74.) After the jury began deliberating, the court clerk found in the jury room a letter from Juror 14, addressed to the other jurors, that read:

> To all –
>
> I cannot believe I am not there to see this through with all of you. I feel a little disappointed, although I can't say I'm not relieved as well. I had prayed on Sunday for help with the awesome task ahead of me this week and he sent wind and rain and I was excused. Careful what you pray for, right?
>
> I am praying for all of you today, that you will have the wisdom to do what is right.
>
> I have to tell you I spent all day yesterday reading blogs and watching closing arguments. It was so tempting to blog back, but I did not.
>
> Linda – I am the one w/ hard eyes :) and I intrigue the bloggers. They talk about us, but nothing terrible.
>
> Deb & Rafik – you must feel some relieve [sic] today too. Deb, if you get a moment (like you won't have all day) call me. [phone number].
>
> Good luck to you all. You are in my thoughts.

(*Id.* at 74–75 (alterations in original) (emphasis in original).) After the letter was found, the trial judge spoke with Juror 14 on the telephone and questioned her about the letter on the record with counsel present:

> The excused juror said that she had left the note on the windshield of Juror 5's car. Her purpose was to express support for her fellow

> jurors.  Regarding the meaning she intended by her advice to "do
> what is right," Juror 14 said she was a religious person who prayed
> for help in making the right decision, but she did not know what the
> right decision was in this case.  She also never discussed her views
> about a verdict with the other jurors.  Asked what she meant by the
> comment about "hard eyes," Juror 14 said one of the jurors had been
> told about an internet blog referring to a juror with hard eyes, and
> the jurors had attempted to guess who that juror was.  Juror 14 could
> recall no other discussions of material from the internet or news
> media.

(*Id.* at 75–76.)  The trial judge then conducted a voir dire of each remaining juror about Juror 14's

note and each juror "said that they did not interpret the note as urging them to reach a verdict either

way, and Juror 14 had not expressed her opinion of the outcome before being excused."  (*Id.* at

76.)  When pressed, each juror also stated that "the note had not and would not influence their

decision."  (*Id.*)  Some jurors seemed generally aware of media coverage of the trial and a few

jurors were aware of a blogger "who sits in the benches and depicts who everyone is."  (*Id.* at 77

(internal quotation marks omitted).)  All the jurors denied obtaining factual information about the

trial and case from any outside source.  (*Id.*)

The Appellate Division, acknowledging Petitioner's right to an impartial jury under the

United States and New Jersey Constitutions, determined that the "[t]he evidence developed

through the court's careful voir dire of the jurors affirmatively established that exposure to

extrinsic blogger information had not and would not affect their decision."  (*Id.* at 78, 80.)  Indeed,

the Appellate Division observed that:

> There was also no evidence that any juror was personally active on
> the internet regarding the case while serving as a juror.  The judge
> questioned the jurors thoroughly and determined that the
> information concerning the internet postings was passed on to the
> jury second-hand.  Each of the jurors denied accessing the internet
> personally; each denied reading any blogs or message boards.  The
> judge observed the jurors' responses and demeanor, and he accepted
> their credibility.  Furthermore, the jurors' assurances were implicitly
> confirmed by Juror 14's note.

(*Id.* at 82–83.)  The Appellate Division explained that Juror 14's letter was merely "an innocuous expression of goodbye and good luck." (*Id.* at 81.)

"The Due Process Clause of the Fourteenth Amendment guarantees state criminal defendants the right to a trial by an impartial finder of fact." *Barry v. Bergen Cnty. Prob. Dep't*, 128 F.3d 152, 163 (3d Cir. 1997) (citing *Morgan v. Illinois*, 504 U.S. 719, 726 (1992) and *Irvin v. Dowd*, 366 U.S. 717, 721–22 (1961)).  Inherent within this constitutional protection is the right to be tried by a jury that is free from outside influence. *Sheppard v. Maxwell*, 384 U.S. 333, 362–363 (1966) ("Due process requires that the accused receive a trial by an impartial jury free from outside influences.").  Indeed, the Supreme Court in *Sheppard* explained:

> Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused.  And appellate tribunals have the duty to make an independent evaluation of the circumstances.  Of course, there is nothing that proscribes the press from reporting events that transpire in the courtroom. . . . If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered.  But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception.  The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences.

*Id.*

In *Remmer v. United States*, the Supreme Court held that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial[.]" 347 U.S. 227, 229 (1954).  The presumption of prejudice, however, may be rebutted by the Government's showing, after notice to defendant and a hearing, "that such contact with the juror was harmless to the defendant." *Id.* Moreover, "the presumption of prejudice [may be] effectively

rebutted by a juror's credible profession of impartiality[.]" *United States v. Smith*, 319 F. Supp. 2d 527, 533 (E.D. Pa. 2004). *Remmer*'s presumption of prejudice applies only "in cases involving a 'direct communication [about the matter pending before the jury] between a juror and a third party during deliberations.'" *Perez v. D'Ilio*, No. 16-4767, 2019 WL 3943012, at *11 (D.N.J. Aug. 20, 2019) (alteration in original) (quoting *United States v. Lloyd*, 269 F.3d 228, 238–39 (3d Cir. 2001)).

Assuming that Juror 14's note constituted a direct communication between the jury and a third party, the Appellate Division's decision was neither contrary to, nor an unreasonable application of this Supreme Court precedent. The trial court conducted, to the extent allowable, a detailed voir dire of the jury to determine whether Juror 14's note had any effect on their deliberations. Each juror indicated that the letter would have no influence on their decision and that they did not read the letter as urging them to reach a certain outcome. Moreover, Petitioner has failed to allege any actual prejudice that occurred as a result of the jurors' receipt of the note from Juror 14. For these reasons, relief on this claim is denied.

## ii.     **Failure to Investigate Juror Activity on Message Boards**

Similarly related to Petitioner's right to a trial by an impartial jury, Petitioner alleges that the trial court "failed to investigate evidence that jurors may have been posting to internet message boards during their deliberations[.]" (Am. Pet. *14.) The Court discerns from the Appellate Division's decision that this claim relates to an issue that arose after trial had concluded. (App. Div. Direct Appeal Op. 83–84.) It appears that following trial, Petitioner's counsel "discovered blog entries suggesting that a member of the jury had posted a message [on the Court TV message boards] during the trial." (*Id.*) The trial court determined that it was unnecessary to re-interview the jurors about these postings. (*Id.* at 84.) Thereafter, counsel contacted Court TV for assistance

9

in locating the post allegedly made by a jury member. (*Id.* at 85.) Court TV conducted a search and found no record of any posting potentially made by a jury member. (*Id.*)

The Appellate Division determined that Petitioner had not presented evidence that there is a "realistic possibility" that her right to a fair trial was prejudiced. (*Id.*) The Appellate Division held:

> [T]he blogger evidence amounted to double hearsay. The messages
> we have quoted . . . suggest little likelihood that a member of the
> jury wrote the message referenced by other bloggers but never
> actually discovered. Weighed against that information were the
> statements of jurors that they had no direct exposure to internet
> blogs.
>
> Our review of the record discloses neither legal error in the
> procedures or standards applied by the trial court, nor abuse of
> discretion in its decision that exposure of jurors to extraneous
> information did not warrant a new trial.

(*Id.*)

Generally, "[a] criminal defendant is entitled to a determination of his or her guilt by an unbiased jury based solely upon evidence properly admitted against him or her in court." *Gov't of V.I. v. Dowling*, 814 F.2d 134, 138 (3d Cir. 1987) (citing *Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961)). Still, the Supreme Court has recognized that "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Therefore, the Supreme Court has instructed that "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.* Such determinations are made at voir dire hearings. *Id.* Based on this Supreme Court precedent, the Third Circuit has held that "[w]hen a party contends that members of the jury have been prejudiced by exposure to publicity, courts must examine three prongs: (1) whether the

publicity material is prejudicial; (2) whether jurors were exposed to it; and (3) whether the impartiality of any exposed juror has been compromised." *Pierce v. Bartkowski*, 11-5265, 2018 WL 4489679, at *10 (D.N.J. Sept. 19, 2018) (citing *Barry*, 128 F.3d at 163).

The Court finds that Petitioner has presented no reason to disturb the decision of the Appellate Division. The trial court considered the evidence presented by counsel about the message board postings and determined it was information that would be extraneous to the jury in rendering their decision. Having already conducted voir dire of the jurors regarding the letter from Juror 14, the trial court was satisfied that the jury was not exposed to internet postings about the trial. Petitioner has not specifically identified that the impartiality of any juror was compromised by the alleged postings. As a result, relief on this claim is denied.

### B.    Ground Two – Prosecutorial Misconduct

In Ground Two, Petitioner contends that her due process right to a fair trial was violated by several instances of alleged prosecutorial misconduct. (Am. Pet. *15.) Petitioner specifically alleges that the prosecutor engaged in misconduct by: (1) referring to hearsay testimony from George Lowery that the trial court had excluded; (2) making an "unsupported inference" that Petitioner's handgun, which was never recovered by law enforcement, was the murder weapon; (3) eliciting "inflammatory" testimony about the condition of the victim's body when it was recovered; and (4) eliciting allegedly prejudicial testimony from Dr. Miller about an affair he was having with Petitioner. (*Id.*) Petitioner also generally alleges that the prosecutor wrongfully speculated in her closing statement. (*Id.*) Each of these claims were raised on Petitioner's direct appeal.

For a prosecutorial misconduct claim to warrant federal habeas relief, the prosecutor's comments must have "so infected the trial with unfairness as to make the resulting conviction a

denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974)). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Id.* (internal quotation marks and citation omitted). When a prosecutor's comments raise appropriate considerations relevant to the criminal case, there is no prosecutorial misconduct. *Parker*, 567 U.S. at 47–48. In reviewing a claim of prosecutorial misconduct on a petition for habeas relief, "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

        i.     **George Lowery Testimony**

Petitioner's first prosecutorial misconduct claim relates to the prosecutor's use of hearsay testimony from witness George Lowery in her closing statement. (Am. Pet. *15.) Mr. Lowery, who worked with the victim before his death, testified that he had a discussion with the victim about purchasing a firearm around three months before the victim disappeared. (Apr. 9, 2007 Trans. 168:16–169:3, ECF No. 9-71.) During closing arguments, defense counsel argued:

> And lastly, you know, in April of 2004, Bill McGuire was talking about the purchase of a gun, undisputed. Well, the State will dispute it, but a co-worker of his. George Lowery came in here and said he told them, he told law enforcement October of 2005 that Bill McGuire and he had a conversation about the purchase of a gun, and they never reached out to him again. . . . They wanted nothing to do with this guy, because that also corroborates everything Melanie McGuire has been saying on these tapes they have been listening to about Bill wanted [sic] a gun and he couldn't get one because he was a convicted felon and she had to buy one for him.

(Apr. 16, 2007 Trans. 81:12–25, ECF No. 9-77.)

In response, the State argued during closing arguments:

> You heard from Mr. Lowery on the defense case who told you, and this is in the transcript, he had a conversation with Bill about purchasing a gun, but there is no evidence before you or during this trial that Bill wanted to purchase a gun.
>
> Look at the question and look how it's worded . . . I wouldn't put much stance [sic] on what Mr. Lowery said; but even so, what he said was there was a conversation with Bill McGuire about purchasing a gun. Not, not that Bill McGuire wanted to purchase a gun, and that's a very, very distinct and important difference.
>
> There is no evidence before you except for what the defendant says herself as an excuse that Bill McGuire wanted that gun.

(Apr. 17, 2007 Trans. 42:8–43:13, ECF No. 9-78 (emphasis added).)  Defense counsel did not object to the prosecutor's statement.

On direct appeal, Petitioner argued that the prosecutor's description of Mr. Lowery's testimony in her closing statement constituted prosecutorial misconduct; the Appellate Division disagreed.  The Appellate Division held that *defense counsel's* summation had "misrepresented the time when Lowery's conversation with Bill had occurred, and his remarks exaggerated that Lowery's testimony corroborated 'everything' defendant had said about a gun." (App. Div. Direct Appeal Op. 65.)  The Appellate Division also found, however, that defense counsel did not "misrepresent the actual content of Lowery's testimony" and that the prosecutor's response, therefore "exceeded the scope of inaccuracies in defense counsel's summation." (*Id.* at 65–66.)  Nevertheless, the Appellate Division held that the prosecutor's remarks were "harmless" when viewed in the context of the entire summation and all the evidence presented at trial. (*Id.* at 66–67.)  Thus, the Appellate Division found that the challenged remarks did not "raise 'a reasonable doubt as to whether the error led the jury to a result that it otherwise might not have reached.'" (*Id.* at 67 (quoting *State v. Daniels*, 861 A.2d 808, 821 (N.J. 2004)).

Upon this Court's review of the prosecutor's closing remarks, within the context of the entire trial, the Court does not find that they denied Petitioner a fair trial. The prosecutor's remarks responded to defense counsel's misrepresentations about Mr. Lowery's testimony and aimed to clarify the misstatements in defense counsel's summation. Even if the prosecutor's comments did exceed "the scope of inaccuracies in defense counsel's summation," when placed in context of the entire trial, the prosecutor's comments did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." (App. Div. Direct Appeal Op. 66–67); *Darden*, 477 U.S. at 181 (internal quotation marks and citation omitted); *see also Moore*, 255 F.3d at 105. As the Appellate Division stated, "the prosecutor's lengthy summation thoroughly and meticulously covered the mass of circumstantial and forensic evidence" against Petitioner. (App. Div. Direct Appeal Op. 66–67.) Furthermore, whether the victim wanted to purchase a firearm "did not refute evidence that defendant had used the gun to kill him." (*Id.* at 67.) Thus, this Court does not find that the state courts' adjudication of this claim was contrary to, or an unreasonable application of, clearly established federal law. Petitioner is not entitled to habeas relief on this claim.

### ii.     Inference Regarding Handgun

Petitioner next claims that the prosecutor engaged in misconduct by "infer[ing] that the handgun purchased by petitioner was the murder weapon[.]" even though the firearm purchased by Petitioner was never recovered. (Am. Pet. *15.) At trial, the State introduced testimony that Petitioner had purchased a Taurus .38 Special handgun and a box of .38 Special wad cutter bullets two days before her husband's disappearance. (Mar. 6, 2007 Trans. 144:13–146:18, ECF No. 9-51.) The State also introduced the testimony of two ballistics experts who testified that the bullets recovered from the victim's body were .38 Special wad cutter bullets. (Mar. 7, 2007 Trans. 94:2–101:18, 178:24–186:6, ECF No. 9-52.) The ballistics experts testified that the bullets had been

fired from a single gun with six lands and grooves with a right twist. (*Id.* at 95:14–97:13, 181:13–14.) After using an F.B.I. computer database to compile a list of manufacturers that made guns with those rifling characteristics, the ballistics experts discovered that Taurus – the manufacturer of the gun Petitioner had purchased – was one of the possible manufacturers of the murder weapon. (*Id.* at 98:4–13, 183:4–19.)

In her opening statement, the prosecutor stated that "[t]he evidence will show that on April 26, 2004 . . . the defendant purchased such a gun of a make and model absolutely consistent with what killed her husband[.]" (Mar. 5, 2007 Trans. 14:9–13, ECF No. 9-50.) The prosecutor reiterated this point again during her summation: "[t]he bullets that were removed from William McGuire's cut-up remains are consistent with the gun and with the bullets that [Petitioner] purchased earlier." (Apr. 17, 2007 Trans. 10:1–3.) On direct appeal, the Appellate Division held in dicta that "[w]e reject without discussion defendant's argument that the prosecutor's opening statement was prejudicial because it incorrectly told the jury ballistics evidence would prove that the 'make and model' of the murder weapon was the same as the gun purchased by defendant." (App. Div. Direct Appeal Op. 74 n.8.)

Here, the prosecutor's remarks during her opening and closing statements were fair comment on the evidence. *See United States v. Ellison*, 804 F. App'x 153, 157 (3d Cir. 2020) (holding that "'fair comment on the evidence adduced at trial'" is not prosecutorial misconduct (quoting *United States v. Reilly*, 33 F.3d 1396, 1421 (3d Cir. 1994))). The State's ballistics experts testified that the bullets recovered from the victim's body were .38 caliber wad-cutter bullets and that, based on the rifling characteristics, the bullets could have been fired from guns produced by six manufacturers, including Taurus. (Mar. 7, 2007 Trans. 94:25–98:13, 180:18–183:19.) Prior trial testimony established that Petitioner had purchased .38 wad-cutter bullets and a Taurus .38 handgun two days before the victim's disappearance. (Mar. 6, 2007 Trans. 144:13–146:18.) Thus, the prosecutor's statement that the Taurus firearm Petitioner purchased was "consistent" with the

type of firearm that killed Petitioner's husband was congruent with the testimony adduced at trial. The prosecutor's comments simply raised appropriate considerations relevant to the criminal case. *See Parker*, 567 U.S. at 47–48. The state courts' adjudication of this claim was, therefore, not contrary to, or an unreasonable application of, clearly established federal law. Habeas relief on this claim is denied.

### iii.    Condition of Victim's Body

Petitioner also asserts that the prosecutor engaged in misconduct when she elicited "inflammatory testimony as to the condition of the victim's body when it was recovered[.]" (Am. Pet. *15.) When Petitioner raised this claim in her direct appeal, she more specifically argued that the State improperly elicited testimony from a witness that the deceased victim's body was so "bloated" as to be unrecognizable. (Pet'r's Direct Appeal Br. 43, ECF No. 9-4.) Petitioner argued that this statement was only used to inflame the jury and that the trial court failed to issue a curative instruction. (*Id.*)

At trial, the prosecutor called the victim's friend, John Rice, to testify. (Apr. 4, 2007 Trans. 14:2, ECF No. 9-68.) Mr. Rice stated that after the victim's body had been recovered, the police released a sketch of the victim to the public. (*Id.* at 20:22–21:3.) Mr. Rice then contacted the police, believing the sketch resembled his friend Bill McGuire. (*Id.* at 21:4–22:7.) The police requested Mr. Rice visit headquarters to view photographs of the victim's body. (*Id.* at 22:1–7.) The prosecutor then asked Mr. Rice the following:

> [Prosecutor]: And did you look at the photos, sir?
>
> [Mr. Rice]: Yes.
>
> [Prosecutor]: And, sir, did you believe that the photos you looked at was your friend, Bill?
>
> [Mr. Rice]: They were bloated. No, I did not think.

> [Prosecutor]: And was your wife with you at the time that you looked at the photos?
>
> [Mr. Rice]: Yes.

(*Id.* at 22:25–23:7.)

Aside from this brief exchange, no other questioning about the photographs occurred and defense counsel did not object to the prosecutor's questions, move to strike the witness' answer, or ask for a curative instruction. (*See id.* at 22:22–23:12.) The Appellate Division considered this claim by Petitioner and rejected it "without further discussion in a written opinion." (*See* App. Div. Direct Appeal Op. 61.)

Here, the record does not support the allegation that the prosecutor intended to elicit prejudicial testimony from Mr. Rice. Rather, the prosecutor asked only whether Mr. Rice viewed the photos and thought they depicted his friend Bill McGuire. The prosecutor did not ask the condition of the body; Mr. Rice offered that testimony spontaneously. In fact, in a later sidebar with the trial judge, the prosecutor stated, "I didn't know he was going to say that, Judge." (Apr. 4, 2007 Trans. 25:21–22.)

Moreover, there was already substantial testimony presented to the jury about the condition of the victim's body. Multiple police officers testified in graphic detail about discovering the suitcases containing Bill McGuire's body parts. (*See generally* Mar. 5, 2007 Trans. 141:24–142:1, 170:1–10; Mar. 6, 2007 Trans. 5:8–12, 6:23–7:8, ECF No. 9-51.) Police officer Janine Hall testified about the discovery of a suitcase on May 5, 2004 which contained two severed legs, "cut approximately at the knee area." (Mar. 5, 2007 Trans. 141:24–142:1.) She stated that, at the time, the legs showed no signs of decomposition or discoloration. (*Id.*) Police officer Elizabeth Dutton testified that on May 11, 2004 another suitcase was discovered, this time containing a man's

17

severed torso "cut from the belly button up" inside black plastic trash bags. (*Id.* at 170:1–10.) And Officer Dutton testified the plastic bags smelled "like decomposing flesh, rotten fish and the actual sea or bay water." (Mar. 6, 2007 Trans. 5:8–12.) Officer Dutton also testified that the torso was severed from the waist down, in various stages of decomposition, with different degrees of discoloration within the skin, and with body organs visible near the waistline where the torso had been cut. (*Id.* at 6:23–7:8.) Given the gruesome nature of this murder and the graphic details presented to the jury, Mr. Rice's testimony that the victim's body was "bloated" did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181 (internal quotation marks and citation omitted).

Furthermore, during the jury charge, the trial court instructed the jury to decide the case based solely upon the evidence and to "weigh the evidence without passion, without prejudice or sympathy. Simply use your common sense. Any influence caused by these emotions has the potential to deprive both the State and the defendant of what you promised, a fair and impartial trial by fair and impartial jurors." (Apr. 17, 2007 Trans. 155:13–20.) "[A]bsent extraordinary circumstances, jurors are presumed to follow the instructions given them by the court." *Glenn v. Wynder,* 743 F.3d 402, 407 (3d Cir. 2014). Here, there are no extraordinary circumstances and no evidence to suggest the jurors were unable to follow the trial court's instructions. Thus, given the context of the entire trial, the prosecutor did not engage in prosecutorial misconduct. Habeas relief on this ground is denied.

iv.      **Affair with Dr. Miller**

Petitioner next alleges that the prosecutor's eliciting of "prejudicial testimony of the details of petitioner's affair with prosecution witness Dr. Miller" constituted prosecutorial misconduct.

(Am. Pet. *15.)  On direct appeal, the Appellate Division determined that the prosecutor's questioning on this topic did not constitute misconduct, explaining:

> The trial transcript shows . . . that the prosecutor asked a few questions to establish the nature of the extra-marital relationship as relevant to defendant's motive to kill her husband. . . . Defense counsel did not object to the questions about the extra-marital affair, and the defense itself later pursued cross-examination testimony from Miller that he continued to be intimate with defendant after he had cooperated with the police and agreed to record telephone conversations with her.

(App. Div. Direct Appeal Op. 58.)  The Appellate Division also highlighted that both the prosecutor and the trial court had reminded the jury that any testimony about the affair had a limited purpose and that it could be used only to determine Petitioner's motive. (*Id.* at 58–59.)

The Court will not disturb that decision. The testimony provided by Dr. Miller was relevant evidence of Petitioner's motive to kill her husband. The eliciting of such testimony, therefore, did not constitute prosecutorial misconduct because the testimony was relevant to the criminal case. *See Parker*, 567 U.S. at 47–48 (holding that there is no prosecutorial misconduct where a prosecutor's comments raise appropriate considerations relevant to the criminal case). Accordingly, relief on this claim is denied.

### v.    Use of Speculation

Petitioner's last claim of prosecutorial misconduct alleges simply "witness speculation and use of speculation in closing arguments." (Am. Pet. *15.) When Petitioner raised this claim on direct appeal, she more specifically explained that the prosecutor "continually pressed questions despite sustained objections and prior rulings." (Pet'r's Direct Appeal Br. 45.) Petitioner referenced the prosecutor's repeated attempts to have one witness speculate about what another witness was thinking, to elicit expert handwriting testimony from a lay witness, and to suggest the State had facts not in evidence related to the victim's gambling. (*Id.*) Petitioner also asserted that

the prosecutor's summation utilized speculation unsupported by the record, such as the Petitioner's use of a saw-silencer, that Petitioner dismembered the victim in their master bathroom, that Petitioner stored the victim's body in a refrigerator, and that Petitioner hacked into the victim's various internet accounts.  (*Id.* at 45–48.)

*a.    Witness Speculation*

Petitioner points to three instances of witness speculation.  First, Petitioner argues that the prosecutor improperly requested a witness speculate about what another witness was thinking.  (*Id.* at 45.)  This allegation appears to arise from the prosecutor's questioning of Detective Sergeant William Scull about whether another police officer, Ryan Dougherty, agreed that the victim's car had been found in a certain parking space outside the Flamingo Hotel in Atlantic City, New Jersey.  (*Id.*; *see also* Apr. 4, 2007 Trans. 48:4–49:5.)  After the prosecutor asked Detective Sergeant Scull this question, however, defense counsel immediately objected before Detective Sergeant Scull was able to answer.  (Apr. 4, 2007 Trans. 49:4–9.)

Second, Petitioner alleges that the prosecutor sought to elicit expert handwriting testimony from a lay witness after the trial court had prohibited that line of questioning.  (Pet'r's Direct Appeal Br. 45.)  At trial, the prosecutor asked lay witness Tamar Joffee, the office manager at the Franklin Lakes branch of Weichert Realters, whether she recognized the victim's sister, Cindy Ligosh's, handwriting on documents sent to the realty office.  (Mar. 27, 2007 Trans. 9:4–5, 10:11–16:4, ECF No. 9-62.)  Before the prosecutor asked the question, the trial court had expressed to counsel at a side bar its intention to let Ms. Joffee testify as to Ms. Ligosh's handwriting, so long as the prosecutor laid the proper foundation for the opinion.  (*Id.* at 7:6–24; 7:19–21.)  But after the prosecutor questioned Ms. Joffee about the handwriting, the trial court convened another sidebar, where it informed the prosecutor they had not, in fact, laid the proper foundation to provide

20

a basis for Ms. Joffee's testimony. (*Id.* at 16:6–17:6.) The trial court then instructed the jury to "disregard the testimony of Ms. Joffee regarding her comparison of the handwriting" as Ms. Joffee was not qualified to render an opinion as to whose handwriting was on the documents. (*Id.* at 18:5–14.)

Finally, Petitioner argues that, despite admonishments from the trial court, the prosecutor repeatedly asked a witness about facts not in evidence; specifically, whether someone other than the victim had engaged in gambling which caused the victim to become "a mob murder target." (Pet'r's Direct Appeal Br. 45.) The basis for this claim appears to arise from the prosecutor's attempt to ascertain whether Jay Salpeter, a private investigator for the defense, knew that Petitioner's father occasionally traveled to Atlantic City. (Apr. 11, 2007 Trans. 31:3–33:18, ECF No. 9-73.) The prosecutor repeatedly asked the questions in a leading manner, however, and defense counsel objected each time. (*See id.*) The trial court ordered the prosecutor to "ask the questions in a form that the court deemed appropriate," which the prosecutor then did. (App. Div. Direct Appeal Op. 60; *see also* Apr. 11, 2007 Trans. 34:18–35:11.)

On direct appeal, the Appellate Division found that none of these three incidents rose to the level of prosecutorial misconduct. (App. Div. Direct Appeal Op. 59–61.) The Appellate Division held:

> Next, defendant complains that the prosecutor improperly elicited expert handwriting testimony from lay witness Tamar Joffee, the office manager of the Weichert Realty office in Franklin Lakes. After showing Joffee the handwritten label on the Federal Express package, the prosecutor asked "is that Cindy Ligosh's handwriting?" When Joffee said it was not, the court itself initiated a sidebar conference and eventually ruled that Joffee was not qualified to provide an opinion about the handwriting. The court struck Joffee's answer and instructed the jury to disregard it because Joffee had "freely admitted she's not a handwriting expert." The court's ruling and instruction corrected any prejudice from the brief, opinion testimony. *See State v. Manley,* 54 *N.J.* 259, 271 (1969) (jury is

assumed to have followed the court's limiting instruction). Moreover, defendant was not convicted of the charges in the second indictment related to the Federal Express package.

Defendant also complains about the prosecutor's cross-examination of defense private investigator Jay Salpeter on the subject of gambling and EZ pass records related to Atlantic City. We have found no error in the manner or form of cross-examination. The prosecutor did not seek to elicit evidence that had been ruled inadmissible. *See State v. Rose*, 112 *N.J.* 454, 517(1988).

Nor did she continue to ask questions after the court ordered the line of questioning to stop. *See State v. Hinds*, 278 *N.J.Super.* 1, 17–18 (App. Div. 1994), *reversed on other grounds*, 143 *N.J.* 540 (1996). The trial court in effect ordered the prosecutor not to ask certain leading questions on cross-examination of Salpeter, despite the provisions of *N.J.R.E.* 611(c) to the contrary, even after the prosecutor represented that she had a good faith basis for the facts included in those questions. The prosecutor attempted to ask the questions in a form that the court deemed appropriate. There was no prosecutorial misconduct. In fact, the defense received a more favorable ruling than the rules of evidence and the circumstances warranted.

We have considered defendant's other claims of prosecutorial misconduct in the questioning of witnesses and reject them without further discussion in a written opinion. *R.* 2:11–3(e)(2).

(*Id.*)

This Court agrees with the Appellate Division that each of Petitioner's allegations of "witness speculation" lacks merit. On none of these occasions did the prosecutor disregard the trial court's orders, or intentionally seek to solicit speculative testimony. Even if the prosecutor had gone outside the bounds of proper conduct, the trial court issued a curative instruction after each of the alleged instances of misconduct or sustained defense counsel's objections to any improper questions. As stated previously, jurors are generally presumed to follow the instructions given to them by the court and there is no indication that the jurors did not do so here. *Glenn*, 743 F.3d at 407. After reviewing the record in context, Petitioner's contention that the prosecutor

engaged in misconduct by eliciting speculation from witnesses and disregarding court orders is, as the Appellate Division found, without merit.  Petitioner's claim for relief on this ground is denied.

### b.    Closing Summation Speculation

Petitioner also alleges the prosecutor relied on improper speculation during her closing summation as well.  (Am. Pet. *15.)  On direct appeal, Petitioner argued these speculative references included: "the absence of trace evidence in [Petitioner's] apartment" which the prosecutor implied demonstrated Petitioner's "extraordinary efforts to conceal evidence of the crimes, that drop cloths may have been used to prevent blood or other body tissue from spilling in the apartment," that Petitioner "or an accomplice could have used a towel to muffle the sound of a reciprocating saw when cutting the [victim's] body," that "ice or refrigeration may have been used to preserve parts of the body" and that the victim was a "computer technician who would have known how to erase" the suspicious internet searches discovered on his computer.  (App. Div. Direct Appeal Op. 67, 72.)

As for the prosecutor's remarks about the lack of trace evidence and the possible use of drop cloths, the Appellate Division found both of these were "reasonable inferences drawn from the evidence produced at trial."  (*Id.* at 69.)  In so ruling, the Appellate Division recounted the following evidence from trial:

> In its closing argument, the defense had emphasized the absence in the apartment of trace evidence of blood, tissue, or DNA, the absence of bullet holes or saw marks, and the absence of testimony from neighbors about gunshots or the sounds of a power saw.  The defense argued the lack of such evidence showed that the murder and desecration of the body could not have occurred in the Woodbridge apartment.
>
> In response, the prosecutor argued the State did not have to prove specifically where the crimes were committed, but the cutting of the body and the draining of blood may have occurred in the shower stall of the master bathroom.  Based on testimony by an expert

23

> anthropologist about the cuts in the body, the prosecutor argued that defendant or her accomplice could have positioned the body to avoid leaving saw marks in the shower stall. The prosecutor also argued that drop cloths may have been used to avoid spilling blood or tissue and that the bathroom and the rest of the apartment had been scrubbed unusually clean and freshly painted by defendant and helpers, not by the landlord, before the first police search was conducted in June 2004.
>
> Lesniak had testified he found no trace evidence providing anyone's DNA in the apartment despite several thorough searches. Another witness had testified of an unusual smell of bleach and cleanser in the master bathroom. The prosecutor also made use of testimony by defense witnesses and others that defendant was an efficient, hard-working nurse at her place of employment. The prosecutor argued that the absence of even the McGuire family's own DNA in the apartment demonstrated unusual efforts to clean the apartment and eliminate evidence. . . . Furthermore, the reference to drop cloths was tied to expert testimony that chips of paint and PVC pipe material had been found in the suitcases along with Bill's body.

(*Id.* at 68–69.)

This Court agrees with the Appellate Division's adjudication of this claim. The prosecutor's remarks raised appropriate considerations relevant to Petitioner's criminal case. *See Parker*, 567 U.S. at 47–48 (holding that there is no prosecutorial misconduct where a prosecutor's comments raise appropriate considerations relevant to the criminal case). Defense counsel argued that no DNA evidence was discovered at the victim and Petitioner's shared apartment. In response, the prosecution suggested that the apartment may have been scrubbed clean before the police searched it or that Petitioner used drop cloths when committing the crime. These statements reflected witness testimony that the apartment smelled like bleach and cleanser, and the testimony of the State's forensic scientist who stated that chips of paint and PVC pipe material had been found in the suitcases containing the victim's body. Placing the prosecutor's comments within proper context, the Court does not find that they "so infected the trial with unfairness as to make

the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (internal quotation marks and citation omitted).

As for the prosecutor's remark that the sound of a saw may have been muffled by a towel, the Appellate Division held that this "may have treaded close to the line of permissible inferences" because there was "no evidential support for that argument[.]" (App. Div. Direct Appeal Op. 69.) The Appellate Division emphasized, however, that the comment was made just after the prosecutor recalled that "the polyester fiber evidence found on one of the bullets recovered from [the victim's] body suggested the killer had used a pillow to muffle the sound of gunfire." (*Id.*) The Appellate Division ultimately held that, when considered in context, the comment about muffling of the sound of the firearm was "not so egregious that it deprived defendant of a fair trial." (*Id.* at 70.)

This Court again agrees with the Appellate Division that, based upon the evidence adduced at trial, the prosecutor's comments were fair comment on that evidence and were not egregious enough to deny Petitioner a fair trial. *See Darden*, 477 U.S. at 181 (the prosecutor's comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process" (internal quotation marks and citation omitted)). The state courts' adjudication of this claim was not contrary to or an unreasonable application of clearly established federal law.

As to the prosecutor's comments about the potential refrigeration of the victim's body and the suspicious internet searches, the Appellate Division found these comments were indeed improper speculation. (App. Div. Direct Appeal Op. 70–71.) As the Appellate Division pointed out, there was no evidence presented at trial that Petitioner "procured quantities of ice near the time of [the victim's] disappearance" and the medical examiner never testified that the victim's legs had been "refrigerated or exposed to ice." (*Id.* at 70.) Nor was there any evidence presented that the victim had the "knowledge, skills, or motivation" to delete his internet search history,

thereby inferring that he could not have been the individual who conducted the suspicious internet

searches. (*Id.* at 72.)

In her closing summation, the prosecutor sought to explain why the victim's severed legs

appeared fresh to rebut the defense's theory that the victim had been dead only one day before his

legs were discovered. (Apr. 17, 2007 Trans. 81:18–82:17.) She stated:

> So, the big question is when did the flesh get in the car, and that's a
> good question, and I would submit to you that it's not necessarily
> true that the victim was cut up all at once. You heard that he was
> significantly bled out. Yes, there was blood recovered from his chest
> cavity, but what Doctor Gunther testified to what she found and
> what you heard about the lack of blood in the suitcases and the bags
> supports that it's very possible, if not likely, that when his legs were
> removed he could have been allowed to bleed out until most of the
> blood had finished running from him and then the rest of the cutting
> could have been done, and I submit to you that wouldn't necessarily
> mean it would all have to be done on the same day.
>
> *She could have cooled the body with ice. There could have been*
> *some refrigeration used. I am not going to invite you to speculate.*
> *We don't know*. [. . .] And, again, it's not a contest where if we don't
> know every conceivable answer that the State loses. The burden is to
> firmly convince you that she participated in this murder; and in
> this case with the mountain of evidence against her and the very
> complex plan executed by a very smart and meticulous woman, I
> submit to you, it's amazing we know as much as we do.

(*Id.* (emphasis added))

The prosecutor also referenced in her closing statement the suspicious internet searches

recovered from Petitioner and the victim's home computer. (*Id.* at 98:25–99:11.) At trial, State

Police computer expert Jennifer Seymour testified that between April 11, 2004 and April 26, 2004,

there were internet searches on the computer for topics including, but not limited to: "'undetectable

poisons,' 'state gun laws,' 'instant poison,' 'gun laws in Pennsylvania,' 'toxic insulin levels,' 'fatal

insulin doses,' 'fatal digoxin doses,' 'instant undetectable poisons,' 'how to commit suicide,' 'how

to commit murder,' 'how to purchase hunting rifles in NJ,' 'pesticide as poison,' [and] 'insulin as

26

a poison[.]'" (App. Div. Direct Appeal Op. 12; *see also* Mar. 13, 2007 Trans. 100:3–8; 102:1–108:8, ECF No. 9-54.)  The defense brought in their own computer expert who testified that some of these suspicious internet searches were conducted around times that websites of interest to the victim, such as work-related websites, were visited.  (Apr. 11, 2007 Trans. 72:16–92:24.)  Thus, the defense argued that it had been the victim who engaged in the suspicious internet searches. (Apr. 16, 2007 Trans. 88:16–92:16.)  In disputing this theory, the prosecutor during summation stated, in pertinent part:

> The searches were there. How to commit a murder, and it was [the victim] that was murdered. Common sense tells you it was defendant that did those searches.
>
> Please, also consider Bill was a computer guy. He was a computer tech. That's what he did for a living, and if he was contacting his ex-wife or doing anything else that was untoward at the computer one thing to be certain of [the victim] would have known how to erase it. That's what he did for a living. He would know that things were cached, not like the rest of us that had no idea, most of us wouldn't know when you do an internet search that things are saved.

(Apr. 17, 2007 Trans. 98:25–99:11.)

The Appellate Division held that although the prosecutor had overstepped the bounds of reasonable inference with her remarks about potential refrigeration and suspicious internet searches, the "brief and isolated" comments, "[v]iewed in the context of the State's entire closing argument and all the evidence reviewed with the jury, [the comments] did not have the capacity to influence the jury's verdict." (App. Div. Direct Appeal Op. 73.)  As a result, the Appellate Division determined Petitioner had not been deprived of a fair trial. (*Id.*)  This Court agrees. As stated previously, federal law regarding prosecutorial misconduct requires reviewing courts to examine the prosecutor's offensive actions in the context of the entire trial to determine whether those remarks "so infected the trial with unfairness as to make the resulting conviction a denial of

27

due process." *Darden*, 477 U.S. at 181 (internal quotation marks and citation omitted); *see also Moore*, 255 F.3d at 105.

Here, the prosecutor's comments did not so infect the proceedings as to render Petitioner's trial unconstitutionally unfair. In discussing the potential refrigeration of the victim's body, the prosecutor was responding to defense counsel's argument that the victim's severed legs were not consistent with someone who had been deceased for several days. (Apr. 16, 2007 Trans. 42:11–43:12.) She fleetingly remarked that Petitioner could have put the body parts on ice, but quickly emphasized to the jury that they were not to speculate and that the State simply did not know whether ice or refrigeration had been used. (Apr. 17, 2007 Trans. 81:18–82:17.) The prosecutor made another brief and fleeting comment about the victim's ability to clear his search history in order to rebut defense counsel's theory that the victim had conducted the suspicious internet searches and not Petitioner. (*Id.* at 98:25–99:11.) The victim's knowledge or ability to clear his search history was unknown and did invite speculation. Yet, at no point did defense counsel object to these comments or request a curative instruction. (App. Div. Direct Appeal Op. 72.) Nevertheless, the trial court, as part of the jury charge, instructed the jurors that they could only decide the case based upon the evidence produced at trial and that "[s]peculation, conjecture and other forms of guessing play no role in the performance of [their] duty." (Apr. 17, 2007 Trans. 155:13–20.) Accordingly, in light of the entire trial, and upon assessment the severity of the prosecutor's conduct, the effect of the curative instructions, and the quantum of evidence against Petitioner, this Court does not find that the state courts' adjudication of this claim was contrary to or an unreasonable application of clearly established federal law.

### C.     Ground Three – Evidentiary Errors

Petitioner asserts that certain evidentiary errors made by the trial court deprived her of her due process right to a fair trial. (Am. Pet. *17.) Petitioner maintains that: "(1) the court erred in admitting expert testimony regarding tool marks on the garbage bags . . . because the technique is not scientifically proven and reliable; (2) the trial court erroneously excluded relevant, admissible[,] and exculpatory evidence supporting the defense ([P]etitioner's motive for purchasing the handgun)"; and (3) that the trial court erroneously excluded "testimony from [the victim's] first wife that [he] had abandoned their marriage in 1992 and disappeared[.]" (*Id.*)

It is well-established that the violation of a right created by state law is not a cognizable basis for federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" (citation omitted)). Thus, Petitioner is not entitled to habeas relief for alleged errors in state law evidentiary hearings, unless those errors rise to the level of a deprivation of due process. *See id.* at 70 ("[T]he Due Process Clause guarantees the fundamental elements of fairness in a criminal trial." (quoting *Spencer v. Texas*, 385 U.S. 554, 563–64 (1967))); *see also Keller v. Larkins*, 251 F.3d 408, 419 (3d Cir. 2001) (observing that the petitioner "was tried in state court, and the admission of expert testimony in a state trial presents a question of state law—unless, of course, the evidence violates due process or some other federal constitutional right").

#### i.     Expert Witnesses

First, with respect to the admission of expert testimony about tool marks on the garbage bags, the State introduced the testimony of Frank Ruiz and Thomas Lesniak. (App Div. Direct Appeal Op. 25–26.) Mr. Ruiz was "qualified by the trial court as an expert witness in plastic bag technology and manufacturing by virtue of his twenty-seven years of experience in the plastic bag

industry and his degree in chemistry." (*Id.*) Mr. Ruiz testified that the garbage bags found in the suitcases with the victim's body and the garbage bags recovered from Petitioner's apartment were "produced on the same production line and within hours of each other." (*Id.*) State police forensic scientist Thomas Lesniak was qualified by the trial court as a tool mark expert based upon, among other qualifications, his twenty-seven years of experience as a forensic scientist, his multiple certifications from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") in tool mark analysis, and his performance of hundreds of tool mark examinations. (*Id.* at 38–39.) Mr. Lesniak testified that both the garbage bags found with the victim's body and the ones discovered at Petitioner's apartment were "produced with the same tools and therefore on the same extrusion line." (*Id.* at 25–26.) The State used the testimony of these experts and their findings regarding the matching garbage bags to argue Petitioner's involvement in the victim's murder. (*Id.* at 33.)

In addressing this claim on direct appeal, the Appellate Division thoroughly analyzed the qualifications of Mr. Ruiz and Mr. Lesniak and the decision by the trial court to admit them as expert witnesses under the standard set forth by *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). (*Id.* at 33–48.) As for Mr. Ruiz, Petitioner challenged none of the criteria for his admission as expert witness but rather, argued that Mr. Ruiz "failed to follow proper testing protocols[.]" (*Id.* at 36–37.) The Appellate Division ultimately held that Petitioner's arguments about Mr. Ruiz's methodology and conclusions "might have affected the credibility and weight of his testimony, but not its admissibility" and that the trial court "committed no error in admitting [Mr.] Ruiz's expert testimony about the two sets of garbage bags." (*Id.* at 37.) With regard to Mr. Lesniak, the Appellate Division found "no error in [the] admission of tool mark analysis as a field appropriate for expert testimony." (*Id.* at 47.) The Appellate Division also added that even if Mr. Lesniak's tool mark analysis "should have been excluded, its admission was at most harmless error" because

the substance of his testimony about the garbage bags was "duplicative" of Mr. Ruiz's and Mr. Ruiz "persuasively provided the same expert opinions on the basis of thorough and complete visual and chemical examination of the two set of bags." (*Id.* at 48.)

Here, the state court's adjudication of this claim is not contrary to or an unreasonable application of clearly established federal law. Evidentiary errors "are not considered to be of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial." *Bisaccia v. Att'y Gen. of N.J.*, 623 F.2d 307, 312 (3d Cir. 1980). Both the trial court and the Appellate Division carefully examined the qualifications of Mr. Ruiz and Mr. Lesniak. (Jan. 25, 2007 Mot. Trans., ECF No. 9-42; Jan. 31, 2007 Mot. Trans., ECF Nos. 9-43, 9-44; App. Div. Direct Appeal Op. 33–48.) Upon review of both the trial court's *Frye* hearing and the Appellate Division's 15-page opinion on the issue, this Court discerns no error in the trial court's admission of expert testimony from either Mr. Ruiz or Mr. Lesniak that would rise to the level of a deprivation of due process. Both Mr. Ruiz and Mr. Lesniak had substantial experience in their respective fields and significant expert testifying as expert witnesses in those fields. Accordingly, Petitioner is not entitled to relief on this claim.

### ii.    Limiting of Mr. Lowery's Testimony

Petitioner also maintains the trial court erred in excluding testimony about her motive for purchasing a firearm. (Am. Pet. *17.) Part of the defense's theory of the case was that the victim asked Petitioner to purchase a firearm for him because his felony record prohibited from purchasing one on his own. (Pet'r's Direct Appeal App. Div. Br. 57–58.) At trial, the defense sought to present the testimony of the George Lowery, the victim's co-worker, who would testify "regarding conversations with [the victim] where [the victim] talked about wanting to purchase or

possess a gun because his headlights kept getting stolen out of his car in late 2003." (App. Div. Direct Appeal Op. 51 (internal quotation marks omitted).) Mr. Lowery would also testify that the victim did plan to ask Petitioner to purchase the firearm for him. (*Id.*) Defense counsel argued these statements to Mr. Lowery fell under two hearsay exceptions: state of mind under New Jersey Rule of Evidence 803(c)(3), and statement against penal interest under New Jersey Rule of Evidence 803(c)(25). (*Id.* at 52.) The prosecution disagreed that these statements were admissible. (*See id.*) After hearing oral argument from the parties, the trial court limited Mr. Lowery's testimony to only the fact that he *had* a discussion with the victim about the purchase of a firearm. (*Id.* at 51.) Mr. Lowery was prohibited from discussing any specifics of the victim's statements. (*Id.*) In arriving at this decision, the trial court held that the victim's "state of mind prior to the time of the murder is not really that significant" and his statements were "inadmissible hearsay" because they could not be "verified at this point or determined to be reliable." (*Id.* (internal quotation marks omitted).)

Here, this Court does not find that the trial court's evidentiary rulings about Mr. Lowery's testimony rise to the level of a deprivation of due process. *See Estelle*, 502 U.S. at 70. New Jersey Rule of Evidence 803(c)(3), which applies to state of mind statements, provides that a hearsay statement may be admitted if:

> [the] statement [was] made in good faith of the declarant's then-existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

And New Jersey Rule of Evidence 803(c)(25), which applies to statements against penal interests, provides that a hearsay statement may be admitted if:

> statement which was at the time of its making so far contrary to the declarant's pecuniary, proprietary, or social interest, or so far tended

> to subject declarant to civil or criminal liability, or to render invalid declarant's claim against another, that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true. Such a statement is admissible against a defendant in a criminal proceeding only if the defendant was the declarant.

Upon review of both rules, this Court agrees with the trial court and the Appellate Division, which both held that the victim's statements to Mr. Lowery did not fall under either hearsay exception. (App. Div. Direct Appeal Op. 54.)[2] As the Appellate Division explained, the victim's statements did not fall under New Rule 803(c)(3) because "they were not a clear expression of a present intention or plan to have his wife buy a gun," they "lacked specificity," and "there was insufficient evidence that [the victim] had made them to Lowery in good faith." (*Id.* (internal quotations marks and citations omitted).) The statements likewise did not fall under Rule 803(c)(25) because there was simply no evidence the victim "believed his wife's purchasing a gun might subject him to criminal prosecution or penalties" and was thus "not necessarily contrary to his penal interest." (*Id.* at 55 (internal quotation marks omitted).)

Moreover, any perceived error from the trial court's limitation of Mr. Lowery's testimony did not deprive Petitioner of fundamental fairness in her trial. The trial court *did* permit Mr. Lowery to testify that he and the victim had spoken about purchasing a firearm a few months before the victim's disappearance. And the jury heard testimony from two other witnesses that Petitioner said she purchased the firearm because the victim asked her to. (Mar. 20, 2007 Trans. 38:3–16, ECF No. 9-58; Mar. 21, 2007 Trans. 51:18–52:12, ECF No. 9-59.) Thus, the jury

---

[2] The New Jersey Rules of Evidence are modeled after the Federal Rules of Evidence. *Travelers Prop. Cas. Co. of Am. v. Hallam Eng'g & Constr. Corp.*, No. 08-0444, 2013 WL 30174, at *7 n.1 (D.N.J. Jan. 2, 2013). New Jersey Rule of Evidence 803(c)(3) mirrors Federal Rule of Evidence 803(3) and New Jersey Rule of Evidence 803(c)(25) mirrors Federal Rule of Evidence 804(b)(3).

ultimately heard the same information Petitioner wanted elicited from Mr. Lowery. Accordingly,
Petitioner is not entitled to habeas relief on this claim.

### iii.    Testimony from Victim's First Wife

Petitioner argues that the trial court improperly excluded the defense from introducing
testimony from the victim's first wife, Marcie Paulk, that the victim had abandoned their marriage
in 1992, maxed out their credit cards, and disappeared. (Am. Pet. *17; Pet'r's Direct Appeal Br.
60.) At trial, the State argued that Petitioner exhibited a lack of concern or "callousness" following
her husband's disappearance. (Pet'r's Direct Appeal Br. 61.) To combat this, the defense wanted
to introduce Ms. Paulk's testimony to establish why Petitioner was unconcerned about her
husband's disappearance – because that was "precisely how [the victim] had left [Ms. Paulk]."
(*Id.*) But the trial court ruled that Ms. Paulk's testimony was "inappropriate and inflammatory in
that it really amounts to a character attack and an appeal to the sympathy of the jury." (App. Div.
Direct Op. 49 (internal quotation marks omitted).) The trial court further explained that the
testimony "from so many years earlier did not constitute admissible habit or custom evidence, and
the remote time made it irrelevant to issues in this case and ultimately prejudicial." (*Id.*)

When Petitioner raised this claim on direct appeal, the Appellate Division held:

> A trial court has broad discretion under *N.J.R.E.* 403 to exclude
> evidence that may be prejudicial or that may divert the jury's focus
> from the relevant issues in the case. *See State v. Sands,* 76 *N.J.* 127,
> 144(1978). Under that rule of evidence, potentially relevant
> evidence may be excluded if its probative value is substantially
> outweighed by the risk of undue prejudice, confusion of issues, or
> undue delay. The trial court's balancing of factors under *N.J.R.E.*
> 403 "is subject to the abuse of discretion standard, which sustains
> the trial court's ruling 'unless it can be shown that the trial court
> palpably abused its discretion, that is, that its finding was so wide
> [of] the mark that a manifest denial of justice resulted.'" *State v.
> Lykes,* 192 *N.J.* 519, 534(2007) (quoting *Green v. N.J. Mfrs. Ins.
> Co.,* 160 *N.J.* 480, 492 (1999)). There was no denial of justice in
> excluding Paulk's proposed testimony.

> The testimony was clearly not admissible under *N.J.R.E.* 406 as
> evidence of Bill's habit or routine of leaving wives. It was
> potentially relevant to explain defendant's behavior following Bill's
> disappearance, but it was also highly inflammatory and prejudicial.
> It would have injected into the trial collateral and complex issues
> about Bill's first marriage. It had the potential of diverting the focus
> of the jury and confusing issues by raising matters that occurred
> twelve years earlier and that could not be adequately addressed in
> this case. Balanced against the potential prejudice and confusion of
> issues, the probative value of Paulk's proposed testimony was slight.
> We conclude the trial court did not abuse its discretion in excluding
> it.

(*Id.* at 49–51 (alteration in original).)

This Court agrees with the Appellate Division's adjudication of the claim. Ms. Paulk's

testimony that the victim had previously "disappeared" on her and abandoned their marriage may

have had slight probative value regarding Petitioner's own conduct when the victim disappeared

in May 2004. Yet Ms. Paulk's testimony was also an inflammatory attack on the victim's

character. Further, the testimony had no tendency in reason to prove that Petitioner thought the

victim had left *her* and abandoned *their* marriage. Thus, the trial court's exclusion of this evidence

did not rise to the level of deprivation of due process. *See Estelle*, 502 U.S. at 70. Petitioner is

not entitled to habeas relief on this claim.

### D.    Ground Four – Ineffective Assistance of Counsel

In Ground Four, Petitioner raises four claims of ineffective assistance of counsel. The

Sixth Amendment guarantees the accused the "right . . . to have the Assistance of Counsel for his

defense." U.S. Const. amend. VI. The Sixth Amendment's guarantee of the right to counsel "is

the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14

(1970). Counsel can deprive a defendant of the right by "failing to render 'adequate legal

assistance[.]'" *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *Cuyler v. Sullivan*,

35

446 U.S. 335, 345 (1980)).   The Supreme Court's well-established two-prong test governing claims of ineffective assistance of counsel is set forth in *Strickland*.

First, a petitioner must show that "counsel's performance was deficient.  This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). The petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "depriv[ed] . . . of a fair trial, . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.  In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance[.]'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005).  A petitioner must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.*  The reasonableness of counsel's representation is evaluated under each case's particular facts, viewed as of the time of the challenged conduct of counsel. *Id.*  So, to meet the deficient performance prong, a defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  In scrutinizing counsel's performance, courts must be highly deferential and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 689.

Second, even where a petitioner can show that counsel's representation was deficient, the petitioner must still affirmatively demonstrate that counsel's deficient performance prejudiced the defense. *Id.* at 692–93.  To satisfy this prejudice prong, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693.  Rather, a petitioner must establish that "there is a reasonable probability that the result of the [case] would

have been different absent the deficient act or omission." *Hinton v. Alabama*, 134 S. Ct. 1081, 1083 (2014) (per curiam); *see also Strickland*, 466 U.S. at 699 (A petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."). "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693.

The well-established two-prong Strickland test requires satisfaction of both components for a claim that counsel's assistance was so defective as to require reversal of a conviction. Given that "failure to satisfy either prong defeats an ineffective assistance claim" and "it is preferable to avoid passing judgment on counsel's performance when possible," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002); *Judge v. United States*, 119 F. Supp. 3d 270, 280–81 (D.N.J. 2015).

When a federal habeas petition under § 2254 is based upon an ineffective assistance of counsel claim, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* (emphasis omitted). "A state court must be granted deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Habeas review of ineffective assistance of counsel claims are, therefore, "doubly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). Federal habeas courts must "take a highly deferential look at counsel's performance" under Strickland, "through the deferential lens of § 2254(d)." *Id.* (internal citations omitted).

37

For the following reasons, Petitioner has not shown that she is entitled to federal habeas relief based upon alleged ineffective assistance of counsel.

i.    **Failure to Obtain Forensic Evidence from Garbage Bags and Victim's Computer**

Petitioner first asserts that her counsel was constitutionally deficient for failing to "have the garbage bags and computer of the victim examined and tested for forensic evidence to support the defense case." (Am. Pet. *18.) Petitioner alleges, without support, that "[t]he forensic evidence uncovered after trial included searches for information on how to 'poison your wife' and a website titled 'www.unfaithfulwife.net.' This suggests it was [the victim], and not petitioner, who made those searches. This rebuts the State's evidence at trial ... that it was petitioner who conducted all the internet searches." (*Id.*)

Petitioner raised this claim in her PCR petition. The PCR court dismissed the claim, explaining:

> Petitioner argues that her counsel was ineffective for failing to authorize their computer expert to review the entire internet history of the Pavillion computer taken from the McGuire apartment. She contends that if her trial attorneys had authorized a search of the entire internet history, rather than a limited search confined to the six-day period reviewed by the State's expert, they would have discovered that on January 21, 2004, someone performed searches for "poison your wife" and "poison," and someone accessed websites with the following titles: "www.unfaithfulwife.net"; and "www.poisonprevention.org"; and "www.poison.org".
>
> However, this argument also fails to establish a *prima facie* case of ineffective assistance of counsel. First, the existence of those searches on the computer in no way proves that William McGuire conducted them, or that the Petitioner did not. As the State's computer experts testified, "one of the most difficult parts of computer forensics is trying to put someone at the keyboard," and that there is "no way of knowing whether someone else in the household jumped on the computer for a few minutes to do a search and then let the prior person return to what they were doing." Moreover, the searches Petitioner relies on were conducted months

> prior to the murder and therefore not necessarily related to the searches that were conducted closer in time to the victim's disappearance.
>
> Lastly, and most significantly, Petitioner fails to appreciate that the decision to limit the search to the six-day timeframe prior to the murder was most likely a strategic one. At trial, Petitioner's counsel was able to challenge the State's contentions regarding the incriminating searches found on the computer by presenting an expert of their own. This defense witness testified that some of these incriminating searches were made within minutes of other searches, thus supporting defense counsel's argument that the searches were more likely to have been conducted by William McGuire. Authorizing a search of the *entire* internet history on the McGuire computer could have undercut this defense insofar as it could have revealed other incriminating evidence linking Petitioner to the crime. This was a risk trial counsel most likely did not wish to take, and accordingly the decision to limit the search constituted sound trial strategy pursuant to *State v. Arthur*. Petitioner is unable to show that her trial counsel's performance was ineffective.

(Law Div. PCR Op. 18–19 (emphasis in original).) The Appellate Division affirmed this decision for substantially the same reasons. (*See* App. Div. PCR Op. 20.)

The state court's decision on this claim was neither unreasonable nor contrary to *Strickland*. Petitioner has not established that her trial counsel was deficient for not expanding the forensic analysis of the computer searches or that she was prejudiced by this decision. As the Superior Court aptly stated, trial counsel's decision was most likely strategical and prevented the reveal of any other incriminating searches that may have been made by Petitioner, or anyone else using the computer. Moreover, Petitioner makes no showing that had this evidence been presented at trial there is a reasonable probability that the outcome of trial would have been different. Accordingly, relief on this claim is denied.

### ii.     Failure to Consult a Gun Expert

Petitioner next argues that counsel "failed to consult an expert to determine if the gun purchased by petitioner matched the bullets recovered from the body of the victim." (Am. Pet.

\*18.) At trial, the State's ballistics experts testified that the bullets recovered from the victim's body had been fired from a gun that had "six lands and grooves[.]" a rifling pattern consistent with the handgun purchased by Petitioner. (*Id.*) Yet Petitioner alleges that after trial her appellate attorney "discovered on a Taurus website that the make and model" of the firearm she purchased only had "five lands and grooves." (*Id.*) Thus, Petitioner submits that if this evidence had been presented at trial, it would have refuted the prosecution's inference that Petitioner's handgun was the murder weapon. (*Id.*)

Petitioner raised this argument in her PCR petition. (Law Div. PCR Op. 13.) She alleged that in preparation for her PCR proceedings, she consulted a ballistics expert, Dr. Peter De Forest, who informed her that the Taurus handgun she had purchased would have fired bullets with only five, and not six, lands and grooves on them. (*Id.*) In response, the State produced an affidavit from Robert Morrison, the President and Chief Executive Office of Taurus International Manufacturing, Inc., the company that manufactured the firearm Petitioner purchased. (*Id.* at 14.) Mr. Morrison attested that the Taurus firearm Petitioner purchased could produce either five or six lands and grooves on bullets that it fired and that "*there [was] no way of knowing whether the revolver at issue [had] five lands and grooves or six lands and grooves*" without examining the weapon itself. (*Id.* (emphasis in original).) Given Mr. Morrison's sworn statements, the PCR court determined Petitioner did not establish her trial counsel had been ineffective. (*Id.* at 15.) The PCR court held that since the firearm Petitioner purchased had never been found, there was no way to inspect the gun and determine its rifling characteristics. (*Id.*) Thus, Mr. De Forest's testimony would not have established "that Petitioner's gun 'most likely had five lands and grooves' as opposed to the six that were found on the bullets extracted from the victim's body[.]"

(*Id.*)  The Appellate Division summarily affirmed the PCR court's determination on appeal.  (*See generally* App. Div. PCR Op.)

Here, this Court agrees with the PCR court's determination that Petitioner's trial counsel was not ineffective.  Even if Petitioner's trial counsel had consulted with a ballistics expert such as Mr. De Forest, the gun Petitioner purchased was never located.  As a result, it would have been impossible to determine whether the firearm produced five or six lands and grooves.  Contrary to Petitioner's assertion, a ballistics expert could not have disproven that Petitioner's gun was consistent with the murder weapon.  Petitioner is therefore not entitled to relief on this claim.

### iii.    **Failure to Investigate Chloral Hydrate**

Petitioner also contends her trial counsel was ineffective for failing to retain an expert witness, a forensic pharmacologist, to present an alternative explanation for the presence of chloral hydrate in the victim's car.  (Am. Pet. *18–19.)  At trial, the State inferred that Petitioner had administered chloral hydrate to her husband to sedate him before ultimately murdering him.  (Apr. 17, 2007 Trans. 22:7–18, 60:9–61:4.)  Petitioner claims, however, that the victim may have been using steroids or "GHB" because in a police interview with the victim's sister, she expressed concern that the victim "had been showing signs of what she believed might be steroid abuse." (Law Div. PCR Op. 15 (internal quotation marks omitted).)  Thus, Petitioner argues that if the victim were using steroids or GHB, he could have been taking chloral hydrate to counteract the side effects.  (Am. Pet. *18–19.)

When Petitioner raised this claim during her PCR proceedings, the PCR court found that Petitioner's claim "flies in the face of the evidence in the record." (Law Div. PCR Op. 15.)  The PCR court explained:

> [T]here was no evidence presented from which a jury could infer that the victim was using steroids or GHB.  Moreover, the victim's

> sister testified that she "had no knowledge of any drug use by William," that he "was not in too good of shape anymore," and although he had purchased a "weight set" the year before, she did not know if he ever "used it." Accordingly, there was nothing in [the victim's sister's] statement indicating that she believed the victim was bodybuilding or showing signs of using steroids to do so. To the contrary, [the victim's sister] indicated that her brother was out of shape and that he had gotten heavier and started balding over the years, all general information provided to the police in an effort to assist their investigation. Therefore, it is unlikely that an expert witness would have been permitted to testify to a wild speculation that has no support in the record. Moreover, assuming that an expert witness was permitted to testify to the fact that chloral hydrate can be used to counteract the symptoms of GHB withdrawal, such testimony would not constitute proof that the victim was in fact using steroids or GHB and suffering from withdrawals. It is highly improbable that such testimony would have resulted in a different verdict by the jury, and accordingly, Petitioner's trial counsel was not ineffective for strategically choosing not to retain or consult with such an expert. More importantly, it is highly unlikely that the Court would have admitted such speculative testimony–testimony that in fact was contrary to all the evidence presented at trial.

(*Id.* at 15–16.)

Here, as the PCR court found, there was no evidence presented from which the jury could infer that the victim was using steroids or GHB. The victim's sister never testified at trial that she suspected her brother was using steroids or GHB or that he may have been using chloral hydrate to counteract symptoms of such drugs. Thus, "it is unlikely that an expert witness would have been permitted to testify to a wild speculation that [had] no support in the record." (*Id.* at 16). Even if the trial court had admitted such expert testimony, however, the testimony would still not have proven that the victim was using chloral hydrate, GHB, or steroids. By Petitioner's own admission, an expert witness would have only established that chloral hydrate was a drug used to counteract withdrawal from GHB or steroids. (Am. Pet. *19.) As a result, this Court finds that Petitioner has not established that her counsel was ineffective. The state courts' adjudication of

42

this claim was not contrary to, or an unreasonable application of, clearly established federal law.

Petitioner is not entitled to relief on this claim.

### iv.     Failure to Consult an Expert Regarding Bloodstain Evidence

Finally, Petitioner asserts that her trial counsel was ineffective for failing "to call an expert

witness to rebut the prosecution's contention that the petitioner could have cleaned up bloodstains

resulting from the murder and dismemberment of William McGuire in her apartment." (Am. Pet.

*19.) Petitioner submits that:

> To explain the complete absence of bloodstains or tissue residue in
> petitioner's apartment, the prosecution presented testimony from
> two forensic scientists who stated that blood and tissue stains can be
> cleaned up with a 10% bleach solution. The inference was that
> petitioner had cleaned up her apartment after murdering and cutting
> up the body of William McGuire. However, petitioner's post-
> conviction relief lawyer consulted with an expert who wrote a report
> stating that luminol test was extremely sensitive and that it was
> highly unlikely that any attempt to completely clean a blood-stained
> area would succeed. This evidence, if presented at trial, would have
> rebutted the prosecution's inference that the apartment was the
> murder scene and was carefully cleaned up afterward.

$(Id.)^3$

When Petitioner raised this claim during her PCR proceedings, the PCR court found that

her trial counsel had engaged in "extensive cross-examination" of the State's forensic scientist,

Thomas Lesniak, "for the purpose of convincing the jury that the murder and dismemberment of

[the victim] could not have occurred inside the McGuire apartment, since multiple searches,

utilizing the most technologically advanced tools available to a forensic scientist, yielded no DNA

evidence." (Law Div. PCR Op. 17.) Review of the record reveals this thorough cross-

examination:

---

[3] Petitioner did not attach to her Petition any report from an expert about the sensitivity of luminol
test. (*See generally* Am. Pet.)

[Defense Counsel]: And you certainly did a thorough job as far as trying to recover as much valuable trace evidence as you could?

[Mr. Lesniak]: That's my job.

[Defense Counsel]: Of course. And you did, correct?

[Mr. Lesniak]: Yes.

[Defense Counsel]: You said something to this jury yesterday about with today's technology you can detect DNA or trace evidence very easily, correct?

[Mr. Lesniak]: Very easily. It depends on how much material is there, very easily.

[Defense Counsel]: Sure.

[Mr. Lesniak]: Let's say technology has improved over the years, yes.

[. . .]

[Defense Counsel]: And you can pick up DNA or blood even if you can't see it, right, in your analysis?

[Mr. Lesniak]: If I can't see it. Usually if I'm looking --

[Defense Counsel]: Let me withdraw that and rephrase the question. I understand I confused you with that. You can pick up, you, the scientist, looking with forensic testing can pick up DNA or blood evidence that a lay person couldn't see?

[Mr. Lesniak]: Correct.

[Defense Counsel]: Okay. That a lay person couldn't feel, right?

[Mr. Lesniak]: Correct.

[Defense Counsel]: That a lay person couldn't smell, for instance, yes?

[Mr. Lesniak]: Yes.

[Defense Counsel]: Okay. And that's why you went to that Woodbridge apartment yourself four times, correct?

44

[Mr. Lesniak]: Yes.

[Defense Counsel]: And you looked thoroughly as you described to this jury, yes?

[Mr. Lesniak]: Yes.

[Defense Counsel]: And you came up with no evidence.

[Mr. Lesniak]: That's correct.

(Mar. 29, 2007 Trans. 109:15–111:11, ECF No. 9-64.)

Defense counsel then emphasized Mr. Lesniak's testimony and the lack of DNA evidence found at the apartment during his closing:

> [W]e know he luminoled the apartment and there was absolutely no evidence of blood found in that apartment. Luminol, as you know now, is that test that detects any blood or any left-on blood, even blood that's not visible to the naked eye. Not one drop of blood came up in that apartment.
>
> We also know that he actually went as far as to remove drain, some of the drain pipe in the bathtub to search, not only for blood, but for DNA. You see, their theory, their theory is that he was also dismembered in that house with the kids there. We'll talk about that in a second, but that's their theory, that he was dismembered in that house, in the tub or in the shower or wherever. So they, being good investigators, decided hey, let's go, let's go take that pipe because if you dismember someone you may get some blood in that drain in the low part of the drain but one thing you are going to get, for certain, is some tissue. None found at all, none found at all.

(Apr. 16, 2007 Trans. 18:14–19:6.)

Moreover, as the PCR court held, even if defense counsel had called an expert witness to testify about luminol testing, it "would have been unnecessary and perhaps even redundant." (Law Div. PCR Op. 17–18.) Petitioner's counsel, therefore, likely had multiple "strategic reasons for not introducing an expert on luminol at trial." (*Id.* at 18.) "'[A] court must indulge a strong presumption that counsel's conduct ... might be considered sound trial strategy.'" *Davis v.*

45

*Superintendent Graterford SCI*, No. 16-3436, 2021 WL 56985, at \*2 (3d Cir. Jan. 7, 2021)

(alterations in original) (quoting *Strickland*, 466 U.S. at 689). For these reasons, this Court does

not find that Petitioner has demonstrated that her counsel was ineffective for failing to call an

expert witness on this matter. The state courts' adjudication of this claim was not contrary to, or

an unreasonable application of, clearly established federal law and Petitioner is not entitled to relief

on this claim.

### E.   Ground Five – Violation of Retainer Agreement

In Ground Five, Petitioner asserts that her right to the effective assistance of counsel under

the Sixth Amendment was violated by a provision in her retainer agreement with her trial counsel

that provided that counsel agreed to pay for any expert witnesses.[4]   (Am. Pet. \*20.)   Petitioner

contends that this provision gave counsel a "financial interest in saving money by not spending

money for expert witnesses." (*Id.*) Petitioner raised this claim in her PCR Petition. (*See generally*

PCR Pet.) The PCR court rejected this claim, as "there is no legal authority that supports

Petitioner's argument that a retainer agreement of this sort creates a conflict of interest and rises

to the level of constitutional ineffective assistance of counsel." (Law Div. PCR Op. 19.) The PCR

court further found Petitioner's claim to be too speculative to warrant relief because she presented

no evidence that suggested her trial counsel was "concerned that hiring additional expert witnesses

could reduce the pool of money from which they would be paid, or that they actually failed to

retain additional experts because of insufficient funds." (*Id.* at 20.) The Appellate Division

affirmed this decision without discussion. (App. Div. PCR Op. 20.)

---

[4] The Court's review of the retainer agreement in question shows that counsel, in fact, agreed only
to "advance on behalf of [Petitioner]" fees and costs "associated with investigators, experts,
paralegals, accommodations in New Jersey, service of subpoenas, and preparation of exhibits."
(Supp. Retainer Agreement \*73–74, ECF No. 9-16.)

The decision of the state courts on this claim was neither contrary to established federal precedent, nor an unreasonable application of any such precedent. Petitioner has failed to cite to any legal authority that would show that her retainer agreement with counsel was legally deficient. Most notably, however, Petitioner has failed to establish that she suffered any prejudice. Petitioner makes no allegation that counsel refused to hire certain experts due to cost, nor does she allege any specific type of expert that counsel should have obtained and what that expert's testimony at trial would have been. Accordingly, because Petitioner has not met her burden under *Strickland*, relief on this claim is denied.

## IV.   MOTION FOR A STAY

Over a year and a half after briefing was completed on Petitioner's habeas petition, Petitioner filed a Motion for a Stay. (Mot. to Stay, ECF No. 14.) In her Motion, Petition requests a "temporary stay" of her petition until such time as she as able to obtain private counsel. (*Id.* at 1.) Petitioner filed this Motion on February 25, 2020 and to date, over one year later, she has still not retained private counsel. (*See id.*)

The Court will deny the Motion because Petitioner is not eligible for a stay. *See Rhines v. Weber*, 544 U.S. 269, 277–78 (2005). The Petition does not contain any unexhausted claims and AEDPA's one-year statute of limitations period is not an issue in this case. *See Rhines*, 544 U.S. at 277–78. Additionally, a habeas petitioner has no constitutional or statutory right to representation by counsel. *Reese v. Fulcomer*, 946 F.2d 247, 263 (3d Cir. 1991), *superseded by statute on other grounds*, 28 U.S.C. § 2254(d). Here, it is unclear what benefit counsel would provide Petitioner. The habeas petition has been fully briefed. Petitioner presented a thorough and cogent Petition and traverse, and the matter can be decided on the record already before the Court. Accordingly, Petitioner's Motion for a Stay is denied.

## V.   CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because jurists of reason would not disagree with this Court's conclusion that Petitioner has failed to make a substantial showing of the denial of a constitutional right, Petitioner's habeas petition is inadequate to deserve encouragement to proceed further. Accordingly, a certificate of appealability shall not issue.

## VI.   CONCLUSION

For the reasons stated above, the Petition for habeas relief is DENIED and a certificate of appealability shall not issue. An appropriate order follows.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated:  3/31/21